# EXHIBIT B

# SALES AND PURCHASE AGREEMENT

This agreement (this "Agreement") is made on May 12, 2021 (the "Effective Date") by and between Katena Computing Technologies, Inc., a Delaware corporation ("Katena" or the "Manufacturer"), and Coinmint, LLC (the "Purchaser"), with its principal place of business at 1413 Avenida Ponce de Leon, #605, San Juan, PR 00907. Katena and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

| CUSTOMER DETAILS | |
|---|---|
| **Customer:** | Coinmint, LLC |
| **Customer Address:** | 1413 Avenida Ponce de Leon, #605, San Juan, PR 00907 |
| **Customer Primary Contact:** | Ashton Soniat, Chairman |
| **Customer Phone Number:** | +1-516-514-7563 |
| **Customer Email Address:** | a@coinmint.one , ashton.soniat@gmail.com |

**WHEREAS**, the Purchaser wishes to purchase from the Manufacturer ASIC mining equipment specified in the Purchase Order, and;

**WHEREAS**, the Manufacturer wishes to provide to Purchaser the ASIC mining equipment, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants exchanged herein, and for good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Parties hereby agree to the terms and conditions set forth in this Agreement, including the Purchase Order.

The Parties hereto agree as follows:

1. **Definitions and Interpretations**

    The following terms, as used herein, have the following meanings:

1.1. "Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person; "Person" means any individual, corporation, partnership, limited partnership, proprietorship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

1.2. "Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including, without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

1.3. "Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take actions of any governmental authority.

1.4. "Insolvency Event" in the context of the Purchaser means any of the following events:

   (i) a receiver, receiver and manager, judicial manager, official manager, trustee, administrator or similar official is appointed, or steps are taken for such appointment, over all or any part of the assets, equipment or undertaking of the Purchaser;

   (ii) if the Purchaser stops or suspends payments to its creditors generally, is unable to or admits its inability to pay its debts as they fall due, seeks to enter into any composition or other arrangement with its creditors, is declared or becomes bankrupt or insolvent or enters into liquidation;

   (iii) a petition is presented, a proceeding is commenced, an order is made or an effective resolution is passed or any other steps are taken by any person for the liquidation, winding up, insolvency, judicial management, administration, reorganization, reconstruction, dissolution or bankruptcy of the Purchaser, otherwise than for the purpose of a bona fide scheme of solvent amalgamation or reconstruction; or

    (iv)    if any event, process or circumstance analogous or having a substantially similar effect to any of the above, in any applicable jurisdiction, commences or exists.

1.5. "Intellectual Property Rights" means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

1.6. "Order" means the Purchaser's request to Katena for certain Product(s) in accordance with this Agreement.

1.7. "Product(s)" means the merchandise that Katena will provide to the Purchaser in accordance with this Agreement.

1.8. "Purchase Order" means an order form referencing, and executed by the parties hereto in connection with, this Agreement, in the form attached hereto as Exhibit A. Each Purchase Order will be incorporated into this Agreement in its entirety.

1.9. "Total Purchase Price" means the aggregate amount payable by the Purchaser as set out in any Purchaser Order.

1.10. "Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Katena or its Affiliates in accordance with Clause 6 of this Agreement.

1.11. "Warranty Start Date" means the earlier of (i) 10 days from the date on which the Product(s) are delivered to the carrier or (ii) date of delivery to the site set forth on the Purchase Order.

**Interpretations:**
i)    Words importing the singular include the plural and vice versa where the context so requires.
ii)    The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.
iii)    References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.
iv)    Unless specifically stated otherwise, all references to days shall mean calendar days.
v)    Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re-enactment or amendment thereof for the time being in force.
vi)    If there is a conflict between the terms of this Purchase Agreement and the Prucahse Order, the terms of the Purchase Order will govern.

2. **Sales of Products**

2.1. Katena will provide the Product(s) set forth in any Purchase Order to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4, Clause 5 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement. The Purchaser acknowledges and confirms that each Purchase Order is irrevocable and cannot be cancelled by the Purchaser, and that the Product(s) ordered are neither returnable nor refundable. All sums paid by the Purchaser to Katena shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason. Down payment and payment of Total Purchase Price are not refundable, save as otherwise mutually agreed by the Parties.

