# EXHIBIT A

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Panel

---

In the Matter of the Arbitration Between:

Coinmint, LLC,

*Claimant and Counter-Respondent,*

- vs –

Katena Computing Technologies, Inc.,

*Respondent and Counter-Claimant.*

AAA Case No. 01-22-0001-7627

---

## <u>FINAL AWARD</u>

**Table of Contents**

| Section | Description | Page |
|---|---|---|
| 1. | Recap Sheet | 1 |
| 2. | Introductory Statement | 2 |
| 3. | Brief Summary of the Parties' Claims | 4 |
| 4. | Basic Background Facts | 5 |
| | A. Bitcoin Mining | 5 |
| | B. Fabless Semiconductor Manufacturing | 6 |
| | C. The Claimant: Coinmint, Inc. | 7 |
| | (1) Coinmint's Ownership | 7 |
| | (2) Coinmint's Operations | 8 |
| | (3) Coinmint's Executive Team Related to the SPA and PO #1 | 9 |
| | D. The Respondent: Katena Computing Technologies, Inc. | 10 |
| | E. Development of the K 10 Chip and DXCorr Design, Inc. | 11 |
| | F. Coinmint's Decision to Pursue Self-Mining in April 2021 | 12 |
| | G. Negotiation and Execution of the SPA and PO #1 | 14 |
| | H. Post-Execution Events – May to November 2021 | 18 |
| | I. Katena's Termination of the SPA and PO #1 in January 2022 | 19 |

| Section | Description | Page |
|---|---|---|
| 5. | Arbitral Jurisdiction Over the Parties' Claims and Counterclaims | 19 |
| 6. | Procedural History | 20 |
|  | A. Claims and Counterclaims Submitted for Determination in this Arbitration | 20 |
|  | B. Discovery | 23 |
|  | C. Motions for Pre-Hearing Relief | 26 |
|  | (1) Katena's Dispositive Motion Request | 26 |
|  | (2) Coinmint's Request for Interim Relief | 26 |
|  | D. Evidentiary Hearing Proceedings | 29 |
| 7. | Rulings During the Evidentiary Hearing | 31 |
|  | A. Objection to Exhibit 2197 – Privileged Document Clawback Issue | 31 |
|  | B. Katena's Motion in Limine to Exclude Testimony from Randall Foret | 32 |
|  | C. Objection to Exhibit 1232 – Proposed Demonstrative by Coinmint's Financial Rebuttal Expert | 33 |
|  | D. Coinmint's Request for Judicial Notice of Delaware Action Filings | 35 |
| 8. | Rulings on Coinmint's Submitted Claims | 37 |
|  | A. Fraud in the Inducement – Declaratory Judgment that the SPA and PO #1 are Voidable – Third Count | 37 |

| Section | Description | Page |
|---|---|---|
| | (1)  Coinmint's Contention that Katena Bribed Maloney | 38 |
| | (2)  Coinmint's Contention that Katena Made False Statements of Fact in its Marketing Materials or that Katena Committed Promissory Fraud | 42 |
| | (3)  Coinmint's Contention that Katena Conspired with Maloney to Misrepresent Bleck's Independence | 48 |
| | (4)  Coinmint's Contention that Katena Lacked the Ability to Perform and Concealed that Fact from Coinmint | 56 |
| | (5)  Concluding Statement | 58 |
| | B.  Theft by False Pretenses under California Penal Code Section 496 – Treble Damages and Attorneys' Fees – Fifth Count | 59 |
| | C.  Violation of California Business and Professions Code Section 17200, *et seq.* – Restitution – Eighth Count | 61 |
| | D.  Breach of Contract – Failure to Provide Adequate Assurances – First and Second Counts | 63 |
| | (1)  First Count for Breach of Contract | 63 |
| | (2)  Second Count for Failure to Provide Adequate Assurance Under Commercial Code Section 2609 | 64 |
| | E.  Breach of Contract – Breach of an Alleged Modification of PO #1 – Unpleaded Claim for Relief | 68 |
| | F.  Breach of Covenant of Good Faith and Fair Dealing – Seventh Count | 70 |

| Section | Description | Page |
|---------|-------------|------|
| | G.  Unjust Enrichment – Fourth Count | 73 |
| | H.  Money Had and Received – Sixth Count | 73 |
| | I.  Request for Award of Attorneys' Fees and Costs | 73 |
| 9. | Rulings on Katena's Submitted Counterclaims | 74 |
| | A.  Breach of Contract | 74 |
| | (1) Coinmint Breached the SPA and PO #1 by Not Performing Its Financial Obligations Under PO #1 | 74 |
| | (2) Coinmint Breached Its Representations and Warranties Under the SPA that It Had the Power to Perform Its Financial Obligations under the SPA and PO #1 | 76 |
| | (3) The Liquidated Damages Provision of the SPA Is Enforceable | 79 |
| | (4) Mitigation of Damages Is Not a Factor When Damages are Agreed to by the Parties at the Time of Contracting | 83 |
| | (5) Katena Is Entitled to an Award of Liquidated Damages of $37.5 Million, Less Credit for the $23.4 Million Coinmint Paid | 84 |
| | (6) Katena Is Not Entitled to an Award of Pre-Award Interest | 85 |
| | B.  Breach of Confidentiality Agreement | 86 |
| | C.  Indemnification – Katena's Attorneys' Fees Request | 86 |

| Section | Description | Page |
|---|---|---|
| 10. | Ruling on Award of Sanctions Against Coinmint for Violation of the Stipulated Protective Order (Order No. 6) | 89 |
| | A.  Background Facts | 89 |
| | B.  Katena's Sanctions Request | 94 |
| | C.  Ruling on Katena's Sanctions Request | 94 |
| | (1) Katena Did Not Over Designate | 94 |
| | (2) The State and Federal Court Actions are Not Related to this Arbitration | 94 |
| | (3) Coinmint's Actions Were Not Privileged | 95 |
| | (4) Coinmint's Actions Were Not Excused | 95 |
| | D.  The Panel Has Authority to Issue Sanctions | 96 |
| | E.  Sanctions Are Awarded Against Coinmint, but Not Coinmint's Attorneys | 97 |
| | F.  Terminating Sanctions Denied | 98 |
| | G.  Sanctions Award | 98 |
| | (1) Monetary Sanctions | 98 |
| | (2) Reasonable Attorneys' Fees | 99 |
| 11. | Award | 102 |

WE, THE UNDERSIGNED ARBITRATORS (the "Panel"),[1] having been designated in accordance with an arbitration agreement dated May 12, 2021 between the above-named parties and having been duly sworn, and having examined and considered the submissions, proofs, allegations, evidence, and arguments of the parties, hereby determine the claims, counterclaims and related issues submitted by the parties, as set forth below, and conclude that it is appropriate to issue this Final Award ("Award").

### 1.    Recap Sheet

**Counsel for Claimant and Counter-Respondent Coinmint, LLC:**

Fletcher Alford
Kevin Liu
Gordon Rees Scully Mansukhani, LLP
275 Battery Street, Suite 2000
San Francisco, CA  94111

Robert A. Lemus
Gordon Rees Scully Mansukhani, LLP
TransWestern Tower
1900 West Loop South, Suite 1000
Houston, TX  77027

Steven D. Feldman
John Carty
Stradley Ronon Stevens & Young LLP
100 Park Avenue, Suite 2000
New York, NY 10017

**Counsel for Respondent and Counter-Claimant Katena Computing Technologies, Inc.:**

John Hardin
Perkins Coie LLP
2001 Ross Avenue, Suite 4225
Dallas, TX  75201

Jacob Tabor
Perkins Coie LLP
1155 Avenue of the Americas, 22nd Floor
New York, NY  10036

**Arbitrators:**

Rebecca Callahan, Esq. (Chair)
5120 Campus Drive
Newport Beach, CA  92660

Ruth V. Glick, Esq.
1325 Howard Avenue, Suite 512
Burlingame, CA  94010

Gilda R. Turitz, Esq.
336 Bon Air Center, Suite 522
Greenbrae,  CA 94904

---

[1]  Rebecca Callahan, Esq. (Chair), Ruth V. Glick, Esq., and Gilda R. Turitz, Esq.

*Dates and Locations of Evidentiary Hearings:*

| | |
|---|---|
| April 18, 2023 | Third-Party Witness Robert Bleck<br>Gordon Rees Scully Mansukhani, LLP, San Diego, CA |
| May 16, 2023 | Third-Party Witness Michael Maloney<br>American Arbitration Association, New York, NY |
| August 28, 2023 to<br>August 31, 2023 | Merits Hearing<br>American Arbitration Association, San Francisco, CA |
| September 18, 2023 to<br>September 21, 2023 | Merits Hearing<br>American Arbitration Association, San Francisco, CA |
| October 16, 2023 and<br>October 17, 2023 | Merits Hearing<br>Video Conference – via Zoom |
| November 17, 2023 | Third-Party Witness James DeNaut<br>Kobre & Kim LLP, New York, NY and Video Conference – via Zoom |
| January 12, 2024 | Closing Arguments<br>American Arbitration Association, San Francisco, CA |

### 2.    Introductory Statement

As noted above, duly noticed evidentiary hearing proceedings were convened before the Panel - in-person and/or by video conference (Zoom platform) - on April 16, 2023, May 18, 2023, August 28, 29, 30 and 31, 2023, September 18, 29, 20 and 21, 2023, October 16 and 17, 2023, and November 17, 2023. Additionally, a duly noticed hearing was convened in-person on January 12, 2024, for the purpose of receiving closing arguments from the parties' counsel.

At the hearings, Fletcher Alford, Kevin Liu and Robert Lemus of Gordon Rees Scully Mansukhani, LLP, appeared on behalf of Claimant and Counter-Respondent Coinmint, LLC ("Coinmint"). Additionally, Steven D. Feldman and John Carty of Stradley Ronon Stevens & Young LLP appeared on behalf of Coinmint at the November 17, 2023 hearing.[2] At

---

[2]    Messrs. Fletcher and Liu were Coinmint's lead trial counsel. Messrs. Feldman and Carty appeared specially for Coinmint on November 17, 2023, to represent Coinmint for purposes of the examination of third-party witness James DeNaut in accordance with the "Ruling on Motion to Compel

various times during the proceedings, Ashton Soniat, CEO of Coinmint, and Randall Foret, its in-house counsel, also appeared as party representatives for Coinmint.

John Hardin and Jacob Taber of Perkins Coie LLP appeared on behalf of Respondent and Counter-Claimant Katena Computing Technologies, Inc. ("Katena"). At various times during the proceedings, Michael Gao, CEO of Katena, and Dan Eaton, its in-house counsel, also appeared as party representatives.

All witnesses were duly sworn, and oral testimony and documentary exhibits were received into evidence as set forth in the hearing reports and hearing exhibit orders.[3] At the conclusion of the January 12, 2024 hearing, each side confirmed that they had no further evidence to offer with respect to their respective claims, defenses and requests for relief in this matter. The hearing proceedings were declared closed as of January 19, 2024, by the American Arbitration Association ("AAA"). Pursuant to stipulation, and as confirmed by the AAA by letter dated January 22, 2024, the deadline for the Award was set as March 8, 2024. *See* Order No. 64.

In addition to the testimonial and documentary evidence described in the hearing reports and hearing exhibit orders, the parties, through their respective counsel, submitted written opening briefs and written closing initial and reply briefs, all of which have been read, reviewed and considered by the Panel.

This Award is based upon those facts found by the Panel to be true and necessary to the determination of the submitted matters. In this regard, the Panel acknowledges the complexity of the facts and legal issues presented, as reflected in the testimony, documentary evidence and briefing. The Panel has carefully considered all matters presented. To the extent that this Award differs from any party's argument or position, that is the result of determinations made by the Panel with respect to witness credibility, burden of proof considerations, the weight to be given to the submitted evidence, the inferences to be drawn from the evidence submitted, and the Panel's analysis of the applicable legal principles. Any matter that has not been explicitly addressed in this Award has been deemed unnecessary to the Panel's factual and legal determinations of the claims at issue. To the extent that the facts have been disputed, the recitation of facts in this Award are factual findings that the Panel has made after submission of all the evidence.

---

Arbitral Summons" issued by Magistrate Judge S. Dave Vatti on October 4, 2023 in *Katena Computing Technologies, Inc. v. Jim DeNaut*, Case No. 3:23-mc-48 (SDV) (D. Conn.) ("Connecticut Action").

[3]  *See* Order Nos. 35, 40, 51, 57, 59, 60, 62, 63 and 64.

This Award refers to certain hearing exhibits, testimony, and argument, but does not and could not refer to every item of evidence, every cited authority, or every argument advanced. Failure to mention any particular testimony, exhibits, cited authority, or arguments is not intended and should not be construed as a lack of consideration by the Panel of such matters.

### 3.     Brief Summary of the Parties' Claims

This arbitration arises from a Sale and Purchase Agreement ("SPA") entered into as of May 12, 2021 between Coinmint, as buyer, and Katena, as seller, with a purchase order of the same date ("PO #1") for USD $150 million for Bitcoin mining rigs, with further details described *infra*. In brief summary, Coinmint as Claimant contends that the SPA and PO #1 (collectively at times referred to as the "Contract") were fraudulently induced by Katena and therefore voidable; that Katena breached the Contract and the covenant of good faith and fair dealing; that Katena is liable under California Penal Code Section 496 (theft by false pretenses), including an award of treble damages and attorneys' fees, and is liable under Business and Professions Code Section 17200 for restitution; and further that Katena is liable for unjust enrichment and money had and received. Generally speaking, through these various legal theories, Coinmint seeks return of approximately $23.4 million that it paid to Katena on the Contract. All such claims are addressed in Section 8 below.

Katena has denied liability on all of Coinmint's claims. Katena has alleged three counterclaims for breach of contract through which it seeks liquidated damages of $37.5 million; breach of a confidentiality agreement; and indemnification for its attorneys' fees and costs incurred in defending against Coinmint's litigation.[4] All such counterclaims are addressed in Section 9, below.

//
//
//
//
//
//

---

[4] On or about November 3, 2023, Katena withdrew two counterclaims it initially pleaded: breach of the covenant of good faith and fair dealing and interference with contract.

### 4.    *Basic Background Facts*[5]

As noted, the subject matter of the Contract is Bitcoin mining rigs. As discussed in detail below, Coinmint operates a large Bitcoin mining operation that it wanted to expand through purchase of rigs. Katena, a start-up fabless semiconductor company, had available for order Bitcoin mining rigs, having developed an application-specific integrated circuit (ASIC) or "chip" essential to the manufacture of such rigs through collaboration with an intellectual property design company, DXCorr Design, Inc. ("DXCorr"). These matters and Bitcoin mining are central to the dispute and accordingly are described below, as are the parties and related individuals or entities.

### A.    *Bitcoin Mining*

Bitcoin (also referred to as "BTC") is a form of virtual currency and is "the world's first widely-adopted cryptocurrency."[6] Bitcoin transactions are recorded on a globally distributed and secure digital ledger called the blockchain. This system relies on an algorithm running on computer hardware distributed around the world. Each computer performs lengthy mathematical calculations to verify transactions and integrate them into the blockchain in a process called mining. The computers that perform the calculations are called mining rigs.

Bitcoin mining difficulty has increased exponentially over time, requiring faster and more energy efficient computer hardware. Specifically, the mining hardware has evolved from CPUs (~2009), to GPUs (~2010), to field programmable gate arrays (FPGAS) (~2011), to application-specific integrated circuits (ASICs) (~2013 or later), which utilize the most advanced semiconductor technology available to maximize performance and energy efficiency.[7] As mining difficulty has increased, the energy efficiency and computational performance of the computer hardware used in mining have become increasingly relevant to Bitcoin miners. Faster and more energy-efficient hardware provides a competitive advantage because more Bitcoin can be mined for less cost.[8]

---

[5]  This section is a factual introduction to the parties and transactions and events leading to the dispute. Therefore, it does not include discussion of certain factual elements of this matter, either because those facts involve conflicts in the evidence or pertain specifically to certain claims. Instead, the Panel discusses those facts in the context of the claims or counterclaims to which they relate.

[6]  *See* Markovic Expert Opinion Report ("Markovic Report") (Exhibit 1181), pp. 6-7.

[7]  In the opinion of Sagar Reddy of DXCorr, ASIC technology is the highest form of technology today because "it's the fastest and most efficient way to run an idea that is in your head on a machine."

[8]  *See* Markovic Report (Exhibit 1181), pp. 7-8, ¶¶ 21, 22.

Bitcoin miners are incentivized to mine because they earn Bitcoin if they solve the computational problems involved in the process. Successful miners add Bitcoin into circulation through the process and get to keep some of the Bitcoin they create as a "reward." The "reward" to a miner was originally 50 BTC when Bitcoin launched in 2009 but had been reduced to 6.25 BTC by 2021. The reduction in the Bitcoin "reward" is a function of the fact that the "reward" halves about every four years and will continue to do so until a supply cap of 21 million Bitcoin is reached. Bitcoin miners thus need to consider many factors when assessing profitability, including the cost of acquiring their hardware, the electricity costs of running the hardware, the speed at which the computer can perform the mathematical computations necessary to achieve a "reward," what the current Bitcoin "reward" is, and the current price of Bitcoin.[9]

Bitcoin has the largest market capitalization of all cryptocurrencies at over $500 billion.[10] According to Katena, in mid-2021 a Bitcoin mining rig could generate more than $56 million in "reward" revenue on average per day.[11]

### B.    Fabless Semiconductor Manufacturing

As noted, Katena, a start-up, is a fabless semiconductor company. Fabless semiconductor companies are those that design, test, and sell, but do not themselves manufacture, semiconductor chips. Rather, a fabless semiconductor manufacturer outsources the chip manufacturing to an external company called a foundry. Well-known fabless semiconductor companies include Qualcomm, Broadcom, NVIDIA, MediaTek, and Advanced Micro Devices.

Generally speaking, foundries create but do not design chips. Among the largest foundries in the world are Taiwan Semiconductor Manufacturing Company ("TSMC"), Global Foundries ("GF"), and Samsung Electronics Company ("Samsung"). A fabless semiconductor company therefore must contract with a foundry, often through an intermediary, to have its designed chips manufactured. In this instance, TSMC was the foundry that was intended to be used to manufacture Katena's chip.

---

[9]   *See*, Markovic Report (Exhibit 1181), pp. 8-9, ¶¶ 23.

[10]   *See*, Markovic Report (Exhibit 1181), p. 9, ¶ 24.

[11]   As a result of this success, many other cryptocurrencies have emerged since Bitcoin came to market. *Id.*

### C.    The Claimaint: Coinmint, LLC

### (1)    Coinmint's Ownership

Coinmint is a privately held limited liability company founded in 2016, domiciled in Puerto Rico, and led by one of its co-founders, Ashton Soniat ("Soniat"). At all relevant times, Soniat, through his living trust, held a majority membership interest in Coinmint and was its Chairman. Since around 1999, Soniat has been involved in electricity and energy trading, working for different energy companies and Deutsche Bank, and then founding his own successful energy trading company that is still in business.

During 2021 Soniat was the only person at Coinmint who had the authority **(a)** to bind Coinmint to contracts with others that committed Coinmint to paying money to the other party, and **(b)** to authorize outgoing disbursements to others, aside from routine business expenses.[12]  Soniat signed the SPA and PO #1 on May 13, 2021 on behalf of Coinmint. Between June  25, 2021 and October 26, 2021, Soniat authorized each of the disbursements of U.S. dollars and BTC paid to Katena (discussed in Section 3(I)).

Soniat's co-founder and minority interest holder in Coinmint was Prieur Leary through his entity Mintvest Capital Ltd. (collectively, "Leary"). On May 19, 2020, in litigation commenced in 2019 by Leary,[13] the Delaware Chancery Court entered a "Status Quo Order" (Exhibit 44, hereafter the "SQO") which, among other obligations, during the pendency of the litigation required notice to Leary before Coinmint entered into any contract with a value over $20,000 (*Id.* at p. 4, ¶ 4(a)).  Soniat testified that the SQO was lifted by the court on or about May 18 or 19, 2021. The court's order in the Delaware Action vacating the SQO was entered on May 19, 2021. Exhibit 1221.

//
//
//
//
//
//

---

[12]    Kathleen Schneider ("Schneider") acted in the role of Controller for Coinmint and Soniat's other businesses and had check-writing authority for ordinary business expenses.

[13]    That action is commonly referred to as *In re Coinmint, LLC*, Court of Chancery of the State of Delaware ("Delaware Action").

### (2)    Coinmint's Operations

Coinmint, through an operating subsidiary, owns and operates one of the largest cryptocurrency mining centers in the world in Massena, New York ("Massena Facility"). In 2021, Coinmint touted itself as "The United State's [*sic*] Leading Renewable Cryptocurrency Mining Facility" (*e.g.*, Exhibits 52, 54). Coinmint leases the Massena Facility, which is the former Alcoa Aluminum smelting factory that abuts the St. Lawrence River and uses hydroelectricity to power its operations. It is a one million square foot industrial facility with capacity of 435 megawatts. According to Soniat, hydroelectricity is plentiful at the Massena Facility and relatively inexpensive compared to alternative sources of power. During 2021, Coinmint conducted its own Bitcoin mining activity and hosted co-located mining facility services for third party miners at the Massena Facility.

As of May 2021, Coinmint's self-mining activities at the Massena Facility were quite limited. Norbert Guiol ("Guiol") is Coinmint's Chief Technology Officer, in charge of connecting the computers operating at the Massena Facility and overseeing its operations, including the planning logistics for expansion. According to Guiol, in 2021 only about half of the total available megawatts were being utilized by the combined mining activities of Coinmint and its co-host customers, so that there was untapped revenue capacity and untapped value. According to Michael Maloney ("Maloney"), who served as Chief Financial Officer of Coinmint from approximately October 2018 to September 2021, Coinmint was self-mining only 10 megawatts of the Massena Facility's 435 megawatt capacity in April 2021.

### (3)    Coinmint's Executive Team Related to the SPA and PO #1

In addition to Soniat, CFO Maloney, CTO Guiol, and Controller Schneider, Coinmint's executive team in 2021 included Randall Foret ("Foret"), Coinmint's General Counsel serving in that capacity since 2020. Foret testified that before joining Coinmint as its general, in-house counsel, he worked as outside counsel for several years for another company owned by Soniat.

In April 2021, Soniat was introduced by a mutual acquaintance to James DeNaut ("DeNaut"), who had retired in or about early 2021 as the head of a Wall Street broker-dealer (Nomura). DeNaut had trading experience in cryptocurrency and expertise in Sarbanes-Oxley, the complicated process of financial controls and financial disclosures for publicly traded companies. As further discussed in Section 3(F), through his discussions with DeNaut about an exit strategy for Coinmint, Soniat decided to invest in Bitcoin

miners for Coinmint to increase its self-mining and therefore exponentially increase its revenues and value for a potential public offering, merger, or sale of the company.

As further discussed below, Soniat then tasked Maloney in April 2021 (while the SQO was still in place) with finding Bitcoin mining rigs for purchase. Maloney handled the negotiations with Katena that led to Coinmint's execution of the SPA and PO #1.

DeNaut was not hired by Coinmint, although Soniat and DeNaut were discussing a CEO role for DeNaut and at times he was held out as Coinmint's CEO. From May to early November 2021, DeNaut conducted due diligence on Coinmint to evaluate the accuracy of what he had been told about Coinmint and whether it was a company he would be interested in taking public or otherwise investing in, which he ultimately determined was not feasible. Beginning in late June / early July 2021, at Soniat's request, DeNaut got involved in trying to **(a)** find money within Coinmint that could be used to satisfy Coinmint's obligations under the SPA and PO #1, and **(b)** secure financing from Blockchain.com that could be used to partially satisfy Coinmint's purchase obligations to Katena. DeNaut also brought in a trusted colleague, Frank Kinney ("Kinney"), with whom he had previously worked, to assist with financial due diligence and the other matters Soniat asked DeNaut to undertake.[14]

In early November 2021, Soniat and DeNaut reached an impasse in their negotiations, handled by compensation attorneys, over the contractual terms of Coinmint possibly hiring DeNaut. Soniat terminated the relationship with DeNaut (and with Kinney) on or about November 3, 2021. Subsequently, at Foret's request, in November and December 2021, DeNaut attempted to broker a compromise and settlement of the SPA and PO #1 between Coinmint and Katena. DeNaut provided the described services to Coinmint without ever receiving any compensation, expense reimbursement, or remuneration of any kind from Coinmint.[15]

//
//
//
//

---

[14]   DeNaut testified that he and Kinney both wanted employment contracts with Coinmint. Soniat testified that they could work out compensation, but he had to wait until the SQO was lifted to enter into such contracts.

[15]   DeNaut also testified that he never received any kind of compensation or remuneration from Katena.

### D.    The Respondent: Katena Computing Technologies, Inc.

As noted above, Katena is a fabless semiconductor startup company. It is a corporation headquartered in California, founded in 2020 by Henry Monzon ("Monzon"), Michael Gao ("Gao"), and Sagar Reddy ("Reddy") for the purpose of designing, manufacturing, and selling computer chips and technology to be used in cryptocurrency mining. The chip to be used in the Katena mining rigs that are the subject of the SPA and PO #1 was named the K10, further described below.

From 2020 to June 2022, Monzon served as the Chief Executive Officer of Katena and handled the negotiations with Coinmint that led to the execution of the SPA and PO #1. Before joining Katena, Monzon spent 18 years at Qualcomm (San Diego) as an electrical engineer who transitioned to program management, then to product development, and finally to sales. Monzon's primary responsibility as CEO of Katena was sales.

Since Katena's inception, Reddy has served as its Chief Technology Officer, responsible for design of the ASIC for the mining rigs to be produced by Katena and for ascertaining that they work. Reddy is an electrical engineer with a master's degree from Ohio State University.[16] Before starting the intellectual property company DXCorr in 2006 (discussed in Section 3(E)), Reddy held several positions with major companies that specialized in microprocessors and chip design.[17]

Since its inception, Gao has served as the Chief Financial Officer of Katena. After Monzon's departure in June 2022, Gao has also served as Katena's Chief Executive Officer. Gao is recognized as a "math whiz"[18] who has been involved in Bitcoin mining and

---

[16]    While working on his master's degree, Reddy was selected by the FAA to code its flight simulators in exchange for which Reddy's tuition was waived and he received a stipend for living expenses.

[17]    For example, Reddy did the coding for the original Jurassic Park movie. He also worked for Silicon Graphics, AMV, Sun Micro Systems and MIPS. In his work, Reddy started with memory design, then moved on to designing the memory on the chip, and finally designing the chip itself.

[18]    For example, Gao testified that when he was in high school, he participated in a variety of scholastic math events in which he took first place or was among the group of selected winners. After high school, Gao went to college at MIT, but dropped out after his freshman year because he cared "about building things." Gao founded a company, Luminous, in about 2017 to build the largest artificial intelligence supercomputer using light – photonic chips – instead of electricity to achieve better efficiency.

investing since he was 15 years old.[19] His reputation as a young math whiz was so well known in tech circles that Reddy had heard of him before he actually met him in about 2018. Gao's primary role in Katena was to work with Reddy in developing the K 10 chip in 12nm TSMC, with Gao's contribution being the functional (*i.e.*, mathematical computing) aspects of the chip.

Katena had about six employees in the U.S. and an additional eight to nine employees in China that work primarily on thermal engineering and system design.[20]

### E.    Development of Katena's K 10 Chip and DXCorr Design, Inc.

DXCorr is an established intellectual property design company founded in 2006 by Reddy. DXCorr provides services to customers who have a need for a chip but do not have an internal team to design or build it, including such industry heavyweights as Dell and Intel. DXCorr has a long history of working with major chip foundries around the world, including TSMC, GF, and Samsung. DXCorr has successfully executed over 100 chip designs ranging in size from a few square millimeters to about 250 square millimeters. As of 2023, DXCorr had approximately 180 employees, many of them working in India and China, with five or six active projects to which ten to 100 engineers had been dedicated depending on complexity and phase of development.

Katena entered into a consulting agreement with DXCorr on May 19, 2020 pursuant to which DXCorr would design and prototype Katena's K10 chip in 12nm TSMC technology ("K 10 Chip"). Exhibit 110. Katena, with input from Gao, created chip specifications and a system design, including packaging and a testing plan. DXCorr then designed and implemented a chip that met the I/O, thermal and packaging specifications.

