# EXHIBIT B

# CHOATE

Paul D. Popeo
t 617-248-4074
f 617-502-4074
ppopeo@choate.com

April 27, 2022

**VIA E-FILING**

American Arbitration Association
Boston Regional Office
200 State Street, 7th Floor
Boston, MA 02109

Re:     Coinmint, LLC v. Katena Computing Technologies, Inc.

To Whom This May Concern:

Enclosed please find a Demand for Arbitration, with accompanying exhibits, of claimant Coinmint, LLC ("Coinmint") against respondent Katena Computing Technologies, Inc. ("Katena").

Pursuant to Section 19.2 of the Sales and Purchase Agreement between Coinmint and Katena (*see* Exhibit A to the Demand for Arbitration), the arbitration shall be conducted pursuant to the American Arbitration Association ("AAA") Commercial Arbitration Rules. Accordingly, AAA Rule 5 provides that Katena may file an answering statement within 14 calendar days after notice of filing of the Demand for Arbitration is sent by the AAA

Please do not hesitate to contact us if you have any questions or require additional information. Thank you very much.

Respectfully Submitted,

Paul D. Popeo

Enclosures

cc: Joseph P. Cutler, Esq. (via email)

 AMERICAN ARBITRATION ASSOCIATION | INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION®

**COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION**

| | |
|---|---|
| **Mediation:** If you would like the AAA to contact the other parties and attempt to arrange a mediation, please check this box ☐. There is no additional administrative fee for this service. | |

You are hereby notified that a copy of our arbitration agreement and this demand are being filed with the American Arbitration Association with a request that it commence administration of the arbitration. The AAA will provide notice of your opportunity   to file an answering statement.

Name of Respondent:  Katena Computing Technologies, Inc.

Address:  7244 Carrizo Drive

| City:  La Jolla | State:  California | Zip Code:  92037 |
|---|---|---|
| Phone No.:  (858) 375-8026 | Fax No.:  N/A | |

Email Address:  henry@katenacomputing.com

Name of Representative (if known): Joseph P. Cutler

Name of Firm (if applicable):  Perkins Coie

Representative's Address: 1210 Third Avenue, Suite 4900

| City:  Seattle | State: Washington ▼ | Zip Code:  98101 |
|---|---|---|
| Phone No.: (206) 359-6104 | Fax No.: (206) 359-7104 | |

Email Address:  jcutler@perkinscoie.com

The named claimant, a party to an arbitration agreement which provides for arbitration under the Commercial Arbitration Rules o f the American Arbitration Association, hereby demands arbitration.

Brief Description of the Dispute:

Claimant asserts claims for fraudulent inducement and related claims and seeks an order from the Panel that, among other things, rescinds a Sales and Purchase Agreement and related Purchase Order, effective as of May 12, 2021, and requires Respondent to return the more than $23 million in deposit payments previously made by Claimant.

Dollar Amount of Claim: $  Undetermined, but no amount less than $23,397,197.91.

Other Relief Sought: ☑ Attorneys Fees  ☑ Interest  ☑ Arbitration Costs  ☐ Punitive/Exemplary
☑ Other:  Declaratory Judgment; rescission; recovery of money previously paid to Respondent by Claimant

Amount enclosed: $  5,500

In accordance with Fee Schedule: ☑ Flexible Fee Schedule ☐ Standard Fee Schedule

Please describe the qualifications you seek for arbitrator(s) to be appointed to hear this dispute:

The Claimant seeks arbitrators who are generally experienced with commercial disputes and fraud claims.

Hearing locale:  Boston, Massachusetts

*(check one)* ☑ Requested by Claimant ☐ Locale provision included in the contract



COMMERCIAL ARBITRATION RULES
DEMAND FOR ARBITRATION

| | |
|---|---|
| Estimated time needed for hearings overall: | hours or 7      days |

Type of Business:

Claimant: Puerto Rican Corporation     Respondent: Delaware Corporation

Are any parties to this arbitration, or their controlling shareholder or parent company, from different countries than each oth er?

No

| Signature (may be signed by a representative): | Date: |
|---|---|
| /s/ Paul D. Popeo | 4/27/2022 |

Name of Claimant: Coinmint, LLC

Address (to be used in connection with this case): 2210 Dorado Beach Rd.

| City: Dorado, Puerto Rico | State: Select... | Zip Code: 00646 |
|---|---|---|
| Phone No.: (972) 979-5235 | Fax No.: N/A | |

Email Address: rforet@coinmint.one

Name of Representative: Paul D. Popeo

Name of Firm (if applicable): Choate, Hall & Stewart LLP

Representative's Address: Two International Place

| City: Boston | State: Massachusetts | Zip Code: 02110 |
|---|---|---|
| Phone No.: (617) 248-4074 | Fax No.: (617) 502-4074 | |

Email Address: ppopeo@choate.com

To begin proceedings, **please file online at www.adr.org/fileonline**. You will need to upload a copy of this Demand and the Arbitration Agreement, and pay the appropriate fee.

**AMERICAN ARBITRATION ASSOCIATION**
**COMMERCIAL ARBITRATION RULES**

| | |
|---|---|
| COINMINT, LLC, | ) |
| | ) |
| Claimant, | ) |
| | ) |
| v. | ) **ARBITRATION DEMAND** |
| | ) |
| KATENA COMPUTING TECHNOLOGIES, INC., | ) |
| | ) **REQUESTED HEARING LOCATION:** |
| | ) **BOSTON, MA** |
| Respondent. | ) |
| | ) |
| | ) |

**PLEASE TAKE NOTICE** of the commencement of arbitration as described in the following Arbitration Demand.  Copies of these documents are being filed with the American Arbitration Association ("AAA") with a request to commence administration of the arbitration.  Pursuant to the AAA's Commercial Arbitration Rules, Respondent may file an answering statement within 14 calendar days after notice of filing of the Demand is sent by the AAA.

Paul D. Popeo
G. Mark Edgarton
Jillian L. Gately
CHOATE, HALL & STEWART, LLP
Two International Place
Boston, MA 02110
(617) 248-5000
ppopeo@choate.com
medgarton@choate.com
jgately@choate.com

Dated:  April 27, 2022

Claimant Coinmint, LLC ("Coinmint") hereby alleges, upon knowledge with respect to its own acts, and upon information and belief with respect to all other matters, the following facts in support of its Arbitration Demand against Respondent Katena Computing Technologies, Inc. ("Katena"):

## SUMMARY OF THE DISPUTE

1.      This action arises from a scheme perpetrated by Katena, pursuant to which it defrauded Coinmint of more than $23 million.  Through a series of false representations about its business and capabilities, Katena induced Coinmint to enter into a $150 million purchase contract that Katena had no ability or intention to perform.  In sum, Coinmint advanced $23 million in deposit payments to Katena under the parties' agreement and has received nothing in return. Katena refuses to return the money and refuses to explain where it is or how it has been used by Katena.  Katena acknowledges that none of Coinmint's $23 million was used to produce, or to begin production of, the specialized computer equipment (including a working prototype) that Coinmint believed it was purchasing.  When Coinmint became concerned with Katena's behavior and demanded assurances of its performance and an accounting of the whereabouts of Coinmint's millions of dollars of deposit payments, Katena responded by purporting to "terminate" the agreement.  Katena maintains that is has no obligation to refund Coinmint's $23 million and that it will not do so.  This action is the result.

2.      Coinmint is a "Bitcoin mining company."  Through its operating subsidiary, it owns and runs one of the largest digital currency data centers in the world, in a former Alcoa Aluminum facility located in Massena, NY (the "Data Center").  The Data Center houses tens of thousands of "miners" – computers specially designed to perform the Bitcoin mining operations central to Coinmint's business (and described in more detail below).

3.     In or around April and May 2021, Coinmint's former CFO, Michael Maloney ("Maloney"), engaged in discussions with Katena concerning a proposed transaction which contemplated Coinmint's purchase of thousands of specially designed "K10 miners" from Katena. During these discussions, Katena (including its CEO, Henry Monzon ("Monzon") and its Chief Scientific Officer, Michael Gao ("Gao")) made a series of intentionally false and/or misleading material representations to Maloney which were conveyed to Coinmint's management, including that:  (a) Katena had developed a patented microchip and was "a world class chip" manufacturer; (b) the miners that Coinmint would purchase from Katena were powered by patented microchips specially designed by Katena and manufactured by the world's leading semiconductor manufacturer, Taiwan Semiconductor Manufacturing Company ("TSMC"); (c) Katena had other significant clients who had entered into contracts similar to those under discussion with Coinmint; and (d) Katena was financed by a large, nationally recognized investment firm and was itself financially secure (collectively, the "Fraudulent Representations").

4.     Maloney, acting in his capacity as CFO, was the sole representative from Coinmint who participated in the discussions with Katena leading up to the proposed $150 million equipment purchase which, if consummated, would be the largest transaction in Coinmint's history.  Katena made numerous false and misleading statements to Maloney concerning Katena and its principals, including with respect to the Fraudulent Representations, and Katena's intent to modify pricing terms at the time of product delivery based on the then trading price of Bitcoin and the anticipated time, based upon that price, that the miners would "pay for themselves" by generating new Bitcoin for Coinmint.  On information and belief, this subterfuge was intended to cause Coinmint to enter into a lopsided and highly unconventional transaction that Katena and its founders intended to use

to fund Katena's business (and perhaps unrelated ventures), rather than to produce products for Coinmint.

