# EXHIBIT W

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION RULES


COINMINT, LLC,

        CLAIMANT,

    vs.

KATENA COMPUTING TECHNOLOGIES,
INC.,

        RESPONDENT.
_____


REPORTER'S TRANSCRIPT OF PROCEEDINGS

Wednesday, September 20, 2023

Volume 6, Pages 1478 - 1784


Reported By:
KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
California CSR 10068, Nevada CCR 995, Texas CSR 12212,
RPR-RMR-CRR-CCRR-CLR-CRC-RDR
JOB NO. 90149

**TRANSCRIPT OF PROCEEDINGS**

**September 20, 2023**

1              APPEARANCES OF COUNSEL

2   ON BEHALF OF THE CLAIMANT:

3       GORDON REES SCULLY MANSUKHANI LLP
        BY:  FLETCHER C. ALFORD, ESQ.
4           KEVIN LIU, ESQ.
            ROBERT A. LEMUS, ESQ. (Via Zoom)
5       275 Battery Street, Suite 2000
        San Francisco, California  94111
6       (415) 875-3115
        Falford@grsm.com
7       Kliu@grsm.com
        Rlemus@grsm.com
8
     ON BEHALF OF THE RESPONDENT:
9
        PERKINS COIE LLP
10         BY:  JOHN HARDIN, ESQ.
        500 North Akard Street, Suite 3300
11         Dallas, Texas  75201
        (214) 965-7700
12         JohnHardin@perkinscoie.com

13         PERKINS COIE LLP
        BY:  JACOB TABER, ESQ.
14         1155 Avenue of the Americas, 22nd Floor
        New York, New York  10036
15         (212) 262-6900
        JTaber@perkinscoie.com
16
     Also in Attendance:
17
        Ashton Soniat
18
        Dan Eaton, Esq., in-House Counsel for Katena
19         Computing Technologies, Inc.

20         Randall Foret, Esq., In-House Counsel for
        Coinmint, LLC
21
        Ted Brooks, Tech
22         Michelle Rose, Tech

23         Michael Gao

24

25

**TRANSCRIPT OF PROCEEDINGS**

**September 20, 2023**

1            I N D E X

2   Wednesday, September 20, 2023

3                         PAGE

4   Morning Session                    1481
    Afternoon Session                  1616
5
                        PAGE  VOL.
6
    MARKOVIC, DEJAN
7
    (SWORN)                    1495  6
8   Direct Examination by Mr. Hardin        1495  6
    Cross-Examination by Mr. Alford          1577  6
9   Redirect Examination by Mr. Hardin       1734  6
    Recross-Examination by Mr. Alford        1744  6
10
    PFLAUM, ISAAC
11
    (SWORN)                    1747  6
12   Direct Examination by Mr. Alford          1747  6

13

14

15

16

17

18

19

20

21

22

23

24

25

 1  SEPTEMBER 20, 2023                9:25 A.M.

 2         SAN FRANCISCO, CALIFORNIA

 3          P R O C E E D I N G S

 4

 5         MORNING SESSION

 6

 7         ARBITRATOR CALLAHAN:  Welcome, everyone.

 8  This is the beginning of our third day of week two.

 9  Had a little bit of a delay getting the court

10   reporter and everything else set up.  But just for

11   the record, this is being recorded on Zoom because,

12   as everyone know, Ms. Turitz had a death in the

13   family and needs to attend a funeral today.

14         However, as indicated previously, all of

15   the panel members have reviewed Mr. Markovic and

16   Mr. Pflaum's expert witness reports and rebuttal

17   reports before this week.  We've talked a little

18   bit, and as I think everybody is aware, pursuant to

19   our hearing procedure's order for week two, we're

20   going to start tomorrow's hearing in terms of

21   testimony taking at 10:00 because the panel is going

22   to meet at 8:30 for the purpose of talking about

23   whatever questions we might have for Mr. Markovic or

24   Mr. Pflaum, because I know that's important.  Both

25   counsel have mentioned it, wanting to make sure the

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    panel has an opportunity, including Ms. Turitz, to

2    talk and pose any questions to the experts while

3    they're here this week.

4         The panel will be meeting starting at

5    about 8:30 tomorrow, and that will be the purpose

6    for starting a little bit late.

7         So we will be doing that tomorrow morning.

8    Then we'll r sum  with the expert witness testimony

9    wherever we leave off today.  And our expectation is

10   that we will be able to conclude with both

11   Messrs. Markovic and Pflaum this week.

12        Let me do what we always do.  I'll give

13   you the time tally for week one through week --

14   through the second day, yesterday, of week two.

15   Right now the running total -- let's see.  Yesterday

16   of the hearing time shared and separated, Coinmint

17   had 330 minutes and Katena had 238 minutes.  So the

18   grand total right now is Katena 1,580 and Katena

19   1,490.  I'm sure that will even up a little bit

20   today?

21        MR. HARDIN:  Ma'am, you said Katena twice.

22        MR. ALFORD:  Yeah.

23        ARBITRATOR CALLAHAN:  I did.  I'm sorry.

24        MR. ALFORD:  It seems to me they took all

25   the time, but it's probably not accurate.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1          ARBITRATOR CALLAHAN:  I'll pull out my

2    notes if you'd like.

3          MR. ALFORD:  I was joking, a joke that

4    didn't go well.

5          ARBITRATOR CALLAHAN:  I'm sorry, Coinmint

6    has 1,580 and Katena has 1,490.  I want to preface

7    the start of today.  We ended yesterday with quite a

8    bit of discussion about the attorney work-product

9    privilege issue with Mr. Foret and his June 30th

10   deposition when the panel was called in.  As I think

11   everybody is aware, Mr. Taber sent the panel the

12   depo excerpt from January 30th, which Ms. Glick

13   and I did review last night.  Did a little bit of

14   burning the midnight oil, I will tell you, plowing

15   through the different proceedings.

16          But before you all spend much more time on

17   that issue, I want to tell you what we found.  And,

18   again, this will be among the topics that the panel

19   talks about tomorrow to see if we can make a

20   decision about an expedited direction on which to go

21   on that issue.

22          First of all, as I read the January 30th

23   transcript where the panel Zoomed in, before the

24   panel Zoomed in, we had been presented with a number

25   of email submissions by counsel raising a number of

TRANSCRIPT OF PROCEEDINGS

1  various discovery dispute items, including clawback

2  and the sufficiency of a privilege log and the

3  numerosity of the privilege log, et cetera, et

4  cetera.

5          So the panel, when I read that transcript,

6  was presented with much, much, much, much more than

7  simply the objections that had been raised during

8  Mr. Foret's deposition.

9          So we had quite a bit of dialogue about

10  those things.  And as I read the January 30th

11  transcript, while the panel made rulings, it did not

12  make substantive rulings.  It made procedural

13  rulings.  It basically told the party's counsel,

14  hey, you've got a lot here.  I think there were 770

15  items on the privilege log that were being disputed.

16          We said you need to meet and confer and

17  try to narrow these issues, because it's going to

18  take a lot of time for the panel to review 770

19  items.  I think I said something to the effect of

20  you're probably going to get a discovery arbitrator

21  to decide those issues because we'll have to do an

22  in-camera review, potentially.

23          In any event, as described in order

24  number -- we did issue an order for briefing on the

25  work-product issue.  You all submitted briefings on

TRANSCRIPT OF PROCEEDINGS

1    the work-product issue on February 7th.  And we

2    issued a ruling, Order Number 17.  So I want to

3    bring that to your attention.

4          I looked at Order Number 17.  And the

5    problem presented to the panel was, as stated in the

6    order, the desire of Katena to receive answers from

7    Mr. Foret concerning, A, Mr. Foret's interviews with

8    Michael Maloney, Jim DeNaut and Robert Bleck, and B,

9    Mr. Foret's discussions with Mr. Soniat in preparing

10   him for his deposition as Coinmint's PMK.

11         We requested briefing, and you submitted

12   briefing on the work-product doctrine and the

13   specific questions and objections and Coinmint's

14   instructions not to answer.  We made several

15   rulings.

16         Paragraph 4, I encourage you to go look at

17   it.  We said the work product at issue here does not

18   pertain to any writings that reflect the results of

19   Mr. Foret's research and investigation through his

20   interviews of Messrs. Maloney, DeNaut and Bleck.

21   Rather, the work product at issue here concerns

22   Mr. Foret's mental impressions and his recollections

23   of, A, what he discussed with Messrs. Maloney,

24   DeNaut and Bleck, and B, what he conveyed to

25   Mr. Soniat in that regard.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1          The issue, therefore, concerns qualified

2    privilege, was the panel's determination, for which

3    Katena's burden is to show that withholding the

4    information about what Messrs. Maloney, DeNaut and

5    Bleck told Mr. Foret and what Mr. Foret relayed to

6    Mr. Soniat in that regard without prejudice to

7    Katena in preparing its claims for defenses and

8    results in injustice.

9          And we cited the case both of you

10   discussed, which is Coito.  Paragraph 5 -- these are

11   the panels' rulings, so these are done.  We said

12   that since Messrs. Maloney, DeNaut and Bleck have

13   all been summoned to provide testimony, Katena will

14   then have the opportunity to ask it to them about

15   their interview discussions with Mr. Foret.  Such

16   testimony, if elicited, would not invoke any

17   privilege as long as such interviews occurred, in

18   the case of Messrs. Maloney and DeNaut, while the

19   witness was not in Coinmint's employ, so as to

20   invoke the attorney-client privilege.

21          Further, as circumstance present today

22   before the panel, Messrs. Maloney, DeNaut and Bleck

23   are not inaccessible to Katena.  Accordingly,

24   Katena's request that the panel overrule Coinmint's

25   assertion of the work-product protection concerning

1   the substance of Mr. Foret's interviews with

2   Messrs. Maloney, DeNaut and Bleck was denied without

3   prejudice.

4        Paragraph 6, the panel concluded that

5   nevertheless, there were questions submitted to the

6   panel in the Katena brief that do not qualify for

7   work-product protection because they simply call for

8   a yes-or-no answer.  The panel went on the order

9   Messrs. Foret and Soniat to answer the precise

10   questions set forth in the order.  I won't repeat

11   them here, but they're in the order.

12        So that's the backdrop against which the

13   panel received a motion in limine to exclude

14   Mr. Foret from testifying in this arbitration

15   evidentiary proceedings.  And specifically, the

16   panel was presented with twelve questions where

17   Mr. Foret had been instructed not to answer.

18        And they basically fell into the

19   categories of the status quo order.  The acquisition

20   of Bitcoin mining rigs in April/May 2021 time frame,

21   discussions with Mr. Maloney, discussions with

22   Mr. Bleck concerning his report, and then some

23   general questions about Coinmint's nondisclosure

24   agreement format and whether Mr. Foret had consulted

25   with any former employee before the original

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  arbitration was filed.

2         And so we said, well, we're going to wait

3  until we hear the questions.

4         Now, as I think I understand the issue to

5  be discussed by the panel tomorrow is, as I just

6  identified, there are a number of areas in which

7  there has been inquiry made and objections asserted

8  and instructions not to answer given and those

9  instructions followed.  And the panel sustained

10  those objections.  That's how I understand and read

11  the record.

12        So I'm telling you this so you can go look

13  at it yourselves.  And I think the issue that

14  Mr. Hardin has raised is, given that the

15  instructions were given and the instructions were

16  followed on this set of inquiry areas, how can we

17  now have questioning on those areas here.

18        Did I understand the issue correctly,

19  Mr. Hardin?

20        MR. HARDIN:  Yes, ma'am.

21        ARBITRATOR CALLAHAN:  Okay.  So I didn't

22  quite appreciate what Mr. Hardin was saying

23  yesterday.

24        MR. HARDIN:  Sorry.

25        ARBITRATOR CALLAHAN:  Because I didn't

1   remember the procedural history.  But now I have

2   gone back through it, and I'm sharing with you what

3   Ms. Glick and I have found.  If there's something

4   else out there, then let us know.  But thus far,

5   that's what I see has heretofore occurred on the

6   work-product issue.  And that's the backdrop against

7   which the panel will be assessing their respective

8   arguments, okay?

9           So -- while we did say in response to the

10   motion in limine we'll wait until we hear the

11   question, we wait until we hear the question against

12   the backdrop against that which has proceeded, which

13   you all know is about 30 discovery motions among 57

14   orders that have been written.

15           So there was -- I just want to remind

16   you -- we really did have some very lengthy

17   discussions and submissions on a number of issues

18   from January 30th, including, but not limited to,

19   the work product, which was briefed and was ruled

20   upon by the panel.  The panel assumes that that now

21   has set in motion the course of events relative to

22   discovery prior to the discovery cutoff.

23           Okay.  So I wanted to share that with you.

24   Again, we'll discuss further, but I did want you to

25   know what Ms. Glick and I found in terms of the

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1  procedural history on that set of issues so that you

2  have a chance, especially our morning, since we'll

3  be starting late, to look further.

4       Okay.  Not for discussion now.  I'm really

5  just giving information, and then we can revisit

6  tomorrow.

7       MR. ALFORD:  Thank you.

8       ARBITRATOR CALLAHAN:  All right.  Let's

9  just talk about a few ground rules.  Mr. Markovic, I

10  know that you are new to our proceedings.  But

11  people in this room tend to talk fast.  And my poor

12  court reporter repeatedly says please slow down,

13  please slow down.  So I'm going to ask you in

14  advance, no matter what the pace at which you are

15  given questions, do not follow suit, please.

16       The whole goal here is for us to hear and

17  understand your testimony, which I know from reading

18  your report has some level of technical difficulty

19  and some words that aren't in our ordinary usage.

20  So you may have the court reporter say excuse me,

21  sir, could you spell that for me or repeat it.  So I

22  want to make sure she has the opportunity to do that

23  so we can get an accurate record of your testimony.

24  Okay?  She doesn't have the luxury of having

25  reviewed your report like the panel has and the

1   lawyers have.  She's going to work off of what she

2   hears.

3           I'm also going to ask you to please speak

4   up.  This is a relatively large room.  And while the

5   machines aren't noisy, there is a certain level of

6   hum.  And, again, the court reporter has to compete

7   with that in order to hear you.  And it has been a

8   problem.  So please do speak up, and she may ask you

9   or prompt you to speak a little louder.  That's the

10  reason why.  She's trying to make sure she hears

11  everything you say.

12          Then I'm going to ask the lawyers please

13  slow down a little bit.  You were really rapid fire

14  yesterday.  And I know that was a challenge for our

15  court reporter, and frankly, I think it's a

16  challenge for any human being's brain to process all

17  those words.  They've done studies as to how much

18  our brains can assimilate in a minute.  And I'm

19  pretty sure we assimilate less than what you were

20  speaking.  So the goal here is for the panel to hear

21  and understand your questions and the answers.  So

22  please slow down, and also please do keep your

23  voices up.

24          I think that's all I have as an admonition

25  other than just a reminder that we are recording.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   And that's the other reason for these instructions.

2   Ms. Turitz will be looking at this this evening, and

3   we would like for her to have as good of a recording

4   as she can so that she's prepared for our panel

5   conference tomorrow morning.

6           All right.  Any questions, procedural

7   questions regarding the start of Mr. Markovic's

8   examination before we get started?

9           Hearing nothing --

10          MR. HARDIN:  I will simply say as a just a

11   FYI, I was telling you about some printing issues,

12   Mr. Taber is on his way.  He's probably going to be

13   in by two minutes.  By all means, let's get started.

14          ARBITRATOR CALLAHAN:  Can you do

15   preliminaries?

16          MR. HARDIN:  Ma'am.

17          ARBITRATOR CALLAHAN:  Can you do some

18   preliminaries?

19          MR. HARDIN:  Oh, totally.  I just didn't

20   want him to walk in and people think, jeez, why

21   didn't you wait until he started to get here.

22          ARBITRATOR CALLAHAN:  Thank you very much.

23   We appreciate the explanation.  I don't think we

24   would attribute anything.  The panel appreciates you

25   folks are working hard.  We see you coming in with

TRANSCRIPT OF PROCEEDINGS

1   boxes and shuffling papers.  I know you're working

2   on the fly.  Not a problem.

3        MR. HARDIN:  As just a procedural point,

4   we're obviously getting started a little bit late

5   for reasons outside of everyone's control.  When

6   does the panel want to take the morning break, just

7   so that I know for my planning purposes.  Because

8   the original thought was I would go from 9 to 10:30,

9   which is now not going to happen.  Do you still want

10   to take the break at 10:30 and I should plan

11   accordingly or are these flexible?

12        ARBITRATOR CALLAHAN:  I don't think we

13   need a break at 10:30.  I think we all had a break

14   before we got started at 9:30.  Mr. Markovic, I'm

15   going to leave this to you.  You're the witness, you

16   may need a break before any of us need a break.

17   What I would like to do, it's 9:40 now.

18        MR. HARDIN:  Yes, ma'am.

19        ARBITRATOR CALLAHAN:  I would like to be

20   able to go till at least 10:45.  A good hour.  If

21   for some reason you need a break beforehand or

22   someone else needs a break, I'm going to discourage

23   it, but Mr. Markovic, of course, if you need a

24   break, please let me know and we will, of course,

25   accommodate you.

1        THE WITNESS:  Thank you.

2        ARBITRATOR CALLAHAN:  Thank you for that,

3  Mr. Hardin, with that, are you ready to proceed?

4        MR. HARDIN:  Yes, ma'am.

5        ARBITRATOR CALLAHAN:  All right.  Go

6  ahead.

7  BY MR. HARDIN:

8    Q.   Hi.  Good morning.

9    A.   Good morning.

10    Q.   Professor, could you please state your

11  name?

12    A.   My name is Dejan Markovic.

13    Q.   I might ask you to speak up just a little

14  bit based on --

15        ARBITRATOR CALLAHAN:  Oh, I didn't swear

16  you.  Excuse me.

17        MR. HARDIN:  Oh.

18        ARBITRATOR CALLAHAN:  Mr. Markovic, is it

19  vich or vic?

20        THE WITNESS:  Vich.

21        ARBITRATOR CALLAHAN:  Mr. Markovic, could

22  you raise your right hand.  Thank you very much.

23  / /

24  / /

25  / /

1              DEJAN MARKOVIC,

2       called as a witness, having been duly sworn,

3              testified as follows:

4         ARBITRATOR CALLAHAN:  Thank you very much.

5         Go ahead.

6              DIRECT EXAMINATION

7    BY MR. HARDIN:

8       Q.   Okay.  Professor, could you please state

9    your name for the record?

10      A.   My name is Dejan Markovic.

11      Q.   Could you tell the panel your connection

12   to this case?

13      A.   I was introduced by Analysis Group to this

14   case.

15      Q.   Okay.  And what was your -- to do what for

16   this case?

17      A.   I was approached to serve as a potential

18   expert witness on this case, and got introduced to

19   counsel by Analysis Group.

20      Q.   Right.

21           And you were ultimately hired as an

22   expert, right?

23      A.   Yes.

24      Q.   And what were the areas you were tasked

25   with reviewing?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1        A.   I was asked to review three areas.  First,

2    whether Mr. Bleck was qualified to perform his

3    ability assessment of the K10 chip.  Second, to look

4    into technical documents and do concordance with

5    Mr. Bleck's report and review all the technical

6    files.  And third, to do my own assessment of the

7    visibility of the K10 chip.

8        Q.   Now, you used the words concordance with

9    his report.

10        Let me ask you this:  Were you asked to

11    review Mr. Bleck's report and assess whether or not

12    it represented a reasonable approach to completing

13    his assignment from Coinmint?

14        A.   Yes.

15        Q.   Okay.  Awesome.

16        We're going to talk about these opinions a

17    lot today and the basis for them.  Before we get

18    there -- I know it's in your report -- I do want to

19    discuss some of your educational background as it

20    relates to chips.

21        First, you're an electrical engineer,

22    right?

23        A.   Yes.

24        Q.   Can you tell the panel where you earned

25    your Bachelor of Science degree?

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1        A.   I earned my Bachelor of Science degree,

2    which is called diploma engineering, it's a

3    five-year undergraduate program from the University

4    of Belgrade in Serbia.

5        Q.   When?

6        A.   That was in 1998.

7        Q.   And any more educational background?

8        A.   Yes.  Actually, part of the diploma work I

9    did at UC Davis for about four months.  And then

10    after that, I moved to UC Berkeley, in Berkeley,

11    California, where I got my Master's degree in 2000

12    in electrical engineering, specialty, integrated

13    circuits, and also earned my Ph.D. degree in 2006,

14    also from UC Berkeley.

15        Q.   Okay.  Can you tell the panel, what was

16    your thesis paper on for your doctorate?

17        A.   For my doctorate, I did methodology for

18    high performance energy efficient ASIC design.

19        Q.   Did you get any awards for that?

20        A.   Yes.  I received David J. Sakrison

21    Memorial Prize, which is an award given by the

22    Department of Electrical Engineering and Computer

23    Sciences for the best Ph.D. dissertation that he

24    earned.

25        Q.   Let's transition from your educational

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  background to your professional background.  What is

2  your current professional role?

3      A.  Currently, I'm a Professor of electrical

4  and computer engineering at UCLA.

5      Q.  Okay.  Can you tell the panel some of the

6  classes that you teach?

7      A.  I teach an undergraduate class in digital

8  electronic circuits, and I teach two graduate

9  classes in VLSI design and VLSI signal processing,

10  which is teaching students how to build hardware

11  accelerators and get started with their ASIC

12  projects.

13      Q.  Okay.  As we go through today, it's

14  inevitable that you're going to use various terms,

15  and I'm going to ask you to state what they mean.

16      So can you tell the panel what you mean --

17  or what is a VLSI?

18      A.  VLSI stands for very large scale

19  integration.

20      ARBITRATOR CALLAHAN:  Oh.  Normal words.

21      MR. ALFORD:  I was expecting some super

22  complicated thing.  Very large.

23  BY MR. HARDIN:

24      Q.  And with respect to the classes that you

25  teach, is there any overlap with neuroengineering?

TRANSCRIPT OF PROCEEDINGS
September 20, 2023

1      A.   Yes.  I also serve as a field area chair

2   for neuroengineering program with our bioengineering

3   department at UCLA, and big chunk of my research

4   activity is also in building clinical research

5   systems and medical devices.

6      Q.   Can you tell the panel what is the

7   Parallel Data Architectures Group at the UCLA Center

8   for Heterogeneous Integration and Performance

9   Scaling?

10     A.   Parallel Data Architecture is a name for

11  my research group signifying that we build ASICs for

12  complex data structures.  For example, recording

13  from hundred electrode contacts in the brain to see

14  what is going on from each one of them at the same

15  time.  So we do all of that in parallel to

16  understand when, where and how to react to provide

17  therapy.  That is one example.

18        Or dealing with multiantenna wireless

19  communications when you have signals transmitted

20  from multiple sources and you need to understand in

21  real time what each source represents.

22     Q.   Okay.  Now, you said your research group.

23  Is this just, like, a side hobby?

24     A.   I don't know what you mean by "side

25  hobby."

TRANSCRIPT OF PROCEEDINGS

1      Q.   Fair enough.  You're going to break me of

2   my habit today.  It's too bad.

3          ARBITRATOR CALLAHAN:  Slow down,

4   Mr. Hardin.

5          MR. HARDIN:  See.

6   BY MR. HARDIN:

7      Q.   Is that something that's sponsored by UCLA

8   or is that just your personal research group?

9      A.   The way that research works is that you

10   seek proposals -- seek grant opportunities from

11   funding agencies like National Science Foundation,

12   National Institutes of Health, DARPA, private

13   industry, who have interest in your research areas,

14   and then you get funded to support your students and

15   hardware prototyping efforts and move on with your

16   research.

17     Q.   Who participates in the research group,

18   and specifically, can you talk about the students?

19     A.   Yes.  Students actually participate in the

20   research group, primarily graduate students, and

21   they can really productively do research after they

22   complete some level of training at the Master's

23   level.  They take maybe year and a half or so of

24   courses, and they can then transition into

25   productively contributing to research efforts.

September 20, 2023

1      Q.   And does participation in this research

2   group count for credits for their graduation?

3      A.   It does.  Parts of the academic credits

4   are derived from research work, so that you have a

5   course component and, obviously, when they are done

6   with all of their coursework, they only sign up for

7   research credits and they're expected to work full

8   time on that.

9      Q.   Can you talk about the qualifications

10   necessary to be accepted into this research

11   project -- into this research group.

12      A.   Yes.  I do accept students with a

13   Bachelor's Degree and sometimes with a Master's

14   Degree.  I like to accept students with a Bachelor's

15   Degree more because they are still kind of undecided

16   and they have more flexibility in what they can

17   train on.  And they need to complete some training.

18   They need to take courses to be able to competently

19   contribute to the complex projects that involve chip

20   design.

21      Q.   And the decision whether to accept

22   students into the research group, is it solely your

23   decision?

24      A.   It is decision first by the department

25   where department looks into their records, such as

1   grades and GRE, graduate reference examination,

2   typical tests that students take to enroll into

3   graduate school.  And then professors, such as

4   myself, look into their statement of purpose, their

5   CV.  I conduct interviews, and then decide which

6   students would be adequate for my research group,

7   and then I make offers and hope they join.

8       Q.   Okay.  We're going to talk a little bit

9   more about the research group.  I got to cover one

10   small point that I forgot to ask about.  Apologies.

11          Have you ever coauthored any graduate

12   level textbook?

13      A.   Yes, I did.

14      Q.   Can you tell panel about it?

15      A.   Yeah.  The graduate level textbook is

16   called DSP Architecture Design Essentials, which I

17   coauthored with my Ph.D. advisor Professor

18   Bob Brodersen from UC Berkley.  The book really

19   teaches about chip design and emphasizing on

20   different architectures for building signal

21   processing chips in general, but applicable to any

22   domain of applications.

23      Q.   Thank you for clearing that up for me.

24   Let's focus back on the research group.

25          What is the -- what's the purpose of the

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   research group?  What's its goal?

2      A.   Great question.  Some people think it's

3   about making students publish papers.  I think it's

4   human resource development.  My main objective is to

5   train engineers who would be able to solve next

6   generation technology problems and be thought

7   leaders, create new industries and positively

8   contribute to society.

9         And with that mind-set, a lot of

10   interesting projects get formulated focusing on the

11   impact.  And a lot of great papers come out that are

12   very well recognized in the community.

13      Q.   Okay.  With that goal in mind, does the

14   research group ever design or tape out any ASICs?

15      A.   Yes, it does.  We are more on the

16   experimental side, and students are required to come

17   up with an idea, do visibility of assessment of that

18   idea, whether it's doable, and show it.  Go through

19   all the steps of design, making it better than what

20   other people have done, and come out with innovative

21   ideas that would be demonstrated on those chips.

22      Q.   I just want to add a little bit of clarity

23   to it, because you're saying that students come up

24   with an idea.  But specifically, it's an idea

25   related to an ASIC, right?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1      A.   Yes.  It's an idea related to an ASIC,

2   which has the potential to create an impact on some

3   real-world application.  'Cause everything starts

4   and ends with an application.  You are solving a

5   certain -- addressing a certain need through your

6   technology, and when you test your chip, you want to

7   show how your chip actually address that specific

8   need in performance, energy efficiency,

9   functionality, other areas.

10      Q.   To say it a little bit differently, the

11   research group is focused on the design of ASICs for

12   these problems.  And sometimes those ASICs end up

13   getting fabricated and used, right?

14      A.   Yes.  Just to put this in prospective, so

15   far since 2006, when I started to bring my pipeline

16   of students, I have graduated 22 Ph.D.s from my

17   group.  And we have built more than 20 ASICs.  So

18   you can almost think of it as, on average, one ASIC

19   per student that results in a published high

20   quality, peer-reviewed paper.

21         Some students end up not building ASICs,

22   and I also work with those students.  But some build

23   more than one.  They just like to keep the pipeline

24   going.  But those are kind of typical numbers.

25      Q.   Okay.  I want to change focus a little bit

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    and have the focus be on the life of one of these

2    chip designs.  Okay?

3          And they're submitted by students, right?

4      A.  Yes.

5      Q.  You got to verbalize.  Is that "yes"?

6      A.  Yes.

7      Q.  And tell the panel, like, what happens

8    with these chip designs?  What happens once a

9    student brings a chip design to you?

10       A.  So I take a look into their idea, and we

11   sit down and talk about visibility.  Does this make

12   sense?  Is it doable?  We have other group members

13   sit in and review the ideas before we make a

14   decision to go ahead and design.  We ask fundamental

15   questions as to, like, what is it that you're

16   building?  Why is it you're building that particular

17   design?  And how?  That's the key question.  How are

18   you going to do it that's different and better in

19   some aspects than what already exists?

20     Q.  Okay.  And I want to make sure -- I think

21   I told you, I've got some hearing issues in one ear.

22   You said that the students bring their idea to you,

23   and then you discuss their feasibility?

24     A.  Yes.

25     Q.  All right.  Let's fast forward to a design

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    being feasible, being fabricated.

2         What happens when the chip leaves the

3    research group, or does it leave the research group?

4         A.  I don't know what you exactly mean by

5    "leave the research group."  Can you explain?

6         Q.  Yeah.  Do you ever have any instances

7    where start-up companies are formed around these

8    chips?

9         A.  Oh, that?  Yes.  So part of the -- this

10   mind-set I described earlier is to find real world

11   application and make an impact, is that the real

12   word recognizes the value of these ideas and then

13   students sometimes do great work, but they don't

14   have interest in running their own companies.  We do

15   have UCLA technology transition office for that if

16   others want to license, but sometimes students do

17   actually have entrepreneurial mind-set and go on.

18   And I help them find connections and present the

19   case to investors and they make start-ups and

20   transition technology into the real world.

21        Q.  Okay.  Awesome.

22             Can you tell the panel about your company,

23   Flex Logix Technologies?

24        A.  Sure.  Flex Logix Technologies is one of

25   those examples where students put in a lot of

1  thought into their project, do the high quality work

2  in making reconfigurable technology, chips that you

3  can reconfigure.  You use the same piece of silicon,

4  but you can program it to run one algorithm today,

5  another algorithm tomorrow.  And things like that.

6          So that paper was presented at the

7  premiere conference in chip design called

8  International Solid-State Circuits Conference, which

9  has about 200 papers that are represented from all

10  major participants from industry and academia

11  worldwide.  So just getting into that conference is

12  challenging enough.

13          And I have to highlight that the students

14  from my group won the best paper award of all the

15  papers presented for that chip, that would recognize

16  their tremendous value.  I took my sabbatical from

17  UCLA, moved on to Stanford knowing that that's where

18  the capital is for Silicon Valley for these kinds of

19  ideas, and we transitioned that technology into Flex

20  Logix that builds so-called embedded FPGA's field

21  programmable gate array technologies.

22          ARBITRATOR CALLAHAN:  Could you repeat

23  that.

24          THE WITNESS:  Yes.  Sorry if I'm speaking

25  too fast.

1          ARBITRATOR CALLAHAN:  No.  No.  No.  It's

2    just too many words that are foreign to me.

3          THE WITNESS:  So FPGA stands for field

4    programmable gate array.  And this is kind of

5    analogous to, you know, Intel builds microprocessor

6    chips, and ARM builds IP that is embedded into other

7    people's chips.  So we build embedded FPGA

8    technology.

9    BY MR. HARDIN:

10     Q.   Can you tell the panel what is --

11          ARBITRATOR CALLAHAN:  Can I just

12    interrupt?

13          MR. HARDIN:  Please.

14          ARBITRATOR CALLAHAN:  So you have the

15    chip, and somebody else's technology goes into it?

16    Or the reverse?

17          THE WITNESS:  Oh, good question.  So

18    customers want to build chips, and they build chips

19    by using various components that they put inside

20    their chip.  Oftentimes, they value additional

21    flexibility that these functional units provide.

22    For example, algorithm is not fully specified or

23    there is a standard that's going to change in the

24    future.

25          So to deal with that level of uncertainty,

TRANSCRIPT OF PROCEEDINGS
September 20, 2023

1    they put kind of an insurance policy, if you will.

2    If I put reconfigurable logic, then my chip will be

3    able to be kind of more flexible in the future.  And

4    so we provide technology that other people put

5    inside their chips, and they build chips using our

6    functional units.

7          ARBITRATOR GLICK:  And to customize the

8    chip?

9          THE WITNESS:  To customize their chip.

10   That's a good way to put it, yes.

11         ARBITRATOR CALLAHAN:  One more question.

12   Let's pretend on day one you put in whatever they

13   gave you.  Is the idea of this embedded chip that

14   you can reprogram it after it leaves?

15         THE WITNESS:  Exactly.  That is the point.

16         ARBITRATOR CALLAHAN:  Okay.  All right.

17   Thank you.  I'm sorry to use such base language, but

18   that's --

19         THE WITNESS:  That's exactly what happens.

20         ARBITRATOR CALLAHAN:  That's my level.

21         THE WITNESS:  That's the value of it.

22         MR. ALFORD:  Couple levels ahead of me.

23   BY MR. HARDIN:

24      Q.  Hence, the name Flex Logix, right?

25      A.  Yes.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1      Q.   I meant to say this, I said it before,

2   this one is particularly important.  There's,

3   obviously, so many clarifying questions, happily,

4   please interrupt me.

5           You know, actually, professor, we had

6   talked about some demonstrative.  Did you just bring

7   some chips?  Did you bring those?  Let's get those

8   out, because this could be a decent time so we can

9   all see what you're talking about.

10     A.   Okay.  Sure.

11          MR. HARDIN:  Madam Chair, we've talked a

12   lot about chips.  This is not the K10 chip.  This is

13   some of his work.  Could you get the end product as

14   well?

15          THE WITNESS:  Yes.

16   BY MR. HARDIN:

17     Q.   I -- because of the size of these chips,

18   would it be okay if he's right here for a minute,

19   and I would flip the Zoom around so that

20   Arbitrator Turitz, when she's seeing the recording,

21   could see these chips as well?

22          ARBITRATOR CALLAHAN:  It's fine with me,

23   whatever facilitates the recording.  Do you have a

24   problem with that, Mr. Alford?

25          MR. ALFORD:  I don't think so, no.

TRANSCRIPT OF PROCEEDINGS

1        ARBITRATOR CALLAHAN:  I'm not exactly sure

2   what I'm saying yes to, but you used the words

3   facilitate the recording.

4        MR. ALFORD:  Sounded good.

5        MR. HARDIN:  I think it will just make it

6   easier to be able to see these.  And, of course, you

7   can bring these back tomorrow.

8        Again, it's not the K10 chip, but as we

9   talk about some of these integrated circuits, I just

10   think it's easier to be able to see one physically.

11        ARBITRATOR CALLAHAN:  I think I'd like to

12   ask, and this is an ask.  If any -- either side

13   doesn't like it, you can say so.

14        You know, we can all a take our notes.

15   We've got a recording.  Do we need to take a photo

16   of what we're looking at and call it something?  I

17   mean, if anybody is going to refer back to this in

18   terms of --

19        MR. HARDIN:  This is purely so that people

20   can understand some of the process.

21        ARBITRATOR CALLAHAN:  All right.  Never

22   mind.

23        MR. HARDIN:  And lay some groundwork.

24        THE WITNESS:  Sure.  So these are some

25   example chips that go through various stages of

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   development.  They are very small, millimeter sized.

2   So you can feel free to use this magnifier and aim

3   maybe somewhere right in the middle to set as a set

4   point so you may be able to appreciate a little bit

5   more the size and the detail, for example, on these

6   ones.  And you can feel free to set for yourself.

7          So this is, for example, one chip that we

8   call bare die that is just cut off from the silicon

9   paper that needs to be packaged.  So they come just

10  like that.  This is a set of chips over here.  You

11  will see as they pass around, they do different

12  functions.  This is, for example, sensing chip for

13  brain recording, this is stimulation chip, this is

14  the DSP, similar to what you would do in the Katena,

15  like this pin grid array package.

16          One thing you will see relative to that

17  chip, if you set this for a zoom, you will see this

18  tiny, like, a hair -- hairline looking wires that

19  are bonding this chip to the package, right, to be

20  able to connect it.  That's the kind of easy form of

21  package.  You make it very big, you put it on a

22  printed circuit board and you put it in various

23  assemblies.

24          Like this one, for example, has three

25  chips packaged differently.  This is a spike, this

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   is the stimulation, this is the signal processing

2   chip, and I can make now multiple of these boards to

3   do -- increase the capacity of this from 64 to 128

4   channels.  The yellow one, this I call, like, LEGO

5   blocks, you can put USB connector to get data out to

6   the computer.

7           And this one is another commercial FPGA

8   technology in which you embed the code.  So you can

9   write embedded code and put it on existing chip, but

10   these are the ones we custom build.  So this is a

11   little bit more kind of user friendly in terms of

12   size.

13           (Reporter clarification.)

14           THE WITNESS:  Stimulator.  So we provide

15   therapy and stimulate the brain.  On these ones,

16   they have magnifying glass, if you press, you will

17   see the light.  These are now a whole other level of

18   challenge.  You go from medical devices far more

19   difficult than just doing the package where things

20   have to be extremely small.  Because when we put

21   something inside a patient, less is more.  You want

22   to be minimally invasive.

23           And, in fact, going through kind of

24   product level making on that, you can see we can put

25   titanium enclosure, and you can feel free to pass if

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   anybody wants to see.  Titanium enclosure.  We

2   finally go even a step further to make devices that

3   are able to record and stimulate the brain, they

4   satisfy all the materials and chemical and

5   biocompatibility requirements with respect to doing

6   stimulation therapy delivery.  This is almost like a

7   digital pill.  You go to take a pill from a doctor.

8   This one, you take a digital pill and say you tickle

9   your brain a little bit to change behavior.  You can

10   just see various levels of assembly and production.

11         So these are the kinds of toys that we

12   build in my lab and students like to --

13         ARBITRATOR GLICK:  Do these --

14         THE WITNESS:  -- do these projects.

15         ARBITRATOR GLICK:  Do these get embedded

16   in the body?

17         THE WITNESS:  Excuse me?  Yes.

18         ARBITRATOR GLICK:  Brain or whatever.

19         THE WITNESS:  Yes, this is how it gets

20   embedded.  You go through this process of

21   encapsulation, then we connect electrode arrays.  So

22   here you have 64 contacts, all these tiny circles

23   are contacts that you put on the surface of the

24   brain that is able to record and stimulate the brain

25   on any of those contacts.

TRANSCRIPT OF PROCEEDINGS

1          We also have -- that's called surface

2    electrode array.  We have depth threads that go

3    straight inside about four centimeters deep, also 64

4    contacts to be able to.

5          ARBITRATOR GLICK:  So the lawyers no

6    longer have to send briefs.

7    BY MR. HARDIN:

8      Q.   Professor, let's leave these.  They may

9    come up, but --

10          ARBITRATOR CALLAHAN:  Let me give you that

11    back.  Let me give you all of these back so I don't

12    accidentally put something on them or spill

13    something on them.  Let me give you those.  Take

14    them away from me.  I'm accident prone.

15          MR. HARDIN:  Turn that back around.

16          ARBITRATOR CALLAHAN:  I've always said

17    that one day, we're not going to have to do those

18    language courses, Babbel or whatever it is.  You're

19    just gonna pop something in --

20          MR. ALFORD:  Start speaking a different

21    language.

22          THE WITNESS:  That's the idea, right.

23          ARBITRATOR CALLAHAN:  You can't understand

24    geometry, oh, I've got something for you.

25          MR. HARDIN:  Feels a little different, to

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   "matrixy."  I never thought I'd hear the phrase

2   "tickle your brain" either.

3        ARBITRATOR CALLAHAN:  I'm not ready for

4   it.

5   BY MR. HARDIN:

6      Q.   With this, can you tell the panel a couple

7   other background questions.  Then we're going to

8   dive into some specifics.  What is Ceribell?

9      A.   Ceribell is a company in this space, but

10   it is a company that does rapid EEG technology for

11   detection of epileptic seizures.  That was one of

12   my, I'd say, hobby projects when I came to Stanford.

13   I met with a colleague from urology, Dr. Parvizi,

14   who had an idea of can we take EEG waveforms from

15   the scalp, from the outside, from the skin, and we

16   can hear them because they're in a low frequency.

17   But if we call a computer music person, we can

18   actually translate them into audible range.

19        So you can hear the sounds of your brain

20   the same way you hear the sounds of the heart.  We

21   call that idea probably at that time brain

22   stethoscope.  Similar to those devices that you see

23   over there, mostly of those externalized,

24   matchbox-size devices, I helped Dr. Parvizi and

25   Professor Chafe, something like that form factor

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1  build proof of concept technology that we tested on

2  ourselves and other people and decided, wow, this is

3  really good.

4        And they performed a company.  I was the

5  advisor for technology, and now it's called

6  Ceribell.  It has technology in over 200 hospitals

7  and growing.  It's a really nice technology where

8  you think in another domain and you can provide this

9  intuitive analysis.

10        ARBITRATOR GLICK:  Can you spell the name

11  of that?

12        THE WITNESS:  Ceribell, C-E-R-I-B-E-L-L,

13  Ceribell, like cerebellum and bell, ringing the bell

14  when something goes wrong with the brain.

15  BY MR. HARDIN:

16     Q.  You said it was in this phase.  It's a

17  medical device start-up company, right?

18     A.  Yes.  It's a medical device.

19     Q.  And those -- that was a start-up that you

20  helped found in 2014; is that right?

21     A.  2014, correct.

22     Q.  Along with all of this, have you ever

23  consulted for other chip design and manufacturing

24  firms and organizations?

25     A.  Yes.

TRANSCRIPT OF PROCEEDINGS

1      Q.   We'll probably get into some examples

2   later.

3            One last thing about your background.

4   Have you ever testified as a retained testifying

5   expert before?

6      A.   This is the first time I am retained as

7   the testifying expert witness.  Previously, I was a

8   consultant on an IP litigation case and did analysis

9   of technology products and patents and submitted

10   charts to the client.

11      Q.   Right.

12            But this is the first time you've ever

13   been a testifying expert, right?

14      A.   Yes.

15      Q.   First time to draft a report?

16      A.   Yes.

17      Q.   First time to be deposed?

18      A.   Yes.

19      Q.   First time to be in front of arbitrators,

20   right?

21      A.   Yes.

22      Q.   Okay.  Let's turn your attention to some

23   of the issues in this case.  Let's start generally

24   with feasibility assessments.

25            Can you -- and as I understand it, this

1   term, feasibility assessment, is also sometimes

2   called tech due diligence, right?

3       A.   Sometimes, yes.

4       Q.   And so apologies if we use those terms

5   back and forth.  Can you describe what is a

6   feasibility assessment of an ASIC.

7       A.   To -- at a high level, feasibility

8   assessment of an ASIC is to determine whether an

9   idea is practical.  Whether an algorithm that you

10   want to implement in a chip will be able to meet

11   performance, power consumption and functionality

12   objectives for a given manufacturing technology.

13       Q.   How do you determine if an idea is

14   practical?

15       A.   You will need to do a set of evaluations.

16   First, you will have to do functionality check.  You

17   describe the behavior of this ASIC, and then you use

18   a computer simulation program to verify if it

19   computes the math correctly.  Then you will need to

20   build it using a chip design tool chain, and then

21   see whether it has certain speed performance, clock

22   rate, whichever you would like to look, and measure

23   the power consumption to see if it can provide the

24   functionality at the required performance and power.

25   So those are some of the basic steps that you do

September 20, 2023

1   initially to determine feasibility.

2     Q.   Okay.  So I want to ask you a couple

3   questions.  As we go through this, I want to

4   distinguish between your role in the academic world

5   and your role in more of a commercial setting, okay?

6     A.   Okay.

7     Q.   Have you ever participated in a

8   feasibility assessment of a commercially designed

9   ASIC?

10    A.   Yes.

11    Q.   How many times?

12    A.   Several times.

13    Q.   Okay.  What -- can you talk generally

14  about the circumstances?  So nothing in particular,

15  but can you tell us what type of circumstances led

16  to you doing a feasibility assessment in a

17  commercial setting?

18    A.   So one, two examples to kind of touch on

19  that you mentioned previously, I participated in

20  technology transition efforts and built companies

21  and helped other people build companies.  So that

22  involved diligence and feasibility assessment to

23  convince investors that was a good idea.

24        I was also called up by others to serve as

25  a consultant to look into their products and also

1   help them project technology road map for

2   development.  One of those companies is called

3   Synchron.  They are based in Australia.  They build

4   implantable brain recording devices.  They are kind

5   of neat.  They do similarly with what you do with

6   endoscopic surgery.  They kind of put the technology

7   through the blood vessel instead of kind of drilling

8   and opening up big craniotomies.

9          And their technology had to be very small.

10  This expertise I've shown you here with extreme

11  miniaturization of electronics almost down to the

12  bear chip was very valuable.  And so I was called up

13  to kind of see what can be done in that space and

14  review their technology.

15     Q.  And I want -- you touched on this

16  miniaturization.  I should have covered this

17  earlier.  I'm holding up the box of chips, and

18  there's a green one with a sense chip.  I want to go

19  through the process.  This sense chip, this is an

20  ASIC, right?

21     A.  Yes.

22     Q.  About how many millimeters in size is this

23  ASIC, best estimate?

24     A.  That is about two-by-two, maybe around

25  four square millimeters.

1     Q.   This is about a four square millimeter

2   ASIC?

3     A.   Yes.

4     Q.   Sorry, I've got boys six and eight, we

5   play with Legos.  This, to me, reminds me of Legos.

6   Looks like I've got a stack of things connected

7   together.

8         This is where the ASIC has been put on the

9   boards, and then the boards have been connected,

10  right?

11    A.   Yes.

12    Q.   Okay.  And apologies, I know I'm

13  butchering the terms.  So I appreciate you not --

14        ARBITRATOR CALLAHAN:  Slow down,

15  Mr. Hardin.

16        MR. HARDIN:  Sorry.  So much good stuff to

17  get through, though.

18        ARBITRATOR CALLAHAN:  We got to hear it

19  and understand it.

20        MR. HARDIN:  I hear you.

21        ARBITRATOR CALLAHAN:  It's technical.

22  BY MR. HARDIN:

23    Q.   And then this stack of chips on boards

24  that are connected is then miniaturized to what

25  really looks like two small pills --

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    A.  Yes.

2    Q.  -- right?

3        And then after it's miniaturized, it can

4  be asserted into a product.  Here, I'm holding up

5  for Ms. Turitz the larger packaging.  It looks

6  like -- I'll call it a chain, it's clearly not, but

7  I think you'll understand.

8        Is that accurate?

9    A.  That is accurate.

10       ARBITRATOR CALLAHAN:  Mr. Hardin.

11       SKWRAO:  Yes, ma'am.

12       ARBITRATOR CALLAHAN:  I would suggest if

13  you're doing that for Ms. Turitz, go give them to

14  Mr. Markovic and have him put it in front of his

15  camera, because I can assure you, no one on the

16  screen of the room could see what you were holding

17  up.  If that was for Ms. Turitz's benefit.

18       MR. HARDIN:  We're going to have these

19  here that.  That way, the description --

20       ARBITRATOR CALLAHAN:  Just so you know.

21       MR. HARDIN:  I agree.

22       ARBITRATOR CALLAHAN:  We can't see you.

23       MR. HARDIN:  I agree.  But thank you.

24  BY MR. HARDIN:

25    Q.  So to get back to the feasibility

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1  assessment, in short, you have done feasibility

2  assessments of chips you designed and chips that

3  others have designed, right?

4      A.  Yes.

5      Q.  Let's focus on the academic feasibility

6  assessments that you've done.

7          Your students submit chip designs to you,

8  right?

9      A.  Yes.

10      Q.  Do you review those designs and give

11  feedback?

12      A.  Yes, I do.

13      Q.  Is it similar to a feasibility assessment?

14      A.  It actually is a feasibility assessment.

15      Q.  Can you explain to the panel?

16      A.  Yes.  Like I said, students need to come

17  up with ideas because it's their Ph.D. project.

18  They need to own it and be the most knowledgeable

19  person in the world about their project.  I give

20  them guidance as to kind of the challenging specs

21  and spaces that they need to explore and go and

22  provide their ideas.  So they tell me, I can try to

23  do this architecture or this kind of circuit

24  topology, how to implement that in detail in a

25  clever way.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1          Once we determine that it has merit, it

2    has made it relative to state of the art and what

3    everybody else in the world has done, we decide to

4    pursue the path of, actually, implementation, which

5    costs nontrivial amount of money to -- and time to

6    make the chip, which is typically about 18 months or

7    longer, and then pay to fabricate the chip.

8          ARBITRATOR CALLAHAN:  To what?

9          THE WITNESS:  To fabricate, to manufacture

10   a chip, to -- also called tapeout.  So all the

11   students who are in chip design, they have this big

12   deadline called tapeout where they have to finish

13   everything, meet all the guidelines from the

14   found- -- factory or fabrication facility, and then

15   have the fabrication facility independently verify,

16   yep, your chip meets all of the guidelines for us to

17   actually be able to build it and happy to do it for

18   you.  Then you wait for three months to -- for their

19   chips to come back.

20          While you are waiting, you are already

21   designing your PCB, you talk about the package at

22   the time of chip design, and so you kind of put it

23   all together, build an experiment and demonstrate

24   the value of your technology.

25          ARBITRATOR CALLAHAN:  What's the PCB?

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1          THE WITNESS:  Oh --

2          MR. HARDIN:  Define it first.

3          THE WITNESS:  Yes.  Thank you for asking.

4          PCB stands for printed circuit board.  So

5    that is really kind of low complexity electronics.

6    Like chips themselves are extremely miniaturized.

7    One of those red, two layers of red, yellow and

8    green that counsel is holding, each one of those is

9    PCB where the spaces are a lot more forgiving, a lot

10   easier to design.  Those are quick kind of design.

11   Maybe take about a week or two at most to --

12          ARBITRATOR CALLAHAN:  Okay.  So the

13   miniaturized chips you showed us in the little

14   containers, that's just the chip?

15          THE WITNESS:  That is just the chip.

16          ARBITRATOR CALLAHAN:  And then the squares

17   are the PCB on to which you've mounted the chip?

18          THE WITNESS:  Packaged the chips, yes.

19          ARBITRATOR CALLAHAN:  Do you put anything

20   else on the board besides the chip?

21          THE WITNESS:  Yes, you do.

22          ARBITRATOR CALLAHAN:  Okay.

23          THE WITNESS:  You do need to put standard

24   components, like power supply and interfaces for

25   data, things like that.  Like USB interface, for

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  example.  That was one of those boards.  And just to

2  kind of put this in prospective, chip design and

3  manufacturing, that takes about two years, a lot of

4  effort, a lot of experience and training, and PCB

5  design takes about two weeks.  That's easy.  That's

6  off-the-shelf components.  You can train almost high

7  school students to do it.

8  BY MR. HARDIN:

9      Q.  I want to clarify a couple of things

10  really quick.

11          And first, Ms. Callahan had said the chip

12  is mounted on the PCB.  Is the terminology -- the

13  terminology is packaging, right?

14          Is that a "yes"?

15      A.  In fact, Ms. Callahan is correct.  One of

16  these packages, particularly on that red board, as I

17  mentioned, there are different kinds of packages.  I

18  have shown pin grade array you kind of penetrate

19  through the PCB and kind of solder them.  One of

20  those is surface mount.  So you literally take

21  packaged chip and mount it on the surface of the PCB

22  and put the solder around it to connect it up.

23      Q.  Right.

24          That's what -- I want to bring together

25  some terms you haven't talked about, but that others

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  have talked about.

2        And so is this -- I'll take this apart.

3  Is this -- this red item that I'm holding up, is

4  this the package or is the package referring to what

5  is in the chip and then the package is mounted on

6  the PCB?

7     A.  The latter.

8     Q.  Perfect.

9     A.  The red one is the printed circuit board,

10  PCB, and those gross square kind of boxes, those are

11  packaged chips that are surface mounted to that PCB.

12     Q.  Okay.  Perfect.  Okay.

13        Let's transition a little bit unless

14  either of the arbitrators have any questions.

15        Is it common for the person performing the

16  feasibility assessment to ask questions of the

17  company or the person that designed the chip?

18     A.  Yes.  That's the only way to find out.

19     Q.  Why?

20     A.  Like I said, chip design is a very complex

21  process that involves a lot of training and

22  knowledge, and it takes, like I said, two years or

23  so.  For more complex chips, you usually have groups

24  of people.  In my experience, I've had about three

25  or four, sometimes five students working on one

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   chip.  So that's absorbing the knowledge of ten man

2   years at the level of detail that you are aiming to

3   understand to convince and yourself and believe you

4   have a good confidence, as an academic advisor or a

5   company, official to say, yeah, let's go spend money

6   to actually do it.

7         Because it's my responsibility, at the end

8   of the day, if that project succeeds or fails, and I

9   have my obligations to funding agencies and

10   responsibility to make sure that we do put the best

11   foot forward to serve the customer.

12     Q.   Okay.  Professor, it is -- is there only

13   one type of universal way to do a feasibility

14   assessment or is it more customer driven?

15     A.   It's entirely customer driven.

16     Q.   Okay.  Let's discuss Mr. Bleck.  And let's

17   start with his qualifications to perform a

18   feasibility assessment of a -- of an ASIC to be used

19   in a Bitcoin miner, okay?

20     A.   Okay.

21     Q.   In your opinion, was Mr. Bleck qualified

22   to perform the feasibility assessment?

23     A.   Yes.

24     Q.   Okay.  Based on what?

25     A.   Based on his professional experience and

TRANSCRIPT OF PROCEEDINGS

1   work experience in ASIC design that elevated him to

2   a higher level of responsibility of manager of ASIC.

3   And being employed by big companies that paid in

4   real money to develop their chips.

5       Q.   Professor Markovic, you understand that

6   Mr. Pflaum is providing expert opinions for Coinmint

7   on certain topics related to Mr. Bleck and the

8   feasibility assessment that Mr. Bleck did?

9       A.   Yes.

10      Q.   It's been stated that Mr. Bleck needed a

11  reference to a comparable project or relevant

12  standard to evaluate the Katena K10 project.  Do you

13  recall that statement?

14      A.   I do.

15      Q.   Do you agree with it?

16      A.   I disagree.

17      Q.   Why?

18      A.   Because -- for several reasons.  Number

19  one, comparison was not part of Mr. Bleck's

20  assignment.  That level of understanding is

21  typically driven by the customer.  So Katena should

22  have that diligence performed on their end.

23      Q.   Katena or Coinmint?

24      A.   I'm sorry.

25      Q.   It's okay.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1       A.   Coinmint is the customer in this case.  So

2   Coinmint -- I would expect Coinmint to have full

3   understanding of the landscape so they're actually

4   spending their money in getting the best technology

5   that is available out there.

6             But regardless of that, on a completely

7   separate issue, there is just simply one metric in

8   Bitcoin mining, which is the energy efficiency,

9   which is the jewels per terahash.  And part of

10   Mr. Bleck's assignment was can I see simulations

11   that demonstrate certain energy efficiencies for

12   jewels per terahash, and that was provided in the

13   technical report.

14            So he had -- didn't need to look any

15   further to verify that this chip indeed had state of

16   the art energy efficiency capability.

17       Q.   How would a person go about getting the

18   schematic -- getting the designs of a chip to be

19   able to compare it to the K10?  Stated differently,

20   can you just walk up to BITMAIN and ask for their

21   schematics?

22       A.   No.  They would not provide --

23       Q.   Right.

24       A.   -- that level of information.

25       Q.   So just from a practical at standpoint,

1   how feasible is it to be able to compare design to

2   design?

3        A.   That's a very good question.  It's very

4   difficult to do in industry, because companies like

5   to provide more on the marketing field for

6   technology than the deep down technical diligence.

7   And from my experience with Flex Logix, that's one

8   of the constant struggles we have where our

9   competitors are just not disclosing their technical

10   metrics.  We kind of raise the bar by saying our

11   chip reaches a certain clock performance and power

12   consumption under these operating conditions.  Under

13   this temperature.  This voltage.  We are not

14   advertising for cherrypicked, best case, but this is

15   guaranteed performance.  We give you the tools to

16   convince yourself you can actually get this level of

17   performance.

18        There is really no way to compare

19   different products when people talk about these

20   chips at different level of disclosure.

21        Q.   Okay.  Another statement has been that

22   Mr. Bleck was not qualified to perform due diligence

23   on the K10 miner because he had never designed a

24   Bitcoin mining ASIC in the past.

25        One, first, do you remember that

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  statement?

2      A.  I remember, yes.

3      Q.  Do you agree with it?

4      A.  I disagree.

5      Q.  Can you tell the panel why?

6      A.  First of all, you do not need to know the

7  nuances of the math and the algorithm in order to

8  build it, and that is -- evidence from my

9  professional experience, my students in building

10  more than 20 chips have built variety of math

11  algorithms.  That's not the tough part.

12          Second, Mr. Bleck was in charge of

13  building much more complex chips than K10.  On the

14  VR obligation that he has multiple algorithms

15  running much more complex set of components to

16  build, K10 is a really simple digital chip.  You can

17  see in that box that has a sensing IC, stim IC and

18  DSPIC, we needed to go through several revisions of

19  these analog chips because of the sensitivity and

20  difficulty of making those components really custom

21  crafted.

22          The DSP chip, digital chip, it was just

23  first pass success.  It's very well streamlined with

24  the simulation tools and verification environment

25  that is pretty much what you simulate with the chip

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   building tools, that's what you get from the

2   foundry, with maybe plus/minus 5 percent on the

3   performance of the measured silicon versus

4   simulations.

5          ARBITRATOR CALLAHAN:  Are you saying that

6   the K10 is in this category of digital chip?

7          THE WITNESS:  Yes.  K10 is a purely

8   digital chip.

9   BY MR. HARDIN:

10      Q.  Can you talk about digital versus analog

11   versus phototonic, real briefly?

12      A.  Sure.

13      Q.  I realize that could probably be a lecture

14   in itself, but let's get the one-minute high level.

15      A.  Well, the simple way to think about it

16   perhaps is digital is just like a flipping the

17   switch.  You have a zero or one.  Whether your

18   voltage is at, you know, hundred millivolts, that's

19   a zero.  That's low.  Whether it's like 900 or 950,

20   that's high, zero and one.  So that's a very simple.

21          Analog chip is more like a dimmer switch.

22   Is this the right level of precision?  So you need

23   to have it set at a specific point, and

24   manufacturing tolerances happen, environment in the

25   chip with the power consumption, currents, voltage,

1   coupling of signals happen.  So it's a lot more kind

2   of tuning necessary to build analog components than

3   digital components, and there is a higher level of

4   risk in building analog and mixed signal chips as

5   compared to flipping zeros and ones.

6       Q.   Okay.  What about phototonic?  Can you

7   compare that real quick?

8       A.   Photonic is also a lot more complex

9   because it involves coupling electronics and

10   photonics.

11          ARBITRATOR CALLAHAN:  And what?

12          THE WITNESS:  Sorry.  Coupling

13   semiconductor microelectronics, like the chips that

14   you see on display.  And really light, the fiber

15   that goes and brings light, the most challenging

16   part of that is actually getting these off the

17   couplers, getting the technology from the

18   microelectronics interface to match up precisely

19   with lasers and light and photonics.

20   BY MR. HARDIN:

21       Q.   Okay.  The K10 chip, digital?

22       A.   Digital.

23       Q.   What type of chips are used in VR

24   technology, digital or analog?

25       A.   They are used both, because VR, first of

TRANSCRIPT OF PROCEEDINGS

1  all, needs interfaces to the environment.  I need a

2  camera, I need various other things that interface

3  with the real world.  I need analog components.  I

4  need analog-to-digital converters.  Then I need

5  processing technology.

6          For example, you will look into images.

7  You will look into videos.  And you do know what

8  kind of things you need to do, but you don't know

9  which one when, because it depends on the

10  environmental dynamics.  Is this what I'm looking on

11  or is the pedestrian crossing the street or is the

12  rain falling at the same time.

13          So you would have to kind of process

14  things slightly differently based on context.

15      Q.  Is there a correlation between the

16  functions you just talked about for a VR chip and

17  the size of the chip?

18      A.  The size of the chip can vary depending on

19  the platform.  If you have a medical device implant

20  or rack-mounted processing devices, it's a different

21  size of the chip.

22      Q.  My question is way more simplistic.  The

23  more function a chip has to do, the larger the size

24  of the chip, right?

25      A.  Usually that's the case.  And I would also

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   say a lot more complex the design, the more

2   functions, the more analog, digital mixture of

3   components.

4       Q.   Obviously we're not talking about

5   miniaturization here, we're just talking about the

6   base side.

7           Isn't it correct that a VR chip is

8   probably something more 150 square millimeters?

9           Is that accurate?

10      A.   Depends on the deployment of the VR chip.

11  Like I said, if we think about VR platform like

12  Oculus or one of these gaming headsets.  They are

13  limited by weight.  Usually these VR platforms are

14  one pound, but after a while, hour or two, that

15  becomes a little bit uncomfortable to carry one

16  extra pound on your head.

17          Then you need to make it smaller by making

18  the battery smaller.  That means you have lower

19  power budget and that would kind of naturally settle

20  on the size of the chip that would be rather on the

21  smaller size, but nevertheless still quite complex.

22      Q.   We're going to come back to the size of

23  the chip here in a little bit.

24          Let's turn to Mr. Bleck's report and his

25  assessment.

1          ARBITRATOR CALLAHAN:  Could we look at it?

2          MR. HARDIN:  That's exactly what we're

3    going to do.  We have -- it is Bleck 0194.

4          THE WITNESS:  We have --

5          ARBITRATOR CALLAHAN:  What's the exhibit

6    number?  What's the exhibit number?  We've

7    previously marked it.

8          MR. HARDIN:  We are actually going to

9    introduce it as 2208 as a separate.

10          ARBITRATOR CALLAHAN:  Why?

11          MR. HARDIN:  Just so that it's --

12          ARBITRATOR CALLAHAN:  Okay.  So you have a

13    new exhibit?

14          MR. HARDIN:  Right.

15          ARBITRATOR CALLAHAN:  Okay.

16          MR. HARDIN:  It would be 1-25 on the joint

17    exhibit, we do have a copy, but as I was saying this

18    morning, we had some printing issues?

19          ARBITRATOR CALLAHAN:  We're going to the

20    binders?

21          MR. HARDIN:  Yes, ma'am.

22          ARBITRATOR CALLAHAN:  Okay.

23          ARBITRATOR GLICK:  What is the joint, 125?

24          ARBITRATOR CALLAHAN:  No, 1 -- Exhibit 1?

25    No.

1          MR. ALFORD:  I think it's part of

2     Exhibit 1, I thought, 'cause Exhibit 1 is his whole

3     file, right?

4          ARBITRATOR CALLAHAN:  No.  The file was in

5     four parts for Mr. Bleck.

6          ARBITRATOR GLICK:  Mr. Taber, do you have

7     an exhibit number, joint exhibit number?

8          MR. HARDIN:  Here we go.

9          MR. TABER:  We would submit it as

10    basically just a few pages from what was Bleck 004,

11    I believe.

12          ARBITRATOR CALLAHAN:  But we need the

13    exhibit number.

14          MR. TABER:  It's stamped as 2208.

15          MR. HARDIN:  2208.  Here we go.  So sorry.

16          MR. ALFORD:  I have it as 12.

17          MR. TABER:  We're not looking at the

18    report right now.

19          MR. HARDIN:  This is -- this is -- this is

20    not it either.

21          MR. ALFORD:  We don't seem to have a 2208.

22          ARBITRATOR CALLAHAN:  I don't know what

23    2208 is.

24          MR. HARDIN:  Hang on one second.

25          ARBITRATOR CALLAHAN:  Mine goes up to

TRANSCRIPT OF PROCEEDINGS

1   2206.

2        MR. TABER:  Same here.

3        MR. HARDIN:  Right.  If I need to figure

4   out what 2207 is, I will.

5        ARBITRATOR CALLAHAN:  No, it can be empty.

6   You don't have to use the numbers.  It can be empty.

7        MR. HARDIN:  This is what we're going to

8   mark as 2208.

9        ARBITRATOR CALLAHAN:  Where is it coming

10   from?

11        MR. HARDIN:  This is from the Bleck's

12   production.  It's Bleck 0194.

13        ARBITRATOR CALLAHAN:  But where do I find

14   that?  I'm trying to orient myself as to where

15   you're taking it from.

16        MR. HARDIN:  I will find it in the joint

17   exhibits.

18        ARBITRATOR CALLAHAN:  Out of Exhibit 4.

19        MR. TABER:  Yes, ma'am.  We just printed

20   it separately for ease, because the way that

21   Exhibits 1 through 4 were put in, they're all

22   smooshed together.

23        ARBITRATOR CALLAHAN:  Okay.  Let the

24   record reflect that in our Joint Exhibits Number 4,

25   which, remember, Mr. Bleck's production got marked

TRANSCRIPT OF PROCEEDINGS

1   in four pieces for various reasons.  So this is an

2   excerpt taken from what was marked as Exhibit 4.

3         MR. TABER:  Right.

4         ARBITRATOR CALLAHAN:  Okay.  Exhibit 4

5   starts with Bleck 0156 and ends with Bleck 0229.

6   The pages of this exhibit are 0194 through -- what's

7   the last page?

8         MR. HARDIN:  201.

9         ARBITRATOR CALLAHAN:  201.  Do you have a

10   copy of Exhibit 2208 that I can look at?

11         MR. HARDIN:  Oh, sure.  I'm sorry.

12         ARBITRATOR CALLAHAN:  No, that's all

13   right.  Do you have one, though?

14         MR. HARDIN:  Yes.

15         MR. ALFORD:  And I would just note for the

16   record that the Bleck -- this is Mr. Bleck's

17   independent contract agreement.  It's also in the

18   binders at 2057.  I may refer to it that way because

19   that's how I have it.

20         MR. HARDIN:  That's fine.  Sorry, we've

21   got too many copies, but we're doing the best we

22   can.

23         ARBITRATOR CALLAHAN:  Okay.  Thus far, I

24   don't think I have 2057 in.  So that's fine.  As we

25   go and you refer to things, I'm going to show it on

TRANSCRIPT OF PROCEEDINGS

1  the hearing report.  And it's fine if there's

2  duplicate, we can figure that out as long as they

3  get mentioned as such.

4        For example, let's pretend you never

5  mention this other exhibit number, it's not going to

6  show as being in evidence.  If you mention it with a

7  witness, then it's going to be on the list, and

8  that's fine.  You'll cite it in your briefing and

9  you'll cite 2208 in your briefing, and the panel

10  will be able to go find it in our binders.  That's

11  the only goal here, is to make sure that if you're

12  going to refer to it by another number, then you're

13  going to need to --

14        MR. ALFORD:  Say that.

15        ARBITRATOR CALLAHAN:  -- talk to a witness

16  about it so it gets recognized as something that you

17  introduced during the hearing.

18        MR. ALFORD:  Thank you.  That was my plan.

19  I wanted to give you a heads up.

20        ARBITRATOR CALLAHAN:  It's fine if you

21  have duplicates.

22        MR. HARDIN:  Given where we are, would it

23  be okay to take the break now?

24        ARBITRATOR CALLAHAN:  Sure.  Sure.  It's

25  about 10:45.  Let's try and keep it to ten minutes

TRANSCRIPT OF PROCEEDINGS

1   since we got a late start.

2          (Whereupon, a recess was taken from

3          10:44 a.m. to 10:56 a.m.)

4          ARBITRATOR CALLAHAN:  Go ahead,

5   Mr. Hardin.

6   BY MR. HARDIN:

7     Q.  Professor Markovic, you've got in front of

8   you Exhibit 2208.

9          Do you understand this to be the contract

10  between Mr. Bleck and Coinmint?

11    A.  Yes.

12         MR. HARDIN:  My real time is not working,

13  but we'll ...

14  BY MR. HARDIN:

15    Q.  In your opinion, what type of feasibility

16  assessment did Coinmint request?

17    A.  Coinmint requested high-level visibility

18  assessment to review architectural design and

19  manufacturing visibility of a --

20         ARBITRATOR GLICK:  Can you talk up,

21  please, a little bit.

22         THE WITNESS:  Oh, sorry.

23         Coinmint requested a high level visibility

24  assessment to review architecture design and

25  manufacturing visibility of the K10 chip.

TRANSCRIPT OF PROCEEDINGS

1   BY MR. HARDIN:

2       Q.   Was there an associated time frame for

3   this high level feasibility?

4       A.   It was about a week, one week.

5       Q.   That's specifically called out in

6   Section 3A on what will be 2208-3, right?

7       A.   Yes, I see that.

8       Q.   Professor, let's discuss the materials

9   that Mr. Bleck was provided.

10         Can you turn to Joint Exhibits 2, 3 and 4?

11      A.   Yes, I'm here.

12      Q.   Do you recognize this as the design

13  collateral that was provided to Mr. Bleck initially

14  by Mr. Reddy?

15      A.   Yes.

16      Q.   Is the information in Exhibits 2, 3 and 4

17  the type of material you would expect to be provided

18  to someone doing a feasibility assessment at the

19  onset?

20      A.   Yes.

21      Q.   Is it practical to show every document

22  that was created as the chip was being designed to

23  someone performing the feasibility assessment?

24      A.   No, that's not practical.  There is 50

25  engineers working for about two years.  That would

TRANSCRIPT OF PROCEEDINGS

1  overwhelm anybody's mental capacity to absorb within

2  such a short time.

3      Q.  Okay.  One complaint that has been raised

4  by Mr. Pflaum is that these are only JPEGs and

5  PowerPoints.

6          Do you recall that?

7      A.  Yes, they have to be.

8      Q.  Can you respond?

9      A.  The PowerPoints illustrate architecture

10  diagrams, block diagrams to share.  But schematics

11  as to how the chips are made, which is the secret

12  sauce, they have to be JPEGs because, otherwise, you

13  would be disclosing your own IP and the IP of third

14  parties that you put inside your chip.  And you just

15  can't share that.

16      Q.  And in your professional opinion, is that

17  why a chip designer would only provide JPEG and

18  PowerPoints as opposed to schematics and actual

19  designs?

20      A.  Yes.

21      Q.  By providing this type of material, does

22  it limit anyone from asking to see the test

23  simulation?

24      A.  No.  You can always ask questions.

25      Q.  Okay.  Is it your understanding that that

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   type of dialogue occurred in this particular case

2   between Mr. Bleck and Mr. Reddy?

3        MR. ALFORD:  Objection.  Lacks foundation,

4   and also vague and ambiguous.  That kind of

5   dialogue.

6        ARBITRATOR CALLAHAN:  Overruled.

7        THE WITNESS:  Yes.  They had this kind of

8   discussion.

9   BY MR. HARDIN:

10      Q.   Okay.

11      A.   That kind of discussion.

12      Q.   And what makes you certain about that?

13      A.   I heard Mr. Bleck testify that meetings

14   with design team of Katena DXCorr to assess

15   particular aspects that needed for his feasibility

16   report.  And I also heard Mr. Reddy testify that

17   Mr. Bleck actually asked some really hard questions

18   that needed his team to go back and run simulations

19   to provide response to Mr. Bleck's inquiry.

20      MR. HARDIN:  Madam Chair, I'd like to get

21   into some of this.  Should we go off the record?

22   It's going to be about Mr. Reddy's testimony.

23      MR. ALFORD:  I object to that.

24      ARBITRATOR CALLAHAN:  Why?

25      MR. ALFORD:  Because I -- look, I think --

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    as I understand it, the purpose of having

2    Mr. Reddy's testimony off the record and Mr. Bleck's

3    testimony off the record is so nothing they say can

4    be used against them.  If a witness testifies under

5    oath, generally, that testimony is admissible

6    against them later, right.  I think that was the

7    panel's concern.  But, of course, Mr. Markovic's

8    testimony about what he thinks Mr. Bleck said

9    wouldn't be admissible against Mr. Bleck in a court,

10    it's hearsay, and it's not an admission of

11    Mr. Bleck.

12          So I don't think this is a concern the

13    panel had that testimony of Mr. Bleck would be

14    admissible against him in a later proceeding.  This

15    is a witness -- a third party or another witness's

16    understanding of what was said.  So I don't think

17    they have the same concerns.

18          Plus, I do think it's going to be a real

19    problem if I can't examine Mr. Markovic on the

20    record and point out important, what I believe are,

21    contradictions between what he says and Mr. Bleck

22    and Mr. Reddy say.  If all that's off the record, we

23    have an incomplete record on a really critical

24    point.

25          ARBITRATOR CALLAHAN:  We don't have a

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   complete record for a variety of reasons --

2        MR. ALFORD:  Right.

3        ARBITRATOR CALLAHAN:  -- in terms of there

4   being a transcript of every word.

5        MR. ALFORD:  That's true.

6        ARBITRATOR CALLAHAN:  Here's one of the

7   issues that the panel has been presented with, and

8   we've tried to balance it as best we can.  We could

9   have been helped along the way if there had been a

10   further stipulated protective order that clients and

11   lawyers signed and had the panel approve.  So we're

12   operating under the Order Number 6, which has not,

13   you know, had the breadth that the panel thought it

14   did in terms of affording protections.

15        So, you know, I think, without getting too

16   technical here, I'm going to accommodate the

17   request, because there was another way that was, for

18   whatever reason, chosen to not be chosen, that would

19   have helped a lot.  But I don't want to have this be

20   so disjointed.

21        MR. HARDIN:  I agree.

22        ARBITRATOR CALLAHAN:  Mr. Hardin --

23        MR. HARDIN:  I'm open to any practical

24   guidance on this.  Because I agree, I don't like

25   going on and off the record.  I'm trying to balance

1    everything out too.  So by all means --

2         ARBITRATOR CALLAHAN:  Here would be my

3    question of you, is, the panel heard Mr. Reddy

4    testify and Mr. Markovic and Mr. Pflaum heard Reddy

5    testify.

6         MR. HARDIN:  I think it was only

7    Professor Markovic.

8         ARBITRATOR CALLAHAN:  I'm sorry,

9    Professor Markovic.  I'm sorry, maybe Mr. Pflaum did

10   not Zoom in.  But there is no record, there's never

11   been a record.  The panel was there, took its notes,

12   and you all took your notes, and you'll say what you

13   think you said and Mr. Markovic will say what he

14   thinks he says.

15        Is that a concern for your purposes

16   relative to that which may be attributed to

17   Mr. Reddy by Mr. Markovic concerning what Mr. Bleck

18   says or what Mr. Reddy says they discussed with each

19   other?

20        MR. HARDIN:  It has sides to it, right.

21   And so what I'm trying to do is to honor the panel's

22   orders with respect to commitments to Mr. Bleck that

23   his testimony would not be recorded, as well as

24   Mr. Reddy.

25        ARBITRATOR CALLAHAN:  They weren't.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1          MR. HARDIN:  No, they weren't.  But

2   because Professor Markovic heard both of them and

3   can now discuss what both of them said, I'm just

4   trying to balance that out.

5          ARBITRATOR CALLAHAN:  I'm asking, is that

6   really a concern given that Mr. Markovic's testimony

7   about what they said -- why is that evidence about

8   what they said?

9          MR. ALFORD:  Against them in a later

10   proceeding in court, it wouldn't be, right.

11          ARBITRATOR CALLAHAN:  Well, I don't know.

12   I'm asking.

13          MR. HARDIN:  I would certainly argue that

14   it is hearsay, although I'm sure I would be faced

15   with an argument that it's not hearsay.  So with

16   respect to this one particular issue, you know,

17   'cause we're going to talk about the example that

18   was posed, it may not be an issue.  But it is -- it

19   is a difficult area to navigate given all the

20   extracurricular activities.

21          MR. ALFORD:  Can I?

22          ARBITRATOR CALLAHAN:  Go ahead.

23          MR. ALFORD:  Just real quick.  Again, I

24   think the rules of evidence are pretty clear.

25          ARBITRATOR CALLAHAN:  But they don't apply

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   here.

2         MR. ALFORD:  Right.  But the concern is

3   about what effect that might have on Mr. Bleck and

4   Mr. Reddy in the civil case.  I'm quite sure, and

5   I'm confident the panel is too, that something

6   Mr. Markovic says he thinks they said is not

7   admissible in court.

8         ARBITRATOR CALLAHAN:  It would be so easy

9   if the Coinmint side and its counsel would simply

10   agree to that in an order that the panel could

11   enforce.  That's our problem, is that we have been

12   deprived of the opportunity to make it so because of

13   the limitations of our power that extend only to

14   Coinmint.

15         MR. ALFORD:  Is the panel asking for a

16   stipulation that what Mr. Markovic --

17         ARBITRATOR CALLAHAN:  We didn't get one.

18         MR. ALFORD:  -- says won't be admissible

19   against Mr. Reddy in court?

20         ARBITRATOR CALLAHAN:  No.

21         MR. ALFORD:  Okay.

22         ARBITRATOR CALLAHAN:  We wanted that and

23   the agreement that the panel has power over both

24   Coinmint and its counsel if they breach that.  And

25   we wanted agreement as to what our sanctioning power

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   was.  That's what we put forth, is that for us to be

2   comfortable with having the third-party witnesses in

3   our case have significant exposure outside of our

4   case based upon things that transpired in our case

5   after we issued a protective order has proved to be

6   problematic relative to getting the witnesses to

7   come here and give us their information, which we're

8   searching for the truth.

9        So we're trying to accommodate the search

10   for truth and the balancing and getting people to

11   show up because they don't have to show up because

12   they're third parties.  And so we weren't given what

13   we asked for.  So I'm going to accommodate what

14   Mr. Hardin has asked for because the panel has been

15   put in a catch-22 situation.

16        MR. ALFORD:  Well, that was never our

17   intention.  But thank you for that.  I understand.

18   I understand.

19        ARBITRATOR CALLAHAN:  We have a very clear

20   order to that effect, and it had to do -- it dates

21   back to the request for entry into the data room,

22   which we said yes.  Katena said yes, subject to a

23   more meaningful, enforceable by the panel,

24   protective order.  We said ordered subject to that

25   agreement, and we didn't get it.  I think that's

TRANSCRIPT OF PROCEEDINGS

1    back to February.

2          I feel like this has been discussed very

3    openly and frequently, and it came up again with

4    Mr. DeNaut and getting him to appear, which didn't

5    happen.  So I think that the better course here is

6    to go off record if we're going to talk about the

7    discussions that refer to testimony given by

8    Mr. Bleck and Mr. Reddy, both of whom we understand

9    have been sued.

10         THE REPORTER:  Off the record?

11         ARBITRATOR CALLAHAN:  Yes.

12          (Discussion held off record.)

13          (Whereupon, a recess was taken from

14          11:08 a.m. to 11:11 a.m.)

15         ARBITRATOR CALLAHAN:  Back on the record.

16   BY MR. HARDIN:

17     Q.   Professor, how much time do you understand

18   that Mr. Bleck billed Coinmint for this project?

19     A.   I understood he billed 5.8 hours, which is

20   five hours and 50 minutes.

21     Q.   In your opinion, was that consistent with

22   his assignment from Exhibit 2208?

23     A.   Yes.  He did a full-time job in one week's

24   time to deliver the report.

25     Q.   Let's bring back in the discussion the

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   size of the chip.

2          And what about -- first, what size was the

3   K10 chip?

4       A.   It was about 35 square millimeters.

5       Q.   On the other end of the spectrum, some

6   chips go up to 256 square millimeters, right?

7       A.   Yes.

8       Q.   What about the size of the K10 chip made

9   it possible for Mr. Bleck to perform a feasibility

10  assessment in that amount of time?

11      A.   The size was relatively --

12          MR. HARDIN:  Hang on one second for

13  Arbitrator Glick.

14          ARBITRATOR GLICK:  I'm okay.  Only three

15  times this time.  I sneeze a lot.

16          MR. HARDIN:  My apologies.

17          THE WITNESS:  There are three things.

18  First, the size of the chip is relatively small, 35

19  square millimeters.  Second, it's highly regular.

20  It's built replicating the same building unit 256

21  times.  And third, there were really no

22  performance-pushing aspects as far as the aisle and

23  power consumption, thermal deliveries.  It was very

24  simple design.

25  / /

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   BY MR. HARDIN:

2       Q.   "Simple design," does that mean that it

3   wasn't innovative?

4       A.   No.  It was innovative.  They put in a lot

5   of effort to optimize power efficiency and a lot of

6   clever techniques with custom design that time that

7   they replicated, put a lot of effort to make sure

8   it's custom built ADDRs with eight bits of

9   precision, which saves a lot of power as compared to

10   64-bit CPUs, to put ADDR design handcrafted, very

11   dense, and then go on and replicate that.

12      Q.   One of the opinions in this case is that

13   Mr. Pflaum has stated the work should have taken

14   Mr. Bleck between 80 and 160 hours.

15         Do you recall that?

16      A.   Yes.

17      Q.   First, can you describe the level of

18   detail that's implicit in Mr. Pflaum's statement?

19      A.   Well, Mr. Pflaum's statement violates the

20   agreement between Coinmint and Mr. Bleck because he

21   only had one week in addition to his full-time job.

22   It is asking basically for two to four weeks of the

23   full-time job itself to provide a review without any

24   basis as to why that number of hours was requested.

25   So Mr. Bleck did exactly what he was asked to do as

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   per the agreement.

2       Q.  Set that aside, though.  Can you tell

3   me -- excuse me.

4           What level of detail is implicit in some

5   type of due diligence project that takes up to

6   160 hours?

7       A.  Well, it just needs to be a lot more

8   effort possibly by multiple people to sustain that

9   workload.  I -- in my personal experience, I have

10   not seen due diligence efforts that take that long.

11      Q.  Right.

12          And that's -- that was going to be my next

13   question.

14          In your experience, is that typical in a

15   B2B transaction like this?

16      A.  No.  It's not.

17      Q.  Let's turn to Exhibit 22, please.

18          I'm focused on the one-pager there at the

19   end, okay?

20          Did you review this document?

21      A.  Yes.

22      Q.  In addition, did you do your own

23   feasibility assessment of the K10 chip?

24      A.  Yes.

25      Q.  Were you able to find anything wrong with

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   Mr. Bleck's summary in Exhibit 22?

2       A.   No.  He did a good job.

3       Q.   Okay.  Based on your years of experience,

4   would you agree with Mr. Bleck's assessment as

5   identified in here?

6       A.   Yes.

7       Q.   Let's go to Exhibit 12.  This is simply --

8   this is Mr. Bleck's report.  You say the title of it

9   there says prepared by Robert Bleck Consulting,

10  5/28/2021?

11      A.   Yes.

12      Q.   Did you review the document as well?

13      A.   Yes, I have.

14      Q.   Were you able to find anything wrong with

15  this report?

16      A.   No.

17      Q.   Okay.  Based on your years of experience,

18  would you agree with Mr. Bleck's assessments as

19  identified in here?

20      A.   Yes.  Specifically to his task of

21  visibility assessment of architecture, design and

22  manufacturing, his assessment is correct.

23      Q.   Okay.  I'm running out of time, but I want

24  to pick out maybe one item in here.  Why don't we --

25  can you talk about -- how about this.  Can you talk

1   about the 400-millivolt SPICE simulations?

2          ARBITRATOR CALLAHAN:  If what?

3          MR. HARDIN:  400-millivolt SPICE

4   simulations.

5          ARBITRATOR CALLAHAN:  Oh, millivolt.

6          THE WITNESS:  Sure.  So usually technology

7   like 12-nanometer, which was the subject here, comes

8   with standard operating voltage like .85 volts.  And

9   everything is ready for designers to use in that

10   domain.

11          Now, in order to meet the extreme energy

12   efficiency targets, Katena needed to lower the

13   supplied voltage to 0.4 volts.  And for that, they

14   needed to do all of the work, ton of the work

15   themselves to fully characterize all of the building

16   blocks of their circuit for that operating voltage.

17          So they did, in other words, everything

18   the foundry would otherwise do to make sure, hey,

19   technology works at 400 millivolts.  And that

20   required extensive amount of characterization,

21   simulations and a SPICE level simulation, a

22   transistor level simulation, which is the finest

23   level of accuracy, just to put that into

24   prospective.

25          One element is switching transistor,

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  although it switches from one to zero and back, it

2  has about 300 different parameters in their SPICE

3  model.  And you have tens of millions, if not

4  hundreds of millions, of these devices that are

5  behind these SPICE simulations.

6          So this is as thorough as it can possibly

7  get to have confidence that this chip is actually

8  going to work at 400 millivolts.

9  BY MR. HARDIN:

10     Q.   Professor, subject to any questions from

11  the panel, let's turn to your feasibility assessment

12  of the K10 chip.

13          ARBITRATOR CALLAHAN:  None right now.

14          MR. HARDIN:  Okay.

15  BY MR. HARDIN:

16     Q.   Have you given an assessment of the K10

17  chip?

18     A.   Yes.

19     Q.   Bottom line up front, was it feasible?

20     A.   Yes, it was.

21     Q.   Okay.  Well, let's break this down.

22          First, what did you do to perform a

23  feasibility assessment?

24     A.   I looked primarily into engineering

25  documents, and there is a series of presentations

1   and updates, engineering updates, from Katena

2   dating -- starting with January of 2020.  Then we

3   have February 2020, September, two updates in

4   November of 2020, one in February of 2021.  And

5   there was that comprehensive presentation in

6   March of 2021, which illustrates 15 months of solid

7   engineering work that methodically goes after the

8   key building block thermal simulations.  Then

9   architecture refinements, integration of all these

10   blocks together, making sure that the control flow

11   and the programming of this machine is set -- well

12   thought out, and finishing up with all the garnish,

13   like PLL and other kind of blocks that are standard

14   in making sure all of that is properly validated.

15        And that all happened before -- well

16   before May 2021, before even Coinmint got into the

17   picture.

18   Q.   Okay.  Did you also interview Mr. Reddy?

19   A.   Yes, I interviewed Mr. Reddy to supplement

20   my understanding of the whole process of the chip

21   development.

22   Q.   How many students do you think have come

23   through your program?

24   A.   I graduated myself 22 Ph.D.s and have

25   maybe another ten masters, so about 30 students.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1      Q.   How was Mr. Reddy during the interview?

2      A.   He was doing great.  I can sense this kind

3   of technical expertise when I talk to professionals

4   in my industry.  And, in fact, during the call,

5   Mr. Reddy was interrupted two or three times, other

6   people calling him to troubleshoot and advise on

7   some other chip projects.  So that just tells me he

8   really knows what he's doing, and he's in very high

9   demand and very busy in running his operation.

10      Q.   Would you let him into the research group?

11      A.   Absolutely.

12      Q.   What about Mr. Bleck?

13      A.   Yes.

14      Q.   You've said earlier -- we've talked about

15   it a couple of times -- that the K10 chip you said

16   was innovative, but not particularly complex?

17      A.   Yeah.

18      Q.   Can you tell me what you mean by that,

19   recognizing that we don't do chip designs on a

20   day-to-day basis?

21          ARBITRATOR CALLAHAN:  And slowly.

22          THE WITNESS:  What I meant was that they

23   exercise good diligence with the tools they had

24   available to come up with a very compelling project.

25   So they used a variety of techniques.  I like to do

TRANSCRIPT OF PROCEEDINGS

1    this analogy with tools.

2         If you have solid understanding how to

3    proficiently use the tools, you build, you know,

4    very compelling products or create really compelling

5    art, like you know how to use, you know, your pallet

6    and your skills, and so on.

7         So they did exactly that.  They

8    handcraft -- they understood the problem really

9    well, they applied the right techniques in the right

10    places and further went through a layer of

11    optimization.

12         That was really one of the key things that

13    impressed me through this whole series of progress

14    reviews, well, we built it -- wait a minute.  We

15    found, actually, a better way to tweak it a little

16    bit to tighten up our consumption.  So they did all

17    the right things at the right places.

18    BY MR. HARDIN:

19         Q.   You've talked a couple of times about the

20    chip, the K10 chip being a 35 square millimeter

21    chip, right?

22         A.   Yes.

23         Q.   As opposed to a 256 square millimeter

24    chip, right?

25         A.   Yes.

TRANSCRIPT OF PROCEEDINGS

1      Q.   What benefits come from fabricating or

2   using a smaller sized chip, such as a 35 millimeter

3   chip?

4      A.   It's higher yield.  You will have more

5   effective utilization of silicon, which is you will

6   have more known good dies, or more working parts, so

7   you would be not wasting silicon.  It's less complex

8   and easier to design.

9      Q.   I want to make sure that we're clear here.

10   We're talking about the size of the chip.

11        This is pre-miniaturization, which you may

12   work with, but really wasn't applicable to the K10,

13   right?

14      A.   Correct.  They still wanted to get --

15   Katena still wanted to have the highest utilization

16   of silicon to do as much compute as possible with as

17   little silicon as possible and kind of replicate

18   that, put it in a package, and put a farm of these

19   miners to efficiently mine bitcoin.

20      Q.   So let's go back to the benefits

21   fabricating -- you talked about the benefits of

22   fabricating a smaller size chip.

23        Was that increased by the production node

24   that Katena had chosen, specifically the 12

25   nanometer?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    A.   Yeah.  12 nanometer would put the pressure

2   on the size of the chip because 12 nanometer is

3   bigger than 7.  You would need more silicon area in

4   12, which is what -- part of the thing that made

5   them work hard to reduce the chip area to make it

6   more efficient.

7        What was really compelling there is that

8   in a situation of the chip supply at that time,

9   where 7 was not accessible, the 12 nanometer parts

10   had the compelling features to compete with 7

11   nanometer.  So it was really testimony to the

12   quality of the design work that had been done.

13    Q.   We talked about your conclusion that was

14   feasible.  Let's talk about a few items that led to

15   that conclusion, first was a P&R database?

16    A.   P&R stands for place and route.

17        ARBITRATOR CALLAHAN:  What?

18        THE WITNESS:  Place and route.

19        ARBITRATOR CALLAHAN:  Thank you.

20        THE WITNESS:  You effectively kind of put

21   blocks, place them on the -- on the -- and then

22   route in between them.

23        ARBITRATOR CALLAHAN:  Place them on the

24   surface.

25        THE WITNESS:  Place them on the surface,

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   and then you provide the routing.  It's kind of

2   building a likelihood.  You put houses and then you

3   put streets and connect them all together.

4   BY MR. HARDIN:

5       Q.   When was it completed for the K10 chip?

6       A.   The place-and-route database evolved over

7   time, and it was about 95 percent complete at the

8   time of assessment, which is May 2021, with about

9   two or three weeks left to finalize the tapeout.

10      Q.   What does that tell you about DXCorr's

11  preparedness with the packaging?

12      A.   They thought about the package early on

13  and provided a full chip diagram, and the layout

14  back in February of 2020 showing the whole layout

15  with all the I/O pins that were thought out upfront

16  for subsequent packaging and system integration.

17      Q.   Why are you confident that this chip is

18  feasible?

19      A.   The chip met the functionality test.  It

20  met energy efficiency and performance simulations.

21  And it was a very low risk.  It was also emulated on

22  FPGA, which is another thing that speeds up

23  simulations.  See, this FPGA technology is very,

24  very commonly used in industry.  Instead of running

25  simulations that take days and sometimes even a

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  week, you use this FPGA to program bitcoin mining on

2  that.  Like I said, FPGAs are flexible chips and

3  that runs much faster, it runs at hardware speed.

4       ARBITRATOR GLICK:  May I just clarify a

5  question?

6       MR. HARDIN:  Yes, ma'am.

7       ARBITRATOR GLICK:  You said it met

8  functionality, energy, efficiency.

9       THE WITNESS:  And performance.

10       ARBITRATOR GLICK:  What's the last one?

11       THE WITNESS:  Speed performance.

12       ARBITRATOR GLICK:  Speed performance.

13       THE WITNESS:  Terahash per second.

14       ARBITRATOR GLICK:  Then you said low risk

15  for what?  I think there was some letters that you

16  mentioned that I didn't know what.

17       THE WITNESS:  Right.  Low risk for -- I

18  meant to say low risk for manufacturing, given that

19  this was a digital chip that was fully verified in

20  this simulation environment.

21       ARBITRATOR GLICK:  Thank you.

22  BY MR. HARDIN:

23    Q.  Since you mentioned fabrication, let's

24  talk about this.

25       Mr. Pflaum has suggested that Katena could

1  have fulfilled Coinmint's order at a fraction of the

2  cost by just using multiproject wafers.

3        Do you recall that testimony?

4    A.  I do recall.

5    Q.   First, can you explain to the panel what

6  is being suggested?

7    A.   Yeah.  So I understand the suggestion

8  given the lack of Mr. Pflaum's experience in this

9  industry.  But the way that chips are built is, you

10  can either, kind of, ride on a bus and have

11  multi-project wafer run.

12        So that is -- for example, our design is

13  one of them, and there is maybe another 50 people

14  that are riding on this bus, shuttle bus.  And

15  everybody chips in to pay one 50th of the price of

16  that wafer.  And that's how the cost is shared for

17  very small volume prototyping.

18        But when it comes to very high-volume

19  prototyping, you want to have a private ride

20  because, obviously, nobody else is going to support

21  the volume production of your chips.  So not all

22  other bus riders are going to say, well, I'm going

23  to pay again for such a high cost.

24        And just to kind of give you a simple

25  engineering and manufacturing economics, over here

TRANSCRIPT OF PROCEEDINGS

1  as calculations were made, 35 square millimeter chip

2  at about 25,000 per square millimeter, and that

3  technology would cost about $875,000.  And you get

4  100 chip samples like the ones I showed you on

5  display.  So that basically tells you one chip costs

6  about $8,700.

7      And now if we have the private run and we

8  read the IMEC invoices to DXCorr, one whole wafer,

9  which produces 1500 chips, cost $7,000.  So that

10  basically means that Mr. Pflaum's suggestions would

11  be $1,500 times more expensive to build production

12  quantity than what would be just to get the private

13  shell.

14     Q.   Well, let's talk about a few other areas

15  here.  Let's talk about the I/O pins.  Can you turn

16  to Exhibit 3, page 31?

17        ARBITRATOR CALLAHAN:  Could you give me

18  the Bates number, please?

19        MR. HARDIN:  No.  Sorry.  I will shortly,

20  though.

21        ARBITRATOR CALLAHAN:  Sorry.  I'm using

22  the original, or if you tell me what it is, I can

23  find it.

24        MR. HARDIN:  I'm almost there.  It's Bleck

25  143.

 1          ARBITRATOR CALLAHAN:  Okay.  Thank you.

 2   I'm there.

 3          MR. HARDIN:  Looks like this on the top

 4   should say full chips in our database without

 5   sensors and PLLs.

 6   BY MR. HARDIN:

 7      Q.   Where are the I/O pins in this diagram?

 8      A.   The I/O pins in this diagram are on the

 9   very periphery of this chip lay out diagrams.  They

10   look like railroad tracks.  They are kind of going

11   around the chip.

12      Q.   Mr. Pflaum had testified previously that

13   an individual that he used, Mr. Schiettecatte said

14   that the P&R diagram of the K10 chip in the design

15   collateral was lacking I/O pins.

16          Would you agree?

17      A.   I would disagree.

18      Q.   Why?

19      A.   You see the I/O pins here, and that level

20   of detail is not expected to be found here.  That is

21   very, kind of, low-level detail and very simple that

22   you share with your packaging company, just like in

23   the chips you see there, bond wires.  You just say,

24   hey, connect this pin to this package.  That's very

25   easy.  That's a trivial task.  But just looking into

1   this I/O diagram here, obviously, implicates that

2   such organization that such a package existed

3   because you see the chip was made.

4       Q.   It's literally right here?

5       A.   It's right here.

6       Q.   What is an LVS report?

7       A.   LVS stands for layout versus schematic.

8   So that is one of the critical comparison points

9   that you show that the schematic diagram of how

10   things are connected fully matches your physical

11   realization of that in the final chip layout place

12   and route database.  So that when you come from,

13   hey, I'm sending this P&R to the foundry, yep, it

14   looks good.  This is exactly how I designed it in my

15   schematic.

16       Q.   Would you turn to 3-33.  And for

17   Ms. Callahan, it's Bleck 0145.

18           ARBITRATOR CALLAHAN:  Got it.

19   BY MR. HARDIN:

20       Q.   These three pages, going from BLECK 0145

21   through BLECK 0147, these are LVS reports, right?

22       A.   Yes.

23       Q.   At a real high level, can you briefly tell

24   us, what do these documents tell you?

25       A.   These documents tell me that these LVS

1   reports validate the key architecture building

2   blocks, all of those things that they handcrafted

3   very tightly and replicated across the chip.  And,

4   in fact, this is as of February 2021, they had fully

5   completed layout of major architecture building

6   blocks.

7       Q.   One of the statements was that Mr. Pflaum

8   testified that, again, another individual,

9   Mr. Schiettecatte, said the design collateral lacked

10  LVS results for several of the key components,

11  including the compressor, for example.

12          Would you agree?

13      A.   I would disagree.  Compressor is part of

14  one of these SH blocks.  He misunderstood that.

15      Q.   What is a design rule check?

16      A.   Design rule check stands for -- yeah.  Or

17  DRC, that is set of checks to make sure that foundry

18  can properly manufacture the chip.  So you have, for

19  example, transistors, they need to be certain size

20  and certain space between them.  It's mostly spacing

21  rules to make sure you're not trying to cram too

22  many things close together to violate rules and also

23  not waste the area.

24          You could if you want to, but just make

25  sure that all of the guidelines from the foundry are

1   fully respected.  It's almost like a contract

2   between the designer and the foundry.  You want to

3   fabricate.  This is how you do it.  These are the

4   rules.

5       Q.   Okay.  Some of the testimony has been

6   that, again, Mr. Schiettecatte told Mr. Pflaum that

7   it was -- that it was a problem that there were no

8   design rule check documents for the K10 chip.

9          What would you say to that?

10      A.   I would say that that doesn't surprise me

11  because Mr. Schiettecatte doesn't have experience in

12  ASIC design at all, and he has never designed a

13  chip.  In fact, DRC check is a routine check that is

14  done at the very end, takes maybe a week before you

15  finally hit the go button for the foundry.

16         And in my experience of building more than

17  20 chips, DRC has never been an issue.  You just sit

18  down, look at the rules, make sure everything is

19  cleaned up and you are ready to go.

20         Once you pass functionality, performance

21  and energy efficiency, DRC is never a problem.

22      Q.   Did you get it before you taped out?

23      A.   You have to do it before you tape out so

24  that you are sending DRC clean design to the

25  foundry, yes.

1    Q.   Perfect.  I've got one more for you.

2         Can you explain what is meant by the

3    phrase "SPICE model at the gate level"?

4    A.   SPICE model at the gate level relates to

5    my previous explanation that you have to fully

6    characterize all of the logic gates and all of the

7    building blocks at the finest level of detail for

8    simulation, in this particular case, 400 millivolts.

9         So that's the highest level of fidelity

10   that you can provide, is the SPICE level gate level

11   simulation to say that if I manufacture this chip,

12   the performance is going to be darn close to what

13   this simulation tells me.

14        MR. HARDIN:  Michelle, could you put up

15   the transcript of Mr. Pflaum's explanation of SPICE

16   models at the gate level.  I think it's page 149,

17   and it starts at --

18        ARBITRATOR CALLAHAN:  Is this a depo?

19        MR. HARDIN:  Yes.

20        ARBITRATOR CALLAHAN:  Oh.

21        MR. HARDIN:  I believe it starts at 18,

22   149-18.

23        ARBITRATOR CALLAHAN:  Is that an exhibit

24   reference, 149?

25        MR. HARDIN:  No.  That's just the page.

1   Just the page of the deposition.

2        ARBITRATOR CALLAHAN:  All right.  That's

3   all right.

4        MR. HARDIN:  We can submit this as an

5   exhibit if the panel would like.

6        ARBITRATOR CALLAHAN:  Well, how else am I

7   going to consider it?

8        MR. HARDIN:  Understood.

9        ARBITRATOR CALLAHAN:  I'm just saying, if

10   I want to refer back to it later.

11        MR. HARDIN:  No.  No.  No.  That is

12   totally appropriate, and we will submit this as the

13   next one.

14   BY MR. HARDIN:

15     Q.   So Professor Markovic, can you -- what

16   does SPICE model at the gate levels mean, and could

17   you read Mr. Pflaum's answer?  And Michelle is going

18   to scroll along with you.

19     A.   So I'm reading from line 20.  (As read):

20              So SPICE is a simulation

21              technology.  I don't recall what

22              that -- what that refers to

23              specifically.  I think it has to do

24              with the -- I think it has to do

25              with the switching efficiency of

1          the gates.  I think in quite a few

2          of these ASIC-type designs or

3          miner-type some type designs, they

4          have a lot --

5          I assume this is ADDRs in them or ADDRs.

6    (As read):

7               And if -- if the gates have

8          to reset each time there is a

9          flop, then that eats the

10          electricity.  As I recall, that

11          was one of the -- I think it's

12          related to what's called

13          glitch-less operations.  What I

14          recall, or understanding of

15          switching or gating efficiency of

16          design, which is part of an

17          assessment of the designer's power

18          efficiency.  That's my

19          recollection.

20          MR. HARDIN:  Michelle, thank you.  Let's

21    leave it up for a minute.  Also, if you could PDF

22    these two pages to us so that we can submit this as

23    the next exhibit.  And apologies for not thinking of

24    that --

25          ARBITRATOR CALLAHAN:  2213.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1        MR. HARDIN:  2213.  If you'll go ahead and

2  please mark it, please, ma'am.

3  BY MR. HARDIN:

4      Q.   In your professional opinion, was that

5  explanation of SPICE models at the gate level

6  accurate?

7      A.   Not at all.  This is completely incoherent

8  mishmashing various topics and not answering the

9  question.

10      Q.   Why does it matter?  Why does it matter?

11        MR. ALFORD:  Objection.  Vague and

12  ambiguous.

13  BY MR. HARDIN:

14      Q.   Does it matter -- does it matter to know

15  where the SPICE model at the gate level means?

16      A.   In the context of understanding how the

17  chip was built and design methodology, absolutely

18  does matter.

19      Q.   Right.

20        Because what is the functionality of this?

21        Can you explain?

22      A.   The functionality of the chip?

23      Q.   Right.

24      A.   The functionality and the performance of

25  the chip.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    Q.  Right.

2         MR. HARDIN:  Can I have just a couple

3    minutes?

4         ARBITRATOR CALLAHAN:  Yes.  Quickly.

5         MR. HARDIN:  Okay.  With that, we're ready

6    to pass.

7         ARBITRATOR CALLAHAN:  All right.  It is

8    11:40.  Mr. Alford, it's your turn.

9         MR. ALFORD:  Okay.  Thank you.

10        ARBITRATOR CALLAHAN:  Why don't we plan on

11   going, could we please, sir, like 12:30.

12        MR. ALFORD:  12:30.

13        ARBITRATOR CALLAHAN:  Get a good 50

14   minutes in.

15        MR. ALFORD:  All right.

16             CROSS-EXAMINATION

17   BY MR. ALFORD:

18    Q.  Mr. Markovic, you're obviously an

19   incredibly impressive and accomplished guy.  I think

20   we all agree on that, including myself.  But I do

21   have to ask you some questions about what you did in

22   this case and what you didn't do.

23        Do you understand?

24    A.  Yes.

25    Q.  Please don't take it as any kind of

1  suggestion that you're not an accomplished and super

2  bright guy, okay?

3     A.  Of course.

4     Q.  I'm going to start by following up on some

5  of the questions Mr. Hardin asked you, some of the

6  topics he asked you about.

7        Now, you said that a feasibility

8  assessment of an ASIC is to determine if the idea is

9  practical.

10       Did I hear that right?

11    A.  Yes.

12    Q.  But you understood that my client was

13  looking for much more than just to know if the idea

14  that Katena had for a chip was practical?  You know

15  that, right?

16    A.  Can you define what you mean by that?

17    Q.  Well, I'm just using your terms.  You said

18  that a feasibility assessment, in your view, is

19  simply to determine an idea is practical, right?

20    A.  That is part of my answer.  The other part

21  of the answer is that we looked into architecture,

22  design and manufacturing feasibility.

23    Q.  Okay.

24    A.  Whether it's -- practical means whether it

25  can be manufactured in sufficient quantity.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    Q.   Okay.  All right.  So I want to make sure

2   that's clear.

3        You're not saying that a feasibility

4   assessment like the one Mr. Bleck did was just to

5   determine sort of an academic level with whether an

6   idea is practical; it's to determine really whether

7   it can be built?

8    A.   Yes.

9    Q.   And whether it will work, right?

10   A.   Yes.

11   Q.   Okay.  Great.  We're on the same page

12   there.

13        And I want to make sure I understand some

14   things you told us about timeline for developing a

15   chip.

16        You said that -- you told us that K10

17   chip -- you told us several times it's very simple,

18   right?

19   A.   Yes.

20   Q.   And yet, very innovative, right?

21   A.   Yes.

22   Q.   Okay.  I think you told us -- you said, at

23   one point, 18 months or longer to make a chip.  What

24   do you mean by that?

25   A.   Usually that is the chip development cycle

1   from the time that you say, okay, I approve this

2   project, let's go build it.

3      Q.   Okay.

4      A.   For designers to come together, make

5   various blocks and say now get ready for a tapeout.

6      Q.   So from -- I want to make sure I

7   understand and the panel understands.

8          From the time a very bright person like

9   yourself gets an idea in their head for a chip,

10   typically, a simple chip like this, to we're ready

11   to tapeout, we're ready to tell the foundry, go,

12   about 18 months?

13      A.   About 18 months, yeah.

14      Q.   Okay.  And you told us that -- I think --

15   and I want to make sure that you looked at these

16   presentations or updates that DXCorr did, right?

17      A.   I did, yes.

18      Q.   Yeah.

19          Now, these updates, they're the material

20   that you reviewed in the course of your feasibility

21   assessment, right?

22      A.   Yes.

23      Q.   You did a feasibility assessment?

24      A.   Yes.

25      Q.   Just like Mr. Bleck did a feasibility

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  assessment?

2      A.   I don't know how Mr. Bleck did it, but I

3  know what I did.

4      Q.   You and he reviewed the same material as

5  far as you know, though, right?

6      A.   I don't know what material he reviewed in

7  online meetings with Katena and DXCorr because I

8  didn't do that, but I did review engineering

9  presentations and chip development updates from

10  DXCorr.

11      Q.   Okay.  And those updates, so far as you

12  know at least, were the same updates Mr. Bleck

13  reviewed?

14      A.   Again, I don't know what Mr. Bleck

15  reviewed, but those are the files that we have in

16  the discovery that I did review.

17      Q.   Okay.  Just so we're clear, I want to make

18  sure your testimony is clear.  You don't know what

19  Mr. Bleck reviewed.  Is that your testimony?

20      MR. HARDIN:  Objection.  Mischaracterizes

21  testimony.

22      MR. ALFORD:  I don't think it does.

23      ARBITRATOR CALLAHAN:  Well, he can answer.

24      MR. HARDIN:  Okay.

25  / /

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1  BY MR. ALFORD:

2      Q.  You can answer.

3      A.  I heard Mr. Bleck testify.  Again, I don't

4  know if this is applicable or helpful.  I understand

5  that he did review engineering presentations from

6  Katena, and there is email communication with

7  Katena, presentation at least, the one from March,

8  which is kind of all inclusive comprehensive updates

9  of the status of the chip.  So it's, you know,

10  reasonable to say that it's substantial equivalent

11  amount of material.  You know --

12      Q.  That you reviewed?

13      A.  That I reviewed.

14      Q.  Sorry.

15      A.  Yes.

16      Q.  I just wanted to -- okay.

17          And what you reviewed and what you

18  understand, at least, or assumed Mr. Bleck reviewed,

19  is these updates that DXCorr would periodically come

20  out with, right?

21      A.  I understood Mr. Bleck reviewed the

22  updates as well as the comprehensive presentation

23  and had the opportunity to go back and forth with

24  questions, see the screen share and what he needed

25  to know.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    Q.  Right.

2        Right now I'm just talking about

3    documents, though, that he reviewed and that you

4    reviewed, and maybe we'll take them separately.

5        But the documents you reviewed are these

6    periodic updates, including one that you call a

7    comprehensive update, that DXCorr did periodically,

8    right?

9    A.  Yes.  Between January of 2020, culminating

10   with March of 2021.

11   Q.  Right.

12       Now, these updates were, I guess,

13   PowerPoint slides, right?

14   A.  They were PowerPoint slides presented as

15   PDFs.

16   Q.  Right.  Okay.  They weren't -- I'm a low

17   tech guy, so I'm probably the worst person to be

18   asking these questions, but I'll do my best.

19       Okay.  So there are these PDFs of

20   PowerPoint slides.  You can't manipulate them and

21   put in new data and see how it works, right?

22   They're static?

23   A.  That's correct.  You cannot change the

24   assumptions, yeah.

25   Q.  Okay.  And you can't really test the

1   assumptions that are in there, right, by looking at

2   the document?

3       A.   Well, yes and no.  You can't manipulate to

4   get the different outcome and compare and see how it

5   works.  But from your professional experience, you

6   see, well, does this all make sense or not.  And

7   you -- you create opinions based on what material

8   tells you.

9       Q.   Well, I hear you, but I didn't ask you

10  whether it made sense.  I asked you, you can't --

11  you can't manipulate the data in the document and

12  see if you come up with different results, right?

13      A.   That, we agree on.

14      Q.   Okay.  Great.  Great.

15          I think we also agree, but I want to make

16  sure.  These updates were not sort of outputs from a

17  computer; they were some human decided to select

18  certain data and put it in the PDF, right?

19      A.   The data is also from the computer.  That

20  is a screen shot in JPEG form that was placed in the

21  presentation.  In this particular instance, the

22  human is a skilled engineer who has enough

23  professional experience to put up relevant technical

24  information that represents these stages of

25  development of the chip with that particular update.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1      Q.   Well, you don't know who created those

2   slides, right?

3      A.   DXCorr -- the title of the slide is titled

4   DXCorr updates, so I understand that the slides were

5   created by DXCorr engineering team because they had

6   the engineering material.

7          Who else would create them?

8      Q.   Well, are you aware that Mr. Bleck in his

9   correspondence referred to them as marketing

10   materials?

11          Do you see that?

12          MR. HARDIN:  Objection.  Mischaracterizes

13   the documents.

14          ARBITRATOR CALLAHAN:  Well, does he recall

15   that?

16          Do you recall that Bleck said that?

17          THE WITNESS:  I recall the reference to

18   marketing materials, but more from Mr. Pflaum than

19   from Mr. Bleck.  So I don't recall specifically what

20   Mr. Bleck said about it, but I remember in

21   Mr. Pflaum's documents, there was a discussion about

22   marketing materials.

23   BY MR. ALFORD:

24      Q.   You don't recall anywhere in Mr. Bleck's

25   file where he and Mr. Reddy, in correspondence with

TRANSCRIPT OF PROCEEDINGS

1    one another, described these updates as marketing

2    materials?  You don't recall that?

3        A.  I vaguely recall.  You would need to

4    refresh me on that and point to a specific file to

5    look --

6        Q.  I will in a bit.

7        A.  Thank you.

8        Q.  I just wanted to make sure that I

9    understood whether you recalled that.

10       A.  Yeah.

11       Q.  Do you regard them as marketing materials?

12       A.  No.

13       Q.  So these updates, you said the last and

14   most comprehensive one was sometime early 2021?

15       A.  March of 2021.  I believe it was

16   March 21st, 2021.  It has a date on the slide.

17       Q.  At least based on that update, it looked

18   to you like, by March 2021, most of the work you

19   told us would take about 18 months was already done,

20   right?

21       A.  Pretty much, yeah.

22       Q.  And you understand we still don't have a

23   K10 chip, right?  It doesn't exist?  You understand

24   that?

25       A.  I understand there is a 4 nanometer chip

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   is in the foundry as we speak.

2       Q.   Well, that wasn't what I asked.  I'm

3   asking about the chip now that you and Mr. Bleck

4   performed a feasibility assessment on.  Okay?

5       A.   Yeah, that 12 nanometer chip, yeah, my

6   understanding, it's not built, correct.

7       Q.   Okay.  I want to be clear, because this is

8   complex.

9           So you didn't perform an assessment on the

10  chip that you claim is now at the foundry, right?

11      A.   I did not.

12      Q.   And Mr. Bleck didn't either, so far as you

13  know?

14      A.   I don't know what Mr. Bleck did.

15      Q.   You all performed a feasibility assessment

16  on the K10 12 nanometer chip?

17      A.   Based on the documents, yes.

18      Q.   And you explained to us from start to push

19  and go at the foundry should be about 18 months

20  given its simplicity, right?

21      A.   Yeah.  Give or take, right.

22      Q.   Just so we're clear, that's the chip that

23  we're talking about most of the work was done on it

24  by March 21?

25      A.   Yes.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    Q.   Okay.  Now, you said you did your own

2   feasibility assessment, right?

3    A.   Yes, on this design.

4    Q.   From start to finish from the time you

5   started doing your feasibility assessment, including

6   really everything you thought that was appropriate

7   for you to do to complete that feasibility

8   assessment, talking to Mr. Reddy, reviewing the

9   materials, whatever else you -- how long did that

10   take?

11    A.   My scope of work did not have time

12   limitation or the number of hours.

13    Q.   But that's -- I didn't ask you if it had

14   time limitations.

15    A.   Yeah.

16    Q.   We can talk -- I'm going to definitely ask

17   you some questions later about time limitations.

18   I'm just asking you now a different question.

19        How long did you, Mr. Markovic, spend in

20   doing your feasibility assessment, including

21   everything you did that you thought was for

22   feasibility assessment, reviewing the materials,

23   talking to Mr. Reddy?  We'll set aside writing up

24   the report for a moment, but until you or --

25   everything you did where you thought, okay, I'm

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    ready, start drafting my report.  How long did that

2    take?

3        A.  I do not accurately remember for that

4    narrow issue simply because I had a lot of

5    discussion to get introduced and familiar with what

6    the case was about and be pointed to various

7    documents.  So I tracked the overall time that I was

8    spending on a monthly basis to respond to various

9    work items as requested that I didn't really kind of

10    put aside, let me now compare with Bleck and see how

11    much time did I spend.  I don't remember exactly.

12        Q.  Okay.  I'm not asking you how much time

13    you spent in preparing Mr. Bleck.  I think we got

14    the answer.  You don't know?

15        A.  I don't know precisely.  I did not measure

16    that specific aspect of time to be able to tell you.

17        Q.  Do you have detailed time entries

18    somewhere that would tell us what you spent your

19    time on, what the nature of those tasks were?

20        A.  Yeah.  I submitted those to counsel for --

21    with my invoices, yeah.

22        Q.  And it took a lot more than 5.833 hours,

23    right?

24        A.  I wouldn't say a lot more, but it took on

25    a similar scale.

TRANSCRIPT OF PROCEEDINGS

1       Q.   Well, more, though?

2       A.   I don't remember how much, sir.

3       Q.   Okay.  And that -- let's talk about

4    Mr. Bleck's report, the actual written document.

5    That must have taken at least a couple hours to do,

6    right?  You've written reports like that yourself?

7            ARBITRATOR CALLAHAN:  Are you asking him

8    if he knows how long Mr. Bleck spent on his report?

9            MR. ALFORD:  I'll ask a different

10   question.

11           ARBITRATOR CALLAHAN:  Okay.

12   BY MR. ALFORD:

13      Q.   You've written feasibility assessment

14   reports yourself, right?

15      A.   Yes.

16      Q.   And based on your experience in writing

17   feasibility assessment reports -- let me withdraw

18   the question.

19           You've told us Mr. Bleck's report, his

20   written report, was very thorough, right?

21      A.   I think it completely addresses the

22   questions being asked.

23      Q.   Okay.  Do you think it's thorough?

24      A.   At a high level, yes.

25      Q.   Okay.  So can you estimate for us how long

TRANSCRIPT OF PROCEEDINGS

1   you think it would take to write a report like that?

2       A.   Well, Mr. Bleck claimed it took 5.8 hours,

3   and the amount of time really that it takes depends

4   on a number of factors.  Like in your industry, for

5   example, you are an experienced attorney, you would

6   be a lot more efficient than someone who is just

7   starting in figuring out how to do things.  We have

8   to keep that in mind that Mr. Bleck is a very senior

9   professional, and he has done a number of similar

10   jobs for his employer.

11          I would assume many times that you have to

12   give to your CEO or to whoever high level summary,

13   quick, I want to understand the high points, these

14   are exactly the things we are looking for.

15          And it depends on the quality of the

16   material and his comfort level to, does this answer

17   my question.  If you remember, he had framed the

18   skeleton, the summary, and based on that, he just

19   filled in the data.

20          So it really depends.  So there is no,

21   like, one, you know, specific answer.  There is many

22   factors involved in making such reports.

23      Q.   Well, my question was really can you --

24   given your experience in drafting reports, can you

25   give us an estimate how long it would take you to

1   write a report like that?

2      A.   It would take a similar amount of time if

3   I get all the information and understanding.  I am

4   pretty proficient in PowerPoint.  I do PowerPoint

5   for a living, almost like designing lectures slides

6   and presentations and give talks, and so I make

7   PowerPoint at a pretty high -- high rate.

8      Q.   Of efficiency?

9      A.   Of efficiency.  And if there is specific

10   information that I'm looking for and specific items

11   that I want to put in, can be fairly quick.

12      Q.   But your best estimate is, even given your

13   efficiency and experience, it would probably take

14   you about five hours to write a report like

15   Mr. Bleck's, just to write it, right?

16      A.   Maybe not.  It depends, again, on the

17   material.

18      Q.   What's your best estimate?

19      A.   I don't know because I haven't learned

20   that particular -- Mr. Bleck's report.

21      Q.   Can we agree, it would at least take a

22   couple hours for someone even of your level of

23   proficiency to write that report?

24      MR. HARDIN:  Objection.  Asked and

25   answered.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1          ARBITRATOR CALLAHAN:  Sustained.

2     BY MR. ALFORD:

3        Q.   Would you agree with that -- okay.

4            And I want to ask a few questions about

5     Mr. Bleck's testimony and just --

6          ARBITRATOR CALLAHAN:  Then we'll go off.

7          MR. ALFORD:  Just formally object to going

8     off, but I understand the panel's ruling, obviously

9     comply with it.

10          ARBITRATOR CALLAHAN:  Your objection is

11     noted.  We'll be going off the record.

12           (Discussion held off record.)

13          MR. ALFORD:  Back on the record.

14          ARBITRATOR CALLAHAN:  Yes.

15     BY MR. ALFORD:

16        Q.   You spoke to Mr. Reddy in the course of

17     your work in this case, right?

18        A.   Yes.

19        Q.   He told you that he spent eight to 20

20     hours?

21        A.   Yes.

22        Q.   Just talking with Mr. Bleck, right?

23        A.   Yes.

24        Q.   Not socializing, but actually talking

25     about this project?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1     A.   Correct.

2     Q.   Okay.  Did you ask him, gee, that's a

3   pretty broad range, can you be more narrow than

4   that?

5     A.   I did not ask, but apparently, Mr. Reddy's

6   and Mr. Bleck's recollections differ in the number

7   of hours, and maybe the hours that I mentioned, I

8   understood Mr. Bleck didn't feel it added up to more

9   than eight hours.  So it's close enough.  That

10   wasn't really the scope of what I was trying to get

11   from Mr. Reddy.

12     Q.   Okay.  You're not -- in other words,

13   you're not here today to testify that Mr. Bleck

14   spent more than the 5.833 hours, right?

15     A.   I understand that he did spend more, but

16   he invoiced for 5.833.

17     Q.   You can't tell us how much more?

18     A.   I don't.  I don't know.

19     Q.   You said -- I think you told us 18 months

20   from the design in your head to push and go at the

21   foundry.  I think you said -- I want to make sure I

22   understand the timeline -- once it goes to the

23   foundry, then another three months before it comes

24   back from the foundry?

25     A.   Usually two to three months, depending on

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   the arrangement.

2      Q.   Okay.  You understand, right, that my

3   client's contract with Coinmint was not to buy

4   chips; it was to buy working mining rigs, right?

5      A.   That's my understanding, yes.

6      Q.   Are you an expert on all of the components

7   that go into a working mining rig other than the

8   chip?

9      A.   Yeah, I would say yes, like you see the

10  printed circuit boards, we routinely build them to

11  put various components.  Other than the K10 chip,

12  everything else would be considered standard

13  off-the-shelf components, which are readily

14  available and easy to source.  Printed circuit board

15  would not be an issue to build a miner once you have

16  the chip.

17     Q.   I understand that's your testimony.

18         Did you hear Mr. Gao testify that when he

19  bought bitcoin mining rigs, the chip was great, but

20  the circuit boards were totally defective?

21     A.   I did not hear Mr. Gao's testimony.

22     Q.   Okay.  So if what he says is true, there

23  can be problems with components of mining rigs other

24  than just the chip, right?

25     A.   There could be.  I'm not saying there

TRANSCRIPT OF PROCEEDINGS

1   cannot be problems.  Again, I'm going to give you

2   the right frame as I give kind of rule of thumb.

3   Chip itself is two-year effort by many people, PCB

4   is two weeks of effort by very few people.  If there

5   are any issues on PCB, it's very easy to fix on a

6   short time scale.  If there's an issue with the

7   chip, it takes a lot longer and expensive to do.

8       Q.   To find out if there's a problem with the

9   circuit board, you have to test it, right?

10      A.   Yes.

11      Q.   You got to test the unit, right?

12      A.   Yes.

13      Q.   If you went to mass production of

14  thousands of mining rigs, you wouldn't know if the

15  board was going to be defective, right, you have to

16  test it first?

17      A.   You would test some sample quantities to

18  make sure everything is working in the right order,

19  and then you would increase the sample size until

20  you get satisfactory yield and push out to

21  production, but, again, those are very short time

22  scales, relatively speaking.

23      Q.   It all takes time?  That all takes time?

24      A.   Sure.

25          (Reporter clarification.)

TRANSCRIPT OF PROCEEDINGS

1        MR. ALFORD:  Sorry.  I'll try to do

2   better.

3        ARBITRATOR CALLAHAN:  Shorter questions

4   would help.

5        MR. ALFORD:  I will try that too.

6        ARBITRATOR CALLAHAN:  I've noticed you

7   kind of get going, and the long questions are like

8   you're rolling down a track, and by the end, it's

9   really fast.

10        MR. ALFORD:  Okay.  I'll work on that.

11        ARBITRATOR CALLAHAN:  I think shorter

12   questions might help.

13        MR. ALFORD:  Okay.

14   BY MR. ALFORD:

15     Q.   So how many chips would be on each circuit

16   board in these K10 mining rigs?

17     A.   So from what I understand from various

18   testimonies, these numbers vary.  But they range

19   from about 50 to 200, somewhere in that range.  So

20   let's say for the sake of discussion, 100 is a nice

21   and round number.

22     Q.   You don't know for sure, though?

23     A.   I don't know for sure.  I haven't seen the

24   specs, but I've heard anywhere between 64, I heard

25   128, I heard up to 100 to 200.  People were kind of

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    giving range.

2        Q.   When you say you haven't seen the specs,

3    it's fair to say you don't even know if the specs

4    exist, right?

5        A.   I have not seen the specs, but that

6    doesn't mean they don't exist.  We don't know if

7    they exist.

8        Q.   You don't know?

9        A.   I don't know.

10       Q.   Well, that's --

11       A.   Yeah.

12       Q.   But it's your testimony that the circuit

13   board with 100 chips on it could be designed in two

14   weeks?

15       A.   Yes.

16       Q.   Okay.  And there's a lot of other things

17   on that printed circuit board besides 100 chips,

18   right?

19       A.   There are some other things.  I wouldn't

20   say a lot of other things, but there are standard

21   things that make a circuit board run.

22       Q.   That can all be done in two weeks?

23       A.   Yeah.

24       Q.   Okay.  Have you done -- do you consider

25   yourself an expert in the incidence of failure rates

TRANSCRIPT OF PROCEEDINGS

1   in components of a mining rig other than the chips?

2       A.   I do have a lot of professional experience

3   in building, like, rigs from known good functional

4   parts that required inspection, particularly for

5   this space of medical devices.

6           In that project I built, we needed to

7   build something on the order of 40 or so functional

8   units for subsequent biocompatibility testing.  And

9   these requirements are a lot more challenging than

10   bitcoin mining.

11          So we ended up, because of the extreme

12   miniaturization and the challenges that are really

13   delicate for that, if you see these little vitamin

14   pills, you have actually three stacks of chips, each

15   with a couple hundred wires running and touching

16   really close to each other, and a lot of things

17   underneath.  It's very difficult to kind of debug at

18   the assembly level.

19          We had something like 42 out of 50 working

20   parts, and we had to go through 50-point inspection,

21   this step works, you put a number manually and you

22   sign your name so there are no typo, errors or

23   things like that.  Or proper documentation and

24   regulatory oversight and so on.  I'm very familiar

25   with these things of errors it can be.  You're

TRANSCRIPT OF PROCEEDINGS

1   classified to known good parts that you need to

2   build for.

3       Q.   My question was more specific, though.  I

4   was asking you about error rates in the various

5   components of a bitcoin mining rig.  Do you consider

6   yourself an expert in that area?

7       A.   Those are -- yes.

8       Q.   Yes.

9       A.   Yeah.

10      Q.   Okay.  And you know that sometimes

11   components of mining rigs can fail other than the

12   chip, right?

13      A.   Yes.

14      Q.   The boards can sometimes fail, as Mr. Gao

15   told us?

16      A.   Correct.

17      Q.   You wouldn't dispute if my client said

18   they had problems with the fans and the heat sinks

19   in those units?

20      A.   That is possible.  Simply to put, any

21   component is a possible source of failure.

22      Q.   Right.

23      A.   They can fail for different reasons.  And

24   so that's why, among other things, people like to

25   have, like in chips, higher level of integration to

TRANSCRIPT OF PROCEEDINGS

1   put more things in one chip because, from the high

2   point of view, just one chip, one point of failure.

3   If I put this into multiple components, there are

4   more things to inspect as far as interaction between

5   parts goes.

6       Q.   And so is it fair to say that in one of

7   these mining rigs, there are hundreds, at least, of

8   components other than the chip, right?

9       A.   I wouldn't say hundreds, but there is

10  probably dozens --

11      Q.   Okay.

12      A.   -- of components in the chip.  And you

13  have a well defined subsystems and interaction

14  points.  Like, you have a power subsystem.  How do

15  you distribute power everywhere.  And then how

16  various parts interact to make these subsystems

17  function.

18          So what I'm trying to say is that

19  inspection is not like, you know, hundred and all

20  possible combinations, you're only looking to

21  meaningful interactions of these subsystems and use

22  the complexity of test.

23      Q.   Speaking of complexity, my question was

24  really more simple than that.  It was just, if we

25  could get an agreement on approximately, not

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   exactly, but approximately, how many components are

2   in these mining rigs other than just the chip.  I

3   think you said dozens, right?

4       A.   Yeah.  Maybe dozens.

5       Q.   Okay.  All of those could possibly fail,

6   right?

7       A.   Yeah.

8       Q.   Okay.  And you've not seen any design or

9   engineering documents on any of the other components

10   that would go into the mining rig other than just

11   the chip, right?

12      A.   That is correct.

13      Q.   Okay.  I want to make sure I understand

14   this.  I think it's your testimony, but you'll tell

15   me if I'm mistaken -- that as of the time Mr. Bleck

16   completed his work in late May of 2021, at least in

17   your view, Katena was about, what, you said maybe

18   three months out from telling the foundry, go make

19   these things?

20      A.   A little bit less.  From what I

21   understand, the contract between Coinmint and Katena

22   was executed sometime late May with the expectation

23   to have early sampling parts as per order by

24   September, which is four months later.  And then

25   with the production quantity starting to kick in in

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   December.

2       Q.   I'm glad that you said that because I did

3   want to ask you about the two, but that wasn't quite

4   my question.  I want to circle back to that, though.

5       A.   Okay.

6       Q.   Because that is an important point.  My

7   question was a little different.  It's not what the

8   contract required, but I do want to talk to you

9   about that, but my present question was from a sort

10   of technical feasibility and industry manufacturing

11   point, I want to make sure I understand your

12   testimony about how long it was, approximately, from

13   the time Mr. Bleck completed his report in late May

14   until you think Katena was ready to push go and say

15   foundry, build it.

16       A.   Yeah, I understand your question.

17           So according to Mr. Bleck's testimony, it

18   was about three months, but I would put more

19   competence in Mr. Reddy's assessment because he was

20   the lead -- chip lead on that project, and he has

21   the most familiar- -- familiarity with the details.

22   His testimony was in a matter of weeks, two to four

23   weeks' time frame, to push it to final DRC.

24           And my experience on chip turnaround times

25   is that TSMC gives precisely 65 days turnaround time

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    for early samples.  So that would put you --

2    everything together with the chips back in hand at

3    three to four months.

4        Q.   You're getting ahead of me, which is fine,

5    but I want to back up a little bit and deconstruct

6    that a little bit, okay?

7           So I -- I don't -- my question is not what

8    Mr. Reddy said.  Okay.  My question is what you

9    believe.  And if your only belief is just what

10   Mr. Reddy told you, then let us know.  But my

11   question is really whether you have your own

12   independent opinion, not just what Mr. Reddy said,

13   but your own independent opinion, based on the

14   materials you reviewed, about how long away -- it's

15   not a very good phrase, but how long away it was

16   from the time Mr. Bleck was done with his work in

17   late May until Katena was ready to push send and

18   tell the foundry to build it, not what Mr. Reddy

19   told you, but what you think.

20       A.   My opinion purely from a technical

21   standpoint, everything else aside, it was on the

22   order of maybe one to two months.

23       Q.   Okay.  And Mr. Bleck, you said, indicated

24   three.  Do you think that was too long?

25       A.   Yeah.  One month, yeah.  Estimate.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    Q.  Okay.

2    A.  It's reasonably close.

3    Q.  You wouldn't quibble with that, could have

4  been as much as three months?

5    A.  Yeah.  I'm comfortable with that.  It's

6  okay.

7    Q.  So from late May, three months goes to the

8  foundry.  That puts us late August, right?  Yes?

9    A.  Yes.

10   Q.  Okay.  And then you said -- I think you

11  said earlier a three-month turnaround once it goes

12  to the factory, right?

13   A.  No.  I said 65 days.

14   Q.  Didn't you tell us earlier when Mr. Hardin

15  was talking to you that it's about three-month

16  turnaround time at the foundry?

17   A.  Depends on the foundries.  Some foundry

18  even have, like, four or five months, but TSMC in

19  particular is a really well-oiled machine, and they

20  give you -- it's almost like -- what I see typical

21  when we send chips, they say 65 days, and we get the

22  chips back at the day 63.  So they make you, you

23  know, put smile on your face for two days, and you

24  got your really good value out of your, you know,

25  supplier.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1        So it's about two months.  Two months.

2   That's kind of -- if you want to kind of sandbag

3   two months, push it to three months, don't do too

4   much sandbagging, give me one month back.  If you

5   want to put three months for layout, let's make the

6   chip for two months because it can be done in that

7   time.

8        Q.   I don't want to belabor it, but I want to

9   make sure --

10       ARBITRATOR CALLAHAN:  Mr. Hardin -- or

11   Mr. Alford, slow down, please.

12       MR. ALFORD:  Sorry.

13   BY MR. ALFORD:

14       Q.   Let's just go with 65 days then.

15       Would that have also been true back in

16   late summer, early fall of 2021?

17       A.   Yes, of course.

18       Q.   There was no supply chain issues going on

19   then that would, in your view, have extended that

20   time frame?

21       A.   From what I understood, there was no money

22   to pay for the chip.

23       Q.   See, that wasn't my question.  We're going

24   to talk about that in a bit too.

25       A.   Okay.

1      Q.   'Cause I know we have a very different

2   view of that.

3          But my question was only about your 65-day

4   estimate.  Okay?

5      A.   Right.

6      Q.   Now, is it your testimony that that 65-day

7   estimate would have held in the late summer, early

8   fall of 2021?

9      A.   Yes.  You need to understand what I would

10   think.  You can't just say, well, I missed the boat,

11   I'm going to take the next one.  Well, next one is

12   not available until two weeks later, because you

13   have certain submission deadlines with TSMC and they

14   don't happen continuous 24/7.  You have a certain

15   tapeout dates from which you get a 65-turnaround

16   time.

17          So if you miss the tapeout, you can do

18   again when they tell you there is a space, right?

19   So if you miss the shuttle -- let's say you budgeted

20   for September and you miss the shuttle, and they say

21   next shuttle is departing in two weeks, but it's

22   full, you have to wait maybe three months from now,

23   actually, until space opened up.  It really depends

24   on how the situation look like at that time.

25      Q.   Right.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1          But I want to make sure I understand your

2     testimony.  You gave us an estimate of 65 days from

3     pushing send to the foundry to chip coming back,

4     right?  And my only question now is, were there any

5     supply chain issues in late summer, early fall 2021

6     that, in your view, would have extended that time

7     frame?

8          A.  There would be no different on a

9     month-by-month basis.  Whatever was up a couple in a

10     previous time reference, June, July, should be no

11     different at in.

12          Q.  Okay.  So let's -- it's your best

13     estimate, at least, that if we start with

14     Mr. Bleck's work being done in late May, we add --

15     let's say, three months like Mr. Bleck said, to get

16     ready to go to the foundry.  Now we're late August,

17     right?  Yes?

18          A.  Okay.

19          Q.  And then at least another two months to

20     get the chips back, right?  Yes?

21          A.  Yes.

22          Q.  So that brings us late October, right?

23          A.  Okay.

24          Q.  And then you got to test the chips, right?

25          A.  Yes.

1      Q.   Okay.  And that takes some time too,

2   right?

3      A.   Right.

4      Q.   And then you've got to procure all of the

5   other components of the mining rig and put the chips

6   in there, right?

7      A.   You do that while the chip is being made.

8      Q.   Okay.

9      A.   So you have everything ready made, the

10   entire infrastructure of the board fully tested.  We

11   call that beep test.  My students do that.  Even you

12   test the bare PCBs before you put any components to

13   say, well, this connection should be here, and I put

14   too short, basically, the meter, and then it does

15   the beep because it's a short circuit.

16          And then we put the components on,

17   everything except the chip, we fully test all the

18   subsystems, is the power coming, is the clock

19   coming, can I talk to this board with my computer,

20   can I program test vectors.

21          And then ideally -- at least that's how I

22   did my Ph.D. chip.  I had everything ready, and I

23   built the whole logic analysis system, again, using

24   a side FPGA as a test board.  And when my chip came,

25   I just put it in the socket, hit the go button, I

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   was done in five minutes.

2       Q.   Well, it's not your testimony that from

3   the time the chip came back from TSMC, it would have

4   taken Katena five minutes to get a working --

5       A.   No.  That's not my testimony.  I'm just

6   saying that you do all the upfront work of procuring

7   the components and doing all of the testing,

8   expecting when the chip comes in, just plug it into

9   the socket and hit the go button.

10          Test engineers are people that have the

11   most stressful jobs because the expectation from

12   them is, I needed this yesterday, how come you don't

13   have test results.  So they're under extreme

14   pressure to say, well, yes, ship this processor,

15   everything is going to be fine.  And if the errors

16   occur in field when people bring this home, then

17   these people get fired.

18          ARBITRATOR CALLAHAN:  Or they put it in

19   their brain.  They're really going to be unhappy.

20          THE WITNESS:  Right.  According to your

21   brain.  So there are other big tests.  That's why

22   they do so much upfront work.  I do everything, just

23   I need to drop in the chip and go on very fast from

24   there.

25   //

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   BY MR. ALFORD:

2      Q.   But we can agree that at least your best

3   estimate, chips come back late October, and still

4   sometime thereafter to test the chips, put them in

5   the packaging and get them in the working mining

6   rig, right?

7      A.   Packaging happens concurrent with chip

8   building, very fast.

9      Q.   Okay.  All right.

10        MR. ALFORD:  You want to break at 12:30, I

11   think, Madam Chair.

12        ARBITRATOR CALLAHAN:  Yes, it's about

13   12:20.  If this is a stopping point for you, that's

14   fine too.

15        MR. ALFORD:  Let me check my notes real

16   quick to see if it's a stopping point.

17        ARBITRATOR CALLAHAN:  All right.

18   BY MR. ALFORD:

19      Q.   You said -- you told us that Mr. Bleck,

20   according to what Mr. Reddy said at least, asked an

21   insightful question, in your view, an insightful

22   question about can one chip find two blocks --

23        MR. HARDIN:  Objection.  Record.  Record.

24        ARBITRATOR CALLAHAN:  Remember, we have to

25   sound --

1          MR. ALFORD:  I think that was on the

2    record.  No, I think that was on the record.  It's

3    okay.  I guess -- that was on the record.

4          ARBITRATOR CALLAHAN:  Well, I'll check my

5    notes.

6          MR. ALFORD:  I don't want to waste time.

7          ARBITRATOR CALLAHAN:  I don't believe it

8    was.

9          MR. ALFORD:  I don't want to spend time

10   arguing about that.  We can go off the record then.

11          ARBITRATOR CALLAHAN:  Let's go off the

12   record.

13          (Discussion held off record.)

14   BY MR. ALFORD:

15    Q.  You mentioned a PNR database, right?

16    A.  Yes.

17    Q.  In the course of your feasibility

18   assessment you never saw that database, right?

19    A.  I have not.

20    Q.  In reviewing Mr. Bleck's work, you saw no

21   evidence that he saw it either, right?

22    A.  Let me just pause for a moment.  For the

23   previous question, the layout image is an evidence

24   of the existing PR database.

25          ARBITRATOR CALLAHAN:  I'm sorry, say one

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    more time.

2        THE WITNESS:  Layout of the chip, image of

3    the chip layout is really the visual of the PNR

4    database.

5    BY MR. ALFORD:

6        Q.   But that wasn't my question.  My question

7    was you talked about a PNR database.

8        A.   Okay.

9        Q.   My question is:  Did you ever see the PNR

10   database?

11       A.   You have to understand that the PNR

12   database has the binary format, which goes to the

13   foundry, which is not human readable, and it has the

14   layout image, which is human readable.  So depending

15   on which one you refer to, the slides do show PNR

16   database back in 2020 in, February of 2020, which

17   was kind of the early PNR database, but it shows you

18   we can do it, we are mindful of the chip geometry

19   constraints and the I/O placement and so on.  And

20   then we are going to continue to refine until we get

21   the final database to send.

22       So I have no reason to believe otherwise

23   that they had a PNR database.

24       Q.   I'm not asking you that, though, because

25   we might agree to disagree about whether there's

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   reason to believe what people say.  But I'm asking a

2   different question, whether you actually saw the PNR

3   database.  Yes or no?

4      A.  I would say I have seen it visually, yes.

5   But no, I have not seen electronic version of this

6   as far as kind of I'm accessing the computer and I

7   can kind of interact with it.

8      Q.  Right.

9         Because, in fact, in the course of your

10  feasibility assessment of the K10 chip, you didn't

11  get any digital data, did you?

12     A.  I did not.

13     Q.  Right.

14     A.  Other than the digital files, PDFs of

15  digital data.

16     Q.  Right.

17        There goes my -- other than the PDF files,

18  you weren't given any kind of digital data from

19  Katena or their lawyers?

20     A.  No.

21     Q.  Okay.

22        MR. ALFORD:  All right.  That's probably a

23  good place to stop for a lunch break.

24        ARBITRATOR CALLAHAN:  It's 12:25.  So

25  let's be back ready to go at 1:00.

1       MR. ALFORD:  Okay.  Sounds good.

2        (Whereupon, a lunch recess was taken

3        from 12:25 p.m. to 1:02 p.m.)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              AFTERNOON SESSION

2              ARBITRATOR CALLAHAN:  Go ahead,

3    Mr. Alford.

4              MR. ALFORD:  Thank you.  We're back on the

5    record.

6    BY MR. ALFORD:

7       Q.   I wanted to follow up --

8              ARBITRATOR CALLAHAN:  Let me start the

9    recording.  We just talked about this.  Let me make

10   sure I push that button.

11             MR. ALFORD:  I said all kinds of profound

12   things.

13             ARBITRATOR CALLAHAN:  I'm sorry, go ahead.

14             MR. ALFORD:  That's okay.

15   BY MR. ALFORD:

16      Q.   Mr. Markovic, I want to follow up on a

17   couple things before I move on to some new

18   territory.

19             You mentioned that you have a company now

20   that -- whose primary product is FPGA.

21             Did I get that right?

22      A.   Yes.

23      Q.   And that product is, in part, used to

24   validate ASIC designs?

25      A.   Not really to validate.  Well, FPGA

1   technology can be used to validate project designs.

2      Q.   Right.

3      A.   But that is not what our company is doing.

4         (Reporter clarification.)

5         THE WITNESS:  Yes, I was saying --

6         (Reporter clarification.)

7   BY MR. ALFORD:

8      Q.   But you agree with me that an FPGA can be

9   used to validate an ASIC design?

10     A.   FPGA, what do you mean by "validate"?

11     Q.   To emulate the design.

12     A.   Emulate, yes, that's one part of it.

13     Q.   Okay. Tell me the other part.

14     A.   The other part, you can also use every day

15  as so-called logic analyzer that allows you to apply

16  input patterns to the chip and read the outputs of

17  the chip and be able to do both silicon verification

18  of the function of your chip.

19     Q.   Okay.  And it's accurate, is it not, that

20  in the course of your feasibility assessment of the

21  K10 chip, you saw no documentary evidence that the

22  design had gone through that kind of FPGA process

23  you just described to us, right?

24     A.   That's not true.

25     Q.   You saw some original source data that

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   showed it had gone through the FPGA process?

2      A.   That was in the documentation.

3      Q.   Okay.

4      A.   Technical document said it, design was

5   emulated on FPGA, which is the highest level of

6   functional verification you can perform.  Because

7   like I said, FPGA reduces verification time from

8   days to minutes.  And so given that, you are able to

9   get through a lot longer and more meaningful test

10   procedure than if you were just to simulate.  And

11   the Katena K10 was emulated on FPGA.

12      Q.   You saw that in some of these updates that

13   DXCorr provided, right?

14      A.   Yes.  And those are perfectly meaningful

15   updates that were placed at the right time when the

16   functionality was to be verified.

17      Q.   My question, though, is:  Did you actually

18   see the actual source data from the FPGA process?

19      A.   I didn't need to.

20      Q.   Okay.  Well, we can agree to disagree

21   about whether you needed to, but the bottom line is

22   you didn't see it?

23      A.   No.

24      Q.   You've seen no evidence that Mr. Bleck saw

25   it either, right?

1      A.   I don't know about Mr. Bleck.

2      Q.   And you told Mr. Hardin that one of the

3   reasons that nobody doing a due diligence like this

4   would ever have access to the actual schematics for

5   the chip design is because of concerns about them

6   appropriating it for their own purposes; is that

7   essentially what you were telling us?

8      A.   That's one part.

9      Q.   Okay.  But you understand Mr. Bleck signed

10  a nondisclosure agreement with Katena, right?

11     A.   Yes.

12     Q.   And you understand that I think, although

13  we can disagree about a lot of things, I think we

14  can all agree that Mr. Reddy and Mr. Bleck were

15  trusted colleagues of one another, right?

16     A.   I don't know.

17     Q.   You don't have any reason to think

18  Mr. Bleck would have taken proprietary data Katena

19  or DXCorr gave them and sold to the Chinese, do you?

20     A.   He wouldn't be able to even access the

21  data under the agreements that companies have as far

22  as the IP goes.  Part of the Katena design was not

23  just what Katena developed, but it's also PLL from

24  another vendor for which there is agreement between

25  the parties that excludes the third party, which

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1  would be Mr. Bleck.  And you just can't really

2  access or open even an invitation for someone to

3  look into IP that they're not supposed to look at.

4      Q.   You said it would have involved PLL of a

5  third party?

6      A.   For example, PLL is one of the components.

7  But any IP that is from another source that is not

8  DXCorr or Katena that is placed inside the K10 chip

9  is not subject to disclosure to third party.

10     Q.   Who were the third parties, other than

11 Katena and DXCorr, who you believe had proprietary

12 data embedded in the design materials?

13     A.   Anybody that Katena would source their IP

14 from.

15     Q.   But, as you sit here today, can you name

16 any of those companies?

17     A.   That's in the contracts.  I think there

18 was one particularly for the PLL.  You can look up

19 from the contract, I don't remember off the top of

20 my head.  For example, companies like analog bits.

21 That's not the company that source the PLL to

22 Katena, but I'm just giving an example, since

23 counsel is asking for examples.

24         But nevertheless, those specific names of

25 vendors are provided in the agreements between

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   Katena and DXCorr.

2      Q.   You told us earlier that a feasibility

3   assessment is supposed to be customer-driven, right?

4      A.   Yes.

5      Q.   And in this case, they were specifically

6   talking about, you understand the customer is

7   Coinmint, right?

8      A.   Yes.

9      Q.   Customer was not Katena or DXCorr, right?

10     A.   Yes.

11     Q.   Although you've no doubt done a lot of

12  impressive and important things, I think it's

13  accurate you've never been retained to testify as an

14  expert on the design of an ASIC chip, right?

15     A.   We discussed that this morning.  This is

16  my first testifying experience.

17     Q.   And you've never before been retained to

18  testify as an expert on whether a due diligence

19  assessment was properly done, right?

20     A.   I was not -- yeah.  That is -- that was

21  not part of my previous work.

22     Q.   And when you prepared your report in this

23  case, you did multiple redline drafts before it was

24  put in final, right?

25     A.   I don't remember multiple redline drafts.

TRANSCRIPT OF PROCEEDINGS

1    I remember making revisions, as it is customary.

2    When you develop a document, you want to draft it,

3    you want to look at it, make sure it's understood

4    and provide a final submission-worthy document.

5        Q.   You haven't produced any of your redline

6    drafts, right?

7        A.   By "produced," what do you mean?

8        Q.   Produced to us.

9        A.   I wasn't asked.

10       Q.   On May 10, you participated in a telephone

11   conference with -- I'm sorry.  Let me start over.

12           On May 10, you participated in a

13   videoconference with Mr. Taber and Mr. Reddy, right?

14       A.   Yes.

15       Q.   And Mr. Reddy, during that

16   videoconference, gave you information that's

17   material to your opinions, right?

18       A.   Part of it.

19       Q.   Okay.  In fact, by my count, you cited

20   that videoconference with Mr. Reddy over 30 times in

21   your report.  Do you take issue with that?

22           MR. HARDIN:  Objection.  Relevance, it's

23   already been ruled on.

24           ARBITRATOR CALLAHAN:  It has, by us?

25           MR. HARDIN:  This was one of their bases

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    for trying to exclude Professor Markovic, was that

2    he had interviews with -- that he had a discussion

3    with Mr. Reddy and then cited to it in his report.

4         MR. ALFORD:  And the panel said it went to

5    the weight.

6         ARBITRATOR CALLAHAN:  Correct.

7         MR. ALFORD:  That's what I'm doing.

8         ARBITRATOR CALLAHAN:  And what's the

9    objection?

10         MR. HARDIN:  I objected to relevance.

11         ARBITRATOR CALLAHAN:  I'm going to

12    overrule that.

13         MR. ALFORD:  Thank you.

14         ARBITRATOR CALLAHAN:  Again, it goes to

15    the weight.  Whether it's relevant or not, we'll

16    consider that when we get to that.

17    BY MR. ALFORD:

18      Q.   So the question was, before the objection,

19    that by my count, in your report, you cite to that

20    videoconference and the information you obtained in

21    that videoconference with Mr. Reddy over 30 times.

22    Do you dispute that?

23      A.   I can't exact recollection of the count

24    'cause I can't remember numbers.  I cited it 33 out

25    of 144 references.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1      Q.  30- --

2      A.  I had 144 references total.  Of the 33

3   with Mr. Reddy, that was mostly background

4   information or technical information that Mr. Reddy

5   confirmed in his testimony in front of the panel.

6      Q.  Well, that wasn't my question, though.  My

7   question was, just do we have an agreement that you,

8   in your report, cite to information you got from

9   Mr. Reddy in your videoconference with him and

10   Mr. Taber at least 30 times?

11      A.  I want to make sure that my report is

12   properly understood.  So I need to place it in the

13   correct context.

14      Q.  Well, here's the thing, though.  Here's

15   the rules.  Mr. Hardin can ask you --

16         ARBITRATOR CALLAHAN:  Mr. Alford.

17         MR. HARDIN:  I am going to object to him

18   instructing the witness.

19   BY MR. ALFORD:

20      Q.  I understand you want to place --

21         ARBITRATOR CALLAHAN:  Mr. Alford, a

22   question, not a statement, please.

23         MR. ALFORD:  Thank you.

24         ARBITRATOR CALLAHAN:  If you need an

25   instruction, you ask me.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1        MR. ALFORD:  I may.  Thank you.

2        ARBITRATOR CALLAHAN:  Okay.  Question.

3   BY MR. ALFORD:

4      Q.   My question is simply this.  Without

5   worrying about context, do we agree that you, in

6   your report, cite information you got from the

7   videoconference with Mr. Reddy and Mr. Taber over 33

8   times -- over 30 times?

9      A.   Precisely 33 times, yes.

10     Q.   You made notes during that call, right?

11     A.   Yes.

12     Q.   And those notes are not attached to your

13  report, right?

14     A.   No.

15     Q.   I want to harken back just a minute to a

16  point -- to follow up on something that was

17  discussed earlier.

18        We were talking about the timeline --

19  remember, before the break about the timeline and

20  your estimate that chip would come back, I think you

21  said, around the end of October, right?

22     A.   No.  That was your estimate, taking

23  Mr. Bleck's position and not my position.  My

24  position was that the chip would come back -- that

25  the design work would complete anywhere between one

TRANSCRIPT OF PROCEEDINGS

1    to two months' range, and then it would take another

2    two months for fabrication if you do proper

3    diligence to schedule fabrication as soon as the

4    chip is ready.

5           So according to that, it would come back

6    mid to late September.

7       Q.   Okay.  Well, the record will reflect what

8    it reflects.

9           Did you see anywhere in Mr. Bleck's report

10   a disclosure to my client that the chips weren't

11   even going to come back until mid to late September,

12   in your view?

13      A.   I don't recall looking into the schedule

14   of delivery, no.

15      Q.   Well, you reviewed Mr. Bleck's report

16   pretty carefully, right?

17      A.   Yes.

18      Q.   And you told us earlier that you are aware

19   the contract between my client and Katena indicated

20   a delivery of a complete working test unit mining

21   rig by September, right?

22      A.   I'd need to look into detail because now

23   you are kind of introducing new statements as far as

24   the complete mining test rig versus chip.  So we

25   discussed previously the chip production timeline

TRANSCRIPT OF PROCEEDINGS

1    and the pressure of test, which is done on an

2    as-soon-as-possible basis.  So you need to point me

3    to the contract to fully understand what is the

4    expectation as far as deliverable.

5         Q.   Is it fair to say you saw nothing in

6    Bleck's report that indicated to the reader that

7    these chips wouldn't come back until mid to late

8    September?

9         A.   No.

10        Q.   I mean, that is correct?

11        A.   Can you repeat again?

12        Q.   Sure.  We had a double negative in there.

13        A.   Yes.  Sorry.

14        Q.   Is it correct that you saw nothing in

15   Mr. Bleck's report that you think would alert a

16   reader that the chips wouldn't come back until mid

17   to late September?

18        A.   To simplify, I did not see any concerns in

19   the Mr. Bleck -- in Mr. Bleck's report as far as the

20   chip delivery timeline.

21        Q.   That wasn't quite my question.  I didn't

22   ask you if you saw concerns in there.

23             Did you see anything in there that alert

24   the reader, hey, these chips aren't going to come

25   back until mid to late September, heads up?

TRANSCRIPT OF PROCEEDINGS

1    A.   No, I didn't see any in there.

2    Q.   As you sit here today, you're not prepared

3  to offer an expert opinion as to why Katena has yet

4  to produce a single working ASIC chip, are you?

5    A.   I do have a knowledge as to why the chip

6  wasn't made.

7    Q.   You're prepared to offer an expert opinion

8  on that issue?

9    A.   Yes.

10    Q.   Okay.  What is your expert opinion on that

11  issue?

12    A.   There was no money to reserve a tapeout.

13    Q.   That's a good segue.  Let's look at that.

14       Now, you say in your report that for

15  about $3 million, Katena could have gotten several

16  hundred pile of chips, right?

17    A.   No.

18    Q.   Okay.  Did you say that in your depo?

19    A.   You are taking it out of context.  I'm

20  sorry.  So I have to say that you cannot get couple

21  hundred chips without paying for the full run.  That

22  would include production chips.  And part of that

23  whole process is that you get so-called sample

24  quantity based on which you continue to build

25  towards full production.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1          So with the $3 million alone, you will not

2    be able to get hundred chips.  But if you

3    put $37 million on the account and say I want this

4    process started, then Phase 1 of that process is

5    that you do get your hundred chips.

6          ARBITRATOR CALLAHAN:  You get your what?

7          THE WITNESS:  100 chips -- test chips,

8    sample -- sample chips.

9    BY MR. ALFORD:

10      Q.  So just to be clear, it's your expert

11    testimony here today under oath that Katena would

12    have had to pay $37 million to get any test chips

13    back; is that your testimony?

14      A.  Yes.  That is in the contract.

15      Q.  Okay.

16      A.  With the invoice from the IMEC.

17      Q.  Okay.  But that's -- that's your expert

18    testimony, though?

19      A.  Yes.  That's in the document.  Pretty

20    clear.

21      Q.  Okay.  I just want to make that clear.

22          Let's take a look at your deposition

23    testimony.

24          MR. ALFORD:  Do we have that

25    electronically?

1       MR. BROOKS:  Only if it's an exhibit.

2       MR. ALFORD:  It's also an exhibit in the

3   hard copy.  It's Exhibit -- I have it right here.

4   Exhibit 1184.  I'm sorry, 1185.

5       ARBITRATOR CALLAHAN:  Is this an excerpt

6   or the whole thing?

7       MR. ALFORD:  It's a full --

8       ARBITRATOR CALLAHAN:  The full thing?

9   Okay.

10      MR. ALFORD:  Yeah.  For better or worse.

11   Oh, no, it's condensed.

12      ARBITRATOR CALLAHAN:  But it's the

13   entirety --

14      MR. ALFORD:  Yes.

15      ARBITRATOR CALLAHAN:  I'm showing him

16   on -- I've got two -- I've got one July 10, one

17   July 12.

18      MR. ALFORD:  I have as 1185 Mr. Markovic's

19   deposition transcript.

20      ARBITRATOR GLICK:  I have one July 10.

21      ARBITRATOR CALLAHAN:  There's July 10,

22   also July 12 in here.  I just want to make sure

23   we're on the right one.

24      ARBITRATOR GLICK:  1185.

25      MR. ALFORD:  1185.

1       ARBITRATOR CALLAHAN:  Well, July 10 is

2   1185.  July 12 is 1184.

3       MR. HARDIN:  It is the same individual?

4       ARBITRATOR CALLAHAN:  Oh, I'm sorry.  They

5   both start with an M.  I can't read anymore.

6       MR. TABER:  I made that mistake earlier

7   today.

8       MR. HARDIN:  I guess I would object to a

9   whole deposition, I mean, being included as an

10  exhibit, but ...

11      ARBITRATOR CALLAHAN:  What is the purpose?

12  Because the witness is here, the reports are in.

13  Typically, depositions are for impeachment, I

14  haven't --

15      MR. ALFORD:  That's exactly what I'm

16  doing.

17      ARBITRATOR CALLAHAN:  Ask the question.

18      MR. ALFORD:  I did.

19      ARBITRATOR CALLAHAN:  What was the

20  question --

21      MR. ALFORD:  The question was that it

22  would take $37 million to get any test chips.

23      ARBITRATOR CALLAHAN:  You're just going to

24  read the --

25      MR. ALFORD:  The impeaching --

1          ARBITRATOR CALLAHAN:  That's the plan.

2          MR. HARDIN:  So I'm still going to object

3   to the entirety of the deposition being introduced

4   as an exhibit because what --

5          ARBITRATOR CALLAHAN:  Sustained.  You

6   don't have to say anything more.  The witness is

7   here, the reports are in.  That's what the panel is

8   treating as opinion testimony, subject to

9   cross-examination, and cross can include impeachment

10   based on prior testimony and the expert witness

11   depositions.

12          MR. ALFORD:  Right.

13          ARBITRATOR CALLAHAN:  But the depositions

14   are not evidence.

15          MR. ALFORD:  Right, I'm just using it for

16   impeachment.

17          ARBITRATOR CALLAHAN:  Fine.

18          MR. ALFORD:  Okay.

19          ARBITRATOR CALLAHAN:  But -- so -- fine.

20   The exhibit number is just for reference purposes --

21          MR. ALFORD:  Yes.

22          ARBITRATOR CALLAHAN:  -- so we can all

23   find it.

24          MR. ALFORD:  Exactly.

25          ARBITRATOR CALLAHAN:  Okay, good.

1          MR. ALFORD:  Just so the question is

2     clear.

3          ARBITRATOR CALLAHAN:  That's fine.

4          MR. ALFORD:  I'm reading it for the

5     record.

6          ARBITRATOR CALLAHAN:  What page?

7          MR. ALFORD:  The question I'm about to

8     impeach on.

9          ARBITRATOR CALLAHAN:  Oh, okay, go ahead.

10    BY MR. ALFORD:

11       Q.   Was so just to be clear, it's your expert

12    testimony here today under oath that Katena would

13    have had to pay $37 million to get any test chips

14    back?  Is that your testimony?  And he says, Yes,

15    that is in the contract.

16         MR. ALFORD:  Okay.  Ted, if we could go to

17    page 98, beginning at line 8.  And oh, yeah.

18         MR. HARDIN:  I'm going to object to this

19    as well because, generally, the witness gets a copy

20    of the deposition.

21         ARBITRATOR CALLAHAN:  That's true.

22         MR. LIU:  I have a copy right here.

23         ARBITRATOR CALLAHAN:  Well, that's true.

24         MR. HARDIN:  Perfect.

25         THE WITNESS:  Thank you.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1          ARBITRATOR CALLAHAN:  I think we have

2     enough paper.  All right.  Go ahead.  Page 98.

3          MR. ALFORD:  Ted, if we could look at

4     page 98, if we blow that up beginning on line 8.

5          MR. BROOKS:  Through?

6          MR. ALFORD:  Through 17.  Blow that up a

7     little bit.  It says -- the question is (as read):

8               So in paragraph 34 --

9               referencing 34 of your report --

10              you are telling us that it would

11              cost $3 million for Katena to get

12              some prototype K10 chips; is that

13              what you're saying?

14              Answer (as read):

15                   Yes.  Very early -- very

16              limited quantity, something on the

17              order of, you know, hundreds of

18              chips, no more, that you would get

19              as a result of this kind of

20              pilot -- pilot run.  This would not

21              be enough to support the full

22              volume production that was expected

23              from Katena, from what I

24              understand.

25              Okay.  Let's go to your report, which --

September 20, 2023

1        MR. HARDIN:  There's no question.

2    Objection.  There's no question.

3        MR. ALFORD:  Impeaching.  Impeachment, you

4    don't ask another question.

5        ARBITRATOR CALLAHAN:  You've already

6    impeached.  Now we're going to move to the next

7    question.

8        MR. ALFORD:  Right.  That's what I was

9    doing.

10        ARBITRATOR CALLAHAN:  We're done.  Now

11    we're going to the report, which is part of the

12    opinion testimony.

13        MR. ALFORD:  Yes.

14        ARBITRATOR CALLAHAN:  But we do need to

15    have a question.

16        MR. ALFORD:  Right.  I was just going to

17    say let's pull up the report, I'm going to ask a

18    question.

19        ARBITRATOR CALLAHAN:  Okay.  All right.

20    Is the report an exhibit?

21        MR. ALFORD:  It's 1181.

22        ARBITRATOR CALLAHAN:  Okay.

23    BY MR. ALFORD:

24    Q.   If I could turn your attention, please, in

25    your report, you can look at it in the hard copy or

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    you can look at it on the screen.  It's

2    Exhibit 1181.  I want to go to paragraph 34, which

3    we just referenced in your deposition testimony.

4          MR. BROOKS:  Page?

5          MR. ALFORD:  It's on the top of page 16 of

6    your report, which has an exhibit page

7    number 1181-18.  And I'm going to refer you to a

8    sentence in paragraph 34 of your report that says

9    (as read):

10             The cost of full mask (private

11             single customer) fabrication run is

12             about $3 million in TSMC 12nm

13             technology.

14             Did I read that correctly?

15          THE WITNESS:  May I just --

16          ARBITRATOR CALLAHAN:  Just did he read

17    that correctly?

18          THE WITNESS:  Which page is that?  I'm

19    sorry.

20    BY MR. ALFORD:

21       Q.  Sure.

22       A.  Yes, I see that.  Yes.

23       Q.  Page 16 of your report.

24       A.  Yes.

25          ARBITRATOR CALLAHAN:  Mr. Markovic, please

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   listen to his questions, a lot of them are yes, no.

2   If there's something further that needs to be drawn

3   out, Mr. Hardin will do that when it's his turn

4   again.  Please listen to Mr. Alford's questions

5   and --

6          THE WITNESS:  I see.

7          ARBITRATOR CALLAHAN:  Go ahead.

8          MR. HARDIN:  I think for right now, he's a

9   little bit more rudimentary, he's just trying to get

10   a physical copy to look at.

11          ARBITRATOR CALLAHAN:  That's fine.

12          THE WITNESS:  Something else, actually.

13   BY MR. ALFORD:

14    Q.   Well, something else -- I have another

15   question for you.  Similar, but different.

16          ARBITRATOR CALLAHAN:  We're not going to

17   do that question you posed?

18          MR. ALFORD:  No.  The question posed was

19   answered, I think.  I'll tell you what, just to be

20   clear, let me ask a new question.

21   BY MR. ALFORD:

22    Q.   It's true, is it not, that in paragraph 34

23   of your report, second line down from the top on

24   page 16 of your report, you tell us (as read):

25          The cost of full mask

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1        (private, single customer)

2        fabrication run is about $3 million

3        in TSMC 12nm technology, which is

4        the option Katena planned to

5        pursue.

6        You tell us that in your report, right?

7        THE WITNESS:  Yes.  And this is consistent

8    with the NRE quote that is discovered after this

9    report precisely matching this price.

10    BY MR. ALFORD:

11    Q.  Right.

12        And I'm glad that you said because let's

13    look at the -- I believe you said it's consistent

14    with the quote from IMEC?

15    A.  Yes.  For NRE component, which is exactly

16    what this is saying.

17    Q.  Right.

18        That's Exhibit 2003.

19        Okay.  You referenced the IMEC quote, so

20    let's pull that up.  That's Exhibit 2003.

21    A.  Excuse me, you said 2003?

22    Q.  Yes, 2003.

23    A.  Okay.  Thank you.

24    Q.  I'll give you a minute to get there.  But

25    while you're getting there, I want to make sure I'm

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   clear.  You were telling us the estimate in your

2   report of $3 million to get a pilot run of test

3   chips is consistent with the information in

4   Exhibit 2003, right?

5       A.  No.  I said that you need to understand

6   the steps of the chip production.  And the cost of

7   the full mask is essentially paying the foundry just

8   to set up the machine to produce any number of chips

9   for you.  Okay.  And that cost, according to the

10  contract, $2.8 million plus tax, which is in my

11  estimate 3 million before even looking at that

12  document, from my experience.

13      However, that itself would not kick in

14  unless there is the entire installed credit line of

15  37 million, which you took out of context in the

16  previous impeachment trial because you overlooked to

17  see my deposition on page 99, which says, to your

18  question, what exactly are you saying Katena could

19  have gotten from the foundry of 3 million of the

20  tooling setup, of the machine --

21       (Reporter clarification.)

22      THE WITNESS:  Only the tooling and setup

23  of the machines to produce these chips, as I'm now

24  trying to explain.  And I'm reading further.  And I

25  think you also said (as read):

1          Several hundred of chips as

2     well, right?

3          And my answer was only (as read):

4               Under the conditions that the

5          rest of the contract was filled,

6          which includes six pilot

7          engineering wafers as per contract

8          with IMEC and the foundry, and

9          additional cost of the wafers for

10          production, which I believe was the

11          contract with this NRE to even

12          happen.

13          So you need to pay full extent of all of

14     these services, and 3 million is just one of the

15     components to make that happen.

16          MR. ALFORD:  Madam Chair, can I get an

17     instruction?  My question was I wanted to make sure

18     I'm clear, you were telling us that the estimate in

19     your report of $3 million to get a pilot run is

20     consistent with the information in Exhibit 2003.

21          ARBITRATOR CALLAHAN:  I think he answered

22     your question.

23          MR. HARDIN:  Right.

24          ARBITRATOR CALLAHAN:  Mr. Alford.

25          MR. ALFORD:  Okay.  All right.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1          ARBITRATOR CALLAHAN:  You know, you can

2    come at this other ways, but ask a question.

3          MR. ALFORD:  Okay.

4    BY MR. ALFORD:

5          Q.   Let's take a look at Exhibit 2003.  And at

6    the bottom of page -- at page 2003-3, do you see

7    that page?

8          A.   Yes.  Uh-huh.

9          MR. ALFORD:  Ted, can we go to that page

10   and blow it up.

11   BY MR. ALFORD:

12         Q.   Under Section 1 there, do you see where it

13   says, "deliverables, pricing and assumptions"?

14         A.   Yes.

15         Q.   And it says that there are certain

16   nonrecurring engineering price.  And

17   that's $2.8 million, roughly, right?

18         A.   Yes.

19         Q.   That's the kind of one-time charges you

20   have to pay the foundry to get their equipment set

21   up?

22         A.   Yes.

23         Q.   Okay.  And then -- and then Section 1.2

24   says -- on the next page, 2003-4, says (as read):

25              Pilot/engineering wafers.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1        Do you see that?

2     A.  Yes.

3     Q.  That price is $8,944 per wafer, right?

4     A.  Yes.  With minimum quantity of six wafers.

5     Q.  Okay.  So six -- let's round up.  Let say

6  it's $9,000 per wafer, okay?

7     A.  Okay.

8     Q.  Because I'm not good at math.  So six

9  times nine is, what, 54,000?

10     A.  Yes.

11     Q.   So for the $2.8 million in nonrecurring

12  engineering costs and for another $54,000, you would

13  get six wafers, right?

14     A.   Only if you are looking to Section 2 in

15  the terms and conditions of Section 2, which require

16  you, that within 30 days after invoicing, you show

17  the amount of installed credit line to purchase the

18  full quantity of production wafers.  And without

19  that, you cannot move at all.

20        That's Payment Term Number 2.  In

21  Section 2, Payment Term Number 2, talking about

22  production pages.

23        MR. HARDIN:  Did you get all that?

24  BY MR. ALFORD:

25     Q.  Okay.  So it's your testimony that Katena

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   would have had to commit to a full run of production

2   wafers before it would get any test chips?

3       A.  My testimony is that Katena had to show

4   the money reserved for the full production run

5   before they get any test chips.

6       Q.  Okay.  Let's take a look at your

7   deposition, for impeachment, at page -- hang on.

8   Let me get a minute to find it.  Page 105 -- well,

9   let me ask a different question, actually.

10          Is it your testimony that the foundry

11   would not do a pilot run of chips for Katena and

12   that the only option was to go to a full production

13   node?

14       A.  There is two answers to that question.  If

15   you follow carefully the agreement between Katena

16   and DXCorr, it is explicitly stated in those

17   agreements that 12-nanometer chip, K10 chip is going

18   to be made using full mask foundry services.  On the

19   other hand, the 7 nanometer chip, which is the more

20   expensive one, would be projected to use

21   multiproject wafer to get some test chips first

22   before engaging to production.

23          In that context, we are talking about

24   12 nanometer CMOS production for which Katena is

25   obligated to use, as per contract, 12-nanometer full

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   mask service.  This IMEC quote to DXCorr for the

2   production of K10 chips is consistent with that.

3   They are giving them price for full wafer production

4   that includes three items, and because of the chip

5   supply situation at that time, they really need to

6   make sure that people have the money to pay and not

7   just playing around.  Because at that time, Apple

8   occupied almost more than 90 percent of the 7

9   nanometer node.  There was no availability of

10   silicon.  Ford couldn't produce their vehicles, and

11   now we have a start-up.  The only way you get the

12   foot in the door, if you show you have the money.

13       Q.   Okay.  So just to be clear, it's your

14   testimony that the foundry would not do a pilot run

15   of chips for Katena unless they could demonstrate

16   financial ability to pay for a full production run,

17   including auditing of bank accounts; is that your

18   testimony?

19       A.   Yes.  That is what is contracted on --

20       Q.   All right.  Let's take a look for

21   impeachment at your deposition at page 105 beginning

22   at line 24.

23           If you could blow that up a little.

24           MR. BROOKS:  We're going to go into the

25   next page.

1      MR. ALFORD:  Yes.

2   BY MR. ALFORD:

3      Q.   I'm going to begin reading from the bottom

4   of page 105, line 24, question (as read):

5             What documents, if any, have

6          you seen in the course of your work

7          in this case that verify the

8          assertion that IMEC was -- IMEC's

9          agreement to produce pilot wafers

10         was, as you say, contingent on

11         proof that funds were available for

12         a full production run?

13         Answer:  (as read):

14            I reviewed invoice from IMEC

15         that provided clause about, upon

16         successful testing of the wafer

17         pilot run, then the next step would

18         be the order of full quantity of

19         the wafers, for which price was

20         provided, but I did not have any

21         other documents beside this to

22         verify -- verify the position of

23         the TSMC in regards to securing a

24         bank account or some level of

25         account with the client that would

1        provide financial assurance that

2        there would be, indeed, a

3        full-volume order of these chips.

4           ARBITRATOR CALLAHAN:  You added

5    "financial."

6           MR. ALFORD:  Sorry.  Full volume order for

7    these chips.

8           ARBITRATOR CALLAHAN:  Would provide

9    assurance that --

10   BY MR. ALFORD:

11      Q.   Would provide assurance.  Sorry.

12        Question (as read):

13            All right.  So I want to make

14        sure the record is totally clear.

15        Have you seen any document in this

16        case that to you indicated very

17        clearly that IMEC was not going to

18        do a run of pilot K10 chips for

19        Katena or DXCorr unless Katena or

20        DXCorr could first demonstrate the

21        financial ability to pay for a full

22        production run?  Have you seen any

23        such documents in this case?

24        There's an objection from Mr. Taber, and

25    the answer is (as read):

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1              From the documents I reviewed,

2           I did not see that specific clause

3           that states financial contingency.

4           Did I read that correctly?

5       A.   No.  Because you missed the answer from

6   the previous question, which says that my

7   understanding from looking into the quote from

8   DXCorr, the invoice from IMEC, and understanding

9   Mr. Reddy's explanation that was pilot -- that pilot

10   wafers were contingent upon showing the full extent

11   of the payment available for downstream engineering

12   production.  That's on page 105, lines 18 through

13   23.

14       Q.   My question was simply whether the portion

15   of the deposition testimony I read to you, other

16   than the one correction Ms. Callahan noted, was a

17   correct reading of the testimony.

18       A.   It's a correct reading at the time that I

19   didn't look into the fine print of Section 2, which

20   I just pointed you to.

21           ARBITRATOR CALLAHAN:  Okay.

22           MR. ALFORD:  Yeah.

23   BY MR. ALFORD:

24       Q.   Have you seen any files -- any materials

25   in Mr. Bleck's file that notified my client that

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   there was not going to be the possibility of a test

2   unit unless all the money was paid for a full

3   production run?  Have you seen that in Bleck's

4   report?

5       A.   In -- can you define Mr. Bleck's report?

6   You assume the 528 feasibility assessment report?

7       Q.   That's what I'm talking about.

8       A.   Yeah.  I did not see business logistics.

9       Q.   And did you see any indication in any of

10  Mr. Bleck's files, not just his report, his file,

11  where there was any kind of documentary evidence

12  that Katena was not going to be able to produce a

13  test unit unless a full production run was paid for

14  in advance?  Did you see any of that in Mr. Bleck's

15  file?

16      A.   By "file," you refer to production

17  documents related to Mr. Bleck's feasibility

18  assessment and his involvement --

19      Q.   Right.

20      A.   -- with Coinmint?

21      Q.   Right.

22      A.   I did not see business logistics, which I

23  understand is the contract between Katena and

24  Coinmint that Mr. Bleck -- that was outside of the

25  scope of Mr. Bleck's work.

TRANSCRIPT OF PROCEEDINGS

1      Q.   Well, I didn't ask if it was outside the

2    scope.  We can disagree about that.  I asked you

3    whether it was in his file, and you agree it wasn't,

4    right?

5      A.   Yeah.  Because it wasn't his scope of

6    work.

7      Q.   Let's take a look at your report, which is

8    back to Exhibit 1181.  Let's look at page 1181-13.

9    I'm sorry.  I apologize.  Let's take a look at

10   Footnote 47, which is on page 1181-14.

11         ARBITRATOR CALLAHAN:  47?

12         MR. ALFORD:  Yes, ma'am, Footnote 47.

13   BY MR. ALFORD:

14     Q.   In that footnote, you talk about a

15   multiproject wafer being a cost effective way to

16   prototype integrated circuits, correct?

17     A.   Yes.

18     Q.   And that this is a process that allows

19   multiple projects to share a single wafer during the

20   fabrication process, which enables lower costs by

21   spreading the cost of the wafer among multiple

22   projects, right?  You say that.

23     A.   I gave the analogy with the bus.

24     Q.   Right.

25     A.   You have 50 passengers, and they all

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   shared the cost of the ride.

2       Q.   You go on to say (as read):

3            By using MPWs, designers can

4         prototype their designs more

5         quickly and inexpensively, which

6         helps accelerate the development of

7         new integrated circuits.

8          Right?

9       A.   Yes.  That's what the footnote reads.

10      Q.   That's an accurate statement, right?

11      A.   Generally speaking, yes.

12      Q.   Okay.  At the top of page 12, you tell us

13   that this project, referring to the DXCorr's project

14   to develop the chip, typically had at least 25

15   engineers working over the course of its life,

16   right?

17      A.   Page -- let me see.

18      Q.   The next page, 1181-15.

19          ARBITRATOR CALLAHAN:  You said 12.

20          THE WITNESS:  You said 12.

21          MR. ALFORD:  I'm sorry.  1181-15 --

22          ARBITRATOR CALLAHAN:  What paragraph?

23          MR. ALFORD:  First sentence at the very

24   top of the page.

25          ARBITRATOR CALLAHAN:  What paragraph?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1       MR. ALFORD:  Paragraph 30.

2       ARBITRATOR CALLAHAN:  Okay, on the top

3    of --

4       MR. ALFORD:  Yes.

5    BY MR. ALFORD:

6       Q.  You say "the project," referring to the

7    development of the K10 chip, typically had at least

8    25 engineers actively working on it over the course

9    of its life, right?

10      A.  Correct.  That's what I understood from

11    Mr. Reddy's interview.

12      Q.  Right.

13          And then you cite there in Footnote 56,

14    5/10/23 interview with Mr. Reddy.  Mr. Reddy stated

15    there were typically 25 to 30 engineers working on

16    the K10 project at any one time, right?

17      A.  Yes.

18      Q.  That's what he told you, right?

19      A.  That's what I noted down.

20      Q.  And you did nothing to independently

21    verify that, right?

22      A.  I didn't need to.

23      Q.  Now, Mr. Reddy told you that the foundry

24    would not do a pilot run, and that the only option

25    was -- was to go to a full production run that would

TRANSCRIPT OF PROCEEDINGS

1   have produced many thousands of chips, correct?

2       A.   Mr. Reddy stated that foundries preferred

3   full mask production runs because of the shortage of

4   production of chips that impacted automotive the

5   most.  And it was really full mask was the only

6   practical option given the timeline that MPWs were

7   significantly delayed, that didn't make sense.

8       Q.   But you saw no documents verifying that;

9   isn't that correct?

10      A.   Well, I understand how the industry looked

11   like at that time.

12      Q.   Well, that wasn't my question.  In your

13   review of Mr. Bleck's file and in the materials you

14   received in this case, you've seen no documents to

15   verify Mr. Reddy's assertion that the foundry would

16   not do a pilot run and the only option was to go to

17   a full production run, right?

18      A.   No.  That's not true.  I mentioned

19   previously that there was explicit agreements

20   between Katena and DXCorr specifying 12-nanometer

21   K10 chip to be produced using full mask production

22   run.

23      Q.   Well, again, I'd like to read from the

24   deposition for impeachment at page 106, beginning at

25   line 14.

1       MR. ALFORD:  If we could get that, Ted,

2   when you get a chance.

3   BY MR. ALFORD:

4       Q.   Question (as read):

5            All right.  So I want to make

6            sure the record is totally clear.

7            Have you seen any document in this

8            case that to you indicated very

9            clearly that IMEC was not going to

10           do a run of pilot K10 chips for

11           Katena or DXCorr unless Katena or

12           DXCorr could first demonstrate the

13           financial ability to pay for a full

14           production run?  Have you seen any

15           such documents in this case?

16           There's an objection.

17           And the answer is (as read):

18             From the documents I reviewed,

19           I did not see that specific clause

20           that states financial contingency.

21       A.   I answered that question already.  And

22   provided that at that time, I wasn't privy to the

23   fine print of the IMEC invoice that the Section 2,

24   payment term subsection number 2, which we also

25   discussed, and also pointing to the context in the

1    previous page that my understanding was that the --

2    any production would be contingent upon payment

3    available for downstream engineering production.

4         And Mr. Reddy is in a better position to

5    testify to that, as he did, and stated the same.

6       Q.   I want to be clear.

7         You're telling us your deposition

8    testimony is no longer accurate because you've

9    gotten this IMEC invoice now; is that your

10   testimony?

11      A.   No.  I had the IMEC invoice before, but

12   deposition is not a memory test, as I was properly

13   coached by counsel, and at that time, I didn't

14   recall the fine print of the IMEC contract

15   Section 2, subsection payment term subsection 2,

16   because I was mainly focused on technical

17   documentation.  And having read -- after I looked

18   into deposition, having read that, I realized, oh,

19   actually it's spelled out here.

20      Q.   Did you go back and change your deposition

21   testimony?

22      A.   I understood I couldn't correct that.  I

23   corrected typos, like silicone instead of silicon,

24   things like that.

25      Q.   So just so I'm clear, the reason you feel

TRANSCRIPT OF PROCEEDINGS

1  your deposition testimony is no longer accurate on

2  this point is because you later reviewed, as you

3  say, "fine print" in the IMEC contract?

4      A.  Yes.

5      Q.  Yes.

6      A.  On that particular question.

7      Q.  So the only basis for your opinion that

8  Katena and DXCorr could not have done a production

9  run without financially committing to a -- sorry, I

10  said it wrong.

11         The only basis for your testimony today

12  that DXCorr could not have done a pilot run without

13  first financially committing to a full production

14  run is a clause of what you say fine print you saw

15  in the contract, right?

16      A.  In addition to that, my understanding from

17  Mr. Reddy's testimony and my understanding generally

18  where industry was at that point where it was a

19  shortage of semiconductor chip production.

20      Q.  Well, in fact, your experience -- in all

21  of your experience working on the development of

22  ASIC chips, you've never had any foundry or

23  aggregator ever tell you that they won't do a

24  production run of chips for you unless you first

25  demonstrate the financial ability to pay for a full

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    production run.  That's never happened to you, has

2    it?

3        A.  I don't deal with those issues.  My CEO at

4    Flex Logix does.  Flex Logix does and finance --

5        Q.  Well, that --

6        A.  -- do that --

7        Q.  -- that wasn't my question.  I mean, in

8    all your experience at the university level, the

9    private sector level, have you ever had a foundry or

10   aggregator come to you and say, wait, we're not

11   going to do a test run of chips for you unless and

12   until you first show us you have the money in the

13   bank to pay for a full production run?  That's never

14   happened to you, has it?

15       A.  No, it did happen.

16       Q.  Okay.

17       A.  It did happen.

18       Q.  Let's take a look, once again for

19   impeachment, at your deposition.  Page 114 beginning

20   at line 15.

21           MR. ALFORD:  If we could blow that up,

22   Ted, 114, line 15.

23   BY MR. ALFORD:

24       Q.  My question was (as read):

25               At any time in your work

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1          developing ASIC chips, either for

2          university or for private

3          companies, have you ever had IMEC

4          or any other aggregator tell you

5          they were not going to give a pilot

6          run of chips for you unless you or

7          your principal could demonstrate

8          financial ability to pay for an

9          entire run; yes or no?

10          There's objection from Mr. Taber.  Several

11     objections.

12          And I say (as read):

13              Have you ever had IMEC or any

14          other aggregator tell you that?

15          Answer (as read):

16              No, I have not encountered

17          that particular situation.

18     A.   Let me explain that.

19          ARBITRATOR CALLAHAN:  No.  Mr. Markovic,

20     your -- Mr. Hardin will ask you questions if he

21     thinks it's necessary.

22          THE WITNESS:  Okay.  I'm sorry.

23          ARBITRATOR CALLAHAN:  Mr. Alford is

24     entitled to just an answer to his question.  The

25     specifics of his question.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1        THE WITNESS:  Thank you.

2        ARBITRATOR CALLAHAN:  Many of which are

3    yes/no.

4        ARBITRATOR GLICK:  Saves a thought.

5        MR. ALFORD:  Thank you.

6    BY MR. ALFORD:

7        Q.   Now, Mr. Reddy told you this project was

8    what he called a slam dunk, right?

9        A.   Yes.

10       Q.   Did you ever ask Mr. Reddy, you know, this

11   is a slam dunk project, a highly innovative chip,

12   why have you never been able to find any customers

13   to pay to bring it to production?  Did you ever ask

14   him that?

15       A.   No.

16       Q.   That wasn't material to your analysis,

17   right?

18       A.   No, it was not.

19       Q.   Let's look at paragraph 27 of your report,

20   which is on page 11 of your report, or the exhibit

21   page is 1181-13.

22       A.   Okay.

23       Q.   You say in the first line of that

24   paragraph (as read):

25           The relationship between

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1              Katena and DXCorr worked as

2              follows:  Katena hired DXCorr to

3              design and prototype Katena's K10

4              chip and 12nm technology.

5              Right?

6      A.   Yes.

7      Q.   All right.  How much money did Katena pay

8   to DXCorr for its work designing and prototyping the

9   chip?  Right, how much?

10      A.   I don't know.

11      Q.   And you referenced there Katena created

12   chip specifications, the next sentence, right?

13   Katena created chip specifications.

14              Do you see that?

15      A.   Yes.

16      Q.   Have you seen the chip specifications?

17      A.   No.

18      Q.   And you say (as read):

19              Katena created a system

20         design.

21         Have you seen the system design?

22      A.   No.

23      Q.   And you say there (as read):

24              Katena created --

25         We talked about the chip specification

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   system design.  The next thing you say Katena

2   created was a -- was a packaging and testing plant,

3   right?

4        A.  Yes.

5        Q.  And you haven't seen the packaging plant

6   either, have you?

7        A.  No.

8        Q.  Okay.  And we talked about packaging a

9   little earlier.  For a layperson like me, I think

10   about putting something in a box filled with

11   Styrofoam peanuts, but I think you explained it's

12   much more complicated than that, right?

13        A.  A little more.  Not too much.

14        Q.  Maybe not to you, but it's really the

15   process by which the chip makes it up to the printed

16   circuit board, right?

17        A.  Yes.

18        Q.  And the package is -- has -- the chip fits

19   into the package through these pins, and then the

20   package itself has pins that fit into the circuit

21   board, right?

22        A.  Yes.

23        Q.  And that all has to be designed

24   specifically to fit both the chip and the circuit

25   board, right?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1      A.   Yes.

2      Q.   Okay.  And that's a very important

3   component that serves as an interface between the

4   chip and the board, right?

5      A.   Yes.  I would say it's definitely a

6   necessary component to provide to the packaging

7   vendor how to do these wire bonding diagrams or just

8   have the ball grid array mate with the package, but

9   I would also have to emphasize that is a zero risk

10   item, or extremely low risk item that is very

11   standard process in the industry.

12      Q.   Well, we'll have to agree to disagree

13   about that.  But my question is, you've never seen

14   any designer or engineering documents that lay out

15   the packaging material, right?

16      A.   No.  I didn't need to.

17      Q.   Well, again, I don't know whether you

18   needed to, but the bottom line is you haven't seen

19   it, right?

20      A.   Okay.  Like I said, there is 50 people

21   working over two years, and you can point always to

22   something that you haven't seen just because there

23   is such a big volume.  All I'm trying to put here is

24   a sanity check on relevance.  Why is this so

25   important?  And from my professional experience, I'm

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  telling you it's not important.

2      Q.  Well, again, I would agree to disagree

3  about that.

4          The bottom line is you've never seen the

5  packaging plant.

6      A.  I have not.

7      Q.  Okay.  You've never seen any evidence from

8  Mr. Bleck's file that he saw the packaging plant

9  either, right?

10     A.  There is one slide summarizing overall

11 packaging to the extent it's going to be done as a

12 vendor service, and that's exactly how it's been

13 done in industry without really breaking too much

14 sweat into that component.  That part itself is,

15 like I said, such a low risk that really doesn't

16 affect feasibility assessment in any substantial

17 way.

18         The packaging was there, the testing

19 procedure, according to the standard for testing,

20 were provided.  So that was sufficient to summarize

21 the overall approach as far as production and

22 testing goes.

23     Q.  And the packaging diagram, if you will,

24 would specify how the chip packaging meets up with

25 the circuit board, that would be in the pin diagram,

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   right?  You -- you explained to me in your

2   deposition about a pin diagram and a wire bonding or

3   packaging diagram.

4        Do you remember that testimony?

5     A.  Yes.

6     Q.  And you haven't seen any of that either,

7   have you?

8     A.  No.

9     Q.  Okay.

10     A.  Like I said, it's a thin issue that you

11   can always find things when you look for it, but

12   it's not relevant.

13     Q.  And in this same paragraph, you say that

14   Katena created a testing plan.

15        You haven't seen any testing plan either,

16   have you?

17     A.  I have seen Mr. Bleck's report as far as

18   the testing plan referring to qualification and

19   reliability standards for volume production testing.

20     Q.  My question is not whether you've seen

21   Mr. Bleck's report.  My question is different.

22        My question is whether you've seen this

23   testing plan that you tell us here Katena created.

24   Yes or no?

25     A.  If you are referring to a detailed testing

1   plan, no, I have not seen it, but I do understand

2   that testing plan exists and it is in place.

3       Q.   'Cause Mr. Reddy told you?

4       A.   And I believe it.

5       Q.   Okay.  Well, all right.  But you haven't

6   seen it, right?

7       A.   I haven't seen it.

8       Q.   Okay.  And you saw no indication from

9   Mr. Bleck's report that he saw it either, right?

10      A.   Mr. Bleck talked to Mr. Reddy on a number

11   of occasions, and his engineering team, to ask

12   specific questions.  And one of those questions that

13   was also documented in emails was about

14   qualification reliability plan, which is kind of

15   related to test.  So I imagine from that, they did

16   have focused discussion that made Mr. Bleck provide

17   a summary of his finding in his report.

18      Q.   My question is different than that,

19   though.

20          ARBITRATOR CALLAHAN:  Listen carefully,

21   Mr. Markovic.

22          THE WITNESS:  Okay.  I'm sorry if I missed

23   it.

24   BY MR. ALFORD:

25      Q.   Have you seen anything in Mr. Bleck's

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  report that tells you he saw a testing plan that you

2  say Katena created?

3      A.  Well, I saw his summary of the report.

4  How he came up with that summary, I am assuming that

5  that's what he discovered in a discussion with the

6  engineering team.  Beyond that, I don't have any

7  knowledge.

8      Q.  And in the next sentence there, you say

9  (as read):

10          DXCorr implemented a chip that

11      met variations specifications.

12      Right?

13      A.  Excuse me, which paragraph?  Oh, I see.

14      Q.  The next sentence.

15      A.  Paragraph 27?

16      Q.  Right, the last sentence in paragraph 27.

17      A.  Yes.  Yes.

18      Q.  You say (as read):

19          DXCorr implemented a chip that

20      met various specifications.

21      Right?

22      A.  Yes.

23      Q.  But when you say they implemented a chip,

24  you know the chip has never been built, right?

25      A.  Well, implemented means also design and

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  make, you know, engineering progress towards

2  production.

3      Q.  Right.

4      A.  Yeah.

5      Q.  So just want to make clear, when you say,

6  "DXCorr implemented a chip," you mean they made

7  progress towards the design.

8      A.  Yeah, in our community, usually you kind

9  of use both terms, design or implementation.  But

10  for physically making the design, you call it

11  manufacturing or fabrication.  So when I say

12  "implemented," that means all of the kind of design

13  and how you build it and get it ready for

14  fabrication.

15      Q.  Right.

16          So one very important milestone in the --

17  as you say, implementation of the chip, would be the

18  chip layout database, right?

19      A.  That is necessary for fabrication, right.

20      Q.  Right.

21          You could never go to the foundry and say,

22  build it, until there's a complete chip layout

23  database, right?

24      A.  Yes.

25      Q.  But you've never seen the actual chip --

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   any actual chip layout database for the K10, have

2   you?

3       A.  We discussed that.  That database is a

4   nonhuman readable format, which is really pointless

5   to even look at.  The extent to which you look from

6   your human senses is the layout images like the ones

7   that we saw in the report, and the rest is just a

8   binary that goes to the foundry.

9       Q.  But that wasn't my question.  My question

10  wasn't whether you believe it's significant or not.

11      A.  Yeah.

12      Q.  My question is whether you've seen it.

13      A.  I've answered that question already.  I've

14  seen the visual, I haven't seen the binary.

15          ARBITRATOR CALLAHAN:  I think he has

16  answered this many times, and I think you've made

17  your point.

18  BY MR. ALFORD:

19      Q.  And you didn't see any evidence in

20  Mr. Bleck's report that he saw the chip layout

21  database either, correct?

22      A.  Beyond the report that states that certain

23  readiness of the chip for manufacturing, I don't

24  know what Mr. Bleck discussed with engineers on that

25  particular issue and where if he saw it or not.  You

TRANSCRIPT OF PROCEEDINGS

1   have to ask Mr. Bleck.

2        Q.   And another very important milestone in

3   the development of a chip in addition to the chip

4   layout database is the design rule check or DRC,

5   right?

6        A.   Yes.

7        Q.   And that would be expected from a full

8   chip implementation, as you say here, right?

9        A.   Yes.

10        Q.   And you were not provided by Katena or

11   DXCorr with the design rule check, correct?

12        A.   I was not.  I explained before, that's

13   never an issue beyond passing functionality and

14   performance checks.

15        Q.   I didn't ask you whether it was an issue.

16   I just asked you whether you saw this data that you

17   tell us is an important milestone in implementation

18   of the chip, this design rule check.

19          Did you see it or did you not?

20        A.   I think I answered that before.  I have

21   not seen it.

22        Q.   Okay.  And have you seen any evidence in

23   Mr. Bleck's report that he saw it?

24        A.   I don't remember.

25        Q.   Okay.  And without a design rule check

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   that's finalized, the foundry is not going to build

2   the chip, right?

3      A.   That's right.

4      Q.   And it's true, is it not, that in all the

5   materials you reviewed, you never saw any

6   documentary indication that either Katena or DXCorr

7   ever reserved a production schedule with the foundry

8   to actually build the K10 chip, correct?

9      A.   I have not seen that communication beyond

10  IMEC invoice.

11     Q.   The IMEC invoice doesn't have what you

12  understand to be a committed schedule for when the

13  chip will actually be built, does it?

14     A.   Usually you reach out to the foundry when

15  you're ready, or within, you know, being pretty

16  close and confident that you are going to hit

17  production schedule.  As we discussed before, you

18  need to know the bus schedule before it gets pulled.

19  And so you arrange this several months in advance at

20  least, and say how much is this going to cost me,

21  what's the availability so we can plan and execute

22  according that timeline.

23         But I have not seen that discussion that

24  explicitly asks for a production schedule and so on.

25     Q.   Right.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1          Just to be totally clear so the record's

2    clear, although you have told us that you think in

3    your opinion this chip was within several months of

4    going to the foundry, you've seen no documentary

5    evidence a schedule was actually reserved with the

6    foundry, right?

7        A.  That's correct.  I understood the terms

8    and conditions from this invoice, but I do not have

9    visibility into the schedule.

10       Q.  And you didn't ask Mr. Reddy, did you?

11       A.  I did not.

12       Q.  When you talked to him?

13       A.  No.  Because that was immaterial to my

14    technical assessment.

15       Q.  Well, you understand it's not immaterial

16    to my client when the chip is going to be built.

17          ARBITRATOR CALLAHAN:  Mr. Alford, a

18    question, please.  You're kind of arguing with the

19    witness.

20    BY MR. ALFORD:

21       Q.  Did Mr. Reddy tell you in your

22    videoconference with him that, for lack of a better

23    phrase, the plug had been pulled on the K10 project

24    in September or October of 2021?

25       A.  He indicated.  I don't remember exact time

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  reference where that happened, but he did indicate

2  that something to the order of about 20 engineers

3  were disappointed they had to leave because project

4  had to be cancelled due to lack of financial

5  resources and support the project.  I understand

6  that in September/October.  I think Mr. Reddy

7  testified to something like that.

8        (Reporter clarification.)

9        THE WITNESS:  Some similar time range,

10  September or October, if I recall Mr. Reddy's

11  testimony.

12  BY MR. ALFORD:

13     Q.  Did -- when Mr. Reddy told you that the

14  project had to be cancelled due to financial

15  inability to pay, did you ask him whether Katena or

16  DXCorr had investor funding?

17     A.  No.  My understanding was that this was a

18  customer-driven project.  And it was agreement to

19  deliver to the customer who was supposed to follow

20  through the contract, and that's what they were

21  expecting that mechanism of engagement to deliver to

22  the customer.

23     Q.  I want to make sure I'm clear.  Did

24  Mr. Reddy tell you that Katena was the -- I'm sorry.

25        Did Mr. Reddy tell you that Coinmint was

1   Katena's only customer as of May 2021 for the K10

2   miners?

3       A.   No.  We did not discuss the number of

4   customers.  The one thing that he did mention was

5   that they believed in the project so much that

6   actually DXCorr ended up putting their money or

7   resources or both to continue the project and kept

8   it going for weeks at a time until they realized

9   payment is actually not coming and people started

10   quitting.

11       Q.   Is it fair to say that, when Mr. Reddy

12   told you the project was cancelled due to financial

13   inability to pay, you didn't ask him any follow-up

14   questions on that?  Is that a fair statement?

15       A.   We didn't discuss that much.  I tried to

16   understand what happened with the technology, and

17   how -- how was the design, most importantly, and

18   what happened during that time as far as execution.

19       Q.   And you didn't ask him any follow-up

20   question; you just accepted that at face value?

21       A.   What else --

22           ARBITRATOR CALLAHAN:  No, it's just a yes

23   or no.

24           THE WITNESS:  I'm sorry, yes, I did not

25   ask question, follow-up questions.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  BY MR. ALFORD:

2      Q.  Did Mr. Reddy tell you that, in fact,

3  Katena had $200 million in secured revolving credit?

4  Did he tell you that?

5      A.  No.  We did not discuss any of the

6  financial.

7      Q.  That would have been --

8          ARBITRATOR CALLAHAN:  Mr. Alford, not a

9  statement, a question, please.

10  BY MR. ALFORD:

11     Q.  Isn't it true that that would have been --

12  that $200 million would have been way more than

13  enough to build thousands and thousands of working

14  miners?  Correct?

15         ARBITRATOR CALLAHAN:  You're giving him a

16  hypothetical.

17         MR. ALFORD:  Yes.

18         ARBITRATOR CALLAHAN:  Hypothetically

19  speaking.

20         THE WITNESS:  Hypothetically speaking,

21  possibly, but I don't know.  I don't know what is in

22  that contract, what are the terms and conditions,

23  how the money is allocated.  I haven't seen any

24  financial reports.  I really have no basis to opine

25  on that.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   BY MR. ALFORD:

2       Q.   Just so I'm clear, you're not here to give

3   an expert opinion that the reason Katena never

4   produced a working chip and working miner is because

5   my client didn't pay; you're not here to give that

6   expert opinion, are you?

7       A.   I'm not quite understanding of the overall

8   logistics in the process.  But I do -- my

9   understanding is that there was no sufficient

10   payment to fulfill this order as per IMEC invoice.

11       Q.   I want to be real clear.  Are you offering

12   an expert opinion here today that the reason Katena

13   never produced a single working chip and a single

14   working miner is because my client didn't pay?

15       A.   That's what I understand.

16       Q.   That's what you understand?

17       A.   Yes.

18       Q.   And that's based solely on one statement

19   from Mr. Reddy that we didn't have the money to pay,

20   project cancelled?  That's it?

21       A.   And also arguments from Coinmint's side,

22   Mr. Pflaum trying to argue that you can make things

23   that you actually can't make with less money without

24   reading the contract.  So I understood that there

25   was shortage of money.  I did not understand the

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  timeline of the -- of the money flow and what

2  happened.

3      Q.  Right.

4      A.  But my understanding really is from all of

5  the documents I have available and my discussion and

6  prior proceedings is that there was a lack of

7  payment.

8      Q.  Okay.  But --

9          ARBITRATOR CALLAHAN:  That's your working

10  assumption.

11          THE WITNESS:  That is my working

12  assumption, yes.

13          ARBITRATOR CALLAHAN:  Okay, that's his

14  working assumption.

15          MR. ALFORD:  Right, and his expert

16  opinion.

17          ARBITRATOR CALLAHAN:  No, it's his working

18  assumption.

19  BY MR. ALFORD:

20      Q.  Not your expert opinion?

21      A.  Can you please help me define "expert

22  opinion"?

23      Q.  Are you here today to offer an expert

24  opinion that the reason the chip was never produced

25  is because my client didn't pay?  Or is that simply

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

 1   your working assumption as Ms. Callahan said?

 2      A.   That is my --

 3          ARBITRATOR CALLAHAN:  Gentleman, can't you

 4   work this out?  We have the experts' reports as

 5   evidence.  There is no -- they are limited to their

 6   opinions.

 7          MR. ALFORD:  It's in there.

 8          ARBITRATOR CALLAHAN:  Where is that?  I

 9   heard three things he was asked to give an opinion

10   on.  Where is it that he was --

11          MR. ALFORD:  There's a statement the

12   project was cancelled due to inability to pay.

13          ARBITRATOR CALLAHAN:  As background.

14          MR. ALFORD:  I just want to make sure --

15          ARBITRATOR CALLAHAN:  Well, I'm asking

16   counsel to try to move this along.

17          MR. ALFORD:  Yeah.

18          ARBITRATOR CALLAHAN:  Aren't the experts

19   limited to the technical areas on feasibility that

20   they gave their opinions on, and they may have all

21   the other stuff in there that's their assumptions or

22   what they were told or their reasoning, but aren't

23   they limited to their stated opinions?

24          MR. ALFORD:  I think they're limited to

25   their stated opinions, but the problem is the report

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   talks about --

2        ARBITRATOR CALLAHAN:  But you're asking

3   him isn't it his opinion, and that's where this is

4   getting mucked up.

5        MR. ALFORD:  If we can have a stipulation.

6        ARBITRATOR CALLAHAN:  That's a legal term,

7   by the way.

8        MR. ALFORD:  That's a great legal term.

9         If we can have a stipulation that

10   Mr. Markovic is not offering an expert opinion if

11   the reason the project was cancelled was because my

12   client didn't pay, I'll take the stipulation and we

13   won't spend any more time on this.

14        MR. HARDIN:  The reports are the reports.

15   You are right.  I mean, it's the opinions in the

16   report.  That's what I'd be willing to stipulate to.

17   The reports are the reports.

18        ARBITRATOR GLICK:  Speak up.

19        MR. HARDIN:  Sorry.  I'd be willing to

20   stipulate to what Madam Chair said, the reports are

21   the reports, the opinions are the opinions.

22        ARBITRATOR CALLAHAN:  And they're limited

23   to what they expressed in their reports, so that

24   your cross is aimed at saying -- showing where they

25   said something different in their deposition or --

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1        MR. HARDIN:  Or not qualified.

2        ARBITRATOR CALLAHAN:  Or not qualified --

3        MR. ALFORD:  Right.

4        ARBITRATOR CALLAHAN:  -- or did you

5   consider this or why did you assume that.  You know,

6   can't we work through this instead of trying to

7   prove the entirety of the case through the

8   questioning of a technical expert that is not here

9   as a fact witness?

10        MR. ALFORD:  I would hope.

11        ARBITRATOR CALLAHAN:  I'm asking.

12        MR. ALFORD:  I think so, yes.  But his

13   report does say that -- it states that it was

14   cancelled by inability to pay.  I think I can handle

15   this --

16        ARBITRATOR CALLAHAN:  Is it in his

17   background statement?

18        MR. ALFORD:  I don't know about background

19   statement.

20        ARBITRATOR CALLAHAN:  There's a section

21   called background statement, and there's a section

22   that says what he was asked to opine on and then

23   there's a section where he states his opinions about

24   Mr. Bleck's qualifications, the reasonableness of

25   his report or his methodology and then

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    Mr. Markovic's own feasibility assessment.

2         I heard there's three opinions he was

3    asked to give and that there's three opinions he's

4    given, and I'm not hearing anything that talks about

5    him making any assessment about why the project

6    didn't go forward.  He looked at the feasibility of

7    the chip.  The design of the chip is what I heard.

8         MR. ALFORD:  I will move on.  I don't want

9    to belabor things.

10        ARBITRATOR CALLAHAN:  I'm asking counsel,

11   are you -- is that what we're doing with these

12   technical experts?

13        MR. ALFORD:  That's what we're doing with

14   ours.

15        ARBITRATOR CALLAHAN:  The reports are in.

16   They're limited to their opinions.  You want to ask

17   them about their assumptions, how did you get there?

18   Great.

19        MR. HARDIN:  I agree.  I do think that the

20   reports are -- contain the opinions.  I mean, he was

21   asked here on cross-examination, so he gave his

22   opinion.  But I agree with you that what we're here

23   for are the technical aspects in his report.  That's

24   why we brought the --

25        ARBITRATOR CALLAHAN:  Here's why I think

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   we can get through this all easier.  I think we're

2   getting hung up on phrasing these other questions

3   about what's the basis for your opinion as -- is it

4   your expert opinion instead of, on page 1 of your

5   report, you make the statement that.  What's the

6   basis for that statement?  How did that statement

7   affect your opinion?

8         MR. ALFORD:  We can do that right now.

9         ARBITRATOR CALLAHAN:  But that way, I

10   think we start focusing what this examination is

11   about 'cause I don't believe we're here when it's

12   qualified as is it your expert opinion that.  I'm

13   kind of going now, wait a minute, I thought we had a

14   stipulation and a procedural order that said to

15   expedite the hearing on the technology experts,

16   their reports are in lieu of direct.  And I'm

17   relying on that.  The panel is relying on that.

18   Because we read them, and then we're here waiting to

19   hear the cross.  Testing the assumptions, where did

20   you get that fact?  Did you consider something else?

21   The classic expert witness exam-type stuff.

22         But I'm hearing a lot of, is it your

23   expert opinion that on topics that I didn't think

24   Mr. Markovic is here for, and I'm a little worried

25   that we're expanding this beyond what anyone

1  contemplated.

2        MR. ALFORD:  Well, I was just clarifying

3  what he says in the report.  But I think we can

4  get -- I don't want to belabor it.

5        ARBITRATOR CALLAHAN:  I'm going to take a

6  short break, because I'd like counsel to have that

7  discussion as to whether or not we're operating

8  under the same assumption that the opinions that the

9  panel is going to consider, are those that the

10  experts have set forth in the reports, and they are

11  here as their direct testimony, their direct

12  evidence and you added a little bit of flavor there.

13  You're allowed to do that on your direct, and then

14  the cross is going to drill down on the basis for

15  the opinion, the assumptions, what you did or didn't

16  consider.  But we're not going to add any more

17  opinions.

18        MR. HARDIN:  We're absolutely of that --

19        MR. ALFORD:  If we can get a stipulation

20  that --

21        ARBITRATOR CALLAHAN:  I got it from

22  Mr. Hardin.

23        MR. HARDIN:  I think a couple times.

24        ARBITRATOR CALLAHAN:  I'm giving you a

25  break, and continue to discuss it.

1      MR. ALFORD:  The only stipulation I'm

2   asking for is, Mr. Markovic is not going to offer an

3   expert opinion that the reason the chip never was

4   developed is 'cause my client didn't pay.  That's

5   the only thing I'm asking for.  If we get that

6   stipulation, I won't waste any more time on it.

7   We'll move on.

8      MR. HARDIN:  Madam Chair, that's a one

9   way.  There seems to be a couple conversations --

10      ARBITRATOR CALLAHAN:  That's a bad

11   question as I'm hearing it.

12      MR. ALFORD:  I think so too.

13      MR. HARDIN:  There's a couple

14   conversations going on here.  One is your ask of

15   ensuring that we're all on the same page that

16   opinions are limited by the reports so that nothing

17   new pops up.  I am saying yes, we are in agreement.

18   In fact, the motion that we filed with respect to

19   Mr. Pflaum and the new affidavit was in -- exactly

20   in line with that.

21      I am not hearing that from Coinmint,

22   however, and I would object to any new opinions

23   coming in.  I -- like you, I want that stipulation

24   because cross-examination is going to be limited to

25   the opinions that have already been put out there in

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   these reports.

2       ARBITRATOR CALLAHAN:  I'm not asking, and

3   I don't think it's fair to ask for either of you to

4   agree that an expert isn't making opinion about X

5   because then we're going to have a logical list of

6   X, Y, Z, one, two -- no.  It's an affirmative

7   statement.

8       The opinions of the technical experts are

9   limited to that which they set forth in their

10  reports.  That's an affirmative statement.  We all

11  know where to go, those are the opinion -- that's

12  the opinion evidence that has been submitted to the

13  panel.  And it's in because we got them.  And all

14  we're -- I'm not going to go down this road of let's

15  also agree they can't express an opinion on this or

16  that because that defeats my purpose.

17      MR. HARDIN:  Right.

18      ARBITRATOR CALLAHAN:  So make it clear

19  affirmatively, the opinion testimony of a technical

20  expert is limited to that which they said they were

21  asked to opine on and which they gave an opinion on.

22      MR. HARDIN:  Agreed.  Stipulated.

23      ARBITRATOR CALLAHAN:  You agree -- do you

24  agree, Mr. Alford?

25      MR. ALFORD:  I agree that we're not going

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    to introduce anything from Mr. Pflaum that's not in

2    his reports.  I agree with that.

3           ARBITRATOR CALLAHAN:  We're going to now

4    limit our cross to the opinions that have been

5    expressed, and it is not cross to go ask if you have

6    opinions on other things.

7           MR. ALFORD:  Right.  There's multiple

8    statements --

9           ARBITRATOR CALLAHAN:  If I get --

10          MR. ALFORD:  Go ahead.

11          ARBITRATOR CALLAHAN:  It's his background,

12    and you get to test him in terms of where did you

13    get that.

14          MR. ALFORD:  Okay.  Okay.

15          ARBITRATOR CALLAHAN:  Did you rely on it.

16          MR. ALFORD:  Understood.

17          ARBITRATOR CALLAHAN:  What opinion does it

18    go to.  So you can challenge his opinion, but we're

19    not here to go seek additional opinions.  Unless you

20    all agree --

21          MR. HARDIN:  No.

22          ARBITRATOR CALLAHAN:  -- you can do that.

23    I think that's where we're getting bogged down.

24          MR. ALFORD:  I think I understand what

25    you're saying, and I agree.

1       ARBITRATOR CALLAHAN:  Let's take a short

2   break and come back and see if we can finish up with

3   Mr. Markovic.

4       (Whereupon, a recess was taken from

5       2:26 PM to 2:42 PM)

6       ARBITRATOR CALLAHAN:  Let's continue on.

7   Go ahead, Mr. Alford.

8       MR. ALFORD:  Great.  Thank you.

9   BY MR. ALFORD:

10      Q.   Do you remember, Mr. Markovic, before the

11   break, you told us that after your deposition, you

12   went back and looked at the IMEC statement of work

13   and that caused you to conclude, contrary to

14   deposition testimony, that a pilot run of chips was

15   not available to Katena absent financial commitment

16   for a full production run?

17      MR. HARDIN:  Hang on one second.

18   Objection to the argument about deposition

19   testimony.

20      MR. ALFORD:  I'm just reorienting the

21   witness to what he said before the break because I

22   want to ask some follow-up questions.

23      ARBITRATOR CALLAHAN:  We're there.  Now

24   ask the question.

25   / /

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   BY MR. ALFORD:

2       Q.   All right.  So let's take a look at that

3   statement of work.

4           MR. ALFORD:  Let's pull up Exhibit 2003,

5   Ted, and you can look at it in hard copy if you

6   want, Mr. Markovic.  If we could look, when you get

7   a chance, Ted, 2003.

8   BY MR. ALFORD:

9       Q.   On page 3, I don't want to go over all the

10  same ground again, but 2003-3 under Section 1, we

11  talked about the nonrecurring engineering price of

12  2.8 million, right?  Do you see that?

13      A.   Yes.

14      Q.   On the next page, there is a section on --

15  for pilot or engineering wafers, right?

16      A.   Yes.

17      Q.   Can we -- is that a term that's commonly

18  used interchangeably with a test chip?

19      A.   No.  You can get test chip in smaller

20  quantities.  You don't need to have whole sample

21  wafers.

22      Q.   Okay.

23      A.   This is sometimes referred as, like, a

24  sample chips.

25      Q.   Okay.

TRANSCRIPT OF PROCEEDINGS

1      A.   Rather than just a test chip.  Test chip

2    is kind of broader meaning that applies also to

3    academic and the MPW runs when you get to 50 to 100

4    chips.

5      Q.   You call these sample chips?

6      A.   Sample chips.

7      Q.   Or pilot chips?

8      A.   Yeah.  Or pilot chips.

9      Q.   The section on these pilot chips is 1.2 --

10   Section 1.2, right?

11     A.   That's what I see, yes.

12     Q.   The minimum quantity of pilot chips is 6,

13   right?

14     A.   No.  Actually this is minimum quantity of

15   pilot engineering wafer is 6.

16     Q.   You're right.

17     A.   Wafers, as we discussed, has maybe 1,500

18   or so chips.

19     Q.   Okay.  Thank you.

20          So for -- for the 6 -- minimum of 6 pilot

21   wafers for $53,000, approximately how many

22   12-nanometer chips would you get?

23     A.   About 9,000.

24     Q.   9,000.  Okay.

25          Now, there's a separate section below that

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    on production wafer pricing, right?

2        A.   Yes.

3        Q.   And you were telling us that you went back

4    after your deposition and reread this contract and

5    came to the conclusion that, in fact, a pilot run

6    wouldn't be done without commitment to a full

7    production run, right?

8        A.   You are saying it in a slightly different

9    way from the way I like to represent it.  My

10   understanding is that you would not be able to do

11   pilot run without showing sufficient funds to

12   actually support the entire production run.

13       Q.   And that's based on something you -- that

14   view you just expressed is based on something you

15   read in this contract?

16       A.   That is from Section 2, bullet -- second

17   bullet, payment term, production wafers, it's item

18   number 2.

19       Q.   You anticipated my next question, which is

20   what part of the contract specifically did you

21   review that made you conclude that it was not

22   possible for DXCorr to get a pilot run without

23   financial commitment for a full production run?  You

24   just told us that's bullet point 2 under Section 2.

25       A.   That is right.  Bullet point number 2

TRANSCRIPT OF PROCEEDINGS

1   titled "payment term" and item number 2, "production

2   wafers."

3       Q.   And under "payment term," subparagraph 1

4   there, addresses the payment terms for masks and

5   pilot runs, right?

6       A.   Yes.  It explains masks and pilot run.

7       Q.   Right.  And it says for mask and pilot

8   runs, it's cash with order, see milestone schedule

9   above, right?

10      A.   Yes.

11      Q.   And then the next section deals with

12   production wafers, right?

13      A.   Yes.

14      Q.   And what language did you see there that

15   led you to believe that it was not possible for

16   DXCorr to get a pilot run without financially

17   committing to a production run?  What language did

18   you see that led you to that conclusion?

19      A.   I see the full paragraph really explains

20   that -- it states that (as read):

21              Met within 30 days after

22          invoicing for the amount of the

23          installed credit line.  And these

24          payment terms are subject to IMEC

25          and TSMC quarterly financing review

TRANSCRIPT OF PROCEEDINGS

1          and agreement in case the

2          customer's quarterly financial data

3          does not --

4          (Reporter clarification.)

5          THE WITNESS:  I'm sorry.

6          ARBITRATOR CALLAHAN:  Just a little slower

7    when you read.

8          THE WITNESS:  Yes.  Thank you.

9          (As read):

10              In case the customer's

11          quarterly financial data does not

12          allow to install a credit line,

13          payment terms of production wafers

14          are cash with order.

15          So that makes me believe that you either

16    need to have cash to pay upfront or that you have to

17    demonstrate installed credit line sufficient to

18    cover the full amount of the production run.

19    BY MR. ALFORD:

20      Q.  And you think that even though those

21    requirements are under the section titled

22    "production wafers," they, in fact, apply to the

23    section above on "pilot runs"?

24      A.  That's what I understood.

25      Q.  And that's just based on your

1   interpretation of this contract?

2        A.   Yes.  And my understanding from what

3   Mr. Reddy explained.

4        Q.   Right.

5            But just to be clear, you've never

6   yourself had that experience where you've had a

7   foundry or an aggregator tell you we won't do a

8   pilot run for you unless you show money in the bank

9   for the full production run, you've never had that

10   experience in your own experience?

11        A.   No.  I had similar experience, if you

12   think it's relevant, that relates to one earlier

13   question we discussed.  In the context of this

14   medical device project, we needed to order enough

15   parts to assemble a couple hundred units.  And on

16   each one of these, we had something like six to

17   eight chip-type capacitors.  So you can buy

18   capacitors as components, but in this particular

19   case, we needed to satisfy the constraints of

20   medical grade that needed to be manufactured as a

21   silicon wafer.

22            And the lead time for that sounds like

23   they are always in the COVID mode.  The lead time

24   was 52 weeks.  And we asked, why is this 52 weeks,

25   and they said, well, because you need to first make

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  an order and pay for it.  And then we have to start

2  dedicated chip wafer run to procure enough

3  capacitors for your project, subject them to

4  verification, temperature inspection, storage and

5  shipping that is fully traceable according to the

6  medical grade component standards.

7       That was one example in the longer lead

8  time when you had to really show all the money

9  upfront due to the nature of that order.  It's

10  related, but not exactly the same context you're

11  describing.

12       MR. ALFORD:  For purposes of impeachment,

13  I would like to read from Mr. Markovic's deposition

14  transcript at page 114, beginning at line 15, to

15  115, line 5.

16       ARBITRATOR CALLAHAN:  I think you already

17  read this.

18       MR. ALFORD:  True.  But, again, he's

19  testified --

20       ARBITRATOR CALLAHAN:  It's so noted.

21  We've read --

22       MR. ALFORD:  Okay --

23       ARBITRATOR CALLAHAN:  We've read it.

24       MR. ALFORD:  Fair enough.

25       ARBITRATOR CALLAHAN:  We don't need to

1   read it again.  We appreciate his answer in the

2   deposition is different than the answer he gave now.

3         MR. ALFORD:  Thank you.  Save time,

4   appreciate that.

5         ARBITRATOR CALLAHAN:  Yes.

6   BY MR. ALFORD:

7      Q.  Now, there's reference in your report to

8   the fact that Mr. Reddy told you a mock tapeout was

9   done, right?

10     A.  Which paragraph was that?

11     Q.  Let me ask you first, do you remember

12  Mr. Reddy telling you that a mock tapeout was done?

13     A.  Yes, I do remember discussion about the

14  mock tapeout.

15     Q.  Okay.  And you remember Mr. Reddy telling

16  you that a mock tapeout had been done?

17     A.  Yes.  I remember that.

18     Q.  Okay.  And you would agree with me that,

19  even though a mock tapeout, obviously, isn't a final

20  tapeout, it nevertheless would have been an

21  important milestone in the trajectory of this chip

22  toward actual production, right?

23     A.  Yes, I can agree to that.

24     Q.  And now, given that you were asked to

25  opine on whether this chip was nearly ready to go to

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   production, surely you asked to see the mock tapeout

2   database, right?

3       A.   No.  I don't need to see that.  We

4   discussed that before.  It's a binary that's not

5   human readable.  It's a computer generated file that

6   is not comprehensible.

7       Q.   Did you see any evidence in Mr. Bleck's

8   report that he viewed the mock tapeout database?

9       A.   I don't remember seeing that.

10      Q.   What, if anything, did you do yourself to

11   confirm what Mr. Reddy told you, that, in fact, a

12   mock tapeout database had been done?

13       ARBITRATOR CALLAHAN:  Mock tapeout had

14   been done?

15       MR. ALFORD:  Yes.

16   BY MR. ALFORD:

17      Q.   What, if anything, did you, Mr. Markovic,

18   actually do to verify Mr. Reddy's statement to you

19   that a mock tapeout database had been created?

20      A.   I did not do anything.  I didn't feel

21   compelled to do that.

22      Q.   Okay.  If you can look in your report,

23   paragraph 35.  Your report is Exhibit 1181.

24   Paragraph 35 at page 1181-18, or it's page 16 of

25   your report.

TRANSCRIPT OF PROCEEDINGS

1           Second sentence of paragraph 35, you say

2     (as read):

3                Although "it" -- referring to

4           the K10 -- although it was high

5           performance and power efficient, it

6           incorporated a limited set of

7           technologies and so had a smaller

8           set of things that could

9           potentially go wrong.

10          Do you see that?

11     A.   Yes.

12     Q.   Your sole source in that footnote for that

13     assertion is you say (as read):

14                5/10/23, interview with

15          Mr. Reddy:  Mr. Reddy stated that

16          he considered the K10 chip to be a

17          very low complexity listing

18          features it did not have and would,

19          therefore, not have to be debugged.

20          Did I read that correctly?

21     A.   You read it correctly, yes.

22     Q.   Okay.  Now, you have seen evidence in the

23     course of your work in this case -- let me rephrase

24     that.

25          In the course of your work in this case,

1  you saw some documents indicating that Mr. Reddy and

2  Mr. Bleck, before Mr. Bleck was retained by my

3  client, worked together to change Mr. Bleck's

4  LinkedIn page and the DXCorr website, right?  You've

5  seen those documents?

6      A.  I have seen that communication, yes.

7      Q.  Right.

8          And you're not prepared to opine today

9  that that is the standard of practice in doing due

10  diligence exercises, are you?

11      A.  I am not sure I understand your question.

12  I'm sorry.  You are -- made a few statements.  I

13  don't understand what the question is.

14      Q.  Sure.

15          I want to make sure I didn't miss

16  anything.

17          I didn't see anything in your report where

18  you say, in effect, that's the way things are

19  supposed to work.  Did I miss anything?

20      A.  You didn't, because my report was not

21  focused on that matter.

22      Q.  Right.

23      A.  My report was in whichever way you retain

24  due diligence expert, the most important thing is

25  the credibility and the quality of work that the

1   person performs.  And I was solely focused on the

2   quality of the engineering work and conclusions made

3   about technology.

4       Q.   You weren't focused in your report on

5   whether Mr. Bleck properly disclosed or concealed

6   prior affiliations he had with DXCorr?  That's not a

7   part of your opinions?

8       A.   No, that was not material to my opinions.

9       Q.   Not material?

10      A.   (Nods head.)

11      Q.   Okay.  You would agree with me, though, as

12  a person who you said has done a great deal of due

13  diligence exercises yourself that, as the due

14  diligence consultant, it's important to disclose and

15  not conceal any prior affiliations you may have had

16  with the target you're doing a due diligence on,

17  right?

18      A.   It depends.  Normally -- the way you

19  really need to look into it is to the extent it

20  impacts the outcome of the work specified, you

21  absolutely have to disclose.  To the extent it does

22  not interfere with the work, you have to also

23  understand it's -- that's what's most important.

24  The quality of the work and, again, it's a small

25  community of people, and you draw experts from the

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   network of your connections who you have trusted in

2   the previous work relationship and knowledgeable

3   experts who you really believe to give you quality

4   work.

5        Q.   Well, you told us that the due diligence

6   exercise is customer driven, right?

7        A.   It is, yes.

8        Q.   Right.

9            So it would be appropriate in your view,

10  would it not, for a customer who is hiring a due

11  diligence expert to say, you know, I want someone

12  who is not only qualified on paper, but someone who

13  doesn't have a prior affiliation with the target

14  that I don't know about?  That would be appropriate

15  for a customer-driven consumer to say that, right?

16  I want someone who has no affiliations with this

17  company?

18       A.   That would be part of Coinmint's kind of

19  burden to exercise that diligence and ask the right

20  questions in the process of screening the candidates

21  for due diligence, isn't it?

22       Q.   Well, I guess so perhaps, but --

23           ARBITRATOR CALLAHAN:  Mr. Alford, let's

24  have questions because right now you guys are

25  engaging in a dialogue.  I'd really appreciate

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  questions.

2       MR. ALFORD:  I'm trying.  Do my best.

3       ARBITRATOR CALLAHAN:  Mr. Markovic, please

4  listen very carefully and try to stay focused on

5  what the question is to you.  And if there's

6  something you don't understand, of course, let us

7  know, but please stay focused.  And I would

8  appreciate it if counsel and the witness would not

9  engage in a dialogue about this topic, that we have

10  questions followed by answers.

11       THE WITNESS:  Understood.

12       ARBITRATOR CALLAHAN:  With a focus on the

13  opinions.

14  BY MR. ALFORD:

15    Q.  Okay.  Just to be clear, you don't have an

16  expert opinion you're prepared to offer today about

17  whether any actual or alleged conduct by Mr. Bleck

18  and Mr. Reddy in changing the website and changing

19  the LinkedIn page met professional standards for due

20  diligence exercises, you don't have any opinion on

21  that?  That was outside the scope?

22    A.  Define "professional standards."

23    Q.  The way that, in your experience, due

24  diligence exercises are supposed to be handled to be

25  done properly.

TRANSCRIPT OF PROCEEDINGS

1        You don't have any opinion whether --

2        MR. HARDIN:  Objection.  Compound.

3        ARBITRATOR CALLAHAN:  Please break it

4    down.

5    BY MR. ALFORD:

6      Q.   Are you prepared to offer an expert

7    opinion today about whether the alleged or apparent

8    conduct by Mr. Reddy and Mr. Bleck in changing the

9    website of DXCorr and changing the LinkedIn page to

10   remove any affiliation between the two was in

11   keeping with the proper way the due diligence

12   exercise is supposed to be done?

13     A.   Well, I do have an opinion on that --

14   derived from my professional experience, and I can

15   share that to the extent it is helpful.

16        ARBITRATOR CALLAHAN:  It's been shared in

17   the rebuttal reports.  So I'm including within the

18   expert reports that have been submitted both sides'

19   rebuttal reports to each other.  I believe that was

20   part of the deal.  So we have both the direct

21   opinions, and we have the rebuttal opinions.

22        MR. ALFORD:  So I can ask him the question

23   'cause it's in his report?

24        ARBITRATOR CALLAHAN:  Well, his opinion is

25   in.  So now we're doing cross.  We've read his

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   opinion.

2        MR. ALFORD:  Right.

3        ARBITRATOR CALLAHAN:  In which he said

4   there are no standards.  He took issue with

5   Mr. Pflaum's opinions.

6   BY MR. ALFORD:

7     Q.   Is that your testimony, that there are no

8   professional norms or standards that would be

9   violated if, in fact, the person who was being

10   considered for the due diligence worked with the

11   target to change their LinkedIn page and change the

12   website to remove any affiliation between the two,

13   that's your testimony?

14        MR. HARDIN:  Objection.  Incomplete

15   hypothetical.  Mischaracterizes the evidence.

16        Can we just get to the opinion and

17   challenging it?

18        MR. ALFORD:  I asked him whether that was

19   his opinion.

20        ARBITRATOR CALLAHAN:  Well, I believe it's

21   a restatement of his opinion.  Why don't we go to

22   his report and pull out what it is in the opinion

23   that we're focusing on.  That might focus us all.

24   BY MR. ALFORD:

25     Q.   Can you point us to the portion of your

1   rebuttal report that addresses this issue, which is

2   1182 -- Exhibit 1182?

3          ARBITRATOR GLICK:  What page?

4          ARBITRATOR CALLAHAN:  12.

5          You're asking specifically about the

6   removal of the website?

7          MR. ALFORD:  Right.  Right.

8          ARBITRATOR CALLAHAN:  And so, again, the

9   opinions that are in are those that are in the

10   reports.  If there's no opinion there, there's no

11   opinion here.

12          MR. ALFORD:  And I'm just trying --

13          ARBITRATOR CALLAHAN:  And then there's no

14   opinion and nothing to cross on.

15          MR. ALFORD:  That's something helpful to

16   know.

17          ARBITRATOR CALLAHAN:  That's what we

18   agreed.

19          MR. ALFORD:  He's not expressing an

20   opinion on that.

21          ARBITRATOR CALLAHAN:  We already -- he

22   can't now express an opinion that isn't in his

23   report.  And so if there isn't a paragraph -- so

24   Mr. Markovic, in Section B of your rebuttal report

25   where you address -- you rebutted or you countered

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   Mr. Pflaum's opinions about industry standards, did

2   you include in that set of opinions anything

3   concerning Mr. Bleck's prior work with DXCorr or

4   Mr. Reddy?

5        THE WITNESS:  No.

6        ARBITRATOR CALLAHAN:  Okay.

7        MR. ALFORD:  Okay.

8        ARBITRATOR CALLAHAN:  So there is no

9   opinion on that subject before the panel.

10       MR. ALFORD:  From you, Mr. Markovic.

11       ARBITRATOR CALLAHAN:  From Mr. Markovic.

12       THE WITNESS:  Yes.

13       MR. ALFORD:  Right.  Okay.  Thank you.

14       THE WITNESS:  Yeah.

15   BY MR. ALFORD:

16       Q.   Now, you understand that among the

17   materials you reviewed was a lengthy exchange of

18   emails between Mr. Bleck and Mr. Reddy about the

19   contents of Mr. Bleck's report before it was

20   finalized, correct?

21       A.   Yes, I remember seeing those emails.

22       Q.   And you've also seen texts correspondence

23   between Mr. Reddy and Mr. -- and the other

24   principals of Katena where Mr. Reddy says that he

25   wasn't happy with Mr. Bleck's draft report and told

1  him what it should be.  You saw that, right?

2      A.  I did see texts that you mention.  Without

3  going into restatements of what those texts are, I

4  would repeat, that those texts were not material to

5  my opinions.

6      Q.  Okay.  All right.  And it's your testimony

7  that my client limited Mr. Bleck to -- let me

8  restate the question.

9        It's your testimony that my client

10  required Mr. Bleck to start and complete all of his

11  due diligence in one week, right?

12      A.  That is what I understood, yes.

13      Q.  Okay.  You said there was something in the

14  contract between my client and Mr. Bleck that

15  required that, right?

16      A.  Yes.

17      Q.  And your view that Mr. Bleck did an

18  adequate job is in part informed by your

19  understanding that he had only -- that my client

20  required him to start and finish all his due

21  diligence in one week, right?

22      A.  Yes.  That was focusing on the scope of

23  the work that specified work to be performed and the

24  timeline of the work.

25        MR. ALFORD:  Okay.  Let's take a look at

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    the contract, which is Exhibit 2057.  Let's go to

2    page 2057-4, Ted, please, under Section Roman III,

3    term of agreement.  If we could blow up that first

4    paragraph.  Under "term of agreement."

5    BY MR. ALFORD:

6        Q.  I think this is the -- the language you're

7    talking about in the contract that leads you to

8    conclude Bleck did an adequate job because my client

9    required him to start and finish all of his due

10   diligence work within one week, right?

11       A.  That's what I understood.

12       Q.  Right.

13           And so let's read that language.  It says

14   (as read):

15              A, indefinite period.

16       Do you see that?

17       A.  Yes, I see that.

18       Q.  (As read):

19              This agreement will begin on

20          the date of the last signature

21          below (the start date) --

22          Let me pause there for a second actually.

23   Let's go back and look at the start date.  Well, the

24   last signature below.  If you could look at

25   page 2057-8.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1         Do you see that?

2      A.   Yes.

3      Q.   And it indicates that this agreement was

4   signed on May 18, right?

5      A.   That is what page 18 indicates, yeah,

6   May 18.

7      Q.   You're aware Mr. Bleck had been working on

8   the due diligence project for at least a week and a

9   half prior to May 18, right?

10      A.   He did sometime prior from the discussion

11   that was going on before that from approximately

12   maybe ten days prior, something like that.

13      Q.   Right.

14         So --

15      A.   Yeah.

16      Q.   -- as of the date this contract was

17   signed, you understood Mr. Bleck had already been

18   working on the due diligence projects for about ten

19   days, right?

20      A.   He -- from what I understand, he was

21   informed of the due diligence project, and he did

22   some preliminary work, such as meeting with

23   Mr. Reddy for one hour to understand the technology.

24   And as of the time that this contract was signed, he

25   had one page kind of outline of what his diligence

TRANSCRIPT OF PROCEEDINGS

1    report is going to delve into that he shared with

2    Coinmint.

3        Q.   Right.

4            And so you would agree with me, would you

5    not, that he'd already been working for more than a

6    week on the due diligence before the contract was

7    even signed, right?

8        A.   I don't know how much he actually -- how

9    much actual work he put on, but a discussion has

10   been going for over a week.  That's what I do know.

11       Q.   Right.

12           So it's not your testimony here today

13   that, in fact, Mr. Bleck was required to and did

14   complete all of his due diligence work within one

15   week, right?  That's not your testimony?

16       A.   Well, if I read the contract here, it says

17   that the term of the agreement shall remain in force

18   for an indefinite period, but it is expected to

19   terminate no later than seven days from the start

20   date, which is May 18.

21           So there was about a week.  This is what

22   made me believe that he really had just one week of

23   time to complete his due diligence report.

24       Q.   Other than this contract, you've seen no

25   correspondence from anyone at Coinmint saying to

1   Mr. Bleck, hey, you got to get this done ASAP?  You

2   haven't seen that correspondence, have you?

3       A.  I did -- I don't remember, because I --

4   like I said, I really wasn't focused on the

5   correspondence between third parties.  But I do

6   vaguely recall there was some discussion, is the

7   report coming and things of that nature.  And

8   Mr. Bleck actually reminding Mr. Reddy that he

9   needed input so that he can send his report.  That

10   makes me think that Mr. Bleck had awareness of a

11   deadline that he needed to fulfill.

12      Q.  In fact, you've seen a large number of

13   texts among the principals of Katena in which they

14   discuss their plan to put a great deal of time

15   pressure on Bleck to get his report done

16   immediately, haven't you?

17      A.  I have seen texts and didn't really use

18   those texts as a basis for my opinions.

19      Q.  Okay.  Let's ask -- I want to ask you a

20   question about some of those texts.

21          ARBITRATOR CALLAHAN:  Are these texts

22   we've viewed before?

23          MR. ALFORD:  I think so.

24          ARBITRATOR CALLAHAN:  Okay.  So let's be

25   quick through them.

1          MR. ALFORD:  I promise I will.  But this

2     is an important part of his opinion that he --

3          ARBITRATOR CALLAHAN:  I haven't heard that

4     yet.  I heard the contrary, that it wasn't a

5     pertinent part.  If you could clarify.

6     Mr. Markovic.

7          THE WITNESS:  Markovic.

8          ARBITRATOR CALLAHAN:  I'm sorry, I keep

9     wanting to call you something else.  I'm having

10     trouble with your last name.

11          Mr. Markovic, you've testified having

12     reviewed some texts and emails.

13          THE WITNESS:  Yes.  That's correct.

14          ARBITRATOR CALLAHAN:  Was your review of

15     those texts and emails material to any of the

16     opinions you've expressed, rebuttal or in your

17     direct report?

18          THE WITNESS:  No.

19          MR. ALFORD:  I think -- but it's

20     different, though, because he's testified clearly

21     that a key part of his opinions is that his view

22     that my client put time pressure on Mr. Bleck.

23          ARBITRATOR CALLAHAN:  I didn't hear that.

24     Is that an opinion?

25          THE WITNESS:  No.  I just am reading the

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   contract to form my understanding based on the

2   contract and what Mr. Bleck testified --

3          ARBITRATOR CALLAHAN:  I don't believe he's

4   offered an opinion, quite frankly, nor would the

5   panel take Mr. Markovic's opinion about how to

6   construe any of the contract documents at issue in

7   this case.  That is not why he's here.  We do not

8   need him to tell us how to construe any contract

9   document.

10          MR. ALFORD:  Okay.

11          ARBITRATOR CALLAHAN:  To the extent he

12   made an assumption, I hear you've asked him what's

13   the basis for your assumption there was a time

14   pressure, he said this section of the agreement.

15          MR. ALFORD:  Right.

16          ARBITRATOR CALLAHAN:  You've shown how

17   maybe that -- there's something else, and --

18          MR. ALFORD:  Well --

19          ARBITRATOR CALLAHAN:  Now where are we

20   going with it.

21          MR. ALFORD:  I was going to show how there

22   was something else, but you don't want me to do

23   that.

24          ARBITRATOR CALLAHAN:  I'm asking what the

25   purpose is when Mr. Markovic has said it wasn't

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    material to any of his opinions.

2         MR. ALFORD:  Okay.  Let me ask the

3    question this way.

4         ARBITRATOR CALLAHAN:  You can spend your

5    time as you wish, but there is a cutoff that's

6    coming.  You can spend your time however you wish.

7    I'm just trying to show -- let me finish,

8    Mr. Alford -- that Mr. Markovic hasn't said anything

9    yet that I've heard.  In fact, he seems to have said

10   it wasn't pertinent to his opinions, and the panel

11   is trying to drill down on and understand the

12   opinions and the basis therefore, and understand

13   where the weakness, where the conflicts.

14         And when an expert says, well, that's not

15   really pertinent to my opinion, then we're, like,

16   well, what are we doing with it?

17         MR. ALFORD:  I hear you.  Thank you.  Let

18   me --

19         ARBITRATOR CALLAHAN:  Maybe your expert

20   may say this is very material, and then we're going

21   to perk up, and go, oh, please tell us how.  Your

22   expert may say this was very material, and we're

23   going to need to know more.  When an expert says

24   this really has nothing to do with my opinion, we're

25   like, oh, what do we do with that?  That's why I'm

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   asking.

2        MR. ALFORD:  I guess the question is

3   whether it should have something to do with his

4   opinion.  I think we can maybe get beyond this with

5   one question.  I'm going to try.

6        ARBITRATOR CALLAHAN:  We're not here to

7   argue with your experts.

8        MR. ALFORD:  No.  No.

9        ARBITRATOR CALLAHAN:  That's the purpose

10   of the dueling experts.  The way to argue with the

11   expert is to say there's another way to look at

12   this.

13        MR. ALFORD:  Okay.

14        ARBITRATOR CALLAHAN:  Not to take issue

15   with the expert as he's in the chair.

16        MR. HARDIN:  May I ask how much time is

17   left?

18        ARBITRATOR CALLAHAN:  Yeah.  Probably

19   about 25, 30 minutes.

20        MR. HARDIN:  Thank you.

21   BY MR. ALFORD:

22     Q.   Is it a material part of your -- let me

23   ask you this:  Is it your opinion that one of the

24   reasons Mr. -- you believe Mr. Bleck did an adequate

25   job on his due diligence is because my client

1   imposed time limitations on the amount of work he

2   could spend on the project?

3       A.   I guess -- I think I can agree to that,

4   just looking into the scope of work what was

5   provided in the contract and the timeline and his

6   full-time job at Microsoft, I believe he was at

7   Microsoft.  That's how much time he had available to

8   perform his due diligence.

9       Q.   Okay.  But just to be clear, in forming

10   that opinion, you have not considered any text

11   messages or other materials from the Katena side

12   that might suggest the Katena people were putting

13   time pressure on him?  You've not considered this?

14       A.   I found quite a contrary in the emails

15   between Mr. Reddy and Mr. Bleck, not text messages,

16   but emails that I kept to review, emails with a

17   little bit more attention because they included

18   attachments, such as Katena technical report,

19   March 2021, in which on, May 21st, Mr. Bleck asks a

20   question by email to Mr. Reddy, can you provide some

21   clarity on the qualification and reliability part.

22            And one week later, after Mr. Reddy did

23   not respond to that, he said, last chance before I

24   send it out.  And Mr. Reddy said, just send it out.

25   All good.  So that basically means that if Katena

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   were putting any pressure, Mr. Reddy would have been

2   pressuring Mr. Bleck, but instead, he waited for a

3   whole week without response, and Mr. Bleck was the

4   one who was kind of in a hurry to get it out.

5       Q.   Okay.  Let's -- I want to briefly explore

6   this.

7           ARBITRATOR CALLAHAN:  That's fine.

8           MR. ALFORD:  Let's take a look at

9   Exhibit 24.  This is -- can you blow it up a little,

10  Ted.

11  BY MR. ALFORD:

12      Q.   This is a series of text exchanges between

13  Mr. Gao, Mr. Monzon and Mr. Reddy dated May 14,

14  2021.

15          Do you see that, Exhibit 24?

16      A.   Yes, I see that.  I see it only in

17  electronic version.  I don't have it in hard copy,

18  but it's fine.

19      Q.   Okay.  You understand that Mr. Bleck was

20  working on his due diligence work during the time

21  period -- time period of May 14, right?

22      A.   As I stated before, I understood that

23  Mr. Bleck had preliminary discussion with Mr. Reddy

24  about technology and expected due diligence work.

25      Q.   My question was a little different,

TRANSCRIPT OF PROCEEDINGS

1   simpler in a way.  You understand that as of May 14,

2   2021, Mr. Bleck was working on his due diligence

3   project, correct?

4       A.   I understand he had an hour of

5   conversation with Mr. Reddy.  Whether he was working

6   on due diligence project or not, I don't know.

7       Q.   So you don't know whether -- that May 14

8   was within the time frame Mr. Bleck was working on

9   his report?  You don't know?

10      A.   I don't know.

11      Q.   Okay.  But let's take a look at this text

12   where Mr. Reddy says (as read):

13           Just had an hour-long

14           conversation with him.  Helped him

15           with what the report should be, et

16           cetera.  I was not very happy with

17           what he had.

18           Do you see that?

19      A.   I see that, yes.

20      Q.   Then there's a "what did he have before?"

21   from Mr. Gao.

22           Do you see that?

23      A.   Yes, I see that.

24      Q.   Mr. Reddy says (as read):

25           It was two floral, too much

TRANSCRIPT OF PROCEEDINGS

1          architecture, et cetera, wanted to

2          steer the whole thing to ASIC

3          viability.

4          Do you see that?

5     A.   Yes.

6     Q.   This is one of the documents you've seen

7   in the course of your work in this case, right?

8     A.   Yes, I have seen it.

9     Q.   But it's not one that in any way

10   influenced your opinions?

11     A.   No.  In the end, it was about ASIC

12   viability and that's what I focused on.

13     Q.   Mr. Monzon says (as read):

14          Remember the Coinmint audience

15          won't understand, blank, anyway.

16          Right?

17     A.   I see that.

18     Q.   Second page, 24-2, Mr. Monzon says (as

19   read):

20          When is the final version

21          being completed by Robert?  Are you

22          checking final version 2?  Note

23          that wire is expected Tuesday

24          assuming all goes well.

25          Right?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1      A.  I see that, yes.

2      Q.   Mr. Gao has a response with a phone

3    number, and Mr. Reddy says (as read):

4              I am pressuring him as much as

5          I can to get it done.  I didn't

6          receive anything last night, so

7          hopefully by tonight.

8          Do you see that?

9      A.  Yes, I see that.

10     Q.   That text you've seen before in the course

11   of your work in this case, right?

12     A.  Yes.  I've seen that text.

13     Q.   It didn't influence your opinions at all

14   about who was putting time pressure on Mr. Bleck,

15   right?

16     A.  No.  Because like I said, I really focused

17   on the technology assessment.

18     Q.   Let's take a look at Exhibit 11.

19          MR. TABER:  That will be in the same

20   binder.

21          THE WITNESS:  Same binder, thank you.

22   BY MR. ALFORD:

23     Q.   Page 10.  This is an exchange of texts

24   between Mr. Monzon, Mr. Gao and Mr. Reddy dated

25   May 5, 2021, right?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1     A.  Yeah.  I see the date.

2     Q.  This is one of the text messages you've

3  seen, at least in the course of your work in this

4  case, right?

5     A.  Yes.

6     Q.  And in the text message I referred to

7  earlier where Mr. Monzon, Mr. Gao and Mr. Reddy talk

8  about changing the LinkedIn for Mr. Reddy,

9  correct -- Mr. Bleck, right?

10    A.  I don't see that on page 10.

11    Q.  Right.

12       Take a look at page 3, 11-3.

13    A.  Page 3?  Okay.

14    Q.  Where Mr. Reddy says (as read):

15       Spoke to Robert.  He removed

16       four from his LinkedIn profile.

17       Website stuff happening.  Will

18       update once removed.

19       Right?

20    A.  Yes, I see that.

21    Q.  That was something, though, that you saw

22  in the course of your work, but didn't influence

23  your opinions, right?

24    A.  It didn't because it was not technical.

25    Q.  Let's take a look at page 10 of that same

1   exhibit.

2         Do you see where Mr. Gao, about halfway

3   down, has a phone number and says (as read):

4              If he can sign today, he can

5          come in tomorrow and Friday give

6          thumbs up.  That's the timeline we

7          need.  Anything else is too slow.

8         Do you see that?

9   A.  I see that, yes.

10   Q.   This is a text string you've seen in the

11   course of your work in this case, but doesn't

12   influence your opinions at all, right?

13   A.   No.  It just reinforces about the week

14   timeline or so, give or take.  Doesn't really change

15   the technology.

16   Q.   Let's go back to the contract, which is

17   Exhibit 2057.  Bless you.  And let's take a look at

18   page 2057-3.  It's Bates page 4149 under the

19   Section D, responsibility of independent contractor.

20         Do you see that?

21   A.   Yes, I see Section D.

22   Q.   And you reviewed this contract in the

23   course of forming your opinions in this case?

24   A.   I did not really review all the fine

25   detail carefully of this contract because, again,

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  this is logistics.  It has no material impact on the

2  review of the stated technology.

3      Q.  Well, I know you told us earlier that in

4  your view, the section Roman III on term of the

5  agreement that talks about indefinite period, that

6  did play a role in your opinions, right?

7      A.  I happened to catch that section because

8  it spoke about a timeline that everybody else was

9  discussing.  So I just looked into and found, yes,

10  there was -- my understanding, there was about a

11  week of time available.

12      Q.  Well, did this section, responsibility of

13  independent contractor, catch your attention when

14  you read the contract?

15      A.  It's a standard section in contracts.

16      Q.  Is the indefinite period section also

17  standard in the contract?

18      A.  Indefinite, I wouldn't say indefinite, but

19  there is typically some term of the agreement that

20  is also standard.

21      Q.  Section D says that the responsibility of

22  the independent contractor is to, among other

23  things, act in the best interest of the company,

24  right?  The last line of Section D1?

25      A.  Oh, D1.  I'm sorry, I was looking at D7.

1      Yes, I see that.

2      Q.   And you would agree with me that Mr. Bleck

3   was supposed to be acting in the best interests of

4   his -- of the company, Coinmint, and not in the best

5   interest of Katena or DXCorr, right?

6      A.   Yeah.  He was hired by Coinmint.

7      Q.   Was supposed to be acting in Coinmint's

8   best interest, right?

9      A.   Yes.

10     Q.   Okay.  Let's take a look at Exhibit 14.

11   This is a series of text messages -- I'm sorry,

12   emails, thank you -- emails between Mr. Reddy and

13   Mr. Bleck in May of 2021, correct?

14     A.   Yes.

15     Q.   And these are some documents you've seen

16   in the course of your work in this case, right?

17     A.   Yes.  I have seen some of these documents.

18     Q.   They're kind of jumbled together in terms

19   of chronologically, but if we start from the back --

20   actually, starting from the -- from the front, the

21   very beginning of the email, page 14-1, it looks

22   like Mr. -- Mr. Reddy gave some slides to Mr. Bleck,

23   right?

24     A.   Yes.  I see that.

25     Q.   And then if you go back to the very end of

TRANSCRIPT OF PROCEEDINGS

1   the document, page 14-4, it indicates that Mr. Bleck

2   sent Mr. Reddy the intro, one page summary, and said

3   that (as read):

4           I will even copy snippets from

5       your material into this one.

6       Right?  Do you see that?

7   A.  Yes, I see that.

8   Q.  He says (as read):

9           Comment/update on the summary

10      table, as I get the feeling that is

11      all Mike and company will look at.

12      Right?

13  A.  Yes, I see it.

14   Q.   And you saw this email in the course of

15  forming your opinions in this case, but it played no

16  role in your opinions, right?

17   A.   Right.  No role.  It's common to ask

18  questions about technology and make sure that it

19  represents accurate account --

20  Q.  Okay.

21  A.  -- on the complex technology.

22   Q.   And at the bottom of page 14-3, there's an

23  email at the very bottom from Mr. Bleck to Mr. Reddy

24  that says (as read):

25          Here's the current deck.  You

TRANSCRIPT OF PROCEEDINGS

1        can see the flow and style I'm

2        going for (high level marketing

3        bullets with pictures for each

4        area.)  Need some help with a

5        couple bullets on design

6        methodology specifics and

7        qual/rel --

8        Is that reliability for --

9    A.  I think, yeah.

10   Q.  (As read):

11          Qual/reliability test plan

12       bullets.

13       Do you see that?

14   A.  Yes.

15   Q.  And you reviewed this email exchange in

16  the course of your work in this case, but it played

17  no part in your opinions?

18   A.  No.  This was just asking for technical

19  input about qualification reliability test plans.

20   Q.  Is it -- would you agree with the

21  suggestion here in Mr. Bleck's email that the -- his

22  report was high level marketing bullets?  Is that

23  how you would describe it, high level marketing

24  bullets?

25   A.  I wouldn't -- that's how he described it.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   I don't know what he meant by that.  I would call

2   this report a high level feasibility assessment.

3        Q.   You wouldn't agree it's marketing bullets?

4        A.   I wouldn't call it marketing bullets.

5        Q.   Okay.

6        A.   I would say feasibility assessment.

7        Q.   But the fact that Mr. Bleck apparently

8   referred to his report as high level marketing

9   bullets doesn't influence your opinion in this case?

10       A.   No.  He spoke about technology.  The way

11   he characterized it, I don't know what he meant by

12   that.

13       Q.   And then Mr. Reddy responds (as read):

14             Let me try to fill out some of

15          the reliability stuff.

16          Right?

17       A.   Yes, he says that.

18       Q.   You would agree with me that this

19   indicates that Mr. Reddy wrote some of Mr. Bleck's

20   report, right?

21       A.   No, it doesn't.

22       Q.   Okay.  And there's nothing about that text

23   exchange that influences your opinion -- that email

24   exchange influences your opinions in any way of the

25   case, right?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    A.   No.  I can see that request for technical

2    information, and in the end, reliability and qual

3    test plans didn't really come from Mr. -- Mr. Reddy.

4    Q.   Here we go.  Let's take a look for a

5    minute at Mr. Bleck's report.  It's Exhibit 12.

6    A.   Okay.

7    Q.   Let's go to page 12-2 where it says K10

8    assessment summary.

9         Am I understanding this correctly that

10   this is the portion of the report that Mr. Bleck

11   said he thought this was the only part Mike and

12   company were going to look at?

13   A.   In the relation to the previous text?

14   Q.   Yes.

15   A.   Yes.  This was my understanding.  This

16   would be kind of executive summary, one-page tell

17   all kind of.

18   Q.   This was the part that Mr. Bleck appeared

19   to be saying this is the only part Mike's going to

20   look at anyway, I think, right?

21   A.   That's what I understood.

22   Q.   Okay.  And each and every one of those

23   areas of focus, for each and every one of those

24   areas of focus on this page, Mr. Bleck concluded

25   that the risk was low, low, low, low, low, low, low,

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    low, right?

2        A.   Yes, I see that.

3        Q.   And you -- it's your professional opinion

4    that he had a sound basis for concluding that each

5    one of those areas of focus was low risk and just

6    5.83 hours of work?

7        A.   Yes.

8        Q.   Now, we know now, don't we, with the

9    benefit of hindsight, that those risks all turned

10   out to be 100 percent, didn't they?

11       A.   No.  I disagree with that.

12       Q.   Okay.  I apologize if I asked this before,

13   but the tapeout database is kind of the very last

14   thing that -- the very last step before the foundry

15   starts manufacturing chips, right?

16       A.   Yes.

17       Q.   And that, so far as you know at least,

18   doesn't exist in final form for the K10 chip, right?

19           Bless you.

20           MR. HARDIN:  Sorry.  Thanks.

21           THE WITNESS:  I understood, as you

22   mentioned, to the reference of a mock tapeout that

23   was mentioned that that was indeed the final

24   database, and they can only send them the mock

25   tapeout, but without the payment, doesn't become a

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   real tapeout.

2   BY MR. ALFORD:

3       Q.   Did you see anything -- any documentation

4   or correspondence back from the foundry saying,

5   yeah, this mock tapeout meets all of our

6   requirements and we're ready to go to production as

7   soon as you have the money?  Did you see anything

8   like that?

9       A.   No, I have not seen that.

10      Q.   You've been involved in a number of ASIC

11   start-up companies, right?

12      A.   Yes.

13      Q.   Did it strike you as at all odd that

14   Katena has this innovative chip design that is

15   beautifully simple in a way, and is very efficient

16   at mining bitcoin, but apparently, supposedly, can't

17   get the money to get it built?  Did that strike you

18   as odd given your experience in the ASIC start-up

19   world?

20      A.   No, not at all, especially around that

21   time.  Actually, that was a very difficult time for

22   investors as well, as it was in a kind of COVID era

23   economy.  Investors were frozen on the sidelines.

24   They were saving their dry powder for existing deals

25   and not really starting new deals.  So it was very

1   difficult to get venture funding during that time.

2        ARBITRATOR CALLAHAN:  About five more

3   minutes, Mr. Alford.

4        MR. ALFORD:  Yeah.  I think -- yeah, I can

5   do that.  Thank you.

6        ARBITRATOR CALLAHAN:  Okay.

7   BY MR. ALFORD:

8     Q.   Now, nowhere in Mr. Bleck's report does he

9   mention a delivery schedule for a test unit, does

10  he?

11    A.   I don't think so.  I would need to recall,

12  but I don't think that was part of the report.

13    Q.   If you're not sure --

14    A.   Let me refresh on that.

15    Q.   Yeah.  I'd welcome you to look at

16  Exhibit 12.

17    A.   I'll take a quick look.

18        In the assessment summary in 12-2, there

19  is a mention of general industry wide supply

20  constraints in 2021 under semiconductor fabrication

21  partner, no concerns with TSMC.  And under

22  lithography process node, started 12-nanometer at

23  the C, switched to 7 nanometer FF when industry

24  supply is no longer constrained with a node of Apple

25  A12 bionic, which is the application processor from

1   Apple that gobbled up all of the silicon capacity of

2   the 7 nanometer.

3       Q.   So I want to make sure -- thank you for

4   pointing that out.

5           So under these -- on page 12-2, under the

6   assessment summary, the -- the area of focus that's

7   second from the bottom, semiconductor fabrication

8   partner, do you see that?

9       A.   Yes.

10      Q.   That would be the section of the report

11  where, in your view at least, any concerns about the

12  production schedule would have been articulated,

13  right?

14      A.   Potentially, yes.

15      Q.   Yeah.  But even there, despite general

16  industry-wide supply constraints, Mr. Bleck has

17  included risk, low, right?

18      A.   He included the risk low for semiconductor

19  fabrication partner --

20      Q.   Right.

21      A.   -- which is TSMC.  And I like to say

22  nobody gets fired from buying chips from TSMC.

23      Q.   Have you seen anything anywhere in

24  Mr. Bleck's report where he says -- I'm not asking

25  you whether this is an exact quote, but he says in

TRANSCRIPT OF PROCEEDINGS

1    effect, hey, heads up, I don't know if Katena DXCorr

2    are going to be able to produce a working test unit

3    mining rig by September given the supply

4    constraints?

5          MR. HARDIN:  Objection.  Vague and

6    ambiguous.

7          ARBITRATOR CALLAHAN:  If you understand

8    the question, Mr. Markovic, you can answer.  If you

9    need some clarification, please ask.

10          THE WITNESS:  I understand the question.

11          I haven't seen that, and that wasn't part

12    of Mr. Bleck's assignment.  The contract logistics

13    and the delivery schedule, it was feasibility,

14    manufacturing partner, plant for production volume.

15    BY MR. ALFORD:

16      Q.   Well, as -- as the customer on -- if you

17    were the customer on this side of this transaction,

18    you'd want to know, hey, Mr. Bleck, are they likely

19    to be able to perform the contract on time.  That's

20    what you'd want to know, right?

21      A.   Yes.  And if I were a customer, I would

22    ask that question, but I don't see that question

23    asked.

24      Q.   Do you see Mr. Bleck ask that question?

25      A.   No.  It was not scope of his work.

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1     Q.  Okay.  Wasn't Mr. Bleck's job to let

2  Coinmint know the risk of whether or not Katena is

3  going to be able to perform on time?

4         MR. HARDIN:  Objection.  This is asking

5  him to construe the contract at this stage.

6         ARBITRATOR CALLAHAN:  Well, as part of due

7  diligence, because I think that's the context,

8  Mr. Alford.

9         MR. ALFORD:  Yeah.

10         ARBITRATOR CALLAHAN:  Part of doing the

11  feasibility assessment.  In that context,

12  Mr. Markovic.

13         THE WITNESS:  Yes, I believe Mr. Bleck was

14  not aware of the timeline and, in fact, it's

15  customary, when you submit a final report, to have a

16  follow-up meeting to present that report and ask --

17  answer any questions.  And from what I understand,

18  Mr. Bleck's email to Coinmint stated here's my

19  report, let me know when you can discuss.  I'm

20  available these days.  And he heard nothing back.

21  BY MR. ALFORD:

22     Q.  What's your basis for that?

23     A.  Email.  Email train.

24     Q.  Okay.  Do you have any basis for knowing

25  whether Mr. Maloney discussed the report with

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   Mr. Bleck after it was done?

2       A.   I don't know.

3       Q.   Yeah.

4       A.   I can see what I can see from the

5   documents, but I don't know what they discussed

6   internally.

7       Q.   Is it important for someone in Mr. Bleck's

8   shoes doing this kind of due diligence to inform

9   himself or herself about what the contract requires

10   so they can help their customer assess the risks

11   about whether the target is going to be able to

12   comply with the contract requirements?

13       A.   No.  It's the customer driven, like we

14   discussed before.  The customer clearly put the

15   statement to work that Mr. Bleck responded to.

16       Q.   And you would agree with me that since

17   it's customer driven, the customer is entitled to

18   say, I want someone who's independent and has no

19   affiliation with the target, right?  The customer is

20   entitled to say that?

21       A.   That's up to the customer, yeah.

22       Q.   Right.

23       A.   If they wish to say that, they can say

24   that.

25           ARBITRATOR CALLAHAN:  We are actually

1   beyond the additional five minutes.

2        MR. ALFORD:  Then I will -- that's fine.

3   We'll --

4        ARBITRATOR CALLAHAN:  All right.

5        MR. ALFORD:  -- yield.

6        ARBITRATOR CALLAHAN:  All right.

7   Mr. Hardin -- what I'd like us to do is let's finish

8   up with any cleanup questions you may have for

9   Mr. Markovic.  Mr. Markovic is coming back tomorrow.

10       MR. HARDIN:  Yes, ma'am.

11       ARBITRATOR CALLAHAN:  Bearing in mind that

12   and the fact that the panel is reserving until

13   tomorrow afternoon to ask questions of Mr. Markovic

14   and Mr. Pflaum.  My expectation is that counsel will

15   finish up with Mr. Markovic by about 4:15, 4:20 so

16   we can then take a short break and start with

17   Mr. Pflaum for an hour, get your direct done, and

18   then tomorrow morning start with your cross.

19       MR. HARDIN:  Okay.  I may personally need

20   a couple minutes.

21       ARBITRATOR CALLAHAN:  You can with the

22   caveat that it's a couple of minutes.  Because we

23   cannot keep taking two and a half hours of breaks

24   and getting six hours of evidence time.

25       MR. HARDIN:  No one will go into our

1   conference room.  How about that?

2        ARBITRATOR CALLAHAN:  Okay.  Perfect.

3        MR. HARDIN:  Couple minutes.

4        ARBITRATOR CALLAHAN:  Yeah.  Couple

5   minutes.

6          (Whereupon, a recess was taken from

7          3:47 p.m. to 3:54 p.m.)

8            REDIRECT EXAMINATION

9   BY MR. HARDIN:

10      Q.  Okay.  First, Professor, let's start with

11  Exhibit 2003.  Okay.  Do you have that?

12      A.  Yeah.

13      MR. HARDIN:  Michelle, could you pull up

14  2003, please.

15  BY MR. HARDIN:

16      Q.  Let's see.  IMEC contract, right?

17      A.  (Nods head.)

18      Q.  Can you --

19        MR. HARDIN:  Michelle, can you go to the

20  terms and conditions, and specifically the clause

21  2 -- excuse me, the bullet point 2 and the item 2.

22        Keep scrolling, Michelle.  It's in the

23  fine print.  Keep scrolling down.

24        ARBITRATOR CALLAHAN:  Oh, none of us can

25  read it.

1        MR. HARDIN:  That's why I was --

2        ARBITRATOR CALLAHAN:  It's even further.

3    It's on 8, 9.  You want the really tiny stuff.

4        MR. HARDIN:  I don't have my copy.

5        ARBITRATOR CALLAHAN:  What paragraph?

6        MR. HARDIN:  There we go -- Michelle, do

7    you see the second paragraph?  Can we scroll in on

8    that, because --

9        ARBITRATOR CALLAHAN:  Is it Number 2 where

10   it says "purchase orders"?

11       MR. HARDIN:  Yeah.

12   BY MR. HARDIN:

13     Q.   So Professor Markovic, point us to the

14   particular clause, please.  It may not be up on the

15   screen.  Can you take a look at the --

16     A.   Yes.

17       ARBITRATOR CALLAHAN:  What's the question?

18       MR. TABER:  Right now I've asked him to

19   point us to the correct paragraph number so that

20   Michelle can pull it up.  And unfortunately --

21       ARBITRATOR CALLAHAN:  In response to what?

22       MR. HARDIN:  Professor Markovic -- let's

23   go to page 6 of 10.  Michelle, go to page 6 of 10

24   back where you were going to go.

25       MR. ALFORD:  What's the Bates number of

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   the page?

2       ARBITRATOR CALLAHAN:  1561.

3       MR. ALFORD:  1561.  Thank you.

4   BY MR. HARDIN:

5       Q.   Should be 2003-6.  Do you see the payment

6   term?

7       A.   Yes.  Payment term.

8       Q.   That's what you were discussing earlier?

9       A.   Yes.

10      Q.   Is this -- so first, is this consistent

11  with your experience?

12      MR. ALFORD:  Vague and ambiguous.

13      ARBITRATOR CALLAHAN:  Is what?

14  BY MR. HARDIN:

15      Q.   Are the terms that you read here, are they

16  consistent with your experience in taking out chips?

17      A.   I would say these terms are consistent in

18  a way that there is an upfront payment required to

19  secure a slot.  These particular terms in the

20  commercial setting I mentioned previously,

21  accounting, and chief executives deal with that.  On

22  the academic side, I mentioned one experience in

23  which was a 52-week lead time, and they need to make

24  all these wafers, but in order to start making them,

25  we have to pay up front.  So I'm not surprised to

TRANSCRIPT OF PROCEEDINGS

1    see these terms.

2      Q.   All right.  You said earlier you were

3    talking about an instance in which you had an entity

4    run up against these terms as well, right?

5          ARBITRATOR CALLAHAN:  Mr. Hardin, you need

6    to speak up.  You're --

7    BY MR. HARDIN:

8      Q.   Is that a "yes"?

9      A.   Yes.

10     Q.   Is that on the academic or the commercial

11   side?

12     A.   That was on the academic side.

13     Q.   On the commercial side, do you deal with

14   this issue?

15     A.   I do not --

16         MR. ALFORD:  I'm sorry.  Objection.  Vague

17   and ambiguous.  Deal with --

18         ARBITRATOR CALLAHAN:  If you understand

19   the question, you can answer, Mr. Markovic.

20         THE WITNESS:  Yes.  I understood the

21   question.

22         I'm aware of the discussions that go about

23   logistics, but I am not in the process, involved

24   actively in the process of kind of sorting it out.

25   / /

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   BY MR. HARDIN:

2      Q.   All right.  So in a commercial setting,

3   that would be more for your CEO?

4      A.   Yes.

5      Q.   Okay.  Let's turn to paragraph 27 of your

6   report.  And I'm sorry, I'm afraid I don't remember

7   what number it is.

8         ARBITRATOR CALLAHAN:  It's 1182.  Oh, no,

9   that's the rebuttal.  Excuse me.  1181.

10  BY MR. HARDIN:

11     Q.   1181, paragraph 27.

12        MR. ALFORD:  Hang on one sec.  1181.

13  Page 1181-27.

14  BY MR. HARDIN:

15     Q.   There was some discussion earlier about

16  whether you reviewed the PNR database.

17     A.   Yes.  I remember that.

18     Q.   First, why didn't you review the PNR

19  database?

20     A.   Because I didn't need to.

21     Q.   Why?

22     A.   PNR database, as far as the DRC goes, like

23  I mentioned, is the standard last step of taking out

24  a chip.  And like I mentioned before, the most

25  important three things is functionality, add

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    performance and power efficiency.  Once all of that

2    is settled and we have LVS reports and functionally

3    correct post-layout construction, SPICE level

4    simulations, then doing a DRC is just the last

5    mundane step that is never an issue.

6        Q.   Okay.  And so in your experience, you

7    don't need to review that because that's not a place

8    where issues occur in this process?

9        A.   Usually not.

10       Q.   One other item before we start down this.

11           You attended Mr. Bleck's testimony, right?

12       A.   Yes.

13       Q.   And you attended Mr. Reddy's testimony,

14   right?

15       A.   Yes, I have.

16       Q.   And I want to be clear about this.  You

17   didn't send someone else to attend it; you attend

18   it, right?

19       A.   Yes, that was me.

20       Q.   So you heard firsthand Mr. Bleck's

21   testimony, right?

22       A.   I have, yes.

23       Q.   Did you hear Mr. Bleck testify that he

24   disclosed his knowledge of DXCorr's past

25   relationship with DXCorr?

 1          MR. ALFORD:  I object, I thought we were

 2    all supposed to be off the record whenever we talk

 3    about this.

 4          MR. HARDIN:  Sure.  Off the record.

 5          MR. ALFORD:  We can't have two standards.

 6          ARBITRATOR CALLAHAN:  All right.  We are

 7    off the record.  Go ahead.

 8          (Discussion held off record.)

 9          MR. HARDIN:  Go back on the record.

10    BY MR. HARDIN:

11       Q.   With respect to paragraph 27, I think you

12    were asked if you actually saw the testing plan, for

13    example?

14       A.   Right.

15       Q.   Did you see the testing plan?

16       A.   I saw the demonstration of the functional

17    test with the test factors and how the report

18    indicated that chip met the functionality, so I

19    didn't need to see any detailed plan beyond that.

20       Q.   But I think the implication was, without

21    seeing the actual testing plan, how do you know that

22    it really exists?

23          MR. ALFORD:  Objection, about implication.

24          ARBITRATOR CALLAHAN:  Could you please

25    restate -- just ask him the question.

1          MR. HARDIN:  Sure.  Sure.

2          MR. ALFORD:  Counsel testifying.

3    BY MR. HARDIN:

4      Q.   Without -- without seeing the testing plan

5    itself, how do you know it really exists?

6      A.   The results of the test report showing the

7    functional chip is demonstration of the outcome.  So

8    that is driven by testing -- testing plan.

9      Q.   As someone who has actually done

10   feasibility assessments, would you actually ask to

11   see the testing plan?

12     A.   Usually not.  You might ask specific

13   questions as to particular aspects of performance

14   and tests, like Mr. Bleck challenged Mr. Reddy with

15   that very unlikely corner case, things like that can

16   happen.

17     Q.   Yeah.

18          Did you see any information about -- I'm

19   trying to remember what was asked.

20          Are there any other aspects of

21   paragraph 27 that you needed to see anything further

22   than what you did review?

23     A.   No.  And this is why I talked to

24   Mr. Reddy, to understand how did it all work between

25   Katena and DXCorr, because he gather all in both.

1    And how did system integration work, which I

2    discovered was the part team in China, making

3    specifications for the chip.  That was this outside

4    in approach, and DXCorr was a vendor to do inside

5    out just to give a chip and deliver it up for Katena

6    team for final assembly of the miners.

7        Q.   Is that common in feasibility assessments

8    to ask the chip designer?

9        A.   Yes.  That's how you find out about the

10   chip.

11       Q.    Would it be common to do any further steps

12   to -- to validate the answers from the chip

13   designer?

14       A.   Usually, you don't.  Sometimes you may

15   want to see particular aspects, organize a telecom,

16   see the screen shots because, again, we all need to

17   appreciate that any one of these details can take,

18   you know, weeks to generate these various simulation

19   runs, reports.  You can just go and review those

20   final reports and say how did you get timing

21   estimate to make sure your chip works at the

22   gigahertz, how did you measure power consumption,

23   what's included in that power budget, what is the

24   silicon area, those kinds of things you want to see.

25   Can I see from the report the breakdown area in your

1    functional units, things like that you can ask and

2    get easy access to.

3        Q.   And then the mock tapeout database, why

4    did you not go look at it?

5        A.   I didn't need to because I felt the

6    frustration from Mr. Reddy's team that they've done

7    so much engineering work, and he felt his

8    credibility was on the line that he jeopardized his

9    credentials with IMEC and long working relationship,

10   that to face the kind of -- you know, the

11   engineering pride.  They said, well, we give them

12   the mock tapeout to show we have actually done it,

13   but the real hurdle is we weren't getting any money,

14   we couldn't put an order in.

15         When they asked us what can we do to make

16   them make it clear it wasn't about technology, here

17   is a mock tapeout, we are ready, but we have

18   logistical issues on our end.

19       Q.   Okay.

20         MR. HARDIN:  As I understand, this is just

21   small cleanup, right?

22         ARBITRATOR CALLAHAN:  Correct.  Correct.

23         MR. HARDIN:  We'll pass.

24         ARBITRATOR CALLAHAN:  Okay.  That's 4:07.

25   Mr. Alford, another ten minutes, and then we'll take

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1    a short break.

2          MR. ALFORD:  I may not even take that.

3          ARBITRATOR CALLAHAN:  Okay.

4          MR. ALFORD:  I may surprise you for once.

5          ARBITRATOR CALLAHAN:  No.  No.  No.

6                RECROSS-EXAMINATION

7    BY MR. ALFORD:

8        Q.   You testified earlier, I think, in

9    response to Mr. Hardin's questions that energy

10   efficiency was one of the most important elements

11   for Mr. Bleck to address in his report, right?

12       A.   Yes.

13       Q.   But you would agree with me that one

14   critically important element the customer would want

15   to know and want Mr. Bleck to address is, does

16   Katena actually have the capability of producing a

17   working mining rig on the schedule identified in the

18   contract.  That would be really important for the

19   due diligence person to address, right?

20       A.   That wasn't part of the scope of work for

21   Mr. Bleck.

22       Q.   Okay.  Well, you would agree with me,

23   would you not, that it would be very important from

24   the customer perspective for Mr. Bleck to address

25   the question of whether these chips can be available

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1    on time to make a working test unit of a mining rig

2    by the time specified in the contract, which you

3    indicated was September, right?

4        A.  Yeah.  That, again, goes into contract,

5    which is outside the scope of technical diligence

6    Mr. Bleck was hired for.

7        Q.  Okay.  So you don't think it was any part

8    of Mr. Bleck's responsibility to opine on the

9    question of whether Katena was likely to, in fact,

10   be able to deliver chips in time to get a working

11   mining rig by the September date specified in the

12   contract?  Not part of his assignment?

13       A.  Correct.  And he had fiduciary duty to his

14   client, and he did exactly what the client asked him

15   to do.

16       Q.  You say you saw some evidence that

17   Mr. Bleck claims he disclosed his connection to

18   DXCorr, right?

19       A.  Yes, I remember him talking about that.

20          MR. ALFORD:  Well, let's see.  I guess we

21   have to go off the record.

22          ARBITRATOR CALLAHAN:  Off the record.

23           (Discussion held off record.)

24          MR. ALFORD:  Back on the record.

25   //

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   BY MR. ALFORD:

2       Q.   Do you -- can you explain to us why, if --

3           MR. ALFORD:  I'm sorry, I just realized

4   that this encompasses, I guess in a roundabout way,

5   something that has to be off the record.

6           ARBITRATOR CALLAHAN:  Okay.  Off the

7   record.

8           MR. ALFORD:  Apologize.

9           ARBITRATOR CALLAHAN:  That's all right.

10  Off the record.

11          (Discussion held off record.)

12  BY MR. ALFORD:

13      Q.   Mr. Markovic, have you ever, yourself,

14  performed a due diligence on a brand-new innovative

15  ASIC chip that took less than six hours from start

16  to finish, including writing a detailed report?

17      A.   No, I was not tasked to do any -- any

18  project like that.

19      Q.   Okay.

20          MR. ALFORD:  All right.  I -- I think

21  that's probably all I have.

22          ARBITRATOR CALLAHAN:  All right.  It is

23  about 4:15, so let's take a short break, be back by

24  4:30 and we'll start with Mr. Pflaum.  And

25  Mr. Markovic is coming back tomorrow, correct?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1          MR. HARDIN:  He is staying here right now

2    and coming back tomorrow.

3          ARBITRATOR CALLAHAN:  Right, but he'll be

4    back tomorrow.

5          MR. HARDIN:  Yes, ma'am.

6          ARBITRATOR CALLAHAN:  Okay.  Good.

7          (Whereupon, a recess was taken from

8          4:15 p.m. to 4:36 p.m.)

9          ARBITRATOR CALLAHAN:  Mr. Pflaum.

10               ISAAC PFLAUM,

11     called as a witness, having been duly sworn,

12             testified as follows:

13          ARBITRATOR CALLAHAN:  Thank you.

14          Go ahead, Mr. Alford.

15          MR. ALFORD:  Thank you.

16               DIRECT EXAMINATION

17    BY MR. ALFORD:

18      Q.  Hello, Mr. Pflaum.  Can you -- do you have

19    your report in front of you there?

20      A.  I do.

21      Q.  I'd like to obviously ask you some

22    questions about it.

23          ARBITRATOR CALLAHAN:  Exhibit number?

24          MR. ALFORD:  It was electronically

25    submitted.

1          ARBITRATOR CALLAHAN:  I have it

2    electronically, but are we going to mark it as an

3    exhibit?  We should.

4          MR. LIU:  What's the next number in line?

5          MR. ALFORD:  Assign it a number --

6          ARBITRATOR GLICK:  I just want to access

7    it.  When was it submitted?

8          MR. LIU:  I think it was on Saturday.

9          ARBITRATOR CALLAHAN:  No.  No.  No.  I

10   have it.  I do have the electronic copy.

11         ARBITRATOR GLICK:  It came from Mr. Liu.

12         MR. LIU:  Yes, from me.

13         MR. ALFORD:  He does all the work.

14         ARBITRATOR CALLAHAN:  I have a note that

15   your next exhibit -- I can tell you.  Hold on.  Your

16   next exhibit is -- I want to say it's 122-something.

17   I think you're up to --

18         MR. LIU:  1225, I think.

19         ARBITRATOR CALLAHAN:  I'm not positive on

20   that.

21         MR. LIU:  Our last one was 1224, so 1225

22   would be next.  Or we can do 1230 if we're concerned

23   about possible duplicates.

24         ARBITRATOR CALLAHAN:  Hold on one second.

25   I show you as going through 1224.  So 1225?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1          MR. LIU:  Yeah.

2          ARBITRATOR CALLAHAN:  1225 and 1226?

3          MR. LIU:  Yeah.  1225.

4          ARBITRATOR CALLAHAN:  Okay.

5          MR. ALFORD:  Okay.  All right.

6    BY MR. ALFORD:

7      Q.  You have your report then in front of you,

8    Mr. Pflaum?

9      A.  Yes, I do.

10     Q.   Okay.  I want to ask you some questions

11   about page 3 of your report, the scope of your work.

12          Can you take a look at your scope of work,

13   Item A there, and can you kind of explain to us what

14   your scope of work is with regard to Item 1A?

15     A.  Yeah.  So Item 1A reads whether Bleck's

16   work as a consultant of Coinmint was consistent with

17   generally accepted professional norms of due

18   diligence investigations and due diligence opinions.

19          My understanding of that was that I was

20   instructed to review Bleck's conduct in the

21   preparation of the Bleck report, including his

22   conduct leading up to his selection and retention by

23   Coinmint, and to evaluate whether or not that

24   conduct conformed to standard of care as applicable

25   to due diligence professionals based on my

1   understanding as -- as I've acquired through my

2   experience over the last ten years.

3       Q.   Okay.  Can you summarize for us your scope

4   of work in Item 1B?

5       A.   Yes.  Item B reads whether it was

6   consistent with industry practice for Coinmint to

7   rely upon Bleck's representations to release funds

8   to Katena.

9           I believe that is relatively

10  self-explanatory, although I suppose to expand upon

11  that just briefly, I would say I understood my

12  instructions to -- to be that I should apply my

13  experience as a consultant and expert witness over

14  the course of the -- over the last ten years having

15  reviewed many due diligence opinions and reviewed

16  the -- analyze and observe the conduct of parties

17  having received due diligence opinions.  And on that

18  basis, opine whether it was reasonable for Coinmint

19  to rely upon Bleck in this context.

20      Q.   Can you explain to us a little bit about

21  your scope of work Item 1C?

22      A.   Yes.  Item C reads whether Katena could

23  deliver the goods and services promised to Coinmint.

24          I understood this instruction as directing

25  me to evaluate Katena's capability to deliver the

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   goods and services that it promised under its

2   contract with Coinmint, specifically the delivery of

3   a test unit of a bitcoin miner based on the K10

4   chip, which as I understand it, was to be delivered

5   sometime in September of 2021.

6           That analysis was based upon my review of

7   Katena's capital, it's human capital, its

8   relationships with vendors, including DXCorr, to the

9   extent that those were documented in the record that

10   was made available to me at the time I wrote this

11   report.  That analysis is extended somewhat in my

12   rebuttal on the basis of Katena's supplemental

13   production that was provided after I submitted this

14   report.

15           But at the time I wrote this report, the

16   documents available to me spoke to the extent of

17   Katena's documented employees, relationships,

18   contracts in place, its intellectual property, to

19   the extent that Katena claimed to have intellectual

20   property, as well as other factors that are

21   discussed in that section of my report.

22       Q.   Okay.  Thank you.

23           Can you give us a summary of your scope of

24   work in Item 1D as in David?

25       A.   Yes.  So this reads whether Coinmint's

1  contention that the parties agreed to variable

2  pricing of mining equipment tied to the bitcoin

3  price is consistent with common or generally

4  accepted practice in the -- practices in the bitcoin

5  mining industry.

6       I understood this instruction to be

7  directing me to apply my experience in the bitcoin

8  industry, purchasing, selling, operating mining

9  equipment, which I have done on several occasions,

10  primarily for academic purposes since 2011, and to

11  apply my understanding of the economics of bitcoin

12  mining to evaluate whether this was a reasonable

13  provision that was consistent with customary

14  practices.

15   Q.  All right.  Thank you.

16       If we can -- I'd like to talk to you a

17  little bit about your professional background and

18  your -- I know the panel members have read your

19  report, so I don't want to go into great detail.  I

20  do want to ask you to highlight some things about

21  your background that you feel are relevant to your

22  ability to express the opinions you have summarized

23  for us a minute ago by reference to your -- I think

24  it's exhibit -- Appendix 1 to your report.  Begins

25  on page 65.  Is that a copy of your CV?

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1      A.   As of the date of this report, yes.

2      Q.   Okay.  Have there been any material

3   changes to it since this time?

4      A.   There have been additional cases added,

5   yes.

6      Q.   Can you tell us a little bit about your

7   educational background?

8      A.   Sure.  So I studied biology and chemistry

9   as an undergraduate and applied mathematics,

10   completed Master's degree in computational chemistry

11   while I was a guest researcher at Brookhaven

12   National Laboratory, a computational science center,

13   which was called the Center for Data Intensive

14   Computing at that time.

15          I then went to law school a few years

16   later after working as a securities broker until

17   the -- the GFC.  Completed law school and an LM in

18   international business law and economics in 2013.

19      Q.   Okay.  Now, I know you said you're a

20   lawyer, but you're not here to offer legal opinions,

21   right?

22      A.   Correct.  I am inactive status in Virginia

23   and California, and I'm not here to offer any legal

24   opinions and have not done so in my capacity as an

25   expert.

TRANSCRIPT OF PROCEEDINGS

1    Q.   You're doing good, but maybe a little

2    slower and a little louder.

3    A.   Yes.

4    Q.   I'm partly deaf like Mr. Hardin, we share

5    that in common at least.

6        You mentioned you were for a time at the

7    Center for Data Intensive Computing.

8        Can you tell us a little bit about that?

9    A.   Sure.  So I was tasked with a series of

10   projects relating to protein folding research, which

11   at that time, was an emerging area of computational

12   chemistry, structural biology.  My research focused

13   on interdisciplinary approaches and new

14   computational methods for accelerating the

15   calculation and simulation of protein structures

16   using various methodologies.

17        My senior research thesis was on a

18   database that I created in Fortran, which was

19   specifically designed to accelerate structural

20   prediction in those simulations, and my Master's

21   thesis was specifically directed towards an enhanced

22   sampling algorithm using a variant of the Monte

23   Carlo procedure based on Crooks fluctuation theorem.

24    Q.   I know you had quite a long list under

25   your professional experience section.  I'm not going

TRANSCRIPT OF PROCEEDINGS

1   to ask you to go through them all.  But can you take

2   a look that the section of your CV.  I guess it

3   begins on page 7 -- 70?

4        A.   I'm seeing it as page 66.

5        Q.   If you could thumb through that and

6   highlight for us any of your professional experience

7   entries that you think are pertinent to the work

8   you've done in this case.

9        A.   Sure.  So as I stated in the

10  qualifications section in my opening report, I'm the

11  director of complex software litigation practice at

12  Quandary Peak Research.  In that capacity, I

13  supervise and manage teams of experts.  At this

14  time, there's approximately 15 engagements.  At any

15  given time -- it's typically less than that, but at

16  the moment, we're quite busy.

17       In that capacity, I have, over the last

18  ten years and, of course, in my prior role before my

19  current title, been hired as a consultant both as a

20  consulting expert, a due diligence consultant and as

21  a testifying expert in a variety of breach of

22  contract matters.  And in each of those have

23  performed due diligence functions as well as

24  reviewed the due diligence performed by the parties

25  involved in those disputes.  I'll go into specific

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   examples of that.

2          But in addition to that, at Quandary Peak,

3   I've also been tasked with building and managing our

4   complex check system, which included specific

5   functionality for our technical due diligence

6   practice.  We have a technical due diligence

7   practice at Quandary Peak, which is technically

8   under the direction of one of my colleagues, but we

9   work quite closely together and I have been tasked

10   with essentially training all of his -- all of the

11   staff which he uses on those engagements.

12          Most of the technical due diligence staff

13   is primarily engaged under my supervision on

14   litigation consulting projects.  And then they are

15   essentially dispatched to technical due diligence

16   projects when those come up.  And Quandary Peak has

17   done approximately 50 of those technical due

18   diligence projects over the last five years while

19   I've been there.  And I have been consulted about

20   the staffing, appropriate staffing before those on a

21   weekly basis for the last five years.

22     Q.   Okay.  Now, are all of the technical due

23   diligence projects that you're overseeing at

24   Quandary Peak, are all of those involving litigation

25   or are some of them involving actual potential

TRANSCRIPT OF PROCEEDINGS

1   transactions such as involved in this case?

2       A.   So I would say the vast majority of

3   technical due diligence activities that I am

4   personally engaged with relate to litigation.

5   Exceptions to that are, for example, continuous

6   improvement audit that I was tasked on that was

7   mandated by the Department of Justice against one of

8   our clients.  And I worked on that for several years

9   on a continuous due diligence function with

10   six-month periodic reporting on the subject's

11   progress towards achieving certain -- certain goals

12   mandated by the Department of Justice.

13           I have in the past, my prior employer,

14   DisputeSoft, and asked to evaluate technical

15   feasibility of certain either targets in a

16   pre-litigation context, or in one example, the

17   design alternatives for improving an electronic

18   device on e-cigarette devices I discussed at some

19   length in my deposition.

20       Q.   All right.  Let me ask you -- I don't want

21   to -- I don't want you to tell me -- tell any of us

22   anything that is protected by confidentiality or an

23   NDA, but can you tell us a little bit more about

24   your -- your work on the continuous improvement

25   project with the DOJ that is -- that you're at

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   liberty to disclose?

2       A.   I'm not at liberty to discuss much.

3   The -- the focus of that was ensuring on a

4   continuous basis that improvements were made both in

5   the staffing, organizational processes, management

6   and quality control that would limit or minimize the

7   potential for patient harm, deaths and similar

8   injuries at thousands of American hospitals.

9       Q.   Was there a technology component to your

10  work in that matter?

11      A.   Yes.  It was all -- it was all

12  technology-oriented.

13      Q.   Can you tell us a little bit more about

14  that, if you feel comfortable doing so, without

15  divulging any confidential information?

16      A.   I can speak to the subject matter --

17      Q.   Okay.

18      A.   -- in a general sense.  So I was tasked

19  with reviewing the source code, reviewing the

20  processes by which modifications and improvements

21  were delivered, using the processes by which defects

22  or risks were identified in the software, how those

23  risks were tracked, what were the prioritization

24  given to those risks, whether or not that was

25  reasonable in the context of the risk to patient

1   health.  I was given the task of sitting with the

2   company's president and trying to understand his

3   prospective and point of view on the priorities that

4   should be put in place to meet the DOJ's

5   expectations.  I'm sure there was more to it.

6   That's what comes to mind.

7       Q.   Okay.  For which side were you retained in

8   that matter?

9       A.   I was retained by the target --

10      Q.   Okay.

11      A.   -- in order to satisfy their obligations

12  to the Department of Justice under their consent

13  decree.

14      Q.   Got it.

15          I think you mentioned another due

16  diligence project for an E-cigarette manufacturer.

17  Can you tell us a little bit about that, again,

18  without revealing information you're not at liberty

19  to disclose?

20      A.   Sure.  I think I discussed it at some

21  length in my deposition.  That -- that engagement

22  related to the assessment of whether it was feasible

23  to improve the battery life of a device by replacing

24  certain chips within the device with alternatives or

25  modifying software that was used to control the

TRANSCRIPT OF PROCEEDINGS

1   hardware elements so that it would be more efficient

2   in a power prospective.

3      Q.   Was that in the context of an actual

4   potential contractual transaction?

5      A.   We were hired by the company itself to

6   assess various options that have been brought to it

7   by potential partners and contractors.

8      Q.   Okay.  You were working for a company to

9   evaluate potential opportunities it had to do

10   business with a vendor?

11      A.   Yes.

12      Q.   Okay.  And you mentioned that involved a

13   chip.  Was that an ASIC?

14      A.   No.  No.  As I recall, it was not an ASIC.

15   But combination of chips on a board with a

16   microcontroller.

17      Q.   Okay.  Is it fair to say that most of your

18   experience in due diligence has been on software

19   versus chips?

20      A.   It is fair to say that.  However, there

21   are a couple of exceptions.  So, for example,

22   Perkins Coie hired me in a couple of confidential

23   pre-litigation assessments to assess potential

24   targets for litigation.  And some of those involved

25   review of processor technology on chip controllers,

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   temperature controllers, things of that nature.

2        I've also been hired in other context.

3   For example, Sterne Kessler, which is a large patent

4   firm in D.C., hired me to reverse engineer and

5   review the VHDL code for an Intel processor.  And I

6   was given access to the -- to the VHDL code by

7   Intel, in a very controlled context.  They gave it

8   to me on, I think, approximately 2,000 PDF

9   documents, and I reviewed that and wrote a report

10   for the law firm to inform the testifying expert in

11   that case.  And then brought the testifying expert

12   in and explained how features of the Intel chip

13   worked.

14       Q.   Approximately how many times have you been

15   retained by the Perkins Coie firm in matters

16   relating to technical due diligence?

17       A.   Well, we never called it that.  These are

18   target evaluations evaluating potential targets of

19   litigation, as well as actually reviewing real

20   targets in patent litigation that have been

21   initiated on the part of their clients.  I'd say I

22   worked for Perkins Coie a half dozen times.

23       Q.   Okay.  Have you been accepted to testify

24   in court as an expert witness?

25       A.   I have, yes.

TRANSCRIPT OF PROCEEDINGS

1     Q.   Approximately how many times?

2     A.   I've been designated as an expert, I

3  think, ten times now.  Most cases settle.  I've been

4  deposed, I think, six times now, or seven, including

5  this one, including this case.

6     Q.   Let's circle back a little bit to you

7  started to tell us a little bit about your work with

8  the due diligence group at Quandary Peak.

9     A.   Yes.

10     Q.   Are those due diligence projects -- excuse

11  me -- a mixture of both in the litigation context

12  and also in the transactional context?

13     A.   I'd say that particular practice, the due

14  diligence practice, is -- the reason it's broken off

15  as a separate practice is because it is purely

16  transactional; mostly merger and acquisitions,

17  sometimes procurements.  So those are the two main

18  categories of tech DD.

19          You know, my involvement with that is

20  typically a lead comes in, the tech DD team lead

21  says, you know, here's the technology, who do you

22  think we should put on this?  And that's -- that's

23  the conversation that we have.

24          Now, that's determined both based upon

25  their qualifications, familiarity with the

1  technology, as well as their rates and their

2  availability in terms of their obligations on

3  other -- on other active matters.

4      Q.  Okay.

5      A.  So that is, I'd say, 60 percent of it in

6  terms of my involvement.  I also have to maintain

7  the conflict check system and have to essentially

8  ensure that tech DD engagements that have enhanced

9  confidentiality requirements, which is quite common,

10  are accurately reflected in the conflict check

11  system so that our other consultants do not

12  inadvertently disclose technical due diligence

13  engagements that are supposed to be confidential.

14          And then, you know, I train all staff that

15  work on those cases.

16      Q.  Okay.  Can you tell us a little bit about

17  your training of the tech due diligence team at

18  Quandary Peak?

19      A.  Sure.  So I -- a lot of that takes place

20  in the context of litigation cases.  So case studies

21  are a fairly significant and prominent part of that.

22  So we have a litigation.  We have fact pattern

23  established, there's an IVV or there's a tech due

24  diligence expert or a due diligence process

25  initiated by a procurement office.  Something goes

TRANSCRIPT OF PROCEEDINGS

1    wrong, we're in litigation in those contexts.  You

2    know, what are the most relevant facts here?  What

3    went wrong?  Why was there a problem here?

4          There are some particularly egregious

5    examples that have -- have become recurring teaching

6    tools.  Those tend to arise from the context of

7    state procurements for large, you know, multihundred

8    million dollar procurements by large corporations,

9    but typically, state and local governments.  And

10   those are -- those are case studies which are -- are

11   used for training purposes.

12       Q.   Okay.  Can you tell us a little bit about

13   the aspects of Quandary Peak's due diligence

14   practice that focus on -- I think you said merger

15   and acquisitions and procurement?

16       A.   So in the merger and acquisitions context,

17   we are typically talking about, at least for our

18   business, foreign acquisitions, so it would be a

19   foreign company acquiring a U.S. asset, maybe a

20   foreign company acquiring another foreign asset.  We

21   do a fair amount of that work in the Middle East.  I

22   don't travel for that.  I won't travel for that.

23   That is left to people without children and who have

24   a lot more time on their hands than I do.

25          But the training that's applicable is more

TRANSCRIPT OF PROCEEDINGS

1   or less the same.  I explain the basic standards

2   that are applicable in my opening report.  But to

3   summarize, that you need to issue opinions or advice

4   that is reliably based, or reasonably based on the

5   reliable application of practices and methods to the

6   facts and data that are available to you.

7           And one of the things that we emphasize,

8   that I emphasize personally in almost all these

9   engagements where I'm training other consultants is,

10  to properly caveat and identify assumptions.  That

11  is absolutely crucial to communicating accurately

12  the basis for the conclusions and information that's

13  needed by the recipient of that to properly weigh

14  those -- those conclusions.

15          So being up front with what are the

16  caveats, what did you have, what didn't you have,

17  why might that matter, what are the assumptions

18  you're operating under, what are the facts and data

19  that you had access, what are some facts and data

20  you may not have that access to that could have

21  assisted you in reaching a -- a more certain

22  conclusion.

23          Those sort of basic mechanics, as well as,

24  as we've already discussed, checking for conflicts,

25  identifying conflicts and making required

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  disclosures.

2      Q.  Okay.  Is -- in your experience, is it --

3  is it critical that conflict checks be done even

4  when a tech due diligence exercise is not in the

5  litigation context?

6      A.  I mean, absolutely.  It's -- it's critical

7  for our practice that we perform conflict checks on

8  every technical due diligence engagement.  We do not

9  leave that to our clients.  We do not rely upon them

10  to ask us or prod us to do that.  And there are

11  situations, as I said, where we have confidential

12  technical due diligence engagements where we cannot

13  make required disclosures, so we have to decline

14  those matters.

15          And that -- that policy is enforced quite

16  rigorously for a number of reasons but most -- most

17  critically because failing to do so would violate

18  our agreements with existing clients.

19      Q.  All right.  And you -- in the course of

20  your work in this case, you've collaborated with

21  some of your colleagues?

22      A.  Yeah.  So when -- when I was initially

23  engaged on this, at the time, I understood that

24  there was a possibility that we would be reviewing,

25  you know, primary engineering and design

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   documentation, VHDL code or other forms of, you

2   know, primary technical data.  And, you know,

3   thought it was advisable to bring on some electrical

4   engineering colleagues; they are subcontractors for

5   our firm.  And, you know, we've employed them on a

6   variety of cases.

7         Bert, in particular, has assisted me on

8   other cases where -- for example, involving robotic

9   controllers and computer vision systems and plant

10   automation and automated manufacturing.  So he

11   seemed like -- like he would have the technical

12   chops to be of use if and when, you know, there was

13   a need to review primary technical documents and

14   data.

15         As it turned out, none of that was made

16   available, so there was not much for him to do.  I

17   ultimately asked him to exploit his connections in

18   the Netherlands to see if he could identify any

19   publicly available information relating to IMEC's

20   pricing and the availability of 12-nanometer process

21   in the summer of 2021.  He was able to identify a

22   couple of available documents from IMEC and from

23   TSMC, but those -- those did not corroborate.  In

24   fact, contradicted, I felt, the narrative put up --

25   put forward by Mr. Reddy, in particular that the 12n

1   process was set by delays and other factors which

2   impacted this -- this particular project.

3       Q.   Can you explain to me a little bit more

4   about that, explain to the panel a little bit more

5   about that?

6       A.   Sure.  I discuss it in my opening report,

7   the publicly available information from TSMC does

8   not indicate any issues with the 12n process during

9   relevant time frame, there's no mention of delays or

10   other issues as there were for, for example, other

11   competing manufacturers of chips in Japan, whether

12   there have been fires, maybe two fires in Japan.

13   They weren't -- a number of issues that occurred in

14   the summer of 2021, none of them impacted the 12n

15   process at TSMC, at least insofar as they may --

16   that they mentioned in the shareholder disclosures.

17       In addition to that, IMEC, at least in

18   terms of its public comments and disclosures, had

19   made nothing -- had said nothing to the effect of --

20   that there was a significant impact on the

21   availability of 12n process during that -- that time

22   period.

23       So I couldn't find any information in the

24   public domain to confirm that.  As I said, I tasked

25   a person operating under my supervision and

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1  direction with doing everything he could to find

2  that out, as well as to find whatever public

3  information could be used to estimate the cost of

4  doing multiplatform wafer manufacture in the summer

5  of 2021.

6        He was able to find some publicly

7  available IMEC documents, which specified pricing

8  for academic users other than the multiplatform

9  wafer program.  And I explained my -- my use of that

10  in my opening report.  But essentially, I -- I tried

11  to use that as a basis for a ballpark estimate of

12  how much it might have cost Katena to produce

13  prototypes of the chip.

14     Q.   Okay.  Well, let's drill down a little bit

15  on some of your opinions.

16        If you could take a look page 8 of your

17  report under Roman IV, and, again, I don't think we

18  need to go into great detail 'cause the panel has

19  read your report.  But if you could give us a

20  summary of your first opinion in paragraph 12 there.

21     A.   Certainly.  So I evaluated Bleck's work as

22  a consultant for Coinmint and found that his conduct

23  was not consistent with generally accepted practices

24  and professional norms for due diligence opinions.

25     Q.   And I'm sorry, let me interrupt you there.

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   I meant to ask you earlier, you're not an electrical

2   engineer, right?

3       A.   No.  I reviewed Bleck's conduct, his work.

4       Q.   So --

5       A.   What he did.

6       Q.   Do you feel the fact that you're not an

7   electrical engineer in any way impairs your ability

8   to express reliable opinions on the topic you've

9   addressed?

10      A.   I don't.  I think that I can evaluate his

11  conduct and work in light of professional norms and

12  practices that I'm aware of by virtue of my

13  professional experience and my role at Quandary Peak

14  and make a determination on whether those conform to

15  the standard of care that's applicable here.

16      Q.   Can you tell us a little bit about those

17  professional norms and practices applicable to

18  technical due diligence projects as you have come to

19  understand them in your work?

20      A.   Sure.  So in my opening report, I lay

21  these out as clearly as I could.  There are

22  essentially two different levels of this.  So first

23  being a two-prong qualification and independence

24  test, basically.

25          So when we are evaluating the tech due

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   diligence opportunity, we evaluate the available

2   resources and identify people to staff on that

3   opportunity based upon whether we can find

4   individuals that -- by virtue of their education and

5   experience, are qualified in the sense that they are

6   capable of identifying the methods and practices to

7   apply and what facts and data to apply those to.

8         That's how we view qualifications.  We

9   would identify staff that's qualified for a

10  technical due diligence engagement on the basis of

11  whether or not they know what they're supposed to do

12  and are able to identify the facts and data that are

13  necessary for them to do what they're supposed to

14  do.

15        In addition to that, as we've spoken to

16  already, we perform conflict checks.  And the reason

17  that those are independent of each other -- I should

18  say separate requirements, both qualification and

19  independence, is because while we might have an

20  expert that's a great fit for something, maybe

21  they're working on something which would present a

22  conflict or they've worked in the past on something

23  which presents a conflict or they have an ongoing

24  relationship, either with a target or with an

25  investor or something of that nature.

TRANSCRIPT OF PROCEEDINGS

1          And without evaluating the potential for

2    an appearance for a real bias that might arise in

3    that -- in that engagement, you know, we might place

4    the wrong person in a position where there could be

5    consequences.  So we do what we can to avoid that.

6          That's the first stage, identifying

7    qualified staff, evaluate conflicts and ensure that

8    we can operate in an independent manner.  I forgot

9    to say one other thing that we do in certain

10   instances on technical due diligence, as well as

11   contract cases, is if the target or the client is a

12   publicly traded company, I will sometimes issue an

13   instruction not to engage in trading of any publicly

14   traded securities.  That's -- that's another

15   potential outcome of that -- of that review.

16       Q.  So that no one working on the due

17   diligence project has a financial stake in the

18   outcome?

19       A.  Correct.  Yes.  That is particularly

20   important in certain -- certain due diligence

21   contexts where there's a publicly traded company

22   involved.

23       Q.  Okay.

24       A.  But it more frequently arises in a breach

25   of contract context.

1    Q.   Now, I know you said that sometimes NDAs

2   may simply require you to decline an engagement

3   without disclosing a potential conflict in allowing

4   the customer to make the call, right?

5    A.   Yes.  If we cannot make required

6   disclosures, the policy is we will decline.

7    Q.   Okay.  But can you tell us a little bit

8   about how it works in those circumstances where you

9   can make disclosures?

10    A.   Yes.  So I developed a conflict check

11   system that allows for searching using wildcards,

12   what's called regular expression searching.  It

13   interrogates a database of all of our past

14   engagements, as well as every inquiry we've received

15   for the last six months.  And it produces a report.

16   That report identifies warnings and notices and

17   lists every single potentially relevant engagement,

18   including the parties, any attorneys that are

19   involved, whether it's a technical due diligence

20   case, whether it has enhanced confidentiality

21   requirements.  Those show up with a big red box on

22   the report to make sure that people don't miss them.

23        And there's a fair amount of additional

24   information included in that report.  As I said, it

25   includes also a sub-report, which lists all the

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   recent inquiries that we've received.

2       Q.  Let me ask you this:  If you -- if it came

3   to your attention that someone that your team was

4   considering for a tech due diligence project was on

5   the board of advisers of someone on the other side

6   of the transaction, would that be something that

7   would be disclosed?

8       A.  Yes.  But that also might just be

9   disqualifying.  We might simply decline that

10   engagement.

11       Q.  But at a minimum, disclosed --

12       A.  Absolutely.

13       Q.  -- to your customer?

14       A.  Absolutely.

15       Q.  Now, you've heard and read Mr. Markovic's

16   thoughts about the absence of generally accepted

17   standards of practices?

18       A.  I have heard him -- I've heard him say

19   that and I have read it in his rebuttal report, yes.

20       Q.  Can you explain to us your thoughts on

21   that subject?

22       A.  Well, I -- I disagree.  As I said, I think

23   it's fairly straightforward.  And everyone should

24   understand going into this type of work that, at the

25   bare minimum, the first level, first sort of tier of

1  professional standards or standard of care is, you

2  should be qualified to do the work.  You should

3  understand what you have to do and what -- what are

4  the processes and methods, processes and procedures,

5  and what are the facts and data that are relevant,

6  and that you should verify that you can do so in an

7  independent manner by performing a conflict check

8  and disclosing any necessary information.  Or if you

9  cannot disclose that information, you should

10  decline.

11        That is how -- that is how Quandary Peak

12  does things, and as I understand it, the way we do

13  things is essentially how everyone in terms of our

14  peer competitors does things.

15     Q.   Have you yourself received training from

16  professional organizations on the standards

17  applicable to due diligence -- tech due diligence

18  assignments?

19     A.   I received training -- formalized

20  training.  I mean, I was mentored by the principal

21  at -- a former firm, Jeff Parmet.

22        He was a partner at Pricewaterhouse for, I

23  think, 25 years, and then started his -- his

24  consulting practice, which I joined in 2013.  I

25  have, over the course of the last ten years,

TRANSCRIPT OF PROCEEDINGS

1   reviewed dozens of due diligence contracts, IVV

2   contracts.  I have received training and instruction

3   on the acceptable parameters of my engagement under

4   the supervision of the DOJ.

5        I should say -- I mean, we're always

6   learning things as a continual -- continuous

7   education component to being in this line of work.

8   So if there is a court case that involves alleged

9   misconduct, if there are other relevant proceedings

10   or articles, those are posted in our general forum.

11   I read those.  I do what I can to stay current in

12   terms of the professional practices that we should

13   be operating by.

14        Q.   Do you have an opinion about whether it's,

15   in keeping with professional standards and norms

16   applicable to tech due diligence exercise, for a due

17   diligence expert retained by a potential customer to

18   allow the target of that exercise to engage in

19   substantive editing and drafting of the report

20   before it goes to the customer?

21        ARBITRATOR CALLAHAN:  Wow.  I didn't

22   understand that.

23        MR. ALFORD:  Sure.

24        ARBITRATOR CALLAHAN:  I'm only telling you

25   that because --

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1      MR. ALFORD:  No.  No.  Thank you for

2   telling me that.

3      ARBITRATOR CALLAHAN:  Could you please --

4      MR. ALFORD:  Sure.

5      ARBITRATOR CALLAHAN:  Maybe just slower.

6      MR. ALFORD:  Sure.

7      ARBITRATOR CALLAHAN:  I didn't follow the

8   question.

9      MR. ALFORD:  Thank you.

10      ARBITRATOR CALLAHAN:  Okay.

11   BY MR. ALFORD:

12      Q.  You've seen the materials in this case

13   indicating that Mr. Reddy participated in editing

14   and revising Mr. Bleck's draft report, right?

15      A.  That is --

16      MR. TABER:  Objection to the

17   characterization of the materials.

18      ARBITRATOR CALLAHAN:  I understand that,

19   and I'm going to allow it.  You can take care of it

20   on cross.

21      THE WITNESS:  That characterization is

22   consistent with my own interpretation of the

23   evidence.  Yes, I've seen that.

24   BY MR. ALFORD:

25      Q.  And can you tell us whether, in your view,

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   that conduct that you've seen conforms with

2   professional norms and standards applicable to tech

3   due diligence undertakings?

4       A.   No.  I don't believe it is consistent.  I

5   have -- I have understood what I've heard from

6   Mr. Markovic and others who argued that it is

7   customary to receive information from the target.  I

8   don't take issue with that in a general sense,

9   however, I think there is a material difference

10   between probing the target to get the facts and data

11   that you need to form your own opinion and allowing

12   the target to write their own due diligence report.

13         I think that's a material distinction, and

14   I think the conduct that's evidenced in the record

15   of this case, evidence is that they crossed that

16   line.

17       Q.   Can you elaborate a little bit on that?

18       A.   Well, there appear to have been repeated

19   and ongoing communications from perhaps around

20   May 5th through the delivery of the report on or

21   about May 29th, during that entire period, before

22   and after Mr. Bleck was retained, both between

23   Katena principals and Mr. Bleck and between Katena

24   principals themselves, which indicate a direct

25   involvement in the authoring, editing and the

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

1   definition of scope of the Bleck report.

2       Q.   In all of your experience involved in tech

3   due diligence assignments, have you ever seen a

4   situation where the tech due diligence expert

5   retained by the potential customer to evaluate a

6   target's technology provides a draft of the report

7   to a representative of the target and allows him or

8   her to substantively revise it without the

9   participation of the customer?

10      MR. TABER:  I'm going to object to the

11   witness's characterization of, I guess, making

12   factual findings.  It seems like it's far beyond the

13   scope of expert testimony for him to opine on what

14   the facts are, what happened as opposed to what they

15   might mean.

16      ARBITRATOR CALLAHAN:  I didn't take the

17   question as that.  I took it as a hypothetical.  Or

18   not even a hypothetical.  I understand Mr. Alford is

19   simply asking him, have you ever seen a situation

20   where blah, blah, blah, blah.  And I am not making

21   any attributions to that question as applied to this

22   case.

23   BY MR. ALFORD:

24      Q.   You can answer.

25      A.   No, I've never seen that.  I think that

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1   would be unacceptable.  It's, frankly, hard to

2   imagine anyone in our practice engaging in that type

3   of behavior.  No, I haven't seen that.

4       Q.   You'd probably fire someone for that?

5       A.   It would raise very serious questions,

6   yes.

7       Q.   In all of the tech due diligence

8   undertakings you've been involved in, have you ever

9   seen a situation where a potential tech due

10   diligence consultant hired by the customer works

11   with the target to alter the social media record to

12   conceal a past affiliation?

13       A.   No, I've never seen that.

14       Q.   In your opinion, is that within

15   professional standards and norms?

16       A.   No.  That would seem to defeat the purpose

17   and the spirit of disclosure and allowing your

18   client to make an informed judgment about your

19   ability to perform your duties and objective in an

20   impartial manner.

21       Q.   You've seen the -- Mr. Bleck's invoice

22   indicating he spent 5.833 hours on this project,

23   correct?

24       A.   Yes.

25       Q.   Do you have experience in your role at

TRANSCRIPT OF PROCEEDINGS

1   Quandary Peak that would allow you to give us an

2   estimate of approximately how long a -- a tech due

3   diligence assessment of this kind would typically

4   require?  How many hours?

5       A.   Well, I would have to estimate.  I mean,

6   many of our technical due diligence assignments, I'd

7   say most, involves deals that are smaller than this

8   one.  I'd say the most typical amount is closer to

9   50 million.  20 to 50 million.  This contract

10   exceeded $100 million.  So it's more similar in its

11   size to the technical due diligence we see in the

12   context of large software procurements, which

13   typically, in the litigation context, when reviewing

14   that and determining whether that due diligence was

15   performed correctly.

16          But, you know, as I said, I coordinate on

17   a weekly basis with the head of the tech DD team in

18   order to identify qualified staff, make sure -- that

19   we staff people who don't have other commitments

20   which might limit their availability or impacts on

21   other -- other obligations.

22          Typically those conversations deal with

23   provisioning individual employees to four to

24   eight weeks, with the expectation of the work merely

25   full time.  It depends upon their -- their rates and

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1  how many people are brought onto the tech DD

2  engagement.  But I think, as I said in my opening

3  report, I would expect something like this to be

4  closer to 80 or 100 hours rather than 5.8.

5      Q.  Okay.

6      A.  That seems like too -- much too little in

7  my experience.  I've never heard of a request on any

8  occasion to have one of the people working under my

9  supervision tasked on a tech DD problem for

10  six hours.  That would be shocking, would be

11  surprising.

12      Q.  Even out -- I want to make sure we're

13  clear.  Even outside a litigation context, let's

14  talk about the M&A and procurement context.  You're

15  involved there in helping to scope those due

16  diligence projects in terms of about how long

17  they're going to take and how many hours should be

18  allocated on staff time?

19      A.  That's part of the conversation.  I just

20  had a conversation on Monday with the incoming head

21  of that practice.  Our existing head is focused more

22  on the litigation side.  So we're -- we're making

23  someone else the director of tech DD at our company,

24  he and I had dinner on Monday night when I arrived

25  in San Francisco.  And that was essentially the

TRANSCRIPT OF PROCEEDINGS

1   entirety of our conversation; how do we better go

2   about appropriately staffing tech DD projects with

3   individuals at rates that can perform the amount of

4   work required to complete those -- those jobs up to

5   our standards while still meeting the expectations

6   of our clients in terms of cost.

7        ARBITRATOR CALLAHAN:  This might be a good

8   place to stop.  We are just a little after 5:30.

9        MR. ALFORD:  Okay.

10        ARBITRATOR CALLAHAN:  Thank you,

11  Mr. Pflaum.  We'll resume with you tomorrow morning.

12        MR. ALFORD:  Thank you.

13        ARBITRATOR CALLAHAN:  Mr. Alford.

14        MR. ALFORD:  Yes.  Thank you.

15        ARBITRATOR CALLAHAN:  And, again, if you

16  can be here at 9:00-ish, the panel will conclude its

17  work as quickly as we can.

18        MR. ALFORD:  Okay.

19        (Proceedings adjourned at 5:32 p.m.)

20

21

22

23

24

25

TRANSCRIPT OF PROCEEDINGS

**September 20, 2023**

1              CERTIFICATE OF REPORTER

2

3          I, KATHLEEN A. MALTBIE,

4    RPR-RMR-CRR-CCRR-CLR-CRC-RDR, Certified Shorthand

5    Reporter, hereby certify that said proceedings were

6    taken down in shorthand by me, a disinterested

7    person, at the time and place therein stated, and

8    was thereafter reduced to typewriting, by computer,

9    under my direction and supervision.

10         I further certify that I am not of counsel

11    or attorney for either or any of the parties to the

12    said proceedings, nor in any way interested in the

13    event of this cause, and that I am not related to

14    any of the parties thereto.

15

16         DATED: September 29, 2023

17

18

19

20    _____

21    KATHLEEN A. MALTBIE,
       California CSR 10068
22     Nevada CCR 995
       Texas CSR 12212
23     RPR-RMR-CRR-CCRR-CLR-CRC-RDR

24

25

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

**$**

**$1,500**
1568:11

**$100**
1781:10

**$2.8**
1639:10
1641:17
1642:11

**$200**
1673:3,12

**$3**
1628:15
1629:1
1634:11
1636:12
1638:2
1639:2
1640:19

**$37**
1629:3,12
1631:22
1633:13

**$53,000**
1687:21

**$54,000**
1642:12

**$7,000**
1568:9

**$8,700**
1568:6

**$8,944**
1642:3

**$875,000**
1568:3

**$9,000**
1642:6

**0**

**0.4**
1558:13

**004**
1539:10

**0145**
1570:17,20

**0147**
1570:21

**0156**
1541:5

**0194**
1538:3
1540:12
1541:6

**0229**
1541:5

**1**

**1**
1538:24
1539:2
1540:21
1629:4
1641:12
1680:4
1686:10
1689:3
1752:24

**1,490**
1482:19
1483:6

**1,500**
1687:17

**1,580**
1482:18
1483:6

**1-25**
1538:16

**1.2**
1641:23
1687:9,10

**10**
1622:10,12
1630:16,20,
21 1631:1
1717:23
1718:10,25
1735:23

**100**
1568:4
1597:20,25
1598:13,17
1629:7
1687:3
1726:10
1782:4

**105**
1643:8
1644:21
1645:4
1647:12

**106**
1652:24

**10:00**
1481:21

**10:30**
1493:8,10,13

**10:44**
1543:3

**10:45**
1493:20
1542:25

**10:56**
1543:3

**11**

**1658:20**
1717:18

**11-3**
1718:12

**114**
1656:19,22
1692:14

**115**
1692:15

**1181**
1635:21
1636:2
1649:8
1694:23
1738:9,11,12

**1181-13**
1649:8
1658:21

**1181-14**
1649:10

**1181-15**
1650:18,21

**1181-18**
1636:7
1694:24

**1181-27**
1738:13

**1182**
1702:2
1738:8

**1184**
1630:4
1631:2

**1185**
1630:4,18,24,
25 1631:2

**11:08**
1553:14

**11:11**
1553:14

**11:40**
1577:8

**12**
1539:16
1557:7
1563:24
1564:1,2,4,9
1587:5,16
1630:17,22
1631:2
1643:24
1650:12,19,
20 1702:4
1725:5
1728:16
1769:20

**12-2**
1725:7
1728:18
1729:5

**12-nanometer**
1558:7
1643:17,25
1652:20
1687:22
1728:22
1767:20

**122-
something**
1748:16

**1224**
1748:21,25

**1225**
1748:18,21,
25 1749:2,3

**1226**
1749:2

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

**1230**
 1748:22

**125**
 1538:23

**128**
 1513:3
 1597:25

**12:20**
 1611:13

**12:25**
 1614:24
 1615:3

**12:30**
 1577:11,12
 1611:10

**12n**
 1767:25
 1768:8,14,21

**12nm**
 1636:12
 1638:3
 1659:4

**14**
 1652:25
 1714:13,21
 1715:1,7
 1721:10

**14-1**
 1721:21

**14-3**
 1722:22

**14-4**
 1722:1

**143**
 1568:25

**144**
 1623:25
 1624:2

**149**
 1573:16,24

**149-18**
 1573:22

**15**
 1560:6
 1656:20,22
 1692:14
 1755:14

**150**
 1537:8

**1500**
 1568:9

**1561**
 1736:2,3

**16**
 1636:5,23
 1637:24
 1694:24

**160**
 1555:14
 1556:6

**17**
 1485:2,4
 1634:6

**18**
 1525:6
 1573:21
 1579:23
 1580:12,13
 1586:19
 1587:19
 1594:19
 1647:12
 1706:4,5,6,9
 1707:20

**1998**
 1497:6

**1:00**

**1614:25**

**1:02**
 1615:3

**1A**
 1749:14,15

**1B**
 1750:4

**1C**
 1750:21

**1D**
 1751:24

---

**2**

---

**2**
 1544:10,16
 1642:14,15,
 20,21
 1647:19
 1653:23,24
 1654:15
 1688:16,18,
 24,25 1689:1
 1716:22
 1734:21
 1735:9

**2,000**
 1761:8

**2.8**
 1686:12

**20**
 1481:1
 1504:17
 1533:10
 1572:17
 1574:19
 1593:19
 1671:2
 1781:9

**200**
 1507:9
 1517:6
 1597:19,25

**2000**
 1497:11

**2003**
 1638:18,20,
 21,22 1639:4
 1640:20
 1641:5
 1686:4,7
 1734:11,14

**2003-3**
 1641:6
 1686:10

**2003-4**
 1641:24

**2003-6**
 1736:5

**2006**
 1497:13
 1504:15

**201**
 1541:8,9

**2011**
 1752:10

**2013**
 1753:18
 1775:24

**2014**
 1517:20,21

**2020**
 1560:2,3,4
 1565:14
 1583:9
 1613:16

**2021**
 1487:20

**1560:4,6,16**
**1565:8**
**1571:4**
**1583:10**
**1586:14,15,**
 16,18
 1602:16
 1606:16
 1607:8
 1608:5
 1670:24
 1672:1
 1713:19
 1714:14
 1715:2
 1717:25
 1721:13
 1728:20
 1751:5
 1767:21
 1768:14
 1769:5

**2023**
 1481:1

**2057**
 1541:18,24
 1705:1
 1719:17

**2057-3**
 1719:18

**2057-4**
 1705:2

**2057-8**
 1705:25

**21**
 1587:24

**21st**
 1586:16
 1713:19

**22**

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1504:16
1556:17
1557:1
1560:24

**2206**
1540:1

**2207**
1540:4

**2208**
1538:9
1539:14,15,
21,23 1540:8
1541:10
1542:9
1543:8
1553:22

**2208-3**
1544:6

**2213**
1575:25
1576:1

**23**
1647:13

**238**
1482:17

**24**
1644:22
1645:4
1714:9,15

**24-2**
1716:18

**24/7**
1607:14

**25**
1650:14
1651:8,15
1712:19
1775:23

**25,000**
1568:2

**256**
1554:6,20
1562:23

**27**
1658:19
1665:15,16
1738:5,11
1740:11
1741:21

**29th**
1778:21

**2:26**
1685:5

**2:42**
1685:5

---

**3**

**3**
1544:10,16
1568:16
1639:11,19
1640:14
1686:9
1718:12,13
1749:11

**3-33**
1570:16

**30**
1489:13
1560:25
1622:20
1623:21
1624:10
1625:8
1642:16
1651:1,15
1689:21

1712:19

**30-**
1624:1

**300**
1559:2

**30th**
1483:9,12,22
1484:10
1489:18

**31**
1568:16

**33**
1623:24
1624:2
1625:7,9

**330**
1482:17

**34**
1634:8,9
1636:2,8
1637:22

**35**
1554:4,18
1562:20
1563:2
1568:1
1694:23,24
1695:1

**37**
1639:15

**3:47**
1734:7

**3:54**
1734:7

**3A**
1544:6

---

**4**

**4**
1485:16
1540:18,21,
24 1541:2,4
1544:10,16
1586:25

**40**
1599:7

**400**
1558:19
1559:8
1573:8

**400-millivolt**
1558:1,3

**4149**
1719:18

**42**
1599:19

**47**
1649:10,11,
12

**4:07**
1743:24

**4:15**
1733:15
1746:23
1747:8

**4:20**
1733:15

**4:30**
1746:24

**4:36**
1747:8

---

**5**

**5**
1486:10
1534:2
1692:15
1717:25

**5.8**
1553:19
1591:2
1782:4

**5.83**
1726:6

**5.833**
1589:22
1594:14,16
1780:22

**5/10/23**
1651:14
1695:14

**5/28/2021**
1557:10

**50**
1544:24
1553:20
1567:13
1577:13
1597:19
1599:19
1649:25
1661:20
1687:3
1756:17
1781:9

**50-point**
1599:20

**50th**
1567:15

**52**

---

**TRANSCRIPT OF PROCEEDINGS**

1691:24

**52-week**
1736:23

**528**
1648:6

**54,000**
1642:9

**56**
1651:13

**57**
1489:13

**5:30**
1783:8

**5:32**
1783:19

**5th**
1778:20

---

**6**

**6**
1487:4
1548:12
1687:12,15,
20 1735:23

**60**
1763:5

**63**
1605:22

**64**
1513:3
1514:22
1515:3
1597:24

**64-bit**
1555:10

**65**
1603:25

1605:13,21
1606:14
1608:2
1752:25

**65-day**
1607:3,6

**65-
turnaround**
1607:15

**66**
1755:4

---

**7**

**7**
1564:3,9,10
1643:19
1644:8
1728:23
1729:2
1755:3

**70**
1755:3

**770**
1484:14,18

**7th**
1485:1

---

**8**

**8**
1633:17
1634:4
1735:3
1769:16

**80**
1555:14
1782:4

**85**
1558:8

**8:30**
1481:22
1482:5

---

**9**

**9**
1493:8
1735:3

**9,000**
1687:23,24

**90**
1644:8

**900**
1534:19

**95**
1565:7

**950**
1534:19

**98**
1633:17
1634:2,4

**99**
1639:17

**9:00-ish**
1783:16

**9:25**
1481:1

**9:30**
1493:14

**9:40**
1493:17

---

**A**

**a.m.**
1481:1
1543:3

1553:14

**A12**
1728:25

**ability**
1496:3
1644:16
1646:21
1653:13
1655:25
1657:8
1752:22
1770:7
1780:19

**absence**
1774:16

**absent**
1685:15

**absolutely**
1561:11
1576:17
1681:18
1697:21
1765:11
1766:6
1774:12,14

**absorb**
1545:1

**absorbing**
1529:1

**academia**
1507:10

**academic**
1501:3
1520:4
1524:5
1529:4
1579:5
1687:3
1736:22
1737:10,12

1752:10
1769:8

**accelerate**
1650:6
1754:19

**accelerating**
1754:14

**accelerators**
1498:11

**accept**
1501:12,14,
21

**acceptable**
1776:3

**accepted**
1501:10
1672:20
1749:17
1752:4
1761:23
1769:23
1774:16

**access**
1619:4,20
1620:2
1743:2
1748:6
1761:6
1765:19,20

**accessible**
1564:9

**accessing**
1614:6

**accident**
1515:14

**accidentally**
1515:12

**TRANSCRIPT OF PROCEEDINGS**

accommodate
1493:25
1548:16
1552:9,13

accomplished
1577:19
1578:1

account
1629:3
1645:24,25
1722:19

accounting
1736:21

accounts
1644:17

accuracy
1558:23

accurate
1482:25
1490:23
1523:8,9
1537:9
1576:6
1617:19
1621:13
1650:10
1654:8
1655:1
1722:19

accurately
1589:3
1763:10
1765:11

achieving
1757:11

acquired
1750:1

acquiring

1764:19,20

acquisition
1487:19

acquisitions
1762:16
1764:15,16,
18

act
1720:23

acting
1721:3,7

active
1763:3

actively
1651:8
1737:24

activities
1550:20
1757:3

activity
1499:4

actual
1545:18
1590:4
1618:18
1619:4
1666:25
1667:1
1693:22
1699:17
1707:9
1740:21
1756:25
1760:3

add
1503:22
1608:14
1681:16
1738:25

added
1594:8
1646:4
1681:12
1753:4

addition
1555:21
1556:22
1655:16
1668:3
1756:2
1768:17
1771:15

additional
1508:20
1640:9
1684:19
1733:1
1753:4
1773:23

ADDR
1555:10

address
1504:7
1702:25
1744:11,15,
19,24

addressed
1770:9

addresses
1590:21
1689:4
1702:1

addressing
1504:5

ADDRS
1555:8
1575:5

adequate
1502:6

1704:18
1705:8
1712:24

adjourned
1783:19

admissible
1547:5,9,14
1551:7,18

admission
1547:10

admonition
1491:24

advance
1490:14
1648:14
1669:19

advertising
1532:14

advice
1765:3

advisable
1767:3

advise
1561:6

advisers
1774:5

advisor
1502:17
1517:5
1529:4

affect
1662:16
1680:7

affidavit
1682:19

affiliation
1698:13
1700:10

1701:12
1732:19
1780:12

affiliations
1697:6,15
1698:16

affirmative
1683:6,10

affirmatively
1683:19

affording
1548:14

afraid
1738:6

afternoon
1616:1
1733:13

agencies
1500:11
1529:9

aggregator
1655:23
1656:10
1657:4,14
1691:7

agree
1523:21,23
1530:15
1533:3
1548:21,24
1551:10
1557:4,18
1569:16
1571:12
1577:20
1584:13,15
1592:21
1593:3
1611:2
1613:25

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1617:8
1618:20
1619:14
1625:5
1649:3
1661:12
1662:2
1679:19,22
1683:4,15,23,
24,25 1684:2,
20,25
1693:18,23
1697:11
1707:4
1713:3
1721:2
1723:20
1724:3,18
1732:16
1744:13,22

**agreed**
1683:22
1702:18
1752:1

**agreement**
1487:24
1541:17
1551:23,25
1552:25
1555:20
1556:1
1601:25
1619:10,24
1624:7
1643:15
1645:9
1671:18
1682:17
1690:1
1705:3,4,19
1706:3
1707:17
1710:14

1720:5,19

**agreements**
1619:21
1620:25
1643:17
1652:19
1766:18

**ahead**
1494:6
1495:5
1505:14
1509:22
1543:4
1550:22
1576:1
1604:4
1616:2,13
1633:9
1634:2
1637:7
1684:10
1685:7
1740:7
1747:14

**aim**
1512:2

**aimed**
1677:24

**aiming**
1529:2

**aisle**
1554:22

**alert**
1627:15,23

**Alford**
1482:22,24
1483:3
1490:7
1498:21
1509:22

1510:24,25
1511:4
1515:20
1539:1,16,21
1541:15
1542:14,18
1546:3,23,25
1548:2,5
1550:9,21,23
1551:2,15,18,
21 1552:16
1576:11
1577:8,9,12,
15,17
1581:22
1582:1
1585:23
1590:9,12
1593:2,7,13,
15 1597:1,5,
10,13,14
1606:11,12,
13 1611:1,10,
15,18 1612:1,
6,9,14 1613:5
1614:22
1615:1
1616:3,4,6,
11,14,15
1617:7
1623:4,7,13,
17 1624:16,
19,21,23
1625:1,3
1629:9,24
1630:2,7,10,
14,18,25
1631:15,18,
21,25
1632:12,15,
18,21,24
1633:1,4,7,
10,16 1634:3,
6 1635:3,8,

13,16,21,23
1636:5,20
1637:13,18,
21 1638:10
1640:16,24,
25 1641:3,4,
9,11 1642:24
1645:1,2
1646:6,10
1647:22,23
1649:12,13
1650:21,23
1651:1,4,5
1653:1,3
1656:21,23
1657:23
1658:5,6
1664:24
1667:18
1670:17,20
1671:12
1673:1,8,10,
17 1674:1
1675:15,19
1676:7,11,14,
17,24 1677:5,
8 1678:3,10,
12,18 1679:8,
13 1680:8
1681:2,19
1682:1,12
1683:24,25
1684:7,10,14,
16,24 1685:7,
8,9,20
1686:1,4,8
1690:19
1692:12,18,
22,24 1693:3,
6 1694:15,16
1698:23
1699:2,14
1700:5,22
1701:2,6,18,

24 1702:7,12,
15,19 1703:7,
10,13,15
1704:25
1705:5
1708:23
1709:1,19
1710:10,15,
18,21 1711:2,
8,17 1712:2,
8,13,21
1714:8,11
1717:22
1727:2
1728:3,4,7
1730:15
1731:8,9,21
1733:2,5
1735:25
1736:3,12
1737:16
1738:12
1740:1,5,23
1741:2
1743:25
1744:2,4,7
1745:20,24
1746:1,3,8,
12,20
1747:14,15,
17,24 1748:5,
13 1749:5,6
1776:23
1777:1,4,6,9,
11,24
1779:18,23
1783:9,12,13,
14,18

**Alford's**
1637:4

**algorithm**
1507:4,5
1508:22

1519:9
1533:7
1754:22

**algorithms**
1533:11,14

**alleged**
1699:17
1700:7
1776:8

**allocated**
1673:23
1782:18

**allowed**
1681:13

**allowing**
1773:3
1778:11
1780:17

**alter**
1780:11

**alternatives**
1757:17
1759:24

**ambiguous**
1546:4
1576:12
1730:6
1736:12
1737:17

**American**
1758:8

**amount**
1525:5
1554:10
1558:20
1582:11
1591:3
1592:2
1642:17

1689:22
1690:18
1713:1
1764:21
1773:23
1781:8
1783:3

**analog**
1533:19
1534:10,21
1535:2,4,24
1536:3
1537:2
1620:20

**analog-to-digital**
1536:4

**analogous**
1508:5

**analogy**
1562:1
1649:23

**analysis**
1495:13,19
1517:9
1518:8
1609:23
1658:16
1751:6,11

**analyze**
1750:16

**analyzer**
1617:15

**answering**
1576:8

**answers**
1485:6
1491:21
1643:14
1699:10

1742:12

**anticipated**
1688:19

**anybody's**
1545:1

**anymore**
1631:5

**apologies**
1502:10
1519:4
1522:12
1554:16
1575:23

**apologize**
1649:9
1726:12
1746:8

**apparent**
1700:7

**apparently**
1594:5
1724:7
1727:16

**appearance**
1772:2

**appeared**
1725:18

**Appendix**
1752:24

**Apple**
1644:7
1728:24
1729:1

**applicable**
1502:21
1563:12
1582:4
1749:24
1764:25

1765:2
1770:15,17
1775:17
1776:16
1778:2

**application**
1504:3,4
1506:11
1728:25
1765:5

**applications**
1502:22

**applied**
1562:9
1753:9
1779:21

**applies**
1687:2

**apply**
1550:25
1617:15
1690:22
1750:12
1752:7,11
1771:7

**appreciates**
1492:24

**approach**
1496:12
1662:21
1742:4

**approached**
1495:17

**approaches**
1754:13

**appropriately**
1783:2

**appropriating**
1619:6

**approve**
1548:11
1580:1

**approximately**
1601:25
1602:1
1603:12
1687:21
1706:11
1755:14
1756:17
1761:8,14
1762:1
1781:2

**April/may**
1487:20

**arbitration**
1487:14
1488:1

**arbitrator**
1481:7
1482:23
1483:1,5
1484:20
1488:21,25
1490:8
1492:14,17,
22 1493:12,
19 1494:2,5,
15,18,21
1495:4
1498:20
1500:3
1507:22
1508:1,11,14
1509:7,11,16,
20 1510:20,
22 1511:1,11,
21 1514:13,
15,18 1515:5,
10,16,23

1516:3
1517:10
1522:14,18,
21 1523:10,
12,20,22
1525:8,25
1526:12,16,
19,22 1534:5
1535:11
1538:1,5,10,
12,15,19,22,
23,24 1539:4,
6,12,22,25
1540:5,9,13,
18,23 1541:4,
9,12,23
1542:15,20,
24 1543:4,20
1546:6,24
1547:25
1548:3,6,22
1549:2,8,25
1550:5,11,22,
25 1551:8,17,
20,22
1552:19
1553:11,15
1554:13,14
1558:2,5
1559:13
1561:21
1564:17,19,
23 1566:4,7,
10,12,14,21
1568:17,21
1569:1
1570:18
1573:18,20,
23 1574:2,6,9
1575:25
1577:4,7,10,
13 1581:23
1585:14
1590:7,11

1593:1,6,10,
14 1597:3,6,
11 1606:10
1610:18
1611:12,17,
24 1612:4,7,
11,25
1614:24
1616:2,8,13
1622:24
1623:6,8,11,
14 1624:16,
21,24 1625:2
1629:6
1630:5,8,12,
15,20,21,24
1631:1,4,11,
17,19,23
1632:1,5,13,
17,19,22,25
1633:3,6,9,
21,23 1634:1
1635:5,10,14,
19,22
1636:16,25
1637:7,11,16
1640:21,24
1641:1
1646:4,8
1647:21
1649:11
1650:19,22,
25 1651:2
1657:19,23
1658:2,4
1664:20
1667:15
1670:17
1672:22
1673:8,15,18
1675:9,13,17
1676:3,8,13,
15,18 1677:2,
6,18,22

1678:2,4,11,
16,20
1679:10,15,
25 1680:9
1681:5,21,24
1682:10
1683:2,18,23
1684:3,9,11,
15,17,22
1685:1,6,23
1690:6
1692:16,20,
23,25 1693:5
1694:13
1698:23
1699:3,12
1700:3,16,24
1701:3,20
1702:3,4,8,
13,17,21
1703:6,8,11
1708:21,24
1709:3,8,14,
23 1710:3,11,
16,19,24
1711:4,19
1712:6,9,14,
18 1714:7
1728:2,6
1730:7
1731:6,10
1732:25
1733:4,6,11,
21 1734:2,4,
24 1735:2,5,
9,17,21
1736:2,13
1737:5,18
1738:8
1740:6,24
1743:22,24
1744:3,5
1745:22
1746:6,9,22

1747:3,6,9,
13,23 1748:1,
6,9,11,14,19,
24 1749:2,4
1776:21,24
1777:3,5,7,
10,18
1779:16
1783:7,10,13,
15

**arbitrators**
1518:19
1528:14

**architectural**
1543:18

**architecture**
1499:10
1502:16
1524:23
1543:24
1545:9
1557:21
1560:9
1571:1,5
1578:21
1716:1

**architectures**
1499:7
1502:20

**area**
1499:1
1550:19
1564:3,5
1571:23
1600:6
1723:4
1729:6
1742:24,25
1754:11

**areas**
1488:6,16,17

1495:24
1496:1
1500:13
1504:9
1568:14
1676:19
1725:23,24
1726:5

**argue**
1550:13
1674:22
1712:7,10

**argued**
1778:6

**arguing**
1612:10
1670:18

**argument**
1550:15
1685:18

**arguments**
1489:8
1674:21

**arise**
1764:6
1772:2

**arises**
1772:24

**ARM**
1508:6

**arrange**
1669:19

**arrangement**
1595:1

**array**
1507:21
1508:4
1512:15
1515:2

1527:18
1661:8

arrays
1514:21

arrived
1782:24

art
1525:2
1531:16
1562:5

articles
1776:10

articulated
1729:12

as-soon-as-possible
1627:2

ASAP
1708:1

ASIC
1497:18
1498:11
1503:25
1504:1,18
1519:6,8,17
1520:9
1521:20,23
1522:2,8
1529:18
1530:1,2
1532:24
1572:12
1578:8
1616:24
1617:9
1621:14
1628:4
1655:22
1657:1
1716:2,11

1727:10,18
1746:15
1760:13,14

ASIC-TYPE
1575:2

ASICS
1499:11
1503:14
1504:11,12,
17,21

asks
1669:24
1713:19

aspect
1589:16

aspects
1505:19
1546:15
1554:22
1679:23
1741:13,20
1742:15
1764:13

assemble
1691:15

assemblies
1512:23

assembly
1514:10
1599:18
1742:6

asserted
1488:7
1523:4

assertion
1486:25
1645:8
1652:15
1695:13

assess
1496:11
1546:14
1732:10
1760:6,23

assessing
1489:7

assessment
1496:3,6
1503:17
1519:1,6,8
1520:8,16,22
1524:1,13,14
1528:16
1529:14,18,
22 1530:8
1537:25
1543:16,18,
24 1544:18,
23 1554:10
1556:23
1557:4,21,22
1559:11,16,
23 1565:8
1575:17
1578:8,18
1579:4
1580:21,23
1581:1
1587:4,9,15
1588:2,5,8,
20,22
1590:13,17
1603:19
1612:18
1614:10
1617:20
1621:3,19
1648:6,18
1662:16
1670:14
1679:1,5
1717:17

1724:2,6
1725:8
1728:18
1729:6
1731:11
1759:22
1781:3

assessments
1518:24
1524:2,6
1557:18
1741:10
1742:7
1760:23

asset
1764:19,20

Assign
1748:5

assignment
1496:13
1530:20
1531:10
1553:22
1730:12
1745:12

assignments
1775:18
1779:3
1781:6

assimilate
1491:18,19

assisted
1765:21
1767:7

assume
1575:5
1591:11
1648:6
1678:5

assumed
1582:18

assumes
1489:20

assuming
1665:4
1716:24

assumption
1675:10,12,
14,18 1676:1
1681:8
1710:12,13

assumptions
1583:24
1584:1
1641:13
1676:21
1679:17
1680:19
1681:15
1765:10,17

assurance
1646:1,9,11

assure
1523:15

attached
1625:12

attachments
1713:18

attend
1481:13
1739:17

attended
1739:11,13

attention
1485:3
1518:22
1635:24
1713:17

**TRANSCRIPT OF PROCEEDINGS**

1720:13
1774:3

**attorney**
1483:8
1591:5

**attorney-client**
1486:20

**attorneys**
1773:18

**attribute**
1492:24

**attributed**
1549:16

**attributions**
1779:21

**audible**
1516:18

**audience**
1716:14

**audit**
1757:6

**auditing**
1644:17

**August**
1605:8
1608:16

**Australia**
1521:3

**authoring**
1778:25

**automated**
1767:10

**automation**
1767:10

**automotive**
1652:4

**availability**
1644:9
1669:21
1763:2
1767:20
1768:21
1781:20

**average**
1504:18

**avoid**
1772:5

**award**
1497:21
1507:14

**awards**
1497:19

**aware**
1481:18
1483:11
1585:8
1626:18
1706:7
1731:14
1737:22
1770:12

**awareness**
1708:10

**Awesome**
1496:15
1506:21

**B**

**B2b**
1556:15

**Babbel**
1515:18

**Bachelor**
1496:25
1497:1

**Bachelor's**
1501:13,14

**back**
1489:2
1502:24
1511:7,17
1515:11,15
1519:5
1523:25
1525:19
1537:22
1546:18
1552:21
1553:1,15,25
1559:1
1563:20
1565:14
1574:10
1582:23
1593:13
1594:24
1603:4
1604:2,5
1605:22
1606:4,15
1608:3,20
1610:3
1611:3
1613:16
1614:25
1616:4
1625:15,20,
24 1626:5,11
1627:7,16,25
1629:13
1633:14
1649:8
1654:20
1685:2,12
1688:3
1705:23
1719:16
1721:19,25

1727:4
1731:20
1733:9
1735:24
1740:9
1745:24
1746:23,25
1747:2,4
1762:6

**backdrop**
1487:12
1489:6,12

**background**
1496:19
1497:7
1498:1
1516:7
1518:3
1624:3
1676:13
1678:17,18,
21 1684:11
1752:17,21
1753:7

**bad**
1500:2
1682:10

**balance**
1548:8,25
1550:4

**balancing**
1552:10

**ball**
1661:8

**ballpark**
1769:11

**bank**
1644:17
1645:24
1656:13

1691:8

**bar**
1532:10

**bare**
1512:8
1609:12
1774:25

**base**
1509:17
1537:6

**based**
1494:14
1521:3
1529:24,25
1536:14
1552:4
1557:3,17
1584:7
1586:17
1587:17
1590:16
1591:18
1604:13
1628:24
1632:10
1674:18
1688:13,14
1690:25
1710:1
1749:25
1751:3,6
1754:23
1762:24
1765:4
1771:3

**bases**
1622:25

**basic**
1519:25
1765:1,23

**TRANSCRIPT OF PROCEEDINGS**

basically
1484:13
1487:18
1539:10
1555:22
1568:5,10
1609:14
1713:25
1770:24

basis
1496:17
1555:24
1561:20
1589:8
1608:9
1627:2
1655:7,11
1673:24
1680:3,6
1681:14
1708:18
1710:13
1711:12
1726:4
1731:22,24
1750:18
1751:12
1756:21
1758:4
1765:12
1769:11
1771:10
1781:17

Bates
1568:18
1719:18
1735:25

battery
1537:18
1759:23

bear
1521:12

Bearing
1733:11

beautifully
1727:15

beep
1609:11,15

begin
1645:3
1705:19

beginning
1481:8
1633:17
1634:4
1644:21
1652:24
1656:19
1692:14
1721:21

begins
1752:24
1755:3

behavior
1514:9
1519:17
1780:3

being's
1491:16

belabor
1606:8
1679:9
1681:4

Belgrade
1497:4

belief
1604:9

believed
1672:5

bell
1517:13

benefit
1523:17
1726:9

benefits
1563:1,20,21

Berkeley
1497:10,14

Berkley
1502:18

Bert
1767:7

bias
1772:2

big
1499:3
1512:21
1521:8
1525:11
1530:3
1610:21
1661:23
1773:21

bigger
1564:3

billed
1553:18,19

binary
1613:12
1667:8,14
1694:4

binder
1717:20,21

binders
1538:20
1541:18
1542:10

biocompatibility
1514:5

1599:8

bioengineering
1499:2

biology
1753:8
1754:12

bionic
1728:25

bit
1481:9,18
1482:6,19
1483:8,13
1484:9
1491:13
1493:4
1494:14
1502:8
1503:22
1504:10,25
1512:4
1513:11
1514:9
1528:13
1537:15,23
1543:21
1562:16
1586:6
1602:20
1604:5,6
1606:24
1634:7
1637:9
1681:12
1713:17
1750:20
1752:17
1753:6
1754:8
1757:23
1758:13
1759:17

1762:6,7
1763:16
1764:12
1768:3,4
1769:14
1770:16
1773:7
1778:17

bitcoin
1487:20
1529:19
1531:8
1532:24
1563:19
1566:1
1595:19
1599:10
1600:5
1727:16
1751:3
1752:2,4,7,11

BITMAIN
1531:20

bits
1555:8
1620:20

blah
1779:20

blank
1716:15

Bleck
1485:8,20,24
1486:5,12,22
1487:2,22
1496:2
1529:16,21
1530:7,8,10
1532:22
1533:12
1538:3
1539:5,10

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1540:12
1541:5,16
1543:10
1544:9,13
1546:2,13,17
1547:8,9,11,
13,21
1549:17,22
1551:3
1553:8,18
1554:9
1555:14,20,
25 1557:9
1561:12
1568:24
1570:17,20,
21 1579:4
1580:25
1581:2,12,14,
19 1582:3,18,
21 1585:8,16,
19,20 1587:3,
12,14
1589:10,13
1590:8
1591:2,8
1593:22
1594:8,13
1602:15
1603:13
1604:16,23
1608:15
1611:19
1618:24
1619:1,9,14,
18 1620:1
1627:19
1648:24
1664:10,16
1667:24
1668:1
1696:2
1697:5
1699:17

1700:8
1703:18
1704:7,10,14,
17 1705:8
1706:7,17
1707:13
1708:1,8,10,
15 1709:22
1710:2
1712:24
1713:15,19
1714:2,3,19,
23 1715:2,8
1717:14
1718:9
1721:2,13,22
1722:1,23
1724:7
1725:10,18,
24 1729:16
1730:18,24
1731:13
1732:1,15
1739:23
1741:14
1744:11,15,
21,24 1745:6,
17 1749:21
1750:19
1778:22,23
1779:1

**Bleck's**
1496:5,11
1530:19
1531:10
1537:24
1540:11,25
1541:16
1546:19
1547:2
1557:1,4,8,18
1585:24
1590:4,19

1592:15,20
1593:5
1594:6
1603:17
1608:14
1612:20
1625:23
1626:9,15
1627:6,15,19
1647:25
1648:3,5,10,
14,17,25
1652:13
1662:8
1663:17,21
1664:9,25
1667:20
1668:23
1678:24
1694:7
1696:3
1703:3,19,25
1723:21
1724:19
1725:5
1728:8
1729:24
1730:12
1731:1,18
1732:7
1739:11,20
1745:8
1749:15,20
1750:7
1769:21
1770:3
1777:14
1780:21

**Bless**
1719:17
1726:19

**block**
1545:10

1560:8

**blocks**
1513:5
1558:16
1560:10,13
1564:21
1571:2,6,14
1573:7
1580:5
1611:22

**blood**
1521:7

**blow**
1634:4,6
1641:10
1644:23
1656:21
1705:3
1714:9

**board**
1512:22
1526:4,20
1527:16
1528:9
1595:14
1596:9,15
1597:16
1598:13,17,
21 1609:10,
19,24
1660:16,21,
25 1661:4
1662:25
1760:15
1774:5

**boards**
1513:2
1522:9,23
1527:1
1595:10,20
1600:14

**boat**
1607:10

**Bob**
1502:18

**body**
1514:16

**bogged**
1684:23

**bond**
1569:23

**bonding**
1512:19
1661:7
1663:2

**book**
1502:18

**bottom**
1559:19
1618:21
1641:6
1645:3
1661:18
1662:4
1722:22,23
1729:7

**bought**
1595:19

**box**
1521:17
1533:17
1660:10
1773:21

**boxes**
1493:1
1528:10

**boys**
1522:4

**brain**
1491:16

**TRANSCRIPT OF PROCEEDINGS**

1499:13
1512:13
1513:15
1514:3,9,18,
24 1516:2,19,
21 1517:14
1521:4
1610:19,21

**brains**
1491:18

**brand-new**
1746:14

**breach**
1551:24
1755:21
1772:24

**breadth**
1548:13

**break**
1493:6,10,13,
16,21,22,24
1500:1
1542:23
1559:21
1611:10
1614:23
1625:19
1681:6,25
1685:2,11,21
1700:3
1733:16
1744:1
1746:23

**breakdown**
1742:25

**breaking**
1662:13

**breaks**
1733:23

**briefed**
1489:19

**briefing**
1484:24
1485:11,12
1542:8,9

**briefings**
1484:25

**briefly**
1534:11
1570:23
1714:5
1750:11

**briefs**
1515:6

**bright**
1578:2
1580:8

**bring**
1485:3
1504:15
1505:22
1510:6,7
1511:7
1527:24
1553:25
1610:16
1658:13
1767:3

**brings**
1505:9
1535:15
1608:22

**broad**
1594:3

**broader**
1687:2

**Brodersen**
1502:18

**broken**
1762:14

**broker**
1753:16

**Brookhaven**
1753:11

**BROOKS**
1630:1
1634:5
1636:4
1644:24

**brought**
1679:24
1760:6
1761:11
1782:1

**budget**
1537:19
1742:23

**budgeted**
1607:19

**build**
1498:10
1499:11
1504:22
1508:7,18
1509:5
1513:10
1514:12
1517:1
1519:20
1520:21
1521:3
1525:17,23
1533:8,16
1535:2
1562:3
1568:11
1580:2
1595:10,15
1599:7

1600:2
1603:15
1604:18
1628:24
1666:13,22
1669:1,8
1673:13

**building**
1499:4
1502:20
1504:21
1505:16
1533:9,13
1534:1
1535:4
1554:20
1558:15
1560:8
1565:2
1571:1,5
1572:16
1573:7
1599:3
1611:8
1756:3

**builds**
1507:20
1508:5,6

**built**
1504:17
1520:20
1533:10
1554:20
1555:8
1562:14
1567:9
1576:17
1579:7
1587:6
1599:6
1609:23
1665:24

1669:13
1670:16
1727:17

**bullet**
1688:16,17,
24,25
1734:21

**bullets**
1723:3,5,12,
22,24 1724:3,
4,9

**burden**
1486:3
1698:19

**burning**
1483:14

**bus**
1567:10,14,
22 1649:23
1669:18

**business**
1648:8,22
1753:18
1760:10
1764:18

**busy**
1561:9
1755:16

**butchering**
1522:13

**button**
1572:15
1609:25
1610:9
1616:10

**buy**
1595:3,4
1691:17

**buying**

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1729:22

**C**

C-E-R-I-B-E-L-L
1517:12

calculation
1754:15

calculations
1568:1

California
1481:2
1497:11
1753:23

call
1487:7
1511:16
1512:8
1513:4
1516:17,21
1523:6
1561:4
1583:6
1609:11
1625:10
1666:10
1687:5
1709:9
1724:1,4
1773:4

Callahan
1481:7
1482:23
1483:1,5
1488:21,25
1490:8
1492:14,17,
22 1493:12,
19 1494:2,5,
15,18,21

1495:4
1498:20
1500:3
1507:22
1508:1,11,14
1509:11,16,
20 1510:22
1511:1,11,21
1515:10,16,
23 1516:3
1522:14,18,
21 1523:10,
12,20,22
1525:8,25
1526:12,16,
19,22
1527:11,15
1534:5
1535:11
1538:1,5,10,
12,15,19,22,
24 1539:4,12,
22,25 1540:5,
9,13,18,23
1541:4,9,12,
23 1542:15,
20,24 1543:4
1546:6,24
1547:25
1548:3,6,22
1549:2,8,25
1550:5,11,22,
25 1551:8,17,
20,22
1552:19
1553:11,15
1558:2,5
1559:13
1561:21
1564:17,19,
23 1568:17,
21 1569:1
1570:17,18
1573:18,20,

23 1574:2,6,9
1575:25
1577:4,7,10,
13 1581:23
1585:14
1590:7,11
1593:1,6,10,
14 1597:3,6,
11 1606:10
1610:18
1611:12,17,
24 1612:4,7,
11,25
1614:24
1616:2,8,13
1622:24
1623:6,8,11,
14 1624:16,
21,24 1625:2
1629:6
1630:5,8,12,
15,21 1631:1,
4,11,17,19,23
1632:1,5,13,
17,19,22,25
1633:3,6,9,
21,23 1634:1
1635:5,10,14,
19,22
1636:16,25
1637:7,11,16
1640:21,24
1641:1
1646:4,8
1647:16,21
1649:11
1650:19,22,
25 1651:2
1657:19,23
1658:2
1664:20
1667:15
1670:17
1672:22

1673:8,15,18
1675:9,13,17
1676:1,3,8,
13,15,18
1677:2,6,22
1678:2,4,11,
16,20
1679:10,15,
25 1680:9
1681:5,21,24
1682:10
1683:2,18,23
1684:3,9,11,
15,17,22
1685:1,6,23
1690:6
1692:16,20,
23,25 1693:5
1694:13
1698:23
1699:3,12
1700:3,16,24
1701:3,20
1702:4,8,13,
17,21 1703:6,
8,11 1708:21,
24 1709:3,8,
14,23 1710:3,
11,16,19,24
1711:4,19
1712:6,9,14,
18 1714:7
1728:2,6
1730:7
1731:6,10
1732:25
1733:4,6,11,
21 1734:2,4,
24 1735:2,5,
9,17,21
1736:2,13
1737:5,18
1738:8
1740:6,24

1743:22,24
1744:3,5
1745:22
1746:6,9,22
1747:3,6,9,
13,23 1748:1,
9,14,19,24
1749:2,4
1776:21,24
1777:3,5,7,
10,18
1779:16
1783:7,10,13,
15

called
1483:10
1495:2
1497:2
1502:16
1507:7
1515:1
1517:5
1519:2
1520:24
1521:2,12
1525:10,12
1544:5
1575:12
1658:8
1678:21
1747:11
1753:13
1761:17
1773:12

calling
1561:6

camera
1523:15
1536:2

cancelled
1671:4,14
1672:12

**TRANSCRIPT OF PROCEEDINGS**

1674:20
1676:12
1677:11
1678:14

**candidates**
1698:20

**capability**
1531:16
1744:16
1750:25

**capable**
1771:6

**capacitors**
1691:17,18
1692:3

**capacity**
1513:3
1545:1
1729:1
1753:24
1755:12,17

**capital**
1507:18
1751:7

**care**
1749:24
1770:15
1775:1
1777:19

**carefully**
1626:16
1643:15
1664:20
1699:4
1719:25

**Carlo**
1754:23

**carry**
1537:15

**case**
1486:9,18
1495:12,14,
16,18
1506:19
1518:8,23
1531:1
1532:14
1536:25
1546:1
1551:4
1552:3,4
1555:12
1573:8
1577:22
1589:6
1593:17
1621:5,23
1645:7
1646:16,23
1652:14
1653:8,15
1678:7
1690:1,10
1691:19
1695:23,25
1710:7
1716:7
1717:11
1718:4
1719:11,23
1721:16
1722:15
1723:16
1724:9,25
1741:15
1755:8
1757:1
1761:11
1762:5
1763:20
1764:10
1766:20
1773:20

1776:8
1777:12
1778:15
1779:22

**cases**
1753:4
1762:3
1763:15,20
1767:6,8
1772:11

**cash**
1689:8
1690:14,16

**catch**
1720:7,13

**catch-22**
1552:15

**categories**
1487:19
1762:18

**category**
1534:6

**caused**
1685:13

**caveat**
1733:22
1765:10

**caveats**
1765:16

**center**
1499:7
1753:12,13
1754:7

**centimeters**
1515:3

**CEO**
1591:12
1656:3
1738:3

**cerebellum**
1517:13

**Ceribell**
1516:8,9
1517:6,12,13

**cetera**
1484:3,4
1715:16
1716:1

**Chafe**
1516:25

**chain**
1519:20
1523:6
1606:18
1608:5

**chair**
1499:1
1510:11
1546:20
1611:11
1640:16
1677:20
1682:8
1712:15

**challenge**
1491:14,16
1513:18
1684:18

**challenged**
1741:14

**challenges**
1599:12

**challenging**
1507:12
1524:20
1535:15
1599:9
1701:17

**chance**
1490:2
1653:2
1686:7
1713:23

**change**
1504:25
1508:23
1514:9
1583:23
1654:20
1696:3
1701:11
1719:14

**changing**
1699:18
1700:8,9
1718:8

**channels**
1513:4

**characterizati
on**
1558:20
1777:17,21
1779:11

**characterize**
1558:15
1573:6

**characterized**
1724:11

**charge**
1533:12

**charges**
1641:19

**charts**
1518:10

**check**
1519:16
1571:15,16

**TRANSCRIPT OF PROCEEDINGS**

1572:8,13
1611:15
1612:4
1661:24
1668:4,11,18,
25 1756:4
1763:7,10
1773:10
1775:7

**checking**
1716:22
1765:24

**checks**
1571:17
1668:14
1766:3,7
1771:16

**chemical**
1514:4

**chemistry**
1753:8,10
1754:12

**cherrypicked**
1532:14

**chief**
1736:21

**children**
1764:23

**China**
1742:2

**Chinese**
1619:19

**chip**
1496:3,7
1501:19
1502:19
1504:6,7
1505:2,8,9
1506:2

1507:7,15
1508:15,20
1509:2,8,9,13
1510:12
1511:8
1512:7,12,13,
17,19 1513:2,
9 1517:23
1519:10,20
1521:12,18,
19 1524:7
1525:6,7,10,
11,16,22
1526:14,15,
17,20 1527:2,
11,21 1528:5,
17,20 1529:1
1531:15,18
1532:11
1533:16,22,
25 1534:6,8,
21,25
1535:21
1536:16,17,
18,21,23,24
1537:7,10,20,
23 1543:25
1544:22
1545:14,17
1554:1,3,8,18
1556:23
1559:7,12,17
1560:20
1561:7,15,19
1562:20,21,
24 1563:2,3,
10,22 1564:2,
5,8 1565:5,
13,17,19
1566:19
1568:1,4,5
1569:9,11,14
1570:3,11
1571:3,18

1572:8,13
1573:11
1576:17,22,
25 1578:14
1579:15,17,
23,25 1580:9,
10 1581:9
1582:9
1584:25
1586:23,25
1587:3,5,10,
16,22 1595:8,
11,16,19,24
1596:3,7
1600:12
1601:1,2,8,12
1602:2,11
1603:20,24
1606:6,22
1608:3
1609:7,17,22,
24 1610:3,8,
23 1611:7,22
1613:2,3,18
1614:10
1617:16,17,
18,21 1619:5
1620:8
1621:14
1625:20,24
1626:4,24,25
1627:20
1628:4,5
1639:6
1643:17,19
1644:4
1650:14
1651:7
1652:21
1655:19
1658:11
1659:4,9,12,
13,16,25
1660:15,18,

24 1661:4
1662:24
1665:10,19,
23,24 1666:6,
17,18,22,25
1667:1,20,23
1668:3,8,18
1669:2,8,13
1670:3,16
1674:4,13
1675:24
1679:7
1682:3
1686:18,19
1687:1
1692:2
1693:21,25
1695:16
1726:18
1727:14
1738:24
1740:18
1741:7
1742:3,5,8,
10,12,21
1746:15
1751:4
1760:13,25
1761:12
1769:13

**chip-type**
1691:17

**chips**
1496:20
1502:21
1503:21
1506:8
1507:2
1508:6,7,18
1509:5
1510:7,12,17,
21 1511:25
1512:10,25

1521:17
1522:23
1524:2
1525:19
1526:6,13,18
1528:11,23
1530:4
1532:20
1533:10,13,
19 1535:4,13,
23 1545:11
1554:6
1566:2
1567:9,15,21
1568:9
1569:4,23
1572:17
1595:4
1597:15
1598:13,17
1599:1,14
1600:25
1604:2
1605:21,22
1608:20,24
1609:5
1611:3,4
1626:10
1627:7,16,24
1628:16,21,
22 1629:2,5,
7,8,12
1631:22
1633:13
1634:12,18
1639:3,8,23
1640:1
1643:2,5,11,
21 1644:2,15
1646:3,7,18
1652:1,4
1653:10
1655:22,24
1656:11

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1657:1,6
1685:14
1686:24
1687:4,5,6,7,
8,9,12,18,22
1726:15
1729:22
1736:16
1744:25
1745:10
1759:24
1760:15,19
1768:11

**chops**
1767:12

**chosen**
1548:18
1563:24

**chronologically**
1721:19

**chunk**
1499:3

**circle**
1603:4
1762:6

**circles**
1514:22

**circuit**
1512:22
1524:23
1526:4
1528:9
1558:16
1595:10,14,
20 1596:9
1597:15
1598:12,17,
21 1609:15
1660:16,20,
24 1662:25

**circuits**
1497:13
1498:8
1507:8
1511:9
1649:16
1650:7

**circumstance**
1486:21

**circumstances**
1520:14,15
1773:8

**cite**
1542:8,9
1623:19
1624:8
1625:6
1651:13

**cited**
1486:9
1622:19
1623:3,24

**civil**
1551:4

**claim**
1587:10

**claimed**
1591:2
1751:19

**claims**
1486:7
1745:17

**clarification**
1513:13
1596:25
1617:4,6
1639:21
1671:8
1690:4

1730:9

**clarify**
1527:9
1566:4
1709:5

**clarifying**
1510:3
1681:2

**clarity**
1503:22
1713:21

**class**
1498:7

**classes**
1498:6,9,24

**classic**
1680:21

**classified**
1600:1

**clause**
1645:15
1647:2
1653:19
1655:14
1734:20
1735:14

**clawback**
1484:1

**clean**
1572:24

**cleaned**
1572:19

**cleanup**
1733:8
1743:21

**clear**
1550:24
1552:19

1563:9
1579:2
1581:17,18
1587:7,22
1629:10,20,
21 1633:2,11
1637:20
1639:1
1640:18
1644:13
1646:14
1653:6
1654:6,25
1666:5
1670:1,2
1671:23
1674:2,11
1683:18
1691:5
1699:15
1713:9
1739:16
1743:16
1782:13

**clearing**
1502:23

**clever**
1524:25
1555:6

**client**
1518:10
1578:12
1600:17
1626:10,19
1645:25
1647:25
1670:16
1674:5,14
1675:25
1677:12
1682:4
1696:3

1704:7,9,14,
19 1705:8
1709:22
1712:25
1745:14
1772:11
1780:18

**client's**
1595:3

**clients**
1548:10
1757:8
1761:21
1766:9,18
1783:6

**clinical**
1499:4

**clock**
1519:21
1532:11
1609:18

**close**
1571:22
1573:12
1594:9
1599:16
1605:2
1669:16

**closely**
1756:9

**closer**
1781:8
1782:4

**CMOS**
1643:24

**coached**
1654:13

**coauthored**
1502:11,17

code
1513:8,9
1758:19
1761:5,6
1767:1

Coie
1760:22
1761:15,22

Coinmint
1482:16
1483:5
1496:13
1530:6,23
1531:1,2
1543:10,16,
17,23 1551:9,
14,24
1553:18
1555:20
1560:16
1595:3
1602:21
1621:7
1648:20,24
1671:25
1682:21
1707:2,25
1716:14
1721:4,6
1731:2,18
1749:16,23
1750:6,18,23
1751:2
1769:22

Coinmint's
1485:10,13
1486:19,24
1487:23
1567:1
1674:21
1698:18
1721:7

1751:25

Coito
1486:10

collaborated
1766:20

collateral
1544:13
1569:15
1571:9

colleague
1516:13

colleagues
1619:15
1756:8
1766:21
1767:4

combination
1760:15

combinations
1601:20

comfort
1591:16

comfortable
1552:2
1605:5
1758:14

Comment/
update
1722:9

comments
1768:18

commercial
1513:7
1520:5,17
1736:20
1737:10,13
1738:2

commercially

1520:8

commit
1643:1

commitment
1685:15
1688:6,23

commitments
1549:22
1781:19

committed
1669:12

committing
1655:9,13
1689:17

common
1528:15
1722:17
1742:7,11
1752:3
1754:5
1763:9

commonly
1565:24
1686:17

communicati
ng
1765:11

communicati
on
1582:6
1669:9
1696:6

communicati
ons
1499:19
1778:19

community
1503:12
1666:8

1697:25

companies
1506:7,14
1520:20,21
1521:2
1530:3
1532:4
1619:21
1620:16,20
1657:3
1727:11

company
1506:22
1516:9,10
1517:4,17
1528:17
1529:5
1569:22
1616:19
1617:3
1620:21
1698:17
1720:23
1721:4
1722:11
1725:12
1760:5,8
1764:19,20
1772:12,21
1782:23

company's
1759:2

comparable
1530:11

compare
1531:19
1532:1,18
1535:7
1584:4
1589:10

compared

1535:5
1555:9

comparison
1530:19
1570:8

compelled
1694:21

compelling
1561:24
1562:4
1564:7,10

compete
1491:6
1564:10

competence
1603:19

competently
1501:18

competing
1768:11

competitors
1532:9
1775:14

complaint
1545:3

complete
1500:22
1501:17
1548:1
1565:7
1588:7
1625:25
1626:20,24
1666:22
1704:10
1707:14,23
1783:4

completed
1565:5

1571:5
1602:16
1603:13
1716:21
1753:10,17

**completely**
1531:6
1576:7
1590:21

**completing**
1496:12

**complex**
1499:12
1501:19
1528:20,23
1533:13,15
1535:8
1537:1,21
1561:16
1563:7
1587:8
1722:21
1755:11
1756:4

**complexity**
1526:5
1601:22,23
1695:17

**complicated**
1498:22
1660:12

**comply**
1593:9
1732:12

**component**
1501:5
1600:21
1638:15
1661:3,6
1662:14
1692:6

1758:9
1776:7

**components**
1508:19
1526:24
1527:6
1533:15,20
1535:2,3
1536:3
1537:3
1571:10
1595:6,11,13,
23 1599:1
1600:5,11
1601:3,8,12
1602:1,9
1609:5,12,16
1610:7
1620:6
1640:15
1691:18

**Compound**
1700:2

**comprehensi
ble**
1694:6

**comprehensi
ve**
1560:5
1582:8,22
1583:7
1586:14

**compressor**
1571:11,13

**computationa
l**
1753:10,12
1754:11,14

**compute**
1563:16

**computer**
1497:22
1498:4
1513:6
1516:17
1519:18
1584:17,19
1609:19
1614:6
1694:5
1767:9

**computes**
1519:19

**Computing**
1753:14
1754:7

**conceal**
1697:15
1780:12

**concealed**
1697:5

**concept**
1517:1

**concern**
1547:7,12
1549:15
1550:6
1551:2

**concerned**
1748:22

**concerns**
1485:21
1486:1
1547:17
1619:5
1627:18,22
1728:21
1729:11

**conclude**
1482:10

1685:13
1688:21
1705:8
1783:16

**concluded**
1487:4
1725:24

**concluding**
1726:4

**conclusion**
1564:13,15
1688:5
1689:18
1765:22

**conclusions**
1697:2
1765:12,14

**concordance**
1496:4,8

**concurrent**
1611:7

**condensed**
1630:11

**conditions**
1532:12
1640:4
1642:15
1670:8
1673:22
1734:20

**conduct**
1502:5
1699:17
1700:8
1749:20,22,
24 1750:16
1769:22
1770:3,11
1778:1,14

**confer**
1484:16

**conference**
1492:5
1507:7,8,11
1622:11
1734:1

**confidence**
1529:4
1559:7

**confident**
1551:5
1565:17
1669:16

**confidential**
1758:15
1760:22
1763:13
1766:11

**confidentialit
y**
1757:22
1763:9
1773:20

**confirm**
1694:11
1768:24

**confirmed**
1624:5

**conflict**
1763:7,10
1766:3,7
1771:16,22,
23 1773:3,10
1775:7

**conflicts**
1711:13
1765:24,25
1772:7

conform
  1770:14

conformed
  1749:24

conforms
  1778:1

connect
  1512:20
  1514:21
  1527:22
  1565:3
  1569:24

connected
  1522:6,9,24
  1570:10

connection
  1495:11
  1609:13
  1745:17

connections
  1506:18
  1698:1
  1767:17

connector
  1513:5

consent
  1759:12

consequences
  1772:5

considered
  1595:12
  1695:16
  1701:10
  1713:10,13

consistent
  1553:21
  1638:7,13
  1639:3

1640:20
1644:2
1736:10,16,
17 1749:16
1750:6
1752:3,13
1769:23
1777:22
1778:4

constant
  1532:8

constrained
  1728:24

constraints
  1613:19
  1691:19
  1728:20
  1729:16
  1730:4

construction
  1739:3

construe
  1710:6,8
  1731:5

consultant
  1518:8
  1520:25
  1697:14
  1749:16
  1750:13
  1755:19,20
  1769:22
  1780:10

consultants
  1763:11
  1765:9

consulted
  1487:24
  1517:23
  1756:19

consulting
  1557:9
  1755:20
  1756:14
  1775:24

consumer
  1698:15

consumption
  1519:11,23
  1532:12
  1534:25
  1554:23
  1562:16
  1742:22

contacts
  1499:13
  1514:22,23,
  25 1515:4

containers
  1526:14

contemplated
  1681:1

contention
  1752:1

contents
  1703:19

context
  1536:14
  1576:16
  1624:13
  1625:5
  1628:19
  1639:15
  1643:23
  1653:25
  1691:13
  1692:10
  1731:7,11
  1750:19
  1757:16

1758:25
1760:3
1761:2,7
1762:11,12
1763:20
1764:6,16
1766:5
1772:25
1781:12,13
1782:13,14

contexts
  1764:1
  1772:21

contingency
  1647:3
  1653:20

contingent
  1645:10
  1647:10
  1654:2

continual
  1776:6

continue
  1613:20
  1628:24
  1672:7
  1681:25
  1685:6

continuous
  1607:14
  1757:5,9,24
  1758:4
  1776:6

contract
  1541:17
  1543:9
  1572:1
  1595:3
  1602:21
  1603:8
  1620:19

1626:19
1627:3
1629:14
1633:15
1639:10
1640:5,7,11
1643:25
1648:23
1654:14
1655:3,15
1671:20
1673:22
1674:24
1688:4,15,20
1691:1
1704:14
1705:1,7
1706:16,24
1707:6,16,24
1710:1,2,6,8
1713:5
1719:16,22,
25 1720:14,
17 1730:12,
19 1731:5
1732:9,12
1734:16
1744:18
1745:2,4,12
1751:2
1755:22
1772:11,25
1781:9

contracted
  1644:19

contractor
  1719:19
  1720:13,22

contractors
  1760:7

contracts
  1620:17

1720:15
1751:18
1776:1,2

**contractual**
1760:4

**contradicted**
1767:24

**contradictions**
1547:21

**contrary**
1685:13
1709:4
1713:14

**contribute**
1501:19
1503:8

**contributing**
1500:25

**control**
1493:5
1560:10
1758:6
1759:25

**controlled**
1761:7

**controllers**
1760:25
1761:1
1767:9

**conversation**
1715:5,14
1762:23
1782:19,20
1783:1

**conversations**
1682:9,14
1781:22

**converters**
1536:4

**conveyed**
1485:24

**convince**
1520:23
1529:3
1532:16

**coordinate**
1781:16

**copies**
1541:21

**copy**
1538:17
1541:10
1630:3
1633:19,22
1635:25
1637:10
1686:5
1714:17
1722:4
1735:4
1748:10
1752:25

**corner**
1741:15

**corporations**
1764:8

**correct**
1517:21
1527:15
1537:7
1557:22
1563:14
1583:23
1587:6
1594:1
1600:16
1602:12

1623:6
1624:13
1627:10,14
1647:17,18
1649:16
1651:10
1652:1,9
1654:22
1667:21
1668:11
1669:8
1670:7
1673:14
1703:20
1709:13
1715:3
1718:9
1721:13
1735:19
1739:3
1743:22
1745:13
1746:25
1753:22
1772:19
1780:23

**corrected**
1654:23

**correction**
1647:16

**correctly**
1488:18
1519:19
1636:14,17
1647:4
1695:20,21
1725:9
1781:15

**correlation**
1536:15

**correspondence**
1585:9,25
1703:22
1707:25
1708:2,5
1727:4

**corroborate**
1767:23

**cost**
1567:2,16,23
1568:3,9
1634:11
1636:10
1637:25
1639:6,9
1640:9
1649:15,21
1650:1
1669:20
1769:3,12
1783:6

**costs**
1525:5
1568:5
1642:12
1649:20

**counsel**
1481:25
1483:25
1484:13
1495:19
1526:8
1551:9,24
1589:20
1620:23
1654:13
1676:16
1679:10
1681:6
1699:8
1733:14

1741:2

**count**
1501:2
1622:19
1623:19,23

**countered**
1702:25

**couple**
1509:22
1516:6
1520:2
1527:9
1561:15
1562:19
1577:2
1590:5
1592:22
1599:15
1608:9
1616:17
1628:20
1681:23
1682:9,13
1691:15
1723:5
1733:20,22
1734:3,4
1760:21,22
1767:22

**couplers**
1535:17

**coupling**
1535:1,9,12

**courses**
1500:24
1501:18
1515:18

**coursework**
1501:6

**court**

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1481:9
1490:12,20
1491:6,15
1547:9
1550:10
1551:7,19
1761:24
1776:8

**cover**
1502:9
1690:18

**covered**
1521:16

**COVID**
1691:23
1727:22

**CPUS**
1555:10

**crafted**
1533:21

**cram**
1571:21

**craniotomies**
1521:8

**create**
1503:7
1504:2
1562:4
1584:7
1585:7

**created**
1544:22
1585:1,5
1659:11,13,
19,24 1660:2
1663:14,23
1665:2
1694:19
1754:18

**credentials**
1743:9

**credibility**
1696:25
1743:8

**credit**
1639:14
1642:17
1673:3
1689:23
1690:12,17

**credits**
1501:2,3,7

**critical**
1547:23
1570:8
1766:3,6

**critically**
1744:14
1766:17

**Crooks**
1754:23

**cross**
1632:9
1677:24
1680:19
1681:14
1684:4,5
1700:25
1702:14
1733:18
1777:20

**cross-examination**
1577:16
1632:9
1679:21
1682:24

**crossed**
1778:15

**crossing**
1536:11

**crucial**
1765:11

**culminating**
1583:9

**current**
1498:2
1722:25
1755:19
1776:11

**currents**
1534:25

**custom**
1513:10
1533:20
1555:6,8

**customary**
1622:1
1731:15
1752:13
1778:7

**customer**
1529:11,14,
15 1530:21
1531:1
1621:6,9
1636:11
1638:1
1671:19,22
1672:1
1698:6,10
1730:16,17,
21 1732:10,
13,14,17,19,
21 1744:14,
24 1773:4
1774:13
1776:17,20
1779:5,9
1780:10

**customer's**
1690:2,10

**customer-driven**
1621:3
1671:18
1698:15

**customers**
1508:18
1658:12
1672:4

**customize**
1509:7,9

**cut**
1512:8

**cutoff**
1489:22
1711:5

**CV**
1502:5
1752:25
1755:2

**cycle**
1579:25

---

**D**

---

**D.C.**
1761:4

**D1**
1720:24,25

**D7**
1720:25

**darn**
1573:12

**DARPA**
1500:12

**data**

**1499:7,10,12**
1513:5
1526:25
1552:21
1583:21
1584:11,18,
19 1591:19
1614:11,15,
18 1617:25
1618:18
1619:18,21
1620:12
1668:16
1690:2,11
1753:13
1754:7
1765:6,18,19
1767:2,14
1771:7,12
1775:5
1778:10

**database**
1564:15
1565:6
1569:4
1570:12
1612:15,18,
24 1613:4,7,
10,12,16,17,
21,23 1614:3
1666:18,23
1667:1,3,21
1668:4
1694:2,8,12,
19 1726:13,
24 1738:16,
19,22 1743:3
1754:18
1773:13

**date**
1586:16
1705:20,21,
23 1706:16

1707:20
1718:1
1745:11
1753:1

**dated**
1714:13
1717:24

**dates**
1552:20
1607:15

**dating**
1560:2

**David**
1497:20
1751:24

**Davis**
1497:9

**day**
1481:8
1482:14
1509:12
1515:17
1529:8
1605:22
1617:14

**day-to-day**
1561:20

**days**
1565:25
1603:25
1605:13,21,
23 1606:14
1608:2
1618:8
1642:16
1689:21
1706:12,19
1707:19
1731:20

**DD**
1762:18,20
1763:8
1781:17
1782:1,9,23
1783:2

**deadline**
1525:12
1708:11

**deadlines**
1607:13

**deaf**
1754:4

**deal**
1508:25
1656:3
1697:12
1700:20
1708:14
1736:21
1737:13,17
1781:22

**dealing**
1499:18

**deals**
1689:11
1727:24,25
1781:7

**death**
1481:12

**deaths**
1758:7

**debug**
1599:17

**debugged**
1695:19

**December**
1603:1

**decent**
1510:8

**decide**
1484:21
1502:5
1525:3

**decided**
1517:2
1584:17

**decision**
1483:20
1501:21,23,
24 1505:14

**deck**
1722:25

**decline**
1766:13
1773:2,6
1774:9
1775:10

**deconstruct**
1604:5

**decree**
1759:13

**dedicated**
1692:2

**deep**
1515:3
1532:6

**defeat**
1780:16

**defeats**
1683:16

**defective**
1595:20
1596:15

**defects**
1758:21

**defenses**
1486:7

**define**
1526:2
1578:16
1648:5
1675:21
1699:22

**defined**
1601:13

**definition**
1779:1

**degree**
1496:25
1497:1,11,13
1501:13,14,
15 1753:10

**Dejan**
1494:12
1495:1,10

**delay**
1481:9

**delayed**
1652:7

**delays**
1768:1,9

**delicate**
1599:13

**deliver**
1553:24
1671:19,21
1742:5
1745:10
1750:23,25

**deliverable**
1627:4

**deliverables**
1641:13

**delivered**
1751:4
1758:21

**deliveries**
1554:23

**delivery**
1514:6
1626:14,20
1627:20
1728:9
1730:13
1751:2
1778:20

**delve**
1707:1

**demand**
1561:9

**demonstrate**
1525:23
1531:11
1644:15
1646:20
1653:12
1655:25
1657:7
1690:17

**demonstrated**
1503:21

**demonstratio
n**
1740:16
1741:7

**demonstrative**
1510:6

**Denaut**
1485:8,20,24
1486:4,12,18,
22 1487:2
1553:4

**denied**
1487:2

**dense**
1555:11

**departing**
1607:21

**department**
1497:22
1499:3
1501:24,25
1757:7,12
1759:12

**depending**
1536:18
1594:25
1613:14

**depends**
1536:9
1537:10
1591:3,15,20
1592:16
1605:17
1607:23
1697:18
1781:25

**deployment**
1537:10

**depo**
1483:12
1573:18
1628:18

**deposed**
1518:17
1762:4

**deposition**
1483:10
1484:8
1485:10
1574:1
1629:22

1630:19
1631:9
1632:3
1633:20
1636:3
1639:17
1643:7
1644:21
1647:15
1652:24
1654:7,12,18,
20 1655:1
1656:19
1663:2
1677:25
1685:11,14,
18 1688:4
1692:13
1693:2
1757:19
1759:21

**depositions**
1631:13
1632:11,13

**deprived**
1551:12

**depth**
1515:2

**derived**
1501:4
1700:14

**describe**
1519:5,17
1555:17
1723:23

**describing**
1692:11

**description**
1523:19

**design**

1497:18
1498:9
1501:20
1502:16,19
1503:14,19
1504:11
1505:9,14,17,
25 1507:7
1517:23
1519:20
1525:11,22
1526:10
1527:2,5
1528:20
1530:1
1532:1,2
1537:1
1543:18,24
1544:12
1546:14
1554:24
1555:2,6,10
1557:21
1563:8
1564:12
1567:12
1569:14
1571:9,15,16
1572:8,12,24
1575:16
1576:17
1578:22
1588:3
1594:20
1602:8
1617:9,11,22
1618:4
1619:5,22
1620:12
1621:14
1625:25
1659:3,20,21
1660:1
1665:25

1666:7,9,10,
12 1668:4,11,
18,25
1672:17
1679:7
1723:5
1727:14
1757:17
1766:25

**designated**
1762:2

**designed**
1520:8
1524:2,3
1528:17
1532:23
1544:22
1570:14
1572:12
1598:13
1660:23
1754:19

**designer**
1545:17
1572:2
1661:14
1742:8,13

**designer's**
1575:17

**designers**
1558:9
1580:4
1650:3

**designing**
1525:21
1592:5
1659:8

**designs**
1505:2,8
1524:7,10
1531:18

1545:19
1561:19
1575:2,3
1616:24
1617:1
1650:4

**desire**
1485:6

**detail**
1512:5
1524:24
1529:2
1555:18
1556:4
1569:20,21
1573:7
1626:22
1719:25
1752:19
1769:18

**detailed**
1589:17
1663:25
1740:19
1746:16

**details**
1603:21
1742:17

**detection**
1516:11

**determination**
1486:2
1770:14

**determine**
1519:8,13
1520:1
1525:1
1578:8,19
1579:5,6

**determined**

1762:24

**determining**
1781:14

**develop**
1530:4
1622:2
1650:14

**developed**
1619:23
1682:4
1773:10

**developing**
1579:14
1657:1

**development**
1503:4
1512:1
1521:2
1560:21
1579:25
1581:9
1584:25
1650:6
1651:7
1655:21
1668:3

**device**
1517:17,18
1536:19
1691:14
1757:18
1759:23,24

**devices**
1499:5
1513:18
1514:2
1516:22,24
1521:4
1536:20
1559:4
1599:5

1757:18

**diagram**
1565:13
1569:7,8,14
1570:1,9
1662:23,25
1663:2,3

**diagrams**
1545:10
1569:9
1661:7

**dialogue**
1484:9
1546:1,5
1698:25
1699:9

**die**
1512:8

**dies**
1563:6

**differ**
1594:6

**difference**
1778:9

**differently**
1504:10
1512:25
1531:19
1536:14

**difficult**
1513:19
1532:4
1550:19
1599:17
1727:21
1728:1

**difficulty**
1490:18
1533:20

**digital**
1498:7
1514:7,8
1533:16,22
1534:6,8,10,
16 1535:3,21,
22,24 1537:2
1566:19
1614:11,14,
15,18

**diligence**
1519:2
1520:22
1530:22
1532:6,22
1556:5,10
1561:23
1619:3
1621:18
1626:3
1696:10,24
1697:13,14,
16 1698:5,11,
19,21
1699:20,24
1700:11
1701:10
1704:11,21
1705:10
1706:8,18,21,
25 1707:6,14,
23 1712:25
1713:8
1714:20,24
1715:2,6
1731:7
1732:8
1744:19
1745:5
1746:14
1749:18,25
1750:15,17
1755:20,23,

24 1756:5,6,
12,15,18,23
1757:3,9
1759:16
1760:18
1761:16
1762:8,10,14
1763:12,17,
24 1764:13
1766:4,8,12
1769:24
1770:18
1771:1,10
1772:10,17,
20 1773:19
1774:4
1775:17
1776:1,16,17
1778:3,12
1779:3,4
1780:7,10
1781:3,6,11,
14 1782:16

**dimmer**
1534:21

**dinner**
1782:24

**diploma**
1497:2,8

**direct**
1495:6
1680:16
1681:11,13
1700:20
1709:17
1733:17
1747:16
1778:24

**directed**
1754:21

**directing**

1750:24
1752:7

**direction**
1483:20
1756:8
1769:1

**director**
1755:11
1782:23

**disagree**
1530:16
1533:4
1569:17
1571:13
1613:25
1618:20
1619:13
1649:2
1661:12
1662:2
1726:11
1774:22

**disappointed**
1671:3

**disclose**
1697:14,21
1758:1
1759:19
1763:12
1775:9

**disclosed**
1697:5
1739:24
1745:17
1774:7,11

**disclosing**
1532:9
1545:13
1773:3
1775:8

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

disclosure
1532:20
1620:9
1626:10
1780:17

disclosures
1766:1,13
1768:16,18
1773:6,9

discourage
1493:22

discovered
1638:8
1665:5
1742:2

discovery
1484:1,20
1489:13,22
1581:16

discuss
1489:24
1496:19
1505:23
1529:16
1544:8
1550:3
1672:3,15
1673:5
1681:25
1708:14
1731:19
1758:2
1768:6

discussed
1485:23
1486:10
1488:5
1549:18
1553:2
1621:15
1625:17

1626:25
1653:25
1667:3,24
1669:17
1687:17
1691:13
1694:4
1731:25
1732:5,14
1751:21
1757:18
1759:20
1765:24

discussing
1720:9
1736:8

discussion
1483:8
1490:4
1546:8,11
1553:12,25
1585:21
1589:5
1593:12
1597:20
1612:13
1623:2
1664:16
1665:5
1669:23
1675:5
1681:7
1693:13
1706:10
1707:9
1708:6
1714:23
1738:15
1740:8
1745:23
1746:11

discussions

1485:9
1486:15
1487:21
1489:17
1553:7
1737:22

disjointed
1548:20

dispatched
1756:15

display
1535:14
1568:5

dispute
1484:1
1600:17
1623:22

disputed
1484:15

disputes
1755:25

Disputesoft
1757:14

disqualifying
1774:9

dissertation
1497:23

distinction
1778:13

distinguish
1520:4

distribute
1601:15

dive
1516:8

divulging
1758:15

doable
1503:18
1505:12

doctor
1514:7

doctorate
1497:16,17

doctrine
1485:12

document
1544:21
1556:20
1557:12
1584:2,11
1590:4
1618:4
1622:2,4
1629:19
1639:12
1646:15
1653:7
1710:9
1722:1

documentary
1617:21
1648:11
1669:6
1670:4

documentatio
n
1599:23
1618:2
1654:17
1727:3
1767:1

documented
1664:13
1751:9,17

documents
1496:4

1559:25
1570:24,25
1572:8
1583:3,5
1585:13,21
1587:17
1589:7
1602:9
1645:5,21
1646:23
1647:1
1648:17
1652:8,14
1653:15,18
1661:14
1675:5
1696:1,5
1710:6
1716:6
1721:15,17
1732:5
1751:16
1761:9
1767:13,22
1769:7

DOJ
1757:25
1776:4

DOJ's
1759:4

dollar
1764:8

domain
1502:22
1517:8
1558:10
1768:24

door
1644:12

double
1627:12

**TRANSCRIPT OF PROCEEDINGS**

doubt
1621:11

downstream
1647:11
1654:3

dozen
1761:22

dozens
1601:10
1602:3,4
1776:1

draft
1518:15
1622:2
1703:25
1777:14
1779:6

drafting
1589:1
1591:24
1776:19

drafts
1621:23,25
1622:6

draw
1697:25

drawn
1637:2

DRC
1571:17
1572:13,17,
21,24
1603:23
1668:4
1738:22
1739:4

drill
1681:14
1711:11

1769:14

drilling
1521:7

driven
1529:14,15
1530:21
1698:6
1732:13,17
1741:8

drop
1610:23

dry
1727:24

DSP
1502:16
1512:14
1533:22

DSPIC
1533:18

due
1519:2
1532:22
1556:5,10
1619:3
1621:18
1671:4,14
1672:12
1676:12
1692:9
1696:9,24
1697:12,13,
16 1698:5,10,
21 1699:19,
23 1700:11
1701:10
1704:11,20
1705:9
1706:8,18,21
1707:6,14,23
1712:25
1713:8

1714:20,24
1715:2,6
1731:6
1732:8
1744:19
1746:14
1749:17,18,
25 1750:15,
17 1755:20,
23,24 1756:5,
6,12,15,17,22
1757:3,9
1759:15
1760:18
1761:16
1762:8,10,13
1763:12,17,
23,24
1764:13
1766:4,8,12
1769:24
1770:18,25
1771:10
1772:10,16,
20 1773:19
1774:4
1775:17
1776:1,16
1778:3,12
1779:3,4
1780:7,9
1781:2,6,11,
14 1782:15

dueling
1712:10

duly
1495:2
1747:11

dunk
1658:8,11

duplicate
1542:2

duplicates
1542:21
1748:23

duties
1780:19

duty
1745:13

DXCORR
1546:14
1568:8
1580:16
1581:7,10
1582:19
1583:7
1585:3,4,5
1618:13
1619:19
1620:8,11
1621:1,9
1643:16
1644:1
1646:19,20
1647:8
1652:20
1653:11,12
1655:8,12
1659:1,2,8
1665:10,19
1666:6
1668:11
1669:6
1671:16
1672:6
1688:22
1689:16
1696:4
1697:6
1700:9
1703:3
1721:5
1730:1
1739:25

1741:25
1742:4
1745:18
1751:8

DXCorr's
1565:10
1650:13
1739:24

dynamics
1536:10

—————————

**E**

—————————

e-cigarette
1757:18
1759:16

ear
1505:21

earlier
1506:10
1521:17
1561:14
1605:11,14
1621:2
1625:17
1626:18
1631:6
1660:9
1691:12
1718:7
1720:3
1736:8
1737:2
1738:15
1744:8
1770:1

early
1565:12
1586:14
1602:23
1604:1

1606:16
1607:7
1608:5
1613:17
1634:15

earned
1496:24
1497:1,13,24

ease
1540:20

easier
1511:6,10
1526:10
1563:8
1680:1

East
1764:21

easy
1512:20
1527:5
1551:8
1569:25
1595:14
1596:5
1743:2

eats
1575:9

economics
1567:25
1752:11
1753:18

economy
1727:23

editing
1776:19
1777:13
1778:25

education
1771:4

1776:7

educational
1496:19
1497:7,25
1753:7

EEG
1516:10,14

effect
1484:19
1551:3
1552:20
1696:18
1730:1
1768:19

effective
1563:5
1649:15

effectively
1564:20

efficiencies
1531:11

efficiency
1504:8
1531:8,16
1555:5
1558:12
1565:20
1566:8
1572:21
1574:25
1575:15,18
1592:8,9,13
1739:1
1744:10

efficient
1497:18
1564:6
1591:6
1695:5
1727:15

1760:1

efficiently
1563:19

effort
1527:4
1555:5,7
1556:8
1596:3,4

efforts
1500:15,25
1520:20
1556:10

egregious
1764:4

elaborate
1778:17

electrical
1496:21
1497:12,22
1498:3
1767:3
1770:1,7

electricity
1575:10

electrode
1499:13
1514:21
1515:2

electronic
1498:8
1614:5
1714:17
1748:10
1757:17

electronically
1629:25
1747:24
1748:2

electronics

1521:11
1526:5
1535:9

element
1558:25
1744:14

elements
1744:10
1760:1

elevated
1530:1

elicited
1486:16

else's
1508:15

email
1483:25
1582:6
1713:20
1721:21
1722:14,23
1723:15,21
1724:23
1731:18,23

emails
1664:13
1703:18,21
1709:12,15
1713:14,16
1721:12

embed
1513:8

embedded
1507:20
1508:6,7
1509:13
1513:9
1514:15,20
1620:12

emerging
1754:11

emphasize
1661:9
1765:7,8

emphasizing
1502:19

employ
1486:19

employed
1530:3
1767:5

employee
1487:25

employees
1751:17
1781:23

employer
1591:10
1757:13

empty
1540:5,6

emulate
1617:11,12

emulated
1565:21
1618:5,11

enables
1649:20

encapsulatio
n
1514:21

enclosure
1513:25
1514:1

encompasses
1746:4

TRANSCRIPT OF PROCEEDINGS

encountered
1657:16

encourage
1485:16

end
1504:12,21
1510:13
1529:7
1530:22
1554:5
1556:19
1572:14
1597:8
1625:21
1716:11
1721:25
1725:2
1743:18

ended
1483:7
1599:11
1672:6

endoscopic
1521:6

ends
1504:4
1541:5

energy
1497:18
1504:8
1531:8,11,16
1558:11
1565:20
1566:8
1572:21
1744:9

enforce
1551:11

enforceable
1552:23

enforced
1766:15

engage
1699:9
1772:13
1776:18

engaged
1756:13
1757:4
1766:23

engagement
1671:21
1759:21
1766:8
1771:10
1772:3
1773:2,17
1774:10
1776:3
1782:2

engagements
1755:14
1756:11
1763:8,13
1765:9
1766:12
1773:14

engaging
1643:22
1698:25
1780:2

engineer
1496:21
1584:22
1761:4
1770:2,7

engineering
1497:2,12,22
1498:4
1559:24
1560:1,7

1567:25
1581:8
1582:5
1585:5,6
1602:9
1640:7
1641:16
1642:12
1647:11
1654:3
1661:14
1664:11
1665:6
1666:1
1686:11,15
1687:15
1697:2
1743:7,11
1766:25
1767:4

engineers
1503:5
1544:25
1610:10
1650:15
1651:8,15
1667:24
1671:2

enhanced
1754:21
1763:8
1773:20

enroll
1502:2

ensure
1763:8
1772:7

ensuring
1682:15
1758:3

entire

1609:10
1639:14
1657:9
1688:12
1778:21

entirety
1630:13
1632:3
1678:7
1783:1

entitled
1657:24
1732:17,20

entity
1737:3

entrepreneuri
al
1506:17

entries
1589:17
1755:7

entry
1552:21

environment
1533:24
1534:24
1536:1
1566:20

environmenta
l
1536:10

epileptic
1516:11

equipment
1641:20
1752:2,9

equivalent
1582:10

era
1727:22

error
1600:4

errors
1599:22,25
1610:15

essentially
1619:7
1639:7
1756:10,15
1763:7
1769:10
1770:22
1775:13
1782:25

Essentials
1502:16

established
1763:23

estimate
1521:23
1590:25
1591:25
1592:12,18
1604:25
1607:4,7
1608:2,13
1611:3
1625:20,22
1639:1,11
1640:18
1742:21
1769:3,11
1781:2,5

evaluate
1530:12
1749:23
1750:25
1752:12
1757:14

1760:9
1770:10
1771:1
1772:7
1779:5

evaluated
1769:21

evaluating
1761:18
1770:25
1772:1

evaluations
1519:15
1761:18

evening
1492:2

event
1484:23

events
1489:21

everyone's
1493:5

evidence
1533:8
1542:6
1550:7,24
1612:21,23
1617:21
1618:24
1632:14
1648:11
1662:7
1667:19
1668:22
1670:5
1676:5
1681:12
1683:12
1694:7
1695:22

1701:15
1733:24
1745:16
1777:23
1778:15

evidenced
1778:14

evidentiary
1487:15

evolved
1565:6

exact
1623:23
1670:25
1729:25

exam-type
1680:21

examination
1492:8
1495:6
1502:1
1680:10
1734:8
1747:16

examine
1547:19

examples
1506:25
1518:1
1520:18
1620:23
1756:1
1764:5

exceeded
1781:10

exceptions
1757:5
1760:21

excerpt

1483:12
1541:2
1630:5

exchange
1703:17
1717:23
1723:15
1724:23,24

exchanges
1714:12

exclude
1487:13
1623:1

excludes
1619:25

excuse
1490:20
1494:16
1514:17
1556:3
1638:21
1665:13
1734:21
1738:9
1762:10

execute
1669:21

executed
1602:22

execution
1672:18

executive
1725:16

executives
1736:21

exercise
1561:23
1698:6,19
1700:12

1766:4
1776:16,18

exercises
1696:10
1697:13
1699:20,24

exhibit
1538:5,6,13,
17,24 1539:2,
7,13 1540:18
1541:2,4,6,10
1542:5
1543:8
1553:22
1556:17
1557:1,7
1568:16
1573:23
1574:5
1575:23
1630:1,2,3,4
1631:10
1632:4,20
1635:20
1636:2,6
1638:18,20
1639:4
1640:20
1641:5
1649:8
1658:20
1686:4
1694:23
1702:2
1705:1
1714:9,15
1717:18
1719:1,17
1721:10
1725:5
1728:16
1734:11
1747:23

1748:3,15,16
1752:24

exhibits
1540:17,21,
24 1544:10,
16

exist
1586:23
1598:4,6,7
1726:18

existed
1570:2

existing
1513:9
1612:24
1727:24
1766:18
1782:21

exists
1505:19
1664:2
1740:22
1741:5

expand
1750:10

expanding
1680:25

expect
1531:2
1544:17
1782:3

expectation
1482:9
1602:22
1610:11
1627:4
1733:14
1781:24

expectations

**TRANSCRIPT OF PROCEEDINGS**

1759:5
1783:5

expected
1501:7
1569:20
1634:22
1668:7
1707:18
1714:24
1716:23

expecting
1498:21
1610:8
1671:21

expedite
1680:15

expedited
1483:20

expensive
1568:11
1596:7
1643:20

experience
1527:4
1528:24
1529:25
1530:1
1532:7
1533:9
1556:9,14
1557:3,17
1567:8
1572:11,16
1584:5,23
1590:16
1591:24
1592:13
1599:2
1603:24
1621:16
1639:12

1655:20,21
1656:8
1661:25
1691:6,10,11
1699:23
1700:14
1727:18
1736:11,16,
22 1739:6
1750:2,13
1752:7
1754:25
1755:6
1760:18
1766:2
1770:13
1771:5
1779:2
1780:25
1782:7

experienced
1591:5

experiment
1525:23

experimental
1503:16

expert
1481:16
1482:8
1495:18,22
1518:5,7,13
1530:6
1595:6
1598:25
1600:6
1621:14,18
1628:3,7,10
1629:10,17
1632:10
1633:11
1674:3,6,12
1675:15,20,

21,23
1677:10
1678:8
1680:4,12,21,
23 1682:3
1683:4,20
1696:24
1698:11
1699:16
1700:6,18
1711:14,19,
22,23
1712:11,15
1750:13
1753:25
1755:20,21
1761:10,11,
24 1762:2
1763:24
1771:20
1776:17
1779:4,13

expertise
1521:10
1561:3

experts
1482:2
1676:18
1679:12
1680:15
1681:10
1683:8
1697:25
1698:3
1712:7,10
1755:13

experts'
1676:4

explain
1506:5
1524:15
1567:5

1573:2
1576:21
1639:24
1657:18
1746:2
1749:13
1750:20
1765:1
1768:3,4
1774:20

explained
1587:18
1660:11
1663:1
1668:12
1691:3
1761:12
1769:9

explains
1689:6,19

explanation
1492:23
1573:5,15
1576:5
1647:9

explicit
1652:19

explicitly
1643:16
1669:24

exploit
1767:17

explore
1524:21
1714:5

exposure
1552:3

express
1683:15
1702:22

1752:22
1770:8

expressed
1677:23
1684:5
1688:14
1709:16

expressing
1702:19

expression
1773:12

extend
1551:13

extended
1606:19
1608:6
1751:11

extensive
1558:20

extent
1640:13
1647:10
1662:11
1667:5
1697:19,21
1700:15
1710:11
1751:9,16,19

externalized
1516:23

extra
1537:16

extracurricula
r
1550:20

extreme
1521:10
1558:11
1599:11

**TRANSCRIPT OF PROCEEDINGS**

1610:13

**extremely**
1513:20
1526:6
1661:10

---

**F**

**fabricate**
1525:7,9
1572:3

**fabricated**
1504:13
1506:1

**fabricating**
1563:1,21,22

**fabrication**
1525:14,15
1566:23
1626:2,3
1636:11
1638:2
1649:20
1666:11,14,
19 1728:20
1729:7,19

**face**
1605:23
1672:20
1743:10

**faced**
1550:14

**facilitate**
1511:3

**facilitates**
1510:23

**facility**
1525:14,15

**fact**

1513:23
1527:15
1561:4
1571:4
1572:13
1614:9
1622:19
1655:20
1673:2
1678:9
1680:20
1682:18
1688:5
1690:22
1693:8
1694:11
1701:9
1707:13
1708:12
1711:9
1724:7
1731:14
1733:12
1745:9
1763:22
1767:24
1770:6

**factor**
1516:25

**factors**
1591:4,22
1740:17
1751:20
1768:1

**factory**
1525:14
1605:12

**facts**
1764:2
1765:6,18,19
1771:7,12
1775:5

1778:10
1779:14

**factual**
1779:12

**fail**
1600:11,14,
23 1602:5

**failing**
1766:17

**fails**
1529:8

**failure**
1598:25
1600:21
1601:2

**fair**
1500:1
1598:3
1601:6
1627:5
1672:11,14
1683:3
1692:24
1760:17,20
1764:21
1773:23

**fairly**
1592:11
1763:21
1774:23

**fall**
1606:16
1607:8
1608:5

**falling**
1536:12

**familiar**
1589:5
1599:24

**familiar-**
1603:21

**familiarity**
1603:21
1762:25

**family**
1481:13

**fans**
1600:18

**farm**
1563:18

**fast**
1490:11
1505:25
1507:25
1597:9
1610:23
1611:8

**faster**
1566:3

**feasibility**
1505:23
1518:24
1519:1,6,7
1520:1,8,16,
22 1523:25
1524:1,5,13,
14 1528:16
1529:13,18,
22 1530:8
1543:15
1544:3,18,23
1546:15
1554:9
1556:23
1559:11,23
1578:7,18,22
1579:3
1580:20,23,
25 1587:4,15
1588:2,5,7,

20,22
1590:13,17
1603:10
1612:17
1614:10
1617:20
1621:2
1648:6,17
1662:16
1676:19
1679:1,6
1724:2,6
1730:13
1731:11
1741:10
1742:7
1757:15

**feasible**
1506:1
1532:1
1559:19
1564:14
1565:18
1759:22

**features**
1564:10
1695:18
1761:12

**February**
1485:1
1553:1
1560:3,4
1565:14
1571:4
1613:16

**feedback**
1524:11

**feel**
1512:2,6
1513:25
1553:2

1594:8
1654:25
1694:20
1752:21
1758:14
1770:6

feeling
1722:10

Feels
1515:25

fell
1487:18

felt
1743:5,7
1767:24

FF
1728:23

fiber
1535:14

fidelity
1573:9

fiduciary
1745:13

field
1499:1
1507:20
1508:3
1532:5
1610:16

figure
1540:3
1542:2

figuring
1591:7

file
1539:3,4
1585:25
1586:4
1647:25

1648:10,15,
16 1649:3
1652:13
1662:8
1694:5

filed
1488:1
1682:18

files
1496:6
1581:15
1614:14,17
1647:24
1648:10

fill
1724:14

filled
1591:19
1640:5
1660:10

final
1570:11
1603:23
1613:21
1621:24
1622:4
1693:19
1716:20,22
1726:18,23
1731:15
1742:6,20

finalize
1565:9

finalized
1669:1
1703:20

finally
1514:2
1572:15

finance
1656:4

financial
1644:16
1646:1,5,21
1647:3
1653:13,20
1655:25
1657:8
1671:4,14
1672:12
1673:6,24
1685:15
1688:23
1690:2,11
1772:17

financially
1655:9,13
1689:16

financing
1689:25

find
1506:10,18
1528:18
1540:13,16
1542:10
1556:25
1557:14
1568:23
1596:8
1611:22
1632:23
1643:8
1658:12
1663:11
1742:9
1768:23
1769:1,2,6
1771:3

finding
1664:17

findings
1779:12

fine
1510:22
1541:20,24
1542:1,8,20
1604:4
1610:15
1611:14
1632:17,19
1633:3
1637:11
1647:19
1653:23
1654:14
1655:3,14
1714:7,18
1719:24
1733:2
1734:23

finest
1558:22
1573:7

finish
1525:12
1588:4
1685:2
1704:20
1705:9
1711:7
1733:7,15
1746:16

finishing
1560:12

fire
1491:13
1780:4

fired
1610:17
1729:22

fires
1768:12

firm
1761:4,10,15
1767:5
1775:21

firms
1517:24

firsthand
1739:20

fit
1660:20,24
1771:20

fits
1660:18

five-year
1497:3

fix
1596:5

flavor
1681:12

Flex
1506:23,24
1507:19
1509:24
1532:7
1656:4

flexibility
1501:16
1508:21

flexible
1493:11
1509:3
1566:2

flip
1510:19

flipping
1534:16

1535:5

**flop**
1575:9

**floral**
1715:25

**flow**
1560:10
1675:1
1723:1

**fluctuation**
1754:23

**fly**
1493:2

**focus**
1502:24
1504:25
1505:1
1524:5
1699:12
1701:23
1725:23,24
1726:5
1729:6
1758:3
1764:14

**focused**
1504:11
1556:18
1654:16
1664:16
1696:21
1697:1,4
1699:4,7
1708:4
1716:12
1717:16
1754:12
1782:21

**focusing**
1503:10

1680:10
1701:23
1704:22

**folding**
1754:10

**folks**
1492:25

**follow**
1490:15
1616:7,16
1625:16
1643:15
1671:19
1777:7

**follow-up**
1672:13,19,
25 1685:22
1731:16

**foot**
1529:11
1644:12

**footnote**
1649:10,12,
14 1650:9
1651:13
1695:12

**force**
1707:17

**Ford**
1644:10

**foreign**
1508:2
1764:18,19,
20

**Foret**
1483:9
1485:7
1486:5,15
1487:9,14,17,

24

**Foret's**
1484:8
1485:7,9,19,
22 1487:1

**forgiving**
1526:9

**forgot**
1502:10
1772:8

**form**
1512:20
1516:25
1584:20
1710:1
1726:18
1778:11

**formalized**
1775:19

**formally**
1593:7

**format**
1487:24
1613:12
1667:4

**formed**
1506:7

**forming**
1713:9
1719:23
1722:15

**forms**
1767:1

**formulated**
1503:10

**Fortran**
1754:18

**forum**

1776:10

**forward**
1505:25
1529:11
1679:6
1767:25

**found**
1483:17
1489:3,25
1517:20
1562:15
1569:20
1713:14
1720:9
1769:22

**found-**
1525:14

**foundation**
1500:11
1546:3

**foundries**
1605:17
1652:2

**foundry**
1534:2
1558:18
1570:13
1571:17,25
1572:2,15,25
1580:11
1587:1,10,19
1594:21,23,
24 1602:18
1603:15
1604:18
1605:8,16,17
1608:3,16
1613:13
1639:7,19
1640:8
1641:20

1643:10,18
1644:14
1651:23
1652:15
1655:22
1656:9
1666:21
1667:8
1669:1,7,14
1670:4,6
1691:7
1726:14
1727:4

**FPGA**
1508:3,7
1513:7
1565:22,23
1566:1
1609:24
1616:20,25
1617:8,10,22
1618:1,5,7,
11,18

**FPGA's**
1507:20

**FPGAS**
1566:2

**fraction**
1567:1

**frame**
1487:20
1544:2
1596:2
1603:23
1606:20
1608:7
1715:8
1768:9

**framed**
1591:17

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

**Francisco**
1481:2
1782:25

**frankly**
1491:15
1710:4
1780:1

**free**
1512:2,6
1513:25

**frequency**
1516:16

**frequently**
1553:3
1772:24

**Friday**
1719:5

**friendly**
1513:11

**front**
1518:19
1523:14
1543:7
1559:19
1624:5
1721:20
1736:25
1747:19
1749:7
1765:15

**frozen**
1727:23

**frustration**
1743:6

**fulfill**
1674:10
1708:11

**fulfilled**
1567:1

**full**
1501:7
1531:2
1565:13
1569:4
1607:22
1628:21,25
1630:7,8
1634:21
1636:10
1637:25
1639:7
1640:13
1642:18
1643:1,4,12,
18,25 1644:3,
16 1645:12,
18 1646:6,21
1647:10
1648:2,13
1651:25
1652:3,5,17,
21 1653:13
1655:13,25
1656:13
1668:7
1685:16
1688:6,23
1689:19
1690:18
1691:9
1781:25

**full-time**
1553:23
1555:21,23
1713:6

**full-volume**
1646:3

**fully**
1508:22
1558:15
1566:19

1570:10
1571:4
1572:1
1573:5
1609:10,17
1627:3
1692:5

**function**
1536:23
1601:17
1617:18
1757:9

**functional**
1508:21
1509:6
1599:3,7
1618:6
1740:16
1741:7
1743:1

**functionality**
1504:9
1519:11,16,
24 1565:19
1566:8
1572:20
1576:20,22,
24 1618:16
1668:13
1738:25
1740:18
1756:5

**functionally**
1739:2

**functions**
1512:12
1536:16
1537:2
1755:23

**fundamental**
1505:14

**funded**
1500:14

**funding**
1500:11
1529:9
1671:16
1728:1

**funds**
1645:11
1688:11
1750:7

**funeral**
1481:13

**future**
1508:24
1509:3

**FYI**
1492:11

---

**G**

**gaming**
1537:12

**Gao**
1595:18
1600:14
1714:13
1715:21
1717:2,24
1718:7
1719:2

**Gao's**
1595:21

**garnish**
1560:12

**gate**
1507:21
1508:4
1573:3,4,10,
16 1574:16

1576:5,15

**gates**
1573:6
1575:1,7

**gather**
1741:25

**gating**
1575:15

**gave**
1509:13
1608:2
1619:19
1622:16
1649:23
1676:20
1679:21
1683:21
1693:2
1721:22
1761:7

**gee**
1594:2

**general**
1487:23
1502:21
1728:19
1729:15
1758:18
1776:10
1778:8

**generally**
1518:23
1520:13
1547:5
1633:19
1650:11
1655:17
1749:17
1752:3
1769:23
1774:16

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

generate
1742:18

generated
1694:5

generation
1503:6

Gentleman
1676:3

geometry
1515:24
1613:18

get all
1592:3
1642:23

GFC
1753:17

gigahertz
1742:22

give
1482:12
1515:10,11,
13 1523:13
1524:10,19
1532:15
1542:19
1552:7
1567:24
1568:17
1587:21
1591:12,25
1592:6
1596:1,2
1605:20
1606:4
1638:24
1657:5
1674:2,5
1676:9
1679:3
1698:3

1719:5,14
1742:5
1743:11
1751:23
1769:19
1781:1

giving
1490:5
1598:1
1620:22
1644:3
1673:15
1681:24

glad
1603:2
1638:12

glass
1513:16

Glick
1483:12
1489:3,25
1509:7
1514:13,15,
18 1515:5
1517:10
1538:23
1539:6
1543:20
1554:13,14
1566:4,7,10,
12,14,21
1630:20,24
1658:4
1677:18
1702:3
1748:6,11

glitch-less
1575:13

goal
1490:16
1491:20

1503:1,13
1542:11

goals
1757:11

gobbled
1729:1

good
1492:3
1493:20
1494:8,9
1508:17
1509:10
1511:4
1517:3
1520:23
1522:16
1529:4
1532:3
1557:2
1561:23
1563:6
1570:14
1577:13
1599:3
1600:1
1604:15
1605:24
1614:23
1615:1
1628:13
1632:25
1642:8
1713:25
1747:6
1754:1
1783:7

goods
1750:23
1751:1

governments
1764:9

grade
1527:18
1691:20
1692:6

grades
1502:1

graduate
1498:8
1500:20
1502:1,3,11,
15

graduated
1504:16
1560:24

graduation
1501:2

grand
1482:18

grant
1500:10

GRE
1502:1

great
1503:2,11
1506:13
1561:2
1579:11
1584:14
1595:19
1677:8
1679:18
1685:8
1697:12
1708:14
1752:19
1769:18
1771:20

green
1521:18
1526:8

grid
1512:15
1661:8

gross
1528:10

ground
1490:9
1686:10

groundwork
1511:23

group
1495:13,19
1499:7,11,22
1500:8,17,20
1501:2,11,22
1502:6,9,24
1503:1,14
1504:11,17
1505:12
1506:3,5
1507:14
1561:10
1762:8

groups
1528:23

growing
1517:7

guaranteed
1532:15

guess
1583:12
1612:3
1631:8
1698:22
1712:2
1713:3
1745:20
1746:4
1755:2
1779:11

guest
1753:11

guidance
1524:20
1548:24

guidelines
1525:13,16
1571:25

guy
1577:19
1578:2
1583:17

guys
1698:24

**H**

habit
1500:2

hair
1512:18

hairline
1512:18

half
1500:23
1706:9
1733:23
1761:22

halfway
1719:2

hand
1494:22
1604:2
1643:19

handcraft
1562:8

handcrafted
1555:10
1571:2

handle
1678:14

handled
1699:24

hands
1764:24

hang
1539:24
1554:12
1643:7
1685:17
1738:12

happen
1493:9
1534:24
1535:1
1553:5
1607:14
1640:12,15
1656:15,17
1741:16

happened
1560:15
1656:1,14
1671:1
1672:16,18
1675:2
1720:7
1779:14

happening
1718:17

happily
1510:3

happy
1525:17
1703:25
1715:16

hard
1492:25
1546:17

1564:5
1630:3
1635:25
1686:5
1714:17
1780:1

**Hardin**
1482:21
1488:14,19,
20,22,24
1492:10,16,
19 1493:3,18
1494:3,4,7,17
1495:7
1498:23
1500:4,5,6
1508:9,13
1509:23
1510:11,16
1511:5,19,23
1515:7,15,25
1516:5
1517:15
1522:15,16,
20,22
1523:10,18,
21,23,24
1526:2
1527:8
1534:9
1535:20
1538:2,8,11,
14,16,21
1539:8,15,19,
24 1540:3,7,
11,16 1541:8,
11,14,20
1542:22
1543:5,6,12,
14 1544:1
1546:9,20
1548:21,22,
23 1549:6,20

1550:1,13
1552:14
1553:16
1554:12,16
1555:1
1558:3
1559:9,14,15
1562:18
1565:4
1566:6,22
1568:19,24
1569:3,6
1570:19
1573:14,19,
21,25 1574:4,
8,11,14
1575:20
1576:1,3,13
1577:2,5
1578:5
1581:20,24
1585:12
1592:24
1605:14
1606:10
1611:23
1619:2
1622:22,25
1623:10
1624:15,17
1631:3,8
1632:2
1633:18,24
1635:1
1637:3,8
1640:23
1642:23
1657:20
1677:14,19
1678:1
1679:19
1681:18,22,
23 1682:8,13
1683:17,22

1684:21
1685:17
1700:2
1701:14
1712:16,20
1726:20
1730:5
1731:4
1733:7,10,19,
25 1734:3,9,
13,15,19
1735:1,4,6,
11,12,22
1736:4,14
1737:5,7
1738:1,10,14
1740:4,9,10
1741:1,3
1743:20,23
1747:1,5
1754:4

**Hardin's**
1744:9

hardware
1498:10
1500:15
1566:3
1760:1

harken
1625:15

harm
1758:7

he'll
1747:3

head
1537:16
1580:9
1594:20
1620:20
1697:10
1734:17

1781:17
1782:20,21

**heads**
1542:19
1627:25
1730:1

**headsets**
1537:12

**health**
1500:12
1759:1

**hear**
1488:3
1489:10,11
1490:16
1491:7,20
1516:1,16,19,
20 1522:18,
20 1578:10
1584:9
1595:18,21
1680:19
1709:23
1710:12
1711:17
1739:23

**heard**
1546:13,16
1549:3,4
1550:2
1582:3
1597:24,25
1676:9
1679:2,7
1709:3,4
1711:9
1731:20
1739:20
1774:15,18
1778:5
1782:7

**hearing**
1481:19,20
1482:16
1492:9
1505:21
1542:1,17
1679:4
1680:15,22
1682:11,21

**hears**
1491:2,10

**hearsay**
1547:10
1550:14,15

**heart**
1516:20

**heat**
1600:18

**held**
1553:12
1593:12
1607:7
1612:13
1740:8
1745:23
1746:11

**helped**
1516:24
1517:20
1520:21
1548:9,19
1715:14

**helpful**
1582:4
1700:15
1702:15

**helping**
1782:15

**helps**
1650:6

**heretofore**
1489:5

**Heterogeneous**
1499:8

**hey**
1484:14
1558:18
1569:24
1570:13
1627:24
1708:1
1730:1,18

**high**
1497:18
1504:19
1507:1
1519:7
1527:6
1534:14,20
1543:23
1544:3
1561:8
1567:23
1570:23
1590:24
1591:12,13
1592:7
1601:1
1695:4
1723:2,22,23
1724:2,8

**high-level**
1543:17

**high-volume**
1567:18

**higher**
1530:2
1535:3
1563:4
1600:25

**highest**
1563:15
1573:9
1618:5

**highlight**
1507:13
1752:20
1755:6

**highly**
1554:19
1658:11

**hindsight**
1726:9

**hired**
1495:21
1659:2
1721:6
1745:6
1755:19
1760:5,22
1761:2,4
1780:10

**hiring**
1698:10

**history**
1489:1
1490:1

**hit**
1572:15
1609:25
1610:9
1669:16

**hobby**
1499:23,25
1516:12

**Hold**
1748:15,24

**holding**
1521:17

**highest**
1523:4,16
1526:8
1528:3

**home**
1610:16

**honor**
1549:21

**hope**
1502:7
1678:10

**hospitals**
1517:6
1758:8

**hour**
1493:20
1537:14
1706:23
1715:4
1733:17

**hour-long**
1715:13

**hours**
1553:19,20
1555:14,24
1556:6
1588:12
1589:22
1590:5
1591:2
1592:14,22
1593:20
1594:7,9,14
1726:6
1733:23,24
1746:15
1780:22
1781:4
1782:4,10,17

**houses**
1565:2

human
1491:16
1503:4
1584:17,22
1613:13,14
1667:6
1694:5
1751:7

hundred
1499:13
1534:18
1599:15
1601:19
1628:16,21
1629:2,5
1640:1
1691:15

hundreds
1559:4
1601:7,9
1634:17

hung
1680:2

hurdle
1743:13

hurry
1714:4

hypothetical
1673:16
1701:15
1779:17,18

Hypothetically
1673:18,20

I

I/o
1565:15
1568:15

1569:7,8,15,
19 1570:1
1613:19

IC
1533:17

idea
1503:17,18,
24 1504:1
1505:10,22
1509:13
1515:22
1516:14,21
1519:9,13
1520:23
1578:8,13,19
1579:6
1580:9

ideally
1609:21

ideas
1503:21
1505:13
1506:12
1507:19
1524:17,22

identified
1488:6
1557:5,19
1744:17
1758:22

identifies
1773:16

identify
1765:10
1767:18,21
1771:2,9,12
1781:18

identifying
1765:25
1771:6

1772:6

III
1705:2
1720:4

illustrate
1545:9

illustrates
1560:6

image
1612:23
1613:2,14

images
1536:6
1667:6

imagine
1664:15
1780:2

IMEC
1568:8
1629:16
1638:14,19
1640:8
1644:1
1645:8,14
1646:17
1647:8
1653:9,23
1654:9,11,14
1655:3
1657:3,13
1669:10,11
1674:10
1685:12
1689:24
1734:16
1743:9
1767:22
1768:17
1769:7

IMEC's

1645:8
1767:19

immaterial
1670:13,15

immediately
1708:16

impact
1503:11
1504:2
1506:11
1720:1
1768:20

impacted
1652:4
1768:2,14

impacts
1697:20
1781:20

impairs
1770:7

impartial
1780:20

impeach
1633:8

impeached
1635:6

impeaching
1631:25
1635:3

impeachment
1631:13
1632:9,16
1635:3
1639:16
1643:7
1644:21
1652:24
1656:19
1692:12

implant
1536:19

implantable
1521:4

implement
1519:10
1524:24

implementati
on
1525:4
1666:9,17
1668:8,17

implemented
1665:10,19,
23,25 1666:6,
12

implicates
1570:1

implication
1740:20,23

implicit
1555:18
1556:4

important
1481:24
1510:2
1547:20
1603:6
1621:12
1661:2,25
1662:1
1666:16
1668:2,17
1693:21
1696:24
1697:14,23
1709:2
1732:7
1738:25
1744:10,14,

TRANSCRIPT OF PROCEEDINGS

18,23
1772:20

importantly
1672:17

imposed
1713:1

impressed
1562:13

impressions
1485:22

impressive
1577:19
1621:12

improve
1759:23

improvement
1757:6,24

improvements
1758:4,20

improving
1757:17

in-camera
1484:22

inability
1671:15
1672:13
1676:12
1678:14

inaccessible
1486:23

inactive
1753:22

inadvertently
1763:12

incidence
1598:25

include
1628:22
1632:9
1703:2

included
1631:9
1713:17
1729:17,18
1742:23
1756:4
1773:24

includes
1640:6
1644:4
1773:25

including
1482:1
1484:1
1489:18
1571:11
1577:20
1583:6
1588:5,20
1644:17
1700:17
1746:16
1749:21
1751:8
1762:4,5
1773:18

inclusive
1582:8

incoherent
1576:7

incoming
1782:20

incomplete
1547:23
1701:14

incorporated

1695:6

increase
1513:3
1596:19

increased
1563:23

incredibly
1577:19

indefinite
1705:15
1707:18
1720:5,16,18

independence
1770:23
1771:19

independent
1541:17
1604:12,13
1719:19
1720:13,22
1732:18
1771:17
1772:8
1775:7

independently
1525:15
1651:20

indicating
1696:1
1777:13
1780:22

indication
1648:9
1664:8
1669:6

individual
1569:13

1571:8
1631:3
1781:23

individuals
1771:4
1783:3

industries
1503:7

industry
1500:13
1507:10
1532:4
1561:4
1565:24
1567:9
1591:4
1603:10
1652:10
1655:18
1661:11
1662:13
1703:1
1728:19,23
1750:6
1752:5,8

industry-wide
1729:16

inevitable
1498:14

inexpensively
1650:5

influence
1717:13
1718:22
1719:12
1724:9

influenced
1716:10

influences
1724:23,24

inform
1732:8
1761:10

information
1486:4
1490:5
1531:24
1544:16
1552:7
1584:24
1592:3,10
1622:16
1623:20
1624:4,8
1625:6
1639:3
1640:20
1725:2
1741:18
1758:15
1759:18
1765:12
1767:19
1768:7,23
1769:3
1773:24
1775:8,9
1778:7

informed
1704:18
1706:21
1780:18

infrastructure
1609:10

initially
1520:1
1544:13
1766:22

initiated
1761:21
1763:25

injuries
1758:8

injustice
1486:8

innovative
1503:20
1555:3,4
1561:16
1579:20
1658:11
1727:14
1746:14

input
1617:16
1708:9
1723:19

inquiries
1774:1

inquiry
1488:7,16
1546:19
1773:14

inside
1508:19
1509:5
1513:21
1515:3
1545:14
1620:8
1742:4

insightful
1611:21

inspect
1601:4

inspection
1599:4,20
1601:19
1692:4

install

1690:12

installed
1639:14
1642:17
1689:23
1690:17

instance
1584:21
1737:3

instances
1506:6
1772:10

Institutes
1500:12

instructed
1487:17
1749:20

instructing
1624:18

instruction
1624:25
1640:17
1750:24
1752:6
1772:13
1776:2

instructions
1485:14
1488:8,9,15
1492:1
1750:12

insurance
1509:1

integrated
1497:12
1511:9
1649:16
1650:7

integration

1498:19
1499:8
1560:9
1565:16
1600:25
1742:1

Intel
1508:5
1761:5,7,12

intellectual
1751:18,19

Intensive
1753:13
1754:7

intention
1552:17

interact
1601:16
1614:7

interaction
1601:4,13

interactions
1601:21

interchangea
bly
1686:18

interdisciplin
ary
1754:13

interest
1500:13
1506:14
1720:23
1721:5,8

interesting
1503:10

interests
1721:3

interface
1526:25
1535:18
1536:2
1661:3

interfaces
1526:24
1536:1

interfere
1697:22

internally
1732:6

international
1507:8
1753:18

interpretation
1691:1
1777:22

interrogates
1773:13

interrupt
1508:12
1510:4
1769:25

interrupted
1561:5

interview
1486:15
1560:18
1561:1
1651:11,14
1695:14

interviewed
1560:19

interviews
1485:7,20
1486:17
1487:1
1502:5

1623:2

intro
1722:2

introduce
1538:9
1684:1

introduced
1495:13,18
1542:17
1589:5
1632:3

introducing
1626:23

intuitive
1517:9

invasive
1513:22

investigation
1485:19

investigation
s
1749:18

investor
1671:16
1771:25

investors
1506:19
1520:23
1727:22,23

invitation
1620:2

invoice
1629:16
1645:14
1647:8
1653:23
1654:9,11
1669:10,11
1670:8

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1674:10
1780:21

**invoiced**
1594:16

**invoices**
1568:8
1589:21

**invoicing**
1642:16
1689:22

**invoke**
1486:16,20

**involve**
1501:19

**involved**
1520:22
1591:22
1620:4
1727:10
1737:23
1755:25
1757:1
1760:12,24
1772:22
1773:19
1779:2
1780:8
1782:15

**involvement**
1648:18
1762:19
1763:6
1778:25

**involves**
1528:21
1535:9
1776:8
1781:7

**involving**
1756:24,25

1767:8

**IP**
1508:6
1518:8
1545:13
1619:22
1620:3,7,13

**ISAAC**
1747:10

**issue**
1483:9,17,21
1484:24,25
1485:1,17,21
1486:1
1488:4,13,18
1489:6
1531:7
1550:16,18
1572:17
1589:4
1595:15
1596:6
1622:21
1628:8,11
1663:10
1667:25
1668:13,15
1701:4
1702:1
1710:6
1712:14
1737:14
1739:5
1765:3
1772:12
1778:8

**issued**
1485:2
1552:5

**issues**
1484:17,21

1489:17
1490:1
1492:11
1505:21
1518:23
1538:18
1548:7
1596:5
1606:18
1608:5
1656:3
1739:8
1743:18
1768:8,10,13

**item**
1528:3
1557:24
1661:10
1688:17
1689:1
1734:21
1739:10
1749:13,14,
15 1750:4,5,
21,22
1751:24

**items**
1484:1,15,19
1564:14
1589:9
1592:10
1644:4

**IV**
1769:17

**IVV**
1763:23
1776:1

---

**J**

**January**
1483:12,22

1484:10
1489:18
1560:2
1583:9

**Japan**
1768:11,12

**jeez**
1492:20

**Jeff**
1775:21

**jeopardized**
1743:8

**jewels**
1531:9,12

**Jim**
1485:8

**job**
1553:23
1555:21,23
1557:2
1704:18
1705:8
1712:25
1713:6
1731:1

**jobs**
1591:10
1610:11
1783:4

**join**
1502:7

**joined**
1775:24

**joint**
1538:16,23
1539:7
1540:16,24
1544:10

**joke**
1483:3

**joking**
1483:3

**JPEG**
1545:17
1584:20

**JPEGS**
1545:4,12

**judgment**
1780:18

**July**
1608:10
1630:16,17,
20,21,22
1631:1,2

**jumbled**
1721:18

**June**
1483:9
1608:10

**Justice**
1757:7,12
1759:12

---

**K**

**K10**
1496:3,7
1510:12
1511:8
1530:12
1531:19
1532:23
1533:13,16
1534:6,7
1535:21
1543:25
1554:3,8
1556:23

**TRANSCRIPT OF PROCEEDINGS**

1559:12,16
1561:15
1562:20
1563:12
1565:5
1569:14
1572:8
1579:16
1586:23
1587:16
1595:11
1597:16
1614:10
1617:21
1618:11
1620:8
1634:12
1643:17
1644:2
1646:18
1651:7,16
1652:21
1653:10
1659:3
1667:1
1669:8
1670:23
1672:1
1695:4,16
1725:7
1726:18
1751:3

**Katena**
1482:17,18,
21 1483:6
1485:6
1486:7,13,23
1487:6
1512:14
1530:12,21,
23 1546:14
1552:22
1558:12

1560:1
1563:15,24
1566:25
1578:14
1581:7
1582:6,7
1602:17,21
1603:14
1604:17
1610:4
1614:19
1618:11
1619:10,18,
22,23 1620:8,
11,13,22
1621:1,9
1626:19
1628:3,15
1629:11
1633:12
1634:11,23
1638:4
1639:18
1642:25
1643:3,11,15,
24 1644:15
1646:19
1648:12,23
1652:20
1653:11
1655:8
1659:1,2,7,
11,13,19,24
1660:1
1663:14,23
1665:2
1668:10
1669:6
1671:15,24
1673:3
1674:3,12
1685:15
1703:24
1708:13

1713:11,12,
18,25 1721:5
1727:14
1730:1
1731:2
1741:25
1742:5
1744:16
1745:9
1750:8,22
1751:19
1769:12
1778:23

**Katena's**
1486:3,24
1659:3
1672:1
1750:25
1751:7,12,17

**keeping**
1700:11
1776:15

**Kessler**
1761:3

**key**
1505:17
1560:8
1562:12
1571:1,10
1709:21

**kick**
1602:25
1639:13

**kind**
1501:15
1504:24
1508:4
1509:1,3
1512:20
1513:11,23
1520:18

1521:4,6,7,13
1524:20,23
1525:22
1526:5,10
1527:2,18,19
1528:10
1532:10
1535:1
1536:8,13
1537:19
1546:4,7,11
1560:13
1561:2
1563:17
1564:20
1565:1
1567:10,24
1569:10,21
1577:25
1582:8
1589:9
1596:2
1597:7,25
1599:17
1606:2
1613:17
1614:6,7,18
1617:22
1626:23
1634:19
1641:19
1648:11
1664:14
1666:8,12
1670:18
1680:13
1687:2
1698:18
1706:25
1714:4
1721:18
1725:16,17
1726:13
1727:22

1732:8
1737:24
1743:10
1749:13
1781:3

**kinds**
1507:18
1514:11
1527:17
1616:11
1742:24

**knowing**
1507:17
1731:24

**knowledge**
1528:22
1529:1
1628:5
1665:7
1739:24

**knowledgeabl
e**
1524:18
1698:2

---

**L**

---

**lab**
1514:12

**Laboratory**
1753:12

**lack**
1567:8
1670:22
1671:4
1675:6

**lacked**
1571:9

**lacking**
1569:15

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

Lacks
  1546:3

landscape
  1531:3

language
  1509:17
  1515:18,21
  1689:14,17
  1705:6,13

large
  1491:4
  1498:18,22
  1708:12
  1761:3
  1764:7,8
  1781:12

larger
  1523:5
  1536:23

lasers
  1535:19

late
  1482:6
  1490:3
  1493:4
  1543:1
  1602:16,22
  1603:13
  1604:17
  1605:7,8
  1606:16
  1607:7
  1608:5,14,16,
  22 1611:3
  1626:6,11
  1627:7,17,25

law
  1753:15,17,
  18 1761:10

lawyer

1753:20

lawyers
  1491:1,12
  1515:5
  1548:11
  1614:19

lay
  1511:23
  1569:9
  1661:14
  1770:20

layer
  1562:10

layers
  1526:7

layout
  1565:13,14
  1570:7,11
  1571:5
  1606:5
  1612:23
  1613:2,3,14
  1666:18,22
  1667:1,6,20
  1668:4

layperson
  1660:9

lead
  1603:20
  1691:22,23
  1692:7
  1736:23
  1762:20

leaders
  1503:7

leading
  1749:22

leads
  1705:7

learned
  1592:19

learning
  1776:6

leave
  1482:9
  1493:15
  1506:3,5
  1515:8
  1575:21
  1671:3
  1766:9

leaves
  1506:2
  1509:14

lecture
  1534:13

lectures
  1592:5

led
  1520:15
  1564:14
  1689:15,18

left
  1565:9
  1712:17
  1764:23

legal
  1677:6,8
  1753:20,23

LEGO
  1513:4

Legos
  1522:5

length
  1757:19
  1759:21

lengthy
  1489:16

1703:17

letters
  1566:15

level
  1490:18
  1491:5
  1500:22,23
  1502:12,15
  1508:25
  1509:20
  1513:17,24
  1519:7
  1529:2
  1530:2,20
  1531:24
  1532:16,20
  1534:14,22
  1535:3
  1543:23
  1544:3
  1555:17
  1556:4
  1558:21,22,
  23 1569:19
  1570:23
  1573:3,4,7,9,
  10,16 1576:5,
  15 1579:5
  1590:24
  1591:12,16
  1592:22
  1599:18
  1600:25
  1618:5
  1645:24
  1656:8,9
  1723:2,22,23
  1724:2,8
  1739:3
  1774:25

levels
  1509:22

1514:10
  1574:16
  1770:22

liberty
  1758:1,2
  1759:18

license
  1506:16

lieu
  1680:16

life
  1505:1
  1650:15
  1651:9
  1759:23

light
  1513:17
  1535:14,15,
  19 1770:11

likelihood
  1565:2

limine
  1487:13
  1489:10

limit
  1545:22
  1684:4
  1758:6
  1781:20

limitation
  1588:12

limitations
  1551:13
  1588:14,17
  1713:1

limited
  1489:18
  1537:13
  1634:16

1676:5,19,23,
24 1677:22
1679:16
1682:16,24
1683:9,20
1695:6
1704:7

**lines**
1647:12

**Linkedin**
1696:4
1699:19
1700:9
1701:11
1718:8,16

**list**
1542:7
1683:5
1754:24

**listen**
1637:1,4
1664:20
1699:4

**listing**
1695:17

**lists**
1773:17,25

**literally**
1527:20
1570:4

**lithography**
1728:22

**litigation**
1518:8
1755:11
1756:14,24
1757:4
1760:24
1761:19,20
1762:11

1763:20,22
1764:1
1766:5
1781:13
1782:13,22

**Liu**
1633:22
1748:4,8,11,
12,18,21
1749:1,3

**living**
1592:5

**LM**
1753:17

**local**
1764:9

**log**
1484:2,3,15

**logic**
1509:2
1573:6
1609:23
1617:15

**logical**
1683:5

**logistical**
1743:18

**logistics**
1648:8,22
1674:8
1720:1
1730:12
1737:23

**Logix**
1506:23,24
1507:20
1509:24
1532:7
1656:4

**long**
1486:17
1542:2
1556:10
1588:9,19
1589:1
1590:8,25
1591:25
1597:7
1603:12
1604:14,15,
24 1743:9
1754:24
1781:2
1782:16

**longer**
1515:6
1525:7
1579:23
1596:7
1618:9
1654:8
1655:1
1692:7
1728:24

**looked**
1485:4
1559:24
1578:21
1580:15
1586:17
1652:10
1654:17
1679:6
1685:12
1720:9

**lot**
1484:14,18
1496:17
1503:9,11
1506:25
1510:12

1526:9
1527:3,4
1528:21
1535:1,8
1537:1
1548:19
1554:15
1555:4,5,7,9
1556:7
1575:4
1589:4,22,24
1591:6
1596:7
1598:16,20
1599:2,9,16
1618:9
1619:13
1621:11
1637:1
1680:22
1763:19
1764:24

**louder**
1491:9
1754:2

**low**
1516:16
1526:5
1534:19
1565:21
1566:14,17,
18 1583:16
1661:10
1662:15
1695:17
1725:25
1726:1,5
1729:17,18

**low-level**
1569:21

**lower**
1537:18

1558:12
1649:20

**lunch**
1614:23
1615:2

**luxury**
1490:24

**LVS**
1570:6,7,21,
25 1571:10
1739:2

---

**M**

---

**M&a**
1782:14

**machine**
1560:11
1605:19
1639:8,20

**machines**
1491:5
1639:23

**Madam**
1510:11
1546:20
1611:11
1640:16
1677:20
1682:8

**made**
1484:11,12
1485:14
1488:7
1525:2
1545:11
1554:8
1564:4
1568:1
1570:3

1584:10
1609:7,9
1625:10
1628:6
1631:6
1643:18
1664:16
1666:6
1667:16
1688:21
1696:12
1697:2
1707:22
1710:12
1751:10
1758:4
1767:15
1768:19

**magnifier**
1512:2

**magnifying**
1513:16

**main**
1503:4
1762:17

**maintain**
1763:6

**major**
1507:10
1571:5

**majority**
1757:2

**make**
1481:25
1483:19
1484:12
1490:22
1491:10
1502:7
1505:11,13,
20 1506:11,

19 1511:5
1512:21
1513:2
1514:2
1525:6
1529:10
1537:17
1542:11
1551:12
1555:7
1558:18
1563:9
1564:5
1571:17,21,
24 1572:18
1579:1,13,23
1580:4,6,15
1581:17
1584:6,15
1586:8
1592:6
1594:21
1596:18
1598:21
1601:16
1602:13,18
1603:11
1605:22
1606:5,9
1608:1
1616:9
1622:3
1624:11
1629:21
1630:22
1638:25
1640:15,17
1644:6
1646:13
1652:7
1653:5
1666:1,5
1671:23
1674:22,23

1676:14
1680:5
1683:18
1691:25
1696:15
1722:18
1729:3
1736:23
1742:21
1743:15,16
1745:1
1766:13
1770:14
1773:4,5,9,22
1780:18
1781:18
1782:12

**makes**
1546:12
1660:15
1690:15
1708:10

**making**
1503:3,19
1507:2
1513:24
1533:20
1537:17
1560:10,14
1591:22
1622:1
1666:10
1679:5
1683:4
1736:24
1742:2
1765:25
1779:11,20
1782:22

**Maloney**
1485:8,20,23
1486:4,12,18,

22 1487:2,21
1731:25

**man**
1529:1

**manage**
1755:13

**management**
1758:5

**manager**
1530:2

**managing**
1756:3

**mandated**
1757:7,12

**manipulate**
1583:20
1584:3,11

**manner**
1772:8
1775:7
1780:20

**manually**
1599:21

**manufacture**
1525:9
1571:18
1573:11
1769:4

**manufactured**
1578:25
1691:20

**manufacturer**
1759:16

**manufacturers**
1768:11

**manufacturing**
1517:23
1519:12
1527:3
1534:24
1543:19,25
1557:22
1566:18
1567:25
1578:22
1603:10
1666:11
1667:23
1726:15
1730:14
1767:10

**map**
1521:1

**March**
1560:6
1582:7
1583:10
1586:15,16,
18 1587:24
1713:19

**mark**
1540:8
1576:2
1748:2

**marked**
1538:7
1540:25
1541:2

**marketing**
1532:5
1585:9,18,22
1586:1,11
1723:2,22,23
1724:3,4,8

**Markovic**

**TRANSCRIPT OF PROCEEDINGS**

1481:15,23
1482:11
1490:9
1493:14,23
1494:12,18,
21 1495:1,10
1523:14
1530:5
1543:7
1547:19
1549:4,7,9,
13,17 1550:2
1551:6,16
1574:15
1577:18
1588:19
1616:16
1623:1
1636:25
1657:19
1664:21
1677:10
1680:24
1682:2
1685:3,10
1686:6
1694:17
1699:3
1702:24
1703:10,11
1709:6,7,11
1710:25
1711:8
1730:8
1731:12
1733:9,13,15
1735:13,22
1737:19
1746:13,25
1778:6

**Markovic's**
1492:7
1547:7

1550:6
1630:18
1679:1
1692:13
1710:5
1774:15

**mask**
1636:10
1637:25
1639:7
1643:18
1644:1
1652:3,5,21
1689:7

**masks**
1689:4,6

**mass**
1596:13

**Master's**
1497:11
1500:22
1501:13
1753:10
1754:20

**masters**
1560:25

**match**
1535:18

**matchbox-
size**
1516:24

**matches**
1570:10

**matching**
1638:9

**mate**
1661:8

**material**
1544:17

1545:21
1580:19
1581:4,6
1582:11
1584:7
1585:6
1591:16
1592:17
1622:17
1658:16
1661:15
1697:8,9
1704:4
1709:15
1711:1,20,22
1712:22
1720:1
1722:5
1753:2
1778:9,13

**materials**
1514:4
1544:8
1585:10,18,
22 1586:2,11
1588:9,22
1604:14
1620:12
1647:24
1652:13
1669:5
1703:17
1713:11
1777:12,17

**math**
1519:19
1533:7,10
1642:8

**mathematics**
1753:9

**matrixy**
1516:1

**matter**
1490:14
1576:10,14,
18 1603:22
1696:21
1758:10,16
1759:8
1765:17

**matters**
1755:22
1761:15
1763:3
1766:14

**meaning**
1687:2

**meaningful**
1552:23
1601:21
1618:9,14

**means**
1492:13
1537:18
1549:1
1568:10
1576:15
1578:24
1665:25
1666:12
1713:25

**meant**
1510:1
1561:22
1566:18
1573:2
1724:1,11
1770:1

**measure**
1519:22
1589:15
1742:22

**measured**
1534:3

**mechanics**
1765:23

**mechanism**
1671:21

**media**
1780:11

**medical**
1499:5
1513:18
1517:17,18
1536:19
1599:5
1691:14,20
1692:6

**meet**
1481:22
1484:16
1519:10
1558:11
1759:4

**meet all**
1525:13

**meeting**
1482:4
1706:22
1731:16
1783:5

**meetings**
1546:13
1581:7

**meets**
1525:16
1662:24
1727:5

**members**
1481:15
1505:12

1752:18

**Memorial**
1497:21

**memory**
1654:12

**mental**
1485:22
1545:1

**mention**
1542:5,6
1672:4
1704:2
1728:9,19
1768:9

**mentioned**
1481:25
1520:19
1527:17
1542:3
1566:16,23
1594:7
1612:15
1616:19
1652:18
1726:22,23
1736:20,22
1738:23,24
1754:6
1759:15
1760:12
1768:16

**mentored**
1775:20

**merger**
1762:16
1764:14,16

**merit**
1525:1

**message**
1718:6

**messages**
1713:11,15
1718:2
1721:11

**Messrs**
1482:11
1485:20,23
1486:4,12,18,
22 1487:2,9

**met**
1516:13
1565:19,20
1566:7
1665:11,20
1689:21
1699:19
1740:18

**meter**
1609:14

**methodically**
1560:7

**methodologies**
1754:16

**methodology**
1497:17
1576:17
1678:25
1723:6

**methods**
1754:14
1765:5
1771:6
1775:4

**metric**
1531:7

**metrics**
1532:10

**Michael**

1485:8

**Michelle**
1573:14
1574:17
1575:20
1734:13,19,
22 1735:6,20,
23

**microcontroller**
1760:16

**microelectronics**
1535:13,18

**microprocessor**
1508:5

**Microsoft**
1713:6,7

**mid**
1626:6,11
1627:7,16,25

**middle**
1512:3
1764:21

**midnight**
1483:14

**Mike**
1722:11
1725:11

**Mike's**
1725:19

**milestone**
1666:16
1668:2,17
1689:8
1693:21

**millimeter**
1512:1

1522:1
1562:20,23
1563:2
1568:1,2

**millimeters**
1521:22,25
1537:8
1554:4,6,19

**million**
1628:15
1629:1,3,12
1631:22
1633:13
1634:11
1636:12
1638:2
1639:2,10,11,
15,19
1640:14,19
1641:17
1642:11
1673:3,12
1686:12
1764:8
1781:9,10

**millions**
1559:3,4

**millivolt**
1558:5

**millivolts**
1534:18
1558:19
1559:8
1573:8

**mind**
1503:13
1511:22
1591:8
1733:11
1759:6

**mind-set**
1503:9
1506:10,17

**mindful**
1613:18

**mine**
1539:25
1563:19

**miner**
1529:19
1532:23
1595:15
1674:4,14
1751:3

**miner-type**
1575:3

**miners**
1563:19
1672:2
1673:14
1742:6

**miniaturization**
1521:11,16
1537:5
1599:12

**miniaturized**
1522:24
1523:3
1526:6,13

**minimally**
1513:22

**minimize**
1758:6

**minimum**
1642:4
1687:12,14,
20 1774:11,
25

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

mining
1487:20
1531:8
1532:24
1566:1
1595:4,7,19,
23 1596:14
1597:16
1599:1,10
1600:5,11
1601:7
1602:2,10
1609:5
1611:5
1626:20,24
1727:16
1730:3
1744:17
1745:1,11
1752:2,5,8,12

minute
1491:18
1510:18
1562:14
1575:21
1625:15
1638:24
1643:8
1680:13
1725:5
1752:23

minutes
1482:17
1492:13
1542:25
1553:20
1577:3,14
1610:1,4
1618:8
1712:19
1728:3
1733:1,20,22
1734:3,5

1743:25

Mischaracteri
zes
1581:20
1585:12
1701:15

misconduct
1776:9

mishmashing
1576:8

missed
1607:10
1647:5
1664:22

mistake
1631:6

mistaken
1602:15

misunderstoo
d
1571:14

mixed
1535:4

mixture
1537:2
1762:11

mock
1693:8,12,14,
16,19 1694:1,
8,12,13,19
1726:22,24
1727:5
1743:3,12,17

mode
1691:23

model
1559:3
1573:3,4
1574:16

1576:15

models
1573:16
1576:5

modifications
1758:20

modifying
1759:25

moment
1588:24
1612:22
1755:16

Monday
1782:20,24

money
1525:5
1529:5
1530:4
1531:4
1606:21
1628:12
1643:4
1644:6,12
1648:2
1656:12
1659:7
1672:6
1673:23
1674:19,23,
25 1675:1
1691:8
1692:8
1727:7,17
1743:13

Monte
1754:22

month
1604:25
1606:4

month-by-
month
1608:9

monthly
1589:8

months
1497:9
1525:6,18
1560:6
1579:23
1580:12,13
1586:19
1587:19
1594:19,23,
25 1602:18,
24 1603:18
1604:3,22
1605:4,7,18
1606:1,3,5,6
1607:22
1608:15,19
1626:2
1669:19
1670:3
1773:15

months'
1626:1

Monzon
1714:13
1716:13,18
1717:24
1718:7

morning
1481:5
1482:7
1490:2
1492:5
1493:6
1494:8,9
1538:18
1621:15

1733:18
1783:11

motion
1487:13
1489:10,21
1682:18

motions
1489:13

mount
1527:20,21

mounted
1526:17
1527:12
1528:5,11

move
1500:15
1616:17
1635:6
1642:19
1676:16
1679:8
1682:7

moved
1497:10
1507:17

MPW
1687:3

MPWS
1650:3
1652:6

mucked
1677:4

multi-project
1567:11

multiantenna
1499:18

multihundred
1764:7

**multiplatform**
1769:4,8

**multiple**
1499:20
1513:2
1533:14
1556:8
1601:3
1621:23,25
1649:19,21
1684:7

**multiproject**
1567:2
1643:21
1649:15

**mundane**
1739:5

**music**
1516:17

**N**

**names**
1620:24

**nanometer**
1563:25
1564:1,2,9,11
1586:25
1587:5,16
1643:19,24
1644:9
1728:23
1729:2

**narrative**
1767:24

**narrow**
1484:17
1589:4
1594:3

**National**

1500:11,12
1753:12

**naturally**
1537:19

**nature**
1589:19
1692:9
1708:7
1761:1
1771:25

**navigate**
1550:19

**NDA**
1757:23

**NDAS**
1773:1

**neat**
1521:5

**needed**
1530:10
1533:18
1546:15,18
1558:12,14
1582:24
1599:6
1610:12
1618:21
1661:18
1691:14,19,
20 1708:9,11
1741:21
1765:13

**negative**
1627:12

**Netherlands**
1767:18

**network**
1698:1

**neuroenginee**
**ring**
1498:25
1499:2

**nice**
1517:7
1597:20

**night**
1483:13
1717:6
1782:24

**node**
1563:23
1643:13
1644:9
1728:22,24

**nods**
1697:10
1734:17

**noisy**
1491:5

**nondisclosur**
**e**
1487:23
1619:10

**nonhuman**
1667:4

**nonrecurring**
1641:16
1642:11
1686:11

**nontrivial**
1525:5

**Normal**
1498:20

**norms**
1701:8
1749:17
1769:24

1770:11,17
1776:15
1778:2
1780:15

**note**
1541:15
1716:22
1748:14

**noted**
1593:11
1647:16
1651:19
1692:20

**notes**
1483:2
1511:14
1549:11,12
1611:15
1612:5
1625:10,12

**noticed**
1597:6

**notices**
1773:16

**notified**
1647:25

**November**
1560:4

**NRE**
1638:8,15
1640:11

**nuances**
1533:7

**number**
1483:24,25
1484:24
1485:2,4
1488:6
1489:17

1530:18
1538:6
1539:7,13
1540:24
1542:5,12
1548:12
1555:24
1568:18
1588:12
1591:4,9
1594:6
1597:21
1599:21
1632:20
1636:7
1639:8
1642:20,21
1653:24
1664:10
1672:3
1688:18,25
1689:1
1708:12
1717:3
1719:3
1727:10
1735:9,19,25
1738:7
1747:23
1748:4,5
1766:16
1768:13

**numbers**
1504:24
1540:6
1597:18
1623:24

**numerosity**
1484:3

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

**O**

oath
1547:5
1629:11
1633:12

object
1546:23
1593:7
1624:17
1631:8
1632:2
1633:18
1682:22
1740:1
1779:10

objected
1623:10

objection
1546:3
1576:11
1581:20
1585:12
1592:24
1593:10
1611:23
1622:22
1623:9,18
1635:2
1646:24
1653:16
1657:10
1685:18
1700:2
1701:14
1730:5
1731:4
1737:16
1740:23
1777:16

objections

1484:7
1485:13
1488:7,10
1657:11

objective
1503:4
1780:19

objectives
1519:12

obligated
1643:25

obligation
1533:14

obligations
1529:9
1759:11
1763:2
1781:21

observe
1750:16

obtained
1623:20

occasion
1782:8

occasions
1664:11
1752:9

occupied
1644:8

occur
1610:16
1739:8

occurred
1486:17
1489:5
1546:1
1768:13

October

1608:22
1611:3
1625:21
1670:24
1671:10

objective
Oculus
1537:12

odd
1727:13,18

off-the-shelf
1527:6
1595:13

offer
1628:3,7
1675:23
1682:2
1699:16
1700:6
1753:20,23

offered
1710:4

offering
1674:11
1677:10

offers
1502:7

office
1506:15
1763:25

official
1529:5

Oftentimes
1508:20

oil
1483:14

one-minute
1534:14

one-page

1725:16

one-pager
1556:18

one-time
1641:19

ongoing
1771:23
1778:19

online
1581:7

onset
1544:19

open
1548:23
1620:2

opened
1607:23

opening
1521:8
1755:10
1765:2
1768:6
1769:10
1770:20
1782:2

openly
1553:3

operate
1772:8

operating
1532:12
1548:12
1558:8,16
1681:7
1752:8
1765:18
1768:25
1776:13

operation
1561:9

operations
1575:13

opine
1673:24
1678:22
1683:21
1693:25
1696:8
1745:8
1750:18
1779:13

opinion
1529:21
1543:15
1545:16
1553:21
1576:4
1604:12,13,
20 1628:3,7,
10 1632:8
1635:12
1655:7
1670:3
1674:3,6,12
1675:16,20,
22,24 1676:9
1677:3,10
1679:22
1680:3,4,7,
12,23
1681:15
1682:3
1683:4,11,12,
15,19,21
1684:17,18
1699:16,20
1700:1,7,13,
24 1701:1,16,
19,21,22
1702:10,11,

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

14,20,22
1703:9
1709:2,24
1710:4,5
1711:15,24
1712:4,23
1713:10
1724:9,23
1726:3
1769:20
1776:14
1778:11
1780:14

opinions
1496:16
1530:6
1555:12
1584:7
1622:17
1676:6,20,23,
25 1677:15,
21 1678:23
1679:2,3,16,
20 1681:8,17
1682:16,22,
25 1683:8
1684:4,6,19
1697:7,8
1699:13
1700:21
1701:5
1702:9
1703:1,2
1704:5
1708:18
1709:16,21
1711:1,10,12
1716:10
1717:13
1718:23
1719:12,23
1720:6
1722:15,16

1723:17
1724:24
1749:18
1750:15,17
1752:22
1753:20,24
1765:3
1769:15,24
1770:8

opportunities
1500:10
1760:9

opportunity
1482:1
1486:14
1490:22
1551:12
1582:23
1771:1,3

opposed
1545:18
1562:23
1779:14

optimization
1562:11

optimize
1555:5

option
1638:4
1643:12
1651:24
1652:6,16

options
1760:6

order
1481:19
1484:23,24
1485:2,4,6
1487:8,10,11,
19 1491:7

1533:7
1548:10,12
1551:10
1552:5,20,24
1558:11
1567:1
1596:18
1599:7
1602:23
1604:22
1634:17
1645:18
1646:3,6
1671:2
1674:10
1680:14
1689:8
1690:14
1691:14
1692:1,9
1736:24
1743:14
1759:11
1781:18

ordered
1552:24

orders
1489:14
1549:22
1735:10

ordinary
1490:19

organization
1570:2

organizationa
l
1758:5

organizations
1517:24
1775:16

organize
1742:15

orient
1540:14

original
1487:25
1493:8
1568:22
1617:25

outcome
1584:4
1697:20
1741:7
1772:15,18

outline
1706:25

outputs
1584:16
1617:16

overlap
1498:25

overlooked
1639:16

overrule
1486:24
1623:12

Overruled
1546:6

overseeing
1756:23

oversight
1599:24

overwhelm
1545:1

_____

**P**

_____

P&r

1564:15,16
1569:14
1570:13

p.m.
1615:3
1734:7
1747:8
1783:19

pace
1490:14

package
1512:15,19,
21 1513:19
1525:21
1528:4,5
1563:18
1565:12
1569:24
1570:2
1660:18,19,
20 1661:8

packaged
1512:9,25
1526:18
1527:21
1528:11

packages
1527:16,17

packaging
1523:5
1527:13
1565:11,16
1569:22
1611:5,7
1660:2,5,8
1661:6,15
1662:5,8,11,
18,23,24
1663:3

pages
1539:10

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1541:6
1570:20
1575:22
1642:22

**paid**
1530:3
1648:2,13

**pallet**
1562:5

**panel**
1481:15,21
1482:1,4
1483:10,11,
18,23,24
1484:5,11,18
1485:5
1486:22,24
1487:4,6,8,
13,16 1488:5,
9 1489:7,20
1490:25
1491:20
1492:4,24
1493:6
1495:11
1496:24
1497:15
1498:5,16
1499:6
1502:14
1505:7
1506:22
1508:10
1516:6
1524:15
1533:5
1542:9
1547:13
1548:7,11,13
1549:3,11
1551:5,10,15,
23 1552:14,

23 1559:11
1567:5
1574:5
1580:7
1623:4
1624:5
1632:7
1680:17
1681:9
1683:13
1703:9
1710:5
1711:10
1733:12
1752:18
1768:4
1769:18
1783:16

**panel's**
1486:2
1547:7
1549:21
1593:8

**panels'**
1486:11

**paper**
1497:16
1504:20
1507:6,14
1512:9
1634:2
1698:12

**papers**
1493:1
1503:3,11
1507:9,15

**paragraph**
1485:16
1486:10
1487:4
1634:8

1636:2,8
1637:22
1650:22,25
1651:1
1658:19,24
1663:13
1665:13,15,
16 1689:19
1693:10
1694:23,24
1695:1
1702:23
1705:4
1735:5,7,19
1738:5,11
1740:11
1741:21
1769:20

**parallel**
1499:7,10,15

**parameters**
1559:2
1776:3

**Parmet**
1775:21

**part**
1497:8
1506:9
1530:19
1531:9
1533:11
1535:16
1539:1
1564:4
1571:13
1575:16
1578:20
1616:23
1617:12,13,
14 1619:8,22
1621:21
1622:18

1628:22
1635:11
1662:14
1688:20
1697:7
1698:18
1700:20
1704:18
1709:2,5,21
1712:22
1713:21
1723:17
1725:11,18,
19 1728:12
1730:11
1731:6,10
1742:2
1744:20
1745:7,12
1761:21
1763:21
1782:19

**participants**
1507:10

**participate**
1500:19

**participated**
1520:7,19
1622:10,12
1777:13

**participates**
1500:17

**participation**
1501:1
1779:9

**parties**
1545:14
1552:12
1619:25
1620:10
1708:5

1750:16
1752:1
1755:24
1773:18

**partly**
1754:4

**partner**
1728:21
1729:8,19
1730:14
1775:22

**partners**
1760:7

**parts**
1501:3
1539:5
1563:6
1564:9
1599:4,20
1600:1
1601:5,16
1602:23
1691:15

**party**
1547:15
1619:25
1620:5,9

**party's**
1484:13

**Parvizi**
1516:13,24

**pass**
1512:11
1513:25
1533:23
1572:20
1577:6
1743:23

**passengers**
1649:25

passing
 1668:13

past
 1532:24
 1739:24
 1757:13
 1771:22
 1773:13
 1780:12

patent
 1761:3,20

patents
 1518:9

path
 1525:4

patient
 1513:21
 1758:7,25

pattern
 1763:22

patterns
 1617:16

pause
 1612:22
 1705:22

pay
 1525:7
 1567:15,23
 1606:22
 1629:12
 1633:13
 1640:13
 1641:20
 1644:6,16
 1646:21
 1653:13
 1655:25
 1656:13
 1657:8
 1658:13

 1659:7
 1671:15
 1672:13
 1674:5,14,19
 1675:25
 1676:12
 1677:12
 1678:14
 1682:4
 1690:16
 1692:1
 1736:25

paying
 1628:21
 1639:7

payment
 1642:20,21
 1647:11
 1653:24
 1654:2,15
 1672:9
 1674:10
 1675:7
 1688:17
 1689:1,3,4,24
 1690:13
 1726:25
 1736:5,7,18

PCB
 1525:21,25
 1526:4,9,17
 1527:4,12,19,
 21 1528:6,10,
 11 1596:3,5

PCBS
 1609:12

PDF
 1575:21
 1584:18
 1614:17
 1761:8

PDFS
 1583:15,19
 1614:14

Peak
 1755:12
 1756:2,7,16,
 24 1762:8
 1763:18
 1770:13
 1775:11
 1781:1

Peak's
 1764:13

peanuts
 1660:11

pedestrian
 1536:11

peer
 1775:14

peer-
reviewed
 1504:20

penetrate
 1527:18

people
 1490:11
 1492:20
 1503:2,20
 1509:4
 1511:19
 1517:2
 1520:21
 1528:24
 1532:19
 1552:10
 1556:8
 1561:6
 1567:13
 1596:3,4
 1597:25

 1600:24
 1610:10,16,
 17 1614:1
 1644:6
 1661:20
 1672:9
 1697:25
 1713:12
 1764:23
 1771:2
 1773:22
 1781:19
 1782:1,8

people's
 1508:7

percent
 1534:2
 1565:7
 1644:8
 1726:10
 1763:5

Perfect
 1528:8,12
 1573:1
 1633:24
 1734:2

perfectly
 1618:14

perform
 1496:2
 1529:17,22
 1532:22
 1554:9
 1559:22
 1587:9
 1618:6
 1713:8
 1730:19
 1731:3
 1766:7
 1771:16

 1780:19
 1783:3

performance
 1497:18
 1499:8
 1504:8
 1519:11,21,
 24 1532:11,
 15,17 1534:3
 1565:20
 1566:9,11,12
 1572:20
 1573:12
 1576:24
 1668:14
 1695:5
 1739:1
 1741:13

performance-
pushing
 1554:22

performed
 1517:4
 1530:22
 1587:4,15
 1704:23
 1746:14
 1755:23,24
 1781:15

performing
 1528:15
 1544:23
 1775:7

performs
 1697:1

period
 1705:15
 1707:18
 1714:21
 1720:5,16
 1768:22

**TRANSCRIPT OF PROCEEDINGS**

1778:21

periodic
1583:6
1757:10

periodically
1582:19
1583:7

periphery
1569:9

perk
1711:21

Perkins
1760:22
1761:15,22

person
1516:17
1524:19
1528:15,17
1531:17
1580:8
1583:17
1697:1,12
1701:9
1744:19
1768:25
1772:4

personal
1500:8
1556:9

personally
1733:19
1757:4
1765:8

perspective
1744:24

pertain
1485:18

pertinent
1709:5

1711:10,15
1755:7

Pflaum
1481:24
1482:11
1530:6
1545:4
1549:4,9
1555:13
1566:25
1569:12
1571:7
1572:6
1585:18
1674:22
1682:19
1684:1
1733:14,17
1746:24
1747:9,10,18
1749:8
1783:11

Pflaum's
1481:16
1555:18,19
1567:8
1568:10
1573:15
1574:17
1585:21
1701:5
1703:1

Ph.d.
1497:13,23
1502:17
1524:17
1609:22

Ph.d.s
1504:16
1560:24

phase

1517:16
1629:4

phone
1717:2
1719:3

photo
1511:15

Photonic
1535:8

photonics
1535:10,19

phototonic
1534:11
1535:6

phrase
1516:1
1573:3
1604:15
1670:23

phrasing
1680:2

physical
1570:10
1637:10

physically
1511:10
1666:10

pick
1557:24

picture
1560:17

pictures
1723:3

piece
1507:3

pieces
1541:1

pile
1628:16

pill
1514:7,8

pills
1522:25
1599:14

pilot
1634:20
1639:2
1640:6,19
1643:11
1644:14
1645:9,17
1646:18
1647:9
1651:24
1652:16
1653:10
1655:12
1657:5
1685:14
1686:15
1687:7,8,9,
12,15,20
1688:5,11,22
1689:5,6,7,16
1690:23
1691:8

Pilot/
engineering
1641:25

pin
1512:15
1527:18
1569:24
1662:25
1663:2

pins
1565:15
1568:15

1569:7,8,15,
19 1660:19,
20

pipeline
1504:15,23

place
1564:16,18,
21,23,25
1570:11
1614:23
1624:12,20
1664:2
1739:7
1751:18
1759:4
1763:19
1772:3
1783:8

place-and-
route
1565:6

placement
1613:19

places
1562:10,17

plan
1493:10
1542:18
1577:10
1632:1
1663:14,15,
18,23 1664:1,
2,14 1665:1
1669:21
1708:14
1723:11
1740:12,15,
19,21 1741:4,
8,11

planned
1638:4

**TRANSCRIPT OF PROCEEDINGS**

planning
 1493:7

plans
 1723:19
 1725:3

plant
 1660:2,5
 1662:5,8
 1730:14
 1767:9

platform
 1536:19
 1537:11

platforms
 1537:13

play
 1522:5
 1720:6

played
 1722:15
 1723:16

playing
 1644:7

PLL
 1560:13
 1619:23
 1620:4,6,18,
 21

PLLS
 1569:5

plowing
 1483:14

plug
 1610:8
 1670:23

plus/minus
 1534:2

PM

 1685:5

PMK
 1485:10

PNR
 1612:15
 1613:3,7,9,
 11,15,17,23
 1614:2
 1738:16,18,
 22

point
 1493:3
 1502:10
 1509:15
 1512:4
 1534:23
 1547:20,24
 1579:23
 1586:4
 1601:2
 1603:6,11
 1611:13,16
 1625:16
 1627:2
 1655:2,18
 1661:21
 1667:17
 1688:24,25
 1701:25
 1734:21
 1735:13,19
 1759:3

pointed
 1589:6
 1647:20

pointing
 1653:25
 1729:4

pointless
 1667:4

points
 1570:8
 1591:13
 1601:14

policy
 1509:1
 1766:15
 1773:6

poor
 1490:11

pop
 1515:19

pops
 1682:17

portion
 1647:14
 1701:25
 1725:10

pose
 1482:2

posed
 1550:18
 1637:17,18

position
 1625:23,24
 1645:22
 1654:4
 1772:4

positive
 1748:19

positively
 1503:7

possibility
 1648:1
 1766:24

possibly
 1556:8
 1559:6
 1602:5

 1673:21

post-layout
 1739:3

posted
 1776:10

potential
 1495:17
 1504:2
 1756:25
 1758:7
 1760:4,7,9,23
 1761:18
 1772:1,15
 1773:3
 1776:17
 1779:5
 1780:9

potentially
 1484:22
 1695:9
 1729:14
 1773:17

pound
 1537:14,16

powder
 1727:24

power
 1519:11,23,
 24 1526:24
 1532:11
 1534:25
 1537:19
 1551:13,23,
 25 1554:23
 1555:5,9
 1575:17
 1601:14,15
 1609:18
 1695:5
 1739:1
 1742:22,23

 1760:2

**Powerpoint**
 1583:13,14,
 20 1592:4,7

**Powerpoints**
 1545:5,9,18

**PR**
 1612:24

practical
 1519:9,14
 1531:25
 1544:21,24
 1548:23
 1578:9,14,19,
 24 1579:6
 1652:6

practice
 1696:9
 1750:6
 1752:4
 1755:11
 1756:6,7
 1762:13,14,
 15 1764:14
 1766:7
 1775:24
 1780:2
 1782:21

practices
 1752:4,14
 1765:5
 1769:23
 1770:12,17
 1771:6
 1774:17
 1776:12

pre-litigation
 1757:16
 1760:23

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

pre-
miniaturizatio
n
  1563:11

precise
  1487:9

precisely
  1535:18
  1589:15
  1603:25
  1625:9
  1638:9

precision
  1534:22
  1555:9

prediction
  1754:20

preface
  1483:6

preferred
  1652:2

prejudice
  1486:6
  1487:3

preliminaries
  1492:15,18

preliminary
  1706:22
  1714:23

premiere
  1507:7

preparation
  1749:21

prepared
  1492:4
  1557:9
  1621:22
  1628:2,7
  1696:8

1699:16
1700:6

preparedness
  1565:11

preparing
  1485:9
  1486:7
  1589:13

present
  1486:21
  1506:18
  1603:9
  1731:16
  1771:21

presentation
  1560:5
  1582:7,22
  1584:21

presentations
  1559:25
  1580:16
  1581:9
  1582:5
  1592:6

presented
  1483:24
  1484:6
  1485:5
  1487:16
  1507:6,15
  1548:7
  1583:14

presents
  1771:23

president
  1759:2

press
  1513:16

pressure

1564:1
1610:14
1627:1
1708:15
1709:22
1710:14
1713:13
1714:1
1717:14

pressuring
  1714:2
  1717:4

pretend
  1509:12
  1542:4

pretty
  1491:19
  1533:25
  1550:24
  1586:21
  1592:4,7
  1594:3
  1626:16
  1629:19
  1669:15

previous
  1573:5
  1608:10
  1612:23
  1621:21
  1639:16
  1647:6
  1654:1
  1698:2
  1725:13

previously
  1481:14
  1518:7
  1520:19
  1538:7
  1569:12

1626:25
1652:19
1736:20

price
  1567:15
  1638:9
  1641:16
  1642:3
  1644:3
  1645:19
  1686:11
  1752:3

Pricewaterho
use
  1775:22

pricing
  1641:13
  1688:1
  1752:2
  1767:20
  1769:7

pride
  1743:11

primarily
  1500:20
  1559:24
  1752:10
  1756:13

primary
  1616:20
  1766:25
  1767:2,13

principal
  1657:7
  1775:20

principals
  1703:24
  1708:13
  1778:23,24

print
  1647:19
  1653:23
  1654:14
  1655:3,14
  1734:23

printed
  1512:22
  1526:4
  1528:9
  1540:19
  1595:10,14
  1598:17
  1660:15

printing
  1492:11
  1538:18

prior
  1489:22
  1632:10
  1675:6
  1697:6,15
  1698:13
  1703:3
  1706:9,10,12
  1755:18
  1757:13

priorities
  1759:3

prioritization
  1758:23

private
  1500:12
  1567:19
  1568:7,12
  1636:10
  1638:1
  1656:9
  1657:2

privilege
  1483:9

**TRANSCRIPT OF PROCEEDINGS**

1484:2,3,15
1486:2,17,20

**privy**
1653:22

**Prize**
1497:21

**probing**
1778:10

**problem**
1485:5
1491:8
1493:2
1510:24
1547:19
1551:11
1562:8
1572:7,21
1596:8
1676:25
1764:3
1782:9

**problematic**
1552:6

**problems**
1503:6
1504:12
1595:23
1596:1
1600:18

**procedural**
1484:12
1489:1
1490:1
1492:6
1493:3
1680:14

**procedure**
1618:10
1662:19
1754:23

**procedure's**
1481:19

**procedures**
1775:4

**proceed**
1494:3

**proceeded**
1489:12

**proceeding**
1547:14
1550:10

**proceedings**
1483:15
1487:15
1490:10
1675:6
1776:9
1783:19

**process**
1491:16
1511:20
1514:20
1521:19
1528:21
1536:13
1560:20
1617:22
1618:1,18
1628:23
1629:4
1649:18,20
1660:15
1661:11
1674:8
1698:20
1728:22
1737:23,24
1739:8
1763:24
1767:20
1768:1,8,15,

21

**processes**
1758:5,20,21
1775:4

**processing**
1498:9
1502:21
1513:1
1536:5,20

**processor**
1610:14
1728:25
1760:25
1761:5

**procure**
1609:4
1692:2

**procurement**
1763:25
1764:15
1782:14

**procurements**
1762:17
1764:7,8
1781:12

**procuring**
1610:6

**prod**
1766:10

**produce**
1628:4
1639:8,23
1644:10
1645:9
1648:12
1730:2
1769:12

**produced**
1622:5,7,8

1652:1,21
1674:4,13
1675:24

**produces**
1568:9
1773:15

**producing**
1744:16

**product**
1485:17,21
1489:19
1510:13
1513:24
1523:4
1616:20,23

**production**
1514:10
1540:12,25
1563:23
1567:21
1568:11
1596:13,21
1602:25
1626:25
1628:22,25
1634:22
1639:6
1640:10
1642:18,22
1643:1,4,12,
22,24 1644:2,
3,16 1645:12
1646:22
1647:12
1648:3,13,16
1651:25
1652:3,4,17,
21 1653:14
1654:2,3
1655:8,13,19,
24 1656:1,13
1658:13

1662:21
1663:19
1666:2
1669:7,17,24
1685:16
1688:1,7,12,
17,23 1689:1,
12,17
1690:13,18,
22 1691:9
1693:22
1694:1
1727:6
1729:12
1730:14
1751:13

**productively**
1500:21,25

**products**
1518:9
1520:25
1532:19
1562:4

**professional**
1498:1,2
1529:25
1533:9
1545:16
1576:4
1584:5,23
1591:9
1599:2
1661:25
1699:19,22
1700:14
1701:8
1726:3
1749:17
1752:17
1754:25
1755:6
1769:24

**TRANSCRIPT OF PROCEEDINGS**

1770:11,13,
17 1775:1,16
1776:12,15
1778:2
1780:15

**professionals**
1561:3
1749:25

**professor**
1494:10
1495:8
1498:3
1502:17
1510:5
1515:8
1516:25
1529:12
1530:5
1543:7
1544:8
1549:7,9
1550:2
1553:17
1559:10
1574:15
1623:1
1734:10
1735:13,22

**professors**
1502:3

**proficiency**
1592:23

**proficient**
1592:4

**proficiently**
1562:3

**profile**
1718:16

**profound**
1616:11

**program**
1497:3
1499:2
1507:4
1519:18
1560:23
1566:1
1609:20
1769:9

**programmabl
e**
1507:21
1508:4

**programming**
1560:11

**progress**
1562:13
1666:1,7
1757:11

**project**
1501:11
1507:1
1521:1
1524:17,19
1529:8
1530:11,12
1553:18
1556:5
1561:24
1580:2
1593:25
1599:6
1603:20
1617:1
1650:13
1651:6,16
1658:7,11
1670:23
1671:3,5,14,
18 1672:5,7,
12 1674:20
1676:12

1677:11
1679:5
1691:14
1692:3
1706:8,21
1713:2
1715:3,6
1746:18
1757:25
1759:16
1768:2
1772:17
1774:4
1780:22

**projected**
1643:20

**projects**
1498:12
1501:19
1503:10
1514:14
1516:12
1561:7
1649:19,22
1706:18
1754:10
1756:14,16,
18,23
1762:10
1770:18
1782:16
1783:2

**prominent**
1763:21

**promise**
1709:1

**promised**
1750:23
1751:1

**prompt**
1491:9

**prone**
1515:14

**proof**
1517:1
1645:11

**proper**
1599:23
1626:2
1700:11

**properly**
1560:14
1571:18
1621:19
1624:12
1654:12
1697:5
1699:25
1765:10,13

**property**
1751:18,20

**proposals**
1500:10

**proprietary**
1619:18
1620:11

**prospective**
1504:14
1527:2
1558:24
1759:3
1760:2

**protected**
1757:22

**protection**
1486:25
1487:7

**protections**
1548:14

**protective**

1548:10
1552:5,24

**protein**
1754:10,15

**prototype**
1634:12
1649:16
1650:4
1659:3

**prototypes**
1769:13

**prototyping**
1500:15
1567:17,19
1659:8

**prove**
1678:7

**proved**
1552:5

**provide**
1486:13
1499:16
1508:21
1509:4
1513:14
1517:8
1519:23
1524:22
1531:22
1532:5
1545:17
1546:19
1555:23
1565:1
1573:10
1622:4
1646:1,8,11
1661:6
1664:16
1713:20

provided
1531:12
1544:9,13,17
1565:13
1618:13
1620:25
1645:15,20
1653:22
1662:20
1668:10
1713:5
1751:13

providing
1530:6
1545:21

provision
1752:13

provisioning
1781:23

public
1768:18,24
1769:2

publicly
1767:19
1768:7
1769:6
1772:12,13,21

publish
1503:3

published
1504:19

pull
1483:1
1635:17
1638:20
1686:4
1701:22
1734:13
1735:20

pulled
1669:18
1670:23

purchase
1642:17
1735:10

purchasing
1752:8

purely
1511:19
1534:7
1604:20
1762:15

purpose
1481:22
1482:5
1502:4,25
1547:1
1631:11
1683:16
1710:25
1712:9
1780:16

purposes
1493:7
1549:15
1619:6
1632:20
1692:12
1752:10
1764:11

pursuant
1481:18

pursue
1525:4
1638:5

push
1587:18
1594:20
1596:20

1603:14,23
1604:17
1606:3
1616:10

pushing
1608:3

put
1504:14
1506:25
1508:19
1509:1,2,4,10,12
1512:21,22
1513:5,9,20,24 1514:23
1515:12
1521:6
1522:8
1523:14
1525:22
1526:19,23
1527:2,22
1529:10
1540:21
1545:14
1552:1,15
1555:4,7,10
1558:23
1563:18
1564:1,20
1565:2,3
1573:14
1583:21
1584:18,23
1589:10
1592:11
1595:11
1599:21
1600:20
1601:1,3
1603:18
1604:1
1605:23

1606:5
1609:5,12,13,16,25
1610:18
1611:4
1621:24
1629:3
1661:23
1682:25
1707:9
1708:14
1709:22
1732:14
1743:14
1759:4
1762:22
1767:24,25

puts
1605:8

putting
1660:10
1672:6
1713:12
1714:1
1717:14

**Q**

qual
1725:2

qual/rel
1723:7

Qual/
reliability
1723:11

qualification
1663:18
1664:14
1713:21
1723:19
1770:23

1771:18

qualifications
1501:9
1529:17
1678:24
1755:10
1762:25
1771:8

qualified
1486:1
1496:2
1529:21
1532:22
1678:1,2
1680:12
1698:12
1771:5,9
1772:7
1775:2
1781:18

qualify
1487:6

quality
1504:20
1507:1
1564:12
1591:15
1696:25
1697:2,24
1698:3
1758:6

Quandary
1755:12
1756:2,7,16,24 1762:8
1763:18
1764:13
1770:13
1775:11
1781:1

quantities

**TRANSCRIPT OF PROCEEDINGS**

1596:17
1686:20

**quantity**
1568:12
1578:25
1602:25
1628:24
1634:16
1642:4,18
1645:18
1687:12,14

**quarterly**
1689:25
1690:2,11

**question**
1489:11
1503:2
1505:17
1508:17
1509:11
1532:3
1536:22
1549:3
1556:13
1566:5
1576:9
1588:18
1590:10,18
1591:17,23
1600:3
1601:23
1603:4,7,9,16
1604:7,8,11
1606:23
1607:3
1608:4
1611:21,22
1612:23
1613:6,9
1614:2
1618:17
1623:18

1624:6,7,22
1625:2,4
1627:21
1631:17,20,
21 1633:1,7
1634:7
1635:1,2,4,7,
15,18
1637:15,17,
18,20
1639:18
1640:17,22
1641:2
1643:9,14
1645:4
1646:12
1647:6,14
1652:12
1653:4,21
1655:6
1656:7,24
1657:24,25
1661:13
1663:20,21,
22 1664:18
1667:9,12,13
1670:18
1672:20,25
1673:9
1682:11
1685:24
1688:19
1691:13
1696:11,13
1699:5
1700:22
1704:8
1708:20
1711:3
1712:2,5
1713:20
1714:25
1730:8,10,22,
24 1735:17

1737:19,21
1740:25
1744:25
1745:9
1777:8
1779:17,21

**questioning**
1488:17
1678:8

**questions**
1481:23
1482:2
1485:13
1487:5,10,16,
23 1488:3
1490:15
1491:21
1492:6,7
1505:15
1510:3
1516:7
1520:3
1528:14,16
1545:24
1546:17
1559:10
1577:21
1578:5
1582:24
1583:18
1588:17
1590:22
1593:4
1597:3,7,12
1637:1,4
1657:20
1664:12
1672:14,25
1680:2
1685:22
1698:20,24
1699:1,10
1722:18

1731:17
1733:8,13
1741:13
1744:9
1747:22
1749:10
1780:5

**quibble**
1605:3

**quick**
1526:10
1527:10
1535:7
1550:23
1591:13
1592:11
1611:16
1708:25
1728:17

**quickly**
1577:4
1650:5
1783:17

**quitting**
1672:10

**quo**
1487:19

**quote**
1638:8,14,19
1644:1
1647:7
1729:25

---

**R**

**rack-mounted**
1536:20

**railroad**
1569:10

**rain**

1536:12

**raise**
1494:22
1532:10
1780:5

**raised**
1484:7
1488:14
1545:3

**raising**
1483:25

**range**
1516:18
1594:3
1597:18,19
1598:1
1626:1
1671:9

**rapid**
1491:13
1516:10

**rate**
1519:22
1592:7

**rates**
1598:25
1600:4
1763:1
1781:25
1783:3

**reach**
1669:14

**reaches**
1532:11

**reaching**
1765:21

**react**
1499:16

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

read
1483:22
1484:5,10
1488:10
1568:8
1574:17,19
1575:6
1617:16
1631:5,24
1634:7,14
1636:9,14,16
1637:24
1639:25
1640:3
1641:24
1645:4,13
1646:12,25
1647:4,15
1650:2
1652:23
1653:4,17
1654:17,18
1656:24
1657:12,15
1658:24
1659:18,23
1665:9,18
1680:18
1688:15
1689:20
1690:7,9
1692:13,17,
21,23 1693:1
1695:2,13,20,
21 1700:25
1705:13,14,
18 1707:16
1715:12,24
1716:13,19
1717:3
1718:14
1719:3
1720:14
1722:3,8,24

1723:10
1724:13
1734:25
1736:15
1752:18
1769:19
1774:15,19
1776:11

readable
1613:13,14
1667:4
1694:5

reader
1627:6,16,24

readily
1595:13

readiness
1667:23

reading
1490:17
1574:19
1633:4
1639:24
1645:3
1647:17,18
1674:24
1709:25

reads
1650:9
1749:15
1750:5,22
1751:25

ready
1494:3
1516:3
1558:9
1572:19
1577:5
1580:5,10,11
1589:1
1603:14

1604:17
1608:16
1609:9,22
1614:25
1626:4
1666:13
1669:15
1693:25
1727:6
1743:17

real
1499:21
1506:10,11,
20 1530:4
1534:11
1535:7
1536:3
1543:12
1547:18
1550:23
1570:23
1611:15
1674:11
1727:1
1743:13
1761:19
1772:2

real-world
1504:3

realization
1570:11

realize
1534:13

realized
1654:18
1672:8
1746:3

reason
1491:10
1492:1
1493:21

1548:18
1613:22
1614:1
1619:17
1654:25
1674:3,12
1675:24
1677:11
1682:3
1762:14
1771:16

reasonable
1496:12
1582:10
1750:18
1752:12
1758:25

reasonablene
ss
1678:24

reasoning
1676:22

reasons
1493:5
1530:18
1541:1
1548:1
1600:23
1619:3
1712:24
1766:16

rebuttal
1481:16
1700:17,19,
21 1702:1,24
1709:16
1738:9
1751:12
1774:19

rebutted
1702:25

recall
1530:13
1545:6
1555:15
1567:3,4
1574:21
1575:10,14
1585:14,16,
17,19,24
1586:2,3
1626:13
1654:14
1671:10
1708:6
1728:11
1760:14

recalled
1586:9

receive
1485:6
1717:6
1778:7

received
1487:13
1497:20
1652:14
1750:17
1773:14
1774:1
1775:15,19
1776:2

recent
1774:1

recess
1543:2
1553:13
1615:2
1685:4
1734:6
1747:7

recipient

1765:13

recognize
1507:15
1544:12

recognized
1503:12
1542:16

recognizes
1506:12

recognizing
1561:19

recollection
1575:19
1623:23

recollections
1485:22
1594:6

reconfigurable
1507:2
1509:2

reconfigure
1507:3

record
1481:11
1488:11
1490:23
1495:9
1514:3,24
1540:24
1541:16
1546:21
1547:2,3,20,
22,23 1548:1,
25 1549:10,
11 1553:6,10,
12,15
1593:11,12,
13 1611:23
1612:2,3,10,

12,13 1616:5
1626:7
1633:5
1646:14
1653:6
1740:2,4,7,8,
9 1745:21,22,
23,24 1746:5,
7,10,11
1751:9
1778:14
1780:11

record's
1670:1

recorded
1481:11
1549:23

recording
1491:25
1492:3
1499:12
1510:20,23
1511:3,15
1512:13
1521:4
1616:9

records
1501:25

RECROSS-
EXAMINATIO
N
1744:6

recurring
1764:5

red
1526:7
1527:16
1528:3,9
1773:21

Reddy

1544:14
1546:2,16
1547:22
1549:3,4,17,
18,24 1551:4,
19 1553:8
1560:18,19
1561:1,5
1585:25
1588:8,23
1593:16
1594:11
1604:8,10,12,
18 1611:20
1619:14
1622:13,15,
20 1623:3,21
1624:3,4,9
1625:7
1651:14,23
1652:2
1654:4
1658:7,10
1664:3,10
1670:10,21
1671:6,13,24,
25 1672:11
1673:2
1674:19
1691:3
1693:8,12,15
1694:11
1695:15
1696:1
1699:18
1700:8
1703:4,18,23,
24 1706:23
1708:8
1713:15,20,
22,24 1714:1,
13,23 1715:5,
12,24 1717:3,
24 1718:7,8,

14 1721:12,
22 1722:2,23
1724:13,19
1725:3
1741:14,24
1767:25
1777:13

Reddy's
1546:22
1547:2
1594:5
1603:19
1647:9
1651:11
1652:15
1655:17
1671:10
1694:18
1739:13
1743:6

REDIRECT
1734:8

redline
1621:23,25
1622:5

reduce
1564:5

reduces
1618:7

refer
1511:17
1541:18,25
1542:12
1553:7
1574:10
1613:15
1636:7
1648:16

reference
1502:1
1530:11

1573:24
1585:17
1608:10
1632:20
1671:1
1693:7
1726:22
1752:23

referenced
1636:3
1638:19
1659:11

references
1623:25
1624:2

referencing
1634:9

referred
1585:9
1686:23
1718:6
1724:8

referring
1528:4
1650:13
1651:6
1663:18,25
1695:3

refers
1574:22

refine
1613:20

refinements
1560:9

reflect
1485:18
1540:24
1626:7

reflected

1763:10

**reflects**
1626:8

**refresh**
1586:4
1728:14

**regard**
1485:25
1486:6
1586:11
1749:14

**regular**
1554:19
1773:12

**regulatory**
1599:24

**reinforces**
1719:13

**relate**
1757:4

**related**
1503:25
1504:1
1530:7
1575:12
1648:17
1664:15
1692:10
1759:22

**relates**
1496:20
1573:4
1691:12

**relating**
1754:10
1761:16
1767:19

**relation**
1725:13

**relationship**
1658:25
1698:2
1739:25
1743:9
1771:24

**relationships**
1751:8,17

**relative**
1489:21
1512:16
1525:2
1549:16
1552:6

**relayed**
1486:5

**release**
1750:7

**relevance**
1622:22
1623:10
1661:24

**relevant**
1530:11
1584:23
1623:15
1663:12
1691:12
1752:21
1764:2
1768:9
1773:17
1775:5
1776:9

**reliability**
1663:19
1664:14
1713:21
1723:8,19
1724:15
1725:2

**reliable**
1765:5
1770:8

**reliably**
1765:4

**rely**
1684:15
1750:7,19
1766:9

**relying**
1680:17

**remain**
1707:17

**remember**
1489:1
1532:25
1533:2
1540:25
1585:20
1589:3,11
1590:2
1591:17
1611:24
1620:19
1621:25
1622:1
1623:24
1625:19
1663:4
1668:24
1670:25
1685:10
1693:11,13,
15,17 1694:9
1703:21
1708:3
1716:14
1738:6,17
1741:19
1745:19

**remind**

1489:15

**reminder**
1491:25

**reminding**
1708:8

**reminds**
1522:5

**removal**
1702:6

**remove**
1700:10
1701:12

**removed**
1718:15,18

**reorienting**
1685:20

**repeat**
1487:10
1490:21
1507:22
1627:11
1704:4

**repeated**
1778:18

**repeatedly**
1490:12

**rephrase**
1695:23

**replacing**
1759:23

**replicate**
1555:11
1563:17

**replicated**
1555:7
1571:3

**replicating**

1554:20

**report**
1487:22
1490:18,25
1496:5,9,11,
18 1518:15
1531:13
1537:24
1539:18
1542:1
1546:16
1553:24
1557:8,15
1570:6
1588:24
1589:1
1590:4,8,19,
20 1591:1
1592:1,14,20,
23 1603:13
1621:22
1622:21
1623:3,19
1624:8,11
1625:6,13
1626:9,15
1627:6,15,19
1628:14
1634:9,25
1635:11,17,
20,25 1636:6,
8,23 1637:23,
24 1638:6,9
1639:2
1640:19
1648:4,5,6,10
1649:7
1658:19,20
1663:17,21
1664:9,17
1665:1,3
1667:7,20,22
1668:23

1676:25
1677:16
1678:13,25
1679:23
1680:5
1681:3
1693:7
1694:8,22,23,
25 1696:17,
20,23 1697:4
1700:23
1701:22
1702:1,23,24
1703:19,25
1707:1,23
1708:7,9,15
1709:17
1713:18
1715:9,15
1723:22
1724:2,8,20
1725:5,10
1728:8,12
1729:10,24
1731:15,16,
19,25 1738:6
1740:17
1741:6
1742:25
1744:11
1746:16
1747:19
1749:7,11,21
1751:11,14,
15,21
1752:19,24
1753:1
1755:10
1761:9
1765:2
1768:6
1769:10,17,
19 1770:20
1773:15,16,

22,24
1774:19
1776:19
1777:14
1778:12,20
1779:1,6
1782:3

**reporter**
1481:10
1490:12,20
1491:6,15
1513:13
1553:10
1596:25
1617:4,6
1639:21
1671:8
1690:4

**reporting**
1757:10

**reports**
1481:16,17
1570:21
1571:1
1590:6,14,17
1591:22,24
1631:12
1632:7
1673:24
1676:4
1677:14,17,
20,21,23
1679:15,20
1680:16
1681:10
1682:16
1683:1,10
1684:2
1700:17,18,
19 1702:10
1739:2
1742:19,20

**represent**
1688:9

**representatio
ns**
1750:7

**representativ
e**
1779:7

**represented**
1496:12
1507:9

**represents**
1499:21
1584:24
1722:19

**reprogram**
1509:14

**request**
1486:24
1543:16
1548:17
1552:21
1725:1
1782:7

**requested**
1485:11
1543:17,23
1555:24
1589:9

**require**
1642:15
1773:2
1781:4

**required**
1503:16
1519:24
1558:20
1599:4
1603:8
1704:10,15,

20 1705:9
1707:13
1736:18
1765:25
1766:13
1773:5
1783:4

**requirements**
1514:5
1599:9
1690:21
1727:6
1732:12
1763:9
1771:18
1773:21

**requires**
1732:9

**reread**
1688:4

**research**
1485:19
1499:3,4,11,
22 1500:8,9,
13,16,17,20,
21,25 1501:1,
4,7,10,11,22
1502:6,9,24
1503:1,14
1504:11
1506:3,5
1561:10
1754:10,12,
17 1755:12

**researcher**
1753:11

**reserve**
1628:12

**reserved**
1643:4
1669:7

1670:5

**reserving**
1733:12

**reset**
1575:8

**resource**
1503:4

**resources**
1671:5
1672:7
1771:2

**respect**
1498:24
1514:5
1549:22
1550:16
1682:18
1740:11

**respected**
1572:1

**respective**
1489:7

**respond**
1545:8
1589:8
1713:23

**responded**
1732:15

**responds**
1724:13

**response**
1489:9
1546:19
1714:3
1717:2
1735:21
1744:9

**responsibility**
1529:7,10

**TRANSCRIPT OF PROCEEDINGS**

1530:2
1719:19
1720:12,21
1745:8

**rest**
1640:5
1667:7

**restate**
1704:8
1740:25

**restatement**
1701:21

**restatements**
1704:3

**result**
1634:19

**results**
1485:18
1486:8
1504:19
1571:10
1584:12
1610:13
1741:6

**resume**
1783:11

**retain**
1696:23

**retained**
1518:4,6
1621:13,17
1696:2
1759:7,9
1761:15
1776:17
1778:22
1779:5

**retention**
1749:22

**revealing**
1759:18

**reverse**
1508:16
1761:4

**review**
1483:13
1484:18,22
1496:1,5,11
1505:13
1521:14
1524:10
1543:18,24
1555:23
1556:20
1557:12
1581:8,16
1582:5
1652:13
1688:21
1689:25
1709:14
1713:16
1719:24
1720:2
1738:18
1739:7
1741:22
1742:19
1749:20
1751:6
1760:25
1761:5
1767:13
1772:15

**reviewed**
1481:15
1490:25
1580:20
1581:4,6,13,
15,19
1582:12,13,

17,18,21
1583:3,4,5
1604:14
1626:15
1645:14
1647:1
1653:18
1655:2
1669:5
1703:17
1709:12
1719:22
1723:15
1738:16
1750:15
1755:24
1761:9
1770:3
1776:1

**reviewing**
1495:25
1588:8,22
1612:20
1758:19
1761:19
1766:24
1781:13

**reviews**
1562:14

**revise**
1779:8

**revising**
1777:14

**revisions**
1533:18
1622:1

**revisit**
1490:5

**revolving**
1673:3

**ride**
1567:10,19
1650:1

**riders**
1567:22

**riding**
1567:14

**rig**
1595:7
1599:1
1600:5
1602:10
1609:5
1611:6
1626:21,24
1730:3
1744:17
1745:1,11

**rigorously**
1766:16

**rigs**
1487:20
1595:4,19,23
1596:14
1597:16
1599:3
1600:11
1601:7
1602:2

**ringing**
1517:13

**risk**
1535:4
1565:21
1566:14,17,
18 1661:9,10
1662:15
1725:25
1726:5
1729:17,18
1731:2

1758:25

**risks**
1726:9
1732:10
1758:22,23,
24

**road**
1521:1
1683:14

**Robert**
1485:8
1557:9
1716:21
1718:15

**robotic**
1767:8

**role**
1498:2
1520:4,5
1720:6
1722:16,17
1755:18
1770:13
1780:25

**rolling**
1597:8

**Roman**
1705:2
1720:4
1769:17

**room**
1490:11
1491:4
1523:16
1552:21
1734:1

**roughly**
1641:17

**round**

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1597:21
1642:5

**roundabout**
1746:4

**route**
1564:16,18,
22 1570:12

**routine**
1572:13

**routinely**
1595:10

**routing**
1565:1

**rudimentary**
1637:9

**rule**
1571:15,16
1572:8
1596:2
1668:4,11,18,
25

**ruled**
1489:19
1622:23

**rules**
1490:9
1550:24
1571:21,22
1572:4,18
1624:15

**ruling**
1485:2
1593:8

**rulings**
1484:11,12,
13 1485:15
1486:11

**run**
1507:4

1546:18
1567:11
1568:7
1598:21
1628:21
1634:20
1636:11
1638:2
1639:2
1640:19
1643:1,4,11
1644:14,16
1645:12,17
1646:18,22
1648:3,13
1651:24,25
1652:16,17,
22 1653:10,
14 1655:9,12,
14,24 1656:1,
11,13 1657:6,
9 1685:14,16
1688:5,7,11,
12,22,23
1689:6,16,17
1690:18
1691:8,9
1692:2
1737:4

**running**
1482:15
1506:14
1533:15
1557:23
1561:9
1565:24
1599:15

**runs**
1566:3
1652:3
1687:3
1689:5,8
1690:23

1742:19

---

**S**

---

**sabbatical**
1507:16

**sake**
1597:20

**Sakrison**
1497:20

**sample**
1596:17,19
1628:23
1629:8
1686:20,24
1687:5,6

**samples**
1568:4
1604:1

**sampling**
1602:23
1754:22

**San**
1481:2
1782:25

**sanctioning**
1551:25

**sandbag**
1606:2

**sandbagging**
1606:4

**sanity**
1661:24

**satisfactory**
1596:20

**satisfy**
1514:4
1691:19

1759:11

**Saturday**
1748:8

**sauce**
1545:12

**Save**
1693:3

**saves**
1555:9
1658:4

**saving**
1727:24

**scale**
1498:18
1589:25
1596:6

**scales**
1596:22

**Scaling**
1499:9

**scalp**
1516:15

**schedule**
1626:3,13
1669:7,12,17,
18,24 1670:5,
9 1689:8
1728:9
1729:12
1730:13
1744:17

**schematic**
1531:18
1570:7,9,15

**schematics**
1531:21
1545:10,18
1619:4

**Schiettecatte**
1569:13
1571:9
1572:6,11

**school**
1502:3
1527:7
1753:15,17

**science**
1496:25
1497:1
1500:11
1753:12

**Sciences**
1497:23

**scope**
1588:11
1594:10
1648:25
1649:2,5
1699:21
1704:22
1713:4
1730:25
1744:20
1745:5
1749:11,12,
14 1750:3,21
1751:23
1779:1,13
1782:15

**screen**
1523:16
1582:24
1584:20
1636:1
1735:15
1742:16

**screening**
1698:20

TRANSCRIPT OF PROCEEDINGS

scroll
1574:18
1735:7

scrolling
1734:22,23

search
1552:9

searching
1552:8
1773:11,12

sec
1738:12

secret
1545:11

section
1544:6
1641:12,23
1642:14,15,
21 1647:19
1653:23
1654:15
1678:20,21,
23 1686:10,
14 1687:9,10,
25 1688:16,
24 1689:11
1690:21,23
1702:24
1705:2
1710:14
1719:19,21
1720:4,7,12,
15,16,21,24
1729:10
1751:21
1754:25
1755:2,10

sector
1656:9

secure

secured
1673:3

securing
1645:23

securities
1753:16
1772:14

seek
1500:10
1684:19

segue
1628:13

seizures
1516:11

select
1584:17

selection
1749:22

self-
explanatory
1750:10

selling
1752:8

semiconduct
or
1535:13
1655:19
1728:20
1729:7,18

send
1515:6
1604:17
1605:21
1608:3
1613:21
1708:9
1713:24
1726:24

1739:17

sending
1570:13
1572:24

senior
1591:8
1754:17

sense
1505:12
1521:18,19
1561:2
1584:6,10
1652:7
1758:18
1771:5
1778:8

senses
1667:6

sensing
1512:12
1533:17

sensitivity
1533:19

sensors
1569:5

sentence
1636:8
1650:23
1659:12
1665:8,14,16
1695:1

separate
1531:7
1538:9
1687:25
1762:15
1771:18

separated
1482:16

separately
1540:20
1583:4

September
1481:1
1560:3
1602:24
1607:20
1626:6,11,21
1627:8,17,25
1670:24
1671:10
1730:3
1745:3,11
1751:5

September/
october
1671:6

Serbia
1497:4

series
1559:25
1562:13
1714:12
1721:11
1754:9

serve
1495:17
1499:1
1520:24
1529:11

serves
1661:3

service
1644:1
1662:12

services
1640:14
1643:18
1750:23

1751:1

SESSION
1481:5
1616:1

set
1481:10
1487:10
1488:16
1489:21
1490:1
1512:3,6,10,
17 1519:15
1533:15
1534:23
1556:2
1560:11
1571:17
1588:23
1639:8
1641:20
1681:10
1683:9
1695:6,8
1703:2
1768:1

setting
1520:5,17
1736:20
1738:2

settle
1537:19
1762:3

settled
1739:2

setup
1639:20,22

SH
1571:14

share
1489:23

1545:10,15
1569:22
1582:24
1649:19
1700:15
1754:4

**shared**
1482:16
1567:16
1650:1
1700:16
1707:1

**shareholder**
1768:16

**sharing**
1489:2

**shell**
1568:13

**ship**
1610:14

**shipping**
1692:5

**shocking**
1782:10

**shoes**
1732:8

**short**
1524:1
1545:2
1596:6,21
1609:14,15
1681:6
1685:1
1733:16
1744:1
1746:23

**shortage**
1652:3
1655:19

1674:25

**shorter**
1597:3,11

**shortly**
1568:19

**shot**
1584:20

**shots**
1742:16

**show**
1486:3
1503:18
1504:7
1541:25
1542:6
1544:21
1552:11
1570:9
1613:15
1642:16
1643:3
1644:12
1656:12
1691:8
1692:8
1710:21
1711:7
1743:12
1748:25
1773:21

**showed**
1526:13
1568:4
1618:1

**showing**
1565:14
1630:15
1647:10
1677:24
1688:11
1741:6

**shown**
1521:10
1527:18
1710:16

**shows**
1613:17

**shuffling**
1493:1

**shuttle**
1567:14
1607:19,20,
21

**side**
1499:23,24
1503:16
1511:12
1537:6
1551:9
1609:24
1674:21
1713:11
1730:17
1736:22
1737:11,12,
13 1759:7
1774:5
1782:22

**sidelines**
1727:23

**sides**
1549:20

**sides'**
1700:18

**sign**
1501:6
1599:22
1719:4

**signal**
1498:9
1502:20

1513:1
1535:4

**signals**
1499:19
1535:1

**signature**
1705:20,24

**signed**
1548:11
1619:9
1706:4,17,24
1707:7

**significant**
1552:3
1667:10
1763:21
1768:20

**significantly**
1652:7

**signifying**
1499:11

**silicon**
1507:3,18
1512:8
1534:3
1563:5,7,16,
17 1564:3
1617:17
1644:10
1654:23
1691:21
1729:1
1742:24

**silicone**
1654:23

**similar**
1512:14
1516:22
1524:13
1589:25

1591:9
1592:2
1637:15
1671:9
1691:11
1758:7
1781:10

**similarly**
1521:5

**simple**
1533:16
1534:15,20
1554:24
1555:2
1567:24
1569:21
1579:17
1580:10
1601:24
1727:15

**simpler**
1715:1

**simplicity**
1587:20

**simplify**
1627:18

**simplistic**
1536:22

**simply**
1484:7
1487:7
1492:10
1531:7
1551:9
1557:7
1578:19
1589:4
1600:20
1625:4
1647:14
1675:25

**TRANSCRIPT OF PROCEEDINGS**

1773:2
1774:9
1779:19

**simulate**
1533:25
1618:10

**simulation**
1519:18
1533:24
1545:23
1558:21,22
1566:20
1573:8,11,13
1574:20
1742:18
1754:15

**simulations**
1531:10
1534:4
1546:18
1558:1,4,21
1559:5
1560:8
1565:20,23,
25 1739:4
1754:20

**single**
1628:4
1636:11
1638:1
1649:19
1674:13
1773:17

**sinks**
1600:18

**sir**
1490:21
1577:11
1590:2

**sit**
1505:11,13

1572:17
1620:15
1628:2

**sitting**
1759:1

**situation**
1552:15
1564:8
1607:24
1644:5
1657:17
1779:4,19
1780:9

**situations**
1766:11

**six-month**
1757:10

**size**
1510:17
1512:5
1513:12
1521:22
1536:17,18,
21,23
1537:20,21,
22 1554:1,2,
8,11,18
1563:10,22
1564:2
1571:19
1596:19
1781:11

**sized**
1512:1
1563:2

**skeleton**
1591:18

**skilled**
1584:22

**skills**
1562:6

**skin**
1516:15

**SKWRAO**
1523:11

**slam**
1658:8,11

**slide**
1585:3
1586:16
1662:10

**slides**
1583:13,14,
20 1585:2,4
1592:5
1613:15
1721:22

**slightly**
1536:14
1688:8

**slot**
1736:19

**slow**
1490:12,13
1491:13,22
1500:3
1522:14
1606:11
1719:7

**slower**
1690:6
1754:2
1777:5

**slowly**
1561:21

**small**
1502:10
1512:1

1513:20
1521:9
1522:25
1554:18
1567:17
1697:24
1743:21

**smaller**
1537:17,18,
21 1563:2,22
1686:19
1695:7
1781:7

**smile**
1605:23

**smooshed**
1540:22

**sneeze**
1554:15

**snippets**
1722:4

**so-called**
1507:20
1617:15
1628:23

**social**
1780:11

**socializing**
1593:24

**society**
1503:8

**socket**
1609:25
1610:9

**software**
1755:11
1758:22
1759:25
1760:18

1781:12

**sold**
1619:19

**solder**
1527:19,22

**sole**
1695:12

**solely**
1501:22
1674:18
1697:1

**solid**
1560:6
1562:2

**Solid-state**
1507:8

**solve**
1503:5

**solving**
1504:4

**Soniat**
1485:9,25
1486:6
1487:9

**sort**
1579:5
1584:16
1603:9
1765:23
1774:25

**sorting**
1737:24

**sound**
1611:25
1726:4

**Sounded**
1511:4

TRANSCRIPT OF PROCEEDINGS

sounds
1516:19,20
1615:1
1691:22

source
1499:21
1595:14
1600:21
1617:25
1618:18
1620:7,13,21
1695:12
1758:19

sources
1499:20

space
1516:9
1521:13
1571:20
1599:5
1607:18,23

spaces
1524:21
1526:9

spacing
1571:20

speak
1491:3,8,9
1494:13
1587:1
1677:18
1737:6
1758:16

speaking
1491:20
1507:24
1515:20
1596:22
1601:23
1650:11
1673:19,20

specialty
1497:12

specific
1485:13
1504:7
1534:23
1586:4
1589:16
1591:21
1592:9,10
1600:3
1620:24
1647:2
1653:19
1664:12
1741:12
1755:25
1756:4

specifically
1487:15
1500:18
1503:24
1544:5
1557:20
1563:24
1574:23
1585:19
1621:5
1660:24
1688:20
1702:5
1734:20
1751:2
1754:19,21

specification
1659:25

specifications
1659:12,13,
16 1665:11,
20 1742:3

specifics

1516:8
1657:25
1723:6

specs
1524:20
1597:24
1598:2,3,5

spectrum
1554:5

speed
1519:21
1566:3,11,12

speeds
1565:22

spell
1490:21
1517:10

spelled
1654:19

spend
1483:16
1529:5
1588:19
1589:11
1594:15
1612:9
1677:13
1711:4,6
1713:2

spending
1531:4
1589:8

spent
1589:13,18
1590:8
1593:19
1594:14
1780:22

SPICE

1558:1,3,21
1559:2,5
1573:3,4,10,
15 1574:16,
20 1576:5,15
1739:3

spike
1512:25

spill
1515:12

spirit
1780:17

spoke
1593:16
1718:15
1720:8
1724:10
1751:16

spoken
1771:15

sponsored
1500:7

spreading
1649:21

square
1521:25
1522:1
1528:10
1537:8
1554:4,6,19
1562:20,23
1568:1,2

squares
1526:16

stack
1522:6,23

stacks
1599:14

staff
1756:11,12
1763:14
1771:2,9
1772:7
1781:18,19
1782:18

staffing
1756:20
1758:5
1783:2

stage
1731:5
1772:6

stages
1511:25
1584:24

stake
1772:17

stamped
1539:14

standard
1508:23
1526:23
1530:12
1558:8
1560:13
1595:12
1598:20
1661:11
1662:19
1696:9
1720:15,17,
20 1738:23
1749:24
1770:15
1775:1

standards
1663:19
1692:6
1699:19,22

1701:4,8
1703:1
1740:5
1765:1
1774:17
1775:1,16
1776:15
1778:2
1780:15
1783:5

standpoint
1531:25
1604:21

stands
1498:18
1508:3
1526:4
1564:16
1570:7
1571:16

Stanford
1507:17
1516:12

start
1481:20
1483:7
1492:7
1515:20
1518:23
1529:17
1543:1
1578:4
1587:18
1588:4
1589:1
1608:13
1616:8
1622:11
1631:5
1680:10
1692:1
1704:10,20

1705:9,21,23
1707:19
1721:19
1733:16,18
1734:10
1736:24
1739:10
1746:15,24

start-up
1506:7
1517:17,19
1644:11
1727:11,18

start-ups
1506:19

started
1492:8,13,21
1493:4,14
1498:11
1504:15
1588:5
1629:4
1672:9
1728:22
1762:7
1775:23

starting
1482:4,6
1490:3
1560:2
1591:7
1602:25
1721:20
1727:25

starts
1504:3
1541:5
1573:17,21
1726:15

state
1494:10

1495:8
1498:15
1525:2
1531:15
1764:7,9

stated
1485:5
1530:10
1531:19
1555:13
1643:16
1651:14
1652:2
1654:5
1676:23,25
1695:15
1714:22
1720:2
1731:18
1755:9

statement
1502:4
1530:13
1532:21
1533:1
1555:18,19
1624:22
1650:10
1672:14
1673:9
1674:18
1676:11
1678:17,19,
21 1680:5,6
1683:7,10
1685:12
1686:3
1694:18
1732:15

statements
1571:7
1626:23

1684:8
1696:12

states
1647:3
1653:20
1667:22
1678:13,23
1689:20

static
1583:22

status
1487:19
1582:9
1753:22

stay
1699:4,7
1776:11

staying
1747:1

steer
1716:2

step
1514:2
1599:21
1645:17
1726:14
1738:23
1739:5

steps
1503:19
1519:25
1639:6
1742:11

Sterne
1761:3

stethoscope
1516:22

stim
1533:17

stimulate
1513:15
1514:3,24

stimulation
1512:13
1513:1
1514:6

Stimulator
1513:14

stipulate
1677:16,20

stipulated
1548:10
1683:22

stipulation
1551:16
1677:5,9,12
1680:14
1681:19
1682:1,6,23

stop
1614:23
1783:8

stopping
1611:13,16

storage
1692:4

straight
1515:3

straightforwa
rd
1774:23

streamlined
1533:23

street
1536:11

streets
1565:3

TRANSCRIPT OF PROCEEDINGS

September 20, 2023

stressful
1610:11

strike
1727:13,17

string
1719:10

structural
1754:12,19

structures
1499:12
1754:15

struggles
1532:8

student
1504:19
1505:9

students
1498:10
1500:14,18,
19,20
1501:12,14,
22 1502:2,6
1503:3,16,23
1504:16,21,
22 1505:3,22
1506:13,16,
25 1507:13
1514:12
1524:7,16
1525:11
1527:7
1528:25
1533:9
1560:22,25
1609:11

studied
1753:8

studies
1491:17
1763:20

1764:10

stuff
1522:16
1676:21
1680:21
1718:17
1724:15
1735:3

style
1723:1

Styrofoam
1660:11

sub-report
1773:25

subcontracto
rs
1767:4

subject
1552:22,24
1558:7
1559:10
1620:9
1632:8
1689:24
1692:3
1703:9
1758:16
1774:21

subject's
1757:10

submission
1607:13

submission-
worthy
1622:4

submissions
1483:25
1489:17

submit

1524:7
1539:9
1574:4,12
1575:22
1731:15

submitted
1484:25
1485:11
1487:5
1505:3
1518:9
1589:20
1683:12
1700:18
1747:25
1748:7
1751:13

subparagraph
1689:3

subsection
1653:24
1654:15

subsequent
1565:16
1599:8

substance
1487:1

substantial
1582:10
1662:16

substantive
1484:12
1776:19

substantively
1779:8

subsystem
1601:14

subsystems
1601:13,16,

21 1609:18

succeeds
1529:8

success
1533:23

successful
1645:16

sued
1553:9

sufficiency
1484:2

sufficient
1578:25
1662:20
1674:9
1688:11
1690:17

suggest
1523:12
1713:12

suggested
1566:25
1567:6

suggestion
1567:7
1578:1
1723:21

suggestions
1568:10

suit
1490:15

sum
1482:8

summarize
1662:20
1750:3
1765:3

summarized
1752:22

summarizing
1662:10

summary
1557:1
1591:12,18
1664:17
1665:3,4
1722:2,9
1725:8,16
1728:18
1729:6
1751:23
1769:20

summer
1606:16
1607:7
1608:5
1767:21
1768:14
1769:4

summoned
1486:13

super
1498:21
1578:1

supervise
1755:13

supervision
1756:13
1768:25
1776:4
1782:9

supplement
1560:19

supplemental
1751:12

supplied

**TRANSCRIPT OF PROCEEDINGS**

1558:13

**supplier**
1605:25

**supply**
1526:24
1564:8
1606:18
1608:5
1644:5
1728:19,24
1729:16
1730:3

**support**
1500:14
1567:20
1634:21
1671:5
1688:12

**suppose**
1750:10

**supposed**
1620:3
1621:3
1671:19
1696:19
1699:24
1700:12
1721:3,7
1740:2
1763:13
1771:11,13

**supposedly**
1727:16

**surely**
1694:1

**surface**
1514:23
1515:1
1527:20,21
1528:11

1564:24,25

**surgery**
1521:6

**surprise**
1572:10
1744:4

**surprised**
1736:25

**surprising**
1782:11

**sustain**
1556:8

**sustained**
1488:9
1593:1
1632:5

**swear**
1494:15

**sweat**
1662:14

**switch**
1534:17,21

**switched**
1728:23

**switches**
1559:1

**switching**
1558:25
1574:25
1575:15

**sworn**
1495:2
1747:11

**Synchron**
1521:3

**system**
1565:16

1609:23
1659:19,21
1660:1
1742:1
1756:4
1763:7,11
1773:11

**systems**
1499:5
1767:9

---

**T**

**Taber**
1483:11
1492:12
1539:6,9,14,
17 1540:2,19
1541:3
1622:13
1624:10
1625:7
1631:6
1646:24
1657:10
1717:19
1735:18
1777:16
1779:10

**table**
1722:10

**takes**
1527:3,5
1528:22
1556:5
1572:14
1591:3
1596:7,23
1609:1
1763:19

**taking**
1481:21

1540:15
1625:22
1628:19
1733:23
1736:16
1738:23

**talk**
1482:2
1490:9,11
1496:16
1500:18
1501:9
1502:8
1505:11
1511:9
1520:13
1525:21
1532:19
1534:10
1542:15
1543:20
1550:17
1553:6
1557:25
1561:3
1564:14
1566:24
1568:14,15
1588:16
1590:3
1603:8
1606:24
1609:19
1649:14
1718:7
1740:2
1752:16
1782:14

**talked**
1481:17
1510:6,11
1527:25
1528:1

1536:16
1561:14
1562:19
1563:21
1564:13
1613:7
1616:9
1659:25
1660:8
1664:10
1670:12
1686:11
1741:23

**talking**
1481:22
1510:9
1537:4,5
1563:10
1583:2
1587:23
1588:8,23
1593:22,24
1605:15
1621:6
1625:18
1642:21
1643:23
1648:7
1705:7
1737:3
1745:19
1764:17

**talks**
1483:19
1592:6
1677:1
1679:4
1720:5

**tally**
1482:13

**tape**
1503:14

1572:23

**taped**
1572:22

**tapeout**
1525:10,12
1565:9
1580:5,11
1607:15,17
1628:12
1693:8,12,14,
16,19,20
1694:1,8,12,
13,19
1726:13,22,
25 1727:1,5
1743:3,12,17

**target**
1697:16
1698:13
1701:11
1732:11,19
1759:9
1761:18
1771:24
1772:11
1776:18
1778:7,10,12
1779:7
1780:11

**target's**
1779:6

**targets**
1558:12
1757:15
1760:24
1761:18,20

**task**
1557:20
1569:25
1759:1

**tasked**
1495:24
1746:17
1754:9
1756:3,9
1757:6
1758:18
1768:24
1782:9

**tasks**
1589:19

**tax**
1639:10

**teach**
1498:6,7,8,25

**teaches**
1502:19

**teaching**
1498:10
1764:5

**team**
1546:14,18
1585:5
1664:11
1665:6
1742:2,6
1743:6
1762:20
1763:17
1774:3
1781:17

**teams**
1755:13

**tech**
1519:2
1583:17
1762:18,20
1763:8,17,23
1766:4
1770:25

1774:4
1775:17
1776:16
1778:2
1779:2,4
1780:7,9
1781:2,17
1782:1,9,23
1783:2

**technical**
1490:18
1496:4,5
1522:21
1531:13
1532:6,9
1548:16
1561:3
1584:23
1603:10
1604:20
1618:4
1624:4
1654:16
1670:14
1676:19
1678:8
1679:12,23
1683:8,19
1713:18
1718:24
1723:18
1725:1
1745:5
1756:5,6,12,
15,17,22
1757:3,14
1761:16
1763:12
1766:8,12
1767:2,11,13
1770:18
1771:10
1772:10

1773:19
1781:6,11

**technically**
1756:7

**techniques**
1555:6
1561:25
1562:9

**technologies**
1506:23,24
1507:21
1695:7

**technology**
1503:6
1504:6
1506:15,20
1507:2,19
1508:8,15
1509:4
1513:8
1516:10
1517:1,5,6,7
1518:9
1519:12
1520:20
1521:1,6,9,14
1525:24
1531:4
1532:6
1535:17,24
1536:5
1558:6,19
1565:23
1568:3
1574:21
1617:1
1636:13
1638:3
1659:4
1672:16
1680:15
1697:3

1706:23
1714:24
1717:17
1719:15
1720:2
1722:18,21
1724:10
1743:16
1758:9
1760:25
1762:21
1763:1
1779:6

**technology-
oriented**
1758:12

**Ted**
1633:16
1634:3
1641:9
1653:1
1656:22
1686:5,7
1705:2
1714:10

**telecom**
1742:15

**telephone**
1622:10

**telling**
1488:12
1492:11
1602:18
1619:7
1634:10
1639:1
1640:18
1654:7
1662:1
1688:3
1693:12,15

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1776:24
1777:2

**tells**
1561:7
1568:5
1573:13
1584:8
1665:1

**temperature**
1532:13
1692:4
1761:1

**ten**
1529:1
1542:25
1560:25
1706:12,18
1743:25
1750:2,14
1755:18
1762:3
1775:25

**tend**
1490:11
1764:6

**tens**
1559:3

**terahash**
1531:9,12
1566:13

**term**
1519:1
1642:20,21
1653:24
1654:15
1677:6,8
1686:17
1688:17
1689:1,3
1705:3,4
1707:17

1720:4,19
1736:6,7

**terminate**
1707:19

**terminology**
1527:12,13

**terms**
1481:20
1489:25
1498:14
1511:18
1513:11
1519:4
1522:13
1527:25
1548:3,14
1578:17
1642:15
1666:9
1670:7
1673:22
1684:12
1689:4,24
1690:13
1721:18
1734:20
1736:15,17,
19 1737:1,4
1763:2,6
1768:18
1775:13
1776:12
1782:16
1783:6

**territory**
1616:18

**test**
1504:6
1545:22
1565:19
1583:25

1596:9,11,16,
17 1601:22
1608:24
1609:11,12,
17,20,24
1610:10,13
1611:4
1618:9
1626:20,24
1627:1
1629:7,12
1631:22
1633:13
1639:2
1643:2,5,21
1648:1,13
1654:12
1656:11
1664:15
1684:12
1686:18,19
1687:1
1723:11,19
1725:3
1728:9
1730:2
1740:17
1741:6
1745:1
1751:3
1770:24

**tested**
1517:1
1609:10

**testified**
1495:3
1518:4
1569:12
1571:8
1671:7
1692:19
1709:11,20
1710:2

1744:8
1747:12

**testifies**
1547:4

**testify**
1546:13,16
1549:4,5
1582:3
1594:13
1595:18
1621:13,18
1654:5
1739:23
1761:23

**testifying**
1487:14
1518:4,7,13
1621:16
1741:2
1755:21
1761:10,11

**testimonies**
1597:18

**testimony**
1481:21
1482:8
1486:13,16
1490:17,23
1546:22
1547:2,3,5,8,
13 1549:23
1550:6
1553:7
1564:11
1567:3
1572:5
1581:18,19,
21 1593:5
1595:17,21
1598:12
1602:14

1603:12,17,
22 1607:6
1608:2
1610:2,5
1624:5
1629:11,13,
18,23 1632:8,
10 1633:12,
14 1635:12
1636:3
1642:25
1643:3,10
1644:14,18
1647:15,17
1654:8,10,21
1655:1,11,17
1663:4
1671:11
1681:11
1683:19
1685:14,19
1701:7,13
1704:6,9
1707:12,15
1739:11,13,
21 1779:13

**testing**
1599:8
1610:7
1645:16
1660:2
1662:18,19,
22 1663:14,
15,18,19,23,
25 1664:2
1665:1
1680:19
1740:12,15,
21 1741:4,8,
11

**tests**
1502:2
1610:21

1741:14

text
1713:10,15
1714:12
1715:11
1717:10,12
1718:2,6
1719:10
1721:11
1724:22
1725:13

textbook
1502:12,15

texts
1703:22
1704:2,3,4
1708:13,17,
18,20,21
1709:12,15
1717:23

theorem
1754:23

therapy
1499:17
1513:15
1514:6

thermal
1554:23
1560:8

thesis
1497:16
1754:17,21

thin
1663:10

thing
1498:22
1512:16
1518:3
1564:4
1565:22

1624:14
1630:6,8
1660:1
1672:4
1682:5
1696:24
1716:2
1726:14
1772:9

things
1484:10
1507:5
1513:19
1522:6
1526:25
1527:9
1536:2,8,14
1541:25
1552:4
1554:17
1562:12,17
1570:10
1571:2,22
1579:14
1591:7,14
1598:16,19,
20,21
1599:16,23,
25 1600:24
1601:1,4
1602:19
1616:12,17
1619:13
1621:12
1654:24
1663:11
1674:22
1676:9
1679:9
1684:6
1695:8
1696:18
1708:7

1720:23
1738:25
1741:15
1742:24
1743:1
1752:20
1761:1
1765:7
1775:12,13,
14 1776:6

thinking
1575:23

thinks
1547:8
1549:14
1551:6
1657:21

third-party
1552:2

thought
1493:8
1503:6
1507:1
1516:1
1539:2
1548:13
1560:12
1565:12,15
1588:6,21,25
1658:4
1680:13
1725:11
1740:1
1767:3

thoughts
1774:16,20

thousands
1596:14
1652:1
1673:13
1758:8

threads
1515:2

three-month
1605:11,15

thumb
1596:2
1755:5

thumbs
1719:6

tickle
1514:8
1516:2

tied
1752:2

tier
1774:25

tighten
1562:16

tightly
1571:3

till
1493:20

time
1482:13,16,
25 1483:16
1484:18
1487:20
1499:15,21
1501:8
1510:8
1516:21
1518:6,12,15,
17,19 1525:5,
22 1536:12
1543:12
1544:2
1545:2
1553:17,24
1554:10,15

1555:6
1557:23
1564:8
1565:7,8
1575:8
1580:1,8
1588:4,11,14,
17 1589:7,11,
12,16,17,19
1591:3
1592:2
1596:6,21,23
1602:15
1603:13,23,
25 1604:16
1605:16
1606:7,20
1607:16,24
1608:6,10
1609:1
1610:3
1612:6,9
1613:1
1618:7,15
1644:5,7
1647:18
1651:16
1652:11
1653:22
1654:13
1656:25
1670:25
1671:9
1672:8,18
1677:13
1682:6
1691:22,23
1692:8
1693:3
1706:24
1707:23
1708:14
1709:22
1710:13

1711:5,6
1712:16
1713:1,7,13
1714:20,21
1715:8
1717:14
1720:11
1727:21
1728:1
1730:19
1731:3
1733:24
1736:23
1745:1,2,10
1751:10,15
1753:3,14
1754:6,11
1755:14,15
1764:24
1766:23
1768:9,21
1781:25
1782:18

timeline
1579:14
1594:22
1625:18,19
1626:25
1627:20
1652:6
1669:22
1675:1
1704:24
1713:5
1719:6,14
1720:8
1731:14

times
1520:11,12
1554:15,21
1561:5,15
1562:19
1568:11

1579:17
1591:11
1603:24
1622:20
1623:21
1624:10
1625:8,9
1642:9
1667:16
1681:23
1761:14,22
1762:1,3,4

timing
1742:20

tiny
1512:18
1514:22
1735:3

titanium
1513:25
1514:1

title
1557:8
1585:3
1755:19

titled
1585:3
1689:1
1690:21

today
1481:13
1482:9,20
1483:7
1486:21
1496:17
1498:13
1500:2
1507:4
1594:13
1620:15
1628:2

1629:11
1631:7
1633:12
1655:11
1674:12
1675:23
1696:8
1699:16
1700:7
1707:12
1719:4

told
1484:13
1486:5
1505:21
1572:6
1579:14,16,
17,22
1580:14
1586:19
1590:19
1593:19
1594:19
1600:15
1604:10,19
1611:19
1619:2
1621:2
1626:18
1651:18,23
1658:7
1664:3
1670:2
1671:13
1672:12
1676:22
1685:11
1688:24
1693:8
1694:11
1698:5
1703:25
1720:3

tolerances
1534:24

tomorrow
1482:5,7
1483:19
1488:5
1490:6
1492:5
1507:5
1511:7
1719:5
1733:9,13,18
1746:25
1747:2,4
1783:11

tomorrow's
1481:20

ton
1558:14

tonight
1717:7

tool
1519:20

tooling
1639:20,22

tools
1532:15
1533:24
1534:1
1561:23
1562:1,3
1764:6

top
1569:3
1620:19
1636:5
1637:23
1650:12,24
1651:2

topic
1699:9
1770:8

topics
1483:18
1530:7
1576:8
1578:6
1680:23

topology
1524:24

total
1482:15,18
1624:2

totally
1492:19
1574:12
1595:20
1646:14
1653:6
1670:1

touch
1520:18

touched
1521:15

touching
1599:15

tough
1533:11

toys
1514:11

traceable
1692:5

track
1597:8

tracked
1589:7
1758:23

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

tracks
1569:10

traded
1772:12,14,
21

trading
1772:13

train
1501:17
1503:5
1527:6
1731:23
1763:14

training
1500:22
1501:17
1527:4
1528:21
1756:10
1763:17
1764:11,25
1765:9
1775:15,19,
20 1776:2

trajectory
1693:21

transaction
1556:15
1730:17
1760:4
1774:6

transactional
1762:12,16

transactions
1757:1

transcript
1483:23
1484:5,11
1548:4
1573:15

1630:19
1692:14

transistor
1558:22,25

transistors
1571:19

transition
1497:25
1500:24
1506:15,20
1520:20
1528:13

transitioned
1507:19

translate
1516:18

transmitted
1499:19

transpired
1552:4

travel
1764:22

treating
1632:8

tremendous
1507:16

trial
1639:16

trivial
1569:25

trouble
1709:10

troubleshoot
1561:6

true
1548:5
1595:22

1606:15
1617:24
1633:21,23
1637:22
1652:18
1669:4
1673:11
1692:18

trusted
1619:15
1698:1

truth
1552:8,10

TSMC
1603:25
1605:18
1607:13
1610:3
1636:12
1638:3
1645:23
1689:25
1728:21
1729:21,22
1767:23
1768:7,15

Tuesday
1716:23

tuning
1535:2

Turitz
1481:12
1482:1
1492:2
1510:20
1523:5,13

Turitz's
1523:17

turn
1515:15

1518:22
1537:24
1544:10
1556:17
1559:11
1568:15
1570:16
1577:8
1635:24
1637:3
1738:5

turnaround
1603:24,25
1605:11,16

turned
1726:9
1767:15

tweak
1562:15

twelve
1487:16

two-by-two
1521:24

two-prong
1770:23

two-year
1596:3

type
1520:15
1529:13
1535:23
1543:15
1544:17
1545:21
1546:1
1556:5
1575:3
1774:24
1780:2

typical
1502:2
1504:24
1556:14
1605:20
1781:8

typically
1525:6
1530:21
1580:10
1631:13
1650:14
1651:7,15
1720:19
1755:15
1762:20
1764:9,17
1781:3,13,22

typo
1599:22

typos
1654:23

---

U

U.S.
1764:19

UC
1497:9,10,14
1502:18

UCLA
1498:4
1499:3,7
1500:7
1506:15
1507:17

Uh-huh
1641:8

ultimately
1495:21

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

1767:17

unacceptable
1780:1

uncertainty
1508:25

uncomfortable
1537:15

undecided
1501:15

undergraduate
1497:3
1498:7
1753:9

underneath
1599:17

understand
1488:4,10,18
1490:17
1491:21
1499:16,20
1511:20
1515:23
1518:25
1522:19
1523:7
1529:3
1530:5
1543:9
1547:1
1552:17,18
1553:8,17
1567:7
1577:23
1579:13
1580:7
1582:4,18
1585:4
1586:22,23,
25 1591:13

1593:8
1594:15,22
1595:2,17
1597:17
1602:13,21
1603:11,16
1607:9
1608:1
1613:11
1619:9,12
1621:6
1624:20
1627:3
1634:24
1639:5
1648:23
1652:10
1664:1
1669:12
1670:15
1671:5
1672:16
1674:15,16,
25 1684:24
1696:11,13
1697:23
1699:6
1703:16
1706:20,23
1711:11,12
1714:19
1715:1,4
1716:15
1730:7,10
1731:17
1737:18
1741:24
1743:20
1751:4
1759:2
1770:19
1774:24
1775:3,12
1776:22

1777:18
1779:18

understanding
1530:20
1531:3
1545:25
1547:16
1560:20
1562:2
1575:14
1576:16
1587:6
1592:3
1595:5
1647:7,8
1654:1
1655:16,17
1671:17
1674:7,9
1675:4
1688:10
1691:2
1704:19
1710:1
1720:10
1725:9,15
1749:19
1750:1
1752:11

understands
1580:7

understood
1553:19
1562:8
1574:8
1578:12
1582:21
1586:9
1594:8
1606:21
1622:3

1624:12
1651:10
1654:22
1670:7
1674:24
1684:16
1690:24
1699:11
1704:12
1705:11
1706:17
1714:22
1725:21
1726:21
1737:20
1750:11,24
1752:6
1766:23
1778:5

undertakings
1778:3
1780:8

unhappy
1610:19

unit
1554:20
1596:11
1626:20
1648:2,13
1728:9
1730:2
1745:1
1751:3

units
1508:21
1509:6
1599:8
1600:19
1691:15
1743:1

universal

1529:13

university
1497:3
1656:8
1657:2

update
1583:7
1584:25
1586:17
1718:18

updates
1560:1,3
1580:16,19
1581:9,11,12
1582:8,19,22
1583:6,12
1584:16
1585:4
1586:1,13
1618:12,15

upfront
1565:15
1610:6,22
1690:16
1692:9
1736:18

urology
1516:13

usage
1490:19

USB
1513:5
1526:25

user
1513:11

users
1769:8

utilization
1563:5,15

**TRANSCRIPT OF PROCEEDINGS**

September 20, 2023

**V**

vague
1546:4
1576:11
1730:5
1736:12
1737:16

vaguely
1586:3
1708:6

validate
1571:1
1616:24,25
1617:1,9,10
1742:12

validated
1560:14

Valley
1507:18

valuable
1521:12

variable
1752:1

variant
1754:22

variations
1665:11

variety
1533:10
1548:1
1561:25
1755:21
1767:6

vary
1536:18
1597:18

vast

1757:2

vectors
1609:20

vehicles
1644:10

vendor
1619:24
1661:7
1662:12
1742:4
1760:10

vendors
1620:25
1751:8

venture
1728:1

verbalize
1505:5

verification
1533:24
1617:17
1618:6,7
1692:4

verified
1566:19
1618:16

verify
1519:18
1525:15
1531:15
1645:7,22
1651:21
1652:15
1694:18
1775:6

verifying
1652:8

version
1614:5

1714:17
1716:20,22

versus
1534:3,10,11
1570:7
1626:24
1760:19

vessel
1521:7

VHDL
1761:5,6
1767:1

viability
1716:3,12

vic
1494:19

vich
1494:19,20

videoconference
1622:13,16,
20 1623:20,
21 1624:9
1625:7
1670:22

videos
1536:7

view
1578:18
1601:2
1602:17
1606:19
1607:2
1608:6
1611:21
1626:12
1688:14
1698:9
1704:17
1709:21

1720:4
1729:11
1759:3
1771:8
1777:25

viewed
1694:8
1708:22

violate
1571:22
1766:17

violated
1701:9

violates
1555:19

Virginia
1753:22

virtue
1770:12
1771:4

visibility
1496:7
1503:17
1505:11
1543:17,19,
23,25
1557:21
1670:9

vision
1767:9

visual
1613:3
1667:14

visually
1614:4

vitamin
1599:13

VLSI
1498:9,17,18

voices
1491:23

voltage
1532:13
1534:18,25
1558:8,13,16

volts
1558:8,13

volume
1567:17,21
1634:22
1646:6
1661:23
1663:19
1730:14

VR
1533:14
1535:23,25
1536:16
1537:7,10,11,
13

**W**

wafer
1567:11,16
1568:8
1642:3,6
1643:21
1644:3
1645:16
1649:15,19,
21 1687:15
1688:1
1691:21
1692:2
1769:4,9

wafers
1567:2
1640:7,9
1641:25

1642:4,13,18
1643:2
1645:9,19
1647:10
1686:15,21
1687:17,21
1688:17
1689:2,12
1690:13,22
1736:24

**wait**
1488:2
1489:10,11
1492:21
1525:18
1562:14
1607:22
1656:10
1680:13

**waited**
1714:2

**waiting**
1525:20
1680:18

**walk**
1492:20
1531:20

**wanted**
1489:23
1542:19
1551:22,25
1563:14,15
1582:16
1586:8
1616:7
1640:17
1716:1

**wanting**
1481:25
1709:9

**warnings**
1773:16

**waste**
1571:23
1612:6
1682:6

**wasting**
1563:7

**waveforms**
1516:14

**ways**
1641:2

**weakness**
1711:13

**website**
1696:4
1699:18
1700:9
1701:12
1702:6
1718:17

**week**
1481:8,17,19
1482:3,11,13,
14 1526:11
1544:4
1555:21
1566:1
1572:14
1704:11,21
1705:10
1706:8
1707:6,10,15,
21,22
1713:22
1714:3
1719:13
1720:11

**week's**
1553:23

**weekly**
1756:21
1781:17

**weeks**
1527:5
1555:22
1565:9
1596:4
1598:14,22
1603:22
1607:12,21
1672:8
1691:24
1742:18
1781:24

**weeks'**
1603:23

**weigh**
1765:13

**weight**
1537:13
1623:5,15

**well-oiled**
1605:19

**whichever**
1519:22
1696:23

**wide**
1728:19

**wildcards**
1773:11

**wire**
1661:7
1663:2
1716:23

**wireless**
1499:18

**wires**
1512:18

1569:23
1599:15

**withdraw**
1590:17

**withholding**
1486:3

**witness's**
1547:15
1779:11

**witnesses**
1552:2,6

**won**
1507:14

**word**
1506:12
1548:4

**words**
1490:19
1491:17
1496:8
1498:20
1508:2
1511:2
1558:17
1594:12

**work**
1485:17,21
1489:19
1491:1
1497:8
1501:4,7
1504:22
1506:13
1507:1
1510:13
1530:1
1555:13
1558:14
1559:8
1560:7

1563:12
1564:5,12
1579:9
1586:18
1587:23
1588:11
1589:9
1593:17
1597:10
1602:16
1604:16
1608:14
1610:6,22
1612:20
1621:21
1625:25
1645:6
1648:25
1649:6
1656:25
1659:8
1676:4
1678:6
1685:12
1686:3
1695:23,25
1696:19,25
1697:2,20,22,
24 1698:2,4
1703:3
1704:23,24
1705:10
1706:22
1707:9,14
1713:1,4
1714:20,24
1716:7
1717:11
1718:3,22
1719:11
1721:16
1723:16
1726:6
1730:25

**TRANSCRIPT OF PROCEEDINGS**

1732:15
1741:24
1742:1
1743:7
1744:20
1748:13
1749:11,12,
14,16 1750:4,
21 1751:24
1755:7
1756:9
1757:24
1758:10
1762:7
1763:15
1764:21
1766:20
1769:21
1770:3,11,19
1774:24
1775:2
1776:7
1781:24
1783:4,17

**work-product**
1483:8
1484:25
1485:1,12
1486:25
1487:7
1489:6

**worked**
1659:1
1696:3
1701:10
1757:8
1761:13,22
1771:22

**working**
1492:25
1493:1
1528:25

1543:12
1544:25
1563:6
1595:4,7
1596:18
1599:19
1610:4
1611:5
1626:20
1628:4
1650:15
1651:8,15
1655:21
1661:21
1673:13
1674:4,13,14
1675:9,11,14,
17 1676:1
1706:7,18
1707:5
1714:20
1715:2,5,8
1730:2
1743:9
1744:17
1745:1,10
1753:16
1760:8
1771:21
1772:16
1782:8

**workload**
1556:9

**works**
1500:9
1558:19
1583:21
1584:5
1599:21
1742:21
1773:8
1780:10

**world**
1506:10,20
1520:4
1524:19
1525:3
1536:3
1727:19

**worldwide**
1507:11

**worried**
1680:24

**worrying**
1625:5

**worse**
1630:10

**worst**
1583:17

**wow**
1517:2
1776:21

**write**
1513:9
1591:1
1592:1,14,15,
23 1778:12

**writing**
1588:23
1590:16
1746:16

**writings**
1485:18

**written**
1489:14
1590:4,6,13,
20

**wrong**
1517:14
1556:25
1557:14

1655:10
1695:9
1764:1,3
1772:4

**wrote**
1724:19
1751:10,15
1761:9

_____

**Y**

_____

**year**
1500:23

**years**
1527:3
1528:22
1529:2
1544:25
1557:3,17
1661:21
1750:2,14
1753:15
1755:18
1756:18,21
1757:8
1775:23,25

**yellow**
1513:4
1526:7

**yes-or-no**
1487:8

**yes/no**
1658:3

**yesterday**
1482:14,15
1483:7
1488:23
1491:14
1610:12

**yield**

1563:4
1596:20
1733:5

_____

**Z**

_____

**zeros**
1535:5

**zoom**
1481:11
1510:19
1512:17
1549:10

**Zoomed**
1483:23,24