# EXHIBIT X



CRAIG WOOD REPORTING

P.O. Box 493577 ◆ Redding, CA 96049-3577 ◆ (530) 244-0789 ◆ FAX: 244-0787

AMERICAN ARBITRATION ASSOCIATION

COINMINT, LLC,                          )
                                        )
            Claimant and               )
            Counter-Respondent,        )
                                        )    AAA Case No.
vs.                                     )
                                        )    01-22-0001-762
KATENA COMPUTING TECHNOLOGIES,          )
INC.,                                   )
                                        )
            Respondent and             )
            Counter-Claimant.          )
                                        )

**CERTIFIED TRANSCRIPT**

TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

Monday, October 16, 2023

9:00 a.m.

Reported By:   CRAIG W. WOOD, CSR No. 9789



COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1

2

3

4

5

6                AMERICAN ARBITRATION ASSOCIATION

7

COINMINT, LLC,                          )
8                                       )     **CERTIFIED**
              Claimant and              )     **TRANSCRIPT**
9             Counter-Respondent,       )
                                        )   AAA Case No.
10   vs.                                )
                                        )   01-22-0001-762
11   KATENA COMPUTING TECHNOLOGIES,     )
     INC.,                              )
12                                      )
              Respondent and            )
13            Counter-Claimant.         )
                                        )

14

15

16

17        TRANSCRIPT OF EVIDENTIARY HEARING PROCEEDINGS

18

19               Monday, October 16, 2023

20                    9:00 a.m.

21

22

23

24        Reported By:  CRAIG W. WOOD, CSR No. 9789

25



COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

```
 1

 2                      APPEARANCES

 3
     ARBITRATORS:  (Via Zoom)
 4
         AMERICAN ARBITRATION ASSOCIATION
 5       One Sansome, Suite 1600
         San Francisco, CA  94104
 6       PANEL:    REBECCA CALLAHAN
                   rebecca@callahanadr.com
 7
                   RUTH V. GLICK
 8                 rvg@ruthvglick.com

 9                 GILDA TURITZ
                   gt@turitzadr.com
10

11   For the Claimant and Counter-Respondent
     COINMINT, LLC:
12
         GORDON, REES, SCULLY & MANSUKHANI, LLP
13       275 Battery Street, Suite 2000
         San Francisco, CA 94111
14       (415) 875-3115
         BY:  FLETCHER C. ALFORD
15            falford@grsm.com
                   and
16            KEVIN LIU
              kliu@grsm.com
17

18   For the Respondent and Counter-Claimant
     KATENA COMPUTING TECHNOLOGIES, INC.:
19
         PERKINS COIE, LLP
20       500 North Akard Street, Suite 3300
         Dallas, TX 75201
21       (214) 965-7743
         BY:  JOHN R. HARDIN    (Via Zoom)
22            JohnHardin@perkinscoie.com
                   and
23            JACOB TABER      (Via Zoom)
              Jtaber@perkinscoie.com
24

25                   ---oOo---
```



COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

```
 1                             WITNESSES
 2

 3     FOR THE CLAIMANT COINMINT:
 4                                                          Page
 5     RANDY FORET:

 6          Continued Direct Examination by Mr. Liu        12
            Cross Examination by Mr. Hardin                75
 7          Redirect Examination by Mr. Liu               107
            Recross Examination by Mr. Hardin             116
 8

 9

10     FOR THE RESPONDENT KATENA:

11     DR. DAVID MORDECAI

12          Direct Examination by Mr. Taber              125
            Cross Examination by Mr. Alford              173
13

14

15                           ---oOo---
16

17

18

19

20

21

22

23

24

25
```

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

```
 1                      PROCEEDINGS

 2                      ---oOo---

 3

 4          ARBITRATOR CALLAHAN:  Let's go on the record.

 5          Mr. Court Reporter, we're going to do some

 6  semblance of a making appearances.  I understand that you

 7  are in a conference room with one of the witnesses for

 8  today, and some counsel.

 9          So let me have the people that are in the room

10  with you, sir, identify themselves.

11          MR. FORET:  Randall Foret here.

12          MR. LIU:  Good morning.  Kevin Liu here.

13          MR. ALFORD:  Good morning.  Fletcher Alford.

14          MR. STAKE:  Kurt Stake, S-t-a-k-e.

15          TRIAL TECH KEN REESER:  Ken Reeser, Trial

16  Technician, as mentioned.

17          ARBITRATOR CALLAHAN:  All right.  And then I

18  also have Mr. Reeser.  You have your own computer and

19  you'll use that for share screen?

20          TRIAL TECH KEN REESER:  Correct.

21          ARBITRATOR CALLAHAN:  And then I have

22  Mr. Lemus.  Are you here with us, sir?

23          MR. LEMUS:  Yes, ma'am, I am.

24          ARBITRATOR CALLAHAN:  Then I have someone

25  that's "iPhone."  I don't know who that is.
```

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          MR. SONIAT:  This is me, Ashton Soniat.

2          ARBITRATOR CALLAHAN:  Okay.  Welcome.

3          Then we have Mr. Wood.

4          Then we have Mr. Liu.  Mr. Liu, I also have you

5   with a computer.  Is that so that you can do share

6   screen?

7          MR. HARDIN:  Yeah.  Potentially.  I don't think

8   I'm going to need it.  But I just did it just so we have

9   an extra -- in the event we do a share screen, or in the

10  event I need to show any documents.  I don't think it's

11  necessary, but just more of a backup.

12          ARBITRATOR CALLAHAN:  Then I have Ms. Rose, who

13  I understand is the legal assistant assisting Mr. Hardin

14  and Mr. Taber; is that correct?

15          MR. TABER:  Yes, ma'am.

16          ARBITRATOR CALLAHAN:  Then I have Mr. Taber and

17  Mr. Hardin.

18          MR. TABER:  Good morning.

19          ARBITRATOR CALLAHAN:  All right.  Is everyone

20  accounted for that either side is expecting to

21  participate in today's hearing?

22          MR. HARDIN:  I think Mr. Gao may join later,

23  potentially.  But certainly nothing that would hold us

24  up.

25          MR. TABER:  And, obviously, Dr. Mordecai will

1   join after the conclusion of Mr. Foret's testimony.

2          ARBITRATOR CALLAHAN:  As additional people join

3   us, we'll note that for the record that they're now

4   participating.  But thank you for the heads up.

5          Okay.  So before we get down to our hearing, I

6   want to make a quick inquiry as to the status of your

7   discussions with Kobre & Kim regarding scheduling

8   Mr. DeNaut for a hearing examination on November 17th.

9          Who would like to report?

10          MR. TABER:  We had productive call this morning

11   with Mr. Feldman, who is conflict counsel for Coinmint

12   and with Mr. Sirota and his associate, Ms. Koo, K-o-o,

13   who are counsel to Mr. DeNaut.  And I've been authorized

14   by all the parties to make a joint statement to the

15   panel about what happened.

16          First, it was a very productive call with

17   Mr. Feldman.  First, Mr. DeNaut, again, agrees to appear

18   without the panel needing to come travel up to where he

19   is.  He'll show up with the panel on Zoom on the 17th at

20   11:00 a.m. eastern.

21          Mr. Sirota invited the parties to use his firm's

22   office in New York at the Kobre & Kim office.  I can get

23   the panel the address for the purpose of the hearing

24   order.  And all parties agreed that will be a good

25   location for the in-person portion.  And then, obviously,

1  the panel will be able to join via Zoom to there.  And

2  Mr. DeNaut agrees to travel from Connecticut to New York

3  to facilitate that.

4         The parties also discussed a document production

5  deadline.  We're not quite there yet, but everyone is

6  working amiably, and we expect to arrive at a date

7  suitable to all parties without the need for the panel's

8  further involvement.

9         ARBITRATOR CALLAHAN:  All right.  Terrific.

10        To the extent that you do -- I assume you'll

11  reach an agreement on documents to be provided and

12  produced by Mr. DeNaut in advance of the hearing?

13        MR. TABER:  Yes, ma'am.

14        ARBITRATOR CALLAHAN:  To the extent that you do

15  that, we'd like you to mark them.  They'll be with the

16  joint exhibit numbering, like we have with the other

17  third party witnesses.  Currently we're at 111.  So if

18  they're -- I'm not sure if you had others in the binder

19  that's a later number.  That's the last number offered.

20  So do take a look at the -- we'll see where we end up

21  this week, if we have any further joint exhibits.  But

22  let's touch base on where your next numbering starts.

23  And it will really hasten our hearing if there needs to

24  be marked -- whatever his production is, if it could be

25  premarked in some fashion and circulated to everybody.

 1          I think that would be quite helpful that we're

 2    all looking at the same thing.  Especially since the

 3    panel will be working by Zoom.

 4          MR. TABER:  We can certainly do that.

 5          I will note that counsel for Mr. DeNaut said that

 6    they're still working on their production.  It's expected

 7    there would be some duplication to what the parties

 8    already produced, because we've asked for communications

 9    with Katena with Coinmint.  Some of that we have.

10          And he also estimated there would be some in

11    the low hundreds number of documents.  So we may not

12    want to mark all of those as exhibits if they're not

13    going to be used.  Certainly they'll all be stamped.

14    But whatever is most convenient and easiest for the

15    panel, that's what we'll do.  But it could make sense

16    for the parties, once they're produced, to take a look

17    and see which ones they want to use and just assign

18    exhibit numbers to those.  I don't know.

19          ARBITRATOR CALLAHAN:  What I think I'd like to

20    do, based on our prior experience, I'd like you to mark

21    the entirety of the set as an exhibit.  And then to the

22    extent that you or the other side wants to select out

23    documents, then mark those as numbers.

24          What we found in the past is the parties went

25    back to that package and found additional documents they

1  wanted to use.  I don't want to -- I want it to be

2  readily available, is what I'm trying to say.  If it's

3  all marked and in a package, it's there for everyone to

4  see and look at at their pleasure, and can make

5  adjustments if they want to add something.  Which is not

6  going to be possible.  And I do want to get Mr. DeNaut

7  done in a day.

8          MR. TABER:  Sounds good.

9          Would the panel appreciate a binder containing

10  that production and hard copy once we have it, at the

11  expense of the parties?

12          ARBITRATOR CALLAHAN:  Yeah.  Once you have it

13  and -- well, yes, why don't you do that.  And to the

14  extent that you reached agreement on what's going to be

15  separate little exhibits from that production, why don't

16  you get us that so we can work with that at our

17  respective ends during the hearing.

18          Good.  Good progress report.  Thank you so much.

19          I know this was reported in the order number

20  54, but let me give you the time tally, because I

21  fear -- panel fears that some adjustments are going to

22  be necessary.

23          Through September 21, the running total was

24  2,161 minutes for Coinmint and 1,966 minutes for Katena.

25  That, basically, is 36 hours for Coinmint and 32 hours for

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  Katena.

2          We have approximately 12 hours available to us

3  today and tomorrow to complete the examination of

4  Mr. Foret and the examination of the parties' respective

5  financial experts.  That's about six hours each.

6          Looking at Coinmint's time estimates for the next

7  two days, it exceeds that number.  So I'm not sure where

8  or how the adjustments are going to be made, but something

9  will be necessary so that we can afford Katena its full

10  allotment of hearing time, and so we can keep the division

11  and sharing of hearing time roughly equal.  I mean, it

12  doesn't have to be to a minute basis, but a four-hour

13  separation when we only have 12 hours available to us is

14  something that I want the parties and their counsel to be

15  cognizant of.

16          So that's what the panel will be expecting.

17  And if it looks like we're not going to live within

18  these boundaries, then one of us will probably speak up.

19          Finally, one other thing to cover with you is the

20  panel -- each of us was provided with a hard copy of

21  Dr. Mordecai's expert witness report, and we assume that

22  once Mr. Mordecai takes a seat to be examined, that will

23  be marked as an exhibit next in order.

24          We have a copy of Mr. Stake's report, but it's in

25  connection with a declaration that he gave in support of

1  Coinmint's motion to exclude testimony.  So we haven't
2  separately been provided with Mr. Stake's report, and we
3  wanted to call that to your attention.  Because I think
4  for purposes of making sure that the panel receives and
5  considers what Coinmint wants us to receive and consider
6  in terms of Mr. Stake's direct testimony, which is going
7  to be his report, we'd like Coinmint's counsel to make a
8  .pdf of the report, circulate it to everyone as its
9  exhibit next in order, so that then we can all have that
10  when Mr. Stake testifies.
11         MR. ALFORD:  Ms. Callahan, this is Fletcher
12  Alford.  I'll make that happen.  I could be wrong, but
13  according to my records, Mordecai's report is
14  Exhibit 1193.
15         ARBITRATOR CALLAHAN:  Oh, I couldn't find it.
16  So, thank you.  I did look.
17         Mr. Hardin and Mr. Taber, is that correct, is
18  it 1193.
19         MR. HARDIN:  We'll have to take a look, your
20  Honor.  Or better yet, we'll have to ask Ms. Rose to
21  take a look.  But we will.
22         ARBITRATOR CALLAHAN:  Okay.  If you already
23  marked it, that's terrific.  We'll work with its
24  existing number.  I took a quick look.  But we do have a
25  lot.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

```
 1            ARBITRATOR TURITZ:  1193.  I have it.
 2            ARBITRATOR CALLAHAN:  Then you don't need to do
 3  anything further.  We have it as 1193 and we have our
 4  separate copy, too.  Good.
 5            With that, it's about 9:15.  Let me yield the
 6  floor to Mr. Liu and Mr. Foret.
 7            Mr. Foret, you are still under oath, sir.
 8            THE WITNESS:  Okay.  Thank you.
 9
10            CONTINUED DIRECT EXAMINATION
11        BY MR. LIU:
12     Q.  Mr. Foret, can you tell us how you became
13  involved with Coinmint as its general counsel?
14     A.  Sure.  That occurred in March -- late March of
15  2020.  Prior to joining as a full-time W-2 employee, I
16  had worked as outside counsel for another company owned
17  by Mr. Soniat.  And under the terms of that
18  relationship, I also did some work for Coinmint.
19            During the time period from about 2017 -- May of
20  2017 until March of 2020, when I did join the company full
21  time.
22     Q.  So is it fair to say you became a full-time
23  employee -- W-2 employee of Coinmint approximately March
24  of 2020?  Is that --
25     A.  Yes.  That's correct.
```

1   Q.  Mr. Foret, you had previously described for us

2   the process for Coinmint's entering into contract while

3   the status quo order was still in effect.

4        Do you generally recall that?

5   A.  Yes.

6   Q.  You told us the first step in that process

7   would be to obtain a copy of whatever agreements

8   Coinmint was considering and sharing a copy of that with

9   the parties in the Delaware litigation.

10       Do you recall that?

11  A.  Not all contracts.  The contract -- I remember

12  the status quo order specifically having a dollar limit

13  of $20,000.  So to the extent that Coinmint was going to

14  enter into an agreement that exceeded $20,000, then it

15  had to provide some advanced notice to the opposing

16  party.

17       In most cases, it was a copy of a letter of

18  intent, a copy of a proposal, or, probably more commonly,

19  a copy of a purchase order from a vendor or supplier that

20  was going to supply equipment to Coinmint that exceeded

21  $20,000.  That was provided to the opposing party.

22  Q.  Okay.  When you say opposing party, are you

23  referring to Mr. Leary in the Delaware --

24  A.  Mr. Leary's entity was technically the opposing

25  party, Mintvest, which was known as Mintvest.

1  Obviously, we didn't supply directly to Mintvest.  It

2  was supplied to the counsel representing Mintvest at the

3  time.

4      Q.  Who would be the one who would share the -- you

5  said purchase orders and letters of intent and potential

6  contracts, who would be the one that would send those

7  types of documents to Mintvest and Mr. Leery?

8      A.  Our counsel representing us in the Delaware

9  matter was Ken Nachbar, and his associated at the time,

10  Liz.  We would transmit the documentation to Ken or Liz

11  and they would then, of course, send it, on a regular

12  time schedule, to Mintvest's counsel.

13      Q.  Now, Mr. Foret, during the last hearing, you

14  had told us Mr. Maloney sent an e-mail, copying you,

15  that attached a copy of a proposal to purchase Bitcoin

16  mining from Blockware in early May of 2021.

17          Do you recall that?

18      A.  Yes, I did.

19          MR. LIU:  Ken, can you pull up Exhibit 1200,

20  please?

21      Q.  On the second page of Exhibit 1200, do you see

22  a proposal from Blockware?

23      A.  Yes.

24          ARBITRATOR CALLAHAN:  Do you see a what?

25          Mr. Liu, I'll have to ask you to speak a little

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  more slowly and a little more clearly.

2          What is this you just asked him?

3          MR. LIU:  Sorry about that.  The attachment to

4  Exhibit 1200.

5          TRIAL TECH KEN REESER:  Would that be 1200-A,

6  please?

7          MR. LIU:  Yes.

8      Q.  Do you see the Blockware proposal in front of

9  you, Mr. Foret?

10     A.  Yes.

11     Q.  Under the process you just described for

12  entering into contracts that exceeded a value of

13  $20,000, was it your understanding that this Blockware

14  proposal would then be sent to Mr. Leary's counsel?

15     A.  That's correct.  Since the proposal -- my

16  understanding is the proposal, as Mike indicated --

17  well, yeah, he did indicate in his e-mail to Ken Nachbar

18  and Liz Mullin that it was $10 million.  That was over

19  the $20,000 threshold.

20     Q.  Have you seen any kind of e-mail like this from

21  Mr. Maloney to Delaware counsel attaching a copy of any

22  proposed agreement with Katena?

23     A.  No.

24          MR. HARDIN:  Objection.  Calls for privileges.

25  Back into the issue of using Mr. Foret's role as general

1  counsel.

2           ARBITRATOR CALLAHAN:  The question was, have

3  you seen any type of e-mail by Maloney to -- and I

4  didn't get the rest of it.

5           MR. LIU:  To Delaware counsel.

6           ARBITRATOR CALLAHAN:  Regarding the Coinmint?

7  What was the rest of your question?

8           MR. LIU:  Mr. Court Reporter, could you repeat

9  that last question?

10          (Record read.)

11          ARBITRATOR CALLAHAN:  And you're saying this is

12  within the scope of the areas that you attempted to

13  inquire into and where the privilege was asserted?

14          Is that what you're saying, Mr. Hardin?

15          MR. HARDIN:  That's right.  Just overall, it

16  gets back into this privilege as a shield and a sword.

17  We would not have those e-mails because they would be

18  sent by Mr. Maloney to outside counsel.  So it would

19  have been marked privileged.

20          It would not have been an area that we would

21  have been allowed to discover.  This gets back into the

22  questions at the deposition, again, where they asserted

23  the privilege instead of having him testify to the

24  facts.  And now they're trying to allege the absence of

25  privileged documents.  And that is a violation of the

1 | shield and sword.

2 |      ARBITRATOR CALLAHAN:  The panel was asked to

3 | rule and make a limiting order, which it did, in order

4 | number 54 on pages 20, 21, and 22.  It's paragraph five

5 | of the order.

6 |      I think, in order to remain in keeping with what

7 | we've put in motion, I'm going to need to have you point

8 | me to the subject area that was previously submitted to

9 | the panel per the deposition inquiries at Mr. Foret's

10 | deposition where you were precluded.

11 |      Just looking at it myself, I'm not finding that.

12 |      MR. LIU:  Yes.  It wasn't asked at his

13 | deposition.  His deposition was about violations, or

14 | perceived violations, of the status quo order.

15 |      ARBITRATOR CALLAHAN:  Mr. Liu, I'm talking to

16 | Mr. Hardin.

17 |      MR. LIU:  Sorry about that.  I apologize.

18 |      ARBITRATOR CALLAHAN:  Mr. Hardin, if you could

19 | point me to the subject area that you believe this

20 | question falls within, that would be helpful.

21 |      MR. HARDIN:  So it's two.

22 |      ARBITRATOR CALLAHAN:  I actually anticipated

23 | this.  So I have the order in front of me.  And it might

24 | be a good idea for you and Mr. Taber to have the order

25 | in front of you if you're going to --

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          MR. HARDIN:  My apologies for interrupting.  I
2   do, as well.  And I think there's two areas.  This gets
3   into the status quo, and it's more than just the factual
4   recitation of what it is.  It is Coinmint's inner
5   workings of how they are dealing with the status quo
6   order, namely as everything is funneled through their
7   general counsel.

8          So there's a series of questions, for example,
9   where we're just talking about violating the status quo
10  order.  Everything with respect to the status quo order
11  and the functions of it was just precluded.

12         Moreover, and I think a separate category from
13  whether a specific question was asked in the deposition,
14  this clearly gets into privileged information.  This
15  gets into his role of what he saw as Coinmint's general
16  counsel and what he did not see.  So they're trying to
17  disclose privileged information that I would have no
18  ability to discover, particularly given the stance that
19  Coinmint took.

20         ARBITRATOR CALLAHAN:  All right.  Let the panel
21  take a short recess.  I'll put us into a breakout room.

22         MR. TABER:  If I could be heard, I'm sorry, but
23  I think we have one more point that would be helpful to
24  the panel.  Which is that they've also withheld on their
25  privilege log communications between Coinmint and

1  Mr. Nachbar presumably on this subject.  So that would

2  be another way in which they've asserted the privilege.

3  The question was whether an e-mail was sent from

4  Coinmint to Mr. Nachbar.  And if they withheld those as

5  privileged, that would be an additional assertion of the

6  privilege other than what was asserted at the

7  deposition.

8         Thank you.

9         (Off record until 9:30 a.m.)

10        ARBITRATOR CALLAHAN:  So I have a question for

11  you, Mr. Liu.

12        Is it a correct statement that Coinmint

13  withheld from production communications with Delaware

14  counsel?

15        MR. LIU:  Yes.  There were some documents that

16  were withheld with Delaware counsel.

17        ARBITRATOR CALLAHAN:  Okay.  So here's the

18  problem.  The broad brush, the status quo order was a

19  subject area that was foreclosed from examination during

20  Mr. Foret's deposition.  To the extent that Coinmint

21  took the position that communications it had with

22  Delaware counsel was off limits, then inquiry into the

23  absence of communications is just the flip side of that.

24  The subject area has been put off limits to Katena, and

25  it just strikes the panel as being unfair to allow that

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  level of inquiry to occur here when it was a foreclosed
2  area of inquiry before the hearing.
3        So we're going to sustain Katena's objection.
4        MR. LIU:  May I just add that that question,
5  that inquiry was not foreclosed.  Because the only
6  question that was foreclosed, with respect to status quo
7  order at Mr. Foret's deposition, was questions about
8  violations of the status quo order, or perceived
9  violations of the status quo order.  There was no
10 inquiry about communications that Maloney -- or e-mails
11 that Maloney sent to Delaware counsel with respect to
12 the Katena contract.  Those types of topics were not
13 asked.
14        ARBITRATOR CALLAHAN:  That's why I asked you at
15 the beginning if Coinmint, in fact, did withhold from
16 production communications it had with Delaware counsel,
17 and the answer was "yes."  So by taking that position
18 you've put that area of inquiry off limits.  Without
19 those communications, how could Coinmint know or prepare
20 to examine Mr. Foret?  So I did not limit it, and the
21 panel is not going to limit it.  The discovery in this
22 matter was much broader than that.  And the orders
23 reflect that.
24        So it's not just a matter of specific
25 questions, it's also the fact of having taken the

1    position that such communications were privileged.  So

2    the flip side is to make inquiries about the absence of

3    communications.  And, again, that having been

4    foreclosed, the ability to inquire about communications,

5    we can't do the flip side.  That's not fair.

6              So next topic, please.

7              MR. LEMUS:  Ma'am, this is Robert Lemus.  May I

8    be heard briefly?

9              ARBITRATOR CALLAHAN:  Go ahead.

10             MR. LEMUS:  I think the salient point here is

11   that there is nothing privileged about the fact that a

12   communication occurred or did not occur.  And the

13   privilege log in and of itself logs the facts that

14   communication occurred or didn't occur.  So that was not

15   something that Katena was precluded from or that Katena

16   was not able to explore.

17             Now, I agree that the contents of a

18   communication -- in other words, the seeking of legal

19   advice or what did you say to Delaware counsel, or what

20   did you ask Delaware counsel, would be covered by the

21   privilege.  But there's already in evidence, by virtue of

22   the privilege log, communications with Delaware counsel.

23   So to preclude the inverse of those communications didn't

24   happen, I think is prejudicial to Coinmint.  But that's

25   all I wanted to say on the point.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          ARBITRATOR CALLAHAN:  This is the fun part
2   about the privilege and the point that you're raising,
3   Mr. Lemus, and I do appreciate it.  But when the
4   question includes the subject matter -- see, it wasn't a
5   question that is simply, did you have any -- were there
6   communications?  It was, "Were there any communications
7   regarding the Coinmint transaction?"
8          So the substance is there.  And so that's
9   why -- you know, I don't want to get into an argument
10  with you.  I think that this is part and parcel of what
11  happens.  And strategic decisions are made all the time
12  during discovery about whether to assert the privilege
13  or not, especially when there's a transaction and you
14  have in-house counsel who can potentially act in both a
15  business role and a legal role.  And so it's not an easy
16  assessment.  But the assessment was made.  So --
17          MR. LEMUS:  I hear you, ma'am.  The only one
18  point I would add to what you've just went on to it was,
19  whether or not it's a transaction that dealt with
20  Coinmint and Katena.  The fact is that this case deals
21  with communications and interaction with Katena.  So
22  things that appear on the privilege log with regard to
23  communications are things that are going to be related
24  to the issues that are in this case.
25          So just as the fact that it appears on the log

1   is salient.  The fact that it doesn't appear on the log

2   is equally salient.

3         And that's kind of the point I'm trying to

4   make, is that the content of the communication is not,

5   "Hey, this is communication about a transaction between

6   Coinmint and Katena."  That's not privileged.  That's

7   just a pure fact whether or not you had that

8   conversation.

9         Now, if it was, "What advice did you solicit?

10  What advice were you given?"  That's where the privilege

11  starts coming in.

12        So, I hear what you're saying.  I just, again,

13  want to caution the panel, from my perspective kind of

14  listening in on this, that I feel that the broad-brush

15  stroke you're making here is too broad because it

16  arguably prevents salient facts that are not privileged

17  and weren't affected by the questioning of Mr. Foret

18  during his deposition from being presented.  And

19  Mr. Hardin will have a full opportunity to ask Mr. Foret

20  about why aren't there communications logged on the

21  privilege log, if that's what he wants to do.

22        He chose strategically not to go into that in the

23  deposition.  That's fine.  That was his strategic

24  decision.  But I think we're getting at a nexus here where

25  there's the expansion of the privilege -- I think the

1  panel is taking too broad of yield what the privilege

2  actually applies to, and I think Katena is urging that in

3  order to shield off what are just basic facts.

4          And I'll shut up for the rest of the hearing.

5  I apologize.

6          ARBITRATOR CALLAHAN:  No.  Don't.  It's fine.

7          Next question.

8          MR. LIU:  Okay.

9      Q.  Mr. Foret, are you aware of any instances where

10 Mr. Maloney would communication with outside counsel and

11 not copy you?

12     A.  Yes.

13         MR. HARDIN:  Objection.  Objection.  It's

14 clear -- objection.  It's the same issue, Madam Chair.

15 I would ask for some type of instruction to pause

16 instead of a rush to get the answer in.

17         ARBITRATOR CALLAHAN:  Well, this is part of the

18 challenge of Zoom.  So -- I will ask everyone to please

19 talk slower and give some breaks so that -- because

20 audio is not interactive, so only one person can control

21 the mic at a time.  And it does make it very difficult

22 for counsel to object, and, quite frankly, for the panel

23 to step in.  So do give us that moment.

24         THE WITNESS:  Yes, ma'am.

25         ARBITRATOR CALLAHAN:  Give everyone that

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1   moment.

2          I guess I would ask, Mr. Liu, where is this

3   going?  Why isn't this just another version of the prior

4   question?

5          MR. LIU:  This one doesn't have anything to do

6   with Katena.  This is just Maloney's communication with

7   outside counsel about any topic.  We're not limiting to

8   Katena.

9          ARBITRATOR CALLAHAN:  Why is that relevant?

10          I think you made your record with regard to

11   communications with outside counsel concerning Coinmint,

12   and that's been put off limits as privileged.  So we're

13   going to foreclose that area of inquiry during the merits

14   hearing.

15          Next question.  Next topic.

16          MR. LIU:  Yeah.  I just have one more question

17   on this one topic and we'll move on.

18          ARBITRATOR CALLAHAN:  But I already ruled.  The

19   panel has ruled.

20          MR. LIU:  All right.

21     Q.  Mr. Foret, in the spring of 2021 did

22   Mr. Maloney ever tell you that he was in the process of

23   negotiating a $100 million contract to purchase Bitcoin

24   mining machines, other than that Blockware proposal?

25          MR. HARDIN:  Sorry.  Are you finished, Mr. Liu?

1          MR. LIU:  Yes.

2          MR. HARDIN:  So I would object.  I think this

3   still is trying to get into his role as the lawyer and

4   what communications was sent to the lawyer.

5          ARBITRATOR CALLAHAN:  One of the areas that was

6   highlighted in order number 54 is acquisition of Bitcoin

7   mining rights in April and May 2021 timeframe.  That

8   area of inquiry was foreclosed as privileged.  And it

9   did have to do with when Katena first came to

10  Mr. Foret's attention and Mr. Maloney being asked to

11  evaluate the potential acquisition of mining rigs.  So

12  that whole area was foreclosed at the deposition.  How

13  can we go into that now?

14         MR. LIU:  Mr. Maloney testified about that when

15  he appeared and testified in this arbitration hearing.

16  I think we should be allowed an opportunity to at least

17  rebut that.

18         ARBITRATOR CALLAHAN:  This is not a deposition,

19  Mr. Liu.  Mr. Maloney was called as a witness, and he's

20  a third-party witness, and he testified.  But we're

21  talking about something that happened before this merits

22  hearing where a deposition of Mr. Foret was taken, and a

23  position was taken at that time to instruct him not to

24  answer and to put certain areas of inquiry off limits on

25  the basis of the assertion of the privilege.

1          Had the privilege not been asserted, then the

2   inquiry would have gone forward and whatever questions

3   would have been asked, and it would be available that the

4   privilege was asserted and the instruction not to answer

5   was made.  And so that instruction has affected the scope

6   of inquiry today.

7          The panel is going to sustain the objection.

8          MR. LIU:  Okay.  I'm going to ask a question

9   that Mr. Hardin had asked Mr. Foret at his deposition.

10      Q.  So, Mr. Foret, to your knowledge, did Coinmint

11  ever report to the Delaware Chancery Court that someone

12  had entered into a contract that potentially might have

13  violated the status quo order?

14          MR. HARDIN:  Objection.  I was specifically --

15  apologies.

16          Objection.  Privilege.  This is a question I

17  specifically asked, and I was specifically denied asking

18  it here in this --

19          MR. LIU:  That's incorrect.  There's no

20  instruction not to answer, and Mr. Foret did, in fact,

21  answer that question.  We can look at the transcript if

22  that helps.  It's on page 81, lines 19 and 24, where

23  this question was asked and there was no instruction not

24  to answer and Mr. Foret did answer the question.

25          ARBITRATOR CALLAHAN:  If he answered a question

1  in his deposition, he can answer it here.

2       Mr. Hardin, do you want to have an opportunity to

3  check that out?

4       MR. HARDIN:  I do.  But I've got a second

5  counter -- a second point that needs to be considered.

6       So, Mr. Liu, can you restate the line and --

7  page and line?

8       MR. LIU:  Yeah.  Page 81, lines 19 to 24 is the

9  question.  And the answer is page 82, lines 3 to 7.

10      MR. HARDIN:  So, one, the actual question and

11  answer is fine.  But the answer that was provided was

12  what was the mechanics.

13      What I was going to say earlier, when I asked

14  the specific question -- again, this is reflected in

15  order 54 -- of whether there were any actual violations

16  of the status quo order, it was shut down.  So the

17  answer that is lines 3 through 7 relates to the

18  mechanics of how the violation was brought to the

19  Delaware court.  Again, that's just mechanics.  Happy

20  to -- I'm not sure how it's relevant, but happy to have

21  the panel hear it if they want.  But when it came down

22  to a substantive answer, when it was pressed, it was

23  shut down.  The privilege was asserted.

24      ARBITRATOR CALLAHAN:  I think the best way to

25  navigate this, and possibly the most efficient way, is,

1  Mr. Liu, why don't you read the actual question and the

2  actual answer, and then you can ask Mr. Foret if that's

3  his testimony today in response to that question.  And

4  then we'll move on.

5           MR. LIU:  And no follow-up questions after

6  that?

7           ARBITRATOR CALLAHAN:  Well, if the follow-up

8  questions go into the violation, implementation,

9  whatever you want to call it, of the status quo order,

10  which was put off limits through instructions, not to

11  answer, most likely that's "yes."  We'll wait to hear

12  the question, and if the panel needs to take another

13  break, we'll take another break.

14           But, please, I -- we had quite a bit of

15  discussion about this on September 19th.  And just

16  speaking for myself -- Ms. Turitz and Ms. Glick can

17  certainly chime in -- I'm a little perplexed by asking

18  questions that are in subject areas where we've already

19  had the objections and the panel's order.  I'm not sure

20  what's to be accomplished, especially in terms of getting

21  the factual evidence out.  We're spending an awful lot of

22  time on objections.

23           MR. LIU:  Okay.

24           ARBITRATOR CALLAHAN:  Ms. Turitz, Ms. Glick, do

25  you have anything to say in that regard?

1    ARBITRATOR TURITZ:  Not at this particular

2  point in time -- session -- I'm still talking.

3    We spent a fair amount of time at the last

4  session about the scope of the objections, and we issued

5  order number 54, and now we're right back with Mr. Liu

6  trying to chip away a bit at that order and go into

7  areas that were precluded at the deposition.  And I

8  remember Mr. Alford vigorously agreeing with me that if

9  it was precluded at the deposition, it would be unfair

10  to allow it during the merits hearing.

11    So I think we should stick with what has been

12  ruled before and move on to areas that were fairly allowed

13  for counsel for Katena to inquire into.

14    MR. LIU:  Okay.  I'll just go ahead and read

15  the question and the answer from the deposition.

16    "Question:  Did Coinmint ever report to the

17  Delaware Chancery Court that someone had entered into a

18  contract outside of the -- excuse me, that potentially

19  might have violated the status quo order?

20    "Answer:  Yes.  To the best of my recollection,

21  the way that that issue was brought to the attention of

22  the Delaware court was through a motion filed by the

23  opposing party."

