# EXHIBIT Y

AMERICAN ARBITRATION ASSOCIATION

COMMERCIAL ARBITRATION RULES


COINMINT, LLC,

     CLAIMANT,

  vs.

KATENA COMPUTING TECHNOLOGIES,
INC.,

     RESPONDENT.
_____





REPORTER'S TRANSCRIPT OF PROCEEDINGS

Tuesday, September 19, 2023

Volume 5, Pages 1121 - 1477




Reported By:
KATHLEEN A. MALTBIE, STENOGRAPHIC REPORTER
California CSR 10068, Nevada CCR 995, Texas CSR
12212, RPR-RMR-CRR-CCRR-CLR-CRC-RDR


Job No. 90148

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

```
 1              APPEARANCES OF COUNSEL

 2   ON BEHALF OF THE CLAIMANT:

 3       GORDON REES SCULLY MANSUKHANI LLP
         BY:  FLETCHER C. ALFORD, ESQ.
 4          KEVIN LIU, ESQ.
            ROBERT A. LEMUS, ESQ. (Via Zoom)
 5       275 Battery Street, Suite 2000
         San Francisco, California  94111
 6       (415) 875-3115
         Falford@grsm.com
 7       Kliu@grsm.com
         Rlemus@grsm.com
 8
     ON BEHALF OF THE RESPONDENT:
 9
         PERKINS COIE LLP
10         BY:  JOHN HARDIN, ESQ.
         500 North Akard Street, Suite 3300
11         Dallas, Texas  75201
         (214) 965-7700
12         JohnHardin@perkinscoie.com

13       PERKINS COIE LLP
         BY:  JACOB TABER, ESQ.
14       1155 Avenue of the Americas, 22nd Floor
         New York, New York  10036
15       (212) 262-6900
         JTaber@perkinscoie.com
16
     Also in Attendance:
17
         Ashton Soniat
18
         Dan Eaton, Esq., in-House Counsel for Katena
19         Computing Technologies, Inc.

20       Randall Foret, Esq., In-House Counsel for
         Coinmint, LLC
21
         Ted Brooks, Tech
22         Michelle Rose, Tech

23       Michael Gao

24

25
```

**TRANSCRIPT OF PROCEEDINGS**

1          I N D E X

2   Tuesday, September 19, 2023
                              PAGE
3
    Morning Session                    1124
4

5                        PAGE  VOL.

6   GAO, ZIJIANG

7   (PREVIOUSLY SWORN)
    Redirect Examination resumed by Mr. Hardin  127    5
8   Recross-Examination by Mr. Alford         1147   5

9   CUTLER, JOSEPH

10  (SWORN)                     1205    5
    Direct Examination by Mr. Taber        1205   5
11  Cross-Examination by Mr. Alford        1228    5
    Redirect Examination by Mr. Taber        1256    5
12  Recross-Examination by Mr. Alford         1259    5

13  GAO, ZIJIANG

14  (PREVIOUSLY SWORN)
    Redirect Examination resumed by Mr. Hardin  264    5
15

16  GUIOL, NORBERT

17  (SWORN)                     1281    5
    Direct Examination by Mr. Liu          1282   5
18  Cross-Examination by Mr. Taber         1343    5
    Redirect Examination by Mr. Liu         1407    5
19

20  FORET, RANDALL

21  (SWORN)                     1414    5
    Direct Examination by Mr. Liu          1414    5
22

23

24

25

TRANSCRIPT OF PROCEEDINGS

1  SEPTEMBER 19, 2023                    9:07 A.M.

2            SAN FRANCISCO, CALIFORNIA

3          P R O C E E D I N G S

4

5            MORNING SESSION

6

7          ARBITRATOR CALLAHAN:  All right.  So, here

8  we are, day 2 of week 2.  And continuing with

9  Mr. Gao.

10         Mr. Gao, you're still under oath.

11         THE WITNESS:  Mm-hmm.

12         ARBITRATOR CALLAHAN:  Quickly, I'll do the

13  time tally through yesterday.  So it's amazing how

14  close you folks are.  Running subtotal, 1254

15  Coinmint, 1252 for Katena.

16         MR. ALFORD:  Wait a second.  We want our

17  two minutes.

18         ARBITRATOR CALLAHAN:  Well, you'll

19  probably make it up today, would be my guess.

20         Okay.  So based on our discussions at the

21  end of yesterday, I think, Mr. Hardin, you're

22  continuing with your exam of Mr. Gao for

23  approximately 25, 30 minutes or so.

24         MR. HARDIN:  Yes, ma'am.

25         ARBITRATOR CALLAHAN:  And then,

TRANSCRIPT OF PROCEEDINGS

1  Mr. Alford, you get Mr. Gao for another 50,

2  60 minutes, but we're going to end by 10:15 to take

3  our morning break, and then prepare for Mr. Cutler.

4       MR. ALFORD:  10:15?

5       ARBITRATOR CALLAHAN:  Yeah.

6       MR. ALFORD:  If Mr. Hardin gets a half

7  hour and I get an hour --

8       ARBITRATOR CALLAHAN:  Okay, so 10:30.

9       MR. HARDIN:  I think it's --

10       ARBITRATOR CALLAHAN:  Approximately.

11       ARBITRATOR TURITZ:  Because we're starting

12  late.

13       ARBITRATOR CALLAHAN:  Please do -- let me

14  just remind everybody.  You know, I think Mr. Gao is

15  our sixth witness.  Am I counting that correctly?

16       MR. ALFORD:  Not sure.  I think fourth.

17       MR. LIU:  Fourth.

18       MR. HARDIN:  Plus Maloney.  He's the sixth

19  witness.

20       ARBITRATOR CALLAHAN:  So I would just

21  offer the comment that, based on, you know -- I've

22  done the hearing report from each set of hearings,

23  and our hearing report through the end of week one,

24  we had quite a large number of exhibits that have

25  been admitted and have been asked about in the prior

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

1   six witnesses.

2         So I would just offer that maybe if we

3   could be a little more focused.  Because I do make

4   lines where we've read those WhatsApp and emails.

5   We've now gone over them at least six times.  So I'm

6   not sure if that's the best use of our time.  So I

7   would encourage everyone, you know, if there's a new

8   matter you're trying to get to the panel, let's

9   really focus our efforts on getting that out.

10         And if there's a way to focus in on what

11   it is about a prior admitted document, that would be

12   super helpful for the panel to appreciate the

13   significance of the witness views of that document

14   instead of going through the entirety of the

15   document again, because, again, we have now read it

16   several times with other witnesses.

17         ARBITRATOR TURITZ:  And before we started

18   the proceedings we've read these WhatsApp messages a

19   couple times in motions.

20         ARBITRATOR CALLAHAN:  That's true.

21         So I would offer that.  We are anxious to

22   make sure that you get all of the matter, the

23   evidence and -- that you're interested in getting

24   in, and to the extent there is new documentary

25   evidence or new areas of testimony, I would just

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  encourage you to please, let's focus on that today.

2      All right.  With that being said,

3  Mr. Hardin, go ahead.

4      MR. HARDIN:  Yes, ma'am.  And it's 9:10;

5  is that right?

6      ARBITRATOR CALLAHAN:  It is.

7          ZIJIANG GAO,

8  called as a witness, having been previously duly

9      sworn, testified as follows:

10      REDIRECT EXAMINATION  (RESUMED)

11  BY MR. HARDIN:

12    Q.  All right.  Mr. Gao, I'm going to go

13  lightning fast.

14    A.  Yes.

15    Q.  Apologies.

16      And notwithstanding that, we're going to

17  go back to a document we started on yesterday.

18  Sorry.

19      ARBITRATOR CALLAHAN:  I'm not saying don't

20  go back.  I'm just saying, do please bear in mind

21  we've been there.

22      MR. HARDIN:  I appreciate that.  I hope

23  you can see the irony of me starting with a document

24  we started yesterday.

25      Let's start with Exhibit 61.  Let's give

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  everybody a chance to go to it -- Ms. Rose, are

2  you -- you are, indeed.  Awesome, thank you.

3       Let's go to page 4, please, ma'am.

4       Arbitrator Turitz, is this working as the

5  document up here?

6       ARBITRATOR TURITZ:  Yeah.

7       MR. HARDIN:  Perfect.

8       ARBITRATOR TURITZ:  Thank you.

9  BY MR. HARDIN:

10     Q.   Just to get back in, this is a June 10th

11  WhatsApp message.  This is a June 10th WhatsApp

12  message between you and Mr. Monzon.  And we want to

13  go to page 4.

14     A.   Mm-hmm.

15     Q.   This is -- the time stamp shows it to be

16  approximately 10:00 a.m. Pacific Time, right?

17     A.   Yes.

18     Q.   Okay.  And Mr. Monzon asked you (as read):

19          So what's final terms exactly?

20          Now, he's referring to a conversation that

21  you and Mr. Maloney had about the potential to

22  modify the May agreement, right?

23     A.   That's right.

24     Q.   Okay.  And can you read your response, the

25  next two text messages.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1    A.   (As read):

2          No.  7.5 million and first

3      50 million payment at 60 per

4      terahash.  Actually, let's wait for

5      him to send written offer.

6    Q.   Why did you say just wait?

7    A.   Because I wanted to make sure that we

8  adequately understood what Mr. Maloney had in mind.

9    Q.   Okay.  And is it accurate, sir, that based

10  on this phone call, it wasn't clear what Mr. Maloney

11  was proposing with precision that you needed for a

12  contract of $150 million?

13    A.   Not only that, but also, we wanted to make

14  sure that he actually -- and Coinmint actually

15  agreed to the terms that we were talking about.

16    Q.   Okay.  Let's transition to 1053.  I'm

17  going to physically hand you the document.  This is

18  a document that was provided yesterday with a

19  corrected attachment.  Okay.

20    A.   Yes.

21          MR. HARDIN:  And I guess let's go to --

22  Michelle, can you go to the second page, please.

23  BY MR. HARDIN:

24    Q.   Now, there was a lot of discussions

25  yesterday about this document.  One, do you consider

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

1  this a complete proposal from which you could draft

2  a contract for $150 million?

3      A.  Not at all.

4      Q.  Okay.  So I'm going to refer to

5  Exhibit 1053-2.  And for these lines of questions --

6  you know, apologies, I'm a little colloquial with my

7  language.  I may call this "the deal," but how much

8  is this proposal?  What's the size of this deal?

9  Did it say?

10     A.  I can't tell.

11     Q.  Right.

12         How much petahash is this deal?

13     A.  I can't tell.

14     Q.  When would the prototype be due under this

15  proposal?  Maybe that would be better.

16     A.  I can't tell.

17     Q.  When is the first delivery under this

18  proposal?

19     A.  I can't tell.

20     Q.  How many delivery tranches?

21     A.  I can't tell at all from this image.

22     Q.  Where are you going to get the money for

23  the chips off of this proposal?

24     A.  It doesn't say.

25     Q.  Right.

1        What's going to be -- what's going to be

2    the tranches of payment?

3        A.  I don't know.

4        Q.  Let's just assume that all of that stuff

5    was taken care of.  What is the multiple for network

6    difficulty that would provide Katena with payment?

7        MR. ALFORD:  Vague and ambiguous.

8        ARBITRATOR CALLAHAN:  To the extent you

9    understand, Mr. Gao, you can answer.  If you don't,

10   please say so.

11       THE WITNESS:  Sure.

12       From this image, I can't tell.

13   BY MR. HARDIN:

14       Q.  Okay.  Where is the point of delivery for

15   the machines, or point of pickup?

16       A.  It doesn't say.

17       Q.  Okay.  So yesterday when you testified

18   that the attachment represented at Exhibit 1053-2

19   was not a full proposal, are those some of the items

20   that you were referencing?

21       A.  Yeah.  And there are more on top of those.

22       Q.  Okay.  Are there any that you would like

23   to explain, just sitting right here?

24       A.  Yeah.  I mean, which part of the order

25   this actually applied to would be very material.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1        As you can see from my earlier message, I

2   thought that the first 50 million payment would be

3   at 60 per terahash.  And as you can see in 1053-1,

4   Mr. Maloney says only 7.5 million would be subject

5   to the current agreement, meaning current price,

6   meaning 60 per terahash.  Each one-third remaining

7   payment would supposedly be calculated from this

8   chart.

9        So there's a discrepancy between what I

10  thought, you know, he was going to come back with

11  and what he actually came back with, and it's

12  unclear, from this, what the resolution is from

13  that.

14      Q.   Would 7.5 million be enough to order -- to

15  start the fabrication of chips to fulfill the order?

16      A.   Not at all.

17      Q.   Okay.  Well, yesterday you were asked

18  questions about the decision for you to say, "Call

19  me, have response from Henry, we are close," as

20  opposed to just saying flat out no.

21      A.   Yes.

22      Q.   Can you tell the panel why in a business

23  discussion you would simply say something like "call

24  me, have response from Henry, we are close"?

25      A.   Yeah.  We were freaked out that Coinmint

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  was defaulting, and we wanted to, you know, give

2  them, you know, as close a framing as we could.  You

3  know, we wanted to maximize the chances that we

4  could figure something out here because we wanted to

5  get to manufacturing these chips.

6      Q.   Okay.  Let's go to Exhibit 2076.

7      A.   Yeah.

8      Q.   Okay.  This is a June 16th WhatsApp

9  message conversation between you and -- you and

10  Mr. Monzon, right?

11     A.   Yes.

12     Q.   I want you to turn to page 2076-4.

13          Actually, before you do that, this is

14  June 16th, right?

15     A.   Yes.

16     Q.   So this is now -- this is now six days

17  after the June 10th meeting at Coinmint, right?

18     A.   Yes.

19     Q.   And I think this is assumed, but let me be

20  clear.  Like, no one from Katena was in this meeting

21  at Coinmint?

22     A.   In --

23     Q.   The June 10th meeting.

24     A.   No.

25     Q.   Okay.  You see where Henry is saying, his

1  second text down (as read):

2          Lancium CEO tells me they're

3          thinking to buy SBI Intel assets.

4          That related to a different customer,

5  different deal, right?

6    A.  Yes.

7          MR. HARDIN:  Hey, Michelle, 2076-4.

8  Awesome.  Thanks.

9  BY MR. HARDIN:

10    Q.  And then he says (as read):

11          Hey, call Maloney or Jim.

12          Let's push for that wire.

13          At this point, had Katena received any

14  funds?

15    A.  No.

16    Q.  At this point, had Katena received a full

17  proposal from Coinmint?

18    A.  No.

19    Q.  At this point, had the parties agreed to

20  amend or modify the SBA or PO?

21    A.  No.

22    Q.  Okay.  You say (as read):

23          I'm literally calling now.

24          To which, on the next page, Mr. Monzon

25  responds (as read):

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          What did he say?

2     (As read):

3          Nothing.  He didn't pick up.

4      He's on the phone with lenders.

5          Okay.  What was your understanding of why

6  Mr. Maloney was on the phone with lenders?

7     A.  Because he wanted to get the capital

8  required to follow through with the purchase order.

9     Q.  Okay.  And then you say (as read):

10          I'm pushing as hard as I can,

11        but can only get him on the phone

12        once a day.  We already agreed wire

13        would still come even if lenders

14        come back today with no.  So next

15        step is probably contract revision,

16        but I told him wire before

17        revision.

18          Do you see that?

19     A.  Yes.

20     Q.  Why would you want a wire before revision?

21     A.  We wanted to be paid pursuant to the

22  current agreement.

23     Q.  Okay.  Given that it's now almost a month

24  past the original payment was due, did you want to

25  waste time drafting a revision if there was no wire

1  or no deal?

2     A.  No.  No.  It would take weeks to do a

3  contract revision, and we didn't want to wait that

4  long before getting into manufacturing.

5     Q.  There was discussion yesterday about a

6  capital call.  And the -- there was discussion

7  yesterday about capital call.

8         Can you read your last text on 2076-5?

9     A.  (As read):

10           He says lenders want to do a

11        capital call.

12     Q.  Is that what popped in the idea of capital

13  call?

14     A.  Yes.

15     Q.  Okay.  And did you do your research after

16  that?

17     A.  Yes.

18        MR. HARDIN:  Let's go to page -- excuse

19  me, let's go to Exhibit 2100.

20  BY MR. HARDIN:

21     Q.  Here we are.  It's August 2nd, 2021.

22  And this is a WhatsApp message string between you

23  and Mr. Monzon, right?

24     A.  Yes.

25     Q.  And I want you to turn to page 2100-5.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1    A.  Yes.

2    Q.  All right.  And you respond (as read):

3         Maloney news.

4      Right?

5    A.  Yes.

6    Q.  What does this mean?

7    A.  This means that Mr. Maloney had called me

8  with some news.

9    Q.  Okay.  What's your next text message?

10   A.  (As read):

11        Ashton is moving forward.

12      They have debt term sheet.

13   Q.  And what did you understand the debt term

14  sheet to mean?

15   A.  I thought it meant that Coinmint had

16  gotten a proposal from a lender to loan money to

17  Coinmint.

18   Q.  To lend money to Coinmint to pay for the

19  Katena agreement?

20   A.  Exactly.

21   Q.  Did you have any understanding of what

22  amount of debt Coinmint was bringing on?

23   A.  I think it was 50 million.

24   Q.  And what were you told was the -- sorry.

25  I'm going too fast.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1        Did Mr. Maloney tell you what they were

2   going to use the 50 million bucks for?

3        A.  Yeah.  He told me that, you know, we could

4   talk about an amendment, at that point, with money

5   in hand.

6        Q.  Okay.  And when it was going to be an

7   amendment, what was going to be the size of the

8   deal?

9        A.  150 million.

10       Q.  Right.

11           So what was going to be amended?  Was it

12   just the payment dates?

13       A.  It was the purchase order.  So it was the

14   payment dates; it was the price formula that would

15   be a blended average of the floating price formula

16   that I described yesterday; and the original 60 per

17   terahash.

18           We didn't know what the different

19   proportions were in the blended average, but it

20   would be probably some proportion.  And there would

21   be all sorts of details in there in order to help

22   calculate that formula.

23       Q.  Okay.

24       A.  And a delivery date as well.

25       Q.  Right.  Right.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          Because, at this point, you hadn't been

2   able to order the fabrication of the chips, right?

3      A.   Exactly.

4      Q.   And so the same time frame for the

5   fabrication of the chips and the manufacturing of

6   the rigs would still apply, right?

7      A.   That's right.

8      Q.   You would just be delayed from starting in

9   May to starting in August, right?

10     A.   That's right.

11     Q.   And tell me if this is accurate.  Let me

12   see if I can get to the nut.

13          With all of these discussions, it seems --

14   what I'm hearing you say is that getting money in

15   the door was the first part, but before there could

16   be any amendment to even discuss a floating price,

17   there was still a lot more negotiations to occur?

18     A.   Yes.

19     Q.   Did you ever tell Mr. Maloney or Coinmint

20   that the May 13th agreement was of no force or

21   effect, that you were just going to walk away from

22   it?

23     A.   No.  We would never do that.

24     Q.   Let's go to Exhibit 2111.

25     A.   Yes.

TRANSCRIPT OF PROCEEDINGS

1      Q.   Okay.  This is August 31st, another

2   WhatsApp message string between you and Mr. Monzon?

3      A.   Yes.

4      Q.   By this point in time, had there been an

5   amendment of the SBA or PO?

6      A.   Not at all.

7      Q.   Had Coinmint made the initial payment, the

8   down payment of 37.5 million?

9      A.   No.  We were trying to work with them to

10  help them get that, but it wasn't getting there.

11      Q.   Was there ever any discussion, at this

12  stage, that it was just a letter of intent?

13      A.   No.

14      Q.   Okay.  Here at the bottom you say (as

15  read):

16           Coinmint looks close to money

17      again.

18      Right?

19      ARBITRATOR CALLAHAN:  What page are you

20  on?

21      MR. HARDIN:  211-3 [sic].  Page 3.

22      THE WITNESS:  Yes.

23  BY MR. HARDIN:

24      Q.   Let's go to the bottom of page 4.  (As

25  read):

TRANSCRIPT OF PROCEEDINGS

1          Thinking we don't want all of

2          Coinmint, but a cheap deal for

3          equity swap of 10 or 20 megawatts.

4          And your response is (as read):

5             Yeah, probably, or maybe more

6          megawatts.  50 megawatts would be

7          really nice with some machines in

8          order to have cash flow.

9          All right.

10   A.   Mm-hmm.

11   Q.   (As read):

12             Comes down to what they would

13          want for it versus premium.

14          Maloney was trying to sell to Alex.

15          10 megawatts for 50 million.

16          Before we go any further, what's kind of

17   going on here?  What are you and Mr. Monzon

18   spit-balling about?

19   A.   We're spit-balling about the potential to,

20   you know, do an equity for power asset swap with

21   Coinmint.

22   Q.   So a payment in kind?

23   A.   That was one of the forms that this could

24   take.  So, you know, we were contemplating, hey, if

25   they give us their data center, the then maybe we

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  can go sell that to someone else, liquidate it for

2  money.

3       And maybe if we match them up with a buyer

4  or, you know, the money could come straight to us.

5  So we didn't know what configuration it would take.

6  You know, it might also be for Katena equity.  We

7  didn't know.

8    Q.   And by "data center," are you referring to

9  the one in Plattsburgh that Coinmint was trying to

10  sell?

11    A.   I think this is about that, yeah.

12    Q.   Right.

13       Even if this particular one is not, do you

14  recall that Coinmint --

15    A.   Yes.

16    Q.   -- was trying to sell its Plattsburgh data

17  center?

18    A.   Yes.

19    Q.   And that one was a smaller facility,

20  right?

21    A.   Yes.  It was ten megawatts.

22    Q.   And then on the next page, page 6, you

23  say -- or Mr. Monzon says (as read):

24       We would.  We want it at

25       10 million.  They won't accept, but

**TRANSCRIPT OF PROCEEDINGS**

1         we can try and give them Katena

2         equity for it.

3         That's what you were talking about just a

4   minute ago, right, that maybe Katena equity would be

5   a part of the spit-balling?

6   A.  Yes.

7   Q.  (As read):

8         Makes our pre-revenue story a

9         thing of the past, we start making

10        revenue in Q4 and buy versus build.

11        We start by buying.

12        Right?

13  A.  Yes.

14  Q.  Was Mr. Maloney involved in any of this

15  spit-balling?  Did he raise payment in kind, for

16  example?

17  A.  I don't remember.  I don't think he raised

18  that.

19  Q.  Okay.  And here towards the bottom, you

20  say (as read):

21        Maybe Coinmint could just pay

22        in kind for their machines, no

23        dilution.  Actually, pay in kind

24        option is very interesting,

25        combination of that and equity, we

1        could really do a lot.  We'll bring

2        this up today on the call.

3        Right?

4    A.  Yes.

5    Q.  All of this windup for your next two text

6  messages.  I see where Mr. Monzon, he says (as

7  read):

8            Yeah, and where do we get the

9        money to build their machines then,

10        LOL?

11    A.  Yes.

12    Q.  And your response is?

13    A.  (As read):

14            First 75 million can be cash,

15        second 75 million can be pay in

16        kind.  This still is enough money

17        to build their machines.  Also we

18        can take out loans on the data

19        center they give us, et cetera.

20    Q.  So as of August 31st, 2021, what was the

21  size of the deal, as far as you understood it?

22    A.  75 plus 75 equals 150 million.

23    Q.  Okay.  Why would you need the first

24  75 million to be in cash?

25    A.  'Cause, at this point, we were thinking

TRANSCRIPT OF PROCEEDINGS

1  that, hey, you know, the line at TSMC is getting

2  even longer, and we may have to pre-book even more

3  wafers at a premium.  And we heard that the wafer

4  price was going up for the next year by something

5  like 10 to 20 percent.  And so we would need even

6  more cash to support this.  And add to that the fact

7  that the difficulty was going up.

8        So we were in danger of if, you know, they

9  tried to come to us with a floating rate, they'd

10  have to come up with even more cash.

11     Q.   Okay.  By "difficulty," you mean the

12  network expansion and contraction?

13     A.   Yeah.  That's right.

14     Q.   Okay.  So is it accurate, Mr. Gao, that as

15  of August 31st, 2021, as shown in Exhibit 2111,

16  Katena still understood the deal to be $150 million?

17     A.   Yes.

18     Q.   Consistent with the deal that was signed

19  on May 13th that Coinmint had still not made the

20  first down payment on?

21     A.   Yes.

22     Q.   Was that understanding of the size of the

23  deal in which, quote, agreement, right, the

24  May 13th agreement, being applicable, was that

25  consistent with your discussions with Mr. Maloney?

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1    A.   Absolutely.

2    Q.   In other words, did Mr. Maloney, ever tell

3  you, hey, wait a minute, we amended, we got a

4  floating price?

5    A.   Not at all.  And yeah, I don't remember

6  that at all.

7    Q.   Okay.  I'm quickly running out of time, so

8  I want to transition to the October -- the dinner,

9  was it October 15th or 16th?

10        MR. TABER:  15th.

11        THE WITNESS:  15th.

12  BY MR. ALFORD:

13    Q.   You were present, right?

14    A.   Yes.

15    Q.   Mr. Soniat was present, right?

16    A.   Yes, he was.

17    Q.   Did he ever stop and tell you, hey, I just

18  kind of thought this was a letter of intent, I

19  didn't know it was a real contract?

20    A.   No.  He didn't.  In fact, he talked about

21  making us whole at the end of the day.

22    Q.   He didn't tell you, at the time, that, oh,

23  I was at dinner, I didn't even read it?

24    A.   No.  He was talking about forcing his

25  tenants to help pay for Katena machines because he

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    knew what he owed us.

2        Q.   You sat through a whole week of testimony.

3    You heard about the letter of intent, the shock that

4    was alleged when he found out it was a real

5    agreement.

6            Did he acknowledge -- did he talk about a

7    real agreement during the dinner?

8        A.   Yeah.  He talked as if the SBA, you know,

9    that was signed May 13th, was the governing

10    contract.

11        Q.   All right.

12            MR. HARDIN:  With that, I'm going to see

13    if I can reserve my last three minutes.

14            MR. ALFORD:  I don't believe there are

15    three.  I thought I go from 9:30 to 10:30.

16            ARBITRATOR CALLAHAN:  It's not a contest,

17    guys.

18            MR. ALFORD:  That's true.

19            ARBITRATOR CALLAHAN:  Let's focus on

20    information.

21            MR. ALFORD:  Sure.  Let's do that.

22            ARBITRATOR CALLAHAN:  All right.

23                RECROSS-EXAMINATION

24            MR. ALFORD:  Ted, let's pull up

25    Exhibit 1069, please, and go to page 3.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  BY MR. ALFORD:

2     Q.   This is a text exchange between yourself

3  and Mr. Monzon dated July 27, 2021, right?

4     A.   Yes.

5     Q.   And by that time, you thought that -- that

6  Coinmint was months and millions of dollars in

7  breach, right?

8     A.   Yes.

9     Q.   Yes.

10        And let's look at what you say on

11  page 1069-3.  About two-thirds of the way down

12  Mr. Monzon writes to you (as read):

13           Maloney, how are we going to

14           get more money from him.

15           Right?

16     A.   Yes.

17     Q.   (As read):

18           Now is the time.  We could

19           term sheet him any day now.

20           Right?

21     A.   Yes.  That was referring to a --

22     Q.   No, I didn't ask you what that was

23  referring to.  I just asked what the document said.

24           MR. HARDIN:  I'm going to object.  I would

25  ask that the witness just be allowed to answer.  We

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   are trying to get information here.

2          ARBITRATOR CALLAHAN:  Gentlemen.  What's

3   the objection, Mr. Hardin?

4          MR. HARDIN:  Objection.  Argumentative.

5   Interrupted the witness.

6          ARBITRATOR CALLAHAN:  Okay.  Overruled.

7          Mr. Alford, let's slow down just a smidge

8   and that way, again, Mr. Gao -- Mr. Alford --

9          MR. ALFORD:  Okay.

10          ARBITRATOR CALLAHAN:  -- I know it's

11   cross-exam, but let's wait for the question mark and

12   then please wait for Mr. Gao to finish his response.

13          MR. ALFORD:  All right.

14   BY MR. ALFORD:

15   Q.   Now, Mr. Monzon said to you (as read):

16          Maloney -- how are we going to

17          get more money from him?  Now is

18          the time.  We could term sheet him

19          any day now.

20       Isn't that what Mr. Monzon wrote to you?

21   A.   No --

22   Q.   Okay.

23   A.   -- he didn't say we could term sheet him

24   any day now.  He said we could term sheet any day

25   now, referring to a potential equity term sheet.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    Q.   Okay.  So you're telling this panel, under

2    penalty of perjury, that when Mr. Monzon wrote to

3    you "now is the time, we could term sheet any day

4    now," you weren't talking about a job offer?

5    A.   No.

6    Q.   Okay.  All right.

7         And you say (as read):

8             I'm pinging him.

9         Right?

10   A.   Yes.

11   Q.   Okay.  Now, you didn't say, though, to

12   Mr. Monzon, well, gee, they're months in breach and

13   millions of dollars in breach.  Why don't we just

14   send them a default notice to let them know, right?

15   A.   No.  We wanted to work with Coinmint

16   because both of us were in an extremely difficult

17   position.

18   Q.   Okay.  And now, as of late July, you knew,

19   as you told us yesterday, that Mr. Maloney was

20   anxious to leave Coinmint because he was very

21   unhappy there and didn't get along well with

22   Mr. Soniat, right?

23   A.   We knew that he wanted to go somewhere.

24   Q.   And that he was having a lot of conflicts

25   with Mr. Soniat, right?

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    A.   Yes.

2    Q.   Okay.  So why is it, then, that -- given

3    that you knew Mr. Maloney was on his way out and he

4    had a lot of disagreements with Mr. Soniat, why

5    didn't you just pick up the phone and call

6    Mr. Soniat and say, hey, we got a problem here, you

7    guys are months late on the payment, what are we

8    going do about it?  How come you didn't do that?

9    A.   Because Mr. Maloney continued to represent

10   himself as the point of contact, and so we continued

11   to think that, hey, Mr. Maloney wants to follow

12   through on the original signed contract, and we

13   don't know what kind of reception we'll get from

14   Mr. Soniat.

15   Q.   Right.

16        'Cause you knew, as you said -- as we saw

17   in the text message yesterday, that if it was up to

18   Mr. Soniat, he wouldn't pay the money, right?

19   A.   It was always up to Mr. Soniat, but it was

20   a matter of Mr. Maloney outlining the financial

21   projections and showing Mr. Soniat the gravity of

22   the situation.

23   Q.   I want to circle back to something I was

24   talking with you about at the end of the day

25   yesterday before my time ran out.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1      Do you remember me talking to you about

2  that series of text messages you had with Mr. Monzon

3  when he was in Dubai in late July while you all were

4  talking about the information you found out about

5  the way capital calls worked at Coinmint?

6      Do you remember that?

7    A.  I'm sorry, can you --

8    Q.  Sure.

9    A.  -- repeat that question.

10   Q.  Do you remember me talking to you

11  yesterday about the text messages you exchanged with

12  Mr. Monzon in late July, when he was in Dubai, about

13  what you learned about how capital calls worked at

14  Coinmint?  Do you remember me talking to you about

15  that?

16   A.  Yes.

17   Q.  Okay.  And let's take a quick look at

18  Exhibit 2093, page 11.  I'm not going to go over the

19  whole thing because I did cover a lot of it with you

20  yesterday, but I just want to give some context.

21      And this is where you -- you say -- you go

22  on the internet and you find these documents from

23  the litigation in Delaware about the way that the

24  capital calls were structured, right?  That's at

25  page 9.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    A.   Hold on.  I'm still getting there.  It's a

2   big binder.

3    Q.   Where you cut and paste a copy of the

4   court documents on page 9 about the capital call,

5   right?

6    A.   Sorry, is this 2094?

7    Q.   2093-9.  You can see it on the screen.

8        2093-4 where you cut and paste --

9    A.   Yes.

10   Q.   -- from the court documents --

11   A.   2093-4 or 2093-9.

12   Q.   2093-9.

13   A.   Okay.

14   Q.   It's on the screen right there.  See it?

15       This is where you cut and paste into your

16  text with Mr. Monzon information you learned about

17  the capital call, right?

18       You see it right there on the screen,

19  right?

20       ARBITRATOR CALLAHAN:  He's looking at --

21  Mr. Alford, let him look at the exhibit.

22       THE WITNESS:  Yes, I see that.

23  BY MR. ALFORD:

24   Q.   Okay.  And then you all discussed the fact

25  that for every dollar that Maloney puts in, Ashton

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    has to put in eight, right?

2        A.   Where is that?

3        Q.   On page 2093-13.

4             Do you see that?

5        A.   Yes, I do.

6        Q.   And at the bottom of 2093-12, you say, at

7    the very bottom (as read):

8                 Maloney tells me he owns

9             10 percent.

10            Right?

11       A.   Yeah.  That's what he told me.

12       Q.   Right.

13            So that's July 22, right?

14       A.   Yes.

15       Q.   Now, on July 20, several days later, you

16   and Mr. Monzon talk about paying $500,000 to

17   Mr. Maloney as a disguised commission to cover his

18   share of the capital call; isn't that true?

19            MR. HARDIN:  Objection.

20   Mischaracterization.

21            ARBITRATOR CALLAHAN:  I'm going to sustain

22   that one.  Are you asking him if that's what he said

23   yesterday?

24            MR. ALFORD:  No.

25            ARBITRATOR CALLAHAN:  Okay --

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  BY MR. ALFORD:

2      Q.  I said -- so just for context, we just

3  looked at the July text exchange.  Now I'm asking

4  you, several days later after that, you and

5  Mr. Monzon discuss a plan to pay

6  Mr. Maloney $500,000 as a disguised sales commission

7  to cover his share of the capital call, right?

8          MR. HARDIN:  I'm sorry.  Objection.

9  Mischaracterization.  And it's --

10          MR. ALFORD:  It's cross-examination.

11          ARBITRATOR CALLAHAN:  He's just asking

12  him.  It's a yes-or-no question.

13          Listen carefully, Mr. Gao.

14          THE WITNESS:  I'm sorry, can you repeat

15  the question?

16  BY MR. ALFORD:

17      Q.  Sure.  I'll read it back.  (As read):

18              Just for context, we've

19          looked -- we just looked at the

20          July text exchange.  Now I'm asking

21          you, several days later after that,

22          you and Mr. Monzon discuss a plan

23          to pay Mr. Maloney $500,000 as a

24          disguised sales commission to cover

25          his share of the capital call;

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1      isn't that true?

2      A.   I don't remember what we did or didn't

3  discuss.

4      Q.   Okay.  Let's take a look at Exhibit 29.

5      A.   29?

6      Q.   29.

7          On page 2.  So it's 29-2.

8          On July 24, Mr. Monzon says to you (as

9  read):

10          Hey, why not fund Maloney 500K

11          now and do yet another capital

12          call?  Question is, we lose 500K as

13          a sales commission or whatever, I

14          guess, unless we find a scheme.

15          Right?

16      A.   Yeah.  Look, Mr. Monzon was

17  spit-balling --

18          MR. ALFORD:  Could I get some --

19          ARBITRATOR CALLAHAN:  What is it,

20  Mr. Alford?

21          MR. ALFORD:  The objection is that I just

22  asked a yes-or-no question, whether that's what he

23  wrote to you.

24          ARBITRATOR CALLAHAN:  Well, you

25  interrupted his answer, so it's hard for me to --

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   okay.  So do you want to ask your question again?

2        MR. ALFORD:  Sure.

3        ARBITRATOR CALLAHAN:  Mr. Gao, listen

4   carefully.

5   BY MR. ALFORD:

6     Q.   My question was just yes or no, is it true

7   or is it not that on or about July 24, Mr. Monzon

8   sent you a text?  That's all I'm asking, whether he

9   sent you this text that says (as read):

10           Hey, why not fund Maloney with

11           500K now and do yet another capital

12           call?

13        ARBITRATOR CALLAHAN:  And the question is

14   did he send that text?

15        MR. ALFORD:  Right.

16        ARBITRATOR CALLAHAN:  That's the question,

17   Mr. Gao.

18        MR. ALFORD:  I'm sorry I'm not quite done.

19        ARBITRATOR CALLAHAN:  No, did he get the

20   text and then you can go for second question.

21        Did he send you this text, Mr. Gao?

22        THE WITNESS:  Yes.  He did.

23        ARBITRATOR CALLAHAN:  Okay.

24   BY MR. ALFORD:

25     Q.   And did he send you the next text, which

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   says (as read):

2          Question is, we lose 500K as a

3      sales commission or whatever, I

4      guess.

5          He sent you that text too, right?

6   A.  He did.

7   Q.  Okay.  And you sent you the next text too

8   that says (as read):

9          Unless we find a scheme.

10         Right?

11  A.  Yes.

12  Q.  And you didn't text him back saying, wait

13  a second, we shouldn't be a part of any scheme, we

14  shouldn't be funding Maloney's capital call to

15  dilute Ashton Soniat and do a hostile takeover of

16  the company, you didn't say that, did you?

17  A.  Look, I didn't take this seriously.

18  Q.  Okay.

19  A.  Mr. Monzon was desperate and was casting

20  about for any option.  You know, it could have been

21  a loan from one of our friendly investors.  It could

22  have been anything.  But we really wanted to get

23  paid, and we knew that Mr. Soniat was

24  concealing $50 million in Coinmint's bank account

25  and could have, you know, paid us pursuant to the

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  contract and he wasn't paying us.

2      MR. ALFORD:  Object to all that as

3  nonresponsive.

4      ARBITRATOR CALLAHAN:  Let's just move on,

5  Mr. Alford.  I mean, we've heard it.

6      MR. ALFORD:  Okay.

7      ARBITRATOR CALLAHAN:  Move on.

8  BY MR. ALFORD:

9    Q.  Now, is it true or is it not that

10  Coinmint -- that Katena viewed Coinmint as its

11  anchor customer?

12    A.  Yes.  It is true.

13    Q.  Well, is it true that, in fact, as you say

14  in your pitch deck to investors that there was

15  276 million in other contracts you had?

16    A.  I don't know what that number referred to.

17    Q.  Okay.

18    A.  You know, I'm sure Mr. Monzon had prepared

19  a data room with those contracts.

20    Q.  Okay.  So according to you, the Coinmint

21  contract was 150 million, right?

22    A.  Yes.

23    Q.  So there must have been -- let's see,

24  you're the math guy.  Must have been at least 126

25  more million in contracts, right?

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    A.   Yes.

2    Q.   But yet Coinmint was your anchor customer?

3    A.   Yes.

4    Q.   Okay.

5    A.   As far as I know, 150 is the majority of

6    276.

7    Q.   Now, you would agree with me that the

8    contract that you say was never changed, the one

9    executed May 13th, required delivery of a test

10   unit after payment one, right?

11   A.   Yes.

12   Q.   Okay.  And -- but it's your testimony that

13   you all were not going to do a test unit; you were

14   going to go straight into production of 27,778

15   machines?  That's your testimony, right?

16   A.   One of the things on the way to mass

17   production is that you get the first slot of wafers

18   and we were going to make, you know, a test machine,

19   run those lots as the production process for the

20   machine that was being calibrated, and we're going

21   to take that machine as the, quote, unquote, test

22   machine.

23        It's a different matter to say that, hey,

24   I'm making a prototype, then I am launching into

25   mass production.  What we meant by "go straight to

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    mass production" was that we were going to buy all

2    of the wafers and we were going to start fabricating

3    wafers before we had the test machine.  It doesn't

4    mean that a test machine wouldn't come out on the

5    way to mass production.

6        Q.   Okay.  So you were going to do a test

7    unit?

8        A.   The meaning of these things has nuance.

9        Q.   Okay.  So if you had $126 million in

10   contracts with customers other than Coinmint, why

11   did you never produce any units to this date?

12       A.   Because, guess what, those customers

13   were -- A, some of them were piggybacking off

14   Coinmint's order, and we were -- everyone relied

15   upon Coinmint.

16          And then the second thing is, those

17   customers, some of them didn't pay on time, just

18   like Coinmint, and so, you know, we -- we had a

19   shortfall in our financials versus where we thought

20   we'd be and we lost a lot of credibility with our

21   supply chain.

22       Q.   So those customers were piggybacking off

23   of Coinmint.  And by that I assume you mean that --

24   you tell me if I'm wrong -- that they agreed you

25   didn't have to perform for them if Coinmint didn't

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   perform for you; is that what you're saying?

2      A.   No.

3      Q.   Okay.  All right.  I just wanted to be

4   clear.

5          Now, I want to ask you about something

6   else.  You told us yesterday that Katena pulled the

7   plug on the K10 project in April 2022, right?

8          MR. HARDIN:  Objection.  Mischaracterizes.

9          THE WITNESS:  Pulled the plug --

10         MR. HARDIN:  Stop.  Stop.

11         ARBITRATOR CALLAHAN:  I'm going to sustain

12   the objection.  That's not what he testified to.

13   BY MR. ALFORD:

14     Q.   When did Katena cease work on the K10

15   project?

16     A.   We ceased work -- let's see.

17     Q.   It was April 2022, right?

18     A.   It might have been April or May of 2022.

19     Q.   Okay.  That's what I thought.

20         And you told us that the K10 was

21   essentially obsolete by April of 2022, correct?

22     A.   Yes.

23     Q.   Okay.  So if someone came in here and told

24   this panel under oath that Katena ceased work on the

25   K10 in September or October of 2021, that would not

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  be truthful testimony, right?

2      MR. HARDIN:  Objection.  Argumentative.

3      ARBITRATOR CALLAHAN:  Well, it's a

4  hypothetical for a lay witness.

5      What's the relevance, Mr. Alford?

6      MR. ALFORD:  The relevance is credibility

7  and impeachment.

8      ARBITRATOR TURITZ:  What's the foundation?

9      ARBITRATOR CALLAHAN:  What's the

10 foundation?

11     MR. ALFORD:  I can't say his name.

12     I guess what Mr. Reddy testified, that the

13 plug was pulled in September/October.

14     ARBITRATOR CALLAHAN:  But why does it

15 matter?

16     MR. ALFORD:  It matters if two principals

17 of the company are saying totally different things.

18 But if you don't think it matters, that's what's the

19 important thing, I'll move on.

20     ARBITRATOR CALLAHAN:  Isn't that what you

21 have to work with?

22     MR. ALFORD:  I want to be sure, I want to

23 be sure we're real clear.

24     ARBITRATOR CALLAHAN:  He's given the other

25 testimony, Mr. Alford.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1          MR. ALFORD:  Okay.  I'll move on.  I get

2     your message.

3          Thank you.

4     BY MR. ALFORD:

5          Q.   So is it your testimony that this K10

6     technology that you've told us was revolutionary in

7     May of 2021 was obsolete less than a year later,

8     April of 2022?  Is that your testimony?

9          A.   Yes.  Because --

10         Q.   Okay.

11         A.   -- Bitcoin mining profitability literally

12    went down by I think five times.

13         Q.   Okay.  Now, the original written contract

14    that you say was never changed required Katena to

15    make deliveries through May 31, 2022, right?

16         A.   The original written -- I don't have it in

17    front of me.  I don't --

18         Q.   Okay.  Let's take a look.  It's

19    Exhibit 51.  Page 20.

20         MR. ALFORD:  Ted, if you could blow up the

21    delivery schedule there.  Right at the top.  There

22    we go.

23    BY MR. ALFORD:

24         Q.   At the top of page 20 is a delivery

25    schedule.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    A.   Hold on.  I'm getting to it.  Top of which

2  page?

3    Q.   20.  It's on your screen there.

4        ARBITRATOR CALLAHAN:  Mr. Alford, just for

5  the record, I know it's on the screen, but this

6  witness is looking at the hard copy and has been

7  through the entirety of his testimony.  So

8  apparently the witness prefers to look at the hard

9  copy.  If you would please accommodate him.

10       MR. ALFORD:  I will.  Yes.

11       ARBITRATOR CALLAHAN:  Okay.

12       MR. ALFORD:  Thank you.

13  BY MR. ALFORD:

14    Q.   Do you see the delivery schedule?

15    A.   Yes, I do.

16    Q.   And this refreshes your recollection that

17  the last delivery of K10 miners was supposed to come

18  on May 31, 2022, right?

19    A.   Yes.

20    Q.   Okay.  And so it's your testimony that

21  those -- that delivery of mining rigs would have

22  already been a month obsolete before you arrived;

23  that's your testimony, right?

24    A.   Well, at this point in time, nobody could

25  have known which way the price of Bitcoin could go

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    or which way the difficulty could go or what the

2    network would do.  Nobody could know those things.

3    So nobody anticipated that these things would

4    continue to, you know, be obsoleted less than a year

5    later.  I think that was a surprise to everybody.

6       Q.   And it's your testimony that you never

7    agreed to revise the contract with Mr. Maloney,

8    right?

9       A.   Yes.  I never agreed to any revision.

10      Q.   Okay.  And that the proposal he sent you

11   in early June was totally unacceptable, right?

12      A.   Sorry, which proposal?

13      Q.   Yeah.  Let's look at Exhibit 1053.

14          (Discussion held off record.)

15          MR. HARDIN:  It's 1000- --

16          THE WITNESS:  Okay, sorry.

17          MR. ALFORD:  1053.

18          THE WITNESS:  Oh, it's the piece of paper.

19   BY MR. ALFORD:

20      Q.   And Mr. Hardin asked you some questions

21   about this.

22          Do you remember?

23      A.   Yes.

24      Q.   Okay.  And you said that the proposal, to

25   the extent that you understood it was a proposal,

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   that was attached to this text string was totally

2   unacceptable to Katena, right?

3       A.   I'm sorry, which --

4       Q.   The attachment.

5       A.   The attachment --

6       Q.   The second page.

7       A.   Yes.

8       Q.   Okay.  And you said that it didn't have

9   any of the key terms that you would need to even

10   assess it, right?

11       A.   Yes.

12       Q.   Okay.  But you didn't write back to

13   Mr. Maloney and say, your proposal is totally

14   unacceptable, did you?

15       A.   Again, no, I didn't --

16       Q.   No.  And you also didn't write back to him

17   and say, hey, your proposal doesn't have any of the

18   key metrics I need to even begin to assess it?  You

19   didn't write back to him and say that, did you?

20       A.   I called Mr. Maloney and pushed back.

21       Q.   Well, in fact, what you wrote back to him

22   is (as read):

23               Michael, we are close.

24         Isn't that true?

25       A.   Yes.  That's right.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    Q.   Okay.  Now, in the -- as of the fall of

2    2021, Katena was working with an outfit called

3    Blockchain to try to get financing from Blockchain,

4    right?

5    A.   Sorry, in what time frame?

6    Q.   As of the fall of 2021, Katena was working

7    with an organization called Blockchain to try to get

8    funding from them, right?

9    A.   You mean Blockchain.com.

10   Q.   Okay.  Blockchain.com.

11   A.   Yes.

12   Q.   Yes.

13        And as of the fall of 2021, Katena was

14   representing to Blockchain that the contract was

15   still being revised; isn't that true?

16   A.   We said that it was under amendment.  We

17   said that we had an initial signed contract.  We

18   told them truthfully that Coinmint had defaulted,

19   and we said, we want to put you in touch with

20   Coinmint so that you can help them, you know, with

21   this whole process.

22   Q.   Let's take a look at Exhibit 1146.

23   Something new.

24   A.   Which --

25   Q.   1146.  Before I ask you questions about

TRANSCRIPT OF PROCEEDINGS

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   this document -- I'll give you a minute to find it

2   first, but I have another question I want to ask you

3   before we get to the document.  Let me know when

4   you've found the document.

5        Are you there?

6   A.  Yes.

7   Q.  Okay.  Great.  I want to -- sorry.  I want

8   to ask you a question before I forget.

9        You were talking earlier about the other

10  contracts you had, those people were going to

11  piggyback on Coinmint, right?

12  A.  Well --

13  Q.  You used that word, "piggyback," right?

14  A.  There were some other contracts that we

15  said we already have an anchor customer, and, you

16  know, this anchor customer is going to help start

17  this production run.

18  Q.  Right.

19       But you had contracts with VectorCloud and

20  EdgeMode that predated the contract with Coinmint,

21  right?

22  A.  Yes.

23  Q.  Okay.

24  A.  The supply chain situation was fast-moving

25  during this time period.

TRANSCRIPT OF PROCEEDINGS

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    Q.  So obviously because the VectorCloud and

2   EdgeMode contracts predated the Coinmint contract,

3   you didn't tell those people, hey, you're going to

4   piggyback on Coinmint.  Those contracts had been

5   executed before the Coinmint contract, right?

6        MR. HARDIN:  Objection.  Compound.  And it

7   matters.  Sorry.

8        ARBITRATOR CALLAHAN:  It's true.  Could

9   you break it down, please?  So sustained.

10        Could you please break it down into two

11   questions, Mr. Alford.

12   BY MR. ALFORD:

13    Q.  You didn't tell the VectorCloud and

14   EdgeMode people that their contract was going to

15   piggyback on a contract that came later from

16   Coinmint, did you?

17    A.  Well, of course not.

18    Q.  Yeah.

19    A.  Because EdgeMode had its own payment

20   schedule that it was supposed to make, and that

21   payment schedule would have gotten us enough money

22   also to start the production run by itself.

23        VectorCloud, on the other hand, was signed

24   in very, very early 2021 when we were not aware of

25   the production challenges that we'd be facing.  We

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   were still under the pre-COVID supply chain

2   assumptions.

3       Q.   Okay.  So that was a little segue.  Let's

4   go back to Exhibit 1146.

5           This is an email chain between Mr. Monzon

6   and Scott Odell and others on which you're copied,

7   right?

8       A.   Yes.

9       Q.   And Scott Odell was an individual with

10   Blockchain, right?

11       A.   Yes.

12       Q.   He's now at Fabric, right?

13       A.   Yes.

14       Q.   Okay.  And about halfway down the page he

15   says, "Hi Henry and Michael."  Then he says -- do

16   you see the one -- two -- third paragraph there

17   where he says (as read):

18               Given the importance and size

19           of certain customer deposits

20           (Coinmint as a material example)

21           I'm sure you're well familiar with

22           the deposit schedule, but I can't

23           seem to make sense of the amounts

24           listed in the purchase agreements.

25               For example, Coinmint's

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1          purchase order suggests 75M should

2          have been already paid to Katena

3          but that number isn't evidenced in

4          the balance sheet customer deposits

5          line.  I know the amount they

6          provided as a deposit was quite

7          smaller than said amount.

8          Right?  Right?

9     A.  Yes.

10    Q.   Okay.  And Mr. Monzon writes back, copying

11   you, saying (as read):

12               Hi Scott.  Thanks.  Re

13          Coinmint, you're right.  We've

14          received 23M and another 50M is

15          expected by end of November.

16          Agreement is being updated.

17          Right?

18    A.  Yes.

19    Q.   Did you write back and say, well, wait,

20   they're actually in breach and we have failed to

21   come to terms on any kind of new update?  Did you

22   write back and say that?

23    A.   These are very sophisticated lenders who

24   could see by themselves that Coinmint was in breach,

25   and we explained the whole situation over a call.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   And that was context behind us introducing

2   Blockchain.com to Coinmint, that Coinmint had a

3   financial shortfall from where they initially

4   started.

5        We introduced Blockchain.com as a way to

6   remedy that, help Coinmint get to the point where

7   they could pay for their order and that's how it

8   played out.

9     Q.   My question is not how it played out.  My

10   question was not whether they're sophisticated

11   players.

12        My question is much simpler than that.

13   When you got this email from Mr. Monzon that he

14   copied you on, did you write back and say, well,

15   wait a second, Mr. Odell, actually, the agreements

16   aren't being updated, we failed to come to an

17   agreement with Mr. Maloney and they're in breach?

18        Did you write back and say that?  Yes or

19   no?

20     A.   We were optimistic that we could come to

21   an amendment this time around.

22     Q.   As late as October 26, you all were

23   working on an amendment still; is that what you're

24   saying?

25     A.   Yeah.  We were having calls with Mr. Gil

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   and -- yeah.

2      Q.  And when you told --

3         MR. HARDIN:  While they're chatting, I'm

4   going to have to take a bio break.  When I do, don't

5   stop the hearing, Mr. Taber will --

6         ARBITRATOR CALLAHAN:  Just --

7         MR. HARDIN:  No.  No.  No.  I don't want

8   to stop the hearing.

9         ARBITRATOR CALLAHAN:  Are you sure?

10        MR. HARDIN:  Yes, ma'am, absolutely.

11        ARBITRATOR CALLAHAN:  Does anybody else

12   need a bio break?

13        MR. HARDIN:  No, no, I don't want to stop

14   the hearing.  I'm just giving you fair warning.

15        MR. ALFORD:  If we need a bio break, we

16   can take a bio break.  That's fine.

17        MR. HARDIN:  No, I don't want to stop the

18   hearing.

19        ARBITRATOR CALLAHAN:  Okay.  Go ahead.

20   BY MR. ALFORD:

21      Q.  Okay.  Now, when you -- when you texted

22   Mr. Monzon on June 10 and told him you'd reached a

23   settlement with Maloney, what you meant is the old

24   contract is off, and they're still trying to work on

25   figuring out terms of a new one.  Isn't that what

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   you meant?

2      A.   Not at all.

3         MR. TABER:  Objection to mischaracterizing

4   the document.

5         MR. ALFORD:  Cross-examination and he

6   answered the question.

7         ARBITRATOR CALLAHAN:  He answered the

8   question.

9         MR. ALFORD:  Okay.

10        ARBITRATOR CALLAHAN:  It's cross, and as I

11   understand it, Mr. Alford, you're simply asking

12   yes-or-no questions --

13        MR. ALFORD:  Right.

14        ARBITRATOR CALLAHAN:  -- of the witness to

15   say I agree with everything you said --

16        MR. ALFORD:  Or I don't.

17        ARBITRATOR CALLAHAN:  -- or I don't.

18        MR. ALFORD:  Exactly.

19        ARBITRATOR CALLAHAN:  I think everyone is

20   on the same page.

21   BY MR. ALFORD:

22      Q.   And you don't.

23         Isn't it true that in June --

24        ARBITRATOR CALLAHAN:  I would only remind

25   you that we did cover this yesterday afternoon.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1       MR. ALFORD:  I'm just following up on some

2   questions that Mr. Hardin asked about revision of

3   the contract.  But I hear you.  I'll try to be

4   brief.

5           ARBITRATOR CALLAHAN:  Irrespective of what

6   he asked today, I know we covered this yesterday.

7           MR. ALFORD:  I promise I'll try and be

8   brief.

9   BY MR. ALFORD:

10      Q.   The truth is, as of the summer of 2021,

11  you and Mr. Monzon were so desperate to get that

12  first wire in, you would have agreed to anything

13  that Mr. Maloney required to get a new -- to get the

14  deposit; isn't that truth?

15      A.   That is not true.

16          MR. ALFORD:  Let's take a look at

17  Exhibit 34.

18          ARBITRATOR CALLAHAN:  The pitch deck that

19  we looked at yesterday?

20          MR. ALFORD:  Yes.  I'll be brief.  Just a

21  couple questions about this.

22          THE WITNESS:  Hold on.  I'm getting there.

23  BY MR. ALFORD:

24      Q.   I want to call your attention to

25  page 34-3.

TRANSCRIPT OF PROCEEDINGS

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    A.   Dash 3.

2    Q.   34-3 under the "at a glance" section.

3    A.   Yes.

4    Q.   And you see the bullet points there (as

5   read):

6           276M of signed binding

7        agreements?

8    A.   Yes.

9    Q.   Do you see that?

10        Do you see the bullet point that says (as

11   read):

12           200M secured revolving credit

13        up to 1 billion financing.

14        Do you see that?

15    A.   Yes, I do.

16    Q.   And this document, as Mr. Monzon told us,

17   was placed in the data room and made available to

18   potential customers and potential investors, right?

19    A.   Yes.

20    Q.   And it was made available to Mr. Maloney,

21   you all gave him access to the data room, right?

22    A.   I don't remember which data room we gave

23   Mr. Maloney access to.

24    Q.   And you intended and expected that

25   investors and potential customers would rely on the

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   accuracy of this document, right?

2       A.   We didn't know whether other customers --

3   actually, this is an investor presentation.  So I

4   don't know whether customers got this at any point.

5   I think it would depend on the customer.  But

6   investors got this presentation along with a

7   complete data room that gave the context behind all

8   of these things:  Financials, binding agreements,

9   the credit facility agreement, all of the

10   preconditions, all of the issues they were made

11   aware of in the data room.

12       Q.   Let's talk a little bit about

13   Core Scientific.

14          You talked a little bit about that

15   yesterday, right, with Mr. Hardin?

16       A.   Yes.

17       Q.   And one of the individuals that you were

18   dealing with there -- there were two individuals,

19   right:  Taras and Ashu, right?

20       A.   Yes.

21       Q.   And Ashu was the due diligence guy and

22   Taras was kind of more the business guy, right?

23       A.   Actually, Ashu was the tech lead, but he

24   brought in another due diligence person, Katumba.

25       Q.   And Taras was the business guy, right?

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1      A.   Yes, that's right.

2      Q.   And you all -- to try to get that

3    contract, you all bribed Taras with an offer of

4    employment at Katena contingent on him bringing in

5    the contract; isn't that true?

6      A.   No.

7      Q.   Okay.  Let's look at Exhibit 1011,

8    page 23?

9      A.   10-11 or --

10     Q.   No.  1011 --

11     A.   Okay.

12     Q.   -- beginning at page 23.

13          This is --

14     A.   1011- -- which page?

15     Q.   1011 beginning at the bottom of page 23.

16     A.   Page 23.

17     Q.   This is a text exchange between yourself

18   and Mr. Monzon in April of 2021 at about the time

19   you were trying to bring in the Core Scientific

20   deal, right?

21     A.   23?

22     Q.   Well, I asked you just a foundational

23   question first.

24          This is a text exchange between you and

25   Mr. Monzon about trying to bring in the

ZIJIANG GAO - RECROSS / FLETCHER ALFORD
1   Core Scientific deal in April of 2021, correct?

2        A.   Yes.  These text messages are correct.

3        Q.   Okay.  And if we look at the bottom of

4   page 23, Mr. Monzon says (as read):

5                Taras will introduce us to

6            more peeps if we want.

7            Right?

8        A.   Yes.

9        Q.   (As read):

10               He just wants to be on my

11           good grace, I feel.

12           Right?

13       A.   Yes.

14           ARBITRATOR CALLAHAN:  What page are you

15   on?

16           MR. ALFORD:  Pardon me?

17           ARBITRATOR CALLAHAN:  Are you on page 23?

18           THE WITNESS:  24.

19           MR. ALFORD:  I'm sorry.  Starting at the

20   bottom of page 23, very bottom.

21           ARBITRATOR CALLAHAN:  All right.

22   BY MR. ALFORD:

23       Q.   Mr. Monzon writes (as read):

24               Taras will introduce us to

25           more peeps if we want.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1       Right?  (As read):

2            He just wants to be on my good

3       grace, I feel.

4       Right?

5   A.  Yes.

6   Q.  And you wrote back (as read):

7            We should --

8       And then he sort of, if you will,

9   interrupted and said (as read):

10           Threw him a carrot to join us

11          as advisor to start if we can close

12          on Core, Quinn, et cetera.

13       Right?

14   A.  Yeah.

15   Q.  He says (as read):

16           Contingent on, LOL.

17       Right?

18   A.  Yes.

19   Q.  You responded (as read):

20           He must be fighting hard.

21       Right?

22   A.  Yes, I did.

23   Q.  Okay.  Now, the people who were doing the

24   due diligence for Core Scientific refused to work

25   with the simulated data that Mr. Bleck signed off

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  on; isn't that true?

2      A.  That's completely inaccurate.  They didn't

3  want to just look at a slide deck.  Like Mr. Bleck,

4  exactly like Mr. Bleck, they wanted to spend a few

5  hours in the Sunnyvale lab and look at the same

6  simulated data in person so that they could make

7  sure it was real and it was done properly.

8      Q.  I want to make sure I understand your

9  testimony.

10         Is it your testimony that in the course of

11  his due diligence work for the Coinmint contract,

12  Mr. Bleck visited the DXCorr lab?  Is that your

13  testimony?

14      A.  That's what Mr. Reddy told me at one

15  point.

16      Q.  Okay.  You don't know that of your

17  firsthand knowledge, though?

18      A.  I don't know that for sure.

19      Q.  In any event, what you do know is the

20  people doing the due diligence for Core Scientific

21  said, we can't work with the PDF presentation

22  materials, the same PDF presentation materials that

23  Mr. Bleck worked with, right?

24      A.  Mr. Bleck worked with more than the PDF

25  presentation materials, as far as I know.  What

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    Mr. Reddy told me was that he was in the lab for

2    hours going over whiteboard results, simulating

3    things live, asking follow-up questions, interacting

4    with the simulation results on Mr. Reddy's computer.

5        It wasn't a PDF presentation.  Nobody

6    would be satisfied with a PDF.  It was just the

7    opening statement that you give the tech TD person.

8        Q.   You testified yesterday that it was

9    Mr. Maloney's idea to increase the Coinmint order

10   from 100 million to 150 million; isn't that true?

11       A.   I don't remember what that is.

12       Q.   Well, let me ask you this:  Is it your

13   testimony today that it was Mr. Maloney's idea to

14   increase the contract size from 100 million to

15   150 million?  Not yours, but Mr. Maloney's?

16       A.   I don't know if it was Mr. Maloney's idea,

17   but the idea was put forth by Mr. Maloney on a phone

18   call.

19       Q.   In fact, the idea was put forward by you

20   and Mr. Monzon, wasn't it?

21       A.   No.

22       Q.   Okay.  Let's take a look at Exhibit 104,

23   something also new, I think.

24          ARBITRATOR CALLAHAN:  No.  It's not.

25          MR. ALFORD:  No?  Okay.  Well, I'm proven

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   wrong in that.  We haven't talked about it in a

2   while.

3         ARBITRATOR CALLAHAN:  Yesterday.  Sorry.

4         MR. ALFORD:  That shows you how good my

5   memory is.

6         ARBITRATOR CALLAHAN:  Well, I take notes.

7         MR. LIU:  It's been a long day.

8   BY MR. ALFORD:

9     Q.   And this is a text exchange between

10  yourself and --

11    A.   Sorry, I'm not there yet.  104?

12    Q.   Yes.

13    A.   Okay.  Give me a little bit.

14        MR. HARDIN:  No.  No.  No.  It's 1004.

15        ARBITRATOR CALLAHAN:  No.  It's 104.

16        MR. HARDIN:  Oh, is it?

17        MR. ALFORD:  104.

18        THE WITNESS:  Okay.

19        MR. HARDIN:  Sorry.

20        ARBITRATOR CALLAHAN:  May 9, 2021,

21  WhatsApp?

22        MR. ALFORD:  Yes.

23        ARBITRATOR CALLAHAN:  Okay.

24        MR. ALFORD:  Yeah.  We're waiting for the

25  witness to find it.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1        ARBITRATOR CALLAHAN:  That's fine.

2        THE WITNESS:  104 --

3   BY MR. ALFORD:

4    Q.   104.  Right.  Let's start at the first

5   page.  My first question is simply going to be, this

6   is a May 9, 2021 WhatsApp exchange between yourself

7   and Mr. Monzon, right?

8    A.   Yes.

9    Q.   And this is where you start out by saying

10   (as read):

11           Just called Mike and got him

12         to agree to no escrow, BTW.

13         Right?

14    A.   Yes.

15    Q.   And then on the second page, about, what,

16   three bubbles down, you tell Mr. Monzon (as read):

17           You should see if you can up

18         order with Maloney maybe.  I didn't

19         know how to do it without seeming

20         desperate in that moment.  But we

21         could have probably bumped him up

22         to 150 to 200 million.

23         Right?  That's what you wrote?

24    A.   Well, that's because Mr. Maloney told me

25   that his demand for machines was beyond what we told

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  him we had capacity for.  And so we had an internal

2  discussion about potentially upping the order, but

3  we would sign off on all of the production

4  constraints before doing that, of course, which

5  later on we were very diligent in doing.

6      Q.   As of the close of business on May 18,

7  2021, Katena viewed Coinmint as in default

8  of $150 million contract, right?

9      A.   Yes.

10     Q.   And you continued to view them in default

11  throughout the rest of 2021, correct?

12     A.   Yes.

13     Q.   But at no time in 2021 did Katena ever

14  issue a written notice to Coinmint saying you're in

15  default, you have 30 days to cure or we're

16  terminating the contract, right?

17        MR. HARDIN:  Objection.  Calls for a legal

18  conclusion.

19        ARBITRATOR CALLAHAN:  Well, to your

20  understanding.  Did you issue such a document?

21  BY MR. ALFORD:

22     Q.   Did you ever send that kind of written

23  notice?

24     A.   We never sent a written notice because we

25  were trying to work with Coinmint.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    Q.   And the reason you didn't send a written

2   notice telling Mr. Soniat and others in Coinmint,

3   hey, you're in default, you have 30 days to cure or

4   we're terminating, the reason you didn't do that is

5   because you knew if you did that, you'd have to

6   notify J.P. Morgan, right, and that would interfere

7   with your raise?

8    A.   No.  The reason that we didn't do that was

9   that we didn't want to make a very unfriendly

10   gesture in the middle of negotiating some sort of

11   amendment.

12    Q.   And you also didn't do that 'cause you

13   knew that if Mr. Soniat found out that you all

14   viewed him in breach, he wasn't going to pay any

15   more money to you guys until it got sorted out,

16   right?  That's you why didn't do it?

17    A.   I'm sorry, can you repeat that?

18    Q.   Sure.

19        Another reason you didn't send that notice

20   is because you knew darn well that if you did,

21   Mr. Soniat was not going to agree to send you any

22   more money until it got sorted out.  That's why you

23   didn't do it; isn't that true?

24    A.   We were trying to work with Coinmint.

25    Q.   Now, in the fall of 2021, you viewed

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   Coinmint as having been in breach for months and for

2   many millions of dollars, right?

3      A.  Yes.

4      Q.  Okay.  But, at that point, you all had an

5   aggressive player that was willing to take all of

6   Katena's capacity; isn't that true?

7      A.  Yes.  There was a player that we were

8   talking to which we thought, at that time, was

9   willing to take all the capacity.

10     Q.  Right.

11         And who was that aggressive player?

12     A.  It was --

13         MR. HARDIN:  Hang on one second.

14   Objection.  I'm concerned that we're on the record

15   and this is under a nondisclosure agreement.  Can I

16   ask the question of whether it's any nondisclosure

17   agreement?

18         ARBITRATOR CALLAHAN:  Yes.

19         MR. HARDIN:  Because, again, we've

20   shown -- Mr. Gao, was this under a nondisclosure

21   agreement.

22         THE WITNESS:  Actually, it might be.

23   Sorry.  Yeah.

24         MR. HARDIN:  Okay.  I'm going to object to

25   identification of any details.  I don't want to

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  bring other matters in here, but we've had

2  difficulty keeping evidence within this arbitration.

3       ARBITRATOR CALLAHAN:  Well, speaking for

4  myself only, and I'll let Ms. Turitz and Ms. Glick

5  speak for themselves, I'm not sure I see the

6  relevance.

7       MR. ALFORD:  Mitigation.  This is

8  crucially relevant.  The claim is that we were in

9  breach and as you all know --

10       ARBITRATOR CALLAHAN:  Isn't that their

11  burden, Mr. Alford?

12       MR. ALFORD:  What's that?

13       ARBITRATOR CALLAHAN:  Isn't that their

14  burden?

15       MR. ALFORD:  To prove mitigation?

16       ARBITRATOR CALLAHAN:  Yes.

17       MR. ALFORD:  Yes.  But I -- and I've

18  explored it and met the burden.  Just because it's

19  their burden doesn't mean I can't question him about

20  it.

21       This is a crucial issue.

22       ARBITRATOR CALLAHAN:  Have they raised it?

23  Have they raised it?

24       MR. ALFORD:  Have they raised it?  Well,

25  we're raising it.  They haven't proved -- they

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  haven't mitigated.  If we can't prove --

2       ARBITRATOR CALLAHAN:  Isn't that all you

3  need to say?

4       MR. ALFORD:  I can say that to you, but I

5  need proof of it.

6       ARBITRATOR CALLAHAN:  Don't they have to

7  prove mitigation.

8       MR. ALFORD:  Yes.  And I'm trying to show

9  that they had a chance to mitigate with an

10  aggressive player who would take all their capacity

11  and they never did.

12       ARBITRATOR CALLAHAN:  Isn't that enough?

13       MR. ALFORD:  Well, it is enough, but I

14  don't know whether this is real or its FOMOing.  So

15  who is this aggressive player?  And I think it's

16  crucial to know whether there really was an

17  aggressive player or whether this was just more

18  FOMOing?

19       ARBITRATOR CALLAHAN:  Isn't the crucial

20  question whether or not they signed that aggressive

21  player up?

22       MR. ALFORD:  That's one.

23       ARBITRATOR CALLAHAN:  Regardless of who

24  they are.

25       MR. ALFORD:  Okay.  I'll just do that.

TRANSCRIPT OF PROCEEDINGS

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1          ARBITRATOR CALLAHAN:  Did they sign them

2    up?

3          MR. ALFORD:  I'll just do that.  I think

4    the name is relevant, but I -- I don't want to

5    argue.  I don't want to waste my time or your time

6    arguing about it.

7          MR. HARDIN:  We can also go off the record

8    too.  I mean, that's another solution.

9          ARBITRATOR CALLAHAN:  If Mr. Hardin is

10   willing to go off the record and give you the

11   information, then that's fine too.

12         MR. ALFORD:  I think it's better just to

13   move on.

14         ARBITRATOR CALLAHAN:  You don't want the

15   information?

16         MR. ALFORD:  I do, but I think I don't

17   want to spend the time that we've already spent

18   arguing about it.

19         ARBITRATOR CALLAHAN:  It would be off the

20   record and you would get the information.  Do you

21   want the --

22         MR. ALFORD:  Without eating into my time?

23         ARBITRATOR TURITZ:  It definitely will eat

24   into your time.

25         MR. ALFORD:  Okay.  Let's keep going then.

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  It's okay.

2       ARBITRATOR CALLAHAN:  So you don't want

3  the one-word answer?

4       MR. ALFORD:  That's right.

5       ARBITRATOR CALLAHAN:  Okay.

6       ARBITRATOR TURITZ:  Okay.  Let's move on.

7  BY MR. ALFORD:

8    Q.   So there was never any contract between

9  Katena and this aggressive player, right?

10    A.   Actually, there was a contract, it just

11  didn't end up being a purchase order.

12    Q.   What do you mean there was contract with

13  no purchase order?

14    A.   There was an investment by this aggressive

15  player.

16    Q.   How much was the investment?

17    A.   I can't comment on that under NDA.

18    Q.   Without revealing the name of the

19  aggressive player, you can't tell us the amount of

20  the investment?

21       MR. HARDIN:  I'm going to object to

22  relevance.

23       ARBITRATOR CALLAHAN:  I'm going to ask for

24  an offer of proof why it's relevant.

25       MR. ALFORD:  Well, if they had an

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   aggressive player who is pouring as much capital in

2   the company, why didn't they have enough money to

3   make machines.

4        ARBITRATOR CALLAHAN:  Ask that question.

5   BY MR. ALFORD:

6     Q.  If you had an aggressive player who was

7   investing money in the company, why didn't you make

8   any machines?

9     A.  It wasn't enough money.  It was a small

10  sum.

11    Q.  I guess we don't know how much it was, but

12  okay.

13        And you would agree, you were here when we

14  talked a couple weeks ago about the fact that

15  Bitcoin was running at an all time -- a near

16  all-time high in November of 2021, correct?

17        You were here when that was discussed a

18  couple weeks ago?

19    A.  Yes, I was.

20    Q.  And so if, in November of 2021, Bitcoin

21  was running near an all-time high and you all had

22  this revolutionary new plan for a Bitcoin mining

23  rig, why didn't you sign up any customers to replace

24  Coinmint's order and mitigate the damages?

25    A.  Because, unfortunately, production had

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   been delayed to such an extent that there were

2   rumors coming out that BITMAIN had a new machine

3   with superior energy efficiency, and so customers

4   were starting to demand that we produce an updated

5   6-nanometer machine.  So he 12-nanometer machine was

6   losing some commercial relevance at that point.

7      Q.  How much money did Katena actually spend

8   preparing to perform for Coinmint?

9      A.  I don't remember.  It -- it's a lot of

10  sums that you have to add up.  I wasn't prepared to

11  testify about that.

12     Q.  Well, you're the CEO of the company and

13  you can't tell us even approximately how much money

14  Katena spent preparing to perform on the contract

15  with Coinmint?

16     A.  I can't.

17     Q.  Okay.  All right.  Now, by the late summer

18  or early fall of 2021, Mr. DeNaut replaced

19  Mr. Maloney as your primary contact at Katena,

20  correct?

21     A.  Yes.

22     Q.  And by early November of that same year,

23  Coinmint -- Katena retained Mr. DeNaut as a

24  consultant to help Katena set up a Bitcoin mining

25  operation in direct competition with Coinmint; isn't

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  that true?

2     A.  I don't think that's true.  You'd have to

3  ask Mr. Monzon, because at the time he was CEO.  But

4  I don't -- I don't think so.

5     Q.  Okay.  And it's true, is it not, that by

6  early November, a couple days after Mr. DeNaut left

7  Coinmint, he executed a nondisclosure agreement with

8  Katena for his work in helping Katena set up a

9  Bitcoin mining operation in direct competition with

10   Coinmint; isn't that true?

11        MR. HARDIN:  Objection.  Lacks foundation.

12   He just said he doesn't know.

13  BY MR. ALFORD:

14     Q.  If you know.  I asked a different question

15   about an NDA.  If you know.

16     A.  I was not aware of --

17        MR. HARDIN:  Hang on a second.  Please at

18   least let madam chair rule.

19        ARBITRATOR CALLAHAN:  Why don't you lay

20   the foundation and then ask your question.

21        MR. ALFORD:  It's just whether he knew.

22        ARBITRATOR CALLAHAN:  Whether he knew

23   what?  It's a very long question.

24  BY MR. ALFORD:

25     Q.  Do you know that, in early November of

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   2021, Katena executed a nondisclosure agreement with

2   Mr. DeNaut for his work in helping Katena set up a

3   Bitcoin mining operation?  Do you know?

4       A.  I don't know --

5       Q.  Okay.

6       A.  -- what specific contracts were signed in

7   that time period.

8       Q.  Did you -- you told us about the K10 chip

9   becoming obsolete.

10          Did you ever inform Coinmint in writing

11   about that fact?

12      A.  That the chip was obsolete?

13      Q.  Yeah.

14      A.  I don't think so.

15      Q.  Okay.

16          MR. ALFORD:  Can I review my notes?  I

17   think I'm almost done.

18          ARBITRATOR CALLAHAN:  Okay.

19          MR. ALFORD:  Let me just check real quick.

20   BY MR. ALFORD:

21      Q.  Oh, just one more line that's -- I think

22   will be quick.

23          You told us that Coinmint -- that Katena

24   would never agree to a contract smaller than

25   150 million with Coinmint, right?

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1      A.   That we would never agree to -- a contract

2   smaller than 150?

3      Q.   Yeah.

4      A.   Well --

5      Q.   Right.

6      A.   -- it probably depends on the time frame.

7   I think I said that about a certain time frame.

8   There were other time frames where demand was

9   bigger, smaller.  You know, it would depend on

10   whether we could make up for the shortfall caused by

11   Coinmint's default.

12      Q.   Well, it's your testimony, as I understand

13   it, that at no time after May 13, 2021, would you

14   all have agreed to reduce the contract below

15   150 million?  That's your testimony, right?

16      A.   "At no time" is a pretty strong wording.

17      Q.   Okay.  There was a time after May 13,

18   2021, when you all were willing to agree to reduce

19   the contract below 150 million, right?

20      A.   No.  That's not what I said.

21      Q.   Okay.  And it's your testimony that Katena

22   would -- absolutely had to have $37.5 million in

23   full from Coinmint before it could even start the

24   process of producing the K10s; that's your

25   testimony, right?

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1    A.   Yes.

2    Q.   But, in fact, in November of 2021, Katena

3    offered to Coinmint, hey, we'll just keep the

4    23 million and give you 23 million worth of

5    machines, no harm, no foul, right?

6        MR. HARDIN:  Objection.  Settlement

7    discussions.

8        ARBITRATOR CALLAHAN:  Was this had in the

9    context of settlement?

10       MR. HARDIN:  Absolutely.

11       ARBITRATOR CALLAHAN:  All right.  I'm

12   going to sustain the objection.

13       MR. ALFORD:  I don't think it was.  It was

14   trying to work out the contract.

15       MR. HARDIN:  No.  No.  Then put up a

16   document.  This is totally settlement discussions.

17       ARBITRATOR TURITZ:  We've seen these

18   documents.

19       MR. HARDIN:  That's right.  I mean --

20       MR. ALFORD:  I think it was in the context

21   of trying to renegotiate the contract, but I mean

22   that's --

23       ARBITRATOR TURITZ:  That document is in

24   evidence already.  There's an email about it.

25       MR. ALFORD:  Right.

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1          ARBITRATOR TURITZ:  I'm sure I've seen it.

2          MR. HARDIN:  Yeah, it's --

3          ARBITRATOR CALLAHAN:  Can we look at the

4   document?

5          MR. ALFORD:  Yeah.  It's 1165.  I think it

6   is in evidence already.

7          ARBITRATOR CALLAHAN:  All right.  Let's

8   see.

9          ARBITRATOR TURITZ:  Ms. Callahan has a

10   comprehensive exhibit list.

11          ARBITRATOR CALLAHAN:  That's my job.

12          I do not have it in evidence yet.

13          ARBITRATOR TURITZ:  Well, then I am

14   mistaken and I will retract what I said.

15          ARBITRATOR CALLAHAN:  We have not looked

16   at this document, so --

17           (Simultaneous speakers - inaudible.)

18          ARBITRATOR TURITZ:  I have seen it.

19          ARBITRATOR CALLAHAN:  You may have seen it

20   but it's not been offered.

21          MR. HARDIN:  I would object.

22          Stephen Doyle is their first lawyer.  This

23   is after a demand has been sent.

24          ARBITRATOR TURITZ:  I have not seen this.

25          MR. HARDIN:  It's clearly a settlement

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  discussion.  It's clearly improper.

2      ARBITRATOR CALLAHAN:  What's the date?

3  See, I can't tell from the description --

4      THE REPORTER:  I'm sorry, you guys, could

5  you just all not talk at one time.

6      MR. HARDIN:  So this is after Mr. Doyle's

7  demand letter.  This is the demand letter that was

8  referenced in the Connecticut action that was sent

9  to Mr. DeNaut.  Okay.  This is after that.  This is

10  Mr. Monzon coming back.  And these are all

11  settlement discussions.

12      So the suggestion that this is any part of

13  contract negotiation is improper.

14      MR. ALFORD:  Well, I think --

15      ARBITRATOR CALLAHAN:  We'll take it under

16  submission.

17      MR. ALFORD:  Okay.

18      ARBITRATOR CALLAHAN:  And it's time for a

19  break anyway.  It's 10:31.

20      MR. ALFORD:  Okay.

21      ARBITRATOR CALLAHAN:  We'll take it under

22  submission.  I'll talk about it with the panel.  All

23  right.  Thank you.

24      MR. HARDIN:  You're wanting Mr. Cutler to

25  start at 10:45.

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1          ARBITRATOR CALLAHAN:  Yes, please.  Is

2   that enough of a break?

3          He'll be coming into the waiting room, I

4   assume on the Zoom?

5          MR. HARDIN:  I think so.

6          ARBITRATOR CALLAHAN:  I'll look for him.

7          MR. ALFORD:  And I think we'll be talking

8   about this same time frame, is my understanding, of

9   the exhibit we just looked at.

10          ARBITRATOR CALLAHAN:  All right.  Let me

11   talk to the panel.

12          MR. ALFORD:  Yeah.

13          (Witness excused subject to recall.)

14           (Whereupon, a recess was taken from

15            10:32 a.m. to 10:47 a.m.)

16          ARBITRATOR CALLAHAN:  The panel is still

17   100 percent operating in consensus.  We all agree

18   that we're going to sustain the objection.  1165

19   will not be in because of the settlement discussion.

20          We do appreciate that there's going to be

21   some testimony regarding attorney discussions as

22   relates to the adequate assurances dialogue.  That's

23   obviously not settlement.

24          So, you know, just because it's attorneys,

25   you know, we are -- we understand what the

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  allegations are, but the settlement discussions

2  after the demand, you know, we're going to put that

3  as off territory.

4        MR. ALFORD:  Can I just briefly make a

5  real super brief record on that?  I do think this

6  came right in the middle of adequate assurance

7  discussions and is part of it, number one.

8        Number two, I do think this is essential,

9  because it goes to impeach what we've heard from

10  Mr. Gao that they would never agree to anything less

11  than 150 million and, in fact, they couldn't --

12  business wise, a payment of less than 37.5 would

13  never work because they couldn't get the product off

14  the ground.

15        And here they're offering to take 23 and

16  produce machines.  So I think it does go to whether

17  there was willingness to amend the contract contrary

18  to what Mr. Gao said, but I hear the panel's ruling

19  and obviously respect it, I just want to make that

20  record.

21        ARBITRATOR CALLAHAN:  You made a record.

22        MR. ALFORD:  Thank you.

23        ARBITRATOR CALLAHAN:  Ruling stands.

24        MR. HARDIN:  And for the record, we're

25  going to reserve all of our responses to those legal

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1  arguments.  We totally disagree, but we'll reserve.

2       ARBITRATOR CALLAHAN:  And I understand

3  Mr. Alford is making his record.  The panel's ruling

4  stands.

5       MR. ALFORD:  Yeah.  That's fine.

6       ARBITRATOR CALLAHAN:  We have to call

7  balls and strikes some way --

8       MR. ALFORD:  Of course.

9       ARBITRATOR CALLAHAN:  -- and set the

10  bumper guards up, and we're drawing a bright line on

11  settlement negotiations after --

12       THE REPORTER:  I'm sorry, I can't hear

13  you.

14       ARBITRATOR CALLAHAN:  The adequate

15  assurance discussions that we understand is what

16  Mr. Cutler is going to talk to.  Yes?

17       MR. TABER:  Yes, ma'am.

18       ARBITRATOR CALLAHAN:  That's our

19  assumption.

20       Okay.  So with that, are we ready to

21  proceed with Mr. Cutler?

22       MR. TABER:  I am.  Should we maybe get an

23  audio level from him before we go on the record?

24       ARBITRATOR CALLAHAN:  I need to admit him,

25  but I didn't want to let him in until everybody was

ZIJIANG GAO - RECROSS / FLETCHER ALFORD

1   ready.

2          I think he's coming in now.

3          MR. HARDIN:  Is it okay if I shut the door

4   for a little bit?  I think there's a little --

5          MR. ALFORD:  There is some noise out

6   there.  Yeah.

7          MR. HARDIN:  Just because the witness is

8   on Zoom.  Apparently, the witness is in the

9   mountains.

10         THE WITNESS:  I'd rather this background

11   than my more busy city collection.

12         THE REPORTER:  Can you just admonish the

13   witness to speak very loudly.

14         ARBITRATOR CALLAHAN:  I will.

15         Mr. Cutler, did you hear the court

16   reporter?  She is asking you to please speak loudly.

17         THE WITNESS:  Sure.  Is that too loud?

18         ARBITRATOR CALLAHAN:  No, it is not.

19         THE WITNESS:  Speak louder?

20         ARBITRATOR CALLAHAN:  That level --

21         MR. HARDIN:  You actually could speak a

22   little bit louder, Joe.

23         Now I guess I --

24         THE WITNESS:  Let me actually just turn

25   the microphone up.  Hold on.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER
1      MR. HARDIN:  I guess I appreciate your

2   issues a little bit better now.

3      ARBITRATOR CALLAHAN:  All right.  Everyone

4   ready?

5      MR. ALFORD:  Yes.

6      ARBITRATOR CALLAHAN:  Okay.  Mr. Cutler,

7   could you please raise your right hand.

8            JOSEPH CUTLER,

9    called as a witness, having been duly sworn,

10            testified as follows:

11      ARBITRATOR CALLAHAN:  4all right.

12      Go ahead, Mr. Taber.

13            DIRECT EXAMINATION

14   BY MR. TABER:

15    Q.   Good morning.

16        What is your name?

17    A.   Joseph Perry Cutler.

18    Q.   Mr. Cutler, what do you do for a living?

19    A.   I am an attorney at Perkins Coie.

20    Q.   Did Katena retain Perkins Coie in

21   connection with claims being made by Coinmint?

22    A.   It did.

23    Q.   Do you recall when that happened?

24    A.   It would have been -- well, the retention

25   of Perkins Coie was first in connection with more

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1  commercial matters.  But we were retained to address

2  the Coinmint issue on or around November of 2021.

3      Q.   In connection with your retention relating

4  to Coinmint, did you interact with counsel for

5  Coinmint?

6      A.   I did.

7      Q.   Do you recall what the name of that

8  counsel was?

9      A.   Stephen Doyle.

10      Q.   Can you tell the panel generally about the

11  discussions you had with Mr. Doyle without getting

12  into the substance of any offer or request related

13  to settlement?

14      A.   Sure.

15          I received an email from Stephen that was

16  a strange email in that it suggested that there had

17  been discussions between the parties about resolving

18  Coinmint's failure to pay its deposit.

19          And Stephen, Mr. Doyle, suggested that

20  there was some informal dispute that we needed to

21  resolve.  And he hinted in the letter at unnamed

22  potential claims and hoped that we would encourage

23  our client to make it right.

24          And so I -- I really didn't understand

25  what the letter said.  It was very vague and

JOSEPH CUTLER - DIRECT / JACOB TABER

1  cryptic.  And so I responded back and asked him what

2  the allegations were.  To our understanding, there

3  was a failure to pay the deposit and we were still

4  waiting for money -- or our client was still waiting

5  for money that.

6          So that first letter was quite strange to

7  me that it didn't really specify what the alleged

8  violations were, what the allegations were, what

9  claims Coinmint might have.

10         And I had an equally challenging

11  conversation the first time I spoke to Mr. Doyle,

12  who vaguely referenced, you know, a disagreement

13  over the terms of fulfilling this purchase order.

14  And after that, I -- I told him I'd have to talk to

15  the client and get into it.

16         And from then, I spoke with -- with our

17  client to get some facts and started gathering facts

18  and I respond to this letter, which most of the

19  correspondence should be in the record.

20         MR. ALFORD:  I do object that I think this

21  is all settlement discussions.  It's in the same

22  time frame as the objection you just sustained to

23  the exhibit I wanted to go into, and it's all about

24  settlement discussions.  You have two lawyers

25  involved.  There's a dispute.  They're trying to

JOSEPH CUTLER - DIRECT / JACOB TABER

1  work it out.

2        And if we're going to be consistent, I

3  think --

4        ARBITRATOR CALLAHAN:  Mr. Alford, I did

5  not hear that.  I heard background like what's

6  his -- why is he here.  I did not hear anything

7  about a settlement discussion, sir.  Let's wait.

8  And if we get there, of course, you'll object, but I

9  heard background.

10        MR. ALFORD:  Okay.

11        ARBITRATOR CALLAHAN:  Like why is this

12  witness here.  Honestly, that's all I heard.  I

13  haven't heard about a conversation about settlement.

14        And, Mr. Taber, given my ruling, I would

15  ask that you please not go there.

16        MR. TABER:  Yes, ma'am.

17        ARBITRATOR CALLAHAN:  Okay.

18  BY MR. TABER:

19     Q.  I heard you say that you spoke with

20  Mr. Doyle.  Was that by phone or by video or

21  something like that?

22     A.  By telephone.

23     Q.  Did you have more than one phone

24  conversation with Mr. Doyle?

25     A.  Yes.  I believe I had several telephone

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1   conversations with him.

2      Q.   During any of those discussions with

3   Mr. Doyle, did he ever tell you there was a signed

4   letter of intent between Coinmint and Katena?

5           MR. ALFORD:  Could I -- could I voir dire

6   the witness about whether these were discussions

7   about trying to settle the dispute before we go to

8   the contents of it.

9           ARBITRATOR CALLAHAN:  I don't think we've

10  established that that's an order, Mr. Alford.

11  You're going to get your chance with this witness.

12  We've all heard extensive testimony about a letter

13  of intent.

14          And I would just make clear, Mr. Cutler --

15          THE WITNESS:  Yes.

16          ARBITRATOR CALLAHAN:  -- to the extent

17  you're talking about any type of agreement being

18  negotiated to settle the dispute, that's off limits.

19          THE WITNESS:  Understood.

20          ARBITRATOR CALLAHAN:  If you're talking

21  about some type of an agreement that's in place or

22  that's what you're told is in place before you were

23  ever involved, that's fair game, because we've heard

24  extensive testimony about a letter of intent during

25  the time frame of May through October.

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1       MR. ALFORD:  I agree.  But if the

2   discussions that Mr. Cutler is about to talk to us

3   about were in the context of trying to resolve a

4   dispute, to settle a dispute doesn't really matter

5   whether they mentioned or didn't mention letter of

6   intent; the point is the discussions are privileged

7   because they were in the context of --

8       ARBITRATOR CALLAHAN:  I've made that

9   ruling, and I've admonished both Mr. Cutler and

10  Mr. Taber not to go there and to stay focused on the

11  facts and circumstances that was the predicate for

12  the dispute.

13      MR. ALFORD:  I don't want to belabor it.

14  But I just want to say for the record that I believe

15  that all of what Mr. Cutler is about to testify to

16  were discussions he had with counsel in the context

17  of trying to resolve the dispute.

18      And all of those discussions, per the

19  panel's ruling just a few minutes ago are

20  privileged.  I'm -- I'll just make the record.  I

21  don't want to belabor it.  What he's about to

22  testify to is all privileged settlement discussions.

23  BY MR. TABER:

24      Q.  Mr. Cutler, I ask you not to tell us about

25  any offers of settlement that either party made.

JOSEPH CUTLER - DIRECT / JACOB TABER

1   It's not relevant to what we're talking about today.

2       You understand that instruction?

3   A.  I do.

4   Q.  Okay.  So with that understanding, during

5   your phone calls with Mr. Doyle, did he ever tell

6   you that there was a signed letter of intent between

7   Coinmint and Katena?

8   A.  No.

9   Q.  During those phone calls with Mr. Doyle,

10  did he ever tell you that the written contracts

11  between Coinmint and Katena had been orally amended?

12  A.  No.

13  Q.  Actually, let me ask you a predicate

14  question.

15       During those phone calls with Mr. Doyle,

16  did he ever talk to you about the written contracts

17  between Coinmint and Katena?

18  A.  Yes.

19  Q.  During those discussions with Mr. Doyle,

20  did he ever tell you that Mr. Soniat had sent Katena

21  an emailed request for adequate assurance in

22  November of 2021?

23  A.  No.

24  Q.  During those discussions, did Mr. Doyle

25  refer to any prior written request for adequate

JOSEPH CUTLER - DIRECT / JACOB TABER

1   assurance from Coinmint?

2       A.   No.

3       Q.   Did you ask him about prior written

4   requests for adequate assurance?

5       A.   No.

6       Q.   Did you and Mr. Doyle exchange -- I think

7   you already said, but did you and Mr. Doyle exchange

8   correspondence related to this dispute?

9       A.   We did.

10          MR. TABER:  Michelle, could you put

11   Exhibit 1169 -- 1169 on the screen.  All right.  If

12   you could scroll down a little bit.

13   BY MR. TABER:

14       Q.   Joe, can you read that okay?

15       A.   I can.

16          MR. ALFORD:  Hang on.  Let me get there.

17          ARBITRATOR CALLAHAN:  Let him get there.

18          MR. TABER:  We'll wait for the folks in

19   the room to get their paper copies.

20          MR. ALFORD:  1169.

21          I'm sorry.  We're trying to find that one.

22   Give us just a minute.

23          THE WITNESS:  While you're looking, for

24   the court reporter, is this louder now?  Is that

25   better?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1        THE REPORTER:  Just don't speak any more

2    quietly, please.  Thank you.

3        MR. HARDIN:  You're at the bare minimum of

4    flare, Joe.

5        MR. TABER:  Are we all ready to go?

6        ARBITRATOR CALLAHAN:  Yes.

7        MR. ALFORD:  I would object because the

8    very first sentence of this letter says (as read):

9            I am writing in response to

10           your settlement proposal.

11       ARBITRATOR CALLAHAN:  Right.  I'm looking

12   at the caption, express written demand for adequate

13   assurance.  Now, it was the panel's understanding

14   that that part of Claimant's complaint, the request

15   for adequate assurance that wasn't addressed.

16       MR. ALFORD:  That was made by Mr. Soniat

17   in early November.

18       ARBITRATOR CALLAHAN:  Is that not part of

19   the claims?

20       MR. ALFORD:  The one made by -- yes.

21       ARBITRATOR CALLAHAN:  No.  The demand.

22       MR. ALFORD:  Not this settlement

23   discussion.

24       ARBITRATOR CALLAHAN:  No.  Has Coinmint

25   taken the position that it requested adequate

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1   assurance and did not receive it?

2       MR. ALFORD:  Yes.

3       ARBITRATOR CALLAHAN:  Okay.  Then we get

4   to inquire here.  It's part of your claim.

5       MR. ALFORD:  Well, I think part of the

6   claim was the $23 million they agreed to amend the

7   contract to, but we couldn't go into that.  And this

8   does say (as read):

9           I'm writing in response to the

10          settlement proposal.

11      That's the first sentence.

12      ARBITRATOR CALLAHAN:  Are you dropping the

13  claim for adequate assurance?

14      MR. ALFORD:  No.

15      ARBITRATOR CALLAHAN:  All right.  Then

16  we're going to proceed.

17  BY MR. TABER:

18      Q.  Mr. Cutler, do you recognize this

19  document?

20      A.  I do.

21      Q.  What is it?

22      A.  It's apparently a written demand for

23  adequate assurance.

24      Q.  It's from Mr. Doyle?

25      A.  It is from Mr. Doyle.

JOSEPH CUTLER - DIRECT / JACOB TABER

1    Q.   Said he was counsel for Coinmint?

2    A.   He was.

3    Q.   And it's sent to you, right?

4    A.   Correct.

5    Q.   What's the date on there?

6    A.   I can't see the date.

7    Q.   Oh, sorry.

8    A.   January 4th, 2022.

9    Q.   All right.  So the first two sentences in

10   the first paragraph there read (as read):

11          I am writing in response to

12       your settlement proposal dated

13       December 29th, 2021.  I have

14       tried to focus our discussions on

15       settling this dispute and thought

16       the two companies were on the same

17       page.

18       Did I read that correctly?

19   A.   You did.

20       MR. TABER:  If you could scroll down,

21   Michelle, to the middle paragraph of page 2.

22       Thank you.

23       The next one, please.  That's -- actually,

24   if you could scroll a little bit more so we can see

25   the list.  That's great.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1  BY MR. TABER:

2    Q.   So do you see that that paragraph begins

3  (as read):

4            Based on your most recent

5         correspondence, it appears that

6         Katena is willfully ignoring

7         Coinmint's polite attempts to seek

8         adequate assurance and that you

9         require a formal express written

10         demand for adequate assurance under

11         California Commercial Code

12         Section 2609.

13            For the avoidance of doubt,

14         please consider this correspondence

15         as the formal written -- excuse me,

16         the formal express written demand

17         for adequate assurance under

18         California Commercial Code

19         Section 2609.

20         Did I read that right?

21    A.   You did.

22    Q.   Do you see under romanette ii -- it's not

23  romanette --

24       MR. TABER:  Actually, could you scroll

25  down, Michelle.  Oh, no.  I'm sorry.

JOSEPH CUTLER - DIRECT / JACOB TABER

1  BY MR. TABER:

2     Q.   Do you see romanette ii towards the end of

3  that middle paragraph that Mr. Doyle is requesting

4  reasonable assurance that, quote:

5          Katena is able to perform its

6          obligations under the agreement.

7          Do you see that?

8     A.   I do see that.

9     Q.   When you received this letter, what did

10  you understand "the agreement" to refer to?

11     A.   The purchase order that was signed in May.

12          MR. TABER:  Michelle, if you could please

13  scroll down to the next page.  Actually -- yes.

14  Please keep scrolling.

15          Thank you.

16  BY MR. TABER:

17     Q.   Do you see here, Mr. Cutler, that

18  Mr. Doyle copied the text of California Commercial

19  Code 2609?

20     A.   I do see that, yes.

21     Q.   Now, without discussing anything

22  substantive, was it your understanding that there

23  can be legal consequences for a party that doesn't

24  respond to a proper request for adequate assurance?

25          MR. ALFORD:  Calls for a legal conclusion.

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1  Work product.

2      ARBITRATOR CALLAHAN:  Overruled.

3      Go ahead.

4      THE WITNESS:  I did understand that.

5      MR. TABER:  If you could turn to page 4,

6  Michelle, the last page of this document.

7  BY MR. TABER:

8    Q.  Now, under heading B, the first sentence

9  reads (as read):

10          As illustrated above, Coinmint

11          considers your failure to provide

12          assurances related to the use of

13          the $23 million deposit as Katena's

14          repudiation of purchaser order

15          number 1 as well as the sales and

16          purchase agreement.

17          Did I read that right?

18    A.  You did.

19    Q.  What is purchaser order number 1?

20    A.  It is the agreement that was signed in May

21  between Coinmint and Katena for the purchase of, if

22  my memory serves correctly, around $150 million

23  worth of mining equipment.

24    Q.  Thank you.

25          What does the sales and purchase agreement

JOSEPH CUTLER - DIRECT / JACOB TABER

1  refer to in that sentence?

2      A.  I believe that is the agreement that was

3  attached to that purchase order.

4      Q.  Did Mr. Doyle refer to any amendment to

5  either of those two written agreements in his

6  letter?

7      A.  He did not.

8          MR. TABER:  Now let's look at the first

9  sentence of the next paragraph.

10         If you could scroll down a little bit,

11  Michelle.  Thank you.

12  BY MR. TABER:

13      Q.  Katena now has ten days to provide

14  adequate assurance of due performance, and failure

15  to do so will confirm Katena's repudiation of the

16  contract and necessitate the return of Coinmint's

17  entire deposit.

18         Did I read that right?

19      A.  You did.

20      Q.  All right.  As counsel for Katena, you had

21  to decide whether and how to respond to this letter,

22  right?

23      A.  That is correct.

24      Q.  All right.  So let's discuss that

25  response.

JOSEPH CUTLER - DIRECT / JACOB TABER

1        MR. TABER:  Michelle, if you could please

2   put up Exhibit 2196, please.  2196.  And we'll wait

3   for everyone here to get their copies.

4        Michelle, if you could scroll down so

5   we're looking at Mr. Doyle's email there in its

6   entirety.  I think it will fit.

7        Great.  Thank you.

8        MR. ALFORD:  Hang on.  We need to find

9   that.

10        MR. TABER:  Of course.

11        I'm just asking Michelle to get it ready.

12        All right.  Are we all there?

13   BY MR. TABER:

14     Q.   This is a January 13th email from

15   Mr. Doyle to you, correct?

16     A.   That is correct.

17     Q.   And sorry, January 13th, 2022.

18        That's within ten days of his

19   January 4th, 2022 letter, right?

20     A.   It is.

21     Q.   Okay.  Can you read to the panel the first

22   sentence of Mr. Doyle's email?

23     A.   It says (as read):

24        Hi Joe, this is to confirm

25        that you do not need to send a

JOSEPH CUTLER - DIRECT / JACOB TABER

1        written reply to my letter of

2        January 4th while we explore if

3        there is the possibility of a

4        settlement.

5    Q.   Then the next paragraph begins (as read):

6        As we discussed.

7        Right?

8    A.   Correct.

9    Q.   So is this email the first time you heard

10   from Mr. Doyle about whether or not Katena would

11   need to respond to the January 4th adequate

12   assurance letter?

13   A.   No.  We talked about it the day before.

14   Q.   On the phone?

15   A.   Correct.

16   Q.   What did you talk about on that call?

17   A.   Without going into any settlement

18   discussions, there were two lines of discussion.

19   One pertained to potential settlement of this

20   dispute as --

21        THE REPORTER:  I'm sorry, a potential

22   dispute as to --

23        THE WITNESS:  As to how -- one pertained

24   to a potential dispute as it had evolved over the

25   course of the prior few weeks.  And the other

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1  related to this demand that had been given on

2  January 4th for an adequate assurance, which was

3  the first time any such demand had been given to us.

4        In fact, I had to have some, you know -- I

5  had to do some legal research between January 4th

6  and January 12th to be able to make sure that we

7  did not make a mistake and accidentally, you know,

8  fail to reply in a property way or end up, as he

9  notes in his letter, repudiate the contract without

10  intending to do so.

11        So it was my job as counsel to make sure I

12  protected the company from repudiating a contract

13  after a formal written demand had been made for

14  adequate assurance.

15        I will say, there was some concern around

16  this time about whether this deadline was

17  enforceable, about whether we really were legally

18  required to respond and what would happen if we did

19  not.

20  BY MR. TABER:

21     Q.   So what did you talk about on that topic,

22  not on the settlement prong, but on the adequate

23  assurance prong, when you had that January 12th

24  call with Mr. Doyle?

25     A.   At the end of the discussions, it appeared

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1  that -- that our clients' respectively had things to

2  think about.  And I asked Mr. Doyle if I continued

3  to need to respond -- if he expected me to respond

4  to his demand for adequate assurances as -- as I

5  think most in the room may know, to do so would have

6  required a fairly detailed response for it to be

7  legally sufficient.

8        And my client did not feel that it needed

9  to do so.  It did not feel like the contract

10  required it to do so.  And after a discussion with

11  Stephen Doyle, he agreed that we would continue to

12  have discussions about resolving our client's

13  concerns as opposed to my going forward and

14  responding to his demand for adequate assurance.

15        And I think the relevant discussion was, I

16  assured him that I believed that if I wrote such a

17  response, it was more likely than not that our

18  client would continue down an adversarial rather

19  than an amicable resolution path.

20        And so I asked him to withdraw the demand

21  to respond, and he orally agreed to do so.  And then

22  I asked him subsequent to that for a written

23  confirmation of that so that I could sleep at night

24  and not have to actually draft a response.

25     Q.  What was your understanding following the

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1    call you just talked about and this email about

2    whether or not Katena needed to respond to the

3    January 4th adequate assurance letter?

4        A.   As I just noted, I -- this was very front

5    of my mind.  I collected an oral confirmation the

6    night before this, and then I asked him to confirm

7    in writing.  And then I made sure he gave me this

8    email.

9            It was very, very important me that I

10   document both -- both the informal and the formal

11   confirmation from Mr. Doyle that we were off the

12   hook, so to speak, from having to respond to that

13   letter.

14           And I fully intended to do so if he didn't

15   give us that -- that -- that release, so to speak,

16   of that obligation.  The first sentence of this

17   email is a direct response to an oral question I had

18   asked him in the prior call.

19       Q.   Did Katena respond to the January 4th,

20   2022 adequate assurance letter?

21       A.   We did not.

22       Q.   Without waiving privilege, why not?

23       A.   Because we had arranged with Stephen Doyle

24   not to, and he withdrew -- this email was his -- was

25   his not-so-articulate withdrawal of that demand.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1    Q.   Did you have any further conversations

2    orally or in writing with Mr. Doyle about the

3    adequate assurance letter?

4    A.   I did not.  This was the end of it.

5    Q.   And did you have any further conversations

6    with any representative of Coinmint -- I'll use that

7    broadly -- about the adequate assurance letter?

8    A.   It did not come out -- it did not come up

9    again until this arbitration.

10   Q.   I'm going to show you one more document

11   very quickly.

12        MR. TABER:  Michelle, if you could please

13   pull up Exhibit 2198.  Which will hopefully be in

14   your binders.

15        Michelle, if you could scroll down a

16   little bit but still have the date at the top.

17        Sorry, scroll up a little bit so we can

18   see the date, please.  Thank you.

19   BY MR. TABER:

20   Q.   Have you seen this letter --

21        MR. ALFORD:  Hang on.

22        MR. TABER:  Oh, I'm sorry.

23        MR. ALFORD:  2198.

24        MR. TABER:  Should be right nearby in the

25   binder.

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1      MR. ALFORD:  Yeah.  Got it.  Had the wrong

2  binder.

3  BY MR. TABER:

4      Q.   Have you seen this document before?

5      A.   I have.

6      Q.   What is it?

7      A.   It appears to be a notice of termination

8  of the sales and purchase agreement and the purchase

9  order number 1 between Coinmint and Katena.

10      Q.   This was sent by your colleague,

11  Mr. Hardin?

12      A.   It was.

13      Q.   But you've seen it, correct?

14      A.   I have.

15      Q.   Now, do you see in the --

16      MR. TABER:  Sorry, could you scroll down,

17  Michelle, a little bit.  Thank you.

18  BY MR. TABER:

19      Q.   Actually, in the first sentence, do you

20  see that it says (as read):

21          Katena hereby terminates the

22          agreement for Coinmint's material

23          breach?

24      A.   I do.

25      Q.   Did you have any conversation with

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - DIRECT / JACOB TABER

1  Coinmint's counsel prior to January 27th, 2022

2  about Coinmint's material breach?

3    A.  Absolutely, I did.

4    Q.  Since you started having conversations

5  about Coinmint's material breach with Coinmint's

6  counsel, did Coinmint do anything to cure it's

7  material breach?

8    A.  Absolutely nothing.

9      MR. ALFORD:  Lacks foundation.

10      ARBITRATOR CALLAHAN:  To the extent he

11  knows.

12  BY MR. TABER:

13    Q.  To the extent you know, did Coinmint do

14  anything to cure that material breach?

15    A.  To my knowledge, they did absolutely

16  nothing.

17    Q.  To your knowledge, did Coinmint -- not

18  Katena, but did Coinmint terminate either the sales

19  and purchase agreement or purchase order number 1

20  before January 27th, 2022?

21    A.  No.

22      MR. TABER:  We have no further questions

23  for the witness at this time.  Thank you.

24      ARBITRATOR CALLAHAN:  Okay.

25      MR. ALFORD:  Okay.

JOSEPH CUTLER - CROSS / FLETCHER ALFORD
1            CROSS-EXAMINATION

2  BY MR. ALFORD:

3     Q.   Mr. Cutler, can you hear me okay?

4     A.  I can.  Thank you.

5     Q.   Are you licensed to practice law in

6  California?

7     A.  I am not.

8     Q.   And you don't consider yourself an expert

9  on California law, right?

10     A.  I think I know a lot about California law.

11     Q.   Have you ever practiced in California?

12     A.   On pro hoc -- well, depends how you ask.

13     Q.   Well, how would you say it?

14     A.   Well, I've practiced pro hoc on, you know,

15  almost 100 occasions on behalf of clients like

16  Facebook and Google.  I've appeared in federal

17  courts in California on -- in both federal and state

18  courts, and I associate -- I have a national

19  practice, and I tend to work alongside teams that

20  span across the whole country.

21          So yes, I have practiced in California on

22  behalf of California clients.

23     Q.   But you're not licensed by the California

24  Bar?

25     A.   No.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1     Q.   Okay.  And you said you became involved in

2   the Katena/Coinmint dispute in November 2021,

3   correct?

4     A.   That's correct.

5     Q.   And, at that point, there was already a

6   dispute between the parties about the contract that

7   you and Mr. Doyle were trying to work out, right?

8     A.   I wouldn't have known that before.

9     Q.   Before what?

10     A.   Before I was contacted by Mr. Doyle.

11     Q.   So Mr. Doyle contacted you out of the

12   blue?

13     A.   Pretty much, yeah.

14     Q.   And he let you know there was a dispute

15   between the parties about the contract, right?

16     A.   He -- his first letter, as I said in my

17   opening remarks, was very vague.  He didn't

18   necessarily refer to a dispute; he referred to

19   potential allegations against our client that he

20   didn't define in the letter.  He didn't describe

21   them.  I had no idea what he was talking about,

22   which is why I contacted him to ask.

23          And then he was similarly vague when we

24   talked on the phone.

25     Q.   Was that the January 4 letter?

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1    A.   No.

2    Q.   What letter was that?

3    A.   It was -- it was a letter -- it was a

4    letter either sent to me by Mr. Doyle or shared with

5    me.  No.  It was sent to me in November.

6    Q.   Okay.  And in that letter, he contacted

7    you about seeing if you could settle the dispute;

8    isn't that true?

9    A.   As I said before, I -- the letter didn't

10   necessarily define what the dispute was.

11   Q.   Okay.

12   A.   He did -- he did say he'd like to resolve

13   something, but he wouldn't define what it was, what

14   "it" was.

15   Q.   Was this a letter sent to you or to

16   Mr. DeNaut?

17   A.   I don't recall.

18       MR. HARDIN:  Do you want to turn the

19   computer around so Joe can see the panel?

20       ARBITRATOR CALLAHAN:  Do you want to be

21   where Mr. Taber is sitting, Mr. Alford?

22       THE WITNESS:  That would be nice.  I can't

23   see Mr. Alford.

24       ARBITRATOR CALLAHAN:  Do you want to sit

25   where Mr. Taber is sitting so Mr. Cutler can see

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1  you?

2         MR. ALFORD:  Well, I'd rather sit where I

3  can confer with my colleagues, too, if possible.

4         MR. HARDIN:  Why don't you flip the

5  computer around so that Joe can actually see instead

6  of this voice.

7         And, Jacob, it's --

8         MR. TABER:  I'm happy to get up.

9         MR. HARDIN:  Ted, I'm looking at the

10  witness.  Obviously, it's pointed on Randy right

11  now.  I'll try to give you a little bit of a heads

12  up.

13         Do you want to -- can we turn it a little

14  bit so that the witness can see the panel as well?

15         MR. ALFORD:  Okay.  Can you see me all

16  right?

17         MR. HARDIN:  There we go.

18         THE WITNESS:  Yes.

19         MR. ALFORD:  You're probably better off

20  not seeing me, but it was your choice.

21         THE WITNESS:  I can see you.

22  BY MR. ALFORD:

23     Q.  Okay.  So this -- you said the first time

24  you really heard about this dispute between Coinmint

25  and Katena was when you got a letter in November

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1   from Mr. Doyle, right?

2      A.  Correct.

3      Q.  I haven't seen that letter.

4         Do you have a copy?

5      A.  I might.

6      Q.  Yeah, could you find that and shoot it to

7   us, please.  Email it to Mr. Hardin so we can take a

8   look at it.

9         MR. HARDIN:  Hang on a second.

10        ARBITRATOR CALLAHAN:  No.

11        MR. HARDIN:  I'm going to object.  This is

12   not discovery, this is an evidentiary hearing.

13        ARBITRATOR CALLAHAN:  Sustained.

14        MR. HARDIN:  Thank you.

15        ARBITRATOR CALLAHAN:  Let's move on, work

16   with what we've got.  This is not discovery.  The

17   discovery cut off long passed and the panel was

18   presented with numerous discovery motions.

19        MR. ALFORD:  He's testified to it and I

20   just wanted to know whether that talked about --

21        ARBITRATOR CALLAHAN:  Correct.  But this

22   is not a deposition.

23        MR. ALFORD:  Okay.

24   BY MR. ALFORD:

25      Q.  And in that letter that you say you got

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1   from Mr. Doyle in November, there was discussion

2   about trying to settle the case, wasn't there?

3        That's what he told you, right?

4        A.   As I've said before, the letter -- the

5   letter made no sense.

6        Q.   Well --

7        A.   In fact, it was so nonsensical that I took

8   it to a colleague and said, I can't even figure out

9   how to respond to this thing, which is why I called

10  him.

11       Q.   Well, we haven't seen the letter so I

12  can't ask you about whether it made sense or not.

13  But that wasn't my question.

14       The question was, that letter referenced

15  trying to settle the dispute, didn't it?

16       A.   No.

17       Q.   No mention of settling the dispute?

18       A.   Well, with all due respect, to mention

19  settling a dispute you have to define what the

20  dispute is, which I didn't even understand.

21       Q.   Okay.

22       A.   So did the letter ask me to work with him

23  to resolve some issue between our clients?  Yes.

24  But it did not -- they did not even refer to it as a

25  "dispute."

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1    Q.   Okay.  If the letter was --

2    A.   In fact --

3    Q.   Go ahead.

4    A.   No.  Go ahead.

5    Q.   If the letter was totally nonsensical,

6    surely you wrote him back and said, hey, Mr. Doyle,

7    with all due respect, your letter was totally

8    nonsensical, I didn't understand a thing you said,

9    could you please clarify?

10        Surely you wrote back to him, right?

11   A.   No, I didn't.

12   Q.   Okay.

13   A.   I called him.

14   Q.   So you said you got involved in the

15   dispute in November, but you previously had been

16   doing work for Katena, right?

17   A.   That's correct.

18   Q.   And so you had some background on the

19   company?

20   A.   I did.

21   Q.   And you had some background on its

22   contracts, right?

23   A.   My role is more of a regulatory role --

24   Q.   Okay.

25   A.   -- for them.  So I -- I did not have much

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1  background about their purchase order for this

2  contract.

3      Q.   You were involved in trying to help him

4  raise money for JPMorgan, right?

5      A.   I was.

6      Q.   Okay.  Did you ever do anything to make

7  sure that the disclosures Katena made to JPMorgan

8  were accurate?

9          MR. TABER:  I'm going to object on

10  privilege and work product grounds at this point.

11  Also relevance, but mostly product -- privilege and

12  work product.

13          ARBITRATOR CALLAHAN:  Sustained.

14          MR. ALFORD:  All right.  They've called

15  their lawyer to testify.

16          ARBITRATOR CALLAHAN:  About the adequate

17  assurance letter and the discussions with Mr. Doyle.

18          MR. ALFORD:  Okay.

19  BY MR. ALFORD:

20      Q.   All right.  So surely before you got

21  involved in your communications back and forth with

22  Mr. Doyle about adequate assurance, you did some

23  background investigation to see what prior

24  correspondence there might have been back and forth

25  between the parties about the contract, right?

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1       MR. TABER:  Objection.  Work product.

2       ARBITRATOR CALLAHAN:  Sustained.

3       You're going before the contact with

4   Mr. Doyle.

5       MR. ALFORD:  No.  No.

6       ARBITRATOR CALLAHAN:  This all started

7   with Mr. Doyle.  You said that before you got

8   involved.

9       MR. ALFORD:  Let me rephrase the question.

10  BY MR. ALFORD:

11    Q.  In deciding how to communicate with

12  Mr. Doyle, you surely did some background

13  investigation to find out what had previously

14  occurred between the parties about their dispute

15  over the contract, right?

16      MR. TABER:  Objection.  Work product.

17      ARBITRATOR CALLAHAN:  Sustained.  You're

18  asking about his investigation, Mr. Alford.

19      MR. ALFORD:  He's testified to that.

20      ARBITRATOR CALLAHAN:  No, he did not.

21      ARBITRATOR TURITZ:  No, he didn't.

22      MR. ALFORD:  Okay.  All right.  Let me ask

23  the question this way.

24  BY MR. ALFORD:

25    Q.  You were aware, at the time you were

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1  corresponding with Mr. Doyle, that Mr. Soniat had

2  previously requested adequate assurance from Katena,

3  correct?

4        MR. TABER:  Object --

5        THE WITNESS:  Could you --

6        MR. TABER:  Okay.  Withdrawn.

7        THE WITNESS:  Could you repeat the

8  question, please.

9        MR. ALFORD:  Sure.  I'll read it back.

10  BY MR. ALFORD:

11   Q.  (As read):

12        You were aware, at the time

13     you were corresponding with

14     Mr. Doyle, that Mr. Soniat had

15     previously requested adequate

16     assurance from Katena, correct?

17   A.  No.

18   Q.  Okay.  Let's look at Exhibit 1169, which

19  you talked about earlier.

20        This is the letter you got on January 4

21  from Mr. Doyle, right?

22   A.  I see it.

23   Q.  Okay.

24        ARBITRATOR CALLAHAN:  1169 is an email.

25  Are you talking about the letter -- I think the --

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1    MR. ALFORD:  1169, in my binder --

2    ARBITRATOR CALLAHAN:  It says email.

3    MR. ALFORD:  -- was covered by Mr. Hardin

4  as a letter dated January 4.

5    ARBITRATOR TURITZ:  It's a letter sent via

6  email, according to the heading on it.

7    MR. ALFORD:  Right.

8    ARBITRATOR CALLAHAN:  Okay.

9    MR. ALFORD:  It is sent via email but it's

10  a letter.

11    MR. TABER:  Covered by Mr. Taber.  I know

12  we look a lot alike, but ...

13    MR. ALFORD:  Sorry.

14    ARBITRATOR CALLAHAN:  Go ahead.

15  BY MR. ALFORD:

16    Q.  So if could you look at Exhibit 1169.

17  This letter you received via email from Mr. Doyle.

18    Do you see that?

19    A.  Yes.

20    Q.  And in the first paragraph, he says (as

21  read):

22        As I have said, Coinmint has

23        had concerns about the

24        negotiations, drafting and signing

25        of the contract, but more

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1       importantly, your letter ignores

2       the communications with Katena

3       computing technologies by which

4       Coinmint requested adequate

5       assurance of performance from

6       Katena under the California

7       Commercial Code.

8           Do you see that?

9       A.  I do.

10      Q.   So when you saw that, you understood that

11  Mr. Doyle was saying a request for adequate

12  assurance had previously been made and ignored?

13          You understood that, right?

14      A.   No.  Actually, I didn't -- so for one --

15  let me read it again.

16          When it says (as read):

17              This letter ignores the

18          communications with Katena

19          Computing Technologies by which

20          Coinmint requested adequate

21          assurance and performance from

22          Katena under California Commercial

23          Code Section 2609.

24          I can definitively testify, that's the

25  first I have ever seen a reference to these

TRANSCRIPT OF PROCEEDINGS

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1   sections.  So I was not aware.  And so I wasn't

2   ignoring any prior communications that I was aware

3   of.

4       Q.   Well, I didn't ask you about a specific

5   citation to the California Commercial Code 2609.  My

6   question was different.

7           When you read this sentence that I just

8   read to you, you understood Mr. Doyle was telling

9   you, hey, Coinmint has previously made requests for

10   adequate assurance and you guys have ignored me?

11   He -- you understood that's what he was saying,

12   right?

13       A.   No.

14       Q.   No?

15       A.   I didn't, I --

16       Q.   Okay.

17       A.   I understood this to mean that he was

18   telling me that Coinmint had demanded, under

19   California Commercial Code 2609 adequate assurances,

20   which, by the way, I now understand is a particular

21   aspect of -- it's a legal maneuver where you demand

22   it formally.

23           Asking someone whether they're going to

24   continue to be able to create a machine or satisfy

25   the contract or fulfill their obligations is not the

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1   same as a formal demand under a commercial code.

2        MR. ALFORD:  Well, I object --

3        THE WITNESS:  Otherwise every -- otherwise

4   every single time someone calls me and says, are we

5   on track to finish this thing, I got to -- I got to

6   treat it like a demand under California Commercial

7   Code?  I'm pretty sure that's not the law.

8        MR. ALFORD:  The witness has just

9   testified and given a legal opinion.  I would ask

10   that it be stricken.

11        ARBITRATOR CALLAHAN:  We've heard it,

12   Mr. Alford.  It's hard -- impossible to strike it

13   from our -- what we heard.

14        MR. ALFORD:  I just want to formally

15   object that the witness is testifying now to legal

16   opinions and work product that I guess I can't

17   explore but he's allowed to talk about.

18        ARBITRATOR CALLAHAN:  We're taking it for

19   his understanding only, not as a legal opinion

20   binding upon the panel.

21   BY MR. ALFORD:

22     Q.   What, if anything, did you do upon receipt

23   of this letter from Mr. Doyle to find out what he

24   was referring to when he said (as read):

25            Your letter ignores

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1        communications with Katena by which

2        Coinmint requested adequate

3        assurance of performance?

4        What did you do to find out what he was

5   referring to?

6        MR. TABER:  Objection.  Work product.

7        ARBITRATOR CALLAHAN:  Oh.

8        MR. ALFORD:  He's just given his work

9   product and his legal opinion about how he responds

10  to these things, how he views them, whether he

11  thinks they're -- he's given his -- it's been

12  waived.

13        ARBITRATOR CALLAHAN:  I don't believe so.

14  Sustained.

15        MR. ALFORD:  Okay.

16  BY MR. ALFORD:

17     Q.   All right.  Now, let's pull up

18  Exhibit 122.  Actually -- 12- --

19        ARBITRATOR CALLAHAN:  What number?

20        MR. ALFORD:  I'm sorry.  It's 68.  I gave

21  the wrong number.  68.

22        MR. TABER:  Joint 68.

23  BY MR. ALFORD:

24     Q.   Do you see that document on the screen?

25     A.   Yes.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1    Q.   In the course of having your

2   correspondence back and forth with Mr. Doyle, you

3   had seen this document, correct?

4         MR. TABER:  I would let him answer yes or

5   no to that.

6         ARBITRATOR CALLAHAN:  It's a yes-or-no

7   question.

8         MR. ALFORD:  Yeah.

9   BY MR. ALFORD:

10    Q.   You saw this document in the course of

11   your preparing to and corresponding with Mr. Doyle,

12   right?

13    A.   No.

14    Q.   Okay.  Now, you're not here today to

15   provide a legal expert opinion that this document is

16   not a request for adequate assurance?  You're not

17   here to provide that expert opinion, are you,

18   Mr. Cutler?

19    A.   That's correct.

20    Q.   Okay.  So you would agree with me that

21   you, in the course of your correspondence back and

22   forth with Mr. Doyle, you were totally unaware of

23   this November 4 email from Mr. Soniat to Mr. Monzon

24   asking about what has happened with the money,

25   right?  You weren't aware of it?

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1    A.   Are you asking whether I was aware of the

2  content of the letter or this email?

3    Q.   Either one.

4    A.   Okay.  I'll pick the email.  I was not

5  aware of this email.

6    Q.   Okay.  And when you got this letter, the

7  January 4 letter from Mr. Doyle referring to prior

8  requests for adequate assurance that Katena has

9  ignored, did you ask him what he was referring to?

10    A.   Did I ask who?

11    Q.   Mr. Doyle, when he wrote you on January 4

12  and says, hey, we've made prior requests for

13  adequate assurance that Katena has ignored, did you

14  ask him what he was referring to?

15    A.   I think his letter was self-explanatory.

16  I responded to -- I read and responded to the

17  letter.

18    Q.   My question wasn't whether his letter was

19  self-explanatory.  We can maybe agree about that.

20  My question was more specific.

21       When you got his letter saying, hey, your

22  client has ignored previous requests for adequate

23  assurance, did you ask him what he was talking

24  about?

25    A.   We actually didn't focus on that sentence.

TRANSCRIPT OF PROCEEDINGS

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1    Q.   Okay.  You didn't focus on that?

2    A.   We didn't have the conversation, sir.

3    Q.   What did you do, if anything, to try to

4    find out what he was referring to when he said there

5    have been prior requests for adequate assurances

6    you've ignored?

7         What did you do to find out what he's

8    talking about?

9         MR. TABER:  Objection.  Work product and

10   asked and answered.

11        ARBITRATOR CALLAHAN:  Sustained.

12   BY MR. ALFORD:

13   Q.   Okay.  Now, you said that you were

14   prepared to respond substantively to Mr. Doyle's

15   January 4 letter, but he told you it wouldn't be

16   necessary, right?

17   A.   That's correct.

18   Q.   And he said it wouldn't be necessary

19   because you guys were gonna engage in settlement

20   discussions, right?

21   A.   No.  He said it wasn't necessary because I

22   specifically asked him to withdraw the demand the

23   night before --

24   Q.   Let's --

25   A.   -- on the phone.

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1      Q.   Let's take a look at Exhibit 2196, which

2   Mr. Hardin went over with you.

3          ARBITRATOR CALLAHAN:  Mr. Taber.

4          MR. ALFORD:  Mr. Taber went over with you.

5   Sorry.

6          ARBITRATOR CALLAHAN:  Which exhibit?

7          MR. ALFORD:  2196.

8   BY MR. ALFORD:

9      Q.   Do you have that up there?

10     A.   I can see it.  You can scroll down a

11   little bit, though, please.

12     Q.   Wait.  Let's look at the top first.

13          You forward this email to somebody, right?

14     A.   Apparently -- it appears so, yes.

15     Q.   But the identity of the person you forward

16   it to is attorney-client?

17     A.   Sure --

18          MR. TABER:  Objection.  Attorney-client

19   privilege and relevance.

20          MR. ALFORD:  Well, I'm just trying to

21   understand.  He forwarded it to somebody, but the

22   identity --

23          ARBITRATOR CALLAHAN:  Sustained.

24          MR. ALFORD:  Okay.

25          I can't inquire about the redactions at

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

    JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1   all?

2        ARBITRATOR CALLAHAN:  What is the

3   relevance?

4        MR. ALFORD:  I want to understand the

5   context of this document and why it was forwarded to

6   people and the identity of the person is

7   attorney-client --

8        ARBITRATOR CALLAHAN:  Why does that

9   matter?

10        MR. ALFORD:  It matters because perhaps it

11   goes to the background of the document, the context

12   of the document.

13        ARBITRATOR CALLAHAN:  Well, ask him.  Lay

14   a foundation, please.

15        MR. ALFORD:  All right.

16        ARBITRATOR CALLAHAN:  Right now I am faced

17   with an attorney-client privilege objection, which I

18   am duty bound to respect, and I am trying to

19   understand why we need to go there since you're

20   trying to focus in on what Mr. Cutler and Mr. Doyle

21   discussed.  So that's very interesting.  I don't

22   understand why we're going off track.

23        MR. ALFORD:  Okay.  I do think it's at

24   least irregular that the name of a person is

25   attorney-client.  But I won't belabor it.  Okay.

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1    MR. TABER:  I would say that these were

2  produced months ago and there was an opportunity to

3  raise attorney-client -- redaction objections or

4  privilege objections at that time.

5  BY MR. ALFORD:

6    Q.  Okay.  So Mr. Doyle writes you on

7  January 13, right, and says (as read):

8         Hi Joe, this is to confirm

9       that you do not need to send a

10       written reply to the letter of

11       January 4th while we explore if

12       there is a possibility of a

13       settlement.

14       Right?

15    A.  Correct.

16    Q.  So you understand that his agreement that

17  you didn't have to respond to his January 4 letter

18  was given to you in the context of settlement

19  negotiations, correct?

20    A.  No.  I want to be -- I would like to be

21  clear.  If you'd like me to clarify, you can ask me

22  to clarify.

23    Q.  No.  I get to ask the questions.  You get

24  to answer them.

25    A.  I know.  I did.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1    Q.   So I would --

2         ARBITRATOR CALLAHAN:  Mr. Alford, please,

3    questions to the witness.

4         MR. ALFORD:  Sure.

5         ARBITRATOR CALLAHAN:  Your next question,

6    please.

7         MR. ALFORD:  I think the witness has told

8    us that this was in the context of settlement

9    discussions, so I would object to it coming into

10   evidence, 2196.  But I'll move on.

11   BY MR. ALFORD:

12   Q.   And Mr. Doyle never told you that he

13   agreed to rescind, on behalf of Coinmint, any prior

14   demands for adequate assurance Mr. Soniat may have

15   made?

16        He never told you that, did he?

17   A.   I'm not sure I understand the question.

18   Q.   Did Mr. Doyle ever say, hey, I agree to

19   rescind on behalf of Coinmint any and all prior

20   demands for adequate assurance Mr. Soniat may have

21   made?  Did he say that to you?

22   A.   In those words, no.

23   Q.   Right.

24        Okay.  And you said that you were prepared

25   to respond substantively to Mr. Doyle's January 4

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1   letter if he hadn't said you didn't need to, right?

2   A.   That's correct.

3   Q.   And if we could take a look at that 27 --

4   it's 1169.

5        And in the second paragraph down, about

6   halfway through that paragraph, he says (as read):

7           To the extent that Katena

8           contends that Coinmint's previous

9           oral and written communications

10          with Katena did not constitute a

11          request under the California code,

12          please consider this letter, et

13          cetera.

14       Did you ever ask him what he was referring

15   to there?

16   A.   Sorry, can we -- the call out was the

17   wrong one.  Can we look at that again.

18   Q.   Second --

19   A.   I'm not trying to be difficult.  I just

20   need to see it again.

21   Q.   No problem.

22       Second paragraph on page 1169-2.

23   A.   Yeah.  I'm looking.

24   Q.   About halfway down that paragraph, he

25   refers to (as read):

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1          Previous oral and written

2          communications from Coinmint to

3          Katena.

4          Did you ever ask him what he was referring

5    to?

6      A.   Give me a moment to reread this.

7          Okay.  Ask your question.

8      Q.   Yeah.  Did you ever ask him what he was

9    referring to in that highlighted -- with that

10   highlighted language that's on the screen there?

11     A.   I think it's pretty clear that he was

12   binding any previous requests that I may or may not

13   have known about into this one.

14     Q.   That's not what I asked you.  I didn't ask

15   you --

16     A.   You asked me if I asked him.  The answer

17   is, no, I did not because it's self-evident.

18     Q.   Okay.  Well, we can agree to disagree

19   whether it's self-evident.  But the bottom line is,

20   you didn't ask him?

21     A.   No.

22     Q.   Okay.  And a little further down that same

23   paragraph, he says that -- he asks you for certain

24   documentation, right?  Do you see that?

25          MR. ALFORD:  Scroll down a little bit,

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1   Ted.

2          THE WITNESS:  Oh, I see it.  Go ahead.

3          MR. ALFORD:  If we could blow it up a

4   little, Ted, the numbers 1 through 5 there.

5          THE WITNESS:  Mm-hmm.

6   BY MR. ALFORD:

7      Q.   He asked you for documentation that Katena

8   has used any portion of the deposit to develop one

9   or more working units, right?

10     A.   It does say that.

11     Q.   Including documents that show the amount

12  of money spent, right?

13     A.   It does say that.

14     Q.   And you were prepared to respond

15  substantively to that, right?

16     A.   I was prepared to respond substantively to

17  the demand for adequate assurances.

18     Q.   Were you prepared to tell Mr. Doyle -- to

19  give him documentation showing that Katena has used

20  the money to build a working machine?  Were you

21  prepared to give him that documentation?

22         MR. TABER:  Objection.  Work product.

23         ARBITRATOR CALLAHAN:  Sustained.

24         MR. ALFORD:  He's waived it by saying he

25  was prepared to respond substantively.  I can't ask

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1  him what the response was going to be, it's work

2  product.  That's the ruling?

3        ARBITRATOR CALLAHAN:  Because it never

4  came forward.

5        MR. ALFORD:  But he testified, under

6  questioning from Mr. Taber, that he was prepared to

7  respond substantively.  I can't ask him --

8        ARBITRATOR CALLAHAN:  And we didn't go

9  into the substance.

10       MR. ALFORD:  He didn't, but --

11       ARBITRATOR CALLAHAN:  If he'd gone into

12  the substance, then I agree he would have waived it,

13  but it never materialized, Mr. Alford, so I don't --

14  if he had responded there would be something to talk

15  about.

16       MR. ALFORD:  I think it's fair

17  cross-examination since it was brought up, but I

18  respect the panel's ruling.  I don't want to argue

19  about it.

20  BY MR. ALFORD:

21    Q.  Let's go back to Exhibit 68 for a minute

22  where --

23       MR. ALFORD:  If we could blow that up a

24  little bit.

25  / /

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1   BY MR. ALFORD:

2       Q.   -- Mr. Soniat asked Mr. Monzon whether the

3   funds are in an escrow account and if they're not

4   escrowed, how are they being used.

5           Do you see that?

6       A.   I do.

7       Q.   Did you ever see any correspondence back

8   from anybody at Katena that answered those questions

9   Mr. Soniat posed?

10          MR. TABER:  Objection.  Work --

11           (Simultaneous speaking - inaudible.)

12          MR. TABER:  Excuse me, Joe, objection.

13   Work product.

14          ARBITRATOR CALLAHAN:  Sustained.

15          THE WITNESS:  Sorry, Jacob.

16          MR. TABER:  Quite the role reversal, huh?

17          THE WITNESS:  Enjoy it.

18   BY MR. ALFORD:

19      Q.   Have you ever seen any correspondence from

20   Katena to Coinmint answering those questions?

21          MR. TABER:  Objection.  Work product.

22          ARBITRATOR CALLAHAN:  Sustained.

23   BY MR. ALFORD:

24      Q.   Did you ever provide Katena with any --

25   I'm sorry.

JOSEPH CUTLER - CROSS / FLETCHER ALFORD

1       Did you ever provide anyone, Mr. Doyle or

2    anyone else on behalf of Coinmint, the answers to

3    these questions?

4          MR. TABER:  Objection.

5    BY MR. ALFORD:

6       Q.  What's happened to the money?  How it's

7    being spent?

8          MR. TABER:  Objection.  I think you

9    misspoke.  Did you mean on behalf of Katena?

10         MR. ALFORD:  Let me rephrase the question

11   to make sure it's clear.

12   BY MR. ALFORD:

13      Q.  Did you, Mr. Cutler, ever provide to

14   anyone affiliated with Coinmint, their lawyers or

15   otherwise, the answers to these questions Mr. Soniat

16   posed back on November 4, 2021?

17      A.  I did not.

18      Q.  Okay.

19         MR. ALFORD:  I'm just going to take a

20   second to confer.

21         ARBITRATOR CALLAHAN:  Okay.

22          (Discussion held off record.)

23         MR. ALFORD:  I don't think we have any

24   further questions.

25         ARBITRATOR CALLAHAN:  Okay.

JOSEPH CUTLER - REDIRECT / JACOB TABER

1      Mr. Taber, do you have anything further of

2  Mr. Cutler?

3      MR. TABER:  I do.  If we could just --

4  Ted, would you mind pivoting -- or John's going to

5  pivot.

6      MR. HARDIN:  You're going to have to sit

7  in that chair.

8      MR. TABER:  In this chair.  Okay.  I'll

9  sit in that chair.

10      THE WITNESS:  I will admit, I like looking

11  at the panel better than you, Jacob.

12      MR. TABER:  You know, no hard feelings.

13      Ted, if you could stop the screen share.

14  I don't know that we'll put any documents up but I'd

15  like Michelle to have the ability to.

16      Thank you.

17          REDIRECT EXAMINATION

18  BY MR. TABER:

19    Q.   Joe, you testified earlier about several

20  phone calls that you had with Mr. Doyle, correct?

21    A.   Correct.

22    Q.   And on any of those phone calls, did

23  Mr. Doyle talk to you about what he said were oral

24  requests for adequate assurance that had been made?

25    A.   No.

JOSEPH CUTLER - REDIRECT / JACOB TABER

1    Q.  No.

2        And on any of those phone calls, did he

3    tell you about prior emailed requests for adequate

4    assurance that had been made?

5    A.  No.  The conversations were more

6    convoluted than that, much to my frustration.

7    Q.  And I just want to follow up on one answer

8    you gave to Mr. Alford.

9        He asked you whether you ever told

10   Mr. Doyle, in response, that it was your

11   understanding that Coinmint was rescinding all prior

12   requests for adequate assurance, and you said "in

13   those words, no."

14       I just wanted to know if you had any

15   followup or clarification on what you said to

16   Mr. Doyle on that topic.

17   A.  Sure.

18       It is -- it is true that -- that the topic

19   of Coinmint's doubts about Katena's ability to

20   deliver on the terms of the contract came up with

21   Mr. Doyle.  He never framed that discussion, nor did

22   I answer it, in the context of a demand for adequate

23   assurances.

24       It was more in the context of discussing

25   the breach of the contract, namely, that they had

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

JOSEPH CUTLER - REDIRECT / JACOB TABER

1   not paid the sufficient deposit, which was my

2   consistent and repetitive answer to any other effort

3   he had made to produce a different result.

4          And so when we received the January 4th

5   letter, and the language that we just reviewed with

6   the panel, as well as my subsequent response, I

7   treated that letter as the formalization of his

8   efforts to get Katena to provide a formal adequate

9   assurance of its ability to deliver under the

10  contract, which was awkward given the fact that they

11  breached first.

12         And I told Mr. Doyle that many times, that

13  it was difficult for me to understand how we --

14  meaning my client -- was being sort of commanded to

15  produce an adequate assurance to deliver on a

16  contract whose underlying assumptions hadn't been

17  fulfilled by his client, meaning the initial deposit

18  that was the precedent condition for the contract to

19  go forward.

20         And so when I read that letter that he

21  was, you know -- I was saying I assumed that all

22  previous communications were rolled into this

23  demand, from that moment forward, January 4th

24  forward, I treated any correspondence as all

25  inclusive.  They were demanding an adequate

TRANSCRIPT OF PROCEEDINGS

JOSEPH CUTLER - RECROSS / FLETCHER ALFORD

1   assurance and we were going respond unless another

2   arrangement was made, which it was.

3        MR. TABER:  I don't think I have anything

4   else but could I have one minute also just to

5   confer.

6        ARBITRATOR CALLAHAN:  Of course.

7        MR. ALFORD:  I have one or two follow-up.

8        ARBITRATOR CALLAHAN:  Okay.

9        MR. TABER:  We've conferred.  We don't

10  have anything else, Mr. Cutler.

11       Thank you.

12       ARBITRATOR CALLAHAN:  Okay.

13            RECROSS-EXAMINATION

14  BY MR. ALFORD:

15    Q.  Mr. Cutler, you're not here to offer

16  expert legal opinion under California law that a

17  written communication is not effective as a demand

18  for adequate assurance unless it has certain

19  buzzwords, are you?

20       MR. TABER:  Objection.  Asked and

21  answered.

22       MR. ALFORD:  It hasn't been asked and

23  answered.

24       ARBITRATOR CALLAHAN:  I actually have

25  notes.  I believe you have asked it.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

JOSEPH CUTLER - RECROSS / FLETCHER ALFORD

1    ARBITRATOR TURITZ:  Yes.

2    ARBITRATOR CALLAHAN:  You can ask it one

3    more time and then move on, please.

4    THE WITNESS:  Can you repeat the question?

5    BY MR. ALFORD:

6    Q.  Sure.

7    I think my prior question was about

8    Exhibit 68 specifically.  This is a more general

9    question, which is, you're not here to offer an

10   expert legal opinion under California law that a

11   written communication is ineffective as a demand for

12   adequate assurance unless it uses certain buzzwords,

13   are you?

14   A.  I am -- I am most assuredly not here to

15   offer expert opinions.

16   Q.  Right.

17   And you're not here to offer an expert

18   legal opinion that a writing is not effective as a

19   demand for adequate assurance unless it cites to any

20   specific provision of the commercial code, right?

21   A.  That's correct.

22   MR. ALFORD:  Okay.  We don't have anything

23   else.

24   ARBITRATOR CALLAHAN:  All right.

25   MR. TABER:  Witness is excused on our end.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

JOSEPH CUTLER - RECROSS / FLETCHER ALFORD

1      MR. HARDIN:  Does the panel have any

2   questions?

3      MR. TABER:  Sorry.  Thank you.

4      MR. HARDIN:  It seems relatively

5   straightforward, but ...

6      ARBITRATOR CALLAHAN:  I don't think the

7   panel -- Ms. Turitz?

8      ARBITRATOR TURITZ:  No.

9      ARBITRATOR CALLAHAN:  Ms. Glick?

10      ARBITRATOR GLICK:  No.

11      ARBITRATOR CALLAHAN:  I have no questions.

12   The panel has no questions.  So we'll break and who

13   is up next after lunch?

14      ARBITRATOR TURITZ:  We can excuse the

15   witness.

16      ARBITRATOR CALLAHAN:  Yes.  I assume the

17   witness may be excused, yes?

18      MR. TABER:  Yes, ma'am.

19      MR. ALFORD:  Yes.

20      ARBITRATOR CALLAHAN:  Thank you very much,

21   Mr. Cutler.  Have a nice day.

22      THE WITNESS:  Appreciate it, thank you.

23         (Witness excused.)

24      THE REPORTER:  Do you want to be on the

25   record still?

JOSEPH CUTLER - RECROSS / FLETCHER ALFORD

1      MR. ALFORD:  I would like to be on the

2   record for a minute.  See what ...

3      ARBITRATOR CALLAHAN:  Who's next?

4      MR. HARDIN:  I would like to ask Mr. Gao a

5   question about mitigation since it was raised at the

6   end.

7      ARBITRATOR CALLAHAN:  I didn't know that

8   we had finished with Mr. Gao.  We didn't have that

9   discussion.  We were trying to accommodate

10  Mr. Cutler.

11     MR. HARDIN:  Oh.

12     ARBITRATOR CALLAHAN:  If you have some

13  more questions, let's finish him up and then take

14  our lunch break.  Can you do that now?

15     MR. HARDIN:  Yes, ma'am.

16     ARBITRATOR CALLAHAN:  Who will be after

17  lunch.

18     MR. HARDIN:  I think it depends, is it

19  going to be Randy or Norbert?

20     MR. LIU:  Guiol, rhymes with greel.

21     ARBITRATOR CALLAHAN:  Okay.  So he'll

22  start about 1:00 o'clock.

23     MR. ALFORD:  Okay.

24     MR. HARDIN:  Can I ask what the panel is

25  thinking with respect to the time left with Mr. Gao?

JOSEPH CUTLER - RECROSS / FLETCHER ALFORD

1   I literally just want to ask him a couple questions

2   about mitigation, but if the panel is envisioning

3   that this is going to go beyond that, obviously I've

4   got questions.

5          ARBITRATOR CALLAHAN:  How much do you

6   have?

7          MR. HARDIN:  For me?

8          ARBITRATOR CALLAHAN:  I was expecting you

9   had cleanup, like five minutes.

10         MR. HARDIN:  Correct.

11         MR. ALFORD:  I thought we were going to be

12  done with Mr. Gao at 10:45.  That's what I thought

13  the panel's order was.  That's what the panel's

14  prior schedule order was.

15         ARBITRATOR CALLAHAN:  We're so far beyond

16  that.

17         MR. ALFORD:  I don't think we are really.

18         ARBITRATOR TURITZ:  I think -- in

19  fairness, I think that both parties have used up the

20  time that we allotted through 10:45.  If each side

21  wants to get another five minutes or something.

22         ARBITRATOR CALLAHAN:  We're going to

23  accommodate another five minutes.  We're not

24  accommodating more than that.

25         MR. HARDIN:  That's what I'm asking.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          ARBITRATOR CALLAHAN:  As we've done

2   previously, if you have a little cleanup, we've been

3   accommodating that, but then we need to be done and

4   move on to our next witness.

5          Go ahead.

6          MR. ALFORD:  Move on to the next witness

7   before lunch or after?

8          MR. HARDIN:  We've got five minutes.  You

9   ready?

10          ARBITRATOR CALLAHAN:  Not before.

11          MR. ALFORD:  I just want to make sure

12   whether we need to get Mr. Guiol.

13          ARBITRATOR CALLAHAN: No.  No.  No.  We're

14   going to start with Mr. Guiol after lunch.

15          MR. ALFORD:  Okay.

16          ARBITRATOR CALLAHAN:  Talk about a start

17   time once we've finished.  Let's go.

18          MR. HARDIN:  Okay.  You ready?

19          THE WITNESS:  Yeah.

20          MR. HARDIN:  All right.

21               ZIJIANG GAO,

22    called as a witness, having been previously duly

23          sworn, testified as follows:

24          REDIRECT EXAMINATION  (RESUMED)

25   BY MR. HARDIN:

TRANSCRIPT OF PROCEEDINGS

1    Q.   Mr. Gao, you heard -- or you were asked

2    some questions about mitigation.  I want to break

3    this down into different time periods.

4    A.   Sure.

5    Q.   May 18th, Coinmint doesn't pay through

6    early November.

7    A.   Yes.

8    Q.   Okay.  Can you tell the panel your efforts

9    with respect to mitigation under the contract?

10    A.   Yes.  Absolutely.

11        MR. ALFORD:  Calls for a narrative.

12    Objection.  Calls for a narrative.

13        ARBITRATOR CALLAHAN:  Overruled.

14        THE WITNESS:  We got, you know, introduced

15    to customers through various sources.  We, I think,

16    talked to maybe ten major customers in this time

17    frame.  It was a very challenging time frame because

18    Bitcoin price had generally gone down in the earlier

19    part of this time frame to where it's later part of

20    this time frame, as mentioned during, you know, my

21    chat with Mr. Alford, we had several aggressive

22    players who started to come and started to indicate

23    heavy amounts of interest.

24        Our plan was that if we could land one of

25    these major players, you know, we would be able to

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  essentially sunset the Coinmint contract in that

2  case.

3  BY MR. HARDIN:

4      Q.   So you were talking during this time

5  period of kind of May to November, one of the

6  factors was the price of Bitcoin, right?

7      A.   Yes.

8      Q.   Did the supply chain also impact these

9  discussions?

10      A.   Absolutely.  The supply chain situation

11  got worse.  As an example, one of the key parts in

12  the production of this mining rig was the Xilinx

13  control chip.  And that chip went from a price of, I

14  believe, $5 to I think $55 during this time period.

15          And so there were key components that were

16  constantly raising in price going from, for example,

17  30 weeks or 26 weeks of lead time all the way up to

18  75 weeks lead time.

19          The supply chain situation was getting

20  more and more critical.  Despite that, we constantly

21  maintained open channels with all of our supply

22  chain vendors, whether it was contract

23  manufacturers, whether it was part suppliers,

24  whether it was TSMC.  We constantly tried to assuage

25  whatever doubts they had about our ability to

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   carryforward with our production plan.

2       Q.   Okay.  Let me interject a question here

3   real quick.  Sorry, I see my time.

4       A.   Go ahead.

5       Q.   How would the price of Bitcoin and the

6   supply chain -- would it have a cascading effect on

7   your capacity constraint?

8       A.   Absolutely.  So as the price of Bitcoin,

9   during this time period, went down and the supply

10  chain got worse, the parts that we had to buy got,

11  you know, more and more expensive.  But the price

12  that we could sell the machines for to customers got

13  worse and worse, because not only were there these

14  rumors that BITMAIN was coming out with a new

15  machine, it was also the case that, you know, the

16  network was growing.  That was one aspect.

17          And, you know, these machines were

18  generally reaching the end of their era.  And so

19  both of these were happening simultaneously.  And it

20  made life very difficult.

21      Q.   So let me ask you this:  Between the

22  period of May to November, if Katena would have

23  secured another customer, we'll call this customer

24  Ted, and if Ted would have brought $150 million

25  worth of machines, but then Coinmint would have

TRANSCRIPT OF PROCEEDINGS

1   actually come through on one of its spit-balling

2   ideas and paid the down payment, could Katena have

3   fulfilled both?

4         MR. ALFORD:  Objection.  Hypothetical,

5   which I was not allowed to ask any hypotheticals.

6         ARBITRATOR CALLAHAN:  All right.  What's

7   the relevance, Mr. Hardin?

8         MR. HARDIN:  The relevance is with respect

9   to this time period, there's only a certain amount

10  of machines that Katena can make.

11        ARBITRATOR CALLAHAN:  But just ask him the

12  factual question.

13        MR. HARDIN:  I'm sorry?

14        ARBITRATOR CALLAHAN:  Just ask him the

15  factual question.

16        MR. HARDIN:  Okay.

17  BY MR. HARDIN:

18     Q.  Mr. Gao, could Katena have brought on

19  another customer of similar size and satisfied that

20  customer and Coinmint?

21     A.  I don't think so.

22     Q.  Okay.  After November, did you continue to

23  discuss potential new customers?

24     A.  Yes.  Absolutely.  We discussed a major

25  joint venture.  We actually got to a term sheet with

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1   Blockchain.com on a joint venture debt deal.  We

2   discussed with major publicly traded Bitcoin miners

3   the possibility of buying further machines.

4          In fact, we continued development of the

5   12-nanometer chip to update it for worsening

6   economic conditions.  And we also engaged in the

7   development of a 6-nanometer chip.  So generally,

8   Katena was trying its best to make the best of its

9   situation.

10   Q.  Now, I know we talked about the

11   12-nanometer and the term grossly has been used of

12   "obsolete."  Isn't it more accurate that it's just

13   not as profitable based on the network?

14   A.  Yes.  That's kind of what I was getting

15   at, with that word, "obsolete."  And in fact, we

16   tried to postpone the obsolescence of the chip by

17   making updates to the chip design.  So I believe

18   that's why Mr. Reddy said that it had sunsetted in

19   October 2021, which is that between October and

20   next -- the next March or so, we continued to make

21   improvements to that chip to make its energy

22   efficiency better for the economic situation.

23          MR. ALFORD:  I would object and move to

24   strike the response because the witness has talked

25   about what Mr. Reddy said.  I have been not allowed

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  to ask him any questions about what Mr. Reddy said.

2       ARBITRATOR CALLAHAN:  I don't think he

3  asked him a question about what Mr. Reddy said.

4       MR. ALFORD:  Right.  I would move to

5  strike the response.

6       ARBITRATOR CALLAHAN:  Okay.  Again,

7  please, both, let the witness answer.  If there's no

8  objection to the question, let the witness please

9  finish the question [sic].  It's very distracting

10  for the panel to hear the gyrations coming from the

11  side of the panel while the witness is saying

12  something, you know, let's not do that.

13  BY MR. HARDIN:

14       Q.   Mr. Gao, so what I hear you say -- and I'm

15  going to put it in my own words.  Tell me if this is

16  true or not.

17       A.   Yes.

18       Q.   Is that in September or October, the ASIC

19  that existed in May of 2021 was modified in order to

20  be more efficient; is that right?

21       A.   We began modifying it because Coinmint's

22  failure to pay had lengthened our production window.

23  And because, you know, the conditions on the Bitcoin

24  network were worsening for profitability, we decided

25  to engage in updating the chip, but we were still

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  ready to tape out the original chip if push came to

2  shove.

3      Q.   And you mentioned Blockchain.  I'll go

4  back to another point.  You had said earlier you

5  were talking with Blockchain.  And you used the

6  phrase, in connection with Coinmint, that the

7  contract was, quote, under amendment.

8          Was that just your way of saying that you

9  were continuing discussions with Coinmint?

10     A.   That's exactly right.  We were continuing

11  amendment discussions with Coinmint.

12     Q.   Right.

13         There was no actual amendment that was

14  agreed upon and/or executed, right?

15     A.   That's exactly right.

16     Q.   Last thing on mitigation.

17         What other efforts -- and specifically I'm

18  thinking about the 6-nanometer, 4-nanometer

19  production nodes.

20     A.   Yeah.  I mean, Katena has always sought to

21  create the most energy-efficient, most available,

22  lowest cost Bitcoin miner in the world.  And so

23  after the 12-nanometer product reached its kind of

24  end of life, we engaged in the development of a

25  6-nanometer miner.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          And, unfortunately, that 6-nanometer miner

2    became ready at a time when Bitcoin started going

3    down even more.  And so we had to update another

4    design for 4-nanometer.  But actually, the

5    6-nanometer design is done.  That chip is ready to

6    go to production.

7          If anyone bought that chip in the volumes

8    that Coinmint wanted, we could make it now.  And the

9    4-nanometer chip is actually in the fab as of today,

10   as we speak, and it's going to come back and,

11   hopefully, we're going to show the world what we've

12   got.  But we've continued in R&D.

13     Q.   And then my last question, I don't want

14   you to give me any names.  I'm going to end on this,

15   but it's kind of an odd question.  Because I don't

16   want you to give me any names based on NDA and other

17   particularized concerns that we've had.

18          But were there active discussions with

19   other customers that led to the entrance -- led you

20   to entering into an NDA with them to discuss a

21   potential commercial deal about the purchase of

22   Bitcoin mining rigs?

23          MR. ALFORD:  I object to the question

24   because it calls for information protected by the

25   NDA.  I'm not going to be allowed to follow up

TRANSCRIPT OF PROCEEDINGS

1  because he's going to say you can't ask him any

2  questions about who these people were, it's covered

3  by the NDA.

4        So it would be unfair to elicit testimony

5  from the witness that I was not allowed to follow up

6  on because it's all covered by the NDA is what

7  they're going to say.

8        MR. HARDIN:  I'm happy to go off the

9  record for the panel's benefit.  The purpose of not

10  identifying names are the issues that we've -- that

11  have been pervasive in this arbitration.

12        ARBITRATOR CALLAHAN:  So you're willing to

13  allow Mr. Gao to tell us all who these people are as

14  long as it's not reported.

15        MR. HARDIN:  That's right.

16        ARBITRATOR CALLAHAN:  All right.  We'll go

17  off the record.

18         (Discussion held off record from

19          12:03 p.m. to 12:07 p.m.)

20        ARBITRATOR CALLAHAN:  Let's go back on.

21        Are you finished?

22        MR. HARDIN:  I'm going to ask that generic

23  question, but then yes, ma'am.

24        ARBITRATOR CALLAHAN:  Oh, all right.

25        MR. HARDIN:  Or it's probably going to be

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  two or three.

2        Are we back on?

3  BY MR. HARDIN:

4     Q.   Mr. Gao, there have been discussions about

5  the contracts that Katena entered into with

6  customers.

7        Were all of the contracts the same?

8     A.   No.  Every single one was customized.

9     Q.   Is it accurate that some of the contracts

10  did not require a sufficient enough down payment to

11  start the fabrication of chips?

12     A.   It was true at every point in time that we

13  believed that we could fulfill the order that was in

14  front of us if the payment scheduled were followed,

15  given our totality of cash flow projections.

16        So yes, sometimes it was the case that

17  some contracts didn't have enough upfront, but we

18  always had a plan to cover that amount.

19        MR. HARDIN:  With that, I'm going to pass.

20        Thank you.

21        ARBITRATOR CALLAHAN:  All right.

22  Mr. Alford, your turn.

23        MR. ALFORD:  Oh, great.  I got some

24  followup for sure.

25        So I guess we need to go back off the

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   record if I talk about that one specific --

2        ARBITRATOR CALLAHAN:  Yes.

3        MR. ALFORD:  Okay.  Well, let's do that.

4        I would say, while we're on the record,

5   that I do formally object to having to go off the

6   record to talk about mitigation efforts, but I

7   understand the panel's ruling.

8        ARBITRATOR CALLAHAN:  It is not to talk

9   about mitigation efforts.  It's to talk about a

10   specific customer.

11        MR. ALFORD:  Right.

12        ARBITRATOR TURITZ:  And the identification

13   of that customer, which is under NDA.

14        ARBITRATOR CALLAHAN:  That's all that was

15   off the record.

16        ARBITRATOR GLICK:  In which the NDA was

17   signed.

18        MR. ALFORD:  Right.

19        ARBITRATOR CALLAHAN:  That's all we did

20   off the record.

21        MR. ALFORD:  I understand.

22        ARBITRATOR CALLAHAN:  Go ahead.

23        MR. ALFORD:  Okay.  We'll go off the

24   record now.

25        ARBITRATOR CALLAHAN:  Okay.

1          (Discussion held off the record from

2          12:09 p.m. to 12:22 p.m.)

3    BY MR. ALFORD:

4      Q.   Okay.  So I want to ask you about a couple

5    of follow-up questions.

6          So Mr. Hardin earlier asked you about a

7    communication that you all had with Blockchain in

8    October about the Coinmint contract being amended,

9    right?

10     A.   Yes.

11     Q.   But you didn't tell Blockchain that it was

12   being amended, did you?  You told him it was being

13   updated, right?

14     A.   That's the same thing.

15     Q.   Well, let's see.  Let's pull up

16   Exhibit 1146, page 1.

17         And I'm not going -- I don't want to

18   re-plow a bunch of old ground, because I did talk to

19   you about this earlier.  But take a look at the top.

20   Mr. Monzon doesn't say it's being amended.  He says

21   it's being updated, right?

22     A.   I don't see what's updated.

23     Q.   Being updated, right?  That's what he

24   said.

25     A.   Being as in being negotiated to be

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  updated.

2     Q.  Right.

3         And you understand what Mr. Monzon was

4  telling Blockchain, is that, look, we've already

5  reached a new agreement with Katena and the written

6  terms are just being updated to reflect the

7  agreement -- I'm sorry.  I misspoke.

8         You understood that what Mr. Monzon was

9  telling Scott Odell is, look, we've already reached

10  new terms with Coinmint, but the written agreement

11  is simply being updated to reflect that?

12        You understood that, right?

13    A.  That was not at all what he meant by that.

14    Q.  Okay.  Well, he didn't say still got to be

15  amended, we still have to come to new terms, did he?

16    A.  We voiced over that many times with

17  Blockchain.com.

18    Q.  Did you ever write back to Mr. Odell in

19  response to this email chain and say, wait, Scott,

20  actually, we haven't can come to any kind of new

21  agreement, we're totally at odds with Coinmint about

22  the breach?

23    A.  That's what he means by agreement is being

24  updated.

25    Q.  Okay.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1          MR. ALFORD:  I don't have any further

2   questions.

3          ARBITRATOR CALLAHAN:  Okay.  We're at

4   about 12:25, so let's break until -- can we come

5   back at 1:00?

6          MR. HARDIN:  I guess the only thing I

7   would say is, does the panel have any questions for

8   Mr. Gao?

9          ARBITRATOR TURITZ:  I need more time.  I

10  have a call.  1:15.

11         ARBITRATOR CALLAHAN:  I don't believe we

12  have questions.  The panel did talk during the

13  break.  I don't believe we do.

14         MR. HARDIN:  He's going to be around too,

15  so that's another way to skin it.

16         ARBITRATOR CALLAHAN:  If something comes

17  up, then we'll let you know, but thus far, the panel

18  did not have any questions of Mr. Gao.

19         MR. HARDIN:  Okay.  And then we need a

20  little bit --

21         ARBITRATOR CALLAHAN:  Except the one I

22  posed yesterday --

23         MR. ALFORD:  1:15.

24         ARBITRATOR CALLAHAN:  -- which was for

25  Mr. Gao to fill in the blanks.

TRANSCRIPT OF PROCEEDINGS

1          MR. HARDIN:  Oh.

2          THE WITNESS:  Oh.

3          ARBITRATOR CALLAHAN:  He can do that

4   later, not now.

5          ARBITRATOR TURITZ:  We don't have those

6   electronically.

7          MR. TABER:  I'm going to email it now.

8   Sorry.

9          ARBITRATOR CALLAHAN:  That's the only

10  question I still have outstanding, but I don't want

11  to disrupt this other, because he's going to be in

12  here.  He can fill it in --

13          MR. HARDIN:  Yes, ma'am.

14          ARBITRATOR CALLAHAN:  -- at some point.

15  That's the only outstanding question.

16          (Witness excused subject to recall.)

17          MR. HARDIN:  We want to come back when?

18          ARBITRATOR CALLAHAN:  You need a few

19  extra?

20          ARBITRATOR TURITZ:  I need 1:15.

21          ARBITRATOR CALLAHAN:  Let's do 1:15.

22          If for some reason it's later because of

23  the call, we'll let you know.  We'll come to your

24  rooms.

25          MR. HARDIN:  You know where to find us.

TRANSCRIPT OF PROCEEDINGS

1    (Whereupon, a lunch recess was taken

2    from 12:26 p.m. to 1:17 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIPT OF PROCEEDINGS

1              AFTERNOON SESSION

2          ARBITRATOR CALLAHAN:  We're on the record.

3          All right.  So we've just returned from

4    lunch, and I understand we have a new witness.

5          MR. ALFORD:  Yes.

6          ARBITRATOR CALLAHAN:  Could you please

7    state your name and in particular, we're all curious

8    as to how to pronounce your last name.

9          THE WITNESS:  So it's Norbert Guiol, like

10   Guiol.  Greel maybe.  Guiol.  Like steak knives.

11         ARBITRATOR CALLAHAN:  Sounds like Guiol.

12         Mm-hmm, we got it.

13         MR. ALFORD:  Sort of like y'all.

14         THE WITNESS:  Yeah.  Guiol.

15         ARBITRATOR CALLAHAN:  Then, Mr. Guiol --

16         THE WITNESS:  Wonderful.

17         ARBITRATOR CALLAHAN:  Mr. Guiol, would you

18   please raise your hand.

19              NORBERT GUIOL,

20      called as a witness, having been duly sworn,

21             testified as follows:

22         ARBITRATOR CALLAHAN:  Thank you very much.

23   Mr. Taber, you're going first or --

24         MR. TABER:  I would be happy for

25   Coinmint --

TRANSCRIPT OF PROCEEDINGS

1      THE REPORTER:  I just have to remind

2  everybody to speak one at a time.

3      And, Mr. Guiol, please speak up loudly for

4  me.  I'm the court reporter.

5      THE WITNESS:  Okay.  Let me know.  I'll be

6  happy to adjust.

7      ARBITRATOR CALLAHAN:  Mr. Liu, go ahead.

8      MR. HARDIN:  Should we close the door?  It

9  will make it --

10      MR. ALFORD:  It will help some things.

11      MR. LIU:  Give and take.

12      ARBITRATOR GLICK:  How do you spell your

13  name?

14      THE WITNESS:  G-U-I-O-L.  First name too

15  or --

16      ARBITRATOR CALLAHAN:  No.  I think we --

17  it's two Rs, Herbert.

18      MR. ALFORD:  Norbert.

19      THE WITNESS:  Norbert.

20      ARBITRATOR CALLAHAN:  Norbert but there's

21  two Rs.

22      THE WITNESS:  Two Rs, okay.

23         DIRECT EXAMINATION

24  BY MR. LIU:

25    Q.  Okay.  Mr. Guiol, hopefully, I pronounced

TRANSCRIPT OF PROCEEDINGS

1   that correctly.

2      A.  Wonderful.

3      Q.  Are you married?

4      A.  Yes.

5      Q.  Do you have any children?

6      A.  Two boys.

7      Q.  How old are they?

8      A.  One and three.

9      Q.  And how long have you been married for?

10     A.  Since 2018.

11     Q.  Where were you born?

12     A.  In Germany.

13     Q.  And is that also where you grew up?

14     A.  Until I was ten, and I left with my

15  parents when I was ten, and I returned in '98.

16     Q.  When you say that you left, where did you

17  go?

18     A.  My parents decided to lead a little bit of

19  an alternative lifestyle, and we sold -- or they

20  sold our home and real estate, and we moved on to a

21  sailboat, and we sailed around the Atlantic.

22     Q.  So you were living on a sailboat after the

23  age of ten?

24     A.  Yes.

25     Q.  Were you able to go to school during this

1  time?

2      A.   Not in a traditional sense.  So in

3  Germany, as long as you're a German resident,

4  registered in Germany, you are obliged to have your

5  children enrolled in some kind of school system.  So

6  my parents purchased a correspondence school program

7  where you can imagine like a magazine subscription

8  maybe with, you know, quizzes at the end.

9          So they would send you, every six months,

10  a big stash of magazines, and you worked through

11  them, and at the end there's a quiz.  And then you

12  maybe get to correspond with the teachers before the

13  time of -- for your conferences and email and then

14  they would grade you at the end of the year.

15      Q.   How did you typically perform at the end

16  of the year?

17      A.   In that part of the school, not so well.

18  It took a while for me to realize that it was -- you

19  can say important to -- to tend to school.  I was a

20  single child for my parents.  Yeah.  They had given

21  up their traditional life.  It was hard to keep a

22  teenager at bay and keep them studying.  So during

23  the time with my parents, not so well, but after my

24  return to Germany where, you know, you can't do

25  anything without some sort of paper or grade, et

TRANSCRIPT OF PROCEEDINGS

1  cetera, I very quickly understood the importance

2  and -- yeah, improved greatly on learning things or

3  honoring such things.

4      Q.   And how old were you when you returned

5  back to Germany?

6      A.   19.

7      Q.   Did you go back to school at that point?

8      A.   So at that time, military service was

9  still mandatory in my country, and being a citizen,

10  I had to return to serve.  And at that time, it was

11  a ten-month period, but -- well, and the people that

12  I served for, my subordinates, they liked me enough,

13  to say, well, why don't you extend, do two years,

14  and at the same time we can help you get a start

15  into your life and you go to evening school.  And

16  that's really where I got to catch up on learning.

17         And yeah, I did quite well.  It was a very

18  satisfying experience.  And I was sad I didn't pay

19  more attention earlier.

20      Q.   Very well said.

21         Mr. Guiol, do you have an engineer degree?

22      A.   I'm -- I have a trade degree, I would call

23  it.  It's in software development, yes.

24      Q.   Do you have any training in electrical

25  engineering?

TRANSCRIPT OF PROCEEDINGS

1     A.   It's -- most things today have any

2   knowledge of -- it's self-taught.  So any training

3   that I have is not through a class I attended, but

4   it's through the need of resolving an issue that was

5   to resolve.  Which, you know, you learn a lot, for

6   example, about electrical engineering if you're

7   redoing the electrical system of a boat.  You just

8   have to.

9          And the way that I -- with my upbringing,

10  the option was you do get a book and you read what

11  most people will need to read to have an engineering

12  degree.  But I don't have an electrical engineering

13  degree.

14     Q.   Okay.  But it sounds like you have a lot

15  of experience doing a lot of things that are similar

16  to what electrical engineers would do; is that

17  right?

18     A.   Yeah.  Maybe to compare that, we have an

19  electrical engineer at the facility where we work,

20  and we have a great time discussing aspects of the

21  electrical engineering facility and can talk at eye

22  level.

23     Q.   And I think you mentioned earlier in your

24  response that you learned how to write software on

25  your own.

**TRANSCRIPT OF PROCEEDINGS**

1          Did I get that right?

2      A.   Yes.  Some people say that when you're

3   good for nothing, you become a software developer.

4   It's not true.  But yeah, my uncle recognized maybe

5   a curiosity and potential in me and he essentially

6   got me a book about software development and asked

7   me to rewrite the software that he used to run his

8   plumbing business.  And that was, like, the first

9   assignment I had, yeah.

10      Q.   Were you able to do that just based solely

11   on that one book that he provided -- your uncle

12   provided you?

13      A.   That task that he gave me, yes.  But after

14   that, many more books followed.

15      Q.   Okay.  And would the same process pretty

16   much follow for each book, where you would read the

17   book, absorb the information and apply it in real

18   life?

19      A.   Yeah.  Very much in general.  I

20   remember -- I feel almost -- at that time, still at

21   the absence of the internet, fortunate to have

22   always been lucky to find the right books.  That

23   helped me do that, yes.

24      Q.   Now, how did you eventually become

25   involved with Coinmint?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1      A.  I think 2016 or 2017, one of the founders

2    reached out to me and started asking me if I knew

3    anything about cryptocurrency and was telling me it

4    was very interesting, I should get into it.  And he

5    was looking to build the world's largest data

6    center, and he would like my help.

7      Q.  Okay.  So you said one of the founders of

8    Coinmint reached out to you around 2016; is that

9    right?

10      A.  Yes.  That was Prieur Leary.

11      Q.  Prieur Leary.  Okay.

12          And how long have you known Mr. Leary for?

13      A.  I think I first met Prieur Leary in 1996,

14    and we quickly developed a friendship.  We both

15    shared a passion for sailboats and being on the

16    water and that actually led to his parents hiring me

17    to maintain their sailboat at the time.

18          So, you know, with the background of

19    having grown up on a sailboat at the beginning of my

20    life, my means of earning a living was maintaining

21    sailboats, maybe a little bit of a younger version

22    of a Kevin Costner in Message in a Bottle.  Yeah.

23      Q.  So through your relationship with

24    Mr. Leary, did you eventually work in Coinmint on

25    around 2016?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    A.   So in 2016/2017, he reached out to me.  At

2   that time, I was basically, I think, ending my

3   consulting career with Accenture, contemplating

4   ending it.  Starting into a new relationship with my

5   wife, not wife then yet, and I wasn't really sure

6   what I wanted to do, but I wasn't very interested

7   yet in jumping into this new adventure.

8        That took until April 2018, which is when

9   I started to basically work as a contractor for

10  Coinmint.

11    Q.   And have you been working for Coinmint in

12  some capacity since 2018 until the present?

13    A.   Yes.

14    Q.   Okay.  How would you generally describe

15  the nature of Coinmint's business?

16    A.   In very broad terms, we provide

17  electricity and internet for cryptocurrency mining.

18  So you think you have a computer, you want to run it

19  somewhere, it does a specific thing.  We provide you

20  with the means to it.

21        And what's different is that it uses a lot

22  of electricity compared to maybe a normal laptop.

23  But other than that, it's just a computer.  And

24  space maybe to add, takes up a lot of space.

25    Q.   In your role as a -- well, first of all,

TRANSCRIPT OF PROCEEDINGS

1  what's your current role at Coinmint?

2      A.  I'm the COO.

3      Q.  Okay.  And that what does that stand for?

4      A.  Chief operating officer.

5      Q.  Are you employed through Coinmint or

6  through a subsidiary?

7      A.  Through a subsidiary.

8      Q.  And what's that subsidiary called?

9      A.  NCCS or North Country co-location

10  Services, which describes this concept of, you know,

11  using your computer and co-locating it in our

12  facility.

13      Q.  Are you familiar with this concept of how

14  Bitcoin mining rigs are designed?

15      A.  I'm not necessarily familiar with the

16  way -- how they're designed.

17      Q.  Are you familiar with how they are

18  operated?

19      A.  Absolutely.  Very familiar.

20      Q.  And can you explain to us how -- how a

21  Bitcoin mining rig is operated?

22      A.  Yeah.  Essentially, maybe continuing on

23  the previous explanation, you have a computer, and

24  for you to operate that computer, it really is

25  nothing else but a computer.  It's like your router

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  at home, you need to provide it with electricity.

2  So it gets placed into a place where there's

3  electricity available, and it gets connected to the

4  internet.

5           And then you have to apply a configuration

6  to it that then describes it as to what Bitcoin

7  wallet, basically what account number it is to do

8  its work for.

9           There's a little piece in the middle

10  there, but essentially that's the simplest way of

11  describing it.

12           And then it runs, day in, day out,

13  nonstop.  And after a while, it needs some service;

14  you may need to change a fan, probably every six

15  months, you need to clean it.  You have to imagine

16  it's like a shoebox that's cut open at either end

17  and there's a fan on each end and there's air

18  blowing through it that cools the hash boards or

19  boards that are inside it.

20           So that catches some dirt.  And every now

21  and then it needs a little bit of a cleanup.

22      Q.   Now, in 2021, what was your role at

23  Coinmint?

24      A.   I was the chief operating officer.

25      Q.   And what did you do in that role?

TRANSCRIPT OF PROCEEDINGS

1      A.   I think the main principal was -- my main

2   focus was around facilitating the people at the

3   facility to be able to do their job, which was

4   operating the mining rigs.  So for existing

5   customers, assure that the terms that were in the

6   contracts, that they were met or satisfying their

7   expectation.

8           And then beyond that, I was helping the

9   organization expand the facility and planning how we

10   can further grow our business.

11      Q.   Now, when you mention expanding the

12   facilities, what was the reasoning behind why you

13   wanted to expand the facilities?

14      A.   We had more electricity available that we

15   could use, and we had customers that were interested

16   in co-locating more equipment with us.  So yeah, we

17   were looking for a way to accommodate them and to

18   grow.

19      Q.   So is it fair to say that you had a lot of

20   unused electricity at the facilities in 2021?

21      A.   I think about half of what was available.

22   I would say that it was a lot, with my own words,

23   yes.

24      Q.   Now, I want to shift gears to this

25   management meeting in Puerto Rico in May of 2021.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          Do you recall that?

2      A.   Yes.

3      Q.   Were you there at that meeting in Puerto

4  Rico?

5      A.   I was.

6      Q.   Do you recall who else was there at the

7  meeting in Puerto Rico?

8      A.   Mike Maloney, Ashton Soniat, Kathleen

9  Schneider, Jim DeNaut, myself and -- yeah, I don't

10  think I'm missing anybody.

11      Q.   Do you recall how long that management

12  meeting was?  How many days?  How many hours?

13      A.   Not exactly, but in rough terms it started

14  around the 11th and it ended on the 13th.  You

15  know, people usually arrive on the 11th and then

16  they try to catch the last plane out on the 13th.

17      Q.   Right.

18          So during this management meeting in

19  Puerto Rico in May of 2021, was the name or phrase

20  "Katena" ever discussed or mentioned?

21      A.   I would say it was mentioned.  Katena was

22  mentioned at the management meeting.

23      Q.   Was that the first time that you had heard

24  of Katena?

25      A.   That was the first time I had heard of

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

1  Katena, yes.

2      Q.   Do you remember who brought up Katena?

3      A.   Mike Maloney.

4      Q.   Was this in the middle of the management

5  meeting or was it before or after the management

6  meeting?

7      A.   It was during the meeting.  It felt like a

8  side conversation, but, you know, there was -- it

9  was mentioned during the meeting, yes.

10      Q.   Now, you mentioned that this was a side

11  conversation.  What do you mean by that?

12      A.   It wasn't like a topic on the agenda that,

13  you know, I -- you know, like it wasn't put on the

14  agenda in a way that you would say, okay, we're

15  dedicating half an hour to this topic.  Let's

16  analyze it, review, hear everybody's opinion.  You

17  know, it didn't have that level of importance, like

18  other items had that were on the agenda.

19      Q.   When Maloney brought up Katena, do you

20  remember if this was in front of the entire

21  management group, or only in front of select

22  individuals?

23      A.   I don't exactly remember, no.

24      Q.   Do you remember specifically what Maloney

25  said about Katena at that time?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    A.   What I remember is that he said it was a

2   manufacturer that was planning to produce a

3   U.S.-built machine, and there was an opportunity for

4   us to get on board in purchasing these machines from

5   them.

6    Q.   When he told you that there was an

7   opportunity to purchase these machines, did he tell

8   you that Coinmint was about to ink a contract with

9   Katena to actually purchase Bitcoin mining machines?

10    A.   No.

11    Q.   Did he tell you that he had already

12   reviewed and redlined a draft contract with Katena

13   to purchase any Bitcoin mining machines?

14    A.   No.

15    Q.   Did Maloney mention anything about having

16   in-house counsel or outside counsel review and

17   provide comments to any draft contract with Katena

18   to purchase Bitcoin mining machines?

19    A.   No.

20    Q.   Did Maloney tell you anything about the

21   performance or efficiency of these Katena Bitcoin

22   mining machines?

23    A.   Not that I recall at that time, no.  There

24   were no specific shared events.  It was like here,

25   this is something we can do, it's interesting.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  Yeah.  No specifics.

2      Q.   At this time, was Coinmint looking to

3  acquire any Bitcoin mining machines?

4      A.   You can think that that appetite comes and

5  goes.  You know, it was a time when BTC price was

6  higher, so the topic of, oh, should we buy machines

7  or not, it always comes and goes.  And it was no

8  different there.  It wasn't like, oh, let's

9  completely change our business, no.

10     Q.   Is the performance of a Bitcoin mining

11  machine an important factor in deciding whether or

12  not to acquire that specific Bitcoin mining machine?

13     A.   Absolutely.

14     Q.   At that time in May of 2021, were you

15  satisfied with the Bitcoin mining machines that you

16  were using at your facilities?

17     A.   I'd say satisfied, but there's better.

18  There's always, you know, different ways.  But

19  it's -- we had a lot of machines from -- co-located

20  from customers that we weren't satisfied with and

21  that it would have been interesting to replace them,

22  for example.  Not necessarily with these but, you

23  know, in any kind of way.

24         Our last purchase that we purchased

25  ourselves worked relatively well, but it was also a

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  first production out of a larger batch by a larger

2  manufacturer that had its little quirks.  But, you

3  know, it can always be better, but it can also be a

4  lot worse like it went for one of our clients.

5      Q.   You mentioned that there was a first

6  production from another manufacturer.  Do you

7  remember the name of that manufacturer?

8      A.   BITMAIN.

9      Q.   Okay.  BITMAIN.

10         And you understand that BITMAIN was one of

11  the bigger manufacturers of Bitcoin mining rigs,

12  right?

13     A.   Yeah.  I think they are the biggest, if

14  it's not MicroBT.

15     Q.   Did you ever experience any issues with

16  any machines that were produced or manufactured by

17  BITMAIN?

18     A.   Yeah.  Certainly.  It's -- you know,

19  everything is always a race against a moment in the

20  market.  If you look at the price of Bitcoin, it

21  always goes up and down, and sometimes it slowly

22  ramps up and then the next day it's way down.  So

23  you can say every day later is a lost day.

24         So there's a lot of pressure for the

25  manufactures to produce the machines quickly and

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  sometimes things go wrong.  And because they're

2  produced in thousands, a small problem quickly gets

3  multiplied into thousands and thousands of machines.

4  And like one of our clients, and like us, maybe in

5  part, of our first order -- or last order with

6  them -- you can just get unlucky on receiving a

7  batch that has a systematic problem, you could say.

8      Q.   What are some examples of issues that you

9  saw with the BITMAIN machines?

10     A.   So BITMAIN, I think there is a very well

11  known shortcoming with the S17.  There seems to be a

12  problem with a glue that they use to attach a

13  component, a heat sink, a little piece of aluminum

14  to a chip.

15          And as the machines change temperature and

16  expands and contracts, this heat sink, which was

17  supposed to absorb the temperature from the chip,

18  just falls off.  And when these miners stopped

19  working, you can pick them up, shake them and they

20  rattle like a baby's rattle, and then you know

21  what's the problem.  So that's a common problem.

22          In a production about two years ago, they

23  seemed to have purchased a set of fans.  There's

24  four of these fans on each machine from a

25  manufacturer that had an issue, and those fans fail

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  by the thousands when you use at high revolutions.

2  They -- they're easy things to mitigate, if you

3  think, you know, you can buy that fan, costs $3, but

4  then you have thousands of machines where you have

5  to replace them.  But these things happen, yes.

6      Q.  So if one of these components -- you

7  mentioned fans and the heat sink as examples.  If

8  one of these components of the machine isn't working

9  properly, are you able to still operate the Bitcoin

10  mining rig?

11      A.  No.  You have to think of it's a high

12  performance machine, tuned, you know, to deliver the

13  last little bit of performance out of it.  So

14  there's a lot of security features for it to not

15  catch on fire.  That when not everything checks out,

16  the rig won't run.  So you lose a fan, it won't run.

17      Q.  So would it be fair to say that if one

18  component of the Bitcoin mining rig isn't working

19  properly, you can't run the machine at all?

20      A.  Pretty much, yeah.  There's one exception,

21  but yeah, in general, it will not run and cause

22  downtime and be lost forever.

23      Q.  Have you ever encountered issues with

24  ordering or acquiring machines only for the machines

25  to arrive and not work properly?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1     A.   Yeah.  Yeah.  Again, you know, these

2   things, they cross an ocean.  I mean, maybe the

3   simplest thing is we've had -- which don't relate to

4   the manufacturers, but we have machines that were in

5   a container that was under a crane on a ship that

6   the hydraulic -- there was a hydraulic leak.  So the

7   hydraulic oil ran over all the machines.

8          We've had a manufacturer that in the

9   production process, the name's Insilica, they forgot

10  to apply a coating to their power supplies, it's

11  like a -- almost like an insulation.  So they ran

12  fine, but within a week, the dust that settled on

13  the power supply inside it, they just blew up, short

14  circuited and we lost these machines by the hundreds

15  a day.

16     Q.   And how long had you had those machines

17  for before it blew up?

18     A.   A week, two weeks.  They failed very

19  quickly.

20          To the credit to the manufacturer, they

21  acknowledged the problem and replayed the power

22  supplies free of charge.

23          ARBITRATOR CALLAHAN:  In the interests of

24  time, can we tie this to Coinmint and Katena?

25          MR. LIU:  Right.  I was about to move to a

1   specific document.

2   BY MR. LIU:

3       Q.   Now, you mentioned that there were

4   co-location clients at the facility; is that right?

5       A.   Correct.

6       Q.   Okay.  If a client -- if a co-location

7   client has machines that are not working properly,

8   how does that affect Coinmint?

9       A.   The only way that, in the co-location

10  model, we make money is when the machine is running.

11  The reason for that is -- like we are incentivized

12  in providing the service that we promise to our

13  customers, so if we don't get the machine running,

14  we make zero money.

15      Q.   Okay.  And not only -- if the machine

16  isn't running properly, do you suffer any storage

17  costs, anything like that?

18      A.   It's -- we share the risk there with our

19  customers.  So you think of, the customer pays for

20  the cost to operate the machine, and we then share

21  the profit off of the machine with them.

22          So the machine -- if the machine isn't

23  running, they still cover the cost of the space that

24  the machine uses.  So the risk there is limited.

25  But we, for example, the profit that would come out

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1   of the machine, we need that money because we didn't

2   charge the customer to build the facility.

3          So for them to put their machines

4   somewhere in our facility, there needs to be a wire

5   run to it and a rack, and that cost, we only make it

6   back through the profit share.

7          So through -- through the mining, if the

8   machine isn't mined, it doesn't run, we can't

9   recover the money that we invested or make any

10   money.

11     Q.   Got it.

12          MR. LIU:  Ted, can we pull Exhibit 80,

13   please.

14          THE WITNESS:  Is that going to show up

15   here?

16          MR. LIU:  Yeah.  Do you want a hard copy?

17   We can provide a hard copy.

18          THE WITNESS:  Whichever works.

19          ARBITRATOR TURITZ:  Can we just ask a very

20   quick question?

21          MR. ALFORD:  Yes.  Absolutely.

22          ARBITRATOR TURITZ:  Just to be clear, the

23   machines are all owned by Coinmint and not by the

24   co-location customer; is that correct?

25          THE WITNESS:  It's the other way around.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1        ARBITRATOR TURITZ:  They own their own

2   Bitcoin mining rigs, you're providing the space --

3        THE WITNESS:  Exactly.

4        ARBITRATOR TURITZ:  -- and the

5   electricity --

6        ARBITRATOR CALLAHAN:  And the access to

7   the internet.

8        THE WITNESS:  You got it.  Exactly.

9        ARBITRATOR TURITZ:  The way you were

10  talking about it, it sounded like it was different

11  from what I had understood previously.

12        THE WITNESS:  I'm sorry.

13        ARBITRATOR TURITZ:  No, it's fine.

14        MR. ALFORD:  It's our fault, not yours.

15        ARBITRATOR CALLAHAN:  It's always the

16  lawyer's fault.

17        MR. ALFORD:  That's right.

18  BY MR. LIU:

19     Q.   So, Mr. Guiol, do you see Exhibit 80 in

20  front of you?  It's an October 14 email from Ashton

21  Soniat to you, Jim DeNaut and Frank Kinney.

22     A.   Yes.

23     Q.   I want to direct your attention to the

24  second sentence where it says (as read):

25            We need to pull the contracts

TRANSCRIPT OF PROCEEDINGS

1        of our customers and see where

2        there is leverage.

3        Do you see that?

4    A.  Yes.

5    Q.  What do you take that sentence to mean?

6    A.  Well, you can think of in the contract of

7  sales that a customer has and a certain amount of

8  space at the facility, we express that space as

9  capacity in megawatts.  So available electricity.

10  And we can then compare this to how much electricity

11  of that space are they actually using.  And that you

12  can use that as a metric to understand, well, if

13  they don't use all of it, we are missing out on

14  making money.

15        So if a customer has 10 megawatts in their

16  contract and we see that there's only 5 megawatts

17  that they're actually using, we can say, oh, there's

18  five megawatts to leverage for additional income for

19  us.

20    Q.  Right.

21        Would this be another way of just saying

22  that you're trying to make sure that each of your

23  clients are being efficient in the space that they

24  are allotted?

25    A.  Yes.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    Q.   In the next sentence Ashton writes (as

2  read):

3          For example, Riot still has

4          T17s running with us.  We can

5          easily force their hands to swap

6          those for new machines.

7          What do you mean by that?  What do you

8  take that to mean?

9    A.  You mean how I interpret it?

10    Q.  Right.  That's right.  Sorry.

11    A.   So I interpret this as the customer has

12  machines out of a previous purchase, which here

13  Ashton wrote T17s, he meant S17s, but it's a small

14  detail.

15          They have -- those are the batch of the

16  machines that had the heat sinks falling off.  So

17  almost half of their machines weren't running, but

18  they were using the space.  So what this means is,

19  hey, we can tell them, you need to use this space or

20  we want it back, or maybe you can take part in

21  acquiring machines for this space.

22    Q.  So was the idea that you would swap these

23  machines that weren't working very well with new

24  machines?  Is that the idea?

25    A.  That's the proposal that I understand and

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  interpreted Ashton is proposing here in this email.

2      Q.   You can take down that exhibit.

3          Are you familiar with the term "failure

4  rate" as it applies to Bitcoin mining rigs?

5      A.   Yes.  Or I think you may be referring to

6  chips for Bitcoin mining rigs where this is more

7  commonly used.  It's also used in failure rate

8  itself.  Yes, I am.

9      Q.   Okay.  What's your understanding as to how

10  these -- what variables effect the failure rate in

11  these chips or the chips that are used in these

12  Bitcoin mining rigs?

13      A.   So the failure rate, what's also referred

14  to as yield of the chips, is basically a metric that

15  you as the one that's requesting for the chips to be

16  built, you can decide on how you want the chips to

17  be produced and you can think of -- you're renting a

18  machine by the hour and to produce the chips.

19          So you take the risk on putting them very

20  close together.  They may have lots of chips but a

21  high failure rate, or you put them very far apart

22  and then you have a lower failure rate.

23      Q.   In May of 2021, when Maloney was

24  presenting this opportunity of purchasing machines

25  from Katena, was there any discussion about what the

1  failure rate was for these Katena machines?

2     A.  No.

3     Q.  Did Mr. Maloney ever approach you and ask

4  you to participate in the due diligence process in

5  order to evaluate this opportunity to acquire

6  machines from Katena?

7     A.  Not that I recall, no.

8     Q.  Were you tasked -- were you asked to do

9  anything in response to Maloney coming to you guys

10  and presenting this opportunity to acquire Bitcoin

11  machines from Katena?

12     A.  Essentially, I think I mentioned that, you

13  know, part of my responsibility is looking to

14  building and growing the facility.  So I was tasked

15  to consider that in building and growing the

16  facility if those machines were to run at our

17  facility.

18     MR. LIU:  Ted, can we pull up Exhibit 84,

19  please.

20  BY MR. LIU:

21     Q.  Mr. Guiol, do you recognize Exhibit 84?

22     A.  Yes.

23     Q.  Now, in this email, there's a reference

24  to -- it's written by Ashton.  And he writes (as

25  read):

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          Norbert is planning to build

2          out and needs the specs.

3          Do you see that?

4     A.   Yeah.

5     Q.   Were you planning some sort of build-out

6  in May of 2021?

7     A.   Yeah.  We're always considering, like I

8  said, how to expand the facility.  And since Bitcoin

9  was at a high and we're just coming off maybe supply

10  chains recovering a little bit after COVID, yes.

11     Q.   So you mentioned you were always doing a

12  build-out, so in other words your plan to do a

13  build-out wasn't specific to Katena; is that right?

14     A.   Yeah, not explicitly, no.

15     Q.   Was it fairly typical for you to know the

16  specifications and energy requirements of Bitcoin

17  mining machines before making a decision to acquire

18  them?

19     A.   Yes.

20     Q.   And why is that important to know?

21     A.   For said build-out, it's relevant

22  essentially for the power distribution.  If you

23  think of it, the build-out is essentially nothing

24  else but building many of these tables here.  So a

25  place where to put the machines on.  And since they

1  all need electricity, a key part of the build-out is

2  the power distribution.

3       So the specs tell me how many machines I

4  can put on the table and the physical space, and

5  then how much energy or electricity they need.  So

6  if you imagine maybe on this table you can put 100

7  miners, 100 of these rigs, and that means somewhere

8  in the middle of this room, we would need power

9  strips to plug in the hundred units.

10       At the same time, because things happen,

11  you would want to kind of balance out these specs

12  with other specs to think of what happens if this

13  doesn't happen and something else comes.  So you're

14  flexible to a certain extent, but there's limits.

15     Q.  In other words -- I'm sorry.  You want to

16  finish?

17     A.  No.  I think that's all I have.

18     Q.  So in other words, you needed this

19  information to determine whether or not you can even

20  accommodate these -- whatever machines you were

21  planning on acquiring?

22     A.  I would say it's -- you know, to put it

23  into consideration.  You know, think if you're maybe

24  building a chair and you want to make a

25  determination of how large the person that's going

TRANSCRIPT OF PROCEEDINGS

1  to sit on that chair can be before you just say this

2  chair is not going to be any larger than this.

3      Q.  What would happen if you were to commit to

4  acquiring Bitcoin machines without knowing any of

5  their specifications, knowing anything about their

6  distribution of power or energy requirements?  What

7  would happen in that scenario?

8          MR. TABER:  Objection.  Calls for

9  hypothetical.

10          ARBITRATOR CALLAHAN:  Well, he can answer.

11          THE WITNESS:  Waste, I would assume.  You

12  would end -- wasting time because you wouldn't build

13  it all the way until you have the machine and you

14  know what the specs are, or you would leave broader

15  room for variance and waste resources.

16  BY MR. LIU:

17      Q.  So in May of 2021, after Maloney presented

18  this opportunity to possibly acquire Katena Bitcoin

19  mining machines, did you talk to anyone outside of

20  Coinmint in response?

21      A.  I think the one party I recall is Horizon

22  Kinetics, one of our co-location customers, that

23  regularly asked about our knowledge of machines

24  being available.

25      Q.  Okay.  How often would you communicate

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  with them during this time period?

2      A.  I talked to our clients once a week, or

3  make myself available for half an hour once a week,

4  and also for them, we would talk weekly.

5      Q.  And during this -- these communications,

6  they expressed an interest in acquiring more Bitcoin

7  mining machines; is that right?

8      A.  Yeah.

9      Q.  And did you tell them about this

10  opportunity to possibly acquiring Katena machines?

11      A.  Yeah.  I mentioned it -- you know, since

12  they were always very pushy about it, I mentioned

13  basically that Mike Maloney had knowledge of an

14  opportunity, and forwarded a follow-up email that

15  Kevin McRae sent me.

16      Q.  You're referring to an email.

17      MR. LIU:  Ted, can you pull up Exhibit 53,

18  please.

19      ARBITRATOR CALLAHAN:  What was the number?

20      MR. LIU:  Exhibit 53.  Five, three.

21      Ted, can you scroll to the very bottom

22  email.

23  BY MR. LIU:

24      Q.  So Kevin McRae, is he your contact

25  person at Horizon Kinetics?

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

1       A.   Yes, that's correct.

2       Q.   Did you respond to this email?

3       A.   No, not that I recall.

4       Q.   It looks like you --

5           MR. LIU:  Ted, can you scroll up just a

6   little bit.

7   BY MR. LIU:

8       Q.   It looks like you forwarded this email to

9   Mike Maloney and then Mike Maloney responded; is

10  that right?

11      A.   Yeah.  I -- I've mentioned -- so if I

12  recall correctly, the call with Horizon Kinetics

13  fell into the timeline of when the management

14  meeting was happening.

15          So I was, you know, brief and did the call

16  with them.  As I said, I make myself available half

17  an hour a week to them.  And I asked Kevin to follow

18  up with me so I don't forget, because I wasn't able

19  to take notes.  And because I didn't know much about

20  it, I would forward it to Mike so he could respond.

21      Q.   So is it fair to say that, at this period

22  in time, Mr. Maloney had not yet provided you with

23  enough information for you to respond directly to

24  Mr. McRae; is that right?

25      A.   That's the reason why I forwarded it

TRANSCRIPT OF PROCEEDINGS

1  directly to him, yeah.

2     Q.   Do you recall a management meeting in June

3  of 2021?

4     A.   June 9th or June 10th, somewhere around

5  there.

6     Q.   Do you recall who attended that meeting?

7     A.   You know, I -- in my memory, these

8  meetings converge pretty much.  And to be very

9  honest, I'm not even 100 percent certain that that

10  meeting was in person in Puerto Rico.  We may have

11  held that one remotely.

12     Q.   Yeah, that's fine.

13        MR. LIU:  Ted, can you pull up Exhibit 77,

14  please.

15  BY MR. LIU:

16     Q.   All right.  So this is a June 9th email

17  from Mike Maloney.

18        MR. LIU:  And, Ted, if you just scroll

19  down just a little bit.

20  BY MR. LIU:

21     Q.   There's a Microsoft Teams invite.  Looks

22  like it's set for June 10, 2021 at 7:30 in the

23  morning; is that right, Mr. Guiol?

24     A.   That's what it reads here.  Maybe that

25  confirms my doubt that we did do this one remotely.

TRANSCRIPT OF PROCEEDINGS

1          MR. LIU:  Ted, if you scroll down to

2   page 2.

3   BY MR. LIU:

4      Q.   Looks like it's an attachment titled

5   Coinmint Management Meeting.

6          And then I want to direct your attention

7   to the bottom of page 77-2, Section 5B.  And it says

8   (as read):

9              Review Katena payment plans.

10         Do you see that?

11     A.   Yeah, I do.

12     Q.   Do you recall a management meeting

13  happening on June 10th that discussed Katena?

14     A.   Yeah.

15         MR. LIU:  Ted, if you scroll down just a

16  little bit to the next page, top of the next page,

17  77-3.  A little bit more, please, so we can capture

18  that chart.

19         All right.  Perfect.

20  BY MR. LIU:

21     Q.   So there's -- on page 77-3 under "Proposed

22  plan," there looks to be a chart.

23         Do you see that?

24     A.   Yes, I do.

25     Q.   Do you know who created that?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    A.   Mike Maloney.

2    Q.   Okay.  And did you guys talk about this

3  chart during the June 10th management meeting?

4    A.   We reviewed it.  He explained the chart.

5  But that was the first time I saw it.

6    Q.   Okay.  And what was the purpose behind

7  preparing this chart?

8    A.   So the way that I recall it, it was to

9  show how a base payment in U.S. dollars and a later

10  payment at -- in BTC, the middle two columns, could

11  make up for the total price per terahash, the first

12  column.  So you can maybe see in the first line, it

13  says $30 per terahash.  And it assumes a base

14  payment of $30 and zero dollars in BTC.

15          And then the further lines basically show

16  as an example of the last column reflecting how much

17  you can earn with a terahash in a day, of how either

18  the base USD payment or the BTC payment would

19  increase.

20          So if I would summarize the chart, the

21  last column shows you how well the market is doing,

22  either very badly, you make 18 cents, dollar cents,

23  in one terahash, or the bottom of the chart, I mean,

24  here what's in view we see 42 cents.  I think it

25  continues a little bit, but I'm not sure.  So the

TRANSCRIPT OF PROCEEDINGS

1  very good market condition.  It's like a range

2  that's reflected on the last column.

3          So if we maybe pick the highlighted

4  column, which I recall is the market conditions as

5  of the time of the meeting, running one terahash for

6  one day would make you 24 cents.  The chart

7  describes that there would be a base payment of $30

8  in U.S. dollars, and $10 as BTC would then make up a

9  total price of $40 per terahash.

10     Q.   Were you guys preparing this chart in

11  order to assess what the appropriate price would be

12  for a potential purchase of Katena machines?

13     A.   That's how I understand it, in part.  And

14  also as to propose a model of -- which wouldn't, you

15  know, settle on a fixed price but would put into

16  consideration the market conditions.

17     Q.   Okay.  Is it your understanding that this

18  model depicts some sort of floating price model?

19     A.   That's how I would interpret it.  And I

20  think what is nice and what we proposed, or what

21  Mike worked out here, is that if the market

22  conditions were not so good, you could say everybody

23  was kept whole, nobody was going to lose money.  And

24  if the market conditions were very good, everybody

25  was making more money, Katena and us based on the

TRANSCRIPT OF PROCEEDINGS

1   market being better.

2       Q.   Now, you mentioned that if the market was

3   good, under this plan, both parties would benefit;

4   is that right?

5       A.   Yeah.

6       Q.   Using the figures on this screen as an

7   example, can you demonstrate to us how that would be

8   the case -- can you demonstrate how, if the market

9   is doing well, both Katena and Coinmint would

10  benefit?

11      A.   Sure.

12          So you can maybe see how when the -- you

13  said when the market is doing well?  Right?

14      Q.   Right.

15      A.   So if we just use the bottom extreme,

16  right, the last line, it shows that you can make

17  50 cents with running a terahash, which if I recall

18  well, these machines -- it doesn't matter.  50 cents

19  you could make with a terahash in a day, and then we

20  would pay, for every terahash that Katena would

21  provide us, $83.33.

22          So I think the line highlighted in blue --

23  I don't know if you can see it well, the $60 line,

24  that's like the initial starting point.  And this

25  proposes that, well, if the market is doing better

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1 than the 36 cents, thank you, a terahash, we're

2 willing to pay you even more.

3    Q.   So instead of --

4    A.   And it would be posed as, you know, if the

5 market is doing not as good, we would pay you less.

6    Q.   Okay.  Got it.

7       So basically the example that you -- that

8 you selected and you compared $60 and $83 --

9    A.   Mm-hmm.

10    Q.   -- what would be the net difference paid

11 to Katena in those two examples?

12    A.   To me, $23.33.  Now, I don't know -- I

13 never knew how much it cost Katena actually to

14 produce a terahash.  So the net difference to them

15 could be much bigger if you think of net as gross

16 minus costs, I don't know their costs.

17    Q.   But the amount of money that you would be

18 paying to Katena would be greater if the market was

19 doing greater?

20    A.   Absolutely, yeah.  83.33 cents instead of

21 60.

22    Q.   And you mentioned that this chart is a --

23 is what you would call a floating price model; is

24 that right?

25    A.   Floating price model.  I'll come back to

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  being self-taught.  And I've learned a lot of things

2  can have a lot of names, and it's, you know, just a

3  definition.

4        I have to be honest, I've not received

5  explicit training of what are the characteristics of

6  a floating price model, but my own interpretation is

7  that it's a price that floats depending on other

8  variables.  Maybe the earnings per terahash in this

9  case.  So it floats depending on another condition,

10  yes.

11    Q.  So in May of 2021, if you were to see this

12  chart, how -- what kind of name would you assign it?

13  Would you call it a floating price?

14    A.  I would call it --

15        MR. TABER:  I'm going to object to

16  foundation.  I think he testified that he didn't

17  have training or knowledge on this.  I think we're

18  pretty far afield from lay testimony at this point.

19        ARBITRATOR CALLAHAN:  I think he's a lay

20  witness.  I think he's just giving his

21  understanding.

22        So go ahead.

23        THE WITNESS:  Thank you.

24        Yeah, I think it describes a way of having

25  a floating price.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  BY MR. LIU:

2      Q.   In your experience, is it common for the

3  price of Bitcoin mining machines to be based on a

4  floating price model similar to the one that you see

5  here?

6      A.   Yes.

7          MR. TABER:  Objection.  Foundation as to

8  his experience in purchasing Bitcoin mining

9  machines.

10          ARBITRATOR CALLAHAN:  If you can lay a

11  foundation.  I don't believe you have.

12  BY MR. LIU:

13      Q.   Mr. Guiol, are you involved in -- in

14  managing the Bitcoin mining machines that are

15  provided by other manufacturers?

16      A.   Yes.

17      Q.   Okay.  And are you aware of the price that

18  you would pay to those manufacturers to acquire

19  those Bitcoin mining machines?

20      A.   I would say I'm aware often of the price

21  that our customers pay, to an extent, especially

22  when they're existing customers and they're planning

23  to expand, yes.

24      Q.   And based on that experience, is it pretty

25  common for the price of these Bitcoin mining

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   machines to be based on a floating price model?

2          MR. TABER:  Same objection.

3          THE WITNESS:  Yes.  It's -- sorry.

4          MR. LIU:  Let her --

5          ARBITRATOR CALLAHAN:  I'm not sure you've

6   laid a foundation for his understanding of pricing.

7   I mean, he's aware of what customers have purchased,

8   but I don't think you laid a foundation as to his --

9          MR. LIU:  We'll move on from the other

10   customers.

11   BY MR. LIU:

12      Q.   I want to ask you about deals involving

13   Coinmint and other Bitcoin mining rigs, okay?

14      A.   Mm-hmm.

15      Q.   What kind of pricing model does Coinmint

16   use when they acquire Bitcoin mining rigs from other

17   manufacturers?

18      A.   In the last purchase that Bitcoin made --

19   that Coinmint made from BITMAIN, I'm aware that

20   there was a scaling model as part of the contract

21   with BITMAIN dependent on the market conditions.

22      Q.   Is -- when you say "scaling" is that the

23   same thing as a floating price model or is that

24   different?

25      A.   No.  It's the same.  I've used those terms

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  interchangeably.

2     Q.   Okay.  Now, you said that this chart that

3  we are looking at on Exhibit 77, this was -- why was

4  Maloney presenting this plan to you guys?

5     A.   It's usually -- because it's a common

6  thing and it was -- it's a common approach when

7  purchasing machines to do such a thing, especially

8  when they are not readily available.  If you can

9  imagine, as the Bitcoin price fluctuates, one is now

10  looking at acquiring something that's six months

11  away, and the conditions then may be very different.

12       So the manufacturer facilitates for a

13  customer to commit to purchase without them maybe

14  knowing, at the time of delivery, what is this thing

15  going to be worth.  You know, it's made to produce

16  Bitcoin, expressed in earnings per terahash, but

17  when I make the decision to send them my money, I

18  may have a different assumption as then what the

19  situation is.

20       So half the customers, always people that

21  say, no, I'm not going to invest in this.  I don't

22  know what's my return of investment going to be.  So

23  that's the idea.

24     Q.   So sounds like you're saying that the idea

25  behind this was to account for the uncertainty that

TRANSCRIPT OF PROCEEDINGS

1  would arise between the time that you agreed to this

2  contract and when the machines would actually

3  arrive?

4      A.  Yes.

5          MR. TABER:  Objection.  Foundation.

6          ARBITRATOR CALLAHAN:  Well, I think he was

7  just asking for his understanding.

8          Go ahead.

9  BY MR. LIU:

10     Q.  Yeah.  And in June 10th of 2021, do you

11  have an understanding as to whether or not Katena --

12  these Katena machines had been manufactured?

13     A.  My understanding was that they were just

14  planning of building a U.S.-based machine --

15     Q.  But to your knowledge at that time, they

16  did not actually have a single Bitcoin mining

17  machine; is that right?

18     A.  No.  They did not, which to me, you know,

19  made the idea very -- I don't know, not -- it seemed

20  like obviously possible.  I love to believe in

21  things, but it also seemed a little bit remote that

22  this was going to happen.  But, you know, it was an

23  opportunity that was interesting.

24     Q.  Do you have an understanding that over the

25  summer and fall of 2021, Coinmint has paid Katena

TRANSCRIPT OF PROCEEDINGS

1  over $23 million?

2     A.  Yes.

3     Q.  Were you involved in making some of these

4  payments to Katena?

5     A.  Yes.

6     Q.  Do you recall when that was when you were

7  involved in making payments to Katena?

8     A.  Summer and fall of 2021.  I think there

9  was some -- at the beginning of September, beginning

10  of October.  I don't -- I don't recall exact dates,

11  but somewhere around there.

12     Q.  Do you know why you were being asked to

13  make payments to Katena?

14     A.  At that time -- I think at that time Mike

15  Maloney was no longer there, and before that, it was

16  only Mike Maloney and me that had the ability of

17  transferring cryptocurrencies out of our wallets.

18  Since he had left, I was the only one left to do

19  that at moment, so --

20        THE REPORTER:  I'm sorry, at the moment,

21  so --

22        THE WITNESS:  At the time when these

23  payments were made, I was the one that would

24  authorize payments in cryptocurrencies from our

25  wallets.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   BY MR. LIU:

2       Q.   Who was the individual that asked you to

3   authorize making these payments to Katena?

4       A.   Jim DeNaut.

5       Q.   Did Jim DeNaut give you a reason as to why

6   he needed you to make these payments to Katena?

7       A.   He said something along the lines of that

8   we were -- we needed to make those payments to keep

9   our spot in line, or -- yeah.  To --

10      Q.   Did he tell you what would happen if

11   Coinmint didn't make these payments?

12      A.   Essentially, we would lose our place in

13   line --

14          (Simultaneous speaking - inaudible.)

15   BY MR. LIU:

16      Q.   And when you say --

17      A.   -- the machines and then if they ever

18   produce a machine, they would receive -- they would

19   be delivered later.

20      Q.   So in other words, if you didn't make this

21   payment, you would not receive these machines on

22   time; is that right?

23      A.   Mm-hmm.  Yes.

24      Q.   So based on what Jim DeNaut told you, did

25   you, in fact, proceed with sending money over to

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   Katena?

2      A.  Yes.

3      Q.   During this time frame -- I think you said

4   September and October, is that right, of 2021?

5      A.  Yes.

6      Q.   During this time frame of September and

7   October of 2021, when you were sending money to

8   Katena, did you have any discussions with any

9   individuals at Katena?

10      A.   I think in October I spoke -- end of

11   October I spoke with Henry Monzon and Michael Gao.

12   And during October, I spoke -- somewhere around mid

13   October with Henry Schroder.  Schrader or Schroder.

14         MR. LIU:  Ted, can you pull Exhibit 73,

15   please.

16         I want to start with the very bottom

17   email, please.  Yeah.  Right there.

18   BY MR. LIU:

19      Q.   So it's an email from Henry Monzon and he

20   writes "Jim, our VPENG".

21         Do you understand VP eng to mean VP of

22   engineering?

23         THE REPORTER:  I'm sorry.  Just speak

24   slower and I can't hear you, so if you could speak

25   louder.

1        MR. LIU:  Absolutely.  Sorry about that.

2        THE WITNESS:  Yes.  I understand that as

3   meaning VP of engineering.

4   BY MR. LIU:

5      Q.   Okay.  And then if you scroll up just a

6   little bit, James DeNaut responds to Mr. Monzon's

7   email and says (as read):

8            Connecting you to Norbert

9         Guiol, who is our COO of Coinmint.

10         Do you see that?

11     A.   Yes, I do.

12     Q.   And it looks like after that, there is

13   another email exchange setting up a call with

14   Katena's VP of engineer?

15     A.   Correct, I see that.

16     Q.   Do you recall the name of the VP of

17   engineer at Katena?

18     A.   I'm pretty sure it's Henry Schroder.

19     Q.   Do you recall what you and Henry Schroder

20   talked about during this October time frame?

21     A.   So what I recall is that it was a Zoom

22   call that we looked at a very rudimentary rendering

23   or display of the machine that they were planning to

24   build.  And it was, you know, very simple.  And the

25   goal of the conversation was for them to get

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1   feedback on where to position plugs as to it being

2   convenient of where they're going to be running.

3          And we also discussed where to place

4   labels so that later for operating the machines,

5   people going to walk around with a scanner and scan

6   their serial numbers.  That's what we discussed.

7     Q.   So were they, in other words, asking you

8   for the ideal place to put certain components of the

9   Bitcoin mining rigs, such as the plugs and the

10  cords, that would facilitate your use of the

11  facilities?

12    A.   Yeah.  I would describe it as that they

13  were asking for my opinion on it.

14    Q.   What else -- did you guys talk about

15  anything else?

16    A.   I think I must have asked about a

17  prototype, and I remember recalling, you know, that

18  there was none.  But that's -- that's all I recall.

19    Q.   That was during this call with

20  Mr. Schroder?

21    A.   Yes.

22    Q.   Was there anyone else that was on the call

23  with you and Mr. Schroder during this time?

24    A.   No.  I recall it only being the two of us.

25    Q.   Did he give you a sense as to whether or

TRANSCRIPT OF PROCEEDINGS

1  not a prototype would be produced at some point?

2      A.   He gave me a sense of that there was no

3  date for one yet.

4      Q.   Okay.  And it was Katena that initiates

5  this call with you?

6      A.   It's them who sent the invite, yes.

7      Q.   But you didn't reach out to ask for this

8  call; is that right?

9      A.   No.

10     Q.   Did you ever -- other than this call with

11  Mr. Schroder in October, did you have any other

12  calls with anyone at Katena?

13     A.   I think one other call at the end of

14  October to discuss what I understood as a variation

15  of the floating price model.

16     Q.   And who was that with?

17     A.   Henry Monzon and Michael Gao and John

18  Tomczak from us, from our side.

19     Q.   Now, you mentioned a floating price model.

20  Was this the same one as the one that was discussed

21  back in June of 2021, or was it a different one?

22     A.   I -- it was different in a sense that it

23  provided detail as to how you could derive the

24  numbers that were shown in the table that Michael

25  Maloney had shown in the June meeting.  I don't know

1  how exactly Michael Maloney came up with that table.

2         So John Tomczak and myself worked out a

3  way to come up with a similar product.  And that

4  was -- yeah, we wanted to share and discuss that

5  open and transparency -- transparently with Henry

6  and Michael to understand where that was.

7     Q.   Did -- when you were having this call with

8  Henry Schroder, did they ask you to have this call

9  with Michael Gao and Henry Monzon?

10     A.   No.

11     Q.   So during this call with just Henry

12  Schroder, what did you feel was the significance for

13  why they were asking you about the locations of the

14  ports and stickers and things of that nature?

15     A.   Well, I think if you're building something

16  from scratch and you're building it for a customer

17  that, you know, was interested in your product, I

18  understood it as, well, let's ask them what their

19  needs are so we can consider that when the machine

20  is put together so they're happy with the machine

21  and they can run it easier and operate it easier.

22         So I think -- I understood it as they were

23  looking for our opinion where things should go so

24  it's easier to operate.

25     Q.   Based on that conversation with

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  Mr. Schroder, could you -- did you have a sense of

2  how far along Katena was in that process of

3  designing and producing a Bitcoin mining machine?

4      A.  I -- you know, from other, I'd say

5  Chinese-based companies that, you know, produced

6  full renderings of the machines that you almost

7  think like, oh, where can I buy this, and it's just

8  a computer rendering, not very far.  It didn't

9  feel -- that sense, the question with the prototype

10  and when is that going to be there.

11        Yeah, it didn't feel like they were very

12  far along.

13      Q.  So turning back to this call with

14  Mr. Monzon, Mr. Gao and later in October, who

15  initiated that call?

16      A.  I think it was them, as I recall it.

17  There's emails that they're asking, you know, when

18  we can present this more transparent model.

19      Q.  So it was your understanding that Katena

20  was asking you to prepare another model of this

21  floating price model that we've been talking about?

22      A.  Yes and no.  I struggle with "another

23  model."  I don't have knowledge of how Mike Maloney

24  produced that first chart, which is a floating price

25  model, so it follows the same principle of saying

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  let's consider the market at the time of you

2  delivering the machine to produce a fair price and

3  an opportunity for both to win, but also to protect

4  each other from a loss.

5      Q.  Was it your understanding that this model

6  was being requested by Katena, or was it being asked

7  for by someone at Coinmint?

8      A.  It was more my understanding that Katena

9  was wanting to see it.

10     Q.  How did you know that?  Did someone

11  communicate that to you?

12     A.  Henry Monzon wrote, you know, when can we

13  look at it.  I think there's emails on that.

14     Q.  You mentioned -- and you mentioned that

15  you did go ahead and create some kind of model; is

16  that right?

17     A.  That's correct.  Together with John

18  Tomczak.

19     Q.  You shared that model with Mr. Monzon; is

20  that right?

21     A.  We did during the Zoom call.  Yes.

22         MR. LIU:  Ted, can you pull up Exhibit 69,

23  please.

24         MR. TABER:  Madam chair, we've been going

25  about an hour, can I just ask, in light of Order

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  Number 51, about how much time the panel expects

2  each side will have with this witness?

3       ARBITRATOR CALLAHAN:  I think we did an

4  hour each.  What did we do?

5       MR. TABER:  That's what I see in Order

6  Number 51.

7       MR. LIU:  We did an hour.  I did say an

8  hour in the order.  I think we said yesterday --

9       ARBITRATOR CALLAHAN:  I think that's

10  enough for this witness, based on his limited

11  temporal involvement with the deal.  I think that an

12  hour each side is sufficient.  So let's try to stay

13  within that estimate.

14       MR. LIU:  How much time do I have left?

15       ARBITRATOR CALLAHAN:  I knew you were

16  going to ask that.  Okay.  You started --

17        (Simultaneous speakers - inaudible.)

18       ARBITRATOR CALLAHAN:  You're at an hour,

19  you started at 1:20, it's 2:20.

20       MR. LIU:  I didn't do a good job.  Can I

21  get maybe 15 minutes?

22       ARBITRATOR CALLAHAN:  How about five?

23       MR. LIU:  Five.  Okay.

24       ARBITRATOR CALLAHAN:  We spent a lot of

25  time in the beginning with customers, background,

1  kids.  On the sailboat with the parents, service in

2  the military.

3        MR. LIU:  I will wrap up with the exhibits

4  and then a couple of closing questions.

5        THE WITNESS:  I hope it was interesting.

6        ARBITRATOR CALLAHAN:  It was very

7  interesting, but I'm not sure --

8        ARBITRATOR TURITZ:  Fascinating actually.

9        THE WITNESS:  Different, very different.

10       ARBITRATOR GLICK:  In fact, instead of

11  being homeschooled, I thought you were going to say

12  you were ship schooled.

13       THE WITNESS:  That's what's going to

14  happen to the other two that are back in

15  North Carolina.

16       ARBITRATOR TURITZ:  You're going to sell

17  everything buy a sailboat, right.

18  BY MR. LIU:

19     Q.  So, Mr. Guiol, is Exhibit 69, is that the

20  pricing model that you prepared and sent over to

21  Mr. Monzon and Mr. Gao?

22     A.  Yeah.  Can you actually scroll to the

23  bottom of that real quick.

24       MR. LIU:  Ted, can you do that, I think

25  the attachment may be a native document.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1           (Reporter clarification.)

2    BY MR. LIU:

3        Q.   I want to jump to this conversation with

4    Katena -- with Mr. Monzon, Mr. Gao after you guys

5    sent them this pricing model.

6             ARBITRATOR TURITZ:  Wait a minute.  You

7    went through this so fast I couldn't even see like

8    what the date of this document is or what it's

9    about.

10            So can you just --

11            ARBITRATOR CALLAHAN:  Slow down.

12            ARBITRATOR TURITZ:  I know you're in a

13   huge hurry.

14            ARBITRATOR CALLAHAN:  The court reporter

15   needs to get it and the panel needs to get it.  Slow

16   down.

17            MR. LIU:  I'll do my best.

18            ARBITRATOR TURITZ:  So it says please find

19   attached our model with footnotes and that's what's

20   the native document.

21            MR. LIU:  Right.

22            ARBITRATOR TURITZ:  Are you going to

23   display the native document?

24            MR. LIU:  Yes.  Ted, go ahead.

25            ARBITRATOR CALLAHAN:  Then what is it

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   that's attached as -- there is something, a chart,

2   after 69-2.  Is that a PDF of what is the native

3   document?  It doesn't have an exhibit number, but it

4   is right after 69-2 with colors, and it says "Online

5   dates TH delivered" -- looks like -- "at purchase

6   10/28/2022."  There's a chart in the exhibits.

7          MR. LIU:  Right.  An Excel spreadsheet.

8   It's an Excel spreadsheet.  But I was just going to

9   ask him about the call, not about the chart.

10          ARBITRATOR CALLAHAN:  What we're trying to

11   understand is, is that reference to this?  It

12   doesn't have an exhibit number but it's in the

13   exhibit binder.

14          MR. LIU:  Yeah.

15          ARBITRATOR CALLAHAN:  This is the

16   placeholder.

17          MR. LIU:  Yeah, that's the attachment.  We

18   can't print that spreadsheet with the email, it was

19   produced natively.

20          ARBITRATOR CALLAHAN:  But this is a

21   picture of it.

22          MR. LIU:  Well, we can have the witness

23   authenticate it, but I believe so.  That's supposed

24   to be an Excel spreadsheet.

25          THE WITNESS:  Yes.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1        ARBITRATOR CALLAHAN:  This is the Excel

2   spreadsheet that was attached to the email.

3        THE WITNESS:  Yes, ma'am.

4        MR. LIU:  Correct.

5        ARBITRATOR CALLAHAN:  Okay.  So it was

6   possible to make a physical -- we have the physical.

7        MR. LIU:  Okay.  Perfect.  Okay.

8        ARBITRATOR CALLAHAN:  Mr. Brooks, do you

9   have it?

10        MR. BROOKS:  I have the native, I believe.

11   Do you want to display that or not, I don't have it

12   in the --

13        ARBITRATOR CALLAHAN:  As long as it's same

14   as what the panel has.

15        MR. LIU:  Yeah.  It's the same.

16        ARBITRATOR TURITZ:  Since I don't have

17   hard copies of the exhibits, do I have -- can I

18   access this in the electronic copy as a native?

19        MR. LIU:  You can.  We provided the jump

20   drive with the native everything, so --

21        ARBITRATOR TURITZ:  Right.  I haven't

22   tried to open the natives, but it's in there.

23        MR. LIU:  Inside the jump drive I think

24   there's like a folder with like five native

25   documents and that's one of them.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1        ARBITRATOR TURITZ:  That's what's in

2   there.

3        MR. TABER:  The joints, I think, were from

4   us, but our jump drive also has the Excel native on

5   it.

6        ARBITRATOR CALLAHAN:  Is there a reason

7   why, since it's a PDF, it can't be part of the

8   Exhibit 69?  I'm just hesitant.  When I hear native

9   format that says, to me, it's manipulatable.  And so

10  since there's a PDF --

11       MR. LIU:  I don't believe it was a PDF.  I

12  think it was an Excel spreadsheet.

13       ARBITRATOR CALLAHAN:  Somehow --

14       MR. TABER:  We printed the Excel

15  spreadsheet to put it in the binder.

16       ARBITRATOR CALLAHAN:  Why can't this be

17  scanned?

18       MR. TABER:  I have no objection to that.

19  I think we're all on the same page here.  Right.

20  It's their document.  We're not contesting the

21  authenticity of it.  I think we can solve this.

22       ARBITRATOR CALLAHAN:  I'm just trying to

23  get the panel --

24       MR. ALFORD:  We'll get you scanned.

25       ARBITRATOR CALLAHAN:  Since it exists.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1       MR. ALFORD:  Yes.  We'll do that.  Go

2  ahead.

3       ARBITRATOR TURITZ:  Attach it as like 69A

4  or something.

5       MR. ALFORD:  Yeah.

6       ARBITRATOR TURITZ:  Give it a number.

7       MR. ALFORD:  We will.  We'll make that

8  happen right away.

9  BY MR. LIU:

10     Q.  So, Mr. Guiol, you shared -- after sending

11  this email to Mr. Gao and Mr. Monzon, did you have a

12  call with them?

13     A.  Yes.

14     Q.  And what did you guys talk about during

15  that call?

16     A.  We looked at that chart and explained how

17  it worked and how it helped to -- allows both

18  parties to profit if the market was good and how it

19  could protect both of us if the market was bad.  Or

20  sufficiently.  And how it related to the chart that

21  Maloney shared and how it worked with the variables

22  in the market.

23         And we demonstrated in the call -- the

24  document is dynamic, it has variables.  So you could

25  basically enter, if you make more earnings per

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  terahash, you could see in the document easily how

2  Katena essentially would receive more money from

3  Coinmint if the conditions were favorable.

4      Q.   Did they express to you that they were in

5  agreement in that price model that you had shared

6  with them?

7      A.   They -- it was interesting, they -- they

8  didn't.  John and me were very happy about building

9  this, because we thought it was really clear,

10  created a lot of transparency.  And they were quite

11  reserved about it.  And -- which -- yeah, was

12  surprising.

13        It felt -- it felt like we were building

14  something together and as a partnership.  And --

15  yeah.  It didn't -- it didn't feel like they

16  accepted it or --

17        ARBITRATOR TURITZ:  Can I get some

18  clarification.  You said you were on -- you were

19  talking with Mr. Monzon.  Was anybody else on that

20  call from the Katena side?

21        THE WITNESS:  The call --

22        ARBITRATOR TURITZ:  You kept saying

23  "they."

24        THE WITNESS:  Yeah.  As I recall it, it

25  was Henry and Michael.  Henry Monzon, Michael Gao,

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   John Tomczak and myself that was on the call.

2        ARBITRATOR TURITZ:  When you say "they,"

3   you were referring to Mr. Gao and Mr. Monzon?

4        THE WITNESS:  Correct.

5        ARBITRATOR TURITZ:  Okay.  Thank you.

6   BY MR. LIU:

7     Q.   Did they ever tell you, during this call,

8   that the model that you had proposed was -- was not

9   workable for them?

10      A.   No.

11     Q.   During this time in September and October,

12   you mentioned that you had conversations with

13   Mr. Schroder, Mr. Gao and Mr. Monzon.

14        Did you talk to anyone else at Katena?

15      A.   No.

16     Q.   Okay.  Did anyone at Katena ever tell you

17   that there was already a binding contract

18   for $150 million between Coinmint and Katena?

19      A.   No.

20     Q.   Did anyone at Katena ever tell you that

21   they believe that Coinmint was in breach or in

22   default of any contract between Coinmint and Katena?

23      A.   No.

24     Q.   Did anyone at Katena ever tell you that

25   they believe that Coinmint owed $37 and a half

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  million that has yet to be paid?

2      A.  No.

3      Q.  Did anyone at Katena ever tell you that

4  the project to create this K10 Bitcoin mining

5  machine was canceled or will be canceled shortly?

6      A.  No.

7          MR. LIU:  Have I used up my five minutes?

8          ARBITRATOR CALLAHAN:  You've used up ten,

9  actually.

10         MR. LIU:  Sorry.

11         ARBITRATOR CALLAHAN:  All right.  Very

12  good.  Hold on.

13         Are you ready to proceed or is this a good

14  time for a short bio break?

15         MR. TABER:  I was going to request if

16  everyone might like a short bio break.  I think five

17  minutes would give me --

18         ARBITRATOR CALLAHAN:  Let's do five

19  minutes.

20         MR. TABER:  Perfect.  Thank you.  You read

21  my mind.

22         (Whereupon, a recess was taken from

23          2:29 p.m. to 2:37 p.m.)

24  / /

25  / /

1                    CROSS-EXAMINATION

2   BY MR. TABER:

3      Q.  Mr. Guiol, good afternoon.  It's nice to

4   see you again.

5           In May of 2021, you were part of the

6   Coinmint management team, right?

7      A.  Yes.

8      Q.  So was Mr. Soniat?

9      A.  Yes.

10     Q.  So were Ms. Schneider and Mr. Maloney,

11  right?

12     A.  Yes.

13     Q.  You told us you were at a Coinmint

14  management team meeting in Puerto Rico from May 11

15  to May 13, 2021, right?

16     A.  Can you repeat that?

17     Q.  Sure.

18          You told us that you were at a Coinmint

19  management team meeting in Puerto Rico from May 11th

20  to May 13th of 2021, right?

21     A.  Yes, that's correct.  James DeNaut was

22  there too.

23     Q.  And Mr. Maloney was there too, right?

24     A.  Mr. Maloney was there too.

25     Q.  And the first time you heard about Katena

1   was from Mr. Maloney, right?

2       A.   Yes.  That's correct.

3       Q.   And you testified he told you there was an

4   opportunity for Coinmint to procure Bitcoin mining

5   machines from a U.S. company, right?

6       A.   The way I recall it is that he said there

7   was an opportunity to procure Bitcoin mining

8   machines that were built in the U.S.

9       Q.   Okay.  And you also heard Mr. Maloney talk

10  about Katena at least one other time during that

11  management committee meeting, right?

12      A.   I cannot differentiate if it was twice.

13  I -- as I said, I think it wasn't very extensive,

14  the amount of conversation.  That was about it.

15          THE REPORTER:  The amount of --

16          THE WITNESS:  Conversation was very

17  limited.

18  BY MR. TABER:

19      Q.   Well, Mr. Maloney told you some other

20  things about Katena in May of 2021, aside from the

21  fact that there was a possibility of procuring

22  Bitcoin mining machines from them, right?

23      A.   No, not that I recall.

24      Q.   All right.  Well, let's see if we can

25  refresh your recollection.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1        It's true he told you that components of

2   Katena's mining rigs would be manufactured in China,

3   correct?

4      A.  Not that I recall.

5      Q.   All right.  I'm going to show you a copy

6   of your deposition transcript.  You recall that you

7   were deposed in this case?

8      A.  I do.

9        MR. ALFORD:  I'm sorry, is that an exhibit

10   or --

11        MR. TABER:  I'm impeaching him with his

12   deposition transcript.  I'm not entering the

13   transcript into evidence.

14        ARBITRATOR CALLAHAN:  That's how it's

15   usually done, so that's fine.

16        MR. TABER:  All right.

17        ARBITRATOR TURITZ:  Just identify it for

18   the record, the page and line, please.

19        MR. TABER:  Yes.  I'm identifying for the

20   record that I'm handing Mr. Guiol -- excuse me -- a

21   copy of his deposition transcript from the

22   deposition that took place on June 20th, 2023.

23        ARBITRATOR TURITZ:  Page and line?

24        MR. TABER:  Put that in front of you.  I'm

25   going --

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1        MR. HARDIN:  It's on page 127.  We'll get

2   to the line here in just a minute.

3        MR. TABER:  Page 127.  I'm just going to

4   read to you -- and I'll ask you to confirm from that

5   copy that I've read it correctly.

6   BY MR. TABER:

7      Q.   Did you testify that the miner was -- line

8   11 (as read):

9            Supposedly built in the U.S.

10           but still relied on some things

11           being manufactured in China?

12     A.   Which line?

13     Q.   Sure.

14           Lines 11 and 12 on page 127 (as read):

15           The mining rig was supposedly

16           built in the U.S. but still relied

17           on things being manufactured in

18           China.

19           That's your testimony, sir?

20     A.   I agree that I testified that, yeah.

21     Q.   So Mr. Maloney told you that some of the

22   components of Katena's mining rigs would be

23   manufactured in China, right?

24     A.   No.  I don't see where I said that

25   Mr. Maloney told me that.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    Q.   So you had some other source of knowledge

2  there?

3    A.   I've been -- yes.  Yeah.

4    Q.   Okay.  That was from the investigation --

5  due diligence investigation you did into Katena?

6    A.   I did no due diligence on Katena.

7    Q.   Okay.  Now, Mr. Maloney also told you

8  about the efficiency of the Katena rigs and how that

9  compared to other Bitcoin mining rigs available in

10  the market, right?

11    A.   I don't recall them specifically

12  mentioning any technical details on those

13  machines --

14    Q.   All right.

15    A.   -- during the management meeting.

16    Q.   I will direct your attention to actually

17  the same page you're on, page 127 of your

18  transcript.

19    MR. LIU:  Objection.  I don't think this

20  is impeachment anymore.

21    ARBITRATOR CALLAHAN:  I haven't heard it

22  yet, and I can't see it.  So what is the question?

23    MR. TABER:  I asked if he recalled

24  Mr. Maloney telling him anything about technical

25  details of the -- of the -- the efficiency of the

TRANSCRIPT OF PROCEEDINGS

1  machines.  He said he didn't recall.  I'm going to

2  impeach him with his different testimony.

3        MR. LIU:  But his testimony says based on

4  my experience, and that that's when he provides the

5  information.

6        ARBITRATOR CALLAHAN:  Oh that, it doesn't

7  tie to Mr. Maloney.

8        MR. LIU:  It doesn't say Maloney.  It says

9  it's based on his experience with the focus of

10  supply chain, and then that's when he talks about

11  manufacturing --

12        MR. TABER:  We haven't -- let's read the

13  transcript, and we can all decide -- the panel can

14  decide whether or not it's impeachment, but I would

15  like to proffer this testimony that he gave, if I

16  may.

17        ARBITRATOR CALLAHAN:  Does it tie it into

18  something Mr. Maloney told him?

19        MR. TABER:  Expressly.

20        I'll read it now.  Page 127 on line 24.

21  My question was (as read):

22            You recall a discussion of

23            efficiency.  Are there any other

24            details?

25            And you then spoke (as read):

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1            Not a discussion.  A mention

2        they're slightly less efficient

3        than a comparable product.

4            Question:  Who said that?

5            Answer:  Mike Maloney.

6   BY MR. TABER:

7      Q.   Was that your testimony, sir?

8      A.   That's what's transcribed, I agree, yes.

9      Q.   So at the deposition you told me that Mike

10   Maloney told you that the Katena mining rigs were

11   slightly less efficient than a comparable product;

12   is that right?

13     A.   I agree.

14     Q.   Okay.  And Mr. Maloney also told you that

15   the Katena rigs could be delivered to Coinmint at

16   the end of the year -- at the end of 2021, right?

17     A.   Yes.

18     Q.   Okay.  And Mr. Maloney also told you --

19   you testified today -- that Katena said they had not

20   yet made a working miner, right?

21     A.   He did not say anything like that during

22   the management meeting.

23     Q.   Okay.  And also during the management

24   meeting, Mr. Maloney proposed purchasing mining rigs

25   from Katena to be used for self-mining and to resell

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   some of them to your cohosting customers, correct?

2      A.   No.  Not that I recall.

3      Q.   Okay.  Well, let's take a look at page 126

4   of your deposition and transcript and see if that

5   refreshes your recollection.

6           If you look to line 19 on page 126, I'll

7   read (as read):

8              Question:  Do you recall

9           Mr. Maloney talking about

10          potentially buying machines from

11          Katena for self-mining or for

12          co-location?

13          And the answer was (as read):

14             So it's part of the mention or

15          the -- you know, how Maloney

16          described the opportunity, it was

17          an opportunity to secure Bitcoin

18          miners to be purchased in the

19          future that we could use for

20          self-mining and for co-location,

21          basically resell them to existing

22          customers.

23          And that continued to the top of 127,

24   line 2.

25          Does that refresh your recollection as to

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  whether or not Mr. Maloney proposed purchasing

2  mining rigs from Katena for self-mining and

3  co-location at the management meeting?

4      A.  Yes.  There is a difference between

5  proposing to purchase and proposing an opportunity

6  to purchase.

7      Q.  Okay.  Now, in fact, those details that

8  Mr. Maloney told you about the deal, those are the

9  same details of the contract that Mr. Soniat

10  actually signed, aren't they?

11     A.  Like I said before, the -- I don't recall

12  hearing any details during the management meeting

13  discussion because I -- yeah, would have said this

14  is ridiculous.

15     Q.  Well, let's look at a document.  And I'm

16  actually going to show you something we haven't seen

17  yet, unlike a lot of what's to come, which will be

18  documents that you did look at with Mr. Liu.

19          MR. TABER:  So, Michelle, if you could

20  please pull up Exhibit 51.  If you could turn to

21  page 51-18, please.

22          THE WITNESS:  Yes.

23  BY MR. TABER:

24     Q.  Full service establishment here.

25          If you could turn to page 51-18.  You

**September 19, 2023**

1  recognize this, don't you, as a purchase order

2  between Coinmint and Katena for $150 million of

3  Bitcoin miners?  Correct?

4      A.  That's what this document says, yes.

5      Q.   And you've seen this document before

6  today, right, sir?

7      A.  Not during the management meeting.

8      Q.   Let me ask, you've seen this document --

9  that wasn't my question.  I'll try again.

10         You've seen this document before we're all

11  sitting here today, other than with your counsel,

12  haven't you, sir?

13      A.  Yes.

14      Q.   Okay.  In fact, you saw this document for

15  the first time in June or July of 2021, right?

16      A.  I don't recall the exact time, but I do

17  recall very well that immediately upon seeing this

18  document the first time, I wrote an email where it

19  challenged some wrong information in the document.

20  So that document is very well --

21         THE REPORTER:  I'm sorry, so that document

22  very well --

23         THE WITNESS:  I have an email where I

24  immediately respond after seeing this document for

25  the first time that it contains, for me, some

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  substantial typos that we review before entering

2  into this agreement or pursuing it further, I

3  encouraged James DeNaut and Frank Kinney to review

4  it with Katena and produce a correct document.

5         THE REPORTER:  When I ask you to repeat I

6  just want the words, just for the next time.

7         THE WITNESS:  Sorry.

8  BY MR. TABER:

9    Q.   So turn to page 51-21, please.

10        MR. TABER:  And Michelle, if you could

11  please scroll down.

12  BY MR. TABER:

13    Q.   Is this document --

14    A.   51-21?

15    Q.   Yes, sir.

16        Is this document signed?

17    A.   It looks like it, yes.

18    Q.   Who signed it for Coinmint?

19    A.   It looks like it was signed by Ashton

20  Soniat.

21    Q.   What's the date?

22    A.   May 12, 2021.

23    Q.   This isn't an LOI, is it?

24        MR. LIU:  Calls for a legal conclusion.

25        THE WITNESS:  I don't think I can --

1      ARBITRATOR CALLAHAN:  Well, it's his

2   understanding.

3      THE WITNESS:  -- determine, you know, what

4   this really is.

5      THE REPORTER:  I'm sorry, I just need you

6   to speak up please.

7      THE WITNESS:  Yeah.  I can't determine

8   what this document really is.  But during the

9   management meeting, Mike Maloney has always

10   described it as an intention to secure a line in the

11   queue to procure these machines.

12   BY MR. TABER:

13    Q.   Now, turn back to page 51-18, please.

14      MR. TABER:  Michelle, if you can scroll

15   back up, please.

16   BY MR. TABER:

17    Q.   Now, at this time, it's your recollection,

18   right that, BITMAIN Antminer S19s were selling for

19   between 110 and $115 a terahash, right?

20    A.   I don't know if -- I would more have said

21   between 90 and $100, but we can settle on

22   around $100.  I don't ...

23    Q.   What's the price per terahash for this

24   deal on page 51-18?

25    A.   $5,400.  Ridiculously high.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1      Q.   All right.  I'm going to ask you to read

2    where it says wholesale price per terahash and tell

3    me what the number is in that line.

4      A.   I think I was going by the last line on

5    product pricing where it says 5,400 U.S. dollars per

6    terahash.

7      Q.   I wasn't asking you about the net price

8    per unit, sir, which is 5400.  I'm asking you what's

9    the wholesale price per terahash on the document.

10     A.   Wholesale price per terahash says 60 U.S.

11   dollars price per terahash.

12     Q.   That's a lot cheaper than what BITMAIN was

13   selling for at the time, right?

14         MR. LIU:  Objection.  Calls for

15   speculation.

16         ARBITRATOR CALLAHAN:  If he knows.  He did

17   testify previously.

18         THE WITNESS:  It's a lot cheaper compared

19   to a machine that doesn't exist yet.

20   BY MR. TABER:

21     Q.   Under "product description," which is

22   above "product pricing," can you read what's after

23   manufacturer performance, please.

24     A.   It says (as read):

25             35 "joules" per terahash

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1      efficiency.

2      Q.  That's about the same as the efficiency of

3  the BITMAIN miners that were available to you at the

4  time, right?

5      A.  No.

6      Q.  It's a little bit less efficient?

7      A.  20 percent.

8      Q.  Okay.  But that's consistent with what

9  Mr. Maloney told you in Puerto Rico, right?

10      A.  He didn't share any specifics of the

11  efficiency of the machines with me in Puerto Rico.

12      Q.  All right.  So when you testified during

13  your deposition that Mr. Maloney told you in Puerto

14  Rico that the machines were slightly less efficient

15  than BITMAIN miners, was that statement untrue?

16          MR. LIU:  Objection.  Mischaracterizes the

17  statement.

18          ARBITRATOR CALLAHAN:  Hold on.

19          THE WITNESS:  Sure.

20          ARBITRATOR CALLAHAN:  I don't have his

21  depo testimony, so maybe I need to --

22          THE WITNESS:  Would you like this one?

23          ARBITRATOR CALLAHAN:  No.  Let's rephrase,

24  Mr. Taber.  That would be the easiest.

25          MR. TABER:  Well, this is important.  So

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  I'd like to make sure --

2       ARBITRATOR CALLAHAN:  But you can ask the

3  question without referencing his deposition, did

4  Mr. Maloney tell you that.

5  BY MR. TABER:

6    Q.   Mr. Maloney told you, in Puerto Rico, did

7  he not, that the Katena rigs were, quote, slightly

8  less efficient than machines that were currently on

9  the market being produced in China?  Right?

10    A.   Yes.  That's correct.

11    Q.   Okay.  And so that's, again, consistent

12  with the number you see in this signed purchase

13  order, it's slightly less efficient than the

14  machines on the market being produced in China,

15  right?

16    A.   Is that a question?

17    Q.   Yes.

18    A.   I can't agree that 20 percent is slightly,

19  so it's not consistent.

20    Q.   We can quibble about the word "slightly."

21       Turn to page 51-20, please.

22       Do you see that there's a delivery

23  schedule on that page?

24    A.   Yes.

25    Q.   You see the date of the first delivery is

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  December 29th, 2021?

2     A.  Yes.

3     Q.  So that's delivery at the end of 2021,

4  right?

5     A.  Yes.

6     Q.  And so that's also consistent with what

7  Mr. Maloney told you about the Katena deal in Puerto

8  Rico, isn't it?

9     A.  I don't recall him saying any details

10  about the delivery timeline.

11     Q.  You don't recall Mr. Maloney telling you,

12  in Puerto Rico, that the Katena machines could be

13  delivered to Coinmint (as read):

14          At the end of the year at the

15        end of 2021?

16     A.  Yes.  Yes.  I thought you said December.

17  Yeah.  End of year, yeah.

18     Q.  Now I'm a little confused.

19        Do you or do you not recall that

20  Mr. Maloney told you in Puerto Rico that the Katena

21  machines could be delivered at the end of 2021?

22     A.  Yes.  Yes.  He did say that, yes.

23     Q.  And so what he told you about the deal,

24  that's consistent with the delivery schedule we see

25  in the signed agreement, right?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    A.   Yes.

2    Q.   So Mr. Maloney shared many of the

3  important details about the Katena deal with you at

4  the management committee meeting in May 2021, right?

5    A.  I don't think he shared all of the details

6  that were important.

7    Q.   Didn't say "all," but he shared many

8  important details with you about the Katena deal at

9  the management committee meeting in May 2021, right?

10    A.   Again, I feel I can't answer.  I can't

11  answer.  Two is many out of maybe five.

12    Q.   It was your testimony, wasn't it, that the

13  efficiency was an important factor for acquiring

14  Bitcoin mining rigs, right?

15    A.   Mm-hmm.

16    Q.   And that's one of the details he shared

17  with you in Puerto Rico, in May of 2021, right?

18    A.   With insufficient accuracy, so

19  insufficient that I actually, when I was asked about

20  those details by one of our customers, I didn't feel

21  confident sharing information which led me to

22  directly forwarding that inquire of the customer to

23  Mike Maloney for him to provide more detail.

24       Not insufficient detail, not insufficient

25  detail to me, and I was in charge of making a

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  decision on purchasing those rigs.

2      Q.   I'll ask you to try to limit your answers

3  to my questions if you can.

4          ARBITRATOR CALLAHAN:  Mr. Guiol, we'll get

5  you out of here much quicker.  Listen really

6  carefully to Mr. Taber's questions and try to just

7  answer the question.  And then if there's anything

8  more that needs to be drawn out, one of the other of

9  these fine lawyers will ask you further questions.

10         THE WITNESS:  I'm sorry.

11         ARBITRATOR CALLAHAN:  No, don't apologize.

12  Just listen carefully to Mr. Taber's questions.

13  BY MR. TABER:

14      Q.   So you see here in front of you, on

15  Exhibit 51, that there's a signed contract between

16  Coinmint and Katena reflecting some of those same

17  important details that has a date on it of

18  May 12th, 2021, right?

19      A.   I don't know if it's a contract, but yes.

20      Q.   Okay.  Let's see whether your actions

21  after that date are consistent with there being a

22  signed agreement.

23          I'd like to start with what you were just

24  talking about, which was your conversation with

25  Mr. McRae.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1        If we could turn to Exhibit 53 please,

2   which would be in that same binder in front of you.

3        MR. TABER:  And, Michelle, if you could

4   put it up on the screen.

5   BY MR. TABER:

6    Q.   Now, Mr. McRae emailed you and said (as

7   read):

8            You mentioned you may want to

9         discuss an equipment deal that

10        you're looking at.  Please, let me

11        know if there are any updates on

12        this.

13        Right?

14        MR. TABER:  Oh, Michelle, can you scroll

15   down please.

16        Perfect, thank you.

17   BY MR. TABER:

18    Q.   Sorry, did I read that correctly?

19    A.   Yes.

20    Q.   Okay.  Now, you didn't tell Mr. McRae that

21   Coinmint didn't have any plans to order new

22   equipment, right?

23    A.   No, I did not.

24    Q.   You didn't tell Mr. McRae it was too early

25   to talk about details 'cause any possible deal was

TRANSCRIPT OF PROCEEDINGS

1  in the future, right?

2     A.  No, I did not.

3     Q.  No.  You forwarded Mr. McRae's email to

4  Mike Maloney, right?

5     A.  That's correct.

6        MR. TABER:  Michelle, can you scroll up,

7  please.

8  BY MR. TABER:

9     Q.  And Mr. Maloney responded to Mr. McRae

10  copying you, right?

11    A.  Yes.

12    Q.  All right.  In the second paragraph there,

13  Mr. Maloney wrote, and you saw (as read):

14           We are looking at a new

15           manufacturer with a 90 --

16           It says TH.  I think that's a T-H that got

17  turned into a -- you'll tell me.  (As read):

18           90 TH per second 3150 watt

19           35 joules.

20           Did I read that right?

21    A.  Yes.

22    Q.  Those are the specs of a Bitcoin mining

23  machine; you recognize that, right?

24    A.  Yes.

25    Q.  Now, if you could flip back to Exhibit 51,

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1   page 51-18 for a second.

2          If you can just hold your place because

3   we'll be flipping back again.

4          Under "Product description," you see it

5   says (as read):

6               K10 minder -- excuse me, K10

7          miner 90 terahash per second

8          output, 3150 watts.

9          Right?

10   A.   Mm-hmm.

11   Q.   And then under that, it says (as read):

12               Manufacturer performance,

13          35 joules a terahash efficiency.

14          Right?

15   A.   Yes.

16   Q.   So the specs that Mr. Maloney provided to

17   Mr. McRae are the same specs for the Katena K10

18   miner, right?

19   A.   Yes.

20   Q.   That's not a coincidence, is it,

21   Mr. Guiol?

22          MR. LIU:  Argumentative.

23          ARBITRATOR CALLAHAN:  Sustained.

24          MR. TABER:  I'll rephrase.

25   //

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  BY MR. TABER:

2      Q.   And Mr. Maloney also sent these specs to

3  you on May 14th, 2021, right?

4      A.   No.

5      Q.   If you could flip back to Exhibit 53.  You

6  see that you're copied on this email where he

7  provides the specs, right?

8      A.   Um, correct.

9      Q.   So you had those specs as early as

10  May 14th, 2021, correct?

11      A.   I received them in an email and CC that

12  wasn't directed to me, yes.

13      Q.   Now, let's take a look at the second

14  sentence of the third paragraph.

15          You see it says (as read):

16              Coinmint has made a large

17          commitment and are making this

18          available to current cohosts.

19          Did I read that right?

20      A.   Mm-hmm, that's correct.

21      Q.   You didn't want to make false statements

22  to Coinmint's customers, did you?

23      A.   I didn't make that statement.

24      Q.   That wasn't my question, sir.

25          You didn't want to make false statements

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  to Coinmint's customers, did you?

2    A.  I don't want to make false statements to

3  Coinmint's customers, no.

4    Q.  And you didn't want Mr. Maloney to make

5  false statements to Coinmint's customers either,

6  right?

7    A.  I don't have any agency over Michael

8  Maloney, but Michael Maloney was, I think here,

9  acting in a sales role, pitching the purchase of

10  these machines, and, you know, I think my experience

11  working with salespeople, they use a lot of freedom

12  in how to express --

13    Q.  Because you don't want to make false

14  statements to Coinmint's customers, did you respond

15  to this email to clarify that Coinmint had not made

16  a large commitment to purchase Bitcoin mining rigs

17  from a new manufacturer?

18    A.  No, I did not.

19    Q.  Did you ask Mr. Maloney to respond or tell

20  the customer that Coinmint had not made a large

21  commitment to purchase Bitcoin mining rigs from a

22  new manufacturer?

23    A.  No, I did not.

24    Q.  And that's because you knew, didn't you,

25  Exhibit 51, that contract, was a signed agreement

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  between Coinmint and Katena dated May 12th, 2021,

2  for the purchase of Bitcoin mining rigs, right?

3      A.  No.

4      Q.  If you could turn to Exhibit 77, please.

5          MR. TABER:  And Michelle, if you could

6  pull that up 77.

7  BY MR. TABER:

8      Q.  Let me know when that you have in front of

9  you.

10         MR. TABER:  Michelle, can you please

11  scroll down to the attachment.  Perfect.  A

12  little -- sorry, a little farther down.  A little

13  further down.  Sorry.

14  BY MR. TABER:

15     Q.  So we looked -- review Katena payment

16  plans, right --

17         MR. TABER:  Scroll up, sorry, Michelle.

18  BY MR. TABER:

19     Q.  Okay.  We looked at review Katena payment

20  plans, right, this is the agenda for that June

21  management meeting committee meeting we already

22  talked about, correct?

23     A.  Yes.

24     Q.  Okay.  And you testified about the

25  proposed plan below, right?

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1      A.   Yes.

2      Q.   But under romanette i right at the top, it

3   says (as read):

4           Initial plan is too costly

5        with delivery delays.

6        Right?

7      A.   Yes.

8      Q.   And that initial plan was for Coinmint to

9   pay $60 a terahash like we just looked at, right?

10          MR. LIU:  Objection.  Foundation.  Calls

11   for speculation.

12          ARBITRATOR CALLAHAN:  Well, he's asking

13   for his understanding.  That's how I understand the

14   question.

15          What was your understanding as to what the

16   initial plan was that's referenced as being quote,

17   unquote, too costly?

18          THE WITNESS:  I don't -- I don't recall

19   the discussion around that during the meeting.

20   BY MR. TABER:

21      Q.   So you recall there was a discussion of

22   this proposed plan, but no one talked about the

23   initial plan that's on the agenda.

24          THE WITNESS:  I don't recall about the

25   discussion of the initial plan being too costly with

**TRANSCRIPT OF PROCEEDINGS**

**September 19, 2023**

1  delivery delays.

2  BY MR. TABER:

3      Q.   And delivery delays kind of implies

4  there's a delivery schedule, right?  You have to

5  have something to be delayed from; wouldn't you

6  agree?

7      A.  I do.

8      Q.   You didn't talk about that initial

9  delivery schedule at the meeting?

10      A.   Which meeting?

11      Q.   At the June 9th or 10th management

12  committee meeting?

13      A.  I'm confused.

14      Q.  Sure.

15          Did you not talk about the delivery

16  schedule for the Katena miners at the June

17  management committee meeting?

18      A.  I must assume so.  I don't explicitly

19  recall.

20      Q.  But you don't --

21          ARBITRATOR CALLAHAN:  But that's the

22  question.  Do you recall as you sit here today?

23          THE WITNESS:  No.  No.  Thank you.

24  BY MR. TABER:

25      Q.   But you do see it on the agenda, right,

TRANSCRIPT OF PROCEEDINGS

1  sir?

2     A.  Yes.

3     Q.  Now, at the end of this meeting, Coinmint

4  had not agreed to a floating price contract with

5  Katena, right?

6     A.  I don't know.

7     Q.  In October -- late October, you were still

8  negotiating floating price with Katena, right?

9     A.  At the end of October, I was clarifying a

10  floating price model that was trying to explain this

11  chart that's shown here.

12     Q.  You said the October 20 -- October 2021

13  floating price model you worked on was sort of

14  different in some way from this one that Maloney put

15  together, right?

16     A.  I don't know exactly how it's different.

17     Q.  They're not exactly same?

18     A.  It's a different table.  I don't know how

19  this table here was produced.  So I don't know if

20  maybe he used the same way that I did to produce

21  this table.  This table lacks an important part of

22  information in this proposal, which is the earnings

23  per terahash are variable, and we don't know what

24  day we would use for this.  That's what my model was

25  trying to explain.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1    Q.   Understood, sir.

2         I'm going to ask you some questions now

3    about the period of June 2021.

4         Do you recall that, in June 2021, Coinmint

5    created a high-level investment overview for the

6    Massena facility?

7    A.   Yes.

8    Q.   Okay.  And the Massena facility is the

9    primary or largest Bitcoin mining facility that

10   Coinmint operates, right?

11   A.   Yes.

12   Q.   The purpose of that high-level investment

13   overview was to share it with the governor of New

14   York, right?

15   A.   Yes.  In a conversation they were planning

16   with her or her staff.

17   Q.   You wanted to share with the governor of

18   New York the significance the work that Coinmint was

19   doing in Massena, right?

20   A.   Yes.

21   Q.   And you wanted to highlight for the

22   governor of New York the potential for investment in

23   Massena, right?

24   A.   No, that's not how I would phrase it.  I

25   would phrase it as we wanted to highlight how much

TRANSCRIPT OF PROCEEDINGS

 1  money we would be looking to invest into our

 2  facility.

 3      Q.  You wanted to highlight, you'd agree, the

 4  potential that existed in a remote region in the

 5  very north of the state where Coinmint had an

 6  opportunity to invest, right?

 7      A.  Yes, that's how we worded it.

 8      Q.  Coinmint wanted its submission to the

 9  governor of New York to be true and accurate, right?

10      A.  Yes.

11      Q.  And you helped prepare that submission to

12  the governor of New York, right?

13      A.  Yes.

14      Q.  And you told the governor of New York that

15  Coinmint had purchased $150 million of mining

16  equipment in 2021, right?

17      A.  Not that I recall.

18      Q.  Let's take a look at the document.  It's

19  Exhibit 67, which would be in that same binder.

20          MR. TABER:  Michelle, if you could please

21  pull up 67.

22          ARBITRATOR CALLAHAN:  Exhibit 67?

23          MR. TABER:  67.

24          ARBITRATOR CALLAHAN:  Six seven.

25          MR. TABER:  I'll wait until you all have

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  it.

2         THE WITNESS:  This is where my German got

3  me.

4         MR. TABER:  We'll talk about your German

5  in a minute, sir.

6         First if you see --

7         THE WITNESS:  I'm not there yet.

8         MR. TABER:  I'm sorry.  I'm sorry.

9         THE WITNESS:  In German we say the numbers

10  the other way around, so I was looking at 76.

11         MR. TABER:  That will do it.

12         ARBITRATOR CALLAHAN:  67, what is 67?

13         MR. TABER:  Well, I'm about to ask him.

14         ARBITRATOR TURITZ:  It's not up on the

15  screen.

16         MR. ALFORD:  Bates number.

17         MR. TABER:  Michelle, if you could scroll

18  down.

19         ARBITRATOR CALLAHAN:  It's an email.

20         MR. TABER:  Yeah, it is an email, and it's

21  really we're going to be looking at this 10:38

22  email.

23         Michelle, if you'd scroll down a little

24  bit more.  Okay.  Stop.  Sorry.  Go up so you can

25  see the heading for that email.  Thanks.  And then

TRANSCRIPT OF PROCEEDINGS

1  we'll scroll down as we need to.

2  BY MR. TABER:

3      Q.  You see that this bottom email here, the

4  one that's at June 22nd at 10:38 is an email that

5  you sent to Jim DeNaut, Mike Maloney and Ashton,

6  correct?

7      A.  That is correct.

8      Q.  And the subject line is "Investment

9  overview Massena to 2024"?

10     A.  Mm-hmm.

11     Q.  You wrote (as read):

12          Please let me know your

13        thoughts on the high-level

14        investment overview for Massena

15        over the next four years.

16        Right?

17     A.  That's correct.

18     Q.  This overview contains projected

19  expenditures for the years 2022, 2023 and 2024,

20  right?

21     A.  An idea of what we could be spending money

22  on, that's correct.

23     Q.  But it also contains your actual

24  expenditures for the year 2021, right?

25     A.  I don't know.  Does it?  Where does it say

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  so?

2     Q.  Let's take a look.

3     A.  Please.

4     Q.  The first -- if you look at the second

5  page of that email --

6        MR. TABER:  Michelle, if you could scroll

7  down there to where it says HPC data center

8  infrastructure.

9  BY MR. TABER:

10    Q.  The HPC data center, that's the Massena

11  facility, right?

12    A.  Yes.

13    Q.  HPC means high performance computing?

14    A.  Yes.

15    Q.  See the first two lines are the 2021

16  infrastructure material and labor for a 40-megawatt

17  expansion, right?

18    A.  That's correct.

19    Q.  And as of June 22nd, 2021, Coinmint had

20  already decided to build out 40 megawatts of data

21  center capacity at Massena in 2021, right?

22    A.  I'm not sure we had already decided at

23  that time, but it's possible, yeah.

24    Q.  Okay.  Let's see --

25        (Simultaneous speakers - inaudible.)

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  BY MR. TABER:

2    Q.  -- we can refresh your recollection with

3  your deposition testimony.

4        You recall that, during your deposition,

5  you told me that you recall either during the May or

6  the June management committee meeting that you

7  decided to build out 40 megawatts of power?

8    A.  If you say so, yeah.  I -- yeah, that's

9  very likely, then.

10    Q.  Okay.  So then this 40-megawatt expansion

11  here, that's something that had already been decided

12  on by Coinmint for 2021, right?

13    A.  Yes.

14        MR. TABER:  Now let's look at "owned

15  mining equipment" a little farther down the page if

16  you want to scroll slightly, Michelle.

17  BY MR. TABER:

18    Q.  You see for 2022 -- sorry.  Let me walk

19  that back.

20        Does "owned mining equipment" refer to

21  buying Bitcoin mining rigs for Coinmint's use in

22  self-mining?

23    A.  Yes.  It can.

24    Q.  And for 2022, 2023 and 2024, you had a

25  projection of a possible investment in owned mining

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  equipment, right?

2    A.  Yes.

3    Q.  That's $125 million per each year?

4    A.  Um-hmm.

5    Q.  You told me that was a ballpark number,

6  right?

7    A.  Mm-hmm.

8    Q.  You didn't use a ballpark number for 2021,

9  did you?

10    A.  I don't know.  If I look at the price per

11  terahash and, you know, the amount of capacity, I

12  don't remember if it's a ballpark number.

13    Q.  Well, it doesn't say 125 million, does it?

14  It says 150 million, right?

15    A.  That's correct.

16    Q.  And that's the same amount as the Katena

17  purchase order we looked at, correct?

18    A.  It also says 150 million, that's correct.

19    Q.  You knew as of June 22nd, 2021, that

20  Coinmint had signed a purchase order with Katena

21  for $150 million, right?

22    A.  That is correct.

23    Q.  And you used that $150 million from the

24  Katena purchase order as the value for 2021 miner

25  purchases on the submission to the governor of New

1  York, correct?

2      A.   I -- I don't know if that's the reason.

3  What I can see is that I planned to purchase miners

4  for 75 megawatts and spend $150 million on them,

5  whereas if I recall correctly, the purchase order

6  was for 87 megawatts in Katena.

7          So, to me, it's just another ballpark

8  number that maybe it was influenced by some

9  information from the Katena deal, maybe not.  I

10  don't recall.

11     Q.   All right.  Well, let's refresh your

12  recollection with your deposition testimony.  It's a

13  little bit different from what you just said.

14         So let's turn to page 190 of your

15  transcript.

16         And I'm going to start reading at line 2.

17  (As read):

18             Question:  Sitting here

19         today --

20         Excuse me, it's line 3.  I apologize.  (As

21  read):

22             Question --

23     A.   One second, I'm not there yet.

24     Q.   Sorry, take your time.

25     A.   119?

TRANSCRIPT OF PROCEEDINGS

1    Q.   Mm-hmm.

2    A.   Line 23.

3         MR. ALFORD:  Line 3.

4         MR. TABER:  Line 3.

5         THE WITNESS:  Yes.

6  BY MR. TABER:

7    Q.   (As read):

8             Question:  Sitting here today,

9        are you aware that the purchase

10       order from Coinmint to Katena was

11       for $150,000,000 of mining

12       equipment?

13           Answer:  I'm aware that that's

14       a number that was on the purchase

15       order agreement, yeah.

16           Question:  And so is there any

17       connection between that

18       $150 million figure and the figure

19       that you put here at this 2021 row?

20           Objection.  Vague and

21       ambiguous.

22           Answer:  I -- I can assume

23       that we used that number as a --

24       you know, general idea, yeah.

25           Question:  What do you mean by

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1 used as a general idea?

2  Answer:  I mean, as we were

3 discussing an opportunity that

4 could potentially develop in the

5 future, we use that number to put

6 something in this table which was

7 intended to be a high-level

8 investment overview to share with

9 the governor of New York about the

10 amount of money that could be

11 invested in a facility in the

12 very -- at the very northern end of

13 his state in a depressed region.

14 Did I read that right?

15 A.   Yeah.  I agree.

16 Q.   So does that refresh your recollection

17 that you used the $150 million number from the

18 signed Katena Coinmint purchase order as the value

19 for the planned 2021 miner purchases in this

20 submission to the governor of New York?

21 MR. LIU:  Mischaracterizes his testimony.

22 ARBITRATOR CALLAHAN:  Hold on.  He's

23 asking if it refreshes his recollection, and then he

24 makes a statement.  So listen carefully,

25 Mr. Guiol --

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          THE WITNESS:  Guiol.

2          ARBITRATOR CALLAHAN:  -- as to whether or

3   not that's your recollection.

4          THE WITNESS:  You know, I see that this is

5   what it said in the testimony.  This happened three

6   years ago; three, two years ago.  You know, this is

7   what I testified.

8          So I guess, you know, this is what I said

9   at that time.  I don't remember exactly.  It's very

10   likely that -- you know, that we used that number

11   because we had knowledge of it.

12  BY MR. TABER:

13     Q.   If could you turn back to page 67-1, it's

14   the first page of Exhibit 67.

15          MR. TABER:  Michelle, if you could scroll

16   up to the top.

17          THE WITNESS: 67-1.

18  BY MR. TABER:

19     Q.   Do you see --

20          MR. TABER:  Sorry, scroll down a little

21   bit, please.

22  BY MR. TABER:

23     Q.   Do you see that at 11:59 you wrote another

24   email that says (as read):

25          Jim, I got feedback from

1      Ashton and Mike and will proceed

2      between 1:00 and 2:00 p.m. unless I

3      hear from you.  I'll be increasing

4      estimated FTE salaries as per Mike.

5      Rest is accepted.

6      Did I read that right?

7    A.   Mm-hmm.

8    Q.   You got feedback as to the governor of New

9   York from Ashton Soniat, right?

10     A.   And Mike Maloney, yes.

11     Q.   And Ashton Soniat signed off on it, right?

12     A.   I -- I must assume so.  I don't recall

13   exactly, but that's what it states here, yes.

14     Q.   Both of you decided to provide

15   this $150 million number to the governor of New

16   York, right?

17     A.   That's what -- that's what it looks like,

18   yes.

19     Q.   That's because both of you, as you said,

20   knew about this $150 million number, right?

21     A.   I see he knew about a $150 million

22   investment, yeah.

23     Q.   You testified, right, that part of your

24   job responsibility in 2021 was planning the

25   build-out of the facility?  Right?

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1     A.  Mm-hmm.

2     Q.  If Coinmint received new mining rigs, it

3  would need infrastructure to plug them into, right?

4     A.  Can you repeat that?

5     Q.  Sure.

6        If Coinmint received new mining rigs, it

7  would need infrastructure to plug the rigs into,

8  right?

9     A.  Correct.

10     Q.  You told us about some of them.  You

11  talked about internet and power.  And you'd need

12  physical racks to hold the machines, right?

13     A.  That's correct.

14     Q.  You'd need wiring to connect them to the

15  power supply?

16     A.  Yes.

17     Q.  And you'd need, I guess, some kind of

18  cable to connect it to the internet.  I assume it's

19  not all Wi-Fi, but you tell me.

20     A.  We wish.

21     Q.  You need cables for that too, right?

22     A.  (Nods head.)

23     Q.  You need to make sure, obviously, you have

24  enough electricity to power all the mining rigs at

25  the facility, right?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1      A.   Correct.

2      Q.   You wouldn't want a blackout for some of

3  your customers, that's not good for business?

4      A.   Excuse me?

5      Q.   You wouldn't want a blackout for some of

6  your customers, you want to make sure you have

7  enough electricity to supply everyone whose got

8  machines at the facility, right?

9      A.   Yes.

10     Q.   Yeah.

11          So I think you've already testified to

12  this.  You couldn't plan a build-out without some

13  information about the new mining rigs, right?

14     A.   I -- like I said earlier, I could plan

15  one, but it would have to have a large degree of

16  variance to accommodate any possible rig.

17     Q.   You would need to know the quantity of

18  machines that Coinmint would be receiving to plan

19  the build-out for those machines, right?

20     A.   It would be more relevant for me to know

21  the footprint and consumption of the machine.

22     Q.   You'd need to know the power usage in

23  watts, right?

24     A.   Yes.

25     Q.   And you need to know the delivery

TRANSCRIPT OF PROCEEDINGS

1   schedule, when they're going to show up at your

2   door, right?

3       A.   To a point, because those schedules are

4   very volatile.  They change all the time, and you

5   try to, you know, not place your eggs in just one

6   basket.

7       Q.   Let's take another look at Exhibit 84,

8   which Mr. Liu asked you about.

9          MR. TABER:  Michelle, can you pull up

10  Exhibit 84.

11  BY MR. TABER:

12      Q.   When Mr. Soniat wrote in this email to you

13  that Norbert is planning to build-out and needs the

14  specs, did you write back to him and say that you

15  weren't planning a build-out?

16      A.   No.

17      Q.   Did you write back to him and say you

18  didn't need the specs?

19      A.   No.

20      Q.   Did you reply to this email and say you

21  couldn't plan the build-out until Coinmint had made

22  a commitment to purchase a specific quantity of

23  Bitcoin miners for delivery on a specific schedule?

24      A.   No.

25      Q.   Did you ask Mr. Soniat why he was jumping

TRANSCRIPT OF PROCEEDINGS

1   the gun on planning the build-out before there was a

2   signed agreement?

3       A.   I wasn't aware that Mr. Soniat was

4   planning to build out.

5       Q.   Well, Mr. Soniat said that you were

6   planning the build-out and needed the stats on the

7   Katena machines, right?

8       A.   That's correct.

9       Q.   And you didn't ask him why he was jumping

10  the gun on planning for something where he didn't

11  know what the specs were, what was going to come in,

12  when it was going to come in, right?

13      A.   I see him asking -- or I see him saying

14  that I am planning the build-out, not him planning

15  the build-out.  Sorry.

16      Q.   Okay.  So let's -- let's be precise, you

17  are an engineer.

18      A.   I am German.

19      Q.   You are German.  Fair.

20          So did you reply to this email and say,

21  you know, I don't think I should be planning the

22  build-out, that's premature because we don't have a

23  signed agreement yet and there's information I need

24  that I don't have?

25      A.   No, I didn't see any need to do that.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    Q.   You didn't say any of that to Mr. Soniat

2   because you knew that Coinmint had already signed an

3   agreement to purchase $150 million of K10 miners for

4   delivery starting at the end of 2021, right?

5    A.   No.  That's not correct.  I didn't say any

6   of that because we've made the decision to build out

7   the facility after China banned mining and half the

8   mining rigs in the world were going to be looking

9   for space soon, and we'd made a decision to build no

10   matter what information we had to accommodate rigs

11   that were going to flood the market.

12    Q.   And you specifically needed the Katena

13   specs in order to plan for all those other

14   non-Katena machines, right?

15    A.   I never asked for those specs.  It's

16   Mr. Soniat that asked for them.

17    Q.   You testified to this already.  As COO of

18   Coinmint, your responsibilities include overseeing

19   customer contracts, right?

20    A.   That's correct.

21    Q.   As part of that job, you check Coinmint is

22   complying with its obligations under customer

23   contracts, right?

24    A.   Yes.

25    Q.   And to do that, you have to read the terms

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   of the contract, right?

2       A.   Yes.

3       Q.   To do that, you also have to interpret the

4   terms of the contract, right?

5       A.   Yes.

6       Q.   It's fair to say you've reviewed dozens of

7   contracts in your time as COO of Coinmint?

8       A.   No.

9       Q.   More or less?

10      A.   I think in all, we've had ten customers so

11  far, maybe nine.

12      Q.   Those ten -- those ten contracts you're

13  responsible for.

14           You've never reviewed an oral contract

15  that Coinmint entered into, right?

16      A.   At the beginning of my time at Coinmint,

17  there were a lot of annoying oral agreements that

18  Prieur Leary had made.  But no, other than that, no.

19      Q.   You're not aware of any oral co-location

20  agreement that Coinmint ever entered -- let me start

21  over.

22           You're not aware of any oral co-location

23  agreement that Coinmint ever entered into with a

24  customer, right?

25      A.   Solely oral, no.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    Q.   And you're not aware of any oral agreement

2  that Coinmint ever entered into to buy Bitcoin

3  mining rigs, right?

4    A.   No.

5    Q.   You testified that Mr. Maloney did not ask

6  you to do any due diligence on the Katena deal,

7  right?

8    A.   Mm-hmm.

9    Q.   I just want to ask you a few questions

10  about the time before May 13th, 2021.

11         You didn't speak to anyone at Katena on or

12  before May 13th, 2021, right?

13    A.   No.

14    Q.   You didn't review any documents that

15  Katena sent to Coinmint on or before May 13th,

16  2021?

17    A.   Not that I recall, no.

18    Q.   You didn't conduct any of your own due

19  diligence, whether or not Mr. Maloney asked you to,

20  into Katena on or before May 13th, 2021?

21    A.   I wasn't aware of the company Katena.

22    Q.   Now, you testified that you're an

23  experienced software programmer, right?

24    A.   Correct.

25    Q.   You're responsible for the maintenance and

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1    upkeep of a complicated digital currency data

2    center, right?

3        A.   I would say of a digital currency data

4    center.  You know, I don't know if it's complicated,

5    but ...

6        Q.   Okay.  You have considerable experience

7    with the operation of Bitcoin mining computers that

8    are produced by different manufacturers, right?

9        A.   I think so, yeah.

10       Q.   Among the members of Coinmint's management

11   team in May 2021, you had the most experience of

12   anyone involving the maintenance and operation of

13   Bitcoin mining computers, right?

14       A.   Potentially, yes.

15       Q.   But you didn't review any technical due

16   diligence report on the Katena K10 miner on or

17   before May 13th, 2021, right?

18       A.   I wasn't asked, and as I know today, there

19   wasn't any available.

20       Q.   Right.

21          Mr. Soniat didn't ask you to review any

22   technical due diligence report on the K10, did he?

23       A.   No.

24       Q.   You have never spoken with Coinmint's

25   technical due diligence expert Robert Bleck, have

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  you?

2      A.  I have not.

3      Q.  Other than with counsel, you never

4  discussed Mr. Bleck's due diligence report with

5  anyone at Coinmint, right?

6      A.  I don't recall discussing it with

7  everybody.  I recall receiving a slide deck that I

8  felt I was underqualified to review and I put in the

9  request or anything -- yeah.  No.

10      Q.  Well, you received that after your

11  deposition, right, 'cause at your deposition you

12  told me you had never read the Bleck report,

13  correct?

14      A.  I said I don't recall, but it's possible

15  that -- that I've received it.  I don't recall

16  looking at it.  I feel I wasn't qualified for doing

17  it.

18      Q.  Sitting here today, you're not aware of

19  anything false or misleading in that Bleck report,

20  are you?

21      A.  I'm not aware of it in that sense of -- I

22  haven't paid any attention.

23      Q.  You personally did not I --

24      A.  It's not something that jumps in my mind

25  that I looked at.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    Q.   Sorry.  Didn't mean to cut you off.

2         You personally did not conduct or review

3    any technically due diligence on Katena's K10 miner

4    at any time prior to the commencement of this

5    arbitration, correct?

6    A.   No.  Or yes, correct, did not.

7    Q.   You were involved in the logistics of

8    making some payments to Katena, right?

9    A.   Yes, that's correct.

10        Q.   And you've testified you're aware that

11   Coinmint made millions of dollars in payments to

12   Katena in 2021, correct?

13   A.   If you say so.  I don't know if I said

14   millions of dollars, but yeah, we've paid --

15        Q.   I think you testified to 23 million, but

16   it's -- we'll move on.

17   A.   Okay.

18   Q.   I'll withdraw that.

19        Now, you testified also that it was your

20   understanding the reason Coinmint was making all

21   these millions of dollars of payments was to keep

22   Coinmint's place in line so it could maybe buy

23   Bitcoin mining rigs in the future, right?

24   A.   Yes, that's correct.

25   Q.   To your knowledge, Coinmint has never made

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  payments to any other seller of Bitcoin mining rigs

2  just to keep its place in line to possibly buy

3  Bitcoin mining rigs in the future, right?

4      A.  It is the only time that I was involved in

5  such a process, so I don't know if we did prior.

6      Q.  Okay.  You have an employment agreement

7  with NCCS, right?

8      A.  Yes.

9      Q.  You don't work directly for Coinmint LLC?

10     A.  No.

11      Q.  But as part of your employment agreement

12  with NCCS, you'll get compensated if there's a sale

13  of Coinmint or if the company goes public, right?

14      MR. LIU:  Objecting.  Privacy,

15  compensation.

16      ARBITRATOR CALLAHAN:  Sustained.

17      MR. TABER:  This goes to -- it's

18  impeachment evidence that goes to the -- his bias in

19  testimony.  He's got a stake in the company -- or

20  I'd like to show that through the testimony.

21      ARBITRATOR CALLAHAN:  Just ask him, do you

22  have a stake in the company?  We don't need to go

23  beyond that.

24      MR. TABER:  Well, I --

25      ARBITRATOR CALLAHAN:  What's the

TRANSCRIPT OF PROCEEDINGS

1  relevance, Mr. Taber?

2       MR. TABER:  The relevance, again, is that

3  he's got a personal financial interest in how this

4  litigation goes, and I think the panel should be

5  aware of it.

6       MR. ALFORD:  Can we ask all the Katena

7  folks about their compensation --

8       ARBITRATOR CALLAHAN:  Yeah.  I think

9  that's a little far afield.  I'm not persuaded that

10  that's particularly helpful to the panel or is the

11  type of thing that would really sway the panel's

12  determination of credibility.  I think we understand

13  that both companies are closely held.

14       MR. TABER:  Okay.  I will move on, then.

15       ARBITRATOR CALLAHAN:  You have about ten

16  more minutes.

17       MR. TABER:  Yeah.  Yeah.

18       (Discussion held off record.)

19       MR. TABER:  Let's take a look at

20  Exhibit 1124 quickly.

21       ARBITRATOR TURITZ:  That's off the record.

22       MR. TABER:  Michelle, can you pull that

23  up.  That will be in a different binder, 1124.

24       Michelle, you got that?

25       THE WITNESS:  Thank you.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  BY MR. TABER:

2      Q.   Do you need me to repeat?  It's 1124.

3      A.   That's what I see here, yes.

4      Q.   There we go.  All right.  So we'll stay at

5  the top for now.  Then we'll scroll down.

6          Do you have the document in front of you,

7  sir?

8      A.   Mm-hmm.

9      Q.   This is an email thread between you, Frank

10  Kinney, Jim DeNaut, Ashton Soniat and John Tomczak,

11  correct?

12     A.   That's correct.

13     Q.   The subject line is (as read):

14             RE emailing Katena/Coinmint

15             PO, May 2021 final.docx.

16             Correct?

17     A.   Yes.

18     Q.   This is an email chain about the May 2021

19  Katena/Coinmint purchase order, right?

20     A.   Yes.

21     Q.   It's sent on October 15th, sometime in

22  the morning, right, depending on time zones?  Yeah?

23     A.   Yeah.

24         MR. TABER:  If you could scroll down,

25  Michelle, to the 11:28 email.  Show all of that.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1   Okay.

2   BY MR. TABER:

3       Q.   So this email is from John Tomczak.  And

4   do you see the sentence that's right above the three

5   dashes?  Do you see he wrote (as read):

6               Here is a timeline I made

7           digesting our PMT obligations and

8           theirs for delivery.

9           Fair to say PMT is payment?

10      A.   Mm-hmm, yes, I see that.

11      Q.   Okay.  Read the -- Mr. Tomczak consulted

12  you in preparing this timeline, right?

13          MR. LIU:  Objection.  Foundation.

14          MR. TABER:  Well, I'm laying that

15  foundation right now.

16          ARBITRATOR CALLAHAN:  Well, the foundation

17  is that he's on the email.

18          THE WITNESS:  May I say something?

19          ARBITRATOR CALLAHAN:  No.  No.

20          MR. TABER:  There's a question.

21          ARBITRATOR CALLAHAN:  Please wait for

22  questions, sir.

23          THE WITNESS:  Okay.

24  BY MR. TABER:

25      Q.   Mr. Tomczak consulted you when he was

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  preparing this timeline, correct?

2      A.  I don't know.  Was he?

3      Q.   Well, let's read -- maybe this will

4  refresh your recollection.  In the paragraph right

5  above the sentence we just read, it says (as read):

6              Another note.  Payment two's

7          timing is tied to Katena's deliver

8          of working unit.  I quickly called

9          Norbert.  We both interpreted that

10          to mean a test unit, and he is not

11          in receipt or even aware of the

12          timing of that.

13          Does that refresh your recollection as to

14  whether or not Mr. Tomczak consulted you in

15  preparing this?

16      A.  I don't remember the call.  It says here

17  that he's consulted me.  I trust that that's true

18  yeah --

19          (Simultaneous speaking - inaudible.)

20  BY MR. TABER:

21      Q.   But you don't --

22      A.  -- possible.

23      Q.   -- you don't remember talking to him on

24  the phone about the Katena purchase order?

25      A.   It's, you know, nearly two years ago.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    Q.   Okay.

2    A.   I don't.

3    Q.   That's fine.

4    A.   But it's very likely that we did.  I'll

5  just say that, yeah.

6    Q.   Below the three dashes, Mr. Tomczak

7  summarized Coinmint's payment obligations and

8  Katena's delivery obligations, right?

9    A.   That's what it looks like to me, yes.

10    Q.   It says signed 5/12/2021, right?  That's

11  the date on the purchase order we just looked at.

12    A.   I agree.

13    Q.   And then under the timeline, the first

14  date is May 15th, 2021.  It says "payment one

15  due," right?

16    A.   Correct.

17    Q.   You understood, when you read this, that

18  Mr. Tomczak was saying that under the signed

19  Katena/Coinmint purchase order, Coinmint had an

20  obligation to pay Katena $37.5 million on

21  May 15th, 2021, right?

22    A.   At this time, this is what I understand,

23  yes.

24    Q.   And then let's look at 12/29/2021,

25  delivery one, 200 petahash per second, right?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1      You see that?

2    A.  I do.

3    Q.  So that's one of Katena's delivery

4  obligations to Coinmint, right?

5    A.  Yes.

6    Q.  So as you and Mr. Tomczak understood it,

7  the signed Katena/Coinmint PO imposed payment

8  obligations on Coinmint and delivery obligations on

9  Katena, correct?

10    A.  Can you repeat that?

11    Q.  Sure.

12      It was your understanding at the time that

13  the signed Katena/Coinmint purchase order that you

14  were all looking at imposed payment obligations on

15  Coinmint and imposed delivery obligations on Katena,

16  right?

17    A.  Yes.

18    Q.  You testified you had a lot of experience

19  reviewing contracts and interpreting their terms,

20  right?

21    A.  Mm-hmm.

22    Q.  And it's also your testimony, looking at

23  the purchase order, that you can't tell if that's a

24  contract or not?

25    A.  I think -- no.  I think that's, you

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  know -- we consult our lawyers all the time about,

2  you know, documents that look like contracts, but,

3  you know, I'm always surprised what they make out of

4  it.

5     Q.  Okay.  You can set that aside.

6        Two more questions quickly.

7        MR. TABER:  First, if you could --

8  Michelle, if you could get Exhibit 80 ready, and I'm

9  going to ask about something else while we're

10  getting that ready.

11  BY MR. TABER:

12     Q.  Just very briefly, it's unrelated to the

13  document I just have asked her to pull out on the

14  fly.

15        Right.  In 2021, did you ever use text

16  messages on your phone for work-related

17  communications?

18     A.  Probably, yes.

19     Q.  In 2021, did you ever use WhatsApp on your

20  phone for work-related communications?

21     A.  Possibly, yeah.

22     Q.  Well, did you or did you not?

23     A.  I -- I probably did, yes.

24     Q.  You're not sure?

25     A.  I did.

TRANSCRIPT OF PROCEEDINGS

1    Q.   Okay.  In 2021, did you ever use Telegram

2   on your phone for work-related communications?

3    A.   Yes.

4    Q.   In 2021, did you ever use Signal on your

5   phone for work-related communications?

6    A.   That, I know I started using Signal at

7   some time.  I can't tell you if that was in 2021.

8    Q.   Since June 2022, your cell phone has not

9   been forensically collected by anyone for any

10  purpose, right?

11       MR. LIU:  Objection.  We're getting into

12  these discovery issues I think the panel ruled we're

13  not going to discuss.

14       ARBITRATOR CALLAHAN:  What's the relevance

15  of this, Mr. Taber?

16       MR. TABER:  Well, I'm establishing

17  evidence that, even though he used WhatsApp and text

18  messages for work, even though he was requested as

19  custodian, those documents weren't collected.

20       ARBITRATOR CALLAHAN:  But the time to

21  raise those issues is passed.

22       MR. TABER:  Respectfully, we're not aware

23  of the deficient collection prior to the discovery

24  cutoff because of his deposition being delayed,

25  but -- and I still think the --

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1           ARBITRATOR CALLAHAN:  Well --

2           MR. TABER:  -- we have the ability to seek

3   discovery sanctions in the form of adverse

4   inferences, et cetera.  We're not trying to reopen

5   discovery.

6           MR. LIU:  The deposition was --

7           THE REPORTER:  I didn't hear you.

8           MR. LIU:  I was just saying the deposition

9   was three months ago.

10          ARBITRATOR CALLAHAN:  Well, I'm not

11   persuaded.

12          ARBITRATOR TURITZ:  Well, I think that --

13   are you saying that his deposition was after the

14   discovery cutoff in April?

15          MR. TABER:  It was, by agreement of the

16   parties.  Due to his unavailability he had, I think,

17   COVID which is completely -- I mean, we all

18   rescheduled things, it was fine.

19          THE WITNESS:  It was much worse than

20   COVID.

21          THE REPORTER:  I'm sorry.  I didn't hear

22   you.

23          MR. ALFORD:  It was much worse than COVID

24   he said.

25          THE WITNESS:  Much worse than COVID.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          (Simultaneous speaking - inaudible.)

2          ARBITRATOR CALLAHAN:  When was it taken?

3          MR. TABER:  It was taken in -- what's the

4   date on here?  June.

5          ARBITRATOR CALLAHAN:  Okay.

6          ARBITRATOR TURITZ:  All right.

7          ARBITRATOR CALLAHAN:  We're in September.

8          ARBITRATOR TURITZ:  If there was a problem

9   that arose out of the deposition where you learned

10   that he used these various messaging services and

11   they weren't -- his texts and other messages were

12   not collected, you should have asked us to -- I

13   mean, you could have done a Redfern, submitted it to

14   us months ago.  So I don't think -- I don't think at

15   least --

16          ARBITRATOR CALLAHAN:  I don't either.

17          ARBITRATOR TURITZ:  -- it's appropriate

18   for us to reopen, you know, some kind of sanction.

19   I don't even know what adverse inference you would

20   try to ask us for.

21          Go ahead, Mr. Hardin.

22          MR. HARDIN:  Well, I think it also

23   dovetails into the filing denied.  I think there's a

24   series of issues that you see with the failure to

25   produce documents.  And I know the panel's response

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  has been bring it to a Redfern, but we have multiple

2  times.

3         And the panel has issued a variety of

4  orders.  And so while we appreciate that the

5  discovery period is now over, there's also the

6  reality that we have evidence of the failures to

7  comply.  And what we're trying to put is that into

8  evidence.

9         ARBITRATOR CALLAHAN:  But you didn't raise

10  the issue of the non-collection in a timely manner.

11  The other issues you've raised with the panel and

12  we've taken them under consideration.  And I think

13  we made orders.

14         And to the extent they haven't complied

15  with the orders, I think at least one instance

16  you've got a motion pending for sanctions.

17         MR. LIU:  Also these aren't company-issued

18  phones, so ...

19         ARBITRATOR CALLAHAN:  Well, I'm not taking

20  the substance of a consideration, Mr. Liu.  We're

21  dealing with, why are we going here.

22         So I'm not persuaded, but, you know, I am

23  interested in moving along.

24         Ms. Turitz.

25         ARBITRATOR TURITZ:  I don't -- I don't

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  think it's --

2          ARBITRATOR CALLAHAN:  I agree.

3          ARBITRATOR TURITZ:  I don't think it's

4  that material, and I think that the time has passed.

5          ARBITRATOR CALLAHAN:  Okay.  So we're kind

6  of deliberating in front of you.

7          MR. ALFORD:  The sausage is made, we're

8  seeing how the sausage is made.

9          ARBITRATOR CALLAHAN:  You're seeing how

10  the sausage is made.

11          ARBITRATOR TURITZ:  Like any sausage

12  factory.

13          MR. ALFORD:  It's not so bad.  It's pretty

14  clean.  I didn't see any fingers go into --

15          ARBITRATOR CALLAHAN:  Yeah.  So let's --

16          MR. TABER:  A couple more questions on one

17  document that was asked about on direct and that

18  will be that, if that's all right.

19          ARBITRATOR CALLAHAN:  Go ahead.

20          MR. TABER:  Michelle, if you could pull up

21  Exhibit 80.

22          And if you, Mr. Hardin --

23          THE WITNESS:  I can look over here.

24  BY MR. TABER:

25      Q.  That's fine.  We've talked about this

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  document before.

2         My question is really this:  This is an

3  October 14th, 2021 email.  And the first sentence

4  is (as read):

5              It seems the easiest path to

6           keeping the Katena order whole is

7           doing a hybrid deal with a party

8           that is already cohosting with us.

9         And I think it was your testimony that, as

10  of this time, you did not think there was any Katena

11  order, right?

12     A.  I don't understand the question.

13     Q.  Sure.

14         Isn't it your testimony that as of

15  October 14th, you were not aware of any contract

16  with Katena to buy mining rigs?

17     A.  Yeah.  I wasn't aware of a contract, yeah.

18     Q.  So my question is, when you read

19  Mr. Soniat say, the easiest path to keeping the

20  Katena order whole, what did you think he meant by

21  the "Katena order"?

22     A.  I think he meant this whole intention of

23  us buying these machines from Katena.  You know, the

24  opportunity of procuring these machines that Katena

25  supposedly was going to build, which he refers to as

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  an order.

2    Q.   You had to keep your intention whole by

3  doing a deal; is that right?

4    A.   I think it's our place in line to receive

5  the machines according to the delivery schedule that

6  they proposed.

7       MR. TABER:  Can I have 30 seconds to

8  confer?

9       ARBITRATOR CALLAHAN:  Okay.

10       MR. TABER:  We have nothing further for

11  Mr. Guiol.

12       Thank you.

13       MR. LIU:  Are we allowed to do a short

14  redirect?

15       ARBITRATOR CALLAHAN:  Well, on what?  If

16  you're just going to reask questions you already

17  asked, no.  'Cause we already heard the questions

18  and the answers.  We don't need to go over it again.

19  If there's something new --

20       ARBITRATOR TURITZ:  Well, if there's

21  something new, something brought up.

22       ARBITRATOR CALLAHAN:  Something new or

23  something that relates to something that he said on

24  cross.  But not to go over the questions already

25  asked.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1        MR. LIU:  Yeah, it's just to go over

2   things on cross that came up on cross.  Does that

3   constitute new?  It would be new on my end.

4        ARBITRATOR CALLAHAN:  As long as it's new

5   and we're going to limit it to, like -- it's 3:43,

6   15 minutes.

7        ARBITRATOR TURITZ:  Before you do that, I

8   just have one question.

9        MR. ALFORD:  Please.

10        ARBITRATOR TURITZ:  Can you tell me who

11   John Tomczak is or what his role is in the company?

12   I know he has an NCCS email address.  So he's part

13   of your organization.

14        THE WITNESS:  Correct.  He's one of our

15   employees, and he works as a financial analyst and

16   treasurer.

17        ARBITRATOR TURITZ:  Thank you.

18        ARBITRATOR CALLAHAN:  Go ahead.

19        THE WITNESS:  Okay.

20            REDIRECT EXAMINATION

21   BY MR. LIU:

22        Q.   Mr. Guiol, so during Mr. Taber's

23   questioning, he asked you about this May 2021

24   meeting and information that Mr. Maloney shared with

25   you.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1        Do you recall that?

2        A.  I recall him asking me, yes.

3        Q.   Now, during this May 2021 conversation

4   that you had with Mr. Maloney, did Mr. Maloney share

5   with you any pricing information concerning these

6   Katena machines that you guys were considering?

7        A.   Not that I recall.

8        MR. LIU:  Okay.  And, Ted, can you pull up

9   Exhibit 53, please.

10        Ted, if you can scroll down to the last --

11   the bottom email.

12   BY MR. LIU:

13        Q.   In this email, Mr. McRae writes to you

14   (as read):

15             Norbert, just looping you back

16             in, you mentioned that you may want

17             to discuss an equipment deal that

18             you're looking at.

19             What do you take that last phrase, "you're

20   looking at," what do you interpret that to mean?

21        A.   So during the meeting, I asked Kevin to

22   remind me about this intention that Maloney

23   mentioned.  And it meant, you know, this opportunity

24   that Mike Maloney had referred to in the May

25   meeting.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    Q.   Now, this opportunity that you're

2  referring to, you didn't interpret that to mean that

3  there was already a signed contract; is that right?

4    A.  No.  No.

5        MR. LIU:  Ted, if you could scroll up to

6  the top email from Mr. Maloney.

7  BY MR. LIU:

8    Q.   In Mr. Maloney's email to you he writes --

9  or Mr. Maloney's email to Mr. McRae copied to you

10  he writes (as read):

11           Norbert forwarded me the

12           message below.  We are looking at a

13           new manufacturer with a 90

14           terahash.

15           I'll leave out the rest of the part.  But

16  what do you interpret Mr. Maloney's email where he

17  says "we are looking at a new manufacturer," what do

18  you interpret that to mean?

19    A.  That he's referring to this opportunity,

20  Katena, we're looking at somebody who's offering a

21  machine that hasn't been manufactured before.

22    Q.   Did you interpret that to mean that there

23  was already a fully executed contract between

24  Coinmint and Katena?

25    A.  No.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          MR. LIU:  Yeah.  No further questions.

2          ARBITRATOR CALLAHAN:  All right.

3          ARBITRATOR GLICK:  I would like to ask a

4     question.

5          ARBITRATOR CALLAHAN:  Sure.  Go ahead.

6          ARBITRATOR GLICK:  What happened to the

7     solicitation with the governor of New York?

8          THE WITNESS:  So we spoke to her staff,

9     and essentially, not much afterwards.  You know, we

10    presented a little bit of our case and -- but that

11    was pretty much it.  I don't recall any --

12         ARBITRATOR GLICK:  When was that?  What

13    was the time frame?

14         THE WITNESS:  It was summer, summer of

15    2021.

16         ARBITRATOR GLICK:  Summer.

17         THE WITNESS:  June, July.  There was one

18    call with two or three of her people where we talked

19    about what we're doing, creating jobs and things

20    like that.

21         ARBITRATOR GLICK:  Okay.  Thank you.

22         ARBITRATOR CALLAHAN:  All right.  Anything

23    more, Ms. Turitz?

24         ARBITRATOR TURITZ:  I'm just really not

25    clear on what you were exactly asking the governor

TRANSCRIPT OF PROCEEDINGS

1  for.  Is it some kind of grant?

2         THE WITNESS:  Yeah.  If you think of it,

3  we -- so we were in a border town, the north fence

4  of the facility is Canada, essentially, really.  And

5  we've come there in 2018, 2017, we started.  And we

6  felt like we've never asked for anything.  We didn't

7  really know what we were asking for, but we see

8  other large companies, like, Alcoa, NIPE, et cetera,

9  that receive grants, support from the government,

10  and we thought we wanted to, you know, raise their

11  awareness that we're there and that we're making an

12  important contribution, you know, we're paying --

13         ARBITRATOR TURITZ:  To the economy.

14         THE WITNESS:  -- I think close

15  to $2 million in salaries, but hourly wages into the

16  region, and, you know, we were looking at doing this

17  build-out that meant like a $20 million expense just

18  for the electricity.  And I think -- I don't know.

19  Alcoa just for keeping a plant alive where -- which

20  isn't really needed, you know, they received a lot

21  of money.  We just wanted to get on the map so

22  people knew who we were.

23         ARBITRATOR TURITZ:  Was it a grant or some

24  kind of debt facility low-cost from the state or you

25  just were exploring what they might do for you?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1       THE WITNESS:  Yeah.  We weren't really

2   wanting to -- we didn't ask for anything; we just

3   wanted to become, you know, aware and begin a

4   conversation.

5       ARBITRATOR TURITZ:  Oh.

6       THE WITNESS:  Let me think about one thing

7   real quick.  When you said grant -- there was no

8   specific grant that we were applying for.  It was

9   also at a time -- now, this is what I recall.  It

10  was also at a time when New York State started

11  looking more into the crypto mining that was

12  happening in its state.

13      And there was one particular facility that

14  has used a former gas plant and was basically, by

15  doing their cryptocurrency mining, polluting the

16  air.  So it was creating a lot of bad press about

17  the industry that we were working in.  And we wanted

18  to make sure that we can describe ourselves as a

19  more legitimate business that was, you know, buying

20  electricity, like this building, and not running a

21  big gas turbine, and, you know, heating up a lake,

22  causing an algae to grow that made a whole town

23  smell like a fish factory.

24      So there was a lot of bad press about that

25  and we wanted to make sure that, you know, we say,

TRANSCRIPT OF PROCEEDINGS

1  hey, we do the same thing but we do it seriously.

2  We have nearly 100 employees.

3        ARBITRATOR TURITZ:  I see.

4        THE WITNESS:  It was really about that.

5        ARBITRATOR TURITZ:  Okay.  Thank you.

6        THE WITNESS:  Thank you for asking.

7        MR. ALFORD:  Can I just say, was the point

8  that it was green energy?  Is that the point?

9        THE WITNESS:  Yeah.  We learned a lot

10  about that during it.  We'd love for it to be and

11  it's hydro energy.  Unfortunately, we've learned

12  construction of a hydro dam is not very

13  environmentally friendly.  You know, you block a

14  river.  So hydro energy yet is not considered green,

15  it's considered renewable.

16        We wish.  It would be much nicer.

17        ARBITRATOR CALLAHAN:  All right.  Very

18  good.  All right.  Why don't we take a short

19  ten-minute break and then Mr. Foret.

20        MR. ALFORD:  I think so.

21        ARBITRATOR CALLAHAN:  Very good.

22        (Whereupon, a recess was taken from

23        3:50 p.m. to 4:19 p.m.)

24        ARBITRATOR CALLAHAN:  Sir.

25  / /

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1              RANDALL FORET,

2      called as a witness, having been duly sworn,

3              testified as follows:

4         ARBITRATOR CALLAHAN:  Thank you so much.

5         Go ahead, Mr. Liu.

6              DIRECT EXAMINATION

7   BY MR. LIU:

8      Q.   Mr. Foret, can you tell us generally what

9   was the status quo order that was in effect in May

10  of 2021?

11     A.   Yeah.  It was a procedure that Delaware

12  Chancellery Court puts in place.  It's very similar

13  to a preliminary injunction, is my understanding.

14  I'm not licensed in Delaware.  I think I practiced

15  there once on a pro hac vice.  I had cases there.

16          But my understanding is -- and then from

17  what went on over the course of a year, that it's

18  very similar in scope to a preliminary injunction,

19  but it's far more restrictive and it's used for the

20  court to essentially not necessarily take control of

21  a company like a receiver would, but to put in place

22  some controls over a company.  And that's what

23  happened in this case.

24     Q.   Now, what led to Coinmint being under the

25  status quo order?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1     A.   The -- in this particular case, it was

2   claimant filed a motion with the court to put in

3   place a status quo order.  We were the respondent in

4   the case and the claimant in this case was MintVest.

5     Q.   And what's the relationship between

6   MintVest and Coinmint?

7     A.   Well, let's set this up in time.  Are you

8   talking at the time that this was put in place?

9     Q.   Right.  At the outset, yes.

10     A.   Okay.  At the time that this was put in

11   place in, I believe it was May 2020, May 18th or

12   19th of 2020, the relationship of the parties were

13   Mr. Soniat, through his entity, Coinmint Living

14   Trust, was arguing that he was the majority owner

15   and owned, I believe it was, 82.8 percent, and that

16   Mr. Leary, through his entity, which is MintVest

17   owned 18.2 percent.

18     Mr. Leary's argument was at the hearts

19   were still 50/50 members.  And this is a limited

20   liability company, so the interests are held as

21   membership interest.

22     Q.   So is it fair to say that there was just a

23   dispute over the ownership interest between

24   Mr. Leary versus Mr. Soniat?

25     A.   That was the -- yes.  The underlying

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  reason for the lawsuit between the parties.

2        MR. LIU:  Ted, can you pull up Exhibit 44,

3  please.

4  BY MR. LIU:

5     Q.   And while Ted is pulling that up,

6  Mr. Foret, the implementation of the status quo

7  order, did that affect the ability for Coinmint to

8  enter into contracts?

9     A.   Yes.  It had some direct impact on the

10  ability to enter into certain types of agreements.

11        MR. LIU:  Ted, can you scroll down to

12  page 444 -- 44-4.

13        THE WITNESS:  You're using 44 -- mine's

14  numbered 1221-1.

15        MR. LIU:  Yeah.  It's not in that folder.

16  You may have to rely on the screen.

17         (Simultaneous speakers - inaudible.)

18        MR. ALFORD:  I can do it.

19        THE WITNESS:  Is the numbering at the

20  bottom still the same when you're saying 44-4?

21        MR. LIU:  44-4.

22        MR. ALFORD:  Do you want 44?

23  BY MR. LIU:

24     Q.   Do you see Section A, under paragraph 4

25  (as read):

TRANSCRIPT OF PROCEEDINGS

1              Engaging in, entering into or

2         agreeing to any transaction,

3         contract or agreement, the value

4         of which exceeds $20,000?

5         I'll give you a moment to get there.

6    A.   Yes.  Yeah, I didn't realize these were

7    double-sided.  Yeah, paragraph 4.  And you were

8    talking about what section, A and B?

9    Q.   Yeah.  Just Section A.

10   A.   Yeah.

11   Q.   So that's the section that governs whether

12   or not Coinmint could enter into certain contracts?

13   A.   Sure.  Subject to what is stated in

14   paragraph 4 above.

15   Q.   Now, Coinmint did want to enter into a

16   contract that exceeded $20,000 in value.

17        What was the process for doing that?

18   A.   Well, exactly what it says up here, we had

19   to provide written notice within five -- here it

20   says five days, not counting Saturday, Sundays or

21   legal holidays.  In other words, five business days.

22   We had to give the opposing party, the claimant,

23   through his attorney, his counsel, written notice,

24   which included, of course, generally an email, and

25   then a copy of the document or the agreement that we

1  were going to enter into.

2      Q.   So it sounds like the first step in that

3  process would be to obtain a copy of whatever

4  agreement that Coinmint was considering and

5  providing a copy to Mr. Leary's counsel; is that

6  fair?

7      A.   That's fair.

8      Q.   Who was aware -- who at Coinmint was aware

9  of that process to follow, for entering into

10  contracts?

11      A.   All of the senior management and at the

12  facility itself -- and when I say that, obviously,

13  Mr. Soniat would have been aware of it at the time,

14  Norbert Guiol would have been aware of it, Kathleen

15  Schneider, Mr. Maloney would have been aware of it.

16          My understanding is Mr. DeNaut was briefed

17  on it when he was brought into the company in his

18  role, as soon as he was brought into the company.

19          And then we notified some of the more

20  senior staff.  I think Mr. Guiol mentioned the

21  engineer that worked there, his name is Mike

22  Campbell, since he would have been one of the

23  individuals that we procure contracts.  So he and

24  his staff at the facility, certain of those

25  individuals would have been notified.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1      Q.   Okay.  Now, you did mention Mr. Maloney.

2   I want to focus a little bit on him.

3          When the status quo order was in effect,

4   did it appear to you, that Mr. Maloney was

5   knowledgeable about the process?

6          MR. HARDIN:  Objection.  Calls for

7   speculation.

8          ARBITRATOR CALLAHAN:  I think it's asking

9   for his understanding.  It appears to him.

10          Just your understanding, sir.

11          THE WITNESS:  Yes.  Definitely.

12   BY MR. LIU:

13      Q.   When the status quo order was in effect,

14   did you observe Mr. Maloney following the process?

15          MR. HARDIN:  Objection.  I asked -- this

16   one is what I'm talking about.  I asked as of May

17   2021, were you aware of anyone violating the status

18   quo order, which is the flip of what he's asking

19   now.  I also asked did anyone ever self-report a

20   violation of the status quo order.  We were shut

21   down on both of those.

22          So for him to now get up there and start

23   stating what -- whether he observed people following

24   the process when he would not answer the question at

25   deposition is fundamentally unfair.

1        MR. ALFORD:  I disagree.  The only

2   question is what his observations were, not his

3   mental impressions.  Whether someone violated the

4   order is a mental impression that requires an

5   analysis.  Whether he's simply observed Mr. Maloney

6   following the process, maybe that is a way to get at

7   the same point, that he -- he knew how to follow the

8   process that was in place in the company.

9        MR. HARDIN:  I'm -- what a fine line and

10  an impossible standard for Katena, because clearly

11  his observations are hand and glove with his

12  analysis.

13        ARBITRATOR CALLAHAN:  Okay.  Hold on.  Let

14  me make a note.  Here's what I'd like to do on the

15  question areas where there's this level of objection

16  and discourse.  I'd like to ask to kind of like we

17  do in a deposition, that that portion of this

18  transcript be marked in some way so that just that

19  could be provided to the panel on an expedited basis

20  so that we have it teed up the way it was asked and

21  the objections that were made.  Is that gonna work

22  for you folks?

23        MR. ALFORD:  I think so.

24        ARBITRATOR CALLAHAN:  That would save on

25  briefing.

TRANSCRIPT OF PROCEEDINGS

1          MR. HARDIN:  I guess I'm not -- what is

2    provided to the appropriate --

3          MR. ALFORD:  The transcript with just

4    marking these pages.

5          MR. HARDIN:  Flag it.  Fine.

6          ARBITRATOR CALLAHAN:  I don't want the

7    whole transcript on an expedite, but just these

8    pages --

9          MR. ALFORD:  That's fine.

10         ARBITRATOR CALLAHAN:  -- so the panel can

11   quickly have something to refer to to then tell you

12   what we need from you, if anything.

13         MR. ALFORD:  That's fine.

14         ARBITRATOR CALLAHAN:  To decide the issue.

15         THE REPORTER:  Can we go off the record?

16          (Discussion held off record from

17          4:29 p.m. to 4:39 p.m.)

18         ARBITRATOR CALLAHAN:  Go ahead.

19   BY MR. LIU:

20      Q.   Now, Mr. Foret, in light of the status quo

21   order, were there any internal processes in place to

22   follow for entering into contracts in 2021?

23      A.   Yes.  Essentially, we were mandated to

24   follow the status quo order, and we notified

25   employees and actually had -- well, I don't want to

TRANSCRIPT OF PROCEEDINGS

1   say what our counsel said, but we had an all sort of

2   hands -- all management hands-on deck meeting as to

3   what it meant and what we could and could not do.

4      Q.   All right.  Now, in May of 2021, just

5   generally speaking, did you generally observe

6   Mr. Maloney following that process?

7         MR. HARDIN:  Objection.  Same objection.

8         ARBITRATOR CALLAHAN:  Okay.  This one --

9   let us get this down.

10        ARBITRATOR TURITZ:  That's the exact same

11   question.

12        ARBITRATOR GLICK:  This is the question,

13   when the status quo order was in effect, did you

14   observe Mr. Maloney --

15        ARBITRATOR TURITZ:  Earlier you said when

16   the status quo order was in effect did you observe

17   Mr. Maloney following process.

18          (Simultaneous speakers - inaudible.)

19        MR. LIU:  Is there a way we should ask the

20   question?

21        ARBITRATOR CALLAHAN:  You've already asked

22   it.

23        ARBITRATOR TURITZ:  You've asked it.  Move

24   on.

25        ARBITRATOR CALLAHAN:  Move to another

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  topic.

2      ARBITRATOR GLICK:  That's the one I have

3  highlighted, it's your first question that's

4  objected to.

5      MR. ALFORD:  I do think we let Mr. Foret

6  talk about that in the depo, the process in place

7  internally, but --

8      ARBITRATOR TURITZ:  That was not the

9  question.

10      MR. HARDIN:  Right.

11      ARBITRATOR TURITZ:  His question was

12  specifically about observing Mr. Maloney, which is

13  the question that started this whole discussion five

14  minutes ago.

15      MR. ALFORD:  Okay.  I think you can talk

16  about the process.

17      MR. LIU:  Sounds like we can't ask if he

18  observed Mr. Maloney following that process?  We can

19  only ask about the process?

20      ARBITRATOR TURITZ:  That's right.

21      ARBITRATOR CALLAHAN:  You've already asked

22  him twice. It's been objected to.

23       (Simultaneous speakers - inaudible.)

24      MR. ALFORD:  Talk about the process, talk

25  about what Mr. Maloney did.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1      Sorry.

2      THE REPORTER:  No, it's okay, but --

3      ARBITRATOR TURITZ:  We're all talking at

4   once.  Sorry.

5      THE REPORTER:  -- I can't get it all on

6   the record if I can't hear it.

7   BY MR. LIU:

8      Q.  Mr. Foret, did you have an understanding

9   that Mr. Maloney generally understood the process

10  that was in place?

11      MR. HARDIN:  Objection.  Calls for

12  speculation.

13      ARBITRATOR CALLAHAN:  Okay.  This is

14  another one.

15      MR. ALFORD:  I think that was just

16  speculation.

17      ARBITRATOR GLICK:  That was speculation --

18  privilege.

19      ARBITRATOR CALLAHAN:  No, it has to do

20  with him not being instructed not to answer.

21      ARBITRATOR TURITZ:  Is that your

22  objection?

23      MR. ALFORD:  The objection was just

24  speculation.

25      MR. HARDIN:  It was just speculation but I

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  do think that the next -- the follow-up question is

2  going to lead us into that.  The question becomes

3  are we here to hear Mr. Foret's analysis or not?

4  Because we were precluded from that.

5       MR. ALFORD:  Just his observations.

6       MR. LIU:  Yeah, I mean, observations.

7       MR. ALFORD:  I don't think -- look, the

8  line we drew is we didn't allow Mr. Foret to give

9  his legal analysis or legal opinions, but we did let

10  him talk about what he observed.  If Mr. Hardin

11  wanted to ask that question in the depo, we let it

12  be answered.

13       ARBITRATOR TURITZ:  It has to do with the

14  status quo order.

15       MR. ALFORD:  Right.  We allowed questions

16  about the status quo order, just not Mr. Foret's

17  legal analysis or opinions about what it meant or

18  who violated it.

19       ARBITRATOR TURITZ:  The question that was

20  just asked, did you have an understanding that

21  Mr. Maloney generally understood the process that

22  was in place, which, to me, is basically the same as

23  observing whether he followed process.

24       ARBITRATOR CALLAHAN:  It's such a close

25  cousin.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          ARBITRATOR TURITZ:  You have to have an

2   understanding based on something which would be your

3   observation.  So I know you're trying to work around

4   the question, but it's not working.

5          MR. LIU:  Okay.  We'll move to a different

6   topic.

7          ARBITRATOR CALLAHAN:  And I join in that.

8   So do you, right?

9          ARBITRATOR GLICK:  Yes.  Yes.

10          ARBITRATOR CALLAHAN:  The panel is

11   unanimous.

12          ARBITRATOR TURITZ:  Sorry to usurp the

13   chair's prerogative.

14   BY MR. LIU:

15      Q.   Mr. Foret, did you attend the May 2021

16   management meeting in Puerto Rico?

17      A.   Not in person.

18      Q.   Did you attend remotely?

19      A.   Just a brief portion of it.

20      Q.   Okay.  How many days was that management

21   meeting?

22      A.   My understanding, it was from May 11th

23   through May 13th.

24      Q.   All right.  You mentioned that you only

25   attended a portion of it.  Can you tell us which

TRANSCRIPT OF PROCEEDINGS

1  portion of the management meeting you attended?

2      A.   I was asked to give a presentation as to

3  the status of ongoing litigation at the time with an

4  emphasis on the litigation pending in Delaware and a

5  sub -- and also related litigation that was ongoing

6  in Texas.

7      Q.   Okay.  What was the purpose of this

8  management meeting in May of 2021 in Puerto Rico?

9      A.   Management meetings were starting to be

10  held, at that time, on -- generally so that the

11  managers could get together and discuss the ongoing

12  business.

13          My understanding, too, was that Mr. DeNaut

14  was attending this so that he could observe the

15  company and start his role with the company.

16      Q.   At that point in time, was it your

17  understanding that Mr. DeNaut was the new CEO of

18  Coinmint?

19      A.   Yes, I think I found out during -- I was

20  notified during the management meeting by

21  Ms. Schneider.

22      Q.   Now, you've heard testimony in this

23  arbitration that Katena was discussed at some point

24  during this management meeting.

25          Do you recall that?

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1      A.   Not -- again, I had a -- maybe a half an

2   hour portion at the very beginning of the management

3   meeting, and I did it remotely via Teams and didn't

4   participate in any other portions of the management

5   meeting.  So it was obviously not discussed during

6   that segment.

7      Q.   Prior to the -- prior to May 13th, 2021,

8   did Mr. Maloney ever approach you and mention to you

9   that Coinmint was considering entering into a

10   contract to purchase Bitcoin mining machines from

11   Katena?

12      A.   It wasn't specifically Katena.  He

13   mentioned another entity.

14      Q.   Which other entity did he mention to you

15   in May of 2021?

16      A.   If I remember correctly, I think the name

17   of the entity was Blockware.

18      Q.   What did he tell you about Blockware?

19      A.   He didn't specifically tell me anything.

20   He notified me by sending me a copy of what I think

21   was called a proposal that Blockware had submitted,

22   which, of course, pursuant to the status quo order

23   and the process --

24        MR. HARDIN:  Objection.  Objection.  If

25   he's going to apply knowledge of the status quo

TRANSCRIPT OF PROCEEDINGS

1  order, that's going to be analysis.  And if they're

2  going to waive the privilege, it's inappropriate to

3  do it now.  Like, again, this is the problem with

4  the shield and the sword.

5       MR. ALFORD:  It's not a shield and sword.

6  He was simply going to explain what happened, not

7  give his analysis but facts he observed.  That's

8  all.  There was no objection in the deposition to

9  facts he observed about what happened.  No legal

10  analysis.

11       MR. HARDIN:  The last statement is

12  which -- the last statement, Madam Chair, is (as

13  read):

14           Which, of course, pursuant to

15           the status quo order, our

16           process ...

17       And so that's where I objected.

18       ARBITRATOR CALLAHAN:  All right.  Well,

19  that is the analysis.  That's the topic that I

20  understand is the sensitive topic.

21       MR. LIU:  I'm just going to ask him what

22  happened.

23       MR. HARDIN:  Well, I mean, but it should

24  be a bar on the testimony not a way to see if we

25  can --

1        ARBITRATOR CALLAHAN:  We haven't ruled

2   yet.

3        MR. HARDIN:  Right.  Until they -- but --

4   that's right, but the answer isn't going to come in

5   until the panel rules is the point, right?

6        ARBITRATOR CALLAHAN:  Well, that's fair.

7   I think, if we haven't made ourselves clear, let me

8   say it again.  Observations, understandings,

9   implementation of the status quo order, questions

10   that touch that are off limits till we can see these

11   depo questions and instructions not to answer, and

12   then the counter questions where you say the

13   questions and the topics were answered.

14        MR. ALFORD:  Okay.  Okay.

15        MR. LIU:  Sure.

16        ARBITRATOR CALLAHAN:  Otherwise we're

17   going to keep having the same -- it's the same copy.

18        MR. ALFORD:  Got it.

19   BY MR. LIU:

20   Q.   Mr. Foret, you mentioned that Mr. Maloney

21   had told you about this proposal from Blockware.

22   Did he share a copy of that Blockware proposal with

23   you?

24   A.   Yes.

25   Q.   Okay.  And what did you do in response?

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1      A.   Again, he shared a copy and I'm going to

2   short-circuit our argument here because it will

3   require me to mention the status quo order.

4      Q.   Okay.  Well, let's not go --

5          MR. HARDIN:  Thanks.

6          MR. LIU:  -- let's not go there.

7          ARBITRATOR GLICK:  He's self-regulating.

8          ARBITRATOR TURITZ:  May I just -- when did

9   he share a copy of the proposal with Blockware,

10   approximately?

11          THE WITNESS:  Yes, ma'am.  I believe it

12   was May 7th, 2021.

13          ARBITRATOR TURITZ:  May 7, 2021?

14          THE WITNESS:  Yes, ma'am.

15          ARBITRATOR TURITZ:  That's very specific.

16   Thank you.

17          MR. ALFORD:  There's a paper trail.

18          MR. LIU:  Ted, can you pull up

19   Exhibit 1200, please.

20          THE WITNESS:  Well, I was wrong.

21   BY MR. LIU:

22      Q.   Okay.  So, Mr. Foret --

23          ARBITRATOR CALLAHAN:  Is this a new one?

24          MR. LIU:  This is.

25          ARBITRATOR TURITZ:  You were wrong about

TRANSCRIPT OF PROCEEDINGS

1   the date?

2        ARBITRATOR CALLAHAN:  I do not have a 1200

3   on your exhibit list.

4        THE WITNESS:  Yes, I was wrong about the

5   date.

6        ARBITRATOR TURITZ:  May 5th.

7        THE WITNESS:  It was May 5th.

8        ARBITRATOR CALLAHAN:  I don't have a 1200.

9        MR. HARDIN:  It is new, however Coinmint

10  did provide it -- they provided it late, but it

11  provided it before for the last hearing.  We're not

12  complaining about that.

13       MR. LIU:  It was the first week.

14       MR. HARDIN:  Yes, ma'am.

15       MR. LIU:  It's was the first week.

16       MR. ALFORD:  But we need a copy for --

17       ARBITRATOR CALLAHAN:  When did we get it?

18       MR. LIU:  I think it was during the first

19  week, during the first week of testimony we provided

20  a copy of exhibits.

21       ARBITRATOR CALLAHAN:  Then I should have

22  it.

23       MR. LIU:  I'm happy to provide another

24  hard copy.

25       ARBITRATOR CALLAHAN:  No.  If it came --

 1  oh, I got it.  Is it this?  No.  This is 1220.

 2          MR. LIU:  It was before that, 1200.

 3          ARBITRATOR CALLAHAN:  Oh, I have it.

 4  Never mind.

 5          MR. LIU:  Okay.

 6          ARBITRATOR CALLAHAN:  All right.

 7          MR. ALFORD:  Great.  Thank you.

 8  BY MR. LIU:

 9     Q.   Okay.  So the question is, Mr. Foret, when

10  did Mr. Maloney provide you a copy of the Blockware

11  proposal?

12     A.   Well, I'll correct my answer.  I assumed

13  it was May 7th, but it was off by two days.  It

14  was May -- it appears it was May 5th of 2021.

15     Q.   Okay.  And then it looks like it was

16  copied -- it was sent from Mike -- Mr. Maloney to

17  Mr. Nachbar, Ms. Mullin, Elizabeth Mullin,

18  Randall Foret, and Ashton Soniat.

19          Do you see that?

20     A.   Yes.

21     Q.   Who is Kenneth Nachbar and Elizabeth

22  Mullin?

23     A.   Ken Nachbar and Elizabeth Mullin were the

24  two attorneys representing us in the litigation, the

25  in re Coinmint litigation in Delaware.  If the panel

TRANSCRIPT OF PROCEEDINGS

1  doesn't mind, if that litigation comes up, I'll just

2  refer to it to either the Delaware or the in re

3  Coinmint litigation.

4        ARBITRATOR CALLAHAN:  They're both the

5  same.

6        THE WITNESS:  Yes.  The in re Coinmint

7  litigation was pending in Delaware.

8        ARBITRATOR CALLAHAN:  Okay.  Understood.

9  BY MR. LIU:

10     Q.  Do you know if this proposal with

11  Blockware ever became a formal contract to purchase

12  Bitcoin mining rigs from Blockware?

13     A.  Not to my knowledge.

14     Q.  Do you have any knowledge as to why it

15  never became a contract with Blockware?

16        MR. HARDIN:  Objection to the extent this

17  gets us back into the status quo order.

18        ARBITRATOR CALLAHAN:  Is there any reason,

19  other than the status quo order why it didn't become

20  a purchase transaction?

21        THE WITNESS:  Yes.

22  BY MR. LIU:

23     Q.  And what is that reason?

24     A.  It didn't -- the deal just didn't go

25  through --

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1    Q.  Okay.

2    A.  -- for some reason.

3    Q.  Do you know what that reason was?

4    A.  No.

5        MR. LIU:  Ted, can you pull up

6  Exhibit 2033.

7  BY MR. LIU:

8    Q.  Now, Mr. Foret you weren't copied on this

9  email, but you were here during last week's -- or,

10  you know, the arbitration hearing in this proceeding

11  in the end of August and throughout this week; is

12  that right?

13    A.  Yes.

14    Q.  Do you recall ever seeing a copy of this

15  email prior to May 13, 2021?

16    A.  Prior to May 13th, 2021?

17    Q.  Correct.

18    A.  No.

19        MR. LIU:  Ted, if you can scroll down to

20  the redline.

21        MR. BROOKS:  Next page?

22        MR. LIU:  Yeah, to the -- right.

23  BY MR. LIU:

24    Q.  Mr. Foret, did you ever see a copy of

25  these redlines prior to November 13, 2021?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1      A.   To the best of my recollection, no.

2      Q.   Okay.  Have you seen a draft of this

3   document in any form prior to November -- prior to

4   May 13, 2021?

5          ARBITRATOR TURITZ:  First you said

6   November.

7          MR. LIU:  Yeah, I meant to say May.

8          ARBITRATOR TURITZ:  Okay.  So when you

9   asked did you ever see a copy of those redlines

10   prior to November 13 you meant to say May 13?

11          MR. LIU:  Correct, May 13, 2021.

12          ARBITRATOR GLICK:  I thought the top of

13   the -- I don't have it in front of me, said

14   May 8th.

15          MR. LIU:  Oh, yeah.  It's May 8th.

16   But -- yeah, May -- I guess it doesn't matter,

17   May 8th or May 13th.

18          ARBITRATOR TURITZ:  But you meant May 13

19   being the date that the contract was actually

20   signed?

21          MR. LIU:  Yeah.  I can reask it May 8th --

22          ARBITRATOR TURITZ:  That's the

23   importance --

24           (Simultaneous speakers - inaudible.)

25          ARBITRATOR TURITZ:  May 8th is the date

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  of email transmitting.

2       MR. LIU:  Right.  Yeah.  I think I should

3  reask that to --

4       ARBITRATOR TURITZ:  I think so.

5       MR. LIU:  -- so we have the correct -- so

6  it matches the date of the email.

7  BY MR. LIU:

8    Q.   Mr. Foret, have you seen a copy of this

9  sales and purchase agreement at any point prior to

10  May 8th, 2021?

11    A.   Not to my recollection.

12    Q.   Did Mr. Maloney ever talk to you about a

13  sales and purchase agreement with Katena on or

14  before May 8th of 2021?

15    A.   Not to my recollection.

16    Q.   Did you ever -- did you ever edit any type

17  of sales and purchase agreement between Coinmint and

18  Katena on or before May 8th of 2021?

19    A.   Not to my recollection.

20       MR. HARDIN:  I'm sorry.  What did you say?

21       THE WITNESS:  Not to my recollection.

22       MR. HARDIN:  Sorry.

23  BY MR. LIU:

24    Q.   Mr. Foret, at any point prior to May 13,

25  2021, did you see any type of contract whatsoever

TRANSCRIPT OF PROCEEDINGS

1  between Coinmint and Katena?

2      A.  I don't recall seeing a contract between

3  Coinmint and Katena.

4      Q.  Were there -- when was the first time you

5  recall seeing a copy of a contract between Coinmint

6  and Katena?

7      A.  Oh, boy.  First reference to some type of

8  document that I remember I think was referenced in

9  Kathleen Schneider's email at some point in either

10  late July or early August --

11      Q.  Okay.

12      A.  -- of 2021.

13      Q.  All right.  But it's your testimony that

14  you've never reviewed a copy of this document on or

15  before May 8th, 2021; is that correct?

16      A.  I don't recollect reviewing a copy of this

17  document, no.

18      Q.  Do you know if any outside counsel of

19  record has ever reviewed a copy of this document on

20  or before May 8th of 2021?

21      A.  It's possible.  I just don't know.  We did

22  use outside counsel, specifically --

23          THE REPORTER:  Specifically --

24          THE WITNESS:  Specifically Mr. Maloney

25  used outside counsel at the time to assist in

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1   reviewing and preparing documents.  Contracts.

2   BY MR. LIU:

3       Q.   Have you ever seen -- have you ever seen

4   any document or emails showing Mr. Maloney sending a

5   copy of this contract to you or outside counsel on

6   or before May 8 of 2021?

7       A.   No.  I mean, in my review of the

8   documents, I have not seen that.

9       Q.   Have you seen any document showing that

10  Mr. Maloney sent a copy of any contract between

11  Coinmint and Katena to either yourself or any

12  outside counsel on or before May 13th, 2021?

13      A.   No, I have not seen such a document.

14          MR. LIU:  Ted, can you scroll back up to

15  the body of the email.

16  BY MR. LIU:

17      Q.   So, Mr. Foret, in the first sentence,

18  Mr. Maloney writes (as read):

19              Henry and Michael, my earlier

20          email appears to have been lost

21          forever, so I have updated the

22          purchase order and purchase

23          agreement attached again with my

24          comments and legal review.

25          On May 8th of 2021, was there a legal

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  department at Coinmint?

2      A.  It was essentially me.

3      Q.  So other than yourself, was there anyone

4  else that was part of legal?

5      A.  You mean in-house?

6      Q.  Yeah.

7          (Simultaneous speakers - inaudible.)

8  BY MR. LIU:

9      Q.  In-house.

10     A.  No, I was the only in-house attorney at

11  the time.

12     Q.  Were there outside counsel that Coinmint

13  would consult to review potential purchase

14  contracts?

15     A.  Yes.

16     Q.  Have you ever seen any evidence showing

17  that Mr. Maloney shared a copy of this contract with

18  any of your outside -- of Coinmint's outside legal

19  counsel?

20     A.  No, I have not seen such a document.

21     Q.  Do you know why Mr. Maloney would tell

22  Mr. Monzon and Mr. Gao that -- that this purchase

23  agreement has undergone legal review?

24     A.  No, I'd be speculating or guessing as to,

25  you know, what was in his mind at the time.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1     Q.   Okay.  And it's true, is it not, that on

2   May 8th of 2021 you had not heard of the word of

3   "Katena" before?

4     A.   Best of my recollection, no, I had not

5   heard the term or the word "Katena" --

6     Q.   Okay.

7     A.   -- at that time.

8     Q.   Now, you mentioned that you believe that

9   the first time that you heard of Katena was through

10   Ms. Kathleen Schneider; is that right?

11     A.   No.  I think what I stated -- you asked me

12   specifically if I'd seen a particular document.  And

13   that was the first time I had seen the document.

14         There may have been a reference to Katena

15   earlier on that I was copied on in reference to the

16   capital call.

17     Q.   Okay.  Do you recall when that was,

18   approximately?

19     A.   Sure.

20         It was approximately late June, possibly

21   around June 26, 27, 28, sometime around there, of

22   2021.

23         MR. LIU:  Ted, can you pull up

24   Exhibit 2103, please.

25   / /

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  BY MR. LIU:

2      Q.   Mr. Foret, do you recall seeing this email

3  on or before -- on or around August the 9th of

4  2021?

5      A.   Yeah.  I'm copied on it, so I'm assuming I

6  saw it.  I usually review all the emails.  I do see

7  I'm copied on it.

8      Q.   Do you have an understanding as to what

9  the issue was with this email?

10      A.   Yeah.  From reading the email, it's pretty

11  obvious what Kathleen was asking for.

12      Q.   And what was -- go ahead.

13      A.   And -- and she's asking for the purchase

14  order that matches the $7.5 million that apparently

15  was paid.

16      Q.   Do you have any understanding as to why

17  she was asking for that purchase order?

18      A.   Well, she's the controller of the company.

19  I mean, if money was -- a certain amount of money

20  was paid, she would want a purchase order to back it

21  up to -- for her accounting purposes.

22      Q.   Did anyone ask her to do anything to

23  assist with this issue?

24      A.   I'm sorry, can you repeat the question?

25      Q.   Right.

TRANSCRIPT OF PROCEEDINGS

1        Did anyone ask you to assist with this

2   issue that you described about trying to locate a

3   copy of the purchase order?

4     A.  No.

5     Q.  Do you recall if you did anything in

6   response, regardless of whether or not anyone asked

7   you?

8     A.  And, again, because I -- I've been

9   involved in talking to all of these people at some

10  point, I don't remember if I talked to Kathleen and

11  Mike at the time or after litigation was

12  anticipated.

13    Q.  Okay.

14    A.  So I -- I just don't remember if I

15  followed up exactly at the time.  And if I did, it

16  would have been a telephone call, because there -- I

17  don't think I responded via email to this -- to this

18  specific inquiry by Ms. Schneider.

19        MR. LIU:  Ted, can you scroll down to the

20  bottom of that first page so that we can see

21  Mr. Maloney's email.

22  BY MR. LIU:

23    Q.  So do you see the second-to-the-last --

24  second-to-last sentence of Mr. Maloney's email on

25  August 9th, he writes that (as read):

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1            Randy did review this contract

2        for machines.

3        Do you see that?

4    A.  Yeah, I see that.

5    Q.   Do you have any recollection of ever

6  reviewing any contract involving Katena for the

7  purchase of machines?

8    A.   No, I don't -- well, I mean, I

9  specifically do not recollect reviewing what is

10  attached to this email trail.

11    Q.   Okay.  Do you have any idea why Maloney,

12  Mr. Maloney, would tell Ms. Schneider that you did

13  review this contract if it wasn't true?

14        MR. HARDIN:  Objection.  Calls for

15  speculation.  Argumentative.

16        THE WITNESS:  Yeah, I mean --

17        MR. HARDIN:  Objection.

18        ARBITRATOR CALLAHAN:  Wait.

19        All right.  Well, I guess you can answer

20  if you have a basis for having an understanding.

21        MR. HARDIN:  Firsthand knowledge that

22  didn't occur based on his investigation?

23        ARBITRATOR CALLAHAN:  Well, that's a

24  different objection.

25        MR. LIU:  We're not asking for his

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  investigation.  Just asking for his understanding.

2        ARBITRATOR CALLAHAN:  Ah, I see what

3  you're saying.  So his understanding would have come

4  from his investigation.

5        MR. HARDIN:  Right.  That becomes the

6  problem because this -- and he's just testified that

7  it's hard for him to distinguish between real time

8  and all the interviews that he's been in.

9        ARBITRATOR CALLAHAN:  All right.  So we'll

10  tee this one up.

11        MR. HARDIN:  Okay.

12        ARBITRATOR CALLAHAN:  Let me just get the

13  question.  Mr. Liu, help me understand the question

14  that you want to have answered.

15        MR. LIU:  I'm just trying to get

16  Mr. Foret's understanding --

17        ARBITRATOR TURITZ:  No.

18        ARBITRATOR CALLAHAN:  The question,

19  Mr. Liu.

20        ARBITRATOR TURITZ:  The question you

21  asked, which question are you trying to get an

22  answer to?

23        MR. LIU:  I'd have to go back and see what

24  was the question that I asked.

25        ARBITRATOR CALLAHAN:  Or just phrase what

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1   it is you're trying to elicit --

2           MR. LIU:  Sure.

3           ARBITRATOR CALLAHAN:  -- so we can tee up

4   the issue from the two depo transcripts.

5   BY MR. LIU:

6    Q.   Mr. Foret, do you know why --

7           ARBITRATOR CALLAHAN:  No.  No.  No.

8           MR. LIU:  Oh, to you.

9           (Simultaneous speaking - inaudible.)

10          THE REPORTER:  I'm sorry, please.

11          MR. HARDIN:  I got the specific question

12   pulled up.  Would it help if I repeated that

13   question?

14          ARBITRATOR CALLAHAN:  Yes.

15          MR. HARDIN:  This is in real time, so I

16   think there's some --

17          ARBITRATOR CALLAHAN:  Yes.

18          MR. HARDIN:  It says (as read):

19              Okay, period, do you have any

20              idea why Maloney, Mr. Maloney,

21              would tell -- it says Mr. Soniat,

22              Schneider, I think that was just

23              Ms. Schneider -- that you did

24              review this contract if it wasn't

25              true.

TRANSCRIPT OF PROCEEDINGS

1          ARBITRATOR CALLAHAN:  So is it Schneider?

2          THE REPORTER:  Yes.

3          MR. HARDIN:  I think that was the point.

4          ARBITRATOR TURITZ:  Schneider.

5          MR. LIU:  Yes.  Schneider.

6          ARBITRATOR CALLAHAN:  That you did review

7    the --

8          MR. HARDIN:  Contract if it wasn't true.

9          ARBITRATOR CALLAHAN:  Okay.  That's the

10   question.

11          And so this is because he's asking for

12   understanding?

13          MR. HARDIN:  Right.

14          MR. ALFORD:  I --

15          ARBITRATOR CALLAHAN:  And he's testified

16   that he didn't have any knowledge, and so you're

17   saying the only understanding he would have was

18   based on his investigation.

19          MR. HARDIN:  Well, it's more than that.

20   He's testified -- Mr. Foret testified that it was

21   hard for him to distinguish factual information that

22   he had at the time versus the multiple times he's

23   talked with Ms. Schneider in investigation, multiple

24   times he's talked with Mr. Maloney, Mr. DeNaut,

25   Mr. Bleck.  And that, again, was part of our issue

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1   with this.

2         MR. ALFORD:  I don't think we even

3   instructed him to answer any -- not answer anything

4   close to this.  But let's say this, let's say his

5   answer is no.  I have no idea why he would say

6   anything like that.  We got no problem.  All right.

7         Can we ask him if that's the answer?  Yes

8   or no, are you going to answer this question, I have

9   no why idea why he would say that.

10        MR. HARDIN:  Hang on a second.  There's

11  not -- is this the --

12        ARBITRATOR TURITZ:  Don't coach the

13  witness, please.

14        MR. HARDIN:  Right.  Right.  I mean ...

15        ARBITRATOR TURITZ:  Now that you've made a

16  speaking objection.

17        MR. ALFORD:  But no, if that's -- if the

18  answer is no, then the objection is moot, is all I'm

19  saying.

20        MR. HARDIN:  But if he doesn't know, then,

21  I mean of what relevance is the question?  Right.

22  So I mean we can play this --

23        ARBITRATOR CALLAHAN:  Shouldn't we just

24  focus our energies on things that are relevant?

25        MR. HARDIN:  Well, that's my point.

TRANSCRIPT OF PROCEEDINGS

1          ARBITRATOR CALLAHAN:  That's my point too.

2          MR. HARDIN:  Yeah, I think it cuts a

3   couple of different ways.  This, again, is the

4   problem having the lawyer --

5          ARBITRATOR CALLAHAN:  You make it clear

6   what the problem is, but we're trying to not grow

7   but narrow the issues for the panel to spend time on

8   and you all to spend hearing time on.  I mean, does

9   it -- it's an ask, does it make any sense to see

10   whether he has any idea?  Just answer to that.

11          ARBITRATOR TURITZ:  Just answer yes or no

12   to that question.

13          MR. HARDIN:  So long as --

14          ARBITRATOR TURITZ:  If he says yes, then

15   we have another step.  If he says no, sort of as

16   Mr. Alford says, then there's nothing to discuss.

17          MR. HARDIN:  So long as I'm not waiving

18   anything.  I understand what the panel's ask is, so

19   long as it's not a waiver on my part let's roll with

20   it.  Let's see.

21          ARBITRATOR CALLAHAN:  It's not a waiver.

22          MR. HARDIN:  Okay.  Let's roll with it.

23   Let's see.  Yes or no.

24          ARBITRATOR GLICK:  I just want a

25   clarifying question for Mr. Foret -- I'm changing

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  the subject.

2          ARBITRATOR CALLAHAN:  Don't change the

3  subject yet.

4          ARBITRATOR GLICK:  Okay.  Go ahead.

5          ARBITRATOR CALLAHAN:  It's yes or no.

6          THE WITNESS:  Yes, ma'am, I understand.

7          ARBITRATOR CALLAHAN:  Okay.  And your

8  answer is?

9          THE WITNESS:  Yes.

10          ARBITRATOR CALLAHAN:  Okay.  So now -- all

11  right.

12          THE WITNESS:  And I know what the next

13  question is going to be and the answer is going to

14  be, so ...

15          MR. ALFORD:  I think we move on to the

16  topic.

17          ARBITRATOR CALLAHAN:  The next question

18  would be, what's the basis of your understanding.

19          THE WITNESS:  Right.  Exactly.

20          ARBITRATOR CALLAHAN:  Is that fair?

21          MR. LIU:  Yeah, that's fair.

22          ARBITRATOR CALLAHAN:  And that would then

23  prompt your objection.

24          MR. HARDIN:  Yeah.

25          ARBITRATOR CALLAHAN:  Okay.  So then --

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1        MR. ALFORD:  We'll table that one and move

2  on -- is that --

3        ARBITRATOR CALLAHAN:  Yeah, hold on.

4        Okay.  Go ahead now, Ms. Glick.

5        ARBITRATOR GLICK:  This is just a very

6  simple question.  When did you join Coinmint?

7        THE WITNESS:  Okay.  Yes.

8        MR. ALFORD:  Wait.  Wait.  Wait.

9        THE WITNESS:  Thank you.

10        Specifically, March 31st of 2020 as

11  in-house counsel.

12        ARBITRATOR GLICK:  March 31st of 2021?

13        THE WITNESS:  2020, yes, ma'am.

14        ARBITRATOR CALLAHAN:  2020.

15        ARBITRATOR TURITZ:  2020.

16        THE WITNESS:  2020, yes, ma'am.

17        ARBITRATOR GLICK:  Right.

18        THE WITNESS:  But I had performed some

19  work as outside counsel for the entity before that,

20  for several years before that.  In other words, I

21  became a formal employee on March 31st.

22        ARBITRATOR TURITZ:  Right after COVID

23  started?

24        THE WITNESS:  Well, yes, ma'am, I mean,

25  the shutdown had just started.

1          ARBITRATOR CALLAHAN:  Wow.

2          THE WITNESS:  Yes.

3          ARBITRATOR CALLAHAN:  Happy COVID shutdown

4   to you.

5          Okay.  All right.

6          ARBITRATOR GLICK:  Thank you.

7          THE WITNESS:  Yes, ma'am.

8          ARBITRATOR CALLAHAN:  Go ahead, Mr. Liu.

9          MR. LIU:  So just to be clear, we no

10   longer ask about this topic because it's been

11   objected to.

12          ARBITRATOR CALLAHAN:  That's right.  Yes.

13          MR. LIU:  We move on.

14          ARBITRATOR CALLAHAN:  We're starting to

15   understand each other.

16          MR. LIU:  Ted, can you pull up

17   Exhibit 2190, please.

18          THE WITNESS:  Are those exhibits in this

19   book?

20          MR. HARDIN:  They are.  They're ours.

21          But, Randy, feel free to use those.  Do

22   you like paper better?  Here.

23          THE WITNESS:  Yeah, I would prefer

24   reading -- I've got old eyes, so ...

25          Let's see, 2190.  No, it's not.  Hold on a

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  second, 21 -- yep, it's going to be in this book.

2  Okay.

3  BY MR. LIU:

4      Q.  Before we get to the document, do you

5  have -- do you know when Mr. DeNaut left Coinmint?

6      A.  I can give you a roundabout answer of

7  November 3rd, 2021 is my understanding.

8      Q.  All right.  Did you have any

9  communications with Mr. DeNaut on November 3rd of

10  2021?

11     A.  No.

12     Q.  What about the following days after

13  November 3rd of 2021?

14     A.  Yes.

15     Q.  What did you guys talk about?

16     A.  Well, specifically, on November 5th, I

17  got Mr. DeNaut's cell phone number from Frank Kinney

18  and called Mr. DeNaut specifically to talk about

19  Katena.

20     Q.  What kind of information did you want

21  Mr. DeNaut to provide you with regards to Katena at

22  that time?

23          MR. HARDIN:  Objection.  This is after the

24  anticipated litigation.

25          ARBITRATOR CALLAHAN:  And?

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          MR. HARDIN:  He's investigating the

2    litigation.  DeNaut is --

3          ARBITRATOR CALLAHAN:  Is this part of

4    your -- is this one of the areas he was instructed

5    not to answer on before?

6          MR. HARDIN:  I don't know that it's a

7    specific answer but --

8          MR. ALFORD:  No.  No.

9          (Simultaneous speaking - inaudible.)

10          MR. HARDIN:  -- it is going to be a

11    disclosure of his investigation --

12          ARBITRATOR TURITZ:  That's his problem.

13          MR. HARDIN:  -- which -- well, but I

14    wasn't allowed to -- there were several items that I

15    was not allowed to discover.  For example, I wasn't

16    allowed to discover any of the discussions that he

17    had with Mr. Maloney.  I was allowed to ask a yes or

18    no, yes or no, did you have it, but then it stopped.

19          And so now for him to come back and

20    provide substantive testimony about those is, again,

21    the sword and the shield.  So --

22          ARBITRATOR CALLAHAN:  That's why I'm

23    asking --

24          ARBITRATOR TURITZ:  This is about DeNaut.

25          ARBITRATOR CALLAHAN:  -- was he instructed

1  not to answer when you asked what -- what they

2  talked about?

3        MR. ALFORD:  No.

4        ARBITRATOR TURITZ:  Did you ask about --

5  you just mentioned Maloney, you were shut down,

6  right?  About the investigation?  He talked to

7  Maloney and you couldn't ask questions about

8  Maloney, am I understanding that correctly?

9        MR. HARDIN:  We had -- there was a

10  hearing.  I'm going to back into that, apologies.

11        ARBITRATOR TURITZ:  Well, let me just --

12  the question I just heard was that he -- or what he

13  started to answer was on November 5th, he got

14  DeNaut's cell phone number from Frank Kinney --

15        MR. HARDIN:  Right.

16        ARBITRATOR TURITZ:  -- to call him to talk

17  about Katena.

18        MR. HARDIN:  Right.

19        ARBITRATOR TURITZ:  Right?

20        THE WITNESS:  That's correct.

21        ARBITRATOR TURITZ:  Okay.  Were you

22  precluded from asking him questions about his

23  conversations with DeNaut?

24        MR. HARDIN:  We were precluded -- and

25  again, we teed this --

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          ARBITRATOR TURITZ:  That's a yes or no,

2   Mr. Hardin.

3          MR. HARDIN:  I think yes.  I don't --

4   again, I don't have the deposition right here

5   either.  I would simply -- what I would refer back

6   to is we had a hearing on this during the

7   deposition.

8          ARBITRATOR TURITZ:  I remember a

9   hearing --

10          MR. HARDIN:  Right.

11          ARBITRATOR TURITZ:  -- during his

12   deposition.

13          MR. ALFORD:  Yes, ma'am.

14          (Simultaneous speakers - inaudible.)

15          ARBITRATOR TURITZ:  It was months ago.

16          THE WITNESS:  In the afternoon, that's

17   correct.

18          THE REPORTER:  I did not get what you just

19   said.

20          THE WITNESS:  I said that's correct.

21   There was a hearing that took place beginning at

22   about 1:30.  So -- and it lasted approximately an

23   hour, during my deposition, and I'm pretty sure a

24   ruling was made.  So, I mean --

25          MR. HARDIN:  So here's the question --

TRANSCRIPT OF PROCEEDINGS

1  here's the question.

2         Did you participate in any conversations

3  with Jim DeNaut, prior to the filing of the

4  arbitration demand, regarding the allegations

5  contained in it?

6         ARBITRATOR TURITZ:  That was your

7  question.

8         MR. HARDIN:  Yes.

9         (As read):

10            Mr. Alford:  I'll instruct you

11            not to answer the question to the

12            extent those communications

13            occurred once litigation was

14            anticipated.

15         ARBITRATOR TURITZ:  Slow down.  Slow down

16  for the court reporter.  You're talking really fast.

17         MR. HARDIN:  Sorry.  I'm excited.

18         And (as read):

19            Open parentheses, instruction

20            not to answer.

21            Answer:  The communication

22            occurred after the anticipation of

23            litigation, so I'll follow

24            counsel's advice.  Period.

25         MR. ALFORD:  The specific question was,

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  did you have discussions with Mr. DeNaut about the

2  allegations you made in the lawsuit.  That's a

3  different question that is being asked now.  Plus

4  Mr. --

5          ARBITRATOR CALLAHAN:  No, that's not the

6  question.  It was:  Did you participate in any

7  conversations with DeNaut prior to the filing of the

8  arbitration?

9          ARBITRATOR TURITZ:  That was in the depo,

10  not today.

11          ARBITRATOR CALLAHAN:  Oh.

12          ARBITRATOR TURITZ:  Not today.  In this

13  hearing.  In this hearing we only got as far as, the

14  answer was he got the cell phone number and -- to

15  call about Katena, and we don't have anything beyond

16  that, at this point --

17          THE WITNESS:  Right.

18          ARBITRATOR TURITZ:  -- in this arbitration

19  right now.

20          THE WITNESS:  Yes, ma'am.

21          ARBITRATOR TURITZ:  But that's -- he was

22  just reading from the depo.

23          ARBITRATOR CALLAHAN:  Well, then what's

24  the question?

25          MR. ALFORD:  The question, according to

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1  the court reporter's record that Mr. Hardin repeated

2  from the transcript is as follows.  So here's the

3  question, Mr. Hardin says (as read):

4         Did you participate in any

5      conversations with James DeNaut

6      prior to the filing of the

7      arbitration demand -- it's a

8      typo -- regarding the allegations

9      contained in it?

10        Yeah, I'm not going to let Mr. Foret talk

11  about whether he discussed something specific to the

12  allegations made in the arbitration demand.  That's

13  obviously work product.  This is not.

14        And besides, Mr. Foret testified in

15  court -- Mr. Hardin was there and Mr. Taber was

16  there -- testified in open court in Connecticut

17  about this exact subject that we -- we're trying to

18  ask about now.

19      MR. HARDIN:  Madam Chair, do I -- should I

20  respond?

21      ARBITRATOR CALLAHAN:  Yes.

22      MR. HARDIN:  So, one, the Connecticut is

23  irrelevant.  It doesn't give me adequate discovery.

24  But, two, we attempted to understand what these

25  conversations were.  And look, this is just one that

TRANSCRIPT OF PROCEEDINGS

1  we've pulled up here on the spot.  Okay.  I am not

2  saying that this is the only time we were shut down

3  with respect to Mr. DeNaut or Mr. Maloney or

4  Mr. Bleck or any of these.

5       The point is to show an illustrative

6  example of how we tried to gather this information

7  through the discovery process.  We were shut down.

8  And now they've picked, is the privilege a shield or

9  a sword?  They picked.  It was a shield.  Okay.

10      They don't get, now, to disclose these

11  communications.  So we would ask that this be

12  reserved until we can provide the various times and

13  the various questions that we were precluded from

14  learning this information.

15      As Madam Chair said, at some point it goes

16  hard.  We think it's gone hard on this issue.

17      ARBITRATOR CALLAHAN:  So you're asking

18  that for now we foreclose any questions about any

19  conversations Mr. Foret may have had with Maloney,

20  DeNaut --

21      MR. HARDIN:  Bleck.  After -- after the

22  litigation was anticipated.  Not just any.  I mean,

23  and there are sometimes -- and look, I'm doing the

24  best that I can -- there's certainly some times

25  between May -- and Mr. Liu has asked some questions

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  about factually did you see X.  Okay.  He can be a

2  fact witness on that.

3       But once litigation is anticipated, he is

4  the general counsel.  He then is doing the

5  investigation.  And so to allow him to testify to

6  those calls brings in an area that I was precluded

7  from discovering.  So yes, ma'am.

8       MR. ALFORD:  I don't think that's

9  accurate.  I don't think he was precluded from

10  asking these kinds of questions we're asking.  I

11  don't think we can paint with this broad brush.

12       I agree with the panel's earlier approach

13  that this is a question-by-question situation and if

14  we want to table this question for now, we'll table

15  it for now and Mr. Hardin can show why he thinks the

16  transcript shut down this question and we can say

17  why we think it didn't.

18       ARBITRATOR CALLAHAN:  And just so -- I

19  just want to make sure I understand the -- what's

20  being sought is what Mr. Foret either said to these

21  witnesses or they said to him.  You're trying to

22  make inquiry about discussions --

23       MR. LIU:  Right.

24       ARBITRATOR CALLAHAN:  -- that occurred

25  between Mr. Foret and some of these other people.

TRANSCRIPT OF PROCEEDINGS

1        MR. LIU:  Right.  Very specific points in

2    time unrelated to the allegations --

3        ARBITRATOR CALLAHAN:  No.  No.  No.  But

4    after -- after November 2021.

5        MR. LIU:  In November of 2021.

6        ARBITRATOR CALLAHAN:  Forward?

7        MR. LIU:  Yeah.  In that time frame.

8        ARBITRATOR CALLAHAN:  Because we know

9    there were discussions.

10        MR. LIU:  Right.  Sorry.

11        ARBITRATOR CALLAHAN:  And you're saying

12    you didn't get to ask about them, so that should be

13    off limits.

14        MR. HARDIN:  I got to ask about them.

15    They were shut down.

16        ARBITRATOR CALLAHAN:  Okay.  But you're

17    saying -- okay.  You asked --

18        ARBITRATOR TURITZ:  You asked --

19        ARBITRATOR CALLAHAN:  And so one further

20    question I would have is, so yes, we're going to

21    table this, but one question I would have, since I

22    believe we now have had hearing testimony by Bleck,

23    Maloney, we have not had DeNaut, but we've had

24    Mr. Bleck and Mr. Maloney, who have submitted to, I

25    think, full questioning by both sides, why -- why

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  it's pertinent for the panel to hear what might have

2  been discussed or not discussed with Mr. Foret.  Why

3  is that pertinent to the claims that that have been

4  submitted?

5      I mean, why does it matter as between the

6  dispute between Coinmint and Katena what Mr. Foret

7  talked about to somebody?  Since we've already heard

8  from those witnesses on whatever you folks wanted to

9  ask them about.  Why is it even relevant?

10      MR. LIU:  We haven't been asked -- been

11  able to ask Mr. DeNaut yet.

12      ARBITRATOR CALLAHAN:  So --

13      MR. LIU:  At some point --

14      ARBITRATOR CALLAHAN:  Well, you have had

15  Mr. Bleck and Mr. Maloney, so why does the panel

16  need to hear what Mr. Foret may have or may not have

17  talked about with them?  Because we've already heard

18  directly from them.

19      MR. HARDIN:  I think that's right.

20  There's not the circumstance that would allow the

21  peeling back of this privilege.  Obviously,

22  Mr. Bleck can testify because what -- his testimony

23  doesn't involve a privilege, Mr. DeNaut can testify

24  because his testimony doesn't involve a privilege.

25  Mr. Maloney can testify because, again his

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  recollection --

2      ARBITRATOR CALLAHAN:  Right.  They're

3  going to testify as fact witnesses.

4      MR. HARDIN:  That's right.

5      ARBITRATOR CALLAHAN:  So why do I need to

6  hear from Mr. Foret what they may have talked about

7  when we've already heard from two of the three

8  witnesses?

9      MR. HARDIN:  You're going to hear from the

10  third.

11      MR. ALFORD:  Well, we do think it's

12  relevant, some information that Mr. Foret gained or

13  didn't gain from Mr. DeNaut -- by the way, I'm sorry

14  to change the subject, but it's not really changing

15  the subject, before I forget, and I'm going to

16  forget --

17      ARBITRATOR GLICK:  Yeah, you're going to

18  grab Mr. DeNaut.

19      MR. ALFORD:  Yes.  Thank you.  I almost

20  forget.  We sent him an email per the panel's

21  instructions, Mr. Liu did yesterday and,

22  unfortunately, the response from his counsel was the

23  same, it was noncommittal, well, we'll get back to

24  you, we're considering the matter.

25      ARBITRATOR GLICK:  The Court said.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          MR. ALFORD:  No.  No.  No.  It was -- you

2   had asked us to encourage Mr. DeNaut's counsel to --

3          ARBITRATOR GLICK:  To give us a date.

4          ARBITRATOR CALLAHAN:  To get us a date.

5          MR. ALFORD:  -- commit or not to those

6   October dates.  And so Mr. Liu emailed his counsel,

7   copied Katena's counsel, and said, essentially, hey

8   the panel wants to know if you're available on these

9   dates.  And they said basically -- I'm

10  paraphrasing -- we're considering it, we'll get back

11  to you.

12         MR. LIU:  We'll get back to you.

13         MR. ALFORD:  It was noncommittal.

14         ARBITRATOR CALLAHAN:  They want to hear

15  from Judge Vatti first.

16         ARBITRATOR TURITZ:  Can I just interject

17  one thing?  I just looked up -- when they had that

18  emergency telephonic hearing during the middle of

19  Mr. Foret's deposition, we issued Order Number 14 as

20  a result, that was January 31st.

21         MR. ALFORD:  Years ago.

22         ARBITRATOR TURITZ:  Could be a century

23  ago, in this case.

24         MR. HARDIN:  It's almost single digits.

25         (Simultaneous speaking - inaudible.)

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1         ARBITRATOR TURITZ:  The order just says

2   (as read):

3              The panel's rulings concerning

4          the matters discussed and raised

5          during that hearing are set forth

6          in the reporter's transcript, an

7          excerpt of which is to be provided

8          to each member of the panel of the

9          case managing the party's counsel

10          and will not be repeated here.

11         So I don't know -- I don't really recall

12   whether I ever got a copy of the excerpt --

13         ARBITRATOR CALLAHAN:  You didn't.

14         ARBITRATOR TURITZ:  -- of his deposition

15   transcript that had those rulings, but I think now

16   is the time for somebody to dig them out --

17         MR. ALFORD:  Yes.

18         ARBITRATOR TURITZ:  -- make a PDF of those

19   pages and send them to us.  Okay?

20         MR. HARDIN:  Yes, ma'am.

21         MR. ALFORD:  For sure.

22         Maybe we can see if we can --

23         ARBITRATOR TURITZ:  I don't mean this

24   second, I mean just for us to be understanding what

25   we previously ruled.

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1        ARBITRATOR GLICK:  Back to --

2        MR. ALFORD:  DeNaut.

3        ARBITRATOR GLICK:  No.  No.  To the

4  question Ms. Callahan asked you, why do we need to

5  inquire of Mr. Foret?

6        MR. ALFORD:  Well, because of what

7  Mr. Foret learned from Mr. DeNaut.

8        MR. LIU:  Right.

9        ARBITRATOR CALLAHAN:  So you're going to

10  yield as to Mr. Bleck and Mr. Maloney?

11        MR. LIU:  Yeah, I don't think I was

12  planning on asking any questions about those two

13  individuals specifically.  It was just mostly

14  Mr. DeNaut, the conversations Mr. Foret had with

15  Mr. DeNaut, but information Mr. DeNaut shared with

16  him concerning employment.  So --

17        MR. ALFORD:  And I would say, this really

18  wasn't part of -- so much part of Mr. Foret's

19  investigation of, hey, what happened.  It was

20  really -- well, I don't want to get too kind of

21  argumentative, if you will, but it was our

22  understanding that Mr. DeNaut was working --

23        MR. HARDIN:  Objection.  I'm going to

24  object to this.  This is a speaking objection to try

25  to get this testimony in.  The point is --

TRANSCRIPT OF PROCEEDINGS

1          MR. ALFORD:  No.  No.  The question was

2   where are you going with it.

3          MR. HARDIN:  -- litigation was

4   anticipated.

5          MR. ALFORD:  I wish counsel wouldn't

6   interrupt.  The question was where are you going

7   with this.  I was trying to explain where we're

8   going with this.

9          MR. HARDIN:  Well --

10          MR. ALFORD:  That's all I was trying to

11   do.  And then counsel interrupted me.  Where we're

12   going with this is that --

13          MR. HARDIN:  Madam, I am going to object.

14   You said it before, once the toothpaste is out of

15   the tube, we're not shoving it back in.

16          ARBITRATOR CALLAHAN:  I'm not hearing from

17   Mr. Foret.  Mr. Foret is the toothpaste.

18          MR. HARDIN:  All right.  If this is random

19   floss, we'll go with it then.

20          MR. ALFORD:  Toothpaste is -- that's good.

21          ARBITRATOR CALLAHAN:  All right.  Wait a

22   minute.

23          THE WITNESS:  Submit that in blog and

24   texts --

25          (Simultaneous speakers - inaudible.)

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1          ARBITRATOR CALLAHAN:  I actually think --

2          THE WITNESS:  You know what I'm talking

3    about.

4          ARBITRATOR CALLAHAN:  I actually think

5    we're going to have to get some briefing on it.  And

6    while hearsay is not an objection in arbitration, it

7    sounds like you're asking for hearsay straight out,

8    what did somebody say to you, and you're offering it

9    for the truth of the matter asserted.

10          Whatever Mr. Foret says Mr. DeNaut said,

11    I'm supposed to -- you're basically pitching that

12    the panel should believe that that's what Mr. DeNaut

13    said, right?

14          MR. ALFORD:  Well, I don't think it's for

15    the truth of the matter asserted.  I think it's for

16    Mr. DeNaut and his state of mind, his state of mind.

17    And we can make a little bit more proffer but

18    Mr. Hardin doesn't want me to do that.

19          ARBITRATOR CALLAHAN:  No.  No.  No.

20    You're -- the hearsay exception goes to his state of

21    mind --

22          MR. HARDIN:  Right.

23          ARBITRATOR CALLAHAN:  -- not DeNaut's

24    state of mind.  It's the speaker who's trying to get

25    in what they say someone else said.  It's his state

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  of mind not Mr. DeNaut that qualifies for the

2  exception, right.

3      MR. ALFORD:  I think that's right.

4      ARBITRATOR CALLAHAN:  Okay.  So -- so

5  where I'm going with this is I think you still need

6  to include, on this topic, why is that --

7      MR. ALFORD:  Material.

8      ARBITRATOR CALLAHAN:  -- evidence.  We may

9  have let it in because we can't keep it out.  But

10  why would we give it weight?

11      MR. ALFORD:  Fair question.

12      ARBITRATOR CALLAHAN:  Why would we give it

13  weight since the witness isn't here and an effort

14  has been made to get the witness?  And we know the

15  witness has testified in other places.  Why would we

16  give that weight?

17      And so I think you got to think about that

18  if -- I don't know how all this evidence lines up,

19  but if there's evidence -- a document that -- and I

20  don't know if a document exists, I'm just

21  spit-balling, to coin a term that we've heard today.

22      MR. ALFORD:  Yeah.

23      ARBITRATOR CALLAHAN:  Okay.  What if

24  Mr. Foret says that DeNaut said something to him,

25  but we have a document where he said something

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  completely different?  You guys probably know

2  whether that document exists or not.  Why would we

3  give what Mr. Foret says Mr. DeNaut said any weight

4  in contrast to that?

5        And I don't know what the purpose of these

6  questions are in terms of the topics, but it sounds

7  like you all know more than we do.  So I think we

8  have to brief it.  I think we just have to brief it.

9        ARBITRATOR GLICK:  How about just waiting

10  to see?  We have a possibility of hearing from

11  Mr. DeNaut and Mr. Foret, you can ask Mr. DeNaut --

12  you or whoever --

13        MR. ALFORD:  We might be able to take

14  Mr. Foret out later, take it later.

15        ARBITRATOR CALLAHAN:  Clearly, my

16  inclination would be, let's just pretend, let's

17  pretend we had DeNaut lined up for Monday,

18  October 16th.

19        MR. ALFORD:  That is pretending, for sure.

20        ARBITRATOR CALLAHAN:  I would say we're

21  tabling this because there's no reason to spend any

22  time on it till we get DeNaut in the seat.

23        I'd say that's the better evidence, why

24  waste our time.

25        MR. ALFORD:  We don't want to waste your

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

1  time, for sure.

2       ARBITRATOR CALLAHAN:  Why would -- if

3  Mr. DeNaut sits here and answers your questions, why

4  would we give much, if any, consideration?  We'd

5  hear it, but why would we give it much of any weight

6  if Mr. Foret said Mr. DeNaut said something

7  completely different and there's no record of that

8  other than what Mr. Foret says Mr. DeNaut said?

9       And Mr. DeNaut sat there and you got to

10  question him and he didn't say any such thing or he

11  said exactly what you're attributing to him or he

12  said that's not true.

13       ARBITRATOR TURITZ:  I have a question for

14  Mr. Liu.  Do you have other topics beside what

15  Mr. -- what Mr. Foret may have talked to Mr. DeNaut

16  about?

17       MR. LIU:  Yeah, I mean, I was going to

18  talk to him about his departure.  His departure from

19  Coinmint.

20       ARBITRATOR TURITZ:  You mean DeNaut's

21  departure?

22       MR. LIU:  Yeah.  Sorry, Mr. DeNaut's

23  departure.

24       ARBITRATOR GLICK:  It's 5:29.

25       ARBITRATOR TURITZ:  I know.  But, I

TRANSCRIPT OF PROCEEDINGS

**September 19, 2023**

 1  mean -- beyond Mr. -- forget about Mr. DeNaut.  You

 2  have other topics for this witness --

 3        MR. LIU:  Yeah.

 4        ARBITRATOR TURITZ:  -- besides the ones

 5  that we've lined up as problematic and we're going

 6  to have to discuss about whether they should be

 7  included because of what happened in the deposition.

 8        MR. LIU:  Sure.  Yeah.  Mr. Maloney's

 9  termination as well.

10        ARBITRATOR TURITZ:  Okay.  Is that it?

11  Give us a preview of --

12        MR. LIU:  Well, then there was --

13        ARBITRATOR GLICK:  Give us something to

14  talk about.

15        MR. LIU:  Yeah.  I mean, there's this

16  issue about the status quo order that we've already

17  covered.

18        ARBITRATOR TURITZ:  Right.

19        MR. LIU:  I mean, that was --

20        ARBITRATOR TURITZ:  I'm talking about in

21  addition to those things that we've already been

22  arguing about for an hour.

23        MR. LIU:  Oh, okay, anything new.  Yeah.

24  No, I don't think so.  Yeah.  Those are the three

25  main topics.

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1          ARBITRATOR TURITZ:  All right.

2          MR. ALFORD:  So it sounds like --

3          ARBITRATOR TURITZ:  Let me just ask,

4   Maloney departure, is that something -- a topic you

5   were shut down about?

6          MR. HARDIN:  I think we were on a couple

7   of different levels, but I need to go back and look.

8          ARBITRATOR TURITZ:  This is what -- this

9   is what you all need to do.  You need to look.  Now

10   you know kind of the basic broad topics.  You've got

11   the deposition transcript.

12          We would like, the three of us would like

13   to see -- I'll speak for them as well -- whatever

14   exactly we said during our ruling during the

15   emergency deposition hearing, okay.  So you need to

16   get us that, because we may have already ruled on

17   some of this.  I don't know.

18          I just honestly have no specific memory of

19   exactly what we talked about that day, except that

20   it was -- there were work product and

21   attorney-client issues that were raised that you

22   wanted resolved.  But we didn't record it because

23   the reporter was there recording what we said.  So

24   we need that whole dialogue when we were there

25   during the deposition.

1     MR. HARDIN:  Yes, ma'am.

2     ARBITRATOR TURITZ:  All right.

3     MR. ALFORD:  Okay.

4     ARBITRATOR CALLAHAN:  I'm thinking I have

5  a vague recollection.  Could be wrong.  But let me

6  just posit.

7     If at the deposition a set of questions

8  was asked by Mr. Hardin, and you objected on

9  attorney work client -- attorney work product or

10  attorney-client privilege and told him not to

11  answer, and we said sustained --

12     MR. ALFORD:  I think that's right.  We

13  can't ask that question.

14     ARBITRATOR CALLAHAN:  Okay.

15     MR. ALFORD:  I agree with that.

16     ARBITRATOR CALLAHAN:  Okay.  Okay.

17     MR. ALFORD:  Now, as Mr. Hardin pointed

18  out -- and we agree on one thing, at least, the

19  devil's in the details.  So what about, you know,

20  well that's related to this other question or it's

21  not related.  That's where you're going to get into

22  some gray.

23     ARBITRATOR CALLAHAN:  All right.  As you

24  can see, the panel has a pretty keen ability to

25  separate the straw from the wheat.

 1          ARBITRATOR TURITZ:  The wheat from the

 2   chaff.

 3          THE WITNESS:  The toothpaste from the

 4   tube.

 5          ARBITRATOR CALLAHAN:  Okay.  All right.

 6   We need to stop.  We'll see you tomorrow morning

 7   9:00 o'clock, starting with Mr. Markovic with

 8   examination by Mr. Hardin, and then --

 9          (Witness excused subject to recall.)

10          ARBITRATOR TURITZ:  You are going to

11   record the Zoom.

12          ARBITRATOR CALLAHAN:  Yes.

13          ARBITRATOR TURITZ:  Don't forget to do

14   that.

15          ARBITRATOR CALLAHAN:  Will you remind me,

16   Ruth?

17          ARBITRATOR GLICK:  To do what?

18          ARBITRATOR CALLAHAN:  To record if I

19   forget.  I'm going to make a note to myself.  Would

20   you send me an email?

21          (Proceedings adjourned at 5:32 p.m.)

22

23

24

25

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1          CERTIFICATE OF REPORTER

2

3          I, KATHLEEN A. MALTBIE,

4   RPR-RMR-CRR-CCRR-CLR-CRC-RDR, Certified Shorthand

5   Reporter, hereby certify that said proceedings were

6   taken down in shorthand by me, a disinterested

7   person, at the time and place therein stated, and

8   was thereafter reduced to typewriting, by computer,

9   under my direction and supervision.

10          I further certify that I am not of counsel

11   or attorney for either or any of the parties to the

12   said proceedings, nor in any way interested in the

13   event of this cause, and that I am not related to

14   any of the parties thereto.

15

16          DATED: September 28, 2023

17   _____

18   KATHLEEN A. MALTBIE,
     California CSR 10068
19   Nevada CCR 995
     Texas CSR 12212
20   RPR-RMR-CRR-CCRR-CLR-CRC-RDR

21

22

23

24

25

TRANSCRIPT OF PROCEEDINGS

## $

**$10**
1316:8

**$100**
1354:21,22

**$115**
1354:19

**$125**
1376:3

**$126**
1161:9

**$150**
1129:12
1130:2
1145:16
1186:8
1218:22
1267:24
1341:18
1352:2
1371:15
1376:21,23
1377:4
1378:18
1379:17
1381:15,20,
21 1386:3

**$150,000,000**
1378:11

**$2**
1411:15

**$20**
1411:17

**$20,000**
1417:4,16

**$23**
1214:6
1218:13

1324:1

**$23.33**
1318:12

**$3**
1299:3

**$30**
1315:13,14
1316:7

**$37**
1341:25

**$37.5**
1197:22
1397:20

**$40**
1316:9

**$5**
1266:14

**$5,400**
1354:25

**$50**
1158:24

**$500,000**
1154:16
1155:6,23

**$55**
1266:14

**$60**
1317:23
1318:8
1367:9

**$7.5**
1442:14

**$83**
1318:8

**$83.33**
1317:21

## 1

**1**
1177:13
1218:15,19
1226:9
1227:19
1252:4
1276:16

**10**
1141:3,15
1142:25
1145:5
1154:9
1174:22
1304:15
1313:22

**10-11**
1179:9

**10/28/2022**
1336:6

**100**
1183:10,14
1201:17
1228:15
1309:6,7
1313:9
1413:2

**1000-**
1166:15

**1004**
1184:14

**1011**
1179:7,10,15

**1011-**
1179:14

**104**
1183:22
1184:11,15,

17 1185:2,4

**1053**
1129:16
1166:13,17

**1053-1**
1132:3

**1053-2**
1130:5
1131:18

**1069**
1147:25

**1069-3**
1148:11

**10:00**
1128:16

**10:15**
1125:2,4

**10:30**
1125:8
1147:15

**10:31**
1200:19

**10:32**
1201:15

**10:38**
1372:21
1373:4

**10:45**
1200:25
1263:12,20

**10:47**
1201:15

**10th**
1128:10,11
1133:17,23
1313:4
1314:13
1315:3

**1323:10**
1368:11

**11**
1152:18
1343:14
1346:8,14

**110**
1354:19

**1124**
1123:3
1393:20,23
1394:2

**1146**
1168:22,25
1171:4
1276:16

**1147**
1123:8

**1165**
1199:5
1201:18

**1169**
1212:11,20
1237:18,24
1238:1,16
1250:4

**1169-2**
1250:22

**119**
1377:25

**11:28**
1394:25

**11:59**
1380:23

**11th**
1293:14,15
1343:19
1426:22

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

**12**
1346:14
1353:22

**12-**
1242:18

**12-nanometer**
1194:5
1269:5,11
1271:23

**12/29/2021**
1397:24

**1200**
1431:19
1432:2,8
1433:2

**1205**
1123:10

**122**
1242:18

**1220**
1433:1

**1221-1**
1416:14

**1228**
1123:11

**125**
1376:13

**1252**
1124:15

**1254**
1124:14

**1256**
1123:11

**1259**
1123:12

**126**
1159:24

**1350:**3,6

**127**
1123:7
1346:1,3,14
1347:17
1348:20
1350:23

**1281**
1123:17

**1282**
1123:17

**12:03**
1273:19

**12:07**
1273:19

**12:09**
1276:2

**12:22**
1276:2

**12:25**
1278:4

**12:26**
1280:2

**12th**
1222:6,23
1360:18
1366:1

**13**
1197:13,17
1248:7
1343:15
1435:15,25
1436:4,10,11,
18 1437:24

**1343**
1123:18

**13th**
1139:20

**1145:**19,24
1147:9
1160:9
1220:14,17
1293:14,16
1343:20
1388:10,12,
15,20
1389:17
1426:23
1428:7
1435:16
1436:17
1439:12

**14**
1303:20
1465:19

**1407**
1123:18

**1414**
1123:21

**14th**
1364:3,10
1405:3,15

**15**
1333:21
1407:6

**150**
1138:9
1144:22
1159:21
1160:5
1183:10,15
1185:22
1196:25
1197:2,15,19
1202:11
1376:14,18

**15th**
1146:9,10,11
1394:21

**1397:**14,21

**16th**
1133:8,14
1146:9
1471:18

**18**
1186:6
1315:22

**18.2**
1415:17

**18th**
1265:5
1415:11

**19**
1123:2
1124:1
1285:6
1350:6

**190**
1377:14

**1996**
1288:13

**19th**
1415:12

**1:00**
1262:22
1278:5
1381:2

**1:15**
1278:10,23
1279:20,21

**1:17**
1280:2

**1:20**
1333:19

**1:30**
1456:22

**2**

**2**
1124:8
1156:7
1215:21
1314:2
1350:24
1377:16

**20**
1141:3
1145:5
1154:15
1164:19,24
1165:3
1356:7
1357:18
1369:12

**200**
1185:22
1397:25

**200M**
1177:12

**2016**
1288:1,8,25

**2016/2017**
1289:1

**2017**
1288:1
1411:5

**2018**
1283:10
1289:8,12
1411:5

**2020**
1415:11,12
1451:10,13,
14,15,16

**2021**

1136:21
1144:20
1145:15
1148:3
1162:25
1164:7
1168:2,6,13
1170:24
1176:10
1179:18
1180:1
1184:20
1185:6
1186:7,11,13
1187:25
1193:16,20
1194:18
1196:1
1197:13,18
1198:2
1206:2
1211:22
1215:13
1229:2
1255:16
1269:19
1270:19
1291:22
1292:20,25
1293:19
1296:14
1306:23
1308:6
1310:17
1313:3,22
1319:11
1323:10,25
1324:8
1326:4,7
1329:21
1343:5,15,20
1344:20
1349:16
1352:15

1353:22
1358:1,3,15,
21 1359:4,9,
17 1360:18
1364:3,10
1366:1
1369:12
1370:3,4
1371:16
1373:24
1374:15,19,
21 1375:12
1376:8,19,24
1378:19
1379:19
1381:24
1386:4
1388:10,12,
16,20
1389:11,17
1391:12
1394:15,18
1397:14,21
1399:15,19
1400:1,4,7
1405:3
1407:23
1408:3
1410:15
1414:10
1419:17
1421:22
1422:4
1426:15
1427:8
1428:7,15
1431:12,13
1433:14
1435:15,16,
25 1436:4,11
1437:10,14,
18,25
1438:12,15,
20 1439:6,12,

25 1441:2,22
1442:4
1451:12
1453:7,10,13
1462:4,5

**2022**
1162:7,17,18,
21 1164:8,15
1165:18
1215:8
1220:17,19
1224:20
1227:1,20
1373:19
1375:18,24
1400:8

**2023**
1123:2
1124:1
1345:22
1373:19
1375:24

**2024**
1373:9,19
1375:24

**2033**
1435:6

**2076**
1133:6

**2076-4**
1133:12
1134:7

**2076-5**
1136:8

**2093**
1152:18

**2093-12**
1154:6

**2093-13**

1154:3

**2093-4**
1153:8,11

**2093-9**
1153:7,11,12

**2094**
1153:6

**20th**
1345:22

**21**
1453:1

**2100**
1136:19

**2100-5**
1136:25

**2103**
1441:24

**211-3**
1140:21

**2111**
1139:24
1145:15

**2190**
1452:17,25

**2196**
1220:2
1246:1,7
1249:10

**2198**
1225:13,23

**22**
1154:13

**22nd**
1373:4
1374:19
1376:19

**23**

1179:8,12,15,
16,21 1180:4,
17,20 1198:4
1202:15
1378:2
1391:15

**23M**
1172:14

**24**
1156:8
1157:7
1180:18
1316:6
1348:20

**25**
1124:23

**26**
1173:22
1266:17
1441:21

**2609**
1216:12,19
1217:19
1239:23
1240:5,19

**264**
1123:14

**27**
1148:3
1250:3
1441:21

**27,778**
1160:14

**276**
1159:15
1160:6

**276M**
1177:6

**27th**

**TRANSCRIPT OF PROCEEDINGS**

1227:1,20

**28**
1441:21

**29**
1156:4,5,6

**29-2**
1156:7

**29th**
1215:13
1358:1

**2:00**
1381:2

**2:20**
1333:19

**2:29**
1342:23

**2:37**
1342:23

**2nd**
1136:21

---

**3**

**3**
1140:21
1147:25
1177:1
1377:20
1378:3,4

**30**
1124:23
1186:15
1187:3
1266:17
1406:7

**31**
1164:15
1165:18

**3150**
1362:18
1363:8

**31st**
1140:1
1144:20
1145:15
1451:10,12,
21 1465:20

**34**
1176:17

**34-3**
1176:25
1177:2

**35**
1355:25
1362:19
1363:13

**36**
1318:1

**37.5**
1140:8
1202:12

**3:43**
1407:5

**3:50**
1413:23

**3rd**
1453:7,9,13

---

**4**

**4**
1128:3,13
1140:24
1218:5
1229:25
1237:20
1238:4
1243:23

1244:7,11
1245:15
1248:17
1249:25
1255:16
1416:24
1417:7,14

**4-nanometer**
1271:18
1272:4,9

**40**
1374:20
1375:7

**40-megawatt**
1374:16
1375:10

**42**
1315:24

**44**
1416:2,13,22

**44-4**
1416:12,20,
21

**444**
1416:12

**4:19**
1413:23

**4:29**
1421:17

**4:39**
1421:17

**4all**
1205:11

**4th**
1215:8
1220:19
1221:2,11
1222:2,5
1224:3,19

1248:11
1258:4,23

---

**5**

**5**
1123:7,8,10,
11,12,14,17,
18,21 1252:4
1304:16

**5,400**
1355:5

**5/12/2021**
1397:10

**50**
1125:1
1129:3
1132:2
1137:23
1138:2
1141:6,15
1317:17,18

**50/50**
1415:19

**500K**
1156:10,12
1157:11
1158:2

**50M**
1172:14

**51**
1164:19
1333:1,6
1351:20
1360:15
1362:25
1365:25

**51-18**
1351:21,25
1354:13,24

1363:1

**51-20**
1357:21

**51-21**
1353:9,14

**53**
1311:17,20
1361:1
1364:5
1408:9

**5400**
1355:8

**5:29**
1472:24

**5:32**
1476:21

**5B**
1314:7

**5th**
1432:6,7
1433:14
1453:16
1455:13

---

**6**

**6**
1142:22

**6-nanometer**
1194:5
1269:7
1271:18,25
1272:1,5

**60**
1125:2
1129:3
1132:3,6
1138:16
1318:21

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1355:10

**61**
1127:25

**67**
1371:19,21,
22,23
1372:12
1380:14

**67-1**
1380:13,17

**68**
1242:20,21,
22 1253:21
1260:8

**69**
1332:22
1334:19
1338:8

**69-2**
1336:2,4

**69A**
1339:3

---

**7**

**7**
1431:13

**7.5**
1129:2
1132:4,14

**73**
1326:14

**75**
1144:14,15,
22,24
1266:18
1377:4

**75M**
1172:1

**76**
1372:10

**77**
1313:13
1322:3
1366:4,6

**77-2**
1314:7

**77-3**
1314:17,21

**7:30**
1313:22

**7th**
1431:12
1433:13

---

**8**

**8**
1439:6

**80**
1302:12
1303:19
1399:8
1404:21

**82.8**
1415:15

**83.33**
1318:20

**84**
1307:18,21
1384:7,10

**87**
1377:6

**8th**
1436:14,15,
17,21,25
1437:10,14,
18 1438:15,

20 1439:25
1441:2

---

**9**

---

**9**
1152:25
1153:4
1184:20
1185:6

**90**
1354:21
1362:15,18
1363:7
1409:13

**98**
1283:15

**9:00**
1476:7

**9:07**
1124:1

**9:10**
1127:4

**9:30**
1147:15

**9th**
1313:4,16
1368:11
1442:3
1443:25

---

**A**

---

**a.m.**
1124:1
1128:16
1201:15

**ability**
1256:15
1257:19

1258:9
1266:25
1324:16
1401:2
1416:7,10
1475:24

**absence**
1287:21

**absolutely**
1146:1
1174:10
1197:22
1198:10
1227:3,8,15
1265:10
1266:10
1267:8
1268:24
1290:19
1296:13
1302:21
1318:20
1327:1

**absorb**
1287:17
1298:17

**Accenture**
1289:3

**accept**
1142:25

**accepted**
1340:16
1381:5

**access**
1177:21,23
1303:6
1337:18

**accidentally**
1222:7

**accommodat
e**
1165:9
1262:9
1263:23
1292:17
1309:20
1383:16
1386:10

**accommodati
ng**
1263:24
1264:3

**account**
1158:24
1254:3
1291:7
1322:25

**accounting**
1442:21

**accuracy**
1178:1
1359:18

**accurate**
1129:9
1139:11
1145:14
1235:8
1269:12
1274:9
1371:9
1461:9

**acknowledge**
1147:6

**acknowledge
d**
1300:21

**acquire**
1296:3,12
1307:5,10

1308:17
1310:18
1320:18
1321:16

acquiring
1299:24
1305:21
1309:21
1310:4
1311:6,10
1322:10
1359:13

acting
1365:9

action
1200:8

actions
1360:20

active
1272:18

actual
1271:13
1373:23

add
1145:6
1194:10
1289:24

addition
1473:21

additional
1304:18

address
1206:1
1407:12

addressed
1213:15

adequate
1201:22
1202:6

1203:14
1211:21,25
1212:4
1213:12,15,
25 1214:13,
23 1216:8,10,
17 1217:24
1219:14
1221:11
1222:2,14,22
1223:4,14
1224:3,20
1225:3,7
1235:16,22
1237:2,15
1239:4,11,20
1240:10,19
1242:2
1243:16
1244:8,13,22
1245:5
1249:14,20
1252:17
1256:24
1257:3,12,22
1258:8,15,25
1259:18
1260:12,19
1459:23

adequately
1129:8

adjourned
1476:21

adjust
1282:6

admit
1203:24
1256:10

admitted
1125:25
1126:11

admonish
1204:12

admonished
1210:9

adventure
1289:7

adversarial
1223:18

adverse
1401:3
1402:19

advice
1457:24

advisor
1181:11

affect
1301:8
1416:7

affiliated
1255:14

afield
1319:18
1393:9

afternoon
1175:25
1281:1
1343:3
1456:16

age
1283:23

agency
1365:7

agenda
1294:12,14,
18 1366:20
1367:23
1368:25

aggressive
1188:5,11
1190:10,15,
17,20 1192:9,
14,19 1193:1,
6 1265:21

agree
1160:7
1175:15
1185:12
1187:21
1193:13
1196:24
1197:1,18
1201:17
1202:10
1210:1
1243:20
1244:19
1249:18
1251:18
1253:12
1346:20
1349:8,13
1357:18
1368:6
1371:3
1379:15
1397:12
1404:2
1461:12
1475:15,18

agreed
1129:15
1134:19
1135:12
1161:24
1166:7,9
1176:12
1197:14
1214:6
1223:11,21
1249:13

1271:14
1323:1
1369:4

agreeing
1417:2

agreement
1128:22
1132:5
1135:22
1137:19
1139:20
1145:23,24
1147:5,7
1172:16
1173:17
1178:9
1188:15,17,
21 1195:7
1196:1
1209:17,21
1217:6,10
1218:16,20,
25 1219:2
1226:8,22
1227:19
1248:16
1277:5,7,10,
21,23 1340:5
1353:2
1358:25
1360:22
1365:25
1378:15
1385:2,23
1386:3
1387:20,23
1388:1
1392:6,11
1401:15
1417:3,25
1418:4
1437:9,13,17
1439:23

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1440:23

**agreements**
1171:24
1173:15
1177:7
1178:8
1219:5
1387:17
1416:10

**ahead**
1127:3
1174:19
1205:12
1218:3
1234:3,4
1238:14
1252:2
1264:5
1267:4
1275:22
1282:7
1319:22
1323:8
1332:15
1335:24
1339:2
1402:21
1404:19
1407:18
1410:5
1414:5
1421:18
1442:12
1450:4
1451:4
1452:8

**air**
1291:17
1412:16

**Alcoa**
1411:8,19

**Alex**
1141:14

**Alford**
1123:8,11,12
1124:16
1125:1,4,6,16
1131:7
1146:12
1147:14,18,
21,24 1148:1
1149:7,8,9,
13,14
1153:21,23
1154:24
1155:1,10,16
1156:18,20,
21 1157:2,5,
15,18,24
1159:2,5,6,8
1162:13
1163:5,6,11,
16,22,25
1164:1,4,20,
23 1165:4,10,
12,13
1166:17,19
1170:11,12
1174:15,20
1175:5,9,11,
13,16,18,21
1176:1,7,9,
16,20,23
1180:16,19,
22 1183:25
1184:4,8,17,
22,24 1185:3
1186:21
1189:7,11,12,
15,17,24
1190:4,8,13,
22,25 1191:3,
12,16,22,25
1192:4,7,25

1193:5
1195:13,21,
24 1196:16,
19,20
1198:13,20,
25 1199:5
1200:14,17,
20 1201:7,12
1202:4,22
1203:3,5,8
1204:5
1205:5
1207:20
1208:4,10
1209:5,10
1210:1,13
1212:16,20
1213:7,16,20,
22 1214:2,5,
14 1217:25
1220:8
1225:21,23
1226:1
1227:9,25
1228:2
1230:21,23
1231:2,15,19,
22 1232:19,
23,24
1235:14,18,
19 1236:5,9,
10,18,19,22,
24 1237:9,10
1238:1,3,7,9,
13,15 1241:2,
8,12,14,21
1242:8,15,16,
20,23 1243:8,
9 1245:12
1246:4,7,8,
20,24 1247:4,
10,15,23
1248:5
1249:2,4,7,11

1251:25
1252:3,6,24
1253:5,10,13,
16,20,23
1254:1,18,23
1255:5,10,12,
19,23 1257:8
1259:7,14,22
1260:5,22
1261:19
1262:1,23
1263:11,17
1264:6,11,15
1265:11,21
1268:4
1269:23
1270:4
1272:23
1274:22,23
1275:3,11,18,
21,23 1276:3
1278:1,23
1281:5,13
1282:10,18
1302:21
1303:14,17
1338:24
1339:1,5,7
1345:9
1372:16
1378:3
1393:6
1401:23
1404:7,13
1407:9
1413:7,20
1416:18,22
1420:1,23
1421:3,9,13
1423:5,15,24
1424:15,23
1425:5,7,15
1429:5
1430:14,18

1431:17
1432:16
1433:7
1447:14
1448:2,17
1449:16
1450:15
1451:1,8
1454:8
1455:3
1456:13
1457:10,25
1458:25
1461:8
1464:11,19
1465:1,5,13,
21 1466:17,
21 1467:2,6,
17 1468:1,5,
10,20
1469:14
1470:3,7,11,
22 1471:13,
19,25 1474:2
1475:3,12,15,
17

**algae**
1412:22

**alike**
1238:12

**alive**
1411:19

**all-time**
1193:16,21

**allegations**
1202:1
1207:2,8
1229:19
1457:4
1458:2
1459:8,12

**TRANSCRIPT OF PROCEEDINGS**

1462:2

alleged
1147:4
1207:7

allotted
1263:20
1304:24

allowed
1148:25
1241:17
1268:5
1269:25
1272:25
1273:5
1406:13
1425:15
1454:14,15,
16,17

alongside
1228:19

alternative
1283:19

aluminum
1298:13

amazing
1124:13

ambiguous
1131:7
1378:21

amend
1134:20
1202:17
1214:6

amended
1138:11
1146:3
1211:11
1276:8,12,20
1277:15

amendment
1138:4,7
1139:16
1140:5
1168:16
1173:21,23
1187:11
1219:4
1271:7,11,13

amicable
1223:19

amount
1137:22
1172:5,7
1192:19
1252:11
1268:9
1274:18
1304:7
1318:17
1344:14,15
1376:11,16
1379:10
1442:19

amounts
1171:23
1265:23

analysis
1420:5,12
1425:3,9,17
1429:1,7,10,
19

analyst
1407:15

analyze
1294:16

anchor
1159:11
1160:2
1169:15,16

and/or
1271:14

annoying
1387:17

answering
1254:20

answers
1255:2,15
1360:2
1406:18
1472:3

anticipated
1166:3
1443:12
1453:24
1457:14
1460:22
1461:3
1468:4

anticipation
1457:22

Antminer
1354:18

anxious
1126:21
1150:20

anymore
1347:20

apologies
1127:15
1130:6
1455:10

apologize
1360:11
1377:20

apparently
1165:8
1204:8
1214:22

1246:14
1442:14

appeared
1222:25
1228:16

appears
1216:5
1226:7
1246:14
1419:9
1433:14
1439:20

appetite
1296:4

applicable
1145:24

applied
1131:25

applies
1306:4

apply
1139:6
1287:17
1291:5
1300:10
1428:25

applying
1412:8

approach
1307:3
1322:6
1428:8
1461:12

approximatel
y
1124:23
1125:10
1128:16
1194:13

1431:10
1441:18,20
1456:22

April
1162:7,17,18,
21 1164:8
1179:18
1180:1
1289:8
1401:14

arbitration
1189:2
1225:9
1273:11
1391:5
1427:23
1435:10
1457:4
1458:8,18
1459:7,12
1469:6

Arbitrator
1124:7,12,18,
25 1125:5,8,
10,11,13,20
1126:17,20
1127:6,19
1128:4,6,8
1131:8
1140:19
1147:16,19,
22 1149:2,6,
10 1153:20
1154:21,25
1155:11
1156:19,24
1157:3,13,16,
19,23 1159:4,
7 1162:11
1163:3,8,9,
14,20,24
1165:4,11

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

1170:8
1174:6,9,11,
19 1175:7,10,
14,17,19,24
1176:5,18
1180:14,17,
21 1183:24
1184:3,6,15,
20,23 1185:1
1186:19
1188:18
1189:3,10,13,
16,22 1190:2,
6,12,19,23
1191:1,9,14,
19,23 1192:2,
5,6,23 1193:4
1195:19,22
1196:18
1198:8,11,17,
23 1199:1,3,
7,9,11,13,15,
18,19,24
1200:2,15,18,
21 1201:1,6,
10,16
1202:21,23
1203:2,6,9,
14,18,24
1204:14,18,
20 1205:3,6,
11 1208:4,11,
17 1209:9,16,
20 1210:8
1212:17
1213:6,11,18,
21,24 1214:3,
12,15 1218:2
1227:10,24
1230:20,24
1232:10,13,
15,21
1235:13,16
1236:2,6,17,

20,21
1237:24
1238:2,5,8,14
1241:11,18
1242:7,13,19
1243:6
1245:11
1246:3,6,23
1247:2,8,13,
16 1249:2,5
1252:23
1253:3,8,11
1254:14,22
1255:21,25
1259:6,8,12,
24 1260:1,2,
24 1261:6,8,
9,10,11,14,
16,20 1262:3,
7,12,16,21
1263:5,8,15,
18,22 1264:1,
10,13,16
1265:13
1268:6,11,14
1270:2,6
1273:12,16,
20,24
1274:21
1275:2,8,12,
14,16,19,22,
25 1278:3,9,
11,16,21,24
1279:3,5,9,
14,18,20,21
1281:2,6,11,
15,17,22
1282:7,12,16,
20 1300:23
1302:19,22
1303:1,4,6,9,
13,15
1310:10
1311:19

1319:19
1320:10
1321:5
1323:6
1333:3,9,15,
18,22,24
1334:6,8,10,
16 1335:6,11,
12,14,18,22,
25 1336:10,
15,20 1337:1,
5,8,13,16,21
1338:1,6,13,
16,22,25
1339:3,6
1340:17,22
1341:2,5
1342:8,11,18
1345:14,17,
23 1347:21
1348:6,17
1354:1
1355:16
1356:18,20,
23 1357:2
1360:4,11
1363:23
1367:12
1368:21
1371:22,24
1372:12,14,
19 1379:22
1380:2
1392:16,21,
25 1393:8,15,
21 1395:16,
19,21
1400:14,20
1401:1,10,12
1402:2,5,6,7,
8,16,17
1403:9,19,25
1404:2,3,5,9,
11,15,19

1406:9,15,20,
22 1407:4,7,
10,17,18
1410:2,3,5,6,
12,16,21,22,
24 1411:13,
23 1412:5
1413:3,5,17,
21,24 1414:4
1419:8
1420:13,24
1421:6,10,14,
18 1422:8,10,
12,15,21,23,
25 1423:2,8,
11,20,21
1424:3,13,17,
19,21
1425:13,19,
24 1426:1,7,
9,10,12
1429:18
1430:1,6,16
1431:7,8,13,
15,23,25
1432:2,6,8,
17,21,25
1433:3,6
1434:4,8,18
1436:5,8,12,
18,22,25
1437:4
1444:18,23
1445:2,9,12,
17,18,20,25
1446:3,7,14,
17 1447:1,4,
6,9,15
1448:12,15,
23 1449:1,5,
11,14,21,24
1450:2,4,5,7,
10,17,20,22,
25 1451:3,5,

12,14,15,17,
22 1452:1,3,
6,8,12,14
1453:25
1454:3,12,22,
24,25 1455:4,
11,16,19,21
1456:1,8,11,
15 1457:6,15
1458:5,9,11,
12,18,21,23
1459:21
1460:17
1461:18,24
1462:3,6,8,
11,16,18,19
1463:12,14
1464:2,5,17,
25 1465:3,4,
14,16,22
1466:1,13,14,
18,23 1467:1,
3,9 1468:16,
21 1469:1,4,
19,23 1470:4,
8,12,23
1471:9,15,20
1472:2,13,20,
24,25 1473:4,
10,13,18,20
1474:1,3,8
1475:2,4,14,
16,23 1476:1,
5,10,12,13,
15,17,18

**area**
1461:6

**areas**
1126:25
1420:15
1454:4

**argue**

TRANSCRIPT OF PROCEEDINGS

1191:5
1253:18

**arguing**
1191:6,18
1415:14
1473:22

**argument**
1415:18
1431:2

**argumentative**
1149:4
1163:2
1363:22
1444:15
1467:21

**arguments**
1203:1

**arise**
1323:1

**arose**
1402:9

**arranged**
1224:23

**arrangement**
1259:2

**arrive**
1293:15
1299:25
1323:3

**arrived**
1165:22

**Ashton**
1137:11
1153:25
1158:15
1293:8
1303:20
1305:1,13

1306:1
1307:24
1353:19
1373:5
1381:1,9,11
1394:10
1433:18

**Ashu**
1178:19,21,
23

**ASIC**
1270:18

**asks**
1251:23

**aspect**
1240:21
1267:16

**aspects**
1286:20

**asserted**
1469:9,15

**assess**
1167:10,18
1316:11

**asset**
1141:20

**assets**
1134:3

**assign**
1319:12

**assignment**
1287:9

**assist**
1438:25
1442:23
1443:1

**associate**
1228:18

**assuage**
1266:24

**assume**
1131:4
1161:23
1201:4
1261:16
1310:11
1368:18
1378:22
1381:12
1382:18

**assumed**
1133:19
1258:21
1433:12

**assumes**
1315:13

**assuming**
1442:5

**assumption**
1203:19
1322:18

**assumptions**
1171:2
1258:16

**assurance**
1202:6
1203:15
1211:21
1212:1,4
1213:13,15
1214:1,13,23
1216:8,10,17
1217:4,24
1219:14
1221:12
1222:2,14,23
1223:14
1224:3,20
1225:3,7

1235:17,22
1237:2,16
1239:5,12,21
1240:10
1242:3
1243:16
1244:8,13,23
1249:14,20
1256:24
1257:4,12
1258:9,15
1259:1,18
1260:12,19

**assurances**
1201:22
1218:12
1223:4
1240:19
1245:5
1252:17
1257:23

**assure**
1292:5

**assured**
1223:16

**assuredly**
1260:14

**Atlantic**
1283:21

**attach**
1298:12
1339:3

**attached**
1167:1
1219:3
1335:19
1336:1
1337:2
1439:23
1444:10

**attachment**
1129:19
1131:18
1167:4,5
1314:4
1334:25
1336:17
1366:11

**attempted**
1459:24

**attempts**
1216:7

**attend**
1426:15,18

**attended**
1286:3
1313:6
1426:25
1427:1

**attending**
1427:14

**attention**
1176:24
1285:19
1303:23
1314:6
1347:16
1390:22

**attorney**
1201:21
1205:19
1417:23
1440:10
1475:9

**attorney-client**
1246:16,18
1247:7,17,25
1248:3
1474:21

1475:10

**attorneys**
1201:24
1433:24

**attributing**
1472:11

**audio**
1203:23

**August**
1136:21
1139:9
1140:1
1144:20
1145:15
1435:11
1438:10
1442:3
1443:25

**authenticate**
1336:23

**authenticity**
1338:21

**authorize**
1324:24
1325:3

**average**
1138:15,19

**avoidance**
1216:13

**aware**
1170:24
1178:11
1195:16
1236:25
1237:12
1240:1,2
1243:25
1244:1,5
1320:17,20

1321:7,19
1378:9,13
1385:3
1387:19,22
1388:1,21
1390:18,21
1391:10
1393:5
1396:11
1400:22
1405:15,17
1412:3
1418:8,13,14,
15 1419:17

**awareness**
1411:11

**Awesome**
1128:2
1134:8

**awkward**
1258:10

---

**B**

**baby's**
1298:20

**back**
1127:17,20
1128:10
1132:10,11
1135:14
1151:23
1155:17
1158:12
1167:12,16,
19,20,21
1171:4
1172:10,19,
22 1173:14,
18 1181:6
1200:10
1207:1

1234:6,10
1235:21,24
1237:9
1243:2,21
1253:21
1254:7
1255:16
1271:4
1272:10
1273:20
1274:2,25
1277:18
1278:5
1279:17
1285:5,7
1302:6
1305:20
1318:25
1329:21
1331:13
1334:14
1354:13,15
1362:25
1363:3
1364:5
1375:19
1380:13
1384:14,17
1408:15
1434:17
1439:14
1442:20
1445:23
1454:19
1455:10
1456:5
1463:21
1464:23
1465:10,12
1467:1
1468:15
1474:7

**background**

1204:10
1208:5,9
1234:18,21
1235:1,23
1236:12
1247:11
1288:18
1333:25

**bad**
1339:19
1404:13
1412:16,24

**badly**
1315:22

**balance**
1172:4
1309:11

**ballpark**
1376:5,8,12
1377:7

**balls**
1203:7

**bank**
1158:24

**banned**
1386:7

**bar**
1228:24
1429:24

**bare**
1213:3

**base**
1315:9,13,18
1316:7

**based**
1124:20
1125:21
1129:9
1216:4

1269:13
1272:16
1287:10
1316:25
1320:3,24
1321:1
1325:24
1330:25
1333:10
1348:3,9
1426:2
1444:22
1447:18

**basic**
1474:10

**basically**
1289:2,9
1291:7
1306:14
1311:13
1315:15
1318:7
1339:25
1350:21
1412:14
1425:22
1465:9
1469:11

**basis**
1420:19
1444:20
1450:18

**basket**
1384:6

**batch**
1297:1
1298:7
1305:15

**Bates**
1372:16

**TRANSCRIPT OF PROCEEDINGS**

bay
1284:22

bear
1127:20

began
1270:21

begin
1167:18
1412:3

beginning
1179:12,15
1288:19
1324:9
1333:25
1387:16
1428:2
1456:21

begins
1216:2
1221:5

behalf
1228:15,22
1249:13,19
1255:2,9

belabor
1210:13,21
1247:25

believed
1223:16
1274:13

benefit
1273:9
1317:3,10

bias
1392:18

big
1153:2
1284:10
1412:21

bigger
1197:9
1297:11
1318:15

biggest
1297:13

billion
1177:13

binder
1153:2
1225:25
1226:2
1238:1
1336:13
1338:15
1361:2
1371:19
1393:23

binders
1225:14

binding
1177:6
1178:8
1241:20
1251:12
1341:17

bio
1174:4,12,15,
16 1342:14,
16

bit
1178:12,14
1184:13
1204:4,22
1205:2
1212:12
1215:24
1219:10
1225:16,17
1226:17
1231:11,14

1246:11
1251:25
1253:24
1278:20
1283:18
1288:21
1291:21
1299:13
1308:10
1312:6
1313:19
1314:16,17
1315:25
1323:21
1327:6
1356:6
1372:24
1377:13
1380:21
1410:10
1419:2
1469:17

Bitcoin
1164:11
1165:25
1193:15,20,
22 1194:24
1195:9
1196:3
1265:18
1266:6
1267:5,8
1269:2
1270:23
1271:22
1272:2,22
1290:14,21
1291:6
1295:9,13,18,
21 1296:3,10,
12,15
1297:11,20
1299:9,18

1303:2
1306:4,6,12
1307:10
1308:8,16
1310:4,18
1311:6
1320:3,8,14,
19,25
1321:13,16,
18 1322:9,16
1323:16
1328:9
1331:3
1342:4
1344:4,7,22
1347:9
1350:17
1352:3
1359:14
1362:22
1365:16,21
1366:2
1370:9
1375:21
1384:23
1388:2
1389:7,13
1391:23
1392:1,3
1428:10
1434:12

BITMAIN
1194:2
1267:14
1297:8,9,10,
17 1298:9,10
1321:19,21
1354:18
1355:12
1356:3,15

blackout
1383:2,5

blanks
1278:25

Bleck
1181:25
1182:3,4,12,
23,24
1389:25
1390:12,19
1447:25
1460:4,21
1462:22,24
1463:15,22
1467:10

Bleck's
1390:4

blended
1138:15,19

blew
1300:13,17

block
1413:13

Blockchain
1168:3,7,14
1171:10
1271:3,5
1276:7,11
1277:4

Blockchain.
com
1173:2,5
1269:1

Blockchain.
com.
1168:9,10
1277:17

Blockware
1428:17,18,
21 1430:21,
22 1431:9
1433:10

**TRANSCRIPT OF PROCEEDINGS**

1434:11,12,
15

blog
1468:23

blow
1164:20
1252:3
1253:23

blowing
1291:18

blue
1229:12
1317:22

board
1295:4

boards
1291:18,19

boat
1286:7

body
1439:15

book
1286:10
1287:6,11,16,
17 1452:19
1453:1

books
1287:14,22

border
1411:3

born
1283:11

Bottle
1288:22

bottom
1140:14,24
1143:19
1154:6,7

1179:15
1180:3,20
1251:19
1311:21
1314:7
1315:23
1317:15
1326:16
1334:23
1373:3
1408:11
1416:20
1443:20

bought
1272:7

bound
1247:18

boy
1438:7

boys
1283:6

breach
1148:7
1150:12,13
1172:20,24
1173:17
1187:14
1188:1
1189:9
1226:23
1227:2,5,7,14
1257:25
1277:22
1341:21

breached
1258:11

break
1125:3
1170:9,10
1174:4,12,15,
16 1200:19

1201:2
1261:12
1262:14
1265:2
1278:4,13
1342:14,16
1413:19

bribed
1179:3

briefed
1418:16

briefing
1420:25
1469:5

briefly
1202:4
1399:12

bright
1203:10

bring
1144:1
1179:19,25
1189:1
1403:1

bringing
1137:22
1179:4

brings
1461:6

broad
1289:16
1461:11
1474:10

broader
1310:14

broadly
1225:7

Brooks
1337:8,10

1435:21

brought
1178:24
1253:17
1267:24
1268:18
1294:2,19
1406:21
1418:17,18

brush
1461:11

BTC
1296:5
1315:10,14,
18 1316:8

BTW
1185:12

bubbles
1185:16

bucks
1138:2

build
1143:10
1144:9,17
1252:20
1288:5
1302:2
1308:1
1310:12
1327:24
1374:20
1375:7
1385:4
1386:6,9
1405:25

build-out
1308:5,12,13,
21,23 1309:1
1381:25
1383:12,19

1384:13,15,
21 1385:1,6,
14,15,22
1411:17

building
1307:14,15
1308:24
1309:24
1323:14
1330:15,16
1340:8,13
1412:20

built
1306:16
1344:8
1346:9,16

bullet
1177:4,10

bumped
1185:21

bumper
1203:10

bunch
1276:18

burden
1189:11,14,
18,19

business
1132:22
1178:22,25
1186:6
1202:12
1287:8
1289:15
1292:10
1296:9
1383:3
1412:19
1417:21
1427:12

TRANSCRIPT OF PROCEEDINGS

**busy**
1204:11

**buy**
1134:3
1143:10
1161:1
1267:10
1296:6
1299:3
1331:7
1334:17
1388:2
1391:22
1392:2
1405:16

**buyer**
1142:3

**buying**
1143:11
1269:3
1350:10
1375:21
1405:23
1412:19

**buzzwords**
1259:19
1260:12

---

**C**

**cable**
1382:18

**cables**
1382:21

**calculate**
1138:22

**calculated**
1132:7

**calibrated**
1160:20

**California**
1124:2
1216:11,18
1217:18
1228:6,9,10,
11,17,21,22,
23 1239:6,22
1240:5,19
1241:6
1250:11
1259:16
1260:10

**call**
1129:10
1130:7
1132:18,23
1134:11
1136:6,7,11,
13 1144:2
1151:5
1153:4,17
1154:18
1155:7,25
1156:12
1157:12
1158:14
1172:25
1176:24
1183:18
1203:6
1221:16
1222:24
1224:1,18
1250:16
1267:23
1278:10
1279:23
1285:22
1312:12,15
1318:23
1319:13,14
1327:13,22
1328:19,22

1329:5,8,10,
13 1330:7,8,
11 1331:13,
15 1332:21
1336:9
1339:12,15,
23 1340:20,
21 1341:1,7
1396:16
1410:18
1441:16
1443:16
1455:16
1458:15

**Callahan**
1124:7,12,18,
25 1125:5,8,
10,13,20
1126:20
1127:6,19
1131:8
1140:19
1147:16,19,
22 1149:2,6,
10 1153:20
1154:21,25
1155:11
1156:19,24
1157:3,13,16,
19,23 1159:4,
7 1162:11
1163:3,9,14,
20,24 1165:4,
11 1170:8
1174:6,9,11,
19 1175:7,10,
14,17,19,24
1176:5,18
1180:14,17,
21 1183:24
1184:3,6,15,
20,23 1185:1
1186:19

1188:18
1189:3,10,13,
16,22 1190:2,
6,12,19,23
1191:1,9,14,
19 1192:2,5,
23 1193:4
1195:19,22
1196:18
1198:8,11
1199:3,7,9,
11,15,19
1200:2,15,18,
21 1201:1,6,
10,16
1202:21,23
1203:2,6,9,
14,18,24
1204:14,18,
20 1205:3,6,
11 1208:4,11,
17 1209:9,16,
20 1210:8
1212:17
1213:6,11,18,
21,24 1214:3,
12,15 1218:2
1227:10,24
1230:20,24
1232:10,13,
15,21
1235:13,16
1236:2,6,17,
20 1237:24
1238:2,8,14
1241:11,18
1242:7,13,19
1243:6
1245:11
1246:3,6,23
1247:2,8,13,
16 1249:2,5
1252:23
1253:3,8,11

1254:14,22
1255:21,25
1259:6,8,12,
24 1260:2,24
1261:6,9,11,
16,20 1262:3,
7,12,16,21
1263:5,8,15,
22 1264:1,10,
13,16
1265:13
1268:6,11,14
1270:2,6
1273:12,16,
20,24
1274:21
1275:2,8,14,
19,22,25
1278:3,11,16,
21,24 1279:3,
9,14,18,21
1281:2,6,11,
15,17,22
1282:7,16,20
1300:23
1303:6,15
1310:10
1311:19
1319:19
1320:10
1321:5
1323:6
1333:3,9,15,
18,22,24
1334:6
1335:11,14,
25 1336:10,
15,20 1337:1,
5,8,13
1338:6,13,16,
22,25 1342:8,
11,18
1345:14
1347:21

---

**TRANSCRIPT OF PROCEEDINGS**

1348:6,17
1354:1
1355:16
1356:18,20,
23 1357:2
1360:4,11
1363:23
1367:12
1368:21
1371:22,24
1372:12,19
1379:22
1380:2
1392:16,21,
25 1393:8,15
1395:16,19,
21 1400:14,
20 1401:1,10
1402:2,5,7,16
1403:9,19
1404:2,5,9,
15,19 1406:9,
15,22 1407:4,
18 1410:2,5,
22 1413:17,
21,24 1414:4
1419:8
1420:13,24
1421:6,10,14,
18 1422:8,21,
25 1423:21
1424:13,19
1425:24
1426:7,10
1429:18
1430:1,6,16
1431:23
1432:2,8,17,
21,25 1433:3,
6 1434:4,8,18
1444:18,23
1445:2,9,12,
18,25 1446:3,
7,14,17

1447:1,6,9,15
1448:23
1449:1,5,21
1450:2,5,7,
10,17,20,22,
25 1451:3,14
1452:1,3,8,
12,14
1453:25
1454:3,22,25
1458:5,11,23
1459:21
1460:17
1461:18,24
1462:3,6,8,
11,16,19
1463:12,14
1464:2,5
1465:4,14
1466:13
1467:4,9
1468:16,21
1469:1,4,19,
23 1470:4,8,
12,23
1471:15,20
1472:2
1475:4,14,16,
23 1476:5,12,
15,18

**called**
1127:8
1137:7
1167:20
1168:2,7
1185:11
1205:9
1233:9
1234:13
1235:14
1264:22
1281:20
1290:8

1396:8
1414:2
1428:21
1453:18

**calling**
1134:23

**calls**
1152:5,13,24
1173:25
1186:17
1211:5,9,15
1217:25
1241:4
1256:20,22
1257:2
1265:11,12
1272:24
1310:8
1329:12
1353:24
1355:14
1367:10
1419:6
1424:11
1444:14
1461:6

**Campbell**
1418:22

**Canada**
1411:4

**canceled**
1342:5

**capacity**
1186:1
1188:6,9
1190:10
1267:7
1289:12
1304:9
1374:21
1376:11

**capital**
1135:7
1136:6,7,11,
12 1152:5,13,
24 1153:4,17
1154:18
1155:7,25
1156:11
1157:11
1158:14
1193:1
1441:16

**caption**
1213:12

**capture**
1314:17

**care**
1131:5

**career**
1289:3

**carefully**
1155:13
1157:4
1360:6,12
1379:24

**Carolina**
1334:15

**carrot**
1181:10

**carryforward**
1267:1

**cascading**
1267:6

**case**
1233:2
1266:2
1267:15
1274:16
1317:8

1319:9
1345:7
1410:10
1414:23
1415:1,4
1465:23
1466:9

**cases**
1414:15

**cash**
1141:8
1144:14,24
1145:6,10
1274:15

**casting**
1158:19

**catch**
1285:16
1293:16
1299:15

**catches**
1291:20

**caused**
1197:10

**causing**
1412:22

**cease**
1162:14

**ceased**
1162:16,24

**cell**
1400:8
1453:17
1455:14
1458:14

**center**
1141:25
1142:8,17
1144:19

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1288:6
1374:7,10,21
1389:2,4

**cents**
1315:22,24
1316:6
1317:17,18
1318:1,20

**century**
1465:22

**CEO**
1134:2
1194:12
1195:3
1427:17

**cetera**
1144:19
1181:12
1250:13
1285:1
1401:4
1411:8

**chaff**
1476:2

**chain**
1161:21
1169:24
1171:1,5
1266:8,10,19,
22 1267:6,10
1277:19
1348:10
1394:18

**chains**
1308:10

**chair**
1195:18
1256:7,8,9
1309:24
1310:1,2

1332:24
1429:12
1459:19
1460:15

**chair's**
1426:13

**challenged**
1352:19

**challenges**
1170:25

**challenging**
1207:10
1265:17

**chance**
1128:1
1190:9
1209:11

**Chancellery**
1414:12

**chances**
1133:3

**change**
1291:14
1296:9
1298:15
1384:4
1450:2
1464:14

**changed**
1160:8
1164:14

**changing**
1449:25
1464:14

**channels**
1266:21

**characteristic
s**
1319:5

**charge**
1300:22
1302:2
1359:25

**chart**
1132:8
1314:18,22
1315:3,4,7,
20,23 1316:6,
10 1318:22
1319:12
1322:2
1331:24
1336:1,6,9
1339:16,20
1369:11

**chat**
1265:21

**chatting**
1174:3

**cheap**
1141:2

**cheaper**
1355:12,18

**check**
1196:19
1386:21

**checks**
1299:15

**chief**
1290:4
1291:24

**child**
1284:20

**children**
1283:5
1284:5

**China**
1345:2

1346:11,18,
23 1357:9,14
1386:7

**Chinese-
based**
1331:5

**chip**
1196:8,12
1266:13
1269:5,7,16,
17,21
1270:25
1271:1
1272:5,7,9
1298:14,17

**chips**
1130:23
1132:15
1133:5
1139:2,5
1274:11
1306:6,11,14,
15,16,18,20

**choice**
1231:20

**circle**
1151:23

**circuited**
1300:14

**circumstance**
1463:20

**circumstance
s**
1210:11

**citation**
1240:5

**cites**
1260:19

**citizen**

1285:9

**city**
1204:11

**claim**
1189:8
1214:4,6,13

**claimant**
1415:2,4
1417:22

**Claimant's**
1213:14

**claims**
1205:21
1206:22
1207:9
1213:19
1463:3

**clarification**
1257:15
1335:1
1340:18

**clarify**
1234:9
1248:21,22
1365:15

**clarifying**
1369:9
1449:25

**class**
1286:3

**clean**
1291:15
1404:14

**cleanup**
1263:9
1264:2
1291:21

**clear**
1129:10

TRANSCRIPT OF PROCEEDINGS

1133:20
1162:4
1163:23
1209:14
1248:21
1251:11
1255:11
1302:22
1340:9
1410:25
1430:7
1449:5
1452:9

**client**
1206:23
1207:4,15,17
1223:8,18
1229:19
1244:22
1258:14,17
1301:6,7
1475:9

**client's**
1223:12

**clients**
1228:15,22
1233:23
1297:4
1298:4
1301:4
1304:23
1311:2

**clients'**
1223:1

**close**
1124:14
1132:19,24
1133:2
1140:16
1167:23
1181:11

1186:6
1282:8
1306:20
1411:14
1425:24
1448:4

**closely**
1393:13

**closing**
1334:4

**co-located**
1296:19

**co-locating**
1290:11
1292:16

**co-location**
1290:9
1301:4,6,9
1302:24
1310:22
1350:12,20
1351:3
1387:19,22

**coach**
1448:12

**coating**
1300:10

**code**
1216:11,18
1217:19
1239:7,23
1240:5,19
1241:1,7
1250:11
1260:20

**cohosting**
1350:1
1405:8

**cohosts**

1364:18

**Coie**
1205:19,20,
25

**coin**
1470:21

**coincidence**
1363:20

**coinmint**
1124:15
1129:14
1132:25
1133:17,21
1134:17
1137:15,17,
18,22
1139:19
1140:7,16
1141:2,21
1142:9,14
1143:21
1145:19
1148:6
1150:15,20
1152:5,14
1159:10,20
1160:2
1161:10,15,
18,23,25
1168:18,20
1169:11,20
1170:2,4,5,16
1171:20
1172:13,24
1173:2,6
1182:11
1183:9
1186:7,14,25
1187:2,24
1188:1
1194:8,15,23,
25 1195:7,10

1196:10,23,
25 1197:23
1198:3
1205:21
1206:2,4,5
1207:9
1209:4
1211:7,11,17
1212:1
1213:24
1215:1
1218:10,21
1225:6
1226:9
1227:6,13,17,
18 1231:24
1238:22
1239:4,20
1240:9,18
1242:2
1249:13,19
1251:2
1254:20
1255:2,14
1257:11
1265:5
1266:1
1267:25
1268:20
1271:6,9,11
1272:8
1276:8
1277:10,21
1281:25
1287:25
1288:8,24
1289:10,11
1290:1,5
1291:23
1295:8
1296:2
1300:24
1301:8
1302:23

1310:20
1314:5
1317:9
1321:13,15,
19 1323:25
1325:11
1327:9
1332:7
1340:3
1341:18,21,
22,25 1343:6,
13,18 1344:4
1349:15
1352:2
1353:18
1358:13
1360:16
1361:21
1364:16
1365:15,20
1366:1
1367:8
1369:3
1370:4,10,18
1371:5,8,15
1374:19
1375:12
1376:20
1378:10
1379:18
1382:2,6
1383:18
1384:21
1386:2,18,21
1387:7,15,16,
20,23 1388:2,
15 1390:5
1391:11,20,
25 1392:9,13
1397:19
1398:4,8,15
1409:24
1414:24
1415:6,13

**TRANSCRIPT OF PROCEEDINGS**

1416:7
1417:12,15
1418:4,8
1427:18
1428:9
1432:9
1433:25
1434:3,6
1437:17
1438:1,3,5
1439:11
1440:1,12
1451:6
1453:5
1463:6
1472:19

**Coinmint's**
1158:24
1161:14
1171:25
1193:24
1197:11
1206:18
1216:7
1219:16
1226:22
1227:1,2,5
1250:8
1257:19
1270:21
1289:15
1364:22
1365:1,3,5,14
1375:21
1389:10,24
1391:22
1397:7
1440:18

**colleague**
1226:10
1233:8

**colleagues**

1231:3

**collected**
1224:5
1400:9,19
1402:12

**collection**
1204:11
1400:23

**colloquial**
1130:6

**colors**
1336:4

**column**
1315:12,16,
21 1316:2,4

**columns**
1315:10

**combination**
1143:25

**commanded**
1258:14

**commencement**
1391:4

**comment**
1125:21
1192:17

**comments**
1295:17
1439:24

**commercial**
1194:6
1206:1
1216:11,18
1217:18
1239:7,22
1240:5,19
1241:1,6
1260:20

1272:21

**commission**
1154:17
1155:6,24
1156:13
1158:3

**commit**
1310:3
1322:13
1465:5

**commitment**
1364:17
1365:16,21
1384:22

**committee**
1344:11
1359:4,9
1366:21
1368:12,17
1375:6

**common**
1298:21
1320:2,25
1322:5,6

**commonly**
1306:7

**communicate**
1236:11
1310:25
1332:11

**communication**
1259:17
1260:11
1276:7
1457:21

**communications**
1235:21
1239:2,18

1240:2
1242:1
1250:9
1251:2
1258:22
1311:5
1399:17,20
1400:2,5
1453:9
1457:12
1460:11

**companies**
1215:16
1331:5
1393:13
1411:8

**company**
1158:16
1163:17
1193:2,7
1194:12
1222:12
1234:19
1344:5
1388:21
1392:13,19,
22 1407:11
1414:21,22
1415:20
1418:17,18
1420:8
1427:15
1442:18

**company-issued**
1403:17

**comparable**
1349:3,11

**compare**
1286:18
1304:10

**compared**
1289:22
1318:8
1347:9
1355:18

**compensated**
1392:12

**compensation**
1392:15
1393:7

**competition**
1194:25
1195:9

**complaining**
1432:12

**complaint**
1213:14

**complete**
1130:1
1178:7

**completely**
1182:2
1296:9
1401:17
1471:1
1472:7

**complicated**
1389:1,4

**complied**
1403:14

**comply**
1403:7

**complying**
1386:22

**component**
1298:13
1299:18

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

components
1266:15
1299:6,8
1328:8
1345:1
1346:22

**Compound**
1170:6

comprehensive
1199:10

computer
1183:4
1230:19
1231:5
1289:18,23
1290:11,23,
24,25 1331:8

computers
1389:7,13

computing
1239:3,19
1374:13

concealing
1158:24

concept
1290:10,13

concern
1222:15

concerned
1188:14

concerns
1223:13
1238:23
1272:17

conclusion
1186:18
1217:25
1353:24

condition
1258:18
1316:1
1319:9

conditions
1269:6
1270:23
1316:4,16,22,
24 1321:21
1322:11
1340:3

conduct
1388:18
1391:2

confer
1231:3
1255:20
1259:5
1406:8

conferences
1284:13

conferred
1259:9

confident
1359:21

configuration
1142:5
1291:5

confirm
1219:15
1220:24
1224:6
1248:8
1346:4

confirmation
1223:23
1224:5,11

confirms
1313:25

conflicts
1150:24

confused
1358:18
1368:13

connect
1382:14,18

connected
1291:3

**Connecticut**
1200:8
1459:16,22

**Connecting**
1327:8

connection
1205:21,25
1206:3
1271:6
1378:17

consensus
1201:17

consequences
1217:23

considerable
1389:6

consideration
1309:23
1316:16
1403:12,20
1472:4

considered
1413:14,15

considers
1218:11

consistent
1145:18,25
1208:2

1258:2
1356:8
1357:11,19
1358:6,24
1360:21

constantly
1266:16,20,
24

constitute
1250:10
1407:3

constraint
1267:7

constraints
1186:4

construction
1413:12

consult
1399:1
1440:13

consultant
1194:24

consulted
1395:11,25
1396:14,17

consulting
1289:3

consumption
1383:21

contact
1151:10
1194:19
1236:3
1311:24

contacted
1229:10,11,
22 1230:6

contained

1457:5
1459:9

container
1300:5

contemplating
1141:24
1289:3

contends
1250:8

content
1244:2

contents
1209:8

contest
1147:16

contesting
1338:20

context
1152:20
1155:2,18
1173:1
1178:7
1198:9,20
1210:3,7,16
1247:5,11
1248:18
1249:8
1257:22,24

contingent
1179:4
1181:16

continue
1166:4
1223:11,18
1240:24
1268:22

continued
1151:9,10

**TRANSCRIPT OF PROCEEDINGS**

1186:10
1223:2
1269:4,20
1272:12
1350:23

**continues**
1315:25

**continuing**
1124:8,22
1271:9,10
1290:22

**contract**
1129:12
1130:2
1135:15
1136:3
1146:19
1147:10
1151:12
1159:1,21
1160:8
1164:13
1166:7
1168:14,17
1169:20
1170:2,5,14,
15 1174:24
1176:3
1179:3,5
1182:11
1183:14
1186:8,16
1192:8,10,12
1194:14
1196:24
1197:1,14,19
1198:14,21
1200:13
1202:17
1214:7
1219:16
1222:9,12

1223:9
1229:6,15
1235:2,25
1236:15
1238:25
1240:25
1257:20,25
1258:10,16,
18 1265:9
1266:1,22
1271:7
1276:8
1295:8,12,17
1304:6,16
1321:20
1323:2
1341:17,22
1351:9
1360:15,19
1365:25
1369:4
1387:1,4,14
1398:24
1405:15,17
1409:3,23
1417:3,16
1428:10
1434:11,15
1436:19
1437:25
1438:2,5
1439:5,10
1440:17
1444:1,6,13
1446:24
1447:8

**contraction**
1145:12

**contractor**
1289:9

**contracts**
1159:15,19,

25 1161:10
1169:10,14,
19 1170:2,4
1196:6
1211:10,16
1234:22
1274:5,7,9,17
1292:6
1298:16
1303:25
1386:19,23
1387:7,12
1398:19
1399:2
1416:8
1417:12
1418:10,23
1421:22
1439:1
1440:14

**contrary**
1202:17

**contrast**
1471:4

**contribution**
1411:12

**control**
1266:13
1414:20

**controller**
1442:18

**controls**
1414:22

**convenient**
1328:2

**converge**
1313:8

**conversation**
1128:20
1133:9

1207:11
1208:13,24
1226:25
1245:2
1294:8,11
1327:25
1330:25
1335:3
1344:14,16
1360:24
1370:15
1408:3
1412:4

**conversation
s**
1209:1
1225:1,5
1227:4
1257:5
1341:12
1455:23
1457:2
1458:7
1459:5,25
1460:19
1467:14

**convoluted**
1257:6

**COO**
1290:2
1327:9
1386:17
1387:7

**cools**
1291:18

**copied**
1171:6
1173:14
1217:18
1364:6
1409:9

1433:16
1435:8
1441:15
1442:5,7
1465:7

**copies**
1212:19
1220:3
1337:17

**copy**
1153:3
1165:6,9
1232:4
1302:16,17
1337:18
1345:5,21
1346:5
1417:25
1418:3,5
1428:20
1430:17,22
1431:1,9
1432:16,20,
24 1433:10
1435:14,24
1436:9
1437:8
1438:5,14,16,
19 1439:5,10
1440:17
1443:3
1466:12

**copying**
1172:10
1362:10

**cords**
1328:10

**Core**
1178:13
1179:19
1180:1

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1181:12,24
1182:20

correct
1162:21
1180:1,2
1186:11
1193:16
1194:20
1215:4
1219:23
1220:15,16
1221:8,15
1226:13
1229:3,4
1232:2,21
1234:17
1237:3,16
1243:3,19
1245:17
1248:15,19
1250:2
1256:20,21
1260:21
1263:10
1301:5
1302:24
1312:1
1327:15
1332:17
1337:4
1341:4
1343:21
1344:2
1345:3
1350:1
1352:3
1353:4
1357:10
1362:5
1364:8,10,20
1366:22
1373:6,7,17,
22 1374:18

1376:15,17,
18,22 1377:1
1382:9,13
1383:1
1385:8
1386:5,20
1388:24
1390:13
1391:5,6,9,
12,24
1394:11,12,
16 1396:1
1397:16
1398:9
1407:14
1433:12
1435:17
1436:11
1437:5
1438:15
1455:20
1456:17,20

corrected
1129:19

correctly
1125:15
1215:18
1218:22
1283:1
1312:12
1346:5
1361:18
1377:5
1428:16
1455:8

correspond
1284:12

corresponden
ce
1207:19
1212:8
1216:5,14

1235:24
1243:2,21
1254:7,19
1258:24
1284:6

cost
1271:22
1301:20,23
1302:5
1318:13

costly
1367:4,17,25

Costner
1288:22

costs
1299:3
1301:17
1318:16

counsel
1206:4,8
1210:16
1215:1
1219:20
1222:11
1227:1,6
1295:16
1352:11
1390:3
1417:23
1418:5
1422:1
1438:18,22,
25 1439:5,12
1440:12,19
1451:11,19
1461:4
1464:22
1465:2,6,7
1466:9
1468:5,11

counsel's

1457:24

counter
1430:12

counting
1125:15
1417:20

country
1228:20
1285:9
1290:9

couple
1126:19
1176:21
1193:14,18
1195:6
1263:1
1276:4
1334:4
1404:16
1449:3
1474:6

court
1153:4,10
1204:15
1212:24
1282:4
1335:14
1414:12,20
1415:2
1457:16
1459:1,15,16
1464:25

courts
1228:17,18

cousin
1425:25

cover
1152:19
1154:17
1155:7,24

1175:25
1274:18
1301:23

covered
1176:6
1238:3,11
1273:2,6
1473:17

COVID
1308:10
1401:17,20,
23,25
1451:22
1452:3

crane
1300:5

create
1240:24
1271:21
1332:15
1342:4

created
1314:25
1340:10
1370:5

creating
1410:19
1412:16

credibility
1161:20
1163:6
1393:12

credit
1177:12
1178:9
1300:20

critical
1266:20

cross

1175:10
1300:2
1406:24
1407:2

cross-exam
1149:11

cross-
examination
1123:11,18
1155:10
1175:5
1228:1
1253:17
1343:1

crucial
1189:21
1190:16,19

crucially
1189:8

cryptic
1207:1

crypto
1412:11

cryptocurren
cies
1324:17,24

cryptocurren
cy
1288:3
1289:17
1412:15

cure
1186:15
1187:3
1227:6,14

curiosity
1287:5

curious
1281:7

currency
1389:1,3

current
1132:5
1135:22
1290:1
1364:18

custodian
1400:19

customer
1134:4
1159:11
1160:2
1169:15,16
1171:19
1172:4
1178:5
1267:23
1268:19,20
1275:10,13
1301:19
1302:2,24
1304:7,15
1305:11
1322:13
1330:16
1359:22
1365:20
1386:19,22
1387:24

customers
1161:10,12,
17,22
1177:18,25
1178:2,4
1193:23
1194:3
1265:15,16
1267:12
1268:23
1272:19
1274:6

1292:5,15
1296:20
1301:13,19
1304:1
1310:22
1320:21,22
1321:7,10
1322:20
1333:25
1350:1,22
1359:20
1364:22
1365:1,3,5,14
1383:3,6
1387:10

customized
1274:8

cut
1153:3,8,15
1232:17
1291:16
1391:1

Cutler
1123:9
1125:3
1200:24
1203:16,21
1204:15
1205:6,8,17,
18 1209:14
1210:2,9,15,
24 1214:18
1217:17
1228:3
1230:25
1243:18
1247:20
1255:13
1256:2
1259:10,15
1261:21
1262:10

cutoff
1400:24
1401:14

cuts
1449:2

_____

D

dam
1413:12

damages
1193:24

danger
1145:8

darn
1187:20

Dash
1177:1

dashes
1395:5
1397:6

data
1141:25
1142:8,16
1144:18
1159:19
1177:17,21,
22 1178:7,11
1181:25
1182:6
1288:5
1374:7,10,20
1389:1,3

date
1138:24
1161:11
1200:2
1215:5,6
1225:16,18
1329:3

1335:8
1353:21
1357:25
1360:17,21
1397:11,14
1402:4
1432:1,5
1436:19,25
1437:6
1465:3,4

dated
1148:3
1215:12
1238:4
1366:1

dates
1138:12,14
1324:10
1336:5
1465:6,9

day
1124:8
1135:12
1146:21
1148:19
1149:19,24
1150:3
1151:24
1184:7
1221:13
1261:21
1291:12
1297:22,23
1300:15
1315:17
1316:6
1317:19
1369:24
1474:19

days
1133:16
1154:15

**TRANSCRIPT OF PROCEEDINGS**

1155:4,21
1186:15
1187:3
1195:6
1219:13
1220:18
1293:12
1417:20,21
1426:20
1433:13
1453:12

**deadline**
1222:16

**deal**
1130:7,8,12
1134:5
1136:1
1138:8
1141:2
1144:21
1145:16,18,
23 1179:20
1180:1
1269:1
1272:21
1333:11
1351:8
1354:24
1358:7,23
1359:3,8
1361:9,25
1377:9
1388:6
1405:7
1406:3
1408:17
1434:24

**dealing**
1178:18
1403:21

**deals**
1321:12

**debt**
1137:12,13,
22 1269:1
1411:24

**December**
1215:13
1358:1,16

**decide**
1219:21
1306:16
1348:13,14
1421:14

**decided**
1270:24
1283:18
1374:20,22
1375:7,11
1381:14

**deciding**
1236:11
1296:11

**decision**
1132:18
1308:17
1322:17
1360:1
1386:6,9

**deck**
1159:14
1176:18
1182:3
1390:7
1422:2

**dedicating**
1294:15

**default**
1150:14
1186:7,10,15
1187:3
1197:11

1341:22

**defaulted**
1168:18

**defaulting**
1133:1

**deficient**
1400:23

**define**
1229:20
1230:10,13
1233:19

**definition**
1319:3

**definitively**
1239:24

**degree**
1285:21,22
1286:12,13
1383:15

**Delaware**
1152:23
1414:11,14
1427:4
1433:25
1434:2,7

**delayed**
1139:8
1194:1
1368:5
1400:24

**delays**
1367:5
1368:1,3

**deliberating**
1404:6

**deliver**
1257:20
1258:9,15
1299:12

1396:7

**delivered**
1325:19
1336:5
1349:15
1358:13,21

**deliveries**
1164:15

**delivering**
1332:2

**delivery**
1130:17,20
1131:14
1138:24
1160:9
1164:21,24
1165:14,17,
21 1322:14
1357:22,25
1358:3,10,24
1367:5
1368:1,3,4,9,
15 1383:25
1384:23
1386:4
1395:8
1397:8,25
1398:3,8,15
1406:5

**demand**
1185:25
1194:4
1197:8
1199:23
1200:7
1202:2
1213:12,21
1214:22
1216:10,16
1222:1,3,13
1223:4,14,20

1224:25
1240:21
1241:1,6
1245:22
1252:17
1257:22
1258:23
1259:17
1260:11,19
1457:4
1459:7,12

**demanded**
1240:18

**demanding**
1258:25

**demands**
1249:14,20

**demonstrate**
1317:7,8

**demonstrated**
1339:23

**Denaut**
1194:18,23
1195:6
1196:2
1200:9
1230:16
1293:9
1303:21
1325:4,5,24
1327:6
1343:21
1353:3
1373:5
1394:10
1418:16
1427:13,17
1447:24
1453:5,9,18,
21 1454:2,24
1455:23

**TRANSCRIPT OF PROCEEDINGS**

1457:3
1458:1,7
1459:5
1460:3,20
1462:23
1463:11,23
1464:13,18
1467:2,7,14,
15,22
1469:10,12,
16 1470:1,24
1471:3,11,17,
22 1472:3,6,
8,9,15 1473:1

**Denaut's**
1453:17
1455:14
1465:2
1469:23
1472:20,22

**denied**
1402:23

**department**
1440:1

**departure**
1472:18,21,
23 1474:4

**depend**
1178:5
1197:9

**dependent**
1321:21

**depending**
1319:7,9
1394:22

**depends**
1197:6
1228:12
1262:18

**depicts**
1316:18

**depo**
1356:21
1423:6
1425:11
1430:11
1446:4
1458:9,22

**deposed**
1345:7

**deposit**
1171:22
1172:6
1176:14
1206:18
1207:3
1218:13
1219:17
1252:8
1258:1,17

**deposition**
1232:22
1345:6,12,21,
22 1349:9
1350:4
1356:13
1357:3
1375:3,4
1377:12
1390:11
1400:24
1401:6,8,13
1402:9
1419:25
1420:17
1429:8
1456:4,7,12,
23 1465:19
1466:14
1473:7
1474:11,15,

25 1475:7

**deposits**
1171:19
1172:4

**depressed**
1379:13

**derive**
1329:23

**describe**
1229:20
1289:14
1328:12
1412:18

**describes**
1290:10
1291:6
1316:7
1319:24

**describing**
1291:11

**description**
1200:3
1355:21
1363:4

**design**
1269:17
1272:4,5

**designed**
1290:14,16

**designing**
1331:3

**desperate**
1158:19
1176:11
1185:20

**detail**
1305:14
1329:23
1359:23,24,

25

**detailed**
1223:6

**details**
1138:21
1188:25
1347:12,25
1348:24
1351:7,9,12
1358:9
1359:3,5,8,
16,20
1360:17
1361:25
1475:19

**determination**
1309:25
1393:12

**determine**
1309:19
1354:3,7

**develop**
1252:8
1379:4

**developed**
1288:14

**developer**
1287:3

**development**
1269:4,7
1271:24
1285:23
1287:6

**devil's**
1475:19

**dialogue**
1201:22
1474:24

**difference**

1318:10,14
1351:4

**differentiate**
1344:12

**difficult**
1150:16
1250:19
1258:13
1267:20

**difficulty**
1131:6
1145:7,11
1166:1
1189:2

**dig**
1466:16

**digesting**
1395:7

**digital**
1389:1,3

**digits**
1465:24

**diligence**
1178:21,24
1181:24
1182:11,20
1307:4
1347:5,6
1388:6,19
1389:16,22,
25 1390:4
1391:3

**diligent**
1186:5

**dilute**
1158:15

**dilution**
1143:23

dinner
1146:8,23
1147:7

dire
1209:5

direct
1123:10,17,
21 1194:25
1195:9
1205:13
1224:17
1282:23
1303:23
1314:6
1347:16
1404:17
1414:6
1416:9

directed
1364:12

directly
1312:23
1313:1
1359:22
1392:9
1463:18

dirt
1291:20

disagree
1203:1
1251:18
1420:1

disagreement
1207:12

disagreements
1151:4

disclose
1460:10

disclosure
1454:11

disclosures
1235:7

discourse
1420:16

discover
1454:15,16

discovering
1461:7

discovery
1232:12,16,
17,18
1400:12,23
1401:3,5,14
1403:5
1459:23
1460:7

discrepancy
1132:9

discuss
1139:16
1155:5,22
1156:3
1219:24
1268:23
1272:20
1329:14
1330:4
1361:9
1400:13
1408:17
1427:11
1449:16
1473:6

discussed
1153:24
1193:17
1221:6
1247:21

1268:24
1269:2
1293:20
1314:13
1328:3,6
1329:20
1390:4
1427:23
1428:5
1459:11
1463:2
1466:4

discussing
1217:21
1257:24
1286:20
1379:3
1390:6

discussion
1132:23
1136:5,6
1140:11
1166:14
1186:2
1200:1
1201:19
1208:7
1213:23
1221:18
1223:10,15
1233:1
1255:22
1257:21
1262:9
1273:18
1276:1
1306:25
1348:22
1349:1
1351:13
1367:19,21,
25 1393:18
1421:16

1423:13

discussions
1124:20
1129:24
1139:13
1145:25
1198:7,16
1200:11
1201:21
1202:1,7
1203:15
1206:11,17
1207:21,24
1209:2,6
1210:2,6,16,
18,22
1211:19,24
1215:14
1221:18
1222:25
1223:12
1235:17
1245:20
1249:9
1266:9
1271:9,11
1272:18
1274:4
1326:8
1454:16
1458:1
1461:22
1462:9

disguised
1154:17
1155:6,24

display
1327:23
1335:23
1337:11

dispute
1206:20

1207:25
1209:7,18
1210:4,12,17
1212:8
1215:15
1221:20,22,
24 1229:2,6,
14,18 1230:7,
10 1231:24
1233:15,17,
19,20,25
1234:15
1236:14
1415:23
1463:6

disrupt
1279:11

distinguish
1445:7
1447:21

distracting
1270:9

distribution
1308:22
1309:2
1310:6

document
1126:11,13,
15 1127:17,
23 1128:5
1129:17,18,
25 1148:23
1169:1,3,4
1175:4
1177:16
1178:1
1186:20
1198:16,23
1199:4,16
1214:19
1218:6

**TRANSCRIPT OF PROCEEDINGS**

1224:10
1225:10
1226:4
1242:24
1243:3,10,15
1247:5,11,12
1301:1
1334:25
1335:8,20,23
1336:3
1338:20
1339:24
1340:1
1351:15
1352:4,5,8,
10,14,18,19,
20,21,24
1353:4,13,16
1354:8
1355:9
1371:18
1394:6
1399:13
1404:17
1405:1
1417:25
1436:3
1438:8,14,17,
19 1439:4,9,
13 1440:20
1441:12,13
1453:4
1470:19,20,
25 1471:2

**documentary**
1126:24

**documentatio
n**
1251:24
1252:7,19,21

**documents**
1152:22

1153:4,10
1198:18
1252:11
1256:14
1337:25
1351:18
1388:14
1399:2
1400:19
1402:25
1439:1,8

**dollar**
1153:25
1315:22

**dollars**
1148:6
1150:13
1188:2
1315:9,14
1316:8
1355:5,11
1391:11,14,
21

**door**
1139:15
1204:3
1282:8
1384:2

**double-sided**
1417:7

**doubt**
1216:13
1313:25

**doubts**
1257:19
1266:25

**dovetails**
1402:23

**downtime**
1299:22

**Doyle**
1199:22
1206:9,11,19
1207:11
1208:20,24
1209:3
1211:5,9,15,
19,24 1212:6,
7 1214:24,25
1217:3,18
1219:4
1220:15
1221:10
1222:24
1223:2,11
1224:11,23
1225:2
1229:7,10,11
1230:4
1232:1
1233:1
1234:6
1235:17,22
1236:4,7,12
1237:1,14,21
1238:17
1239:11
1240:8
1241:23
1243:2,11,22
1244:7,11
1247:20
1248:6
1249:12,18
1252:18
1255:1
1256:20,23
1257:10,16,
21 1258:12

**Doyle's**
1200:6
1220:5,22
1245:14

1249:25

**dozens**
1387:6

**draft**
1130:1
1223:24
1295:12,17
1436:2

**drafting**
1135:25
1238:24

**drawing**
1203:10

**drawn**
1360:8

**drew**
1425:8

**drive**
1337:20,23
1338:4

**dropping**
1214:12

**Dubai**
1152:3,12

**due**
1130:14
1135:24
1178:21,24
1181:24
1182:11,20
1219:14
1233:18
1234:7
1307:4
1347:5,6
1388:6,18
1389:15,22,
25 1390:4
1391:3

1397:15
1401:16

**duly**
1127:8
1205:9
1264:22
1281:20
1414:2

**dust**
1300:12

**duty**
1247:18

**DXCORR**
1182:12

**dynamic**
1339:24

---

**E**

**earlier**
1132:1
1169:9
1237:19
1256:19
1265:18
1271:4
1276:6,15
1285:19
1286:23
1383:14
1422:15
1439:19
1441:15
1461:12

**early**
1166:11
1170:24
1194:18,22
1195:6,25
1213:17
1265:6

**TRANSCRIPT OF PROCEEDINGS**

1361:24
1364:9
1438:10

**earn**
1315:17

**earning**
1288:20

**earnings**
1319:8
1322:16
1339:25
1369:22

**easier**
1330:21,24

**easiest**
1356:24
1405:5,19

**easily**
1305:5
1340:1

**easy**
1299:2

**eat**
1191:23

**eating**
1191:22

**economic**
1269:6,22

**economy**
1411:13

**Edgemode**
1169:20
1170:2,14,19

**edit**
1437:16

**effect**
1139:21
1267:6

1306:10
1414:9
1419:3,13
1422:13,16

**effective**
1259:17
1260:18

**efficiency**
1194:3
1269:22
1295:21
1347:8,25
1348:23
1356:1,2,11
1359:13
1363:13

**efficient**
1270:20
1304:23
1349:2,11
1356:6,14
1357:8,13

**effort**
1258:2
1470:13

**efforts**
1126:9
1258:8
1265:8
1271:17
1275:6,9

**eggs**
1384:5

**electrical**
1285:24
1286:6,7,12,
16,19,21

**electricity**
1289:17,22
1291:1,3

1292:14,20
1303:5
1304:9,10
1309:1,5
1382:24
1383:7
1411:18
1412:20

**electronic**
1337:18

**electronically**
1279:6

**elicit**
1273:4
1446:1

**Elizabeth**
1433:17,21,
23

**email**
1171:5
1173:13
1198:24
1206:15,16
1220:5,14,22
1221:9
1224:1,8,17,
24 1232:7
1237:24
1238:2,6,9,17
1243:23
1244:2,4,5
1246:13
1277:19
1279:7
1284:13
1303:20
1306:1
1307:23
1311:14,16,
22 1312:2,8
1313:16

1326:17,19
1327:7,13
1336:18
1337:2
1339:11
1352:18,23
1362:3
1364:6,11
1365:15
1372:19,20,
22,25 1373:3,
4 1374:5
1380:24
1384:12,20
1385:20
1394:9,18,25
1395:3,17
1405:3
1407:12
1408:11,13
1409:6,8,9,16
1417:24
1435:9,15
1437:1,6
1438:9
1439:15,20
1442:2,9,10
1443:17,21,
24 1444:10
1464:20
1476:20

**emailed**
1211:21
1257:3
1361:6
1465:6

**emailing**
1394:14

**emails**
1126:4
1331:17
1332:13

1439:4
1442:6

**emergency**
1465:18
1474:15

**emphasis**
1427:4

**employed**
1290:5

**employee**
1451:21

**employees**
1407:15
1413:2
1421:25

**employment**
1179:4
1392:6,11
1467:16

**encountered**
1299:23

**encourage**
1126:7
1127:1
1206:22
1465:2

**encouraged**
1353:3

**end**
1124:21
1125:2,23
1146:21
1151:24
1172:15
1192:11
1217:2
1222:8,25
1225:4
1260:25

1262:6
1267:18
1271:24
1272:14
1284:8,11,14,
15 1291:16,
17 1310:12
1326:10
1329:13
1349:16
1358:3,14,15,
17,21 1369:3,
9 1379:12
1386:4
1407:3
1435:11

ended
1293:14

ending
1289:2,4

energies
1448:24

energy
1194:3
1269:21
1308:16
1309:5
1310:6
1413:8,11,14

energy-
efficient
1271:21

enforceable
1222:17

eng
1326:21

engage
1245:19
1270:25

engaged
1269:6
1271:24

Engaging
1417:1

engineer
1285:21
1286:19
1327:14,17
1385:17
1418:21

engineering
1285:25
1286:6,11,12,
21 1326:22
1327:3

engineers
1286:16

Enjoy
1254:17

enrolled
1284:5

enter
1339:25
1416:8,10
1417:12,15
1418:1

entered
1274:5
1387:15,20,
23 1388:2

entering
1272:20
1345:12
1353:1
1417:1
1418:9
1421:22
1428:9

entire
1219:17
1294:20

entirety
1126:14
1165:7
1220:6

entity
1415:13,16
1428:13,14,
17 1451:19

entrance
1272:19

environmenta
lly
1413:13

envisioning
1263:2

equally
1207:10

equals
1144:22

equipment
1218:23
1292:16
1361:9,22
1371:16
1375:15,20
1376:1
1378:12
1408:17

equity
1141:3,20
1142:6
1143:2,4,25
1149:25

era
1267:18

escrow

1185:12
1254:3

escrowed
1254:4

essential
1202:8

essentially
1162:21
1266:1
1287:5
1290:22
1291:10
1307:12
1308:22,23
1325:12
1340:2
1410:9
1411:4
1414:20
1421:23
1440:2
1465:7

established
1209:10

establishing
1400:16

establishmen
t
1351:24

estate
1283:20

estimate
1333:13

estimated
1381:4

evaluate
1307:5

evening
1285:15

event
1182:19

events
1295:24

eventually
1287:24
1288:24

everybody's
1294:16

evidence
1126:23,25
1189:2
1198:24
1199:6,12
1249:10
1345:13
1392:18
1400:17
1403:6,8
1440:16
1470:8,18,19
1471:23

evidenced
1172:3

evidentiary
1232:12

evolved
1221:24

exact
1324:10
1352:16
1422:10
1459:17

exam
1124:22

examination
1123:7,10,11,
14,17,18,21
1127:10

**TRANSCRIPT OF PROCEEDINGS**

1205:13
1256:17
1264:24
1282:23
1407:20
1414:6
1476:8

**examples**
1298:8
1299:7
1318:11

**exceeded**
1417:16

**exceeds**
1417:4

**Excel**
1336:7,8,24
1337:1
1338:4,12,14

**exception**
1299:20
1469:20
1470:2

**excerpt**
1466:7,12

**exchange**
1148:2
1155:3,20
1179:17,24
1184:9
1185:6
1212:6,7
1327:13

**exchanged**
1152:11

**excited**
1457:17

**excuse**
1136:18

1216:15
1254:12
1261:14
1345:20
1363:6
1377:20
1383:4

**excused**
1201:13
1260:25
1261:17,23
1279:16
1476:9

**executed**
1160:9
1170:5
1195:7
1196:1
1271:14
1409:23

**exhibit**
1127:25
1130:5
1131:18
1133:6
1136:19
1139:24
1145:15
1147:25
1152:18
1153:21
1156:4
1164:19
1166:13
1168:22
1171:4
1176:17
1179:7
1183:22
1199:10
1201:9
1207:23

1212:11
1220:2
1225:13
1237:18
1238:16
1242:18
1246:1,6
1253:21
1260:8
1276:16
1302:12
1303:19
1306:2
1307:18,21
1311:17,20
1313:13
1322:3
1326:14
1332:22
1334:19
1336:3,12,13
1338:8
1345:9
1351:20
1360:15
1361:1
1362:25
1364:5
1365:25
1366:4
1371:19,22
1380:14
1384:7,10
1393:20
1399:8
1404:21
1408:9
1416:2
1431:19
1432:3
1435:6
1441:24
1452:17

**exhibits**
1125:24
1334:3
1336:6
1337:17
1432:20
1452:18

**exist**
1355:19

**existed**
1270:19
1371:4

**existing**
1292:4
1320:22
1350:21

**exists**
1338:25
1470:20
1471:2

**expand**
1292:9,13
1308:8
1320:23

**expanding**
1292:11

**expands**
1298:16

**expansion**
1145:12
1374:17
1375:10

**expectation**
1292:7

**expected**
1172:15
1177:24
1223:3

**expecting**

1263:8

**expects**
1333:1

**expedite**
1421:7

**expedited**
1420:19

**expenditures**
1373:19,24

**expense**
1411:17

**expensive**
1267:11

**experience**
1285:18
1286:15
1297:15
1320:2,8,24
1348:4,9
1365:10
1389:6,11
1398:18

**experienced**
1388:23

**expert**
1228:8
1243:15,17
1259:16
1260:10,15,
17 1389:25

**explain**
1131:23
1290:20
1369:10,25
1429:6
1468:7

**explained**
1172:25
1315:4

TRANSCRIPT OF PROCEEDINGS

1339:16

explanation
1290:23

explicit
1319:5

explicitly
1308:14
1368:18

explore
1221:2
1241:17
1248:11

explored
1189:18

exploring
1411:25

express
1213:12
1216:9,16
1304:8
1340:4
1365:12

expressed
1311:6
1322:16

Expressly
1348:19

extend
1285:13

extensive
1209:12,24
1344:13

extent
1126:24
1131:8
1166:25
1194:1
1209:16
1227:10,13

1250:7
1309:14
1320:21
1403:14
1434:16
1457:12

extra
1279:19

extreme
1317:15

extremely
1150:16

eye
1286:21

eyes
1452:24

F

fab
1272:9

Fabric
1171:12

fabricating
1161:2

fabrication
1132:15
1139:2,5
1274:11

Facebook
1228:16

faced
1247:16

facilitate
1328:10

facilitates
1322:12

facilitating
1292:2

facilities
1292:12,13,
20 1296:16
1328:11

facility
1142:19
1178:9
1286:19,21
1290:12
1292:3,9
1301:4
1302:2,4
1304:8
1307:14,16,
17 1308:8
1370:6,8,9
1371:2
1374:11
1379:11
1381:25
1382:25
1383:8
1386:7
1411:4,24
1412:13
1418:12,24

facing
1170:25

fact
1145:6
1146:20
1153:24
1159:13
1167:21
1183:19
1193:14
1196:11
1198:2
1202:11
1222:4

1233:7
1234:2
1258:10
1269:4,15
1325:25
1334:10
1344:21
1351:7
1352:14
1461:2
1464:3

factor
1296:11
1359:13

factors
1266:6

factory
1404:12
1412:23

facts
1207:17
1210:11
1429:7,9

factual
1268:12,15
1447:21

factually
1461:1

fail
1222:8
1298:25

failed
1172:20
1173:16
1300:18

failure
1206:18
1207:3
1218:11
1219:14

1270:22
1306:3,7,10,
13,21,22
1307:1
1402:24

failures
1403:6

fair
1174:14
1209:23
1253:16
1292:19
1299:17
1312:21
1332:2
1385:19
1387:6
1395:9
1415:22
1418:6,7
1430:6
1450:20,21
1470:11

fairly
1223:6
1308:15

fairness
1263:19

fall
1168:1,6,13
1187:25
1194:18
1323:25
1324:8

falling
1305:16

falls
1298:18

false
1364:21,25

**TRANSCRIPT OF PROCEEDINGS**

1365:2,5,13
1390:19

**familiar**
1171:21
1290:13,15,
17,19 1306:3

**fan**
1291:14,17
1299:3,16

**fans**
1298:23,24,
25 1299:7

**farther**
1366:12
1375:15

**Fascinating**
1334:8

**fast**
1127:13
1137:25
1335:7
1457:16

**fast-moving**
1169:24

**fault**
1303:14,16

**favorable**
1340:3

**features**
1299:14

**federal**
1228:16,17

**feedback**
1328:1
1380:25
1381:8

**feel**
1180:11

1181:3
1223:8,9
1287:20
1330:12
1331:9,11
1340:15
1359:10,20
1390:16
1452:21

**feelings**
1256:12

**fell**
1312:13

**felt**
1294:7
1340:13
1390:8
1411:6

**fence**
1411:3

**fighting**
1181:20

**figure**
1133:4
1233:8
1378:18

**figures**
1317:6

**figuring**
1174:25

**filed**
1415:2

**filing**
1402:23
1457:3
1458:7
1459:6

**fill**
1278:25

1279:12

**final**
1128:19

**final.docx.**
1394:15

**financial**
1151:20
1173:3
1393:3
1407:15

**financials**
1161:19
1178:8

**financing**
1168:3
1177:13

**find**
1152:22
1156:14
1158:9
1169:1
1184:25
1212:21
1220:8
1232:6
1236:13
1241:23
1242:4
1245:4,7
1279:25
1287:22
1335:18

**fine**
1174:16
1185:1
1191:11
1203:5
1300:12
1303:13
1313:12
1345:15

1360:9
1397:3
1401:18
1404:25
1420:9
1421:5,9,13

**fingers**
1404:14

**finish**
1149:12
1241:5
1262:13
1270:9
1309:16

**finished**
1262:8
1264:17
1273:21

**fire**
1299:15

**firsthand**
1182:17
1444:21

**fish**
1412:23

**fit**
1220:6

**fixed**
1316:15

**Flag**
1421:5

**flare**
1213:4

**flat**
1132:20

**flexible**
1309:14

**flip**

1231:4
1362:25
1364:5
1419:18

**flipping**
1363:3

**floating**
1138:15
1139:16
1145:9
1146:4
1316:18
1318:23,25
1319:6,13,25
1320:4
1321:1,23
1329:15,19
1331:21,24
1369:4,8,10,
13

**floats**
1319:7,9

**flood**
1386:11

**floss**
1468:19

**flow**
1141:8
1274:15

**fluctuates**
1322:9

**fly**
1399:14

**focus**
1126:9,10
1127:1
1147:19
1215:14
1244:25
1245:1

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1247:20
1292:2
1348:9
1419:2
1448:24

**focused**
1126:3
1210:10

**folder**
1337:24
1416:15

**folks**
1124:14
1212:18
1393:7
1420:22
1463:8

**follow**
1135:8
1151:11
1257:7
1272:25
1273:5
1287:16
1312:17
1418:9
1420:7
1421:22,24
1457:23

**follow-up**
1183:3
1259:7
1276:5
1311:14
1425:1

**followup**
1257:15
1274:24

**FOMOING**
1190:14,18

**footnotes**
1335:19

**footprint**
1383:21

**force**
1139:20
1305:5

**forcing**
1146:24

**foreclose**
1460:18

**forensically**
1400:9

**Foret**
1123:20
1413:19
1414:1,8
1416:6
1421:20
1423:5
1424:8
1425:8
1426:15
1430:20
1431:22
1433:9,18
1435:8,24
1437:8,24
1439:17
1442:2
1446:6
1447:20
1449:25
1459:10,14
1460:19
1461:20,25
1463:2,6,16
1464:6,12
1467:5,7,14
1468:17
1469:10

1470:24
1471:3,11,14
1472:6,8,15

**Foret's**
1425:3,16
1445:16
1465:19
1467:18

**forever**
1299:22
1439:21

**forget**
1169:8
1312:18
1464:15,16,
20 1473:1
1476:13,19

**forgot**
1300:9

**form**
1401:3
1436:3

**formal**
1216:9,15,16
1222:13
1224:10
1241:1
1258:8
1434:11
1451:21

**formalization**
1258:7

**formally**
1240:22
1241:14
1275:5

**format**
1338:9

**forms**

1141:23

**formula**
1138:14,15,
22

**fortunate**
1287:21

**forward**
1137:11
1183:19
1223:13
1246:13,15
1253:4
1258:19,23,
24 1312:20
1462:6

**forwarded**
1246:21
1247:5
1311:14
1312:8,25
1362:3
1409:11

**forwarding**
1359:22

**foul**
1198:5

**found**
1147:4
1152:4
1169:4
1187:13
1427:19

**foundation**
1163:8,10
1195:11,20
1227:9
1247:14
1319:16
1320:7,11
1321:6,8

1323:5
1367:10
1395:13,15,
16

**foundational**
1179:22

**founders**
1288:1,7

**fourth**
1125:16,17

**frame**
1139:4
1168:5
1197:6,7
1201:8
1207:22
1209:25
1265:17,19,
20 1326:3,6
1327:20
1410:13
1462:7

**framed**
1257:21

**frames**
1197:8

**framing**
1133:2

**FRANCISCO**
1124:2

**Frank**
1303:21
1353:3
1394:9
1453:17
1455:14

**freaked**
1132:25

**free**

1300:22
1452:21

**freedom**
1365:11

**friendly**
1158:21
1413:13

**friendship**
1288:14

**front**
1164:17
1224:4
1274:14
1294:20,21
1303:20
1345:24
1360:14
1361:2
1366:8
1394:6
1404:6
1436:13

**frustration**
1257:6

**FTE**
1381:4

**fulfill**
1132:15
1240:25
1274:13

**fulfilled**
1258:17
1268:3

**fulfilling**
1207:13

**full**
1131:19
1134:16
1197:23

1331:6
1351:24
1462:25

**fully**
1224:14
1409:23

**fund**
1156:10
1157:10

**fundamentally**
1419:25

**funding**
1158:14
1168:8

**funds**
1134:14
1254:3

**future**
1350:19
1362:1
1379:5
1391:23
1392:3

---

**G**

**G-U-I-O-L**
1282:14

**gain**
1464:13

**gained**
1464:12

**game**
1209:23

**Gao**
1123:6,13
1124:9,10,22
1125:1,14

1127:7,12
1131:9
1145:14
1149:8,12
1155:13
1157:3,17,21
1188:20
1202:10,18
1262:4,8,25
1263:12
1264:21
1265:1
1268:18
1270:14
1273:13
1274:4
1278:8,18,25
1326:11
1329:17
1330:9
1331:14
1334:21
1335:4
1339:11
1340:25
1341:3,13
1440:22

**gas**
1412:14,21

**gather**
1460:6

**gathering**
1207:17

**gave**
1177:21,22
1178:7
1224:7
1242:20
1257:8
1287:13
1329:2
1348:15

**gears**
1292:24

**gee**
1150:12

**general**
1260:8
1287:19
1299:21
1378:24
1379:1
1461:4

**generally**
1206:10
1265:18
1267:18
1269:7
1289:14
1414:8
1417:24
1422:5
1424:9
1425:21
1427:10

**generic**
1273:22

**Gentlemen**
1149:2

**German**
1284:3
1372:2,4,9
1385:18,19

**Germany**
1283:12
1284:3,4,24
1285:5

**gesture**
1187:10

**get all**
1126:22

**get along**
1150:21

**Gil**
1173:25

**give**
1127:25
1133:1
1141:25
1143:1
1144:19
1152:20
1169:1
1183:7
1184:13
1191:10
1198:4
1212:22
1224:15
1231:11
1251:6
1252:19,21
1272:14,16
1282:11
1325:5
1328:25
1339:6
1342:17
1417:5,22
1425:8
1427:2
1429:7
1453:6
1459:23
1465:3
1470:10,12,
16 1471:3
1472:4,5
1473:11,13

**giving**
1174:14
1319:20

**TRANSCRIPT OF PROCEEDINGS**

glance
  1177:2

Glick
  1189:4
  1261:9,10
  1275:16
  1282:12
  1334:10
  1410:3,6,12,
  16,21
  1422:12
  1423:2
  1424:17
  1426:9
  1431:7
  1436:12
  1449:24
  1450:4
  1451:4,5,12,
  17 1452:6
  1464:17,25
  1465:3
  1467:1,3
  1471:9
  1472:24
  1473:13
  1476:17

glove
  1420:11

glue
  1298:12

goal
  1327:25

good
  1180:11
  1181:2
  1184:4
  1205:15
  1287:3
  1316:1,22,24
  1317:3

1318:5
1333:20
1339:18
1342:12,13
1343:3
1383:3
1413:18,21
1468:20

Google
  1228:16

governing
  1147:9

government
  1411:9

governor
  1370:13,17,
  22 1371:9,12,
  14 1376:25
  1379:9,20
  1381:8,15
  1410:7,25

governs
  1417:11

grab
  1464:18

grace
  1180:11
  1181:3

grade
  1284:14,25

grant
  1411:1,23
  1412:7,8

grants
  1411:9

gravity
  1151:21

gray
  1475:22

great
  1169:7
  1215:25
  1220:7
  1274:23
  1286:20
  1433:7

greater
  1318:18,19

greatly
  1285:2

greel
  1262:20
  1281:10

green
  1413:8,14

grew
  1283:13

gross
  1318:15

grossly
  1269:11

ground
  1202:14
  1276:18

grounds
  1235:10

group
  1294:21

grow
  1292:10,18
  1412:22
  1449:6

growing
  1267:16
  1307:14,15

grown
  1288:19

guards
  1203:10

guess
  1124:19
  1129:21
  1156:14
  1158:4
  1161:12
  1163:12
  1193:11
  1204:23
  1205:1
  1241:16
  1274:25
  1278:6
  1380:8
  1382:17
  1421:1
  1436:16
  1444:19

guessing
  1440:24

Guiol
  1123:16
  1262:20
  1264:12,14
  1281:9,10,11,
  14,15,17,19
  1282:3,25
  1285:21
  1303:19
  1307:21
  1313:23
  1320:13
  1327:9
  1334:19
  1339:10
  1343:3
  1345:20
  1360:4
  1363:21
  1379:25

1380:1
1406:11
1407:22
1418:14,20

gun
  1385:1,10

guy
  1159:24
  1178:21,22,
  25

guys
  1147:17
  1151:7
  1187:15
  1200:4
  1240:10
  1245:19
  1307:9
  1315:2
  1316:10
  1322:4
  1328:14
  1335:4
  1339:14
  1408:6
  1453:15
  1471:1

gyrations
  1270:10

---

H

hac
  1414:15

half
  1125:6
  1292:21
  1294:15
  1305:17
  1311:3
  1312:16

**TRANSCRIPT OF PROCEEDINGS**

1322:20
1341:25
1386:7
1428:1

**halfway**
1171:14
1250:6,24

**hand**
1129:17
1138:5
1170:23
1205:7
1281:18
1420:11

**handing**
1345:20

**hands**
1305:5
1422:2

**hands-on**
1422:2

**Hang**
1188:13
1195:17
1212:16
1220:8
1225:21
1232:9
1448:10

**happen**
1222:18
1299:5
1309:10,13
1310:3,7
1323:22
1325:10
1334:14
1339:8

**happened**
1205:23

1243:24
1255:6
1380:5
1410:6
1414:23
1429:6,9,22
1467:19
1473:7

**happening**
1267:19
1312:14
1314:13
1412:12

**happy**
1231:8
1273:8
1281:24
1282:6
1330:20
1340:8
1432:23
1452:3

**hard**
1135:10
1156:25
1165:6,8
1181:20
1241:12
1256:12
1284:21
1302:16,17
1337:17
1432:24
1445:7
1447:21
1460:16

**Hardin**
1123:7,14
1124:21,24
1125:6,9,18
1127:3,4,11,
22 1128:7,9

1129:21,23
1131:13
1134:7,9
1136:18,20
1140:21,23
1147:12
1148:24
1149:3,4
1154:19
1155:8
1162:8,10
1163:2
1166:15,20
1170:6
1174:3,7,10,
13,17 1176:2
1178:15
1184:14,16,
19 1186:17
1188:13,19,
24 1191:7,9
1192:21
1195:11,17
1198:6,10,15,
19 1199:2,21,
25 1200:6,24
1201:5
1202:24
1204:3,7,21
1205:1
1213:3
1226:11
1230:18
1231:4,9,17
1232:7,9,11,
14 1238:3
1246:2
1256:6
1261:1,4
1262:4,11,15,
18,24 1263:7,
10,25 1264:8,
18,20,25
1266:3

1268:7,8,13,
16,17
1270:13
1273:8,15,22,
25 1274:3,19
1276:6
1278:6,14,19
1279:1,13,17,
25 1282:8
1346:1
1402:21,22
1404:22
1419:6,15
1420:9
1421:1,5
1422:7
1423:10
1424:11,25
1425:10
1428:24
1429:11,23
1430:3
1431:5
1432:9,14
1434:16
1437:20,22
1444:14,17,
21 1445:5,11
1446:11,15,
18 1447:3,8,
13,19
1448:10,14,
20,25 1449:2,
13,17,22
1450:24
1452:20
1453:23
1454:1,6,10,
13 1455:9,15,
18,24 1456:2,
3,10,25
1457:8,17
1459:1,3,15,
19,22

1460:21
1461:15
1462:14
1463:19
1464:4,9
1465:24
1466:20
1467:23
1468:3,9,13,
18 1469:18,
22 1474:6
1475:1,8,17
1476:8

**harm**
1198:5

**hash**
1291:18

**he'll**
1201:3
1262:21

**head**
1382:22

**heading**
1218:8
1238:6
1372:25

**heads**
1231:11

**hear**
1176:3
1202:18
1203:12
1204:15
1208:5,6
1228:3
1270:10,14
1294:16
1326:24
1338:8
1381:3
1401:7,21

1424:6
1425:3
1463:1,16
1464:6,9
1465:14
1472:5

heard
1145:3
1147:3
1159:5
1202:9
1208:5,9,12,
13,19
1209:12,23
1221:9
1231:24
1241:11,13
1265:1
1293:23,25
1343:25
1344:9
1347:21
1406:17
1427:22
1441:2,5,9
1455:12
1463:7,17
1464:7
1470:21

hearing
1125:22,23
1139:14
1174:5,8,14,
18 1232:12
1351:12
1432:11
1435:10
1449:8
1455:10
1456:6,9,21
1458:13
1462:22
1465:18

1466:5
1468:16
1471:10
1474:15

hearings
1125:22

hearsay
1469:6,7,20

hearts
1415:18

heat
1298:13,16
1299:7
1305:16

heating
1412:21

heavy
1265:23

held
1166:14
1255:22
1273:18
1276:1
1313:11
1393:13,18
1415:20
1421:16
1427:10

helped
1287:23
1339:17
1371:11

helpful
1126:12
1393:10

helping
1195:8
1196:2
1292:8

Henry
1132:19,24
1133:25
1171:15
1326:11,13,
19 1327:18,
19 1329:17
1330:5,8,9,11
1332:12
1340:25
1439:19

Herbert
1282:17

hesitant
1338:8

hey
1134:7,11
1141:24
1145:1
1146:3,17
1151:6,11
1156:10
1157:10
1160:23
1167:17
1170:3
1187:3
1198:3
1234:6
1240:9
1244:12,21
1249:18
1305:19
1413:1
1465:7
1467:19

high
1193:16,21
1299:1,11
1306:21
1308:9
1354:25

1374:13

high-level
1370:5,12
1373:13
1379:7

higher
1296:6

highlight
1370:21,25
1371:3

highlighted
1251:9,10
1316:3
1317:22
1423:3

hinted
1206:21

hiring
1288:16

hoc
1228:12,14

hold
1153:1
1165:1
1176:22
1204:25
1342:12
1356:18
1363:2
1379:22
1382:12
1420:13
1451:3
1452:25

holidays
1417:21

home
1283:20
1291:1

homeschoole
d
1334:11

honest
1313:9
1319:4

honestly
1208:12
1474:18

honoring
1285:3

hook
1224:12

hope
1127:22
1334:5

hoped
1206:22

Horizon
1310:21
1311:25
1312:12

hostile
1158:15

hour
1125:7
1294:15
1306:18
1311:3
1312:17
1332:25
1333:4,7,8,
12,18 1428:2
1456:23
1473:22

hourly
1411:15

hours
1182:5

1183:2
1293:12

**HPC**
1374:7,10,13

**huge**
1335:13

**hundred**
1309:9

**hundreds**
1300:14

**hurry**
1335:13

**hybrid**
1405:7

**hydraulic**
1300:6,7

**hydro**
1413:11,12,
14

**hypothetical**
1163:4
1268:4
1310:9

**hypotheticals**
1268:5

---

**I**

---

**idea**
1136:12
1183:9,13,16,
17,19
1229:21
1305:22,24
1322:23,24
1323:19
1373:21
1378:24
1379:1

1444:11
1446:20
1448:5,9
1449:10

**ideal**
1328:8

**ideas**
1268:2

**identification**
1188:25
1275:12

**identify**
1345:17

**identifying**
1273:10
1345:19

**identity**
1246:15,22
1247:6

**ignores**
1239:1,17
1241:25

**ignoring**
1216:6
1240:2

**ii**
1216:22
1217:2

**illustrated**
1218:10

**illustrative**
1460:5

**image**
1130:21
1131:12

**imagine**
1284:7
1291:15

1309:6
1322:9

**immediately**
1352:17,24

**impact**
1266:8
1416:9

**impeach**
1202:9
1348:2

**impeaching**
1345:11

**impeachment**
1163:7
1347:20
1348:14
1392:18

**implementati
on**
1416:6
1430:9

**implies**
1368:3

**importance**
1171:18
1285:1
1294:17
1436:23

**important**
1163:19
1224:9
1284:19
1296:11
1308:20
1356:25
1359:3,6,8,13
1360:17
1369:21
1411:12

**importantly**
1239:1

**imposed**
1398:7,14,15

**impossible**
1241:12
1420:10

**impression**
1420:4

**impressions**
1420:3

**improper**
1200:1,13

**improved**
1285:2

**improvement
s**
1269:21

**in-house**
1295:16
1440:5,9,10
1451:11

**inaccurate**
1182:2

**inappropriate**
1429:2

**inaudible**
1199:17
1254:11
1325:14
1333:17
1374:25
1396:19
1402:1
1416:17
1422:18
1423:23
1436:24
1440:7

1446:9
1454:9
1456:14
1465:25
1468:25

**incentivized**
1301:11

**inclination**
1471:16

**include**
1386:18
1470:6

**included**
1417:24
1473:7

**Including**
1252:11

**inclusive**
1258:25

**income**
1304:18

**increase**
1183:9,14
1315:19

**increasing**
1381:3

**individual**
1171:9
1325:2

**individuals**
1178:17,18
1294:22
1326:9
1418:23,25
1467:13

**industry**
1412:17

**ineffective**

TRANSCRIPT OF PROCEEDINGS

1260:11

inference
1402:19

inferences
1401:4

influenced
1377:8

inform
1196:10

informal
1206:20
1224:10

information
1147:20
1149:1
1152:4
1153:16
1191:11,15,
20 1272:24
1287:17
1309:19
1312:23
1348:5
1352:19
1359:21
1369:22
1377:9
1383:13
1385:23
1386:10
1407:24
1408:5
1447:21
1453:20
1460:6,14
1464:12
1467:15

infrastructure
1374:8,16
1382:3,7

initial
1140:7
1168:17
1258:17
1317:24
1367:4,8,16,
23,25 1368:8

initially
1173:3

initiated
1331:15

initiates
1329:4

injunction
1414:13,18

ink
1295:8

inquire
1214:4
1246:25
1359:22
1467:5

inquiry
1443:18
1461:22

inside
1291:19
1300:13
1337:23

Insilica
1300:9

instance
1403:15

instruct
1457:10

instructed
1424:20
1448:3
1454:4,25

instruction
1211:2
1457:19

instructions
1430:11
1464:21

insufficient
1359:18,19,
24

insulation
1300:11

Intel
1134:3

intended
1177:24
1224:14
1379:7

intending
1222:10

intent
1140:12
1146:18
1147:3
1209:4,13,24
1210:6
1211:6

intention
1354:10
1405:22
1406:2
1408:22

interact
1206:4

interacting
1183:3

interchangea
bly
1322:1

interest
1265:23
1311:6
1393:3
1415:21,23

interested
1126:23
1289:6
1292:15
1330:17
1403:23

interesting
1143:24
1247:21
1288:4
1295:25
1296:21
1323:23
1334:5,7
1340:7

interests
1300:23
1415:20

interfere
1187:6

interject
1267:2
1465:16

internal
1186:1
1421:21

internally
1423:7

internet
1152:22
1287:21
1289:17
1291:4
1303:7
1382:11,18

interpret
1305:9,11
1316:19
1387:3
1408:20
1409:2,16,18,
22

interpretation
1319:6

interpreted
1306:1
1396:9

interpreting
1398:19

interrupt
1468:6

interrupted
1149:5
1156:25
1181:9
1468:11

interviews
1445:8

introduce
1180:5,24

introduced
1173:5
1265:14

introducing
1173:1

invest
1322:21
1371:1,6

invested
1302:9
1379:11

investigating
1454:1

**TRANSCRIPT OF PROCEEDINGS**

investigation
1235:23
1236:13,18
1347:4,5
1444:22
1445:1,4
1447:18,23
1454:11
1455:6
1461:5
1467:19

investing
1193:7

investment
1192:14,16,
20 1322:22
1370:5,12,22
1373:8,14
1375:25
1379:8
1381:22

investor
1178:3

investors
1158:21
1159:14
1177:18,25
1178:6

invite
1313:21
1329:6

involve
1463:23,24

involved
1143:14
1207:25
1209:23
1229:1
1234:14
1235:3,21
1236:8

1287:25
1320:13
1324:3,7
1391:7
1392:4
1443:9

involvement
1333:11

involving
1321:12
1389:12
1444:6

irony
1127:23

irregular
1247:24

irrelevant
1459:23

Irrespective
1176:5

issue
1186:14,20
1189:21
1206:2
1233:23
1286:4
1298:25
1403:10
1421:14
1442:9,23
1443:2
1446:4
1447:25
1460:16
1473:16

issued
1403:3
1465:19

issues
1178:10

1205:2
1273:10
1297:15
1298:8
1299:23
1400:12,21
1402:24
1403:11
1449:7
1474:21

items
1131:19
1294:18
1454:14

---

**J**

---

J.P.
1187:6

Jacob
1231:7
1254:15
1256:11

James
1327:6
1343:21
1353:3
1459:5

January
1215:8
1220:14,17,
19 1221:2,11
1222:2,5,6,23
1224:3,19
1227:1,20
1229:25
1237:20
1238:4
1244:7,11
1245:15
1248:7,11,17
1249:25

1258:4,23
1465:20

Jim
1134:11
1293:9
1303:21
1325:4,5,24
1326:20
1373:5
1380:25
1394:10
1457:3

job
1150:4
1199:11
1222:11
1292:3
1333:20
1381:24
1386:21

jobs
1410:19

Joe
1204:22
1212:14
1213:4
1220:24
1230:19
1231:5
1248:8
1254:12
1256:19

John
1329:17
1330:2
1332:17
1340:8
1341:1
1394:10
1395:3
1407:11

John's
1256:4

join
1181:10
1426:7
1451:6

joint
1242:22
1268:25
1269:1

joints
1338:3

Joseph
1123:9
1205:8,17

joules
1355:25
1362:19
1363:13

JPMORGAN
1235:4,7

Judge
1465:15

July
1148:3
1150:18
1152:3,12
1154:13,15
1155:3,20
1156:8
1157:7
1352:15
1410:17
1438:10

jump
1335:3
1337:19,23
1338:4

jumping

**TRANSCRIPT OF PROCEEDINGS**

1289:7
1384:25
1385:9

**jumps**
1390:24

**June**
1128:10,11
1133:8,14,17,
23 1166:11
1174:22
1175:23
1313:2,4,16,
22 1314:13
1315:3
1323:10
1329:21,25
1345:22
1352:15
1366:20
1368:11,16
1370:3,4
1373:4
1374:19
1375:6
1376:19
1400:8
1402:4
1410:17
1441:20,21

**K**

**K10**
1162:7,14,20,
25 1164:5
1165:17
1196:8
1342:4
1363:6,17
1386:3
1389:16,22
1391:3

**K10s**
1197:24

**Katena**
1124:15
1131:6
1133:20
1134:13,16
1137:19
1142:6
1143:1,4
1145:16
1146:25
1159:10
1162:6,14,24
1164:14
1167:2
1168:2,6,13
1172:2
1179:4
1186:7,13
1192:9
1194:7,14,19,
23,24 1195:8
1196:1,2,23
1197:21
1198:2
1205:20
1209:4
1211:7,11,17,
20 1216:6
1217:5
1218:21
1219:13,20
1221:10
1224:2,19
1226:9,21
1227:18
1231:25
1234:16
1235:7
1237:2,16
1239:2,6,18,
22 1242:1

1244:8,13
1250:7,10
1251:3
1252:7,19
1254:8,20,24
1255:9
1258:8
1267:22
1268:2,10,18
1269:8
1271:20
1274:5
1277:5
1293:20,21,
24 1294:1,2,
19,25 1295:9,
12,17,21
1300:24
1306:25
1307:1,6,11
1308:13
1310:18
1311:10
1314:9,13
1316:12,25
1317:9,20
1318:11,13,
18 1323:11,
12,25 1324:4,
7,13 1325:3,6
1326:1,8,9
1327:17
1329:4,12
1331:2,19
1332:6,8
1335:4
1340:2,20
1341:14,16,
18,20,22,24
1342:3
1343:25
1344:10,20
1347:5,6,8
1349:10,15,

19,25
1350:11
1351:2
1352:2
1353:4
1357:7
1358:7,12,20
1359:3,8
1360:16
1363:17
1366:1,15,19
1368:16
1369:5,8
1376:16,20,
24 1377:6,9
1378:10
1379:18
1385:7
1386:12
1388:6,11,15,
20,21
1389:16
1391:8,12
1393:6
1396:24
1397:20
1398:9,15
1405:6,10,16,
20,21,23,24
1408:6
1409:20,24
1420:10
1427:23
1428:11,12
1437:13,18
1438:1,3,6
1439:11
1441:3,5,9,14
1444:6
1453:19,21
1455:17
1458:15
1463:6

**Katena's**
1188:6
1218:13
1219:15
1257:19
1327:14
1345:2
1346:22
1391:3
1396:7
1397:8
1398:3
1465:7

**Katena/
coinmint**
1229:2
1394:14,19
1397:19
1398:7,13

**Kathleen**
1293:8
1418:14
1438:9
1441:10
1442:11
1443:10

**Katumba**
1178:24

**keen**
1475:24

**keeping**
1189:2
1405:6,19
1411:19

**Ken**
1433:23

**Kenneth**
1433:21

**Kevin**
1288:22

**TRANSCRIPT OF PROCEEDINGS**

1311:15,24
1312:17
1408:21

**key**
1167:9,18
1266:11,15
1309:1

**kids**
1334:1

**kind**
1141:16,22
1143:15,22,
23 1144:16
1146:18
1151:13
1172:21
1178:22
1186:22
1266:5
1269:14
1271:23
1272:15
1277:20
1284:5
1296:23
1309:11
1319:12
1321:15
1332:15
1368:3
1382:17
1402:18
1404:5
1411:1,24
1420:16
1453:20
1467:20
1474:10

**kinds**
1461:10

**Kinetics**

1310:22
1311:25
1312:12

**Kinney**
1303:21
1353:3
1394:10
1453:17
1455:14

**knew**
1147:1
1150:18,23
1151:3,16
1158:23
1187:5,13,20
1195:21,22
1288:2
1318:13
1333:15
1365:24
1376:19
1381:20,21
1386:2
1411:22
1420:7

**knives**
1281:10

**knowing**
1310:4,5
1322:14

**knowledge**
1182:17
1227:15,17
1286:2
1310:23
1311:13
1319:17
1323:15
1331:23
1347:1
1380:11

1391:25
1428:25
1434:13,14
1444:21
1447:16

**knowledgeabl
e**
1419:5

—————

**L**

—————

**lab**
1182:5,12
1183:1

**labels**
1328:4

**labor**
1374:16

**lacks**
1195:11
1227:9
1369:21

**laid**
1321:6,8

**lake**
1412:21

**Lancium**
1134:2

**land**
1265:24

**language**
1130:7
1251:10
1258:5

**laptop**
1289:22

**large**
1125:24
1309:25

1364:16
1365:16,20
1383:15
1411:8

**larger**
1297:1
1310:2

**largest**
1288:5
1370:9

**lasted**
1456:22

**late**
1125:12
1150:18
1151:7
1152:3,12
1173:22
1194:17
1369:7
1432:10
1438:10
1441:20

**launching**
1160:24

**law**
1228:5,9,10
1241:7
1259:16
1260:10

**lawsuit**
1416:1
1458:2

**lawyer**
1199:22
1235:15
1449:4

**lawyer's**
1303:16

**lawyers**
1207:24
1255:14
1360:9
1399:1

**lay**
1163:4
1195:19
1247:13
1319:18,19
1320:10

**laying**
1395:14

**lead**
1178:23
1266:17,18
1283:18
1425:2

**leak**
1300:6

**learn**
1286:5

**learned**
1152:13
1153:16
1286:24
1319:1
1402:9
1413:9,11
1467:7

**learning**
1285:2,16
1460:14

**Leary**
1288:10,11,
12,13,24
1387:18
1415:16,24

**Leary's**
1415:18

1418:5

**leave**
1150:20
1310:14
1409:15

**led**
1272:19
1288:16
1359:21
1414:24

**left**
1195:6
1262:25
1283:14,16
1324:18
1333:14
1453:5

**legal**
1186:17
1202:25
1217:23,25
1222:5
1240:21
1241:9,15,19
1242:9
1243:15
1259:16
1260:10,18
1353:24
1417:21
1425:9,17
1429:9
1439:24,25
1440:4,18,23

**legally**
1222:17
1223:7

**legitimate**
1412:19

**lend**
1137:18

**lender**
1137:16

**lenders**
1135:4,6,13
1136:10
1172:23

**lengthened**
1270:22

**letter**
1140:12
1146:18
1147:3
1200:7
1206:21,25
1207:6,18
1209:4,12,24
1210:5
1211:6
1213:8
1217:9
1219:6,21
1220:19
1221:1,12
1222:9
1224:3,13,20
1225:3,7,20
1229:16,20,
25 1230:2,3,
4,6,9,15
1231:25
1232:3,25
1233:4,5,11,
14,22 1234:1,
5,7 1235:17
1237:20,25
1238:4,5,10,
17 1239:1,17
1241:23,25
1244:2,6,7,
15,17,18,21
1245:15
1248:10,17

**lender**
1250:1,12
1258:5,7,20

**level**
1203:23
1204:20
1286:22
1294:17
1420:15

**levels**
1474:7

**leverage**
1304:2,18

**liability**
1415:20

**licensed**
1228:5,23
1414:14

**life**
1267:20
1271:24
1284:21
1285:15
1287:18
1288:20

**lifestyle**
1283:19

**light**
1332:25
1421:20

**lightning**
1127:13

**limit**
1360:2
1407:5

**limited**
1301:24
1333:10
1344:17
1415:19

**limits**
1209:18
1309:14
1430:10
1462:13

**lined**
1471:17
1473:5

**lines**
1126:4
1130:5
1221:18
1315:15
1325:7
1346:14
1374:15
1470:18

**liquidate**
1142:1

**list**
1199:10
1215:25
1432:3

**listed**
1171:24

**listen**
1155:13
1157:3
1360:5,12
1379:24

**literally**
1134:23
1164:11
1263:1

**litigation**
1152:23
1393:4
1427:3,4,5
1433:24,25
1434:1,3,7

1443:11
1453:24
1454:2
1457:13,23
1460:22
1461:3
1468:3

**Liu**
1123:17,18,
21 1125:17
1184:7
1262:20
1282:7,11,24
1300:25
1301:2
1302:12,16
1303:18
1307:18,20
1310:16
1311:17,20,
23 1312:5,7
1313:13,15,
18,20 1314:1,
3,15,20
1320:1,12
1321:4,9,11
1323:9
1325:1,15
1326:14,18
1327:1,4
1332:22
1333:7,14,20,
23 1334:3,18,
24 1335:2,17,
21,24 1336:7,
14,17,22
1337:4,7,15,
19,23
1338:11
1339:9
1341:6
1342:7,10
1347:19

**TRANSCRIPT OF PROCEEDINGS**

1348:3,8
1351:18
1353:24
1355:14
1356:16
1363:22
1367:10
1379:21
1384:8
1392:14
1395:13
1400:11
1401:6,8
1403:17,20
1406:13
1407:1,21
1408:8,12
1409:5,7
1410:1
1414:5,7
1416:2,4,11,
15,21,23
1419:12
1421:19
1422:19
1423:17
1424:7
1425:6
1426:5,14
1429:21
1430:15,19
1431:6,18,21,
24 1432:13,
15,18,23
1433:2,5,8
1434:9,22
1435:5,7,19,
22,23 1436:7,
11,15,21
1437:2,5,7,23
1439:2,14,16
1440:8
1441:23
1442:1

1443:19,22
1444:25
1445:13,15,
19,23 1446:2,
5,8 1447:5
1450:21
1452:8,9,13,
16 1453:3
1460:25
1461:23
1462:1,5,7,10
1463:10,13
1464:21
1465:6,12
1467:8,11
1472:14,17,
22 1473:3,8,
12,15,19,23

**live**
1183:3

**living**
1205:18
1283:22
1288:20
1415:13

**LLC**
1392:9

**loan**
1137:16
1158:21

**loans**
1144:18

**locate**
1443:2

**locations**
1330:13

**logistics**
1391:7

**LOI**
1353:23

**LOL**
1144:10
1181:16

**long**
1136:4
1184:7
1195:23
1232:17
1273:14
1283:9
1284:3
1288:12
1293:11
1300:16
1337:13
1407:4
1449:13,17,
19

**longer**
1145:2
1324:15
1452:10

**looked**
1155:3,19
1176:19
1199:15
1201:9
1327:22
1339:16
1366:15,19
1367:9
1376:17
1390:25
1397:11
1465:17

**looping**
1408:15

**lose**
1156:12
1158:2
1299:16

1316:23
1325:12

**losing**
1194:6

**loss**
1332:4

**lost**
1161:20
1297:23
1299:22
1300:14
1439:20

**lot**
1129:24
1139:17
1144:1
1150:24
1151:4
1152:19
1161:20
1194:9
1228:10
1238:12
1286:5,14,15
1289:21,24
1292:19,22
1296:19
1297:4,24
1299:14
1319:1,2
1333:24
1340:10
1351:17
1355:12,18
1365:11
1387:17
1398:18
1411:20
1412:16,24
1413:9

**lots**

1160:19
1306:20

**loud**
1204:17

**louder**
1204:19,22
1212:24
1326:25

**loudly**
1204:13,16
1282:3

**love**
1323:20
1413:10

**low-cost**
1411:24

**lower**
1306:22

**lowest**
1271:22

**lucky**
1287:22

**lunch**
1261:13
1262:14,17
1264:7,14
1280:1
1281:4

**M**

**machine**
1160:18,20,
21,22 1161:3,
4 1194:2,5
1240:24
1252:20
1267:15
1295:3
1296:11,12

1298:24
1299:8,12,19
1301:10,13,
15,20,21,22,
24 1302:1,8
1306:18
1310:13
1323:14,17
1325:18
1327:23
1330:19,20
1331:3
1332:2
1342:5
1355:19
1362:23
1383:21
1409:21

**machines**
1131:15
1141:7
1143:22
1144:9,17
1146:25
1160:15
1185:25
1193:3,8
1198:5
1202:16
1267:12,17,
25 1268:10
1269:3
1295:4,7,9,
13,18,22
1296:3,6,15,
19 1297:16,
25 1298:3,9,
15 1299:4,24
1300:4,7,14,
16 1301:7
1302:3,23
1305:6,12,16,
17,21,23,24

1306:24
1307:1,6,11,
16 1308:17,
25 1309:3,20
1310:4,19,23
1311:7,10
1316:12
1317:18
1320:3,9,14,
19 1321:1
1322:7
1323:2,12
1325:17,21
1328:4
1331:6
1344:5,8,22
1347:13
1348:1
1350:10
1354:11
1356:11,14
1357:8,14
1358:12,21
1365:10
1382:12
1383:8,18,19
1385:7
1386:14
1405:23,24
1406:5
1408:6
1428:10
1444:2,7

**madam**
1195:18
1332:24
1429:12
1459:19
1460:15
1468:13

**made**
1140:7
1145:19

1177:17,20
1178:10
1202:21
1205:21
1210:8,25
1213:16,20
1222:13
1224:7
1233:5,12
1235:7
1239:12
1240:9
1244:12
1249:15,21
1256:24
1257:4
1258:3
1259:2
1267:20
1321:18,19
1322:15
1323:19
1324:23
1349:20
1364:16
1365:15,20
1384:21
1386:6,9
1387:18
1391:11,25
1395:6
1403:13
1404:7,8,10
1412:22
1420:21
1430:7
1448:15
1456:24
1458:2
1459:12
1470:14

**magazine**
1284:7

**magazines**
1284:10

**main**
1292:1
1473:25

**maintain**
1288:17

**maintained**
1266:21

**maintaining**
1288:20

**maintenance**
1388:25
1389:12

**major**
1265:16,25
1268:24
1269:2

**majority**
1160:5
1415:14

**make**
1124:19
1126:3,22
1129:7,13
1160:18
1164:15
1170:20
1171:23
1182:6,8
1187:9
1193:3,7
1197:10
1202:4,19
1206:23
1209:14
1210:20
1222:6,7,11
1235:6
1255:11

1264:11
1268:10
1269:8,20,21
1272:8
1282:9
1301:10,14
1302:5,9
1304:22
1309:24
1311:3
1312:16
1315:11,22
1316:6,8
1317:16,19
1322:17
1324:13
1325:6,8,11,
20 1337:6
1339:7,25
1357:1
1364:21,23,
25 1365:2,4,
13 1382:23
1383:6
1399:3
1412:18,25
1420:14
1449:5,9
1461:19,22
1466:18
1469:17
1476:19

**makes**
1143:8
1379:24

**making**
1143:9
1146:21
1160:24
1203:3
1269:17
1304:14
1308:17

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1316:25
1324:3,7
1325:3
1359:25
1364:17
1391:8,20
1411:11

**Maloney**
1125:18
1128:21
1129:8,10
1132:4
1134:11
1135:6
1137:3,7
1138:1
1139:19
1141:14
1143:14
1145:25
1146:2
1148:13
1149:16
1150:19
1151:3,9,11,
20 1153:25
1154:8,17
1155:6,23
1156:10
1157:10
1166:7
1167:13,20
1173:17
1174:23
1176:13
1177:20,23
1183:17
1185:18,24
1194:19
1293:8
1294:3,19,24
1295:15,20
1306:23

1307:3,9
1310:17
1311:13
1312:9,22
1313:17
1315:1
1322:4
1324:15,16
1329:25
1330:1
1331:23
1339:21
1343:10,23,
24 1344:1,9,
19 1346:21,
25 1347:7,24
1348:7,8,18
1349:5,10,14,
18,24 1350:9,
15 1351:1,8
1354:9
1356:9,13
1357:4,6
1358:7,11,20
1359:2,23
1362:4,9,13
1363:16
1364:2
1365:4,8,19
1369:14
1373:5
1381:10
1388:5,19
1407:24
1408:4,22,24
1409:6
1418:15
1419:1,4,14
1420:5
1422:6,14,17
1423:12,18,
25 1424:9
1425:21
1428:8

1430:20
1433:10,16
1437:12
1438:24
1439:4,10,18
1440:17,21
1444:11,12
1446:20
1447:24
1454:17
1455:5,7,8
1460:3,19
1462:23,24
1463:15,25
1467:10
1474:4

**Maloney's**
1158:14
1183:9,13,15,
16 1409:8,9,
16 1443:21,
24 1473:8

**management**
1292:25
1293:11,18,
22 1294:4,5,
21 1312:13
1313:2
1314:5,12
1315:3
1343:6,14,19
1344:11
1347:15
1349:22,23
1351:3,12
1352:7
1354:9
1359:4,9
1366:21
1368:11,17
1375:6
1389:10
1418:11

1422:2
1426:16,20
1427:1,8,9,
20,24 1428:2,
4

**managers**
1427:11

**managing**
1320:14
1466:9

**mandated**
1421:23

**mandatory**
1285:9

**maneuver**
1240:21

**manipulatabl
e**
1338:9

**manner**
1403:10

**manufactured**
1297:16
1323:12
1345:2
1346:11,17,
23 1409:21

**manufacturer**
1295:2
1297:2,6,7
1298:25
1300:8,20
1322:12
1355:23
1362:15
1363:12
1365:17,22
1409:13,17

**manufacturer
s**
1266:23
1297:11
1300:4
1320:15,18
1321:17
1389:8

**manufactures**
1297:25

**manufacturin
g**
1133:5
1136:4
1139:5
1348:11

**map**
1411:21

**March**
1269:20
1451:10,12,
21

**mark**
1149:11

**marked**
1420:18

**market**
1297:20
1315:21
1316:1,4,16,
21,24 1317:1,
2,8,13,25
1318:5,18
1321:21
1332:1
1339:18,19,
22 1347:10
1357:9,14
1386:11

**marking**

1421:4

**Markovic**
1476:7

**married**
1283:3,9

**mass**
1160:16,25
1161:1,5

**Massena**
1370:6,8,19,
23 1373:9,14
1374:10,21

**match**
1142:3

**matches**
1437:6
1442:14

**material**
1131:25
1171:20
1226:22
1227:2,5,7,14
1374:16
1404:4
1470:7

**materialized**
1253:13

**materials**
1182:22,25

**math**
1159:24

**matter**
1126:8,22
1151:20
1160:23
1163:15
1210:4
1247:9
1317:18

1386:10
1436:16
1463:5
1464:24
1469:9,15

**matters**
1163:16,18
1170:7
1189:1
1206:1
1247:10
1466:4

**maximize**
1133:3

**Mcrae**
1311:15,24
1312:24
1360:25
1361:6,20,24
1362:9
1363:17
1408:13
1409:9

**Mcrae's**
1362:3

**meaning**
1132:5,6
1161:8
1258:14,17
1327:3

**means**
1137:7
1277:23
1288:20
1289:20
1305:18
1309:7
1374:13

**meant**
1137:15
1160:25

1174:23
1175:1
1277:13
1305:13
1405:20,22
1408:23
1411:17
1422:3
1425:17
1436:7,10,18

**meeting**
1133:17,20,
23 1292:25
1293:3,7,12,
18,22 1294:5,
6,7,9 1312:14
1313:2,6,10
1314:5,12
1315:3
1316:5
1329:25
1343:14,19
1344:11
1347:15
1349:22,24
1351:3,12
1352:7
1354:9
1359:4,9
1366:21
1367:19
1368:9,10,12,
17 1369:3
1375:6
1407:24
1408:21,25
1422:2
1426:16,21
1427:1,8,20,
24 1428:3,5

**meetings**
1313:8
1427:9

**megawatts**
1141:3,6,15
1142:21
1304:9,15,16,
18 1374:20
1375:7
1377:4,6

**member**
1466:8

**members**
1389:10
1415:19

**membership**
1415:21

**memory**
1184:5
1218:22
1313:7
1474:18

**mental**
1420:3,4

**mention**
1210:5
1233:17,18
1292:11
1295:15
1349:1
1350:14
1419:1
1428:8,14
1431:3

**mentioned**
1210:5
1265:20
1271:3
1286:23
1293:20,21,
22 1294:9,10
1297:5
1299:7
1301:3

1307:12
1308:11
1311:11,12
1312:11
1317:2
1318:22
1329:19
1332:14
1341:12
1361:8
1408:16,23
1418:20
1426:24
1428:13
1430:20
1441:8
1455:5

**mentioning**
1347:12

**message**
1128:11,12
1132:1
1133:9
1136:22
1137:9
1140:2
1151:17
1164:2
1288:22
1409:12

**messages**
1126:18
1128:25
1144:6
1152:2,11
1180:2
1399:16
1400:18
1402:11

**messaging**
1402:10

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

met
1189:18
1288:13
1292:6

metric
1304:12
1306:14

metrics
1167:18

Michael
1167:23
1171:15
1326:11
1329:17,24
1330:1,6,9
1340:25
1365:7,8
1439:19

Michelle
1129:22
1134:7
1212:10
1215:21
1216:25
1217:12
1218:6
1219:11
1220:1,4,11
1225:12,15
1226:17
1256:15
1351:19
1353:10
1354:14
1361:3,14
1362:6
1366:5,10,17
1371:20
1372:17,23
1374:6
1375:16
1380:15

1384:9
1393:22,24
1394:25
1399:8
1404:20

Microbt
1297:14

microphone
1204:25

Microsoft
1313:21

mid
1326:12

middle
1187:10
1202:6
1215:21
1217:3
1291:9
1294:4
1309:8
1315:10
1465:18

Mike
1185:11
1293:8
1294:3
1311:13
1312:9,20
1313:17
1315:1
1316:21
1324:14,16
1331:23
1349:5,9
1354:9
1359:23
1362:4
1373:5
1381:1,4,10
1408:24

1418:21
1433:16
1443:11

military
1285:8
1334:2

million
1129:2,3,12
1130:2
1132:2,4,14
1137:23
1138:2,9
1140:8
1141:15
1142:25
1144:14,15,
22,24
1145:16
1158:24
1159:15,21,
25 1161:9
1183:10,14,
15 1185:22
1186:8
1196:25
1197:15,19,
22 1198:4
1202:11
1214:6
1218:13,22
1267:24
1324:1
1341:18
1342:1
1352:2
1371:15
1376:3,13,14,
18,21,23
1377:4
1378:18
1379:17
1381:15,20,
21 1386:3

1391:15
1397:20
1411:15,17
1442:14

millions
1148:6
1150:13
1188:2
1391:11,14,
21

mind
1127:20
1129:8
1224:5
1256:4
1342:21
1390:24
1433:4
1434:1
1440:25
1469:16,21,
24 1470:1

minder
1363:6

mine's
1416:13

mined
1302:8

miner
1271:22,25
1272:1
1346:7
1349:20
1363:7,18
1376:24
1379:19
1389:16
1391:3

miners
1165:17
1269:2

1298:18
1309:7
1350:18
1352:3
1356:3,15
1368:16
1377:3
1384:23
1386:3

minimum
1213:3

mining
1164:11
1165:21
1193:22
1194:24
1195:9
1196:3
1218:23
1266:12
1272:22
1289:17
1290:14,21
1292:4
1295:9,13,18,
22 1296:3,10,
12,15
1297:11
1299:10,18
1302:7
1303:2
1306:4,6,12
1308:17
1310:19
1311:7
1320:3,8,14,
19,25
1321:13,16
1323:16
1328:9
1331:3
1342:4
1344:4,7,22

1345:2
1346:15,22
1347:9
1349:10,24
1351:2
1359:14
1362:22
1365:16,21
1366:2
1370:9
1371:15
1375:15,20,
21,25
1378:11
1382:2,6,24
1383:13
1386:7,8
1388:3
1389:7,13
1391:23
1392:1,3
1405:16
1412:11,15
1428:10
1434:12

**Mintvest**
1415:4,6,16

**minus**
1318:16

**minute**
1143:4
1146:3
1169:1
1212:22
1253:21
1259:4
1262:2
1335:6
1346:2
1372:5
1468:22

**minutes**
1124:17,23
1125:2
1147:13
1210:19
1263:9,21,23
1264:8
1333:21
1342:7,17,19
1393:16
1407:6
1423:14

**Mischaracteri
zation**
1154:20
1155:9

**Mischaracteri
zes**
1162:8
1356:16
1379:21

**mischaracteri
zing**
1175:3

**misleading**
1390:19

**missing**
1293:10
1304:13

**misspoke**
1255:9
1277:7

**mistake**
1222:7

**mistaken**
1199:14

**mitigate**
1190:9
1193:24
1299:2

**mitigated**
1190:1

**mitigation**
1189:7,15
1190:7
1262:5
1263:2
1265:2,9
1271:16
1275:6,9

**Mm-hmm**
1124:11
1128:14
1141:10
1252:5
1281:12
1318:9
1321:14
1325:23
1359:15
1363:10
1364:20
1373:10
1376:7
1378:1
1381:7
1382:1
1388:8
1394:8
1395:10
1398:21

**model**
1301:10
1316:14,18
1318:23,25
1319:6
1320:4
1321:1,15,20,
23 1329:15,
19 1331:18,
20,21,23,25
1332:5,15,19

1334:20
1335:5,19
1340:5
1341:8
1369:10,13,
24

**modified**
1270:19

**modify**
1128:22
1134:20

**modifying**
1270:21

**moment**
1185:20
1251:6
1258:23
1297:19
1324:19,20
1417:5

**Monday**
1471:17

**money**
1130:22
1137:16,18
1138:4
1139:14
1140:16
1142:2,4
1144:9,16
1148:14
1149:17
1151:18
1170:21
1187:15,22
1193:2,7,9
1194:7,13
1207:4,5
1235:4
1243:24
1252:12,20

1255:6
1301:10,14
1302:1,9,10
1304:14
1316:23,25
1318:17
1322:17
1325:25
1326:7
1340:2
1371:1
1373:21
1379:10
1411:21
1442:19

**month**
1135:23
1165:22

**months**
1148:6
1150:12
1151:7
1188:1
1248:2
1284:9
1291:15
1322:10
1401:9
1402:14
1456:15

**Monzon**
1128:12,18
1133:10
1134:24
1136:23
1140:2
1141:17
1142:23
1144:6
1148:3,12
1149:15,20
1150:2,12

1152:2,12
1153:16
1154:16
1155:5,22
1156:8,16
1157:7
1158:19
1159:18
1171:5
1172:10
1173:13
1174:22
1176:11
1177:16
1179:18,25
1180:4,23
1183:20
1185:7,16
1195:3
1200:10
1243:23
1254:2
1276:20
1277:3,8
1326:11,19
1329:17
1330:9
1331:14
1332:12,19
1334:21
1335:4
1339:11
1340:19,25
1341:3,13
1440:22

**Monzon's**
1327:6

**moot**
1448:18

**Morgan**
1187:6

**morning**
1123:3
1124:5
1125:3
1205:15
1313:23
1394:22
1476:6

**motion**
1403:16
1415:2

**motions**
1126:19
1232:18

**mountains**
1204:9

**move**
1159:4,7
1163:19
1164:1
1191:13
1192:6
1232:15
1249:10
1260:3
1264:4,6
1269:23
1270:4
1300:25
1321:9
1391:16
1393:14
1422:23,25
1426:5
1450:15
1451:1
1452:13

**moved**
1283:20

**moving**
1137:11

1403:23

**Mullin**
1433:17,22,
23

**multiple**
1131:5
1403:1
1447:22,23

**multiplied**
1298:3

---

**N**

**Nachbar**
1433:17,21,
23

**name's**
1300:9

**names**
1272:14,16
1273:10
1319:2

**narrative**
1265:11,12

**narrow**
1449:7

**national**
1228:18

**native**
1334:25
1335:20,23
1336:2
1337:10,18,
20,24 1338:4,
8

**natively**
1336:19

**natives**
1337:22

**nature**
1289:15
1330:14

**NCCS**
1290:9
1392:7,12
1407:12

**NDA**
1192:17
1195:15
1272:16,20,
25 1273:3,6
1275:13,16

**nearby**
1225:24

**necessarily**
1229:18
1230:10
1290:15
1296:22
1414:20

**necessitate**
1219:16

**needed**
1129:11
1206:20
1223:8
1224:2
1309:18
1325:6,8
1385:6
1386:12
1411:20

**negotiated**
1209:18
1276:25

**negotiating**
1187:10
1369:8

**negotiation**
1200:13

**negotiations**
1139:17
1203:11
1238:24
1248:19

**net**
1318:10,14,
15 1355:7

**network**
1131:5
1145:12
1166:2
1267:16
1269:13
1270:24

**news**
1137:3,8

**nice**
1141:7
1230:22
1261:21
1316:20
1343:3

**nicer**
1413:16

**night**
1223:23
1224:6
1245:23

**NIPE**
1411:8

**nodes**
1271:19

**nods**
1382:22

**noise**
1204:5

**TRANSCRIPT OF PROCEEDINGS**

non-
collection
 1403:10

non-katena
 1386:14

noncommittal
 1464:23
 1465:13

nondisclosur
e
 1188:15,16,
 20 1195:7
 1196:1

nonresponsiv
e
 1159:3

nonsensical
 1233:7
 1234:5,8

nonstop
 1291:13

Norbert
 1123:16
 1262:19
 1281:9,19
 1282:18,19,
 20 1308:1
 1327:8
 1384:13
 1396:9
 1408:15
 1409:11
 1418:14

normal
 1289:22

north
 1290:9
 1334:15
 1371:5
 1411:3

northern
 1379:12

not-so-
articulate
 1224:25

note
 1396:6
 1420:14
 1476:19

noted
 1224:4

notes
 1184:6
 1196:16
 1222:9
 1259:25
 1312:19

notice
 1150:14
 1186:14,23,
 24 1187:2,19
 1226:7
 1417:19,23

notified
 1418:19,25
 1421:24
 1427:20
 1428:20

notify
 1187:6

notwithstandi
ng
 1127:16

November
 1172:15
 1193:16,20
 1194:22
 1195:6,25
 1198:2
 1206:2

1211:22
1213:17
1229:2
1230:5
1231:25
1233:1
1234:15
1243:23
1255:16
1265:6
1266:5
1267:22
1268:22
1435:25
1436:3,6,10
1453:7,9,13,
16 1455:13
1462:4,5

nuance
 1161:8

number
 1125:24
 1159:16
 1172:3
 1202:7,8
 1218:15,19
 1226:9
 1227:19
 1242:19,21
 1291:7
 1311:19
 1333:1,6
 1336:3,12
 1339:6
 1355:3
 1357:12
 1372:16
 1376:5,8,12
 1377:8
 1378:14,23
 1379:5,17
 1380:10
 1381:15,20

1453:17
1455:14
1458:14
1465:19

numbered
 1416:14

numbering
 1416:19

numbers
 1252:4
 1328:6
 1329:24
 1372:9

numerous
 1232:18

nut
 1139:12

―――――――

**O**

oath
 1124:10
 1162:24

object
 1148:24
 1159:2
 1188:24
 1192:21
 1199:21
 1207:20
 1208:8
 1213:7
 1232:11
 1235:9
 1237:4
 1241:2,15
 1249:9
 1269:23
 1272:23
 1275:5
 1319:15

1467:24
1468:13

objected
 1423:4,22
 1429:17
 1452:11
 1475:8

Objecting
 1392:14

objection
 1149:3,4
 1154:19
 1155:8
 1156:21
 1162:8,12
 1163:2
 1170:6
 1175:3
 1186:17
 1188:14
 1195:11
 1198:6,12
 1201:18
 1207:22
 1236:1,16
 1242:6
 1245:9
 1246:18
 1247:17
 1252:22
 1254:10,12,
 21 1255:4,8
 1259:20
 1265:12
 1268:4
 1270:8
 1310:8
 1320:7
 1321:2
 1323:5
 1338:18
 1347:19

**TRANSCRIPT OF PROCEEDINGS**

1355:14
1356:16
1367:10
1378:20
1395:13
1400:11
1419:6,15
1420:15
1422:7
1424:11,22,
23 1428:24
1429:8
1434:16
1444:14,17,
24 1448:16,
18 1450:23
1453:23
1467:23,24
1469:6

**objections**
1248:3,4
1420:21

**obligation**
1224:16
1397:20

**obligations**
1217:6
1240:25
1386:22
1395:7
1397:7,8
1398:4,8,14,
15

**obliged**
1284:4

**observation**
1426:3

**observations**
1420:2,11
1425:5,6
1430:8

**observe**
1419:14
1422:5,14,16
1427:14

**observed**
1419:23
1420:5
1423:18
1425:10
1429:7,9

**observing**
1423:12
1425:23

**obsolescence**
1269:16

**obsolete**
1162:21
1164:7
1165:22
1196:9,12
1269:12,15

**obsoleted**
1166:4

**obtain**
1418:3

**obvious**
1442:11

**occasions**
1228:15

**occur**
1139:17
1444:22

**occurred**
1236:14
1457:13,22
1461:24

**ocean**
1300:2

**October**
1146:8,9
1162:25
1173:22
1209:25
1269:19
1270:18
1276:8
1303:20
1324:10
1326:4,7,10,
11,12,13
1327:20
1329:11,14
1331:14
1341:11
1369:7,9,12
1394:21
1405:3,15
1465:6
1471:18

**odd**
1272:15

**odds**
1277:21

**Odell**
1171:6,9
1173:15
1277:9,18

**offer**
1125:21
1126:2,21
1129:5
1150:4
1179:3
1192:24
1206:12
1259:15
1260:9,15,17

**offered**
1198:3

1199:20

**offering**
1202:15
1409:20
1469:8

**offers**
1210:25

**officer**
1290:4
1291:24

**oil**
1300:7

**one-third**
1132:6

**one-word**
1192:3

**ongoing**
1427:3,5,11

**Online**
1336:4

**open**
1266:21
1291:16
1330:5
1337:22
1457:19
1459:16

**opening**
1183:7
1229:17

**operate**
1290:24
1299:9
1301:20
1330:21,24

**operated**
1290:18,21

**operates**

1370:10

**operating**
1201:17
1290:4
1291:24
1292:4
1328:4

**operation**
1194:25
1195:9
1196:3
1389:7,12

**opinion**
1241:9,19
1242:9
1243:15,17
1259:16
1260:10,18
1294:16
1328:13
1330:23

**opinions**
1241:16
1260:15
1425:9,17

**opportunity**
1248:2
1295:3,7
1306:24
1307:5,10
1310:18
1311:10,14
1323:23
1332:3
1344:4,7
1350:16,17
1351:5
1371:6
1379:3
1405:24
1408:23

**TRANSCRIPT OF PROCEEDINGS**

1409:1,19

**opposed**
1132:20
1223:13

**opposing**
1417:22

**optimistic**
1173:20

**option**
1143:24
1158:20
1286:10

**oral**
1224:5,17
1250:9
1251:1
1256:23
1387:14,17,
19,22,25
1388:1

**orally**
1211:11
1223:21
1225:2

**order**
1131:24
1132:14,15
1135:8
1138:13,21
1139:2
1141:8
1161:14
1172:1
1173:7
1183:9
1185:18
1186:2
1192:11,13
1193:24
1207:13
1209:10

1217:11
1218:14,19
1219:3
1226:9
1227:19
1235:1
1263:13,14
1270:19
1274:13
1298:5
1307:5
1316:11
1332:25
1333:5,8
1352:1
1357:13
1361:21
1376:17,20,
24 1377:5
1378:10,15
1379:18
1386:13
1394:19
1396:24
1397:11,19
1398:13,23
1405:6,11,20,
21 1406:1
1414:9,25
1415:3
1416:7
1419:3,13,18,
20 1420:4
1421:21,24
1422:13,16
1425:14,16
1428:22
1429:1,15
1430:9
1431:3
1434:17,19
1439:22
1442:14,17,
20 1443:3

1465:19
1466:1
1473:16

**ordering**
1299:24

**orders**
1403:4,13,15

**organization**
1168:7
1292:9
1407:13

**original**
1135:24
1138:16
1151:12
1164:13,16
1271:1

**outfit**
1168:2

**outlining**
1151:20

**output**
1363:8

**outset**
1415:9

**outstanding**
1279:10,15

**Overruled**
1149:6
1218:2
1265:13

**overseeing**
1386:18

**overview**
1370:5,13
1373:9,14,18
1379:8

**owed**

1147:1
1341:25

**owned**
1302:23
1375:14,20,
25 1415:15,
17

**owner**
1415:14

**ownership**
1415:23

**owns**
1154:8

___

**P**

___

**p.m.**
1273:19
1276:2
1280:2
1342:23
1381:2
1413:23
1421:17
1476:21

**Pacific**
1128:16

**pages**
1421:4,8
1466:19

**paid**
1135:21
1158:23,25
1172:2
1258:1
1268:2
1318:10
1323:25
1342:1
1390:22

1391:14
1442:15,20

**paint**
1461:11

**panel**
1126:8,12
1132:22
1150:1
1162:24
1200:22
1201:11,16
1206:10
1220:21
1230:19
1231:14
1232:17
1241:20
1256:11
1258:6
1261:1,7,12
1262:24
1263:2
1265:8
1270:10,11
1278:7,12,17
1333:1
1335:15
1337:14
1338:23
1348:13
1393:4,10
1400:12
1403:3,11
1420:19
1421:10
1426:10
1430:5
1433:25
1449:7
1463:1,15
1465:8
1466:8
1469:12

TRANSCRIPT OF PROCEEDINGS

1475:24

**panel's**
1202:18
1203:3
1210:19
1213:13
1253:18
1263:13
1273:9
1275:7
1393:11
1402:25
1449:18
1461:12
1464:20
1466:3

**paper**
1166:18
1212:19
1284:25
1431:17
1452:22

**paragraph**
1171:16
1215:10,21
1216:2
1217:3
1219:9
1221:5
1238:20
1250:5,6,22,
24 1251:23
1362:12
1364:14
1396:4
1416:24
1417:7,14

**paraphrasing**
1465:10

**Pardon**
1180:16

**parentheses**
1457:19

**parents**
1283:15,18
1284:6,20,23
1288:16
1334:1

**part**
1131:24
1139:15
1143:5
1158:13
1200:12
1202:7
1213:14,18
1214:4,5
1265:19
1266:23
1284:17
1298:5
1305:20
1307:13
1309:1
1316:13
1321:20
1338:7
1343:5
1350:14
1369:21
1381:23
1386:21
1392:11
1407:12
1409:15
1440:4
1447:25
1449:19
1454:3
1467:18

**participate**
1307:4
1428:4

1457:2
1458:6
1459:4

**particularized**
1272:17

**parties**
1134:19
1206:17
1229:6,15
1235:25
1236:14
1263:19
1317:3
1339:18
1401:16
1415:12
1416:1

**partnership**
1340:14

**parts**
1266:11
1267:10

**party**
1210:25
1217:23
1310:21
1405:7
1417:22

**party's**
1466:9

**pass**
1274:19

**passed**
1232:17
1400:21
1404:4

**passion**
1288:15

**past**

1135:24
1143:9

**paste**
1153:3,8,15

**path**
1223:19
1405:5,19

**pay**
1137:18
1143:21,23
1144:15
1146:25
1151:18
1155:5,23
1161:17
1173:7
1187:14
1206:18
1207:3
1265:5
1270:22
1285:18
1317:20
1318:2,5
1320:18,21
1367:9
1397:20

**paying**
1154:16
1159:1
1318:18
1411:12

**payment**
1129:3
1131:2,6
1132:2,7
1135:24
1138:12,14
1140:7,8
1141:22
1143:15

1145:20
1151:7
1160:10
1170:19,21
1202:12
1268:2
1274:10,14
1314:9
1315:9,10,14,
18 1316:7
1325:21
1366:15,19
1395:9
1396:6
1397:7,14
1398:7,14

**payments**
1324:4,7,13,
23,24 1325:3,
6,8,11
1391:8,11,21
1392:1

**pays**
1301:19

**PDF**
1182:21,22,
24 1183:5,6
1336:2
1338:7,10,11
1466:18

**peeling**
1463:21

**peeps**
1180:6,25

**penalty**
1150:2

**pending**
1403:16
1427:4
1434:7

TRANSCRIPT OF PROCEEDINGS

**people**
1169:10
1170:3,14
1181:23
1182:20
1247:6
1273:2,13
1285:11
1286:11
1287:2
1292:2
1293:15
1322:20
1328:5
1410:18
1411:22
1419:23
1443:9
1461:25

**percent**
1145:5
1154:9
1201:17
1313:9
1356:7
1357:18
1415:15,17

**Perfect**
1128:7
1314:19
1337:7
1342:20
1361:16
1366:11

**perform**
1161:25
1162:1
1194:8,14
1217:5
1284:15

**performance**
1219:14

1239:5,21
1242:3
1295:21
1296:10
1299:12,13
1355:23
1363:12
1374:13

**performed**
1451:18

**period**
1169:25
1196:7
1266:5,14
1267:9,22
1268:9
1285:11
1311:1
1312:21
1370:3
1403:5
1446:19
1457:24

**periods**
1265:3

**perjury**
1150:2

**Perkins**
1205:19,20,
25

**Perry**
1205:17

**person**
1178:24
1182:6
1183:7
1246:15
1247:6,24
1309:25
1311:25
1313:10

1426:17

**personal**
1393:3

**personally**
1390:23
1391:2

**persuaded**
1393:9
1401:11
1403:22

**pertained**
1221:19,23

**pertinent**
1463:1,3

**pervasive**
1273:11

**petahash**
1130:12
1397:25

**phone**
1129:10
1135:4,6,11
1151:5
1183:17
1208:20,23
1211:5,9,15
1221:14
1229:24
1245:25
1256:20,22
1257:2
1396:24
1399:16,20
1400:2,5,8
1453:17
1455:14
1458:14

**phones**
1403:18

**phrase**
1271:6
1293:19
1370:24,25
1408:19
1445:25

**physical**
1309:4
1337:6
1382:12

**physically**
1129:17

**pick**
1135:3
1151:5
1244:4
1298:19
1316:3

**picked**
1460:8,9

**pickup**
1131:15

**picture**
1336:21

**piece**
1166:18
1291:9
1298:13

**piggyback**
1169:11,13
1170:4,15

**piggybacking**
1161:13,22

**pinging**
1150:8

**pitch**
1159:14
1176:18

**pitching**
1365:9
1469:11

**pivot**
1256:5

**pivoting**
1256:4

**place**
1209:21,22
1291:2
1308:25
1325:12
1328:3,8
1345:22
1363:2
1384:5
1391:22
1392:2
1406:4
1414:12,21
1415:3,8,11
1420:8
1421:21
1423:6
1424:10
1425:22
1456:21

**placeholder**
1336:16

**places**
1470:15

**plan**
1155:5,22
1193:22
1265:24
1267:1
1274:18
1308:12
1314:22
1317:3
1322:4

1366:25
1367:4,8,16,
22,23,25
1383:12,14,
18 1384:21
1386:13

plane
1293:16

planned
1377:3
1379:19

planning
1292:9
1295:2
1308:1,5
1309:21
1320:22
1323:14
1327:23
1370:15
1381:24
1384:13,15
1385:1,4,6,
10,14,21
1467:12

plans
1314:9
1361:21
1366:16,20

plant
1411:19
1412:14

Plattsburgh
1142:9,16

play
1448:22

played
1173:8,9

player
1188:5,7,11

1190:10,15,
17,21 1192:9,
15,19 1193:1,
6

players
1173:11
1265:22,25

plug
1162:7,9
1163:13
1309:9
1382:3,7

plugs
1328:1,9

plumbing
1287:8

PMT
1395:7,9

PO
1134:20
1140:5
1394:15
1398:7

point
1131:14,15
1134:13,16,
19 1138:4
1139:1
1140:4
1144:25
1151:10
1165:24
1173:6
1177:10
1178:4
1182:15
1188:4
1194:6
1210:6
1229:5
1235:10

1271:4
1274:12
1279:14
1285:7
1317:24
1319:18
1329:1
1384:3
1413:7,8
1420:7
1427:16,23
1430:5
1437:9,24
1438:9
1443:10
1447:3
1448:25
1449:1
1458:16
1460:5,15
1463:13
1467:25

pointed
1231:10
1475:17

points
1177:4
1462:1

polite
1216:7

polluting
1412:15

popped
1136:12

portion
1252:8
1420:17
1426:19,25
1427:1
1428:2

portions
1428:4

ports
1330:14

posed
1254:9
1255:16
1278:22
1318:4

posit
1475:6

position
1150:17
1213:25
1328:1

possibility
1221:3
1248:12
1269:3
1344:21
1471:10

possibly
1310:18
1311:10
1392:2
1399:21
1441:20

postpone
1269:16

potential
1128:21
1141:19
1149:25
1177:18,25
1206:22
1221:19,21,
24 1229:19
1268:23
1272:21
1287:5

1316:12
1370:22
1371:4
1440:13

potentially
1186:2
1350:10
1379:4
1389:14

pouring
1193:1

power
1141:20
1300:10,13,
21 1308:22
1309:2,8
1310:6
1375:7
1382:11,15,
24 1383:22

practice
1228:5,19

practiced
1228:11,14,
21 1414:14

pre-book
1145:2

pre-covid
1171:1

pre-revenue
1143:8

precedent
1258:18

precise
1385:16

precision
1129:11

precluded
1425:4

1455:22,24
1460:13
1461:6,9

preconditions
1178:10

predated
1169:20
1170:2

predicate
1210:11
1211:13

prefer
1452:23

prefers
1165:8

preliminary
1414:13,18

premature
1385:22

premium
1141:13
1145:3

prepare
1125:3
1331:20
1371:11

prepared
1159:18
1194:10
1245:14
1249:24
1252:14,16,
18,21,25
1253:6
1334:20

preparing
1194:8,14
1243:11
1315:7

1316:10
1395:12
1396:1,15
1439:1

prerogative
1426:13

present
1146:13,15
1289:12
1331:18

presentation
1178:3,6
1182:21,22,
25 1183:5
1427:2

presented
1232:18
1310:17
1410:10

presenting
1306:24
1307:10
1322:4

press
1412:16,24

pressure
1297:24

pretend
1471:16,17

pretending
1471:19

pretty
1197:16
1229:13
1241:7
1251:11
1287:15
1299:20
1313:8

1319:18
1320:24
1327:18
1404:13
1410:11
1442:10
1456:23
1475:24

preview
1473:11

previous
1244:22
1250:8
1251:1,12
1258:22
1290:23
1305:12

previously
1123:7,14
1127:8
1234:15
1236:13
1237:2,15
1239:12
1240:9
1264:2,22
1303:11
1355:17
1466:25

price
1132:5
1138:14,15
1139:16
1145:4
1146:4
1165:25
1265:18
1266:6,13,16
1267:5,8,11
1296:5
1297:20
1315:11

1316:9,11,15,
18 1318:23,
25 1319:6,7,
13,25 1320:3,
4,17,20,25
1321:1,23
1322:9
1329:15,19
1331:21,24
1332:2
1340:5
1354:23
1355:2,7,9,
10,11 1369:4,
8,10,13
1376:10

pricing
1321:6,15
1334:20
1335:5
1355:5,22
1408:5

Prieur
1288:10,11,
13 1387:18

primary
1194:19
1370:9

principal
1292:1

principals
1163:16

principle
1331:25

print
1336:18

printed
1338:14

prior
1125:25

1126:11
1211:25
1212:3
1221:25
1224:18
1227:1
1235:23
1240:2
1244:7,12
1245:5
1249:13,19
1257:3,11
1260:7
1263:14
1391:4
1392:5
1400:23
1428:7
1435:15,16,
25 1436:3,10
1437:9,24
1457:3
1458:7
1459:6

Privacy
1392:14

privilege
1224:22
1235:10,11
1246:19
1247:17
1248:4
1424:18
1429:2
1460:8
1463:21,23,
24 1475:10

privileged
1210:6,20,22

pro
1228:12,14
1414:15

**TRANSCRIPT OF PROCEEDINGS**

**problem**
1151:6
1250:21
1298:2,7,12,
21 1300:21
1402:8
1429:3
1445:6
1448:6
1449:4,6
1454:12

**problematic**
1473:5

**procedure**
1414:11

**proceed**
1203:21
1214:16
1325:25
1342:13
1381:1

**proceeding**
1435:10

**proceedings**
1126:18
1476:21

**process**
1160:19
1168:21
1197:24
1287:15
1300:9
1307:4
1331:2
1392:5
1417:17
1418:3,9
1419:5,14,24
1420:6,8
1422:6,17
1423:6,16,18,

19,24 1424:9
1425:21,23
1428:23
1429:16
1460:7

**processes**
1421:21

**procure**
1344:4,7
1354:11
1418:23

**procuring**
1344:21
1405:24

**produce**
1161:11
1194:4
1202:16
1258:3,15
1295:2
1297:25
1306:18
1318:14
1322:15
1325:18
1332:2
1353:4
1369:20
1402:25

**produced**
1248:2
1297:16
1298:2
1306:17
1329:1
1331:5,24
1336:19
1357:9,14
1369:19
1389:8

**producing**

1197:24
1331:3

**product**
1202:13
1218:1
1235:10,11,
12 1236:1,16
1241:16
1242:6,9
1245:9
1252:22
1253:2
1254:13,21
1271:23
1330:3,17
1349:3,11
1355:5,21,22
1363:4
1459:13
1474:20
1475:9

**production**
1160:14,17,
19,25 1161:1,
5 1169:17
1170:22,25
1186:3
1193:25
1266:12
1267:1
1270:22
1271:19
1272:6
1297:1,6
1298:22
1300:9

**proffer**
1348:15
1469:17

**profit**
1301:21,25
1302:6

1339:18

**profitability**
1164:11
1270:24

**profitable**
1269:13

**program**
1284:6

**programmer**
1388:23

**project**
1162:7,15
1342:4

**projected**
1373:18

**projection**
1375:25

**projections**
1151:21
1274:15

**promise**
1176:7
1301:12

**prompt**
1450:23

**prong**
1222:22,23

**pronounce**
1281:8

**pronounced**
1282:25

**proof**
1190:5
1192:24

**proper**
1217:24

**properly**

1182:7
1299:9,19,25
1301:7,16

**property**
1222:8

**proportion**
1138:20

**proportions**
1138:19

**proposal**
1130:1,8,15,
18,23
1131:19
1134:17
1137:16
1166:10,12,
24,25
1167:13,17
1213:10
1214:10
1215:12
1305:25
1369:22
1428:21
1430:21,22
1431:9
1433:11
1434:10

**propose**
1316:14

**proposed**
1314:21
1316:20
1341:8
1349:24
1351:1
1366:25
1367:22
1406:6

**proposes**
1317:25

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

proposing
1129:11
1306:1
1351:5

protect
1332:3
1339:19

protected
1222:12
1272:24

prototype
1130:14
1160:24
1328:17
1329:1
1331:9

prove
1189:15
1190:1,7

proved
1189:25

proven
1183:25

provide
1131:6
1218:11
1219:13
1243:15,17
1254:24
1255:1,13
1258:8
1289:16,19
1291:1
1295:17
1302:17
1317:21
1359:23
1381:14
1417:19
1432:10,23
1433:10

1453:21
1454:20
1460:12

provided
1129:18
1172:6
1287:11,12
1312:22
1320:15
1329:23
1337:19
1363:16
1420:19
1421:2
1432:10,11,
19 1466:7

providing
1301:12
1303:2
1418:5

provision
1260:20

public
1392:13

publicly
1269:2

Puerto
1292:25
1293:3,7,19
1313:10
1343:14,19
1356:9,11,13
1357:6
1358:7,12,20
1359:17
1426:16
1427:8

pull
1147:24
1225:13
1242:17

1276:15
1302:12
1303:25
1307:18
1311:17
1313:13
1326:14
1332:22
1351:20
1366:6
1371:21
1384:9
1393:22
1399:13
1404:20
1408:8
1416:2
1431:18
1435:5
1441:23
1452:16

pulled
1162:6,9
1163:13
1446:12
1460:1

pulling
1416:5

purchase
1135:8
1138:13
1171:24
1172:1
1192:11,13
1207:13
1217:11
1218:16,21,
25 1219:3
1226:8
1227:19
1235:1
1272:21

1295:7,9,13,
18 1296:24
1305:12
1316:12
1321:18
1322:13
1336:5
1351:5,6
1352:1
1357:12
1365:9,16,21
1366:2
1376:17,20,
24 1377:3,5
1378:9,14
1379:18
1384:22
1386:3
1394:19
1396:24
1397:11,19
1398:13,23
1428:10
1434:11,20
1437:9,13,17
1439:22
1440:13,22
1442:13,17,
20 1443:3
1444:7

purchased
1284:6
1296:24
1298:23
1321:7
1350:18
1371:15

purchaser
1218:14,19

purchases
1376:25
1379:19

purchasing
1295:4
1306:24
1320:8
1322:7
1349:24
1351:1
1360:1

purpose
1273:9
1315:6
1370:12
1400:10
1427:7
1471:5

purposes
1442:21

pursuant
1135:21
1158:25
1428:22
1429:14

pursuing
1353:2

push
1134:12
1271:1

pushed
1167:20

pushing
1135:10

pushy
1311:12

put
1154:1
1168:19
1183:17,19
1198:15
1202:2
1212:10

**TRANSCRIPT OF PROCEEDINGS**

1220:2
1256:14
1270:15
1294:13
1302:3
1306:21
1308:25
1309:4,6,22
1316:15
1328:8
1330:20
1338:15
1345:24
1361:4
1369:14
1378:19
1379:5
1390:8
1403:7
1414:21
1415:2,8,10

**puts**
1153:25
1414:12

**putting**
1306:19

---

**Q**

**Q4**
1143:10

**qualified**
1390:16

**qualifies**
1470:1

**quantity**
1383:17
1384:22

**question**
1149:11
1152:9

1155:12,15
1156:12,22
1157:1,6,13,
16,20 1158:2
1169:2,8
1173:9,10,12
1175:6,8
1179:23
1185:5
1188:16
1189:19
1190:20
1193:4
1195:14,20,
23 1211:14
1224:17
1233:13,14
1236:9,23
1237:8
1240:6
1243:7
1244:18,20
1249:5,17
1251:7
1255:10
1260:4,7,9
1262:5
1267:2
1268:12,15
1270:3,8,9
1272:13,15,
23 1273:23
1279:10,15
1302:20
1331:9
1347:22
1348:21
1349:4
1350:8
1352:9
1357:3,16
1360:7
1364:24
1367:14

1368:22
1377:18,22
1378:8,16,25
1395:20
1405:2,12,18
1407:8
1410:4
1419:24
1420:2,15
1422:11,12,
20 1423:3,9,
11,13 1425:1,
2,11,19
1426:4
1433:9
1442:24
1445:13,18,
20,21,24
1446:11,13
1447:10
1448:8,21
1449:12,25
1450:13,17
1451:6
1455:12
1456:25
1457:1,7,11,
25 1458:3,6,
24,25 1459:3
1461:14,16
1462:20,21
1467:4
1468:1,6
1470:11
1472:10,13
1475:13,20

**question-by-
question**
1461:13

**questioning**
1253:6
1407:23
1462:25

**questions**
1130:5
1132:18
1166:20
1168:25
1170:11
1175:12
1176:2,21
1183:3
1227:22
1248:23
1249:3
1254:8,20
1255:3,15,24
1261:2,11,12
1262:13
1263:1,4
1265:2
1270:1
1273:2
1276:5
1278:2,7,12,
18 1334:4
1360:3,6,9,12
1370:2
1388:9
1395:22
1399:6
1404:16
1406:16,17,
24 1410:1
1425:15
1430:9,11,12,
13 1455:7,22
1460:13,18,
25 1461:10
1467:12
1471:6
1472:3
1475:7

**queue**
1354:11

**quibble**
1357:20

**quick**
1152:17
1196:19,22
1267:3
1302:20
1334:23
1412:7

**quicker**
1360:5

**quickly**
1124:12
1146:7
1225:11
1285:1
1288:14
1297:25
1298:2
1300:19
1393:20
1396:8
1399:6
1421:11

**quietly**
1213:2

**Quinn**
1181:12

**quirks**
1297:2

**quiz**
1284:11

**quizzes**
1284:8

**quo**
1414:9,25
1415:3
1416:6
1419:3,13,18,
20 1421:20,

**TRANSCRIPT OF PROCEEDINGS**

24 1422:13,
16 1425:14,
16 1428:22,
25 1429:15
1430:9
1431:3
1434:17,19
1473:16

**quote**
1145:23
1160:21
1217:4
1271:7
1357:7
1367:16

---

**R**

**R&d**
1272:12

**race**
1297:19

**rack**
1302:5

**racks**
1382:12

**raise**
1143:15
1187:7
1205:7
1235:4
1248:3
1281:18
1400:21
1403:9
1411:10

**raised**
1143:17
1189:22,23,
24 1262:5
1403:11

1466:4
1474:21

**raising**
1189:25
1266:16

**ramps**
1297:22

**ran**
1151:25
1300:7,11

**Randall**
1123:20
1414:1
1433:18

**random**
1468:18

**Randy**
1231:10
1262:19
1444:1
1452:21

**range**
1316:1

**rate**
1145:9
1306:4,7,10,
13,21,22
1307:1

**rattle**
1298:20

**re-plow**
1276:18

**reach**
1329:7

**reached**
1174:22
1271:23
1277:5,9
1288:2,8

1289:1

**reaching**
1267:18

**read**
1126:4,15,18
1128:18,24
1129:1
1134:1,10,22,
25 1135:2,9
1136:8,9
1137:2,10
1140:15,25
1141:4,11
1142:23
1143:7,20
1144:7,13
1146:23
1148:12,17
1149:15
1150:7
1154:7
1155:17
1156:9
1157:9
1158:1,8
1167:22
1171:17
1172:11
1177:5,11
1180:4,9,23
1181:1,6,9,
15,19
1185:10,16
1212:14
1213:8
1214:8
1215:10,18
1216:3,20
1218:9,17
1219:18
1220:21,23
1221:5
1226:20

1237:9,11
1238:21
1239:15,16
1240:7,8
1241:24
1244:16
1248:7
1250:6,25
1258:20
1286:10,11
1287:16
1303:24
1305:2
1307:25
1314:8
1327:7
1342:20
1346:4,5,8,14
1348:12,20,
21,25 1350:7,
13 1355:1,22,
24 1358:13
1361:7,18
1362:13,17,
20 1363:5,11
1364:15,19
1367:3
1373:11
1377:17,21
1378:7
1379:14
1380:24
1381:6
1386:25
1390:12
1394:13
1395:5,11
1396:3,5
1397:17
1405:4,18
1408:14
1409:10
1416:25
1429:13

1439:18
1443:25
1446:18
1457:9,18
1459:3
1466:2

**readily**
1322:8

**reading**
1377:16
1442:10
1452:24
1458:22

**reads**
1218:9
1313:24

**ready**
1203:20
1204:1
1205:4
1213:5
1220:11
1264:9,18
1271:1
1272:2,5
1342:13
1399:8,10

**real**
1146:19
1147:4,7
1163:23
1182:7
1190:14
1196:19
1202:5
1267:3
1283:20
1287:17
1334:23
1412:7
1445:7

TRANSCRIPT OF PROCEEDINGS

1446:15

reality
1403:6

realize
1284:18
1417:6

reask
1406:16
1436:21
1437:3

reason
1187:1,4,8,19
1279:22
1301:11
1312:25
1325:5
1338:6
1377:2
1391:20
1416:1
1434:18,23
1435:2,3
1471:21

reasonable
1217:4

reasoning
1292:12

recall
1142:14
1201:13
1205:23
1206:7
1230:17
1279:16
1293:1,6,11
1295:23
1307:7
1310:21
1312:3,12
1313:2,6
1314:12

1315:8
1316:4
1317:17
1324:6,10
1327:16,19,
21 1328:18,
24 1331:16
1340:24
1344:6,23
1345:4,6
1347:11
1348:1,22
1350:2,8
1351:11
1352:16,17
1358:9,11,19
1367:18,21,
24 1368:19,
22 1370:4
1371:17
1375:4,5
1377:5,10
1381:12
1388:17
1390:6,7,14,
15 1408:1,2,7
1410:11
1412:9
1427:25
1435:14
1438:2,5
1441:17
1442:2
1443:5
1466:11
1476:9

recalled
1347:23

recalling
1328:17

receipt
1241:22

1396:11

receive
1214:1
1325:18,21
1340:2
1406:4
1411:9

received
1134:13,16
1172:14
1206:15
1217:9
1238:17
1258:4
1319:4
1364:11
1382:2,6
1390:10,15
1411:20

receiver
1414:21

receiving
1298:6
1383:18
1390:7

recent
1216:4

reception
1151:13

recess
1201:14
1280:1
1342:22
1413:22

recognize
1214:18
1307:21
1352:1
1362:23

recognized
1287:4

recollect
1438:16
1444:9

recollection
1165:16
1344:25
1350:5,25
1354:17
1375:2
1377:12
1379:16,23
1380:3
1396:4,13
1436:1
1437:11,15,
19,21 1441:4
1444:5
1464:1
1475:5

record
1165:5
1166:14
1188:14
1191:7,10,20
1202:5,20,21,
24 1203:3,23
1207:19
1210:14,20
1255:22
1261:25
1262:2
1273:9,17,18
1275:1,4,6,
15,20,24
1276:1
1281:2
1345:18,20
1393:18,21
1421:15,16
1424:6

1438:19
1459:1
1472:7
1474:22
1476:11,18

recording
1474:23

recover
1302:9

recovering
1308:10

Recross-
examination
1123:8,12
1147:23
1259:13

redaction
1248:3

redactions
1246:25

Reddy
1163:12
1182:14
1183:1
1269:18,25
1270:1,3

Reddy's
1183:4

Redfern
1402:13
1403:1

redirect
1123:7,11,14,
18 1127:10
1256:17
1264:24
1406:14
1407:20

redline

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1435:20

**redlined**
1295:12

**redlines**
1435:25
1436:9

**redoing**
1286:7

**reduce**
1197:14,18

**refer**
1130:4
1211:25
1217:10
1219:1,4
1229:18
1233:24
1375:20
1421:11
1434:2
1456:5

**reference**
1239:25
1307:23
1336:11
1438:7
1441:14,15

**referenced**
1200:8
1207:12
1233:14
1367:16
1438:8

**referencing**
1131:20
1357:3

**referred**
1159:16
1229:18
1306:13

1408:24

**referring**
1128:20
1142:8
1148:21,23
1149:25
1241:24
1242:5
1244:7,9,14
1245:4
1250:14
1251:4,9
1306:5
1311:16
1341:3
1409:2,19

**refers**
1250:25
1405:25

**reflect**
1277:6,11

**reflected**
1316:2

**reflecting**
1315:16
1360:16

**refresh**
1344:25
1350:25
1375:2
1377:11
1379:16
1396:4,13

**refreshes**
1165:16
1350:5
1379:23

**refused**
1181:24

**region**
1371:4
1379:13
1411:16

**registered**
1284:4

**regularly**
1310:23

**regulatory**
1234:23

**relate**
1300:3

**related**
1134:4
1206:12
1212:8
1218:12
1222:1
1339:20
1427:5
1475:20,21

**relates**
1201:22
1406:23

**relating**
1206:3

**relationship**
1288:23
1289:4
1415:5,12

**release**
1224:15

**relevance**
1163:5,6
1189:6
1192:22
1194:6
1235:11
1246:19

1247:3
1268:7,8
1393:1,2
1400:14
1448:21

**relevant**
1189:8
1191:4
1192:24
1211:1
1223:15
1308:21
1383:20
1448:24
1463:9
1464:12

**relied**
1161:14
1346:10,16

**rely**
1177:25
1416:16

**remaining**
1132:6

**remarks**
1229:17

**remedy**
1173:6

**remember**
1143:17
1146:5
1152:1,6,10,
14 1156:2
1166:22
1177:22
1183:11
1194:9
1287:20
1294:2,20,23,
24 1295:1
1297:7

1328:17
1376:12
1380:9
1396:16,23
1428:16
1438:8
1443:10,14
1456:8

**remind**
1125:14
1175:24
1282:1
1408:22
1476:15

**remote**
1323:21
1371:4

**remotely**
1313:11,25
1426:18
1428:3

**rendering**
1327:22
1331:8

**renderings**
1331:6

**renegotiate**
1198:21

**renewable**
1413:15

**renting**
1306:17

**reopen**
1401:4
1402:18

**repeat**
1152:9
1155:14
1187:17

TRANSCRIPT OF PROCEEDINGS

1237:7
1260:4
1343:16
1353:5
1382:4
1394:2
1398:10
1442:24

**repeated**
1446:12
1459:1
1466:10

**repetitive**
1258:2

**rephrase**
1236:9
1255:10
1356:23
1363:24

**replace**
1193:23
1296:21
1299:5

**replaced**
1194:18

**replayed**
1300:21

**reply**
1221:1
1222:8
1248:10
1384:20
1385:20

**report**
1125:22,23
1389:16,22
1390:4,12,19

**reported**
1273:14

**reporter**
1200:4
1203:12
1204:12,16
1212:24
1213:1
1221:21
1261:24
1282:1,4
1324:20
1326:23
1335:1,14
1344:15
1352:21
1353:5
1354:5
1401:7,21
1421:15
1424:2,5
1438:23
1446:10
1447:2
1456:18
1457:16
1474:23

**reporter's**
1459:1
1466:6

**represent**
1151:9

**representativ
e**
1225:6

**represented**
1131:18

**representing**
1168:14
1433:24

**repudiate**
1222:9

**repudiating**
1222:12

**repudiation**
1218:14
1219:15

**request**
1206:12
1211:21,25
1213:14
1217:24
1239:11
1243:16
1250:11
1342:15
1390:9

**requested**
1213:25
1237:2,15
1239:4,20
1242:2
1332:6
1400:18

**requesting**
1217:3
1306:15

**requests**
1212:4
1240:9
1244:8,12,22
1245:5
1251:12
1256:24
1257:3,12

**require**
1216:9
1274:10
1431:3

**required**
1135:8
1160:9
1164:14

1176:13
1222:18
1223:6,10

**requirements**
1308:16
1310:6

**requires**
1420:4

**reread**
1251:6

**rescheduled**
1401:18

**rescind**
1249:13,19

**rescinding**
1257:11

**research**
1136:15
1222:5

**resell**
1349:25
1350:21

**reserve**
1147:13
1202:25
1203:1

**reserved**
1340:11
1460:12

**resident**
1284:3

**resolution**
1132:12
1223:19

**resolve**
1206:21
1210:3,17
1230:12

1233:23
1286:5

**resolved**
1474:22

**resolving**
1206:17
1223:12
1286:4

**resources**
1310:15

**respect**
1202:19
1233:18
1234:7
1247:18
1253:18
1262:25
1265:9
1268:8
1460:3

**Respectfully**
1400:22

**respond**
1137:2
1207:18
1217:24
1219:21
1221:11
1222:18
1223:3,21
1224:2,12,19
1233:9
1245:14
1248:17
1249:25
1252:14,16,
25 1253:7
1259:1
1312:2,20,23
1352:24
1365:14,19

1459:20

**responded**
1181:19
1207:1
1244:16
1253:14
1312:9
1362:9
1443:17

**respondent**
1415:3

**responding**
1223:14

**responds**
1134:25
1242:9
1327:6

**response**
1128:24
1132:19,24
1141:4
1144:12
1149:12
1213:9
1214:9
1215:11
1219:25
1223:6,17,24
1224:17
1253:1
1257:10
1258:6
1269:24
1270:5
1277:19
1286:24
1307:9
1310:20
1402:25
1430:25
1443:6

1464:22

**responses**
1202:25

**responsibiliti es**
1386:18

**responsibility**
1307:13
1381:24

**responsible**
1387:13
1388:25

**rest**
1186:11
1381:5
1409:15

**restrictive**
1414:19

**result**
1258:3
1465:20

**results**
1183:2,4

**resumed**
1123:7,14
1127:10
1264:24

**retain**
1205:20

**retained**
1194:23
1206:1

**retention**
1205:24
1206:3

**retract**
1199:14

**return**
1219:16
1284:24
1285:10
1322:22

**returned**
1281:3
1283:15
1285:4

**revealing**
1192:18

**revenue**
1143:10

**reversal**
1254:16

**review**
1196:16
1294:16
1295:16
1314:9
1353:1,3
1366:15,19
1388:14
1389:15,21
1390:8
1391:2
1439:7,24
1440:13,23
1442:6
1444:1,13
1446:24
1447:6

**reviewed**
1258:5
1295:12
1315:4
1387:6,14
1438:14,19

**reviewing**
1398:19
1438:16

1439:1
1444:6,9

**revise**
1166:7

**revised**
1168:15

**revision**
1135:15,17,
20,25 1136:3
1166:9
1176:2

**revolutionary**
1164:6
1193:22

**revolutions**
1299:1

**revolving**
1177:12

**rewrite**
1287:7

**rhymes**
1262:20

**Rico**
1292:25
1293:4,7,19
1313:10
1343:14,19
1356:9,11,14
1357:6
1358:8,12,20
1359:17
1426:16
1427:8

**ridiculous**
1351:14

**Ridiculously**
1354:25

**rig**
1193:23

1266:12
1290:21
1299:10,16,
18 1346:15
1383:16

**rigs**
1139:6
1165:21
1272:22
1290:14
1292:4
1297:11
1303:2
1306:4,6,12
1309:7
1321:13,16
1328:9
1345:2
1346:22
1347:8,9
1349:10,15,
24 1351:2
1357:7
1359:14
1360:1
1365:16,21
1366:2
1375:21
1382:2,6,7,24
1383:13
1386:8,10
1388:3
1391:23
1392:1,3
1405:16
1434:12

**Riot**
1305:3

**risk**
1301:18,24
1306:19

TRANSCRIPT OF PROCEEDINGS

river
1413:14

Robert
1389:25

role
1234:23
1254:16
1289:25
1290:1
1291:22,25
1365:9
1407:11
1418:18
1427:15

roll
1449:19,22

rolled
1258:22

romanette
1216:22,23
1217:2
1367:2

room
1159:19
1177:17,21,
22 1178:7,11
1201:3
1212:19
1223:5
1309:8
1310:15

rooms
1279:24

Rose
1128:1

rough
1293:13

roundabout
1453:6

router
1290:25

row
1378:19

Rs
1282:17,21,
22

rudimentary
1327:22

rule
1195:18

ruled
1400:12
1430:1
1466:25
1474:16

rules
1430:5

ruling
1202:18,23
1203:3
1208:14
1210:9,19
1253:2,18
1275:7
1456:24
1474:14

rulings
1466:3,15

rumors
1194:2
1267:14

run
1160:19
1169:17
1170:22
1287:7
1289:18
1299:16,19,

21 1302:5,8
1307:16
1330:21

running
1124:14
1146:7
1193:15,21
1301:10,13,
16,23 1305:4,
17 1316:5
1317:17
1328:2
1412:20

runs
1291:12

Ruth
1476:16

_____

S

S17
1298:11

S17s
1305:13

S19s
1354:18

sad
1285:18

sailboat
1283:21,22
1288:17,19
1334:1,17

sailboats
1288:15,21

sailed
1283:21

salaries
1381:4
1411:15

sale
1392:12

sales
1155:6,24
1156:13
1158:3
1218:15,25
1226:8
1227:18
1304:7
1365:9
1437:9,13,17

salespeople
1365:11

SAN
1124:2

sanction
1402:18

sanctions
1401:3
1403:16

sat
1147:2
1472:9

satisfied
1183:6
1268:19
1296:15,17,
20

satisfy
1240:24

satisfying
1285:18
1292:6

Saturday
1417:20

sausage
1404:7,8,10,
11

save
1420:24

SBA
1134:20
1140:5
1147:8

SBI
1134:3

scaling
1321:20,22

scan
1328:5

scanned
1338:17,24

scanner
1328:5

scenario
1310:7

schedule
1164:21,25
1165:14
1170:20,21
1171:22
1263:14
1357:23
1358:24
1368:4,9,16
1384:1,23
1406:5

scheduled
1274:14

schedules
1384:3

scheme
1156:14
1158:9,13

Schneider
1293:9
1343:10

TRANSCRIPT OF PROCEEDINGS

1418:15
1427:21
1441:10
1443:18
1444:12
1446:22,23
1447:1,4,5,23

Schneider's
1438:9

school
1283:25
1284:5,6,17,
19 1285:7,15

schooled
1334:12

Schrader
1326:13

Schroder
1326:13
1327:18,19
1328:20,23
1329:11
1330:8,12
1331:1
1341:13

Scientific
1178:13
1179:19
1180:1
1181:24
1182:20

scope
1414:18

Scott
1171:6,9
1172:12
1277:9,19

scratch
1330:16

screen
1153:7,14,18
1165:3,5
1212:11
1242:24
1251:10
1256:13
1317:6
1361:4
1372:15
1416:16

scroll
1212:12
1215:20,24
1216:24
1217:13
1219:10
1220:4
1225:15,17
1226:16
1246:10
1251:25
1311:21
1312:5
1313:18
1314:1,15
1327:5
1334:22
1353:11
1354:14
1361:14
1362:6
1366:11,17
1372:17,23
1373:1
1374:6
1375:16
1380:15,20
1394:5,24
1408:10
1409:5
1416:11
1435:19

1439:14
1443:19

scrolling
1217:14

seat
1471:22

second-to-
last
1443:24

second-to-
the-last
1443:23

seconds
1406:7

section
1177:2
1216:12,19
1239:23
1314:7
1416:24
1417:8,9,11

sections
1240:1

secure
1350:17
1354:10

secured
1177:12
1267:23

security
1299:14

seek
1216:7
1401:2

segment
1428:6

segue
1171:3

select
1294:21

selected
1318:8

self-evident
1251:17,19

self-
explanatory
1244:15,19

self-mining
1349:25
1350:11,20
1351:2
1375:22

self-
regulating
1431:7

self-report
1419:19

self-taught
1286:2
1319:1

sell
1141:14
1142:1,10,16
1267:12
1334:16

seller
1392:1

selling
1354:18
1355:13

send
1129:5
1150:14
1157:14,21,
25 1186:22
1187:1,19,21
1220:25

1248:9
1284:9
1322:17
1466:19
1476:20

sending
1325:25
1326:7
1339:10
1428:20
1439:4

senior
1418:11,20

sense
1171:23
1233:5,12
1284:2
1328:25
1329:2,22
1331:1,9
1390:21
1449:9

sensitive
1429:20

sentence
1213:8
1214:11
1218:8
1219:1,9
1220:22
1224:16
1226:19
1240:7
1244:25
1303:24
1304:5
1305:1
1364:14
1395:4
1396:5
1405:3

TRANSCRIPT OF PROCEEDINGS

1439:17
1443:24

**sentences**
1215:9

**separate**
1475:25

**September**
1123:2
1124:1
1162:25
1270:18
1324:9
1326:4,6
1341:11
1402:7

**September/
october**
1163:13

**serial**
1328:6

**series**
1152:2
1402:24

**serve**
1285:10

**served**
1285:12

**serves**
1218:22

**service**
1285:8
1291:13
1301:12
1334:1
1351:24

**services**
1290:10
1402:10

**Session**
1123:3
1124:5
1281:1

**set**
1125:22
1194:24
1195:8
1196:2
1203:9
1298:23
1313:22
1399:5
1415:7
1466:5
1475:7

**setting**
1327:13

**settle**
1209:7,18
1210:4
1230:7
1233:2,15
1316:15
1354:21

**settled**
1300:12

**settlement**
1174:23
1198:6,9,16
1199:25
1200:11
1201:19,23
1202:1
1203:11
1206:13
1207:21,24
1208:7,13
1210:22,25
1213:10,22
1214:10

1215:12
1221:4,17,19
1222:22
1245:19
1248:13,18
1249:8

**settling**
1215:15
1233:17,19

**shake**
1298:19

**share**
1154:18
1155:7,25
1256:13
1301:18,20
1302:6
1330:4
1356:10
1370:13,17
1379:8
1408:4
1430:22
1431:9

**shared**
1230:4
1288:15
1295:24
1332:19
1339:10,21
1340:5
1359:2,5,7,16
1407:24
1431:1
1440:17
1467:15

**sharing**
1359:21

**sheet**
1137:12,14
1148:19

1149:18,23,
24,25 1150:3
1172:4
1268:25

**shield**
1429:4,5
1454:21
1460:8,9

**shift**
1292:24

**ship**
1300:5
1334:12

**shock**
1147:3

**shoebox**
1291:16

**shoot**
1232:6

**short**
1300:13
1342:14,16
1406:13
1413:18

**short-circuit**
1431:2

**shortcoming**
1298:11

**shortfall**
1161:19
1173:3
1197:10

**shortly**
1342:5

**shove**
1271:2

**shoving**
1468:15

**show**
1190:8
1225:10
1252:11
1272:11
1302:14
1315:9,15
1345:5
1351:16
1384:1
1392:20
1394:25
1460:5
1461:15

**showing**
1151:21
1252:19
1439:4,9
1440:16

**shown**
1145:15
1188:20
1329:24,25
1369:11

**shows**
1128:15
1184:4
1315:21
1317:16

**shut**
1204:3
1419:20
1455:5
1460:2,7
1461:16
1462:15
1474:5

**shutdown**
1451:25
1452:3

**sic**

**TRANSCRIPT OF PROCEEDINGS**

1140:21
1270:9

**side**
1263:20
1270:11
1294:8,10
1329:18
1333:2,12
1340:20

**sides**
1462:25

**sign**
1186:3
1191:1
1193:23

**Signal**
1400:4,6

**signed**
1145:18
1147:9
1151:12
1168:17
1170:23
1177:6
1181:25
1190:20
1196:6
1209:3
1211:6
1217:11
1218:20
1275:17
1351:10
1353:16,18,
19 1357:12
1358:25
1360:15,22
1365:25
1376:20
1379:18
1381:11

1385:2,23
1386:2
1397:10,18
1398:7,13
1409:3
1436:20

**significance**
1126:13
1330:12
1370:18

**signing**
1238:24

**similar**
1268:19
1286:15
1320:4
1330:3
1414:12,18

**similarly**
1229:23

**simple**
1327:24
1451:6

**simpler**
1173:12

**simplest**
1291:10
1300:3

**simply**
1132:23
1175:11
1185:5
1277:11
1420:5
1429:6
1456:5

**simulated**
1181:25
1182:6

**simulating**
1183:2

**simulation**
1183:4

**simultaneous**
1199:17
1254:11
1325:14
1333:17
1374:25
1396:19
1402:1
1416:17
1422:18
1423:23
1436:24
1440:7
1446:9
1454:9
1456:14
1465:25
1468:25

**simultaneous
ly**
1267:19

**single**
1241:4
1274:8
1284:20
1323:16
1465:24

**sink**
1298:13,16
1299:7

**sinks**
1305:16

**sir**
1129:9
1208:7
1245:2
1346:19

1349:7
1352:6,12
1353:15
1355:8
1364:24
1369:1
1370:1
1372:5
1394:7
1395:22
1413:24
1419:10

**sit**
1230:24
1231:2
1256:6,9
1310:1
1368:22

**sits**
1472:3

**sitting**
1131:23
1230:21,25
1352:11
1377:18
1378:8
1390:18

**situation**
1151:22
1169:24
1172:25
1266:10,19
1269:9,22
1322:19
1461:13

**sixth**
1125:15,18

**size**
1130:8
1138:7
1144:21

1145:22
1171:18
1183:14
1268:19

**skin**
1278:15

**sleep**
1223:23

**slide**
1182:3
1390:7

**slightly**
1349:2,11
1356:14
1357:7,13,18,
20 1375:16

**slot**
1160:17

**slow**
1149:7
1335:11,15
1457:15

**slower**
1326:24

**slowly**
1297:21

**small**
1193:9
1298:2
1305:13

**smaller**
1142:19
1172:7
1196:24
1197:2,9

**smell**
1412:23

**smidge**
1149:7

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

software
1285:23
1286:24
1287:3,6,7
1388:23

sold
1283:19,20

solely
1287:10
1387:25

solicitation
1410:7

solution
1191:8

solve
1338:21

Soniat
1146:15
1150:22,25
1151:4,6,14,
18,19,21
1158:15,23
1187:2,13,21
1211:20
1213:16
1237:1,14
1243:23
1249:14,20
1254:2,9
1255:15
1293:8
1303:21
1343:8
1351:9
1353:20
1381:9,11
1384:12,25
1385:3,5
1386:1,16
1389:21
1394:10

1405:19
1415:13,24
1418:13
1433:18
1446:21

sophisticated
1172:23
1173:10

sort
1181:8
1187:10
1258:14
1281:13
1284:25
1308:5
1316:18
1369:13
1422:1
1449:15

sorted
1187:15,22

sorts
1138:21

sought
1271:20
1461:20

sounded
1303:10

sounds
1281:11
1286:14
1322:24
1418:2
1423:17
1469:7
1471:6
1474:2

source
1347:1

sources
1265:15

space
1289:24
1301:23
1303:2
1304:8,11,23
1305:18,19,
21 1309:4
1386:9

span
1228:20

speak
1189:5
1204:13,16,
19,21 1213:1
1224:12,15
1272:10
1282:2,3
1326:23,24
1354:6
1388:11
1474:13

speaker
1469:24

speakers
1199:17
1333:17
1374:25
1416:17
1422:18
1423:23
1436:24
1440:7
1456:14
1468:25

speaking
1189:3
1254:11
1325:14
1396:19

1402:1
1422:5
1446:9
1448:16
1454:9
1465:25
1467:24

specific
1196:6
1240:4
1244:20
1260:20
1275:1,10
1289:19
1295:24
1296:12
1301:1
1308:13
1384:22,23
1412:8
1431:15
1443:18
1446:11
1454:7
1457:25
1459:11
1462:1
1474:18

specifically
1245:22
1260:8
1271:17
1294:24
1347:11
1386:12
1423:12
1428:12,19
1438:22,23,
24 1441:12
1444:9
1451:10
1453:16,18
1467:13

specifications
1308:16
1310:5

specifics
1296:1
1356:10

specs
1308:2
1309:3,11,12
1310:14
1362:22
1363:16,17
1364:2,7,9
1384:14,18
1385:11
1386:13,15

speculating
1440:24

speculation
1355:15
1367:11
1419:7
1424:12,16,
17,24,25
1444:15

spell
1282:12

spend
1182:4
1191:17
1194:7
1377:4
1449:7,8
1471:21

spending
1373:21

spent
1191:17
1194:14
1252:12

TRANSCRIPT OF PROCEEDINGS

1255:7
1333:24

**spit-balling**
1141:18,19
1143:5,15
1156:17
1268:1
1470:21

**spoke**
1207:11,16
1208:19
1326:10,11,
12 1348:25
1410:8

**spoken**
1389:24

**spot**
1325:9
1460:1

**spreadsheet**
1336:7,8,18,
24 1337:2
1338:12,15

**staff**
1370:16
1410:8
1418:20,24

**stage**
1140:12

**stake**
1392:19,22

**stamp**
1128:15

**stand**
1290:3

**standard**
1420:10

**stands**
1202:23

1203:4

**start**
1127:25
1132:15
1143:9,11
1161:2
1169:16
1170:22
1181:11
1185:4,9
1197:23
1200:25
1262:22
1264:14,16
1274:11
1285:14
1326:16
1360:23
1377:16
1387:20
1419:22
1427:15

**started**
1126:17
1127:17,24
1173:4
1207:17
1227:4
1236:6
1265:22
1272:2
1288:2
1289:9
1293:13
1333:16,19
1400:6
1411:5
1412:10
1423:13
1451:23,25
1455:13

**starting**

1125:11
1127:23
1139:8,9
1180:19
1194:4
1289:4
1317:24
1386:4
1427:9
1452:14
1476:7

**stash**
1284:10

**state**
1228:17
1281:7
1371:5
1379:13
1411:24
1412:10,12
1469:16,20,
24,25

**stated**
1417:13
1441:11

**statement**
1183:7
1356:15,17
1364:23
1379:24
1429:11,12

**statements**
1364:21,25
1365:2,5,14

**states**
1381:13

**stating**
1419:23

**stats**
1385:6

**status**
1414:9,25
1415:3
1416:6
1419:3,13,17,
20 1421:20,
24 1422:13,
16 1425:14,
16 1427:3
1428:22,25
1429:15
1430:9
1431:3
1434:17,19
1473:16

**stay**
1210:10
1333:12
1394:4

**steak**
1281:10

**step**
1135:15
1418:2
1449:15

**Stephen**
1199:22
1206:9,15,19
1223:11
1224:23

**stickers**
1330:14

**stop**
1146:17
1162:10
1174:5,8,13,
17 1256:13
1372:24
1476:6

**stopped**
1298:18

1454:18

**storage**
1301:16

**story**
1143:8

**straight**
1142:4
1160:14,25
1469:7

**straightforwar
d**
1261:5

**strange**
1206:16
1207:6

**straw**
1475:25

**stricken**
1241:10

**strike**
1241:12
1269:24
1270:5

**strikes**
1203:7

**string**
1136:22
1140:2
1167:1

**strips**
1309:9

**strong**
1197:16

**structured**
1152:24

**struggle**
1331:22

TRANSCRIPT OF PROCEEDINGS

studying
1284:22

stuff
1131:4

subject
1132:4
1201:13
1279:16
1373:8
1394:13
1417:13
1450:1,3
1459:17
1464:14,15
1476:9

submission
1200:16,22
1371:8,11
1376:25
1379:20

Submit
1468:23

submitted
1402:13
1428:21
1462:24
1463:4

subordinates
1285:12

subscription
1284:7

subsequent
1223:22
1258:6

subsidiary
1290:6,7,8

substance
1206:12
1253:9,12

1403:20

substantial
1353:1

substantive
1217:22
1454:20

substantively
1245:14
1249:25
1252:15,16,
25 1253:7

subtotal
1124:14

suffer
1301:16

sufficient
1223:7
1258:1
1274:10
1333:12

sufficiently
1339:20

suggested
1206:16,19

suggestion
1200:12

suggests
1172:1

sum
1193:10

summarize
1315:20

summarized
1397:7

summer
1176:10
1194:17
1323:25

1324:8
1410:14,16

sums
1194:10

Sundays
1417:20

Sunnyvale
1182:5

sunset
1266:1

sunsetted
1269:18

super
1126:12
1202:5

superior
1194:3

suppliers
1266:23

supplies
1300:10,22

supply
1161:21
1169:24
1171:1
1266:8,10,19,
21 1267:6,9
1300:13
1308:9
1348:10
1382:15
1383:7

support
1145:6
1411:9

supposed
1165:17
1170:20
1298:17

1336:23
1469:11

supposedly
1132:7
1346:9,15
1405:25

surely
1234:6,10
1235:20
1236:12

surprise
1166:5

surprised
1399:3

surprising
1340:12

sustain
1154:21
1162:11
1198:12
1201:18

sustained
1170:9
1207:22
1232:13
1235:13
1236:2,17
1242:14
1245:11
1246:23
1252:23
1254:14,22
1363:23
1392:16
1475:11

swap
1141:3,20
1305:5,22

sway
1393:11

sword
1429:4,5
1454:21
1460:9

sworn
1123:7,10,14,
17,21 1127:9
1205:9
1264:23
1281:20
1414:2

system
1284:5
1286:7

systematic
1298:7

———————

T

———————

T-H
1362:16

T17s
1305:4,13

Taber
1123:10,11,
18 1146:10
1174:5
1175:3
1203:17,22
1205:12,14
1208:14,16,
18 1210:10,
23 1212:10,
13,18 1213:5
1214:17
1215:20
1216:1,24
1217:1,12,16
1218:5,7
1219:8,12
1220:1,10,13

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1222:20
1225:12,19,
22,24 1226:3,
16,18
1227:12,22
1230:21,25
1231:8
1235:9
1236:1,16
1237:4,6
1238:11
1242:6,22
1243:4
1245:9
1246:3,4,18
1248:1
1252:22
1253:6
1254:10,12,
16,21 1255:4,
8 1256:1,3,8,
12,18 1259:3,
9,20 1260:25
1261:3,18
1279:7
1281:23,24
1310:8
1319:15
1320:7
1321:2
1323:5
1332:24
1333:5
1338:3,14,18
1342:15,20
1343:2
1344:18
1345:11,16,
19,24 1346:3,
6 1347:23
1348:12,19
1349:6
1351:19,23
1353:8,10,12

1354:12,14,
16 1355:20
1356:24,25
1357:5
1360:13
1361:3,5,14,
17 1362:6,8
1363:24
1364:1
1366:5,7,10,
14,17,18
1367:20
1368:2,24
1371:20,23,
25 1372:4,8,
11,13,17,20
1373:2
1374:6,9
1375:1,14,17
1378:4,6
1380:12,15,
18,20,22
1384:9,11
1392:17,24
1393:1,2,14,
17,19,22
1394:1,24
1395:2,14,20,
24 1396:20
1399:7,11
1400:15,16,
22 1401:2,15
1402:3
1404:16,20,
24 1406:7,10
1459:15

**Taber's**
1360:6,12
1407:22

**table**
1309:4,6
1329:24
1330:1

1369:18,19,
21 1379:6
1451:1
1461:14
1462:21

**tables**
1308:24

**tabling**
1471:21

**takeover**
1158:15

**takes**
1289:24

**taking**
1241:18
1403:19

**talk**
1138:4
1147:6
1154:16
1178:12
1200:5,22
1201:11
1203:16
1207:14
1210:2
1211:16
1221:16
1222:21
1241:17
1253:14
1256:23
1264:16
1275:1,6,8,9
1276:18
1278:12
1286:21
1310:19
1311:4
1315:2
1328:14

1339:14
1341:14
1344:9
1361:25
1368:8,15
1372:4
1423:6,15,24
1425:10
1437:12
1453:15,18
1455:16
1459:10
1472:18
1473:14

**talked**
1146:20
1147:8
1178:14
1184:1
1193:14
1221:13
1224:1
1229:24
1232:20
1237:19
1265:16
1269:10,24
1311:2
1327:20
1366:22
1367:22
1382:11
1404:25
1410:18
1443:10
1447:23,24
1455:2,6
1463:7,17
1464:6
1472:15
1474:19

**talking**
1129:15

1143:3
1146:24
1150:4
1151:24
1152:1,4,10,
14 1169:9
1188:8
1201:7
1209:17,20
1211:1
1229:21
1237:25
1244:23
1245:8
1266:4
1271:5
1303:10
1331:21
1340:19
1350:9
1360:24
1396:23
1415:8
1417:8
1419:16
1424:3
1443:9
1457:16
1469:2
1473:20

**talks**
1348:10

**tally**
1124:13

**tape**
1271:1

**Taras**
1178:19,22,
25 1179:3
1180:5,24

**task**

**TRANSCRIPT OF PROCEEDINGS**

1287:13

**tasked**
1307:8,14

**TD**
1183:7

**teachers**
1284:12

**team**
1343:6,14,19
1389:11

**teams**
1228:19
1313:21
1428:3

**tech**
1178:23
1183:7

**technical**
1347:12,24
1389:15,22,
25

**technically**
1391:3

**technologies**
1239:3,19

**technology**
1164:6

**Ted**
1147:24
1164:20
1231:9
1252:1,4
1256:4,13
1267:24
1302:12
1307:18
1311:17,21
1312:5
1313:13,18

1314:1,15
1326:14
1332:22
1334:24
1335:24
1408:8,10
1409:5
1416:2,5,11
1431:18
1435:5,19
1439:14
1441:23
1443:19
1452:16

**tee**
1445:10
1446:3

**teed**
1420:20
1455:25

**teenager**
1284:22

**Telegram**
1400:1

**telephone**
1208:22,25
1443:16

**telephonic**
1465:18

**telling**
1150:1
1187:2
1240:8,18
1277:4,9
1288:3
1347:24
1358:11

**tells**
1134:2
1154:8

**temperature**
1298:15,17

**temporal**
1333:11

**ten**
1142:21
1219:13
1220:18
1265:16
1283:14,15,
23 1342:8
1387:10,12
1393:15

**ten-minute**
1413:19

**ten-month**
1285:11

**tenants**
1146:25

**tend**
1228:19
1284:19

**terahash**
1129:4
1132:3,6
1138:17
1315:11,13,
17,23 1316:5,
9 1317:17,19,
20 1318:1,14
1319:8
1322:16
1340:1
1354:19,23
1355:2,6,9,
10,11,25
1363:7,13
1367:9
1369:23
1376:11
1409:14

**term**
1137:12,13
1148:19
1149:18,23,
24,25 1150:3
1268:25
1269:11
1306:3
1441:5
1470:21

**terminate**
1227:18

**terminates**
1226:21

**terminating**
1186:16
1187:4

**termination**
1226:7
1473:9

**terms**
1128:19
1129:15
1167:9
1172:21
1174:25
1207:13
1257:20
1277:6,10,15
1289:16
1292:5
1293:13
1321:25
1386:25
1387:4
1398:19
1471:6

**territory**
1202:3

**test**
1160:9,13,18,

21 1161:3,4,6
1396:10

**testified**
1127:9
1131:17
1162:12
1163:12
1183:8
1205:10
1232:19
1236:19
1241:9
1253:5
1256:19
1264:23
1281:21
1319:16
1344:3
1346:20
1349:19
1356:12
1366:24
1380:7
1381:23
1383:11
1386:17
1388:5,22
1391:10,15,
19 1398:18
1414:3
1445:6
1447:15,20
1459:14,16
1470:15

**testify**
1194:11
1210:15,22
1235:15
1239:24
1346:7
1355:17
1461:5
1463:22,23,

**TRANSCRIPT OF PROCEEDINGS**

25 1464:3

**testifying**
1241:15

**testimony**
1126:25
1147:2
1160:12,15
1163:1,25
1164:5,8
1165:7,20,23
1166:6
1182:9,10,13
1183:13
1197:12,15,
21,25
1201:21
1209:12,24
1273:4
1319:18
1346:19
1348:2,3,15
1349:7
1356:21
1359:12
1375:3
1377:12
1379:21
1380:5
1392:19,20
1398:22
1405:9,14
1427:22
1429:24
1432:19
1438:13
1454:20
1462:22
1463:22,24
1467:25

**Texas**
1427:6

**text**
1128:25
1134:1
1136:8
1137:9
1144:5
1148:2
1151:17
1152:2,11
1153:16
1155:3,20
1157:8,9,14,
20,21,25
1158:5,7,12
1167:1
1179:17,24
1180:2
1184:9
1217:18
1399:15
1400:17

**texted**
1174:21

**texts**
1402:11
1468:24

**thing**
1143:9
1152:19
1161:16
1163:19
1233:9
1234:8
1241:5
1271:16
1276:14
1278:6
1289:19
1300:3
1321:23
1322:6,7,14
1393:11

1412:6
1413:1
1465:17
1472:10
1475:18

**things**
1160:16
1161:8
1163:17
1166:2,3
1178:8
1183:3
1223:1
1242:10
1282:10
1285:2,3
1286:1,15
1298:1
1299:2,5
1300:2
1309:10
1319:1
1323:21
1330:14,23
1344:20
1346:10,17
1401:18
1407:2
1410:19
1448:24
1473:21

**thinking**
1134:3
1141:1
1144:25
1262:25
1271:18
1475:4

**thinks**
1242:11
1461:15

**thought**
1132:2,10
1137:15
1146:18
1147:15
1148:5
1161:19
1162:19
1188:8
1215:15
1263:11,12
1334:11
1340:9
1358:16
1411:10
1436:12

**thoughts**
1373:13

**thousands**
1298:2,3
1299:1,4

**thread**
1394:9

**Threw**
1181:10

**tie**
1300:24
1348:7,17

**tied**
1396:7

**till**
1430:10
1471:22

**time**
1124:13
1126:6
1128:15,16
1135:25
1139:4
1140:4

1146:7,22
1148:5,18
1149:18
1150:3
1151:25
1161:17
1165:24
1168:5
1169:25
1173:21
1179:18
1186:13
1188:8
1191:5,17,22,
24 1193:15
1195:3
1196:7
1197:6,7,8,
13,16,17
1200:5,18
1201:8
1207:11,22
1209:25
1221:9
1222:3,16
1227:23
1231:23
1236:25
1237:12
1241:4
1248:4
1260:3
1262:25
1263:20
1264:17
1265:3,16,17,
19,20 1266:4,
14,17,18
1267:3,9
1268:9
1272:2
1274:12
1278:9
1282:2

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1284:1,13,23
1285:8,10,14
1286:20
1287:20
1288:17
1289:2
1293:23,25
1294:25
1295:23
1296:2,5,14
1300:24
1309:10
1310:12
1311:1
1312:22
1315:5
1316:5
1322:14
1323:1,15
1324:14,22
1325:22
1326:3,6
1327:20
1328:23
1332:1
1333:1,14,25
1341:11
1342:14
1343:25
1344:10
1352:15,16,
18,25 1353:6
1354:17
1355:13
1356:4
1374:23
1377:24
1380:9
1384:4
1387:7,16
1388:10
1391:4
1392:4
1394:22

1397:22
1398:12
1399:1
1400:7,20
1404:4
1405:10
1410:13
1412:9,10
1415:7,8,10
1418:13
1427:3,10,16
1438:4,25
1440:11,25
1441:7,9,13
1443:11,15
1445:7
1446:15
1447:22
1449:7,8
1453:22
1460:2
1462:2,7
1466:16
1471:22,24
1472:1

**timeline**
1312:13
1358:10
1395:6,12
1396:1
1397:13

**timely**
1403:10

**times**
1126:5,16,19
1164:12
1258:12
1277:16
1403:2
1447:22,24
1460:12,24

**timing**
1396:7,12

**titled**
1314:4

**today**
1124:19
1127:1
1135:14
1144:2
1176:6
1183:13
1211:1
1243:14
1272:9
1286:1
1349:19
1352:6,11
1368:22
1377:19
1378:8
1389:18
1390:18
1458:10,12
1470:21

**told**
1135:16
1137:24
1138:3
1150:19
1154:11
1162:6,20,23
1164:6
1168:18
1174:2,22
1177:16
1182:14
1183:1
1185:24,25
1196:8,23
1207:14
1209:22
1233:3

1245:15
1249:7,12,16
1257:9
1258:12
1276:12
1295:6
1325:24
1343:13,18
1344:3,19
1345:1
1346:21,25
1347:7
1348:18
1349:9,10,14,
18 1351:8
1356:9,13
1357:6
1358:7,20,23
1371:14
1375:5
1376:5
1382:10
1390:12
1430:21
1475:10

**Tomczak**
1329:18
1330:2
1332:18
1341:1
1394:10
1395:3,11,25
1396:14
1397:6,18
1398:6
1407:11

**tomorrow**
1476:6

**toothpaste**
1468:14,17,
20 1476:3

**top**
1131:21
1164:21,24
1165:1
1225:16
1246:12
1276:19
1314:16
1350:23
1367:2
1380:16
1394:5
1409:6
1436:12

**topic**
1222:21
1257:16,18
1294:12,15
1296:6
1423:1
1426:6
1429:19,20
1450:16
1452:10
1470:6
1474:4

**topics**
1430:13
1471:6
1472:14
1473:2,25
1474:10

**total**
1315:11
1316:9

**totality**
1274:15

**totally**
1163:17
1166:11
1167:1,13

**TRANSCRIPT OF PROCEEDINGS**

September 19, 2023

1198:16
1203:1
1234:5,7
1243:22
1277:21

**touch**
1168:19
1430:10

**town**
1411:3
1412:22

**track**
1241:5
1247:22

**trade**
1285:22

**traded**
1269:2

**traditional**
1284:2,21

**trail**
1431:17
1444:10

**training**
1285:24
1286:2
1319:5,17

**tranches**
1130:20
1131:2

**transaction**
1417:2
1434:20

**transcribed**
1349:8

**transcript**
1345:6,12,13,
21 1347:18
1348:13

1350:4
1377:15
1420:18
1421:3,7
1459:2
1461:16
1466:6,15
1474:11

**transcripts**
1446:4

**transferring**
1324:17

**transition**
1129:16
1146:8

**transmitting**
1437:1

**transparency**
1330:5
1340:10

**transparent**
1331:18

**transparently**
1330:5

**treasurer**
1407:16

**treat**
1241:6

**treated**
1258:7,24

**true**
1126:20
1147:18
1154:18
1156:1
1157:6
1159:9,12,13
1167:24
1168:15

1170:8
1175:23
1176:15
1179:5
1182:1
1183:10
1187:23
1188:6
1195:1,2,5,10
1230:8
1257:18
1270:16
1274:12
1287:4
1345:1
1371:9
1396:17
1441:1
1444:13
1446:25
1447:8
1472:12

**trust**
1396:17
1415:14

**truth**
1176:10,14
1469:9,15

**truthful**
1163:1

**truthfully**
1168:18

**TSMC**
1145:1
1266:24

**tube**
1468:15
1476:4

**Tuesday**
1123:2

**tuned**
1299:12

**turbine**
1412:21

**Turitz**
1125:11
1126:17
1128:4,6,8
1163:8
1189:4
1191:23
1192:6
1198:17,23
1199:1,9,13,
18,24
1236:21
1238:5
1260:1
1261:7,8,14
1263:18
1275:12
1278:9
1279:5,20
1302:19,22
1303:1,4,9,13
1334:8,16
1335:6,12,18,
22 1337:16,
21 1338:1
1339:3,6
1340:17,22
1341:2,5
1345:17,23
1372:14
1393:21
1401:12
1402:6,8,17
1403:24,25
1404:3,11
1406:20
1407:7,10,17
1410:23,24
1411:13,23

1412:5
1413:3,5
1422:10,15,
23 1423:8,11,
20 1424:3,21
1425:13,19
1426:1,12
1431:8,13,15,
25 1432:6
1436:5,8,18,
22,25 1437:4
1445:17,20
1447:4
1448:12,15
1449:11,14
1451:15,22
1454:12,24
1455:4,11,16,
19,21 1456:1,
8,11,15
1457:6,15
1458:9,12,18,
21 1462:18
1465:16,22
1466:1,14,18,
23 1472:13,
20,25 1473:4,
10,18,20
1474:1,3,8
1475:2
1476:1,10,13

**turn**
1133:12
1136:25
1204:24
1218:5
1230:18
1231:13
1274:22
1351:20,25
1353:9
1354:13
1357:21

1361:1
1366:4
1377:14
1380:13

turned
1362:17

turning
1331:13

two's
1396:6

two-thirds
1148:11

type
1209:17,21
1393:11
1437:16,25
1438:7

types
1416:10

typical
1308:15

typically
1284:15

typo
1459:8

typos
1353:1

U

U.S.
1315:9
1316:8
1344:5,8
1346:9,16
1355:5,10

U.s.-based
1323:14

U.s.-built
1295:3

Um-hmm
1376:4

unacceptable
1166:11
1167:2,14

unanimous
1426:11

unavailability
1401:16

unaware
1243:22

uncertainty
1322:25

uncle
1287:4,11

unclear
1132:12

undergone
1440:23

underlying
1258:16
1415:25

underqualified
1390:8

understand
1131:9
1137:13
1175:11
1182:8
1197:12
1201:25
1203:2,15
1206:24
1211:2
1217:10
1218:4

1233:20
1234:8
1240:20
1246:21
1247:4,19,22
1248:16
1249:17
1258:13
1275:7,21
1277:3
1281:4
1297:10
1304:12
1305:25
1316:13
1326:21
1327:2
1330:6
1336:11
1367:13
1393:12
1397:22
1405:12
1429:20
1445:13
1449:18
1450:6
1452:15
1459:24
1461:19

understanding
1135:5
1137:21
1145:22
1186:20
1201:8
1207:2
1211:4
1213:13
1217:22
1223:25
1241:19

1257:11
1306:9
1316:17
1319:21
1321:6
1323:7,11,13,
24 1331:19
1332:5,8
1354:2
1367:13,15
1391:20
1398:12
1414:13,16
1418:16
1419:9,10
1424:8
1425:20
1426:2,22
1427:13,17
1442:8,16
1444:20
1445:1,3,16
1447:12,17
1450:18
1453:7
1455:8
1466:24
1467:22

understandings
1430:8

understood
1129:8
1144:21
1145:16
1166:25
1209:19
1239:10,13
1240:8,11,17
1277:8,12
1285:1
1303:11
1329:14

1330:18,22
1370:1
1397:17
1398:6
1424:9
1425:21
1434:8

unfair
1273:4
1419:25

unfriendly
1187:9

unhappy
1150:21

unit
1160:10,13
1161:7
1355:8
1396:8,10

units
1161:11
1252:9
1309:9

unlike
1351:17

unlucky
1298:6

unnamed
1206:21

unquote
1160:21
1367:17

unrelated
1399:12
1462:2

untrue
1356:15

unused
1292:20

upbringing
1286:9

update
1172:21
1269:5
1272:3

updated
1172:16
1173:16
1194:4
1276:13,21,
22,23 1277:1,
6,11,24
1439:21

updates
1269:17
1361:11

updating
1270:25

upfront
1274:17

upkeep
1389:1

upping
1186:2

usage
1383:22

USD
1315:18

usurp
1426:12

**V**

vague
1131:7
1206:25
1229:17,23
1378:20

1475:5

vaguely
1207:12

variable
1369:23

variables
1306:10
1319:8
1339:21,24

variance
1310:15
1383:16

variation
1329:14

variety
1403:3

Vatti
1465:15

Vectorcloud
1169:19
1170:1,13,23

vendors
1266:22

venture
1268:25
1269:1

version
1288:21

versus
1141:13
1143:10
1161:19
1415:24
1447:22

vice
1414:15

video
1208:20

view
1186:10
1315:24

viewed
1159:10
1186:7
1187:14,25

views
1126:13
1242:10

violated
1420:3
1425:18

violating
1419:17

violation
1419:20

violations
1207:8

visited
1182:12

voice
1231:6

voiced
1277:16

voir
1209:5

VOL
1123:5

volatile
1384:4

volumes
1272:7

VP
1326:21
1327:3,14,16

VPENG

1326:20

**W**

wafer
1145:3

wafers
1145:3
1160:17
1161:2,3

wages
1411:15

wait
1124:16
1129:4,6
1136:3
1146:3
1149:11,12
1158:12
1172:19
1173:15
1208:7
1212:18
1220:2
1246:12
1277:19
1335:6
1371:25
1395:21
1444:18
1451:8
1468:21

waiting
1184:24
1201:3
1207:4
1471:9

waive
1429:2

waived
1242:12

1252:24
1253:12

waiver
1449:19,21

waiving
1224:22
1449:17

walk
1139:21
1328:5
1375:18

wallet
1291:7

wallets
1324:17,25

wanted
1129:7,13
1133:1,3,4
1135:7,21
1150:15,23
1158:22
1162:3
1182:4
1207:23
1232:20
1257:14
1272:8
1289:6
1292:13
1330:4
1370:17,21,
25 1371:3,8
1411:10,21
1412:3,17,25
1425:11
1463:8
1474:22

wanting
1200:24
1332:9
1412:2

TRANSCRIPT OF PROCEEDINGS

September 19, 2023

warning
1174:14

waste
1135:25
1191:5
1310:11,15
1471:24,25

wasting
1310:12

water
1288:16

watt
1362:18

watts
1363:8
1383:23

ways
1296:18
1449:3

week
1124:8
1125:23
1147:2
1300:12,18
1311:2,3
1312:17
1432:13,15,
19 1435:11

week's
1435:9

weekly
1311:4

weeks
1136:2
1193:14,18
1221:25
1266:17,18
1300:18

weight

1470:10,13,
16 1471:3
1472:5

Whatsapp
1126:4,18
1128:11
1133:8
1136:22
1140:2
1184:21
1185:6
1399:19
1400:17

whatsoever
1437:25

wheat
1475:25
1476:1

Whichever
1302:18

whiteboard
1183:2

wholesale
1355:2,9,10

Wi-fi
1382:19

wife
1289:5

willfully
1216:6

willingness
1202:17

win
1332:3

window
1270:22

windup
1144:5

wire
1134:12
1135:12,16,
20,25
1176:12
1302:4

wiring
1382:14

wise
1202:12

withdraw
1223:20
1245:22
1391:18

withdrawal
1224:25

Withdrawn
1237:6

withdrew
1224:24

witnesses
1126:1,16
1461:21
1463:8
1464:3,8

Wonderful
1281:16
1283:2

word
1169:13
1269:15
1357:20
1441:2,5

worded
1371:7

wording
1197:16

words
1146:2

1249:22
1257:13
1270:15
1292:22
1308:12
1309:15,18
1325:20
1328:7
1353:6
1417:21
1451:20

work
1140:9
1150:15
1162:14,16,
24 1163:21
1174:24
1181:24
1182:11,21
1186:25
1187:24
1195:8
1196:2
1198:14
1202:13
1208:1
1218:1
1228:19
1229:7
1232:15
1233:22
1234:16
1235:10,12
1236:1,16
1241:16
1242:6,8
1245:9
1252:22
1253:1
1254:10,13,
21 1286:19
1288:24
1289:9

1291:8
1299:25
1370:18
1392:9
1400:18
1420:21
1426:3
1451:19
1459:13
1474:20
1475:9

work-related
1399:16,20
1400:2,5

workable
1341:9

worked
1152:5,13
1182:23,24
1284:10
1296:25
1316:21
1330:2
1339:17,21
1369:13
1418:21

working
1128:4
1168:2,6
1173:23
1252:9,20
1289:11
1298:19
1299:8,18
1301:7
1305:23
1349:20
1365:11
1396:8
1412:17
1426:4
1467:22

**TRANSCRIPT OF PROCEEDINGS**

**works**
1302:18
1407:15

**world**
1271:22
1272:11
1386:8

**world's**
1288:5

**worse**
1266:11
1267:10,13
1297:4
1401:19,23,
25

**worsening**
1269:5
1270:24

**worth**
1198:4
1218:23
1267:25
1322:15

**Wow**
1452:1

**wrap**
1334:3

**write**
1167:12,16,
19 1172:19,
22 1173:14,
18 1277:18
1286:24
1384:14,17

**writes**
1148:12
1172:10
1180:23
1248:6
1305:1

1307:24
1326:20
1408:13
1409:8,10
1439:18
1443:25

**writing**
1196:10
1213:9
1214:9
1215:11
1224:7
1225:2
1260:18

**written**
1129:5
1164:13,16
1186:14,22,
24 1187:1
1211:10,16,
25 1212:3
1213:12
1214:22
1216:9,15,16
1219:5
1221:1
1222:13
1223:22
1248:10
1250:9
1251:1
1259:17
1260:11
1277:5,10
1307:24
1417:19,23

**wrong**
1161:24
1184:1
1226:1
1242:21
1250:17

1298:1
1352:19
1431:20,25
1432:4
1475:5

**wrote**
1149:20
1150:2
1156:23
1167:21
1181:6
1185:23
1223:16
1234:6,10
1244:11
1305:13
1332:12
1352:18
1362:13
1373:11
1380:23
1384:12
1395:5

---

**X**

**Xilinx**
1266:12

---

**Y**

**y'all**
1281:13

**year**
1145:4
1164:7
1166:4
1194:22
1284:14,16
1349:16
1358:14,17
1373:24

1376:3
1414:17

**years**
1285:13
1298:22
1373:15,19
1380:6
1396:25
1451:20
1465:21

**yes-or-no**
1155:12
1156:22
1175:12
1243:6

**yesterday**
1124:13,21
1127:17,24
1129:18,25
1131:17
1132:17
1136:5,7
1138:16
1150:19
1151:17,25
1152:11,20
1154:23
1162:6
1175:25
1176:6,19
1178:15
1183:8
1184:3
1278:22
1333:8
1464:21

**yield**
1306:14
1467:10

**York**
1370:14,18,

22 1371:9,12,
14 1377:1
1379:9,20
1381:9,16
1410:7
1412:10

**younger**
1288:21

---

**Z**

**ZIJIANG**
1123:6,13
1127:7
1264:21

**zones**
1394:22

**Zoom**
1201:4
1204:8
1327:21
1332:21
1476:11