2.2. Purchaser acknowledges and agrees that, to the extent required by Katena as part of its due diligence and risk compliance requirements under Applicable Laws, Purchaser may be required to provide certain information to Katena in connection with customer identity verification/know your customer (the "KYC Information").

3. **Prices and Terms of Payment**

3.1 The Purchaser shall pay the Total Purchase Price under the Payment Terms defined in each Purchase Order.

3.2 The Parties understand and agree that the applicable prices of the Product(s) are exclusive of applicable bank transaction fees and any and all applicable import duties, taxes and governmental charges set forth in the Purchase Order and unspecified duties, taxes, and governmental charges applied to the purchase following the signing of the Purchase Order. The Purchaser shall pay or reimburse Katena for all taxes levied on or assessed against the amounts payable hereunder. If any payment is subject to withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that Katena receives the full amount it would have received had payment not been subject to such withholding.

4. **Shipping of Product(s)**

4.1 Subject to the limitations stated in any Purchaser Order, the terms of delivery of the Product(s) shall be ex works (place of pick up to be specified later). Once the Product(s) have been delivered to specified place of pick up, Katena shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

4.2 All delivery dates in Purchaser Orders are estimated, but not guaranteed. In the case that Purchaser has fulfilled its payment obligations in accordance with the terms and conditions of this Agreement and Katena fails to deliver the Products within the shipping period listed in a Purchase Order, the Purchaser is entitled to submit a written notice to Katena. If Katena fails to deliver the Products within ninety (90) days after receiving the written reminder from the Purchaser, the Purchaser is entitled

to: (i) terminate the applicable Purchase Order and require Katena to return the amounts paid by the Purchaser for the applicable undelivered product (Katena shall not pay any interests in this respect), or (ii) continue to perform under the applicable Purchase Order and require Katena to deliver the Products by a new mutually acceptable delivery date.

4.3 Notwithstanding anything to the contrary above, Katena shall not be responsible for any delivery delay caused by the Purchaser or any third party, including but not limited to the carrier, the customs, and the import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequential.

4.4 Katena shall not be responsible and the Purchaser shall be fully and exclusively responsible for any loss of Product(s), personal injury, property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to the Purchaser or any third party, or theft of the Product(s) during transportation from Katena to the Purchaser.

4.5 Katena has the right to discontinue the sale of the Product(s) and to make changes to its Product(s) at any time, without prior approval from or notice to the Purchaser.

4.6 If the Product(s) is rejected and/or returned back to Katena because of any reason and regardless of the cause of such delivery failure, the Purchaser shall be solely and exclusively liable for and shall defend, fully indemnify and hold harmless Katena against any and all related expenses, fees, charges and costs incurred, arising out of or incidental to such rejection and/or return (the "Return Expense"). Furthermore, if the Purchaser would like to ask for Katena's assistance in redelivering such Product(s) or assist in any other manner, and if Katena at its sole discretion decides to provide this assistance, then in addition to the Return Expense, the Purchaser shall also pay Katena an administrative fee as mutually agreed to by the parties.

5. **Customs**

5.1 Katena shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances for the export of the Product(s) that are required to be obtained by Katena or the carrier under Applicable Laws.

5.2 The Purchaser shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances required for the import of the Product(s) to the country of delivery as indicated in the applicable Purchase Order, that are required to be obtained by the Purchaser or the carrier under Applicable Laws, and shall be responsible for any and all additional fees, expenses and charges in relation to the import of the Product(s).

5.3   Katena will not be held liable for Purchaser's failure to acquire or maintain any approvals, permits, authorizations, licenses and clearances required for the delivery or operation of the Product(s) delivered as indicated in the Purchase Order.

**6.   Warranty**

6.1   The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date. During the Warranty Period, the Purchaser's sole and exclusive remedy, and Katena's entire liability, will be to repair or replace, at Katena's sole discretion, the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser. If the performance metrics of any Products are lower than thresholds specified in the applicable Purchase Order, then Katena may compensate the Purchaser by delivering additional corresponding Products to Purchaser to achieve applicable performance metrics ±5%.