The K 10 Chip was about 35 millimeters in size, was fully digital, and represented a low to medium complexity project for DXCorr. According to Reddy, the relatively small chip size lowered the risk of yield problems in manufacturing. DXCorr dedicated approximately 25 to 30 engineers to the K 10 Chip project over the course of its development commencing in December 2020.[21]

---

[19]    As of the Hearing dates in 2023, Gao was 27 years old, so he had been mining and investing in Bitcoin for 12 years. One of Gao's early investments was an ASIC Miner in which he had a proportional share of its machines. Gao grew his Bitcoins to 12,000, which in 2013 had a value of $1.2 million.

[20]    Markovic Report (Exhibit 1181), pp. 9-10, ¶ 25.

[21]    Markovic Report (Exhibit 1181), pp. 12-13, ¶ 30; pp. 16-17, ¶ 35.

As of January 2021 – months before  Coinmint had decided to purchase rigs and had yet to hear of Katena -- the K 10 Chip that DXCorr had designed for Katena was ready to go into production. In furtherance of that objective, DXCorr had obtained a pricing quotation for the chip to be produced by TSMC. *See* Exhibit 2003. In order to go into production with TSMC, Katena had to have funds on deposit sufficient to cover the cost of production as estimated by TSMC.

### F.    *Coinmint's Decision to Pursue Self-Mining in April 2021*

In or about April 2021, Soniat was looking for an exit strategy that envisioned either taking Coinmint public or finding a buyer or investor. Soniat met with DeNaut, who explained to him how the public offering process worked in terms of the necessary key ingredients for a public offering to be viable, including how Coinmint's financial and accounting information must be presented.

Historically, Coinmint's business was centered on co-hosting with other miners, which entailed servicing and operating the rigs owned by Coinmint's customers at the Massena Facility and others. The co-location business model only generated about $0.25 for Coinmint for every dollar of revenue generated by the co-host customer's mining rig,[22] meaning that Coinmint's customers kept 75% of the "reward" revenue from mining Bitcoin. If Coinmint expanded its self-mining operations, including upgrading existing rigs with new, state of the art mining rigs, Coinmint could keep 100% of the funds generated by its mining rig operations with essentially the same overhead expenses associated with the Massena Facility. By filling the capacity of the Massena Facility with self-mining rigs, Coinmint could increase its revenues and cash flow exponentially, which would in turn improve Coinmint's EBIDTA and thus increase its value in the public market or to a possible buyer or investor.

As a further incentive for Coinmint to pursue a course of action to increase its value through increased self-mining operations, the price of Bitcoin during the first two quarters of 2021 was at all-time highs and had consistently trended upward. In April 2021, the SQO imposed in the Delaware Action still restricted Coinmint's ability to enter into transactions. However, the trial in that court had already occurred, and internally Coinmint expected the SQO to be lifted shortly.[23]

---

[22]    According to Guiol, as of May 2021, Coinmint's self-mining operations were quite limited. The combined mining activities of Coinmint and its co-host customers were utilizing only about half of the total available space and energy. As noted above, Maloney testified that in April 2021 Coinmint was self-mining only 10 megawatts of the Massena Facility's 435 megawatt capacity.

[23]    As noted above, the SQO was vacated on May 19, 2021. Exhibit 1221.

It was in this environment and context that Soniat made the decision in April 2021 to **(a)** increase Coinmint's self-mining activities at the Massena Facility, and **(b)** decrease the space and energy allocated to co-hosting with other miners.[24] He tasked Maloney to find a supplier or suppliers of mining rigs. To that end on April 12, 2021, Maloney emailed Tianlin Gao at Bitmain, the largest supplier of rigs (with a copy to Soniat), stating that Coinmint was "ready to resume business," and wanted "to discuss Coinmint's future business model and how Bitmain can play a role in that," and "availability of machines." Exhibit 45.

When Maloney began his search for available mining rigs in April 2021, he discovered that all of the major suppliers were already committed to other purchasers; that Coinmint would have no leverage to negotiate price or terms; and that the major suppliers were demanding full payment up front with estimated delivery dates of 18 to 36 months. In short, Maloney learned that the market rate for the most efficient mining rigs was over $110 per Tera Hash ("TH"), and that in order for Coinmint to "go to the front of the line," Coinmint would have to fund 100% of the purchase order up front and then wait 12 to 18 months for delivery. Maloney testified that he talked with Soniat about lead time and the need to put 100% down, and Soniat responded that to do so was too expensive.

In April 2021, a mutual acquaintance of Maloney and Monzon, Rachel Pipan, introduced Monzon to Maloney via email as someone who had expertise that might be helpful to Katena. Exhibit 31. Maloney testified that he was not interested in working for a startup, but he became interested in Katena as a vendor because Katena was offering mining rigs on more favorable terms and with less money down. He believed that Coinmint could get favorable terms because it would be first in line at Katena. In connection with the negotiations, Maloney wanted to do due diligence on the K10 Chip but was unsuccessful in locating a qualified engineer who could review the chip and confirm the test results (known as SPICE reports). He asked Katena for a recommendation. With assistance from Reddy, Katena suggested Robert Bleck ("Bleck"), an experienced engineer working for Microsoft. Through Maloney, Coinmint retained Bleck as a consultant who prepared a report on the K10 Chip, further discussed below.

---

[24] DeNaut undertook to do due diligence on Coinmint for purposes of taking it public or investing in Coinmint himself. DeNaut's due diligence focused on confirming what he had been told about its finances, ownership, and operational status as a limited liability company, and on evaluating the financial viability of Coinmint's self-mining expansion plans. DeNaut's due diligence started with confirming Coinmint's finances and its ability to generate accurate financial reports reflecting same. Even after five months of working with DeNaut and having the benefit of DeNaut's expertise in such matters, Coinmint was unable to adequately provide DeNaut with the information or financial reporting he needed.

13

### G.   Negotiation and Execution of the SPA and PO #1

Maloney handled the contract negotiations for Coinmint and Monzon did so for Katena, both with counsel assisting. *See* Exhibit 64; Exhibit 2033. The SPA and PO #1 were negotiated over a relatively short period of time, starting with a first draft circulated by Monzon to Maloney on April 20, 2021. *See*, Exhibit 2024. The essential terms of the proposed mining rig purchase were as follows:

- The product was the K 10 Miner.

- The total purchase price was $100 million USD.

- The payment terms were 50% ($50 million) at the time of signing, and 50% ($50 million) at the time of delivering a working unit, which was stated to be September 2021.

- The down payment and payment of the total purchase price were not refundable unless the parties otherwise agreed.

- Deliveries were to occur on a monthly basis for a six-month period beginning January 31, 2022, as follows:

    January 31, 2022 – 166.67 Ph/s
    February 28, 2022 – 300 Ph/s
    March 31, 2022 – 300 Ph/s
    April 30, 2022 – 300 Ph/s
    May 31, 2022 – 300 Ph/s
    June 30, 2022 – 300 Ph/s

- Katena had the right to terminate the SPA with 60 days' notice to Coinmint if Coinmint was in material breach of the SPA or PO #1.

- Coinmint had the right to terminate the SPA with 60 days' notice to Katena, with the caveat that Coinmint "may not terminate [the SPA] until all Purchase Orders have been fulfilled."

- If Coinmint failed to perform, Katena had the right to request and Coinmint had the obligation to pay liquidated damages in the amount of 100% of any down payment specified in each outstanding purchase order.

On May 8, 2021, Maloney sent an email to Monzon and Gao to which he attached his redline comments to both the SPA and PO #1, stating that he "added the language as discussed." *See*, Exhibit 2033. In his email, Maloney stated that he would be in "Puerto Rico next week finalizing our financing decision around the purchase." In terms of the original deal points, discussed above, the only substantive change made by Coinmint was to the payment terms, which were modified to provide for Coinmint to make four installment payments instead of two, and a proposed escrow provision:

- 25% ($25 million) was due at the time of signing, to be held in escrow pending delivery and acceptance by Coinmint of a working unit,

- 25% ($25 million) was due at the time of delivering a working unit,

- 25% ($25 million) was due within 15 business days of the first scheduled delivery, and

- 25% ($25 million) was due within 15 business days of the third scheduled delivery date.

Katena rejected Maloney's proposed escrow provision, with Gao explaining to Maloney that Katena needed the initial deposit funds to get the ASIC chip for the K 10 miner into production. *See* Exhibit 64. On May 12, 2021, Maloney sent Monzon and Gao a second set of redline comments to PO #1. *See* Exhibit 2044. In terms of the original deal points, discussed above, the substantive changes Coinmint wanted were an increase of $50 million to the purchase price, the installment payment amounts, and the delivery schedule, as follows:

- Coinmint increased the total purchase price from $100 million to $150 million.

- There were still four installment payments, due in accordance with the above schedule, but the amount of each payment was increased to $37.5 million.

- The escrow provision in the first redline requiring that the initial 25% installment payment be escrowed was removed.

- The delivery schedule was changed so that deliveries were made on a monthly basis, beginning December 29, 2021, with a corresponding increase in the amount of each shipment, as follows:

December 29, 2021 – 250 Ph/s
January 31, 2022 – 450 Ph/s
February 28, 2022 – 450 Ph/s
March 31, 2022 – 450 Ph/s
April 30, 2022 – 450 Ph/s
May 31, 2022 – 450 Ph/s

Effective May 12, 2021, Coinmint and Katena signed both the SPA and PO #1, with Soniat signing on behalf of Coinmint and Monzon signing on behalf of Katena on May 13, 2021. *See* Exhibits 2046, 2407, 2048 and 2049. The signed PO #1 incorporated the changes set forth in the second redline (discussed above). The essential terms of the final mining rig purchase agreement were as follows:

- The total purchase price was $150 million USD, to be paid in four installments, as follows:

  a. 25% ($37.5 million) was due at the time of signing (within three business days of the effective date),

  b. 25% ($37.5 million) was due at the time of delivering a working unit,

  c. 25% ($37.5 million) was due within 30 business days of the first scheduled delivery, and

  d. 25% ($37.5 million) was due within 30 business days of the third scheduled delivery date.

- Pursuant to Section 2.1 of the SPA, the down payment and payment of the total purchase price were not refundable unless the parties otherwise agreed.

- The total number of units purchased was 27,778.[25]

//
//
//

---

[25] The documents refer to 2,778 units but the testimony consistently confirmed that the number was a typo and meant to be 27,778 units.

- The agreed upon delivery schedule provided for monthly deliveries, beginning December 29, 2021, as follows:

  December 29, 2021 – 250 Ph/s
  January 31, 2022 – 450 Ph/s
  February 28, 2022 – 450 Ph/s
  March 31, 2022 – 450 Ph/s
  April 30, 2022 – 450 Ph/s
  May 31, 2022 – 450 Ph/s

- Pursuant to paragraph 12.2 of the SPA, Katena had the right to terminate the SPA with 60 days' notice to Coinmint if Coinmint was in material breach of the SPA or PO #1.

- Pursuant to paragraph 12.3 of the SPA, Coinmint had the right to terminate the SPA with 60 days' notice to Katena, with the caveat that Coinmint "may not terminate [the SPA] until all Purchase Orders have been fulfilled."

- Pursuant to paragraph 12.4 of the SPA, if Coinmint failed to perform, Katena had the right to request and Coinmint had the obligation to pay liquidated damages in the amount of 100% of any down payment specified in each outstanding purchase order.

//
//
//
//
//
//
//
//
//
//
//
//
//
//

17

### H.      Post-Execution Events – May to November 2021

Coinmint did not fund its initial deposit of $37.5 million dollars within three days of executing the SPA and PO #1. The reason for Coinmint not meeting its initial installment obligation was not made clear during the evidentiary hearing proceedings. However, right around the date when the initial payment was due, Bitcoin prices started falling. The evidence showed that the parties worked together for several months in an effort to get the required funds paid so that the K 10 mining rigs could get into production. During that period – late June to late October 2021 – Coinmint made several payments to Katena which totaled $23,397,197.91. *See* Exhibit 1201. Those payments were as follows:

| Date | USD Amount |
|---|---|
| 6-25-2021 | $7,500,00.00 |
| 9-2-2021 | 500,000.00 |
| 9-2-2021 | 99.99 |
| 9-2-2021 | 1,318,220.01 |
| 9-2-2021 | 746,968.43 |
| 9-2-2021 | 3,421,735.58 |
| 9-2-2021 | 1,304,570.21 |
| 9-2-2021 | 195,529.79 |
| 10-4-2021 | 4,789,549.00 |
| 10-15-2021 | 3,000,000.00 |
| 10-26-2021 | 620,524.90 |

One avenue the parties explored was reducing Coinmint's purchase obligation to $75 million, with that amount paid upfront with $25 million to be paid by Coinmint and $50 million to be financed through Katena's credit facility with Blockchain.com. In the Fall of 2021, DeNaut was handling the negotiation of the financing through Blockchain.com for Coinmint. DeNaut's efforts were stymied by Coinmint's inability to generate accurate financial reports even after having the benefit of DeNaut's expertise and due diligence efforts. When Soniat terminated DeNaut's association with Coinmint in early November 2023, those financing efforts stopped, as did the discussions to change the terms of PO #1. However, at Foret's request, for several months DeNaut continued to try to broker a settlement between Coinmint and Katena, including trying to find a buyer to step into Coinmint's contract with Katena or perhaps stepping into the contract himself.[26]

---

[26]    Ultimately, DeNaut determined that it was not economically feasible for him to step into Coinmint's shoes or go into Bitcoin mining with Katena.

### I.      Katena's Termination of the SPA and PO #1 in January 2022

On January 27, 2022, Katena's attorney (John Hardin at Perkins Coie) sent Coinmint's attorney (Stephen Doyle at TCF Law Group) a notice of termination letter in which Katena notified Coinmint that the SPA and PO #1 were being terminated effective immediately pursuant to paragraphs 12.2 and 12.5 of the SPA. Exhibit 2198.

### 5.      Arbitral Jurisdiction Over the Parties' Claims and Counterclaims

On May 12, 2021, Coinmint and Katena entered into the SPA. While Coinmint claims that the SPA was amended in June 2021 to change the terms of the SPA regarding the amount of units to be purchased, the price to be paid per unit and the timing of Coinmint's funding obligations, the existence of the SPA was the basis upon which Coinmint commenced this arbitration.[27] The SPA was also the basis upon which Katena denied Coinmint's claims and asserted its counterclaims.[28]

Included in the SPA is a section providing for binding arbitration of disputes that might thereafter arise between the parties. Paragraph 19.2 of the SPA provides for binding arbitration, as follows:

> "Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by American Arbitration Association under the rules for commercial arbitration of the American Arbitration Association in force when the notice of arbitration is submitted. The decision and awards of the arbitration shall be final and binding upon the parties hereto."

Exhibit 2052; see also Exhibit 51, p. 13.

---

[27] In both the original and First Amended Demand submitted by Coinmint, Coinmint included a section specifically addressing arbitral jurisdiction over the submitted dispute and referenced paragraph 19.2 of the SPA. See Demand for Arbitration, dated April 27, 2023, ¶¶ 13, 14 and 15; First Amended Demand for Arbitration, dated August 29, 2022, ¶¶ 13, 14 and 15.

[28] In both the Answering Statement and Notice of Counterclaim and the Answering Statement to First Amended Arbitration Demand and Amended Notice of Counterclaim submitted by Katena, Katena appeared without objection to arbitral jurisdiction and submitted counterclaims for determination based upon the SPA.

This matter concerns disputes between Coinmint and Katena regarding their respective rights and obligations under the SPA. Coinmint is seeking the return of all monies it paid to Katena on several theories, including fraudulent inducement, unjust enrichment and repudiation of contract by Katena. Katena has denied Coinmint's claims and entitlement to any relief, and is seeking a compensatory damages award of $37.5 million against Coinmint based upon (a) the liquidated damages provisions of the SPA, and (b) the allegation that Coinmint breached its payment obligations under the SPA.

Coinmint voluntarily submitted its claims and disputes with Katena to arbitration by filing a demand for arbitration with the American Arbitration Association ("the AAA") in this matter.[29]

Katena voluntarily submitted its counterclaims and disputes with Coinmint to arbitration by filing an answering statement with counterclaims with the AAA in this matter.[30]

Based upon the foregoing, as well as the appearances and submissions made by and on behalf of Coinmint and Katena during the course of this arbitration, as well as the numerous pre-hearing disputes submitted to the Panel during the course of this arbitration, all without objection to the Panel's jurisdiction, it is the Panel's determination that the parties' respective claims, counterclaims, affirmative defenses and requests for relief, are subject to and were submitted to binding arbitration before the undersigned Panel.

### 6.    Procedural History

#### A.    Claims and Counterclaims Submitted for Determination in this Arbitration

On April 27, 2022, Coinmint submitted its Demand for Arbitration, in which it asserted five clams for relief: fraudulent inducement of the SPA and PO No. 1 requiring that both contract documents be voided (First Count); unjust enrichment (Second Count); theft by false pretenses under California Penal Code § 496 (Third Count); money had and received (Fourth Count); and declaratory relief that Katena repudiated the SPA and PO #1 because it failed to respond to Coinmint's request for adequate assurance (Fifth Count).

---

[29] *See* footnote 3.

[30] *See* footnote 4.

Coinmint also requested an award of attorneys' fees and costs, treble damages and pre- and post-judgment interest.

On May 12, 2022, Katena submitted and served its answering statement to Coinmint's Demand for Arbitration, in which it **(a)** denied Coinmint's entitlement to relief; **(b)** denied Coinmint's requests for punitive, treble and extracontractual damages on the grounds that such relief is expressly barred by the SPA; **(c)** disputed Coinmint's factual allegations; and **(d)** asserted its own factual allegations in response to Coinmint's. Additionally, in its answering statement, Katena set forth three counterclaims for damages relief against Coinmint: breach of contract, breach of the implied covenant of good faith and fair dealing, and indemnity. In addition to damages, Katena requested an award of indemnification of its fees incurred in defending Coinmint's claims, including legal fees.

On August 29, 2022, Coinmint submitted and served a First Amended Arbitration Demand in which it asserted eight claims for relief: breach of contract (First Count); breach of contract – failure to provide adequate assurances pursuant to California Commercial Code § 2609 (Second Count); fraud in the inducement (Third Count); unjust enrichment (Fourth Count); theft by false pretenses under California Penal Code § 496 (Fifth Count); money had and received (Sixth Count); breach of covenant of good faith and fair dealing (Seventh Count); and violation of California Business and Professions Code § 17200 (Eighth Count). Coinmint also requested an award of attorneys' fees and costs, treble damages and pre- and post-judgment interest.[31]

On September 16, 2022, Katena submitted and served its Answering Statement to First Amended Arbitration Demand and Amended Notice of Counterclaim, in which it **(a)** denied Coinmint's entitlement to relief; **(b)** denied Coinmint's requests for punitive, treble and extracontractual damages on the grounds that such relief is expressly barred by the SPA; **(c)** disputed Coinmint's factual allegations; and **(d)** asserted its own factual allegations in response to Coinmint's. Additionally, Katena set forth five counterclaims for damages relief against Coinmint: breach of contract (¶ IV((A)); breach of the implied covenant of good faith and fair dealing (¶ IV((B)); indemnity (¶ IV((C)); tortious interference with contract (¶ IV((D)); and breach of contract – confidentiality (¶ IV((E)).

---

[31]    On August 30, 2022, Katena objected to Coinmint's First Amended Arbitration Demand because Coinmint did not first seek leave from the Panel. Coinmint responded to Katena's objection by requesting leave, which the Panel granted. *See* Order No. 2.

Coinmint did not submit or serve an answering statement to Katena's Amended Notice of Counterclaim. Pursuant to AAA Commercial Rule R-5,[32] Coinmint is deemed to have denied Katena's counterclaims in their entirety and thus put them in issue.

After the merits hearing, the parties agreed, through their respective counsel, to each prepare and submit a statement by November 3, 2023 setting forth (a) what claims or counterclaims are withdrawn, (b) what claims or counterclaims remain to be decided by the Panel, (c) what affirmative defenses are withdrawn, and (d) what affirmative defenses remain to be decided by the Panel.

On November 3, 2023, Coinmint submitted and served a written statement in which advised the Panel and Katena that Coinmint was not withdrawing any of its claims or defenses and that the following claims remained to be decided:

(a)     Breach of Contract

(b)     Breach of Contract – Failure to Provide Adequate Assurances Pursuant to California Commercial Code Section 2609

(c)     Fraud in the Inducement – Declaratory Judgment that the Sales and Purchase Agreement and First Purchase Order are Voidable

(d)     Unjust Enrichment

(e)     Theft by False Pretenses Under California Penal Code Section 496

(f)     Money Had and Received

(g)     Breach of Covenant of Good Faith and Fair Dealing

(h)     Violation of Business and Professions Code Section 17200

---

[32]  All references to the AAA Commercial Rules are to the AAA Commercial Arbitration Rules and Mediation Procedures, as amended and effective October 1, 2013 ("2013 Rules"), which were the rules in effect when Coinmint filed its Demand for Arbitration in April 2021. The AAA amended its Commercial Rules effective September 1, 2022 ("2022 Rules"). Absent agreement of the parties, the 2022 Rules apply only to cases filed on or after September 2, 2022. Coinmint and Katena did not agree to use of the 2022 Rules, so all references herein to rules are to the 2013 Rules.

On November 3, 2023, Katena submitted and served a written statement in which it advised the Panel and Coinmint of the following:

(a)     The following counterclaims remained to be decided:

- Breach of Contract

- Breach of Confidentiality Agreement

- Indemnification

(b)     The following counterclaims had been withdrawn:

- Breach of the Implied Covenant of Good Faith and Fair Dealing

- Tortious Interference

### B.     Discovery

Discovery in this arbitration was conducted over the course of seven months between October 2022 and July 2023. The discovery matters in this arbitration consisted of the following:

(a)     the voluntary exchange of documents and information required under AAA Commercial Rule R-22,[33]

(b)     five party-witness depositions,[34]

(c)     expert witness designations with written opinion reports,[35]

(d)     expert witness depositions, [36]

---

[33]  *See* Order No. 3 – Scheduling and Discovery Matters ("Order No. 3"), ¶ 2.

[34]  *See* Order No. 3, ¶¶ 3(a) and (b).

[35]  *See* Order No. 1 – Scheduling Order ("Order No. 1"), § II, ¶¶ 2.2 and 2.3.

[36]  *See* Order No. 1, § II, ¶ 2.4 and Order No. 3, ¶ 3(d).

(e)    formal document production requests, with written verified responses,[37]

(f)    a procedure for resolving anticipated disputes regarding the subject matter and/or scope of the parties' respective document requests,[38]

(g)    a stipulated ESI order governing the production protocols of ESI, including custodians and search terms,[39]

(h)    a stipulated protective order,[40] and

(i)    a mutually agreed upon fact discovery cutoff date.[41]

The parties' discovery efforts prompted numerous disputes which the Panel was required to decide on no less than 18 occasions.[42] In addition to discovery disputes that were presented to the Panel in the form of Redfern charts, the Panel was also called upon to rule on an emergency basis during the deposition of Randall Foret, Coinmint's in-house counsel, on objections with instructions not to answer based on assertions of attorney-client privilege and/or work product.

Early on in the arbitration, both parties expressed the desire to obtain documents and testimony from third-party witnesses, which both parties claimed were "critical" to their respective cases: namely, Michael Maloney, former CFO of Coinmint, Robert Bleck, outside consultant engaged by Coinmint, and James DeNaut, asserted by Coinmint to be the former CEO and a consultant to Coinmint.[43] The aforementioned witnesses could not be summoned to appear and testify in San Francisco – the locale of the arbitration – and the parties were unsuccessful in their efforts to persuade Messrs. Maloney, Bleck and

---

[37]  *See* Order No. 3, ¶ 4(a) through (d).

[38]  *See* Order No. 3, ¶ 4(e).

[39]  *See* Order No. 3, ¶ 4(f) and Order No. 5 on Parties' Agreement Regarding Discovery of Electronically Stored Information.

[40]  *See* Order No. 6 on Parties' Stipulated Protective Order.

[41]  *See* Order No. 3, ¶ 5.

[42]  *See* Order Nos. 4, 7, 10, 11, 12, 13, 14, 17, 18, 19, 22, 23, 26, 27, 31, 44, 45 and 47.

[43]  DeNaut testified that he was never employed as CEO, nor did he consider himself a consultant.

DeNaut to voluntarily sit for pre-hearing depositions after Coinmint sued them (and others) for fraud, seeking to recover from them the $23 million Coinmint paid to Katena.[44] Accordingly, the Panel issued summonses for each of those witnesses and held special evidentiary hearings in the states where the witnesses resided or otherwise agreed to appear.[45] All such third-party witnesses appeared pursuant to their respective summonses, produced documents and testified in this arbitration.[46]

//
//
//
//
//

---

[44]   As the record in this arbitration reflects, the Panel was presented with a number of disputes concerning the procedures that would govern the hearing proceedings conducted for the purpose of receiving testimony by non-party witnesses who were sued by Coinmint for tort damages allegedly sustained as a result of the witnesses' alleged conduct and interactions concerning the SPA and PO #1. In Order No. 24, the Panel ordered that there would be no court reporter, videotaping or any other manner of recording the testimony given by Bleck, Maloney and DeNaut. *See* Order No. 24, ¶ 2(e). In Order No. 48, the Panel ordered that there would be no court reporter for the testimony of Reddy who, along with DXCorr, had also been sued by Coinmint in the aforementioned litigation. *See* Order No.48, ¶ 3. These orders were in response to the unique situation presented where special hearing proceedings were ordered to receive testimony and documents from non-party witnesses Bleck, Maloney and DeNaut (Order No. 15), only to learn afterwards that Coinmint had **(a)** sued these witnesses (along with Reddy and DXCorr) for $23 million, and **(b)** taken the position that it could use "CONFIDENTIAL" testimony and documents subject to protection under the SPO in those court filings without first going through the agreed-upon de-designation procedures in this arbitration as provided in Order No. 6. The Panel members took copious notes of all witnesses' testimony offered during the Hearing, including but not limited to the testimony given by Bleck, Maloney, DeNaut and Reddy. Whenever there are quoted statements attributed to Bleck, Maloney, DeNaut or Reddy, those are paraphrases from the Panel's notes, as the Panel heard the testimony and recorded it in their notes.

[45]   Michael Maloney resides in New York, New York, and was summoned to appear for hearing at the AAA Offices in New York. Robert Bleck resides in San Diego, California, and was summoned to appear for hearing at the San Diego offices of Coinmint's counsel. James DeNaut resides in Greenwich, Connecticut, and was summoned to appear for hearing in Greenwich (although he later agreed to appear in the New York offices of his counsel).

[46]   Robert Bleck appeared and testified on April 8, 2023, which constituted the first day of evidentiary hearing proceedings in this arbitration. *See* Order No. 35. Michael Maloney appeared and testified on May 16, 2023, which constituted the second day of evidentiary hearing proceedings in this arbitration. *See* Order No. 40. James DeNaut appeared and testified on November 17, 2023, which constituted the last day of evidentiary hearing proceedings in this arbitration. *See* Order No. 59.

### C.   Motions for Pre-Hearing Relief

#### (1)   Katena's Dispositive Motion Requests

On November 14, 2022, Katena submitted two dispositive motion requests under Rule R-33. One proposed motion sought summary disposition and dismissal of Coinmint's breach of contract claim based upon the allegation that Katena failed to provide adequate assurance as required by Section 2609 of the California Commercial Code and thus must be held to have breached the SPA. The second motion request sought summary disposition of Katena's breach of contract claims against Coinmint.

On November 28, 2022, Coinmint submitted and served its opposition to Katena's Rule R-33 requests. Coinmint contended that Katena was not likely to prevail on its proposed motions because there were disputed issues of fact that could be resolved only through the taking of evidence. Additionally, because Katena's proposed dispositive motions would not address or dispose of Coinmint's fraudulent inducement claim, allowing the proposed motions, even if successful, would not narrow the issues to be heard and determined because of that remaining claim.

The Panel denied both of Katena's dispositive motion requests on the grounds that the parties' papers made it clear that disputed issues of fact must be resolved in order to rule on the merits of either party's claims, counterclaims, or defenses, including those that were the subject of Katena's proposed motions. *See* Order No. 9.