5.     On May 13, 2021, just weeks after the discussions between Maloney and Katena apparently began, based on the representations made by Katena, Ashton Soniat (Coinmint's co-founder and Chairman ("Soniat")) electronically executed a Sales and Purchase Agreement[1] (the "S&P Agreement") (Ex. A) and an associated Purchaser Order No. 1 (the "First PO") (Ex. B) via DocuSign software.

6.     Contrary to representations made to Soniat, those documents purport to obligate Coinmint to pay Katena $150 million for miners without security or customary protection for Coinmint's payments or the equipment that Katena allegedly would supply.  After the execution of the contracts, Katena continued to make false statements to Coinmint in an attempt to convince Coinmint to make still further deposit payments to Katena.  Based on the representations made by Katena, Coinmint made deposit payments to Katena via wire transfers totaling $23,397,197.91 ("$23 million").

7.     In the weeks and months that followed Coinmint's entry into the S&P Agreement and the First PO, Coinmint (primarily through Maloney) and Katena continued to engage in discussions regarding the transaction and potential amendments to the agreements.  During these discussions, Katena continued to make additional misrepresentations to Maloney and other Coinmint executives concerning Katena's intentions and ability to perform.  Among other things, after already accepting approximately $15 million in deposits, Katena told Coinmint that it could not deliver a prototype (or any other working unit of a miner) unless Coinmint paid it at least an additional $35 million.

---

[1] Although the S&P Agreement is dated May 12, 2021, it was signed on May 13, 2021.

8.      Based on its continued dealings with Katena, Soniat and other Coinmint executives became increasingly concerned with Katena's trustworthiness and ability to perform its contractual obligation to deliver thousands of miners to Coinmint.  Ultimately, Coinmint requested that Katena (a) confirm that it had used the $23 million deposit payments for their intended purpose (i.e. to manufacture and deliver miners to Coinmint), (b) provide Coinmint with adequate and reasonable assurances of Katena's performance under the agreements, and (c) ultimately refund the $23 million in deposit payments paid to Katena by Coinmint.  In response, Katena rejected all of Coinmint's requests, and insisted that Katena had no obligations with respect to any of Coinmint's deposit payments.  In addition, Katena sent Coinmint a notice purporting to terminate the S&P Agreement and the First PO on grounds that Coinmint had failed to make sufficient deposit payments to Katena.  According to Katena, it is entitled now to keep Coinmint's entire $23 million deposit even though Katena failed to deliver even a single working unit of a miner and failed to use the money for its intended purpose.  Katena asserts that Coinmint has no recourse and should simply walkway empty-handed.

9.      To date, Coinmint has paid Katena more than $23 million and has received literally nothing in return.  Upon information and belief, as of the signing of the contracts, Katena did not design, and had never before manufactured, the K10 miner it proposed to sell to Katena (or for that matter any other semiconductor chip of any kind), Katena did not have the significant customers represented to Coinmint (and/or any customers) and Katena had no ability or intention to produce thousands of miners for Coinmint.  To the contrary, Katena recently admitted that it was hoping that Coinmint would be its "anchor customer" whose cash deposits would provide the capital that Katena needed to finance its foray into the microchip and miner business.  But

Coinmint intended to purchase specialized computer equipment as called for under the agreements, not to "finance" Katena's fledgling business.

10.    Coinmint brings this action seeking a declaration, judgment and order from the Arbitration Panel that, among other things: (a) declares the S&P Agreement and the First PO void because Coinmint was induced by fraud to sign those agreements and Katena had no ability and/or intent to perform; (b) requires Katena to return the more than $23 million in deposits previously paid by Coinmint, because Coinmint made those payments under false pretenses and as a direct result of the false representations and fraud alleged herein and/or Katena repudiated the agreements by failing to provide reasonable and timely assurance of performance; and (c) requires Katena to compensate Coinmint for any and all other damages, attorneys' fees and/or expenses caused by Katena's willful misconduct.

## THE PARTIES

11.    Coinmint is a Puerto-Rican limited liability company, having its principal place of business at 2210 Dorado Beach Road, Dorado, PR  00646-2243.  Coinmint maintains its principal place of business in Puerto Rico and operates, through its subsidiaries, a substantial Bitcoin mining facility in Massena, NY.

12.    Upon information and belief, Katena (a) is a Delaware corporation with a principal place of business in California, listed at the same address as Monzon's home, and (b) purports to be in the business of, among other things, the development, manufacturing, and sale of computer chips and cryptocurrency mining technology.

## ARBITRATION DEMAND

13.    This demand for arbitration is made pursuant to the AAA Commercial Arbitration Rules (the "AAA Rules") and an agreement by the parties to arbitrate this dispute.

14.    Section 19.2 of the S&P Agreement states as follows:

Any dispute, controversy, difference or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance, breach or termination hereof or any dispute regarding non-contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by American Arbitration Association under the rules for commercial arbitration of the American Arbitration Association in force when the notice of arbitration is submitted.  The decision and awards of the arbitration shall be final and binding upon the parties hereto.

(Ex. A).

15.     Pursuant to AAA Rule 5, Respondents "may file an answering statement with the AAA within 14 calendar days after notice of the filing of the Demand is sent by the AAA."

## FACTUAL ALLEGATIONS

### I.    Coinmint And Bitcoin Mining

16.     Mr. Soniat founded Coinmint in 2016 with a minority partner.  As explained above, Coinmint operates, through its subsidiaries, an extensive Bitcoin mining facility at its Data Center in Massena, New York.  The Data Center is one of the largest digital currency data centers in the world.  It presently houses tens of thousands of specialized mining computers of the type Katena claims to design and manufacture.  Prior to entering the Bitcoin mining industry, Soniat founded a successful energy trading firm.  With Coinmint, Soniat sought to leverage his experience in the energy industry and bring hope that the new economics of cryptocurrencies would revive a region suffering due to the decline of American manufacturing.  Coinmint eventually brought over one hundred new jobs to the Northern New York region.

17.     Bitcoin mining is both the process that (i) creates new Bitcoin to add to those already in circulation and (ii) verifies and records transactions on the blockchain.  The blockchain is a decentralized public ledger that records and secures Bitcoin transactions.  The process of transaction verification is known as proof of work (or PoW) because "miners" must solve complex math problems (i.e. algorithms) in order to be able to verify a new block of Bitcoin transactions.

In order to solve these unusually complex math functions (called hashes), Bitcoin miners require powerful computers with specialized graphics processing units (GPUs) and application-specific integrated circuits (ASICs).

18.     Miners earn Bitcoin as a reward for solving the hash functions that secure and enable the blockchain.  Bitcoin mining is a costly process because it requires expensive and highly powerful computers that consume large amounts of electricity in order to power the specialized microprocessors needed to solve these hash functions.  If derived from non-renewable sources, mining can be both financially expensive and damaging to the environment.  Soniat innovated an idea to mine Bitcoin in a manner that was both environmentally friendly and profitable by providing Bitcoin miners with access to significant quantities of renewable low-cost electricity. He was drawn to upstate New York both for the access to low cost hydroelectric power and the low temperatures, which increase the efficiency and reliability of Bitcoin-mining computers while avoiding much of the ancillary electricity and costs ordinarily necessary to cool the powerful ASIC semiconductors operating within those computers.

19.     Soniat endeavored to leverage the abundance of hydroelectric generation in upstate New York by leasing a former Alcoa Aluminum smelting facility in Massena, New York that utilizes dedicated, environmentally-conscious hydroelectric power from the abutting St. Lawrence River to power Coinmint's Bitcoin mining computers.  At a significant cost, Coinmint made substantial investments and rehabilitated the facility to transform it into a Data Center suitable to house, power and cool the tens of thousands of dedicated mining computers used in its Bitcoin mining operation.  The Data Center has been operational since 2018, and currently utilizes 140 MW of the total 435 MW capacity of the Facility.

II.     **Katena's Negotiations And Misrepresentations**

20.     In 2019, Coinmint hired Maloney as a consultant to serve as Coinmint's CFO to manage its finance administration and assist Coinmint's Controller with the accounting functions of its business.  He served in that role until he left Coinmint in September 2021.  Maloney remained an independent contractor at all times relevant to this lawsuit and during the entirety of his relationship with Coinmint.  While working at Coinmint, Maloney was also an adjunct professor at Fordham University School of Law, with claimed expertise in blockchain technology.

21.     Prior to working at Coinmint, Maloney was a managing director and co-founder of Galaxy Digital Assets, a merchant bank serving the blockchain space.  Maloney touted his experience at Galaxy Digital Assets as providing him with expertise in the blockchain space and the capability to effectively oversee Coinmint's financial operations.

22.     On or around April 17, 2021, Maloney entered into a Non-Disclosure Agreement (the "NDA") with Katena on behalf of Coinmint, without notifying or receiving authorization from Soniat or Coinmint's General Counsel.   Although the NDA expressly states that the parties thereto are Coinmint and Katena, Maloney signed the NDA on behalf of "MNA Advisory Limited"– not Coinmint.  Upon information and belief, MNA Advisory Limited is Maloney's personal consulting company.