24    Q.  Mr. Foret, is that your recollection of your

25  testimony from your deposition?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      A.  Yes.

2      Q.  Did Coinmint file anything to the Delaware

3  court in response to this?

4      A.  Yes.  We filed responses each time.

5          MR. HARDIN:  Objection.  It's getting back into

6  this -- again, I was precluded from asking about any

7  violations of the stipulated -- of the status quo order.

8          ARBITRATOR CALLAHAN:  Sustained.

9          Could we please move on to another topic,

10  Mr. Liu?

11         MR. LIU:  Yes.  Will do.

12         Ken, can you pull up Exhibit 1026.

13         TRIAL TECH KEN REESER:  Stand by.

14         BY MR. LIU:

15     Q.  Mr. Foret, looks like Exhibit 26 is a May 10

16  e-mail between you and Mr. Nachbar and Ms. Mullin.

17  These were your attorneys representing Coinmint in the

18  Delaware litigation; is that right?

19     A.  That's correct.

20     Q.  I want to start off with the bottom e-mail you

21  sent on May 10, 2021, at 1:06 p.m.

22         Why did you send this e-mail to your Delaware

23  counsel?

24         MR. HARDIN:  Objection.  It clearly calls for

25  privileged information.  They have selected -- they've

1  made a conscious decision that to protect Mr. Foret's

2  status as a lawyer, they are now selectively waiving.

3          So I would ask that whoever is in control of

4  the screen, take it off, and/or give up control to the

5  panel or someone else so that the panel can rule on

6  this.

7          ARBITRATOR CALLAHAN:  Please remove it.

8          All right.  Give us a moment.

9          (Off the record.)

10          (Time is 9:58 a.m.)

11          ARBITRATOR CALLAHAN:  All right.  I have

12  Ms. Glick, Ms. Turitz.

13          Here's what we're going to do, in the interest of

14  moving things forward.

15          The status quo order, communications with

16  Delaware counsel, are off limits.  And at the end of these

17  proceedings, time permitting, Coinmint can make an offer

18  of proof.  We won't release Mr. Foret, so that if the

19  offer of proof is granted and further testimony from

20  Mr. Foret is allowed, then we'll revisit these topics or

21  these questions at that time.

22          Right now, Mr. Liu, we'd like you to move on to

23  another topic.  So if any of your questions or exhibits

24  pertain to the status quo order or communications with

25  Delaware counsel, then please do not pose them at this

 1  time.  Wait until the end.  You can submit an offer of

 2  proof to the panel, we'll consider it, and take it up at

 3  that time.  But right now let's move on to another

 4  topic.

 5          MR. LIU:  Fair enough.

 6          Ken, can you pull Exhibit 2103.

 7          TRIAL TECH KEN REESER:  Stand by.

 8          BY MR. LIU:

 9      Q.  So Exhibit 2013 is August 9th e-mail in which

10  you are copied on Mr. Foret.

11          Do you see that?

12      A.  Yes.

13      Q.  Do you recall talking about this e-mail during

14  your testimony back in September?

15      A.  Yes.

16      Q.  I just wanted to direct your attention to the

17  purchase order that is on page 2103-4.

18          Do you see that?

19      A.  Yes.

20      Q.  It's a purchase order.  All right.

21          Do you see the signatures there on page 2103-7,

22  dated May 12, 2021?

23      A.  Yes.

24      Q.  All right.  Did you ever see this document,

25  this purchase order on May 12, 2021?

1       A.   No.

2       Q.   How do you know that you didn't see it on

3   May 12, 2021?

4       A.   It was not sent to me.

5       Q.   Do you see the top row where it's -- it looks

6   like it says a DocuSign envelope, it's really small.

7   Can you see that at the top?  It's page 2103-4, the

8   purchase order.

9       A.   Says -- ID?

10      Q.   Yes.  Did you ever receive a DocuSign

11  containing this purchase order on or before May 13,

12  2021?

13      A.   No.

14           MR. HARDIN:  Objection.  General counsel --

15  they're asking the general counsel about the actions

16  that they took.

17           ARBITRATOR CALLAHAN:  Well, we heard the

18  answer.  He answered "no."

19           Go ahead.

20           BY MR. LIU:

21      Q.   Mr. Foret, when did Mr. Maloney leave Coinmint?

22      A.   I believe the date that his termination letter

23  was sent to him was September 21st of 2021.

24           MR. LIU:  Ken, can you pull up Exhibit 2120.

25      Q.   Is Exhibit 2120 the termination letter that you

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  referenced in your earlier response?

2          MR. HARDIN:  Objection.  This is another area

3  we sought discovery on, and it was precluded.

4          ARBITRATOR CALLAHAN:  Hold on.

5          Well, this is your exhibit, Mr. Hardin, isn't it?

6          MR. HARDIN:  Anything with a "2" is our

7  exhibit.

8          ARBITRATOR CALLAHAN:  Yes.  And I think I'm not

9  understanding the objection.

10          MR. HARDIN:  I'll withdraw it for now.  I'll

11  withdraw it.

12          ARBITRATOR CALLAHAN:  Would you repeat your

13  question, Mr. Liu.

14          MR. LIU:  Mr. Court Reporter, could you repeat

15  the last question, please?

16          (Record read.)

17          THE WITNESS:  By way of further response,

18  2120-1 is the e-mail, and attached to that e-mail as

19  2120-2 is the termination letter.  And then following

20  that, 2120-3 for a number of pages going 2120-5, is what

21  was styled the Settlement Agreement and Release.

22          BY MR. LIU:

23      Q.  So on September 21, 2021, you sent an e-mail

24  with Mr. Maloney that attached a termination letter and

25  a settlement agreement.

1          Do I have that right?

2      A.  That's correct.

3      Q.  Do you know if Mr. Maloney received this e-mail

4  containing the settlement -- containing the termination

5  letter and settlement agreement?

6      A.  Yes.  He did receive it.  Because he confirmed

7  to me later that day.

8      Q.  All right.  Why was Mr. Maloney terminated?

9      A.  My general understanding from Mr. -- talking to

10 Mr. Kinney and Mr. DeNaut is that Mr. Maloney, the

11 primary reason is that he was not showing up for work

12 and he had locked us out of --

13          MR. HARDIN:  I'm going to object to -- sorry,

14 Mr. Foret, but I'm going to object to anything else as

15 hearsay.  As Mr. Foret said, the basis for his answer is

16 what others told him; specifically, Mr. DeNaut and

17 Mr. Kinney.

18          ARBITRATOR CALLAHAN:  Objection is overruled.

19 We've been presented with hearsay objections in the

20 past, and I think the panel has made clear that we

21 understand what hearsay is.  Formal rules of evidence

22 are not a fight in this case, and in particular it is

23 commonplace to allow hearsay.

24          So the objection is overruled.

25          THE WITNESS:  Yeah.  To complete the answer,

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  Mr. DeNaut and Mr. Kinney informed me that Mr. Maloney

2  was not being cooperative and that he had locked --

3  apparently he was the custodian or administrator of the

4  share file, and other places where we stored

5  information, and he locked us out of that file and we

6  didn't have access to it.

7          In addition, when I spoke to Mr. Maloney, one of

8  the things that we talked about, I said, "Mike, you have

9  to give us access to this information."  And he confirmed

10 that he had done that.

11         MR. LIU:  Okay.

12     Q.  He confirmed that he had locked you guys out of

13 your share file?

14     A.  Yes.

15     Q.  At some point did he give access back to

16 Coinmint?

17     A.  Yes.

18         MR. HARDIN:  Objection.  Potential privilege.

19 Sorry to do it.  There was no coordination beforehand.

20 But I was shut down for any of the discussions after

21 Coinmint "anticipated litigation."  And it's unclear

22 whether this question relates to after Coinmint

23 "anticipated litigation."  To the extent it does, I

24 think they've chosen to bar this testimony as

25 privileged.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1           ARBITRATOR CALLAHAN:  Right.

2           Could you please include a time reference in your

3    question, Mr. Liu.

4           MR. LIU:  Okay.

5      Q.  Did Mr. Maloney provide access back to

6    Coinmint's shareholder drive before October of 2021?

7      A.  Yes.

8      Q.  When did he provide access back to Coinmint?

9      A.  I don't know the exact timeframe, but shortly

10   around the time that he was terminated, or right before

11   that he -- we were able to gain access.  And I think it

12   was through help Mr. Maloney -- or access Mr. Maloney

13   provided.

14     Q.  Do you have an approximate timeframe of how

15   long Coinmint -- approximately how long Mr. Maloney had

16   locked Coinmint out of its files.

17     A.  My understanding is it was weeks.

18     Q.  Okay.  Who made the decision to terminate

19   Mr. Maloney?

20     A.  My understanding of the way things transpired,

21   Mr. DeNaut was essentially running the company during

22   that period of time, meaning the July/August/September

23   timeframe.  And he reported to Mr. Soniat that the

24   situation with Mike Maloney was no longer workable, that

25   they didn't have any control over him, he wasn't

1  following directions, et cetera, et cetera.

2         So, because the situation had sort of reached a

3  head where they couldn't work with him, couldn't get him

4  to cooperate, something needed to be done.  And

5  Mr. DeNaut's opinion was that they needed to part ways

6  with Mr. Maloney.  And he recommended to Mr. Soniat that

7  Mike Maloney be terminated, that his relationship with

8  the company be terminated.  And Mr. Soniat approved it.

9       Q.  Is it fair to say, if I understand you

10  correctly, Mr. DeNaut recommended that Mr. Maloney's

11  relationship with Coinmint should be terminated, and

12  Mr. Soniat agreed?

13       A.  Yes.

14       Q.  I want to point your attention to the

15  settlement agreement that's on page 2120-3.

16         Can you let me know when you're there?

17       A.  Yes.

18       Q.  Do you know if Mr. Maloney ever accepted the

19  settlement agreement on page 2120-3?

20       A.  He did not accept it.  It was presented to him,

21  we discussed it.  And he had, I guess, a counter to it.

22  But he did not accept what's written here in this

23  agreement.  In terms of this exact agreement.

24       Q.  Do you recall him giving you any particular

25  reason for why he would not accept this settlement

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  agreement?

2      A.  Well, part of the discussion was, if you look

3  at the termination letter, "In return for the

4  compensation contained in the settlement agreement,

5  Coinmint requests that you agree to the following."

6          So the settlement agreement was conditioned on

7  Mr. Maloney cooperating with us.  And the cooperation

8  required -- well, I set forth in the letter dated

9  September 21st, and attached as Exhibit 2120-2.  And

10  what we were asking Mr. Maloney to first do is to

11  identify all electronic files in his possession that

12  contained Coinmint information, cooperate with us and

13  assist us in copying those files to another hard drive,

14  and then removing Coinmint-related information from his

15  files, and then refrain from soliciting for employment

16  or assisting others in soliciting Coinmint employees for

17  employment, for a period of two years.

18          And then -- I said four things, there's

19  actually five.  Refrain from soliciting Coinmint's

20  current clients or customers.

21          The last two points were not really discussed.

22  It was primarily one, two, and three.  And primarily

23  starting off with one, we wanted Mr. Maloney to identify

24  where all the files were.  Because we understood that

25  Mr. Maloney, like several other officers at the time, did

1  work using his own cell phone, his own computer, and he

2  used his own e-mail address.  So we wanted him to identify

3  where the files were and allow us access to those files so

4  we could copy and retain and save those files.

5       Q.  Okay.  So with respect to the point -- item one

6  in your letter, of that paragraph, did Mr. Maloney ever

7  identify all electronic files that he had in his

8  possession that contained Coinmint information?

9       A.  He, throughout the history of our

10  conversations, prior to anticipation of the litigation

11  with Katena -- I mean, I was aware that he had a cell

12  phone.  He told me that.  I was aware he had a laptop.

13  He confirmed that.  He confirmed that he used -- and I

14  knew this because he had communicated with other  people

15  and told me about some of these communication outside of

16  just normal text messages, WhatsApp, Signal, Telegram --

17  that he used those sources to communicate, sometimes,

18  with our clients, our co-hosting clients, with potential

19  vendors and that sort of thing.

20       So I had discussed that with him, "Mike, we need

21  you to identify where all of this is and either return it

22  to us or allow us to copy it."

23       Q.  Okay.  And did he ever copy these files to

24  another hard drive and send them back to you?

25       A.  No.  He refused to do so.

1     Q.  Did he give you a reason why he would not do

2  that?

3     A.  Yeah.  I mean, during our conversations -- and

4  I think some of it might be addressed in text messages

5  between us -- Mike would not cooperate with us until we

6  entered into a full release with him and full

7  indemnification.  He refused to cooperate with us.

8     Q.  Is it Coinmint's custom and practice to ask --

9  ask for the return of documents and information from all

10  of its departing employees?

11     A.  Yes.  I mean, now it certainly is customary.

12  Even at this time, at least where I was involved, the

13  practice was, with individuals in the position of

14  Mr. Maloney, to ask for the return of all of that type

15  of information.

16     Q.  So I want to point your attention to the third

17  item on your letter, "Delete all Coinmint-related

18  files."

19        Why did you want Mr. Maloney to delete

20  Coinmint-related files from his electronic devices?

21     A.  This was prefaced by obviously identifying

22  first, allowing us to copy all that information.  And

23  Mr. Maloney, acting as the CFO, had a lot of Coinmint's

24  confidential information.  For example, he had

25  information that could be classified as not just

1  confidential, but potentially -- it was a trade secret.

2  He had pricing, he had our entire business plan on his

3  computer, he had customer information which would be

4  considered a trade secret, of who we did business with,

5  what the terms were.  And Mr. Maloney had possession of

6  all of the vendor and customer contracts, all the

7  colocation agreements with these customers.  And,

8  obviously, Coinmint considered that to be confidential

9  and a trade secret.  And we wanted -- not only wanted it

10  back, we obviously had some copies on the share file,

11  but we didn't want Mr. Maloney to have possession of

12  these documents.

13      Q.  So you wanted him to return all of these

14  documents back to Coinmint first, before deleting them;

15  is that right?

16      A.  Well, obviously.

17      Q.  Did you ever instruct him to delete these files

18  first without returning them back to Coinmint?

19      A.  No.  The letter is pretty clear.  We -- on

20  several occasions we spoke to Mr. Maloney, and we even

21  invited him to meet with us in New York and bring his

22  attorney, and at that time have an exchange of how he's

23  going to turn over this information to us.  We were

24  prepared to have a forensic person there to copy his

25  cell phone or his computer, or whatever.

1    Q.  Okay.  Did you hear Mr. Maloney testify in this

2  arbitration?

3    A.  Yeah.  I was there.

4    Q.  Did you hear him testify that he was instructed

5  by you to destroy documents?

6    A.  Well, I mean, obviously I heard that.  But if

7  you look at the letter -- I mean, the letter is pretty

8  clear on its face, what we expected Mr. Maloney to do;

9  what we wanted him to do.

10    Q.  Right.  And if I understand you correctly, your

11  testimony is that he was supposed to turn over all of

12  the Coinmint-related documents first before destroying

13  or deleting them; is that right?

14    A.  That's correct.

15    Q.  Now, after this arbitration had commenced, did

16  you have any follow-up conversations with Mr. Maloney

17  about turning over documents back to Coinmint?

18    A.  Yes.  And I think Mr. Maloney produced a

19  handful of text messages at his --

20      MR. HARDIN:  Objection.  This is clearly

21  getting into the post-litigation area.

22      ARBITRATOR CALLAHAN:  Could you please

23  reference the timeframe, Mr. Liu, in your questions?

24  And please be cognizant that to the extent the position

25  was taken that Mr. Foret could not be examined on

1  certain topics after litigation was anticipated because

2  it was work product privilege, then that area of inquiry

3  will not be allowed here.

4           MR. LIU:  Okay.

5           ARBITRATOR CALLAHAN:  Please use the timeframe.

6  I think we all have heard that October 2021 was the

7  earliest point in time that Coinmint anticipated

8  litigation.  So if it's after that point in time, I

9  think we'll hear an objection from Mr. Hardin.

10          MR. LIU:  Okay.  I won't ask any questions

11 after that timeframe then.

12          ARBITRATOR GLICK:  Could we stop the screen

13 share if you're done with this document?

14          MR. LIU:  Okay.  Yeah.  You can take it down.

15          BY MR. LIU:

16     Q.  Mr. Foret, did you have any communication with

17 a company called Blockchain in the late summer and fall

18 of 2021?

19     A.  Yes.

20     Q.  What did you guys talk about, generally?

21     A.  I was introduced to Blockchain by Mr. DeNaut

22 and Mr. Kinney, and I was asked to interact with

23 Blockchain -- first with Blockchain's in-house counsel

24 related to a non-disclosure agreement.  And then after

25 the non-disclosure agreement was agreed to and executed,

1  I was further asked to participate by -- specifically by

2  Mr. DeNaut, and I think Mr. Kinney is the one that

3  orchestrated the actual conversations with Blockchain

4  related to potential financing to purchase machines.

5        Mr. DeNaut related to me we were considering

6  buying machines and that Blockchain was going to do the

7  financing -- was potentially going to do some of the

8  financing.

9        My understanding at that time was that Mr. DeNaut

10  said that a company called Katena had already engaged

11  Blockchain and had a line of credit, customer line of

12  credit is what I understood, and Blockchain was vetting us

13  as one of the customers to give us a portion, I believe

14  half, of that customer financing.  And my role was to

15  assist John Tomasic, who was an analyst, a young analyst

16  brought onboard by Mr. Kinney and Mr. DeNaut, in

17  assembling a data room that Blockchain could access.

18        My role specifically involved they needed

19  corporate documents, an organizational chart, a

20  management chart, and bios of the officers, including

21  Mr. DeNaut and Mr. Kinney and myself and Kathleen

22  Schneider, I think Norbert Guiol.  They needed that sort

23  of information in the data room.  So my job was to

24  assist Mr. Tomasic in gathering all that information and

25  putting it in the data room.

1    Q.   Did Mr. DeNaut tell you the amount of financing

2   that was available through Blockchain?

3    A.   Yeah.  The number that was mentioned to me was

4   $100 million, of which we were going to be eligible for

5   half of that, or $50 million.

6    Q.   Did you have communications with Blockchain

7   about how that potential financing would be available to

8   Coinmint?

9    A.   I had general conversations with a gentleman --

10   I specifically remember --

11        MR. HARDIN:  This is calling for privileged

12   information in his role as general counsel.  I've tried

13   to be patient as there's some facts identified, but now

14   we get into the purpose of it --

15        MR. LIU:  This is a communication with Scott

16   O'Dell.  He's a third party at Blockchain.

17        ARBITRATOR CALLAHAN:  Right.  But is he acting

18   as counsel for Coinmint?  Is he working as a lawyer for

19   Coinmint?

20        MR. LIU:  Well, he testified that this was a

21   potential business deal to obtain financing, and his

22   communication with a third party.  I don't think there's

23   any privileges attached to any communications between

24   Mr. Foret and Scott O'Dell at Blockchain.

25        ARBITRATOR CALLAHAN:  Mr. Hardin?

1           MR. HARDIN:  Well -- ma'am?

2           ARBITRATOR CALLAHAN:  Why would it be subject

3  to the privilege?

4           MR. HARDIN:  Well, the point is that what

5  they're now talking about is the internal business

6  analysis and his involvement in that.  He has said

7  that -- sorry, let me step back.

8           He's said that he has filled the specific roles

9  that you would expect of a general counsel.  He's gathered

10 various documents, he's made them available, he's helped

11 set up the data room, et cetera.  They're now taking it a

12 step further and asking his impressions of what the funds

13 were to be used for.  And so what they're trying to get is

14 the benefit of his status, as the lawyer, to provide

15 substantive testimony.  And that's what I mean by

16 "privileged."

17          ARBITRATOR CALLAHAN:  Okay.  I'm going to

18 overrule the objection.

19          I would offer that -- I'm not really clear on the

20 relevance, if you will, to the claims, counterclaims that

21 have been submitted to the panel.

22          But go ahead.

23          We're at about 10:30.  We'll take a break at

24 10:30, and then I'll check in with you, Mr. Liu, on how

25 much more time, with the added caveat that it's not

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  unlimited.

2          MR. LIU:  Sure.  Thank you.

3          ARBITRATOR CALLAHAN:  You have another five

4  minutes or so.

5          MR. LIU:  Thank you.  I appreciate it.

6          Mr. Foret, you mentioned earlier that Mr. DeNaut

7  had told you that there was approximately $150 million of

8  potential financing available through Blockchain.

9          Do you recall that?

10     A.  I think I said $100 million.

11     Q.  Sorry.

12     A.  Which we were supposedly applying for half of

13  that, or $50 million, of vendor credit that was

14  allocated to Katena by Blockchain.

15     Q.  Did you have any conversations with Scott

16  O'Dell about this approximately $100 million in credit?

17     A.  Yeah.  I came to learn from Mr. O'Dell and

18  others on the phone call that that was not actually

19  true, that we were applying completely individually and

20  separate from Katena.  That ultimately the money may

21  have been used to buy machines -- or might have been

22  used to buy machines from Katena or another vendor,

23  another Bitcoin mining manufacturer, but that this was

24  an independent evaluation of Coinmint for an independent

25  line of credit that would be attached to Coinmint only.

1    Q.  Did Mr. O'Dell tell you anything about whether

2  or not Katena did, in fact, have $100 million in credit

3  available for financing?

4    A.  In one of the conversations it was mentioned

5  that there was no line of credit that attached to Katena

6  gaining, as I testified this was completely independent.

7  So we were going to have to get the line of credit on

8  our own without any affiliation with Katena.  Because

9  Katena was not involved in this line of credit.  They

10  didn't have -- in other words, they didn't have what I

11  thought was a $100 million vendor line of credit and we

12  were being approved for $50 million of that

13  $100 million.

14    Q.  Was Coinmint ultimately able to obtain any type

15  of financing from Blockchain, whether it's through

16  Katena or not?

17    A.  The process ended -- was terminated after

18  Mr. DeNaut left the company.

19    Q.  And when did Mr. DeNaut's relationship with

20  Coinmint -- sorry, you had just mentioned that this

21  relationship or communication with Blockchain ended when

22  Mr. DeNaut left the company.

23       So my question to you is:  When did Mr. DeNaut

24  end the company?

25    A.  Early November.  I'm not sure of the exact

1   date.  But I know by November 5th when I spoke to him,

2   he was no longer affiliated with Coinmint.

3       Q.  Now, before we get there, can I ask you when

4   did Mr. DeNaut's relationship with Coinmint begin?

5       A.  I was informed by Kathleen Schneider, and

6   others that I spoke to during the management meeting --

7   I did not attend the management meeting personally, as I

8   testified to last time.  I was in attendance remotely,

9   and only for a short portion of it.  But during that

10  time period, I had the occasion to communicate with

11  Kathleen Schneider a couple times and Mike Maloney a few

12  times.  Kathleen informed me that Ashton was bringing

13  onboard a new CEO, gave me his name and possibly a bio

14  related to Mr. DeNaut.

15      Q.  Do you know if there was an employment contract

16  between Mr. DeNaut and Coinmint?

17      A.  I'm aware of the negotiations of potential

18  contracts and the fact that Mr. DeNaut was being brought

19  onboard was communicated in the -- to opposing counsel

20  in the Delaware litigation.

21      Q.  Do you know if a draft of any employment

22  contract between DeNaut and Coinmint, was that provided

23  to counsel in the Delaware litigation?

24      A.  Yes.

25          MR. HARDIN:  Objection.  Calls for privilege.



1      ARBITRATOR CALLAHAN:  Sorry.  I'll need that

2   question back again, please.

3      (Record read.)

4      ARBITRATOR CALLAHAN:  All right.  Sustained.

5      BY MR. LIU:

6   Q.  Mr. Foret, do you know if these discussions

7   between Mr. DeNaut and Coinmint about a potential

8   employment contract, did that ever result in an actual

9   signed employment contract?

10  A.  No.  My understanding is at some point in late

11  October, Mr. DeNaut changed one of the terms that he and

12  Mr. Soniat had negotiated earlier on.  One of those

13  terms changed so that Mr. DeNaut had complete and full

14  control of the company.  And Mr. Soniat wasn't willing

15  to give him that complete control, so the parties parted

16  ways.  Which included Mr. Kinney, also.

17  Q.  Do you know approximately when that was that

18  Mr. DeNaut asked, in your words, to take complete

19  control of the company?

20  A.  It was an ongoing process through the late

21  summer, early fall.  And I know that Mr. Soniat had

22  retained counsel -- it was not me that was

23  negotiating -- retained outside counsel, an employment

24  specialist, to prepare a comprehensive agreement.  And

25  Mr. DeNaut, either alone or through his counsel, maybe

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  through his counsel, was negotiating with this attorney.

2  And they exchanged drafts, and I guess they thought they

3  had an agreement in place at some point in maybe the

4  very early fall, late summer, early fall.  And then

5  things changed in October.  And as a result, they

6  couldn't come to an agreement and Mr. DeNaut and

7  Mr. Soniat parted ways.

8          ARBITRATOR CALLAHAN:  This is probably a good

9  point to take a break.  It's about 10:30.  We'll break

10  for 15.

11          Why don't you mute your microphones at everyone's

12  end.

13          MR. HARDIN:  Ma'am, just to be clear, you did

14  say 15 minutes, like normal?

15          ARBITRATOR CALLAHAN:  Yes.  See you back at

16  10:45.  Please mute everyone at your end.

17          (Break taken from 10:30 to 10:45.)

18          ARBITRATOR CALLAHAN:  Let me bring everybody up

19  to speed.

20          Mr. Liu, you're about an hour and 15 into your

21  two-hour estimate.  What is your current estimate, keeping

22  in mind that I am going to limit you to the time that's

23  available to you today and tomorrow?

24          MR. LIU:  Right.  I think I only have about

25  30 minutes left.  I should be able to wrap up in about

1   30 minutes.

2          ARBITRATOR CALLAHAN:  Okay.

3          Ms. Turitz, are you there?

4          So we have Ms. Turitz back with us.  Mr. Liu, go

5   ahead.

6          MR. LIU:  Thank you.

7          BY MR. LIU:

8      Q.  Mr. Foret, when did Mr. DeNaut depart

9   employment?

10     A.  It was early November.  I'm not exactly sure of

11  the exact date, but it was early November of 2021;

12  first, second or third.

13     Q.  Did he leave Coinmint on good terms?

14     A.  Generally, my understanding is that it was not

15  any animosity.  Just that they couldn't -- and he,

16  Mr. Soniat, could not come to terms on final agreement,

17  so he decided to move on.

18     Q.  Did he tell you what kind of work he'll be

19  moving on to now that he would no longer be working for

20  Coinmint?

21     A.  Yes.  At some point later that week, I reached

22  out to Mr. DeNaut, I got his cell phone number from

23  Mr. Kinney -- because I didn't speak to Mr. DeNaut

24  regularly during the time that he was there -- and

25  reached out to him to contact him to have a general

1 discussion about what had been going on at the company.

2 And he, during that conversation, told me that he had

3 been --

4          MR. HARDIN:  I'm going to object.  My

5 understanding is this is after the anticipation of

6 litigation.

7          MR. LIU:  This is not about his investigation

8 with the deal, it's communications with DeNaut about

9 what kind of work he would be doing post Coinmint.

10          ARBITRATOR CALLAHAN:  Maybe let's do a

11 timeframe.  You're in November 2021 after Mr. DeNaut has

12 left?

13          MR. LIU:  Right.  And the topic is what

14 Mr. DeNaut told Mr. Foret about the type of work he

15 would be doing.  Basically his next job post Coinmint.

16 It's not about investigating into the Katena deal or

17 anything like that.

18          ARBITRATOR CALLAHAN:  I don't see the problem

19 with the question other than I'm not sure I see the

20 relevance to the claims and counterclaims that have been

21 submitted to the panel.

22          MR. HARDIN:  Although, I would say, Madam

23 Chair, any discussion with these witnesses that was

24 after the anticipation of litigation or the

25 investigation started was a hard stop during the

1  deposition.  So while I -- question is relevance, there

2  is still the reality that we were precluded from asking

3  any questions about these discussions with Mr. DeNaut or

4  Mr. Maloney.  In fact, the best we could get is, "Yes or

5  no, did you have a conversation?"

6           "Yes."

7           Hard stop.

8           ARBITRATOR CALLAHAN:  Could you point me to the

9  point -- let me just look.

10          MR. HARDIN:  Ma'am, I'm sorry, if you asked me

11  a question, I could not understand it.

12          ARBITRATOR CALLAHAN:  All right.  That is not

13  among the categories that was brought to the panel's

14  attention.  And I have to say on this point, the panel

15  was provided with the transcripts of the Connecticut

16  proceedings, as well as a copy of Judge Vatti's

17  October 4th order.  We're aware that there's been

18  testimony about these discussions.  I don't know that --

19  whatever the issue has been -- by the fact that

20  proceedings --

21          MR. HARDIN:  Ms. Callahan, you're breaking up.

22          ARBITRATOR TURITZ:  You are breaking up.

23          ARBITRATOR CALLAHAN:  I don't see the relevance

24  to the claims and counterclaims that have been

25  submitted.  But, again, I'm going to let Mr. Liu use his

1  time how he wishes, with the caveat that his time is not

2  unlimited.

3        Go ahead, Mr. Liu.

4        MR. LIU:  Yeah.

5    Q.  Mr. Foret, what kind of work, if any, did

6  Mr. DeNaut share with you that he would be doing post

7  Coinmint?

8    A.  Yeah.  Mr. DeNaut essentially started the

9  conversation with, "Hey, I want to let you know that

10  Katena reached out to me and wanted -- wants to hire me

11  as a consultant.  Will Ashton approve of that?"

12        And, obviously, I said, "Well, I'm going to

13  check with Ashton.  But my feeling is, Jim, why are you

14  going to work for Katena when you understand what was

15  going on with them, you were negotiating a new deal with

16  them.  It wouldn't make sense, and there's probably some

17  implication of breach of fiduciary duty, giving trade

18  secret information.  You have all of our confidential

19  information.  I just don't understand this request.  And

20  I think it would be really ill-advised for you to

21  considering going to work for Katena at this point."

22    Q.  Did he say anything in response to you to

23  address these concerns that you had just raised?

24    A.  Not during that conversation.  But later on.

25  He did indicate that he wasn't working for Katena.

1    Q.  Did he say anything to you in response to

2  alleviate any of your concerns about a potential breach

3  of fiduciary duty?

4    A.  Well, he said he reached out to the -- the

5  reason he was bringing the topic --

6        ARBITRATOR CALLAHAN:  Let me interrupt.

7  There's something going on in the conference room.

8  Maybe the court reporter is getting it, but I can't hear

9  complete -- I don't know if you need to be -- something.

10   A.  Yes.

11       THE WITNESS:  Is this better?

12       ARBITRATOR TURITZ:  You're also breaking up

13  somewhat, Ms. Callahan.

14       ARBITRATOR CALLAHAN:  I think what's happening

15  is you're interrupting.

16       MR. ALFORD:  Ms. Callahan, we'll try hard to

17  not interrupt you.

18       ARBITRATOR CALLAHAN:  You just broke up again.

19       MR. ALFORD:  Ms. Callahan, this is Fletcher

20  Alford.  Can you hear me?

21       ARBITRATOR CALLAHAN:  So I'm telling you as

22  you're speaking when you're breaking up, and I can't

23  hear you.

24       MR. ALFORD:  Your screen is freezing, and we

25  often see your screen freeze, and your audio and your

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  video both freezes.  I think all of us are having that

2  experience with you and your connection.  So I don't

3  think it's on our end.  We are all observing you, your

4  video and your audio periodically freezing.

5           ARBITRATOR CALLAHAN:  Ms. Glick, Ms. Turitz,

6  you having any problem with the breakup?

7           ARBITRATOR TURITZ:  You have broken up a few

8  times.  Very briefly.

9           ARBITRATOR CALLAHAN:  What was the breakup on

10 the conference call end?  Were you able to get

11 everything?

12          ARBITRATOR GLICK:  What do you mean on the

13 conference call end?

14          ARBITRATOR CALLAHAN:  In the conference room.

15 I wasn't hearing the complete --

16          ARBITRATOR TURITZ:  Their conference call?  I

17 was hearing it.

18          ARBITRATOR CALLAHAN:  Without breakup?

19          ARBITRATOR TURITZ:  Without breakup.

20          Sometimes your sentences, there's a lapse in

21 between words, and we're only getting -- not the whole

22 sentence.

23          ARBITRATOR CALLAHAN:  All right.  I don't know

24 what to do other than --

25          ARBITRATOR TURITZ:  Now it's fine.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1       We'll continue and maybe it was a temporary
2    glitch.
3            ARBITRATOR CALLAHAN:  Okay.  Go ahead.
4            MR. ALFORD:  Re-ask the question.
5            BY MR. LIU:
6       Q.  Mr. Foret, during this conversation that you
7    had with Mr. DeNaut in this November timeframe, did he
8    say anything in response to your concerns about a
9    potential breach of fiduciary duty?
10      A.  Well, I mean, he acknowledged what I told him,
11   and said that he would reconsider and would not work in
12   an advisor role with Katena.
13      Q.  Did you relay -- this job offer from Katena to
14   Mr. DeNaut, did you relay that to Mr. Soniat?
15      A.  Yeah.  I mean, it was somewhat -- like I said,
16   I had not had a lot of conversations with Mr. DeNaut.
17   It was mostly -- most of my dealings had been with
18   Mr. Kinney on a more regular basis.
19          So I immediately contacted Mr. Soniat and let
20   him know that I reached out, I had spoken to Mr. DeNaut,
21   and what he told me.  And Mr. Soniat used a few choice
22   words.  But to phrase it mildly, he was livid that
23   Mr. DeNaut would consider going to work for Katena right
24   after -- literally within days of parting ways with
25   Coinmint.  And specifically in light of the fact that

1  Mr. DeNaut was the one, after Mr. Maloney had left, that

2  was placed in charge of talking to Mr. Monzon and

3  Mr. Gao.

4       So Mr. Soniat placed that particular issue in

5  Mr. DeNaut's hands, and here Mr. DeNaut was turning

6  around and considering going to work for Katena.

7       Q.  So it sounds like Mr. Soniat wasn't

8  particularly upset when Mr. -- I think the word you used

9  was "livid"?