6.2   The Parties acknowledge and agree that the warranty provided by Katena as stated in the preceding paragraph does not apply to the following:
(i)      normal wear and tear;
(ii)     damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;
(iii)    damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;
(iv)    damage or loss of the Product(s) caused by acts of nature including, but not limited to, floods, storms, fires, and earthquakes;
(v)     damage caused by operator error, or non-compliance with instructions as set out in accompanying documentation;
(vi)    alterations by persons other than Katena, associated partners or authorized service facilities;
(vii)   Product(s), on which the original software has been replaced or modified by persons other than Katena, associated partners or authorized service facilities;
(viii)  counterfeit products;
(ix)    damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;
(x)     failure of the Product(s) caused by usage of products not supplied by Katena; and
(xi)    damage to hash boards or chips from improper uses.
(xii)   Damage resulting from operations above or below the manufacturer defined temperature range, through submersion into liquid or similar cooling systems,
(xiii)  Damage resulting from using unauthorized, 3rd party, or failure to update authorized firmware within thirty (30) days of release

6.3 Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by Katena do not guarantee any cryptocurrency mining rewards and, Katena shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). Katena does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. Except as provided in Clause 6.1 of this Agreement, Katena makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a particular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

**7   Representations and Warranties**

The Purchaser makes the following representations and warranties to Katena:

7.1 It has the full power and authority to own its assets and carry on its businesses.

7.2 The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

7.3 It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

7.4 The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:
   (i)   any Applicable Law;
   (ii)  its constitutional documents; or
   (iii) any agreement or instrument binding upon it or any of its assets.

7.5 All authorizations required or desirable:
   (i)   to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;
   (ii)  to ensure that those obligations are legal, valid, binding and enforceable; and
   (iii) to make this Agreement admissible in evidence in its jurisdiction of incorporation,
   have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.

7.6 It is not aware of any circumstances which are likely to lead to:
   (i)   any authorization obtained or effected not remaining in full force and effect;
   (ii)  any authorization not being obtained, renewed or effected when required or desirable; or

(iii) any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

7.7 (a) It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not violate any Sanctions or import and export control related laws and regulations or other Applicable Laws.

7.8 All information supplied by the Purchaser, including the KYC Information, is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading.

## 8  Indemnification and Limitation of Liability

8.1 The Purchaser shall, during the term of this Agreement and at any time thereafter, indemnify and save Katena and/or its Affiliates and their officers, directors, and agents harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of any kind, including legal fees, whatsoever arising out of or incidental to the Products pursuant to this Agreement, including, without limitation, Purchaser's violations of any Applicable Laws.

8.2 Notwithstanding anything to the contrary herein, Katena and its Affiliates shall under no circumstances, be liable to the Purchaser for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and the Purchaser hereby waives any claim it may at any time have against Katena and its Affiliates in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

8.3 Katena and its Affiliates' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action shall be limited to and not exceed the amount paid by Purchaser to Katena under the applicable Purchaser Order during the prior twelve (12) months.

8.4 The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems

or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. Katena specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

8.5  The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not Katena has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and Katena's pricing reflects this allocation of risk and the above limitations.

## 9  Distribution

9.1  This Agreement does not constitute a distributor agreement between Katena and the Purchaser. Therefore, the Purchaser is not an authorized distributor of Katena.

9.2  Unless explicitly authorized by Katena in writing, the Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of Katena or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of Katena. As between the Purchaser and Katena, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.

## 10  Intellectual Property Rights

10.1  The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Katena and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Katena and/or acquired by Katena from any other person in performance of this Agreement shall be the exclusive property of Katena and/or its Affiliates.

10.2  Notwithstanding anything to the contrary herein, all Intellectual Property Rights in the Product(s) shall remain the exclusive property of Katena and/or its licensors. Except for licenses explicitly identified in this Agreement, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Katena and/or its Affiliates or any Intellectual Property residing in the Product(s) provided by Katena to the Purchaser, including in any documentation or any data furnished by Katena. Katena grants the Purchaser a non-exclusive, non-transferrable, royalty-free and irrevocable license of Katena and/or its Affiliates' Intellectual Property Rights to solely use the Product(s) delivered by Katena to the Purchaser for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event violate the Intellectual Property Rights of Katena and/or its licensors.