#### (2)   Coinmint's Request for Interim Relief

On March 3, 2023, Coinmint submitted a "Motion for an Interim Award Enjoining Katena from Disposing of Assets Other than in the Ordinary Course of Business" ("Motion"). In the Motion Coinmint sought broad relief that basically amounted to a request for **(a)** a pre-judgment writ of attachment and appointment of the Panel as escrow agent / receiver as to Katena, and **(b)** injunctive relief as to Katena's attorneys and Katena's principals Gao, Monzon and Reddy. The Panel denied the relief requested by Coinmint. *See* Order No. 28. The following is a summary recap of the Panel's rulings.

(A)   <u>Relief requested against Katena's attorneys, Gao, Monzon and Reddy</u>. In its Motion, Coinmint asked the Panel to enter an order against individuals who were non-parties - Gao, Monzon and Reddy – requiring them to deposit $23 million into an escrow to be established for Coinmint's benefit. Coinmint also asked the Panel to issue an order against Katena's counsel (the Perkins Coie firm) precluding it from accessing funds placed in its client trust account to the extent such funds were received from Katena, Gao, Monzon, Reddy, "or any other associated party." These requests were denied because

the Panel lacks jurisdiction over Gao, Monzon, Reddy and Perkins Coie for purposes of awarding any relief against them. As noted in Order No. 28, this arbitration concerns a dispute between two business entities, Coinmint and Katena, that are the only ones who were bound to submit their disputes to binding arbitration. Perkins Coie, Gao, Monzon and Reddy are not parties to the arbitration clause in the SPA that underlies the disputes in this arbitration and have not otherwise submitted to the Panel's jurisdiction concerning any disputes or claims for relief Coinmint might want to assert against them. Coinmint cited no authority to support its contention that the Panel had the authority to exercise jurisdiction over the financial affairs of Perkins Coie or those of Gao, Monzon or Reddy to order those non-parties to deposit $23 million into escrow. The Panel concluded that it lacked jurisdiction without such an agreement or a court order compelling Perkins Coie, Gao, Monzon and/or Reddy to be subject to its jurisdiction and it therefore could not enter the requested orders of relief against them.

(B)    Relief requested against Katena. In its Motion, Coinmint sought various orders directed at Katena in the nature of a pre-judgment writ of attachment: **(a)** to require the deposit of $23 million into an escrow to be established for Coinmint's benefit; **(b)** to restrict Katena's operations so that its day-to-day business operations were subject to the Panel's oversight or someone appointed to act in a receiver-like capacity, and/or **(c)** to require Katena to deposit $23 million into escrow or into the client trust account of one of the Panel members to be held for the benefit of Coinmint pending the outcome of the arbitration. These requests for relief were all denied for the below reasons, briefly summarized (and more fully stated in Order No. 28).

First, while Rule R-37 allows an arbitrator to award such interim relief as he or she deems necessary "for the protection or conservation of property or disposition of perishable goods," Coinmint failed to identify property or goods needing protection. To the contrary, the relief Coinmint sought was to create a pool of money to be held in escrow for its benefit on which it could levy if it prevailed on its claims against Katena.

Assuming for the sake of argument that the Panel had authority to order a remedy in Coinmint's favor equivalent to a prejudgment writ of attachment – which authorities Coinmint did not cite to the Panel - attachment is an extraordinary remedy that has strict statutory requirements, which the Panel found Coinmint did not meet.

To obtain a prejudgment writ of attachment, the moving party must show the existence of a claim eligible for an attachment. Cal. Code of Civil Procedure ("CCP") § 483.010(a). Attachment is limited to: "(1) a claim for money based upon a contract, express or implied; (2) of a fixed or readily ascertainable amount not less than $500; (3) either unsecured or secured by personal property, not real property (including fixtures); and (4) commercial in nature." *Goldstein v. Barak Constr.*, 164 Cal. App. 4th 845, 852 (2008). In other words, the underlying claim must be based upon an unsecured

commercial contract. Here, Coinmint's interim relief request was based upon its claim that it was fraudulently induced to enter into the SPA, citing, *inter alia, In re Baroff*, 105 F.3d 439, 443 (9th Cir. 1997) for the proposition that such a claim qualifies as an action on the contract. Assuming for argument's sake that a fraudulent inducement claim would qualify for a prejudgment writ of attachment, Coinmint failed to establish "the probable validity" of its claim as required by CCP § 484.090(a)(2).

Further, the amount to be secured by a prejudgment writ of attachment must be "greater than zero." *Id.* § 484.090(a)(4). In its opposition, Katena argued that Coinmint's claimed damages of $23 million must be "reduced by," among other things, the "amount of any indebtedness of the plaintiff that the defendant has claimed in a cross-complaint filed in the action if the defendant's claim is one upon which an attachment could be issued." Katena has pleaded a counterclaim for breach of contract for $37.5 million, which would reduce Coinmint's claim to less than zero, and thus make Coinmint ineligible for attachment relief under CCP § 484.090(a)(4). The Panel made no findings on the "probable validity" of the merits of Katena's claims for purposes of offset to Coinmint's claims. The Panel merely observed that had it found that Coinmint had established the probable validity of its claim, the Panel would then have had to consider Katena's offsetting counterclaim.

Finally, Coinmint based much of its argument on the risk of irreparable harm it would suffer without the requested relief. Aside from Coinmint's failure to demonstrate the likelihood that it would prevail on the merits of its fraudulent inducement claim, Coinmint's arguments concerning harm and the balance of hardships were largely based on speculation and lacked evidentiary support.

(C)   <u>Relief requested against Katena for something akin to the appointment of a receiver</u>. In its Motion, Coinmint asked the Panel to issue an order "freezing the status quo" by restricting Katena's operations so that **(a)** no new contracts or obligations in excess of $10,000 can be entered into without the advance approval of the Panel, **(b)** no funds in any Katena bank accounts can be transferred out "except pursuant to a bona fide written contract and in exchange for legitimate consideration," **(c)** only current vendors of routine services may be paid in the normal course, and **(d)** Katena's officers, directors and employees can only be paid their regular, periodic wages or salary. Boiled down to its essence, Coinmint sought an order that would require day-to-day oversight of Katena's business operations, akin to a request for the appointment of a receiver, with the Panel acting as the oversight supervisor of Katena's day-to-day operations.

28

The Panel concluded that the relief Coinmint sought was within the exclusive province of the courts and thus not relief that the Panel had authority to grant. CCP § 564(a) plainly states that "[a] receiver may be appointed … by the court in which an action or proceeding is pending in any case in which the court is empowered by law to appoint a receiver." "The appointment of a receiver rests within the discretion of the trial court." *Gold v. Gold*, 114 Cal. App. 4th 791, 807 (2003). The courts have held that arbitrators do not have the power to appoint a receiver. *Marsch v. Williams*, 23 Cal. App. 4th 238, 245-246 (1994) ("Arbitrators do not have the power to provide all the remedies which are available from the superior court."). To ensure that such a provisional remedy is available to disputants in arbitration, CCP § 1281.8(b) expressly permits such parties the right to resort to the courts for interim equitable remedies. Section 1281.8(d) makes clear that filing an application for provisional relief with the courts "shall not operate to waive any right of arbitration." Accordingly, the Panel denied the Motion. Order No. 28.

### D.   Evidentiary Hearing Proceedings

As set forth in the hearing reports and orders that the Panel issued, the Panel received extensive testimony and documentary evidence in the Hearing. *See* Order Nos. 35, 40, 51, 54, 57, 59, 60 62 and 63. The following is a summary recap.

The following witnesses testified and were examined by both parties' counsel:

a.   Robert Bleck (April 18, 2023) testified for a full day and was examined with regard to 24 exhibits, among other matters. *See* Order No. 35.

b.   Michael Maloney (May 16, 2023) testified for a full day and was examined with regard to 41 exhibits, among other matters. *See* Order No. 40.

c.   Henry Monzon (August 28, 2023) testified for a full day and was examined with regard to 51 exhibits, among other matters. *See* Order No. 51.

d.   Sagar Reddy (August 29 and 30, 2023), testified for a full day and an additional half day, and was examined with regard to 26 exhibits, among other matters. *Id.*

e.   Ashton Soniat (August 30 and 31, 2023) testified for about one and one-half days and was examined with regard to 48 exhibits, among other matters. *Id.*

29

f.     Michael Gao (September 18 and 19, 2023) testified for about one and one-half days and was examined with regard to 37 exhibits, among other matters. *See* Order No. 54.

g.     Joseph Cutler (September 19, 2023) testified for approximately 30 minutes and was examined with regard to 4 exhibits, among other matters. *Id.*

h.     Norbert Guiol (September 19, 2023) testified for approximately two hours and was examined with regard to 8 exhibits, among other matters. *Id.*

i.     Randall Foret (September 19, 2023 and October 16 2023) testified for approximately two hours and was examined with regard to 9 exhibits, among other matters. *See* Order Nos. 54 and 57.

j.     Dejan Markovic, Katena's technical expert (September 20 and 21, 2023) testified and/or was present for the testimony of Coinmint's technical expert for about one and one-half days and was examined with regard to 15 exhibits, among other matters. *See* Order No. 54.

k.     Isaac Pflaum, Coinmint's technical expert (September 20 and 21, 2023) testified and/or was present for the testimony of Katena's technical expert for about one and one-half days and was examined with regard to 11 exhibits, among other matters . *Id.*

l.     David Mordecai, Katena's financial expert (October 16 and 17, 2023) testified and/or was present for the testimony of Coinmint's financial expert for two days and was examined with regard to 7 exhibits, among other matters. *See* Order No. 57.

m.     Kurt Stake, Coinmint's financial expert (October 17, 2023) testified for approximately one-half day with regard to 3 exhibits, among other matters. *Id.*

n.     James DeNaut (November 17, 2023) testified for a full day and was examined with regard to 33 exhibits, among other matters. *See* Order No. 59.

The documents admitted into evidence are as set forth in paragraph 2(a), (b) and (c) of Order No. 60, as supplemented by Order No. 62, and as restated in paragraphs 1(a), (b) and (c) of Order No. 63.

During the evidentiary hearing proceedings, each hearing day comprised approximately eight hours. That hearing time was shared approximately 53% (Coinmint) and 47% (Katena), as described in the daily tallies set forth in paragraph 3 of Order No. 60.

### 7.    Rulings During the Evidentiary Hearing

During the evidentiary hearing proceedings, the Panel was called upon to make rulings on several significant matters. Those rulings are set forth below:

### A.    Objection to Exhibit 2197 – Privileged Document Clawback Issue

Exhibit 2197 (COINMINT_0000024) is an email exchange between Foret, Coinmint's in-house counsel, and Soniat, its CEO, dated January 14, 2022 ("the January 14, 2022 Email"). Coinmint produced the January 14, 2022 Email during discovery by including it in its October 2022 document exchange under AAA Rule R-22. It later became the subject of a clawback request Coinmint submitted to the Panel.

In its Order No. 22 – Order on Discovery Dispute Matters Regarding Coinmint's Clawback Letter Dated January 25, 2023 and Redfern Chart Dated February 23, 2023 ("Order No. 22"), the Panel denied Coinmint's clawback request, ruling that **(a)** Coinmint had waived any privilege protections applicable to the documents included in Coinmint's, Rule R-22 exchange; **(b)** Coinmint's clawback request was untimely; and **(c)** Coinmint had failed to make any showing as to how it prepared its Rule R-22 exchange, how documents were selected, what efforts were made to conduct a privilege review, or how production of the January 14, 2022 Email as part of its exchange was inadvertent.

When Katena introduced the January 14, 2022 Email as Exhibit 2197 during questioning of Soniat on August 31, 2023, Coinmint's counsel objected on the grounds of attorney-client privilege. That objection was overruled as untimely and unsubstantiated for the same reasons previously stated in Order No. 22. *See* Order No. 51, ¶ 4.

//
//
//

31

###### B.   *Katena's Motion in Limine to Exclude Testimony from Randall Foret*

On August 18, 2023, Katena submitted a motion *in limine* to the Panel seeking an order excluding any testimony from Foret, Coinmint's in-house counsel, on any topic related to his knowledge of the Katena-Coinmint relationship because Coinmint had asserted the attorney work product or attorney-client privilege during Foret's pre-hearing deposition on January 30, 2023 and instructed him not to answer. As stated in Order No. 49, the Panel declined to preclude Foret from testifying at the evidentiary hearing and stated that it would rule on objections on a question-by-question basis.

Foret's testimony through Coinmint's questioning at the September 19, 2023 hearing was interrupted by Katena's objections when questions veered into topics that Katena argued it had been precluded from asking about at Foret's pre-hearing deposition in January 2023. The Panel had been called upon by the parties on an emergency basis during that deposition to make rulings on privilege objections. Katena's objections were tabled to the next day so that the Panel could review excerpts of the deposition transcript ("Transcript"), as well as any submissions and orders on this subject.

The Panel's review of the Transcript identified the subject areas on which Katena posed questions and Foret had been instructed not to answer, as follows and all as described in paragraph 5 of Order No. 54:

a.   Questions regarding the "Status Quo Order"

b.   Questions regarding Coinmint's acquisition of bitcoin mining rigs during the April to May 2021 time frame

c.   Questions regarding Foret's discussions with Maloney

d.   Questions regarding Foret's discussions with Bleck.

e.   Some general questions regarding Coinmint's operations and the filing of this arbitration

The Panel noted that in its Order No. 17, issued on February 9, 2023, it sustained Coinmint's work product objections and instructions not to answer, except for a few questions requiring only a "yes" or "no" answer. *See*, Order No. 17.

The Panel having sustained Coinmint's privilege objections during Foret's deposition, Katena was foreclosed from obtaining discovery on those subject areas of communications and activities in which Foret was involved as Coinmint's legal counsel. Having made the strategic decision to view Foret's involvement as that of legal counsel versus his acting as part of Coinmint's management and business decision making team (which would not be privileged), Coinmint set the limits of what it could seek to introduce as evidence through Foret in the merits hearing. Accordingly, the Panel sustained Katena's objection to Coinmint's questions to Foret concerning communications and/or activities in which he participated in subject areas that were closed to Katena during discovery based upon Coinmint's privilege objections and instructions not to answer. *See* Order No. 54, ¶ 5.

### C.    Objection to Exhibit 1232 – Proposed Demonstrative by Coinmint's Financial Rebuttal Expert

Exhibit 1232 is a chart titled "Analysis of Mordecai Damages Claim Before Prejudgment Interest - For Illustrative Purposes Only – Not a Rebutal [*sic*] Damages Analysis" and was first produced to Katena's counsel via an email sent by Coinmint's counsel approximately two hours before the commencement of the hearing at 9:00 a.m. Pacific Time on October 17, 2023. At the hearing Katena promptly objected to the admission of Exhibit 1232 and to any testimony by Mr. Kurt Stake, Coinmint's rebuttal expert witness, with respect to the analysis in the exhibit on the grounds that the analysis represented a new opinion that had not been disclosed in Mr. Stake's June 21, 2023 rebuttal report ("Stake Report") (Exhibit 1231), was untimely, and would be prejudicial. The Panel sustained Katena's objection for the below reasons and as more fully explained in Order No. 57.

On June 5, 2023, pursuant to Section II, paragraph 2.2, of Order No. 1, Katena submitted and served its designation of Dr. David Mordecai as its financial expert. As required by Order No. 1, Katena's designation included a written report ("Mordecai Report") (Exhibit 1193) setting forth all opinions Dr. Mordecai would offer at the merits hearing, along with his analysis and supporting materials.

In Section V, paragraphs 56 through 59 of the Mordecai Report, Dr. Mordecai set forth his opinions and analysis concerning the "economic harm" Katena suffered as a result of Coinmint not performing under the SPA and PO #1. Paragraph 58 of the Mordecai Report included a chart titled "Table 1 / Estimated Lost Profits and Damages Related to the SPA and PO" ("Table 1") which showed how Dr. Mordecai calculated Katena's economic harm for purposes of rendering his opinion concerning the commercial reasonableness of the SPA's liquidated damages clause. The calculations

contained in Table 1 include line items for "Nominal Manufacturing Cost" and "Nominal Engineering Cost."

In accordance with Order No. 1, on June 21, 2023, Coinmint submitted and served its designation of Mr. Stake as its rebuttal financial expert, including the Stake Report, setting forth all rebuttal opinions Mr. Stake would offer at the merits hearing in response to Dr. Mordecai's opinions in his report, along with Mr. Stake's analysis and supporting materials.

The sum and substance of Mr. Stake's opinions – as stated in the Stake Report – is that Dr. Mordecai's approach to quantifying Katena's lost profits was incorrect and was not based on the type of information required to perform a proper lost profits analysis. *See* Exhibit 1231. Nowhere in his report did Mr. Stake (1) provide a rebuttal opinion to Dr. Mordecai's "economic harm" analysis or any of the assumptions made with regard to that analysis; (2) offer a rebuttal opinion regarding how Katena's economic harm should be measured or calculated; or (3) offer a rebuttal analysis using Dr. Mordecai's approach, but plugging in different figures for any line items contained in Section V and Table 1 in the Mordecai Report. Mr. Stake conceded as much as to all such points during his testimony.

Consistent with the examination procedure for experts proposed by the parties and approved by the Panel, as set forth in paragraph 7 of Order No. 49 – Order Regarding Week One Hearing Procedures, Etc., Dr. Mordecai's direct testimony on October 16, 2023 stayed within the bounds of the opinions, reasoning and analysis set forth in the Mordecai Report. No additional opinions, reasoning or support materials were offered by Katena through Dr. Mordecai during direct examination or elicited through Coinmint's cross-examination.

As noted above, two hours before commencement of the merits hearing on October 17, 2023, Coinmint circulated as a new, proposed Exhibit 1232 prepared by Mr. Stake responding to the opinions expressed by Dr. Mordecai in Section V of the Mordecai Report. Whether styled as an "opinion" or an "analysis," Exhibit 1232 proposes an alternative scenario for calculating Katena's economic harm using the "Mordecai Approach," but plugging in different figures for manufacturing and engineering costs and adding a line item called "Other Saved Costs – Not Addressed Mordecai."

The issue concerning the commercial reasonableness of the liquidated damages clause in the SPA is at the heart of Katena's counterclaim. It is not peripheral to the parties' dispute. The Panel rejected Coinmint's argument that the analysis in Exhibit 1232 was not a rebuttal to Dr. Mordecai's testimony on October 16, 2023. As noted above, nothing new was presented through Dr. Mordecai's testimony – which stayed within the bounds of his opinions, reasoning and analysis in his report -- that opened the door to

Coinmint supplementing Mr. Stake's opinions, reasoning or analysis. All of the information Mr. Stake needed concerning Dr. Mordecai's opinions, reasoning and analysis regarding the economic harm to Katena suffered as a result of Coinmint's nonperformance was set forth in the Mordecai Report.

To the extent that Mr. Stake had or wanted to offer a rebuttal opinion or analysis, he should have done so in his June 21, 2023 report. Exhibit 1232 is simply a new opinion not timely disclosed in Coinmint's June 21, 2023 designation of Mr. Stake, as discussed above. Coinmint failed to provide an explanation or make a showing of good cause for the proposed late submission of this change / addition to the Stake Report. Given that the issue concerning the lost profits / economic harm to Katena arising from Coinmint's alleged breach of the SPA is central to Katena's counterclaim, the Panel ruled that it would be unfair and highly prejudicial to Katena to allow (a) the admission of Exhibit 1232 into evidence or (b) testimony from Mr. Stake concerning this belated new opinion / analysis raised on the day after Dr. Mordecai's testimony. For these reasons, Katena's objection to Exhibit 1232 was sustained. *See* Order No. 57, ¶ 6.

### D.    *Coinmint's Request for Judicial Notice of Delaware Action Filings*

At the October 17, 2023 merits hearing, Coinmint sought to introduce two exhibits that were public filings in the Delaware Action that had not previously been shared with Katena or provided to the Panel during the pre-hearing exchange of proposed exhibits, namely:

- ▪    a heavily redacted declaration of Maloney filed on May 10, 2021 ("Maloney Declaration"), in the Delaware Action; and

- ▪    an order vacating the SQO in the Delaware Action, as filed on May 19, 2021 ("Order Vacating Status Quo Order").

Katena objected to the admission of these documents into evidence as untimely. The Panel suggested that Coinmint file a request for judicial notice with an opportunity for Katena to review the documents and submit any comments or objections it might have. The parties, through their respective counsel, agreed to that process. *See*, Order No. 57, ¶ 7.

//
//
//
//

On October 23, 2023, Coinmint submitted and served its request for judicial notice of the Maloney Declaration and Order Vacating Status Quo Order. On October 26, 2023, Katena submitted its response in which it (a) objected to judicial notice of the Maloney Declaration, and (b) did not object to judicial notice of the Order Vacating Status Quo Order.[47]

The Panel granted the unopposed request for judicial notice of the Order Vacating Status Quo Order, noting that Coinmint's request simply confirms that such an order in fact exists and is of record in the Delaware Action. The Panel allowed its admission as Exhibit 1221.

The Panel denied the request as to the Maloney Declaration, stating as follows:

> "2. Coinmint's request for judicial notice of the Maloney Declaration is DENIED. Based upon Coinmint's arguments, the declaration is being offered for the truth of the matters stated therein and not just for the fact that Mr. Maloney provided a declaration in the Delaware Action. That is not the appropriate subject of a request for judicial notice. Given the date of the declaration – May 10, 2021 – and that it was filed in an action in which Coinmint was the lead party, the Panel infers that the existence of Mr. Maloney's declaration as provided in the Delaware Action was known and available to Coinmint when Mr. Maloney testified in this arbitration on May 16, 2023. If Coinmint had questions for Mr. Maloney about his May 2021 declaration, they should have been raised on May 16, 2023, and Coinmint should have sought to introduce the declaration at that time. Katena's objection is sustained because it would be prejudicial to Katena to allow Coinmint to effectively seek to impeach Mr. Maloney, a third-party witness, in absentia. Additionally, Coinmint has not established good cause for the delayed introduction of the Maloney Declaration. Coinmint has not explained why it did not include the Maloney Declaration in its proposed exhibits exchanged before the start of the evidentiary hearing proceedings. Coinmint also has not explained why it did not bring the Maloney Declaration forth as an impeachment exhibit during Mr. Maloney's testimony on May 16, 2023. For these reasons, the Panel will not take judicial notice of the Maloney Declaration and it shall not be introduced as an exhibit for any purpose."

*See* Order No. 58.

---

[47] The specifics of Katena's objections are set forth on page 2 of Order No. 58.

### 8.    Rulings on Coinmint's Submitted Claims

The focus of Coinmint's claims is on alleged fraud, theft and bribery by Katena in its dealings with Coinmint in entering into the SPA and PO #1. *See* Coinmint Closing Brief, pp. 1-12. This theme is carried out in Coinmint's closing brief, which starts with its claim that Katena fraudulently induced Coinmint to enter into the mining rig purchase transaction and thus the SPA and PO #1 should be rescinded and all monies paid to Katena returned. *Id.* pp. 13-29 and 30-38. As a follow-on to its fraudulent inducement claim, Coinmint argues that Katena's alleged conduct amounts to civil theft under California Penal Code Section 496, and that Coinmint should be awarded treble damages and attorneys' fees pursuant to the statute. *Id.* pp. 38-45. Finally, Coinmint argues that Katena's alleged wrongful conduct constitutes unfair competition violative of California Business and Professions Code Section 17200, *et seq.*, and that Coinmint is entitled to restitution. *Id.* pp. 46-49.

In the alternative, if Coinmint is unsuccessful on its fraud-based claims, Coinmint has argued that it is entitled to relief on its contract-based claims: namely, that Katena repudiated (and thus breached) the SPA by failing to provide adequate assurance of its ability to perform; that Katena breached the implied covenant of good faith and fair dealing through its "sustained fraudulent scheme" against Coinmint;[48] and that Katena failed to perform the SPA, as allegedly modified.[49] *Id.* pp. 49-60.

### A.    Fraud in the Inducement – Declaratory Judgment that the SPA and PO #1 Are Voidable – Third Count

To prevail on its claims that it was fraudulently induced to enter into the SPA and PO #1, Coinmint has the burden of proving five elements: "(1) misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (scienter); (3) intent to defraud (*i.e.,* to induce reliance); (4) justifiable reliance; and (5) resulting damage." *Alliance Mortg. Co. v. Rothwell*, 10 Cal. 4th 1226, 1239 (1995); *see also Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996).

---

[48]   This claim is dependent upon Coinmint establishing some aspect of its fraud-based claims.

[49]   The First and Second Counts as stated in Coinmint's First Amended Demand are both based upon Katena's alleged failure to provide adequate assurance of its ability to perform under the SPA. There is no mention of an alleged modification of the SPA or Katena's alleged breach of said alleged modification in the First Amended Demand.

The fraudulent representation relied upon must be with regard to a material fact. *Gonsalves v. Hodgson*, 38 Cal. 2d 91, 100 (1951) (*en banc*). Additionally, to establish fraud through nondisclosure or concealment of facts, it is necessary to show the defendant was under a legal duty to disclose such facts. *OCM Principal Opportunities Fund v. CIBC World Markets Corp.*, 157 Cal. App. 4th 835, 845 (2007).

In its Closing Brief, Coinmint argued that it is entitled to have the SPA and PO #1 rescinded because Katena "perpetrated four interrelated, but distinct, fraudulent schemes." Coinmint Closing Brief, p. 13. Each of Katena's alleged acts of fraudulent inducement are discussed below, and each fails because the evidence does not support Coinmint's evolving allegations of fraud, bribery, theft, anti-competitive activity or other wrongdoing that Katena purportedly directed at Coinmint.

### (1)    Coinmint's Contention that Katena Bribed Maloney

The first fraud "scheme" argued by Coinmint is that Katena engaged in a "sustained, repeated, and pervasive scheme" to covertly bribe Maloney by offering him a job and equity in Katena in order to induce Maloney (a) to obtain Soniat's signature on the SPA and PO #1 contract, and then (b) to induce Soniat to authorize the millions of dollars of payments made to Katena between June and October 2021. Coinmint Closing Brief, p. 13. For the reasons discussed below, the evidence does not support a finding that Katena bribed Maloney. Rather, the weight of the evidence supports the conclusion that Soniat was very much in control of Coinmint, signed the SPA and PO #1, and made a series of payments to Katena as part of a bigger / bolder business plan aimed at taking Coinmint public, preparing it for sale or finding a mergers and acquisitions partner to take Coinmint to the next level. *See, e.g.,* Exhibit 67.[50]

First, there is no evidence that Katena ever offered Maloney a job or equity in Katena. Moreover, Maloney testified that he was not interested in going to work for Katena. Maloney acknowledged that Katena had approached him about the possibility of working for Katena, but having previously worked at a start-up, stated that he "had no intention of joining another start-up," that his efforts were devoted to "trying to help Coinmint be successful and to get the money [he] was owed."[51]

---

[50]    Guiol testified concerning a grant application to the State of New York that included a presentation to Governor Cuomo in June 2021 concerning Coinmint's intended investment in the Massena Facility totaling $645 million over four years, including in 2021, $150 million in miner purchases of Coinmint owned equipment (followed by an additional $125 million annually for 2022, 2023, and 2024). *See* Exhibit 67 at 67-2.

[51]    Maloney testified that Soniat recruited him away from his prior employer in October 2018 by promising him a full salary, nondiscretionary quarterly bonuses, annual bonuses of between $80,000 and

Second, there is no evidence that Katena offered Maloney anything to induce him to get the SPA and PO #1 signed by Soniat. Maloney's unrebutted and unimpeached testimony was that he never received a job offer from Katena, he never received any equity in Katena, and he was never paid anything by Katena. Maloney's testimony in this regard was corroborated by Monzon and Gao. Monzon testified:

> "To me, it's offensive to insinuate that there was any kind of bribery with Katena. I've never committed any kind of bribing in my career. I'm a first generation immigrant. I've worked very hard for everything I've accomplished in my life, and that comes through hard work and dedication. And this insinuation of bribery, to me, is – frankly, it's offensive. We didn't need to bribe anyone to lock in preorders. Our technology was solid."

RT 287:14-23.