23.     Three days later, on April 20, Monzon, Katena's Founder and CEO, sent Maloney a draft purchase agreement offering to sell Coinmint Katena's "K10 miner" and 1,666.67 Ph/s total hashing output for $100M USD.  Ph/s, or Petahash, is a unit of computing power of Bitcoin miners that is the equivalent of one quadrillion hashes per second.  On information and belief, Maloney and Monzon (and others from Katena) participated in follow-up phone conversations on at least April 28 and April 29 that included Katena's legal counsel.  Despite the fact that Katena had enlisted an attorney to participate in the contract negotiations, Maloney did not send the draft

documents to Soniat nor did he enlist the assistance of Coinmint's General Counsel, as was the practice and policy at Coinmint at that time.

24.     On May 10, 2021, Maloney circulated a final, written schedule and meeting agenda (the "Meeting Agenda") to Soniat, Jim DeNaut (Coinmint's acting CEO ("DeNaut")), and other senior executives for an upcoming Management Meeting to be held in Puerto Rico on May 12 and 13 to discuss important business issues.  Maloney made no mention of his ongoing business discussions with Katena or the contemplated $150 million transaction with Katena, even though it would represent the single largest transaction in the Company's history.

25.     On the very same day that Maloney circulated the Meeting Agenda, Maloney engaged in further "negotiations" with Monzon, Gao, and a Katena lawyer.  During "negotiations" with Katena, Maloney agreed to terms – without consulting Soniat, Coinmint's General Counsel or any other Coinmint executive – that were highly favorable to Katena and detrimental to Coinmint.  For example, Maloney agreed to completely forego a standard escrow provision that would have expressly required Katena to maintain Coinmint's initial deposit payments in an escrow account until Katena delivered a working miner that was acceptable to, and approved by, Coinmint.  Indeed, Coinmint learned later that a draft purchase order sent by Monzon to Maloney included an express requirement addressing Coinmint's initial deposit, which stated that "[t]hese funds will be held in escrow until the scheduled working unit showcase and acceptance of product by [Coinmint]."  Monzon, apparently motivated to obtain money from Coinmint without having any obligation to actually deliver a working miner to Coinmint, later removed this language and informed Maloney that:  "I understand Coinmint will be fine proceeding without Escrow for first 25% deposit."  As a result, there is no express escrow provision set forth in the final First PO.

26.     Maloney's actions in foregoing an express escrow requirement exceeded his authority and was in conflict both to industry norms and Coinmint's standard.   Contrary to Katena's position, however, the mere fact Katena removed an express escrow requirement from the contract does not mean that Katena was free to defraud Coinmint by using the deposit payments for a purpose completely unrelated to their agreed-upon purpose: manufacturing and delivering the required miners to Coinmint.

27.     The first Soniat heard any mention of "Katena" was just days before he signed the S&P Agreement and First PO.   Only a day or so before he signed the agreement, Maloney sent Soniat a copy of a single "draft" purchase order.   Soniat did not typically review drafts of contracts because the mechanics of formulating these documents were left to Maloney with final approval required by Coinmint's General Counsel.   At the time that Maloney sent the draft, Maloney described the arrangement with Katena as an "open order" with "floating" pricing and quantity terms, such that the agreement was not a firm commitment by Coinmint to purchase anything from Katena.   Soniat had no knowledge that Katena's true motivation apparently was to cause Coinmint to sign the S&P Agreement and First PO for the purpose of binding Coinmint to purchase $150 million of mining computers pursuant to a one-sided contract that Katena had designed to defraud Coinmint and abscond with millions of dollars in deposit payments.

28.     Katena and its attorneys apparently took advantage of Maloney, who was unrepresented by counsel, to provide Soniat and Coinmint's executive team with false, limited and/or misleading information about Katena.   As described above, Katena (including Monzon and Gao) made Fraudulent Representations to Coinmint, including that Katena (a) had developed a patented microchip and was a "world class" chip manufacturer with the resources to deliver, and (b) was well financed and had previous customers who had entered into similar deals.   Contrary to

these representations, and based upon information and belief (including the facts alleged herein), it now appears that Katena was a brand new startup with no operational capacity, no capability of actually producing the microchips or ASIC miners that it was attempting to sell to Coinmint, no track record whatsoever, and no financial capability to design chips to be manufactured by TSMC. Instead, Katena was apparently depending on Coinmint to be its "anchor customer" (i.e., a customer willing and able to make very large orders and payments) whose payments would be required to launch its nascent business and have TSMC manufacture the microchips that Katena was required to deliver to Coinmint.

29.    Upon information and belief, Katena (including Monzon and Gao) took advantage of Maloney and fraudulently induced Coinmint to enter into the S&P Agreement and First PO with the hope that Katena could use Coinmint's deposit payments and the fact that it had procured a large contract to "shop it around" and attract additional customers and payments necessary to jumpstart its business. Upon information and belief, Katena knew that Coinmint, upon execution of the agreements, would be placed in an automatic default position because Coinmint did not have the financial capability to providing all of the deposit payments within the inexplicably short time period required by the agreements drafted by Katena and its lawyers. Indeed, Monzon later attempted to exploit Coinmint's lack of financial capability by making additional fraudulent representations that Katena could not provide Coinmint with a working prototype of its miner unless Coinmint paid even more deposits to Katena. Monzon continued to demand additional, weekly, multimillion dollar deposits before Katena would agree to deliver a working prototype miner, even though Katena was apparently using the deposits previously paid by Coinmint for purposes entirely unrelated to the parties' transaction and not to produce a working miner or order microchips for the benefit of Coinmint.

**III.     Katena's Refusal To Provide Adequate Assurance Of Performance**

30.     After the S&P Agreement and First PO were executed in May 2021, Coinmint and Katena continued to discuss alternative and revised arrangements, including arrangements that would significantly reduce Coinmint's total purchase obligations from Katena and/or allow Coinmint to access financing to purchase the miners from Katena.

31.     In or around mid-September 2021, Monzon introduced Coinmint's CEO, Jim DeNaut, to Blockchain.com, an investment firm.  Monzon represented to DeNaut that Katena had a $100 million line of credit with Blockchain.com that could be used by Katena customers to secure purchases with Katena.  Monzon offered to allow Coinmint to utilize $50 million of the line of credit to engage in a deal with Katena.  This is an example of one of the options explored by Coinmint in attempting to reach an amicable resolution with Katena following the execution of the S&P Agreement and the First PO.  Upon information and belief, Katena did not, in fact, have a $100 million line of credit with Blockchain.com that could be used by Katena customers to secure purchases with Katena.

32.     Ultimately, Soniat became increasingly concerned with Katena and its ability to produce the contracted-for miners.  Soniat wanted to do "a side by side comparison" between a Katena miner and a miner available from another company called Bitmain. However, Katena (including through Monzon and Gao) repeatedly told Coinmint executives (including DeNaut and Maloney), as they had on several occasions following the execution of the contracts, that Katena could not provide a working unit unless and until Katena received additional million dollar deposits from Coinmint.  During this time period, Katena (including Monzon and Gao) also continued to assure Coinmint, as they had done on several occasions following the execution of

the contracts, that Katena had customers and adequate financing and resources to produce the miners.

33.     Soniat also sought assurances from Katena concerning the status and whereabouts of Coinmint's $23 million in deposit payments.  Rather than account for Coinmint's deposits and address Soniat's legitimate concerns, Monzon told Soniat matter-of-factly that:  "We don't have escrow obligations with Coinmint pre-order deposits."

34.     As confirmed by a letter from Coinmint's lawyer to Katena's lawyer dated January 4, 2022 (the "January 4th Letter"), on numerous occasions Coinmint had requested adequate assurances from Katena regarding its ability to perform under the agreements, and had conveyed its specific concerns to Katena, including, but not limited to, concerns that (i) Katena was not using Coinmint's deposit for its intended purpose, (ii) Katena did not have the ability to produce the requisite miners and (iii) Katena was using its contract with Coinmint to raise funds and attract additional customers rather than performing under the contract.  Katena inexplicably ignored Coinmint's legitimate requests and repudiated the agreements by failing to provide adequate assurance by the time period required by Coinmint and applicable law.

35.     Because Katena and its attorneys continued to dodge and/or ignore Coinmint's requests, the January 4th Letter was styled as an "*Express Written Demand For Adequate Assurance Under Cal.Com.Code Section 2609*" and informed Katena that:  "As allowed by Cal. Com. Code section 2609, if Coinmint does not receive adequate assurance as described above within the ten days, Coinmint will consider Katena's refusal to provide adequate assurance as confirmation of Katena's repudiation of the contract and will require the refund of the $23 million within thirty (30) days of the date of his letter."

36.     Katena repudiated the S&P Agreement and First PO because it failed to provide adequate assurance of performance and also failed to provide the documentation and information requested by the January 4th Letter.  To the contrary, Katena's response only validated Coinmint's concerns that Katena was fraudulently and improperly misusing the $23 million deposit payment and had no ability to perform its obligations.  On January 27, 2022, Katena's attorney sent two letters to Coinmint's attorney, neither of which provided Coinmint with the adequate assurance that it had requested.

37.     In the first letter, instead of providing Coinmint with an explanation as to the use of the $23 million deposit, Katena actually admitted that it was hoping that Coinmint would be an "anchor customer" whose cash deposits could be used by Katena to finance its operations, and that Coinmint would be willing and able to make the very large orders that TSMC required to meet its volume forecasts.  Katena also blamed Coinmint for its failure to provide even a single working unit of a miner or even a prototype, because Coinmint refused to send it millions of additional "deposit payments" without first receiving the information and assurance it was requesting.