10      A.  Yes.

11      Q.  Was he livid when Mr. DeNaut left Coinmint?

12      A.  No.  At that point he didn't have the frame of

13  reference that -- the frame of reference was simply that

14  they tried to come to terms, they did not.  He was

15  somewhat upset, "Okay, I have to start over and find

16  somebody else."  But it was not in the mind-set of being

17  livid like he was on -- I guess the date was around

18  November 5th.  It was November 5th when I first reached

19  out to Mr. DeNaut.

20      Q.  When you told Mr. Soniat that Mr. DeNaut had

21  received this job offer from Katena, did Mr. Soniat

22  decide to file a lawsuit against Mr. DeNaut during that

23  time?

24      A.  No.  I mean, obviously we had some

25  conversations related to it.  But, no, he did not decide



1 to institute litigation against Mr. DeNaut at that time.

2     Q.  You had mentioned earlier that when Mr. DeNaut

3 had relayed to you this job offer that he was

4 considering from Katena, that there would be some -- be

5 some kind of conflict of interest.  Can you talk a

6 little bit about that?

7     A.  Yeah.  Specifically, the topic came up about

8 Katena and what was going on with Katena.  And I was

9 trying to not necessarily press, but since I had not

10 been kept in the loop by either Mr. DeNaut and

11 Mr. Kinney related to what was going on with Katena at

12 all, I was trying to get information from Mr. DeNaut.

13       I had first reached out to Mr. Kinney, and he's

14 the one that told me, "You need to talk to Jim about

15 this.  This is his deal, not mine."

16       So he gave me his cell phone number.  So I

17 reached out to Mr. DeNaut.  When he mentioned this about

18 going to work as an advisor or a consultant or -- I

19 think he used the phrase "consultant for Katena" -- and

20 I mentioned the breach of fiduciary duty, the

21 conversation evolved into, "Well, what if I help you get

22 your money back," or, "What if you -- Ashton gets all of

23 his money back, what about then?"

24       And the conversations from November 5th onward

25 was about Mr. DeNaut attempting to help us get the money

1  back.

2      Q.   Okay.  So it was -- so Mr. DeNaut, he was the

3  one who suggested to you that he would help Coinmint get

4  the money back to address the concerns that you had

5  raised about a potential breach of fiduciary duty?

6          Is that generally accurate?

7      A.   Yes.

8          MR. LIU:  Ken, can you pull up Exhibit 2190.

9      Q.   Mr. Foret, Exhibit 2190 is a letter from

10  Stephen Doyle to Jim DeNaut on November 16, 2021.  It's

11  an e-mail that attaches a letter, the second

12  page 2190-2.

13          Do you see the letter that's attached to it?

14      A.   Yes, I do.

15          MR. LIU:  Ken, can you turn to page 2190-2.

16      Q.   Now, you had mentioned that DeNaut was offering

17  to help Coinmint get its money back.

18          Do you have an idea why this letter was sent to

19  Mr. DeNaut if he had made that offer to you?

20      A.   It was to reinforce -- my understanding, it was

21  to reinforce our concerns that Mr. DeNaut had indicated

22  that he was going to work for Katena.  And then also to

23  relay to Mr. DeNaut, I think at the very bottom of this

24  letter, that he was to take reasonable steps to preserve

25  and retain copies of electronically-stored information.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          Mr. DeNaut also communicated using, periodically,
2   the Coinmint e-mail address that was assigned to him.  But
3   my understanding is that, more often than not, he
4   communicated using his personal e-mail and text messages.
5          Q.  So was this similar to the discussion that you
6   had with Mr. Maloney, when he was leaving Coinmint,
7   about preserving documents and turning them over back to
8   Coinmint?
9          A.  Yes.  In this particular case, it came from
10  outside counsel and not directly from me.
11         Q.  Do you know if Mr. DeNaut received a copy of
12  this letter?
13         A.  Yes.  He did -- my understanding is he did
14  receive a copy of it.
15         Q.  Did you have any conversations with Mr. DeNaut
16  after this letter was sent with regards to his previous
17  offer about helping Coinmint get its money back?
18         A.  Yeah.  We had -- this was on November 16th.  We
19  had at least three major conversations that I'm aware of
20  that were after this letter was sent to him.
21         Q.  And were those conversations, they relate to
22  his offer of helping Coinmint get its money back?
23         A.  Yeah.  All the conversations were --
24              MR. HARDIN:  Madam Chair, again, this -- these
25  are questions that I asked in the deposition about the



COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  conversations with Mr. DeNaut.

2          ARBITRATOR CALLAHAN:  They're not among the

3  topics that were alerted to the panel.  At least that

4  was memorialized in order 54, paragraph 5.  And that was

5  based upon the record excerpts that Mr. Taber sent the

6  panel during the September hearing proceedings.

7          I have no basis upon which to make such a ruling,

8  Mr. Hardin.  Unless you can point to me where in order 54

9  this is covered.  I've looked.  I don't see it.

10          MR. HARDIN:  Well, with respect to order number

11  54, respectfully, those were -- I need to ask the

12  exhibit be taken down so we can talk to the panel during

13  this time.

14          ARBITRATOR CALLAHAN:  Please.

15          Thank you.

16          MR. HARDIN:  So with respect to order number

17  54, you're right, there is some articulation of

18  particular questions.  We were not given a chance to

19  provide anything with respect to that.  And what I mean

20  by -- we provided the hearing transcript as requested.

21  But, otherwise, there were no more submissions.

22          With respect to the deposition, itself, there was

23  a very clear line drawn by Counsel.  Any conversation

24  after "the investigation period" was only allowed to be a

25  yes or no question.

 1        We've got -- I have some specific excerpts here

 2   that we can talk about, if that would be helpful.

 3        MR. LIU:  Those only relate to Mr. Foret's

 4   investigation of the Katena deal.  I mean, the topic

 5   that we're talking about right now, we're not going back

 6   and asking him about things that happened in the past.

 7   We're asking him about things that happened in November

 8   that he has personal knowledge of, and that's this

 9   discussion with Mr. DeNaut that's ongoing in November of

10   2021 about helping Coinmint get its money back.  We're

11   not asking about what happened in the earlier months

12   about how the Katena deal came to be.  We're asking

13   about moving forward.  This has nothing to do with any

14   type of investigation.

15        ARBITRATOR CALLAHAN:  The panel's concern, as

16   we discussed at length on September 19th, is -- and I

17   think all counsel were in agreement -- that to the

18   extent a party was foreclosed from making inquiry of a

19   witness based on an assertion of privilege with an

20   instruction not to answer, that those areas would not be

21   the subject of inquiry at the merits hearing.

22        Now, Mr. Hardin is correct, the panel was trying

23   to move things along and simply ask for the transcript and

24   no submissions.  It is a serious issue.

25        So what we're going to do is table this.  And,

1  Mr. Hardin, you and Mr. Taber can make a further

2  submission to us about any additional areas where you

3  were foreclosed from making inquiry, and we'll take a

4  look at it.  I'll ask you do that tonight -- the panel

5  is going to work tonight -- so we can get it right.

6          If there are other areas where you were

7  foreclosed from making inquiry, then we're certainly

8  going to look at it.  And if that's not the case, then

9  we'll look at that, too.  So I think that's how we'll

10 deal with it.

11         Mr. Liu, please move to another topic and we'll

12 take it under submission.

13         MR. LIU:  Okay.

14         Ken, can you pull up Exhibit 2191, please.

15         TRIAL TECH KEN REESER:  Stand by.

16         BY MR. LIU:

17    Q.  Mr. Foret, on Exhibit 21, it's a -- sorry,

18 Exhibit 2191 -- it's an e-mail that you sent on

19 November 26, 2021, to Mr. DeNaut.  And the e-mail starts

20 off with a -- with, "Jim, please see summary discussion,

21 contents for discussion with Henry and Michael Gao

22 below."

23         Why did you send this e-mail to Mr. DeNaut on

24 November 26, 2021?

25    A.  Mr. DeNaut asked me specifically what it was

1  that we wanted from Mr. -- excuse me -- from Mr. Monzon.
2  And he indicated that he was going to have some series
3  of discussions with him.

4          So I said, "Well, this is what we need."  And I
5  spelled it out.  I said that we were concerned about how
6  the funds were being spent, or whether they had been
7  used at all.  And I -- just a general overview of what
8  adequate assurance was.  And I said, "This is the kind
9  of information that we want you to discuss with
10 Mr. Monzon and obtain from him.  If you're offering to
11 help us, this is the best way that you could help us out
12 by getting this information, because it hasn't been
13 forthcoming to us."

14     Q.  Was it your understanding that Mr. DeNaut
15 would, in fact, discuss these five items that are listed
16 in your e-mail with the folks at Katena?

17     A.  Yeah.  I mean, he indicated that he would.  And
18 based on a follow-up e-mail that we received -- that I
19 received directly from Mr. Monzon -- which kind of
20 surprised me.  Because, obviously, Mr. Monzon was a
21 recipient of the e-mail and the letter from Stephen
22 Doyle, the attorney.

23          But Mr. Monzon reached out directly to me and
24 to Ashton and indicated that Jim DeNaut discussed these
25 topics -- I'm assuming had even -- that Mr. Monzon had

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  even seen this e-mail about adequate assurance and that

2  he was going to address these.

3      Q.  So you're referencing an e-mail response from

4  Mr. Monzon.

5          Ken, can you pull up Exhibit 1222, please.

6          I want to point your attention to the middle of

7  the e-mail.  It's a November 30th e-mail from Mr. Monzon

8  at 8:33 p.m.

9          Do you see that, middle of the page?

10     A.  Yes.

11     Q.  So there's a reference in there by Mr. Monzon

12 to "Conversation with Randall."

13         Do you understand "Randall" to mean you?

14     A.  Yes.

15     Q.  There's also a reference by Mr. Monzon to a

16 conversation with Randall.  And do you understand that

17 to mean the items that you had asked Mr. DeNaut to talk

18 with Katena about?

19     A.  Yeah.  I mean, not only did I understand that,

20 but it's pretty obvious that Randall's request around --

21 it states, "We had inputs from Jim today from his

22 conversation with Randall," meaning me, "around

23 Coinmint's request."  And Coinmint's requests were set

24 forth in the e-mail we just took a look at.

25         ARBITRATOR CALLAHAN:  I hate to interrupt.  I

1  don't have Exhibit 1222.  And it is -- it doesn't show

2  up on the admitted exhibits.

3           MR. LIU:  Okay.  This was e-mailed around, I

4  think, the first or second week, and it may be in one of

5  the smaller binders that we had circulated.  I'm happy

6  to e-mail a copy to the panel right now, if that helps.

7           MR. HARDIN:  Our point was going to be further,

8  when we get to this being settlement discussions.

9           ARBITRATOR CALLAHAN:  The binder I have starts

10 at 1225 to 1226.

11          MR. LIU:  There should be another binder

12 that's, I believe, 1221 through 1226.

13          ARBITRATOR CALLAHAN:  All right.  I guess

14 you'll need to recirculate those.

15          MR. HARDIN:  Ms. Callahan, I'm not sure it was

16 heard.  Our objection, going further on this document,

17 this is clearly settlement discussions.

18          MR. LIU:  It's a demand for adequate assurance.

19 There's no settlement here.

20          ARBITRATOR CALLAHAN:  Well, I need to see the

21 document.  So I'm going to table that until I can see

22 the document.  I can't see it.  So -- please get those

23 to the panel.

24          MR. LIU:  Okay.  Will do.

25          We're close to 11:15, Mr. Liu.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1           BY MR. LIU:

2       Q.  Did Mr. Monzon ever respond to you and tell you

3   what they did with the money they received from

4   Coinmint?

5       A.  It never responded directly to me.  My

6   understanding is that at some point, I believe it was

7   around December 7th or so, Mr. Monzon engaged Mr. Cutler

8   who testified.  And then at that point I had very

9   sporadic conversations with Mr. DeNaut and no further

10  interchanges directly with Mr. Monzon.

11          But, no, I never received the information that

12  we were informed we were going to receive.

13      Q.  Did Mr. Monzon, anyone at Katena or any of

14  their lawyers, ever tell you what happened to the money

15  they had received from Coinmint?

16      A.  No.

17      Q.  Did Mr. Monzon, anyone at Katena, or their

18  lawyers ever tell Coinmint whether they were still

19  planning on delivering machines to Coinmint?

20      A.  No.

21      Q.  After Mr. DeNaut's relationship with Coinmint

22  had ended, did he mention anything to you about

23  obtaining a feasibility study on Coinmint's behalf?

24      A.  I never heard the term "feasibility study"

25  until Mr. DeNaut testified in Connecticut.  That was the

 1  first time I heard that he would be doing a feasibility

 2  study.  And it didn't seem plausible to me, because he

 3  did mention in a text message he might go off to

 4  California.  He never indicated he actually did that.

 5          MR. HARDIN:  Objection.  This gets back into

 6  what DeNaut is telling him.  I'm trying to distinguish

 7  between what has come out in Connecticut versus

 8  additional stuff.  But he's -- the witness has now

 9  clearly veered into their conversations.

10          ARBITRATOR CALLAHAN:  I didn't hear him

11  reference a conversation.

12          Are you talking about a conversation you had

13  with Mr. DeNaut, Mr. Foret?

14          THE WITNESS:  No.  I'm talking about the

15  history of what went on -- just that I never heard the

16  term mentioned "feasibility study."  And then I think I

17  mentioned -- was going to mention that my communications

18  with Mr. DeNaut sort of wound down because Mr. Cutler

19  got involved in early December, and the conversations

20  then were between Mr. Cutler and Mr. Doyle.

21          ARBITRATOR CALLAHAN:  And not you?

22          THE WITNESS:  And not me.

23          ARBITRATOR CALLAHAN:  Okay.  All right.

24          We're close, Mr. Liu.  Are you almost done?

25          MR. LIU:  Yeah.  I think the only ones that are

1  left are the couple questions I have about the status

2  quo order and then those questions about Mr. Foret's

3  conversations with DeNaut about getting the money back.

4  Which we don't think there was any instruction about not

5  to answer those type of questions.

6          ARBITRATOR CALLAHAN:  Okay.  We'll look at

7  those issues tonight.

8          MR. LIU:  Right.  And then when I mentioned the

9  status quo order, I mean the Declaration from

10  Mr. Maloney and the order vacating it.  Those two

11  documents, specifically.

12          MR. ALFORD:  If I might, this is Fletcher

13  Alford.  On Mr. Maloney's Declaration, it was filed with

14  the Court in Delaware, it's a public document, there's

15  no, even, argument that it's work product or

16  attorney-client privilege.  So we would ask that that be

17  admitted into evidence.  And it's self-authenticating.

18  And it's directly contrary to Mr. Maloney's testimony.

19          MR. LIU:  Right.

20          ARBITRATOR CALLAHAN:  I think the appropriate

21  step is to request judicial notice and give Katena an

22  opportunity to respond.  I think that's the more

23  appropriate way to go.  We don't have Mr. Maloney here

24  anymore.

25          MR. ALFORD:  Okay.  Shall we do that in

1  writing?

2          ARBITRATOR CALLAHAN:  Yes.  It should be in

3  writing, and then Katena can submit any response that it

4  would like to submit, if any.  But that's the more

5  appropriate way.

6          By the way, I don't consider BAJI instructions

7  evidence.  Those were among the documents, so I'm not sure

8  what the panel is supposed to do with that.

9          MR. LIU:  Demonstrative?

10         MR. ALFORD:  On Mr. Maloney's Declaration,

11  thank you, yes, we'll submit, right away, a request for

12  judicial notice on that.

13         ARBITRATOR CALLAHAN:  Okay.  All right.

14         And then Katena can respond.

15         So are we ready, Mr. Hardin or Mr. Taber?  Who

16  will be examining -- cross-examining Mr. Foret?

17         MR. HARDIN:  Yes, ma'am.  Is it possible for us

18  to huddle up for five minutes, even if it comes out of

19  our time?

20         ARBITRATOR CALLAHAN:  Yeah.  Five minutes.

21         Everybody please mute or leave the room if you're

22  going to chat.  Back at 11:25.

23         (Break taken from 11:14 to 11:23.)

24         ARBITRATOR CALLAHAN:  Mr. Liu, I found electronic

25  versions of the 1221 series, so you don't need to send

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1    that around.

2            MR. LIU:  Okay.  I just sent the e-mail around.

3    I'm glad you found it.

4            ARBITRATOR CALLAHAN:  Okay.

5            Go ahead, Mr. Hardin.

6            MR. HARDIN:  I do think -- by the way, Madam

7    Chair, I know we're coming up -- it's 11:25, so we're

8    getting close to the lunch hour in the Pacific Time

9    zone.  I do still think this will be less than an hour.

10   I might be able to finish it close to noon.  Maybe if we

11   can push a little beyond noon Pacific, I think we might

12   be able to finish.  Obviously, we can talk about it --

13           ARBITRATOR CALLAHAN:  Yeah.  Why don't we touch

14   base at noon.  If you only need 10 or 15 minutes, we'll

15   keep going.  Otherwise, we'll take our break.

16   Why don't we plan on that.

17           Okay, go ahead.

18

19                   CROSS-EXAMINATION

20           BY MR. HARDIN:

21      Q.  Mr. Foret, I want to talk with you briefly

22   about Exhibit 2103.

23           MR. HARDIN:  Michelle, could you screen share

24   that document, please, ma'am?

25      Q.  Mr. Foret, I thought I saw you flip.

1          Do you have the physical document in front of

2    you?

3         A.   Yes, I do.

4         Q.   It's here on the screen.   Obviously, if you

5    prefer the physical copy, by all means.

6          This is an e-mail stream that's talked about with

7    a couple different witnesses; you and Mr. Soniat.   And

8    you're a recipient of this e-mail stream when it came out;

9    right?

10        A.   Yes.

11        Q.   And it involves Mr. Maloney and Ms. Schneider,

12   as well; right?

13        A.   Yes.   It's a long thread.   I think I'm a

14   recipient on some of it, but not all of it.

15        Q.   Well -- but let's clarify that then.

16          Here the very last e-mail was sent August 9,

17   2021; right?

18        A.   If you're looking at the top of the page, yes,

19   from Kathleen Schneider.   August 9th at -- yes.   At

20   7:51:13 a.m.

21        Q.   And you're on that e-mail; right?

22        A.   Yes.

23        Q.   Although, it is just your iCloud account;

24   right?

25        A.   Yes.

1    Q.  Let's talk first about Ms. Schneider.  She was

2  the Controller for years; right?

3    A.  For Coinmint.  Yes.  That's correct.

4    Q.  And then there's been testimony that she was

5  fired; right?

6    A.  That's correct.

7    Q.  But, in reality, she was an independent

8  contractor for DuFossat until September 2022; right?

9    A.  That's not my understanding.  No.

10    Q.  When is your understanding of when she was an

11  independent contractor from -- with DuFossat?

12    A.  I would have to look at the terms of the

13  settlement agreement, but I think her relationship with

14  both entities essentially ended as an employee with the

15  caveat that she would continue to provide some basic

16  assistance through 2022.  Not just to DuFossat, but also

17  to Coinmint.

18    Q.  Well, you said "employee," but my question had

19  said "independent contractor."

20        Isn't it accurate she remained an independent

21  contractor until approximately September of 2022?

22    A.  Again, we could look at the terms of the

23  separation agreement and see specifically what she's

24  defined as.  Obviously, she was -- as I said, she was

25  not an employee.  And her obligations, her remaining

1   obligations.

2           I don't know if it continued all the way through

3   2022.  I know she was obligated to provide some services,

4   a certain amount of services, limited to a certain

5   timeframe and a certain amount of hours per month or per

6   week.  But I haven't reviewed her separation agreement in

7   some time.

8       Q.  We're getting caught up on the smallest

9   distinctions.  So maybe it's in my question.

10          The point is, she was around and assisting until

11  late '22 -- late 2022, approximately September; right?

12      A.  She provided some ongoing services.  That's

13  correct.

14      Q.  Until approximately September 2022; right?

15      A.  It -- yeah.  It's possible that she provided

16  services through September of 2022.

17      Q.  So when this arbitration commenced, she was

18  still providing services for DuFossat and for Coinmint;

19  right?

20      A.  She was providing assistance, yes.  Pursuant to

21  that separation agreement.

22      Q.  Okay.  After this arbitration commenced;

23  correct?

24      A.  Well, let's see.  The arbitration commenced in

25  April of 2022, and I believe she did provide --

1  continued to provide some assistance for the next couple

2  months.  Yes.

3      Q.  And then she was allowed to leave after the

4  arbitration commenced; right?

5          MR. LIU:  Vague and ambiguous.

6          ARBITRATOR CALLAHAN:  Overruled.

7          THE WITNESS:  I mean, you used the term "she

8  was allowed to leave."  Again, we had a written

9  agreement as to what types of services she would provide

10 and what she would do for the company.  There wasn't

11 "leaving."  She had been replaced by a Controller, and

12 at some point her ongoing assistance with helping that

13 Controller and helping the company out generally wasn't

14 needed.  So she wasn't asked to do very much anymore.

15         BY MR. HARDIN:

16     Q.  Whether you want to say she was allowed to

17 leave or her service agreement expired, that occurred

18 after this arbitration commenced.  Yes or no?

19     A.  Yes.

20     Q.  And when that happened, you didn't collect any

21 messages off of her phone before that time period; did

22 you?

23         MR. LIU:  Objection.  We're getting into

24 discovery issues which the panel already ruled was not

25 the proper subject of the hearing testimony.

1          MR. HARDIN:  Except for --

2          ARBITRATOR CALLAHAN:  Overruled.  Go ahead.

3          THE WITNESS:  Are you asking me specifically

4   what I did or what we did through counsel?

5          BY MR. HARDIN:

6      Q.  Yes or no, were the messages off of her phone

7   collected before she left?

8      A.  That I can't answer, because we employed an

9   independent service, FTI, that contacted Ms. Schneider

10  directly and worked with her to get that information.

11     Q.  As you are sitting here today, have you ever

12  seen any text messages, e-mails, WhatsApp, you name it,

13  from Mrs. Schneider's telephone that was collected as

14  part of this dispute with Katena?

15     A.  I don't recall specifically seeing -- I mean,

16  obviously, I didn't see WhatsApp or any of those.

17         There may have been some text messages that I've

18  seen from Ms. Schneider.

19     Q.  I'm not asking if you've just seen some text

20  messages from Ms. Schneider.  I'm being very clear --

21  I'm asking, as you sit here today, can you recall seeing

22  any information collected from Ms. Schneider's phone

23  related to this dispute with Katena?  Yes or no?

24     A.  Again, as I told you, I wasn't involved in the

25  process.  FTI was.  So I didn't -- the simple answer to

1  your question is, I didn't see the raw data collected.

2        Q.  Right.  That's what I'm asking.  I'm just

3  simply asking you, sir, have you ever seen any

4  information that was collected from Ms. Schneider's

5  phone related to any dispute with Katena?  Yes or no?

6        A.  Yes.  With respect to e-mails.

7        Q.  Okay.  Collected from her phone, not her

8  e-mails?

9        A.  Well, you're using the phone generically.  I

10 know she used her phone, just like I do sometimes, to

11 send e-mails.  She had an e-mail account on there.

12       Q.  Indeed she did.  But e-mails, even if they're

13 pushed out to a phone, can be collected through

14 Coinmint's database; correct?

15       A.  That's not correct with respect to

16 Ms. Schneider.

17       Q.  Are you telling me that they cannot be

18 collected internally at Coinmint, her -- just yes or no?

19       A.  Well, what I was trying to explain is that

20 Ms. Schneider used --

21             MR. HARDIN:  I object.  I asked yes or no.  I

22 am trying to get through this efficiently.  I would ask

23 for an instruction to get an answer in the way that

24 we've asked the question.

25             ARBITRATOR CALLAHAN:  The instruction is given.

1   It's a very, very narrow, specific question, sir.

2           THE WITNESS:  Yes.  Her Coinmint e-mails could

3   be collected externally.

4           BY MR. HARDIN:

5       Q.  So what I'm asking is, did you see information

6   that was collected from her phone?  Just yes or no.

7           Can you tell us whether you ever saw any

8   information related to this dispute that was collected

9   from her phone?

10      A.  Yes.

11      Q.  You did?

12      A.  Yes.

13      Q.  What specifically did you see that was

14  collected from her phone, and when?

15      A.  Well, an example -- again, you're using her

16  phone -- but the --

17      Q.  I don't want to know about text messages --

18          MR. LIU:  Interrupting the witness.

19          THE WITNESS:  You're asking specifically did I

20  see information collected from her phone.  You showed me

21  an exhibit marked 2103, and that e-mail is

22  kschneider@dufossat.com.  So that didn't come through

23  Coinmint.  That was something collected individually

24  from her.

25          BY MR. HARDIN:

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      Q.  Well, DuFossat is a company of Mr. Soniat's;

2    right?

3      A.  You asked me a question.  I was trying to give

4    you a specific answer related to was something collected

5    from her.

6      Q.  Sir, DuFossat is a company of Mr. Soniat's;

7    right?

8      A.  It's a completely separate company that is

9    owned by Mr. Soniat.  Correct.

10     Q.  So, again -- let's try it this way:

11         Here's a simple point:  Mrs. Schneider is on this

12   e-mail, Exhibit 2103.  Ms. Schneider was associated with

13   Coinmint when the arbitration commenced.  Ms. Schneider

14   then ceased being associated with Coinmint after the

15   arbitration commenced.

16         My simple question to you is:  Can you point to

17   anything where you collected information exclusively

18   from her phone?  Yes or no.  Not an e-mail.  I'm talking

19   about texts, talking about WhatsApp message.

20     A.  Yes.  I mentioned it earlier.  FTI was retained

21   to collect information from Ms. DuFossat -- from

22   Ms. Schneider.

23     Q.  Retained.  I'm not asking about who was

24   retained.  I'm asking as to whether you had ever seen

25   any actual data -- text, WhatsApp, Signal, Telegram --

1  that was pulled from Kathleen Schneider's e-mail.  Yes

2  or no, have you seen it?

3       A.  From her e-mail?  Yes.  I just gave --

4       Q.  From her phone.  Have you ever seen a text, a

5  WhatsApp message, a telegram, that was pulled from her

6  phone?

7       A.  I don't specifically remember seeing text

8  messages that would have been collected by FTI from

9  Ms. Schneider.

10      Q.  Or from you.  Or from you when she was leaving.

11 You were the general counsel, you knew about this

12 arbitration, it had already commenced, you knew that she

13 was an important witness.  So did you -- not FTI -- did

14 you collect any information from her phone?

15      A.  Again, we retained, as I just explained to you,

16 we retained FTI to collect that information.

17      Q.  I understand.  And as I just asked you, I'm not

18 asking about FTI now.  I'm asking you about you, sir.

19          Did you ever collect anything --

20      A.  Well, again, using the term "you," I'm not a

21 forensic expert.  I wouldn't know how to collect the

22 information.  We retained counsel, counsel hired FTI,

23 and FTI collected that information.

24          MR. HARDIN:  Madam Chair, could I get an

25 instruction?  I apologize, I didn't think this would be

1   this challenging.  But --

2           ARBITRATOR CALLAHAN:  Mr. Foret, please

3   interpret the question Mr. Hardin is posing.  Even

4   though you've said you're not a forensic person, he's

5   asking if you did it.

6           THE WITNESS:  Yeah.  No, obviously, I wouldn't

7   be capable of doing that.

8           MR. HARDIN:  Ms. Rose, can we put up 2103

9   again?

10          Let's go down to page 2.  Hang on one second.

11          Can we see who the recipients are of this e-mail?

12      Q.  Here it is, Saturday, August 7, 2021.

13  Ms. Schneider, from her DuFossat account, is e-mailing

14  you to your iCloud account, and Mr. Maloney and

15  Mr. Soniat; is that right?

16      A.  It appears to be correct.  Yes.

17      Q.  She says, "Randy, Mike, I do not understand why

18  Ashton did not sign this document."  And "not" is in all

19  capitals; right?

20      A.  It is.

21      Q.  She says, "Ashton is the only one with

22  authority to sign this on behalf of Coinmint."

23          Do you see that?

24      A.  I see that.

25          MR. HARDIN:  Ms. Rose, can you scroll upwards?

1   There you go.  Perfect.

2      Q.  Mr. Maloney responds that day, and he says, "He

3   did sign it."  "Sign" being all caps again; right?

4      A.  Yes.

5      Q.  "And I sent it to you.  You sent me this in

6   DocuSign, and I couldn't get rid of it.  We have a

7   signed version from Ashton already.  No idea why you

8   sent the attachment to me."

9          Did I read that correctly?

10     A.  Yes.

11     Q.  Now, there are two purchase orders attached to

12  this e-mail; right?

13         MR. HARDIN:  Ms. Rose, can you scroll down to the

14  attachments?

15         THE WITNESS:  I see a purchase order, the very

16  back, 2103-10 and -11.

17         BY MR. HARDIN:

18     Q.  So you see two purchase orders; right?

19     A.  Yeah.  2103-6 -- well, actually -4 to -7.

20         BY MR. HARDIN:

21     Q.  Right.  So this is 2103-4, I believe, and says

22  Purchase Order No. 1; right?

23     A.  Yes.

24     Q.  And this one --

25         MR. HARDIN:  Michelle, can you scroll down to

1   the signature.

2        Q.  Now, this one is signed by Ashton Soniat;

3   right?

4        A.  I see that.

5        Q.  Now, the next one -- scroll down one more page.

6   This Exhibit A form of purchase order is the other

7   purchase order that's attached to this e-mail; right?

8        A.  Yes.

9        Q.  This one is not signed by Ashton, is it?

10       A.  No.

11       Q.  That's right.

12            So let's go back to where we were, 2103-2.

13            So, as Mr. Maloney says, "He," meaning Ashton,

14  "did sign it, and I sent it to you," the only purchase

15  order that is attached to this e-mail is the one for

16  $150 million; right?

17  I see where you're flipping through.  Let's go ahead and

18  go to 2103-5.

19       A.  Yeah.  I'm assuming that is the only -- based

20  on what you're saying -- I haven't checked the entire

21  set of documents.  But that was attached to this e-mail.

22       Q.  I'm talking about what's attached to this

23  e-mail.

24            Do you need a minute to read this entire

25  e-mail?  I'll give it to you.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1           Can you show us any other purchase order that is

2   signed by Ashton Soniat on this exhibit?  That's what

3   we're talking about.

4        A.   No.  I mean, the purchase order that is signed

5   by Mr. Soniat is the one that's labeled "Purchase Order

6   number 1" and --

7        Q.   For $150 million; right?

8        A.   That's correct.  Yes.

9        Q.   And it's got here on 2103, it's got a precise

10  payment 1 of $37-and-a-half million; right?

11       A.   Yes.

12       Q.   Due within three business days; right?

13       A.   That's what it says.  Under payment number one.

14  Right.

15       Q.   And you're on this e-mail, this e-mail string;

16  right?

17       A.   Yes.

18       Q.   Go back up to 2103-2.

19       A.   Yes.  I'm there.

20           MR. HARDIN:  Michelle, let's go to the next

21  e-mail up.  Perfect.

22       Q.   The next day, Ms. Schneider responds to

23  Mr. Maloney.  Again, it's Ms. Schneider from DuFossat

24  account responding to Mr. Maloney, to you, in your

25  iCloud account, and to Mr. Soniat in his Gmail account.

1    And second paragraph, "Randy really needs to sign off on

2    all contracts before they are signed and finalized."

3           Right?

4       A.   Yeah.  I see that.

5           MR. HARDIN:  And then, Michelle, let's go to

6    the next e-mail up.

7       Q.   Here's Mr. Maloney.  He's responding the

8    following day on Monday.  Again, you're on this e-mail

9    string; right?

10      A.   Yes.  Correct.

11      Q.   He's responding to Ms. Schneider, to you, to

12   Mr. Soniat.  And so the first paragraph, "This doesn't

13   explain why it was sent to me for signing.  I'm not in

14   the mood this morning to have everything I do

15   questioned.  This was already signed by Ashton.  The

16   attached is extraneous that was sent by you/DocuSign."

17          Again, the only thing we've seen that was

18   signed by Ashton was the Purchase Order No. 1 for

19   $150 million; right?

20      A.   Right.

21      Q.   Then he responds and he says last, "Randy did

22   review this contract for machines.  We've already done

23   this."  And "did" being in all caps; right?

24      A.   That's what he says.

25      Q.   That's right.  That's what he says.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          MR. HARDIN:  And then scroll up, Michelle.

2      Q.  You don't respond and correct him, do you?

3      A.  I'm not in this chain.  But I did respond.

4      Q.  That's not what I asked.  I'm asking, is the

5   e-mail -- you did not respond and tell him, "I did not

6   review this"; did you?

7      A.  I didn't respond in this e-mail thread is what

8   I'm saying.

9      Q.  That's right.  I know.  You didn't, did you?

10     A.  No.  I mean, it's obvious.  There's -- you're

11  showing it to the panel.  I didn't respond in this

12  e-mail thread.

13     Q.  Let's talk about Mr. Bleck.  Do you recall

14  during your deposition I asked you when did you find out

15  that Mr. Bleck had been retained in May, in May 2021?

16  Do you recall that?

17          Hang on one second before you answer.

18          MR. HARDIN:  Michelle, could you take this

19  document down now?

20     Q.  My apologies for stopping.  Let's start over,

21  Mr. Foret.

22          Do you recall during your deposition I asked

23  you when did you find out that Mr. Bleck had been

24  retained in May 2021?  Do you recall that?

25     A.  My deposition was in January.  You're asking

1  when did I learn that Mr. Bleck was retained, when did I

2  come about the knowledge that he was retained in May of

3  2021?

4       Q.  Yeah.  During the deposition you told me at

5  some point, to the best of my recollection, at some

6  point in October of 2021.

7            Do you recall that?

8       A.  That's what I stated then.  Yes.

9       Q.  Is it still your understanding?

10      A.  That is what I -- yeah.  I mean, formally

11  retained, I believe, I saw the signed contract for the

12  first time -- or the report in October of 2021.

13           MR. HARDIN:  Michelle, can you pull up the

14  Coinmint 4073.  I recognize I'm not identifying it by an

15  exhibit number.  I think it's an exhibit number, but

16  I'll need you to pull it up first in order to cite that.

17           Here we go.

18           ARBITRATOR CALLAHAN:  What's the exhibit

19  number?

20           MR. HARDIN:  That's what I was about to say.

21  Michelle, I see where it's identified.  Ms. Rose, if you

22  could unmute to confirm, this is Exhibit 2209; right?

23           Okay, so I take it from you scrolling down,

24  you're going to choose not to unmute.  I do see where it

25  says 2209.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1        ARBITRATOR CALLAHAN:  Is it a new exhibit?