10.3  If applicable, payment by the Purchaser of non-recurring charges to Katena for any special designs, or engineering or production materials required for Katena's performance of Orders for customized Product(s), shall not be construed as payment for the assignment from Katena to the Purchaser of title to the design or special materials. Katena shall be the sole owner of such special designs, engineering or production materials.

## 11  Confidentiality and Communications

11.1  All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential information of Katena and, as such, may not be divulged to any unauthorized person. The Purchaser undertakes and agrees to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

## 12  Term and Termination of this Agreement

12.1  This Agreement will commence on the Effective Date and expire on the later of: (i) the two (2) year anniversary of the Effective Date, and (ii) the last delivery of Product under any outstanding Purchase Order.

12.2  Katena shall be entitled to terminate this Agreement with immediate effect upon written notice to the Purchaser if:
(i)  the Purchaser fails to comply in any material respect of this Agreement, and where that failure is capable of being remedied, fails to remedy it within thirty (30) days of being notified by Katena to do so;
(ii)  Katena delivers sixty (60) days' notice to the Purchaser for material breach of this Agreement;
(iii)  it is or becomes unlawful for the Purchaser to perform or comply with any of its material obligations under this Agreement or all or a material part of the obligations of the Purchaser under this Agreement are not or cease to be valid, binding and enforceable; or
(iv)  an Insolvency Event occurs in respect of the Purchaser.

12.3  The Purchaser shall be entitled to terminate this Agreement upon providing sixty (60) days' notice to Katena, except that Purchaser may not terminate this Agreement until all Purchaser Orders have been fulfilled.

12.4  If the Purchaser fails to comply in any material respect of this Agreement, Katena will have the right to request and the Purchaser will be obliged to pay to Katena liquidated damages (but not penalty) for such breach in the amount of 100% of any down payment specified in each Purchaser Order. Both Parties acknowledge and

agree that the amount of liquidated damages set out in this Clause is agreed as a genuine pre-estimate of the losses which may be sustained by Katena in the event that the Purchaser fails in its respective obligations under this Agreement, and not as a penalty.

12.5 Termination of this Agreement shall be without prejudice to the rights and liabilities of the Parties accrued prior to or as a result of such termination, including those related to antecedent breaches. Termination of this Agreement for any cause or otherwise shall not release a Party from any liability which at the time of termination has already accrued to the other Party or which thereafter may accrue in respect of any act or omission prior to such termination. Provisions contained in this Agreement that expressly or by their sense and context are intended to survive the expiration or termination of the Agreement shall so survive such expiration or termination, it being the intent that a claim or right which accrued to a Party prior to such expiration or termination shall not be prejudiced.

## 13  Contact Information

All communications in relation to this Agreement shall be made to the contacts specified in the signature blocks and each Purchase Order.

## 14  Compliance with Laws and Regulations

14.1 The Purchaser undertakes that it will fully comply with all Applicable Laws in relation to export and import control and Sanctions and shall not take any action that would cause Katena or any of its Affiliates to be in violation of any export and import control laws or Sanctions. The Purchaser shall also be fully and exclusively liable for and shall defend, fully indemnify and hold harmless Katena and/or its Affiliates from and against any and all claims, demands, actions, costs or proceedings brought or instituted against Katena and/or its Affiliates arising out of or in connection with any breach by the Purchaser or the carrier of any Applicable Laws in relation to export and import control or Sanction.

14.2 The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to the export control laws and regulations of all related countries, including but not limited to the Export Administration Regulations ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall not, without receiving the proper licenses or license exceptions from all related governmental authorities, including but not limited to the U.S. Bureau of Industry and Security, distribute, re-distribute, export, re-export, or transfer any Product(s) subject to this Agreement either directly or indirectly, to any national of any country identified in Country Groups D:1 or E:1 as defined in the EARs. In addition, the Product(s) under this Agreement may not be exported, re-exported, or transferred to (a) any person or entity listed on the "Entity List", "Denied Persons List" or the SDN List as such lists are maintained by the U.S. Government, or (b) an end-user engaged in activities

related to weapons of mass destruction. Such activities include but are not necessarily limited to activities related to: (1) the design, development, production, or use of nuclear materials, nuclear facilities, or nuclear weapons; (2) the design, development, production, or use of missiles or support of missiles projects; and (3) the design, development, production, or use of chemical or biological weapons. The Purchaser further agrees that it will not do any of the foregoing in violation of any restriction, law, or regulation of the European Union or an individual EU member state that imposes on an exporter a burden equivalent to or greater than that imposed by the U.S. Bureau of Industry and Security.