Third, there is no evidence that Katena offered Maloney anything to induce him to get Soniat to authorize the $23 million in payments made to Katena during the months of June through October 2021.[52] To the contrary, the evidence showed that the process of making the incremental payments to Katena was carried out internally by and among Soniat, Maloney, Schneider and DeNaut, and that Soniat specifically tasked DeNaut with the responsibility for finding the cash internally or through financing with Blockchain.com through Katena's line of credit (which Katena had agreed to make available to Coinmint to make good on Coinmint's payment obligations under PO #1). DeNaut testified that getting financing was difficult because of the state of Coinmint's financials, as he discussed with Soniat in August 2021. *See, e.g.,* Exhibit 92.[53] Maloney simply was not involved in Coinmint's payments to Katena except for the initial $7.5 million paid in June.

---

$120,000 depending on reaching certain performance benchmarks, full health insurance benefits, full expense reimbursement, and an equity interest in Coinmint. Soniat had not performed on these promises as of 2021, but did not deny that he had made these promises to Maloney, and claimed that he intended to make good on these promises once the SQO was lifted. Maloney therefore had incentive to do well for Coinmint, particularly because of the promised equity.

[52]   Maloney testified that he had stopped coming to the office and working by July 2021 and that he was fired in September 2021. Foret and DeNaut also so testified.

[53]   On August 26, 2021, DeNaut told Soniat in a text message that "We still don't have proper financials which is limiting what we can do" in relation to outside sources of funds (loans or investors) to make payments to Katena. Exhibit 92 at 92-2. In late October 2021, after the dinner meeting with the Katena principals, DeNaut was still working on finances, telling Soniat "remember that we are already paying off an agreed contract" "[s]o we will need agreement by both parties to make changes." He also told Soniat he was attempting to renegotiate a new contract with Katena at $75 million with renegotiated

39

Coinmint has argued that there is a "mountain of evidence" that "makes very clear that Katena bribed Maloney, and that the bribery influenced Maloney's conduct in material respects." The <u>only</u> evidence Coinmint has referenced in support of its bribery arguments are *internal* text messages exchanged between Monzon and Gao, many of which were exchanged *after* the SPA and PO #1 were signed. *See, e.g.,* Coinmint Closing Brief, pp. 34-36, referencing Exhibits 29, 36,[54] 37, 38, 41,[55] 102, 1035,[56] 1064[57] and 1069.[58] The Panel thoroughly examined and considered all the text messages relied upon by Coinmint to prove fraud and found that they only represented clipped instantaneous messages between colleagues that were often colorful, irreverent banter combined with wishful thinking. Examples of the internal text messages Coinmint has relied on are as follows:

- "Wow Mike even put clauses in our favor in the document… He must really want to be hired…" Exhibit 102, p. 5. These statements were disproven by the evidence which showed that Maloney successfully negotiated favorable terms for Coinmint – *e.g.,* negotiating for a 25% down payment versus a 50% down payment; negotiating to spread Coinmint's payment obligations over a longer period; negotiating for four installments equal to 25% of the Purchase Price versus two installments equal to 50% of the Purchase Price; instead of two; and negotiating for deliveries to start a month earlier. *Compare,* Exhibit 2024 (original draft) with Exhibits 2033 (first redline of SPA and PO #1), 2044 (second redline of PO #1 only), 2047 (signed PO #1) and 2049 (signed SPA).

- Monzon text to Maloney: "How's June 1st as a tentative start date at Katena … can you start putting together / thinking of a comp package …" Exhibit 1038. Maloney response to Monzon: "I can put something together." *Id*. Maloney testified that he had no interest in working at Katena and never pursued the matter further. Monzon corroborated Maloney's testimony

---

delivery and payment dates and to "have Blockchain.com finance a $50 balance on an agreed schedule." Exhibit 2156.

[54]  WhatsApp exchange, dated May 18, 2021.

[55]  Page 21 of WhatsApp exchange, dated May 13, 2021, after the SPA and PO #1 had been signed.

[56]  WhatsApp exchange, dated May 17, 2021.

[57]  WhatsApp exchange, dated July 1, 2021.

[58]  WhatsApp exchange, dated July 27, 2021.

and testified that in fact no job offer was ever made to Maloney. No evidence was offered to support Coinmint's suggestion that Maloney was engaged by Katena to act on Katena's behalf in the negotiation of the SPA or PO #1. The evidence was to the contrary; that Maloney had worked at Coinmint for over two years and had been promised an equity interest and bonuses, and worked to advance Coinmint's interests, especially as they pertained to Coinmint's decision to increase its self-mining operations and thus its revenues and profitability.

• On July 24, 2021, Monzon texted Gao: "Hey, why not fund Maloney with $500K now and do yet another capital call…" Exhibit 29, pp. 1-2. Maloney testified that he never received any money or remuneration of any kind from Katena, and Monzon testified that nothing was ever paid or offered to be paid by Katena to Maloney. No evidence was offered to substantiate that the above text was anything more than brainstorming and ambitious chatter between two of Katena's principals.

Messages between Maloney and Katena's Monzon and Gao did not constitute evidence of actual job negotiations, any control that Katena exercised over Maloney, or any *quid pro quo* of a job offer or equity in Katena in exchange for Maloney acting against his employer's interest, as alleged by Coinmint.

Coinmint argues that Katena engaged in commercial bribery by offering a job to Maloney, citing Cal. Penal Code Section 641.3(a) that provides:

> Any employee who solicits, accepts, or agrees to accept money or anything of value from a person other than his or her employer, other than in trust for the employer, *corruptly* and without the consent of the employer, in return for using or agreeing to use his or her position for the benefit of that other person, and any person who offers or gives any employee money or anything of value under those circumstances, is guilty of commercial bribery. (Italics added.)[59]

---

[59]   Most tellingly, in quoting Section 641.3(a) (on page 37 of its Closing Brief), Coinmint omitted the statutory language requiring that the specified actions be done "corruptly."

The requirement that Maloney, as the employee purportedly solicited by Katena, or Katena, as the allege briber, acted "corruptly" was not proven. "'Corruptly' is defined to mean the person 'specifically intends to injure or defraud' either his own employer, the employer on the other side of the transaction, or a competitor of 'any such employer.'" *CrossTalk Prods., Inc. v. Jacobson,* 65 Cal. App. 4th 631, 643 (1998), quoting Cal. Penal Code Section 641.3(d)(3). Aside from the lack of any evidence showing that Katena offered or paid anything to Maloney or that Maloney had the power or prestige within Coinmint or with Soniat to influence Soniat's decision-making, Coinmint failed to satisfy the statutory requirement that either Maloney or Katena acted "corruptly" by specifically intending to injure or defraud Coinmint. Moreover, the weight of the evidence shows that Soniat was the sole decision-maker at the helm of Coinmint and exercised his decision-making power independently and of his own free will.[60]

### (2)   Coinmint's Contention that Katena Made False Statements of Fact in its Marketing Materials or that Katena Committed Promissory Fraud

AAA Rule R-4 requires that any claim or counterclaim submitted to arbitration include "a statement setting forth the nature of the claim including the relief sought and the amount involved."

AAA Rule R-6 provides that after the arbitrator is appointed, "[a]ny new or different claim or counterclaim, as opposed to an increase or decrease in the amount of a pending claim or counterclaim," may only be advanced "with the arbitrator's consent."

Coinmint included a fraudulent inducement claim for relief in both its original and amended demands. Both demands described the nature of Coinmint's fraudulent inducement claim as being predicated upon the following alleged misrepresentations by Katena before Coinmint executed the SPA and PO #1:

//
//
//
//

---

[60] As discussed above, the evidence shows that in about April 2021, after meeting with DeNaut, Soniat was on a mission to take Coinmint public, sell it, or find a mergers and acquisitions partner, and understood that in order to accomplish this goal Coinmint needed to substantially increase its revenues and profitability by (a) transitioning into self-mining and (b) exponentially increasing its utilization of the power and space available at the Massena Facility.

- "Katena had developed a patented microchip and had the ability to produce the thousands of miners it agreement (*sic*) to deliver to Coinmint;" Original Demand, ¶ 48; First Amended Demand, ¶ 68.

- "the miners that Coinmint would purchase from Katena were designed by Katena and would be manufactured by the world's leading semiconductor manufacturer, TSMC;" *Id.*

- "Katena had significant clients who had entered into contracts similar to those under discussion with Coinmint;" *Id.*

- "Katena was financed by a large, nationally recognized investment firm, and had the resources to manufacture and deliver thousands of miners to Coinmint." *Id.*

Additionally, in its original demand but not in its First Amended Demand, Coinmint alleged that "[e]ven after the execution of the agreements, Katena continued to make false representations to Coinmint for the purpose of inducing Coinmint to make additional deposit payments, including telling Coinmint that Katena could not provide a working miner unless Coinmint made additional deposits." Original Demand, ¶ 49.

In its Closing Brief, Coinmint has <u>changed</u> the nature of its fraudulent inducement claim and has done so without the Panel's consent. In its Closing Brief, Coinmint argued for the first time that (a) Katena made affirmative misrepresentations to Coinmint in specific marketing documents, and (b) Katena committed promissory fraud because it secretly intended to breach the SPA and PO #1 at the time of signing.[61]

Coinmint's fraudulent inducement claims as alleged in its original and amended demands all fail because the evidence showed that all of the alleged misrepresentations of fact were actually true: namely, Katena had developed a patented microchip for the K 10 miner; Katena had the ability through DXCorr and its fabrication connections, as well as Katena's facilities in Asia, to produce the K 10 miners it contracted to produce and deliver to Coinmint; the chips for the K 10 miners were to be manufactured by TSMC and then assembled by DXCorr; at the time the SPA and PO #1 were being negotiated, Katena had contracts in place with several other companies for the supply of K 10 mining rigs;

---

[61] These arguments also were <u>not</u> included in Coinmint's pre-hearing Opening Brief. Rather, the focus of that brief was on Katena's alleged bribery of Maloney to induce Soniat to sign the SPA and PO #1 and Maloney's alleged misrepresentation about there being an amended agreement to induce Soniat to authorize the $7.5 million paid to Katena in June 2021. *See* Coinmint Opening Brief, pp. 1-8.

Katena had a credit facility in place with Blockchain.com which it made available to Coinmint to secure financing up to $50 million towards its purchase obligation under PO #1; and Katena was a start-up and needed Coinmint to fund its initial payment obligation under PO #1 in order to get the ASIC chip for the K 10 miner into production with TSMC – facts known to Coinmint. At that time, due to severe supply chain disruptions from the COVID-19 pandemic, chips were in short supply and foundries such as TSMC were requiring up-front payments of orders customers wanted to place, as testified to by Reddy and Dr. Markovic (and unrebutted by Coinmint).

Because Katena has addressed Coinmint's new contentions in its reply brief and because they arise from the same transactions and events as Coinmint's previously submitted claims and contentions, the Panel will treat Coinmint's new fraud contentions as submitted claims and will address their merits.

<u>Katena Marketing Materials</u>

Coinmint has premised its fraudulent inducement claim upon alleged misrepresentations contained in Katena's marketing materials in two documents – (1) a PowerPoint slide deck titled "Investor Presentation / 2021" (Exhibit 34), which Coinmint refers to as the "Pitch Deck," and (2) a 4-page, undated document titled "Katena" (Exhibit 1002), which Katena refers to as the "Teaser" – which Coinmint claims Maloney relayed to Soniat to induce him to sign the SPA and PO #1. Preliminarily, looking just at Coinmint's new contentions on their face, the problems are three-fold:

- there is <u>no evidence</u> that Maloney or anyone else at Coinmint received or reviewed the marketing materials before discovery in this arbitration,[62]

- there is no evidence that Maloney had any communications with Soniat based upon the marketing materials,[63] and

---

[62]   According to Katena, there is no evidence that Coinmint received the Pitch Deck or Teaser before discovery in this arbitration. Pointing to the fact that Exhibits 34 and 1002 bear Katena Bates numbers, Katena claims that these documents were not included in any of Coinmint's document productions and were not otherwise referenced in any Coinmint pleading prior to Coinmint's Closing Brief. Coinmint has not demonstrated otherwise.

[63]   No testimony was elicited from Maloney to corroborate Coinmint's suggestion / inference that (a) Maloney received and reviewed the Pitch Deck and/or Teaser before Soniat signed the SPA and PO #1, and (b) Maloney made representations to Soniat based upon anything stated in the Pitch Deck or Teaser.

- the reference at page 15 of the Pitch Deck to a "[s]igned binding agreement" with Coinmint for "$150M" is evidence that the Pitch Deck was created <u>after</u> Soniat signed the SPA and PO #1. *See* Exhibit 34, p. 15.

Accordingly, there is no evidentiary basis to tie Soniat's execution of the SPA or PO #1 to reliance by Coinmint upon the Pitch Deck or Teaser to support its fraudulent inducement claim.

Substantively, there is no evidence to support Coinmint's suggestion / inference that any statement made in the Pitch Deck or Teaser were false. The evidence is to the contrary. Monzon and Gao both testified that Katena had $200 million of secured revolving credit with Blockchain.com, contingent upon Katena reaching certain milestones. RT 155:19–25; 979:24–980:15. DeNaut corroborated the existence of this credit facility and said he was working on Coinmint's financing application and responding to Blockchain.com's due diligence questions aimed at obtaining $50 million in financing to apply towards Coinmint's K 10 mining rig purchase before Soniat cut ties with DeNaut in early November 2021.

Regarding Katena's ability to have the ASIC chip for the K 10 miner produced, Monzon testified that Katena had a letter of intent with TSMC through IMEC. Reddy then explained how DXCorr worked with IMEC to reserve space with TSMC and why, as a matter of course, there was no direct contract between Katena and TSMC – that IMEC was the intermediary.

With regard to the forward-looking statements and forecasts contained in the Pitch Deck and Teaser, even if these documents had been reviewed by Coinmint before Soniat signed the SPA and PO #1, the law treats such statements as nonactionable opinions that cannot later be labeled as false or misleading simply because the projection does not materialize. *See, e.g.*, *Sugarman v. Brown*, 73 Cal. App. 5th 152, 174 (2021) (affirming dismissal of fraudulent inducement claim based on "statements or predictions about future events" which are "nonactionable opinions"). Thus, the bottom line is that even if Coinmint had demonstrated that Soniat reviewed the Pitch Deck or Teaser before he signed the SPA and PO #1, Coinmint has not shown that Katena knew – for example – that Coinmint would fail to pay as promised and thereby prevent the K 10 miner from going into production. Putting aside the lack of evidence that Soniat relied on any statements in the Pitch Deck or Teaser to induce his signing of the SPA and PO #1, as well as the issue of lack of reliance, there is no evidence to support a finding that the Pitch Deck and Teaser contain any actionable false statements of fact.

Promissory Fraud

Relying on supposition and innuendo, Coinmint has argued that Katena committed fraud because – at the time the SPA and PO #1 were signed on May 13, 2021 – Katena never intended to perform; that it was "the plan" of Monzon, Gao and Reddy to "pack up the money, and move on to the next scheme" because "[t]hat's too much work" to manufacture the mining rigs and they never intended to do so. Coinmint Closing Brief, p. 29.

First, the *ad hominem* attack on Katena's founders is not supported by the evidence. The profiles of Katena's founders do not support an inference of laziness or unscrupulous conduct:

- Reddy is an electrical engineer with a master's degree from The Ohio State University who, before starting DXCorr in 2006, held several positions with major companies that specialized in microprocessors and chip design. Reddy speaks multiple languages and engages in business on an international level in the United States, India, South Korea, Vietnam and Japan. Since founding DXCorr, Reddy has designed and produced over 100 chips and related intellectual property, including design projects with recognized industry leaders and has employed 200 people working in five different countries.

- Monzon is an electrical engineer with a degree from Florida Atlantic. Prior to joining forces with Reddy and Gao to form Katena, Monzon spent 18 years at Qualcomm in San Diego where he transitioned from technical work as an electrical engineer to program management to product development and, finally, to sales.

- Gao is a recognized "math whiz" who dropped out of MIT to pursue his passion for "building things." Gao has been successfully involved with bitcoin mining and investing since he was 15 years old. Gao has also been involved in building the largest artificial intelligence supercomputer using photonic chips and, in connection with that endeavor, registered several patents as the inventor.

Second, Katena submitted extensive evidence– without any <u>evidentiary</u> rebuttal or impeachment by Coinmint – concerning the design of the ASIC chip for the K 10 and getting the chip design ready for submission to the foundry, including running simulations to test for errors in the chip's design (RT 165:19–166:11; 174:18–24; 185:3–17; 822:4–24; Reddy Testimony; Bleck Testimony; Exhibits 2, 3 and 4); the establishment of a subsidiary in China, including the hiring and paying of employees, to design and build "the box" to house the mining rig computer (RT 185:18–187:10; 822:15–16; 883:1–10); identifying suppliers and costs for the internal components of the mining rig computer (RT 822:11–13 and Exhibit 113); and obtaining a $200 million of revolving credit with Blockchain.com to fund the manufacturing once chips were in hand (RT 979:24–980:15). As Dr. Mordecai explained, manufacturing the K 10 miner presented a profitable opportunity for Katena on which it could conservatively expect to earn a profit of roughly $90 million, on the PO #1 transaction alone. RT (Oct. 16 2023) 166:4-167:5; Exhibit 1193, ¶¶ 58-59.

That evidence persuasively refuted what Coinmint offered in support of its contention that Katena never intended to perform the SPA or PO #1 and that the whole transaction was a ruse orchestrated at getting as much money out of Coinmint as possible. As argued by Katena, given the time, money and effort Katena and its founders had contributed to the design, development and production of the K 10 miner, as well as the anticipated profits to be received from the PO #1 transaction alone, there is no factual basis to support an inference that Katena was motivated from the outset to deceive Coinmint. Moreover, no evidence to support Coinmint's argument that Katena knew it could not meet the December 29, 2021 delivery deadline and concealed that knowledge from Coinmint in order to induce it to enter into the SPA and PO #1. On this point, Coinmint has misconstrued Professor Markovic's testimony. He testified that he had confidence in Reddy's assessment that it was "a matter of weeks, two to four weeks' time frame, to push it [the chip design] to final DRC." RT 1603:17–23. Because TSMC gets chips back in approximately 65 days from the start of production, that would put Katena at "three to four months" from May to get the "chips back in hand." RT 1603:24–1604:3. Professor Markovic never opined that the ASIC chip would not have been ready until October. He merely agreed that, in Coinmint's counsel's hypothetical, August fell three months after May. RT 1608:12–18. Contrary to Coinmint's assertion, Professor Markovic never testified that Katena would have needed to wait until after the chips were received to design and manufacture printed circuit boards. RT 1525:9–19. Rather, he testified that printed circuit boards are typically designed while foundries fabricate the chips. RT 1526:4–1527:7. He also testified that printed circuit boards take at most a week or two to design and are so easy that a high school student could do it. RT 1526:4-11 and 1527:1-7. According to Professor Markovic -- the only technical expert to render an opinion on this subject – at the time Coinmint entered into the SPA and PO #1, the design and production of the ASIC chip for the K 10 miner was "a low-risk project nearing

completion,"[64] the K 10 chip "was within a few months of tapeout," had "no red flags," and was poised for "a smooth transition to operation in the near future." Exhibit 1181, pp. 26 and 29-30.

Based upon the foregoing, Coinmint's promissory fraud argument fails for lack of proof.

### (3)   Coinmint's Contention that Katena Conspired with Maloney to Misrepresent Bleck's Independence

Before addressing Coinmint's fraud contentions and arguments related to Robert Bleck ("Bleck"), it is necessary to start with who Bleck is, what Coinmint asked Bleck to do, and what Bleck did. During this arbitration, Coinmint has alleged, argued and inferred that Bleck – in some way – engaged in conduct to help Katena mislead Coinmint so as to induce Coinmint to enter into the SPA and PO #1. Specifically what Bleck allegedly did for or at the behest of Katena has not been articulated or substantiated with any evidence. As discussed below, the evidence concerning Bleck does not support Coinmint's claim that (a) Bleck was not independent, or (b) Katena conspired with Maloney to misrepresent Bleck's independence to Coinmint.

Who Is Bleck?[65]

Bleck is an electrical engineer with a bachelor's degree in computer science and engineering. He has had over 30 years of experience in various aspects of computer technology and extensive experience in the development of microchips, including over 10 years of experience in custom chip design. Bleck also has had experience in ASIC chip quality assurance and testing. He has worked in hardware design roles at various major companies including Motorola, Freescale, Broadcom, HP, Google, Facebook, and

---

[64]   In his rebuttal opinion report, Professor Markovic explained that "[t]he K 10 is a hardware accelerator" and was "built to run an algorithm quickly and efficiently," but noted that "the actual algorithm itself does not add much to the complexity of the hardware;" that the assessment of the ASIC chip for the K 10 miner would have looked "much the same" if it had been built for another purpose "such as mining a different cryptocurrency, machine learning or computer vision." Exhibit 1182, p. 11.

[65]   Bleck was a third-party witness who appeared and produced documents in response to a hearing summons and sat for a full day of questioning, without objection and conducting himself with decorum. The Panel had the opportunity to assess Bleck in-person and found him to be cooperative, direct, responsive and highly credible, even while being treated and examined as a hostile witness by Coinmint's counsel who repeatedly pressed him with questions inferring that Coinmint's adverse allegations about him and his work were true.

Microsoft.[66] When he was engaged by Coinmint in May 2021, Bleck was working full-time at Microsoft as a technical engineer / program manager leading various projects.[67] Professor Markovic[68] opined that Bleck had the necessary qualifications and experience to perform a feasibility assessment of the Katena K 10 project in May 2021. That opinion was not rebutted or impeached by Coinmint.

<u>What Bleck Was Asked to Do</u>

Bleck was familiar with DXCorr, its work and how the company's processes worked because, in 2017, when Bleck was working at Facebook, Facebook hired DXCorr to do simulations on the design requirements, power consumption and thermal profile analysis of a custom chip Facebook had designed. Bleck, in his capacity as a Senior Engineering Program Manager, was the point person who interfaced with Reddy at DXCorr.

---

[66]   In 2016, Bleck was a senior engineering program manager at Google where he led an engineering team in VR technology development. Between 2017 and 2020, Bleck was a senior engineering program manager at Facebook. Bleck has been working at Microsoft since 2020, where he is a principal engineering program manager.

[67]   Bleck testified that Microsoft allows its engineers to accept outside consulting engagements such as that presented by Katena's feasibility assessment job.

[68]   Professor Markovic was Katena's technical expert who provided opinion testimony regarding Bleck and his report. Professor Markovic is a full professor of electrical and computer engineering at the Samueli School of Engineering of the University of California, Los Angeles (UCLA). He earned a Ph.D. in Electrical Engineering and Computer Science in 2006 at the University of California, Berkeley, for which he was awarded the 2007 David J. Sakrison Memorial Prize, a prize awarded to graduate students who have completed what a faculty committee deemed to be an outstanding piece of research. He also earned a master's degree in electrical engineering and computer science in 2000 from the University of California, Berkeley, and a Bachelor of Science Degree in Integrated Circuits from the University of Belgrade, Serbia in 1998. *See* Exhibit 1181.

Professor Markovic has over 15 years of experience in the design and production of ASICs, and leads the Parallel Data Architectures Group at the UCLA Center for Heterogenous Integration and Performance Scaling ("UCLA CHIPS"). At UCLA, Professor Markovic's research group has designed and manufactured over 20 chip prototypes under his supervision since 2006. These chip prototypes have been primarily domain-specific hardware accelerators focused on high-performance and power-efficient computation. Professor Markovic teaches graduate and undergraduate digital circuit and system design courses and VLSI signal processing and neuro-engineering at the graduate level. Professor Markovic is a co-author of DSP Architecture Design Essentials, a graduate-level textbook focused on challenging applications mapping data processing algorithms onto underlying hardware while meeting application constraints for power, performance, and area. *Id.*

After the Facebook project, Bleck and Reddy remained professional acquaintances, but did not work together on any other projects, did not socialize with each other,[69] and had not seen or spoken to each other for two years before the reach-out in 2021. While DXCorr listed Bleck as an "advisor" on its website, Bleck was never an owner, officer, director or employee of DXCorr, never received any kind of compensation or remuneration from DXCorr, and never attended any meetings or consulted on any projects for DXCorr.

In May 2021, Maloney asked Monzon for a recommendation for an engineer who could do a feasibility assessment of Katena's K 10 chip. Maloney testified that he had tried to find someone on his own, but had been unable to do so. Monzon reached out to Reddy for a recommendation and Reddy recommended Bleck, whom he testified was one of only about 10 engineers that he knew who were qualified to do the assessment.

On May 6, 2021, Bleck reached out to Maloney through LinkedIn and introduced himself as someone who had experience with ASIC / SOC architecture design and validation," stated that "it's one of my core roles currently at Microsoft." That same day, Maloney and Bleck scheduled a call to discuss Coinmint's feasibility assessment needs. During his initial conversation with Maloney, Bleck told Maloney about his prior work with DXCorr while he was at Facebook and told him what he knew about DXCorr's operations. Maloney then asked Bleck if he could do a feasibility analysis on the architecture and design of Katena's chip, and if he knew of Katena.[70] Bleck told Maloney he had never heard of Katena, but could do an analysis of its chip.

On May 7, 2021, Maloney provided Bleck with Coinmint's standard form independent contractor agreement and asked Bleck to fill in the description of the services he would be providing. Exhibit 18.

On May 11, 2021, Bleck returned the independent contractor agreement with the description of services section completed. Exhibit 19. Bleck described the services he was to provide to Coinmint as follows:

---

[69]  Reddy testified that before 2021, he had not spoken to Bleck for over two years.

[70]  Bleck testified that Maloney provided him with very little information. He did not mention a timeline and only stated that what Coinmint wanted was a "review" of the chip.

"high level review and feasibility assessment of the proposed custom ASIC as enumerated below:

- General assessment of architectural feasibility and power efficiency
- General assessment of design methodology, simulations and pre-silicon validation
- General assessment that typical and industry standard ASIC engineering best practices are being followed
- General assessment of post-silicon validation plans such as wafer level probing or post-packaging ATE programs"

Exhibit 19, p 1.

On May 18, 2021, five days after Soniat had signed the SPA and PO #1, Maloney (on behalf of Coinmint) accepted all changes / inserts Bleck had made to the standard form independent contractor agreement, signed it and returned it to Bleck. Exhibit 20.

While Coinmint has made various arguments that distort or are at odds with the above facts, Coinmint did not controvert any of the above facts through evidence.

<u>What Bleck Did</u>

Bleck's primary point of contact for his work was Reddy, who brought in additional DXCorr members to discuss specific engineering details,[71] as requested by Bleck. Bleck was also given access to various written materials by Katena and DXCorr, including schematics in JPEG format, a diagram of the chip, a PowerPoint of the architecture description, and materials for the testing simulations run by DXCorr. According to Reddy, Bleck spent between eight and 20 hours interviewing Reddy and other DXCorr engineers gathering information of his report. Reddy testified that he was impressed by the depth of Bleck's understanding of the K 10 chip design based upon a question he posed and a test simulation he required Reddy to run to prove that the K 10 chip would not explode if every core in a chip found a bitcoin at the same trillionth of a second.[72]

---

[71]   DXCorr was formally engaged by Katena to develop and design the ASIC and related technologies for the Katena K 10 mining rig. Exhibits 109 and 110. Reddy testified that DXCorr committed 50 engineers to work on the Katena project.

[72]   Reddy testified that he welcomes outside feasibility assessments because he welcomes having a second set of eyes look at his design. Reddy successfully performed the simulation requested by Bleck.

On May 18, 2021 (after Coinmint had already signed the SPA and PO #1), Bleck provided Maloney with a "one-pager summary" in which he set forth a summary of his assessment of Katena's K 10 chip. Exhibit 22.

On May 31, 2021, Bleck provided Maloney with his feasibility assessment report, along with his invoice.[73] Exhibits 9 and 12. Soniat testified that he never reviewed the report. Maloney testified that he reviewed the report and had no follow-up questions for Bleck.

Professor Markovic reviewed Bleck's work and report, and testified that (a) Bleck's assessments were supported by the materials and information he was provided, and (b) the materials and information Bleck was provided were what he would have expected to be provided for a high-level feasibility assessment. Professor Markovic also did his own feasibility assessment of Katena's K 10 chip and testified that his assessment of the K 10 chip matched that of Bleck. Exhibit 1181, p. 29.