38.     In the second letter, Katena purported to terminate the S&P Agreement and First PO on grounds that Coinmint committed a material breach of the agreement by failing to make sufficient deposit payments to Katena.  Thus, Katena contends that it can keep the entirety of Coinmint's $23 million deposit even though Coinmint received nothing in return.[2]

## IV.     Recently Obtained Evidence Of Katena's Fraud

39.     Shortly before Coinmint signed the S&P Agreement and First PO, Maloney retained Robert Bleck ("Bleck"), a semiconductor chip expert who was recommended by Katena, to run simulations on the semiconductor chip that Katena claimed to have designed and proposed

---

[2] The S&P Agreement contains a liquid damages provision that is unenforceable.

to sell to Coinmint.  However, Bleck did not prepare and provide his report to Maloney until *after* the agreements were signed by Coinmint.

40.     Soniat and Coinmint's other executives did not obtain a copy of Bleck's report until after Maloney's termination in September 2021, and they did not speak with Bleck until the weeks leading up to the filing of this Demand.  The information provided to Coinmint by Bleck provides additional evidence of Katena's fraud, including the following:

41.     Contrary to numerous statements made by Katena (including Monzon and Gao) after the execution of the P&S Agreement and First PO stating that Katena could not provide Coinmint with a working miner unless and until it received additional million dollar deposits from Coinmint, Bleck stated that Katena could have contracted with TSMC to manufacture tens of thousands of chips for just a fraction of the $23 million deposit paid to Katena.

42.     Bleck stated that he spoke with Monzon and Gao regarding Katena's capabilities. Contrary to Katena's representations prior to the execution of the contracts, he learned that Katena contracted chip design to DX Corr and did not possess the experience or capability to design the chip that it said it was going to incorporate into the miners.

43.     Bleck also confirmed that he had not been able to physically inspect any microchips because Katena had not manufactured any.  Instead, Bleck was able to review only a computer simulation of the microchip designed by DX Corr (not Katena) that would be later manufactured by TSMC.  Bleck also noted that he had continued to follow the progress of Katena's chip manufacturing venture and it did not appear to him that TSMC ever reached the "tape out" stage for the manufacture of the chip designed by DX Corr for Katena.

44.     Lastly, Bleck stated that Monzon introduced him to other "potential" customers and investors, and he did not believe that Katena had any actual customers or investors in May 2021. It was Bleck's understanding that Coinmint was Katena's first-ever customer.

45.     In sum, the evidence shows that Katena devised a scheme whereby Coinmint was fraudulently induced to enter into a $150 million contract and pay $23 million in deposit payments so that Katena would be able to show the investing public and prospective customers that it had procured a $150 million contract, even though Katena had no ability and/or intent to perform under the agreements.   Moreover, because it eliminated the escrow provision from the agreements, Katena incorrectly believed that it was free to use Coinmint's deposit for any purpose it desired, as opposed to using the deposit for procuring chips and building miners to deliver to Coinmint.

## FIRST COUNT

**(Fraud In the Inducement - Declaratory Judgment that the S&P Agreement and First PO are Voidable)**

46.     Coinmint repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

47.     By engaging in the conduct alleged in this Complaint, Coinmint was fraudulently induced by Katena to sign the P&S Agreement and First PO.

48.     As alleged herein, Katena made several material representations prior to Coinmint's execution of the P&S Agreement and the First PO, including the Fraudulent Representations that: (a) Katena had developed a patented microchip and had the ability to produce the thousands of miners it agreement to deliver to Coinmint; (b) the miners that Coinmint would purchase from Katena were designed by Katena and would be manufactured by the world's leading semiconductor manufacturer, TSMC; (c) Katena had significant clients who had entered into contracts similar to those under discussion with Coinmint; and (d) Katena was financed by a large,

nationally recognized investment firm, and had the resources to manufacture and deliver thousands of miners to Coinmint.

49.     Even after the execution of the agreements, Katena continued to make false representations to Coinmint for the purpose of inducing Coinmint to make additional deposit payments, including telling Coinmint that Katena could not provide a working miner unless Coinmint made additional deposits.

50.     Upon information and belief, including the facts and Katena's admissions described herein, Katena's representations were false.

51.     Katena knew these representations were false and made them with the intent to induce Coinmint to rely on them so that Coinmint would sign the S&P Agreement and First PO and advance deposit payments to Katena.

52.     Coinmint and Soniat justifiably relied on Katena's misrepresentations, including because of Katena's representations about Katena and its ability to produce the miners to Coinmint.

53.     Coinmint and Soniat actually relied on Katena's representations because the company would not have entered into the S&P Agreement and First PO, or made deposit payments to Katena, absent Katena's representations.

54.     As a proximate cause and result of these representations, Coinmint has suffered and continues to suffer actual and irreparable harm.

55.     Under applicable law, fraud in the inducement renders the entire contract voidable.

56.     Coinmint therefore requests a judicial determination rescinding the S&P Agreement and First PO and declaring them voidable as they were executed as a result of Katena's fraudulent inducement.

## SECOND COUNT

### (Unjust Enrichment)

57.     Coinmint repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

58.     By engaging in the conduct alleged in this Complaint, Katena has been unjustly enriched.

59.     Coinmint conferred a benefit on Katena at least by paying Katena $23 million.

60.     Katena knowingly accepted and has retained the $23 million.

61.     Katena has been unjustly enriched by Coinmint's $23 million in payments because Coinmint did not receive anything from Katena in exchange.

62.     Katena has no legitimate and reasonable explanation for withholding Coinmint's $23 million when it has not provided Coinmint with anything in return.

63.     Despite numerous requests, Katena has refused to provide any evidence that Coinmint's $23 million was used for any legitimate purposes related to the S&P Agreement and the First PO.

64.     For the reasons alleged herein, it would be unconscionable for Katena to retain Coinmint's $23 million in payments.

65.     Coinmint does not have an adequate remedy at law.

## **THIRD COUNT**

### **(Theft By False Pretenses under California Penal Code § 496)**

66.     Coinmint repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

67.     By engaging in the conduct alleged in this Demand, Katena violated California Penal Code § 496.

68.     Upon information and belief, Katena received $23 million from Coinmint through false pretenses by fraudulently inducing Coinmint to enter into the P&S Agreement and First PO when Katena had no ability or intent to perform its contractual obligations.

69.     Upon information and belief, Katena intended to take Coinmint's $23 million in deposits to finance its business and/or other ventures unrelated to the S&P Agreement and First PO.

70.     Had Coinmint known of Katena's Fraudulent Representations and its true intent and/or capabilities (or lack thereof), it would not have paid Katena $23 million.

71.     Katena knew it obtained the $23 million from Coinmint under false pretenses and as a result of its Fraudulent Representations.

72.     Katena received or had possession of Coinmint's $23 million.

73.     Pursuant to § 496(c), Coinmint is entitled to treble damages, costs of suit, and attorneys' fees.

## FOURTH COUNT

### (Money Had and Received)

74.     Coinmint repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

75.     Katena is indebted to Coinmint for monies Katena received for the use and benefit of Coinmint.

76.     Coinmint has received nothing in return from Katena and has obtained no benefit from Katena in return for the money received.

77.     Consequently, there has been a total failure of consideration under the parties' contract, and Coinmint has suffered damages in excess of $23 million as a result.

## FIFTH COUNT

**(Failure to Provide Adequate Assurance - Declaratory Judgment that Katena Repudiated the S&P Agreement and First PO Pursuant to Cal. Com. Code Section 2609)**

78.     Coinmint repeats and re-alleges each of the foregoing paragraphs as if fully set forth herein.

79.     Katena and Coinmint entered into the S&P Agreement and First PO, which both have effective dates of May 12, 2021.

80.     Pursuant to the agreements, Coinmint was to purchase K10 miners from Katena.

81.     Section 2609(1) of the California Commercial Code provides "[w]hen reasonable grounds for insecurity arise with respect to the performance of either party the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return."

82.     Section 2609(4) provides "[a]fter receipt of a justified demand failure to provide within a reasonable time not exceeding 30 days such assurance of due performance as is adequate under the circumstances of the particular case is a repudiation of the contract."

83.     As alleged above, Coinmint previously requested that Katena provide adequate assurance of its performance and Katena failed to provide such adequate assurance as required by Coinmint and applicable law.

84.     By way of example only, Coinmint's prior counsel sent Katena's counsel the January 4th Letter.

85.     At the time of the January 4th Letter, Coinmint had obtained information revealing that Katena was not using Coinmint's $23 million in payments to satisfy the intended purpose of the First PO to build a prototype and reserve the purchase of K10 miners.

86.     More than thirty days have passed since Coinmint first requested adequate assurance from Katena (including with respect to Katena's use of the $23 million) and since the January 4th Letter.  Katena has not provided any assurance of its performance.

87.     Coinmint therefore requests a judicial determination that (i) Katena repudiated the S&P Agreement and First PO and (ii) Coinmint is therefore entitled to a refund of the $23 million it paid Katena pursuant to those agreements.