2        MR. HARDIN:  I did not think so.  The way you

3   phrased the question, I take it then that --

4        ARBITRATOR CALLAHAN:  I have a 2208, and then

5   my next exhibit goes 2210.  I don't believe you handed

6   this to us.  Let me see if you sent it electronically.

7        MR. HARDIN:  Ms. Callahan, you're right.

8   Recall that when I skipped 2208 and 2209, you called me

9   out on it.  So this is -- we now have 2208 in backfill,

10   but this is the 2209.  Apologies.

11        Michelle, could you forward that to the panel.

12        MR. LIU:  Before we move on, I don't think we

13   received a copy of 2209.  I'm not seeing it in my

14   records here.

15        MR. ALFORD:  First time we've seen it.

16        MR. TABER:  It's a Coinmint-produced document

17   and I'm e-mailing it to everyone right now.

18        ARBITRATOR CALLAHAN:  Go ahead.  Everybody have

19   it?

20        MR. LIU:  No.

21        MR. ALFORD:  No.

22        MR. HARDIN:  We're actually still relatively on

23   track, Ms. Callahan.  That's why I was just going to

24   pause.

25        MR. TABER:  I just clicked "send."

1        MR. HARDIN:  Awesome.  Thanks, Jacob.

2        MR. TABER:  Once it gets through our firewall,

3  you should have it.

4        MR. HARDIN:  It's come through on my end.

5  Ms. Callahan, has it come through on your end?

6        ARBITRATOR CALLAHAN:  I can't get out of this

7  screen while in screen share.  I can get it on the

8  break.  I can look at it on the screen.  As long as

9  everybody else has it.

10        ARBITRATOR GLICK:  I just got mine.

11        MR. ALFORD:  We just got it.  Give us a minute,

12  please, to take a look at it.

13        ARBITRATOR CALLAHAN:  Go ahead.

14        ARBITRATOR TURITZ:  It does have a Coinmint

15  Bates number.

16        MR. LIU:  That's right.  It just wasn't on the

17  exhibit list, so we weren't aware of it.

18        MR. HARDIN:  Madam Chair, am I good to start?

19        ARBITRATOR CALLAHAN:  Yes, you are.

20        Everyone satisfied that we can go forward?

21        MR. LIU:  Yes.

22        ARBITRATOR CALLAHAN:  Go ahead, Mr. Hardin.

23        BY MR. HARDIN:

24    Q.  Mr. Foret, you see where this is a document

25  generated by Microsoft that's sent to Mr. Maloney -- I

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  think we all get these now -- our daily briefing or
2  weekly updates?  You see that?
3      A.  Yeah.  I see that.
4      Q.  Let's scroll down and see what his daily
5  briefing contained.
6          MR. HARDIN:  First, Michelle, you'll kill me,
7  can you scroll back up?  I forgot to get the date.
8      Q.  This is May 10, 2021.  You see that?
9      A.  Yes.
10         MR. HARDIN:  Michelle, now can you scroll down.
11     Q.  You see where there's a daily briefing about
12 you.  It says, "Randall Foret, form consulting
13 agreement.  Please send me a copy of the NDA so that I
14 have the contractor's information."
15         Do you see that?
16     A.  I see that.
17     Q.  It says four days ago.  Right?  So May 6th.
18     A.  I see that.
19     Q.  Michelle, could you go to Exhibit 1, page 39.
20         And four days ago, Thursday, May 6, 2021, from
21 Mike Maloney to Robert Bleck.
22         Mr. Foret, are you able to see this?
23     A.  Yes.
24     Q.  It says, "Robert, pleasure meeting you.
25 Excited to begin work together.  As discussed, please

1  find our standard NDA.  Following execution, I will

2  introduce you to the team for their NDA."

3         Did I read that correctly?

4    A.  Yes.

5         MR. HARDIN:  Let's turn back, Michelle, if you

6  will, to Exhibit 2209.  Leave this one up.

7    Q.  Mike Maloney is sending that standard NDA you

8  referenced right here to Mr. Bleck, isn't he?

9    A.  I don't know what he's sending.  It says --

10 Mike says, "Please send my a copy of the NDA so that I

11 have the contractor's information."

12        I mean, he doesn't reference Mr. Bleck in that.

13   Q.  That says Jonathan Bates.  It says, "Four days

14 ago, you said," referring to Mr. Maloney.  But for you,

15 under the entry for you, it says, "Four days ago, they

16 asked," referencing Randy Foret.  "Four days ago, Randy

17 Foret asked, please send me a copy of the NDA so I have

18 the contractor's information."

19        Isn't that correct?

20   A.  Yeah.  I mean, I forwarded a copy of an NDA to

21 Mike, of our standard NDA, and asked him after it was

22 signed to send me a copy of it.

23   Q.  Because you knew about Bleck because the entire

24 Coinmint management team was talking about a binding

25 deal with Katena, and it was your job to review the

1  paperwork; right?

2       A.  No.  That's not what that says at all --

3  references.

4       Q.  It references the NDA, doesn't it?

5       A.  It referenced an NDA, and it specifically says

6  "so that I have the contractor's information."  The

7  implication is please send me a copy of the NDA --

8       Q.  That's a yes or no.

9       A.  -- so I have the contractor's information.

10       Q.  Yes or no?

11       A.  Can you repeat your question?

12       Q.  Sure.

13           What this references is your request to get a

14  copy of the NDA that Mr. Bleck signed; right?

15       A.  Well --

16       Q.  Yes or --

17       A.  No.  It references a generic contractor.

18  There's no mention of Mr. Bleck in there.

19       Q.  Okay.  All right.

20           Go back to Exhibit 1.

21           Yet four days prior to that, here's Mr. Maloney

22  sending a standard NDA to Mr. Bleck; right?

23       A.  That's what it appears.

24       Q.  Now --

25       A.  But I wouldn't know about this.  I'm obviously

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  not included on that text message or that Gmail account.

2      Q.  Now, you're included on the other one, though;

3  right?

4      A.  But I'm not included on this one where he's

5  directing it --

6      Q.  Just yes or no, you're included on the other

7  one?  Do we have to go back to 2209?

8      A.  No.  You established that I'm included on that

9  message where I requested generic NDA signed by -- or an

10  NDA signed by an unnamed contractor.  Yes.

11      Q.  So let's talk about Mr. Bleck.  You know that

12  Mr. Pflaum claimed Mr. Bleck wasn't qualified to perform

13  the feasibility assessment; right?

14      A.  I heard Mr. Pflaum's testimony.  Yes.  And I've

15  read his report.

16      Q.  Right.  But specifically, sir, I'm asking about

17  a specific point.  You know that Mr. Pflaum claims that

18  Mr. Bleck wasn't qualified to perform the feasibility

19  assessment; right?

20      A.  I think that's what he testified to, and I

21  think that was in his report.

22      MR. HARDIN:  So, Michelle, sorry, I see where

23  you -- we need to go back to Exhibit 1 real quick.

24  Sorry I couldn't get the text out fast enough.

25      This time let's go to 1-18.  1-18.  So page 18.



1          My apologies let me make that more clear.

2     Exhibit 1, page 18.

3          Q.  Here you are January 13, 2022.  And your

4     reaching out via LinkedIn; right?

5          A.  Yes.

6          Q.  You say "Mr. Black," but that was a typo;

7     right?  This is to Mr. Bleck; right?

8          A.  That's Correct.

9          Q.  Says, "I am the general counsel for Coinmint.

10    I understand that you performed a report for Coinmint

11    related to a chip that was to be manufactured by Katena.

12    I have a couple of questions that I would like to ask

13    you about the report.  I can be contacted at your

14    convenience at the following."

15          Did I read that correctly?

16          A.  Yes.

17          MR. HARDIN:  Michelle, can you go down to

18    page 20.

19          And then here's the point.  Scroll up one more

20    please, Michelle.

21          Q.  Then on the same day, you send an e-mail, as

22    well, right, saying roughly the same:  "Mr. Bleck, I'm

23    the general counsel of Coinmint, LLC.  I understand that

24    you prepared a K10 assessment summary on behalf of

25    Coinmint related to a chip that was to be manufactured

1  by Katena.  It appears that you were retained by Mike

2  Maloney.  Since Mr. Maloney is no longer with Coinmint,

3  I have been asked to contact you to discuss the K10

4  assessment performed on the Katena chip.  My contact

5  information is below.  Please call me at your

6  convenience."

7        Did I read that correctly?

8     A.  Yes.

9     Q.  And he responded on January 24, right, which is

10  the next e-mail down -- and again to coordinate times

11  when the two of you could chat; right?

12     A.  Yes.

13        MR. HARDIN:  Michelle, can we go down to 1-22.

14     Q.  Then, generally, you guys try to schedule a

15  meeting for this particular Friday; right?

16     A.  Yeah.  That's what it states.  9:30 a.m. Friday

17  Pacific Standard Time.  Yeah.

18        MR. HARDIN:  And keep scrolling, Michelle.

19     Q.  And you recall having -- perfect.  You recall

20  scheduling this call to be with Mr. Popeo -- hopefully

21  I'm saying his name right -- with you, and with

22  Mr. Bleck; right?  Just yes or no.

23     A.  Yes.

24     Q.  You recall that conversation occurring; right?

25     A.  Yes.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      Q.   And Mr. Soniat was on that call, as well;

2   right?

3      A.   I don't recall if Mr. Soniat -- I know Paul

4   Popeo.  I think Marc, who was his partner, and I think

5   an associate was on the call.  I don't know if

6   Mr. Soniat was on that call.

7           MR. HARDIN:  Okay.  And then, Michelle, let's

8   go down to page 47.

9      Q.   Then ultimately, Mr. Foret, after participating

10  on that call, Coinmint tried to engage Mr. Bleck, didn't

11  they?

12     A.   Yes.  It looks like Mr. Edgerton send a letter

13  to Mr. Bleck.  Correct.

14     Q.   As a consulting expert in this case; right?

15          MR. HARDIN:  Michelle, scroll down just a little

16  bit.  There you go.

17     Q.   See where it says the purpose of this letter is

18  to confirm the terms and conditions of your engagement

19  by Choate, Hall & Stewart, legal counsel to Coinmint,

20  LLC, to provide consulting services in relation to the

21  arbitration styled Coinmint, LLC, versus Katena

22  Computing Technologies?"

23     A.   Can you scroll up so I can see the date?

24     Q.   Sure.

25     A.   Yeah.  That's what it appears that they sent

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1   engagement -- a consulting engagement letter to

2   Mr. Bleck.

3       Q.  Right.  And that was after you participated in

4   a call with him; right?

5       A.  Yes.

6           MR. HARDIN:  Madam Chair, I actually think,

7   with reservations, depending on the panel's ruling or

8   anything further being offered by Coinmint, I'd like to

9   break for lunch.  I really think that we're done with

10  this witness.

11          ARBITRATOR CALLAHAN:  But you want to use the

12  lunch hour to look over your notes?

13          MR. HARDIN:  Yeah.  I don't think there really

14  is going to be anything else.  But, yeah.

15          MR. LIU:  Same here.  I may only have a minute

16  of redirect, at most.

17          ARBITRATOR CALLAHAN:  Well, I'll ask for time

18  estimates.  So please be prepared for that.

19          I'd ask that both of you look over your notes and

20  your plans for today and tomorrow, and we'll talk about

21  time estimates when we come back.

22          Also, I know, in looking through some of the

23  exhibits, that there are a number of -- I'm going to call

24  them official records, whether they're pleadings or

25  orders, or whatever.  I'd like to encourage Counsel -- you

 1  don't have to do it today or tomorrow -- but I would like

 2  you to take a look at those items that are either in your

 3  exhibits or you've otherwise given to the panel, and make

 4  a determination, hopefully jointly, on if those are

 5  matters that the panel is expected to consider in any

 6  regard in its deliberations.  And, if so, if you could

 7  please either give us those exhibit numbers, whether

 8  you've referenced them or not, during your witness

 9  examinations.  And if there's something you haven't marked

10  as an exhibit, but you want to make sure it's considered,

11  then please let us know so we can deal with that and have

12  a clear record of what was submitted by the parties for

13  the panel to consider.

14          And, in particular, I am thinking about the

15  pleadings that you've given us in both the Connecticut and

16  the Delaware actions.  There is quite a bit of material

17  that, in some form or fashion, has been either made an

18  exhibit in these proceedings or otherwise attached to

19  declarations or motions along the way of getting here.  So

20  I would like to have a clear understanding from the

21  parties as to whether you're expecting the panel to

22  consider, whether you're expecting those items to be

23  available in some regard, for you to reference in your

24  closing briefs.

25          Do give some thought to that.  If at all

1  possible, whatever you can figure out that you know for

2  sure you want the panel to consider, if you could be

3  prepared to tell us that at the close of tomorrow's

4  hearings so we can reflect it in the hearing report and

5  order, along with talking about a briefing schedule.  So

6  we'll all have a clear understanding where we're closing,

7  with the exception of Mr. DeNaut.

8          All right.  It's about --

9          MR. TABER:  Madam Chair, just a small

10  logistical plan.  We're going to get Dr. Mordecai into

11  the Zoom over the lunch, and perhaps you can leave him

12  in the waiting room until we're done with Mr. Foret so

13  we don't have to take another break for that.

14          ARBITRATOR CALLAHAN:  Sure.

15          The panel has talked, and we'd like an hour for

16  lunch.  The half hour lunches weren't doing it for us.

17  That's just really too much.

18          We're going to take 60 minutes.  So it's about

19  12:15.  So come on back, be ready to go by 1:15.  I'll try

20  to be back here and open up by 1:10.  It's a hard start at

21  1:15.

22          Mr. Hardin, we'll check in with you first and

23  then I'll go to Mr. Liu.

24          MR. HARDIN:  Thank you.

25          MR. LIU:  Thank you.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1            ARBITRATOR CALLAHAN:  Thank you so much.  Mute
2   all your respective ends, and I'll see you in an hour.
3            (Lunch taken from 12:11 to 1:15 p.m.)
4            ARBITRATOR CALLAHAN:  Okay.  Do we have
5   everyone back?
6            Mr. Hardin, Mr. Taber, I see I have the
7   conference room with Mr. Foret and Mr. Liu and Mr. Alford
8   and the court reporter.
9            MR. LEMUS:  I'm here.  Robert Lemus.
10           ARBITRATOR CALLAHAN:  And I know I have a
11  separate computer.
12           I have Mr. Mordecai, Dr. Mordecai, in the waiting
13  room.  Should I leave him there?  Let him in?  What is
14  your preference?
15           MR. TABER:  I think it would be fine to leave
16  him in the waiting room until we're done with Mr. Foret,
17  and then admit him.
18           ARBITRATOR CALLAHAN:  Can you communicate with
19  him by text?
20           MR. TABER:  Yes.  I'll let him know that's the
21  plan.
22           ARBITRATOR CALLAHAN:  Mr. Hardin, I think I
23  need to hear from you, sir, if you have any further
24  questions of Mr. Foret.
25           MR. HARDIN:  Apologies, but we do.  I know you

1  had asked for a timeframe.  I think it's going to be

2  five to ten minutes.

3          ARBITRATOR CALLAHAN:  Okay.  And then, Mr. Liu,

4  you said you had some redirect.  How long -- what is

5  your time estimate?

6          MR. LIU:  My estimate is five minutes.

7          ARBITRATOR CALLAHAN:  Okay.  All right.

8          Then go ahead, Mr. Hardin.

9          MR. HARDIN:  Michelle, can you pull up

10 Exhibit 2191.

11     Q.  Mr. Foret, are you still with us?

12     A.  Yes.

13     Q.  This is an exhibit that you discussed on

14 direct; right?

15     A.  Yes.

16     Q.  And these are the points that you shared with

17 Jim DeNaut for Jim DeNaut to share with Katena; right?

18     A.  Yes.

19     Q.  You talked a little bit about them on direct.

20 Do you recall that?

21     A.  I'm sorry, can you repeat that?

22     Q.  Sure.  You talked a little bit about these

23 points on direct.  Do you recall that?

24     A.  Yes.

25     Q.  With respect to the contract in this kind of

1  point number one, you don't reference anything at all

2  about a letter of intent, do you?

3      A.  About a what?

4      Q.  A letter of intent.

5      A.  No.  I don't see that term -- let me read

6  through it.

7      Q.  Sure.  It says, "Contract lacks detail and

8  appears that Mike Maloney drafted in an attempt to harm

9  Coinmint in favor of Katena, despite the fact that

10 Katena is a startup with no history of performance.

11 Mike has informed us that he has damaging information

12 and can burn company down.  Mike refuses to cooperate

13 with us, and his Coinmint e-mail account is suspiciously

14 lacking relevant detail about the contract."

15         Did I read that correctly?

16     A.  Yes.

17     Q.  There's nothing in here about a letter of

18 intent, is there?

19     A.  No.

20     Q.  There's nothing in here about the contract

21 being admitted in June; was there?

22     A.  I don't see that mentioned in this letter; no.

23 Or in this e-mail.

24     Q.  There's nothing in here about a floating price,

25 was there?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

```
1        A.  No, there's not.
2             MR. HARDIN:  I think with that, Madam Chair, we
3    pass the witness.
4             ARBITRATOR CALLAHAN:  All right.  Mr. Liu.
5             MR. LIU:  Thank you.
6
7                    REDIRECT EXAMINATION
8        BY MR. LIU:
9        Q.  Mr. Foret, during your cross-examination by
10   Mr. Hardin, he showed you some communications between
11   yourself and Mr. Bleck.  Do you recall that?
12       A.  Yes.  Wait, I'm sorry, did you say between
13   myself and Mr. Bleck?
14       Q.  Correct.
15       A.  It wasn't between myself and Mr. Bleck.  I
16   recollect that he showed me -- oh, I'm sorry.  Between
17   myself and Mr. Bleck in January of 2022.
18       Q.  Correct.  Yes.
19       A.  Okay.  Sorry.
20       Q.  During the time that you were communicating
21   with Mr. Bleck in 2022, did Mr. Bleck send any documents
22   to you?
23       A.  I think in the e-mail exchanges I asked him to
24   provide documents to me.  And he did respond.  If I
25   recollect correctly, he provided four documents -- not
```

1  sets -- four tiny sets of documents, including the

2  independent contractor agreement, I think the

3  non-disclosure agreement, and then a copy of his report,

4  and then I guess what we have all referred to as the

5  summary page.  And I think that's it.

6      Q.  Okay.  Did any of the documents that Mr. Bleck

7  sent you in 2022, did any of that include text messages

8  between Mr. Bleck and any of the principals at Katena?

9      A.  No.

10          MR. LIU:  Ken, can you pull up Exhibit 1-1,

11  please.

12          ARBITRATOR CALLAHAN:  What was the exhibit

13  again?

14          MR. LIU:  Exhibit 1, page 1.

15      Q.  Mr. Foret, do you recall seeing this series of

16  text messages during this arbitration?

17      A.  Yes.

18      Q.  Did you understand that this was produced by

19  Mr. Bleck?

20      A.  Yes.

21      Q.  When you were communicating with Mr. Bleck in

22  2022, did he share any of these text messages with you?

23      A.  Not -- no.

24      Q.  In 2022, were you aware of the existence of

25  these text messages between Mr. Bleck and Katena?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      A.   No.

2      Q.   Would that have been important in your decision

3  of whether to offer Mr. Bleck a consulting engagement

4  back in 2022?

5      A.   Absolutely.  I mean, it would have, I'm sure,

6  weighed heavily on the counsel that sent him the

7  consulting agreement, because they weren't aware of this

8  information either.

9      Q.   So, in other words, if you were aware of this

10  information, you would not have offered Mr. Bleck a

11  consulting position in 2022; is that right?

12      A.   That's correct.

13      Q.   Mr. Foret, did Ms. Schneider have a

14  Coinmint-issued phone?

15      A.   Ms. Schneider used her own personal cell phone.

16      Q.   So when you were answering questions from

17  Mr. Hardin about Ms. Schneider using her phone for

18  Coinmint-related business, that was with respect to her

19  personal phone; is that right?

20      A.   That's correct.

21      Q.   I want to talk a little about Exhibit 2103.

22  Mr. Hardin had showed you this e-mail, and pointed to

23  you that you did not respond to Ms. Schneider's

24  August 9, 2021, e-mail.

25           Do you recall that?



1      A.  Yes.

2      Q.  But did you have any conversations with

3  Ms. Schneider about this e-mail after it was sent on

4  August 9, 2021?

5      A.  Yes.  I still tend to be a little bit old

6  school, and when I get something like this that I wasn't

7  originally copied on and it's confusing and multiple

8  pages, I tend to pick up the phone.  Ms. Schneider and I

9  spoke on a very regular basis, sometimes multiple times

10  a day.  So I picked up the phone and asked her about

11  this.

12          There's another reason I would have done that,

13  is because Ms. Schneider and Mr. Maloney weren't getting

14  along at this particular time.  There were multiple

15  reasons why they weren't.  And I had sort of been drug

16  into this, and I think Mike, at this time, had a little

17  bit of animosity towards me.

18          So I picked up the phone, contacted

19  Ms. Schneider probably about a list of things we needed

20  to discuss on a weekly basis, and asked her, "Kathleen,

21  what's going on with this?"  And was informed, "I'll let

22  you know if you need to worry about it.  I'm talking to

23  Mike about this, and also talking to Frank and Jim to

24  get to the bottom of this.  If we need to drag you into

25  it, we'll do that.  Sorry I copied you on it, but you

1    may need to be brought into this at some point."

2         Q.  Did Ms. Schneider ever follow up with you and,

3    in your words, drag you back into this conversation?

4         A.  No.  She did not.  Nor did Mr. Kinney or

5    Mr. DeNaut, who were obviously aware of this particular

6    issue.

7         Q.  During your cross-examination, Mr. Hardin

8    showed you a document about a standard NDA -- about

9    Mr. Maloney asking for a standard NDA.

10             Do you recall that?

11        A.  Yes.

12        Q.  And you had testified that you were not copied

13   on that -- on the e-mail exchange between Mr. Bleck and

14   Mr. Maloney that attached a copy of that standard NDA.

15             Do you recall that?

16        A.  That's correct.

17        Q.  At some point, Mr. Maloney did ask you for a

18   copy of a standard NDA; is that right?

19        A.  Yeah.  Actually, it wasn't just this one time.

20   It was a pretty standard request at that particular

21   time.  He did ask me on or about the 6th of May for a

22   non-disclosure agreement related to retaining an

23   independent contractor.

24        Q.  When he made this request to you on or about

25   May 6th of 2021, did he tell you that this was in

1  connection with a potential deal with Katena?

2      A.  The term "Katena" was not used.  So -- I mean,

3  he explained to me that he needed a non-disclosure

4  agreement, as I was well aware of, because of what was

5  going on in the Delaware case.  We were exploring

6  becoming more of a co-hosting company.  There was an

7  allegation that we were wasting company resources by

8  simply co-hosting and not owning our own machines.

9          So based on responding to that motion, I was

10 well aware that we responded to the motion, Mr. Maloney

11 had helped us do that, and we were investigating

12 purchasing -- the potential of purchasing machines at

13 the time.  And in that regard, we needed to hire

14 somebody to investigate -- I think my understanding

15 was -- a chip that would be used in some machines.  And

16 that the expert, since we were still under the -- I

17 guess I can mention the name, status quo, but I won't

18 get into details -- Mr. Maloney spelled out that the

19 person we were going to retain was going to charge about

20 $300 an hour.  And he didn't anticipate the individual

21 needing to utilize more than about 15 to 20 hours worth

22 of time.  So it would not have encroached on the status

23 quo.

24          So I told him where he could find it in the

25 share file, and I also, just out of an abundance of

1  caution, said, "This is the most recent NDA we are

2  using.  But, as you know, if somebody wants to enter

3  into this, I would prefer participating in it.  And, if

4  not, at least send me a copy of the signed

5  non-disclosure agreement, provided it hasn't been

6  changed."

7       Q.  Did Mr. Maloney ever send you a signed copy of

8  the NDA as you had requested?

9       A.  No.

10      Q.  Did he ever tell you the name of this

11  contractor or expert that he was considering?

12      A.  Not during the time that he was working for the

13  company.  Later on, yes, after he departed the company.

14      Q.  So this is after August of 2021 when he finally

15  told you the name of the contractor that was ultimately

16  retained?

17      A.  It was after we learned about it.

18          MR. HARDIN:  Objection.  Objection.  We need to

19  clarify, because October 2021 and the investigation is

20  also after August 2021.

21          ARBITRATOR CALLAHAN:  I don't think I

22  understand the objection.

23          MR. HARDIN:  Sure.  It calls for potentially

24  privileged information, specifically, the communications

25  that he had after Coinmint anticipated litigation as of

1  October 15, 2021.

2          ARBITRATOR CALLAHAN:  So with that caveat,

3  Mr. Foret, time reference your response.

4          THE WITNESS:  Yeah.  The timeframe that we --

5  that I would have discussed with Mr. Maloney would have

6  been after mid-October when we anticipated litigation.

7          BY MR. LIU:

8      Q.  Mr. Foret, in November of 2021, were you aware

9  that the contract with Katena had been amended?

10     A.  November of 2021?

11     Q.  Correct.

12     A.  No.

13         MR. HARDIN:  Objection.  Objection.  Calls for

14  a legal conclusion.  He's not involved in the

15  discussions yet.

16         ARBITRATOR CALLAHAN:  Overruled.  Overruled.

17         As we've said before, with any professional,

18  the panel is not taking any attorney/witness's testimony

19  that might sound like an opinion, be used as an opinion,

20  as an opinion to guide the panel.  The panel will make

21  its own determination.

22         MR. HARDIN:  It's also privileged.  This is,

23  again, after.  So now they're going to dial into what

24  his analysis is.

25         ARBITRATOR CALLAHAN:  I haven't heard that

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  question yet.  I'm not even sure I remember the

2  question.

3         MR. LIU:  Me neither.

4         THE WITNESS:  Could I please have the question

5  read back so I can get oriented, please?

6         (Record read.)

7         ARBITRATOR CALLAHAN:  I'm going to sustain the

8  objection.

9         I think, Mr. Liu, along the prior lines, if you

10 could keep your questions of prior to when the

11 litigation was anticipated.

12        MR. LIU:  Sure.  Yeah.  Let me try to ask it

13 this way.

14    Q.  Mr. Foret, do you recall Mr. Hardin asking

15 you -- maybe I'll do it this way.

16        MR. LIU:  Ken, can you put up Exhibit 2191.

17    Q.  Now, Mr. Foret, a couple minutes ago Mr. Hardin

18 had shown you this document and pointed to you that you

19 did not reference any amendment to the contract.

20        Do you recall that?

21    A.  Yes.  I recall the question and answers related

22 to this document.

23    Q.  Now, were you part of any discussions with

24 respect to any possible amendments to the Katena

25 contract on or before November of 2021?

```
 1            MR. HARDIN:  Objection.  Calls for privilege.
 2            ARBITRATOR CALLAHAN:  I'll overrule that, given
 3   the context of which the question is being asked.
 4            THE WITNESS:  No.
 5            ARBITRATOR CALLAHAN:  Which is Exhibit 2191.
 6            THE WITNESS:  No, I was not.
 7            MR. LIU:  All right.  No further questions.
 8   Thank you.
 9            ARBITRATOR CALLAHAN:  Okay.
10            MR. HARDIN:  I have something I'd like to pick
11   up on that.
12            ARBITRATOR CALLAHAN:  Do you have any further
13   questions, Mr. Hardin?
14            MR. HARDIN:  Just a few.
15            ARBITRATOR CALLAHAN:  Okay.
16
17                    RECROSS EXAMINATION
18            MR. HARDIN:  Could I ask the court reporter to
19   repeat Mr. Liu's last question.
20            (Record read.)
21            MR. HARDIN:  Michelle, can you scroll up to the
22   date.
23       Q.  Mr. Foret, this document is dated November 26,
24   2021; correct?
25       A.  Yes.
```

1      Q.  Coinmint anticipated litigation as of

2   October 15, 2021?

3      A.  I would say probably, at least from my frame of

4   reference, a couple of days later is when we actually --

5      Q.  October 17th?

6      A.  Yeah.  By that date.

7          I mean, there's a series of e-mails between me

8   and the analyst, and that's when I became aware of

9   information that could potentially --

10         MR. ALFORD:  I think the witness was

11   interrupted.

12         THE WITNESS:  I would say it would be a few

13   days after that.

14         MR. HARDIN:  That's a yes or no question.

15     Q.  Mr. Foret, do you think it was October 17th?

16     A.  A few days later.

17     Q.  What date do you believe Coinmint began

18   anticipating litigation?

19     A.  17th, 18th or the 19th.  Within that timeframe.

20     Q.  All right.  So with that understanding, this

21   would have been five weeks afterwards?

22     A.  Yes.

23     Q.  During that time, you conducted an internal

24   investigation?

25     A.  We began conducting an internal investigation.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1    Yes.

2        Q.  You talked to Mr. Soniat; right?

3        A.  Yes.

4        Q.  You were reviewing documents; right?

5        A.  Yes.

6        Q.  And, yet, when you sent this e-mail on

7    November 26, 2021, at no point did you reference an

8    amendment in June, did you?

9        A.  It doesn't mention that in there.

10       Q.  At no point did you mention a floating price,

11   did you?

12       A.  Doesn't mention it in there.  No.

13           MR. HARDIN:  Madam Chair, with that, we would

14   tender the witness.

15           ARBITRATOR CALLAHAN:  All right.  Anything

16   further, Mr. Liu?

17           MR. LIU:  No, your Honor.  No, Panel.

18           ARBITRATOR CALLAHAN:  All right.

19           So, I'm not going to release Mr. Foret, because

20   we still have some outstanding issues.  But I understand

21   that he was planning on staying to be part -- listen to

22   the proceedings.

23           So we'll leave Mr. Foret open until we have a

24   chance to review the matters we talked about this morning.

25           Mr. Hardin, are you ready to get started with

1  Dr. Mordecai?

2           MR. TABER:  We are.

3           MR. HARDIN:  Mr. Taber is.

4           ARBITRATOR CALLAHAN:  I'm so sorry.

5           MR. TABER:  Didn't mean to jump the gun.

6           ARBITRATOR CALLAHAN:  I don't mean to exclude

7  you, sir.  Just when one of you starts talking -- and

8  you do look so much alike.

9           MR. HARDIN:  I had one quick question, though,

10 on Mr. Foret.  And the panel may be circling back to

11 this at the end.

12          As we close, for now, the chapter on him, could

13 I ask -- I want to confirm, the panel wants from Katena,

14 tonight, statements from the deposition related to

15 Mr. DeNaut?  Or is it anyone in any of the calls after

16 "the investigation began"?

17          ARBITRATOR CALLAHAN:  Well, what I think the

18 panel was looking for was broader.  That whatever it is

19 that -- you all were at that depo, the panel wasn't.

20 There's something that's transpired that is prompting

21 your objections.  And we want to be apprised of it so we

22 can consider it.  So I'd like you to send us whatever

23 else.

24          We already have the one set that Mr. Taber

25 sent, and everybody saw it.  If there's anything else in

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  that deposition transcript that is prompting the

2  objections based on Katena having been denied the

3  opportunity to make inquiry.

4          So, yes, if it includes Mr. DeNaut, yes.  But

5  we're not limiting it.  I really want to make sure we

6  can figure out what the scope is, and then allow any

7  further examination, depending upon the panel's ruling.

8          MR. HARDIN:  Okay.

9          ARBITRATOR CALLAHAN:  Again, whatever you send

10  needs to be sent to everybody so that if Coinmint's

11  lawyers look at it and disagree with something about

12  what it represents -- whether it's complete, incomplete,

13  it's not a good copy, whatever -- that they can see it

14  and raise any concerns or objections they might have.

15          MR. LIU:  Yes.  We appreciate that.

16          ARBITRATOR CALLAHAN:  Then we'll take it up

17  tomorrow.

18          Okay.  Then anything else before I let

19  Dr. Mordecai in?

20          MR. ALFORD:  I think, just on our end, we need

21  the court reporter to go off the record for a minute so

22  he can do something that he can't do while he's taking

23  the record.

24          ARBITRATOR CALLAHAN:  Is he going to -- I think

25  it would be good at this juncture to utilize additional

1  computers so that we can see you, Mr. Alford.  And I

2  know Mr. Liu has a computer ready to go.  And then we

3  can see the court reporter.  And then we'll have

4  Dr. Mordecai, a more of a traditional setup here.  Right

5  now we can't see anything except Mr. Foret, and he's not

6  going to be the witness anymore.  It would be need to

7  see other people who might be talking.

8          MR. ALFORD:  Are you sure you really want to

9  see me?  I'll leave that up to you.  But it's

10 ill-advised.

11          If it's possible.  I'll leave it up to you.

12 Maybe you have a panoramic camera or something.

13          MR. ALFORD:  If we can go off the record so the

14 court reporter can help facilitate that.

15          ARBITRATOR CALLAHAN:  Sure.  It's 1:41.  We'll

16 take five, and then we'll come back and I'll let

17 Dr. Mordecai in once we reassemble.

18          Please mute yourself on your end.

19          MR. ALFORD:  Okay.

20          (Off the record.)

21          ARBITRATOR CALLAHAN:  Mr. Court Reporter, are

22 you ready?

23          THE REPORTER:  Yes, I am.

24          ARBITRATOR CALLAHAN:  I'll let Dr. Mordecai in.

25          Dr. Mordecai, welcome.

1             DR. MORDECAI:  Thank you.

2             ARBITRATOR CALLAHAN:  All right.  My name is

3    Rebecca Callahan.  I'm chair of the panel.  Ms. Glick and

4    Ms. Turitz, whose pictures you can see, they're the

5    co-panelists.  We're the Arbitrators in the dispute

6    between Coinmint and Katena, of which you've been engaged.

7             So I think you understand that you've been

8    called here to give expert opinion testimony today.

9             Do you understand that?

10            THE WITNESS:  I do.

11            ARBITRATOR CALLAHAN:  Before we get started, I

12   need to have you take the oath.

13            (Witness sworn.)

14            THE WITNESS:  I do.

15            ARBITRATOR CALLAHAN:  Thank you very much.

16            Go ahead, Mr. Taber.  And I would just ask, I

17   think we all figured out that Exhibit 1193 is

18   Dr. Mordecai's report.  Do you agree with that?

19            MR. TABER:  Yes, ma'am.  And that's what we

20   used today.

21            ARBITRATOR CALLAHAN:  Are we all on the same

22   page that the report is in as an exhibit for us to --

23   for the panel to consider as if it was Dr. Mordecai's

24   testimony in this hatter and Mr. Taber can spend some

25   time pulling out any items that he wants to highlight.