14.3   The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breach of any anti-money laundering laws, any anti-corruption laws, and/or any counter-terrorist financing laws.

14.4   The Purchaser warrants that the Product(s) have been purchased with funds that are from legitimate sources and such funds do not constitute proceeds of criminal conduct, or realizable property, or proceeds of terrorism financing or property of terrorist, within the meaning given in the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Chapter 65A) and the Terrorism (Suppression of Financing) Act (Chapter 325), respectively. The Purchaser understands that if any Person resident in Singapore knows or suspects or has reasonable grounds for knowing or suspecting that another Person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the Person will be required to report such knowledge or suspicion to the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force. The Purchaser acknowledges that such a report shall not be treated as breach of confidence or violation of any restriction upon the disclosure of information imposed by any Applicable Law, contractually or otherwise.

## 15  Force Majeure

15.1   To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming that its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to which the Party expects that the event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.

15.2 The affected Party shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

## 16 Entire Agreement and Amendment

This Agreement along with all Purchase Orders, constitute the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties. If there is a conflict between the terms of this Purchase Agreement and the Purchase Order, the terms of the Purchase Order will govern.

## 17 Assignment

17.1 Katena may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party, provided that Katena will provide notice to Purchaser of such assignment or transfer. The Purchaser may not assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part without Katena's prior written consent, which consent may not be unreasonably withheld.

17.2 This Agreement shall be binding upon and ensure to the benefit of each Party to this Agreement and its successors in title and permitted assigns.

## 18 Severability

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

## 19 Governing Law and Dispute Resolution

19.1 This Agreement shall be solely governed by and construed in accordance with the laws of California.

19.2 Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by American Arbitration Association under the rules for commercial arbitration of the American Arbitration Association in force when the notice of arbitration is submitted. The decision and awards of the arbitration shall be final and binding upon the parties hereto.

## 20 No Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or

option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

## 21  Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

## 22  Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be reasonable and necessary to give all Parties the full benefit of this Agreement.

## 23  Third Party Rights

24  A person who is not a Party to this Agreement has no right to enforce or to enjoy the benefit of any term of this Agreement.

(<i>The rest part of the page is intentionally left in blank</i>)

IN WITNESS WHEREOF, the Parties hereto have executed this Sales and Purchaser Agreement as of the Effective Date:

**Katena**: **Katena Computing Technologies, Inc.**

Signature _____
Name_____Henry Monzon_____
Title _____Chief Executive Officer_____

Signed for and on behalf of the Purchaser

**Coinmint, LLC**

Signature _ashton soniat_____
Name: Ashton Soniat
Title: Chairman

# EXHIBIT A

## Form of Purchaser Order

This Purchase Order No. __ between Katena Computing Technologies, Inc., a Delaware corporation ("Katena"), and the purchaser listed below (the "Purchaser") is made in connection with and includes, incorporates, and is subject to the terms of the Sales and Purchase Agreement between Katena and Purchaser dated as of _____, 20__ (the "Agreement"). Any terms used herein and not defined will have the meanings given to them in the Agreement.  If there is a conflict between the terms of this Purchase Order and the Agreement, the terms of this Purchase Order will govern.

| | |
|---|---|
| Purchaser: | Contact: |
| Address: | Phone: |
| | E-Mail: |
| Product: | |
| Price: | |
| Payment Timing: | |
| Payment Form: | |
| Delivery Destination: | |
| Delivery Date: | |
| Other: | |

IN WITNESS WHEREOF, the Parties hereto have executed this Purchaser Order No. __ as of the last date signed below:

**Katena**: **Katena Computing Technologies, Inc.**                    **Purchaser**: _____

_____                     _____
Signature                                                    Signature

_____                     _____
Name                                                          Name

_____                     _____
Title                                                            Title

_____                     _____
Date                                                           Date