<u>Coinmint's "Fraud" Charges Concerning Bleck</u>

Against the foregoing backdrop, Coinmint contends that it was fraudulently induced to enter into the SPA and PO #1 on May 13, 2021 because **(a)** Soniat told Maloney to find an ***independent*** engineer to do an assessment of the Katena K10 chip, **(b)** Bleck was not independent because he had previously worked with Reddy and DXCorr and Maloney knew it, and **(c)** Maloney concealed from Soniat the fact that Bleck was not independent as part of a conspiracy to aid and assist Katena in its fraudulent scheme to induce Coinmint to sign the SPA and PO #1 and pay over $23 million to Katena thereafter, knowing that Katena could not or would not perform its end of the bargain.

Even assuming for sake of argument that Coinmint's contentions were true – which the evidence shows they are not (as discussed above) – none of Coinmint's allegations prove Coinmint's fraudulent inducement claim because Coinmint did not engage Bleck until *after* Soniat had signed the SPA and PO #1. *Compare* Exhibits 2046, 2047, 2048 and 2049 *with* Exhibit 20. Additionally, the evidence does not support Coinmint's fraud contentions for the following reasons:

---

[73]   Bleck charged Coinmint $1,749.90 for 5.833 hours of consulting services. Exhibit 9. Professor Markovic testified that these time charges were consistent with what one would expect for a "high level review and feasibility assessment of the proposed customer ASIC." Exhibit 1181, p. 23. Along these lines, Professor Markovic noted that it was clear from Bleck's contract and the time frame within which he was asked to perform that "it was clear that he was not being asked to undertake an exhaustive evaluation of the K 10 program or to write or run his own tests – that would have been completely infeasible within the allotted time." *Id.*

- Bleck was independent. He was a full-time employee at Microsoft. His only prior work with DXCorr was in 2017 – four years earlier -- when he was employed by Facebook. While DXCorr described Bleck as an "advisor" on its website, the uncontroverted evidence showed that there was no activity related to that "title" beyond Reddy and Bleck chatting from time to time about trends in artificial intelligence, with their last conversation being two years earlier (2019). The uncontroverted evidence was that Bleck never worked for DXCorr in any capacity, never had any ownership interest in DXCorr, and never received or was promised any compensation or remuneration of any kind from DXCorr. The evidence was also uncontroverted that prior to being contacted to do a feasibility analysis of the Katena K 10 chip, Bleck had never heard of Katena and had had no dealings with it.

- In terms of what Soniat knew about Bleck, Bleck testified that he told Maloney about the Facebook project when he worked with Reddy and DXCorr in 2017, and Maloney testified that he told Soniat everything. While Soniat claimed that he did not recall such a conversation, Soniat had numerous lapses of memory during the course of his testimony which conveniently occurred when it did not suit Coinmint's narrative.

- As discussed above, Coinmint has failed to establish that Katena contrived, intended or perpetrated a scheme to defraud Coinmint. Coinmint's reference to a few internal emails or text messages among Monzon, Gao and Reddy do not implicate Maloney or Bleck because they were not part of those discussions. The evidence is insufficient to find that there was a "scheme" that involved Bleck or Maloney. Moreover, even assuming for sake of argument that Maloney was less than candid with Soniat about his discussions with or knowledge about Bleck's background, *Maloney was Coinmint's (not Katena's) agent and representative.* Coinmint offered no evidence to show that Maloney was Katena's agent. As discussed above, the evidence supports the opposite conclusion: namely, that Maloney was a compensated employee and officer of Coinmint, that Maloney had an equity stake (or believed he had a stake) in Coinmint, and that Maloney worked to advance Coinmint's interests and goals for several years, especially in 2021 as related to Coinmint's business plan to increase its revenues by going into self-mining so that it could go public or attract a mergers and acquisitions partner.

53

- Katena's recommendation of Bleck was exactly that – *a recommendation* -- that Coinmint was free to take or leave. There was no evidence of Katena or Bleck doing anything to "sell" Bleck to Coinmint. To the contrary, the evidence showed that Maloney had tried – on his own – to find an engineer and failed, and that *he reached out to Katena for help*. The uncontroverted evidence was that there is a very small cadre of engineers who work in the field of ASIC chip design, and that Coinmint was aware of that circumstance based upon Maloney's failed efforts to find a qualified engineer on his own. Given this circumstance, if Soniat really wanted someone who met his qualifications of "independent" – assuming the truth of Soniat's uncorroborated assertion that he actually had so instructed Maloney -- one would have expected that Soniat, the CEO and majority member of Coinmint, would have taken some steps to satisfy himself that Bleck was "independent," by for example, **(a)** interviewing Bleck, **(b)** doing some level of due diligence research on Bleck or requiring Maloney to report on any such research, and/or **(c)** asking Maloney how he found Bleck. There was no evidence that Soniat undertook any of these or similar actions.

Based upon the foregoing, the Panel concludes that how Bleck was engaged was not a concern to Coinmint until after it was unable to get out of the SPA and PO #1 with Katena in 2022.

Coinmint's "Fraud" Charges Concerning the Bleck Report

At points during this arbitration, Coinmint claimed that Bleck was a "rubber stamp" for Katena and DXCorr; that he did not independently assess the Katena K 10 chip; and that the Bleck Report was written or heavily influenced by Reddy. The evidence was to the contrary.

//
//
//
//
//
//
//
//
//

54

In Bleck's full day of testimony, he forthrightly answered all questions posed to him by Coinmint's and Katena's counsel.[74] Bleck described in detail the work that he did and the basis for the statements in his report and produced all of his working papers. Bleck testified that he alone authored the Bleck Report. Reddy adamantly denied that he wrote or influenced Bleck's evaluation, assessment or report.[75] Reddy explained that feasibility assessments are part of the process of designing an ASIC chip and, as the one who is aiming for perfection in his design work, Reddy welcomes the opportunity for "another set of eyes" to look at his work. It was noteworthy to the Panel that Reddy performed additional simulations of the K 10 chip to address the hypothetical challenge posed to him by Bleck during his interview (as discussed above).

Coinmint has also vaguely claimed that the Bleck Report contains false statements and representations but failed to produce evidence to support these charges. Professor Markovic did his own independent assessment of the K 10 chip as of May 2021 and referred to and relied upon the same materials and data as Bleck. In so doing, he confirmed that the test and simulation data and other materials Bleck referred to and relied upon existed and were as represented. He also reviewed and analyzed the materials Bleck reviewed and concluded that the K 10 chip was feasible, was within a few months of being read for tapeout (production), had no red flags indicating likely trouble (errors), and was reasonably likely to experience a smooth transition to operation in the near future. That opinion was not rebutted or impeached by Coinmint.[76]

---

[74]   As described in footnote 65, Coinmint's counsel treated Bleck as a "hostile" witness, yet Bleck responded forthrightly to the questions posed. The Panel found his testimony to be highly credible and of significance to the issues raised in this arbitration.

[75]   Reddy appeared before the Panel for two partial days of examination. As discussed in Section 2(C), Reddy is a highly educated and skilled electrical engineer who has worked in the field of microprocessing his entire career, with considerable success and acclaim. Reddy's credentials and the accomplishments of DXCorr in the field of designing chips and taking them through tapeout on the first try were not disputed or impeached. Coinmint's counsel treated Reddy as a "hostile" witness and asked repeated questions directed at having Reddy admit that which Coinmint had alleged about him and DXCorr was true. Reddy sat through this examination with decorum, was not at all defensive, and responded to the questions posed. The Panel found his testimony to be highly credible and significant to the issues raised in this arbitration.

[76]   Concerning the technical aspects of the case as related to the feasibility of the K 10 chip as of May 2021, all Coinmint offered was a rebuttal opinion by Isaac Pflaum ("Pflaum"). Mr. Pflaum's opinions criticized Professor Markovic, but provided no independent analysis or opinions concerning a feasibility assessment of the K 10 chip. Exhibit 1182 (Pflaum Report). Indeed, since Mr. Pflaum admittedly is not an engineer and acknowledged that he has had no experience in the design or production of ASIC chips, he would not have been qualified to render such opinions. Exhibit 1182, pp. 10-11. Mr. Pflaum's own offered credentials show his lack of  any expertise or credentials in ASIC design and development. He has had no education, training, or practice in electrical engineering, and has never played any role in the design or

Coinmint again relies on internal clipped WhatsApp messages among Katena's principals as proof that Bleck was not independent, not the author of the Bleck Report, and just a "rubber stamp." However, this text message chatter was taken out of context and represented only bluster and banter between colleagues. In the Panel's assessment, the WhatsApp messages do not constitute persuasive evidence of fraud or scienter by Katena.

### (4)   Coinmint's Contention that Katena Lacked the Ability to Perform and Concealed that Fact from Coinmint

Coinmint has argued that Katena lacked the ability to perform under the SPA and PO #1, never intended to manufacture K 10 mining rigs, and concealed these facts from Coinmint. Coinmint Closing Brief, p. 29. Coinmint's argument includes *ad hominem* attacks on Reddy, Monzon and Gao, as well as third-party witnesses Bleck, Maloney and DeNaut, which have been addressed and rejected above.

Dr. Mordecai's undisputed testimony showed that Katena could expect to earn a profit of roughly $90 million by performing PO #1 alone, and was thus highly motivated to perform and to get the K 10 chip into production.

Katena's witnesses testified about all the work invested into developing the K 10 mining rig before Coinmint even entered the picture – *e.g.,* getting an innovative, power-efficient chip design ready for submission to the foundry (RT 165:19–166:11, 174:18–24, 185:3–17, 822:4–24); setting up a China subsidiary and hiring and paying employees to design the box and oversee manufacturing (RT 185:18–187:10, 822:15–16, 883:1–10); identifying suppliers and costs for every bit and bobbin in the finished mining rig, as evidenced by the Bill of Materials (RT 822:11–13 and Exhibit 113); and obtaining $200 million of revolving credit to fund the manufacturing once chips were in hand (RT 979:24–980:15). These are hardly the type of activities or expenses one would expect an alleged fraudster to undertake if its true intent as the supplying party was to simply con the other side out of whatever money they could extract.

---

manufacture of an ASIC. As for his education, Mr. Pflaum's undergraduate degree was in biology and chemistry, his master's degree was in physical chemistry, his juris doctorate was in International Business / Trade / Commerce and his Master of Laws was in International Business Law and Economics, none of which has anything to do with electrical engineering or ASIC design. Mr. Pflaum's primary experience, as reflected in his CV and hearing testimony, is acting as a professional expert witness in contract disputes involving a failure in the performance of software or software-related intellectual property.

Coinmint has also argued that in May 2021 Katena knew but concealed from Coinmint that it would not hit the December 29, 2021 delivery target. Coinmint Closing Brief, pp. 26-27. Coinmint failed to adduce any evidence in support of this charge, and PO #1 does not support Coinmint's inference that December 29, 2021 was a hard deadline. First, the deadline was predicated upon Coinmint funding its initial 25% down payment which was a condition precedent to the commencement of fabrication because that deposit was needed to secure the ASICs order from TSMC. Second, the express terms of PO #1 contemplate and allow for Katena to miss any delivery deadline by up to 60 days without penalty, and allows for late deliveries beyond 60 days subject to giving Coinmint "a refund and/or credit in the amount of 2.1% of the price of that same monthly production lot for each one (1) full week of delay." Exhibit 2047, p. 3.

Coinmint provided no evidence that Katena would have missed any delivery date, much less that it knew in May 2021 before execution of the contract documents that it would miss the delivery deadline but concealed that knowledge from Coinmint.[77] Reddy testified that the design of the K 10 chip was 95% complete as of May 2021, and was just weeks away from being ready to go to final tapeout. Professor Markovic independently reviewed the feasibility data and materials that existed as of May 2021, and testified that he agreed with Reddy's assessment that the K 10 chip was "a matter of weeks, two to four weeks' time frame, to push it [the chip design] to final DRC." RT 1603:17–23. Professor Markovic testified that TSMC gets chips back in approximately 65 days, and that would mean that Katena would have had "chips back in hand" at "three to four months" from May had Coinmint timely funded its down payment so that the process could move forward to tapeout and production. RT 1603:24–1604:3. Based upon this evidence, which was not disputed or impeached, the Panel finds that it was entirely feasible that Katena would have had the K 10 chips in hand by August 2021, and would have been able to build and deliver a test unit by September 2021. There is no basis to infer otherwise.

Based upon the foregoing, Coinmint's fraudulent inducement claim based upon the allegation that Katena concealed from Coinmint that Katena knew it could not perform or never intended to perform fails for lack of evidence.

---

[77]    In its argument, Coinmint asserted that PO #1 required Katena to provide a test unit by September 2021, and, if Katena did not, that lack of performance would demonstrate promissory fraud. That assertion is not supported by the terms of PO #1. *Coinmint* is the only party with an obligation tied to the delivery of a working unit. Under PO #1, Coinmint is not obligated to make its second 25% installment of $37.5 million unless and until it receives delivery of a working unit. That provision is construed as a condition precedent. Katena's delivery obligations appear under the Delivery Schedule on page 3 of Exhibit 2047, and do not include delivery of a working unit.

### *(5)    Concluding Statement*

The SPA and PO #1 were transactions conducted between sophisticated businesses, with experienced management teams and access to legal counsel. Coinmint's pre-execution statements to Katena that it had "cash in hand" was a representation and warranty to Katena in the SPA that it had the financial wherewithal to perform its financial obligations under PO #1. The evidence shows that Coinmint alone pegged its purchase obligation at $150 million (a $50 million increase unilaterally made by Coinmint, without advance discussion with Katena, from the original $100 million the parties had discussed). Coinmint did so knowing that it would be required to fund an advance payment of $37.5 million within three days of signing the SPA and PO #1. Those decisions were entirely within Coinmint's control and were exercised independently and without pressure or influence by Katena.[78] As Dr. Mordecai explained, Coinmint had everything to gain by consummating the deal with Katena. For whatever reason, even after making significant installment payments towards its initial down payment obligation, Coinmint chose not to perform and tried to get out of the deal instead.[79] Coinmint's seminal argument was that Maloney was an unfaithful agent. That argument was not supported by the evidence, but even if it had been, that still would not provide grounds to excuse Coinmint from its contractual obligations to Katena.

//
//
//
//

---

[78]  There was no evidence that Katena had any involvement in Coinmint's decision to increase the size of the purchase from $100 million to $150 million. Gao's WhatsApp message to Monzon on the morning of May 12, 2021 when he learned of the *possibility* that Coinmint might increase its purchase "up to $125-$150 or more" and expressed concern about over committing Katena (Exhibit 2040), corroborates the inference that Coinmint, through Soniat, made the decision to increase its order on its own and without discussing it with anyone at Katena. Only a few hours later, Maloney emailed the second redline of PO #1 increasing Coinmint's initial purchase from $100 million to $150 million. Exhibit 2037. Significantly, that email was copied to Soniat, so he was aware of the increased purchase commitment, and most certainly approved it.

[79]  DeNaut testified that he was unable to find cash reserves within Coinmint to fund Coinmint's obligations under PO #1. However, that circumstance appears to have been contrived based upon Maloney's testimony that Coinmint recently had paid Soniat over $60 million in repayment of loans, plus interest, and therefore he believed that Soniat would make funds available to the company for the contract.

### B.    *Theft by False Pretenses Under California Penal Code Section 496 – Treble Damages and Attorneys' Fees - Fifth Count*

As a follow-on to its fraudulent inducement claim, discussed in Section 8(A), above, Coinmint has sought an award of treble damages and attorneys' fees under California Penal Code Section 496, asserting that Katena's alleged fraud in inducing Coinmint to enter into the SPA and PO #1 amounts to receipt of stolen property for purposes of triggering the civil remedies available under subsection (c).

Penal Code Section 496(c) provides a civil cause of action for any person who has been injured by a violation of subsection (a), which defines the criminal offense of what is commonly referred to as receipt of stolen property.[80] *Siry Investment, L.P. v. Farkhondehpour,* 13 Cal. 5th 333, 346 (2022) ("*Siry*").[81] A criminal conviction is not a prerequisite to the recovery of civil remedies under Section 496(c). *Bell v. Feibush*, 212 Cal. App. 4th 1041, 1043-1044 (2013) ("*Bell*"). As explained by the California Supreme Court in *Siry*, the purpose behind the enactment of the civil remedies section in Section 496 was to reduce theft by reducing the market for stolen goods by punishing those who operate in that market. 13 Cal. 5th at 348-349, *citing Bell*, 212 Cal. App. 4th at 1047.[82] However, *Siry* also made clear that, in the context of commercial disputes "*not all*

---

[80]  Penal Code Section 496(a) provides in relevant part that "[e]very person who buys or receives any property that has been stolen or that has been obtained in any manner constituting theft or extortion, knowing the property to be so stolen, or who conceals, sells, withholds, or aids in concealing, selling or withholding any property from the owner, knowing the property to be so stolen or obtained," is subject to incarceration.

[81]  The California Supreme Court in *Siry* resolved a conflict among the state Courts of Appeal concerning whether Section 496(c) could be applied in a case not involving the trafficking of stolen goods but, instead, fraudulent diversion of a partnership's cash distributions. 13 Cal. 5th at 339. The Court of Appeal in *Siry* had answered "no," and the California Supreme Court reversed. *Siry* now makes clear that Section 496(c) may be applied to commercial disputes where it is established that money or assets belonging to one party are misappropriated or wrongfully diverted by another party, provided that the requisite intent to deprive the one party of the funds or property can be shown.

[82]  *Bell* dealt with the situation where the defendant induced the plaintiff to loan him more than $200,000 on the pretense that defendant needed the money to settle a lawsuit so as to protect a trademark he owned and his interest in a related enterprise. There was no trademark and there was no enterprise. Defendant's representations were a complete scam. When the plaintiff asked for her money back, the defendant gave a litany of excuses and never repaid her. Therein was the act of holding and concealing stolen property: namely, the $200,000 plaintiff advanced to defendant under false pretenses. The facts of *Bell* are distinguishable from the facts of this case because there is no evidence to support Coinmint's argument that it was induced to make payments to Katena based upon any fraudulent misrepresentation or concealment of fact.

commercial or consumer disputes alleging that a defendant obtained money or property through fraud, misrepresentation, or breach of a contractual promise will amount to a theft" for purposes of triggering the right to civil remedies under Section 496(c); that in order to prove theft, the plaintiff "must establish criminal intent on the part of the defendant beyond 'mere proof of nonperformance or actual falsity.'" *Id.* at 361-362, *citing People v. Ashley*, 42 Cal. 2d 246, 264 (1954).[83]

As discussed in this Section 8, Coinmint failed to establish fraud on the part of Katena and failed to show that Katena breached any sort of contractual promise or obligation owed to Coinmint. Coinmint has argued repeatedly that evidence of fraud is the fact that Katena never produced a K10 mining rig, thus suggesting that Katena fraudulently represented the existence of the K10 mining rigs. That was not the case. The evidence showed that everyone knew that the K10 mining rigs that were the subject of the SPA and PO #1 had yet to be produced and that Coinmint's initial $37.5 million payment was needed to pay for the first production run of the ASIC chips necessary to build the K10 mining rigs Coinmint had ordered. It goes without saying that Coinmint failed to establish criminal intent on Katena's part with regard to the payments Coinmint made to Katena towards the funding of its down payment under PO #1, as described in Section 4(H), above. Indeed, Coinmint submitted no evidence to show that any of the payments it made to Katena were in response to anything Katena said or did beyond asking that Coinmint perform as it promised under the SPA and PO #1.

Based upon the foregoing, Coinmint's Section 496(c) claim fails for lack of proof. Accordingly, Coinmint's request for treble damages and an award of attorneys' fees is denied.

---

[83]   *Siry* dealt with the situation where a partnership was formed for the purpose of owning and operating a commercial property that had several tenants. The general partner then surreptitiously formed a new entity and instructed the tenants to pay their rents to that entity instead of the partnership, which he then diverted and used for his and the new entity's benefit. The wrongdoing general partner also paid himself for reimbursement of expenses that were not properly chargeable to the partnership. The net effect was that the wrongdoing general partner received partnership funds through his fraudulent scam and retained those funds through his and the new entity's expenditures. The facts of *Siry* are distinguishable from the facts of this case because there is no evidence to support Coinmint's argument Katena did anything or had the power to do anything to divert funds from Coinmint without its knowledge. Indeed, the evidence showed that the only person authorized to approve the disbursements that resulted in the payments to Katena was Soniat. There was no evidence that any payment Soniat authorized was the product of anything Katena said or did to Soniat. To the contrary, the evidence showed that until the October 15, 2021 dinner meeting, Soniat had no communications with anyone at Katena beyond being copied on emails from time to time – none of which related to Coinmint's incremental payments to Katena.

### C.      Violation of California Business and Professions Code
### Section 17200, et seq.  – Restitution – Eighth Count

As a further follow-on to its fraudulent inducement claim, discussed in Section 7(A), above, Coinmint has asserted a claim for restitution under California Business and Professions Code Sections 17200, *et seq.*, California's Unfair Competition Law (UCL). The UCL requires Coinmint to prove that Katena engaged in an "unlawful, unfair, or fraudulent business act or practice." Although in its Closing Brief Coinmint argued that all three "prongs" of Section 17200 apply and are satisfied, in its operative First Amended Demand Coinmint only pleaded the fraud prong.

For this claim Coinmint alleges that Katena fraudulently represented that "(a) Katena had developed a patented microchip and had the ability to produce the thousands of miners it agreed to deliver to Coinmint; (b) the miners that Coinmint would purchase from Katena were designed by Katena and would be manufactured by the world's leading semiconductor manufacturer, TSMC; (c) Katena had significant clients who had entered into contracts similar to those under discussion with Coinmint; (d) Katena was financed by a large, nationally recognized investment firm, and had the resources to manufacture and deliver thousands of miners to Coinmint; and (e) Katena would use the deposit payment to fulfill its obligations under the contract." Coinmint further alleges that Katena violated Section 17200 "because members of the public were likely to believe that Katena had the capability to develop and produce specialized computer systems to perform Bitcoin mining operations and would use deposit payments for such purposes." First Amended Demand, ¶¶ 102, 103.

Although Coinmint's demand refers to "members of the public," that bare allegation is insufficient to sustain a UCL claim which requires proof that the "public in general" was harmed by the alleged practices. *See, e.g., Rosenbluth Int'l, Inc. v. Superior Court,* 101 Cal. App. 4th 1073, 1077 (2002). Further, as stated in *Linear Tech Corp. v. Applied Materials, Inc.*, 152 Cal. App. 4th 115, 135 (2007), where a UCL action is based on contracts not involving either the public in general or individual consumers who are parties to the contract, a corporate plaintiff may not rely on the UCL for the relief it seeks. *Sacramento E.D.M., Inc. v. Hynes Aviation Indus., Inc.*, 965 F. Supp. 2d 1141, 1155 (E.D. Cal. 2013) (UCL claim arising from plaintiff's business relationship with defendant dismissed where "[n]othing in the Complaint suggests that individual consumers or the public at large were harmed as a result of Defendants' wrongdoing. Because the Complaint, as pled, fails to 'establish the requisite public or individual consumer interest as required under California law,' it fails to state a viable UCL claim. [citation omitted].").

It is abundantly clear from the evidence adduced at the Hearing that the dispute between Coinmint and Katena is a commercial dispute between two sophisticated business entities that does not concern contracts involving the public in general or individual consumers who are parties to the contract. Further, there was no evidence presented to prove harm to the public or individual consumers. Katena does not sell its products to the public. Therefore, Coinmint failed to sustain its UCL claim on the "fraud" prong.[84]

Moreover, even if Coinmint's allegations of Katena's fraudulent conduct were sufficient to prosecute its UCL claim, for the reasons discussed in Section 7(A), the evidence does not support a finding of fraudulent conduct by Katena under any of Coinmint's theories. There is thus no evidentiary basis to find that Katena engaged in fraudulent or anti-competitive conduct.

As noted above, Coinmint also asserted for the first time in its Closing Brief that Katena's conduct violated the "unfairness" and "unlawful" prongs of the UCL, again without leave of the Panel as required under the Rules to add claims. However, since Katena has responded to the arguments, the Panel has treated such arguments as submitted claims.

To satisfy the "unfairness" prong, Coinmint had to prove that Katena's conduct was tethered to an underlying constitutional, statutory or regulatory provision, or that it threatened an incipient violation of an antitrust law, or violated the policy or spirit of an antitrust law. *See, Graham v. Bank of Am., N.A.,* 226 Cal. App. 4th 594, 613 (2014). But Coinmint's arguments rely again on the allegations and arguments it relies on for its fraud and contract claims. Those arguments are not "tethered "to any constitutional, statutory or regulatory provision or have anything to do with antitrust law. The "unfair" prong therefore fails as a matter of law.

For the "unlawful" prong, Coinmint had to prove violation of another law as a predicate for stating a claim under the UCL. *See, e.g., Berryman v. Merit Prop. Mgmt., Inc.,* 152 Cal. App. 4th 1544, 1554 (2007). The only law Coinmint has cited is Penal Code Section 641.3, the commercial bribery statute discussed above. For the reasons already discussed, Coinmint had not proven bribery as defined by that statute. The unlawfulness prong also fails for lack of proof.

---

[84]   To the extent that Coinmint has argued that the "unfair" and "unlawful" prongs of Section 17200 apply to satisfy the UCL, such arguments constitute unpleaded claims that also fail for lack of proof.

Accordingly, Coinmint's request for restitution for violation of Business and Professions Code Section 17200 is denied in its entirety.

### D.   Breach of Contract – Failure to Provide Adequate Assurances – First and Second Counts

#### (1)   First Count for Breach of Contract

In its First Count in its First Amended Demand, Coinmint asserted a claim for breach of contract by alleging that "[a]ccording to Katena, the S&P Agreement and First PO constitute valid, enforceable, written contracts"… "for the purchase and procurement of goods, for which Coinmint tendered partial performance to the tune of approximately $23 million." First Amended Demand, ¶¶ 43, 44. Coinmint further alleged that Katena did not perform its obligations, including "refus[ing] to provide any accounting of itself or its action or to provide any assurance whatsoever that it will be able to fulfill its obligations" and that such "inaction is a breach of the agreement with Coinmint to provide the contracted goods," causing harm to Coinmint. *Id.*, ¶¶ 45, 46, 47.

A cause of action for breach of contract under California law requires proof of these elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff. *Durell v. Sharp Healthcare*, 183 Cal. App. 4th 1350, 1367 (2010).

Coinmint cannot prevail on its First Count for breach of contract. "[A] plaintiff suing for breach of contract must prove it has performed *all* conditions on its part or that it was excused from performance." *Consol. World Inv., Inc. v. Lido Preferred Ltd.,* 9 Cal. App. 4th 373, 380 (1992) (italics added). The second element of the claim – to prove its own performance or excuse for nonperformance -- is demonstrably not satisfied because Coinmint alleges that it "tendered *partial* performance" (First Amended Demand ¶ 44, italics added). This allegation is an admission that Coinmint has not performed "all conditions on its part," and that alone is fatal to its claim. The evidence indisputably confirmed Coinmint's allegation of only partial performance: Coinmint made its first partial payment of $7.5 million on June 28, 2021. Its total payments of approximately $23.4 million through its last payment in October 2021 fell far short of the required $37.5 million that was due within three business days of executing the SPA and PO #1. Exhibit 1201. Further, Coinmint failed to allege or prove any excuse for its failure to fully perform.

The evidence established that Coinmint breached its contract obligation by failing to make the full $37.5 million payment on time, or ever, as discussed in Section 4(H). "One who himself breaches a contract cannot recover for a subsequent breach by the other party." *Silver v. Bank of Am. N.T. & S.A.*, 47 Cal. App. 2d 639, 645 (1941).

Moreover, insofar as this claim asserts a breach for Katena's alleged failure to give "any accounting of itself or its action," it also does not succeed. In its First Amended Demand and in its Closing Brief, Coinmint does not cite to any contractual provision in the SPA or PO #1 requiring Katena to provide an accounting. Indeed, those documents have no such provision. Coinmint therefore has not demonstrated that Katena committed any breach of a contractual provision.

For these reasons, Coinmint's claim for breach of contract fails.

### (2) Second Count for Failure to Provide Adequate Assurance Under Commercial Code Section 2609

In the Second Count of its First Amended Demand, Coinmint asserted another breach of contract claim based upon Katena's alleged failure to respond to a demand under Section 2609 of the California Commercial Code for "adequate assurance" of Katena's performance.