## PRAYER FOR RELIEF

WHEREFORE, Claimant respectfully requests the following relief:

A.     Award Claimant actual, compensatory and consequential damages, including but not limited to the more than $23 million in funds Coinmint has paid Katena;

B.     Award Claimant treble damages, costs of suit, and attorneys' fees pursuant to California Penal Code § 496(c);

C.     Pre- and Post-judgment interest at the maximum rate provided by law;

D.     A declaratory judgment (i) rescinding the S&P Agreement and First PO and declaring them voidable for fraud in the inducement and/or (ii) declaring that Katena repudiated the agreements by failing to provide adequate assurance of its performance; and

E.     Such other and further relief as this Court may deem just and proper.

Dated:  April 27, 2022                    Respectfully submitted,


                                          By:  /s/ *Paul D. Popeo*
                                          Paul D. Popeo
                                          G. Mark Edgarton
                                          Jillian L. Gately
                                          CHOATE, HALL & STEWART, LLP
                                          Two International Place
                                          Boston, MA 02110
                                          (617) 248-5000
                                          ppopeo@choate.com
                                          medgarton@choate.com
                                          jgately@choate.com

                                          *Attorneys for Claimant Coinmint, LLC*

# EXHIBIT A

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

# SALES AND PURCHASE AGREEMENT

This agreement (this "Agreement") is made on May 12, 2021 (the "Effective Date ") by and between Katena Computing Technologies, Inc., a Delaware corporation ("Katena" or the "Manufacturer"), and Coinmint, LLC (the "Purchaser"), with its principal place of business at 1413 Avenida Ponce de Leon, #605 San Juan, PR 00907 Katena and the Purchaser shall hereinafter collectively be referred to as the "Parties", and individually as a "Party".

| CUSTOMER DETAILS | |
|---|---|
| **Customer:** | Coinmint, LLC |
| **Customer Address:** | 1413 Avenida Ponce de Leon, #605, San Juan, PR 00907 |
| **Customer Primary Contact:** | Ashton Soniat, Chairman |
| **Customer Phone Number:** | +1-516-514-7563 |
| **Customer Email Address:** | a@coinmint.one, ashton.soniat@gmail.com |

**WHEREAS** , the Purchaser wishes to purchase from the Manufacturer ASIC mining equipment specified in the Purchase Order, and;

**WHEREAS** , the Manufacturer wishes to provide to Purchaser the ASIC mining equipment, subject to the terms and conditions of this Agreement.

NOW, THEREFORE, in consideration of the mutual promises and covenants exchanged herein, and for good and valuable consideration, the adequacy and receipt of which are hereby acknowledged, the Parties hereby agree to the terms and conditions set forth in this Agreement, including the Purchase Order.

The Parties hereto agree as follows:

1. **Definitions and Interpretations**

    The following terms, as used herein, have the following meanings:

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

1.1.   "Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling, Controlled by, or under common Control with such Person;   "Person" means any individual, corporation, partnership, limited partnership, proprietor ship, association, limited liability company, firm, trust, estate or other enterprise or entity (whether or not having separate legal personality); and "Control" means the power or authority, whether exercised or not, to direct the business, management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise, provided that such power or authority shall conclusively be presumed to exist upon possession of beneficial ownership or power to direct the vote of more than fifty percent (50%) of the votes entitled to be cast at a meeting of the members or shareholders of such Person or power to control the composition of a majority of the board of directors of such Person. The terms "Controlled" and "Controlling" have meanings correlative to the foregoing.

1.2.   "Applicable Law" means any treaty, law, decree, order, regulation, decision, statute, ordinance, rule, directive, code or other document that has legal force under any system of law, including , without limitation, local law, law of any other state or part thereof or international law, and which creates or purports to create any requirement or rule that may affect, restrict, prohibit or expressly allow the terms of this Agreement or any activity contemplated or carried out under this Agreement.

1.3.   "Force Majeure" means in respect of either Party, any event or occurrence whatsoever beyond the reasonable control of that Party, which delays, prevents or hinders that Party from performing any obligation imposed upon that Party under this Agreement, including to the extent such event or occurrence shall delay, prevent or hinder such Party from performing such obligation, war (declared or undeclared), terrorist activities, acts of sabotage, blockade, fire, lightning, acts of god, national strikes, riots, insurrections, civil commotions, quarantine restrictions, epidemics, earthquakes, landslides, avalanches, floods, hurricanes, explosions and regulatory and administrative or similar action or delays to take   actions of any governmental authority.

1.4.   "Insolvency Event" in the context of the Purchaser means any of the following events:

(i)   a receiver, receiver and manager, judicial manager, official manager, trustee, administrator or similar official  is appointed, or steps are taken for  such appointment, over all or any part of the assets, equipment or undertaking of the Purchaser;

(ii)   if the Purchaser stops or suspends payments to its creditors generally, is unable to or admits its inability to pay its debts as they fall      due, seeks to enter into any composition or other arrangement with its creditors, is declared or becomes bankrupt or insolvent or enters into liquidation;

(iii)   a petition is presented, a proceeding is commenced, an order is made or an effective resolution is p assed or any other steps are taken by any person for the liquidation, winding up, insolvency, judicial  management, administration, reorganization, reconstruction, dissolution or bankruptcy of the Purchaser, otherwise than for the purpose of a bona fide sch eme of solvent amalgamation or reconstruction; or

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

(iv)   if any event, process or circumstance analogous or having a substantially similar effect to any of the above, in any applicable jurisdiction, commences or exists.

1.5.  "Intellectual Property Rights " means any and all intellectual property rights, including but not limited to those concerning inventions, patents, utility models, registered designs and models, engineering or production materials, drawings, trademarks, service marks, domain names, applications for any of the foregoing (and the rights to apply for any of the foregoing), proprietary or business sensitive information and/or technical know-how, copyright, authorship, whether registered or not, and any neighbor rights.

1.6.  "Order" means the Purchaser's request to Katena for certain Product(s) in accordance with this Agreement.

1.7.  "Product(s)" means the merchandise that Katena will provide to the Purchaser in accordance with this Agreement.

1.8.  "Purchase Order" means an order form referencing, and executed by the parties hereto in connection with, this Agreement , in the form attached hereto as Exhibit A . Each Purchase Order will be incorporated into this Agreement in its entirety .

1.9.  "Total Purchase Price" means the aggregate amount payable by the Purchaser as set out in any Purchaser Order

1.10. "Warranty Period" means the period of time that the Product(s) are covered by the warranty granted by Katena or its Affiliates in accordance with Clause 6 of this Agreement.

1.11. "Warranty Start Date " means the earlier of (i ) 10 days from the date on which the Product(s) are delivered to the carrier or (ii) date of delivery to the site set forth on the Purchase Order

**Interpretations:**
i)    Words importing the singular include the plural and vice versa where the context so requires.
ii)   The headings in this Agreement are for convenience only and shall not be taken into consideration in the interpretation or construction of this Agreement.
iii)  References to Clauses and Appendix(es) are references to Clauses and Appendix(es) of this Agreement.
iv)   Unless specifically stated otherwise, all references to days shall mean calendar days.
v)    Any reference to a code, law, statute, statutory provision, statutory instrument, order, regulation or other instrument of similar effect shall include any re     -enactment or amendment thereof for the time being in force.
vi)   If there is a conflict between the terms of this Purchase     Agreement and the Prucahse Order, the terms of th e Purchase Order will govern.

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

**2.   Sales of Products**

2.1.   Katena will provide the Product(s) set forth in any Purchase Order to the Purchaser in accordance with provisions of Clause 2, Clause 3, Clause 4, Clause 5 and Appendix A of this Agreement, and the Purchaser shall make payment in accordance with the terms specified in this Agreement. The Purchaser acknowledges and confirms that each Purchase Order is irrevocable and cannot be cancelled by the Purchaser, and that the Product(s) ordered are neither returnable nor refundable. All sums paid by the Purchaser to Katena shall not be subject to any abatement, set off, claim, counterclaim, adjustment, reduction, or defense for any reason. Down payment and payment of Total Purchase Price are not refundable, save as otherwise mutually agreed by the Parties.

2.2.   Purchaser acknowledges and agrees that to the extent required by Katena as part of its due diligence and risk compliance requirements under Applicable Laws, Purchaser may be required to provide certain information to Katena in connection with customer identity verification/know your customer (the "KYC Information").

**3.   Prices and Terms of Payment**

3.1   The Purchaser shall pay the Total Purchase Price under the Payment Terms defined in each Purchase Order

3.2   The Parties understand and agree that the applicable prices of the Product(s) are exclusive of applicable bank transaction fee s and any and all applicable import duties, taxes and governmental charges set forth in the Purchase Order and unspecified duties, taxes, and governmental charges applied to the purchase following the signing of the Purchase Order The Purchaser shall pay or reimburse Katena for all taxes levied on or assessed against the amounts payable hereunder. If any payment is subject to withholding, the Purchaser shall pay such additional amounts as necessary, to ensure that Katena receives the full amount it would have received had payment not been subject to such withholding.

**4.   Shipping of Product(s)**

4.1   Subject to the limitations stated in any Purchaser Order, the terms of delivery of the Product(s) shall be ex works (place of pick up to be specified later). Once the Product(s) have been delivered to specified place of pick up, Katena shall have fulfilled its obligation to supply the Product(s) to the Purchaser, and the title and risk of loss or damage to the Product(s) shall pass to the Purchaser.