 1 And then, of course, Mr. Alford and Mr. Liu will have an

 2 opportunity to cross-examine Dr. Mordecai?

 3          We on the same page?

 4          MR. ALFORD:  Sorry, I didn't mean to interrupt.

 5 This is Mr. Alford.

 6          Yes, we do object to, and we'd like to reserve

 7 our objections, to the relevance of certain aspects of

 8 Dr. Mordecai's report.  But subject to that, yes.

 9          MR. TABER:  I believe all reports so far have

10 been admitted as the direct testimony of the witness,

11 and this will be the same.

12          ARBITRATOR CALLAHAN:  So I think the way the

13 panel has dealt with those types of issues is it's a

14 pretty broad range of evidence we have allowed in, even

15 though the panel has noted several times that we're not

16 quite seeing or understanding the relevance to the

17 claims or the counterclaims submitted.

18          I think the way we would like to handle that,

19 we're going to let both and all experts reports in as

20 direct testimony.  We'll look to counsel to either draw

21 things out through their exam or cross-examinations of the

22 expert witnesses.  And then to the extent there's

23 something that you just think is off -- doesn't belong

24 there, no pertinence, then we'll argue that to the panel.

25 As we said before, while evidence may be admitted, not all

 1  evidence is equal.  Evidence gets different levels of

 2  weight, and that can certainly -- that certainly holds

 3  true for the expert witness opinions as with the other

 4  evidence.

 5          So, not foreclosing your making those objections,

 6  Mr. Alford, but, in all likelihood, those types of

 7  objections will be overruled.  It will go to weight.  But

 8  certainly I have no problem with you pointing that out, as

 9  long as it doesn't become too disruptive with the

10  questions.

11          MR. ALFORD:  I'll try to be judicious.  Thank you

12  for the warning.

13          ARBITRATOR CALLAHAN:  All right.  Then go

14  ahead, Mr. Taber.

15          MR. HARDIN:  Ms. Callahan, one more procedural

16  item before Mr. Taber gets started.

17          I hear your comment about the lighting with

18  Dr. Mordecai.  So someone from our New York office is

19  going to try to find one of the Delfi lights.  We may have

20  a small two-minute interruption at some point.  It will be

21  for that purpose.

22          ARBITRATOR CALLAHAN:  If you can do that, we

23  would like everyone to have their chance.  And right now

24  we really can't see Dr. Mordecai's face.  But we can see

25  that he's there and we'll listen carefully.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          Of course, if you're able to find a lamp or

2    lighting instrument of some sort, let us know.

3          THE WITNESS:  I look forward to receiving my

4    interrogation light at the appropriate time.

5          MR. TABER:  We're working on a Ring light.

6    You'll be a great influencer, Dr. Mordecai.

7

8                    DIRECT EXAMINATION

9          BY MR. TABER:

10         Q.  With that, good afternoon.  Can you hear me

11   okay?

12         A.  I can.

13         Q.  If you have any trouble technically today

14   hearing me, hearing Mr. Alford, or any of the panelists,

15   let us know.  We want to make sure you hear all the

16   questions.

17         The panel has already read your report.

18         A.  One second.  Sorry about this.  A gentleman is

19   coming in.

20         Sorry.  Go ahead.

21         Q.  The panel already read your report.  We'll keep

22   this to the highlights; okay?

23         A.  Yes.

24         Q.  To the members of the panel, as we've done in

25   the past, if you have any questions for Dr. Mordecai as

1  we go, we'd be happy to yield our time so you can ask

2  them.  Although, we understand you also reserved time to

3  ask questions of Dr. Mordecai and Mr. Stake at the end.

4        Let's start with your qualifications.  What did

5  you do for work after you graduated from college?

6        A.  I worked for just over ten years as a

7  commercially-trained -- a formally-trained commercial

8  credit analyst and --

9        THE REPORTER:  I'm sorry --

10        MR. ALFORD:  Time out.  Sorry to interrupt.

11        The court reporter was asking for help, and so

12  was I.  None of us in the room can hear you,

13  Dr. Mordecai.  We can hear sounds, but it's a bit

14  garbled.

15        THE WITNESS:  I also asked the technical person

16  to see if they can adjust that.  Am I speaking too

17  quickly, as well?  Because I'm a New Yorker.

18        ARBITRATOR CALLAHAN:  I think you do need to be

19  closer to the speaker, if that's what you've just done.

20        THE WITNESS:  I can do that.  I was trying to

21  find a balance between trying to give you a little bit

22  of light and have you hear me.  I think it's more

23  important you hear me.

24        Okay.  I was saying my first ten years of my

25  40-year career, I was a formally-trained commercial

1  credit analyst who worked on a wide range of the

2  non-recourse and structured finance, non-recourse

3  project finance, domestic and international, trade

4  credit, leverage buyout and mergers and acquisitions

5  financing, equipment financing.  So across a wide range

6  of industries for a number of institutions, including

7  West LB, Banker's Trust, den Norske Credit Bank, which

8  was a Scandinavian merchant bank with a U.S. branch.

9          So that was my first ten-ish years of my

10  career.

11         BY MR. TABER:

12     Q.  Was the valuation of contracts part of the work

13  that you were doing at that time?

14     A.  You can't evaluate the viability of a credit

15  arrangement without looking at the valuation of the

16  contracts underlying the credit arrangement.

17  Particularly for non-recourse transactions, where if

18  the -- if the contract is not viable, the loans are

19  going to default.

20     Q.  When you were doing this work, did you decide

21  to pursue any post-graduate study?

22     A.  Well, while I was working as a banker, I did do

23  an MBA at NYU Stern.  I did that part time for a couple

24  semesters.  And then I switched to finishing the program

25  full time and working part time for den Norske

1   Creditbank, before I joined Banker's Trust upon

2   graduation.

3       Q.  Did your MBA at NYU have any area of specialty?

4       A.  International banking and finance was a heavy

5   concentration for me.  I also did extensive work on

6   restructuring.  So my MBA thesis was a restructuring of

7   International Harvester to Navistar.  I wrote another

8   study on the savings and loan crisis restructuring.  And

9   then I did a couple other research papers on distressed

10  restructuring and analyzing distressed debt, and so

11  forth.

12      Q.  Did any of your course work for your MBA

13  involve the kind of valuation analysis that we were just

14  talking about that was part of your work as a credit

15  analyst?

16      A.  No.  I think if you take, for example, the

17  restructuring of International Harvester to Navistar,

18  it's about a 110-page, single-spaced analysis of the

19  company.  A number of things that would have been

20  analyzed would have been their trade credit agreements

21  and other bilateral agreements that they had with regard

22  to their products, delivering their products, and so

23  forth.

24      Q.  After you completed your MBA, did you pursue

25  any further post-graduate education?

1      A.  So, about ten years into my career, I decided

2  to return to education for a Ph.D at the University of

3  Chicago.

4      Q.  What were your areas of study or concentration

5  in your Ph.D?

6      A.  A branch of economics called Industrial

7  Organization, which is law -- economic analysis of the

8  law and regulation, how industry structure -- actually,

9  contract structures are at -- one of the things you

10  study in industrial organization.  The other

11  concentration was mathematical statistics and

12  econometrics.  So being able to apply econometrics and

13  statistical models to valuation.

14          I also did the Ph.D coordinated core sequence in

15  finance, and some breadth analysis in things like social

16  network analysis, which would be important, for example,

17  to understanding, in this particular case, the network

18  cash capacity of the various miners.

19      Q.  How would you describe the caliber of the

20  faculty you studied with at the University of Chicago?

21      A.  Smartest people I'd ever met.  I worked with --

22  I took a course with the late Merton Miller, Nobel

23  laureate.  I took a course with Eugene Fama, who got his

24  Nobel Prize in 2013; Doug Diamond, who got his Nobel

25  Prize last October, October 2022.  Part of my

1   dissertation committee was the protege of the late

2   George Stigler, who was also a Nobel laureate.

3          Also on my credit committee -- my dissertation

4   committee was Raghu Rajan, at the time the youngest

5   chief economist of the International Monetary Fund,

6   until the subsequent youngest economist came along.

7          So it cost me a couple years of finishing my

8   dissertation because he's so busy, I had to wait for his

9   comments to various drafts of my work.  He was a very

10  influential member, so I couldn't just push it along.  I

11  had to be patient.

12         THE REPORTER:  Doctor, I'm sorry, I'm having a

13  hard time keeping up and understanding some of your

14  answer.

15         ARBITRATOR CALLAHAN:  Again, the problems of

16  Zoom.

17         (Off the record.)

18         BY MR. TABER:

19  Q.  Dr. Mordecai, can you please tell the panel

20  briefly about your doctoral dissertation that you did at

21  UC Chicago?

22  A.  Yes.  So my doctoral dissertation at the

23  University of Chicago was on something called limits of

24  arbitrage.  Understanding -- it's actually something

25  that became central to a lot of my testimony during and

1 after the financial crisis.  It is focused on being able

2 to estimate from changes in volatility and shocks to

3 volatility, the leverage in the contracts entered into

4 by hedge funds and other financial institutions.

5        So, it was very much about how liabilities

6 connect different parties in a financial setting.

7        Is there more that you would like me to say

8 about that, Jacob?

9    Q.  We only have an hour, unfortunately, and I

10 know -- trying to condense a 40-year career into that.

11        If I can ask you very briefly to tell us where

12 you were working after you completed your Ph.D course

13 work.

14    A.  So I spent three years full time doing my

15 course work at Chicago.  I did a brief stint, which is

16 irrelevant to this matter, working for the Chief

17 Operating Officer at McDonald's U.S.A. analyzing their

18 joint venture with Walmart.  And then I got recruited to

19 run three rating practices at the rating agency Fitch.

20 I ran the commercial Equifax, and I started and built

21 their structured notes practice from a zero to about 50

22 billion national structured notes ratings.

23        So I was at Fitch when I got recruited to join

24 AIG to report directly to the CEO on his payroll, and to

25 the C-Suite of AIG.  I was there for three years.  I

1  worked across the firm on a number of things, which I

2  don't think we have time for me to get into.  But many of

3  them would have been relevant to the kinds of economics

4  we're looking at here.

5         I then, six weeks before 9/11, got recruited to

6  run half the assets, reported assets of a very large

7  fixed-income arbitrage hedge fund called Clinton Group.

8  They were the largest non-bank participant in the mortgage

9  markets.  I ran their structured products and CEO business

10 for just over two-and-a-half years or so, at which point I

11 stepped back and did some consulting -- or advisory work I

12 would say, rather -- for the International Monetary Fund

13 Financial Stability Unit for the International

14 Association -- International Organization of Securities

15 Commissions, with is the SEC and all their related

16 commissioners across different markets.  I continued to

17 operate as a member of the New York Mercantile Exchanges,

18 Investment Advisory Committee, and other such things while

19 I was finishing my dissertation.

20        Upon completing my dissertation, I got -- that

21 was actually how I met Roger Ferguson.  So, when he joined

22 Swiss Re, he invited me to reprise my role for the

23 executive committee Swiss Re, similar to what I had done

24 for AIG.

25        So, that actually took me a little bit past my

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  Ph.D.

2      Q.  So I'll ask you again, and I know it can be

3  tricky, but we -- if you can slow down a little bit for

4  the benefit of the court reporter.  I know he'd

5  appreciate it.

6          THE REPORTER:  Yes.

7          BY MR. TABER:

8      Q.  What kinds of work have you been doing since

9  you left working at these sort of larger financial

10  institutions that you were just telling us about?

11     A.  Well, I, as I said, I was at Swiss Re working

12  for the executive committee from around February of 2007

13  until midway through 2009.  I was recruited to provide

14  expert work in the financial crisis matters and other

15  such matters.  I founded a firm with the endorsement of

16  my previous employers called Risk Economics --

17          ARBITRATOR CALLAHAN:  Going way too fast.  Way

18  too fast.

19          THE WITNESS:  Okay.

20          ARBITRATOR CALLAHAN:  Slower.

21          THE WITNESS:  Okay.

22          Jacob, I think what we'll have to do is shorten

23  my story.  It's a lot of information to try to unpack if

24  I'm going to talk really, really slowly, and we'll end up

25  over the hour.

1        MR. TABER:  That's okay.  We've got -- they

2   have your full CV.  So we're just trying to hit the

3   highlights.

4        Q.  Let me ask you this way:  As I understand it,

5   you've been doing this sort of commercial and industry

6   advising work.  And you've also doing some work in

7   academia in the last ten years; is that right?

8        A.  That would be correct.  I have one foot in the

9   academic world, and another in industry work.  So what I

10  call industrial economics.

11       I have two firms.  One is called Risk

12  Economics, Inc., and the primary focus there is economic

13  analysis in the resolution, liability analysis in that

14  nature.

15       The other firm I co-founded is called Numerati

16  Partners, co-founded in 2012, and it tests technology.

17  We test technology for, for example, a global consortium

18  of insurance companies, looking for technology they can

19  adopt for their core insurance functions.  There are

20  other things, as well.

21       We established a lab and funded a lab at the

22  Courant Institute of Mathematical Sciences at NYU

23  called (inaudible) -- which participated in much of the

24  testing described.  Also conducts additional research.

25       I also --

1          MR. ALFORD:  I'm sorry, the court reporter is

2     exasperated, and we are to some degree, too.  We're not

3     getting what you say, Doctor.  We want to.

4          You have to pretend --

5          ARBITRATOR CALLAHAN:  I think it's the

6     microphone.

7          MR. TABER:  Can we go off the record two

8     minutes?  I'm going to check it's the right microphone.

9          ARBITRATOR CALLAHAN:  Yeah.  There's a problem.

10          MR. TABER:  I'm going to walk across the hall.

11          (Off the record.)

12          BY MR. TABER:

13     Q.  Dr. Mordecai, you've also done some litigation

14     consulting work over the past ten years; correct?

15     A.  Correct.

16     Q.  How many times have you been retained to

17     provide economic analysis in the context of a litigation

18     or an arbitration?

19     A.  I've been engaged on approximately, at this

20     point, 27 or 28 matters.  Not counting two consulting

21     engagements in '06.  So just since 2009 it's been about

22     27 matters.

23     Q.  Have you testified before in court or in

24     arbitration as an expert witness?

25     A.  I have testified in federal, state and county

1  court, as well as a number of arbitrations.

2      Q.  To your knowledge, has a judge ever issued an

3  order excluding you from testifying as an expert

4  witness?

5      A.  No.

6      Q.  To your knowledge, has a judge ever issued an

7  order limiting the topics about which you were permitted

8  to testify as an expert witness?

9      A.  Yes.

10     Q.  In what case was that?

11     A.  MF -- Pricewaterhouse -- sorry -- MF Global

12  versus Pricewaterhouse Coopers.

13     Q.  And which of those parties were you testifying

14  for?

15     A.  I was engaged on behalf of the plan

16  administrator for MF Global, who was basically pursuing

17  Pricewaterhouse Coopers for malpractice.

18     Q.  Did the order that judge issued in the

19  MF Global case apply just to you?

20     A.  No.

21     Q.  It applied to other experts, also; right?

22     A.  It was a set of instructions regarding topics

23  for three experts on my side of the case.

24     Q.  Did you end up testifying at trial in the

25  MF Global case?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      A.  No.  I did not.

2      Q.  Why not?

3      A.  Because the other side settled before we even

4  completed the plaintiff matter.  They settled probably

5  like the second witness in.

6      Q.  To your understanding, did the judge in

7  MF Global find that you were sufficiently qualified and

8  experienced to testify as an expert in that case?

9      A.  Yes.

10     Q.  To your understanding, did the judge in

11 MF Global permit you to offer expert testimony in that

12 case?

13     A.  Yes.

14     Q.  I'm going to turn now to your report which has

15 been marked as Exhibit 1193.

16         MR. TABER:  We're not going to put it up yet,

17 Michelle, but if you could have it handy, that would be

18 great.

19         Actually, I'm sorry, could you put it up so the

20 witness can identify it and then we'll take it back down.

21         Michelle, if you could scroll through a little

22 quickly.

23     Q.  Do you recognize this to be your report, this

24 Exhibit 1193?

25     A.  I do.



1          MR. TABER:  I guess, Michelle, if you could

2    scroll down to the signature page, which is towards the

3    end.

4          Q.   That's your signature; right?

5          A.   It is.

6          MR. TABER:  Michelle, you can take it down.

7    But we'll come back to it.

8          Q.   Who wrote this report, Dr. Mordecai?

9          A.   I did.

10         Q.   Did anyone assist you in preparing that report?

11         A.   Yes.

12         Q.   Who?

13         A.   I had members of a team from Analysis Group led

14   under my oversight by Michael Kwak.

15         Q.   That's K-w-a-k?

16         A.   Correct.

17         Q.   What work did you ask Mr. Kwak to do?

18         A.   I, basically, asked him to delegate certain

19   analytical tasks, either to be handled by himself or

20   delegate it to various, more junior, analysts on the

21   team, which I would then review and provide additional

22   input or other such oversight.

23         Q.   In your view, is Mr. Kwak qualified to perform

24   the kind of analytical work you asked him to do?

25         A.   Absolutely.

1      Q.  Why?

2      A.  Mr. Kwak has been my lead support on more than

3  half of my 27 matters over the last ten-plus years.  He

4  has -- I think he's got an honors -- I don't remember if

5  it's magna cum laude or summa cum laude -- in Economics

6  from Columbia University, and a similar level of

7  accomplishment in his Master's degree from NYU in

8  Economics.

9           MR. ALFORD:  I apologize for interrupting.  I

10  hope I didn't interrupt the witness.  I tried not to.

11           We have Mr. Soniat in the waiting room unable to

12  enter.  I apologize for interjecting.

13           ARBITRATOR CALLAHAN:  No problem.  I was just

14  admitting him.

15           THE WITNESS:  And Michael also has 15 years

16  experience as a consulting expert in economic analysis.

17  I met him when I was the technical advisor to the

18  Unsecured Credit Committee for the Lehman Brothers

19  bankruptcy where I analyzed, on behalf of that

20  committee, the valuations of the structured -- for the

21  structured portfolio.  And Michael led that team for me.

22           BY MR. TABER:

23      Q.  Dr. Mordecai, did anyone at Perkins Coie

24  instruct you to reach any of the conclusions in your

25  report?

1        A.  No.

2        Q.  Did anyone at Perkins Coie draft any portions

3   of your report?

4        A.  No.

5        Q.  Did anyone at Perkins Coie provide you with any

6   line edits to the language of your report?

7        A.  No.

8        Q.  Is this report your work?

9        A.  It is.

10       Q.  Do you stand by the opinions that are contained

11  in the report?

12       A.  Unreservedly.

13       Q.  Let's talk about them.

14            Now, you have reviewed the May 12, 2021, sales

15  and purchase agreement and purchase order between Coinmint

16  and Katena; correct?

17       A.  I have.

18       Q.  And you'll understand what I mean if I refer to

19  those as the May 12th agreement?

20       A.  I will.  Yes.

21       Q.  So we, Perkins Coie, asked you to analyze the

22  expected economic value to Coinmint of the May 12th

23  agreement; right?

24       A.  That is correct.

25       Q.  Now, in economic theory, do rational actors

1  seek out transactions that have a negative expected

2  economic value?

3      A.  In the absence of hedging -- of not matching a

4  trade, but just hedging, the absence of that you want to

5  at least break even on a transaction and, obviously,

6  preferably make a return.

7      Q.  What is a win-win transaction?

8      A.  A win-win transaction is where two parties

9  enter into a contract or a transaction in order to share

10  the benefits of such an exchange.  And so both parties

11  end up with a positive outcome from the transaction.

12      Q.  Let's not keep anyone in suspense.

13          In your analysis, did you find that the

14  May 12th agreement was a win-win transaction?

15      A.  I did.

16          MR. ALFORD:  Sorry to interrupt, I -- I'm

17  cognizant of Madam Chair's advice earlier.  I do want to

18  object for the record that that portion of

19  Dr. Mordecai's report, and this portion of his testimony

20  that offers his opinion about the supposed value of this

21  contract to Coinmint, is irrelevant to Katena's case.

22          That's my objection.

23          ARBITRATOR CALLAHAN:  So noted.  And overruled.

24          MR. ALFORD:  Thank you.

25          ARBITRATOR CALLAHAN:  Go ahead.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          BY MR. TABER:

2      Q.  So I guess I'll ask the question again.

3          In your analysis, did you find that the May 12th

4   agreement was a win-win transaction?

5      A.  I did.

6      Q.  Did the May 12th agreement have a positive or a

7   negative expected economic value for Coinmint at the

8   time of contracting?

9      A.  A positive expected value.

10     Q.  What return on investment should Coinmint have

11  expected at the time of contracting, according to your

12  analysis?

13     A.  It would depend on which of the two analyses

14  conducted in my report, in the static -- what's called a

15  discounted cash flow, a static NPB analysis.  It was an

16  expected value of 305 percent.

17         Then my real options analysis, which takes into

18  account the volatility of Bitcoin prices, it's closer to

19  400 in change.

20     Q.  So for every dollar that Coinmint invested in

21  these Bitcoin mining rigs, you found they could have

22  expected to get somewhere between $3 and $4 of positive

23  investment return; correct?

24     A.  Correct.

25     Q.  Let's talk about how you figured that out,

1  starting with Coinmint's costs.  What are the two

2  primary categories of Coinmint's expected costs

3  associated with the May 12th agreement?

4      A.  Well, there's the acquisition cost for the

5  rates themselves, what would typically be called the

6  installed capacity, the acquisition cost of the

7  infrastructure of the mining rigs.

8          Secondly is the operating cost for running the

9  capacity acquired.

10     Q.  Let's start with the acquisition costs.

11         MR. TABER:  Michelle, could you pull up

12  the report and turn to page 20.  Want to look at

13  paragraph 38, please.

14         Paragraph 38.  Perfect.

15     Q.  So what did you find was Coinmint's fixed

16  acquisition cost for acquiring the Bitcoin mining

17  rights?

18     A.  Per rig?

19     Q.  First per rig, and then we can work backwards.

20     A.  Per rig it was approximately $5,400 per rig.

21     Q.  And I guess, actually, if you flip to paragraph

22  21 of the report, do you have the total acquisition

23  costs there?

24     A.  In paragraph 21, which describes, I think,

25  approximately four installments, it's $150 million or

1   27,778 mining rigs.

2       Q.  What was the source of that number in your

3   analysis?

4       A.  It was the sales and purchase agreement and PO,

5   purchase order.

6       Q.  Now let's flip and -- go down to paragraph

7   40-B, which is on page 45.

8           If you could tell the panel how you went about

9   determining Coinmint's operating costs.

10      A.  So, Coinmint had an offering circular they

11  prepared for distribution to their own investors and

12  other counterparties that were being considered as

13  business participants.  And in their presentation, they

14  described and assumed electricity and other operational

15  costs of .031.  So, basically, 3.1 cents per kilowatt

16  hour, which could be broken down into two broad

17  categories.

18      Q.  Let's take a look at that document, the

19  circular you were talking about.

20          MR. TABER:  Michelle, can you pull up Exhibit 52,

21  please.

22          ARBITRATOR CALLAHAN:  Which exhibit?

23          MR. TABER:  52.  We'll wait until everyone's

24  got it in front of them.

25      Q.  So, this is an e-mail from Mike Maloney to

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  Ashton Soniat and James DeNaut dated May 14, 2021, with

2  an attachment called "Katena 1 pager - V2.pdf."

3          Am I describing that correctly?

4      A.  Yes.

5          MR. TABER:  If you can scroll down to the

6  attachment, Michelle, to the top of the next page.

7      Q.  Dr. Mordecai, what do you understand this

8  document to be?

9      A.  It's my understanding that this was a document

10  created or prepared by Coinmint for circulation among

11  either investors or participants in their mining rig

12  capacity.  Third-party participants.

13     Q.  Why did you rely on this document as a source

14  for Coinmint's expected operating costs for the Bitcoin

15  mining rigs.

16     A.  It's simple.  Coinmint produced it.  Coinmint

17  had assumptions in it that they were representing to

18  other parties with whom they were going to be engaging.

19     Q.  So if you could scroll down a little bit to the

20  middle of the page.

21         Dr. Mordecai, what here shows you Coinmint's

22  expected electricity costs?

23     A.  So if you look on the right, where it says

24  "Coinmint co-hosting," the second checkmark has,

25  "Globally competitive prices of electricity averaging

1  below 2.4 cents per kilowatt hour."

2      Q.  And then what on this document shows you

3  Coinmint's other expected operating costs, aside from

4  electricity?

5      A.  I believe that would be further down.

6          MR. TABER:  Michelle, if you could scroll down

7  to the next page.  Stop there.  Thank you.

8          THE WITNESS:  So if you look at "Current

9  maintenance fee and fees, average electricity and Opex

10 fees" of 3.1 cents per kilowatt hour, assuming a

11 25 percent profit share.

12         BY MR. TABER:

13     Q.  Let's look at -- sorry.  Those are the

14 operating costs.

15         How do you go about calculating Coinmint's

16 expected revenues from using these machines for Bitcoin

17 mining?

18     A.  Well, in my report I describe the Bitcoin

19 profit function.

20     Q.  Is that the chart on page 16?

21         MR. TABER:  Michelle, if you could go there.

22         THE WITNESS:  It's the -- I would call it

23 probably a flow.

24         MR. TABER:  I'm a lawyer.  Everything other

25 than the words is what I need help with.

1     Q.  The image there, the flow chart, what is this

2   showing?

3          ARBITRATOR CALLAHAN:  What page are you on?

4          MR. TABER:  On page 16 looking at Figure 2 at

5   the top.

6          ARBITRATOR CALLAHAN:  Okay.  Thank you.

7          THE WITNESS:  So Figure 2 describes the Bitcoin

8   token mining profit function as a function of operating

9   costs and revenue.

10         BY MR. TABER:

11    Q.  We talked about the operating costs up there

12  already, right, the electricity costs and the other

13  operating costs?

14    A.  So the first row shows how the mining operating

15  costs are comprised of electricity and dollars per

16  kilowatt, or actually pennies per kilowatt hour.  Then

17  there's the rated efficiency of the mining rig, which is

18  something that I'm sure we'll talk more about later,

19  which determines how many terahashes, or how many

20  guesses, the chip rate -- the rig can produce per unit

21  of electricity consumed.  And then there's the output

22  capacity, which are the number of guesses per second --

23  in this case, trillions of hashes, trillions of

24  guesses -- and then the other operating costs mentioned,

25  approximately 7/10 of a penny per -- per terahash.

1        So the mining revenue is the second row.  The

2   mining revenue is basically the number of Bitcoin expected

3   to be awarded per terahash, the hashing output capacity in

4   terahashes.  And then once you get to the expected number

5   of tokens generated from this terahash activity, the

6   tokens are multiplied times dollars at the prevailing

7   Bitcoin price.

8        Q.  So the first spot, expected awards in BTC/TH,

9   Bitcoins per terahash, is that something that's fixed,

10  or it varies over time?

11       A.  It's something that varies over time based on

12  something called network difficulty.  The algorithm

13  adjusts the difficulty of the terahash that has to be

14  matched based on the amount of network-wide capacity

15  being applied to the problem.  And the way that's done

16  is that the algorithm tries to keep the time to the next

17  award fairly constant.  So as more capacity is being

18  applied by the overall network to solve the problem, the

19  algorithm adjusts by making the problem harder.  In

20  order to keep that time, the interval constant to

21  between Bitcoin awards.

22       So much like with a lottery, achieving the

23  Bitcoin award is an uncertain thing.  But you can compute

24  an estimate or expectation of how many terahashes will

25  yield how many tokens.  And then obviously the price times

1  a number of tokens determines profitability.

2      Q.  Now, let's look at how this formula outbreaks

3  in the context of this particular contract.

4          MR. TABER:  Michelle, if you could scroll down to

5  paragraph 45 on page 23 of the report.  We're going to

6  look at the last sentence on that paragraph.

7      Q.  So you wrote there, "On the revenue side,

8  Coinmint assumed Bitcoin prices of $50,000 per Bitcoin

9  and expected daily awards of 0.000486 Bitcoin for the

10  offering sheet directed to customers."

11          So what was the source that you had for those

12  numbers?

13      A.  The Coinmint offering sheet.

14          MR. TABER:  Michelle, can you go back to

15  Exhibit 52.

16      Q.  Could you show the panel where those two

17  figures came from?

18          MR. TABER:  I believe you need to scroll down,

19  Michelle.

20      Q.  You see the Bitcoin price there on the right?

21      A.  I do.

22      Q.  Was that your source for the --

23      A.  $50,000.  Correct.

24      Q.  And then you see it says "Daily U.S. dollars

25  per terahash" there?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      A.   That's correct.

2      Q.   That was -- why don't we look at footnote 37 of

3    your report, which is on page 24.  If you scroll down to

4    the bottom of the other page.

5      A.   My footnote clearly states that, "The Coinmint

6    offering sheet states daily awards per terahash per

7    second."

8           So, a terahash, for the panel's benefit, is a

9    trillion hashes per second.  So that's a trillion -- if

10   you think about the algorithm -- the rig making a

11   trillion guesses with regard to this number every

12   second.  So you're looking at a trillion hashes per

13   second.  So U.S. dollars per terahash per second is

14   .2702 USD per terahash of hashing output per day.

15          Then there's an arithmetic calculation for

16   converting that into the .000486 of Bitcoin.  It's equal

17   to that .2702 of U.S. dollars per terahash, multiplied

18   times the hashing capacity of the machine, which is 90,

19   and divided by $50,000 per Bitcoin.

20     Q.   So you used numbers provided by Coinmint in

21   their estimate in your calculation; right?

22     A.   Correct.  So I look at 37, and then I have

23   another calculation in footnote 38 that follows the same

24   format.  But at $40,000 per Bitcoin instead of $50,000.

25     Q.   As of May 12, 2021, did Coinmint know what the

1  daily price of Bitcoin in dollars was going to be over

2  the lifetime of the K10 miners?

3      A.  No.  It's an uncertain number.

4      Q.  How do you account for that kind of uncertainty

5  when you're calculating the expected economic value of a

6  planned transaction?

7      A.  So that -- I mean, when you say, how do I do

8  it, what's the question you're specifically asking?  I

9  have two kinds of analyses in my report.  One of them

10 actually, explicitly, takes volatility into account.  So

11 if you could be maybe a little more specific with your

12 question.

13     Q.  Let's start with the simpler analysis.

14         I mean, how would you -- let's do it this way.

15         MR. TABER:  Why don't we turn to Figure 6 on

16 page 26, Michelle.

17     Q.  Why don't you tell the panel what this figure

18 represents.

19     A.  So, as I mentioned earlier, I have two --

20     Q.  Figure 6 on page 26.

21     A.  So I have two approaches to valuation in my

22 report.  This first one does not explicitly take

23 volatility into account.  What it does is it looks at

24 pairs of, across the top row, fixed -- what you call

25 point estimates of Bitcoin prices.

1      They say, okay, what if Bitcoin is priced at

2  $52,500, what if Bitcoin is priced at $55,000?  So think

3  of that as a scenario if Bitcoin is at $50,000 or

4  $52,500 or $57,500 and then that's each of the columns.

5      The rows are using the expected daily awards in

6  Bitcoins multiplied times ten -- what's called 10^-4.  So

7  you're basically calculating what your daily expected

8  awards in Bitcoin might be.

9      And then this chart, rows and columns, looks at

10 the expected value of a mining rig given the expected

11 daily awards and some realized value of Bitcoin to tell

12 you what the expected value of the rate would be if it

13 operated over what's called a habit interval.  So from

14 the time it's delivered and turned on, until the Bitcoin

15 algorithm goes to reduce the amount of Bitcoin supply

16 available, we're treating that as useful life of the

17 rig.  And what this does is says what's the expected

18 value for over the -- use of the life of a rig at 90

19 terahashes per second of hashing output with an energy

20 consumption -- the rated energy consumption, which is in

21 Note 1 to this diagram.

22 Q.  Is that the expected value net of the

23 acquisition costs and the operating costs that we were

24 talking about earlier?

25 A.  It's the expected value net of the operating

1  costs and the acquisition costs.  That is correct.  And

2  it is discounted based on a risky discount rate of

3  12 percent.

4       I can explain what I mean by "risky discount

5  rate."

6    Q.  Sure.  Why don't you tell us what you mean by

7  "risky discount rate"?

8    A.  In the subsequent analysis, which we haven't

9  gotten to yet, it uses the risk-free rate of U.S.

10  Treasury as just simple time value of money.  In the

11  DCF, or Discounting Cash Flow analysis, you have to

12  discount the cash flows based on some cost of funds.  We

13  use a cost of funds equal to 12 percent, which is the

14  average of interest rates in a term sheet that was part

15  of production.

16       So we take all the cash flows, discount them at

17  12 percent to the contract signing date.  These are

18  the -- how the present values are calculated for this

19  analysis.

20    Q.  So what is the net present value that's in the

21  blue box?  What does that indicate to you?  I think

22  that's note 7 to the figure.

23    A.  That indicates that is a $55,000 Bitcoin price,

24  prevailing Bitcoin price, with an expected daily award

25  of 5.37, the net present positive value of the rig is

1  $16,447 for each rig.

2      Q.  So it says in note 7 here that's the net

3  present value around the time the SPA and PO were

4  executed?

5      A.  Correct.

6      Q.  So that means that would be the expected return

7  that Coinmint would make if that Bitcoin price and that

8  daily award stayed constant?

9      A.  With a fixed constant $55,000 Bitcoin price,

10  you discount back at 12 percent.  Given the expected

11  daily award function, those cash flows would be $16,447

12  over the acquisition operating costs.

13      Q.  What do all these green boxes tell us about

14  what would have happened to the expected value of those

15  rigs if over time the price of Bitcoin dropped as low as

16  $30,000 or the daily mining awards fell significantly?

17      A.  So if we look at a $30,000 constant Bitcoin

18  price, as long as you're at or above expected daily

19  awards of $3.15, you're in positive territory.

20          If the Bitcoin price -- prevailing Bitcoin

21  price is $32,500, as long as you're at $2.94 or better

22  on the daily awards, you're also staying in positive

23  territory.

24          And then at $35,000 of prevailing Bitcoin price

25  as a constant, discounted at 12 percent, as in all the

1  other cases, as long as your daily expected awards are

2  at least $2.75, you're going to be in positive

3  territory.

4       Q.  So from those green boxes, almost all of them,

5  Coinmint is getting more back in profit than it spent on

6  the mining rigs; correct?

7       A.  That is correct.  Until you start to get to the

8  yellow boxes with the negatives, they're in positive

9  territory.