Section 2609 provides as follows:

(1) A contract for sale imposes an obligation on each party that the other's expectation of receiving due performance will not be impaired. When reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return.

(2) Between merchants the reasonableness of grounds for insecurity and the adequacy of any assurance offered shall be determined according to commercial standards.

(3) Acceptance of any improper delivery or payment does not prejudice the aggrieved party's right to demand adequate assurance of future performance.

(4) After receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract.

Coinmint alleged that on January 4, 2022, Coinmint's prior counsel sent Katena's counsel an "Express Written Demand for Adequate Assurance Under Cal. Com. Code Section 2609" (the "Demand"), contending that when it made the Demand it had obtained information revealing that Katena was not using Coinmint's $23 million in payments to satisfy the intended purpose of the PO #1 to build a prototype and reserve the purchase of K 10 miners. First Amended Demand, ¶¶ 55, 56. Coinmint also alleged that more than thirty days had passed since the Demand, and that Katena had not provided assurance of its performance and "has refused to supply any documentation related to the use of the $23 million deposit." *Id.*, ¶¶ 57, 58, 59. It further alleged that pursuant to Section 2609, it considered that Katena had breached the terms of the agreements and Coinmint was entitled to repudiation of the agreements and a refund of the $23 million it paid Katena. *Id.*, ¶¶ 59, 60.

The evidence established that Coinmint's prior counsel, Stephen Doyle, sent Katena's counsel, Joseph Cutler, the Demand on January 4, 2022, seeking a response by Katena in 10 days. Exhibit 1169, p. 4. Cutler testified at the Hearing that he had discussed the Demand with Doyle and had requested its withdrawal. After that conversation, on January 13, 2022 (before the 10-day deadline stated in the Demand), Doyle sent Cutler an email stating that "you do not need to send a written reply to my letter of January 4th while we explor[e] the possibility of a settlement." Exhibit 2196. After the January 13th email, neither Doyle nor any other representative of Coinmint requested that Katena respond to the Demand, renewed the Demand, or issued a new demand for adequate assurances.

Coinmint contended in its Closing Brief that the Demand had been preceded by an earlier demand for adequate assurance through an email from Soniat to Monzon dated November 4, 2021, asking "(1) Are the funds in an escrow account; and, (2) if the funds are not escrowed, please explain how the funds are being used." Exhibit 68. Soniat's email was not expressly referenced in the Demand.[85] *See* Exhibit 1169. Monzon responded to Soniat's email on the same day, stating "[w]e don't have escrow obligations with Coinmint pre-order deposits. Our intention has been to support you/Coinmint from the start of this

---

[85] Cutler testified that in the course of his correspondence with Doyle, he was not aware of Soniat's November 4, 2021 email to Monzon and that in their discussions they "didn't focus on" the statement in the January 4th letter that Coinmint had made prior requests for adequate assurance that Katena had ignored. RT 1243:20-1244:25. Doyle was not called to testify.

engagement, vs going a different route. That intention remains if you're on the same page." Exhibit 2184**.** Soniat did not reply to Monzon's email. The next communication on this subject was Doyle's January 4th letter, discussed above.

Coinmint further contended that Monzon's response did not address Soniat's second question as to how Coinmint's money was being used, and therefore, "[a]t that moment, and by operation of law, Katena repudiated the contract and was in breach," citing California Commercial Code Section 2609(4). Coinmint Closing Brief, p. 54. Coinmint has argued that "reasonable grounds for insecurity abounded" because of Monzon's response and because Coinmint, in making payments, had been operating under certain assumptions that the original pricing and payment terms had been modified, but had learned at the October dinner that Monzon and Gao were of the view that the contract had never been modified. *Id.* at p. 53.

Coinmint's breach of contract claim based on Section 2609 fails. First and foremost, as discussed with respect to Count 1, Coinmint was in breach of the SPA and PO #1 for failing to timely make the required $37.5 million down payment within three business days of execution. A party in breach of a contract is not entitled to invoke UCC Section 2-609[86] by demanding assurances. *See, e.g., Hope's Architectural Prods., Inc. v. Lundy's Constr., Inc.,* 781 F. Supp. 711, 715-16 (D. Kan. 1991) (seller who was in breach due to late delivery of goods who sought adequate assurances from buyer was not entitled to invoke Kansas' version of Cal. Comm. Code § 2-609; "[to] hold otherwise would allow a party to avoid liability for breaching its contract by invoking 2-609 to extract from the nonbreaching party an assurance that no damages will be sought for the breach."); *Advanced Bodycare Solutions, LLC v. Thione Int'l Inc.,* 613 F. 3d 1352, 1361 (11th Cir. 2010) (party already in breach was held not entitled to invoke Georgia version of Cal. Comm. Code § 2-609 to seek adequate assurances, following *Hope's*). Accordingly, Coinmint cannot sustain this claim for relief.

Moreover, Coinmint's burden on this putative claim demands that it prove that it had "reasonable grounds for insecurity" as required under Section 2609(1). Whether a buyer such as Coinmint had reasonable grounds for insecurity is a question of fact. *SPS Industries, Inc. v. Atlantic Steel Co.,* 366 S.E. 2d 410, 414 (Ga. App. 1988). As stated above, Section 2609(2) requires that "the reasonableness of grounds for insecurity . . . *shall be determined according to commercial standards."* (Italics added.) Coinmint has provided argument but failed to produce any evidence of the commercial standards required by statute by which to measure whether Coinmint had reasonable grounds for insecurity

---

[86]    Cal. Comm. Code 2609 is California's adoption of the Uniform Commercial Code Section 2609. The cited cases discuss other states' adoption of UCC Section 2609 which are substantially identical to Cal. Comm. Code Section 2609 and are persuasive authority.

when Doyle sent the January 4th demand letter or when Soniat sent his November 4th email. Accordingly, even if Coinmint were not in breach of the contract, it did not sustain its burden in this regard.[87]

Concerning Doyle's January 4th demand letter, the undisputed evidence established that Coinmint withdrew the demand for assurances before the stated 10-day deadline. Therefore, it cannot be a basis to support Coinmint's breach of contract claim in the Second Count.

Soniat's November 4th email also is insufficient to establish the claim. That email only requested information as to whether Coinmint's funds were in an escrow account and, if not, how they were being used. It did not **(a)** set a deadline for a response, **(b)** use the term "adequate assurances," **(c)** identify concerns about Katena's performance, or **(d)** reference Section 2609. While the statute does not require any particular language, the November 4th email did not rise to the level of a required writing under the statute reflecting stated grounds for insecurity. In this regard, *SPS Industries* is instructive. The defendant buyer in that case had sent a letter to the seller after a failure to meet delivery dates of the product, stating in part that it was "imperative" that the seller provide the information that the buyer had orally requested the prior week on the subject orders and that an "immediate response is expected." *SPS Industries,* 366 S.E. 2d at 411. Referencing the Georgia version of UCC Section 2-609(1) and (2), the court stated:

> "Reviewing the record, we can find no evidence showing the reasonableness of grounds for insecurity on August 6, 1979, by any objective standard. … Obviously, defendant's letter meets the requirement of a writing. We are not convinced, however, that the letter demanded adequate assurance of performance. It would appear that the letter was nothing more than a request for information. [citations] At any rate, it cannot be said that the letter constituted a demand for adequate assurance as a matter of law."

*Id.* at 413-414. So, too, Soniat's email of November 4 was a request for information, not a demand for adequate assurance of Katena's performance, especially considering that Coinmint was in breach of its obligations.

---

[87] Based upon DeNaut's testimony concerning the credit facility that was available to Katena customers through Blockchain.com, Coinmint did not have a reasonable basis for concern about Katena's ability to perform. Katena and the feasibility of the K 10 mining rig had been vetted by Blockchain.com and it had agreed to provide customer financing for customers green-lighted by Katena, provided that such customers could provide financials and satisfy Blockchain.com's financing requirements. According to DeNaut, Coinmint had not yet generated useable financial statements.

Based upon the foregoing, Coinmint's breach of contract claim predicated upon Section 2609 is denied.

Finally, even if the Panel had found that Katena breached the SPA and PO #1, Coinmint presented no evidence of damages resulting from the alleged breach. Instead, in its Closing Brief, Coinmint suggested that the Panel should divine a "proper damages award" based upon "the Panel's good judgment and equitable sense." Coinmint Closing Brief, p. 60. Coinmint then suggests, as "a reasonable compromise," that the Panel determine Coinmint's damages to be the amount it paid to Katena under the SPA and PO #1, "with interest calculated from the day Katena attempted to 'cancel' the [SPA.]" Coinmint provided the Panel with no authority for this approach to computing breach of contract damages. Coinmint's argument / suggestion is the equivalent of the type of relief that would be awarded for restitution or rescission. As discussed in this Section 8, the Panel determined that these claims for relief fail for lack of evidence.

### E.    Breach of Contract – Breach of An Alleged Modification of PO #1 – Unpleaded Claim for Relief

Even though Coinmint did not assert a breach of contract claim based upon an alleged modification or amendment of PO #1 in its original or amended demands, it has submitted an argument to that effect in its Closing Brief. Since Katena has responded to the argument, the Panel has treated Coinmint's breach of an alleged amended PO #1 as a submitted claim.

While there was evidence of discussions between Coinmint (through Maloney and DeNaut) and Katena (through Monzon and Gao) of some sort of an amendment to PO #1, **(a)** Monzon and Gao testified that Katena never accepted any of Coinmint's proposals, **(b)** DeNaut testified that he and others searched Coinmint's records looking for a written amendment and found none, and **(c)** while Maloney sent an email to Soniat and DeNaut on June 10, 2021 with the subject line "Katena Negotiation Summary," no evidence was presented to show that Maloney ever confirmed any of the stated items with anyone at Katena or that Katena acknowledged or accepted same. To the contrary, the evidence shows that in late July 2021, Soniat had been informed by Maloney that the negotiations with Katena had not been finalized.[88]

---

[88]    In a July 28, 2021 email from Schneider to Soniat concerning the backup documentation for the $7.5 million paid to Katena, Schneider reported that, according to Maloney, Maloney was "in the process of negotiation (sic) a new price, contract, purchase order, etc and we should have it shortly." Exhibit 63. Maloney responded to Schneider and Soniat that he had "not finalized negotiations as we have not secured financing yet." *Id.*

The evidence of Coinmint's actions also countermands the existence of any sort of an amendment of PO #1. For example:

a.    Maloney spoke to Gao on June 11, 2021 - the day after Maloney sent his "Katena Negotiation Summary" email to Soniat and told him that Soniat had not signed off on any amendment. RT 941:12–942:13. Gao passed that communication on to Monzon in a WhatsApp message that same day. Exhibit 57, p. 2.

b.    Coinmint made a submission to the Governor of New York on June 22, 2021, in which it reported that Coinmint owned or was on track to own $150 million worth of Bitcoin mining rigs during calendar year 2021. Exhibit 67, p. 2.

c.    On June 25, 2021, Coinmint made a $7.5 million payment to Katena.[89] Exhibit 1201.

d.    On July 8, 2021, Kathleen Schneider sent an email to Maloney that was copied to Soniat and attached a PDF of the signed PO #1 and asked about how to book the $7.5 million payment that had been made to Katena on June 25, 2021. Exhibit 2091.

e.    On July 8, 2021, in response to the email discussed in paragraph (d), above, Maloney sent an email that was copied to Soniat in which he wrote: "The PO was for $37.5mm, which is 25% of $150mm. We only paid the first $7.5mm because they gave us an extension and we are currently renegotiating pricing and delivery." Exhibit 2091.

e.    On September 2, 2021, Coinmint made several transfer payments to Katena totaling approximately $6.4 million. Exhibit 1201.

f.    On October 4, 2021, Coinmint made a $4,789,549 payment to Katena. Exhibit 1201.

[89]    DeNaut (as well as Maloney) testified that Soniat was the only one at Coinmint who had authority to authorize the $7.5 million payment to Katena or, indeed, any of the payments Coinmint made to Katena. Soniat did not deny or dispute DeNaut's testimony.

Case 3:23-cv-04683-RS   Document 43-1   Filed 04/01/24   Page 77 of 110



g.     On October 15, 2021, Coinmint made a $3,000,000 payment to Katena. Exhibit 1201.

h.     On October 25, 2021, DeNaut sent an email to Soniat in which he stated "but remember that we are already paying off an agreed contract. So we will need agreement by both parties to make changes." Soniat responded that same day with an email in which he stated, "Agreed but timing is everything." Exhibit 2156.

i.     On October 26, 2021, Coinmint made a $620,524 payment to Katena (which was its last payment). Exhibit 1201.

Based upon the foregoing, Coinmint's breach of contract claim based on an alleged amendment to PO #1 fails because **(a)** the SPA at Section 16 expressly states that the SPA "along with all Purchase Orders" can only be amended with "the written consent of both Parties or otherwise as mutually agreed by both Parties," **(b)** no evidence was provided of a written consent or other agreement by Katena to any sort of an amendment, and **(c)** Coinmint's actions – especially its significant incremental payments over a four-month period - are inconsistent with the allegation that PO #1 was amended in any way. DeNaut's testimony about Soniat tasking him with responsibility to find money within Coinmint or through outside financing to pay PO #1 contradicts the amendment argument Coinmint advanced in these proceedings.[90]

### F.     Breach of the Covenant of Good Faith and Fair Dealing – Seventh Count

Coinmint's Seventh Count seeks damages for Katena's alleged breach of the covenant of good faith and fair dealing, which is tied to the SPA and PO #1. In support of this claim, Coinmint argued that Katena's bad faith and unlawful conduct "frustrated the purpose and spirit of the contract and deprived Coinmint of the benefit of the bargain." Katena's alleged wrongful conduct was **(a)** its demand that Coinmint make the entire $37.5 million down payment without providing an accounting or a prototype miner, and **(b)** its termination of the SPA and PO #1 without refunding Coinmint's partial payments. First Amended Demand, ¶ 97.

---

[90]   The Panel observed that even with the sophisticated assistance of DeNaut, Coinmint was unable to complete its application for $50 million in financing for the Katena deal because Coinmint's financial records were apparently in such disarray that it was unable to produce the requisite financial statements.

70

Coinmint did not establish any breach of the implied covenant. Seeking compliance with the terms of an agreement does not violate the duty of good faith and cannot give rise to such a claim because "there can be no implied covenant where the subject is completely covered by the contract." *Third Story Music, Inc. v. Waits,* 41 Cal. App. 4th 798, 804 (1995) (quoting *Lippman v. Sears, Roebuck & Co.*, 44 Cal. 2d 136, 142 (1955)). The implied covenant cannot "be read to prohibit a party from doing that which is expressly permitted by an agreement" or to "vary express terms" of the agreement. *Carma Devs. (Cal.), Inc. v. Marathon Dev. Cal., Inc.*, 2 Cal. 4th 342, 374 (1992) ("*Carma*"). As discussed in Section 8(A), below, Coinmint signed a contract obligating it to pay Katena $37.5 million within three business days. It did not perform that contractual obligation(nor was it excused from performance) and was thus in material breach of the SPA and PO #1. Coinmint's material breach excused Katena's performance and barred Coinmint's claim for breach of the implied covenant. To rule otherwise would impermissibly use the implied covenant to vary the express terms of the Agreement. *See Carma*, 2 Cal. 4th at 374.

Coinmint had no contractual right to receive a prototype before it made the complete down payment and Katena had no obligation (express or implied) to deliver a prototype because Coinmint did not meet its down payment obligation. Coinmint's request for an accounting is premised on the notion / assumption that Katena was holding Coinmint's funds in escrow, but Coinmint expressly negotiated away any escrow requirement. As such, Coinmint had no right to an accounting and Katena had no obligation to provide one. *Teselle v. McLoughlin*, 173 Cal. App. 4th 156, 179 (2009) ("An action for accounting is not available where the plaintiff alleges the right to recover a sum certain."). Furthermore, Coinmint's argument that Katena demanded payment "while refusing to provide an accounting" is factually unsupported by the evidence. The evidence showed that Coinmint first requested an accounting through its attorney in January 2022 (Exhibit 1169), which was three months after Coinmint's last partial payment to Katena was delivered in October 2021. *See* Exhibit 1201. Coinmint had no right to demand or expect the return of its partial payments towards the initial down payment because it expressly agreed that "[d]own payment and payment of Total Purchase Price are not refundable, save as otherwise mutually agreed by the Parties," and "[a]ll sums paid by [Coinmint] to Katena shall not be subject to any abatement, set-off, claim, counterclaim, adjustment, reduction, or defense for any reason." Exhibit 51, ¶ 2.1. The implied covenant cannot be used to vary these express terms of the SPA. *See, e.g.*, *Bevis v. Terrace View Partners, LP*, 33 Cal. App. 5th 230, 256–57 (2019).

Pursuant to paragraph 12.2 of the SPA, Katena had express contractual rights to **(a)** terminate the SPA and PO #1 and **(b)** retain Coinmint's partial payments. Pursuant to paragraph 12.2 of the SPA, Katena had the contractual right to terminate the SPA "with immediate effect upon written notice to the Purchaser" because Coinmint "fail[ed] to comply in any material respect of this Agreement, and, where that failure is capable of being remedied, fail[ed] to remedy it within thirty (30) days of being notified by Katena to do so." Exhibit 51, ¶ 12.2(i)). Again, the implied covenant cannot be used to vary these express terms of the SPA.

Finally, at its core, the disputes between Coinmint and Katena are contractual in nature. While Coinmint's keynote claims sound in tort, the relief Coinmint seeks is to be relieved from its obligations under the SPA and PO #1. A breach of the implied covenant of good faith and fair dealing involves something more than a breach of a contractual duty. *Careau & Co. v. Security Pacific Business Credit, Inc.*, 222 Cal. App. 3d 1371, 1394 (1990). It involves unfair dealing in the form of a conscious and deliberate act that unfairly frustrates the agreed common purpose of the contract and disappoints the reasonable expectations of the other party to the contract. *Id.* at 1395. "If the allegations do not go beyond the statement of a mere contract breach and, relying on the same alleged facts, simply seek the same damages or other relief already claimed in a companion contract cause of action, they may be disregarded as superfluous as no additional claim is actually stated." *Id.*

There is no real difference between the relief sought by Coinmint through its rescission claims and the relief sought through its breach of the implied covenant of good faith and fair dealing claim. Accordingly, this claim for relief is redundant and is subsumed within Coinmint's rescission claim, which has been denied for the reasons stated above.

Moreover, Coinmint did not put forth evidence of damages for breach of contract or breach of the implied covenant in terms of the benefit of the bargain it anticipated by entering into the SPA and PO #1. Damages are required to be proven for both causes of action.

For the foregoing reasons, Coinmint's claim for breach of the implied covenant of good faith and fair dealing is denied.

### G.     Unjust Enrichment – Fourth Count

Coinmint did not include in its Closing Brief any argument or presentation of any evidence in support of its claim for unjust enrichment. Accordingly, this claim is deemed withdrawn and is also denied for lack of proof.

The Panel notes that Coinmint has argued as a theme throughout this case that it paid $23.4 million to Katena and "received nothing in return" – and so Katena was unjustly enriched at Coinmint's expense. Coinmint ignores the fact that it breached the contract by not timely (or ever) fulfilling its contractual financial obligation to make an initial down payment to Katena in the amount of $37.5 million, as discussed in Section 9(A). Coinmint was well aware that Katena was a start-up and needed the contracted amount in order to place the order with the foundry, TSMC, for manufacture of the chips central to the K 10 miners. Coinmint also was aware that its payments were not refundable under the SPA (except for limited circumstances concerning late delivery by Katena and even then with certain conditions being met). When Coinmint breached its obligation to timely pay $37.5 million within the specified time period, it became liable for liquidated damages to Katena equal to that amount. What Coinmint received in exchange for the incremental payments it made to Katena was not "nothing in return" but rather credit towards its liquidated damages obligation.

### H.     Money Had and Received – Sixth Count

Coinmint did not include in its Closing Brief any argument or presentation of any evidence in support of its claim for unjust enrichment. Accordingly, this claim is deemed withdrawn.

Further, the Panel notes that money had and received is a common count generally premised on the lack of a valid contract. Such a claim for relief is not available here because both parties have acknowledged that they executed the SPA and PO #1.

### I.     Request for Award of Attorneys' Fees and Costs

The only argument Coinmint advanced in support of its request for an award of attorneys' fees and costs was in connection with its civil theft claim under Penal Code Section 496. Since that claim has been denied, there is no basis to award Coinmint attorneys' fees or costs. In this regard, the Panel notes that neither the SPA nor PO #1 contain an attorneys' fees clause.

*9.*     ***Rulings on Katena's Submitted Counterclaims***

*A.*     ***Breach of Contract Claim***

*(1)*     ***Coinmint Breached the SPA and PO #1 by Not Performing Its Financial Obligations Under PO #1***

As stated earlier, "A cause of action for damages for breach of contract is comprised of the following elements: (1) the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to plaintiff." *Durell v. Sharp Healthcare*, *supra,* 183 Cal. App. 4th 1350 at 1367 (emphasis omitted).

The existence of the SPA and PO #1 are not disputed. The evidence shows that an agreement for the purchase and sale of K 10 mining rigs was negotiated and written up by Maloney (for Coinmint) and Monzon (for Katena), both with the assistance of legal counsel, and then signed by Soniat (for Coinmint) and Monzon (for Katena).[91]) *See* Exhibits 2046, 2047, 2048 and 2049. While the evidence showed that, internally, Monzon and Gao were anxious to get the deal with Coinmint signed up, there was no evidence that anyone at Katena did anything to pressure Soniat to sign the SPA or PO #1. Indeed, the evidence showed that there was no contact or communication at all between Soniat, on the one hand, and anyone at Katena, and that on May 13, 2021, Soniat was hosting a management team meeting in Puerto Rico where he was surrounded by his executive team (Maloney, DeNaut, Guiol and Schneider) and had phone access to his in-house counsel (Foret).

---

[91]   In his testimony, Soniat did not deny that he signed the SPA and PO #1. He did, however, testify that he did not understand that he was signing a binding contract; that he thought he was signing a nonbinding letter of intent (LOI). (Although DeNaut testified that he thought that Coinmint had entered into a term sheet, in May 2021 he was not given access to the documents signed.) Soniat also testified that he did not know that a binding contract had been put in place between Coinmint and Katena until just before a dinner with Monzon, Reddy and Gao on October 15, 2021. This testimony was not credible for several reasons, most notably the testimony of DeNaut who testified that he became aware of the existence of the SPA and PO #1 – and of Coinmint's obligation to make an initial payment of $37.5 million – in late June 2021, *and* that Soniat tasked him at that time with finding the money within Coinmint or through outside financing to fund Coinmint's obligations under PO #1. DeNaut's testimony was corroborated by several emails and WhatsApp exchanges regarding the need to pay Katena that included Soniat. *See* Exhibits 80, 88, 92, 95, 128, 130 and 136. Moreover, (a) no other witness corroborated Soniat's LOI testimony and it was obvious from the very titles of the two documents he signed via DocuSign – "Sales and Purchase Agreement" and "Purchase Order" -- that they were not intended to be nonbinding LOIs and (b) in June 2021, Coinmint made a presentation to the Governor of New York in which it represented that in 2021 it had purchased $150 million of Bitcoin mining equipment and intended to purchase another $375 million over the next three years. *See* Exhibit 67, p. 2.

Soniat's testimony that he did not read the SPA or PO #1 before signing, and was thus unaware of the creation of a purchase obligation by Coinmint to Katena, is of no legal effect. It was undisputed that Soniat is the only one at Coinmint who was authorized to sign agreements such as the SPA and PO #1 that created Coinmint to pay money.[92] Soniat's signature constitutes a manifestation of assent on behalf of Coinmint regardless of whether Soniat chose to read the documents before signing them. *Stewart v. Preston Pipeline, Inc.*, 134 Cal. App. 4th 1565, 1589 (2005 ("[A] party who fails to read a contract but nonetheless objectively manifests his assent by signing it" may not "later rescind the agreement on the basis that he did not agree to its terms."); *see also Dhaliwal v. Ace Hardware Corp.*, 2023 WL 2555471, at *5 (E.D. Cal. Mar. 17, 2023) (an electronic signature is evidence of "objective manifestation of assent to the terms" of a contract by signatory who did not recall reading or signing it).

As discussed in Section 3(H), above, the parties' respective obligations under PO #1 are clear and unconditional. Coinmint agreed to purchase and Katena agreed to deliver $150 million worth of K 10 mining rigs (approximately 27,780 units) over an approximate six-month period, subject to a defined payment and delivery schedule. *See* Exhibit 2047, p 3. To get the production process[93] started, Coinmint agreed to pay 25% of the total purchase price ($37,500,000.00) up front within three business days of signing PO #1. *Id.*, p. 2. It is undisputed that Coinmint failed to make that payment within three business days or ever, as promised, understood, and necessary to get the Katena K 10 chips into production.

Unless and until Coinmint satisfied its initial funding obligation, Katena had no obligation to perform under the SPA or PO #1. In this regard, the evidence showed that

---

[92]   Additionally, just one day before Soniat signed the SPA and PO #1, he was copied on Maloney's email to Monzon to which Maloney attached a redline of PO #1 increasing Coinmint's purchase from $100 million to $150 million. Exhibit 2037. After the fact, before the October 15th dinner meeting with Katena's principals, Soniat emailed DeNaut, Kinney and Guiol – Soniat's inner circle – and told them he wanted to find a "path to keeping the Katena order whole," and wanted "to keep the deal." Under these circumstances, it is not plausible that Soniat did not know about Coinmint's $150 million purchase commitment to Katena before the October 15th dinner meeting.

[93]   The evidence was undisputed that at the time the SPA and PO #1 were signed, the expected payoff and profit function for Bitcoin mining was high, especially where the cost of electricity to power the mining rigs was low and the efficiency of the mining rig was high. *See* Mordecai Report, Exhibit 1193, pp. 14-18. Dr. Mordecai's opinions were not rebutted or impeached. The evidence was also undisputed that the COVID pandemic created severe disruptions in the semiconductor supply chain, meaning longer wait times for deliveries and higher prices for chip manufacturing. *See* Exhibit 1181, pp. 14-16. It was undisputed that Coinmint did not have a lot of options in terms of sources from whom it could purchase the mining rigs necessary to implement its plan to increase its self-mining operations to increase revenues to the point of being able to go public, sell the company, or attract a mergers and acquisitions partner.

Reddy and his engineers and his contacts at IMEC and TSMC were standing at the ready to put the Katena K 10 chip into production, but Coinmint's initial 25% payment had to be paid to Katena before Katena would be able to show TSMC that it had readily available funds to cover the cost of production so that TSMC would commit production space to the K 10 wafers.

> *(2)* ***Coinmint Breached Its Representations and Warranties Under the SPA that It Had the Power to Perform Its Financial Obligations Under the SPA and the Resulting PO #1***

In some ways, Coinmint caused the problems of which it now complains because it did not have the financial wherewithal to perform the financial obligations it put in motion by signing PO #1, but represented otherwise to Katena during the negotiations. In a May 4, 2021 WhatsApp message exchange between Gao and Monzon, Gao reported the following:[94]

> "Interesting call with Mike from Coinmint
> He tells me that fowling {*sic*]
> Following
> CEO is signed off on $60/th, $100M order
> **They have cash in hadn [*sic*] to pay the down payment**
> CEO has already been briefed on Katena
> …"

Exhibit 37, pp. 37-31 to 37-32 (bold added).

At the Hearing, Maloney was questioned about the statements attributed to him by Gao in the above-quoted WhatsApp message. Maloney confirmed that Soniat signed off on the $100 million purchase transaction with Katena, but did not recall if Soniat had actually stated to him that Coinmint had the cash in hand for the down payment. However, Maloney testified that it was his belief that Coinmint had the ability to fund its financial obligations. In this regard, Maloney testified that:

> "At this time, we had north of ten million dollars cash in the bank, and we had been paying down Soniat's owner controlled debt. We had another sixty million paid back to Soniat and we knew we could draw down on that if we needed to."