4.2   All delivery dates in Purchaser Orders are estimated, but not guaranteed. In the case that Purchaser has fulfilled its payment obligations in accordance with the terms and conditions of this Agreement and Katena fails to deliver the Products within the shipping period listed in a Purchase Order, the Purchaser is entitled to submit a written notice to Katena. If Katena fails to deliver the Products within ninety (90) days after receiving the written reminder from the Purchaser, the Purchaser is entitled

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

to: (i) terminate  the applicable Purchase Order and require Katena to return the amounts paid by the Purchaser for the applicable undelivered product  (Katena shall not pay any interests in this respect), or (ii) con  tinue to perform  under the applicable Purchase Order and require Katena to deliver the Products by a new mutually acceptable delivery date .

4.3   Notwithstanding anything to the contrary above,   Katena shall not be responsible for any delivery delay caused by the Purchaser or any third party, including but not limited to the carrier, the customs, and the import brokers, nor shall it be liable for damages, whether direct, indirect, incidental, consequental.

4.4   Katena shall not be responsible and the Purchaser shall be fully and exclusively responsible for  any loss of  Product(s), personal injury,  property damage, other damage or liability caused by the Product(s) or the transportation of the Product(s) either to  the  Purchaser or  any  third  party,  or  theft  of  the  Product(s) during transportation from  Katena to the Purchaser.

4.5   Katena has the right to discontinue the sale of the Product(s) and to make changes to its Product(s) at any time, without prior appro  val from or notice to the Purchaser.

4.6   If the Product(s) is rejected and/or returned back to  Katena because of any reason and regardless of the cause of such delivery failure, the Purchaser shall be solely and exclusively liable for and shall defend, fully indemnify and hold harmless      Katena against any and all related expenses, fees, charges and costs incurred, arising out of or incidental to such rejection and/or return (the   "Return Expense"). Furthermore, if the Purchaser would like to ask for  Katena's assistance in redelivering such Product(s) or assist in any other manner, and if  Katena at its sole discretion decides to provide this assistance, then in addition to the Return Expense, the Purchaser shall also pay Katena an administrative fee  as mutually agreed to by the parties .

## 5.   Customs

5.1   Katena shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances for the export of the Product(s) that are required to be obtained by     Katena or the carrier under Applicable Laws.

5.2   The Purchaser shall obtain in due time and maintain throughout the term of this Agreement (if applicable), any and all approvals, permits, authorizations, licenses and clearances required for the import of the Product(s) to the co   untry of delivery as indicated in the  applicable Purchase Order, that are required to be obtained by the Purchaser or the carrier under Applicable Laws, and shall be responsible for any and all additional fees, expenses and charges in relation to the impor t of the Product(s).

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

5.3   Katena will not be held liable for Purchaser's failure to acquire or maintain any approvals, permits, authorizations, licenses and clearances required for the delivery or operation of the Product(s) delivered as indicated in the Purch ase Order.

## 6.   Warranty

6.1   The Warranty Period shall start on the Warranty Start Date and end on the 365th day after the Warranty Start Date. During the Warranty Period, the Purchaser 's sole and exclusive remedy, and Katena's entire liability, will be to repair or replace, at Katena's sole discretion, the defective part/component of the Product(s) or the defective Product(s) at no charge to the Purchaser. If the performance metrics of any Products are lower than thresholds specified in the applicable Purchase Order, then Katena may compensate the Purchaser by delivering additional corresponding Products to Purchaser to achieve applicable performance metrics ±5%.

6.2   The Parties acknowledge and agree that the warranty provided by Katena as stated in the preceding paragraph does not apply to the following:

(i)      normal wear and tear;

(ii)     damage resulting from accident, abuse, misuse, neglect, improper handling or improper installation;

(iii)    damage or loss of the Product(s) caused by undue physical or electrical stress, including but not limited to moisture, corrosive environments, high voltage surges, extreme temperatures, shipping, or abnormal working conditions;

(iv)    damage or loss of the Product(s) caused by acts of nature including, but not limited to, f loods, storms, fires, and earthquakes;

(v)     damage caused by operator error, or non-compliance with instructions as set out in accompanying documentation;

(vi)    alterations by persons other than Katena, associated partners or authorized service facilities;

(vii)   Product(s) on which the original software has been replaced or modified by persons other than Katena, associated partners or authorized service facilities;

(viii)  counterfeit products;

(ix)    damage or loss of data caused by improper usage and behavior which is not recommended and/or permitted in the product documentation;

(x)     failure of the Product(s) caused by usage of products not supplied by  Katena; and

(xi)    damage to hash boards or chips from improper uses.

(xii)   Damage resulting from operations above or below the manufacturer defined temperature range, through submersion into liquid or similar cooling systems,

(xiii)  Damage resulting from using unauthorized, 3rd party, or failure to update authorized firmware within thirty (30) days of release

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

6.3    Notwithstanding anything to the contrary herein, the Purchaser acknowledges and agrees that the Product(s) provided by Katena do not guarantee any cryptocurrency mining rewards and, Katena shall not be liable for any cryptocurrency mining time loss or cryptocurrency mining revenue loss that are caused by downtime of any part/component of the Product(s). Katena does not warrant that the Product(s) will meet the Purchaser's requirements or the Product(s) will be uninterrupted or error free. Except as provided in Clause 6.1 of this Agreement, Katena makes no warranties to the Purchaser with respect to the Product(s), and no warranties of any kind, whether written, oral, express, implied or statutory, including warranties of merchantability, fitness for a partic   ular purpose or non-infringement or arising from course of dealing or usage in trade shall apply.

## 7    Representations and Warranties

The Purchaser makes the following representations and warranties to Katena:

7.1    It has the full power and authority to own its      assets and carry on its businesses.

7.2    The obligations expressed to be assumed by it under this Agreement are legal, valid, binding and enforceable obligations.

7.3    It has the power to enter into, perform and deliver, and has taken all necessary action to authorize its entry into, performance and delivery of, this Agreement and the transactions contemplated by this Agreement.

7.4    The entry into and performance by it of, and the transactions contemplated by, this Agreement do not and will not conflict with:
   (i)       any Applicable Law;
   (ii)      its constitutional documents; or
   (iii)     any agreement or instrument binding upon it or any of its assets.

7.5    All authorizations required or desirable:
   (i)       to enable it lawfully to enter into, exercise its rights under and comply with its obligations under this Agreement;
   (ii)      to ensure that those obligations are legal, valid, binding and enforceable; and
   (iii)     to make this Agreement admissible in evidence in its jurisdiction of incorporation,
   have been or will have been by the time, obtained or effected and are, or will be by the appropriate time, in full force and effect.

7.6    It is not aware of any circumstances which are likely to lead to:
   (i)       any authorization obtained or  effected not remaining in full force and effect;
   (ii)      any authorization not being obtained, renewed or effected when required or desirable; or

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

(iii)     any authorization being subject to a condition or requirement which it does not reasonably expect to satisfy or the compliance with which has or could reasonably be expected to have a material adverse effect.

7.7     (a) It is not the target of economic sanctions administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury, the U.S. Department of State, the United Nations Security Council, the European Union, Her Majesty's Treasury or Singapore ("Sanctions"), including by being listed on the Specially Designated Nationals and Blocked Persons (SDN) List maintained by OFAC or any other Sanctions list maintained by one of the foregoing governmental authorities, directly or indirectly owned or controlled by one or more SDNs or other Persons included on any other Sanctions list, or located, organized or resident in a country or territory that is the target of Sanctions, and (b) the purchase of the Product(s) will not violate any Sanctions or import and export control related laws and regulations or other Applicable Laws.

7.8     All information supplied by the Purchaser, including the KYC Information, is and shall be true and correct, and the information does not contain and will not contain any statement that is false or misleading.

## 8     Indemnification and Limitation of Liability

8.1     The Purchaser shall, during the term of this Agreement and at any time thereafter, indemnify and save Katena and/or its Affiliates and their officers, directors, and agents harmless from and against any and all damages, suits, claims, judgments, liabilities, losses, fees, costs or expenses of any kind, including legal fees, whatsoever arising out of or incidental to the Products pursuant to this Agreement, including, without limitation, Purchaser's violations of any Applicable Laws.

8.2     Notwithstanding anything to the contrary herein, Katena and its Affiliates shall under no circumstances, be liable to the Purchaser for any consequential loss, or loss of goodwill, business, anticipated profits, revenue, contract, or business opportunity arising out of or in connection with this Agreement, and the Purchaser hereby waives any claim it may at any time have against Katena and its Affiliates in respect of any such damages. The foregoing limitation of liability shall apply whether in an action at law, including but not limited to contract, strict liability, negligence, willful misconduct or other tortious action, or an action in equity.

8.3     Katena and its Affiliates' cumulative aggregate liability pursuant to this Agreement, whether arising from tort, breach of contract or any other cause of action shall be limited to and not exceed the amount paid by Purchaser to Katena under the applicable Purchaser Order during the prior twelve (12) months.

8.4     The Product(s) are not designed, manufactured or intended for use in hazardous or critical environments or in activities requiring emergency or fail-safe operation, such as the operation of nuclear facilities, aircraft navigation or communication systems

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

or in any other applications or activities in which failure of the Product(s) may pose the risk of environmental harm or physical injury or death to humans. Katena specifically disclaims any express or implied warranty of fitness for any of the above described application and any such use shall be at the Purchaser's sole risk.