10      Q.  So what does that chart tell you about the

11  expected economic value of the May 12th agreement to

12  Coinmint at the time that it was signed?

13      A.  It was extremely valuable to Coinmint as -- the

14  terms were extremely valuable to Coinmint on the date of

15  signing.  According to the static discounted cash flow

16  analysis.

17      Q.  I think you told us a little bit ago a problem

18  with the static discounted cash flow analysis, it

19  doesn't account for volatility?

20      A.  No.

21      Q.  You didn't try to account for volatility?

22      A.  As I said before, this analysis is showing this

23  table is basically a static scenario analysis that

24  treats the realized Bitcoin prices as a fixed constant

25  quantity, which they are not.  So the real options

1  analysis, which I conduct in the next section, uses a

2  technique called Monte Carlo simulation to simulate a

3  statistical distribution for Bitcoin prices.  It assumes

4  that Bitcoin prices fluctuate.  So it's designed -- it

5  takes the discounted cash flow methodology, and that's

6  static at present value, and enhances it to explicitly

7  account for the volatility of Bitcoin prices in the same

8  way that an option analysis accounts for the volatility

9  of underlying interest rates or underlying stock prices,

10 whatever the underlying reference price happens to be.

11     Q.  How many possible worlds did you simulate in

12 your Monte Carlo analysis for this report?

13     A.  I believe the Monte Carlo analysis simulated

14 50,000 prices.  There were 50,000 simulations in this

15 distribution.

16     Q.  50,000 different combinations of Bitcoin price

17 and mining awards over time; right?

18     A.  That is correct.

19         MR. TABER:  Michelle, could you scroll down to

20 Figure 8 on page 31, which is the red bar graph.  Might

21 be .pdf page 32.

22         Could you Zoom out a little bit so we can see the

23 whole graph on the screen at once?  Perfect.

24     Q.  What is this, again, graph or chart?  What's it

25 show?

1      A.   This is something called a probability

2   distribution function.   And what that is is it is

3   showing you the full spread of values based on

4   Bitcoin -- volatile Bitcoin prices and the traditional

5   expected daily awards.

6      Q.   What does the vertical line at 16,264 mean on

7   this chart?

8      A.   That is the -- the 95 percentile of prices to

9   the right of the vertical line.   That's the cutoff or

10  the threshold at 16,264.   So to the left of 16,264 is

11  the five percent of these combinations, these simulated

12  combinations we talked about.   So basically the bulk of

13  the distribution is to the right of that number.   So

14  bulk meaning 95 percent of the possible outcomes are to

15  the right of that number.   Or I should say, probable

16  outcomes under the Monte Carlo.

17     Q.   So more than 95 percent of the simulations that

18  you ran, the net present value of these Bitcoin mining

19  machines was at least $16,264 per machine?

20     A.   That is correct.

21     Q.   And the cost of the machines is fixed, it's

22  $5,400 per machine; right?

23     A.   $5,400, and an operating -- total operating

24  cost, according to Coinmint, of 3.1 cents per kilowatt

25  hour.

1    Q.  Right.  So on that investment, you found in 95

2  percent of cases in this analysis, Coinmint would get at

3  least a 300 percent return on its investment; right?

4    A.  Correct.  And the extreme tail to the right for

5  these 50,000 -- obviously, if I did more, there would

6  probably more to the right tail, based on the shape of

7  this distribution.  But it exceeds 45,000 as you move to

8  the right.

9    Q.  So that -- I can't do math in my head.  What

10  return on investment would 45,000 signify?

11    A.  Put it this way, you paid $5,400 and you're

12  getting $45,000.  So nine-plus times.

13    Q.  In your experience, how would you characterize

14  the economic risk to Coinmint of entering into the

15  May 12 agreement at the time of contracting?

16    A.  Well, according to the real options analysis in

17  particular, where it treats this investment as if it's

18  an option, just pay it off.  The risk is fairly

19  mitigated by the low cost of the rig and the low

20  operating cost of the rig, given its output.

21        So I guess the way to put that is, the risk for

22  award for them is extremely high risk -- excuse me,

23  extremely high award for the given risk, or extremely low

24  risk given the high award, depending which side you want

25  to take of the logic.

1    Q.  I'm looking at the time we've been on the

2   record, so I'll try to move through the rest of this a

3   little more quickly.  I'm going to ask you some

4   questions now about how the May 12 agreement compared to

5   the then available market price for Bitcoin mining rigs.

6          So according to your analysis, was the May 12th

7   agreement above or below the then available market price

8   for comparable Bitcoin mining rigs?

9          MR. ALFORD:  Again, I'm going to object on

10   relevance, whether the contract price is above or below

11   a market price.  I don't think it's relevant to any

12   claims that Katena has in the case.

13          ARBITRATOR CALLAHAN:  So noted.

14          Go ahead, Mr. Taber.

15          MR. TABER:  Thank you.

16    Q.  I'd also note, for the record, that Coinmint

17   has already filed a motion in limine on Dr. Mordecai's

18   testimony.  These issues have been resolved?

19          I'll ask the question again.  Was the May 12th

20   agreement above or below the then available market price

21   for comparable Bitcoin mining rigs?

22    A.  The acquisition price was approximately half

23   the prevailing indicative price in the market for the

24   same rated capacity and efficiency.

25    Q.  And how did you identify what the market price

1  was at that time?

2      A.  I refer, in my report in my analysis, to an

3  index.  If you go to paragraph 39 of my report, the

4  indicative Bitcoin mining ASIC rig price index published

5  by Luxor Technology Group, which is generally used

6  accepted by market participants and, in fact, replicated

7  by one of the larger market participants.

8      Q.  You say it's generally used by market

9  participants.

10         Did you do anything else to ensure yourself the

11  indicative Bitcoin basic price index is reliable?

12     A.  Yes.  Independently, searched for posted

13  Bitcoin rig prices.  And in addition to that, did a

14  literature review looking at other sources and other

15  commentary.  So I think I also cite Galaxy Digital,

16  which is one of the larger participants in the crypto

17  space.  Their own independent analysis, not only do they

18  cite to this index, but they also compute their own

19  index that it matches this one.

20         MR. TABER:  Michelle, could you pull up

21  Exhibit 1200-A.  If you could scroll down here to the

22  offering there.

23         So -- Michelle, if you could also pull up 1200.

24  We'll need it to date this document.

25     Q.  You see the date of this e-mail is May 5, 2021?

1        A.   I do.

2        Q.   It's about a week before the May 12th contract

3   date?

4        A.   Yes.

5            MR. TABER:   If you go back, Michelle, to

6   1200-A.

7        Q.   What is the price per terahash here of these

8   Bitmain Antminer S19j Pros, according to this offering

9   document?

10       A.   The price per unit is $12,250.  If you take the

11  price per unit of $12,250 and divide it by the hash

12  rate, you know kind of what you're getting per unit hash

13  rate.

14       Q.   So it's fair to say, we don't need to do math,

15  it's more than $100 per terahash?

16       A.   Absolutely.

17       Q.   And then down the second miner there, the S19j

18  Pro with the 100 hash rate and the $9,750 unit price,

19  what would the price per terahash be there,

20  approximately?

21       A.   $97.50.

22       Q.   Is that consistent with your understanding of

23  the market price for comparable Bitcoin mining rigs as

24  of this time?

25       A.   At that point in time, you had tremendous

1  supply chain issues and a lot of over-demand or excess

2  demand relative to supply.  Yes, it's consistent with

3  what I observed independently.  And, in fact, work we

4  were doing in GPUs and other things in our lab, this is

5  also consistent with some of the work we were doing in

6  our lab.

7      Q.  How does this pricing that Coinmint was being

8  offered by another vendor at this time compare to the

9  price that Katena was offering?

10     A.  So Katena's at $60 per terahash.

11     Q.  So a lot less?

12     A.  A lot less.  With the rated energy consumption

13 of 35 joules, or kilowatt per second, per terahash.  So

14 highly efficient.

15     Q.  How does that compare to the Bitmain Antminer

16 S19j you see there?

17     A.  They're in the 31 and 34-and-a-half range.

18     Q.  So would you say 35 is comparable to the 34?

19     A.  35 is comparable.  Yeah.

20         MR. TABER:  Michelle, you can turn off the --

21 stop screen sharing for a moment.  Although we'll go

22 back to the report.

23     Q.  Perkins Coie also asked you to compute the

24 profit that Katena expected to earn on the May 12th

25 agreement if Coinmint had performed; right?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      A.   Yes.

2      Q.   Did anyone ever ask you to compute Katena's

3  actual lost profits?

4      A.   No.

5      Q.   Did you do so in your report?

6      A.   No.

7      Q.   What's the difference between estimated or

8  expected profits and actual lost profits?

9      A.   Well, estimated profits are, at the time of the

10 signing, had Coinmint performed under the contract as

11 written, it's the forecast of what Katena would have

12 earned for delivery capacity.

13     Q.   Would have earned net of costs; right?

14     A.   Net of costs.  Of course.

15     Q.   What are the steps involved to compute Katena's

16 expected lost profits -- or expected profits, excuse

17 me -- at the time of contracting?

18     A.   Well, you're going to take -- in fact, I do

19 that on pages 31 and 32 and 33 of my report.  There's a

20 schedule I described previously in my report on payments

21 and when payments arrive.  There's delivery schedule for

22 rigs based on payments, and I've been able to come up

23 with a calculation of what the nominal manufacturing

24 costs and nominal engineering costs would have been

25 applied against the revenue, the revenue being

1  $150 million for the rig capacity, subtracting nominal

2  manufacturing costs, subtracting nominal engineering

3  costs, which were sourced from certain documents in the

4  production.  So then you end up with a cost --

5  effectively you end up with a gross profit which you

6  discount backwards to come up with a present value of

7  lost profits at the time of signing.

8       Q.  Let's look at Table 1 on page 33.

9           MR. TABER:  Michelle, if you could pull that

10  back up.  And that will be .pdf page 34.  Scroll up a

11  little bit to Table 1.

12       Q.  This is the analysis that you just described to

13  us; right?  There's the --

14       A.  Correct.

15       Q.  -- nominal total revenue.  You told us that

16  came from the contract; right?

17       A.  Correct.

18       Q.  What was your source for the nominal

19  manufacturing costs?

20       A.  There was a spreadsheet that was produced or

21  generated by Katena at the time that they were preparing

22  for delivery and at the time that they were negotiating

23  the contract.  And the manufacturing and engineering

24  costs, oftentimes called non-return engineering costs in

25  this particular field, were calculated, or at least

1  displayed, in the index spreadsheet.

2      Q.  How did you determine that that spreadsheet was

3  reliable?

4      A.  Well, it was produced by one of the two parties

5  to the contract at the time in order to -- as they were

6  trying to ascertain what their viable costs would be

7  under the agreement.

8      Q.  In your work as a credit risk analyst in a

9  large financial institution valuating contracts, is it

10  the kind of spreadsheet that you would rely on in

11  valuating a contract?

12     A.  All the time.  Especially when I would do

13  credit analysis for private companies.  You would ask

14  for these managerial operating costs type of documents.

15     Q.  And then what was the source for the nominal

16  engineering costs, other than the manufacturing costs,

17  per unit?

18     A.  There was a document that broke down

19  engineering costs by chip design, photomasking, and then

20  other related costs which was an e-mail from Michael Gao

21  on April 30th, 2023.

22     Q.  Michael Gao is the CEO of Coinmint -- Michael

23  Gao is the CEO of Katena?

24     A.  He's part of the C-Suite.  Correct.

25     Q.  Is that the kind of source that you would rely

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  upon in doing valuation work in your commercial

2  experience over 40 years?

3       A.  Yes.  Correct.

4       Q.  Are you aware that the -- sorry.  If you look

5  at your total there, present value of lost profits, the

6  discounted present value of Katena's expected profit was

7  a little less than $90 million at the time of

8  contracting?

9       A.  It was a little less than $90 million based on

10  a discount factor that's equal to a one-year treasury

11  bill rate.  Which the reason for that, this analysis

12  assumes that both -- were both parties to perform, the

13  only thing we're discounting for is time value money.

14       Q.  You've got the -- I guess I should ask this.

15           You have the report in front of you; right?

16       A.  I do.

17       Q.  So when you're looking down at the document --

18       A.  Yes.

19       Q.  -- that's what that is.

20           You're aware that the May 12th agreement that you

21  looked at contains a $37.5 million liquidated damages

22  provision?

23       A.  I am.

24       Q.  How does that $37.5 million liquidated damages

25  provision compare to Katena's estimated profits at the

1   time of contracting if Coinmint had fully performed?

2        A.  It's less than half of the $89,969,722.

3        Q.  So it's a conservative estimate certainly, but

4   is it a reasonable --

5        A.  It's a very conservative estimate.

6        Q.  In your opinion, is it a reasonable estimate by

7   Katena and --

8              MR. ALFORD:  Objection

9              MR. TABER:  -- in the damages.

10             MR. ALFORD:  Objection.  Objection.  Calls for

11   a legal conclusion about reasonableness.

12             ARBITRATOR CALLAHAN:  All right.  And, again,

13   the panel is going to make all the ultimate

14   determinations.  We're not swayed by terminology that

15   may be used by a witness, not even an expert, to make

16   the determinations that are left as to decide.  So we'll

17   just let the witness testify.  We're just really

18   listening for his opinions.

19             MR. ALFORD:  Okay.  Thank you.

20             THE WITNESS:  So to the panel, Ms. Callahan and

21   fellow panelists, I'm speaking as a 40-year industry

22   veteran on custom and practice.  I would not presume to

23   try to reach conclusions for the finders of fact or

24   legal conclusions.  But as someone who has analyzed

25   asset sales, mergers, acquisitions, commercial credit

1  arrangements, project financings, the question about

2  whether it's a conservative estimate of damages is

3  really something that I've done every single day of my

4  professional career since 1984 -- '83, '84.  I turned 62

5  this week.  I've been doing this since I was 22.

6          When I answered this question for Mr. Taber and

7  for your -- to the extent that you have questions for me,

8  it's coming from there.  I'm not aware.  What I am is I'm

9  a trained economist, financial transactions professional,

10 who has to reach these conclusions as a course of my

11 business every single day.

12          BY MR. TABER:

13     Q.  Dr. Mordecai, when you were calculating

14 Katena's expected profits at the time of contracting,

15 did you consider, as part of that analysis, any actual

16 costs that Katena incurred after the time of

17 contracting?

18     A.  No.

19     Q.  Why not?

20     A.  It's not relevant to the calculation of the

21 actual contract, itself.  This was expected profits,

22 expected revenue, lost profits under the contract.  None

23 of the rest of the firm's activities or operations are

24 within scope.

25     Q.  A few more questions for you about the Bitcoin

1  mining revenue function that we discussed earlier.

2           For the panel, I think we probably are less

3  than ten minutes out from the conclusion.

4           ARBITRATOR CALLAHAN:  Okay.

5           BY MR. TABER:

6      Q.  Is it your understanding that the commercial

7  terms of the May 12th agreement incorporates any kind of

8  floating price for the Bitcoin mining rights?

9      A.  It does not.

10     Q.  And you told us the expected value of the

11 contract Coinmint at the time of contracting was

12 affected by possible changes in Bitcoin price and

13 Bitcoin mining awards; is that right?

14     A.  The value to Coinmint, that's right.

15 Particularly with the real options analysis, increased

16 volatility means increased value in this contract as it

17 was written and executed on May 12th.

18     Q.  So then under the May 12th agreement as it's

19 written, as you've read it, who bears the market risk of

20 changes to Bitcoin price or changes to network

21 difficulty that happen after the contract was signed?

22     A.  Coinmint does.  And Coinmint also has all the

23 control toggles around their operations with respect to

24 that.

25     Q.  Hypothetically, if the May 12th agreement had

1  been amended to replace the fixed price with the

2  floating price, how would that affect the risk

3  allocation in the original agreement?

4      A.  The risk allocation for those elements, which I

5  do mention in one of my footnotes -- although, I didn't

6  know this question was going to come -- would shift

7  those risks to -- some of those risks to Katena while

8  Coinmint would retain operating control over the fleet.

9      Q.  One more question on this.

10         In your view, if you compared a floating price

11  based on just the Bitcoin price to a floating price

12  based on the buyer's ROI, which one of those would be

13  riskier to the seller, to Katena?

14      A.  The second would be would much riskier.

15      Q.  Why is that, in your experience as a risk

16  analyst?

17      A.  Because Coinmint cannot solely influence --

18  small relevance to global market, they can't influence

19  Bitcoin prices.  However, under the ROI, they can toggle

20  up and down and control their own operations.  And by

21  having Katena bearing or sharing that risk, it would

22  enable Coinmint to benefit at the expense of Katena.  We

23  actually have a term for that in economics, particularly

24  industrial organization, and it's referred to as --

25         THE REPORTER:  As what?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          MR. ALFORD:  I'm sorry, we didn't hear the

2    answer -- it's referred to as?

3        A.  Predation, p-r-e-d-a-t-i-o-n.  There's a whole

4    literature on predatory trading and other types of

5    predatory activity around bilateral agreements.

6          BY MR. TABER:

7        Q.  All right.  Just going to close by giving you

8    the opportunity to respond to a few questions that were

9    raised by Mr. Stake, Coinmint's rebuttal expert.

10          Am I staying that right?  Is it Stake?

11          MR. STAKE:  Yes.

12          MR. TABER:  Wanted to be respectful.

13        Q.  Have you read Mr. Stake's rebuttal report?

14        A.  I have.

15        Q.  Mr. Stake says that you should have considered

16    Katena's possible mitigation of its loss sales to

17    Coinmint in your report.

18          Why didn't do you that?

19        A.  Because the analysis is the report as of the

20    signing date.  I'm sorry, the expected profits under the

21    contract as of the signing date on May 12th.

22        Q.  Mr. Stake also says you should have considered

23    sales in total instead of sales from a single customer

24    or contracts as parts of your analysis.

25          Why didn't you do that?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1        A.  Because I'm focused on the contract, not other

2   activities of that firm.  The scope of my analysis is

3   the contract as of the date of signing.  And the other

4   thing is, that my lost profits analysis is a present

5   value.  So any future cash flows under this contract

6   have been discounted to a value on the day of signing.

7   So actual versus expected, there's no notion of actual

8   in an expected value analysis for your present value --

9   present value and future cash flows to the signing day.

10       Q.  Mr. Stake also criticizes you and says that it

11  was wrong to compute prejudgment interests starting in

12  May of 2021.

13          Why is that incorrect?

14       A.  Because that's when the contract was signed and

15  that's when the first payment was due.

16       Q.  To your understanding, was that payment made?

17       A.  At best, a partial payment was made, and it was

18  late.  Based on what I've seen in the record.

19       Q.  So is it usual in your experience to calculate

20  prejudgment interest from the time of the breach?

21       A.  Yes.

22       Q.  And then similarly, because you're working on a

23  net present value basis, is it usual to discount that

24  back to the date of the breach?

25       A.  Yes.



COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1    Q.  Then, lastly, Mr. Stake said that you should

2  have considered "detailed financial information and

3  documentation from Katena as part of conducting your

4  analysis."

5          Why is that wrong?

6    A.  As I said before, it has nothing to do with the

7  expected value of the contract at the time of signing.

8          MR. TABER:  We have nothing else.  I might

9  suggest just a five-minute break before cross, for five?

10          ARBITRATOR CALLAHAN:  Is this a good time to do

11  our afternoon break?

12          MR. ALFORD:  Why don't we do that.  Yeah.

13          ARBITRATOR CALLAHAN:  Okay.  So it is about

14  3:10.  Why don't we come back at 3:25.

15          Please mute, everyone, on your ends.

16          (Break taken from 3:10 to 3:25.)

17          ARBITRATOR CALLAHAN:  Are you ready,

18  Mr. Alford?

19          MR. ALFORD:  More or less.  Yes.

20          ARBITRATOR CALLAHAN:  Then your witness.

21

22                    CROSS EXAMINATION

23          BY MR. ALFORD:

24    Q.  Dr. Mordecai, according to your report, your

25  hourly rate is $1,125 per hour.  Did I read that right?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      A.   That is correct.

2      Q.   And, on top of that, you also receive

3  additional compensation based on fees charged on this

4  matter by Analysis Group; correct?

5      A.   Based on utilization of junior staffers by

6  Analysis Group.  That is correct.

7      Q.   Okay.  How many total hours have you and your

8  team spent on this assignment to date?

9      A.   I have no visibility into their time, and I

10  haven't really tracked my time.  I put in a substantial

11  amount of time reviewing the documents and preparing the

12  analysis with the team.  But I don't have an exact

13  number right now.

14      Q.   You must have spent at least 20 or 30 hours

15  writing your 35-page report; right?

16      A.   That would not count all of the time spent in

17  analysis.

18      Q.   Yeah.  So probably, what, if you could

19  estimate, about 60 hours just for you so far?

20      A.   I really am -- I'd have to go back and do an

21  actual calculation.

22      Q.   All right.

23           Before I get into the questions that I prepared

24  for you, I want to follow up on some of the things that

25  you told us when you were being asked questions earlier.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          You said that you were -- you were explaining to

2   us --

3          If we could pull up your report, Exhibit 1191,

4   Ken.

5          ARBITRATOR CALLAHAN:  I believe it's 1193.

6          MR. ALFORD:  1193.  I apologize.  Messing up

7   already.

8          ARBITRATOR CALLAHAN:  I wanted to make sure

9   your tech got to the right exhibit.

10         MR. ALFORD:  Thank you.

11      Q.  When you get that, if we can go to page 20 --

12   report page 26.  I think the .pdf pages are maybe one

13   off.  The one that has Figure 6 at the top.

14         Page 26 of your report, Doctor.  I'm using the

15   report pages.  Maybe the .pdf page is different.

16         You talked about this analysis.  And I'll

17   confess, I didn't quite follow it all.  But one thing I

18   think I understood is that your analysis is premised on

19   the assumption that these rigs have a useful life through

20   May of 2024.  Did I get that right?

21      A.  The hashing interval that we used for the

22   purpose of the analysis, basically we make the

23   assumption that the rigs are disposed of as of the next

24   halving of the Bitcoin price.  It's the way of having an

25   ending to the calculation.

1    Q.  Yes or no, Doctor, is it true your analysis is

2    predicated on the assumption that the rigs have a useful

3    life until at least May of 2024?  Yes or no?

4    A.  The calculation done for Figure 6 --

5    Q.  Doctor, I'm sorry to interrupt.  I have a

6    limited amount of time.

7        Yes or no, is it true that your analysis is

8    predicated on the assumption that these rigs have a

9    useful life through at least May of 2024?  Yes or no?

10   A.  Yes.  The calculation uses a useful life for

11   the rigs from the month of delivery through the next

12   halving of Bitcoin awards, which was expected to be in

13   May 2024.  That is correct.

14   Q.  As part of your analysis in this case, you had

15   an interview of Mr. Reddy; correct?

16   A.  It is correct that we had a discussion with

17   Mr. Reddy that was very limited to --

18   Q.  Well, I'm sorry to interrupt you.

19       Just yes or no; as part of your analysis in

20   this case, did you interview Mr. Reddy?

21   A.  I had a fairly-limited discussion with

22   Mr. Reddy.  That is correct.

23   Q.  And Mr. Taber was on the phone, too; right?

24   A.  He was.

25   Q.  Okay.  And during that interview of Mr. Reddy,

1  did he tell you that, in his view, the chips that are

2  the brain of these machines were obsolete as of

3  September of 2021?  Did he tell you that?

4       A.  We -- this was not a focus of our discussion.

5       Q.  So the answer is "no," he didn't tell you that?

6       A.  We did not have that discussion.

7       Q.  Okay.

8            Has anyone at Perkins Coie, until the time that

9  you sat here today, ever told you that Mr. Reddy testified

10  to this panel that these machines were obsolete as of

11  September of 2021 and the project was discontinued.

12            MR. TABER:  Objection.  Mischaracterizes

13  Mr. Reddy's testimony.

14            ARBITRATOR CALLAHAN:  Just -- you can answer

15  the question that that's an assumed fact.  It doesn't --

16  it's not a substitute for whatever Mr. Reddy testified

17  to.

18            MR. TABER:  I would also -- sorry, I wasn't

19  done.  I apologize.

20            I would object to any questions regarding the

21  testimony of witnesses whose testimony was not

22  transcribed if we're going to be on the record.  As

23  we've done with Mr. Bleck's testimony, I don't know why

24  there would be questions of Mr. Reddy's testimony, which

25  Dr. Mordecai didn't attend.  If there are, I'd request

1   we be off the record for those questions.

2           Thank you.

3           ARBITRATOR CALLAHAN:  Your request is granted

4   and we'll continue with the previous protocol.

5           So, Mr. Alford, you'll need to give us an alert.

6           MR. ALFORD:  All right.

7       Q.  Let's go off the record briefly.

8           (Off the record.)

9           MR. ALFORD:  Okay.  Back on the record then.

10      Q.  So you described in your earlier testimony --

11  this contract as a win-win for both parties, and my

12  client in particular; right?

13      A.  That is correct.

14      Q.  Now, that opinion assumes that Katena was

15  ready, willing, and able to perform per the contract

16  terms; yes or no?

17      A.  It does.

18      Q.  And you would agree with me that if, in fact,

19  as my client believes the evidence shows, Katena's

20  intent was not to perform, but to defraud my client,

21  that wouldn't be a win-win for my client; would it?

22      A.  Could you repeat the question?  Because I'm not

23  sure what you're actually asking me.

24      Q.  Sure.

25          You would agree with me that if, in fact, as my

1 client believes the evidence shows, Katena's intent was

2 not to perform, but to defraud my client, that wouldn't

3 be a win-win for my client, would it?

4      A.   That's outside the scope of the analysis that I

5 did or the scope of my assignment.

6      Q.   You have no opinion on that?

7      A.   I have no -- in this case I have no opinion on

8 that whatsoever, because it's not part of my analysis.

9      Q.   Okay.  Let's look at page 26 of your report.

10 I'm using the report pages, Exhibit 1193.

11           Actually, let's go to your Monte Carlo simulation

12 on page 31.

13           Do I understand this chart correctly to say that

14 there's a 95 percent probability that the value of these

15 mining rigs, as of the time of the contract signing, was

16 in excess of $16,000 each.

17      A.   That's correct.  That's the net present value

18 of the operation of those rigs under the simulated

19 distribution of Bitcoin prices.

20      Q.   Just to be clear, I'm not an economist, and

21 math has never been my strong suit, so I want to be

22 totally clear:  It's your opinion that there's a

23 95 percent probability that as of the time this contract

24 was executed, these machines had a net present value of

25 over $16,000?  Yes or no?

1      A.  Based on the volatility of Bitcoin pricing, as

2    simulated here, the expected net present value of these

3    mining rigs, taking the volatility of Bitcoin into

4    account, says that more than 95 percent of its

5    distribution comes up with an expected value of $16,264

6    or higher.

7      Q.  Right.

8           So it's your opinion that Katena sold mining

9    rigs for $5,400 each that were worth, in great

10   probability, more than $16,000 each?  That's your

11   opinion, right?  Yes or no?

12     A.  It is my opinion that at the --

13     Q.  Yes or no, Doctor.  I'm sorry, yes or no?  Is

14   that your opinion?

15     A.  My opinion, as discussed in my report, is that

16   the productive output, the net present value from the

17   productive output of these rigs, at $5,400 per rig,

18   would have an expected value of $16,264 or greater

19   with -- across 95 percent of the distribution of Bitcoin

20   prices.  So that answer is, that is my opinion.

21     Q.  Well, I want to make sure the record is totally

22   clear.

23          Yes or no, is it your opinion that Katena sold

24   mining rigs for $5,400 each that, in 95 percent

25   probability, were, in fact, worth more than $16,000

1  each?  Is that your opinion?  Yes or no?

2          MR. TABER:  Objection.  Asked and answered.

3  And also incomplete hypothetical.

4          THE WITNESS:  Under the assumptions of the

5  analysis --

6          MR. TABER:  You have to wait for --

7          ARBITRATOR CALLAHAN:  Yeah.  I think the

8  problem is in the wording, Mr. Alford.  I think it's

9  that he's using the words "productive output" and you're

10  just using "value."  You're using two different words.

11  And so I -- I think that's where we have the problem.

12  So I don't know if it's possible for you to rephrase.

13          MR. ALFORD:  Okay.  Let me do this.

14      Q.  Let's go to page 31 of your report, Figure 8 --

15  it's on the screen -- and you used the phrase "net

16  present value."  Right?

17          Go to page 31 of your report, Figure 8, you

18  characterized this as a calculation to what you say is --

19  am I reading this right -- net present value?

20      A.  It is the net present value of the productive

21  output of these mining rigs as contracted.

22      Q.  Okay.

23      A.  And I spent a fair bit of time explaining to

24  the panel what productive output means in terms of

25  terahashes per second at the particular efficiency

1  rating, with the electricity costs and operating costs

2  incorporated.

3         That's why I said the net present value of

4  operating these rigs in accordance with the volatility

5  of Bitcoin prices modeled, results in a net present

6  value of the rigs of $16,264 each.  That is correct.

7     Q.  Right.  I just want --

8     A.  Or more.  Or more.

9     Q.  Right.  I don't want to belabor the point.

10  Since Ms. Callahan had a question, I want to make sure

11  the record is totally clear.

12         It's your opinion that these mining rigs that

13  Katena sold for $5,400 each, in fact, had a net present

14  value at the time of contracting of at least $16,000 or

15  more based on a 95 percent probability; right?  Yes or no?

16     A.  It's based on the expectation of operating

17  those rigs.  Had Coinmint paid for and those rigs gotten

18  delivered according to the contract, the value of

19  Coinmint of operating those rigs at those Bitcoin

20  prices, with the assumed daily expected awards, would

21  have meant that those rates would have had this expected

22  value.  That is correct.

23         MR. ALFORD:  All right.  Let's pull up

24  Exhibit 1200-A please, Ken.

25         ARBITRATOR CALLAHAN:  What was that again?

1           MR. ALFORD:  1200-A.

2           ARBITRATOR CALLAHAN:  Okay.  Blockware.

3           BY MR. ALFORD:

4       Q.  This is the Bitmain proposal -- or proposal

5   from Blockware for Bitmain machines that Mr. Taber asked

6   you about.  You see that?

7       A.  I see the exhibit.

8       Q.  Now, these machines are, according to this

9   proposal, at least, more energy efficient than Katena's

10  machines.  Yes or no?

11      A.  Their ratings are in the same neighborhood.

12      Q.  Doctor, that wasn't my question.

13          Yes or no, according to this document at least,

14  are the Bitmain machines more energy efficient than the

15  Katena machines?  Yes or no?

16      A.  Their efficiency ratings are marginally more

17  efficient.

18      Q.  Right.  And, also, this indicates that these

19  machines are ready for delivery within the next month or

20  two after proposal; right?  You see under "batch"?

21          MR. TABER:  Objection.  Foundation.

22          MR. ALFORD:  Well, the witness was --

23          ARBITRATOR CALLAHAN:  Overruled.  You can

24  answer.

25          THE WITNESS:  Where are you showing me the

1    delivery date?

2              BY MR. ALFORD:

3        Q.  If you drop down to "batch" where it says

4    "batch."

5        A.  You mean June and July?

6        Q.  Yes.  This is a proposal made in June or July

7    for batches that were ready -- sorry, let me start over.

8              This was a proposal made in May for batches of

9    machines that, according to the proposal at least, were

10   ready to deliver in June and July; correct?

11             MR. TABER:  Objection.  Mischaracterizes the

12   document.  It doesn't say anything about being ready.

13             ARBITRATOR CALLAHAN:  Well -- Dr. Mordecai can

14   answer.  He can certainly answer for himself.

15             THE WITNESS:  I don't have any context for this

16   document.  I see something that says "batch," and I see

17   it says "June" and see it says "July."  I don't really

18   have any other context for the document.  So I'm not

19   going to presume or try to interpret when they were

20   ready or what their delivery -- time of delivery would

21   be.

22             BY MR. ALFORD:

23       Q.  I'm just following up on questions that

24   Mr. Taber asked you about the document.

25             Let me ask you another question.  You understand

1  Bitmain is a very well-established manufacturer and

2  supplier of mining rigs; correct?

3      A.  I'm quite familiar with Bitmain.

4      Q.  And you understand that as a market leader in

5  that space, it might command a higher price for its

6  machines than a brand new, untested, unknown start-up;

7  right?  That wouldn't surprise you; right?

8      A.  What do you mean as by "market leader," that it

9  may command a higher price?

10          At this point in time, the economics of the

11  industry and the supply constraints, relative to the

12  excess demand in the industry, certainly gave market power

13  to certain participants.  So I don't know what you -- I'm

14  not sure what you're asking me, other than that.

15      Q.  Bitmain is the largest supplier in the world of

16  Bitcoin mining machines.  You know that, right, Doctor?

17      A.  I'm aware of their position in the marketplace.

18  I'm also aware contemporaneously of the constraints of

19  their supply at the time.

20      Q.  Doctor, my question was not about supply chain

21  constraints.

22          Yes or no, as of May 2021, was Bitmain the

23  largest manufacturer and supplier of mining rigs in the

24  world?

25      A.  They were the dominant supplier of mining rigs

1  at the time.

2      Q.  Okay.  As a very experienced economist, you

3  know, yes or no, that the predominant supplier in the

4  marketplace may well command a higher price than a brand

5  new, untested, unknown startup.  You know that; right?

6      A.  It depends on market conditions.

7      Q.  Okay.

8      A.  That's a fairly under- -- undefined,

9  under-defined hypothetical you're asking me to respond

10 to.

11     Q.  Well, your counsel could object.  But --

12     A.  I --

13     Q.  Let's talk some more about your report.

14         Let's look at your report, page 13.  Let's pull

15 up the report first.  We have it on the screen,

16 Exhibit 1193.

17         I want to clarify one thing.  Let's go to your

18 assignments on page 13.  Very top of the page.

19         Where you say the -- one of your assignments was

20 to calculate "The economic value that Coinmint would have

21 been expected to receive based on the terms of the SPA and

22 PO at the time these agreements were executed."

23         Yes or no, Doctor, do you have an understanding

24 of how that particular assignment fits into the claims and

25 defenses being made in this case?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      A.  Based on my experience as a professional

2  economist and as a market participant, the value of

3  arrangements -- bilateral agreements between market

4  participants, is very important to understanding the

5  viability of an agreement, the viability of a contract,

6  and the benefits and how they apportion to each of the

7  parties in the bilateral agreement.