---

94  Each line is a separate message "bubble" from Gao.

Maloney also testified that during the management team meeting in Puerto Rico in May 2021, the management team (including Soniat) "was confident that we would be able to pay" the amounts due under PO #1; that "Soniat had received a large amount of money from the company – more than he had put in. Comfortable with the new team. Confident we could raise external money." Maloney further testified that during the management team meeting, Soniat had agreed to fund the entire amount of the down payment if necessary. However, the evidence submitted at the Hearing showed that Coinmint intended to raise money externally by attempting to interest its co-hosts / customers to participate in the mining rig purchase in that Maloney drafted a flyer for that purpose, as Soniat's instruction, the day after Soniat signed the SPA and PO #1. *See* Exhibit 52. Such solicitation for a possible investment by third parties is not the equivalent of "cash in hand." Similarly, the fact that Maloney believed that Soniat had sufficient cash reserves and was willing to invest his own money for Coinmint's purchase is not "cash in hand." That Soniat was aware of the fact that Coinmint did not have the cash in hand to fund its financial obligations was confirmed by Soniat himself, who testified that Coinmint did not have "anywhere close to $37.5 million in liquid assets at that time." RT 423:10-12.[95]

The information conveyed by Maloney to Gao on May 4, 2021 (Exhibit 52) also violated the express representations and warranties Coinmint made to Katena when Soniat signed the SPA. In Section 7 of the SPA, Coinmint – as "Purchaser" – made the following relevant representations and warranties to Katena:

> "7.2   The obligations expressed to be assumed by [Purchaser] under this Agreement are legal, valid, binding and enforceable obligations.

> 7.3   [Purchaser} has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement….

---

[95]   Soniat also testified that he did not authorize Maloney to represent to Katena that Coinmint had "anything close to $37.5 million available to it as of early May 2021 'cause it wouldn't be true." RT 438:25-439:1. The more credible testimony was that of Maloney, the person Soniat charged with responsibility for handling all direct negotiations with Katena with instructions to get a deal done for the purchase of mining rigs so that Coinmint could pursue self-mining. Maloney testified that he reported everything to Soniat and that he "socialized" with (*i.e.*, reported back to) the entire team about his negotiations with Katena. Additionally, Maloney was the CFO of Coinmint and had ostensible – if not actual – authority to make representations to Katena about Coinmint's ability to perform. Given the size of the purchase transactions and its importance to Katena, it is more likely than not that these types of discussions occurred between Maloney, on the one hand, and Gao and Monzon, on the other, just as Maloney testified and as Gao's WhatsApp message to Monzon reflects.

. . .

7.8    All information supplied by the Purchaser, including the KYC Information, is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading."

Based upon the evidence submitted at the Hearing, while Maloney (for Coinmint) told Gao that Coinmint had "cash in hand" to pay the down payment of $37.5 million within three business days, in fact, as Soniat confirmed in his testimony at the hearing, that was not true. Coinmint did not have sufficient funds on hand due, in part, to the fact that Coinmint had used its cash reserves to repay Soniat on his loans to the company. The information conveyed by Maloney to Gao on May 4, 2021, as confirmed by Soniat when he signed the SPA and PO #1 on May 13, 2021, was not true and thus violated the express representation and warranty set forth in paragraph 7.8 (quoted above). Soniat knew what Coinmint's financial circumstances were on the day he signed the SPA and PO #1, and he knew when he signed PO #1 on May 13, 2021 that Coinmint – then and there – incurred a financial obligation to Katena to fund a down payment three business days later in the amount of $37.5 million, notwithstanding that the SQO had not yet been vacated. Without Soniat contributing his personal capital to Coinmint to fund the purchase or Coinmint finding an external source of financing, Coinmint would not be able to perform as promised. And when that is what happened. Soniat was unwilling to contribute or loan monies to Coinmint and Coinmint's co-host customers were not interested in participating in the purchase of the K 10 mining rigs.

//
//
//
//
//
//
//

---

[96] According to DeNaut, even after months of working with Coinmint in an effort to get its books in order so that it could produce proper financials to support a financing request to Blockchain.com, DeNaut was unable to do so because Coinmint's financial records were in such disarray. As such, it is reasonable to infer that in May 2021, when Soniat signed the SPA and PO #1, it was not reasonable for Soniat to think that Coinmint could find an external source of funding from an institutional lender or outside investor, and it had no basis for believing that its co-host customers would be interested in participating in the purchase.

***(3)     The Liquidated Damages Provision of the SPA is Enforceable***

The SPA includes a liquidated damages provision, which provides as follows:

> "If the Purchaser fails to comply in any material respect of this Agreement, Katena will have the right to request and the Purchaser will be obliged to pay to Katena liquidated damages (but not a penalty) for such breach in the amount of 100% of any down payment specified in each Purchase Order. Both Parties acknowledge and agree that the amount of liquidated damages set out in this Clause is agreed as a genuine estimate of the losses which may be sustained by Katena in the event that the Purchaser fails in its respective obligations under this Agreement, and not as a penalty."

Exhibit 2049, ¶ 12.4.

Coinmint has argued that the liquidated damages provision in the SPA does not apply to the PO #1 transaction because PO #1 does not describe any of Coinmint's payment obligations as a "down payment." Instead, PO #1 describes Coinmint's payment obligations as "Payment 1," "Payment 2," Payment 3" and "Payment 4. Exhibit 51, p. 2/4. This semantic argument fails because both parties understood and referred to Coinmint's first payment of $37.5 million as a "down payment." Irrespective of the nomenclature used in PO #1, the evidence is clear that the parties understood that Coinmint's first payment obligation under PO #1 was a down payment because Monzon and Gao referred to it as such. Exhibit 37, p. KATENA006617. Also DeNaut, who was the person charged with finding the money for Coinmint to perform its financial obligations under PO #1, testified that he understood that Katena was a start-up and needed the initial $37.5 million payment as a "down payment to make the wafer order," and that because Katena never received the $37.5 million down payment, Katena was unable to place the wafer order for the ASIC chip for the K 10 miner. Under the facts and circumstances of this case, it is reasonable to construe Coinmint's "First Payment" obligation under PO #1 as "down payment" for purposes of fixing Coinmint's downside risk should it fail to perform. Additionally, treating the "First Payment" obligation as a "down payment" is consistent with how the term is generally used and understood in financial transactions where a "down payment" is the "initial payment of a portion of a purchase price, paid by a buyer to a seller, upon the execution of a sale agreement."[97]

---

[97] Cornell Law School Legal Information Institute, https://www.law.cornell.edu/wex/down_payment#:~:text=A%20down%20payment%20is%20an,for%20purposes%20of%20this%20definition).

Here, the evidence shows that Coinmint's "First Payment" obligation under PO #1 had to be performed as promised in order for the K 10 mining rigs to move forward to production, *and everyone knew that at the outset of negotiating the deal.*

- On May 13, 2021, Soniat signed a $150 million contract to buy Bitcoin mining rigs from Katena. *See* Exhibits 41, 2046, 2047, 2048 and 2049.

- The signing of the SPA and PO #1 occurred after extensive discussions amongst Coinmint's Management Team regarding: **(a)** the need for Coinmint to increase its self-mining operations in order to increase its profitability, and **(b)** the need to find a mining rig supplier who could meet its timing and budgetary needs.

- The signing of the SPA and PO #1 occurred after the parties exchanged drafts and redlined comments. While on May 8, 2021 Maloney (for Coinmint) made numerous redline changes to the SPA and PO #1, *no changes whatsoever were made to the liquidated damages provision.* Exhibit 2033, p. 12. The evidence shows that on May 12, 2021, Maloney returned to Monzon and Gao a second redline of PO #1 which increased the total purchase price from $100 million up to $150 million, and that Maloney's email was copied to Soniat. Exhibit 2037. While the down payment was reduced from 50% down to 25% of the total purchase price in Maloney's first redline (Exhibit 2044, p. 2/4), the down payment amount was increased from $25,000,000.00 to $37,500,000.00 due to the increase in the purchase price.[98] *Id.,* p. 1/4.

- From day one, Coinmint fully understood its financial undertaking and obligations to Katena under the SPA and PO #1, as evidenced by the fact that **(a)** Maloney created flyers for distribution to Coinmint's mining tenants at the Massena Facility inviting them to participate in the acquisition as a way to create internal "financing" for the transaction (Exhibits 52 and 54), **(b)** DeNaut testified that he was tasked by Soniat with the job of doing due diligence on Coinmint's

---

[98]   There was no evidence of any negotiation between Coinmint and Katena regarding the increase in the total purchase price. To the contrary, because Gao expressed surprise about the increase in the total purchase price set forth in the second redline, the inference drawn by the Panel is that Coinmint, through Soniat, made that decision independent of any communications or negotiations with Katena.

finances to find money within Coinmint that could be used to fund the deal and that he performed that "clerical" role for several months, and **(c)** DeNaut testified that he worked on trying to secure $50 million in outside financing from Blockchain.com through its customer financing relationship with Katena.

In general, liquidated damages provisions specify a predetermined amount of money that must be paid as damages if one party fails to perform its contractual obligations. *See ABI, Inc. v. City of Los Angeles,* 153 Cal. App. 3d 669, 685 (1984) ("*ABI*"); *Better Food Markets, Inc. v. American District Telegraph Company*, 40 Cal. 2d 179, 184 (1953); *see also* McCormick on Damages, § 146 (1935). The ultimate purpose of a liquidated damages provision is to allow the parties to agree, at the outset of their relationship, on a fair and reasonable estimate of damages that might otherwise be difficult or impossible to calculate. *ABI*, *supra,* 153 Cal. App. 3d at 685. From this vantage point, a liquidated damages provision is intended to benefit both parties by defining the downside risk of nonperformance at the outset so as to eliminate the need to spend time and resources to calculate actual damages.

Coinmint has objected to the award of liquidated damages to Katena based upon the argument that a liquidated damages provision is generally viewed as a penalty and thus denied enforcement. Coinmint Closing Brief, p. 64. In this regard, Coinmint cited *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*, 9 Cal. 3d 731, 739 (1973) ("*Garrett Case*"). The Garrett Case was superseded by statute when, in 1978, the California Legislature "amended section 1671 to express a new policy favoring the enforcement of liquidated damage provisions except against the consumer in a consumer case." *ABI*, *supra*, 153 Cal. App. 3d at 684-685. Given this statutory development and the reported cases that have since followed (some of which are discussed above), the general premise of Coinmint's argument is incorrect as a matter of law.

Under California law, liquidated damages provisions are presumed to be valid and enforceable unless the party seeking to invalidate the provision proves that the clause "bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach." Cal. Civ. Code § 1671(b); *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1988) ("*Ridgley Case*"); *see also Weber, Lipshie & Co. v. Christian*, 52 Cal. App. 4th 645, 656 (1997) ("A liquidated damages provision is not invalid merely because it is intended to encourage a party to perform, so long as it represents a reasonable attempt to anticipate the losses to be suffered."). "The validity of the liquidated damages provision depends upon its reasonableness at the time the contract was made and not as it appears in retrospect." *Krechuniak v. Noorzoy*, 11 Cal. App. 5th 713, 721 (2017).

Coinmint did not carry its burden of proof with respect to its argument that the liquidated damages should not be enforced. Indeed, Coinmint did not adduce any evidence whatsoever regarding the range of damages that the parties could have anticipated at the time of contracting. To the contrary, its sole financial expert, Kurt Stake, admitted that he did not attempt to calculate Katena's expected lost profits if Coinmint failed to perform as agreed. RT Oct. 17, 2023, 324:14–17; 327:19–328:11. Mr. Stake did not provide any opinion whatsoever about the liquidated damages clause. *Id.,* 378:24–379:2; 379:17–22; 380:19-381:7. If Coinmint wanted to escape the liquidated damages provision it agreed to in the SPA, it needed to submit evidence proving that the liquidated damages amount had "no reasonable relationship" to what the parties could have anticipated at the time of contracting. *Ridgley Case*, 17 Cal. 4th at 977. Mr. Stake did not provide a calculation of what Katena's probable loss would be if Coinmint breached its down payment obligations under PO #1, nor did he provide a rebuttal opinion to the opinion expressed by Katena's financial expert – Dr. David Mordecai. Accordingly, under the facts and circumstances of this case and Coinmint's failure to carry its burden of proof as prescribed by California Civil Code Section 1671(b), the liquidated damages provision contained in the SPA is binding and enforceable.

Assuming for sake of argument that Coinmint had provided evidence that put the reasonableness of the liquidated damages amount in issue, Katena - through the expert opinion testimony of Dr. Mordecai – provided strong evidence regarding the range of actual damages Katena could have anticipated would flow from Coinmint's breach of its obligations under PO #1. Exhibit 1193, ¶ 58; RT Oct. 16, 2023, 166:4-167:5. In this regard, Dr. Mordecai walked through Katena's expected cost of performance and demonstrated that **(a)** both parties stood to profit from their performance under PO #1, and **(b)** Katena's expected lost profits flowing from Coinmint's failure to perform was $90 million.[99] *Id.* Such testimony was unrebutted and unimpeached. Measured against $90 million, the much lower liquidated damages amount of $37.5 million is deemed reasonable by the Panel.

Based upon the foregoing, the liquidated damages provision is enforceable, and requires Coinmint to pay $37,500,00.00 to Katena as damages for its breach of the SPA

---

[99]   The UCC provides a clear measure of damages for nonpayment by a buyer: either "the difference between the market price at the time and place for tender and the unpaid contract price" or, if that measure "is inadequate to put the seller in as good a position as performance would have done," then the "profit (including reasonable overhead) which the seller would have made from full performance by the buyer." Cal. Com. Code § 2708(1), (2). Basing Katena's damages on market price would be inadequate because the unpaid contract price was far below the market price for Bitcoin mining rigs at the time of contracting. Therefore, the appropriate measure of Katena's anticipated damages at the time of contracting is lost profits.

resulting from its failure to fund the initial payment required and agreed to pursuant to PO #1.

> **(4)** **Mitigation of Damages Is Not a Factor When Damages are Agreed to by the Parties at the Time of Contracting**

While Coinmint did not plead the failure to mitigate as an affirmative defense and did not provide legal argument or authorities concerning the application of mitigation when damages are based upon a liquidated damages clause, Coinmint's financial expert Mr. Stake criticized Dr. Mordecai's opinions and analysis because Dr. Mordecai did not consider Katena's mitigation efforts (or the lack thereof). As pointed out by Katena in its Closing Brief, Coinmint's mitigation defense fails for two reasons – one legal and one factual. Katena Closing Brief, pp. 34-35.

First, the duty to mitigate is not relevant when damages are based upon a liquidated damages provision. This is so because an underlying purpose of liquidated damages is to allow the contracting parties to avoid the cost, difficulty, and delay of proving damages, and thereby eliminate the issues of causation and foreseeability. *Radisson Hotels Int'l, Inc. v. Majestic Towers, Inc.*, 488 F. Supp. 2d 953, 963 (C.D. Cal. 2007) ("Requiring Radisson to prove its mitigation efforts would wholly undermine the rationale for employing liquidated damages provisions in the first place."); *Edwards v. Symbolic Int'l, Inc.*, 2009 WL 1178662 at *10 (S.D. Cal. Apr. 30, 2009) (liquidated damages were available even when counterclaim plaintiff mitigated its damages by reselling the subject of the contract for more money because mitigation efforts and actual damages are not relevant to the enforceability of liquidated damages); *see also* 13 Cal. Law Rev. Com. Reports 1740, 1741.

Second, even if mitigation were relevant to the inquiry, the burden of proof was on Coinmint to show that losses could have been avoided by reasonable effort and expense on the part of Katena. *See Millikan v. American Spectrum Real Estate Services California, Inc.,* 117 Cal. App. 4th 1094, 1105 (2004) ("The burden of proving that losses could have been avoided by reasonable effort and expense must always be borne by the party who has broken the contract."). Coinmint did not offer any evidence of how Katena could have avoided or minimized its losses when Coinmint failed to perform. On the other hand, the unimpeached and unrebutted testimony of Katena's witnesses explained why changing market conditions made it impossible for Katena to find a replacement buyer for the K 10 mining rig in early 2022. RT 899:9-14; 1193:20-1194:6.

//
//
//

**(5)** ***Katena Is Entitled to an Award of Liquidated Damages of $37.5 Million, Less Credit for the $23.4 Million Coinmint Paid***

Katena has argued that it is entitled to an award of liquidated damages in the amount of $37.5 million without taking into consideration or applying a credit for the $23.4 million Coinmint paid to Katena. Katena Closing Brief, pp. 35-36. In support of this argument, Katena has cited to two cases that stand for the proposition that liquidated damages may be awarded even if there is no evidence that the plaintiff suffered any actual damages. *Id.* That is a different proposition from the issue presented concerning the treatment of the $23.4 million Coinmint paid to Katena.

Katena has also pointed to the SPA and argued that credit for the $23.4 million cannot be given because that would violate the "no set-off" provisions of paragraph 2.1 ("All sums paid by the Purchaser to Katena shall not be subject to any … set-off, …") and the "no refund" provisions of paragraph 2.1 ("Down payment and payment of Total Purchase Price are not refundable, save as otherwise mutually agreed by the Parties."). The Panel finds that it is a real stretch to construe the provisions of the SPA as in any way impacting the application of the liquidated damages provision in paragraph 12.4.

The unique situation presented here is one that the SPA does not directly address. As discussed above, the intent and purpose of the liquidated damages provision was to quantify at the outset of the contract relationship what the downside risk was for Coinmint if it did not perform its obligations under any purchase order. Because Coinmint's initial payment was due within three business days of Soniat's execution of the SPA and PO #1 on May 13, 2021, it was in default as of May 18, 2021. The evidence makes clear that in making the incremental payments set forth on Exhibit 1201, Coinmint never fully satisfied its initial payment obligation even though Katena was willing to work with it in that regard. The evidence also makes clear that Coinmint's initial payment obligation was not modified. In this regard, DeNaut testified that he very much understood that Coinmint had an initial funding obligation to Katena of $37.5 million, and was trying to find the money within Coinmint or through outside financing to satisfy this obligation. The point here is that whether Coinmint paid zero dollars, $10 million or any amount less than $37.5 million, it would be in default of its initial payment obligation under the SPA and PO #1.

//
//
//
//

The Panel does not read or construe the "no set-off" provision of paragraph 2.1 of the SPA as prohibiting credit against the liquidated damages amount of $37.5 million. This reading of the SPA and PO #1 also addresses Coinmint's argument that it paid $23.4 million and "received nothing in return." As noted above in Section 8(G) concerning its unjust enrichment claim, what Coinmint received was credit towards its contractual liquidating damages obligation which was triggered when it failed to pay $37.5 million to Katena on May 18, 2021.

Coinmint also has argued that Katena never sent a notice of default or claimed that Coinmint was in breach when it failed to make payment on May 18, 2021 as the contract required. Coinmint fails to acknowledge that the parties expressly agreed in paragraph 20 of the SPA titled "No Waiver" that "[f]ailure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option." Katena therefore did not waive any right to pursue its liquidated damages claim by not asserting that Coinmint was in default or claiming a contractual breach. Rather, as explained by Monzon, Katena worked with Coinmint in an effort to have its customer to fulfill its contractual requirements. *See also* Exhibit 2184.

Based upon the foregoing, Katena shall be awarded liquidated damages of $37,500,000.00, less credit for the $23,397,197.91 Coinmint paid to Katena, for a resulting award of $14,102,802.09.

### (6) *Katena Is Not Entitled to an Award of Pre-Award Interest*

At page 37 of its Closing Brief, Katena stated that it was entitled to an award of prejudgment interest. Katena did not provide any legal authority to support its request, nor did it explain why the circumstances of this case warranted such an award. All Katena cited to was the expert report of Dr. Mordecai who, among his opinions, calculated at the direction of counsel the amount of prejudgment interest on $37.5 million, computed at the rate of 10% per annum simple interest starting on the date of breach (May 2021) or on the date of Coinmint's first legal demand (November 2021). Dr. Mordecai did not otherwise cite to any authority or opine on why an award of pre-award interest would be appropriate under the facts and circumstances.

California Civil Code Section 3287(b) is the governing statute and provides that where a party receives an award of damages based upon "an action in contract where the claim was unliquidated," an award of prejudgment interest is discretionary and may not be assessed any earlier than "the date the action was filed."

Pre-award interest is not in order in this case because Katena failed to provide any explanation or evidence that would compel the Panel to exercise its discretion in favor of such an award.

### B.      Breach of Confidentiality Agreement

This claim is based upon the NDA (Exhibit 2019) and the confidentiality provisions contained in the SPA (Exhibit 51) (collectively, "Confidentiality Agreements"). Katena also based its claim on the confidentiality provisions contained in the parties' Stipulated Protective Order (Order No. 6).

Katena argued that it was damaged by Coinmint's willful breaches of the above Confidentiality Agreements. Coinmint's violation of Order No. 6 has been addressed and redressed through the award of sanctions, as discussed in Section 10 and as provided in this Final Award. Katena's claim concerning Coinmint's alleged breach of the Confidentiality Agreements involves the *same conduct* that has been addressed through the award of sanctions for violation of Order No. 6, as discussed in Section 10, and is thus redundant. Moreover, Katena failed to present any evidence quantifying what damage it allegedly sustained beyond that which has been provided by the Panel's decision to award sanctions.

Based upon the foregoing, the Panel denies Katena's claim seeking damages for Coinmint's alleged breach of the confidentiality provisions contained in the Stipulated Protective Order (Order No. 6) and in the Confidentiality Agreements.

### C.      Indemnification – Katena's Attorneys' Fees Request

Katena is seeking to recover its attorneys' fees and costs by invoking the indemnification provision contained in paragraph 8 of the SPA (Exhibit 51). Katena has argued that the language of the indemnification provision is "broadly worded" and, as such should be construed to apply to first-party claims between the parties such as those at issue in this arbitration. In support of its argument, Katena cited *Zalkind v. Ceradyne, Inc.*, 194 Cal. App. 4th 1010 (2011) ("*Zalkind*") and *Hot Rods, LLC v. Northrup Grumman Sys. Corp.,* 242 Cal. App. 4th 1166 (2015) ("*Hot Rods*"). While the *Zalkind* and *Hot Rods* decisions support the stated proposition, the facts of those cases are quite different from those presented here and are thus misplaced as authority that should guide the Panel's decision.

The indemnification clause at issue in *Zalkind* was not just a broadly worded / generic indemnification clause, it expressly stated that Ceradyne – the buyer under the asset purchase agreement – would indemnify, hold harmless and defend the selling parties from and against any and all "Damages" (broadly defined to include reasonable attorneys' fees and expenses) arising from or in connection with  any breach or default by Ceradyne of its covenants or agreements under the asset purchase agreement. The court focused in on that precise language in construing the meaning to be afforded the word "indemnify." 194 Cal. App. 4th 1024-1025.

The indemnification clause at issue in *Hot Rods* also involved very precise wording concerning the definition of "claim" and "Person," and was quite broad. The clause purported to indemnify *Hot Rods* from "any claims, demands, penalties …." The term "claim" was defined as "any claim or demand by any Person ….," and "Person" was defined as "any person, employee, individual, corporation … or other private or public entity." The court thus had no trouble finding that "any alleged liabilities" covered both first- and third-party claims given the language employed in the indemnification provision. 242 Cal. App. 4th at 1181.

The indemnification provision in the SPA differs significantly from the language presented to the courts in the *Zalkind* and *Hot Rods* cases. Paragraph I of the SPA states as follows:

> "The Purchaser shall, during the term of this Agreement and at any time thereafter, indemnify and save Katena …. harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of any kind, including legal fees, whatsoever ***arising out of or incidental to the Products*** pursuant to this Agreement, including, without limitation, Purchaser's violations of any Applicable Laws."

Exhibit 51*,* p. 8.

The Panel construes the highlighted language in the indemnification clause as <u>limiting</u> the scope of Coinmint's indemnification obligation to claims related to the K 10 mining rigs to be manufactured and supplied by Katena to Coinmint -  the "Products" in the clause. The dispute in this arbitration does not concern the K 10 mining rigs. It concerns issues related to the underpinnings of the SPA and PO #1: namely, **(a)** Katena's complaint that Coinmint failed to perform its financial obligation to make an initial payment of $37.5 million, and **(b)** Coinmint's complaint that Katena defrauded it into entering into the contract, never intended or never had the ability to perform from the outset and committed other breaches. Under these facts, circumstances and allegations, the Panel sees no basis to construe the SPA indemnification provision as covering the first-

party claims asserted in this arbitration. The circumstances of this arbitration and the language of the SPA's clause are distinguishable from those encountered in the *Zalkind* and *Hot Rods* cases.

In its Closing Brief, Katena also mentioned AAA Rule R-47 as giving the Panel the power to award attorneys' fees where both parties have requested them (which is the case here) and to reallocate arbitration administrative fees and arbitrator compensation. At the conclusion of the January 12, 2024 hearing, the Panel specifically inquired of the parties' counsel whether the Panel should consider their respective attorneys' fees requests under the basis provided by AAA Rule R-47 even if the legal basis upon which a party made its fee request was denied by the Panel. RT January 12, 2024, pp. 134-136. The parties' counsel responded that they needed to discuss that matter with their clients and with each other. *Id.,* pp. 136-139. The Panel set January 19, 2024, as the deadline by which the parties' counsel were to let the Panel know whether they agreed that AAA Rule R-47 should be applied and if not, what was each party's position. *Id.*, pp. 139-140; *see also* Order No. 64.

On January 19, 2024, the parties' counsel sent the Panel an email in which they advised that the parties were not in agreement. They explained that Katena believed that AAA Rule R-47 was in play and that Coinmint disagreed because the parties had requested an award of attorneys' fees under very specific / limited circumstances.

Assuming that an award of attorneys' fees is available under AAA Rule R-47 without the parties' agreement to invoke it, the Panel declines to exercise its power to enter such an award in this case. The disputes in this case were complex and raised many legitimate issues, and the stakes were high for both parties. From the Panel's perspective, the "American Rule," where each side bears its own attorneys' fees and share of the costs absent a contract or statute that provides otherwise, is appropriate for this matter in the absence of a stipulation (which the parties did not reach) on whether the Panel should exercise its discretion under Rule R-47(d)(4) to enter an award of attorneys' fees and shift costs. The Panel accordingly declines to do so, finding insufficient circumstances here to warrant an award of attorneys' fees or a reallocation of arbitration fees or arbitrator compensation.

//
//
//
//
//
//
//

**10.**    ***Ruling on Award of Sanctions Against Coinmint for Violation of the Stipulated Protective Order (Order No. 6)***

      **A.**    ***Background Facts***

On November 10, 2022, before exchanging discovery, the parties, through their respective counsel, submitted a proposed form of stipulated protective order. The Panel did not change, add or subtract from what the parties submitted in the way of protective order protocols that would govern in this arbitration. The Panel simply approved and adopted the parties' proposed form of protective order as Order No. 6 ("Stipulated Protective Order" or "SPO").

While parties in a court proceeding may be constrained by court-defined standards, guidelines and legal principles concerning the types of materials and information that properly may be designated as "confidential" for purposes of keeping such materials and information away from the public, no such standards or guidelines exist in arbitration because arbitration is not a public forum. The parties are thus free to define the scope of protection they deem necessary or appropriate for the circumstances of their dispute.

In this arbitration, the parties defined the scope of confidentiality protection quite broadly to include "confidential, proprietary and/or private information," and made clear that materials and information designated as "confidential" could only be used "for prosecuting, defending, or attempting to settle *this arbitration*." *See* Order No. 6, ¶¶ 1 and 7.1. (Italics added.) Under the terms of the Stipulated Protective Order, the only prerequisite to material or information becoming "Protected Material" was for a party to affix the legend "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY" to each page containing information that party wanted to be protected under the SPO. *See* Order No. 6, ¶ 5. Importantly, the SPO does <u>not</u> contain a provision instructing against "over designation," setting limits on designation, or requiring the parties to only designate materials that would qualify for protection in the courts under general legal principles. This omission is significant because, in defense of its actions in which Coinmint disclosed materials that either Katena had designated or the Panel had ordered be treated as "CONFIDENTIAL," Coinmint argued that Katena's designation of "CONFIDENTIAL" material should be evaluated in the context of court guidelines and case law rather than the terms and provisions of the Stipulated Protective Order.[100]

---

[100]    The Panel rejected Coinmint's arguments in this regard because they are anathema to the core concept of arbitration: namely, arbitration is a creature of contract and is a dispute resolution process agreed to and defined by the parties.