8.5    The above limitations and exclusions shall apply (1) notwithstanding failure of essential purpose of any exclusive or limited remedy; and (2) whether or not Katena has been advised of the possibility of such damages. This Clause allocates the risks under this Agreement and Katena's pricing reflects this allocation of risk and the above limitations.

## 9    Distribution

9.1    This Agreement does not constitute a distributor agreement between Katena and the Purchaser. Therefore, the Purchaser is not an authorized distributor of Katena.

9.2    Unless explicitly authorized by Katena in writing, t he Purchaser shall in no event claim or imply to a third party that it is an authorized distributor of Katena or any similar terms, or perform any act that will cause it to be construed as an authorized distributor of Katena As between the Purchaser and Katena, the Purchaser shall be exclusively and fully responsible for complying with the Applicable Laws regarding repackaging the Product(s) for the Purchaser's redistribution needs, and shall be solely liable for any and all liabilities or costs directly incurred or incidental to such redistribution.

## 10    Intellectual Property Rights

10.1    The Parties agree that the Intellectual Property Rights in any way contained in the Product(s), made, conceived or developed by Katena and/or its Affiliates for the Product(s) under this Agreement and/or, achieved, derived from, related to, connected with the provision of the Product(s) by Katena and/or acquired by Katena from any other person in performance of this Agreement shall be th e exclusive property of Katena and/or its Affiliates.

10.2    Notwithstanding anything to the contrary herein, all Intellectual Property Rights in the Product(s) shall remain the exclusive property of Katena and/or its licensors. Except for licenses explicitly id entified in this Agreement, no rights or licenses are expressly granted, or implied, whether by estoppel or otherwise, in respect of any Intellectual Property Rights of Katena and/or its Affiliates or any Intellectual Property residing in the Product(s) pr ovided by Katena to the Purchaser, including in any documentation or any data furnished by Katena. Katena grants the Purchaser a non-exclusive, non-transferrable, royalty -free and irrevocable license of Katena and/or its Affiliates ' Intellectual Property Rights to solely use the Product(s) delivered by Katena to the Purchaser for their ordinary function, and subject to the Clauses set forth herein. The Purchaser shall in no event violate the Intellectual Property Rights of Katena and/or its licensors.

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

10.3   If applicable, payment by the Purchaser of non-recurring charges to Katena for any special designs, or engineering or production materials required for Katena's performance of Orders for customized Product(s), shall not be construed as payment for the assignment from Katena to the Purchaser of title to the design or special materials. Katena shall be the sole owner of such special designs, engineering or production materials.

## 11   Confidentiality and Communications

11.1   All information concerning this Agreement and matters pertaining to or derived from the provision of Product(s) pursuant to this Agreement between the Parties, whether in oral or written form, or in the form of drawings, computer programs or other, as well as all data derived therefrom ("Confidential Information"), shall be deemed to be confidential information of Katena and, as such, may not be divulged to any unauthorized person. The Purchaser undertakes and agrees to take all reasonable and practicable steps to ensure and protect the confidentiality of the Confidential Information which cannot be passed, sold, traded, published or disclosed to any unauthorized person.

## 12   Term and Termination of this Agreement

12.1   This Agreement will commence on the Effective Date and expire on the later of: (i) the two (2) year anniversary of the Effective Date, and (ii) the last delivery of Product under any outstanding Purchase Order

12.2   Katena shall be entitled to terminate this Agreement with immediate effect upon written notice to the Purchaser if:

(i)      the Purchaser fails to comply in any material respect of this Agreement, and where that failure is capable of being remedied, fails to remedy it within thirty (30) days of being notified by Katena to do so;

(ii)     Katena delivers sixty (60) days ' notice to the Purchaser for material breach of this Agreement ;

(iii)    it is or becomes unlawful for the Purchaser to perform or comply with any of its material obligations under this Agreement or all or a material part of the obligations of the Purchaser under this Agreement are not or cease to be valid, binding and enforceable; or

(iv)     an Insolvency Event occurs in respect of the Purchaser.

12.3   The Purchaser shall be entitled to terminate this Agreement upon providing sixty (60) days' notice to Katena, except that Purchaser may not terminate this Agreement until all Purchaser Orders have been fulfilled .

12.4   If the Purchaser fails to comply in any material respect of this Agreement, Katena will have the right to request and the Purchaser will be obliged to pay to Katena liquidated damages (but not penalty) for such breach in the amount of 100% of any down payment specified in each Purchaser Order. Both Parties acknowledge and

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

agree that the amount of liquidated damages set out in this Clause is agreed as a genuine pre-estimate of the losses which may be sustained by Katena in the event that the Purchaser fails in its respective obligations under this Agreement, and not as a penalty.

12.5    Termination of this Agreement shall be without prejudice to the rights and liabilities of the Parties accrued prior to or as a re sult of such termination, including those related to antecedent breaches. Termination of this Agreement for any cause or otherwise shall not release a Party from any liability which at the time of termination has already accrued to the other Party or which thereafter may accrue in respect of any act or omission prior to such termination. Provisions contained in this Agreement that expressly or by their sense and context are intended to survive the expiration or termination of the Agreement shall so survive such expiration or termination, it being the intent that a claim or right which accrued to a Party prior to such expiration or termination shall not be prejudiced .

## 13   Contact Information

All communications in relation to this Agreement shall be made to the contacts specified in the signature block s and each Purchase Order

## 14   Compliance with Laws and Regulations

14.1    The Purchaser undertakes that it will fully comply with all Applicable Laws in relation to export and import control and Sanctions and shall not take any action that would cause Katena or any of its Affiliates to be in violation of any export and import control laws or Sanctions. The Purchaser shall also be fully and exclusively liable for and shall defend, fully indemnify and hold harmless    Katena and/or its Affiliates from and against any and all claims, demands, actions, costs or proceedings brought or instituted against Katena and/or its Affiliates arising out of or in connection with any breach by the Purchaser or the carrier of any Applicable Laws in relation to export and import control or Sanction.

14.2    The Purchaser acknowledges and agrees that the Product(s) in this Agreement are subject to the export control laws and regulations of all related countries, including but not limited to the Export Administration Regulations    ("EAR") of the United States. Without limiting the foregoing, the Purchaser shall n ot, without receiving the proper licenses or license exceptions from all related governmental authorities, including but not limited to the U.S. Bureau of Industry and Security, distribute, re  -distribute, export, re-export, or transfer any Product(s) subject to this Agreement either directly or indirectly, to any national of any country identified in Country Groups D:1 or E:1 as defined in the EARs. In addition, the Product(s) under this Agreement may not be exported, re-exported, or transferred to (a) any person or entity listed on the "Entity List ", " Denied Persons List" or the SDN List as such lists are maintained by the U.S. Government, or (b) an end-user engaged in activities

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

related to weapons of mass destruction. Such activities include but are not ne cessarily limited to activities related to: (1) the design, development, production, or use of nuclear materials, nuclear facilities, or nuclear weapons; (2) the design, development, production, or use of missiles or support of missiles projects; and (3) t he design, development, production, or use of chemical or biological weapons. The Purchaser further agrees that it will not do any of the foregoing in violation of any restriction, law, or regulation of the European Union or an individual EU member state t hat imposes on an exporter a burden equivalent to or greater than that imposed by the U.S. Bureau of Industry and Security.

14.3 The Purchaser undertakes that it will not take any action under this Agreement or use the Product(s) in a way that will be a breac h of any anti -money laundering laws, any anti-corruption laws, and/or any counter -terrorist financing laws.

14.4 The Purchaser warrants that the Product(s) have been purchased with funds that are from legitimate sources and such funds do not constitute proceeds of criminal conduct, or realizable property, or proceeds of terrorism financing or property of terrorist, within the meaning given in the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Chapter 65A) and the Terrorism (Suppression of Financing) Act (Chapter 325), respectively. The Purchaser understands that if any Person resident in Singapore knows or suspectsor has reasonable grounds for knowing or suspecting that another Person is engaged in criminal conduct or is involved with terrorism or terrorist property and the information for that knowledge or suspicion came to their attention in the course of business in the regulated sector, or other trade, profession, business or employment, the Person will be required to r eport such knowledge or suspicion to the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force. The Purchaser acknowledges that such a report shall not be treated as breach of confidence or violation of any re striction upon the disclosure of information imposed by any Applicable Law, contractually or otherwise.

## 15 Force Majeure

15.1 To the extent that a Party is fully or partially delayed, prevented or hindered by an event of Force Majeure from performing any obligation under this Agreement (other than an obligation to make payment), subject to the exercise of reasonable diligence by the affected Party, the failure to perform shall be excused by the occurrence of such event of Force Majeure. A Party claiming th at its performance is excused by an event of Force Majeure shall, promptly after the occurrence of such event of Force Majeure, notify the other Party of the nature, date of inception and expected duration of such event of Force Majeure and the extent to w hich the Party expects that the event will delay, prevent or hinder the Party from performing its obligations under this Agreement. The notifying Party shall thereafter use its best effort to eliminate such event of Force Majeure and mitigate its effects.

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

15.2    The affected Party  shall use reasonable diligence to remove the event of Force Majeure, and shall keep the other Party informed of all significant developments.

## 16   Entire Agreement and Amendment

This Agreement along with all Purchase Orders, constitute the entire agreement of the Parties hereto and can only be amended with the written consent of both Parties or otherwise as mutually agreed by both Parties. If there is a conflict between the terms of this Purchase Agreement and the Purchase Order, the terms of the Purchase Order will govern.