8      Q.  I know you're not a lawyer, but just yes or no,

9  is it your understanding that the economic value that

10  Coinmint would have been expected to receive under the

11  contract is part of your client's damages claim in this

12  case?

13           Is that your understanding?

14           MR. TABER:  Objection.  Relevance, and also

15  calls for a legal conclusion.

16           Counsel is going to have the opportunity,

17  apparently, in briefing to attack the relevance of

18  Dr. Mordecai's opinions.  But this question I don't think

19  is the way to do it.

20           ARBITRATOR CALLAHAN:  Well, Dr. Mordecai, if

21  you understand the question, you can answer it.  If you

22  need something more, you can ask for it.

23           THE WITNESS:  Could I ask, Mr. Alford, could

24  you repeat your question, please, and I will do my best

25  to try to answer it.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          MR. ALFORD:  Sure.

2      Q.  Now, yes or no, Mr. Taber can ask you for an

3   explanation when he talks to you again, but right now,

4   just yes or no -- I know you're not a lawyer -- but is

5   it your understanding that the economic value Coinmint

6   would have been expected to receive under the contract

7   is part of your client's damages claim in this case?

8      A.  I can't really comment on the legal aspects of

9   what's in the damages claim, what's not in the damages

10  claim.

11     Q.  Okay.  Fair enough.

12     A.  But -- I'm not finished.

13     Q.  It was a yes or no question.

14     A.  No.  No.  It's not --

15         ARBITRATOR CALLAHAN:  Dr. Mordecai, let me

16  interject here.

17         This is -- you're on cross, and Mr. Alford does

18  get to ask you yes or no questions.  Which means you're

19  kind of limited.  And then your attorney can follow up

20  with you.

21         THE WITNESS:  Okay.  So can you ask the

22  question again then, Mr. Alford?

23         MR. ALFORD:  No.  I think the answer has been

24  given.  Thank you.  I'll ask a new question.

25         ARBITRATOR CALLAHAN:  Okay.  Go ahead.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          MR. ALFORD:  If we could take down the blowup

2    bubble, Ken.

3          Q.  I'm going to ask you about Roman ii there.

4          Part of your assignment -- yes or no -- part of

5    your assignment was to calculate, "Damages related to

6    Coinmint's alleged breach of the SPA and PO as measured by

7    lost profits."

8          Correct?

9          A.  Correct.  Well, that's what's on the page.

10         Q.  And that was part of your assignment; right?

11         A.  It was lost profits under the SPA and PO.

12         Q.  Right.

13         A.  Expected lost profits at the date of signing

14   under the SPA and PO.  Which is what my summary of

15   opinions actually says.

16         Q.  Now, I don't think anyone in this room doubts

17   you're an incredibly accomplished guy that's done some

18   very important work.  But you haven't done a lot of the

19   sort of pedestrian issue that brings us here today,

20   right, which is calculating a part -- the quantum of

21   profits that a party would have received under a

22   contract, but for the other parties' alleged breach;

23   correct?  You haven't done much of that?

24         A.  Part of my business activities and business

25   practices for 40 years, regardless of whether I've

1 testified in a particular case exactly like this one or

2 not, it's been my bread and butter for four decades.

3      Q.  Well, yes or no --

4      A.  And I'd also like to point out that in the

5 Bayer Crop Science matter in Desha County, that was a

6 damages analysis that had to do with lost profits to

7 farmers for genetically-modified rice that was rejected

8 by the government of France.  There I was calculating --

9 very much calculating of daily lost profit calculations,

10 a very complicated one, actually.

11     Q.  It's true, is it not, Doctor, you've never been

12 retained to testify as an expert on the amount of lost

13 profits one litigant claimed it experienced due to the

14 other litigant's alleged breach of contract?  That's

15 true, is it not, Doctor?  Yes or no?

16     A.  I've -- as I said with the --

17     Q.  Yes or no, Doctor?

18     A.  I have not testified before on a bilateral

19 damages analysis in a matter between two folks for

20 breach of contract.

21     Q.  Okay.  Thank you.

22          And it's true, is it not, Doctor, that the

23 Southern District of New York held that the opinions you

24 were offering were impermissibly speculative in that case;

25 right?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1        A.   That is incorrect.

2             MR. TABER:  Objection.  Vague and ambiguous as

3    to "that case."

4             THE WITNESS:  Actually, incorrect.

5             BY MR. ALFORD:

6        Q.   Okay.  Let's pull up -- because I know

7    Mr. Taber asked you about it -- let's actually pull up

8    and take a look at the decision and order of the Court,

9    Exhibit 1229.

10            Before we do that, I want to make totally clear

11   your testimony:  Yes or no, did the Southern District of

12   New York conclude that the opinions you were prepared to

13   offer were impermissibly speculative?  Yes or no?

14       A.   No.

15       Q.   Okay.  And, yes or no, did the Southern

16   District of New York conclude that the opinions you were

17   prepared to offer in that case were as to matters on

18   which you had no expertise?  Yes or no?

19       A.   That is also incorrect.

20       Q.   Okay.  Let's take a look at what the Court

21   said.  Exhibit 1229.

22            MR. TABER:  I have no objection to this

23   document being used for impeachment, but I'd object to

24   it being marked as an exhibit.  I don't think it's

25   evidence.

1          ARBITRATOR CALLAHAN:  Well, that's why I raised
2    the issue before.  But, you know, we have had a number
3    of pleadings, various types of pleadings from various
4    types of court proceedings that had, in some way,
5    touched this arbitration or been extraneous to it.
6    That's why I did raise the issue.
7          I would appreciate it if counsel would get
8    together -- I don't think it much matters what we call
9    it, whether we call it an exhibit or an order on a
10   request for judicial notice, or just something that you
11   all agree that the panel can review and consider.
12         This falls in that league.  So let's leave it at
13   that.  I hear what you're saying, but the panel has been
14   given a lot of other court stuff.  And I think it would be
15   good for the panel to get some level of direction from the
16   parties as to their expectation as to what the panel is
17   supposed to do with it.
18         And, again, I have -- and I'm just concerned
19   that you'll want to cite it, want to argue about it or
20   refer to it in some way.  So I just want to put it on
21   the table for counsel, the panel is going to lean in the
22   direction of allowing this stuff "in," if anybody wants
23   to mention it as part of your arguments in this case.
24         But I think it would be a good idea to just get
25   an agreement on how we're going to refer to this stuff.

1  And exhibit number is nice, because then in your briefs

2  you can just do the number and not the whole title of

3  something.

4          MR. ALFORD:  Thank you.  And we'll definitely

5  work on that.

6          This is Exhibit 1229.  If we can go to page 28

7  and blow up the last full sentence at the bottom, please,

8  Ken.  The one that begins with "Because."

9      Q.  Do you see that, Doctor?

10     A.  I see that it discusses auditing.  That's

11 something I would have given an opinion on anyway.

12     Q.  That wasn't my question, Doctor.  My question

13 was simply whether you see the document on the screen in

14 front of you.  Yes or no?

15     A.  I see the document on the screen and --

16     Q.  That's my only question, Doctor, right now.

17     A.  But I would not have given an accounting

18 opinion.

19     Q.  Please --

20     A.  This is one place where context matters.  I

21 would not have given an accounting opinion.

22         MR. ALFORD:  Madam Chair, can I please get an

23 instruction?  I just asked if he saw the document.

24         ARBITRATOR CALLAHAN:  It may be a stretch.  Let

25 me try again.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          Dr. Mordecai, to the extent that something more

2    needs to be said other than an answer to the questions

3    that Mr. Alford is posing, I'm sure Mr. Taber will go back

4    over them with you.

5          THE WITNESS:  Okay.

6          ARBITRATOR CALLAHAN:  If you would please just

7    listen carefully to Mr. Alford's questions and do your

8    best to answer them -- he is asking yes or no questions.

9          BY MR. ALFORD:

10    Q.  So, yes or no, Dr. Mordecai, did the District

11   Court hold that, "Because Michaud and Mordecai have no

12   experience in auditing, this court concludes they are

13   not qualified to interpret the requirements of PCAOB

14   standards"?  Yes or no?

15    A.  That is what the Court said.

16    Q.  Right.  And let's take a look at page 29,

17   please.  The sentence that begins at the top of the

18   page, "Similarly."

19          You see that?

20          MR. ALFORD:  It's the first full sentence at

21   the top of the page, Ken.

22    Q.  It's true, is it not, Doctor, that the District

23   Court also held, "Similarly, Michaud and Mordecai are

24   not qualified to opine on what PWC should have known or

25   foreseen, to the extent those opinions are premised on

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1   their interpretation of PCAOB auditing standards."

2           That's what the Court said; right?

3       A.   That is what the Court said.  And I agree with

4   the Court.  I would not have offered auditing opinions.

5       Q.   All right.  Let's take a look at page 30.

6   First full paragraph at the top.

7           The District Court also held, yes or no, that,

8   "Michaud and Mordecai have no basis to testify as to what

9   market participants did or did not 'understand.'  That

10  would be impermissible speculation into those market

11  participants' state of mind."

12          That's what the District Court said; right?

13      A.   That is correct.  And I would not have done

14  that.

15      Q.   Do you know why there was a big fight between

16  the lawyers about something you never would have done

17  anyway?

18      A.   Well, I was never --

19          MR. TABER:  Objection.  Argumentive.

20          THE WITNESS:  I can answer the question,

21  though.

22          The other side of the case never deposed me on my

23  report.  In fact, my report ended up being cited when the

24  judge denied their request for a mistrial.  And, in fact,

25  the motion offered by Kasowitz was, "Dr. Mordecai's points

1  of view that were supported by the fact that this John

2  Corzine were offered in his reports a whole year ago.

3  Since you never bothered to depose Dr. Mordecai, you

4  didn't understand that what he was offering was custom and

5  practice with regard to market participants, exchanges,

6  and rating agencies.  I would not speculate on what the

7  participants were thinking at the time.  I'm merely going

8  to evaluate how rating agencies and counterparties

9  customarily interpret certain types of trading

10  disclosures.

11        BY MR. ALFORD:

12     Q.  You told us earlier about -- talked a little

13  about your interview of Mr. Reddy.  You also separately

14  interviewed Mr. Gao in the course of your work in this

15  case; correct?

16     A.  We did have a discussion in the presence of

17  counsel where I had asked specific questions about the

18  PSA.  Yes.

19     Q.  And you haven't produced any notes or

20  recordings from either of those interviews, have you?

21     A.  I did not take notes and I did not record the

22  discussion.

23     Q.  And you also exchanged e-mails with Mr. Gao in

24  the course of working on your analysis in this case;

25  correct?

1          A.  I did not exchange e-mails with Mr. Gao.

2          Q.  Okay.  Let's take a look at your report,

3     Exhibit 1193, page 33 of the report.  I'm using the

4     report pages.  This is simply a yes or no question,

5     Doctor.

6          I'll wait until you get that on the machine.

7     There we go.

8          If we can blow up under "Notes and Sources"

9     number 3.

10          Yes or no, Doctor, do you cite an e-mail from

11     Michael Gao dated April 30th, 2023?

12          A.  Footnote 3 has an e-mail from Michael Gao dated

13     April 30th, 2023.  That is correct.

14          Q.  And that e-mail is the only source of

15     information that you cite for the engineering costs that

16     you used in your lost profits analysis; correct?

17          MR. TABER:  Objection.  Vague.

18          THE WITNESS:  I also cite the Total Cost

19     Breakdown Final Rev, 20210307.XLSX in footnote 7.

20          BY MR. ALFORD:

21          Q.  I'll ask you about that in a moment.  Let's

22     talk about under Table 1 --

23          A.  That's under Table 1.

24          Q.  Let's talk about Table 1.  Let me ask you

25     about --

```
 1          MR. ALFORD:  If we could get rid of the bubble
 2  and go to Table 1, please, Ken, and blow up Table 1 for
 3  us.
 4       Q.  This is your last profits analysis; right?
 5       A.  That is correct.
 6       Q.  And third line down, you have a figure of
 7  $6.68 million for nominal engineering costs; right?
 8       A.  Correct.
 9       Q.  And, yes or no, Doctor, is it true that the
10  only source you cite for that $6.68 million figure is an
11  e-mail from Mr. Gao?
12       A.  I don't know that to be correct.  I don't -- I
13  don't have my binder, support binder, in front of me.
14  But there's also Katena 003097.  And, unfortunately, I
15  don't remember what that is.
16       Q.  Well, I'm just asking you about your report
17  now, Doctor.
18           Is it true --
19       A.  But it's in my report.  It's right there.  It
20  includes $1.1 million for chip design, Katena 003097.
21  The one you highlighted.
22       Q.  We can't interrupt each other, Doctor.  The
23  court reporter won't get a clear record.
24           Let me finish my question.
25           Yes or no, is it true, or is it not, that in your
```

1  report the only data you cite to support your

2  $6.68 million of nominal engineering costs is an e-mail

3  from Mr. Gao dated April 30th?

4      A.   I don't believe that to be the case.

5      Q.   Okay.  All right.

6      A.   And that's -- I'm still -- the Katena 003097 --

7  and that's why I brought up the Total Cost Breakdown

8  Final Review 20210307.XLSX.

9      Q.   All right.  Let's talk about that, too.  And

10  that's the line right above where you come up with

11  $53 million in nominal manufacturing costs; right?

12      A.   Correct.

13      Q.   And for that, you cite this spreadsheet,

14  right -- so let me back up a little bit.  That was not

15  well done.

16          If I understand it correctly, the $53.3 million

17  in nominal manufacturing costs is derived from two figures

18  under the Assumptions table; correct?

19      A.   What do you mean by "two figures under the

20  Assumptions table"?  I'm not sure I'm following your

21  question.

22      Q.   Okay.  Let me do it better.

23          You see under the Assumptions table where you

24  have manufacturing costs per unit of $1,919?

25      A.   Uh-huh.  That's correct.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1     Q.  And you see where you have a total number of
2  units of $27,778?

3     A.  I do.

4     Q.  So you came up with a nominal manufacturing
5  cost by multiplying the manufacturing cost per unit of
6  $1,900, and change, times number of units; right?

7     A.  Yeah.  The math works.

8     Q.  Okay.  And so you got that manufacturing cost
9  per unit of $1,919 from this total cost breakdown
10  spreadsheet you referenced a minute ago; right?

11     A.  That is the source I reference.  Yes.

12     Q.  Okay.  So I just want to make totally clear,
13  the only sources of information that you have for the
14  cost of Katena performing under this contract were an
15  e-mail you got from Mr. Gao and this spreadsheet that's
16  referenced in number 7; right?

17     A.  I wouldn't say that's the only.  That's why I
18  keep asking about the Katena 003097 and other things in
19  my report that I also cite elsewhere.

20     Q.  Let's get at it this way.

21          For nominal manufacturing costs up above, you
22  cite -- you have notes and sources that says, under
23  number 2, "Manufacturing costs per unit" -- and I assume
24  that's a times -- " * PO number of units."

25          Right?



COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1         A.   That is an arithmetic calculation, yes, that I

2    understand.   We also have the sales agreement and the

3    PO.

4         Q.   And the sole source of information that you

5    cite for the manufacturing costs per unit in number 7 is

6    this total cost breakdown spreadsheet; right?   That's

7    the only thing --

8         A.   That's what I cite on in footnote 7 to support

9    the Table 1; correct?

10        Q.   Right.   That's what you cite.   That spreadsheet

11   is what you cite for support for the idea that it would

12   have cost $1,919 to manufacture each of these units.

13   That's what you cite; correct?

14        A.   That is what I cite.   Correct.

15        Q.   And what you cite for your number of nominal

16   engineering costs of $6.68 million is an e-mail you

17   received from Mr. Gao; right?

18             MR. TABER:   Objection.   Asked and answered, and

19   ignores the witness's consistent testimony.

20             ARBITRATOR CALLAHAN:   I'm going to sustain on

21   this, Mr. Alford.   I think this might be the fourth or

22   fifth time over it.   He keeps saying there's Katena

23   003097.   So there's two references there, and you're

24   trying to limit him to the one, and he's not buying it.

25             MR. ALFORD:   Okay.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1    Q.  Let's take a look at the sole document that you

2    cite in footnote 7 for your support of the cost of

3    manufacturing these rigs.  Let's pull that up.  That is

4    a spreadsheet that is Katena 8191.

5         ARBITRATOR CALLAHAN:  Is it an exhibit?

6         MR. ALFORD:  Yes.  It's -- let's pull up

7    Exhibit -- we'll start with context.  Let's pull up

8    Exhibit 113.  It's a native document, so there's a

9    placeholder for it.

10        Let's go to Exhibit 113.

11        ARBITRATOR CALLAHAN:  The document you have

12   printed out for the panel is hardly legible.  I think

13   it's about 6 point font.  But go ahead.

14        MR. ALFORD:  Hang on.  Let's go to Exhibit 113.

15   Okay, if you can blow that up.

16        MR. TABER:  I want to object and note for the

17   record this is a highly-confidential,

18   attorneys-eyes-only document.  I have no problem

19   handling it the way we had with Mr. Soniat in past AEO

20   documents.  I wanted to file that for the record.

21        ARBITRATOR CALLAHAN:  All right.  So noted.

22        BY MR. ALFORD:

23    Q.  So, this is an e-mail from Edwin Song to Henry

24   Monzon dated March 12, 2021, that says -- references an

25   attachment of "Total cost breakdown final rev 20210307"

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1    Excel spreadsheet.

2            You see that?

3        A.   I do.

4        Q.   In your footnote 7, you reference that same

5    spreadsheet 20210307; correct?

6        A.   Correct.

7        Q.   Let's pull up the spreadsheet.  And let's go to

8    the -- there's a tab under "Cost With Chipset."  If we

9    can look at that tab.

10           Okay, do you see where it says "total cost," and

11   then in sort of orange says $1,919?  Do you see that?

12       A.   I do.

13       Q.   This document is the source of your information

14   that it would have cost Katena $1,919 to manufacture

15   these machines; right?

16       A.   Correct.

17       Q.   And you don't know who prepared this document;

18   right?

19       A.   Well, I think the cover e-mail actually says

20   who did it.

21       Q.   Well, yes or no, Doctor, do you know who

22   prepared this document?

23       A.   It's a document that it's my understanding

24   Katena produced at the time of the contract negotiation,

25   or subsequently -- I guess March -- what was it,

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  March 2021?  So it was during the time of -- during the

2  contract negotiation process.

3      Q.  Did you ever ask anyone at Katena or at Perkins

4  Coie who actually prepared this document?

5      A.  No.  It was not relevant to --

6      Q.  I didn't ask you, Doctor, whether it was

7  relevant.  I simply asked whether you ever asked anyone

8  at Perkins Coie or Katena who prepared this document.

9  And I think the answer is "no."

10      Correct?

11      A.  Answer is "no."

12      Q.  Do you read Chinese?

13      A.  I don't.

14      Q.  Do you have any idea what these Chinese

15  characters mean under "Description"?

16      A.  I don't.

17      Q.  All right.

18      Now, Mr. Taber asked you about documents that you

19  would normally rely on in making credit risk assumptions.

20      You'd never advise a client or employer to lend

21  credit to someone based on a document like this written in

22  Chinese that you don't understand, would you, Doctor?

23      A.  I may have the management of the company

24  represent what the managerial cost breakdown would be.

25      Q.  Okay.  Did you ever ask anyone at Katena or

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  Perkins Coie for the actual backup documents that would

2  support the conclusions set forth in this document?

3       A.  I asked for relevant cost information, and this

4  was what was produced along with the other documents

5  that I cite in my report.

6       Q.  Well, you didn't ask them for -- to see

7  contracts with vendors that would support any of these

8  figures, did you?  Yes or no?

9       A.  We had discussions with regard to IMEC and TSMC

10 through IMEC.

11      Q.  Yes or no, Doctor, did you ask anyone at Katena

12 or Perkins Coie for any of the contracts with vendors

13 that would underlie these numbers?

14      A.  I asked for any data or any production that

15 would be indicative of the costs that were being

16 estimated at the time of contract signing.

17      Q.  And this is what you got; right?

18      A.  Correct.

19      Q.  Okay.  Did you ask anyone at Perkins Coie or

20 Katena for evidence that any of the amounts in this

21 document were, in fact, paid by Katena?

22      A.  I'm not sure I understand the question.

23 My analysis -- the scope of my analysis was not about

24 whether or not they paid third parties.  The scope of my

25 analysis was about the economic -- the economics and the

1  viability of the contract at the time of signing.

2      Q.  Well, Doctor, I'm asking you what you did, if

3  anything, to try to verify the figures shown in this

4  Chinese language document.  And my question was whether

5  you asked anyone at Perkins Coie or Katena for evidence

6  that any of the amounts set forth in this document were,

7  in fact, paid by Katena to any vendors?

8      A.  Outside the scope of the analysis I was doing,

9  since I was looking at expected costs at the time of

10  signing.  At the time of signing it's -- it would be

11  unusual --

12      Q.  Doctor, I'm sorry, it's a yes or no question.

13  I only have a limited amount of time, and I'm sorry to

14  interrupt you.  But, yes or no, did you ask anyone at

15  Perkins Coie or Katena for evidence that any of the

16  amounts set forth in this Chinese language document

17  were, in fact, paid by Katena to any vendors?  Yes or

18  no?

19          MR. TABER:  Objection.  Asked and answered.

20          ARBITRATOR CALLAHAN:  Well, he needs to still

21  answer.

22          THE WITNESS:  My answer is "no," because it's

23  outside the scope of my analysis.

24          BY MR. ALFORD:

25      Q.  And, yes or no, did you ask anyone at Perkins

1   Coie or Katena for any invoices from vendors that would

2   support any of the figures set forth in this Chinese

3   language document?

4        A.   The answer is "no," for the reason that I

5   already gave.  Which is, they would not have started

6   incurring those costs at the time of the signing of the

7   agreement.  So how would there be invoices?

8        Q.   So it was your assumption that -- yes or no

9   Doctor.  Was it your understanding that Katena incurred

10  no costs in connection with preparing to bring K10

11  miners onto the market before this contract was signed?

12       Is that your testimony?

13       A.   Could you repeat the question, please?

14       Q.   Sure.  Is it your testimony that Katena

15  incurred no costs in connection with preparing to bring

16  the K10 miners onto the market before this contract was

17  signed?  Is that your testimony?

18       A.   That is not my testimony.  Mischaracterizes

19  what I said.

20       Q.   All right.

21       And the -- did you ever ask anyone at Perkins

22  Coie or Katena for an English language translation of this

23  Chinese language spreadsheet we're looking at on the page?

24       MR. TABER:  Objection.  Mischaracterizes the

25  document.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1    ARBITRATOR CALLAHAN:  Well, we're looking at

2  it.  So the question is:  Did you get a translated

3  version of this spreadsheet, Dr. Mordecai?

4    THE WITNESS:  I did not, because I understood.

5    MR. ALFORD:  That's --

6    THE WITNESS:  May I finish?

7    MR. ALFORD:  No.

8    ARBITRATOR CALLAHAN:  No.

9    Dr. Mordecai, this is cross-examination.

10  Mr. Alford gets to ask you yes or no questions, and

11  Mr. Taber can follow up with you.

12    THE WITNESS:  Okay.

13    BY MR. ALFORD:

14    Q.  So let's go back to your report for a minute,

15  Exhibit 1193, under Notes and Sources, 3 on page 33.

16    A.  Okay.  I'm here.

17    Q.  And we are getting there.  Exhibit 1193,

18  page 33, "Notes and Sources 3"?

19    We talked a little bit about this earlier.

20    MR. ALFORD:  If we can blow up number 3,

21  please, Ken.

22    Q.  We talked a little about this earlier, but I

23  want to make sure the record is clear.  You cite this

24  e-mail from Mr. Gao for the costs of engineering.

25    Did Mr. Gao attach to his e-mail any invoices or

1  other original documents that would support those figures?

2       A.  Not to my recollection.

3       Q.  Okay.  Now, it's your understanding or

4  your assumption, at least, as of the date the contract

5  was signed, the engineering on the K10 chip was done;

6  right?

7       A.  I really -- that's outside the scope of my

8  opinion.  That, I think, falls under Mr. Markovic's

9  opinions as to what state the chip design was in.

10      Q.  Well, you tell us in your timeline of your

11  report that as of April, a final design of the chip had

12  been transmitted to TSMC and was ready for production;

13  right?

14      A.  That is correct.

15      Q.  Okay.  So --

16      A.  And --

17      Q.  That was a yes or no question, Doctor.

18          So my next question is:  Did you ever ask

19  Mr. Gao for any backup documentation to support these

20  figures that he gave you in his e-mail?

21      A.  I did not.

22      Q.  Okay.  Now, as a credit analyst, you wouldn't

23  advise a client or an employer to enter into a

24  $150 million transaction based on assertions made in an

25  e-mail by the borrower, would you?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1    A.  It depends on the situation, the facts and the

2  circumstances.

3    Q.  Okay.

4    A.  We would often get managerial numbers produced

5  with private companies where the managers would

6  basically certify -- whether it's the CFO, CEO, or

7  others -- who, basically, certified as to the veracity

8  of the numbers.  That's not unusual.  It depends on the

9  facts and circumstances.

10    Q.  Yes or no, Doctor, at any time during your work

11  in this case, did you ever ask anyone at Perkins Coie or

12  Katena for any financial statements of Katena?  Whether

13  audited or not.

14    A.  I did not.

15    Q.  Okay.  Let's look at another portion -- I think

16  it's the same -- note 3.  We're there already.

17        Mr. Gao told you that these costs, that there was

18  a $1.788 million cost for 200 risk wafers; right?

19    A.  Was this what the note says?

20    Q.  We haven't seen the e-mail, so we have to

21  assume that's true.  But that's your recollection what

22  the e-mail from Mr. Gao said; right?

23    A.  As I sit here now?

24    Q.  Yeah.  And you told us earlier your report is

25  accurate, so you stand by that statement, right, that



1  that's what he told you?

2       A.  I do.

3       Q.  Okay.

4       A.  Again, I think I was explaining that right now

5  from my memory, one of the things that I cite is the

6  e-mail from Gao.  But I also cite at least one other

7  document.

8       Q.  I haven't seen, in your report, any other

9  documents that -- a citation to any other documents that

10 support your nominal engineering costs of $6.68 million.

11      ARBITRATOR CALLAHAN:  Mr. Alford, questions

12 please.

13      BY MR. ALFORD:

14      Q.  Show me where in your report you cite to any

15 other document to support this $6.68 million in nominal

16 engineering costs, other than the e-mail from Mr. Gao.

17      A.  Again, I'm going to refer to Katena 003097 as

18 part of that note.

19      Q.  My question was:  Show me where in your report

20 you cite any other document for support for your

21 $6.68 million engineering cost figure other than the

22 e-mail from Mr. Gao.

23      Where in your report do you cite any other

24 authority for that figure other than the easement from

25 Mr. Gao?

1    A.   That's certainly the primary source I cite.

2    Q.   And when Mr. Gao told you they could get 200

3  risk wafers for $1.788 million, you understood that he

4  was telling you that they were test chips, right, a test

5  run of chips?

6    A.   I'm going to defer any technical answers to the

7  scope of Dr. Markovic.  I can't say that definitively

8  yes or no.

9    Q.   Since we don't have Mr. Gao's e-mail, I have to

10  ask you:  Did Mr. Gao use the word "risk wafers" in his

11  e-mail to you?

12    A.   I don't recall what the e-mail's contents were

13  right now.

14    Q.   You understand, don't you, Doctor, that "risk

15  wafers" refers to a test run of chips; right?

16    A.   I do.

17    Q.   So irrespective of the exact language Mr. Gao

18  used -- and I understand you're not the technical

19  expert -- you understood Mr. Gao was telling you the

20  plan was to get 200 test chips; right?

21    A.   My understanding of the LSI Manufacturing is

22  that there are often iterations done during the

23  production process, and that this may have been an

24  assumption about how many iterations may have had to

25  have been run.  Nobody has a crystal ball on this stuff.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  So it is an estimate.  What I was doing was something

2  that involved estimated cost.

3      Q.  Right.  I understand that.

4          What I'm trying to get at is what Mr. Gao told

5  you.  And Mr. Gao told you that the plan was to spend

6  around $1.7, $1.8 million for 200 test chips; right?

7          MR. TABER:  Objection.  This calls for hearsay.

8  Mr. Gao was on the stand for a long time.  You could

9  have asked him this question.

10         ARBITRATOR CALLAHAN:  Overruled.

11         THE WITNESS:  I think my response to this is, I

12 don't have access right now to all of my support binders

13 as I sit here in this room.  And I don't want to do a

14 disservice to the panel of Ms. Callahan, Ms. Glick or

15 Ms. Turitz by guessing.  So not having what I'm

16 accustomed to, which is access to all my support binders

17 to refresh my memory, I'm not going to presume anything.

18         BY MR. ALFORD:

19     Q.  Could you pull up that April 30 e-mail for

20 Mr. Gao for us so we can see what he said to you?

21 Doctor?

22     A.  I don't have it in -- how would I pull it up?

23     Q.  You have your computer there; don't you?

24     A.  No, I don't.

25     Q.  You got your phone with e-mail?

1    MR. TABER:  I'm objecting to this line of

2  questioning.  Discovery is over.  If Mr. Alford wanted

3  to ask the panel to order the production of a particular

4  document, there was time to do that.  This is an

5  evidentiary hearing.  I don't think we should be playing

6  these games.

7    ARBITRATOR CALLAHAN:  I'm going to sustain that

8  objection.  These reports were exchanged before the

9  discovery cutoff.  We've heard nothing about this.

10    MR. ALFORD:  Okay.

11    Q.  So, yes or no, when you interviewed Mr. Reddy,

12  did he ever tell you, "You know, we're so confident in

13  our chip design, we're not going to do a test run, we're

14  going to go straight to mass production"?

15    Did he ever tell you that?

16    A.  We did not have any such discussion with

17  Mr. Reddy.

18    Q.  Okay.  But just so we're clear, Mr. Gao told

19  you in his e-mail that for $6.68 million, they could

20  have gotten a chip fully designed, photomasked, and

21  gotten 200 test chips from the foundry; right?

22    A.  The e-mail from Mr. Gao, to my recollection,

23  was simply a breakdown of costs in these categories.

24    Q.  But you -- yes or no, Doctor, did you

25  understand Mr. Gao's e-mail to be telling you that for

1   $6.68 million, Katena could have gotten a -- the chip

2   fully designed and photomasked and gotten 200 test

3   chips?  Yes or no?

4           Is that what you understood him to be telling

5   you?

6           MR. TABER:  Objection.  Asked and answered.

7           ARBITRATOR CALLAHAN:  One more time.  Go ahead,

8   Dr. Mordecai, and then --

9           THE WITNESS:  My understanding was that the

10  non-recurring engineering costs associated with

11  producing and delivering the chips was going to be

12  6.688 -- $6,688,000.  That's why I included it in that

13  line in my report.

14          BY MR. ALFORD:

15      Q.  And for that amount, they could also get 200

16  risk wafers; right?

17      A.  The breakdown is as it appears in my report.

18      Q.  Right.

19          Yes or no, did you ever ask anyone at Katena or

20  Perkins Coie why they did not spend that $6.68 million and

21  get 200 risk wafers?

22      A.  As I said, no, I did not.  Because it was not

23  relevant to the scope of my opinion.

24      Q.  Okay.

25      A.  Which was the estimated revenues, estimated

1  costs, and present value of estimated lost profits at

2  the time of signing of the contract.

3      Q.  But part of your opinion in this case, yes or

4  no, is that this contract was a great deal for my

5  client; right?  That's part of your opinion; right?

6      A.  My opinion estimates the value of the contract

7  to Coinmint, based on the observable market data, and

8  based on the cost of the rigs.  That is exactly what my

9  opinion is.

10     Q.  Well, yes or no, Doctor, in the course of

11  forming your opinion that this contract was a great deal

12  for my client, did it ever occur to you to investigate

13  whether Katena was, in fact, ready, willing, and able to

14  perform under that contract?  Yes or no?

15         MR. TABER:  Objection.  Asked and answered.

16         ARBITRATOR CALLAHAN:  Sustained.  You already

17  asked him if that was part of his analysis with regard

18  to assignment one.

19         MR. ALFORD:  Well, you can drop the blowup, if

20  you will, and just show us the whole page if you could,

21  Ken, please.

22     Q.  Now, if the numbers in your analysis are

23  accurate on this page, for $6.68 million, plus $1,919,

24  Katena could have had at least one actual mining rig.

25  Right?  Yes or no?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1              MR. TABER:  Objection.  Foundation.

2              ARBITRATOR CALLAHAN:  Overruled.

3         You can answer.  If you understand the question,

4    Dr. Mordecai, you can answer.

5              THE WITNESS:  If you'd please repeat the

6    question, Mr. Alford.

7              MR. ALFORD:  Sure.

8         Q.  Now, if the numbers in your analysis are

9    accurate on this page, it's true, is it not, yes or no,

10   that for $6.68 million, plus $1,919, Katena could have

11   had at least one actual mining rig; correct?

12        A.  No.  That's false.  That's actually inaccurate

13   and completely wrong.

14        Q.  All right.

15        A.  Would you like me to explain why?

16        Q.  No.  Mr. Taber is free to do that when he has a

17   chance to speak with you.  I have limited time.

18             Let's pull up Exhibit 1057.

19             MR. TABER:  While doing that, could I ask

20   whether we're going until 5:00 or 5:30 Pacific today?

21   Which will inform whether a short break might be needed.

22             ARBITRATOR CALLAHAN:  Mr. Alford, how long --

23   how much longer do you have?

24             MR. ALFORD:  I think I probably have another

25   hour.  I would love to be able to finish today if we can

1  go until -- get a little dispensation to go to 5:30.

2          MR. TABER:  I have no objection to that if it

3  works for the panel.  I'd just request a three-minute

4  bio break.

5          MR. ALFORD:  We can take a break now if

6  everybody would like to do that, a bio break.

7          ARBITRATOR CALLAHAN:  All right.  It is 4:35,

8  come back at 4:40.  And please mute your microphones on

9  your respective end.

10          (Break taken.)

11          ARBITRATOR CALLAHAN:  We're going to go until

12  5:30.  We've taken our bio break.

13          Mr. Alford, you need to finish up with

14  Dr. Mordecai today.  I've done the tabulation.  Once

15  again, Coinmint is using more of the hearing time, when I

16  expressly told everybody at the beginning that you need to

17  make adjustments, because you've already exceeded your

18  share of the hearing time.  You're up to 175, and you're

19  going to have another 40 minutes or so.  That will take

20  you over 200.  Coinmint is 135 for the day.  So you're

21  going to be about another hour more of shared hearing

22  time.  So I do expect you to finish up with Dr. Mordecai.