The keys terms of the Stipulated Protective Order, as adopted and approved by the Panel's Order No. 6, are the following:

- The parties could designate disclosures and discovery materials produced or generated in this arbitration as "CONFIDENTIAL" or "ATTORNEYS' EYES ONLY." (¶ 5)

- Upon designating disclosures and/or discovery materials as "CONFIDENTIAL" or ATTORNEYS' EYES ONLY," the materials would be treated as "Protected Material" (¶ 2.14) subject to the protections conferred by the Stipulated Protective Order. (¶ 5)

- The protections conferred on Protected Material by the Stipulated Protective Order cover not only the Protected Materials itself, but also **(1)** any information copied or extracted from the Protected Materials, **(2)** all copies, excerpts, summaries or compilations of the Protected Materials, and **(3)** any testimony, conversations, or presentations by the parties or their counsel that might reveal Protected Materials. (¶ 3)

- Testimony given in deposition, pretrial or trial proceedings would automatically be considered Protected Materials for a period of 30 days following the delivery of the transcript of such deposition, hearing or proceedings so as to allow a party to designate some or all of the testimony as Protected Material. (¶ 5.1(b))

- A "Receiving Party" could use Protected Material "only for prosecuting, defending, or attempting to settle this arbitration" and could disclose such materials "only to the categories of persons and under the conditions described in this [Protective Order]." (¶ 7.1)

- The parties may challenge the other's designation at any time, but must do so in the manner prescribed in the SPO, to wit: **(1)** In order to initiate a challenge to the other party's designation, the challenging party must provide a written notice of each designation being challenged and must state the basis for each challenge, and must then meet-and-confer with the other side. **(2)** If any designation challenges are not resolved through the meet-and-confer process, the challenging party may seek the Panel's intervention, but must do so within 14 days of the failed meet-and-confer effort. (¶ 6)

- The parties could mutually agree to modify the terms of the SPO and, absent agreement, either party could petition the Panel to modify the terms of the Stipulated Protective Order "upon a showing of good cause." (¶ 14)

On February 7, 2023, Katena filed a motion with the Panel in which it complained that Coinmint had violated the Stipulated Protective Order by attaching documents that Katena had designated as "CONFIDENTIAL" to a complaint Coinmint filed in the Santa Clara County Superior Court.[101]

On February 9, 2023, Coinmint submitted and served a response to Katena's motion, and Katena submitted and served a supplemental brief concerning Coinmint's alleged violation of the Stipulated Protective Order.

After reviewing the complaint Coinmint filed in the State Court Action, as well as the parties' respective briefs, the Panel concluded that it was undisputed that the documents attached to Coinmint's complaint as exhibits were materials produced by Katena in this arbitration that Katena had designated as "CONFIDENTIAL." Additionally, upon review of Coinmint's complaint, the Panel found that Coinmint had quoted directly from or paraphrased some of the attached exhibits in several places in the complaint, which constituted a further violation of the SPO even if the documents themselves had not been attached to the complaint.

On February 13, 2023, the Panel issued Order No. 18 in which it found that Coinmint had violated the Stipulated Protective Order, and specifically noted that **(a)** Coinmint never asked the Panel to intervene and de-designate any of the materials or disclosures Katena designated as "CONFIDENTIAL," **(b)** Coinmint never identified the existence of any exigent circumstances to justify the need to file the complaint using "CONFIDENTIAL" documents without first seeking permission from the Panel to de-designate those materials, **(c)** Coinmint could have filed its complaint without attaching or directly quoting from the "CONFIDENTIAL" documents and could have then petitioned the Panel to de-designate "CONFIDENTIAL" materials for use in the State Court Action,

---

[101]    That action is commonly referred to as *Coinmint, LLC v. DX Corr Design, Inc., et al.,* Case No. 23cv410979 (the "State Court Action"). The named defendants in the State Court Action were DXCorr, Reddy, Monzon, Gao, Bleck and DeNaut. Maloney was later added as Doe 1. In its complaint, based on theories of alleged fraud and conspiracy by the defendants, Coinmint sought to recover the $23 million it paid to Katena pursuant to the SPA and PO #1 transaction. The State Court Action was filed during a time period when the parties were attempting to schedule depositions of the named defendants, causing them to cease cooperating to be deposed in the arbitration and creating complications that resulted in the Panel's need to schedule special hearing proceedings to receive the testimony and documents of third-party witnesses Bleck, Maloney and DeNaut.

and **(d)** Coinmint's decision to use the "CONFIDENTIAL" materials in the State Court Action was deliberate and not the result of mistake or inadvertence.[102] *See* Order No. 18, pp. 4-6. Of significance to the Panel was the fact that the SPO included procedures for de-designation and Coinmint, without explanation, failed to file any de-designation motion with the Panel in accordance with those procedures until several months after Order No. 18 was issued.

The Panel noted that the violation of a protective order – especially one issued pursuant to parties' stipulation – was a rare occurrence in both arbitration and court proceedings and that there is little guidance on this topic. Accordingly, the Panel deferred ruling on sanctions until both parties provided the Panel with full briefing with respect to **(a)** what type of sanctions are within the Panel's power, **(b)** what type of sanctions are appropriate under the circumstances, **(c)** in the case of monetary sanctions, the basis for and propriety of the amount being requested by Katena, and **(d)** whether sanctions should be awarded against Coinmint, Coinmint's counsel, or both, and on what grounds.[103]

The Panel received briefing on the above issues from both parties, and conducted an in-person hearing on May 17, 2023, during which the parties' counsel presented their respective oral arguments, and answered the Panel's questions. On May 25, 2023, the Panel issued Order No. 43 in which it found that Coinmint had violated the Stipulated Protective Order in three ways:

▪ <u>First Violation</u>. Coinmint violated the Stipulated Protective Order on January 26, 2023 when it **(a)** attached as exhibits to its complaint in the State Court Action 14 documents that Katena had designated as "CONFIDENTIAL," and **(b)** quoted, paraphrased, or otherwise summarized the contents of the attached "CONFIDENTIAL" documents in the complaint allegations.

---

[102]   The Panel rejected Coinmint's argument that Katena's filing and pursuit of a recovery against DXCorr and the individuals named in the lawsuit was within the scope of "prosecuting, defending or attempting to settle this arbitration." Coinmint failed to explain how its pursuit of third parties justified its use of Protected Material based upon this language in the SPO that expressly *limits* the use of such materials to *this arbitration. See* Order No. 6, ¶ 7.1.

[103]   The Panel rejected Katena's request that the Panel order Coinmint to withdraw or dismiss its complaint in the State Court Action, finding that the Panel had no jurisdiction or authority over the state court or any of the proceedings that might occur in state or federal court related to the complaint Coinmint had filed. *See* Order No. 18, p. 6.

▪ <u>Second Violation</u>. Coinmint violated the Stipulated Protective Order on March 20, 2023 for a second time when it filed pleadings in the Federal Court Action[104] to which it attached as exhibits 23 documents produced by Katena in this arbitration and designated "CONFIDENTIAL."[105] Additionally, Coinmint attached as exhibits to its pleadings excerpts from the depositions of Gao and Monzon taken in this arbitration in violation of the Panel's Order No. 20, as well as paragraph 5.1 of the SPO. Order No. 20 was issued on February 14, 2023, and expressly prohibited the parties and their counsel from using, copying, excerpting or quoting from <u>any</u> deposition or its exhibits pending the expiration of the 30-day period following delivery of the transcript so as to allow the parties and their counsel time to make confidentiality designations in accordance with paragraph 5.1(b) of the SPO. On February 22, 2023, in an email to the Panel, Coinmint's counsel acknowledged receipt of Order No. 20 and represented to the Panel that *"Coinmint fully intends to abide by that order."* (Italics added.) Nevertheless, before the expiration of the 30-day designation periods and without otherwise seeking permission from the Panel or Katena, Coinmint filed additional pleadings in the Federal Court Action to which it attached excerpts of the deposition transcripts of Gao and Monzon. Coinmint breached not only the Panel's order but its express promise and representations to the Panel that it would abide by the SPO.

▪ <u>Third Violation</u>. On March 20, 2023, Coinmint filed a "First Amended Complaint" in the Federal Court Action to which it **(a)** attached as exhibits to the complaint the same "CONFIDENTIAL" documents attached to the complaint in the State Court Action, and **(b)** quoted or paraphrased or otherwise summarized the contents of the attached "CONFIDENTIAL" documents in the amended complaint allegations.

---

[104] Sagar Reddy, a named defendant in the State Court Action, removed the case to the United States District Court for the Northern District of California, where the Coinmint action is pending and commonly referred to as *Coinmint, LLC v. DX Corr, et al.,* Case No. 5:23-cv-00599-RS ("Federal Court Action").

[105] Nine of the exhibits were previously attached to Coinmint's complaint in the State Court Action and represent repeat violations of the SPO with respect to those documents. Fourteen of the exhibits were not published previously, and thus represent new violations of the SPO.

For purposes of determining the amount of monetary sanctions to be awarded against Coinmint, the Panel viewed the First and Second Violations as the ones deserving monetary redress.

### B.    Katena's Sanctions Request

In its sanctions request, Katena requested **(a)** terminating sanctions, **(b)** monetary sanctions based upon a proposed "per use" formula, and **(c)** attorneys' fees and costs related to Coinmint's violations of the Stipulated Protective Order.

Coinmint opposed Katena's sanctions request and continued to argue that its conduct in using and quoting from the "CONFIDENTIAL" documents and deposition excerpts of Gao and Monzon was not subject to sanctions as a matter of law. The Panel was not persuaded by Coinmint's arguments that it was justified or excused for its conduct in violating Order Nos. 6 and 20.

### C.    Rulings on Katena's Sanctions Request

In its May 25, 2023, order, the Panel made several rulings, including the following.

#### (1)    Katena Did Not Over Designate

Coinmint argued that it should not be sanctioned because Katena was the party at fault; that Katena had over-designated and "robo-stamped" documents as "CONFIDENTIAL." In support of this argument, Coinmint cited to *court* authorities, guidelines and standards, which are inapplicable here because **(a)** this is arbitration, **(b)** the federal court standards for judging what should be held confidential from the public do not apply absent party agreement, and thus **(c)** the agreed upon terms of the Stipulated Protective Order are what govern the issue.

#### (2)    The State and Federal Court Actions Are Not Related to this Arbitration

Coinmint argued that it was allowed to use the designated documents and deposition excerpts in the State and Federal Court Actions without first seeking to have the materials de-designated under the protocols provided for in the SPO because those actions are "related" to this arbitration insofar as they both involve the same underlying contract transaction. The Panel rejected that argument because the express terms of paragraph 7.1 of the SPO clearly state that "[a] Receiving Party may use Protected Materials that are produced by another Party or by a Non-Party in connection with ***this case only*** for prosecuting, defending, or attempting to settle ***this arbitration***." [Bold and italics added.]

### (3)    *Coinmint's Actions Were Not Privileged*

Coinmint argued that it should not be sanctioned because it used the designated documents in the pursuit of advocating for a client in a litigation matter, and that its actions in the State and Federal Court Actions are protected under California Civil Code Section 47(c). The Panel rejected the premise that Coinmint can avoid its obligations under the Stipulated Protective Order by simply having the same lawyers represent it in both this arbitration and the State and Federal Court Actions. Under such a reading of the SPO, the disclosure limitation to "the Receiving Party's Outside Counsel of Record in the Action" would be meaningless, as would the designation and disclosure limitation to "ATTORNEYS' EYES ONLY."

### (4)    *Coinmint's Actions Were Not Excused*

Coinmint argued that it used the designated documents and deposition excerpts in pursuit of a claim for civil bribery and, in this context, the Stipulated Protective Order is unenforceable under California Civil Code Section 1668 as an illegal contract and, if interpreted to warrant sanctions against Coinmint, it would operate indirectly to exempt Katena from liability for fraud.

California Civil Code Section 1668 provides that "[a]ll contracts which have for their object, directly or indirectly, to exempt any one from responsibility for his own fraud, or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law." The Panel found that Coinmint's arguments were off point. The object of the SPO was not to exempt anybody from anything. It represents a contract voluntarily entered into between Coinmint and Katena to protect the confidentiality of information and materials in this arbitration as the producing party might designate in accordance with the its terms and provisions. Moreover, the SPO includes a set of procedures should either party wish to challenge the other's designation. If there was something in the materials Katena designated as "CONFIDENTIAL" that Coinmint needed in order to pursue claims outside of this arbitration, Coinmint had a means through which to seek to have the "CONFIDENTIAL" materials de-designated, and that procedure allowed for both parties to be heard on the issue. *See* Order No. 6, ¶¶ 6.2 and 6.3. The Panel found that Coinmint's unilateral action was not justified or excused.

//
//
//
//
//

### D.    The Panel Has Authority to Issue Sanctions

The AAA Rules empower the Panel to police its own orders and award sanctions and/or such other relief as it deems appropriate to address a party's failure to comply with the Rules or the Panel's orders. AAA Rule R-23 grants the Panel broad authority to enforce the Rules and address willful violations of its orders. AAA Rule R-58 grants the Panel with broad authority to order appropriate sanctions where a party fails to comply with the Rules or the Panel's orders.[106]

//
//
//
//
//
//

---

[106]   As noted in Katena's Brief in Support of Sanctions, as a general matter, courts have recognized that arbitrators have authority to issue sanctions for abuse of the arbitration process and failure to comply with an arbitrator's orders. Brief in Support of Sanctions, pp. 16-20. *See, e.g., Forsythe Int'l, S.A. v. Gibbs Oil Co. of Tex.,* 915 F.2d 1017, 1023 n.8 (5th Cir. 1990) (citing *Bigge Crane & Rigging Co. v. Docutel Corp.,* 371 F.Supp. 240, 246 (E.D.N.Y.1973))*; Interbill, Inc. v. Atl.-Pac. Processing Sys. NV Corp.,* 2022 WL 17833429 (D. Nev. Dec. 21, 2022) ("I decline to vacate the arbitrator's award of attorneys' fees and costs because she did not exceed her authority in awarding them."); *Neurosigma, Inc. v. De Salles,* 2016 WL 10654051 (C.D. Cal. May 12, 2016) (upholding arbitrators' award of penalties for failure to comply with interim decision, and citing to the AAA Rules in determining that an arbitration panel has the power to award sanctions "where a party fails to comply . . . with an order of the arbitrator"); *Interchem Asia 2000 Pte. Ltd. v. Oceana Petrochemicals AG,* 373 F.Supp. 2d 340 (S.D.N.Y. 2005) (confirming in part arbitration award that sanctioned a party for faulty document production); *Salowitz Organization v. Traditional Industries,* 219 Cal. App. 3d 797, 807 (1990) (affirming monetary sanction against defendant who failed to attend arbitration hearing); *Todd Shipyard Corp. v. Cunard Line, Ltd.*, 943 F.2d 1056, 1064 (9th Cir. 1991) (holding that arbitrators may award attorneys' fees where a party has acted in bad faith and explaining that "Federal law takes an expansive view of arbitrator authority to decide disputes and fashion remedies."); *ReliaStar Life Ins. Co. v. EMC Nat'l Life Co.*, 564 F.3d 88, 85–87 (2d Cir. 2009) (upholding a $3.5 million award of costs and attorneys' fees as sanctions where a party acted in bad faith; *Neurosigma, Inc. v. De Salles*, 2016 WL 10654051 (C.D. Cal. May 12, 2016) (upholding arbitrators' award of penalties for failure to comply with interim decision, and citing to the AAA Rules in determining that an arbitration panel has the power to grant sanctions "where a party fails to comply ... with an order of the arbitrator."); *Konkar Maritime Enters., S.A. v. Compagnie Belge D'Affretement*, 668 F. Supp. 267 (S.D.N.Y. 1987) (affirming award of the arbitration fees against respondent due to failure to comply with arbitration order); *Polin v. Kellwood Co.*, 103 F. Supp. 2d 238 (S.D.N.Y. 2000), reconsideration denied, 132 F. Supp. 2d 126 (S.D.N.Y. 2000) (confirming arbitration award which awarded defendant half its expenses, including attorney fees, as a sanction for plaintiff's conduct).

### E.    *Sanctions Awarded Against Coinmint, but Not Coinmint's Attorneys*

In its Order No. 43, the Panel found that Coinmint's disclosures in the State and Federal Court Actions violated Order Nos. 6 and 20. Based upon Coinmint's arguments and the circumstances surrounding Coinmint's violations, as well as its arguments at the May 17, 2023 hearing, the Panel concluded that Coinmint acted intentionally and in knowing disregard of the Stipulated Protective Order and the Panel's orders, and that an award of sanctions was thus appropriate against Coinmint to redress this conduct.

Katena argued that sanctions should be awarded against Coinmint *and* its attorneys in this arbitration (Gordon Rees Scully Mansukhani LLP). The Panel found that that request was at odds with the relief requested in Katena's motion where Katena expressly stated that it was <u>not</u> requesting sanctions against Coinmint's counsel "as Gordon Rees did not sign the SPO." *See* Brief in Support of Sanctions, p. 20. In any event, pursuant to Rule R-58(a), the Panel's sanctioning power is limited to the parties to the arbitration unless the parties' counsel have stipulated and submitted otherwise, which is not the case in this arbitration. Accordingly, Katena is not entitled to an award of sanctions against Coinmint's attorneys, and that request is denied.

In its Order No. 43, the Panel ordered that Coinmint be sanctioned in the form of **(a)** monetary sanctions, and **(b)** reasonable attorneys' fees and costs incurred by Katena in this arbitration for Coinmint's violation of the SPO, as discussed above,[107] to be determined after the close of the evidentiary hearing proceedings and as part of the Final Award.

//
//
//
//
//
//
//
//

---

[107]    Katena made two additional requests for sanctions related to Coinmint's further use of "CONFIDENTIAL" documents in the Delaware and Federal Court Actions, both of which the Panel denied. *See* Order Nos. 55 and 56.

### F.    Terminating Sanctions Denied

In its Order No. 43, the Panel denied Katena's request for terminating sanctions. As stated in Order No. 43, sanctions should tie to the harm caused by Coinmint's violative conduct. Here, Katena made no showing with respect to how it was economically harmed. The harm Katena complained of was reputational harm through Coinmint's public filings in the State and Federal Court Actions.[108] Having reviewed the documents and testimony at issue, the Panel determined that the content of those materials did not include trade secrets or proprietary information, but were principally internal and private conversations among the principals of Katena, a young company seeking both customers and capital financing. Without evidence of some type of particularized harm to Katena's business rights or interests or conduct by Coinmint that interferes with the arbitration (*e.g.*, spoliation of evidence, refusal to exchange information, refusal to appear), monetary sanctions and an award of reasonable attorneys' fees and costs incurred by Katena in connection with the sanctions motion proceedings are sufficient to redress Coinmint's violation of the SPO.

### G.    Sanctions Award

After the conclusion of the evidentiary hearing proceedings, and in conjunction with its closing brief, the Panel requested briefing from Katena regarding the amount of attorneys' fees and costs that should be awarded as sanctions. *See* Order No. 60, ¶ 9. The briefing scheduling included an opportunity for Coinmint to respond and Katena to reply.

### (1)    Monetary Sanctions

In its Brief in Support of Sanctions, Katena argued that Coinmint should be sanctioned $50,000 per violation of the Stipulated Protective Order. In support of this argument, Katena cited to *Superadio Ltd. P'ship v. Winstar Radio Prods., LLC*, 446 Mass. 330, 339 (2006) where a court upheld an arbitration panel's monetary sanction of $271,000, which was based upon a daily sanction assessment of $1,000 until the offending party complied with the panel's order compelling discovery." The Panel agrees with Katena that Coinmint's First and Second Violations, discussed above, were significant and deserve a significant "fine."

---

[108]    The Panel's authority is over Coinmint and Katena with respect to the disputes they have submitted for hearing and determination in this arbitration. The Panel has no authority to direct or dictate what the parties or their counsel may do in other forums.

In its opposition, Coinmint did not take issue with Katena's proposed $50,000 figure. Rather, Coinmint took issue with the "draconian" sanction that would result if the Panel multiplied every filing or service event against each "CONFIDENTIAL" document included in the filing or service - as proposed by Katena - which would yield a total monetary sanction of $6.7 million. *See*, Brief in Support of Sanctions, p. 18. The Panel agrees with Coinmint and has determined that an appropriate monetary sanction to impose on Coinmint is $100,000: $50,000 for each of the First and Second Violations that the Panel has found to be the most serious and problematic in terms of the impact Coinmint's conduct has had on this arbitration.

### (2)    Reasonable Attorneys' Fees

In determining what qualifies as a "reasonable" attorneys' fees award, the Panel applied the lodestar approach using the factors that have been identified by the California Supreme Court for this purpose. *See PLCM Group, Inc. v. Drexler*, 22 Cal. 4th 1084, 1095 (2000). Those factors include:

- the difficulty / complexity of the case

- the skill required to handle the case

- the skill actually employed in the case

- the attention given to the case

- the success or failure of the attorneys' efforts

*Id.* at 1096. All of the above were in play with regard to the sanctions motion proceedings.[109]

- <u>Complexity of the Case.</u> As discussed above, Coinmint's violation of the SPO presented a novel situation and thus novel legal issues with respect to how to address the sanctions issue. Moreover, while, at its core, the parties' dispute is based in contract and involves consideration of various principles of contract law, the amounts put in issue by the parties' respective claims and counterclaims were

---

[109]  The Panel denied Katena's request for attorneys' fees and costs related to activities it pursued in the State and Federal Court Actions because that request was *outside the scope* of the Panel's sanctions award, which was expressly limited to reasonable attorneys' fees and costs incurred *in this arbitration* in connection with the sanctions motion proceedings. *See* Order No. 43, ¶ 5(D), p. 14.

significant - $23.4 million being sought by Coinmint and $37.5 million being sought by Katena. Adding to the complexity was the fact of the concurrent proceedings in two federal courts where some of the "CONFIDENTIAL" documents were used and where the courts made rulings with regard to the use of some (or possibly all) of the "CONFIDENTIAL" documents in those court proceedings.

- <u>Difficulty of the Case</u>. In addition to the complexities of the legal and factual issues presented, the parties were represented by equally matched, zealous advocates as trial counsel. Counsel for both sides were persistent and vigorous in their efforts to advance their respective clients' positions on the claims and issues presented. That resulted in both sides' attorneys being required to do a lot of work to meet the evidence and legal arguments being advanced by the other side.

- <u>Skill Required</u>. The skill level required to handle the case - on both sides of the dispute - was high with regard to legal knowledge and trial experience.

- <u>Skill Level Employed</u>. The skill level actually employed in the case – on both sides of the dispute - was high.

- <u>The Attention Given to the Case</u>. The attention given to the case was significant because of the difficulty, complexity, and high stakes of the case demanded of the parties and their counsel, including but not limited to the proceedings related to Coinmint's violation of the SPO. From the Panel's vantage point, counsel for both sides were actively and thoroughly engaged from the outset in all aspects of the arbitration and worked diligently to prepare and present their respective clients' cases, and performed in an organized and thoughtful manner. Both sides utilized litigation teams (and thus timekeepers) of approximately equal size in terms of the participants the Panel observed during the course of the proceedings.

- <u>The Success of Katena's Efforts</u>. As discussed above, Katena prevailed on its request for sanctions to redress Coinmint's violation of the Stipulated Protective Order.

In its Attorney Fee Application ("Application"), Katena requested that it be awarded $482,826.00 in attorneys' fees "in connection with Coinmint's violation of the SPO." Application, p. 1. Coinmint objected on essentially three grounds: the breadth of Katena's request (which included $342,405.00 in billings for work done in connection with proceedings in the State and Federal Court Action), the reasonableness of Perkins Coie's rates, and the reasonableness of the time charges. Those objections are addressed below:

Katena's request for attorneys' fees incurred in the State and Federal Court Actions. Coinmint's objection to the breadth of Katena's attorneys' fees request is well taken. In Order No. 43, the Panel purposely and clearly *limited* the attorneys' fees to be award to Katena as a sanction to the sanction motion proceedings *in this arbitration.* Accordingly, Katena's request for $342,405.00 in attorneys' fees incurred "in connection with defending against Coinmint's improper pursuit of the State Court Action and Federal Court Action" is DENIED. The attorneys' fees award shall be limited to attorneys' fees incurred by Katena in connection with the sanctions motion proceedings in this arbitration, which Katena has stated totaled $142,421.00.

Reasonableness of Perkins Coie's Rates. In support of the Application, Katena provided a survey of rates being charged by national law firms. While Coinmint has complained that Perkins Coie's rates are too high, Coinmint provided no corroborating evidence. It also offered no evidence to rebut or impeach Katena's rate survey. Based upon the evidence presented, Perkins Coie's rates are within the "reasonable" range based upon the rates being charged by national firms comparable to Perkins Coie. The rates charged by the various Perkins Coie timekeepers shall thus be allowed for purposes of calculating the attorneys' fees to be awarded.

Reasonableness of the Time Charges. In its objection, Coinmint argued that there was duplication of effort and thus duplication of billing by Katena's attorneys. Coinmint directed the Panel to only one example. The Panel has reviewed that example, as well as the invoices attached to attorney John Hardin's supporting declaration, and finds that the staffing related to the sanctions issue proceedings was consistent with the staffing the Panel has observed throughout the course of the arbitration. In that regard, the Panel notes that **(a)** both Coinmint and Katena had litigation teams of approximately the same size, and **(b)** there were several sets of proceedings, briefings, hearings and orders related to Coinmint's violation of the SPO, many of which occurred on an expedited basis. The Panel is thus not surprised that Katena's attorneys, John Hardin and Jacob Taber, both worked and billed on these matters with the assistance of a paralegal, nor does the Panel find such staffing to be inappropriate or reflective of overbilling. Having reviewed both sides' pleadings regarding the sanctions issue, the research and analysis was extensive

and obviously took considerable time and effort by both sides' counsel, the billing for which the Panel does not find excessive.[110]

Based upon the foregoing the Panel concludes that Katena reasonably incurred $142,421.00 in attorneys' fees with connection with the sanctions motion proceedings and shall be awarded that amount as sanctions in this matter.

### 11.    *Award*

A.    Coinmint's claims against Katena, as pleaded in its First Amended Demand and/or unpleaded but deemed submitted as set forth above, are all denied in their entirety. Coinmint is not entitled to any damages, restitution, rescission, or other relief sought against Katena.

B.    Coinmint is not entitled to an award of its attorneys' fees or costs incurred in connection with this arbitration.

C.    Katena is the prevailing party on its counterclaim for breach of contract and is awarded liquidated damages in the amount of $37,500,000.00, less credit for the sum of $23,397,197.91 that Coinmint paid to Katena, for a resulting damages award in Katena's favor of **$14,102,802.09**. Katena's request for pre-award interest is denied.

D.    Katena is hereby awarded monetary sanctions against Coinmint in the amount of $100,000.00, plus attorneys' fees and costs associated with the sanctions motion proceedings in the amount of $142,421.00, for a total sanctions award against Coinmint of **$242,421.00**.

E.    Accordingly, Katena is awarded the total sum of **$14,345,233.09** against Coinmint, which Coinmint is ordered to pay to Katena.

F.    Katena's counterclaims for breach of confidentiality agreement and indemnification are denied in their entirety, including its claim seeking an award of attorneys' fees and costs in this matter.

G.    Aside from the award of attorneys' fees as part of the sanctions award to redress Coinmint's violations of the Stipulated Protective Order, Katena is not entitled to an award of its attorneys' fees or costs incurred in connection with this arbitration.

H.    The administrative fees and expenses of the American Arbitration Association totaling $72,739.72, and the compensation and expenses of the Arbitrators totaling $875,898.80, shall be borne as incurred.

---

[110]   Since Coinmint's counsel did not put forth its time charges and billings for these activities, the Panel infers that the attorneys' fees incurred by Coinmint for these activities were comparable.

I.      This award is in full settlement of all claims, counterclaims, and requests for relief submitted in this arbitration. All claims, counterclaims and requests for relief not specifically addressed above are hereby denied in their entirety.

J.      Pursuant to California Code of Civil Procedure Section 1283.4, this Final Award includes a determination of all questions submitted by the parties to the Arbitrators in this arbitration, the decision of which was necessary in order to determine the controversy.

We, the undersigned Arbitrators, do hereby affirm upon our oaths that we are the individuals described in and who executed this instrument which is our Final Award.

Dated:  6 February 2024.

_____
Rebecca Callahan, Chair

_____
Ruth Glick, Arbitrator

_____
Gilda R. Turitz, Arbitrator