## 17   Assignment

17.1    Katena may freely assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part to its Affiliates or to any third party      , provided that Katena will pro vide notice to Purchaser of such assignment or transfer. The Purchaser may not assign or transfer any of its rights, benefits or obligations under this Agreement in whole or in part without   Katena's prior written consent , which consent may not be unreasonably withheld .

17.2    This Agreement shall be binding upon and ensure to the benefit of each Party to this Agreement and its successors in title and permitted assigns.

## 18   Severability

To the extent possible, if any provision of this Agreement is held to be illegal, invalid or unenforceable in whole or in part by a court, the provision shall apply with whatever deletion or modification is necessary so that such provision is legal, valid   and enforceable and gives effect to the commercial intention of the Parties. The remaining provisions of this Agreement shall not be affected and shall remain in full force and effect.

## 19   Governing Law and Dispute Resolution

19.1    This Agreement shall be solely governed by and construed in accordance with the laws of California .

19.2    Any dispute, controversy, difference  or claim arising out of or relating to this Agreement, including the existence, validity, interpretation, performance , breach or termination hereof or any dispute regarding non -contractual obligations arising out of or relating to this Agreement shall be referred to and finally resolved by arbitration administered by American Arbitration Association   under the rules for c ommercial arbitration  of the American Arbitration Association   in force when the notice of arbitration is submitted. The decision and awards of the arbitration shall be final and binding upon the parties hereto.

## 20   No Waiver

Failure by either Party to enforce at any time any provision of this Agreement, or to exercise any election of options provided herein shall not constitute a waiver of such provision or

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

option, nor affect the validity of this Agreement or any part hereof, or the right of the waiving Party to thereafter enforce each and every such provision or option.

### 21  Counterparts and Electronic Signatures

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original copy of this Agreement, and all of which, when taken together, will be deemed to constitute one and the same agreement. The facsimile, email or other electronically delivered signatures of the Parties shall be deemed to constitute original signatures, and facsimile or electronic copies hereof shall be deemed to constitute duplicate originals.

### 22  Further Assurance

Each Party undertakes to the other Party to execute or procure to be executed all such documents and to do or procure to be done all such other acts and things as may be reasonable and necessary to give all Parties the full benefit of this Agreement.

### 23  Third Party Rights

24   A person who is not a Party to this Agreement has no right to enforce or to enjoy the benefit of any term of this Agreement.

*(The rest part of   the page is intentionally left in blank   )*

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

IN WITNESS WHEREOF, the Parties hereto have executed this Sales and Purchaser Agreement as of the Effective Date :

**Katena**: **Katena Computing Technologies, Inc.**

Signature_____
Name_____
        Heny Monzon
Title _____
        Chief Executive Officer

Signed for and on behalf of  the Purchaser

**Coinmint, LLC**

Signature_____
 Name: Ashton Soniat
Title : Chairman

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

**EXHIBIT A**

**Form of Purchaser Order**

This Purchase Order No. ___ between Katena Computing Technologies, Inc., a Delaware corporation ("Katena"), and the purchaser listed below (the "Purchaser") is made in connection with and includes, incorporates, and is subject to the terms of the Sales and Purchase Agreement between Katena and Purchaser dated as of _____, 20___ (the "Agreement"). Any terms used herein and not defined will have the meanings given to them in the Agreement. If there is a conflict between the terms of this Purchase Order and the Agreement, the terms of this Purchase Order will govern.

| Purchaser: | Contact: |
|---|---|
| Address: | Phone: |
| | E-Mail: |
| Product: | |
| Price: | |
| Payment Timing: | |
| Payment Form: | |
| Delivery Destination: | |
| Delivery Date: | |
| Other: | |

DocuSign Envelope ID: 7B774BAE-2EAE-4502-89AB-6131D5C1B23C

IN WITNESS WHEREOF, the Parties hereto have executed this Purchaser Order No. __ as of the last date signed below:

**Katena: Katena Computing Technologies, Inc.**                **Purchaser _____**

_____                                    _____
Signature                                                  Signature

_____                                    _____
Name                                                       Name

_____                                    _____
Title                                                      Title

_____                                    _____
Date                                                       Date

**17 / 17**

# EXHIBIT B

DocuSign Envelope ID: 51919473-2838-4C4A-B599-23DD036D0772

**Purchaser Order No. 1**

This Purchase Order No. 1 between Katena Computing Technologies, Inc., a Delaware corporation ("Katena"), and the purchaser listed below (the "Purchaser") is made in connection with and includes, incorporates, and is subject to the terms of the  Sales and Purchase Agreement between Katena and Purchaser dated as of May 12, 2021 (the "Agreement"). Any terms used herein and not defined will have the meanings given to them in the Agreement.   If there is a conflict between the terms of this      Purchase Order and the Agreement, the terms of this Purchase Order will govern

| Purchaser Coinmint, LLC | Contact Ashton Soniat, Chairman |
|---|---|
| Address:<br><br>1413 Avenida Ponce de Leon, #605 | Phone: +1-516-514-7563 |
| San Juan, Puerto Rico 00907 | E-Mail:<br>a@coinmint.one<br>ashton.soniat@gmail.com |

| **Product Description** |
|---|
| Product Description: K10 Miner, 90 Th/s output , 3150W |
| Manufacturer  Performance: 35 J/Th efficiency |
| Power Supply Unit: Description |
| [Note: Katena reserves the right to deliver  a lower J/Th efficiency and/or higher    Th/s output per Miner  at their sole discretion,  or other product configuration options in good faith,   as long as it meets Total Hashing Output] |

| **Product Pricing** |
|---|
| Wholesale Price per TH: $60.00 USD per TH |
| Wholesale Unit Price: $5,400.00 per unit |
| Applied Discount: N/A |
| Net Price per TH: $60.00 USD per TH |
| Net Unit Price: $5,400.00 USD per TH |

DocuSign Envelope ID: 51919473-2838-4C4A-B599-23DD036D0772

Total Purchase Price $150,000,000 USD

Total Purchased Hashing Output: 2,500 Ph/s

Approximate Number of Units:   2,778 units

Payment Terms

* Payment 1: 25% of Total Purchase Price due within 3 business days upon signed Purchase Order totaling $ 37,500,000.

* Payment 2: 25% of Total Purchase Price due 10 calendar days after working unit delivery to Purchaser (September 2021) totaling $37,500,000

* Payment 3: 25% of Total Purchase Price due 30 calendar days prior to first scheduled delivery under "Delivery Schedule" totaling $37,500,000

* Payment 4: 25% of Total Purchase Price due 30 calendar days prior to third scheduled delivery under "Delivery Schedule" totaling $37,500,000

Upon Payment 3, Purchaser agrees to a best efforts contract at best available terms for a new Purchase Order of equal or greater Purchase Price. 25% of this new Purchase Order will be due January 31 st.

| Payment Options: | |
| --- | --- |
| For USD (via wire transfer) | For BTC |
| Bank Name | Address: 0x…. |
| Bank Address | QR Code: |
| Account Number | Note: Payment must match within 1% of the CME BRTI upon 6 confirmations on the Bitcoin network. |
| Routing Number | Katena will not be held responsible for incorrect address transactions or any failure to transact by the Purchaser |

Pick-up location:

EXW at location to be determined by Katena.

DocuSign Envelope ID: 51919473-2838-4C4A-B599-23DD036D0772

**Delivery Schedule**

Purchaser will pick up production units   at a destination to be provided by Katena, which will meet hashing totals   per schedule below:

1.  December 29, 2021– 200 Ph/s

2.  January 31, 2022 – 460 Ph/s

3.  February 28, 2022 –460 Ph/s

4.  March 31, 2022 – 460 Ph/s

5.  April 30, 2022  – 460 Ph/s

6.  May 31, 2022 – 460 Ph/s

Other

If Katena fails    to d eliver the Products as per schedule above by more than 60 days for  each monthly production lot, Katena will offer a refund and/or credit        in the amount of 2.1% of the price of that same monthly production lot for each one (1)     full week of delay.

As an example, if Katena fails to deliver first production lot by January 31, 2022 deadline, and instead delivers on April  8, 2022, Katena will refund/credit a portion of amounts actually paid by Purchaser to Katena hereunder calculated as follows: 2.1% of the purchase price for  the delayed January production lot will be refunded  /credited for each one (1) full week of delay after March 31, 2022.

If Katena fails to delivery any of the Products by     May 31, 2022, the Purchaser is entitled to: (i) request to terminate this Purchase Order and require Katena to return the amounts paid by the Purchaser (Katena shall not pay any interests in this respect), or (ii) continue to perform under this Purchase Order and require Katena to deliver the P roducts by a new mutually acceptable delivery date.

DocuSign Envelope ID: 51919473-2838-4C4A-B599-23DD036D0772

IN WITNESS WHEREOF, the Parties hereto have executed this Purchaser Order No. 1 as of the last date signed below:

**Katena**: **Katena Computing Technologies, Inc.**

_____
Signature

Heny Monzon
_____
Name

Chief Executive Officer
_____
Title

5/12/2021
_____
Date

**Purchaser [Coinmint, LLC]**

_____
Signature

Ashton Soniat
_____
Name

Chairman
_____
Title

May 12, 2021
_____
Date