23          It will help if you ask your questions once, not

24  repeat them three, four, five times.  So ask your

25  questions once and then move on.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          MR. ALFORD:  I will do my best.  I promise.
2    It's not my goal to monopolize.
3          ARBITRATOR CALLAHAN:  Well, 5:30 is a hard
4    stop, and then Mr. Taber will have a few moments
5    tomorrow to do redirect with Dr. Mordecai.  And I expect
6    us to be starting with Mr. Stake by 10:00.
7          MR. ALFORD:  I would hope.  Yeah.  That would
8    be great.
9          Okay.
10         ARBITRATOR CALLAHAN:  Dr. Mordecai had a
11   process question.  I wanted --
12         THE WITNESS:  It's a really minor process
13   question.  I'm almost embarrassed to ask it.
14         Are the three panelists comfortable, if I need to
15   address you directly, calling you Ms. Callahan,
16   Ms. Glick, Ms. Turitz?  Or is there something else you
17   prefer?
18         ARBITRATOR CALLAHAN:  You can call us by our
19   last names, but there really should not be a need for
20   you to do so.
21         THE WITNESS:  Okay.  I just want to make sure
22   if I'm responding to a question from one panelists, I
23   don't want to say something offensive.
24         ARBITRATOR CALLAHAN:  If we ask you a question,
25   which we might tomorrow, yes, Ms. Callahan, Ms. Turitz,

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  Ms. Glick is perfectly fine.  Otherwise, during the

2  course of the attorney questioning, please allow

3  Mr. Taber and Mr. Hardin to interface on your behalf.

4          THE WITNESS:  Absolutely.

5          ARBITRATOR CALLAHAN:  That's what they're there

6  to do.

7          THE WITNESS:  Suppose I'm responding to you,

8  and I say, "As I said to Ms. Glick or Ms. Turitz" when

9  she asked the question.  That's all I'm looking for to

10  make sure.

11          ARBITRATOR CALLAHAN:  Fair enough.  Thank you

12  for asking.  Yes, just calling us by our last names is

13  perfectly fine.

14          Go ahead, Mr. Alford.

15          MR. ALFORD:  Okay.  "Your Excellency" will

16  suffice, as well.

17          ARBITRATOR CALLAHAN:  The Queen.

18          BY MR. ALFORD:

19      Q.  Yes or no, did anyone at Perkins Coie or Katena

20  tell you that Katena had contracts with other customers

21  in excess of $100 million that predated the Coinmint

22  contract?  Yes or no?

23      A.  Not to my recollection.  I don't -- again,

24  outside the scope of the analysis I was doing on this

25  contract.

1    Q.  Yes or no, did you ask anyone at Katena or

2   Perkins Coie whether they had contracts with other

3   customers?

4    A.  Same answer.  No.  Because it's outside the

5   scope of my analysis.  I'm an analyzing discounter.

6    Q.  Yes or no, Doctor, did you feel comfortable

7   opining that this contract was a great deal for my

8   client, without ever looking at any other contracts

9   Katena may have had with other customers?  Yes or no?

10   A.  Yes.  Because my analysis speaks for itself in

11  terms of the discounted cash flow analysis and the real

12  options analysis.  Neither of those require those other

13  outside references.  They're just out of scope.

14   Q.  Let's pull up Exhibit 1057.  And if we can go

15  down to the -- this is a string of e-mails between folks

16  at Katena and folks at JP Morgan.

17      You see at the bottom it says, "We have

18  $276mm" -- presumably million -- "$276 million in binding

19  POs, Coinmint $150 million, Edgemode $116 million,

20  VectorCloud $10 million."

21      You see where it says that?

22   A.  I do.

23   Q.  Did anyone at Katena or Perkins Coie ever tell

24  you about those other contracts?

25      MR. TABER:  Objection.  Asked and answered.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1        THE WITNESS:  I think I said -- as I said

2   before, it was outside the scope of my analysis of this

3   contract.  So --

4        ARBITRATOR CALLAHAN:  That's twice, Mr. Alford.

5   Next question.

6        MR. ALFORD:  Okay.

7   Q.  Let's pull up Exhibit 2026.

8        While we're looking for that, did you ever ask

9   anyone at Katena or Perkins Coie how the pricing on the

10  Coinmint contract that you thought was way below market

11  value, compared to pricing Katena offered other

12  customers?  You ever ask them that?

13  A.  The answer is no, because it's outside the

14  scope of my analysis of this contract and the

15  methodologies I used to do so.

16  Q.  Let's take a look at this document.

17       MR. ALFORD:  If you could scroll down a little

18  bit, please, Ken, to the contract that's attached.  It's

19  page 2026-3.

20       If you can blow that up a little bit.  Blow up

21  the whole thing a little bit.

22  Q.  Do you see this document on the screen there,

23  Doctor?

24  A.  I have not reviewed the document, but I see the

25  part you've blown up.

1    Q.  Do you see where it says, "Total Purchase Price

2    from 2021 to 2023, $116 million USD"?

3    A.  I see what's on the page.  Yes.

4    Q.  If we can go down to the signature page, which

5    I think is the next one.  If we can blow that up a

6    little bit.

7        Do you see this appears to be signed by Katena

8    and Edgemode in April of 2021?

9    A.  That's as it appears.

10   Q.  If we can go up to the pricing page, which I

11   think is the previous page, do you see the pricing of

12   55 -- sorry -- $35 per terahash is offered to Edgemode?

13   You see where it says that?

14   A.  I do.

15   Q.  All right.  But just to be clear, you never

16   asked Katena about any of the pricing offered to other

17   customers?

18   A.  So you're asking me about the 35 joules per

19   terahash.  That's not dollars.  That's joules per

20   terahash.

21   Q.  You're right.

22       Do you see below that where it says, "Price,

23   $55 U.S. dollars per terahash"?

24   A.  I do.  For reference only, non-binding and not

25   confirmed.



1      Q.  Did you ever ask anyone at Katena whether this

2   was one of the contracts that they were representing to

3   JP Morgan was a signed, binding purchase order?

4           MR. TABER:  Objection.  Asked and answered, and

5   foundation.  He already testified he didn't see this.

6           ARBITRATOR CALLAHAN:  Let me pop in here.

7   Ms. Turitz and Ms. Glick can speak for themselves if I'm

8   off base.  Given that he testified that he didn't ask to

9   review, and he didn't review, any of Katena's contracts

10  with others, I don't understand why we're now going

11  through one of Katena's contracts with another.  I don't

12  understand where this is headed.

13          MR. ALFORD:  Let me see if I can help.  Fair

14  point.  Let me see if I can help.

15      Q.  Doctor, if you had seen this contract

16  indicating a price of 55 USD per terahash, would that in

17  any way have affected your opinions in this case?  Yes

18  or no?

19      A.  No.

20      Q.  Okay.  Fair enough.

21          Now let's pull up Exhibit 1003.

22          Do you see this appears to be a purchase order

23  between VectorCloud and Katena?  Do you see that?

24      A.  I do.

25      Q.  And do you see -- let's go to the signature

1  page.

2          MR. TABER:  Going to object on the same ground

3  as the previous document.  As Ms. Callahan said, I'm not

4  sure why we're looking at this.

5          ARBITRATOR CALLAHAN:  I'm going to let

6  Mr. Alford ask his question once.  But, again, I'll make

7  the same admonition.  Given that Dr. Mordecai testified

8  that he did not review, nor did he ask to review, any of

9  Katena's contracts with others, I do not understand why

10 we are reviewing any of Katena's contracts with others.

11         MR. ALFORD:  Fair enough.  My question is going

12 to be whether, if he had seen this, it would have

13 impacted his opinions.  That's my only question.

14     Q.  Other than just authenticating date, do you see

15 the date at the bottom of the screen there, Doctor?

16     A.  I do.

17     Q.  It appears to be the contract was signed in

18 February of 2021?

19     A.  I do see that.

20     Q.  Let's go up to the pricing section, which is

21 on -- if we can blow it up where it says, "Price,

22 $25 USD per terahash."  You see that?

23     A.  I do.

24     Q.  If you had seen this contract through the

25 course of your work, would it have affected any of your

1  opinions in the case?

2      A.  Not at all.

3      Q.  Yes or no, Doctor, did it ever occur to you

4  that it would be important for you to see the income and

5  expense records associated with any contracts Katena had

6  with its other customers?

7      A.  No.

8          MR. TABER:  Objection.

9          THE WITNESS:  No.  Because it's outside the

10 scope of --

11         MR. TABER:  Dr. Mordecai, if I make an

12 objection, I'm sorry, but --

13         ARBITRATOR CALLAHAN:  He's already answered.

14 He's already answered.

15         THE WITNESS:  Sorry, Jacob.  It's just that

16 it's going to be the same answer every time.  So I

17 apologize for running ahead of you.

18         BY MR. ALFORD:

19     Q.  Now, in -- let's go back to your report for a

20 moment and look at Table 1 on page 3.  Your report is

21 Exhibit 1193.  Page 33, Table 1.  If we can blow up

22 Table 1 a bit.

23         You say -- see the line that says "Damages" --

24 sorry.  Line up above it says, "Present value of lost

25 profits"?

1      A.  Yes.

2      Q.  $89.9 million?

3      A.  Yes.

4      Q.  And do you see under that where it says

5  $23 million?

6      A.  Yes.

7      Q.  And then you subtract that $23 million from the

8  $89.9 million to get $66.9 million; right?

9      A.  Correct.

10     Q.  And you did that because you understood that,

11 in fact, Katena had received $23 million from my client;

12 right?

13     A.  Eventually.  Yes.

14     Q.  And you subtracted that from its damages;

15 right?

16     A.  I subtracted it from the present value of the

17 lost profits; correct.

18     Q.  And you subtracted all of it -- let me ask the

19 question a different way.

20         Nowhere in your report do you have any figures

21 that show what part of that $23 million, if any, Katena,

22 in fact, used to prepare to perform on the contract.

23 Isn't that true?

24     A.  I do not have anything in my report discussing

25 that.



1    Q.  Right.  And, in fact, your report assumes that

2    none of that $23 million was, in fact, used on expenses

3    related to the contract; correct?

4        A.  I think that that mischaracterizes my analysis.

5    All I'm saying is that $23 million of $150 million was

6    received, and so that reduces damages by the

7    $23 million.  That's the only thing.  I'm not assuming

8    other things.

9        Q.  Right.  But because you assumed that the whole

10   $23 million reduced the damages, you also necessarily

11   assume that none of that $23 million was spent on

12   expenses related to the contract; right?

13       A.  I don't know that I'd go that far.

14       Q.  And you also, on your prejudgment interest, you

15   calculate prejudgment interest as beginning to run on

16   May 12, 2021; correct?

17       A.  I have two calculations.  One that starts on

18   May 12th and one that starts on November 16th.

19       Q.  Isn't it true, Doctor, that you calculate

20   prejudgment interest as beginning on May 12, 2021, and

21   ending on September 21, 2023?

22       A.  I have -- so my Table 2, page 34 of my report,

23   I calculate prejudgment interest starting on May 17th,

24   2021, to September 21st, 2023.  And then I have another

25   second calculation that goes from November 16, 2021, to

1  September 21st, 2023.  And I explain in the text the

2  motivation for those two calculations.

3      Q.  But all your calculations are of prejudgment

4  interest on the entire $150 million; correct?

5      A.  Are you referring to Table 2 on page 34?

6      Q.  Well, let's start with Table 1.  On --

7      A.  Okay.  So you're saying -- yes, on Table 1,

8  sorry, prejudgment interest taking simple basis from

9  May 12, 2021, to September 21st, 2023, and I'm using a

10  ten percent simple interest rate.

11      Q.  On the entire $150 million; correct?  Correct?

12      A.  I do not believe that's correct.  It's because

13  it's more than a year; right.  It's a year and about

14  four months.  So I do not believe that that's what I

15  did.  But I have to go back and double-check it.

16      Q.  All right.  And it's true, is it not, Doctor,

17  that your analyses and opinions are premised on the

18  assumption that the original written contract was never

19  modified by the parties; correct?  Yes or no?

20      A.  It is presumed that this -- the contract signed

21  on May 12th was the only contract that both parties

22  cited and agreed to.

23      Q.  And if, in fact, the parties did subsequently

24  alter, in a material way, the pricing and payment terms

25  of the contract, your analysis would have to be changed

1  accordingly; correct?

2      A.  I would revisit it if so instructed under those

3  terms and conditions.  It's my understanding that never

4  occurred.

5      Q.  Well, you understand, yes or no, do you not,

6  that my client believes the evidence shows that, in

7  fact, that did occur.  You understand that; right?

8      A.  I don't understand that.  Because I've been

9  focused entirely on analyzing this contract.  And when I

10  requested whether there were any subsequent contracts

11  signed by both parties in accordance with the PSA and

12  the PO's language, it's my understanding that that never

13  occurred.

14      Q.  But you're not here --

15      A.  So the SPA and PO said that both parties would

16  have to sign any amendment or any new agreement.  And it

17  is my understanding that that never occurred.

18      Q.  But you're not here to offer an expert opinion

19  on that; right?

20      A.  Well, I'm not offering an expert opinion on it.

21  I'm just telling you what facts and evidence I was

22  provided.

23      Q.  Right.  From Perkins Coie?

24      A.  Yes.

25      Q.  Now, yes or no, did you ever ask anyone at

1  Perkins Coie or Katena for any financial documents

2  showing how, in fact, Katena performed financially,

3  despite my client's alleged breach of the contract?

4        A.  Would you repeat the question, please?

5        Q.  Sure.

6            Yes or no, did you ever ask anyone at Perkins

7  Coie or Katena for any financial documents showing how, in

8  fact, Katena performed financially, despite my client's

9  alleged breach of the contract?

10           MR. TABER:  Objection.  Vague as to

11  "performed."

12           ARBITRATOR CALLAHAN:  Well, Dr. Mordecai, if

13  you understand it, you can answer.

14           THE WITNESS:  Well, what I understand is being

15  asked is some question about the overall enterprise

16  activities of Katena, which were outside the scope of my

17  assignment.  My assignment was to evaluate damages under

18  the breach of this agreement in question with Coinmint.

19  So that just simply means my answer is I did not ask

20  about these other extraneous things.

21           MR. ALFORD:  We can agree to disagree about

22  whether they're extraneous.  But --

23           ARBITRATOR CALLAHAN:  Mr. Alford -- Mr. Alford,

24  questions, please.

25           MR. ALFORD:  Yes.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1    Q.  Now, as an experienced economist and someone in

2    the business world for many years, you understand that

3    it's important for a company who claims they've lost

4    their rights under a contract to try to mitigate their

5    loss by finding new contractual opportunities; correct?

6    A.  It depends.

7    Q.  Okay.  In --

8    A.  If, in fact, they would incur costs that would

9    make their damages higher, then it might not be a good

10   idea to scramble and race around looking for

11   substitutes.

12   Q.  And nowhere in your Table 1 lost profits

13   analysis do you include any figures showing Katena's

14   mitigation of its alleged damages; isn't that true?  Yes

15   or no?  Yes or no, Doctor?

16   A.  So, could you repeat the question?

17   Q.  Sure.

18       And nowhere in your Table 1 lost profits

19   analysis do you include any figures showing Katena's

20   mitigation of its alleged damages; isn't that true?  Yes

21   or no.

22   A.  There is no line item here that discusses

23   mitigation of damages in those tables.

24   Q.  Okay.

25       Now, it's your opinion that this contract was



1  approximately 45 -- the price of the machines specified in

2  this contract was approximately 45 percent below market

3  value; right?

4       A.  Forty-five percent below the indicative ASIC

5  index.  So for similarly-rated or comparably-rated

6  efficiency capacity, according to the Luxor index of

7  prevailing prices, it was at about 45 percent of that.

8  Correct.

9       Q.  Yes or no, Doctor, are you aware that at or

10 about the time that the contract was entered into, and

11 before any litigation by us arose, your clients were

12 saying the opposite of that.  You aware of that?

13      A.  I don't understand the question.

14      Q.  All right.

15      ARBITRATOR CALLAHAN:  Please rephrase,

16 Mr. Alford.

17      MR. ALFORD:  What's that?

18      ARBITRATOR CALLAHAN:  Please rephrase.  He says

19 he doesn't understand your question.

20      MR. ALFORD:  You bet.

21      Q.  Yes or no, Doctor, are you aware that, in fact,

22 at or about the time the contract was entered into, and

23 before any litigation by us arose, Mr. Gao and

24 Mr. Monzon were saying that, in fact, they thought this

25 contract was above market price?  Are you aware of that?

1            MR. TABER:  Objection.  False foundation.

2            ARBITRATOR CALLAHAN:  I'm going to sustain

3    that.  You can ask him if he heard any such thing from

4    Mr. Monzon or Mr. Gao; if he has any personal knowledge

5    of such a thing.

6            BY MR. ALFORD:

7        Q.  Did you ever ask Mr. Monzon or Mr. Gao what

8    they thought, at the time this contract was entered

9    into, about whether it corresponded with market price?

10       A.  I've never had any communications with

11   Mr. Monzon.  My communications with Mr. Gao were very

12   specific to the PSA, certain terms of the PSA and PO.

13   Wasn't a wide range of discussion.

14           And for the analysis I'm did, which is an

15   arms-length --

16           MR. ALFORD:  I'm sorry, Doctor -- sorry to

17   interrupt.  I asked you a yes or no question, whether

18   you ever asked him that.

19           THE WITNESS:  The answer is "no."

20           MR. ALFORD:  Let's pull up Exhibit 41, please.

21   And specifically page 20.

22       Q.  I want to show you a part of this document.  My

23   question is simply going to be whether, if you had known

24   about this document, it would have influenced your

25   opinions in any way in the case?

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1      MR. TABER:  I'll object to Dr. Mordecai being

2  questioned on this document unless he's given the

3  opportunity to review it.  Just asking him about a

4  particular screen of a much longer document I think is

5  improper and unfair.

6      ARBITRATOR CALLAHAN:  Mr. Alford, again, like

7  with the contracts with other customers, I don't

8  understand why you want to ask Dr. Mordecai about texts

9  or WhatsApp messages between, I guess it's Monzon and --

10      MR. ALFORD:  Mr. Gao.

11      ARBITRATOR CALLAHAN:  -- and Mr. Gao.

12      How is that helpful?  Why --

13      MR. ALFORD:  This is a text exchange between

14  Mr. Monzon and Mr. Gao in which they, at the time the

15  contract was entered into, expressed their views about

16  how the contract compares with market price.  And I'm

17  simply --

18      ARBITRATOR CALLAHAN:  You have that evidence

19  in.

20      MR. ALFORD:  Yes.

21      ARBITRATOR CALLAHAN:  You also have

22  Dr. Mordecai saying he didn't ask them what they

23  thought.

24      MR. ALFORD:  Right.

25      ARBITRATOR CALLAHAN:  So --

1          MR. ALFORD:  My question is simply -- I have

2  one question on this.  Whether, if he had known about

3  this, it would have influenced his opinion.  Maybe the

4  answer is going to be no and we can move on.

5          MR. TABER:  It's the same objection to him

6  being asked about --

7          ARBITRATOR CALLAHAN:  Go ahead, Doctor.  Go

8  ahead, Mr. Alford.

9          BY MR. ALFORD:

10     Q.  In this text exchange, Mr. Monzon and Mr. Gao

11 write to one another on May 13, 2021, "It definitely

12 won't be easy to get other deals like Coinmint."

13          Mr. Gao responds, "True."

14          Mr. Monzon says, "Don't expect that."  He says,

15 "It won't happen."

16          Mr. Gao says, "What do you think Celsius will

17 do?"

18          Mr. Monzon says, "It's due to Maloney because

19 the deal in the works for him."

20          Mr. Gao says, "Yeah, sweetheart deal."

21          My question to you is:  If you had known about

22 this text exchange, would it have been at all influential

23 to your opinions in this case?

24     A.  No.  Because it would not have affected the

25 analysis that I did.  And, also, I can't even say it

1  would, given the limited context under which you're

2  providing me with the document.  Mr. Taber pointed out I

3  haven't had a chance to review context for this limited

4  answer.

5          MR. ALFORD:  If we can pull up Exhibit 37,

6  please.

7      Q.  We know that Exhibit 37 is a text exchange you

8  reviewed because you discuss it in your timeline; right?

9          Let me withdraw the question and help focus a

10  little bit.

11          Let's look briefly at your timeline.  So let's

12  go -- toggle back to Exhibit 1193, your report.  Let's

13  look at your timeline.  Page 11.  Under the timeline

14  entry.

15          If we can blow up the timeline entry for

16  5/4/2021.  You see where it says, "Coinmint CFO Mike

17  Maloney called Katena's Chief Strategy Officer, Michael

18  Gao, and told him Katena had cash in hand to pay down

19  payment"?  You see that?

20      A.  I do.

21      Q.  Let's go back to Exhibit 37.

22          ARBITRATOR CALLAHAN:  This is WhatsApp

23  exchanges in July of 2021.  What is the connection,

24  Mr. Alford?

25          MR. ALFORD:  I think Exhibit 37 is a May 4 text

 1  exchange, the same one referenced -- that references the

 2  cash in hand.

 3          ARBITRATOR CALLAHAN:  Oh, I see.  Okay.

 4          BY MR. ALFORD:

 5     Q.  If we can take a look at page -- Bates

 6  page 6586 and blow that up a little bit.

 7          If we can go down to actually to the bottom -- to

 8  page 6592.

 9          ARBITRATOR CALLAHAN:  You said that

10  Dr. Mordecai referred to this.  Where are you looking as

11  sources?

12          MR. ALFORD:  Yes.  Let's cover that.

13          Let's go back to the beginning of the document.

14  There's a text exchange where -- interesting call from

15  Mike Maloney.

16          ARBITRATOR CALLAHAN:  No.  I was asking you in

17  reference to Figure 1, the timeline that references that

18  are by the 5/4/2021 issue, you said that he had referred

19  to this.

20          MR. ALFORD:  Yes.

21          ARBITRATOR CALLAHAN:  So I was asking you where

22  is that reflected?  Because I'm not seeing that

23  mentioned.  So I'm wondering where that's reflected.

24          MR. ALFORD:  Yes.  Let's look at the beginning

25  of the document.

1    ARBITRATOR CALLAHAN:  No, I'm looking at his
2  document where he says that his source for that was
3  Katena's response to Coinmint's Motion for Interim
4  Award, page 8.
5    MR. ALFORD:  Right.
6    THE WITNESS:  And I said, "I cite the fact the
7  statement was quoted" --
8    MR. TABER:  There's no question pending.
9    ARBITRATOR CALLAHAN:  Again, Mr. Alford, we're
10  going back over documents that don't appear to have been
11  considered by this witness.  At least you haven't
12  established that.  And I'm trying to find, where is the
13  reference.  Because I thought you said, "He referred to
14  Exhibit 37 in his timeline."  I'm asking you where that
15  reference is.
16    MR. ALFORD:  I should have been more precise.
17  He refers to the facts alleged in this text exchange in
18  his timeline.  This text exchange is the text exchange
19  which Mr. Gao purports to quote Mr. Maloney is telling
20  him that they have cash in hand.
21    So I'm going to withdraw that, and let me ask a
22  new question.
23    Q.  Let's go to page 6592.  Bates page 6592.
24    ARBITRATOR CALLAHAN:  Mr. Alford, you still
25  haven't established why we are going through a document

1  that you have not yet laid a foundation that

2  Dr. Mordecai looked at it or considered it.

3         MR. ALFORD:  I'm going to ask him whether, if

4  he had known about it, would it have influenced his

5  opinions.

6         Q.  Okay, if we can blow it up a little bit at the

7  bottom of page 6592.  It says -- you see where Mr. Gao

8  writes, "BTW, if Maloney tells the truth in his resume,

9  he has MFN status with Bitmain and Micro BT."  Right?

10        You see that?

11        A.  I do.

12        Q.  If you go to the next page and blow up the top

13  of the next page.  Do you see where Mr. Gao says,

14  "Meaning, he knows $45 per terahash prices, et cetera."

15        You see that?

16        A.  I see what's on the page.

17        Q.  And do you see where the response from

18  Mr. Monzon is "MFN"?

19        And Mr. Gao says, "Not only that, but he gets

20  those prices."

21        Do you see that?

22        A.  I see what's on the page.

23        Q.  Did anyone at Katena or Perkins Coie ever tell

24  you that they had information from Mr. Maloney that he

25  was getting $45 per terahash prices from Bitmain in May

1  of 2021?

2         MR. TABER:  Objection -- objection.  Both,

3  relevance and, I think, false foundation as to what

4  anyone was getting from Bitmain.

5         ARBITRATOR CALLAHAN:  He just asked him if

6  anybody told him.  It's yes or no.

7         THE WITNESS:  The answer is no.

8         MR. ALFORD:  Okay.

9     Q.  If you had seen this document in the course of

10  your analysis, would it have affected your opinions at

11  all?

12    A.  No.  In the context of the analysis I

13  conducted, which I clearly explained in my report, this

14  would be relevant to that.

15    Q.  Just a few more questions.  I want to talk to

16  you about your timeline, which I believe is on page 11

17  of your report.  If we can go to Exhibit 1193, please.

18  If we can blow that up a bit.

19         You understand, Doctor, that my client feels and

20  contends that documents produced by Katena, itself,

21  contradict many of the facts set forth in your timeline.

22  You understand that; right?

23    A.  No.

24    Q.  You're not here to opine that any of the facts

25  set forth in your timeline are, in fact, true; are you?

1      A.  Would you rephrase the question?  I'm not sure

2  it's clear on what you're asking.

3      Q.  You're not here to offer an opinion that, in

4  fact, the alleged facts set forth in your timeline are

5  accurate; are you?

6      A.  Well, I think my opinions are the ones that are

7  stated in my report, which are the results of my

8  analyses.  I'm not here to try to pretend to be a fact

9  witness, if that's what you're asking.

10      Q.  Okay.  Let's look at one, for example.  I'm not

11  going to talk about all of them, because time doesn't

12  permit.

13          ARBITRATOR CALLAHAN:  Mr. Alford, let me make

14  the record quite clear, that the panel has created and

15  will continue to create its own chronology based on the

16  evidence that it's heard and the inferences it is

17  drawing.  We will not rely on this timeline by

18  Dr. Mordecai, or any witness's timeline, how they've

19  construed or been represented that the events occurred.

20  That is in the province of the panel.

21          So let me be clear, we are not relying on

22  Dr. Mordecai's representation of the "key facts" as

23  being the key facts or being true and accurate in any

24  regard.  We will make that determination independently.

25          MR. ALFORD:  Okay.  I appreciate that.  So I am

1  not going to dwell on much.  I want to ask a couple

2  questions and then I'll hopefully be close to being

3  done.

4      Q.  All right, if we can take a look at your entry

5  for 11/3/2021 there.  Do you see that?

6      A.  I do.

7      Q.  It says, "Coinmint CEO, Ashton Soniat, wrote

8  that Coinmint was 'open to whatever creative ways that

9  can make Katena whole as per our agreement.'"

10         Do you see that?

11     A.  I do.

12     Q.  And you got that Katena's -- what's your cite

13  there?  What do you cite for that as support for that?

14     A.  Are you asking -- is that a yes or no question?

15         Answering Statement to First Amended Arbitration

16  Demand and Amended Notice of Counterclaim, page 11.

17     Q.  Did you ever actually see that writing that was

18  attributed to Mr. Soniat?

19     A.  I don't recall.

20     Q.  Can we pull up Exhibit 2179, please?  If we can

21  blow that up a bit.  Scroll down a bit.

22         Okay, the very top, sorry.  Go up to the very

23  top.

24         You see where Mr. Monzon writes, "Hi, Ashton.

25  On back-to-back calls.  Let me try you around 4:00 p.m.

1  EST when I get a breather.  If you want to send over

2  some thoughts already, please do.  Open to whatever

3  creative ways that can make Katena whole as per our

4  agreement."

5         Do you see that?

6     A.  I do.

7     Q.  Did anyone at Perkins Coie or Katena ever tell

8  you that, in fact, contrary to the information in your

9  timeline, it was Mr. Monzon, and not Mr. Soniat, who

10  authored that statement that's erroneously attributed to

11  Mr. Soniat?

12         Anyone ever tell you that?

13     A.  Not to my recollection.

14     Q.  When anyone at Perkins Coie reviewed your

15  report, did they ever tell you that that timeline event

16  was erroneous?

17     A.  Not to my recollection.

18     Q.  But you still stand by everything in your

19  report; right?

20     A.  My analysis is still my analysis.  I mean, this

21  timeline of the events does not -- it's background.  It

22  doesn't affect the nature of this kind of cash flow

23  analysis or the real options analysis.  So I do.

24     Q.  Well, you thought it was important enough to

25  include the timeline; right?

1      A.   As part of this -- part of the background of

2  facts that were represented in the briefs.  However, it

3  is not central to the analysis, the results or the

4  opinion that I provide, which is based on market

5  evidence and prices.

6      Q.   Let me ask you about another entry.  The entry

7  on April 17, 2021, you say, "Katena transmitted the

8  design for its proprietary chip to TSMC.  TSMC

9  acknowledged Katena's volume forecast for wafer

10 production and was ready to produce substantially more

11 chips than just Coinmint's first order."

12         Do you see that?

13     A.   I do.

14     Q.   Now, you tell us in Note B that you've never

15 received a copy of that transmission or the

16 acknowledgment from TSMC; is that correct?

17     A.   Correct.

18     Q.   And, yes or no, did you ever ask for it?

19     A.   I did have a conversation with Perkins Coie

20 regarding the nature of the relationship between TSMC

21 and Katena.  I understood that IMEC was acting as the

22 aggregator.  I've had previous contacts with IMEC.  I've

23 had contact with them in various capacities.

24         So we did have a conversation about it.  I did

25 not ask, specifically, for those communications.  We did

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1  have a conversation about it.

2      Q.  All right.  If I can just have a minute to

3  review my notes, I think I'm either done, or darned

4  close.

5          ARBITRATOR CALLAHAN:  All right.  It's 5:25.

6  So hopefully you're done.

7          MR. ALFORD:  Yeah.  I think I'm very, very

8  close.  Let me take a minute.

9          Can we just go off the record for a minute?

10         ARBITRATOR CALLAHAN:  Sure.

11         (Off the record.)

12         MR. ALFORD:  Looks like I just have a very,

13  very limited set of questions that I think I can get

14  done by 5:30.

15         ARBITRATOR CALLAHAN:  We'll be stopping at

16  5:30.

17         MR. ALFORD:  Yes.  I understand that.

18     Q.  Did you, Doctor -- yes or no, did you at any

19  point, during the course of your work in this case, ask

20  anyone at Katena or Perkins Coie how much financing

21  Katena had available to it in the spring of 2021 to

22  produce machines?  You ever ask that question?

23     A.  No.

24     Q.  Did anyone at Katena or Perkins Coie ever tell

25  you, in the course of your work in this case, that in

1  the spring of 2021 Katena had $200 million in guaranteed

2  secured financing available to it?

3         Anyone ever tell you that?

4     A.   No.  Not to my recollection.

5     Q.  It would have been important to you in the

6  course of your analysis to know if, in fact, Katena had

7  $200 million in secured guaranteed financing available

8  to it in the spring of 2021; isn't that true?

9     A.   No.  Because this has nothing to do with the

10  discounted cash flow analysis I did or the real options

11  analysis which is based on prevailing market prices and

12  manufacturing and recost.  It's tangential.  It's just

13  not relevant.

14     Q.  Okay.  I understand your opinion that

15  $200 million in guaranteed finances is tangential.

16         Is that your opinion?

17         MR. TABER:  Objection.  Argumentative.

18         ARBITRATOR CALLAHAN:  Sustained.

19         MR. ALFORD:  All right.  I have no further

20  questions.

21         ARBITRATOR CALLAHAN:  All right.

22         So we'll resume tomorrow at 9:00 a.m.  Mr. Taber,

23  you'll be up with any short redirect you may have of

24  Dr. Mordecai.  And, Dr. Mordecai, we will see you -- I

25  don't know where you are.  9:00 o'clock.

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

1          THE WITNESS:  I'm in New York.

2          ARBITRATOR CALLAHAN:  So it's noon your time.

3          THE WITNESS:  Noon my time.  I don't have to be

4    up at the crack of dawn.

5          ARBITRATOR CALLAHAN:  All right.  See everybody

6    tomorrow at 9:00, and thank you very much.

7          Ms. Turitz, Ms. Glick, let me send you a new Zoom

8    link so we can chat a little bit.

9          THE WITNESS:  Thank you for your leadership,

10   Ms. Callahan, and look forward to seeing you all

11   tomorrow.

12         ARBITRATOR CALLAHAN:  Thank you so much.

13         MR. ALFORD:  Thank you.

14         ARBITRATOR CALLAHAN:  Night everyone.

15         MR. TABER:  Thanks everyone.  Take care.

16         (Adjourned for the evening at 5:29 p.m.)

17

18                    ---oOo---

19

20

21

22

23

24

25

COINMINT, LLC vs KATENA COMPUTING TECHNOLOGIES, INC.
Arbitration - Evidentiary Hearing - 10/16/2023

```
 1              CERTIFICATE OF REPORTER

 2      DECLARATION OF COURT REPORTER REGARDING CCP 237(a)(2)

 3

 4
        I, CRAIG W. WOOD, a Certified Shorthand Reporter,
 5  licensed by the State of California, License No. 9789,
    being empowered to administer oaths and affirmations
 6  pursuant to Section 2093(b) of the Code of Civil
    Procedure, do hereby certify:
 7
        That the foregoing proceedings were taken in
 8  stenographic shorthand before me at the time and place
    herein stated, that said proceedings were taken before
 9  me in shorthand writing, and were thereafter transcribed
    under my direction by computer-aided transcription;
10
        That the foregoing transcript, pages 1 to 248,
11  constitutes a full, true, and accurate record of the
    proceedings which took place;
12
        That I am not of counsel or attorney for any of the
13  parties hereto, or in any way interested in the event of
    this cause, and that I am not related to any of the
14  parties hereto.

15      I further declare that pursuant to the provisions
    of the Code of Civil Procedure section 237(a)(2) and to
16  the best of my ability, personal juror identifying
    information has been redacted from those portions of the
17  reporter's transcript governed by CCP 237(a)(2).

18      IN WITNESS WHEREOF, I have hereunto subscribed my
    signature.
19

20      DATED:   November 2, 2023

21

22

23      _____

24              CRAIG W. WOOD, CSR 9789

25
```